NIGHT BOX

ⅡUL 19 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PATRICK SCOTT MAJOR,                    :        CASE NO. 00-6070-Ferguson/Snow
                                                 L.T. Case No. 99-021746-11
        Plaintiff,                      :

vs.                                     :

AMERIJET INTERNATIONAL, INC.,           :

        Defendant.                      :
_____/

### PLAINTIFF'S
### RESPONSE MEMORANDUM IN OPPOSITION TO
### DEFENDANT'S MOTION TO DISMISS
### COUNT I OF AMENDED COMPLAINT

Plaintiff, Patrick Scott Major, submits this memorandum in opposition to defendant,

Amerijet International Inc.'s, motion to dismiss served July 3, 2000.

### PLAINTIFF'S ALLEGATIONS UNDER THE WHISTLEBLOWER ACT
### STATE A CAUSE OF ACTION

Defendant relies on a hypertechnical and ultimately misplaced point to argue that

plaintiff's Count I fails to state a cause of action under the Florida Whistleblower Act. In Count

I, Major alleges he was fired by Amerijet after protesting, in writing, an illegal takeoff. Amerijet

challenges only one element of Major's Count I; i.e., whether Major's report to NASA was to an

"appropriate governmental agency." As defendant readily concedes, there is no case law

interpreting an "appropriate governmental agency" under Fla. Stat., § 448.102(1). Yet defendant

contends that Amerijet should not answer for firing the plaintiff for reporting a safety violation

because a pilot making a report to NASA **may**, under some limited circumstances, personally escape FAA disciplinary measures. Since filing its original motion to dismiss, in which Amerijet relied exclusively on two pages of a six-page fax which is an excerpt from a 1975 Federal Register, and which is some form of agreement that was to expire in 1980, Amerijet has tried to beef up its argument by adding resource materials found by plaintiff, distinguishing plaintiff's cases and basically preempting plaintiff's arguments from the last time around. This tactic, however, has a flavor of "protesting too much." As demonstrated below, the FAA was found to be so ineffectual, and so embedded with the airlines, that it could not serve as a place for pilot safety complaints. Congress had to delegate this function to NASA, and provide limited "safe harbor" protections to pilots, in order to get safety complaints made. However, the "de-identified" complaints are forwarded to the FAA, the enforcing agency, and NASA is its agent. Plaintiff complained to an entity that is cognizable under the Whistleblower Act. In **fact**, Major's complaint resulted in an enforcement action against Amerijet directly, which belies Amerijet's argument that a report to NASA does not lead to FAA attention. See Exhibit A (notice of proposed civil penalty from FAA to Amerijet).

Defendant's argument falls short for a variety of specific reasons:

**First**, the NASA reporting system came about precisely to try to encourage pilots to report safety violations. As recently acknowledged by President Clinton, pilots operate in an atmosphere of reprisal. See Jan. 14, 2000 article attached as Exhibit B. The problem is so rampant among air carriers that today, 25 years after the NASA system was set up, the attached article reflects that new programs are being started to protect pilots from the kind of vituperative conduct visited on Pat Major by Amerijet. The fact that NASA was created to encourage pilot

2

reports and prevent reprisals, for the ultimate good of the public, should not support the distortion that Major cannot "blow the whistle" to this federally-established channel and then seek damages.

**Second.** NASA is a mere agent of the FAA for the receipt of reports of safety violations. The FAA's current circular AL00-46D, describing the program, is attached as Exhibit C. The FAA originally received reports directly, but later determined that "the Aviation Safety Reporting Program would be greatly enhanced" if it was handled by an outside agency. Id. at 3(b). this is bureau-speak for the recognition that the FAA itself could not be trusted to impartially resolve complaints and prevent reprisals against pilots. NASA receives reports but submits the information to the FAA. A pilot reporting a safety violation to NASA may escape disciplinary action, but is subject to being found in violation. Moreover, if the violation is deemed deliberate, the pilot loses all benefit of the program and is subject to full disciplinary action. Id. at 9(c). For an overview of the pilot's vulnerability in these situations, see Armstrong, A., Pilot Certificate Actions and Civil Penalties, 52 J. Air L. & Com. 77 (1986) (Exhibit D). Federal case law confirms that, while reporting to NASA can mitigate fines and suspensions, if the FAA investigates and finds a violation, the pilot can still be charged with it. See, e.g., Copsey v. Nat'l. Transportation Safety Board, 993 F.2d 736, 738 (10th Cir. 1993) (pilot who reported violation to NASA not entitled to waiver of sanction on finding of deliberate violation). In Jackson v. Nat'l. Transportation Safety Board, 114 F. 3d 283, 285 (D.C. Cir. 1997), the court likewise upheld FAA findings that a pilot was subject to discipline for misunderstanding an air traffic controller, notwithstanding the pilot's own NASA report.[1]

---

[1] Neither Copsey nor Jackson make reference to how the FAA became aware of the violations.

3

An excellent analysis of the tremendous public policy considerations supporting whistleblower protection for pilots such as Major can be found in Marksteiner. P; The Flying Whistleblower: It's Time for Federal Statutory Protection for Aviation Industry Workers, 25 J. Legis. 39 (1999) (available on Westlaw database JLR). Footnote 55, inter alia. discusses the relationship between the NASA reporting system and the FAA.

All NASA does is provide an avenue for pilots to report **indirectly** to the FAA. While its anonymity provisions offer some solace, the reporting party is still subject to FAA action, as is the carrier. It would grossly circumvent the purposes of the Florida Whistleblower Act if Amerijet could use the slender promises of this vital reporting system as a means to circumvent accountability for a retaliatory firing.

**Third**, Amerijet **itself** is an "appropriate governmental agency." Pursuant to federal regulations, anytime a flight crew is on a trip under Parts 121 or 125, the carrier **is** an agency of the FAA. When a crewmember reports a safety violation, to the Director of Operations, the Director is encouraged to **self-disclose** to the FAA. Amerijet's general operations manual (GOM) **requires** that a crew member report any safety infraction or regulatory violation to the Director of Operations. This manual has the force of an FAR. If it does so promptly, it is subject to the same protections as a pilot. See AC00-58 (Exhibit E).

Major alleges that in August 1999, he was a member of a flight crew that, over his protest, violated federal safety regulations in taking off, overweight, from a wet runway. Complaint, ¶¶17-21. After this incident, he furnished a written report to Amerijet's chief pilot and Director of Operations. (Complaint ¶22). He sent it as well to Amerijet's safety officer. Id. at 24. He held the report back from NASA to allow Amerijet time for corrective action. Id. at

4

¶23. He did not actually report to NASA until he made two written reports to Amerijet and afforded Amerijet a reasonable opportunity to correct the practice. Id. at ¶31. Pursuant to HBAT 99-19 (an offshoot of the regulations), attached as Exhibit F, Amerijet is required to have a Director of Safety who will disclose all instances of noncompliance to management, take necessary corrective action, and report to the FAA as required.

Amerijet is not just a private employer. Based on Amerijet's unique role and obligations as an air carrier/FAA certificate holder, it clearly meets the definitions of an agency charged with enforcement of laws, rules, or regulations governing an activity, policy, or practice of an employer. Fla. Stats. §448.101(1). It is **both** the employer **and** the appropriate governmental agency for reporting of safety violations. Pat Major did exactly the right thing in going to his employer and giving **it** the chance to self-disclose on a protected basis.

The Florida Supreme Court has just affirmed the remedial intent of the Whistleblower Act. The Golf Channel v. Jenkins, 752 So. 2d 561 (Fla. 2000). Id. at *5. In Jenkins, it rejected an argument that written notice to the employer is a prerequisite in every case. Despite ambiguities, the court opted to liberally construe the Act to provide access to the remedy provided. Id. at *6. The court also discussed the impracticalities of imposing a writing requirement. Its pragmatic approach is applicable to the situation here, in which Amerijet would have plaintiff's claim thrown out because Pat Major reported first to it, and then to an agency which affords him some qualified personal protection. This result has no legal support.

Plaintiff alleged each and every element necessary to a claim under section 448.102(1), Florida Statutes. Defendant's motion to dismiss should be denied.

5

CASE NO. 99-21746 (11)

## CONCLUSION

For the foregoing reasons. defendant's motion to dismiss Counts I and V should be denied, and defendant should be ordered to fully answer the complaint.

## CERTIFICATE OF SERVICE

We hereby certify that a true and correct copy of the foregoing instrument was furnished via U.S. Mail to: **Susan Potter Norton, Esquire** and **Stephen P. Santiago, Esquire**. Attorney for Defendant, of Allen. Norton & Blue, P.A., 121 Majorca, Suite 300. Coral Gables, FL 33134, this 19th day of July, 2000.

> HEINRICH    GORDON    HARGROVE
> WEIHE & JAMES, P.A.
> Attorneys for Plaintiff
> 500 East Broward Boulevard. Suite 1000
> Fort Lauderdale, Florida 33394
> Telephone:    954-527-2800
> Facsimile:    954-524-9481
>
> By: _____
> VALERIE SHEA
> Florida Bar No. 436800

G:\law\81975\002\Resp-Oppo M-Dismiss002.doc

6

EXHIBIT A

U.S. Department
of Transportation

Federal Aviation
Administration

Southern Region
Office of the Regional Counsel

P.O. Box 20636
Atlanta, Georgia 30320

(404) 305-5200
(404) 305-5223 FAX

FEB 16 2000

CERTIFIED - RETURN RECEIPT REQUESTED

2000SO170009

Amerijet International, Inc.
David G. Bassett, President
498 S.W. 34th Street
Fort Lauderdale, FL 33315

## NOTICE OF PROPOSED CIVIL PENALTY

We have received a report of investigation, which indicates that:

1.    At all times material herein, Amerijet International, Inc., was and is the holder of
Air Carrier Operating Certificate No. PCSA059B.

2.    On or about August 17, 1999, Amerijet operated N397AJ, a Boeing 727, as
Amerijet Flight 827, under part 121 of the Federal Aviation Regulations, departing from Fort
Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida.

3.    At the time Flight 827 departed FLL, there was less than one quarter (¼) of an
inch of standing water on the departure runway.

4.    Chapter 4, Section 1A of the Airplane Operating Manual places limitations on
takeoff in water less than one quarter of an inch deep in accordance with the Airplane
Performance Manual.

5.    The Airplane Performance Manual requires a reduction in the maximum gross
takeoff weight by 17,000 pounds where the runway surface condition is that of less than one
quarter of an inch of standing water, slush, or wet snow.

6.    At the time Flight 827 departed FLL; no reduction in the maximum gross weight
of N397AJ was applied.

7.    By reason of the foregoing, at the time Flight 827 departed FLL the takeoff weight
exceeded the weight allowed under the prevailing conditions.

000589

CONFIDENTIAL

8.    As a result, Amerijet violated the following sections of the Federal Aviation Regulations:

a.    Section 91.13(a) in that no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

b.    Section 91.605(b)(3) in that no person may operate a turbine engine-powered transport category airplane contrary to the Airplane Flight Manual, or take off that airplane unless the takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet).

Under 49 U.S.C. Sections 46301 (a)-(d), you are subject to a civil penalty not to exceed $11,000 for each violation of the regulations. By reason of the foregoing facts and circumstances, we propose to assess a civil penalty in the amount of $11,000.

Enclosed is information concerning your options in responding to this Notice. The options include participating in an informal conference with an FAA attorney and submission of information to the FAA for consideration. You must submit, in writing, your choice of the alternatives explained on the enclosed information form, on or before 30 days after you receive this Notice. If you fail to submit your choice within that time, you will have no further right to participate in the two informal procedures listed above.

EDDIE L. THOMAS
REGIONAL COUNSEL

BY: _Juliana M. Winters_
JULIANA M. WINTERS
Attorney
Office of the Regional Counsel

Enclosures:    Information Sheet
               Reply Form
               FAR 13.16 and Subpart G of Part 13

000590
CONFIDENTIAL

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
ATLANTA, GEORGIA

INFORMATION REGARDING CIVIL PENALTIES
UNDER TITLE 49 U.S.C. SECTION 46301
(ATTACHMENT TO NOTICE OF PROPOSED CIVIL PENALTY)

Under 49 U.S.C. §46301, any person who violates pertinent provisions of 49
U.S.C. §§40101 et seq., or any rule, regulation, or order issued thereunder, is
subject to a civil penalty for each violation. The maximum assessment for each
violation is also prescribed by law, as specified in the Notice of Proposed
Civil Penalty to which this is attached. The Notice also states the amount of
the proposed civil penalty for the alleged violation(s).

This proceeding is governed by the Federal Aviation Regulations (FAR) set forth
in 14 C.F.R. §13.16 and 14 C.F.R. Part 13, Subpart G. Copies of these
regulations are attached. WITHIN THIRTY (30) DAYS AFTER YOUR RECEIPT OF THE
ENCLOSED NOTICE, you may elect to proceed in one or more of the following ways
by appropriately marking the corresponding box(es) on the attached election
sheet and returning it by mail or personal delivery to the address provided
below.

    1.     Submit the amount of the civil penalty specified in the Notice by
certified check or money order payable to the "Federal Aviation
Administration." Your submission constitutes your agreement that an Order
Assessing Civil Penalty in that amount may be issued without further notice,
and that you waive your right to a hearing in this matter.

    2.     Submit, in writing, information and evidence demonstrating that a
violation of the regulations was not committed or that, if it were, the facts
and circumstances do not warrant the proposed civil penalty. Information
provided will be considered in determining whether a civil penalty should be
imposed and the amount of any such civil penalty. This information may be
submitted in conjunction with a request for informal conference under
paragraph 5. Choosing this option will not affect your right to a hearing.

    3.     Submit, in writing, information and records indicating that you are
financially unable to pay the proposed civil penalty, or showing that payment
of the proposed penalty would prevent you from continuing in business. This
will not affect your right to a hearing.

    4.     Request that a civil penalty be assessed in a specific amount other
than that proposed in the Notice, or that no civil penalty be assessed. If you
choose this option, you should explain why a reduction or no civil penalty is
appropriate, and provide any supporting documentation. Information provided
will be considered in determining whether the amount you specified should be
assessed.

    If the FAA does not accept your offer, this will not affect your
right to a hearing. If the FAA accepts your offer, your request constitutes
your agreement that an Order Assessing Civil Penalty in that amount may be
issued without further notice, and that you waive your right to a hearing.

    5.     Request to discuss the matter informally with an FAA attorney
either telephonically or in person at any Regional Office of the FAA (see
attachment for addresses of Regional Offices), or at the Flight Standards

5/99 - nopcp.doc

000591
CONFIDENTIAL

District Office (FSDO) in Atlanta, Georgia.  If you request a telephonic informal conference, an FAA attorney will call you at the telephone designation of your choice at any place within the United States.  This will not affect your right to a hearing.

IMPORTANT - The informal conference is intended to provide you with an opportunity to present your reasons why the FAA should not proceed with the action as proposed.  It also is intended to provide you with an opportunity to present any supporting documentation or information you wish the FAA to consider before the agency decides whether to proceed with the proposed action.  NOTE: Ordinarily, air carrier informal conferences must be held in the region which issued the Notice.

6.    Request that the FAA assess a civil penalty without making findings of violations, and submit the reasons and any additional information in writing (with appropriate supporting documentation) to support your request.  If the FAA does not accept your offer, your right to a hearing will not be affected.  If the FAA accepts your offer, your request will constitute your agreement that a Compromise Order in that amount may be issued and that you waive your right to a hearing.

7.    Request to have a hearing in accordance with Section 13.16 of the Federal Aviation Regulations.  Your request must be dated and signed.  A Complaint will be filed and a formal evidentiary hearing of the matter will be held by an administrative law judge, under FAR Part 13, Subpart G.  At the conclusion of the hearing all issues of fact and law will be decided and a decision rendered whether and in what amount a civil penalty will be assessed.  An appeal from the judge's decision to the FAA decisionmaker is available and from there to the U.S. Court of Appeals.

Your request for a hearing must be made to the Hearing Docket, Federal Aviation Administration, 800 Independence Ave., SW, Room 924A, Washington, DC 20591, Attention:  Hearing Docket Clerk.  You must mail a copy to the FAA attorney handling this case at the address indicated below.

Please address all correspondence in this matter to the FAA attorney who signed the Notice at the following address:

[Attorney's Name]
Office of the Regional Counsel
Federal Aviation Administration
Southern Region
P. O. Box 20636
Atlanta, GA  30320

Your response may be delivered personally to the Office of the Regional Counsel for the Southern Region at 1701 Columbia Ave., College Park, Georgia, during normal business hours.

Telephone:  (404) 305-5200 (Collect calls cannot be accepted).

000592
CONFIDENTIAL

If you are an individual:

## PRIVACY ACT NOTICE

This notice is provided in accordance with Section (e)(3) of the Privacy Act, 5 U.S.C. Section 552a(e)(3), and concerns the information requested in the letter or form to which this Notice is attached.

A.    Authority.    This information is solicited pursuant to the Federal Aviation Act of 1958, 49 U.S.C. §§40101, et seq., and regulations issued thereunder, codified in Part 13 of Title 14 of the Code of Federal Regulations. Submission of the telephone number is voluntary.  The request for information is intended to provide you with an opportunity to participate in the investigation.

B.    Principal Purpose.    The requested information is intended to assist us in contacting you regarding this enforcement case.

C.    Routine Uses.    Records from this system of records may be disclosed in accordance with the routine uses as set forth in System of Records No. DOT/FAA 847, as published from time to time in the Federal Register.

D.    Effect of Failure to Respond.    If you do not provide the requested information, there may be a delay in contacting you regarding this enforcement case, and you may forfeit your right to a hearing on the merits of this case.

CONFIDENTIAL
000593

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
ATLANTA, GEORGIA

RETURN WITHIN 30 DAYS TO:

Office of the Regional Counsel                              DATE _____
Federal Aviation Administration
Southern Region
P. O. Box 20636
Atlanta, GA  30320

Telephone:  (404) 305-5200
Facsimile:  (404) 305-5223

Subject: Notice of Proposed Civil Penalty, Case No. _____

In reply to your Notice of Proposed Civil Penalty, I elect to proceed as
indicated by my check mark beside the numbered paragraph(s) below:

1.    [ ]    I hereby submit the amount of the proposed civil penalty with the
understanding that an Order Assessing Civil Penalty will be issued in that
amount without further notice, and that I waive my right to a hearing.

2.    [ ]    I hereby submit evidence and information, demonstrating that a
violation of the regulations did not occur as alleged or that the amount of the
penalty is not warranted by the circumstances.

3.    [ ]    I hereby submit information and records showing that I am
financially unable to pay the proposed civil penalty, or that payment of the
penalty would prevent me from continuing in business.

4.    [ ]    I hereby request that a civil penalty be assessed in the amount of
$_____ and I submit the reasons for the reduction of the proposed
amount.  My request constitutes my agreement that if this offer is accepted by
the FAA, an Order Assessing Civil Penalty in the amount I submitted may be
issued without further notice and I waive my right to a hearing.

5.    a.    [ ]    I hereby request to discuss this matter in person at an
informal conference with an attorney from your office at the location checked
below.

        Check one:

        [ ]    Office of the Regional Counsel in Atlanta, Georgia
        [ ]    Flight Standards District Office in Atlanta, Georgia
        [ ]    Office of the Regional Counsel in _____
               (See Attached List of Regional Offices.)

                                   OR

        b.    [ ]    I hereby request a telephonic informal conference.  Please
call me at the number listed below to make arrangements for the conference.

        _____ Telephone number to call for conference

000504
CONFIDENTIAL

6.    [ ]    I hereby request that the FAA assess a civil penalty without making
findings of violations, and submit my reasons.    My request constitutes my
agreement that if this offer is accepted, a Compromise Order will be issued in
that amount and I waive my right to a hearing.

7.    [ ]    I hereby request a hearing in accordance with Part 13, Subpart G of
the Federal Aviation Regulations with the understanding that a Complaint will
be filed.    I request that the hearing be held in _____.  I am
sending this request both to the FAA attorney and to the Hearing Docket,
Federal Aviation Administration, 800 Independence Ave., SW, Room 924A,
Washington, DC 20591, Attention: Hearing Docket Clerk.


Respondent:

Signature:    _____

Name:    _____

Address:    _____

    _____

    _____

Telephone:    _____


Attorney/representative:

Name:    _____

Address:    _____

    _____

    _____

Telephone:    _____


Flmeryt International

Zuicimaun


Jnw

000505
CONFIDENTIAL

## ADDRESSES OF THE REGIONAL OFFICES

| | |
|---|---|
| **ALASKA** | Alaskan Region Headquarters<br>222 West 7th Avenue, #14<br>Anchorage, AK 99513 |
| **CALIFORNIA** | Western-Pacific Region Headquarters<br>15000 Aviation Boulevard<br>Hawthorne, CA 90261 |
| **GEORGIA** | Southern Region Headquarters<br>1701 Columbia Avenue<br>College Park, GA 30337 |
| **ILLINOIS** | Great Lakes Region Headquarters<br>O'Hare Lake Office Center<br>2300 East Devon Avenue, Room 419<br>Des Plaines, IL 60018 |
| **MASSACHUSETTS** | New England Region Headquarters<br>12 New England Executive Park<br>Burlington, MA 01803 |
| **MISSOURI** | Central Region Headquarters<br>601 East 12th Street, Room 1558<br>Federal Building<br>Kansas City, MO 64106 |
| **NEW YORK** | Eastern Region Headquarters<br>JFK International Airport<br>Fitzgerald Federal Building<br>Jamaica, NY 11430 |
| **OKLAHOMA** | Mike Monroney Aeronautical Center<br>6500 South MacArthur<br>Oklahoma City, OK 73169 |
| **TEXAS** | Southwest Region Headquarters<br>2601 Meacham Boulevard - 6E<br>Fort Worth, TX 76193-0007 |
| **WASHINGTON** | Northwest Mountain Region Headquarters<br>1601 Lind Avenue, SW<br>Renton, WA 98055-4056 |

000596

CONFIDENTIAL

EXHIBIT B

## Feds Urging Pilots To Report Errors

.c The Associated Press

By SONYA ROSS

WASHINGTON (AP) - President Clinton told airline pilots and mechanics Friday that they will be protected if they go to the Federal Aviation Administration as whistle-blowers on safety problems. "Everyone must focus on fixing problems, not fixing blame," he said.

Clinton appeared at the White House with officials from the FAA, the Transportation Department, pilots unions, Delta Air Lines and American Airlines to announce the deal. He said the plan allows airlines, labor and federal regulators to work on aviation safety issues "as partners, not adversaries," for the benefit of the flying public.

"Already, there is less than one fatal crash for every one million commercial flights," Clinton said. "But we know we can do better still. Any accident, any death in the air, is still one too many."

Under the Aviation Safety Action Program, a public-private partnership will be created to accept from aviation workers reports of safety problems or concerns before they worsen, Clinton said. In turn, those who report problems will be protected from possible reprisal.

"They'll be encouraged to share their valuable insights about doing a job more safely," Clinton said. "They will be freed from the fear of being disciplined for admitting that something went wrong."

The FAA's ability to handle deliberate aviation rules violations, criminal activity or drug and alcohol use will not be affected, Clinton said. "The experts will get the data they need to stay in front on safety, to solve problems, evaluate existing safety systems and propose new ones," Clinton said.

The deal is the result of more than a year of discussions between the airlines, the pilots and the Clinton administration and are an outcrop of the work done by an aviation safety commission headed by Vice President Al Gore.

It aims to improve understanding of errors that cause accidents, which might go unreported by pilots or crew members fearing reprisals or punishment for violating FAA regulations.

Pilots at American Airlines and ground crew members of the Transport Workers Union already are experimenting with safety committees that share information among workers, airline officials and government regulators.

Under the expanded deal, unionized pilots from American Airlines, Continental Airlines and members of the Air Line Pilots Association, which represents 50,000 pilots at 51 airlines, and others will participate in the safety program.

Pilots, mechanics and other airline personnel can go to committees established by the program with problems they observe or even errors they themselves commit. The aim is to increase the pool of safety information to try to stop accidents from happening.

"I hope we'll be able to follow their example and open this program to all the people who make airplanes fly - flight attendants, mechanics, dispatchers," Clinton said. "When it comes to safety, everyone has a responsibility. We want everyone on the team."

EXHIBIT C

# AC 00-46D - AVIATION SAFETY REPORTING PROGRAM

Department of Transportation
Federal Aviation Administration

February 26, 1997
Initiated by: ASY-300

1. **PURPOSE.** This circular describes the Federal Aviation Administration (FAA) Aviation Safety Reporting Program (ASRP) which utilizes the National Aeronautics and Space Administration (NASA) as a third party to receive Aviation Safety Reports. This cooperative safety reporting program invites pilots, controllers, flight attendants, maintenance personnel, and other users of the National Airspace System (NAS), or any other person, to report to NASA actual or potential discrepancies and deficiencies involving the safety of aviation operations. The operations covered by the program include departure, en route, approach, and landing operations and procedures, air traffic control procedures and equipment, crew and air traffic control communications, aircraft cabin operations, aircraft movement on the airport, near midair collisions, aircraft maintenance and recordkeeping, and airport conditions or services. The effectiveness of this program in improving safety depends on the free, unrestricted flow of information from the users of the NAS. Based on information obtained from this program, FAA will take corrective action as necessary to remedy defects or deficiencies in the NAS. The reports may also provide data for improving the currant system and planning for a future system.

2. **CANCELLATION.** Advisory Circular 00-46C dated February 4, 1985, is canceled.

3. **BACKGROUND.**
   a. The primary mission of the FAA is to promote aviation safety. To further this mission, the FAA instituted a voluntary ASRP on April 30, 1975, designed to encourage the identification and reporting of deficiencies and discrepancies in the system.
   b. The FAA determined that the ASRP effectiveness would be greatly enhanced if the receipt, processing, and analysis of raw data were accomplished by NASA rather than by the FAA. This would ensure the anonymity of the reporter and of all parties involved in a reported occurrence or incident and, consequently, increase the flow of information necessary for the effective evaluation of the safety and efficiency of the system. Accordingly, NASA designed and administers the Aviation Safety Reporting System (ASRS) to perform these functions in accordance with a Memorandum of Agreement (MOA) executed by the FAA and NASA on August 15, 1975, as modified September 30, 1983, and August 13, 1987. Current ASRS operations are conducted in accordance with an MOA executed by FAA and NASA on January 14, 1994.

4. **NASA RESPONSIBILITIES.**
   a. NASA ASRS provides for the receipt, analysis, and de-identification of aviation safety

reports; in addition, periodic reports of findings obtained through the reporting program
are published and distributed to the public, the aviation community, and the FAA.
b. A NASA ASRS Advisory Subcommittee, composed of representatives from the aviation
community, including the Department of Defense, NASA, and FAA, advises NASA on
the conduct of the ASRS. The subcommittee conducts periodic meetings to evaluate and
ensure the effectiveness of the reporting system.

## 5. PROHIBITION AGAINST THE USE OF REPORTS FOR ENFORCEMENT PURPOSES.
a. Section 91.25 of the Federal Aviation Regulations (FAR) (14 CFR 91.25) prohibits the
use of any reports submitted to NASA under the ASRS (or information derived
therefrom) in any disciplinary action, except information concerning criminal offenses or
accidents which are covered under paragraphs 7a(1) and 7a(2).
b. When violation of the FAR comes to the attention of the FAA from a source other than a
report filed with NASA under the ASRS, appropriate action will be taken. See paragraph
9.
c. The NASA ASRS security system is designed and operated by NASA to ensure
confidentiality and anonymity of the reporter and all other parties involved in a reported
occurrence or incident. The FAA will not seek, and NASA will not release or make
available to the FAA, any report filed with NASA under the ASRS or any other
information that might reveal the identity of any party involved in an occurrence or
incident reported under the ASRS. There has been no breach of confidentiality in more
than 20 years of the ASRS under NASA management.

## 6. REPORTING PROCEDURES. 
Forms in the NASA ARC 277 series have been prepared
specifically for intended users (including ARC 277 A for air traffic use, 277B for general use
including pilots, 277C for flight attendants and 277D for maintenance personnel) and are
preaddressed and postage free. Completed forms or a narrative report should be completed
and mailed only to ASRS at NASA, Aviation Safety Reporting System, P.O. Box 189,
Moffett Field, CA 94035-9800.

## 7. PROCESSING OF REPORTS.
a. NASA procedures for processing Aviation Safety Reports ensure that the reports are
initially screened for:
(1) Information concerning criminal offenses, which will be referred promptly to the
Department of Justice and the FAA;
(2) information concerning accidents, which will be referred promptly to the National
Transportation Safety Board (NTSB) and the FAA; and

Note: Reports discussing criminal activities or accidents are not de-identified prior to their
referral to the agencies outlined above.

(3) time-critical information which, after de-identification, will be promptly referred to
the FAA and other interested parties.
b. Each Aviation Safety Report has a tear-off portion which contains the information that

identifies the person submitting the report. This tear-off portion will be removed by NASA, timestamped, and returned to the reporter as a receipt. This will provide the reporter with proof that he/she filed a report on a specific incident or occurrence. The identification strip section of the ASRS report form provides NASA program personnel with the means by which the reporter can be contacted, in case additional information is sought in order to understand more completely the report's content. Except in the case of reports describing accidents or criminal activities, no copy of an ASRS form's identification strip is created or retained for ASRS files. Prompt return of identification strips is a primary element of the ASRS program's report de-identification process and ensures the reporter's anonymity.

8. **DE-IDENTIFICATION.** All information that might assist in or establish the identification of persons filing ASRS reports and parties named in those reports will be deleted, except for reports covered under paragraphs 7a(1) and 7a(2). This de-identification will be accomplished normally within 72 hours after NASA's receipt of the reports, if no further information is requested from the reporter.

9. **ENFORCEMENT POLICY.**
   a. The Administrator of the FAA will perform his/her responsibility under Title 49, United States Code, Subtitle VII, and enforce the statute and the FAR in a manner that will reduce or eliminate possibility of, or recurrence of, aircraft accidents. The FAA enforcement procedures are set forth in Part 13 of the FAR (14 CFR Part 13) and FAA enforcement handbooks.
   b. In determining the type and extent of the enforcement action to be taken in a particular case, the following factors are considered:
      (1) nature of the violation;
      (2) whether the violation was inadvertent or deliberate;
      (3) the certificate holder's level of experience and responsibility;
      (4) attitude of the violator;
      (5) the hazard to safety of others which should have been foreseen;
      (6) action taken by employer or other government authority;
      (7) length of time which has elapsed since violation;
      (8) the certificate holder's use of the certificate;
      (9) the need for special deterrent action in a particular regulatory area, or segment of the aviation community; and
      (10) presence of any factors involving national interest, such as the use of aircraft for criminal purposes.
   c. The filing of a report with NASA concerning an incident or occurrence involving a violation of 49 U.S.C. Subtitle VII, or the FAR is considered by FAA to be indicative of a constructive attitude. Such an attitude will tend to prevent future violations. Accordingly, although a finding of violation may be made, neither a civil penalty nor certificate suspension will be imposed if:
      (1) the violation was inadvertent and not deliberate;
      (2) the violation did not involve a criminal offense, or accident, or action under 49

U.S.C. Section 44709 which discloses a lack of qualification or competency, which is wholly excluded from this policy;

(3)  the person has not been found in any prior FAA enforcement action to have committed a violation of 49 U.S.C. Subtitle VII, or any regulation promulgated there for a period of 5 years prior to the date of occurrence; and

(4)  the person proves that, within 10 days after the violation, he or she completed and delivered or mailed a written report of the incident or occurrence to NASA under ASRS. See paragraphs 5c and 7b.

Note:  Paragraph 9 does not apply to air traffic controllers. Provisions concerning air traffic controllers involved in incidents reported under ASRS are addressed in FAA Order 7210.3G, Facility Operations and Administration.

**10. OTHER REPORTS.** This program does not eliminate responsibility for reports, narratives, or forms presently required by existing directives.

**11. EFFECTIVE DATE.** This modified Aviation Safety Reporting Program described by this Advisory Circular was effective October 1, 1996.

## 12. AVAILABILITY OF FORMS.
a.  Copies of reporting forms (NASA ARC Form 277, Aviation Safety Report, series) may be obtained free of charge from FAA Flight Standards District Offices or Flight Service Stations, or directly from NASA, ASRS, P.O. Box 189, Moffett Field, CA 94035-9800.
b.  The NASA ARC 277 forms will be stocked at the FAA Depot (AML-640) and will be available to FAA organizations and offices through normal supply channels. The form numbers and descriptions are: NSN 0052-00-916-7000 (NASAARC277A, ATC), NSN 0052-00-916-8000 (NASAARC277B, General Use/Pilots), NSA 00-52-00-916-9000 (NASAARC277C, Cabin Crew) and NSN 0052- 00920-2000 (NASAARC277D, Maintenance).

Barry L. Valentine
Acting Administrator

EXHIBIT D

Journal of Air Law and Commerce
Fall, 1986

*77 PILOT CERTIFICATE ACTIONS AND CIVIL PENALTIES

Alan Armstrong [FNa]

Copyright 1986 by the Southern Methodist University School of Law; Alan

Armstrong

THERE APPEARS TO BE increased concern relating to aviation safety following a series of major air carrier accidents during the past year. It has been suggested that these events are the result of airline deregulation and competitive pressures that force air carriers to compromise safety by hiring less experienced flight crews and overlooking inadequate maintenance practices. Others point to an inadequate number of Federal Aviation Administration (FAA) inspectors to police air safety and the shortage of air traffic controllers to manage the national airspace system. In the wake of media attention focused on this 'crisis' it is the author's impression that the FAA is responding by seeking more punitive sanctions against airmen and operators. The FAA can suspend or revoke the certificate of an airman or operator under certain circumstances. The FAA can also impose civil penalties or seize aircraft for alleged violations of the Federal Aviation Regulations (FARs). The purpose of this article is to familiarize lawyers with the legal principles and governmental policy considerations that apply in these proceedings.

*78 NASA SAFETY REPORTS

The Aviation Safety Reporting System (ASRS) administered by the National Aeronautics and Space Administration (NASA) was established to identify and correct deficiencies in the National Aviation System. The FAA distributes an Advisory Circular to encourage the filing of safety reports. This circular explains the FAA's policy of granting pilots immunity from the imposition of sanctions in certain situations. Provided the violation was inadvertent and not deliberate, [FN1] did not involve a criminal offense, does not disclose a lack of qualification or competency, the pilot has not committed a violation of the FARs in the preceding five years, and can prove that he filed a Safety Report with NASA within ten days of the violation, a pilot may escape the imposition of sanctions. [FN2] While a pilot who satisfies these conditions may escape the imposition of sanctions, the FAA may still bring an action to establish a violation. [FN3]

The FAA is also prohibited from using reports submitted to NASA in an enforcement action; [FN4] however, information concerning criminal offenses or accidents is excluded from the program. [FN5] Accordingly, NASA removes the pilot's identification from the Safety Report and submits criminal matters and information concerning accidents. [FN6]

THE INVESTIGATION

Flight Standards inspectors investigate all known or reported violations of the FARs. [FN7] When an alleged violation *79 occurs, an inspector has a duty to investigate to determine whether an enforcement action is warranted. In common practice the inspector sends the pilot a 'notice of investigation.' The pilot then presents his version of the facts and provides the inspector with any other information he deems important.

A pilot under investigation should realize that such a reply may be used as evidence against him in subsequent legal proceedings. In Administrator v. Salkind, [FN8] the pilot was charged with two violations, (1) a near collision, and (2) violating VFR weather criteria. Salkind's letters established that he was flying the aircraft on two occasions in question. The NTSB Judge relied on these letters in ordering his certificate revoked.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

When the investigator has gathered sufficient facts to recommend enforcement action, Flight Standards personnel determine whether to take administrative or legal (enforcement) action. [FN9]   There are two forms of administrative action. First, the FAA may send a Safety Compliance Notice. The notice may include a letter of reprimand, if appropriate. Second, a letter of correction may be sent to the pilot specifying corrective action. [FN10] These administrative actions are in the nature of warning tickets, and if this approach is taken, the matter should end at this stage. On the other hand, if legal action is deemed appropriate, the matter is forwarded to the FAA's Regional Counsel. [FN11]   The investigator recommends that a civil penalty be imposed or a certificate action commenced against the pilot. [FN12]

Personnel at the Flight Standards District Office make discretionary determinations as to whether administrative or legal action is appropriate. The degree of punishment *80 to be imposed is discretionary as well.   These discretionary determinations are to be made in light of certain guidelines. The personnel should consider whether the violation was inadvertent or deliberate, the experience and responsibility of the pilot, the potential harm to others which was created, and what action, if any, was taken by the employer or any other government authority. [FN13]

In addition to sanction recommendations, the Flight Standards' report to the Regional Counsel includes a technical analysis of the pilot's alleged actions. [FN14]   If the Regional Counsel does not agree with the recommended sanction, he is to consult with Flight Standards to reach an agreement. The matter is referred to the national director if an agreement is not reached. The director then makes the final determination after consulting with the FAA's Office of General Counsel. [FN15]

## SANCTIONS

### Certificate Action

Under Section 609 of the Federal Aviation Act of 1958 ('the Act'), the Secretary of Transportation (via the FAA) can issue an order amending, modifying, suspending or revoking an airman's certificate after giving the pilot notice of the proposed action and an opportunity to answer and show why such action should not be taken. [FN16] After such an order is issued by the FAA, the pilot may appeal the order to the National Transportation Safety Board (NTSB). [FN17]   Except in emergency cases (a small percentage), the pilot's appeal to the NTSB acts as a stay of the FAA order, and the NTSB is authorized to amend, modify or reverse the FAA's order. [FN18]   During this period the pilot *81 may continue to exercise the privileges of his certificate. In those cases where the FAA contends an emergency exists, an appeal to the NTSB does not stay the effectiveness of the order, but the appeal must be finally disposed of by the NTSB within sixty days of being so notified, [FN19] the NTSB having adopted rules providing for an expedited hearing and appeal in emergency proceedings. [FN20]   In emergency cases, the pilot may not resume flying until his case has been successfully disposed of.

Whether the FAA will seek a temporary suspension or a permanent revocation of the pilot's certificate depends on the alleged facts giving rise to the enforcement proceedings. If the infraction is operational in nature (flying over gross weight, landing on or departing from the wrong runway, etc.), a suspension would be indicated. Where the pilot's actions demonstrate a deficiency in qualification or an unwillingness to comply with air safety regulations revocation would be indicated. [FN21]

### Civil Actions

Section 901 of the Act empowers the FAA to assess a civil penalty of $1,000.00 for each violation and $10,000.000 for each violation that relates to the transportation of hazardous materials. [FN22]   Where the violation is continuous, each day it exists constitutes a separate violation. [FN23]   In assessing the amount of the penalty, the FAA is to consider the nature, circumstances, extent and gravity of the violation committed. [FN24]

In addition to assessing a civil penalty, the FAA may *82 seize an aircraft being used in violation of the FAR's

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

[FN25] where the operator has been warned to cease the infraction. Such a seizure was upheld in Aircrane, Inc. v. Butterfield, [FN26] even though the seizure was initiated before the civil penalty action. However, seizing an aircraft without prior notice where no 'special need' for the public safety was demonstrated was declared unlawful as violating due process in U.S. v. Vertol H21C. [FN27] Finally, the FAA has emergency powers to issue cease and desist orders [FN28] and to initiate proceedings in Federal District Court to secure injunctions forbidding further violations. [FN29]

## NOTICE OF PROPOSED ACTION

After Flight Standards has referred the case to the Regional Counsel's office for prosecution, the FAA attorney to whom the case is assigned must send the pilot a written notice reciting the pertinent facts of the alleged violation and notifying the pilot of the action the FAA proposes to take. Generally, the pilot is given four options: (1) he may accept the penalty proposed by the FAA by surrendering his license or paying the fine; (2) he may submit additional information to the FAA for its consideration; (3) he may request an informal conference with the FAA attorney; or (4) he may file an appeal with the NTSB. After receiving the notice, if he wishes to request an informal conference, he must take a written request to that effect within the time specified in the notice.

## THE INFORMAL CONFERENCE

The informal conference is an opportunity to find out how strong or weak the FAA's case is. Generally, the FAA's attorney will reveal the evidence collected by the Flight Standards investigator. If the pilot wants to persuade *83 the FAA that a mistake has been made and he is innocent, or to present evidence that his error was not deliberate, he should bring with him to the conference any witnesses, documents or other materials that support his contention.

While the informal conference gives the pilot a chance to engage in some informal discovery and to find out what the FAA does (and, perhaps, does not) know, the pilot who takes all of his evidence to the informal conference affords the FAA attorney discovery, as well. While evidence respecting settlement negotiations is generally inadmissible in a court of law, [FN30] the Federal Rules of Evidence are not strictly followed in NTSB hearings, the NTSB having ruled that information learned at the informal conference and used in asking questions at the hearing does not prejudice the respondent. [FN31] Because of these factors, some thought should be given as to how one is going to proceed and what use, if any, either side may make of information learned from the other if the matter cannot be resolved at the conference and proceeds to the NTSB on appeal.

A pilot based on Illinois who flies to Florida during the winter may be surprised to receive a notice of proposed action from the Regional Counsel's office for the Southern Region. If the alleged infraction occurred in the Southern Region, it will handle the enforcement action and would normally be the site of any informal conference. However, the pilot or his counsel may ask that the case be transferred to his region for purposes of conducting the informal conference. If the matter cannot be resolved, the file will be returned to the Southern Region for preparation and trial before the NTSB Administrative Law Judge.

After the pilot and his attorney have discussed the case with the FAA's attorney at the informal conference, there may be considerations which warrant disposal. Disposition *84 in this manner is similar to plea bargaining in criminal law proceedings. The defense of enforcement actions can be both expensive and time consuming. Moreover, if the alleged violation occurred in a region distant from the pilot's residence, this is another factor weighing on his decision to fight it out or seek a settlement. If for whatever reason a decision is made to explore settlement possibilities, it is not uncommon to find that the FAA is willing to accept a civil penalty to compromise the matter [FN32] in lieu of the suspension of the pilot's license as demanded in the notice of proposed action.

If the case is compromised and settled after the informal conference by the pilot's agreeing to pay a civil penalty, his attorney should offer a check to the FAA in the amount agreed upon with a cover letter stating very clearly that the offer is not an admission of the charges made, but is merely being made to avoid the expense and trouble of

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

litigation.

## THE STALE COMPLAINT RULE

Prior to attending the informal conference, the pilot and his attorney should compare the date of the alleged violation to the date on the FAA's notice of proposed action. If more than six months passed from the date of alleged violation until the date the pilot received a notice from the FAA's counsel, the charges brought by the FAA could be dismissed based on the stale complaint rule. [FN33] However, a delay of more than six months by the FAA will not result in an automatic dismissal.

If efforts to resolve the case at the formal conference fail and the matter is appealed to the NTSB for trial, a pilot who is not alleged to be unqualified by the FAA can make a motion to dismiss the charges relying on the stale complaint rule. The FAA must then prove to the NTSB judge either (1) that the FAA had good cause for the delay, *85 or (2) that imposing a sanction is in the public interest even though there was delay of more than six months. [FN34] If the judge is not persuaded by the FAA's showing in response to the pilot's motion to dismiss, the charges that occurred more than six months prior to the pilot's receiving the notice of proposed action are dismissed. [FN35]

If the FAA charges lack of qualification of the pilot, the result may be different. If the NTSB judge finds that lack of qualification is not really an issue, the charges are ruled on as discussed above. [FN36] If the NTSB judge finds it is an issue, the case proceeds to trial on the issue of lack of qualification, and the parties are notified that the issue at trial is not merely a remedial sanction. [FN37] Since the possibility of dismissal on appeal weighs heavily in the pilot's favor, both sides should consider this in their efforts to resolve the matter.

## A HEARING BEFORE THE NTSB JUDGE

The sanction most frequently sought by the FAA's attorney is a certificate action for either a suspension or revocation under Section 609 of the Act. If the case could not be resolved after the informal conference, the FAA will serve an order on the pilot suspending or revoking his certificate, and the pilot has twenty days from the time of service of the order to file an appeal to the NTSB. [FN38] As discussed above, the filing of an appeal by the pilot stays the effective date of the order until the final disposition before the NTSB, except in emergency proceedings. [FN39]

The order of the FAA from which the pilot appeals serves as a complaint, and it is filed with the NTSB within five days after the pilot files his notice of appeal. [FN40] Then the pilot must file an answer to the complaint within *86 twenty days of service on him by the FAA. [FN41] After the initial pleadings have been filed, the parties are permitted to engage in formal discovery, the Federal Rules of Civil Procedure being 'instructive rather than controlling' in this phase of the litigation. [FN42] The NTSB judge to whom the case is assigned sets the date, time and place for the hearing, giving the parties at least 30 days prior notice. [FN43] With regard to where the hearing is held, ' t he location of a majority of the witnesses and the suitability of a site served by a scheduled air carrier are factors to be considered in setting the place for the hearing.' [FN44]

When the hearing before the NTSB judge is convened, the FAA bears the burden of proof in certificate actions under Section 609 of the Act. [FN45] In satisfying the burden of proof requirements, the FAA is only required to prove its case by a 'preponderance of the evidence' and not 'beyond a reasonable doubt.' If the FAA makes a prima facie case, the burden of going forward with the evidence then shifts to the pilot. The FAA can make out a prima facie case of carelessness by circumstantial evidence. The pilot must then prove: (1) that carelessness is not the only reasonable inference to be drawn from the circumstances, and (2) the evidence supports an alternate theory as to the cause of the incident. [FN46] The burden then shifts back to the FAA.

The rules of evidence are relaxed in proceedings before the NTSB Administrative Law judge. Hearsay is admissable but double hearsay is not. [FN47] However, a finding cannot be based on uncorroborated hearsay.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

[FN48] Re-recordings of Air Traffic Control (ATC) tapes are admissible, even though the original tape is not available for *87 inspection. [FN49] However, recordings made on cockpit voice recorders in air carrier aircraft are inadmissible in civil penalty or certificate actions under Section 121.359(e) of the FAR's. [FN50] Similarly, flight data recorder information is generally inadmissible in enforcement actions, but the NTSB may consider this information solely to corroborate other evidence or to resolve conflicting evidence. [FN51]

There is no Fifth Amendment protection afforded the pilot. He may be called by the FAA for cross-examination to testify against himself during the presentation of its case. [FN52] Concerning Fourth Amendment rights, evidence seized in an unlawful search by Federal agents has been held inadmissible in a subsequent NTSB hearing. [FN53] However, evidence obtained during an FAA inspection of an aircraft has been held admissible based on its reinspection authority under Section 609 of the Act. [FN54] Finally, the pilot has no Sixth Amendment right to counsel nor to effective assistance of counsel, since the NTSB takes the view that it is the pilot's responsibility to obtain proper counsel. [FN55]

The NTSB judge acts as the trier of fact, being in a position to best observe and assess the demeanor of witnesses. Following the presentation of evidence, the parties are afforded a reasonable opportunity to submit proposed findings and conclusions to the judge before he renders an initial decision. [FN56] Most often, the judge renders his initial decision orally in the presence of the parties and counsel.

While the judge has the authority to affirm the finding of a violation and reduce the sanction, the judge must have clear and compelling reasons for doing so. [FN57] *88 The cost to the pilot of his defense is not a factor to be considered by the judge in mitigation of punishment. [FN58] Factors which are relevant to the matter of punishment are, inter alia, (1) the pilot's level of experience, (2) his attitude, (3) the action taken by his employer, (4) whether the act was deliberate or inadvertent, and (5) the pilot's use of his certificate. [FN59]

## APPEAL TO FULL NTSB

A party dissatisfied with the NTSB judge's initial decision may file an appeal to the case considered by all of the NTSB judges, provided his notice of appeal is filed and served upon the other parties within ten days of the decision. [FN60] The pilot must then file five copies of his appellate brief within fifty days after an oral initial decision or thirty days after a written initial decision. [FN61] The issues the pilot may argue on appeal are limited to the following:

a. Are the findings of fact each supported by a preponderance of reliable, probative, and substantial evidence?

b. Are conclusions made in accordance with precedent and policy?

c. Are the questions on appeal substantial?

d. Have any prejudicial errors occurred? [FN62]

In considering the pilot's appeal, the board may make new findings and issue an order, or may remand the case for such purposes as it deems necessary. [FN63] On its own initiative, the Board may raise any issue during the appeal which it deems important to a proper disposition of the case, in which the parties are afforded a reasonable opportunity to submit argument on the issue. [FN64] Finally, within thirty days of the Board's order on his appeal, any party *89 may file a petition [FN65] for rehearing, reargument, reconsideration or modification of the order, a reply from the other party being due within ten days of the petition. [FN66] Filing a petition for rehearing stays the effective date of the Board's order, unless otherwise ordered by the Board. [FN67]

## APPEAL TO THE CIRCUIT COURTS OF APPEAL

If an appeal to the full NTSB proves unsuccessful, the pilot may file a petition for review with an appropriate

United States Circuit Court of Appeals within sixty days of the NTSB order. [FN68] After his petition has been filed, the clerk of court transmits a copy to the NTSB, which, in turn, files a copy of its record with the court. [FN69] The petition must be filed in the circuit where the pilot resides, or has his principal place of business, or with the United States Court of Appeals for the District of Columbia. [FN70] Upon a showing of good cause by the pilot, the court may stay the NTSB order while the appeal is pending. [FN71] Also, the NTSB will frequently sustain a petition to stay its order if an appeal has been filed to a Circuit Court of Appeal.

In reviewing the NTSB record, the court is required to accept the NTSB's findings of fact as conclusive if they are supported by substantial evidence. [FN72] Objections not raised before the NTSB may not be raised on appeal to the court, unless reasonable grounds existed for failing to raise the issue below. [FN73] Finally, if the appeal to the Court of Appeals should fail, the pilot may seek an appeal to the *90 United States Supreme Court. [FN74]

## THE EQUAL ACCESS TO JUSTICE ACT

Under the Equal Access to Justice Act (EAJA), a party who prevails in an adversary proceeding with an administrative agency may be awarded fees and expenses incurred in defending himself, unless the agency's position was substantially justified or special circumstances make an award unjust. [FN75] However, individuals whose net worth exceeds two million dollars, owners of businesses, corporations and partnerships with a net worth of over seven million dollars, and others may not recover their fees and expenses under EAJA. [FN76]

The NTSB has promulgated rules to be followed by those seeking to recover expenses incurred in defending their interests where the FAA's actions were not substantially justified. [FN77] Under the NTSB rules, the prevailing party must submit a written application to the Board within thirty days after its final disposition of the case, [FN78] and the agency (FAA) has thirty days following service of the application in which to file its answer. [FN79] The prevailing party may file a reply to the FAA's answer within fifteen days. [FN80] An initial decision is due from the Administrative Law judge within sixty days after completion of proceedings on the application, [FN81] and either party may appeal the judge's initial decision to the full NTSB. [FN82] Finally, a dissatisfied party may seek judicial review of the NTSB's order. [FN83]

*91 In Sottile v. Administrator, [FN84] Sottile was charged with making false and fraudulent entries into a student pilot's logbook. The accusing student eventually withdrew his accusations under oath while the investigation was underway, admitting that he, not Sottile, made the entries. The student initially misrepresented the facts to FAA inspector Mastro in an attempt to recover money paid by the student for flight instruction. Even though Sottile denied the charges and the student later admitted the truth, the FAA persisted in taking the case to trial. ' T he FAA attorney . . . spent her entire direct examination of her chief complaining witness cross-examining him to show what a liar he was. . . .' [FN85]

In awarding Sottile expenses in excess of $6,900.00, Judge Reilly concluded in his initial decision that the mere fact that the FAA survived Sottile's motion to dismiss and made out a prima facie case, did not prohibit him from awarding Sottile expenses under EAJA. He concluded that just making out a prima facie case did not 'automatically dictate that the reasonableness of the government's prosecution is no longer open to question or that its action has now been 'substantially justified." [FN86]

The full NTSB affirmed Judge Reilly's initial decision and awarded Sottile additional expenses for responding to the FAA's appeal. They also awarded damages for the appearance of his attorney at oral argument, the total award exceeded $11,000.00. [FN87] The NTSB reasoned that although the granting of a motion to dismiss raises the possibility that the government has been unreasonable, the converse is not automatically true, i.e. that a denial of such motion amounts to substantial justification. The NTSB observed that the Administrative Law judge hearing enforcement actions has an obligation to ensure the development of a complete record, and that was Judge *92 Reilly's motivation in denying Sottile's motion to dismiss at the close of the FAA's case. [FN88]

## CONCLUSION

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

The lawyers and/or pilots involved in one or more of the many facets of aviation should have some familiarity with devices at the FAA's disposal where violations of the FAR's have occurred or are suspected. It is the author's hope that the reader has obtained information from this article that will serve them as they utilize the National Airspace System. Further, for those pilots and lawyers who find themselves participating in proceedings before the NTSB and/or appellate courts, perhaps this material will be of some assistance.

[FNa] Alan Armstrong is an attorney engaged in the general practice of law in Atlanta, Georgia with an emphasis on litigation, including aviation law, personal injury and product liability litigation. Mr. Armstrong is a pilot with commercial and instrument ratings in both single engine and multi-engine land airplanes and is a certified instrument flight instructor. He owns and regularly flies a Bellanca Viking. The author gratefully acknowledges the assistance provided him by Judge John E. Faulk (retired NTSB Law Judge) and Robert Baker, Esq. in the preparation of this article.

[FN1] The phrase 'inadvertent and not deliberate' has been interpreted by the N.T.S.B. to mean reckless. See Administrator v. Ferguson, 3 N.T.S.B. 3068, 3071 (1980), aff'd Ferguson v. N.T.S.B., 678 F.2d 821 (9th Cir. 1982).

[FN2] Advisory Circular, AC 00-46C (Feb. 4, 1985) [hereinafter cited as Advisory Circular, AC 00-46C].

[FN3] Id.

[FN4] 14 C.F.R. § 91.57 (1985).

[FN5] Id.

[FN6] Advisory Circular, AC 00-46C, supra note 2.

[FN7] FAA Order 1000.9B. The FAA has the duty of investigating reported violations of the Federal Aviation Act. 49 U.S.C. § 1354 (1982); 14 C.F.R. § 13.1 (1985).

[FN8] 1 N.T.S.B. 714, 715 (1970).

[FN9] FAA Order 1000.9B.

[FN10] Id.

[FN11] Id.

[FN12] Id.

[FN13] FAA Agency Handbook, FAA Order 2150.7A.

[FN14] Enforcement Handbook, FAA Order 2150.2A.

[FN15] Id.

[FN16] Id.

[FN17] Id.

[FN18] Id.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

(Cite as: 52 J. Air L. & Com. 77, *92)

[FN19]  Id.

[FN20]  49 C.F.R. § 821.54 (1985).

[FN21]  Jonathan Howe, Airman's Rights--FAA Enforcement Procedures, (1977).  Mr. Howe formerly served as
FAA Regional Counsel for the Northwest Region. He currently serves as FAA Director for the Southern Region.
For a complete discussion of Mr. Howe's article, see ROLLO, AVIATION LAW AN INTRODUCTION
(Maryland Hist. Press, 2nd Ed. 1982).

[FN22]  49 U.S.C. § 1471(a)(1) (1982).

[FN23]  Id.

[FN24]  Id.

[FN25]  49 U.S.C. § 1473 (1982).

[FN26]  369 F. Supp. 598 (E.D.Pa. 1974).

[FN27]  545 F.2d 648 (9th Cir. 1976).

[FN28]  49 U.S.C. § 1485(a) (1982).

[FN29]  Id.

[FN30]  FED. R. EVID. 408.

[FN31]  Administrator v. Honan, 1982 N.T.S.B. Adv. Sh. 1803.

[FN32]  49 U.S.C. § 1471(a)(2) (1982); 14 C.F.R. § 13.15(b) (1985) ( 'the Administrator may compromise any
civil penalty').

[FN33]  49 C.F.R. § 821.33 (1985).

[FN34]  Id. §321.83(a)(1).

[FN35]  Id. § 821.33(a)(2).

[FN36]  Id. § 821.33(b)(1).

[FN37]  Id. § 821.33(b)(2).

[FN38]  Id. § 821.30(a).

[FN39]  Id. § 821.30(c).

[FN40]  Id. § 821.31(a).

[FN41]  Id. § 821.31(c).

[FN42]  Id. § 821.19(a), (c).

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

52 JALC 77
(Cite as: 52 J. Air L. & Com. 77, *92)

[FN43] Id. § 821.37(a).

[FN44] Id.

[FN45] Id. § 821.32.

[FN46] Administrator v. Sanders, 1983 N.T.S.B. Adv. Sh. 1937.

[FN47] Administrator v. Smith, 2 N.T.S.B. 2527, 2528 (1976).

[FN48] See id.

[FN49] Administrator v. Ivie, 2 N.T.S.B. 1248, 1249 (1975).

[FN50] 14 C.F.R. § 121.359(e). See also Administrator v. Rapattoni, 1 N.T.S.B. 241, 242-45 (1968).

[FN51] Administrator v. Moore, 1982 N.T.S.B. Adv. Sh. 1760.

[FN52] Administrator v. Roach, 1983 N.T.S.B. Adv. Sh. 1886.

[FN53] Administrator v. Danielson, 3 N.T.S.B. 161, 162-64 (1977).

[FN54] Administrator v. Fisher, 1984 N.T.S.B. Adv. Sh. 2009.

[FN55] Administrator v. Jones, 3 N.T.S.B. 3649, 3650 (1981).

[FN56] 49 C.F.R. § 821.39.

[FN57] Administrator v. Muzquiz, 2 N.T.S.B. 1474, 1477 (1975).

[FN58] Administrator v. Robinson, 2 N.T.S.B. 1051, 1053 n.10 (1984).

[FN59] Administrator v. Whitaker, 1 N.T.S.B. 1983 (1972).

[FN60] 49 C.F.R. § 821.47.

[FN61] Id. § 821.48(a), (b), (f).

[FN62] Id. § 821.49.

[FN63] Id.

[FN64] Id.

[FN65] Five copies of the petition must be filed. 49 C.F.R. § 821.50(b).

[FN66] Id. § 821.50(a), (e) (1985).

[FN67] Id. § 821.50(f) (1985).

[FN68] 49 U.S.C. §§ 1486(a), 1903(d) (1981).

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

(Cite as: 52 J. Air L. & Com. 77, *92)

[FN69] Id. § 1486(c) (1981).

[FN70] Id. § 1486(b) (1981).

[FN71] Id. § 1486(d) (1981).

[FN72] Id. § 1486(e) (1981); Sorenson v. N.T.S.B., 684 F.2d 683, 685 (10th Cir. 1982); Ferguson v. N.T.S.B., 678 F.2d 821, 825 (9th Cir. 1982).

[FN73] 49 U.S.C. § 1486(e) (1981).

[FN74] Id. § 1486(f) (1981).

[FN75] 5 U.S.C. § 504(a)(1) (1984).

[FN76] Id. § 504(b)(1)(B). EAJA was recently amended to increase the individual's net worth from $1,000,000 to $2,000,000 and a business owner's net worth from $5,000,000 to $7,000.000. See 54 U.S.L.W. § 1(c)(1)(B) (1985).

[FN77] 49 C.F.R. § 826 (1985).

[FN78] Id. § 826.24(a) (1985).

[FN79] Id. § 826.32(a) (1985).

[FN80] Id. § 826.33 (1985).

[FN81] Id. § 826.37 (1985).

[FN82] Id. § 826.38 (1985).

[FN83] Id. § 826.39 (1985).

[FN84] 608 F. Supp. 1040 (D.C. Cir. 1985).

[FN85] Id.

[FN86] Id.

[FN87] Id.

[FN88] Id.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

EXHIBIT E

# AC 00-58 - VOLUNTARY DISCLOSURE REPORTING PROGRAM

Department of Transportation
Federal Aviation Administration

05/04/98

Initiated by: AFS-350

1. **PURPOSE.**
   a. This advisory circular (AC) provides information and guidance material that may be used by a certificate holder, an indirect air carrier, a foreign air carrier (regarding compliance with its FAA-approved security program only), or a production approval holder (PAH) operating under Title 14 of the Code of Federal Regulations (14 CFR) when voluntarily disclosing to the Federal Aviation Administration (FAA) apparent violations of those FAA regulations listed in paragraph 3. The procedures and practices outlined in this AC can be applied to the maintenance, flight operations, anti-drug and alcohol misuse prevention programs, and security functions of the certificate holder's organization, the security functions of indirect air carriers and foreign air carriers, and to the manufacturing functions of the production approval holder's organization. The procedures and practices outlined in this AC can **not** be applied to those persons who are required to report failures, malfunctions and defects under 14 CFR part 21.3 and do not make those reports in the time frame required by the regulation. With respect to foreign air carriers, apparent violations of FAA regulations requiring compliance with their FAA-approved security program only are covered by this program; references in this AC to foreign air carriers are to be interpreted in light of this fact.
   b. Certificate holders, indirect air carriers, foreign air carriers, and PAHs are encouraged, but not required, to develop internal evaluation programs that continually monitor company policies and procedures and ensure that the highest level of safety and security compliance is maintained. They may voluntarily disclose apparent violations of 14 CFR covered by this program in accordance with the procedures in this AC even though an internal evaluation program has not been established. Guidance on internal evaluation programs is contained in advisory materials on the subject.

2. **CANCELLATION.** AC 120-56, Air Carrier Voluntary Disclosure Reporting Procedures, dated January 23, 1992, is canceled.

3. **RELATED REGULATIONS.** 14 CFR Parts 21, 107, 108, 109, 121, 125, 129, 133, 135, 137, 141, 142, 145, and 147.

4. **BACKGROUND.** Civil penalties under the FAA's enforcement program have always been

considered a means to promote compliance with the FAA's regulations, not an end in themselves. In addition to the deterrence achieved by the appropriate use of civil penalties, the public interest is also served by positive incentives to promote and achieve compliance. Indeed, the FAA believes that aviation safety is well served by incentives for certificate holders, indirect air carriers, foreign air carriers (regarding their compliance with their FAA-approved security programs), and PAHs to identify and correct their own instances of noncompliance and to invest more resources in efforts to preclude their recurrence. The FAA's policy of forgoing civil penalty actions when one of these entities detects violations, promptly discloses the violations to the FAA, and takes prompt corrective action to ensure that the same or similar violations do not recur is designed to encourage compliance with the FAA's regulations, foster safe operating practices, and promote the development of internal evaluation programs.

5. **KEY TERMS.** The following key terms and phrases are defined to ensure a standard interpretation and understanding of the FAA's voluntary disclosure policy.

    a. Evidence. For the purpose of voluntary disclosure, evidence generally should be in the form of written documentation or reports that support a certificate holder's, indirect air carrier's, foreign air carrier's, or PAH's analysis of the disclosed apparent violation and the resulting elements of the proposed comprehensive fix. Evidence generally comes from the following four elements:

        (1) Documents or manuals reviewed.
        (2) Equipment examined.
        (3) Activities observed.
        (4) Interview data.

    b. Comprehensive Fix.

        (1) A comprehensive fix is an action, or actions, proposed by the certificate holder, indirect air carrier, foreign air carrier, or PAH and accepted by the principal inspector (see definition in paragraph 5.d.) to preclude recurrence of the apparent violation that has been voluntarily disclosed under this program. (When appropriate, a regulated entity may work with an airport consortium on a comprehensive fix. However, the appropriate regulated entity will remain responsible for implementation of the comprehensive fix.)

        (2) A schedule of the dates and events encompassed by the comprehensive fix must be established and included in a letter of correction.

    c. Satisfactory Fix. A satisfactory fix is a comprehensive fix, in which all corrective measures have been completed on schedule and are satisfactory to the FAA.

    d. Principal Inspector. Under the voluntary disclosure program, principal inspector refers to the appropriate security (domestic or foreign), maintenance, avionics, operations inspector, or other designated FAA official of the program office responsible for oversight of the area of noncompliance involved in the disclosure.

        (1) The designated FAA official for voluntary disclosure concerning anti-drug and alcohol misuse prevention program violations is the Branch Manager, Compliance

and Enforcement Branch, Drug Abatement Division, FAA Headquarters;

(2) The designated FAA officials for disclosures by Category X airports are the Federal Security Managers;

(3) The designated FAA officials for disclosures by Category 1-4 airports are the managers of the Civil Aviation Security Field Offices (CASFO) or the designated representative of the CASFO manager; and,

(4) The designated FAA officials for disclosures by indirect air carriers are the regional Dangerous Goods/Cargo Security (DG/CS) coordinators.

6. **VOLUNTARY DISCLOSURE POLICY.** The FAA believes that the open sharing of apparent violations and a cooperative as well as an advisory approach to solving problems will enhance and promote aviation safety. Certificate holders, indirect air carriers, foreign air carriers, and PAHs will receive a letter of correction in lieu of civil penalty action for covered instances of noncompliance that are voluntarily disclosed to the FAA in accordance with the procedures set forth in this AC. Once the letter of correction is issued, the case will be considered closed unless the agreed-upon comprehensive fix is not satisfactorily completed by the appropriate entity.

a. In evaluating whether an apparent violation is covered by this policy, the FAA will ensure that the following five conditions are met:

(1) The certificate holder, indirect air carrier, foreign air carrier, or PAH has notified the FAA of the apparent violation immediately after detecting it and before the agency has learned of it by other means.

(2) The apparent violation was inadvertent.

(3) The apparent violation does not indicate a lack, or reasonable question, of qualification of the certificate holder or PAH.

(4) Immediate action, satisfactory to the FAA, was taken upon discovery to terminate the conduct that resulted in the apparent violation.

(5) The certificate holder, indirect air carrier, foreign air carrier, or PAH has developed or is developing a comprehensive fix and schedule of implementation satisfactory to the FAA. The comprehensive fix includes a follow-up self-audit to ensure that the action taken corrects the noncompliance. This self-audit is in addition to any audits conducted by the FAA.

b. Ordinarily, the FAA will not forgo legal enforcement action if the certificate holder, indirect air carrier, foreign air carrier, or PAH informs the FAA of the apparent violation during, or in anticipation of, an FAA investigation/inspection or in association with an accident or incident.

c. The procedures to be followed when applying the voluntary disclosure policy are further described in the following paragraphs.

7. **NOTIFICATION TO THE FAA OF AN APPARENT VIOLATION.** The Voluntary Disclosure policy applies only when notification of an apparent violation is made to the FAA by the certificate holder, indirect air carrier, foreign air carrier, or PAH immediately after the apparent violation has been discovered by that regulated entity, and before the FAA learns of

the apparent violation by some other means. The form of notification may be oral, a written hard copy, or a written electronic copy. The FAA believes that it is important for the initial notification to be within 24 hours of the discovery of the apparent violation.

a. Notification by the certificate holder or the PAH. When a certificate holder, indirect air carrier, foreign air carrier, or PAH notifies the FAA of an apparent violation, contact must be made with, or directed to, the appropriate principal inspector. The certificate holder, indirect air carrier, foreign air carrier, or PAH should not delay notification for any reason, and should address, to the maximum extent possible, the following items with the principal inspector:

(1) A brief description of the apparent violation, including an estimate of the duration of time that it remained undetected, as well as how and when it was discovered.

(2) Verification that noncompliance ceased after it was identified.

(3) A brief description of the immediate action taken after the apparent violation was identified, the immediate action taken to terminate the conduct that resulted in the apparent violation, and the person responsible for taking the immediate action.

(4) Verification, that an evaluation is underway to determine if there are any systemic problems and a description of the corrective steps necessary to prevent the apparent violation from recurring.

(5) Identification of the person responsible for preparing the comprehensive fix.

(6) Acknowledgment that a detailed written report will be provided to the principal inspector within 10 working days.

b. Disclosure to the FAA in the context of airport consortia. Normally when the FAA becomes aware of an apparent violation by a certificate holder, indirect air carrier, foreign air carrier, or PAH before that entity notifies the FAA of its apparent violation, the Voluntary Disclosure policy will not apply.

(1) Several airports, however, have created consortia to conduct airport security vulnerability assessments. Membership in each consortium is voluntary and usually includes air carrier and airport certificate holders as well as an FAA representative. Consortium membership also may include persons and entities that do not hold certificates, including, but not limited to, law enforcement personnel, screening company representatives, and airport tenants. The purpose of an airport consortium is to conduct formal airport vulnerability assessments in order to identify actual or potential security weaknesses, and to openly discuss assessment findings with a view toward collaborating on security improvements. Airport consortia also are encouraged to engage in informal ongoing assessments of airport vulnerabilities. During consortium assessment activities, an apparent violation by a certificate holder may be discovered by someone other than the certificate holder, indirect air carrier, or foreign air carrier and brought forward for discussion by the consortium members. Because an FAA representative is a member of the consortium, the FAA may become aware of an apparent violation during this discussion, at the same time, or before, the certificate holder, indirect air carrier, or foreign air carrier, becomes aware of the apparent violation.

(2) Notwithstanding the requirement that an appropriate regulated entity notify the FAA of its apparent violation before the agency has learned of it by other means, (1) if the FAA initially becomes aware of the entity's apparent security violation before or at the same time the responsible entity does, because of information disclosed by a person or entity other than the certificate holder, indirect air carrier, or foreign air carrier during an airport consortium activity or meeting, or (2) if the FAA becomes aware of an apparent security violation at the same time the responsible regulated entity does during consortia assessments that involve both FAA personnel and a certificate holder, indirect air carrier or foreign air carrier, the apparent violation will be covered by this policy provided the other elements of paragraphs 6(a) and (b) are met. Such disclosure will be deemed notification to the FAA of the apparent violation, instead of the initial notification outlined in paragraph 7(a). The appropriate FAA principal inspector will send a written acknowledgment of the notification to the pertinent regulated entity and open an enforcement investigative report (EIR) in accordance with procedures outlined in paragraph 8. The regulated entity will have 10 work days from the date of the written acknowledgment of the apparent violation to follow up with a written report to the principal inspector in accordance with the guidance in paragraph 9. If the regulated entity does not agree that there has been a violation, or otherwise fails to provide information identified in paragraph 9, the FAA thereafter will proceed with its investigation and initiate enforcement action, if appropriate, against the entity. Except when the FAA becomes aware of an apparent violation, at the same time the regulated entity does during consortia assessments that involve both FAA personnel, and the regulated entity, or, at the same time or before the regulated entity does because of information disclosed by another entity during a consortium activity or meeting, a regulated entity self-reporting an apparent violation must follow the procedures outlined in paragraph 7(a).

8. **FAA RESPONSE TO CERTIFICATE HOLDER, INDIRECT AIR CARRIER, FOREIGN AIR CARRIER, OR PAH NOTIFICATION.** The principal inspector responds with a written acknowledgment of the entity's initial notification.

This acknowledgment includes the request for a written report, and is sent in lieu of a letter of investigation provided the written report is completed in accordance with the voluntary disclosure reporting procedures set forth in this AC and Appendix 1. The principal inspector will open an enforcement investigative report that will be closed out with a letter of correction, following satisfactory development of a comprehensive fix and schedule of implementation agreed upon by the FAA and the entity.

9. **WRITTEN REPORT OF CERTIFICATE HOLDER, INDIRECT AIR CARRIER, FOREIGN AIR CARRIER, OR PAH's WRITTEN REPORT.** The written report should be provided to the principal inspector by the entity within 10 working days after the initial notification was made. A sample format for this report is provided as appendix 1. In

summary, the written report should include the following information:

a. A list of the specific FAA regulations that may have been violated.

b. A description of the apparent violation, including the duration of time it remained undetected, as well as how and when it was detected.

c. A description of the immediate action taken to terminate the conduct that resulted in the apparent violation, including when it was taken, and who was responsible for taking the action.

d. An explanation that shows the apparent violation was inadvertent.

e. Evidence that demonstrates the seriousness of the apparent violation and the regulated entity's analysis of that evidence.

f. A detailed description of the proposed comprehensive fix, outlining the planned corrective steps, the responsibilities for implementing those corrective steps, and a time schedule for completion of the fix. If a proposed comprehensive fix is not fully developed within 10 working days, the pertinent regulated entity should provide at least an overview of its comprehensive fix plans.

In any event, a detailed description of the comprehensive fix should be provided to the principal inspector within 30 calendar days after the certificate holder or PAH initially notified the principal inspector of the apparent violation.

g. Identification of the company official responsible for monitoring the implementation and completion of the comprehensive fix.

10. **REVIEW BY THE FAA.** The FAA works with the certificate holder, indirect air carrier, foreign air carrier, or PAH to ensure that the comprehensive fix is acceptable to the FAA.

a. If the principal inspector determines that the proposed fix is acceptable, he/she will prepare a letter of correction that includes the date by which the comprehensive fix will be implemented and completed.

b. Following issuance of the letter of correction, the case is closed but remains subject to reopening in the event that the agreed-upon actions covered in the comprehensive fix are not completed to the satisfaction of the FAA.

c. The principal inspector has the authority to close the case. Consultation with regional specialists, legal counsel, or other FAA personnel may be accomplished when deemed appropriate by the principal inspector.

## 11. IMPLEMENTATION OF A COMPREHENSIVE FIX.

a. During the implementation period, the FAA and the pertinent regulated entity should continue to work together. The FAA may advise and assist the entity in correcting any identified systemic problems. Changes can be made to the corrective action(s) outlined in the comprehensive fix when the need is identified and when the FAA concurs with the change. When a change to a comprehensive fix has been agreed upon, the principal inspector, or the inspector assigned to the case at the direction of the principal inspector, will prepare an amended letter of correction that reflects this change.

b. The FAA monitors the implementation of the corrective steps. Throughout the

implementation period, the FAA assesses the pertinent regulated entity's corrective efforts and top management's awareness of these efforts. If, during this period, the FAA determines that the steps taken by the entity are not those documented in the comprehensive fix, the letter of correction may be rescinded, the investigative report may be reopened, and appropriate legal enforcement action may be initiated.

c. Following completion of the agreed-upon corrective action(s), the certificate holder, indirect air carrier, foreign air carrier, or PAH conducts a self-audit to ensure that the action taken remedies the problem that gave rise to the apparent violation.

d. At the conclusion of the implementation period, the principal inspector makes a final assessment. If all elements of the comprehensive fix have been adequately accomplished, the principal inspector finds the fix satisfactory. A statement of follow-up investigation, confirming that the comprehensive fix was satisfactorily implemented and completed, shall be prepared to complete the FAA's investigative package.

e. If the same or similar violations are discovered subsequent to the FAA's completion of an investigative package, the FAA does not reopen the case unless it determines that the pertinent regulated entity failed to comply with all the elements of the comprehensive fix agreed upon by the FAA and the entity.

12. **DISPUTE RESOLUTION.** When disputes occur regarding the acceptance of a proposed comprehensive fix, or a modification thereto before the fix is considered satisfactory, the principal inspector and the pertinent regulated entity may request that the issue be resolved at the next level of management within the FAA. This procedure will provide for an independent assessment of the areas in disagreement.

## 13. SEPARATE ACTIONS AGAINST AIRMEN OR OTHER INDIVIDUAL AGENTS.

a. The voluntary disclosure policy applies to individual airmen or other agents of an employing certificate holder, indirect air carrier, foreign air carrier, or PAH when:

   (1) The apparent violation involves a deficiency of the employing entity's practices or procedures that causes the employing certificate holder, indirect air carrier, foreign air carrier, or PAH to be in violation of a covered violation of an FAA regulation;

   (2) The airman or other agent of the employing entity, while acting on behalf of the employing entity, inadvertently violates the FAA's regulations as a direct result of a deficiency of the employing entity that causes the employing entity to be in violation of the regulations. (The voluntary disclosure policy does not apply to the airman or other agent when his/her apparent violation is the result of actions unrelated to the employing entity's deficiency);

   (3) The airman or other agent immediately makes the report of his/her apparent violation to the employing entity; and

   (4) The employing certificate holder, indirect air carrier, foreign air carrier, or PAH immediately notifies the FAA of both the airman or other agent's apparent violation and the apparent deficiency in its practice or procedures.

b. When all the above conditions are met, a separate EIR is opened for the individual and closed with an administrative action.

   c. If all the above conditions are not met, the principal inspector will review all facts associated with the case and determine what action is appropriate for individual airmen or other agents of the employing entity.

   d. This provision does not apply to matters concerning qualifications to hold an airman certificate.

**14. APPLICABILITY OF THE FREEDOM OF INFORMATION ACT (FOIA) TO SELF-DISCLOSURE RECORDS.** Records submitted to the FAA for review pursuant to this voluntary self-disclosure program will be protected to the extent allowed by law.

**15. REPEATED VIOLATIONS.** If a repeated violation occurs, notwithstanding the fact that a comprehensive fix was satisfactorily completed and followed, the procedures outlined in this AC may apply to the disclosure of the repeated violation. The determination whether a repeated violation will be covered under this policy will be made by the FAA on a case-by-case basis, upon consideration of the facts and circumstances surrounding the repeated violation.

**16. CONCLUSION.** Development of internal evaluation programs should help to ensure that any apparent violations are promptly identified, corrected, and reported to the FAA. While not required, the FAA strongly encourages certificate holders, indirect air carriers, foreign air carriers, and PAH's to make internal evaluation programs an integral part of their everyday management process so that the full benefits of voluntary disclosure can be realized. Aviation safety is served by programs that allow certificate holders, indirect air carriers, foreign air carriers, and PAH's to identify and correct their own instances of noncompliance and invest more resources in efforts to preclude their recurrence.

*Guy S. Gardner* (signature)

**Guy S. Gardner**
**Associate Administrator for**
**Regulation and Certification, AVR-l**

*Cathal L. Flynn* (signature)

**Cathal L. Flynn**
**Associate Administrator for**
**Civil Aviation Security, ACS-1**

## APPENDIX 1. SAMPLE FORMAT TO BE FOLLOWED WHEN SUBMITTING THE WRITTEN REPORT

The following sample is only a suggested format to be followed when preparing the written report that will be submitted to the FAA. While a certificate holder, indirect air carrier, foreign air carrier, or PAH should include at least all the elements specified below, the structure of the written report can be modified by the regulated entity to fit its particular needs.

I. GENERAL.

   A. Date.

   B. Certificate type or equivalent.

C. Pertinent regulated entity number or equivalent.
D. Company name.
E. Company address.
F. Company official filing report.
   1. Name.
   2. Position.
   3. Telephone number.

II. DESCRIPTION OF APPARENT VIOLATION.

A. Applicable 14 CFR.
B. Date apparent violation was discovered.
C. Location of discovery.
D. Company official who discovered the apparent violation.
   1. Name.
   2. Position.
   3. Telephone number.
E. Date and time of initial notification to the FAA.
F. Name of FAA official notified (principal inspector).
G. Company official making notification.
   1. Name.
   2. Position.
   3. Telephone number.
H. Duration of time apparent violation remained undetected.
   1. Hours.
   2. Cycles.
   3. Days.

III. SUMMARY OF APPARENT VIOLATION.

(The summary should be a brief statement that describes the nature of the apparent violation and identifies the specific aircraft, engines, appliances, facilities, checkpoint, gate, cargo, and/or individuals associated with the apparent violation.)

IV. IMMEDIATE ACTION.

A. When immediate action was taken.

B. Description of immediate action. (This description should outline the immediate steps that were taken to cease the violative action.)

C. Company official responsible for immediate action.
   1. Name.
   2. Position.
   3. Telephone number.

V. ANALYSIS.

A. Summary of evidence. (This summary should describe the scope of the apparent violation and explain how it was detected. In addition, conclusions reached regarding possible or probable systemic deficiencies, i.e., who, what, when, why, and how the noncompliance occurred, should be described.)

B. Reasons why the apparent violation was inadvertent.

C. Supporting documentation. (The evidence associated with the apparent violation should be attached. This evidence should include a statement regarding how the certificate holder, indirect air carrier, foreign air carrier, or PAH determined the extent of the apparent violation.)

VI. COMPREHENSIVE FIX PROPOSAL. The proposed long-term corrective steps to be taken by the certificate holder, indirect air carrier, foreign air carrier, or PAH to preclude recurrence of the apparent violation should be listed in this section. Each corrective step should identify the individual or department responsible for implementing and completing the corrective step as well as the time allotted for completion of each corrective step. Examples of types of questions or issues that a comprehensive fix proposal should address are as follows:

A. Whether the apparent violation involves equipment, facilities, or individuals beyond those addressed in the initial notification and for which immediate action was taken.

B. Whether procedural or organizational changes are necessary.

C. How it will be determined whether any procedural or organizational changes are effective.

D. What procedures will be developed to ensure that the affected area is periodically reviewed in the future so that concerns can be identified before a violation occurs?

E. Who will be responsible for performing periodic reviews?

F. To whom in the certificate holder's, indirect air carrier's, foreign air carrier's, or PAH's organization will the results of those periodic reviews be reported, and how will they be documented?

VII. RESPONSIBILITY FOR MONITORING THE IMPLEMENTATION OF THE COMPREHENSIVE FIX.

A. Name.
B. Position.
C. Telephone number.
D. Signature.

VIII. FAA ACCEPTANCE (TO BE COMPLETED BY THE FAA).

A. Name.
B. Position (principal inspector).
C. Date.
D. Office.
E. Signature.

EXHIBIT F

**HBAT 99-19 and HBAW 99-16 - 14 CFR Part 121 and 135 Air Carrier Safety Departments, Programs, and the Director of Safety**

{New-2000-1}
Joint Flight Standards Handbook Bulletin for Air Transportation (HBAT) and
Airworthiness(HBAW)
EFFECTIVE DATE: 11-30-99
TRACKING: NTSB A-94-201
NOTE: THIS BULLETIN REQUIRES PTRS INPUT. SEE ITEM #6

**1. PURPOSE.** This bulletin provides guidance for principal inspectors and Title 14 of the Code of Federal Regulations (14 CFR) part 121 and 135 air carriers for the development of a comprehensive and effective safety department. Also, guidance is provided on the suggested functions, qualifications, and responsibilities of the Director of Safety position.

**2. BACKGROUND.**

A. In December 1994, Secretary of Transportation Frederico Pena invited senior U.S. aviation officials to meet with him and Federal Aviation Administration (FAA) Administrator David E. Hinson in a safety conference in Washington, DC. More than 1,000 industry, government, and aviation officials met in various working sessions to address aviation safety issues. The major theme of the safety conference was that aviation safety is a shared responsibility. At the conclusion of the conference, participants agreed, among various initiatives, to take immediate and voluntary action to establish flight safety departments within all commercial carriers.

B. In December 1995, the FAA published a final rule which was titled "The Commuter Operations and General Certification and Operations Requirements." In the notice of the final rule, the FAA required that each certificate holder that conducts operations under part 121 have a Director of Safety. This person would be responsible for keeping the highest management officials of the certificate holder fully informed about the safety status of the certificate holder's entire operation. The FAA believes that an independent, full time position is important if at all available or possible. However, the FAA recognizes that in smaller operations, the Director of Safety function might be an additional function of a current manager. Title 14 of the Code of Federal Regulations part 119, section 119.65(b) provides flexibility in the requirements for positions and the number of positions for management personnel, including the Director of Safety.

C. As part of the National Transportation Safety Board's (NTSB) 1994 safety study on commuter airline safety, the NTSB issued safety recommendation A-94-201 to the FAA. In part, this safety recommendation asked the FAA to revise the Federal Aviation Regulations to require that all air carriers operating under parts 121 and 135 establish a safety function, such as outlined

in Advisory Circular (AC) 120-59, Air Carrier Internal Evaluation Programs.

## 3. SAFETY AND EVALUATION PROGRAMS.

A. As a matter of policy, the FAA encourages part 121 and 135 certificate holders to identify, correct, and disclose instances of noncompliance with company procedures and FAA regulations. The FAA has previously developed guidance material (AC 120-59) that encourages certificate holders to develop Internal Evaluation Programs as a tool for continuously monitoring and evaluating practices and procedures. The FAA believes that the development and implementation of a comprehensive and effective safety department that employs Safety and Internal Evaluation Programs will benefit both the certificate holder and the flying public.

B. Each part 121 and 135 air carrier should have a safety department that addresses the broad range of risks involved in commercial aviation to include, but not limited to, flight, maintenance, and ground safety. Since operators vary in both size and scope of operations, it is appropriate to consider such criteria as the kind of operations involved, the number and type of airplanes used, and the areas of operations when determining the size and complexity of a safety department.

C. Any safety program should be designed to prevent personal injury and property losses resulting from accidents and incidents. The primary objectives of a safety program should be to motivate safe actions through establishment of a dynamic corporate safety culture; identify hazards to safe operations; work with other company departments to develop and implement safety interventions; monitor intervention strategies to validate effectiveness; and communicate the results throughout the air carrier.

## 4. DIRECTOR OF SAFETY.

A. FUNCTIONS.

(1) One of the functions of a Director of Safety is to develop and implement a comprehensive safety program. This safety program would include a safety structure and staff that is appropriate to the size of the operator, the kind and scope of operations, and the type and number of aircraft used in its operations. In all cases, it is important for the safety program to emphasize operational safety, including all aspects of flight and ground operations, maintenance programs and passenger safety.

(2) The Director of Safety should ensure that the necessary safety program elements have been developed, properly integrated, and coordinated throughout the air carrier. These elements include:

(a) A safety incident/accident reporting system.

(b) Accident/incident investigation.

(c) Safety audits and inspections.

(d) Internal evaluation program.

(e) Operational risk assessment program.

(f) Open reporting systems.

(g) Routine monitoring and trend analysis programs.

(h) Review of external evaluation programs.

(i) Safety Committee(s).

(3) The Director of Safety should ensure that the safety program has been disseminated to all appropriate personnel and a detailed description of the safety program is incorporated in the appropriate manuals as described in part 121, sections 121.133 and 121.135.

(4) The Director of Safety should ensure that adequate safety program management is maintained.

(5) To the greatest extent possible, the Director of Safety should be autonomous and separate from other departments and report directly to the chief executive.

(6) The Director of Safety should have direct access to the appropriate level of senior management and to all managers/supervisors on safety issues.

(7) The Director of Safety should provide safety concerns and findings to appropriate senior operations managers for appropriate corrective actions.

(8) The Director of Safety should be a primary participant in the development of an internal evaluation program and the resultant safety audit procedures.

(9) For part 121 operations and requirements, the Director of Safety position was established as a full time position responsible for keeping the highest management officials of the certificate holder fully informed about flight, maintenance, and ground safety practices, procedures, and programs of the certificate holder's entire operation.

(10) Although part 135 does not establish a requirement for a Director of Safety position, these operators are still encouraged to designate a company management official or manager to monitor and evaluate flight, maintenance, and ground safety practices, procedures, and programs.

B. QUALIFICATIONS.

(1) Training. It is highly desirable that the Director of Safety complete an aviation safety education program consistent with the position's responsibilities. If an individual has not completed such a program prior to appointment, the Director of Safety should attend one to supplement his/her experience. Participation in industry safety meetings, conferences or schools is considered an essential part of the continuing education of the Director of Safety. Training should also include such subject areas as:

(a) Corporate safety culture.

(b) The role of the safety director as advisor to Senior management officials.

(c) Safety philosophy.

(d) Safety data collection and analysis programs.

(e) Risk management.

(f) Incident/accident prevention and investigation.

(g) Human factors.

(2) Experience. The person assigned as the Director of Safety should have extensive operational experience and professional qualifications in aviation. This would include the knowledge and understanding of the following:

(a) Aviation safety programs.

(b) Aviation safety standards.

(c) Safe aviation operating practices.

(3) Expertise. The person assigned as the Director of Safety should have established professional qualifications. These qualifications may be any of the following:

(a) An FAA commercial pilot or airline transport pilot certificate.

(b) An FAA mechanics certificate.

(c) An FAA aircraft dispatcher certificate.

(d) Three years experience in a supervisory position with a part 121 or a scheduled part 135 air carrier.

(e) Three years experience in a position comparable to paragraph 4.B.3.(d) above in U.S. military aviation operations.

(f) Three years experience in a supervisory position with a U.S. Government department, board, or agency that deals directly with aviation matters.

(4) Knowledge. The person assigned as the Director of Safety should have a full understanding of the following materials with respect to the certificate holder's operation:

(a) The certificate holder's operations specifications.

(b) The manual required by section 121.133.

(c) All appropriate maintenance and airworthiness requirements of 14 CFR chapter I (parts 1 through 199).

C. RESPONSIBILITIES. The Director of Safety responsibilities may include, but not be

limited to, the following:

(1) Monitor and report to senior management on all air carrier activities that may have an impact on safety.

(2) Establish a reporting system which provides for a timely and free flow of safety-related information.

(3) Develop and maintain a database of incident/accident information to monitor and analyze trends.

(4) Monitor and evaluate the various safety and malfunction reporting systems to ensure appropriate integration and evaluation of data.

(5) Investigate and report on incidents/accidents and make recommendations to preclude a recurrence.

(6) Conduct safety audits and inspections.

(7) Solicit and process safety improvement suggestions.

(8) Develop and maintain a safety awareness program.

(9) Review and evaluate the adequacy of the emergency response plan.

(10) Monitor industry safety concerns that may have an impact on operations.

(11) Maintain close liaison with the FAA, NTSB and industry safety organizations and associations.

(12) Discharge their duties to meet applicable legal requirements and to maintain safe operations in accordance with section 119.65.

## 5. ACTION.

A. Within 30 days of receipt of this bulletin, part 121 principal operations inspectors (POI) shall ensure that their assigned air carriers are made aware of the information contained in this bulletin.

B. Part 121 POI's shall review their assigned air carriers' manual(s) to ensure that the duties, responsibilities, and authority of the Director of Safety have been included.

C. Part 121 POI's shall use the guidance material contained in this bulletin when reviewing the qualifications of an individual to serve full time in the Director of Safety position.

D. Part 135 principal inspectors shall encourage their assigned air carriers to develop a safety department, appropriate to the size and scope of operations, that addresses the broad range of risks involved in commercial aviation to include, but not limited to, flight, maintenance and ground safety.

E. Part 135 principal inspectors shall encourage their assigned air carriers to designate a company management official or manager to monitor and evaluate flight, maintenance, and ground safety practices, procedures, and programs.

## 6. PROGRAM TRACKING AND REPORTING SUBSYSTEM (PTRS) INPUT.

A. Principal inspectors shall make a PTRS entry to record the actions directed by this bulletin with each of their assigned part 121 and 135 air carriers as outlined in HBAT 94-08, Program Tracking and Reporting Subsystem (PTRS) Documentation of Action Required by Flight Standards Bulletins. The PTRS entry shall be listed as activity code number 1381 and the "national use" field entry shall be HBAT9919.

B. Principal inspectors shall use the comment section to record comments of interaction with the operators.

## 7. INQUIRIES.

A. AFS-200 and AFS-300 jointly developed this bulletin. Any inquiries from air carriers concerning this bulletin should be directed to their assigned principal inspector.

B. Any other inquiries regarding this bulletin should be directed to Jim Gardner (AFS-200) at (202) 267-9579 or William O'Brien (AFS-300) at (202) 267-3796.

**8. LOCATION.** This bulletin will be incorporated into the appropriate sections of FAA Orders 8400.10 and 8300.10. Until the material is incorporated into the appropriate handbook, inspectors should make written reference of this bulletin in the margin next to sections referencing safety programs and management personnel.

/s/
L. Nicholas Lacey
Director, Flight Standards Service