UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 00-6070-CIV-FERGUSON/ SNOW

PATRICK SCOTT MAJOR,

Plaintiff,

v.

AMERIJET INTERNATIONAL, INC.,

Defendants.

_____/

## NOTICE OF FILING EXHIBITS AND DEPOSITION EXCERPT PAGES
## REFERRED TO IN DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, AMERIJET INTERNATIONAL, INC., by and through its undersigned

counsel, hereby gives Notice of Filing the following Exhibits and Deposition excerpt pages

referred to in its Motion for Summary Judgment, Memorandum of Law in Support of its

Motion for Summary, and Defendant's Filing of Undisputed Facts, which are attached

hereto:

1. Plaintiff's Amended Complaint

2. Exhibit 1, Bate stamped 000070

3. Exhibit 2, Bate stamped 000316

4. Exhibit 3, Bate stamped 000307

5. Exhibit 4, Tape Transcript

6. Deposition of Patrick Scott Major, February 15, 2001, Vol. 1, pp. 97, 109,

110, 114, 115, 119, 124, 145, 146, 147, 148, 154, 156, 157, 159, 160, 163, 164, 189, 190,

201, 209, 219



77900_2

ALLEN, NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

7.      Deposition of Patrick Scott Major, February 19, 2001, Vol. 2, pp. 253, 254,

256, 257, and Defendant's Exhibits 3, 4, 7, 8, and 13

8.      Deposition of John c. Roseborough, February 13, 2001, pp. 4, 5, 9, 10, 61,

62, 63, 68, 80, 81, 87, 92, 93, 94, and 96

9.      Deposition of Derry S. Huff, November 8, 2000, Vol. 1, pp. 38, 39, 48, 49, 80,

81, 82, 83, 84, 100, 101, 116, 117, and 160

10.     Continued Deposition of Derry S. Huff, January 8, 2001, Vol. 2, p. 209 and

Plaintiff's Exhibits 15 and 19

11.     Deposition of David Bassett, February 19, 2001, pp. 16, 17, 18, 38, 39, 40,

50, 51, 52, 53, 65, and 209

12.     Deposition of John W. Washington, January 8, 2001, pp. 10, 11, 13, 14, 19,

20, 36, 37, 40, 41, 42, 43, 44, 50, and 51

13.     Deposition of Al Jorsey, January 24, 2001, pp. 13, 14, 15, 23, 30, 31, 35, 46,

51, 56, 59, 72, 74, 75, 76, 77, and 78

Respectfully submitted,

Susan Potter Norton
Florida Bar No. 0201847
Stephen P. Santiago
Florida Bar No. 0964425

ALLEN, NORTON & BLUE, P.A.
121 Majorca, Suite 300
Coral Gables, FL 33134
Tel: (305) 445-7801

77900_2

2

Fax: (305) 442-1578
snorton@anblaw.com
ssantiago@anblaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via World Courier, on this 12th day of March, 2001, upon:

Ms. Valerie Shea, Esq.
Heinrich Gordon Hargrove Weihe & James
500 East Broward Boulevard, Suite 1000
Ft. Lauderdale, Florida 33394

_____
Attorney

77900_2

3

`

`

`

**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| PATRICK SCOTT MAJOR. | : | CASE NO. 00-6070-Ferguson/Snow |
| | | L.T. Case No. 99-021746-11 |
| Plaintiff. | : | |
| | | |
| vs. | : | |
| | | |
| AMERIJET INTERNATIONAL, INC., | : | |
| | | |
| Defendant. | : | |
| | / | |

## AMENDED COMPLAINT

Plaintiff. Patrick Scott Major. sues defendant, Amerijet International, Inc., (Amerijet) and alleges:

1. This is an action under the Florida Whistleblower Act. Fla. Stats. sections 448.102-.109; the federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634; and Florida Statutes Chapter 760 (the Florida Civil Rights Act).

2. Major is a resident of Broward County.

3. Amerijet is a Florida corporation with its principal place of business in Broward County.

4. Damages in excess of $15,000 are sought, together with injunctive and other equitable relief.

### GENERAL ALLEGATIONS

5. Plaintiff Major was employed by Amerijet from March 1991 until September 1. 1999.

6. Amerijet is a privately-owned company which has been in the air carrier business since 1974. Its primary business is the operation of all-cargo aircraft.

CASE NO 00-6070-Ferguson/Snow

7. Major started with Amerijet as a flight engineer and. in November 1994. was promoted to first officer.

8. Major was periodically reviewed. and was always evaluated as satisfactory to superior in all areas.

9. On several occasions in 1996. 1997. and 1998; and three times in 1999, Major applied for a promotion to the rank of captain. In each instance. Amerijet promoted younger pilots, with less seniority. to the position.

10. In February 1999, Major filed a complaint with the EEOC and FCHR, alleging Amerijet discriminated against him. in the promotion process. on the basis of age. Major further alleged that he had been denied promotion due to having been vocal on prior occasions when Amerijet appeared to be cutting corners on safety.

11. Immediately after Amerijet learned of the EEOC complaint. its management became hostile to Major and began to harass him. In April 1999. Major was falsely accused of having "stalked" another employee.

## JUNE 8, 1999 INCIDENT

12. On June 8, 1999, Major was first officer on Amerijet Flight 823 out of Miami, Florida. serving with Captain Brian Steele. It had rained 10 inches the previous 24 hours, and was still raining when the flight prepared for takeoff. The flight crew was furnished information that reflected the plane's gross weight was 195,300 pounds. On information and belief, the actual weight was greater by at least five thousand pounds.

13. After taxiing out. air traffic control offered the flight runway RW-12; a runway declined by a Continental 727 immediately ahead of Amerijet 823. Major declined that runway and

2

CASE NO. 00-6070-Ferguson/Snow

requested permission to take off from the longest runway to which the Continental flight had just been re-routed. Captain Steele became angry at Major and insisted that he radio back and accept the shorter runway. Major refused; and after some tense moments the flight was cleared to depart from the longer runway.

14. Amerijet departed on 9L, the longer runway, using nearly all of it before becoming airborne. Given the plane's excessive weight and runway conditions, use of the shorter runway may well have resulted in an accident.

15. Captain Steele complained to Amerijet's chief pilot, Derry Huff, concerning Major; and Major submitted written and oral reports as to the incident.

16. Major expressed concern about the facts that Amerijet was relocating to the Ft. Lauderdale airport. with even shorter runways; and that Amerijet's protocols did not adequately address wet runway takeoff performance limits.

## AUGUST 17, 1999 INCIDENT

17. On August 17, 1999, Major was again assigned to fly with Captain Brian Steele, on Amerijet Flight 827 out of Fort Lauderdale.

18. The conditions were again bad. There was intermittent heavy rain on the field, large puddles of water throughout the ramp area. and surrounding thunderstorms.

19. Major recommended that the crew assume a condition of standing water on the runway, requiring a significant weight and decision speed (V-1) reduction. This would have delayed the flight, and was rejected by Captain Steele and the check airman on board.

20. Using the weight and speed reductions is mandatory when there is an official report of standing water. Here, just prior to being cleared for takeoff, the tower reported that there was

3

CASE NO. 00-6070-Ferguson/Snow

standing water. Pursuant to federal aviation regulations, this mandated that the flight comply with the reduced weight and decision speed calculations Major had provided. Amerijet's captain, however, advanced the throttles, released the brakes and commenced takeoff before Major could ask for permission to taxi clear of the runway.

21. The takeoff of Amerijet Flight 827 exceeded aircraft performance limitations and violated FAA regulations, including but not limited to 14 C.F.R. § 91.9; 91.13; 91.103; 91.605; 121.189; 121.537; 121.599; and 121.603. It endangered life and property by taking off from a wet runway in an aircraft that weighed fifteen thousand pounds more than the maximum specified for the circumstances, and into conditions ripe for wind shear.

22. The following day, Major furnished a written report of the incident to Amerijet's chief pilot and Director of Operations; requesting that it be copied to the company's safety officer.

23. Major said in the report that he had submitted a copy of it to the NASA Aviation Safety Reporting System; however, in fact, he held it to allow Amerijet time for corrective action.

24. Major sent a copy of his report to David Bassett, CEO and Designated Safety Officer, on August 25, 1999.

25. Immediately on receipt of Major's report. Huff ordered Major removed from the schedule.

26. On September 1, 1999, Major was abruptly terminated from employment, for the stated reason that Amerijet lost confidence in his ability to perform the duties of an airman.

27. Major filed a second EEOC/FCHR complaint, alleging his termination was in retaliation for his initial EEOC complaint. On December 7 and 8, 1999, the EEOC issued rights-to-sue with respect to both charges. Major has satisfied all administrative prerequisites to his ADEA claims.

4

28. Major has satisfied all administrative prerequisites to his FCRA claims for the matters raised in both EEOC/FCHR charges.

## COUNT I
### VIOLATION OF THE FLORIDA WHISTLEBLOWER ACT, SECTION 448.102 (1). FLORIDA STATUTES

29. This is an action for Amerijet's violations of section 448.102 (1). Florida Statutes. Paragraphs 1-28 are incorporated by reference.

30. Amerijet took retaliatory personnel action against Major because Major disclosed, after warning that he would disclose, Amerijet's practices that violated federal law, including but not limited to FAA regulations.

31. Plaintiff's report to NASA was not made until he had made two written reports to Amerijet concerning the same policy and practice; and had afforded Amerijet a reasonable opportunity to correct the practice.

32. Amerijet's refusal to promote Major, and its abrupt termination of him, were in retaliation for his complaints concerning unsafe and illegal practices at Amerijet.

WHEREFORE, plaintiff demands the remedies of section 448.103 (3) as follows:

(a)    an injunction against Amerijet's continued violation of the subject acts;

(b)    reinstatement of his position;

(c)    reinstatement of full fringe benefits and seniority rights;

(d)    compensation for lost wages, benefits, and other remuneration;

(e)    other compensatory damages including but not limited to damages to reputation; embarrassment, mental anguish and humiliation;

5

(f)    attorney's fees and costs pursuant to section 448.104, Florida Statutes;

(g)    plaintiff reserves the right to amend to add a claim for punitive damages; and

(h)    all other interests, costs, or damages allowable in law or equity.

## COUNT II
## VIOLATION OF THE FLORIDA WHISTLEBLOWER ACT,
### SECTION 448.102 (3), FLORIDA STATUTES

33.    This is an action for Amerijet's violation of section 448.102(3), Florida Statutes. Paragraphs 1 - 28 are incorporated by reference.

34.    Major objected to, or refused to participate in, activities, and practices of Amerijet which violated federal law, including but not limited to FAA regulations. Specifically, on June 8 and August 17, 1999, Major objected to Amerijet's overweight takeoff under unsafe conditions; a practice of Amerijet that violates federal regulations.

35.    Major's Amerijet employment was terminated in retaliation for his objection to, and refusal to participate in, the illegal activities and practices directed by Amerijet in the June and August 1999 incidents; as well as for his earlier complaints and opposition to directions which would require him to violate federal regulations.

WHEREFORE, plaintiff demands the remedies of section 448.103 (3) as follows:

(a)    an injunction against Amerijet's continued violation of the subject acts;

(b)    reinstatement of his position;

(c)    reinstatement of full fringe benefits and seniority rights;

(d)    compensation for lost wages, benefits, and other remuneration;

(e)    other compensatory damages including but not limited to damages to reputation; embarrassment, mental anguish and humiliation;

6

(f)    attorney's fees and costs pursuant to section 448.104, Florida Statutes:

(g)    plaintiff reserves the right to amend to add a claim for punitive damages; and

(h)    all other interests. costs, or damages allowable in law or equity.

## COUNT III
## VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT,
## 29 U.S.C. §§ 621-634

36. This is an action for Amerijet's violations of the Age Discrimination in Employment Act, U.S.C. §§ 621-634; as amended by the Older Workers' Benefits Protection Act of 1990. Paragraphs 1 through 28 are incorporated by reference.

37. Major was born in 1953 and is therefore in the protected class of workers older than age 40.

38. Between 1996 and 1999, Major applied to be promoted to captain at Amerijet.

39. Major at all times was eligible for promotion to the position of captain. As of December 1998. Major was fully qualified for the position of captain.

40. Major was not promoted. Amerijet promoted younger employees who are not in the protected class: who are junior to Major; and whose qualifications are inferior to Major's.

41. Amerijet's failure to promote Major is due to a pattern and practice of age discrimination.

WHEREFORE, plaintiff demands the remedies allowable by statute:

(a)    an injunction against Amerijet's continued violation of the subject act;

(b)    reinstatement of Major and promotion to the position of captain;

(c)    award of full fringe benefits and seniority rights associated with the position;

7

CASE NO. 00-6070-Ferguson/Snow

(d)     compensation for back pay and front pay:

(e)     liquidated damages based on Amerijet's willful violation;

(f)     attorney's fees and prejudgment interest and all costs; and

(h)     all other relief as the court deems just.

## COUNT IV
## VIOLATION OF THE ADEA ANTI-RETALIATION PROVISION

42.  This is an action for violation of the ADEA anti-retaliation provision, 29 U.S.C. §623(d). Paragraphs 1 through 28 are incorporated by reference.

43.  Major opposed unlawful age discrimination practices at Amerjet, and made a charge to the EEOC and FCHR.

44.  Following the EEOC/FCHR complaint, Major suffered adverse employment action by being harassed, intimidated, subjected to a hostile work environment and eventually by being terminated.

45.  Major's termination, and the other conduct described above, was causally related to his statutorily protected activity.

WHEREFORE, plaintiff demands the remedies allowable by statute:

(a)     an injunction against Amerijet's continued violation of the subject acts;

(b)     reinstatement of Major to his position as a first officer;

(c)     award of full fringe benefits and seniority rights associated with the position:

(d)     compensation for back pay and front pay:

(e)     liquidated damages based on Amerijet's willful violation;

(f)     attorney's fees and prejudgment interest and all costs; and

(h)     all other relief as the court deems just.

## COUNT V
### VIOLATION OF FLORIDA CIVIL RIGHTS ACT, FLA. STATS. CHAPTER 760

46.    This is an action for violation of Florida Civil Rights Act, §§ 760-01-.11, Florida Statutes. Paragraphs 1 through 28 are incorporated by reference.

47.    Major was born in 1953 and is therefore in the protected class of workers older than age 40.

48.    Between 1996 and 1999, Major applied to be promoted to captain at Amerijet.

49.    Major at all times was eligible for promotion to the position of captain.  As of December 1998, Major was fully qualified for the position of captain.

50.    Major was not promoted.  Amerijet promoted younger employees who are not in the protected class; who are junior to Major; and whose qualifications are inferior to Major's.

51.    Amerijet's failure to promote Major is due to a pattern and practice of age discrimination.

WHEREFORE, plaintiff demands the remedies allowable by statute:

(a)     an injunction prohibiting age discrimination;

(b)     an order providing affirmative relief from the effects of prior age discrimination, including back pay;

(c)     compensatory damages, including but not limited to damages, for mental anguish, loss of dignity, and other intangible injuries;

(d)     punitive damages pursuant to §760.11(5);

(e)     costs and attorney's fees; and

9

CASE NO. 00-6070-Ferguson/Snow

(f)    such other relief as the court deems just.

## COUNT VI
## VIOLATION OF THE FCRA ANTI-RETALIATION PROVISION

52. This is an action for violation of the FCRA anti-retaliation provision, section 760.10(7),

Florida Statutes. Paragraphs 1 through 28 are incorporated by reference.

53. Major opposed unlawful age discrimination practices at Amerjet, and made a charge to

the EEOC and FCHR.

54. Following the EEOC/FCHR complaint, Major suffered adverse employment action by

being harassed, intimidated, subjected to a hostile work environment and eventually by being

terminated.

55. Major's termination, and the other conduct described above, was causally related to his

statutorily protected activity.

WHEREFORE, plaintiff demands the remedies allowable by statute:

(a)    an injunction prohibiting age discrimination;

(b)    an order providing affirmative relief from the effects of prior age discrimination,

including back pay;

(c)    compensatory damages, including but not limited to damages, for mental anguish,

loss of dignity, and other intangible injuries;

(d)    punitive damages pursuant to §760.11(5);

(e)    costs and attorney's fees; and

(f)    such other relief as the court deems just.

CASE NO. 00-6070-Ferguson/Snow

PLAINTIFF DEMANDS A TRIAL BY JURY .

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished via United

States Mail to: **SUSAN POTTER NORTON, ESQUIRE** and **STEPHEN P. SANTIAGO,**

**ESQUIRE.** Attorney for Defendant, of Allen, Norton & Blue, P.A.. 121 Majorca. Suite 300.

Coral Gables, FL 33134, this 25th day of April. 2000, and will be deemed served as of the date of

the order granting plaintiff's motion to amend.

HEINRICH GORDON HARGROVE
WEIHE & JAMES. P.A.
Attorneys for Plaintiff
500 East Broward Boulevard. Suite 1000
Fort Lauderdale. FL 33394
Telephone: 954/527-2800
Facsimile: 954/524-9481

By:_____

VALERIE SHEA
Florida Bar No. 436800

vjr-G:\LAW 81975\002\Pleadings complaint002 doc

11

**2**

77578_1



February 5, 1999

Mr. Pat Major
1722 W. Las Olas Blvd.
Ft. Lauderdale, FL 33312

Dear Pat:

I would like to begin by saying that I value you very highly as an employee and recognize the contribution that you have made to the company during your tenure with Amerijet.

I know that it has long been your desire to become a Captain at Amerijet. I have had numerous and lengthy discussions with the training department and flight department personnel, and it is abundantly clear that they do not feel you are capable of filling this position safely. I have full trust and confidence in the judgement of my senior staff members and will uphold their recommendation.

I take my responsibility to all of my employees, to the insurance company, and to myself very seriously, and cannot in good conscience allow you to become a Captain here at Amerijet. Based upon what I've learned, and what I know, the decision is made and my position will not change. I would like to make it abundantly clear that the safety of the aircraft and crew is my first responsibility, and you as a Captain are a risk I am not willing to take.

Pat, I know you have worked hard and I would like you to continue working for Amerijet in your current capacity. Ultimately, you will have to decide whether this is what you want, and I will support whatever decision you choose to make.

Sincerely,

David G. Bassett
Chairman & CEO

**EXHIBIT**

1

000070

498 S.W. 34TH STREET, FORT LAUDERDALE, FL 33315 • (954) 359-0077 • FAX: (954) 359-7866 • http://www.amerijet.com

CARGO *IS* OUR BUSINESS

**3**

| CREWMEMBER NAME | Date of Hire as Captain | D.O.B. |
|---|---|---|
| LATORRE, JOSEPH G. | 11/11/1996 | 01/18/1942 |
| LYTLE, RICHARD | 03/31/1997 | 07/09/1942 |
| KORBY, JAMES | 07/23/1997 | 04/06/1943 |
| GUZMAN, LEONIDAS | 07/23/1997 | 12/24/1949 |
| McGRAY, BRUCE | 09/08/1997 | 09/14/1946 |
| ALVAREZ, JR. JOSE | 09/10/1997 | 09/17/1946 |
| MILLER, JOHN | 12/03/1997 | 05/22/1948 |
| RUBEY, ALBERT | 03/09/1998 | 11/28/1942 |
| REPLOGLE, JAMES | 03/22/1999 | 11/26/1948 |

EXHIBIT

tabbies

2

000316

**4**



Page:       5
Issued:     12/21/98
Revision:   37

GENERAL OPERATIONS MANUAL

DUTIES/RESPONSIBILITIES

CAPTAIN

The captain is responsible to the Chief Pilot. When on duty, the captain is in full command of the aircraft and crew. He shall have full authority and responsibility for the safe and efficient conduct of the flight. Such authority commences at the time the crew reports for duty, continues while enroute, at the intermediate points, and until the crewmembers have gone off duty for crew rest. While in command of the aircraft, the captain may be relieved of command only by the Vice President of Operations, the Chief Pilot or their designee. He is responsible for compliance with Federal Aviation Regulations and Company Policies and Procedures. He shall ensure that the aircraft to which he is assigned is airworthy, properly and adequately serviced and that the loading is proper and secure. He shall make himself familiar with the route and reports that or which indicate the flight can be made safely. He is responsible to insure that all checklists and company forms are completed as required by the company. At any station where the company does not maintain a maintenance base, the captain will act as company representative.

FIRST OFFICER

The first officer is administratively responsible to the Chief Pilot and functionally responsible to the captain of the flight. The first officer is second-in-command of the flight. While acting in this capacity, he shall comply with all regulations and directives pertaining to the conduct of the flight in a manner suitable to the captain. He is responsible for ensuring that all required manuals, enroute charts, terminal and approach charts are up to date with the latest revision and aboard the aircraft. The First Officer will observe the cargo loading operation. He shall confirm that the aircraft and the load plan are in agreement. He shall perform all functions as assigned by the captain.

SECOND OFFICER

The second officer is administratively responsible to the Chief Pilot and functionally responsible to the captain of the flight. Any action taken by the second officer while on duty will be at the captain's request, or with his know-ledge and approval. He is responsible for the mechanical pre-flight acceptance and servicing of the aircraft and the safe and efficient operation of the air-craft components and equipment over which he has control. He shall keep the captain informed of the mechanical condition of the aircraft and components. He is responsible for inspecting, supervising or assisting in the performance of any maintenance or servicing required by the aircraft at enroute stations where company maintenance personnel are not available.

ADDITIONAL RESPONSIBILITIES FOR ALL CREWMEMBERS

It is the responsibility of every crewmember to ensure that their manuals are current. Therefore, all manual revisions must be read, inserted and fully understood before a crewmember may take their next flight.

EXHIBIT

3

000307

`

`

**5**

`

August 1999
Amerijet International Flight #827
  Capt:   Brain Steele
  FO:     Patrick Major
  FE:     Brett Wise

**KEY**

AJT = Amerijet
GRD = Ft. Lauderdale ground controller
TWR = Ft. Lauderdale tower controller
RAMP 1 = Broward County Aviation Department

---

Ft. Lauderdale Ground Controller Transcripts

---

AJT 827: Hello Lauderdale ground Amerijet 827.
GRD: Amerijet 827 Fort Lauderdale.
AJT 827: Yes ma'am just sitting here on our ramp seriously considering the possibility of starting engines, are we looking at a delay ahead or what?
GRD: Actually all the aircraft that are in that line up right there are uh are holding on the ground for pilot's discretion reference the weather.
AJT 827: Understood ma'am, and what is the runway condition right now?
GRD: The runway condition is wet, we don't have any reports of the braking action.
AJT 827: Roger ma'am 827 appreciate it.

(22 SECOND DELAY)

GRD: And ramp one Lauderdale.
RAMP 1: Ramp one.
GRD: Yeah ramp one, were gonna need a standing water report of nine left when you get a chance.
RAMP 1: Ok roger, as soon as I conclude this escort.
GRD: Yeah.

(1 MINUTE 12 SECOND DELAY)

AJT 827: Ground Amerijet 827 request taxi please.
GRD: Amerijet 827 hold short of taxiway bravo and standby.
AJT 827: Roger, turn right and hold short of bravo 827 standing by.
RAMP 1: And Lauderdale ground Ramp one out at the Jet center ramp uh hold short uh Quebec or hold short of nine left at Quebec.
GRD: Ramp one hold short of runway nine left.
Ramp 1: Ramp one.
AJT 827: Ground Amerijet 827, what's your current winds?
GRD: Uh wind zero three zero at one three.
AJT 827: Thank you very much.
GRD: And Amerijet 827, uh will you be able to depart?

(4 SECOND DELAY)

AJT 827: Yes ma'am, Amerijet 827.
GRD: And Amerijet 827 taxi to runway niner left and uh you can plan to hold at the first intersection, tower will give you a back taxi to full length.
AJT 827: Taxi nine left hold at the first intersection go to tower Amerijet 827.
RAMP 1: And ground Ramp one.
GRD: Ramp one proceed on nine left.
RAMP 1: Cleared down nine left Ramp one.
GRD: And Amerijet 827 if you can uh you can except departure you can switch over to tower one one niner point three.
AJT 827: Nineteen three, Amerijet 827.



**EXHIBIT**
4

*NOTE: THIS REPORT FROM RAMP ONE TO THE GROUND CONTROLLER WOULD NOT HAVE BEEN HEARD ON THE FLIGHT DECK OF AMERIJET 827. THIS IS BECAUSE THEY HAVE CHAGED FREQUENCIES OVER TO TOWER. THE GROUND CONTROLLER MUST RELAY THE INFORMATION TO THE TOWER CONTROLER THEN HE/SHE PASSES THAT INFORMATION TO THE CREW OF AMERIJET 827 OVER THE TOWER FREQENCEY.*

RAMP 1: And ground ramp one clear of nine left.
GRD: Ramp one roger, and uh did you did you have any standing water?
RAMP 1: And standby.
RAMP 1: Ok ready to copy?
GRD: Yes sir.
RAMP 1: Ok I have less than a quarter of an inch ah good drainage however there are some slight standing water ah about six feet on either side of the center line.

(23 SECOND DELAY)

RAMP 1: Ground did ya copy?
GRD: Yes sir I've got it, thank you.
RAMP 1: Ok roger thank you for your help I'll clear the airfield.
GRD: Roger.

---
Ft. Lauderdale Tower Transcripts
---

AJT 827: Tower Amerijet 827 on your frequency with you sir.
TWR: Amerijet 827 Lauderdale are ready for departure?
**(NO DELAY IN TRANSMITION)**
AJT 827: Yes sir 827. you'll pass on that runway report when you get it right?
TWR: Yeah, he's out there inspecting it right now.
TWR: Amerijet 827 uh, runway niner left, uh, you can go out bravo two back taxi into position and hold.
AJT 827: Bravo two back taxi into position and hold, Amerijet 827, thank you sir.
TWR: Amerijet 827 he reports there's some standing water less than a quarter of an inch.
AJT 827: Some standing water less than a quarter of an inch, Amerijet 827, **READY FOR TAKEOFF**.
TWR: Amerijet 827 runway nine left turn right heading one one zero cleared for takeoff.
TWR: Amerijet 827 runway nine left turn right heading one one zero cleared for takeoff.
AJT 827: Right heading one one zero, cleared for takeoff, Amerijet 827 thank you now.
TWR: Amerijet 827 change your code to one one five three.
AJT 827: One one five three, 827.
TWR: Thank you, contact Miami departure.
AJT 827: See ya now 827.

August 1999
Amerijet International Flight #827
Capt: Brain Steele
FO:    Patrick Major
FE:    Brett Wise

Ft. Lauderdale Tower Transcripts

AJT 827: Tower Amerijet 827 on your frequency with you sir.

TWR: Amerijet 827 Lauderdale are ready for departure?
**(NO DELAY IN TRANSMITION)**

AJT 827: Yes sir 827. you'll pass on that runway report when you get it right?

TWR: Yeah, he's out there inspecting it right now.

TWR: Amerijet 827 uh, runway niner left, uh, you can go out bravo two back taxi into position and hold.

AJT 827: Bravo two back taxi into position and hold, Amerijet 827, thank you sir.

TWR: Amerijet 827 he reports there's some standing water less than a quarter of an inch.

AJT 827: Some standing water less than a quarter of an inch, Amerijet 827, READY FOR TAKEOFF.

TWR: Amerijet 827 runway nine left turn right heading one one zero cleared for takeoff.

AJT 827: Right

**6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6070-CIV-FERGUSON

PATRICK SCOTT MAJOR,

       Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,

       Defendant.

**ORIGINAL**

_____/

One East Broward Blvd.
Fort Lauderdale, Florida
Friday, 9:45 a.m.
February 15, 2001

VIDEOTAPED DEPOSITION

OF

PATRICK MAJOR

taken on behalf of the Defendant
pursuant to a Notice of Taking Deposition
- - -

**FRIEDMAN, LOMBARDI & OLSON**

```
 1   spiritually oriented -- what I would consider to be
 2   insightful types of documents that I might use if I were
 3   at church giving the meditation that day or giving the
 4   talk.  I would write that talk or that meditation.
 5            Other than that, it would be a newsletter in
 6   conjunction with my activities either at work or at
 7   church or what have you.
 8       Q    Again, I'm excluding work.
 9       A    That's about it.
10       Q    You joined Amerijet in I think March of '91?
11       A    That's correct.
12       Q    And you went through the flight engineer
13   training program?
14       A    That's correct.
15       Q    What did that consist of, to the best of your
16   memory?
17       A    It consisted of orientation to the systems of
18   the Boeing 727, the duties and responsibilities of flight
19   engineers.  I'm sure there was a basic indoctrination,
20   which is a term specifically described in the Federal
21   Aviation Regulations, required of all air carriers.
22       Q    Do you have a copy of the FARs?
23       A    Yes.
24       Q    Would you receive a copy when you went to
25   Amerijet, or is that just something you have?
```

FRIEDMAN, LOMBARDI & OLSON

1    Q    Do you remember who was involved?

2    A    Ed Cook.

3    Q    Anybody else?

4    A    Other individuals who were showing up for both

5    new-hire training and upgrade training.

6    Q    Is it your contention that it was cancelled

7    because you showed up?

8    A    No, ma'am.

9    Q    You're not saying it was cancelled because of

10   you?

11   A    No, ma'am.

12   Q    Was that before or after your discussion with

13   Ed Cook sometime in the fall of '94?

14        MS. SHEA:  Object to the form, lack of

15        time frame.  Why would it be fall of '94?

16   A    That may have been before '94 and I don't

17   recall dating my discussion with Ed Cook in the fall of

18   '94.  I think it might have been sometime prior.

19   Q    Do you remember when your first discussion with

20   Ed Cook was on that subject?

21   A    No, I don't.

22   Q    Do you remember being offered the opportunity

23   to upgrade on the Falcon?

24   A    Yes, I do.

25   Q    And you declined that?

FRIEDMAN, LOMBARDI & OLSON

```
 1         A    I did.
 2         Q    And you declined it because you didn't want to
 3   have to go three weeks away from home without expenses
 4   paid for?
 5         A    That's part of the reason.
 6         Q    What was the other reason?
 7         A    I had some frame of reference with regard to
 8   what happens to flight crews out on the road with
 9   Amerijet, having been based in Miami.  I had also been
10   based in New Orleans and from time to time had accepted
11   temporary assignments throughout the Amerijet system and
12   the assignments away from Miami were unsatisfactory.
13         Q    Okay.  You didn't want to be assigned away from
14   Miami?
15         A    That was part of the reason and the other part,
16   if I may, was that I had a sense that the Falcon program
17   was soon to be dismantled.
18         Q    But you were offered that opportunity?
19         A    I was.
20         Q    The class that you're talking about that was
21   being discontinued, did that deal with Steve Schubert?
22         A    Yes.
23         Q    The aborted class?
24         A    Yes.
25         Q    Does the time period of April, '93, does
```

FRIEDMAN, LOMBARDI & OLSON

```
 1          identification as Defendant's Exhibit 3.)

 2     Q     Do you have that in front of you?

 3     A     Yes, I do.

 4     Q     Take a minute and look at that.

 5     A     Is there something specific you want --

 6     Q     No.  I just wanted to ask you if that refreshes

 7   your memory as to any other discussions you might have

 8   had with Mr. Cook or Mr. Pete Steele about the subject of

 9   promotion to first officer.

10     A     Any other discussions about that one in

11   particular?  I think that's pretty complete.

12     Q     Well, my question to you is does that refresh

13   your memory as to any other discussions?

14     A     Insofar as it's described here, yes.

15     Q     So it doesn't refresh it; you just remember

16   writing this letter and what is detailed there?

17     A     Right.

18     Q     In this Exhibit 3, you seem to express

19   frustration with the fact that they are hiring from the

20   outside through Falcon and then coming into Boeing.  Is

21   that it?

22     A     I think the letter is explicit.  Initially the

23   people were hired into the Falcon program as it's

24   described here, with the explanation that they were two

25   separate operations, each with its own upgrade policy.
```

FRIEDMAN, LOMBARDI & OLSON

1   They were just separate and distinct.

2           Later and what was a marked departure from that

3   policy and was perceived by many, including myself, as

4   being an unfortunate retraction of Amerijet's earlier

5   assurances to its flight crew, the Falcon program became

6   a prerequisite for upgrade opportunities, certain upgrade

7   opportunities in the Boeing, which had the effect of

8   placing more senior employees behind less senior

9   employees.

10      Q    Well, look at your fourth paragraph, unless you

11  count "thank you" as the beginning paragraph.  "Despite

12  the temptation of an employment pool rich with

13  qualifications and experience, Amerijet's decision should

14  reflect the loyalty of existing flight crew."

15          In other words, it seems to me your complaint

16  is that they're hiring qualified people from the outside

17  rather than promoting from within?

18      A    No, ma'am.  I make reference to hiring from

19  outside and how, were that had been done with the Boeing,

20  particularly hiring captains directly into the left seat,

21  much of that experience had proven very unsatisfactory

22  from the company standpoint.  So there was a reference

23  made to that.

24          There's also a reference made to -- when I say

25  loyalty of the existing flight crew, the seniority of

FRIEDMAN, LOMBARDI & OLSON

1    Steele dated 10/19/94.

2        Q    All right.  And in this letter you now are

3    raising the issue that more junior individuals are being

4    promoted to first officer instead of you.  Do you recall

5    that?

6        A    Yes.

7        Q    Do you recall it independently of this letter?

8        A    Yes.

9        Q    And who specifically do you recall being

10   promoted to first officer ahead of you that you contend

11   was junior?

12       A    I see one name here, and this is included in

13   the document, John Washington Jr.

14       Q    John Washington Jr. was more senior than you,

15   was he not?

16       A    No.

17       Q    Are you saying that Mr. Washington had not been

18   with Amerijet longer than you had?

19       A    If you're speaking of John Washington Sr., yes.

20       Q    Jr.

21       A    No, John Washington Jr.'s seniority with regard

22   to the flight crew was an issue that someone had asked

23   about at one of the many meetings we had and as he

24   indicated the other day in his own deposition, his

25   seniority for flight crew purposes began with his full

FRIEDMAN, LOMBARDI & OLSON

1   told or have been -- insofar as like we're talking about

2   such things, I have a vague idea or at least a rumored

3   idea, rumored notion of what a person's qualifications

4   and background are.

5       Q    So you would have no knowledge of his

6   qualifications?

7       A    Right.

8       Q    Thank you.  It was shortly after you first

9   raised this idea of age discrimination that you in fact

10  were successfully upgraded to first officer, were you

11  not?

12          MS. SHEA:  Object to the form of the

13      question.  I don't see that age discrimination

14      is raised in this document, unless you do.

15          MS. NORTON:  He's already suggested it

16      could be there.

17          MS. SHEA:  We'll let the testimony speak

18      for itself on that.

19          MS. NORTON:  Fine.

20      Q    After your letter of October of '94 you became

21  first officer, correct?

22      A    Yes, ma'am.

23      Q    It was in November, I believe, you filled out a

24  contract.  Do you remember that?

25      A    Sounds right.

FRIEDMAN, LOMBARDI & OLSON

 1          Plaintiff's.

 2                MS. NORTON:  I'm sorry, Major's.

 3                THE COURT REPORTER:  Defendant's Exhibit

 4          7.

 5                MS. SHEA:  I don't know.  She didn't want

 6          to call it Defendant's exhibits either.  I

 7          don't know what we're doing here.

 8                MS. NORTON:  I'm just calling it Major's

 9          Exhibit 7.

10                THE COURT REPORTER:  It's Defendant

11          Major -- I'm sorry, it's not Defendant Major.

12          It's Defendant's Exhibit 7.

13                MS. SHEA:  Okay.  Do it your way.  Won't

14          be a clear record, but --

15                (The document referred to was marked for

16          identification as Defendant's Exhibit 7.)

17          Q     Mr. Major, would you look at that?  I believe

18     this is something that your attorney produced to me.  In

19     fact, I'm sure it's something your attorney produced to

20     me, and it looks like your notes of the meeting on

21     February 11th.  Is that correct?

22          A     Yup.

23          Q     Did this conversation take place on

24     February 11th, 1997?

25          A     I reckon it did, by virtue of the document

FRIEDMAN, LOMBARDI & OLSON

1    here.

2        Q    So then Tuesday, February 11th would have been

3    the date of the meeting, not necessarily the date you

4    wrote the memo?

5        A    More than likely, but it's not a memo.  It's a

6    note to myself, as I described it earlier.  The date

7    there shows the meeting.  15:30, asked me to come to a

8    meeting.

9        Q    And Ed, Wayne and you were in the meeting room.

10   Anybody else, to your recollection?

11       A    There was no one else.

12       Q    At this particular meeting, Ed told you that it

13   was Dave's opinion that you would not be promoted now or

14   in the foreseeable future.  He didn't think you would

15   make a good captain, but that you were welcome to

16   continue on as first officer.  Is that accurate?

17       A    I believe that is.

18       Q    Now, if you turn to the next page, it looks

19   like on February 17 it looks like you were offered an

20   exit package?

21       A    The exit package was offered the same day.

22       Q    The same day, okay.  So is the 17th the eight

23   days later that you had to sign or why the 17th?

24       A    The note on the 17th says -- there's a small X

25   and then the capital letters, "FU", Fox trot uniform,

FRIEDMAN, LOMBARDI & OLSON

1    "Wayne Penny re: release." That's follow up. That means

2    follow up Wayne Penny with reference to a release.

3        Q    Okay.

4        A    He had provided to me a pile of legal

5    documentation, asking me to waive all rights to any kind

6    of age discrimination claim, etc., in order for me to

7    be -- to accept or to be offered, you could say, granted

8    the exit package that you referred to earlier.

9        Q    Well, do you have any knowledge that the

10   company routinely would offer an exit package at this

11   level?

12       A    I do not.

13       Q    So they were offering you something that you

14   would not normally receive, to your knowledge, if you

15   chose to leave the company and accept it?

16       A    I don't have any idea.

17       Q    One way or the other?

18       A    I don't know.

19       Q    Okay. But you had the option of staying?

20       A    Yes.

21       Q    This was just a way if you wanted to leave?

22       A    If I wanted to leave and take the exit package,

23   all I had to do was agree that I would never bring any

24   kind of a claim with respect to their behavior toward me

25   in applying for promotions.

FRIEDMAN, LOMBARDI & OLSON

1           Q    Right.  Now, you also could leave and file

2    whatever charges you want, couldn't you?

3           A    Correct.

4           Q    So what they were offering is money if you

5    chose to leave, in exchange for you signing a contract or

6    agreement?

7           A    Correct.

8           Q    It was your option one way or the other?

9           A    Correct.

10          Q    Then it was subsequent to that -- let's go off

11   the record one second.

12               (Discussion off the record.)

13          Q    Mr. Major, do you recall sometime in February

14   of '97 you also filed an EEOC charge alleging age

15   discrimination for your failure to be promoted?

16          A    Yes, I did.

17          Q    Sometime after being advised you would not be a

18   captain -- or excuse me, after your conversation with Ed

19   Cook February 11th, wherein he indicated that Dave

20   Bassett did not consider you promotable, do you remember

21   providing the company a letter that you had written

22   previously in which you referenced that you were, in your

23   opinion, being the victim of age discrimination?

24          A    No, I do not.

25          Q    Let me show you what I'm going to mark as Major

FRIEDMAN, LOMBARDI & OLSON

```
 1        A      I believe it was written, yes.

 2        Q      Now, it was subsequent to your complaints in

 3   that letter of age discrimination that in fact, you were

 4   awarded the bid to upgrade to captain, were you not?

 5        A      Subsequent to this?

 6        Q      Yes.

 7        A      Yes.

 8        Q      And in fact, in May of '98 I believe you

 9   submitted a bid for the position of captain?

10        A      Right.  That's two years later.

11        Q      How do you figure May of '98 is two years after

12   February of '97?

13        A      This is February, '97 -- okay, I was thinking

14   '96, December 18th, '96.  Right, I had gone on -- okay.

15   In May of '98, that would be correct.

16        Q      What positions between February of '97 and May

17   of '98, if any, did you submit a bid for?  Let me

18   rephrase that.

19               Did you submit the bid for captain upgrade

20   prior to May of '98?

21        A      Yes, ma'am.

22        Q      Okay, when?

23        A      Continuously.  I had a discussion with -- if

24   memory serves, with -- in fact, Ed came out to visit

25   Dolphin Holiday and indicated that he was aware that I
```

FRIEDMAN, LOMBARDI & OLSON

1    perception of your qualifications?

2        A    There could be on the one hand no dispute with

3    regard to my qualifications.  They're exemplary.

4        Q    On what basis, Mr. Major, other than your

5    opinion?

6        A    On the basis that I had at the time all of the

7    stated criteria and that some of the people who were

8    promoted didn't even satisfy the -- to captain, did not

9    even satisfy the criteria for promotion to first officer.

10       Q    Who?

11       A    That would be John Washington Jr.

12       Q    Anybody else?

13       A    Not that comes immediately to mind.

14            To further answer your question, all of the

15   people who had been promoted were under age 40.  The only

16   people over age 40 being made captain were people who

17   were hired from outside the company.  The company was

18   reluctant -- appeared reluctant by virtue of its practice

19   to provide such training to candidates over 40.  The only

20   other individual that I can recall having been given that

21   opportunity had been discharged.

22       Q    Who were the other first officers over 40 that

23   were applying for the position of captain?

24       A    I don't recall.

25       Q    Do you know if there were any?

FRIEDMAN, LOMBARDI & OLSON

```
 1        A     I think I made reference to some in here, so
 2   apparently I did.
 3        Q     So in Exhibit 8?
 4        A     Exhibit 8, yes.
 5        Q     It would have them in there?
 6        A     I don't think it says their names.  It just
 7   says --
 8        Q     But during this time period?
 9        A     "Instead of creating a nurturing and empowering
10   environment" -- okay.  To answer the question, I can't
11   find the answer, but there's a reference made to first
12   officers, other first officers not being promoted in
13   there, and that's what I'm drawing that on.
14        Q     So whatever information you have would be
15   contained in Exhibit 8?  As you sit there now, you don't
16   have any independent recollection of anyone else that was
17   a first officer that was over 40 and applied for the
18   position of captain and did not get it?
19        A     No, I do.
20        Q     Okay, who?
21        A     That would be Fred Edalatti.
22        Q     Fred -- can you spell it?
23        A     F-R-E-D.  Spell the last name?
24        Q     Yes, please.
25        A     E-D -- I believe it's A -- it's an Iranian
```

FRIEDMAN, LOMBARDI & OLSON

1   from what Ed described -- he said after that critique,

2   it's such a crucial part of the flight, it would have

3   been in what's called a sterile cockpit environment, the

4   individual was no longer capable of flying the approach,

5   prompting --

6        Q    Mr. Major, my question was did he quit or was

7   he fired?

8        A    You asked me what happened.

9        Q    Yes, that was my question.  Did he quit or was

10  he fired?

11       A    I don't know.

12       Q    Okay.  Was he still there when you left?

13       A    He left the company immediately after that.

14       Q    Anyone else?

15       A    Not that comes right away to mind.

16       Q    The individuals that were hired that were over

17  40 into the captain position, they too had to go through

18  an IOE?

19       A    Very reduced training program, yes, and a

20  reduced IOE, yes.

21       Q    But that would also be conducted by Ed Cook?

22       A    Oh, no, hardly ever.

23       Q    Who would conduct it?

24       A    They would be conducted by any of several check

25  airmen, depending on the needs of the company and the

1    urgency to get them qualified, they may be perfunctory in

2    nature.

3        Q    Perfunctory?  Aren't there specific FAR

4    requirements as to what is required?

5        A    Oh, absolutely.

6        Q    But you are aware during this time period that

7    individuals over 40 were hired into the captain seat?

8        A    I am.

9        Q    You went through recurrent training as a flight

10   officer in May of '98; is that correct?

11       A    Yes.

12       Q    And then your bid was accepted for upgrade to

13   captain in May of '98 and you went again to ground school

14   for that position as an upgrade?

15       A    That's the way I recall it, yes.

16       Q    And that was another 40 hours?

17       A    I don't know.

18       Q    You don't remember?

19       A    No, ma'am, and up to this point I've been

20   unable to find any documentation that it ever took place.

21       Q    And you have no recollection?

22       A    I recall being in the ground school.

23       Q    You've wanted this position for how many years

24   and you don't remember the training you went through?

25                MS. SHEA:  Objection, argumentative.  You

FRIEDMAN, LOMBARDI & OLSON

```
 1        A     Assuredly, no.  I remember it would have been
 2   around June of that same year.
 3        Q     And how soon after you finished that did you go
 4   to the FAA oral with Barney?
 5        A     I'm not certain.
 6        Q     And Ed Hoffman, did he finish the course?
 7        A     No.
 8        Q     And when did he leave?
 9        A     He just stopped showing up for the class.
10        Q     Do you know why?
11        A     No.
12        Q     Did the other first officers continue to show
13   up?
14        A     Yes.
15        Q     During this class were there any videos or was
16   it all instruction?
17        A     There were quite a few videos.
18        Q     Do you remember any of the videos?
19        A     They would have been in the same content of the
20   ones I described before.
21        Q     And after -- what was the process from the last
22   day of ground school to appearing before the FAA
23   examiner, Barney Sonnen?  What happened?
24        A     You want to know what happened to me or you
25   want to know the process?
```

FRIEDMAN, LOMBARDI & OLSON

```
 1        Q    Well, I want to know exactly what happened to
 2   you.
 3        A    I went to two or three -- I believe it was
 4   three, actually, simulator training periods and then had
 5   an appointment for an oral exam with Barney Sonnen.
 6        Q    Had you heard of Mr. Sonnen before?
 7        A    Yes, I had.
 8        Q    And who had told you about him or how had you
 9   heard about him?
10        A    I believe Mike Peley told me about him.
11        Q    And had Mike Peley had him as an FAA examiner?
12        A    I think that's how that came up.
13        Q    And what did he tell you about him?
14        A    That he was fair and reasonable and no
15   surprises.
16        Q    Did you ask him anything else?
17        A    Not that I recall.
18        Q    Did you ask him what kind of questions he
19   asked?
20        A    I believe that was the nature of the
21   discussion, talking about where his emphasis is and that
22   sort of thing.
23        Q    Well, based on the FARs, you knew you had to
24   know certain things, right?
25        A    Yes.  The FARs are -- the practical test
```

FRIEDMAN, LOMBARDI & OLSON

     1    length.  In fact, they're the exact same piece of

     2    pavement.

     3         Q    And you said the airline had just been recently

     4    certified for using them?

     5         A    At the weights they were using, yes.

     6         Q    And who had done the certification?

     7         A    A company called Nav-Tech Performance

     8    Engineering.

     9         Q    Did you have any difficulty with the fact it

    10    had just been certified by Nav-Tech?

    11         A    I had reservations.

    12         Q    Were those certifications not approved by the

    13    FAA?

    14         A    I don't know.  I know they were given to us.

    15         Q    By whom?

    16         A    By the operations department.

    17         Q    Well, are you saying that you don't know

    18    whether or not Nav-Tech certifications were approved by

    19    the FAA or not or you just don't know if those particular

    20    ones were?

    21         A    I don't have any personal frame of reference

    22    with regard to it either way.

    23         Q    Okay.  So what was the basis for your

    24    reservation?

    25         A    The basis for my reservation was that

FRIEDMAN, LOMBARDI & OLSON

 1   Amerijet's performance planning policy had been and

 2   continued to be that unless a tower report came out

 3   describing a runway as wet, then for Amerijet's

 4   performance planning purposes, it was dry.

 5           This had become an issue on a prior flight,

 6   where in fact a longer runway was used or was

 7   contemplated being used and we -- well, it just -- that

 8   policy had been a matter of discussion between myself and

 9   others at Amerijet for some time.

10       Q    But that policy had been improved up to that

11   point in time by the FAA, had it not?

12       A    I don't even know if the FAA was even aware

13   that policy existed.

14       Q    Well, it was part of what, the GOM?

15       A    No, ma'am, it wouldn't be part of any.  It was

16   a standard operational procedure which is derived from

17   the runway analysis and the other documents that were

18   approved by the FAA.  The documents provided --

19       Q    I'm sorry, you said it's part of the runway

20   analysis that had been approved by the FAA?

21       A    No, I didn't say that.

22       Q    What did you say?

23       A    I said it's derived from.  I said it's a

24   standard operational procedure derived from.

25       Q    Then let me ask my question to you this way.

FRIEDMAN, LOMBARDI & OLSON

1    this, we've got to take a degradation.  Help me talk with

2    Brian, he won't listen to me", or something?

3         A    I'm certain Brett Weiss was privy to a

4    sufficient portion of my conversation with both Brian

5    Steele and Al Jorsey as to know what the circumstances

6    were.

7         Q    Mr. Major, did you go to Mr. Weiss and say,

8    "Brett, he's not listening to me, you go talk to him?"

9         A    No, ma'am.

10             MS. SHEA:  Keep your answers short.  We're

11        going to need to leave shortly before five,

12        so --

13             MS. NORTON:  You want to finish tomorrow

14        morning?

15             MS. SHEA:  No.

16        Q    What did you say to Brett Weiss, you

17   specifically, on this issue?

18        A    Most of what I said was directed to the

19   captain, whose authority it was to make the final

20   determination and to Al Jorsey.

21        Q    Okay.  Let me ask you, what did you say to

22   Brett Weiss?

23        A    I don't recall if I said anything addressed --

24   I may have addressed Brett Weiss directly, but if I did,

25   I don't recall it.  I know he was there.

FRIEDMAN, LOMBARDI & OLSON

1          Q    Do you remember any discussion coming up about
2     classes?
3          A    I don't recall.
4          Q    Do you remember any discussion about your
5     demeanor in class?
6          A    No.
7          Q    Or questioning the instructors?
8          A    No.
9          Q    When you returned to Amerijet, what
10    conversations, if any, did you have with anyone about
11    continuation of promotion to captain?
12         A    When I returned to Amerijet when?
13         Q    I'm sorry, after your completion of the
14    training at Pan Am.
15         A    I had been in constant contact with Amerijet
16    representatives, Pete.  Ed had left.  That was presumably
17    the reason for his visit to Aero Services.
18         Q    Did you accuse Pete of being deceptive to you
19    when he wouldn't put you into IOE training immediately?
20         A    That wasn't -- A, Pete did not decline to put
21    me into IOE immediately and that meeting was not where --
22    there's two questions there.  I'm trying to answer both
23    of them.  Why don't you ask them one at a time.  Ask them
24    one at a time, please.
25         Q    Well, were you under the impression you would

FRIEDMAN, LOMBARDI & OLSON

1   provided, the pre-oral exam or the pre-oral inquiry, is

2   there any other aspects of training you weren't given

3   that they were?

4        A    No provision had even been made to give me a

5   pre-oral review.

6        Q    I understand your position on the pre-oral

7   review.  Is there any other aspect of the training that

8   you believe you did not get and they did?

9        A    Only the completion of the training.  I didn't

10  get all of the captain training from Amerijet.

11       Q    Well, because of the pre-oral -- because you

12  were disqualified or discontinued by the FAA?

13       A    That's another interesting point.  Amerijet's

14  policies as stated were that a failure would produce

15  retraining and another opportunity to take the oral.  I

16  had not failed and so here's a policy on the one hand and

17  here's their behavior toward me on the other.  The two

18  did not correspond.

19       Q    Anything else?

20       A    Not that I can think of at this point.

21       Q    Did anybody say, "Pat Major, you're too old for

22  captain?"

23       A    I'm trying to recall.  I don't know that those

24  exact words were used.

25       Q    Mr. Major, they were hiring in captains older

**7**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-6070-CIV-FERGUSON
Magistrate Judge Snow

PATRICK SCOTT MAJOR,

     Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,

     Defendant.

_____/



One E. Broward Blvd.,
Ft. Lauderdale, Florida,
Monday, 9:04 a.m.,
February 19, 2001.

C O N T I N U E D

V I D E O T A P E D

D E P O S I T I O N

of

PATRICK SCOTT MAJOR

taken on behalf of the Defendant
pursuant to a Notice of Taking Deposition



FRIEDMAN, LOMBARDI & OLSON

1    made the weather report.  Do you recall that?

2        A.    I recall that the airplane was already throttles up,

3    brakes released and accelerating for takeoff when the tower

4    issued that report or issued that clearance, excuse me.

5        Q.    You say ready for takeoff.  Why did you not tell the

6    tower you were overweight, we cannot take takeoff, we're

7    overweight?

8        A.    It frankly didn't occur to me.

9        Q.    Okay.

10            MRS. NORTON:  Let's go off the record just a minute.

11    I'm about finished.

12            THE VIDEOGRAPHER:  At this time we're going off video

13    record, it is 9:52 a.m.

14            [Recess Taken.]

15            THE VIDEOGRAPHER:  At this time we are returning to

16    video record, it is 9:55 a.m.

17        Q.    (By Mrs. Norton:)  Mr. Major, why did you just not get

18    off the plane?

19        A.    It would have cost me my job.

20        Q.    Don't you remember Derry Huff telling you just in June

21    that he had gotten off the plane?

22        A.    Yes, ma'am, I do.

23        Q.    Did you think of that as an alternative, just to get

24    off the ramp and leave?

25        A.    I did.

FRIEDMAN, LOMBARDI & OLSON

1    Q.    But you didn't do it?

2    A.    No, ma'am.

3    Q.    You have indicated that you were subject to

4    harassment, workplace harassment and you referenced the stalking

5    with Tim Greene, all right, and the fact that you had filed an

6    EEOC charge on age discrimination.  Other than what we've talked

7    about, are there any other incidents that come to your mind?

8    A.    I referenced the allegation of stalking.

9    Q.    Okay.

10    A.    Are there any other incidents ---

11    Q.    That you were harassed by the company.

12    A.    Ma'am, I was denied promotion for several years while

13    an assortment of flight officers, junior and less qualified,

14    were promoted in my place.

15    Q.    Can you tell me anyone that you considered junior and

16    less qualified?

17    A.    I think I enumerated as many as I could remember in

18    prior testimony.

19    Q.    Do you remember any as you sit there now?

20    A.    I remember several as I sit here now.

21    Q.    Would you give me their names?

22    A.    Ray Maneure.  I believe it's spelled M-a-n-e-u-r-e.

23    Tim Greene.  David Mitchell.  Pat McManis.  John Washington,

24    Junior.  Several others whose names escape me at the moment.

25    Q.    In regarding Tim Greene, do you have any knowledge of

Q.    And where did you pick up the term illegal charter?

A.    I think that would accurately describe the events.

Q.    Who -- well, that remains to be seen.  But where did you learn the term?  Where did you hear that it was an illegal charter?  From whom?

A.    I was reasonably familiar with the facts as they pertain to the incident.

Q.    So that is your understanding or your perception of it, no one told you that?

A.    That's my professional opinion, yes, ma'am.

Q.    And Mr. Greene won an award and you were describing this to people or telling them about it?

A.    I used it as an example to dissuade flight crew members from forming or from joining a union.  I wanted to impress upon them that there were several alternatives available to them short of bringing in an outside third-party which could produce and perhaps even better and more quickly produce the results they sought than by --

Q.    Mr. Major.

A.    -- bringing in the Teamsters Union.

Q.    Let me ask it this way then.  Other than Mr. Morales and Mr. Huff talking with you about this and indicating that, you know, if it ceased and deceased they would remove anything from your file, were you subject to any other penalty?

A.    Ma'am, a charge of stalking in a pilot's personnel

FRIEDMAN, LOMBARDI & OLSON

1    file, when you're a threat that one personnel proffered that
2    day, could have been a career-ending event.

3        Q.    It was not in your personnel file, though, was in
4    Mr. Major?

5        A.    He indicated it would go there if I continued to act
6    in a manner, which is completely consistent with my right with
7    respect to promoting safety in the workplace.

8        Q.    Okay, talking about how Mr. Greene got a
9    multi-million-dollar award.

10        Is there any other actions on the part of Amerijet
11    that you contend created a unpleasant work environment or
12    hostile environment for you?

13        A.    There were several, ma'am, but I don't carry them
14    around as excess baggage.  I'm sure there's -- I've made note of
15    most of them and you've been given copies of most of my
16    correspondence and my notes and my files.

17        Q.    What would you do to refresh your memory?

18        A.    I would go back through some of my notes.

19        Q.    There's nothing that stands out now?

20        A.    Nothing that comes to mind at the moment.

21        Q.    Well, you knew you were gonna finish your deposition
22    today, right?

23        A.    Yes, ma'am.

24        Q.    We sat on Thursday for a while, then you had the
25    weekend.  So you knew you were gonna be asked additional

FRIEDMAN, LOMBARDI & OLSON

# Patrick Scott Major

Peter Steele, Vice President
Edward Cook, Chief Pilot
Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

09-29-94

Dear Pete and Ed,

Thank you for the time and effort invested in speaking with me Thursday and Friday.

I initiated our discussion as a result of frustration with Amerijet's employment and
upgrade policies: specifically, the decisions to place new-hires in the Falcon, then promote
them to the Boeing ahead of flight crew who already have Boeing experience and greater
tenure with the company.

I sought the meeting with you, not for an explanation, but for a new decision. Having
invested three and a half years in and on the Amerijet career path, and ready to advance, I
asked for the opportunity to upgrade to Boeing first officer.

Pete and I met Thursday evening. Then, the three of us met Friday afternoon. Our
discussions included topics ranging from professionalism in our work group, to the
feasibility of implementing a merit pay and performance appraisal system, as well as
other items of mutual interest and concern.

You explained that, upon inception, Amerijet was uncertain of the long term viability of the
Falcon operation. So, you selected new-hires to staff it. Your decision produced the
additional advantage of reducing training time and expense by obviating the need to
upgrade Boeing flight crew to the Falcon, then to screen, hire, and train replacements for
the Boeing. We remembered that initial consternation among Boeing flight officers had
been deflected by emphasizing separation of the two operations. Later, however, Falcon
experience became a prerequisite for upgrade on the Boeing. This effectively downgraded
those of us previously invested in Amerijet...a condition confirmed when Falcon flight
crew were promoted to captain and first officer aboard the Boeing.

Peter asked how I felt about Falcon captains being promoted to Boeing captain. As my
concerns previously focused on the first officer position, I hadn't given it much thought.
Upon reflection, however, I now recognize that the same values and logic apply to captains
as they do to first officers. Despite the temptation of an employment pool rich with
qualifications and experience, Amerijet's decisions should reflect the loyalty of existing
flight crew. Besides, Amerijet has previously experimented with highly qualified flight
crew possessed of significant experience obtained elsewhere...with less than satisfactory
results. While your perspective, Pete and Ed, emphasizes the relative inexperience of
many Amerijet employees, it overlooks the inherent opportunity to mold a class of flight
officer uniquely suited to the needs of our company. More on that later.

You stated that Amerijet policies make no distinction between first and second officers.
Rather, the entire class is regarded as flight crew. Indeed, this view is supported by
Amerijet's pay practices. Secondly, despite appearances, you said there will be zero net
effect of having Falcon crew placed ahead of me on the career path. In fact, you said the
experience I am gaining by serving as second officer on the Boeing, combined with pilot in



DEFENDANT'S
EXHIBIT 27C
3
1/02 2/15/01

1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312
(305) 763-7019

091

command, first officer, and decision-making experience obtained elsewhere, is much more valuable to Amerijet than the knowledge and experience I would gain by serving as first officer aboard the 727. You said it is more likely for me to upgrade directly to the captain's position than a Boeing first officer possessed of little PIC experience who is not actively gaining experience outside our company.

Two ideas arise:

While Amerijet's second officer recurrent training program emphasizes 727 systems and operational procedures, it ignores instrument flying skills. The company expects its second officers to retain and even enhance their instrument flying skills through individual effort and experience obtained elsewhere during off-duty hours. Perhaps, in doing so, we are overlooking the opportunity to more effectively direct and monitor flight officer professional development.

By installing a multi-engine flight simulator in a room adjacent the CPT, Amerijet could more effectively screen flight officer candidates and submit second officers to IFR practice and review. By conducting recurrent training twice each year, as opposed to only once, additional training for first and second officers could focus on the finer elements of instrument flying, regulations, weather and the General Operations Manual (GOM), as well as the development of resource management skills. Captains could receive supervisory and management skills training, be exposed to administrative policies and procedures, and participate in the development of a flight crew performance evaluation program. In so doing, Amerijet could more effectively direct, develop, and evaluate first and second officers while assuring itself a more reliable and more qualified resource of ready-to-upgrade employees, and empower captains to make a greater contribution in the conduct of our enterprise. Upgrade training could then focus on issues more specific to flying the Boeing. I've heard you bristle, "Amerijet is not a flying school.". But if Amerijet teaches what its flight officers most need to know, then it must be. And, why not? If Amerijet is not actively directing, encouraging, and evaluating the professional development of its employees, then who is?

Secondly: mindful of our discussion last week, I reaffirm my request to upgrade to first officer. However, now that I know it is possible to upgrade directly from second officer to Captain, I seek that opportunity as well...with this proviso: once type-rated on the Boeing, I would like to obtain a minimum of 500 hours experience in the right seat before being asked to actually serve as PIC. Incidentally, once rated in the aircraft, I can log as PIC all hours where I am sole manipulator of the controls: the capacity to upgrade to captain only candidates produced through our own, superior, in-house training and development programs, who nonetheless possess significant levels of type-specific PIC experience, could prove valuable during insurance negotiations.

Alternatively (or even concurrently), I request the opportunity to obtain type specific training and a rating in the Citation. Not only would I feel more qualified to make a contribution in that aircraft, such an outcome will afford Amerijet the opportunity to utilize the Citation to meet business needs without requiring the pilot services of David Bassett or you, Pete, to fly the aircraft.

I want to reiterate to both of you my thanks for our discussion last week. Perhaps, together, we have produced some ideas that will result in positive action to more effectively develop and evaluate employees... and which will better empower Amerijet to meet present challenges as well as future demand.

092

L.PSteele&ECook.09-29-94, page 3

Feel free to copy this document wherever and whenever it might be useful in communicating these ideas to others.

As always, with warmest regards,

Patrick Scott Major
Second Officer,
Amerijet International, Inc.

**093**

## Patrick Scott Major

Pete Steele, Vice President
Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

10-19-94

Dear Pete,

In speaking with you today I learned that you intend to respond to my letter of September 27, but need to complete the new AOM first. I'm pleased that you are giving my comments and suggestions heartfelt consideration and I am patient enough not to interfere with that process. But there is an important point I only recently realized that you will probably want to factor into your thoughts.

After consulting my Amerijet correspondence files and my personal notes, I am certain that except for the aborted class I attended with Steve Schubert in April, 1993, I have never been offered an opportunity to upgrade to first officer on the Boeing 727.

The only other chance I ever had to upgrade was on the Falcon. An important factor in reaching the decision to decline that opportunity was the commitment from you and Ed that, "You will have right of first refusal on any future first officer upgrade opportunities". Additionally, considering my family and homeowner responsibilities, Ed recommended that I continue to decline to upgrade until I could hold a Miami base. Despite this, five junior flight officers have been upgraded to Boeing first officer ahead of me. Two of them are now based in Miami and one enjoys what may be a desirable position in New York. I have not been approached even once.

I did not, and do not, take issue with the upgrade of John Washington (Jr.). The way I see it, he has worked for Amerijet quite a bit longer than me and is arguably entitled to whatever position you want to offer him. Besides, he is an excellent pilot and a fine human being.

Nor was I overly concerned when Boeing first officer positions were awarded to people who would be based out of town for three weeks at a time...at their own expense...not an experience my family or its budget could withstand. Everyone else down the seniority list was polled before those positions were awarded. So, no harm was done. But these two most recent decisions merit revision.

I like, admire and respect you, Pete. None of my comments are intended to convey anything else. But I feel very strongly about this. If I did not pursue it, if I did not try to make clear my perspective and that of other flight officer employees, I think my sense of personal integrity would suffer and the character of the relationship we have cultivated for three and a half years

094


DEFENDANT'S
EXHIBIT

(through the 401K, the union threat, and the formulation of a strategy for implementing an HR department) would diminish. I am proud that we can discuss such sensitive issues professionally and on friendly terms.

I have attempted to persuade you and offered suggestions. But ultimately, this is your call. I realize upgrade training is time consuming and that sometimes the right thing is more expensive and less expedient than nearly all of the alternatives. But there is a significant difference between expense and cost. For instance, what is the cost of alienating people who see themselves as dedicated and loyal employees deeply invested in the Amerijet career path? What is the cost if they should perceive a violation of their trust and faith?

In China, the hieroglyphic for the word "Crises" is actually two symbols joined: one symbol means danger, the other means opportunity. Perhaps the challenge facing Amerijet is to avoid the potential crises by capitalizing on the opportunity imbedded within...an opportunity to set things right, or perhaps even to innovate creative solutions to its long term needs. That is the character and intent of my suggestions to you. Although I'm not always comfortable with the import and the intensity of our exchange, I'm proud to be part of the process.

Warmest regards,


Patrick Scott Major
Second Officer,
Amerijet International, Inc.

**Tuesday, February 11, 1997**

15:30 Ed Cook called. Asked me to come meet with him in 1/2 hour. Said I would cancel two pending appointments and get there as quickly as I could. Upon arrival witnessed Ed giving a reference for Steve Shubert. Said, "Seemed to prefer night freight. He 1 d marital problems resulting in divorce. But now he is 1 ... b, ... ... With 1 ... ... to bad t ... ... ... ... ... ... ... ... now he's out on ... street."

We i illititted u ... Wayne Penny showed up.. then the following discuss ... ensued:

Ed: 1 have had several discussions with Dave Bassett. Dave has appointe himself safety officer of the company and he approves all promotions to captain. Dave feels the captain is responsible for a $9-$10,000,000 business. Dave does not feel comfortable with you as a candidate for captain. He has no specific basis for this. But having flown with you (he's never seen me fly) on many trips on the Citation, he does not feel inclined to promote you now or in the foreseeable future. Dave cannot describe what would have to happen or what period of time would need to pass in order to change his impression. He just doesn't feel you would make a good captain. You are welcome to continue working here. We have no reason to fire you. You may stay on as first officer for the remainder of your career. But you may never make captain. So, that said, I'll turn the meeting over to Wayne.

Wayne: Pat, as you know, we've been discussing this for some time. And Ed and I feel you would not be happy to remain a First Officer indefinetly. So we have devised an Exit Incentive: you may leave your Amerijet employment of your own accord and the company will pay you one week's severance for each year of employment plus all your accrued vacation and personal days. Of course you'll need to sign a release.

Ed: And you just heard me give a reference. You can say what ever you want to about why you left. We will have nothing but good to say about you.

Me: Thank you for taking the time to share this with me and for devising this alternative. I do not agree with Dave's assessment.

Wayne: we knew you wouldn't. I would have been dissappointed in you, otherwise.

Me: Technical Questions. Will the six weeks be at guarantee or at my average rate of earnings.

Wayne: What's your average.

Me: About 90 hours.

Wayne: I'll check into it. It shouldn't be a problem.

Me: What sort of release.

Wayne: that you were not coerced or threatened, that you could have remained working here indefinitely. Release from litigation. That sort of thing.

Me: How much notice will you need.

Ed: none. Would start imediately.

Wayne: Also, all this would start next week. We would continue to pay you through the week. Your severence package would begin next week. But remember. Noone is forcing you to resign. We just feel you would be very unhappy to remain here as a first officer with no opportunities for advancement.

Me: to Ed: what is Dave's preference?

Ed: I don't know that he has one.

249



DEFENDANT'S
EXHIBIT
7
Major 2/15/01

Me: What about you?

Ed: I think you would be very unhappy. Your business is really starting to take off. You've just about got your second aircraft up and running.    You really should think about focusing your attention.  Knowing you, I just think you'd be real unhappy staying in here.

in the house I need to  ?

Discussion ensued and we agreed on Thursday at 4:30.

Me: I'd like to take tomorrow off to think about this.  Can you get someone to replace me for tomorrow's flight?

Ed. Yes.

Me: Then, I will be in touch with you Thursday afternoon.

We shook hands all around and I left. I stopped by Pete's office on my way out to say "Hi". Dean was in there.

When I got back to the truck, I called Ed to confirm that he would notify dispatch of my unavailability for tomorrow's flight.

**Monday, February 17, 1997**

xFly with AJT.

xHome to sleep.

xTo DHFC: PU 38X Airworthiness Certificate on way in.

xFU Wayne Penny re release.

21 days to make decision from day offer presented. After that, recinded.

Monies: $5130 gross wages, 90 hours at $38.00, less taxes, 401K Net: $3,100.

Confidentiality both ways.

After signing 7 days to void.

Dave: no intention to meet with me. "If Pat wants to stay with us, great, if not great." Tomorrow.

David Bassett, President
Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

> I wrote this several months ago, originally addressing it to "The Leadership": you,
> Pete, Ed and Wayne... the operations "Chain of command." However, I chose to heed
> the advice of counsel and friends, and resolved to keep it to myself. In light of recent
> circumstances, that may have been an error. Please give this a thorough read and your
> heartfelt consideration.

December 18, 1996

Dear Sir,

As I contemplated writing, I found myself empathizing with Amerijet's anonymous letter
writers. Perhaps their intention was to instigate change while ensuring their comments
were evaluated solely on merit, avoiding recrimination and disapproval; often the only
results achieved by expressing ideas that are not in keeping with a company's self-concept.
Anonymously, important messages can be conveyed without personal risk. Few letters are
more carefully scrutinized. But the affront is considerable, implying employees cannot
trust their leaders, and reflects a certain cowardice upon the writer.

I believe that: 1) a thought worth writing deserves a signature, 2) I can help, and 3) as a
flight officer willing to accept a pay check every two weeks, I should serve to the extent of
my ability...whether or not that contribution is immediately appreciated.

That said, here goes: These comments are offered in accordance with Amerijet's open door
policy on behalf of its flight officer employees.

I am deeply concerned by Amerijet's recent difficulty distinguishing issues from
personalities. And, by its apparent determination to incite and inflame the ire of flight
officers; "I can line-up pilots around the block willing to work for free to take your jobs."
This to a group of more than 45 flight officers gathered from across the nation for the
purpose of working with management to solve their work-place problems. Some wondered
if the company was not deliberately provoking its pilots to organize, then exert concerted
activity to force it to be fair. Having spent most of my adult life avoiding unions, I am
disturbed by the prospect of having my work relationship defined by third-party
opportunists.

Instead of creating a nurturing and empowering environment that unleashes the will and
dedication of talented employees, Amerijet leadership threatens its flight officers with
reprisal, recrimination, and loss of income or advancement opportunities. As a result,
performance is rendered through a sieve of seething resentment, and hovers around the
lowest levels of mediocrity. That flight officers are not openly hostile and vindictive, and
that counterproductive behavior has not been more conspicuous, is a tribute to the
professionalism of the group, not to the success of the company's methods. The common
wisdom is, "Keep your head down, your mouth shut, and get another job as quickly as you
can." ...This among vital professional employees excessively expensive to replace.

But, I am told, "This is the way Dave Bassett wants it."

106

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Home: (954) 763-7019, Office: (954) 776-7766, Fax: (954) 776-6693

DEFENDANT'S
EXHIBIT
2/15/01

Is that true?

Work is the primary component of American life... occupying more time, effort and energy than all other conscious pursuits combined. Family, personal, community, social, educational, and church activities, in total, occupy less time than a forty hour work-week; and, who works only forty hours? The work-place, then, as well as the content and construct of our work lives, ought to describe our highest ideals for one another. Some might protest that the ends justify any means. But it is our means that define us, our means that reveal our true values and the depth our convictions.

The irony is, not only are the solutions simple and inexpensive, but Amerijet could easily become a pretty decent place to invest a flying career. Instead of facing high rates of turnover, and expensive training and replacement costs, it could build a depth of valuable experience among its flight staff.

Consider Our perspective: Amerijet's senior flight officers willingly contributed well beyond reasonable expectation when adverse conditions threatened. We were on call 24 hours each day, six and seven days a week, for years... without pay. We used jump-seat privileges to reduce Amerijet's travel expenses, waited weeks, if not months, for per-diem payments and expense checks, charged air-fare and hotel accommodations to our personal credit cards, and forfeited scheduled time-off to help ensure Amerijet's recovery. In short, we invested personally and substantially in Amerijet's success.

Yet, Amerijet's pay practices reward us with some of the lowest rates in the industry, and a work-to-pay ratio of less than 50%. Flight officers routinely experience delays for freight, maintenance or weather, without compensation, and unscheduled overnights entail lifestyle disruptions of twenty-four or more hours each; again, without additional consideration.

Recurrent training requires more than forty hours work without even credit toward "guarantee"...punishing those who would otherwise earn extra and distorting management's tally of "Unearned Income."

Captains are asked to evaluate flight crew for promotion, yet have not received even rudimentary company training in leadership, supervision, or employee appraisal; nor are there standards of performance to guide them.

The flight simulator is viewed as a tool of reprisal. Once a flight officer is in position, little training takes place...only check rides; the severity of which seems metered by management's perception of the employee's willingness to go-along and get-along.

And, the Miami schedule is nothing short of brutal[1]. Despite the NTSB's published alarm over the failure of the FAA to restrict international duty times, citing fatigue as causal or contributory in several recent accidents, Amerijet requires its flight officers to operate continuously for time-periods well in excess of the limits of human endurance. Sixteen to eighteen hour work-days are the norm. Extra sections and delays routinely increase that to twenty-four hours or more. Clearing customs twice on some flights adds two extra hours, without pay. And, there is the additional requirement for pilots to shepherd ill-prepared Amerijet passengers through the process(es). Then, they set out in their cars for the long drive home.

---

[1] Thank you for your recent efforts in this regard.

Now that Amerijet is prospering, instead of eliminating these hardships and rewarding flight officers in other ways, the company retroactively reduced earned vacation pay, down-graded health-care benefits and, within the past twelve months, passed-over nearly half its senior first officers in order to upgrade to captain four relative new hires: Al Jorsey, David Mitchell, David Bruns and John Washington, Jr...all in their 20's & 30's; indeed, the youngest of these fails to satisfy the company's published criteria for advancement to first officer, let alone captain. Yet, nearly all of those denied advancement are 40 years of age or older, have greater tenure, and possess experience levels well above Amerijet's promotion criteria. Not only are these actions perceived as capricious and arbitrary, they seem to underscore an entrenched pattern of discrimination at Amerijet. Of 60 flight officers ranging from new-hire to more than fifteen years seniority, not one is female or African-American.

And still, rather than investing in the training and development of flight officers who contributed so readily, Amerijet continues to hire captains from outside the organization: in one instance, unleashing on several unsuspecting flight crew an alcoholic who frequently flew under the influence.

Yet, when leadership fails to plan effectively and staffing levels fall short, who compensates for it? When a captain hired from outside the company is thrust into the unfamiliar rigor of Amerijet operations, who brings him up to speed? What group of Amerijet employees routinely salve Amerijet's communications and logistical, training and maintenance snafus?

"If you don't like it, leave. Get another job. Be my guest! No one is holding you back." These comments are management's typical response to flight officer efforts to improve their lot.

Few transitions in life create more trauma and emotional anguish than a job change...even a voluntary one. Fact is, job changes rank next to "Death In The Immediately Family" as life experiences likely to create the most harsh and protracted mental and emotional anguish. One gives up the known for the unknown, friends for strangers, and comfort for discommodation. Often, life's other most trying experiences are involved...family moves, financial hardships, and more. Why, then, should Amerijet employees change jobs simply because their leadership has a problem? Why, indeed, when they must know it is within their power to change things... with management's cooperation, or without, through intra-company exchange or outside pressure? Leadership's demeanor toward flight officers challenges them to take action.

If Amerijet's employment practices do not substantially improve, soon, the company could find its attention diverted away from the growth of a leading regional air-freight utility and entrenched in a legal and labor-relations quagmire. Amerijet leadership has made the mistake of discounting the contribution of its flight officers far too long and, while congratulating itself for the company's success, has earned the ire of one of its most valuable resources.

No one likes a threat. That's not what this is. I am simply providing insight from beyond the executive suite. If I didn't make this extra effort, some dear friends and a good company could get hurt.

On the bright side, you may begin immediately to solve this by resolving to discipline your management team to training and promotion policies, pay practices and leadership

behaviors which make outside intervention unnecessary, and by convincing flight officers of your genuine intent, not only through meetings, but in your day-to-day choices.

. . . . . . . .

David, my efforts to provoke change at Amerijet are intended to help us all enjoy a brighter future together. I thought you understood that. I am deeply hurt by the notion that you feel angered and threatened by my efforts to contribute above and beyond the requirements of my position.

Warmest Regards,

Pat Major
First Officer

*109*

TRANSMITTAL

DATE OF PRINTING :  7/08/98
PAGE :  1

Record ID: S0179812722                          Comment Section

    Primary Area: J   Key Word: 109     Opinion: I

Comment Text:

MR MAJOR APPEARED BEFORE ME TO TAKE AN ORAL EXAMINATION FOR A TYPE RATING ON
THE B-727.   HE WAS AN UPGRADE PILOT, HAVING SPENT A TOTAL OF SEVEN YEARS IN
THE POSITIONS OF FLIGHT ENGINEER AND FIRST OFFICER ON THE B-727.MR MAJOR HAD
BEEN RECOMMENDED BY PETE STEELE. THE D.O. OF AMERIJET. DURING THE NEXT
FIFTEEN MINUTES OR SO, MR MAJOR MISSED QUESTIONS ON LIMITATIONS, FLIGHT
CONTROLS, AND WIND SHEAR.   I ASKED HIM IF HE HAD RECEIVED ANY SIMULATOR
PERIODS UP TO NOW, AND HE STATED THAT HE HAD.   I THEN ASKED HIM IF THE
INSTRUCTION INCLUDED WIND SHEAR, AND HE CATEGORICALLY STATED THAT HE DID NOT
RECEIVE ANY WIND SHEAR TRAINING.
   BECAUSE OF HIS TOTAL LACK OF PREPARATION FOR THIS ORAL, AND BECAUSE I WAS
LED TO BELIEVE THAT HE DID NOT RECEIVE TRAINING DUE HIM (WIND SHEAR), I
TERMINATED THE ORAL.  MR MAJOR AND I THEN PROCEEDED TO MR. STEELE'S OFFICE
WHERE WE DISCUSSED MR MAJOR'S PROBLEM FOR ABOUT 20 MINUTES.
MR STEELE SAID HE WOULD GIVE MR MAJOR MORE TRAINING AND SEE TO IT THAT HE
IS BETTER PREPARED THE NEXT TIME.   (I SHOULD POINT OUT THAT IT WAS MR STEELE
WHO SIGNED THE  APPLICATION  AS THE RECOMMENDING INSTRUCTOR, EVEN THOUGH MR
MAJOR STATED TO ME THAT HE WAS NOT GIVEN A PRE-ORAL IN REPLY TO MY INQUIRY)
IT IS MY FEELING THAT WHEN  A QUALIFIED INDIVIDUAL IN AN AIRLINE SIGNS AS
THE RECOMMENDING INSTRUCTOR, HE SHOULD ASCERTAIN THAT THE APPLICANT IS
THOROUGHLY PREPARED FOR THE TEST, ORAL, SIMULATOR, OR AIRCRAFT.   THE
RECOMMENDATION   SHOULD NEVER BE MADE IN A PERFUNCTORY MANNER IN THE ABSENCE
OF A  PROPER      EVALUATION AS  IT WAS IN THIS CASE.



NASA, Aviation Safety Reporting System (ASRS report).
Report Date: 08-18-1999, Incident Date: 08-17-99
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs., Ratings: Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, with approximately 150 hours flight experience in the last ninety days.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors:    Thunderstorms in vicinity, rainshowers overhead, contaminated runway; conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International, Inc. (AJT) Flight 827, Boeing 727, N397AJ.    Thunderstorms and rainshowers had passed through the area and were forecast to continue throughout the evening.  When I arrived, the field was under heavy rainshowers.  Anticipating a Max-weight performance-limited takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated interpretation regarding the *Navtech* runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff decision made June 08, 1999 out of MIA.  On that rainy morning, a Continental 727 had taxied into position and hold RW-12, then declined takeoff clearance... requesting full length 9L, instead.  The night before it had rained ten inches.  It was raining at the time.  While Tower had not provided a runway condition report, the runways were obviously wet. Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without prompting from the captain, I declined, reminding Tower that our flight required full-length 9L.  The captain chastised me for refusing RW-12 against his wishes (even though we had just finished discussing that the runway analysis did not support it, even on a dry day, even if we believed the weights reported by ramp personnel).    The captain insisted I radio-back Tower and accept RW-12.    I demurred.  After a brief but intense discussion, AJT 823 finally departed full-length 9L using nearly all available runway before finally breaking ground.  9L in MIA is 1,300' longer than MIA RW-12;  clearly, had we taken 12, there may have been an accident.  However, my refusal to accept RW-12 became the subject of a complaint by the captain which was investigated by Amerijet's acting chief pilot.  I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them.  The new (acting) chief pilot seemed intent on making a difference.  At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

DEFENDANT'S
EXHIBIT
13

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), as is the case in all Amerijet Runway Analysis, there are no weight decrements for wet runways that do not specifically contain "Standing water". Consequently, flight crews, the training department and dispatch personnel consider all runways "Dry" for performance planning purposes unless there exists a contamination report that contains the specific words, "Standing Water".  I have noted that some Boeing 727 performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot reduction to the Max-weight V1 speed for runways that are, "...well-soaked with water but do not have large areas of actual standing water". As of August 17, 1999, such questions had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 200' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they were June 08. The dispatcher I queried reported to me that to his understanding Amerijet performance analysis do not contain weight-limiting decrements unless "Standing water" is reported.  I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers seem to imply a braking degradation, and perhaps an impediment to acceleration as well, resulting from wet runway surfaces... irrespective of whether or not the runway contains "Standing water". "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights.", I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' on the runway, it's dry."

As aircraft 397AJ was loaded for departure, I explained my question to the check airman, who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safer solution and accept the "Standing Water ≤ 1/4" weight and V1 reduction for our flight. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain dismissed my concern, "We'll have to takeoff between water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.  He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst in the cross-groove channels worn by successive landing and departing aircraft. No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a Max EPR, packs-off, takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect a packs-off takeoff.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch'. AJT 827 is cleared for takeoff, turn right heading one zero zero". As Tower began its transmission, the captain had advanced the throttles. The takeoff clearance was then issued without pause or delay. The captain had released the brakes before I could reply to the runway report and clearance. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. AJT 827 used all available runway. The captain rotated well inside the alternating red and white lights at the departure end of the runway and the main wheels broke ground at the last possible instant. The aircraft crossed the airport boundary at less than 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation."

000054

NasaRpt 8/19/99, 4:42 PM page 5
Incident date: 08-17-99

"By knowing where I am, then drawing a straight line on my chart and navigating."   I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits specified in Amerijet's Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked, incredulous. "Do you realize how incongruent that sounds coming from a check airman that just encouraged a flight crew to takeoff from a contaminated runway into possible windshear fifteen thousand pounds overweight? Even if I am wrong about navigating direct, ...and I don't think I am, one could get you violated, the other will get you killed. What is safe about that?" I shook my head.

AJT flight 827 exceeded aircraft performance limitations and violated FAA regulations in disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway in an aircraft that weighed fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the inevitable consequences eventually bestowed upon any air carrier which actively cultivates a culture of non-compliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on runways that are obviously contaminated, but cannot be described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning materials, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the contamination report.

My mistake August 17, was in letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence.  Due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the brother of its vice president, director of operations and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included.  Had I done so before the aircraft taxied out of the ramp for take-off, I may have avoided the circumstances which placed my crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

NasaRpt: 8/19/99, 4:42 PM
Incident date: 08-17-99

After transmitting its report, Tower might have asked, "AJT 827, State your intenti There had been no prior report indicating "Standing Water" on the runway. controller could have surmised that the Amerijet crew might want to reconsider circumstances before commencing takeoff. At very least, it would have presente opportunity for me to key the mike and request permission to taxi clear of the runway resulting criticism from the check airman and captain much preferred when compar the risk of an overweight departure into possible windshear...and to the more str actions required to prevent takeoff once initiated. But that was not the contro responsibility.

While I went well beyond the call of reasonableness in repeatedly voicing my concer the chief pilot, dispatch, the captain and the check airman, prior to the flight, as well everyone in my crew immediately before the incident, I did not do everything possit prevent Amerijet flight 827 from taking off August 17. I should not have allowec aircraft to depart. Would forcibly aborting the take-off from the right seat have presen less dangerous scenario than what we encountered? Who can say? I decided agair Should I have pressed the push-to-talk on my radio and transmitted over the open t frequency while commanding the captain to abort the takeoff...embarrassing him int Honestly, that did not occur to me until later. Would it have worked? I made a judg call and elected not to intervene once the takeoff roll began.

Contributing factors included my excessive deference to management, not only regard to the presence of the check airman, but pertaining to the recency of what, desp outcome, can only be characterized as a rebuke subsequent to a similar experience sli more than sixty days prior, as well the protracted reprimand implied by a successi denials for promotional, professional, training and income opportunities as a result c age and on-going concern for regulatory compliance and flight safety at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, concerned what might happen the next time a runway is wet and an aircraft prepares performance limited takeoff. I have addressed it specifically with the chief pilots acting and interim), the directors of operations, dispatch and training. I provided th copy of this report and recommended that it be forwarded in its entirety to the air designated safety officer (its CEO). The overwhelming corporate imperative has been the job done at any cost; to punish those who stand in the way by denying promotional and professional opportunities, abusing them in the simulator if be...exploiting the PRIA to soil their careers while sending an unmistakably clear me to other flight crew who might consider showing similar unwelcome concern for safety and regulatory compliance.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did n done. That is the reason for this report. I hope it will do someone, somewhere, good.

Respectfully submitted,

**8**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,           )  L.T. CASE NO.
                             )  99-021746-11
        Plaintiff,     )
                             )
vs.                       )
                             )  COPY
AMERIJET INTERNATIONAL, INC.,  )
                             )
        Defendant.     )
- - - - - - - - - - - - - - - - - - - - - -)

1050 Lee Wagener Blvd.
Fort Lauderdale, Florida
Tuesday, February 13, 2001
9:10 a.m. - 11:15 a.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

-------------------------------

DEPOSITION

OF

JOHN C. ROSEBOROUGH

-------------------------------

```
 1              A.    John C. Roseborough, at FAA Fort

 2      Lauderdale FSDO.

 3              Q.    What's FSDO?

 4              A.    Flight Standards District Office.

 5              Q.    FAA is?

 6              A.    Federal Aviation Administration.

 7              Q.    All right.  And where is your office

 8      located?

 9              A.    At the Fort Lauderdale-Hollywood

10      International Airport.

11              Q.    All right.  And what does the Flight

12      Standard District Office of the FAA do here at Fort

13      Lauderdale Airport?

14              A.    We oversee airlines, aircraft operators,

15      airmen and any aviation enterprise that we regulate.

16              Q.    All right.  Is that restricted to airlines

17      that are based here in Fort Lauderdale or does it

18      encompass all the airlines that use the airport?

19              A.    All the airlines that use the airport.  We

20      have geographic responsibility for.

21              Q.    And what is your job here?

22              A.    I'm a principal operations inspector.

23              Q.    Is that also known as POI?

24              A.    That's correct.

25              Q.    And what do you do, sir, as principal
```

1    operations inspector?

2        A.    I oversee the operations of airlines for

3    which I am assigned to ensure that their training

4    programs and their operational procedures are in

5    accord with federal aviation regulations, FAR.

6        Q.    All right.  Let's break that down a little

7    bit.  You're assigned a number of airlines, so there

8    are other POIs for other airlines?

9        A.    That's correct.

10       Q.    And your job responsibilities are for the

11   training portions of those airlines?

12       A.    Training portions of their pilots, their

13   flight engineers and if they have flight attendants,

14   their flight attendants.

15       Q.    All right.  And operations, what does that

16   encompass?

17       A.    All movements of the aircraft for the

18   purpose of flight.  Their general operations manual,

19   their weight and balance manual, certain portions of

20   their fueling manual, their minimum equipment lists.

21   Everything that is operationally involved with the

22   carrier.

23       Q.    All right.  So your job is to ensure

24   compliance with the scheme of federal regulations

25   and laws?

```
 1    him, with the understanding that what was said would
 2    stay in this room, would not go out.  I asked him at
 3    the time to put in writing what his concerns were
 4    and to send them to me and upon receipt I would
 5    conduct an investigation.
 6    BY MS. SHEA:
 7        Q.   All right.  Did there come a time after
 8    that meeting when you received a written report from
 9    Mr. Major?
10        A.    There did.  It was about October the 4th,
11    I believe.
12        Q.   Of 1999?
13        A.   Yes, ma'am.
14        Q.   All right.  And did you thereafter conduct
15    an investigation?
16        A.   No, ma'am, I did not.  The report came in
17    perhaps on the Friday before that Monday.  The
18    Saturday night before that Monday my mother passed
19    away, so that Monday, which I had walk-in duty, to
20    accommodate all people that come in the office on
21    all phone calls, I noticed that a report in a brown
22    envelope had come from Mr. Major.  I did not examine
23    the contents.
24             I spent the day resolving walk-ins and
25    making reservations for my family to travel to San
```

1    Antonio for my mother's funeral.  The funeral was on

2    Wednesday, we returned on Thursday and I had been

3    on -- then I was on scheduled annual leave for the

4    next two or three weeks.

5         When I came back from annual leave, I

6    determined that Mr. Major must have become impatient

7    because he forwarded his complaint to the Office of

8    the Inspector General of the Secretary of

9    Transportation.  And at that time an investigation

10   was conducted.

11        Q.   All right.  How did you become aware that

12   the Office of Inspector General of the Department of

13   Transportation was conducting an investigation?

14        A.   It was in written form.

15        Q.   A notification to you from them?

16        A.   Something like that.  I don't recall the

17   exact situation.  As I said, my mother died about

18   that time and I have very vague memory of specifics

19   around Mr. Major.

20        Q.   All right.  What, if anything, were you

21   asked to do in terms of the investigation?

22        A.   I was directed to do the investigation

23   that I would otherwise have done had it not been

24   forwarded to the secretary.  And I did conduct the

25   investigation, and the investigation is being

1    policies were previous to Pat Major's report of this

2    violation on August 17th, 1999?

3         A.    As 1 recall, their takeoff performance

4    requirements in their performance section were very

5    sparse.  There were -- there was a potential to have

6    a better clarified policy which would be less

7    restrictive than the process that they had.

8         Q.    Okay.  I may need you to translate that a

9    little bit.  Is it fair to say that under Amerijet's

10   policies, unless there was a report of standing

11   water, that the air -- the runways were to be deemed

12   or considered dry?

13        A.    Less than a certain amount of water.  And

14   their procedure didn't provide for any variance

15   between a certain amount of standing water and a wet

16   runway, as I recall.

17        Q.    Right.  So when you indicated they were

18   restrictive, you mean either there was no report of

19   standing water, so they were considered

20   uncontaminated, which may not necessarily be the

21   case?

22        A.    In essence, when the report came out less

23   than a quarter inch of standing water, they could,

24   through engineering data, provide different levels,

25   say, three-sixteenths, one-eighth, one-sixteenth and

```
 1    wet runway, so that they could have derivations from

 2    that for less restriction.  But they didn't have

 3    that in their manual.  They didn't have a procedure

 4    for mitigating a standard reduction.

 5         Q.   Or likewise, the procedure which would

 6    allow a captain to take a degradation even in the

 7    absence of an official report of standing water.

 8              MS. NORTON:  Object to the form of the

 9    question.

10         A.   Um, the captain can always take a

11    degradation.  He can always reduce the weight, he

12    can always reduce the air speed.  I don't really

13    understand your question.

14    BY MS. SHEA:

15         Q.   Did Amerijet, to -- does Amerijet now, or

16    did it then, to your knowledge, have any policy

17    which explicitly authorized captains to exercise

18    that kind of judgment and discretion in taking

19    degradations based on their own assessment of water?

20    Even when there was no report.

21         A.   I think I understand what you're asking.

22    The way that I would answer it is their performance

23    data requires a specific degradation for a specific

24    set of conditions.  They can be more restrictive

25    because that's the captain's command authority.
```

1      They cannot be less restrictive than that time

2      dictated by the FAA-approved manuals which have

3      tabulated data provided by an engineering source.

4          Q.   Okay.  Let me try asking my question one

5      more time.  I don't think I asked it very well.

6      From your familiarity with Amerijet's manuals, would

7      you agree that there is no express provision which

8      authorizes or -- which authorizes captains of

9      aircraft to make weight or speed degradations based

10     on observations of runway conditions in the absence

11     of contamination reports?

12          MS. NORTON:  Object to the form of the

13     question.

14          A.   There is information in their manual which

15     states that if the runway is wet, as I recall, they

16     consider it a dry runway unless it has a certain

17     amount of standing water.

18     BY MS. SHEA:

19          Q.   Okay.  What is -- what is or what are the

20     Part 125 criteria with respect to what portion of a

21     runway has to have standing water in order for the

22     runway to be deemed contaminated?

23          A.   It's -- part 121 is an operating

24     regulation.  Part 125 is a certification.  Rules

25     of -- certification rules fall under the purview of

```
 1    respect to the upgrade process for flight crew
 2    members seeking to upgrade to captain position?
 3         A.    Upon the person completing the ground
 4    simulator and the appropriate airplane portions of
 5    the training, the company would make contact with
 6    this office to schedule an inspector to accommodate
 7    an oral exam, followed by a simulator check, then
 8    followed by an airplane ride.  And such requests are
 9    generally made to me, and then I accommodate the
10    request by locating an inspector that can perform
11    the function.
12         Q.    All right.  Do you -- when you say locate
13    an inspector, are those FAA employees?
14         A.    That's correct.
15         Q.    All right.  So Amerijet, for example,
16    would advise you personally that they have a
17    candidate ready for this testing?
18         A.    That's correct.
19         Q.    And you would assign an inspector to --
20         A.    I would request assistance from an
21    inspector that is current and qualified in the type
22    of aircraft involved.
23         Q.    So that may depend on the aircraft, et
24    cetera.
25         A.    That's correct.
```

1    Unless it's in a formal -- formal letter or

2    something of that nature, we really wouldn't process

3    it as a violation.

4    Mr. Major may have contacted us or

5    Amerijet may have contacted us that such and such

6    occurred and provided us information and we would

7    examine that information in the light of all that we

8    had available to us and make some determination.  I

9    can't recall for certain.

10    Q.    But had that occurred, that would have

11    been a different incident, it wouldn't have been

12    this incident referring to the weight and balances

13    takeoff in August?

14    MS. SHEA:  Object to the form.

15    BY MS. NORTON:

16    Q.    Is that correct?

17    A.    It may have been, it may not have been.  I

18    can't recall.

19    Q.    Is the first notice that the FAA has of

20    the incident regarding the weights and balances and

21    contaminated runway, would that be October 18th?

22    A.    Yes, ma'am.

23    MS. SHEA:  Objection.  Form.

24    BY MS. NORTON:

25    Q.    There would be nothing prior to that, to

81

```
 1   your knowledge, prior to that time?
 2        A.   I don't have anything that I can recall
 3   that came in, in any kind of official capacity prior
 4   to this document here.
 5        Q.   Okay.
 6        A.   There -- if I could just say, the 10/18
 7   date would be the date that I opened the
 8   investigation, because that would have been the date
 9   that I would have examined the documents that Mr.
10   Major provided.
11        Q.   And it would have been after the opening
12   of the investigation you would have contacted
13   Amerijet, is that your policy and procedure?
14        A.   I would think so, yes, ma'am.  That's
15   what -- that's been my standard operating procedure.
16        Q.   You wouldn't have any reason to contact
17   them about an investigation you hadn't opened, would
18   you, sir?
19        A.   No.
20        Q.   Okay.  Mr. Major was terminated in August
21   of '99.  And you had previously asked counsel of the
22   allegations in the complaint and one of them is he's
23   alleging that he was discharged because of his age.
24   And the other -- and refused to be upgraded because
25   of his age.
```

 1    then it may have been provided.

 2    BY MS. SHEA:

 3        Q.    Okay.  Are you familiar with -- strike the

 4    question.  Pat goes on to state that he had sent a

 5    letter to NASA's ASRS, Aviation Safety Reporting

 6    System.  Are you familiar with that agency?

 7        A.    Yes, ma'am.

 8        Q.    What is that?

 9        A.    The National Aviation Space

10    Administration.

11        Q.    All right.  And what is the ASRS?

12        A.    Aviation Safety Reporting System provides

13    a forum where any airman or any aviation entity can

14    report to NASA the events surrounding an aviation

15    occurrence anonymously.  The information is signed,

16    but the information that could identify the reporter

17    is sterilized prior to NASA's release.

18            The ASRS program is designed to enhance

19    the national air space system without implicating

20    the person providing the information.  To make

21    things safer without that person being culpable.

22        Q.    And without pilots suffering reprisals for

23    having made safety violations; is that fair to say?

24        A.    They would not be culpable.

25            MS. NORTON:  Object to the form of the

```
 1    Major wrote.  What's the date of that letter?

 2         A.    October 1st, 1999.

 3         Q.    The reference in there to NASA, that is an

 4    organization that has no enforcement powers, does

 5    it?

 6         A.    No enforcement powers in regard to this

 7    issue.

 8         Q.    Thank you.  And this issue being what's

 9    raised in his letter of October 1st?

10         A.    Yes, ma'am.

11         Q.    The -- what constitutes a contaminated

12    runway, the one-quarter of an inch less, whether the

13    degradation should be taken that you referenced

14    earlier, that it could have had more definition.

15    And let's see, I think you said it could have been

16    one-sixteenth of an inch, three-sixteenths of an

17    inch.  You went on to describe various ways it could

18    be more detailed.  Do you recall that in general?

19         A.    Yes, ma'am.

20         Q.    The policy, though, that was in effect at

21    the time that Amerijet used, had that been approved

22    by the FAA?

23         A.    I believe that it had in their performance

24    data, which there are portions of here.  This

25    particular page is not an approved page, but what it
```

1    says is adverse weather, takeoff and climb, it's --

2    this is chapter 4, section 1-A, subject 55, adverse

3    weather, takeoff and climb.  Takeoff limitations,

4    takeoff should not be attempted if the following

5    limitations are exceeded, water more than

6    one-quarter inch deep.

7         And then it's -- it's deeper than that.

8    And it has certain stipulations here.  It doesn't

9    have a lot of definitive information.  It does have

10   an item from Daniel Liu, aircraft performance

11   engineer, which is page 2 of 3, with item 6.  It

12   talks about wet runway.  A runway is considered wet

13   when it is well soaked but without significant areas

14   of standing water, depth less than one-eighth inch,

15   or 3 millimeters of standing water.

16        A runway is considered to be well soaked

17   when there is sufficient moisture on the runway

18   surface to cause it to appear reflective.  The

19   information that they have is not, in my estimation,

20   or in my estimation, at the time, as generous as it

21   could have been because the data can be computed by

22   an engineering firm that is contracted to do that

23   kind of work.

24        Q.   Such a firm like Navtech?

25        A.   Yes, ma'am.  I believe that's who provided

```
 1    this data, or provided some of this data.  They
 2    have -- there is a letter here from Daniel Liu,
 3    Navtech System Support Incorporated.
 4              MS. NORTON:  Thank you.
 5              THE WITNESS:  I think there was an
 6    implication, if I may interject this, with regard to
 7    the second paragraph of page 2, of item approved
 8    three that Mr. Major alleges that a report from the
 9    safety officer would have been sent to the POI.  I
10    think that I should interject that if a report were
11    sent it would have contained a NASA form.  And any
12    information as contained in that NASA form really
13    could not be used to initiate an enforcement
14    investigation.
15                   REDIRECT EXAMINATION
16    BY MS. SHEA:
17         Q.   All right, sir.  That information could be
18    used with respect to implementing new safety and
19    performance policies; is that correct?
20         A.   That's correct.  And that would be carried
21    on by NASA through a bridge with the FAA in
22    Washington, as I recall.
23         Q.   And is there a law regulation with which
24    you're familiar which can subject a crew member to
25    disciplinary action for a willful violation,
```

```
 1   violation.
 2           MS. SHEA:  Okay.  Thank you.  All right.
 3   We're finished.  Thank you, sir.
 4           THE WITNESS:  You're quite welcome.
 5                   RECROSS-EXAMINATION
 6   BY MS. NORTON:
 7      Q.   In response to your last question, though,
 8   that does not change the fact the report may be
 9   used, but NASA is not an enforcement agency?
10           MS. SHEA:  Object to the form.
11      A.   Only within NASA, national aviation and
12   space, the space program they enforce.
13   BY MS. NORTON:
14      Q.   But not reports such as we've been
15   discussing here?
16      A.   That's correct.
17           MS. NORTON:  Thank you.  I have no other
18   questions.  I understand that you wanted to read
19   your earlier statement.
20           MS. SHEA:  Don't waive the right to review
21   it.
22           THE WITNESS:  Yes.
23           MS. SHEA:  Let's just do it on the record.
24   When it's transcribed, and I will order it, if it's
25   all right with Amerijet's counsel, then send me the
```

**9**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                  )    L.T. CASE NO.
                                      )    99-021746-11
            Plaintiff,                )
                                      )
vs.                                   )    © © P Y
                                      )
AMERIJET INTERNATIONAL, INC.,         )
                                      )
            Defendant.                )
- - - - - - - - - - - - - - - - - - -)

                        337 East Las Olas Boulevard
                        Fort Lauderdale, Florida
                        November 8, 2000
                        10:30 o'clock a.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
         - and -
     DANIEL BRESSLER, ESQUIRE
Appearing on behalf of the Defendant


------------------------------

DEPOSITION

OF

DERRY S. HUFF

------------------------------

```
 1              A.   We felt that Pat was a safety hazard to
 2      the airline.
 3              Q.   Based on what?
 4              A.   Based upon a letter that he had written in
 5      the form of a NASA report.
 6              Q.   So the discussion concerning Pat and the
 7      decision to terminate him was prompted by the NASA
 8      report?
 9              MS. NORTON:   Object to the form of the
10      question.   Go ahead.
11              A.   It was prompted by a specific sentence
12      in -- contained within the report.
13      BY MS. SHEA:
14              Q.   So it was an aspect of the report?
15              A.   Correct.
16              Q.   And what were all the factors that were
17      discussed in that and that were part of that
18      decision?
19              A.   The statement within the letter written by
20      Pat in which he stated that he had seriously
21      considered throwing himself upon the throttles of
22      the airplane as it was rolling down the runway,
23      which we considered to -- would have resulted in
24      certain tragedy.
25                   And the fact that based upon a review of
```

1    the tower tapes versus his record of the account and

2    his letter that there was significant differences

3    which either resulted from his -- either he really

4    believes it happened that way or he was deliberately

5    distorting the facts.

6        Q.    Okay.  Let's look a little bit at the

7    underlying scenario.  What was it that Pat was

8    complaining about in the NASA report?

9        A.    Pat was concerned about departing on a wet

10    runway.

11        Q.    Okay.  And by way of simple explanation,

12    are there considerations that need to be taken into

13    account when an aircraft takes off from a runway

14    that's wet rather than dry?

15        A.    Yes, there is.

16        Q.    And what is that basic consideration?

17        A.    The basic consideration that if a runway

18    is considerably contaminated by varying degrees,

19    which are specified in our performance manuals, that

20    there's a weight degradation taken on the airplane

21    to allow for a higher safety margin.

22        Q.    Degradation --

23        A.    A weight decrease.  Decrease the weight on

24    the airplane.

25        Q.    All right.  To allow a greater safety

```
 1              Q.    Okay.  Had those already been obtained?
 2              A.    They were not actually obtained at the
 3    time.  We requested production of them, I believe.
 4    But we did actually listen to them in the tower.
 5              Q.    All right.  So you, Derry Huff, got the
 6    tower tapes?
 7              A.    We requested the tower tapes.
 8              Q.    Okay.  In other words, they weren't
 9    available when you returned from va -- or from being
10    out of town?
11              A.    They were available for us to listen to,
12    but we were not given a hard copy of the tapes.
13              Q.    When did you listen to them?
14              A.    Sometime early in that week.
15              Q.    Okay.  So you actually went over to the
16    aviation authority and listened to them?
17              A.    Yes.
18              Q.    Who was part of that?
19              A.    I believe it was Pete Steele, John
20    Washington and myself.
21              Q.    Okay.  And are you able to testify as to
22    the discrepancy between what was in Pat's complaint
23    and what you heard when you went to the aviation
24    authority?
25                    MS. NORTON:  Object to the form of the
```

```
 1   question.  Go ahead and answer.
 2          MS. SHEA:  I'll rephrase it.
 3   BY MS. SHEA:
 4      Q.   Was there anything about your listening to
 5   the tower tapes that you found significant?
 6      A.   Yes.  The content -- just flat out that
 7   the content of the letter was not the same as the
 8   content of the audiotapes.
 9      Q.   Okay.  Do you recall any material way in
10   which it differed?
11      A.   There was significant discrepancies
12   between the sequence of events, the reported
13   material.
14      Q.   Okay.  Was there a -- an advisory or a
15   bulletin, whatever you would call it, from the tower
16   of standing water of less than one quarter inch
17   before the Amerijet plane was given take off
18   permission?
19          MS. NORTON:  Object to the form of the
20   question.  What time frame?  Immediately before,
21   days before, hours before?
22          MS. SHEA:  Well, on the tape that you
23   listened to.
24          MS. NORTON:  Okay.
25      A.   As far as I can recall, there was a report
```

```
 1    member or was that a term that was --

 2         A.    That was how it was reported to us, that

 3    he was being stalked.

 4         Q.    And who was that?

 5         A.    Tim Green.

 6         Q.    And did he tell you what he meant by

 7    stalked?  Strike the question.  Did you personally

 8    meet with Tim Green concerning this?

 9         A.    Tim Green came to me with it, yes.

10         Q.    And told you that he was being stalked?

11         A.    Yes.

12         Q.    Okay.  That was the word he used?

13         A.    That was the word he used.

14         Q.    And I assume you said what do you mean by

15    stalked?

16         A.    Yes.

17         Q.    What did he say?

18         A.    He proceeded to describe to me how he had

19    been closely following circumstances in his life and

20    intruding into his personal business and sharing

21    with other employees within the company, to include

22    documentation, copies of documentation and I believe

23    repeated phone calls to Tim Green's house

24    concerning -- concerning the subject, and that Tim

25    had asked him on several occasions to stop, to stop
```

1 the behavior. And he had not done so.

2   Q. Did Tim make a written complaint?

3   A. I don't recall that if he did or not.

4   Q. Okay. Do you recall the personal business

5 of Tim's that he was objecting to Pat's interest in?

6   A. I believe that some of it centered around

7 an injury that Tim had received while traveling on

8 company business.

9   Q. He got something like almost a $4 million

10 judgment?

11   A. Really?

12   Q. Is that -- have you heard that?

13   A. I have no idea.

14   Q. Never heard that before?

15   A. No.

16   Q. What else, if anything, do you know about

17 the subject that Pat was interested in? Pat Major

18 was interested in.

19   A. I don't recall any other specifics of the

20 accusation.

21   Q. It was a workers' compensation injury, as

22 you know it.

23   A. I don't recall the specifics of the rest

24 of it.

25   Q. An injury. Anyone else involved in this

```
 1    investigation or this -- accepting this complaint

 2    other than you?

 3         A.    Juan Morales.

 4               MS. NORTON:  Object to the form of the

 5    question.

 6    BY MS. SHEA:

 7         Q.    Who was Juan Morales?

 8         A.    He was the director of human resources.

 9         Q.    And did Tim make this report to the two of

10    you or did you involve Juan after Tim Green came to

11    you?

12         A.    He made the report to the two of us.

13         Q.    Is Juan still with the company?

14         A.    No, he's not.

15         Q.    Where did he go?

16         A.    I believe that he's working at DHL.

17         Q.    Okay.  What, if any -- strike the

18    question.  You said you brought Pat in for a

19    meeting, and his response to this accusation caused

20    you to question his state of mind.

21         A.    That's correct.

22         Q.    Did you make any documentation of the

23    complaint or of your meeting with Pat?

24         A.    Yes, I did.

25         Q.    What did that consist of?
```

1          A.    A summary of the meeting.

2          Q.    Okay.  Was -- did that become part of

3     Pat's file?

4          A.    I don't know if it's in Pat's file or not.

5          Q.    What did you do with that after you

6     created it?

7          A.    I submitted it to the human resources, to

8     Juan Morales.

9          Q.    Did it have opinions in it or did it just

10    recount who said what?

11         A.    I don't recall the specifics of the

12    letter.

13         Q.    Okay.  Did you make any recommendations in

14    it regarding any discipline or any measures to be

15    taken, either involving Pat or involving Tim Green?

16         A.    I don't recall the specifics of the

17    letter.

18         Q.    Well, did you form an opinion that

19    anything should be done concerning the situation?

20         A.    The result of the meeting was that -- was

21    that we had asked Pat to cease his behavior and that

22    was the end of it.

23         Q.    No further complaints from Tim Green?

24         A.    No.

25         Q.    So to your knowledge, Pat did refrain from

84

```
 1      whatever it was that Tim had objected to following
 2      your meeting?
 3          A.    To my -- I had no further complaints from
 4      Tim Green.
 5          Q.    Okay.  Other than phone calls to his home,
 6      did Tim Green recount any direct contact with Pat
 7      Major that he was objecting to?
 8              MS. NORTON:  Other than what he's already
 9      said.
10          A.    I believe that Tim stated that he had been
11      confronted by Pat on the airport ramp on occasion.
12      BY MS. SHEA:
13          Q.    So Pat had, according to Tim, confronted
14      him on the ramp and telephoned him at home?
15          A.    That's correct.
16          Q.    All right.  Okay.  Anything else that Tim
17      recounted to you that would comprise what he called
18      stalking, that you recall?
19          A.    No.
20          Q.    And other than it being something when an
21      injury that he, Tim, had received, do you recall
22      what it was that was the subject of what Pat was
23      supposedly interested in about Tim?
24          A.    No.
25          Q.    Okay.  All right.  So this episode did not
```

```
 1            Q.   How?
 2                 MS. NORTON:  Object to the form of the
 3       question.
 4       BY MS. SHEA:
 5            Q.   In what way?
 6                 MS. NORTON:  My objection or are you
 7       asking him a question?
 8                 MS. SHEA:  I'm rephrasing.
 9                 MS. NORTON:  Okay.
10       BY MS. SHEA:
11            Q.   In what way?
12            A.   That Brian took -- that there was concerns
13       raised in the cockpit that Brian addressed them,
14       evaluated the decision and made a decision and was
15       it correct or not.
16            Q.   So you don't fault Pat Major for raising
17       the issue?
18            A.   I don't fault him for raising the issue.
19       I do fault him that if the issue was a significant
20       issue for him, that he should not have -- he should
21       not have participated in the flight.
22                 He was concerned, that concerned about the
23       safety of the flight that he was considering
24       throwing himself on the throttles while it was
25       rolling down the runway, and he was aware of these
```

1    conditions while he was still parked at the gate,

2    that if it is that serious of a concern to him, that

3    he should have gotten off the airplane and would

4    have gotten off the airplane at that time.

5         Q.    Well, what if he did -- what if his

6    concern arose during the taxi, after the push back,

7    what then should Pat Major have done, other than

8    articulate his concerns to the captain, if anything?

9         MS. NORTON:    Object to the form of the

10   question.

11        A.    He should articulate his question to the

12   captain.    And for this specific instance, the

13   conditions had improved since the time that he had

14   performed the weight and balance.

15   BY MS. SHEA:

16        Q.    What do you base that on?

17        A.    The fact that the crew members told me

18   that it was raining while they were loading the

19   airplane, and it was not raining during their

20   departure.

21        Q.    All right.    And that's not documented at

22   all, as I understand it, at or before the time that

23   Pat was terminated.

24        A.    I'm not -- I'm not -- I don't know what's

25   documented, if that's specifically documented or

```
 1              Q.    Even if they were unfounded?

 2              A.    Absolutely.

 3              Q.    That would not be considered

 4       subordination?

 5              A.    That would not.

 6              Q.    Is there a policy on that, a written

 7       policy, that says that a first officer or flight

 8       engineer who has concerns about a pilot is

 9       authorized, without any disciplinary repercussions,

10       to leave the flight?

11              A.    That's part of our cockpit resource

12       management training.

13              Q.    So the difference is whether you push back

14       or not, if you haven't pushed back you can get off

15       any time, as a crew member?

16              MS. NORTON:    Object to the form of the

17       question.

18              A.    The difference is, on both of these

19       circumstances, Pat was the one responsible for

20       generating the weight and balance performance

21       report.    Pat did that at the gate.    And if he had

22       serious questions about it, that was the time for

23       him to raise those issues.

24                    And if he raised them and produced them to

25       the captain and the captain ignored his concerns,
```

```
 1   then he should have -- then he and I firmly believed
 2   that he was right, that he should get off the
 3   airplane.
 4   BY MS. SHEA:
 5       Q.   But that's not what you concluded is the
 6   course of action that Pat should have followed here
 7   because you didn't agree that the concerns were well
 8   founded; is that correct?
 9       A.   No.
10            MS. NORTON:  Object to the form of the
11   question.  Go ahead.
12       A.   That's not correct.
13   BY MS. SHEA:
14       Q.   Okay.  All right.  Did you conclude that
15   Pat Major's concerns were well-founded?
16       A.   No, I did not.
17       Q.   Therefore, if he'd gotten off at the gate,
18   he would not have been doing so for a well-based
19   reason; correct?
20       A.   If he was concerned about it, that was
21   reason enough for him to get off the flight.
22   Whether or not he was right or not would have been a
23   training concern.
24       Q.   And under no circumstances is a
25   disciplinary concerned?
```

1    things I believe that are referred to in the first

2    page.

3         Q.    Questioning his ability as a first

4    officer?

5         A.    That's correct.

6         Q.    On the comments, starting on page 4 and

7    going to page 5, did you -- were you faulting Pat

8    Major for not preventing the plane from taking off?

9         A.    Let me read what my comment is here.  And

10   your question is again?

11        Q.    Well, you say if you're correct, Pat, it's

12   very sad that you got onto that runway and took off.

13   What were you implying there?

14        A.    What I am implying is that if Pat truly

15   believed the position that he was taking, then he

16   should never have prepared the weight and balance

17   document that he did and he should have never

18   departed on that flight the way that he did.  Which

19   again refers to his poor decision-making ability.

20        Q.    Even though there was no reporting of

21   standing water at the time of push back?

22        A.    The conditions did not change between the

23   time that he prepared the weight and balance and the

24   time that the plane departed.

25        Q.    But Amerijet's policies would have the

`

`

**10**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.   00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                    )    L.T. Case No.
                                        )    99-021746-11
              Plaintiff,                )
                                        )
vs.                                     )
                                        )    COPY
AMERIJET INTERNATIONAL, INC.,           )
                                        )
              Defendant.                )
- - - - - - - - - - - - - - - - - - -)

                        500 East Broward Blvd.
                        Fort Lauderdale, Florida
                        Monday, January 8, 2001
                        10:00 a.m. - 12:05 p.m.

                    VOLUME 2

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

------------------------------

DEPOSITION

OF

DERRY S. HUFF

------------------------------

1       A.   It was about -- I believe yes, that it

2   was -- it was concerning the -- a lawsuit that he

3   had against Amerijet or a settlement that he had

4   against Amerijet and that Pat was disclosing --

5   disclosing the results of that to cockpit crew

6   members, something to that effect.

7       Q.   All right.  Had Tim Green sued Amerijet?

8       A.   I don't know what the specifics of it

9   were.

10      Q.   That was the gist of his complaint, that

11  Pat was discussing this matter with other crew

12  members?

13      A.   And that Pat was repeatedly confronting

14  him about the issue when he had asked him to stop.

15      Q.   Who prepares contamination reports at the

16  Fort Lauderdale Airport, who generates those?

17      A.   The airport itself.

18      Q.   The aviation authority?

19      A.   Broward County Aviation Department.

20      Q.   Okay.  Isn't it a fact that there are

21  trained people who go out and review the runway in

22  order to make those reports?

23      A.   I don't know the specifics of the training

24  involved.

25      Q.   Okay.  I asked you this two months ago, I

First Officer Proficiency Report
Pat Major
Flight 823
6-8-99

Flight 823 scheduled to depart at 1200z, myself and Larry Clifford; the Engineer arrived at 1100z. First Officer Major arrived at 1200z. We were delayed due to perishable freight and blocked out at 1305z. We weighed 195,000 lbs. in the blocks with 50,000 lbs. of fuel. During 20 minutes of waiting for takeoff clearance, the Engineer said we had 48,700 lbs. of fuel remaining. I told First Officer Major to check the runway analysis for runway 12. He did not open the book, but replied " it is the same for runway 9 left lima 1 intersection -191,000 lbs. takeoff limit". I again told him to open the runway analysis book and he disgustingly opened it to Miami runway 12. I showed him at the current temperature the runway limit was 194,000 lbs. with packs off and the wind at 8 knots - that we were well within limits to use runway 12. About 5 minutes later ATC requested us to use runway 12. I told First Officer Major to tell them O.K. Instead he replied to them "negative - we are too heavy, we must use runway 9 left full length". I told First Officer Major, "for the rest of the flight all decisions will come from the Captains seat. If he could not except that, I would taxi back and get another First Officer." His reply was "all I want to do is make it back alive!"

We arrived in Port of Spain 4 hours after block out from Miami. The agent brought us up the weight sheet and I told First Officer Major what positions to put them in. Instead of doing what he was told, he entered the information into his own personal laptop computer and I did the weight and balance myself. He then left the cockpit and proceeded to take pictures of the pallets as it was being off-loaded from the aircraft. He then started complaining to the agent about how the freight was palletized in Miami. I told him if he was that worried about how it was loaded; he should have showed up for work on time and complained about it then - not after the leg has already been flown. The leg from Port of Spain to St. Lucia was uneventful.

We left St. Lucia for St. Vincent where he complained I was not allowed to use flaps 40 for landing. I told him what I will use and when I will use it, and I will land the aircraft with or without his help. The leg from St. Vincent to San Juan was also uneventful.


PLAINTIFF'S
EXHIBIT
15
1/8/01

000254

We then left San Juan for Miami, at which time I allowed the First Officer to fly the leg. Then ATC requested us to descend from 31,000 ft. to 28,000 ft. and cross junior intersection at 16,000 ft. We were 150 miles from Miami when we started down. At 26,000 ft. I asked First Officer Major why he was still descending. He replied "we have to make the intersection at 16,000ft." I told him "you are 100 miles from junior, if you keep descending we will be 55 miles too early." He argued a little more, then realized he was not reading his DME correctly.

After flying this trip with First Officer Major, I feel he needs to pay more attention to his job according to the GOM and not concentrate all his efforts in finding fault in everyone else. First Officer Major has a hard time taking commands from his superiors and seems to enjoy being argumentative. Since he refuses to follow Captains orders he is a danger to himself and everyone around him. With 13 ½ years experience on the B-727 I feel very strongly that if First Officer Major were placed with a newly upgraded Captain, he might sway him to make poor decisions because of his persistence in arguing at every turn. That Captain might take his word that he is correct and ends up in a dangerous situation. He would be an accident waiting to happen. Maybe counciling may help him. My overall grade for him is 5 – unsatisfactory.

cc: Derry Huff
    Mark Stewart
    Pete Steele

Received 01-50-01   02:43pm   From-305 442 1578   -To-   Page 04

**RS. .FFICER OR FLIGHT ENGINEER PRU. .CIENCY REPORT**

American INTERNAT

| NAME | | CHARLOTTE NUMBER | | | BASE | DATE |
|---|---|---|---|---|---|---|
| PAT MAJOR | | | ☒ FIRST OFFICER ☐ FLIGHT ENGINEER | | MIA | 6-8-99 |

| AIRCRAFT TYPE | T&M/DATE | | APPROX. FLIGHT TIME HOURS |
|---|---|---|---|
| B-727 | FLT B-23  6-8-99 | HIA-POS-SLU-SVD-SSU-MIA | 9.8 |

INSTRUCTIONS: Evaluate the officer's items based on the following scale.

① EXCELLENT  ② ABOVE AVERAGE  ③ AVERAGE  ④ BELOW AVERAGE  ⑤ UNSATISFACTORY

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | PUNCTUALITY | 5 | COOPERATION | 3 | KNOWLEDGE OF JOB | 3 | KNOWLEDGE OF F.A.A. AND COMPANY PROCEDURES |
| 2 | PERSONAL APPEARANCE | 3 | FLIGHT EQUIPMENT | 4 | ABILITY TO PERFORM JOB | 3 | USE OF CHECKLIST |
| 5 | CONDUCT | 3 | KNOWLEDGE OF AIRCRAFT AND SYSTEMS | 5 | ABILITY TO ACCEPT INSTRUCTIONS | 3 | CONCERN FOR CUSTOMER |
| 4 | ATTITUDE | 3 | KNOWLEDGE OF NORMAL AND EMERGENCY PROCEDURES | 5 | RETENTION OF INSTRUCTIONS | 5 | CREW COOPERATION |

| FIRST OFFICER | | | | FLIGHT ENGINEER | | | |
|---|---|---|---|---|---|---|---|
| 3 | FLIGHT PLANNING | 2 | HANDLING OF AIRPLANE | | AIRCRAFT PREFLIGHT | | MONITORING CORRECT CLIMB POWER |
| 3 | FORMS WORK | 2 | ALTITUDE AWARENESS | | COCKPIT PREPARATION | | USE AND KNOWLEDGE OF PERFORMANCE MANUAL |
| 3 | COCKPIT PREPARATION | 4 | ABILITY TO LAND AIRPLANE | | LOG BOOK CHECK | | USE OF TAKEOFF & LANDING D CARD |
| | RADIO EQUIPMENT CHECK | 3 | COMPLIANCE WITH NORMAL OPERATING PROCEDURES | | REPORT OF AIRCRAFT CONDITIONS TO CAPTAIN | | ENROUTE OPERATIONS |
| 3 | USE OF COMMUNICATIONS RADIO | 3 | INSTRUMENT FLYING AND A T C PROCEDURES | | ENGINE START PROCEDURES | | IN RANGE AND BEFORE LANDING DUTIES |
| 3 | HANDLING OF A T C CLEARANCES | 3 | NAVIGATION (MAINTAINING TRACK, ALTITUDE, ETC.) | | MONITORING ELECTRICAL SYSTEM | | SECURING |
| 4 | DEPARTURE AND APPROACH PATTERN | 2 | USE OF NAVIGATION RADIOS | | INSTRUMENT MONITORING | | LOG BOOK ENTRIES |
| 3 | MONITORING OF INSTRUMENTS AND CONTROLS | 3 | AREA NAVIGATION | | HEATING AND COOLING | | INTERMEDIATE STATION WALK AROUND & FUEL LOADING |
| 3 | AIRSPEED CONTROL | 4 | USE AND KNOWLEDGE OF PERFORMANCE MANUAL | | PRESSURIZATION | | HYDRAULICS |
| 2 | COLLISION WATCH | 3 | KNOWLEDGE OF ROUTES, FREQ. & AIRPORT INFORMATION | | ABILITY TO TROUBLESHOOT MALFUNCTIONING SYSTEMS | | POST FLIGHT INSPECTION |
| 3 | RADIO WATCH AND POSITION REPORTS | | | | | | |

**REMARKS**

SEE Attached

| OVERALL GRADE | WERE UNSATISFACTORY ITEMS DISCUSSED? ☐ YES ☒ NO | CHECK IF TWO-LANDING REQUIREMENT COMPLETED PER FAR 121.441(e). ☐ | ON FLIGHT NO. / DATE |
|---|---|---|---|

| CHECK PILOT SIGNATURE | EMPLOYEE NO. | BASE | DATE |
|---|---|---|---|
| Brian A. Steele | 2025 | MIA | 6-8-99 |

**NOTE: USE REVERSE SIDE TO BETTER EXPLAIN AND UNUSUAL EVALUATIONS OR CHARACTERISTICS.**

000253

**11**

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2

3
                         CASE NO. 00-6070 FERGUSON/SNOW
4                        L.T. CASE NO. 99-021746-11

5

6     PATRICK SCOTT MAJOR,

7              Plaintiff,

8     vs.

9     AMERIJET INTERNATIONAL, INC.,

10             Defendant.
                                    /
11                                        

12

13

14                            One E. Broward Blvd.,
                              Ft. Lauderdale, Florida,
15                            Monday, 10:40 a.m.,
                              February 19, 2001.
16

17

18

19

20                    D E P O S I T I O N

21                            of

22                      DAVID BASSETT

23             taken on behalf of the Plaintiff
         pursuant to a Notice of Taking Deposition
24

25


              FRIEDMAN, LOMBARDI  & OLSON

16

anything, happened after that to cause you to make the decision
that he was not a viable Captain candidate at Amerijet?

MRS. NORTON:  Object to the form of the question.

A.    I am lost on that question.  You will have to start it
again.  I don't know what you are asking me.

Q.    Well, he had the problem with the FAA oral, which you
did not flush him out of the upgrade program because of that.
Correct?

A.    That is correct.

Q.    You knew about it at the time?

A.    Uh-huh.

Q.    You could have decided that that was a disqualifying
event.  Correct?

A.    Yes.

Q.    He was still in the upgrade program?

A.    Yes.

Q.    Then he went and got a type rating elsewhere and I
hear what you are saying, that that is not conclusive of
anything.  Correct?

A.    Yes.

Q.    Then you decided not to upgrade him, to wash him out
of the upgrade process.  I just wanted to know what caused that
decision to be made.

A.    Again, the decision was made based on the
recommendation of the Training Department and the Operations

FRIEDMAN, LOMBARDI & OLSON

1    Department.

2         Mr. Major went out and got a type rating from
3    someplace else. You can get a type rating from anybody, that
4    does not really mean anything. You still have to pass the
5    training program and actually go into and go through the whole
6    process of becoming a Captain or any other position, for that
7    matter, for an air carrier.

8         Q.   So in Mr. Major's case, did he go through that process
9    subsequent to getting this type rating?

10        A.   I don't even know if I know -- I am not sure I
11   understand your question.

12        Q.   Did he fail something in the training process at
13   Amerijet?

14        A.   Yes, he did. He failed the upgrade training.

15        Q.   What training did he fail?

16        A.   According to the Training Department, he failed the
17   oral.

18        Q.   But he failed, according to your Training Department,
19   he failed the oral, but you did not rule him out. So I just
20   want to understand. Did he fail some training subsequent to
21   that?

22        A.   No. As I recall, Pat, at that time, felt that if he
23   went out and got a type rating, that that would somehow change
24   the situation in the Training Department. That now that he had
25   the type rating, that would then enable him to become a Captain

FRIEDMAN, LOMBARDI & OLSON

1    and that is not just what has to happen. He has to complete the
2    training program, he has to go through the training program in
3    order to do that.

4        Q.    Basically you made your decision based on the failure
5    of the FAA oral exam and you are being told that he had failed
6    internal training at Amerijet?

7        A.    I made my decision based on the recommendation of the
8    Training Department and the Operations Department. The Training
9    Department and the Operations Department told me that they were
10   not satisfied with Mr. Major and his training and his ability to
11   be a Captain at Amerijet. Even though he had subsequently
12   received a type rating, they were not satisfied that he was
13   capable of doing that.

14       Q.    But if I ask you, did he have any Amerijet training
15   after the FAA oral, do you know the answer to that question?

16       A.    I don't know the answer to that question.

17       Q.    If I asked you, should he have had additional Amerijet
18   training after the FAA oral before such a determination was
19   made?

20       A.    No.    I don't think he necessarily should or should
21   not.    You asked me did I make up my mind and I told you I did
22   not make up my mind. Shouldn't or should he have received the
23   training? I don't know whether he should or should not have.

24       Q.    You don't know whether he got any or did not get
25   anymore training at Amerijet?

FRIEDMAN, LOMBARDI & OLSON

1   our manuals someplace, at least, layout broad guidelines as to
2   the viability of candidates.

3       Q.    Could you contrast Pat Major with other Captain
4   candidates and describe for me the differences in qualifications
5   or criteria?

6       A.    I am not familiar.

7       Q.    Are you the final authority on who makes Captain and
8   who doesn't make Captain in general?

9       A.    Well, yes and no.  I mean most of the time I am not.
10  The only time I become that final authority is if either I voice
11  a concern or there is a concern in terms of the ultimate safety
12  of the operation.

13      Q.    When you made the decision concerning Pat Major in
14  1999, you haven't mentioned any safety issues.  What, if any,
15  concerns did you have with regard to safety?

16      A.    The Training Department told me that he was again not
17  qualified and, not necessarily qualified, but not able and
18  capable of filling that position.

19      Q.    But if I understood your earlier testimony that
20  related to failures of formal training within the training
21  manual of Amerijet, were they safety related or not?

22          MRS. NORTON:  Object to the form of the question.
23  That is not what his testimony reflected.

24      A.    I will repeat it one more time.  The Training
25  Department told me that in their opinion Pat Major was not

FRIEDMAN, LOMBARDI & OLSON

1    qualified and was not able to be a Captain.  That is what they
2    told me.

3           When I did my review and I asked my questions, short
4    of getting in the airplane and going to fly with him, which I
5    haven't done in years and years, I basically take the
6    information that comes from that department and I evaluate that
7    and look at it, look at its history and then make a
8    determination.

9           Q.    Let me ask it this way.  Obviously you continued in
10   your belief that Pat was a safety capable First Officer or you
11   could have discharged him?

12          A.    That is correct.  At that point in time I felt that he
13   was a capable First Officer.  He was not a capable Captain.

14          Q.    Why did you offer Pat in his exit package in 1997 an
15   age discrimination release?

16          A.    Any time you offer a package to anybody, an exit
17   package, there is a standard program that is put together, our
18   attorneys put together, that encompasses all kinds of things.
19   We just gave him a standard package.

20          Q.    So you had legal advice and counsel at that point?

21          A.    I always have legal advice and counsel when it comes
22   to employee issues.

23          Q.    Did you specifically seek any advice of counsel
24   regarding your decision to inform Pat in 1999 that he would not
25   be promoted to Captain?

FRIEDMAN, LOMBARDI & OLSON

1    A.    No, I did not seek any legal advice on that one, no.

2    Q.    Was Pat's age a factor in your personal

3    decision-making process?

4    A.    Absolutely not.

5    Q.    Have you ever made statements to Pat to the effect of,

6    if you don't like it here, just go somewhere else?

7    A.    I don't remember.

8    Q.    Have you made statements of that nature in pilot

9    meetings or to pilots in general that work for you?

10    A.    Oh, I have made statements many times to people, you

11    have to like your job and if you are not happy at the job here

12    at Amerijet, then it is probably best for both of us that you

13    not be here.

14    Q.    Did you have any involvement in the decision to

15    terminate Pat Major's employment?

16    A.    Yes, I did.

17    Q.    How was that presented to you?  What happened?

18    MRS. NORTON:    Object to the form.  Can we take a break

19    or do you want him to answer that?

20    MS. SHEA:    Answer the question, then we can take a

21    break.

22    MRS. NORTON:    Okay.

23    A.    The decision to terminate Pat was when I realized and

24    became aware of the situation on the runway that ultimately

25    resulted in what I refer to as the NASA report.  The report

FRIEDMAN, LOMBARDI & OLSON

Q.    Are your pilots authorized to disregard official runway contamination reports?

MRS. NORTON:    Object to the form of the question.

A.    No.

Q.    If given your conclusion in August of 1999 that if Pat had a concern about the flight, it did not matter whether it was unfounded or well-founded, he should have gotten off the flight and had he done so there would be no repercussions to him, why did you not simply do a memorandum to him advising him of that fact?    What, in your opinion, warranted termination?

A.    Well, because he allowed this flight to actually continue to the point where he had got to the place where a severe hazard had occurred or what could have occurred.    I mean in his NASA report he mentions that ultimately.    The ones that particular stick out in my brain, the most was ultimately I was out of options and all I could really do is throw myself on the throttles to stop the airplane.

I mean to me, as a pilot, there is really two very, very serious times or dangerous places in an airplane.    Probably the most dangerous is a fire.    An airborne fire is an incredibly dangerous place to me.    Probably, to me, the second most dangerous place is to be on the take-off roll and abort the take-off.

Any airman that basically considers himself in a position that he has no other option other than to throw himself

FRIEDMAN, LOMBARDI & OLSON

1    on the throttles on the take-off roll is incredible.  There is

2    no cockpit resource management going on.  There is a severe lack

3    of judgment.  There is a severe lack of pre-flight planning.

4    There is no crew coordination going on.  It is just the wrong

5    place to be.

6            Any crew member that is involved in and feels that way

7    at that point and has allowed it to go that far, particularly a

8    crew member that has been with Amerijet as long as Pat has been

9    with Amerijet, is just unacceptable.

10        Q.    Well, obviously Pat Major did nothing to forcibly

11    prevent the take-off of that flight.  He did not get fired for

12    doing some rash maneuver in the cockpit in terms of flying.

13        A.    He got fired for not taking care of the problem before

14    or making sure the problem was cared for to his level of concern

15    and comfortable before the airplane ever had the engine started.

16        Q.    To answer my question, you are well aware at the time

17    you decided to fire him that he did not do anything in the

18    cockpit to disrupt the flight?

19        A.    Thank God.

20            MRS. NORTON:  Object to the form.

21        Q.    He deferred and that is what you are supposed to do

22    once you are underway?

23            MRS. NORTON:  Object to the form.

24        A.    No.  I am sorry, that is not what you are supposed to

25    do.

FRIEDMAN, LOMBARDI & OLSON

1    Q.    You are supposed to ---

2    A.    You are supposed to do something before you are

3    underway.

4    Q.    Once you are underway then the pilot in command is in

5    charge?

6    A.    The pilot in command is in charge as long as the

7    airplane is operating, yes.

8    Q.    I just want to make sure I understand. He got fired

9    because he should have gotten off at the ramp regardless of

10   whether his concern was well-founded or not?

11   A.    No, no. If he had as much as a concern as he

12   obviously had, it was his duty and his obligation by FARs to

13   stop at least for him not to participate in that flight.

14   Q.    And he was fired for his poor judgment. Tell me in

15   your own words.

16   A.    He didn't have the courage, did not have the correct

17   judgment. He felt very strongly about a situation as it related

18   to safety and failed to follow through.

19   Q.    Now, you don't know anything more about the prior

20   incident than what you testified to a few minutes ago that you

21   discussed it with Derry?

22   A.    I don't recall.

23   Q.    Don't recall any specifics about that?

24   A.    Don't know.

25   Q.    Don't know if he was reprimanded or not?

1      A.    Don't know.  Certainly he was not fired.

2      Q.    Don't know whether Brian Steele complained about him

3  or not?

4      A.    Don't remember.

5      Q.    What other employees at Amerijet had made a NASA

6  report and brought it to your attention?

7      A.    Can't remember any specifics.

8      Q.  ·Can't think of any?

9      A.    Can't think of any.

10     Q.    Can you tell me any other employees who have ever

11  gotten off an airplane under this duty that you testified about

12  to not participate in the flight that have escaped any

13  discipline or reprimand?

14     A.    Well, me for one.

15     Q.    Tell me.

16     A.    I have done it.

17     Q.    Tell me your experience.

18     A.    I was flying with my ex-partner actually in a Learjet

19  and I was serving as the copilot and we actually came to the

20  runway with take-off clearance with snow on the wicks and I

21  refused to be part of the crew.  It was his leg, I was not the

22  Captain and I got off the airplane.  I basically said I am not

23  accepting the take-off clearance.

24         I am aware of one other incident that Mr. Huff told me

25  about in which he actually did the same thing.

FRIEDMAN, LOMBARDI & OLSON

1     Q.   Let me rephrase that.  Have you testified fully as to

2  all the reasons underlying your decision not to promote Pat

3  Major?

4          MRS. NORTON:  Object to the form of the question.

5          THE WITNESS:  Do I answer this?

6          MRS. NORTON:  I don't know how you can.

7     Q.   Have you given me all your reasons?

8          MRS. NORTON:  Object to the form of the question.

9     A.   I think I have.  I mean basically the reasons that I

10  have for not promoting him is that I felt that without the

11  recommendation of the people that trained him that it is just a

12  safety risk that I am just not ready to do.

13         Ultimately when the decision of the Flight Department

14  and the Training Department is disputed by an employee and they

15  ultimately come to me to mediate it, I have to look at what I

16  can look at and then make that determination.  That is what I

17  did.

18     Q.   Well, was there a dispute between Pat Major and the

19  Departments at that point?

20     A.   Well, certainly once Pat wanted to be promoted and he

21  was not, so Pat was continuing to desire to be promoted.

22     Q.   Right, and he had not been dissuaded in that effort

23  until your decision, as I understand it.  Do you know to the

24  contrary?

25     A.   No.

FRIEDMAN, LOMBARDI & OLSON

209

1        A.    It was about -- I believe yes, that it

2    was -- it was concerning the -- a lawsuit that he

3    had against Amerijet or a settlement that he had

4    against Amerijet and that Pat was disclosing --

5    disclosing the results of that to cockpit crew

6    members, something to that effect.

7        Q.    All right.  Had Tim Green sued Amerijet?

8        A.    I don't know what the specifics of it

9    were.

10        Q.    That was the gist of his complaint, that

11    Pat was discussing this matter with other crew

12    members?

13        A.    And that Pat was repeatedly confronting

14    him about the issue when he had asked him to stop.

15        Q.    Who prepares contamination reports at the

16    Fort Lauderdale Airport, who generates those?

17        A.    The airport itself.

18        Q.    The aviation authority?

19        A.    Broward County Aviation Department.

20        Q.    Okay.  Isn't it a fact that there are

21    trained people who go out and review the runway in

22    order to make those reports?

23        A.    I don't know the specifics of the training

24    involved.

25        Q.    Okay.  I asked you this two months ago, I

**12**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                    )    L.T. Case No.
                                        )    99-021746-11
                Plaintiff,              )
                                        )
vs.                                     )
                                        )    COPY
AMERIJET INTERNATIONAL, INC.,           )
                                        )
                Defendant.              )
- - - - - - - - - - - - - - - - - - - -)

                        500 East Broward Blvd.
                        Fort Lauderdale, Florida
                        Monday, January 8, 2001
                        3:05 p.m. - 4:04 p.m.


APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant


- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION

OF

JOHN W. WASHINGTON

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 1     flight from Fort Lauderdale that Pat was crew on

 2     in --

 3          A.   Yes.  Yes, ma'am.

 4          Q.   -- in August 1999?

 5          A.   Yes, ma'am.

 6          Q.   Okay.  What was your role in that?

 7          A.   I was asked by Pete Steele and Derry Huff

 8     to coordinate a visit to the Fort Lauderdale tower

 9     to review a tower tape that was on the date of that

10     flight, I believe 8/27, out of Fort Lauderdale.  And

11     to a company them just to take notes or jot down

12     anything that may have been on the tape that raised

13     any questions.

14          Q.   Okay.  And who did you go with to that

15     visit to --

16          A.   I think his name -- the person that

17     accompanied us, I think it was Mr. Boyd.  At the

18     Fort Lauderdale tower.

19          Q.   Okay.  And then did Pete, Derry and you

20     three all go --

21          A.   Yes, ma'am.

22          Q.   -- and listen to this tape?

23          A.   It wasn't really a physical tape, it was

24     digital.  It was on a computer.  They don't transfer

25     to tape until later on.

1        Q.   All right.  What did you understand to be

2    the purpose for your listening to the tape when you

3    set this meeting up and went?

4        A.   I was given a NASA report that Pat had

5    faxed to I believe Derry or Pete Steele, and they

6    just wanted me to accompany them and to see if there

7    was any discrepancy between the report and what the

8    tape said.

9        Q.   Okay.  So before you went to listen to the

10   tape, you understood you were going to see if the

11   tape was consistent with --

12       A.   That's correct.

13       Q.   -- the NASA report?

14       A.   That's correct.

15       Q.   Was there any discussion about the

16   potential FAA violation that Pat had outlined in the

17   report?

18       A.   No.  I don't recall that, no.

19       Q.   Did you read the NASA report before you

20   went and listened to the tower tape?

21       A.   I believe I did.

22       Q.   Did you give any opinion, as director of

23   training, as to whether what was reported by Pat

24   Major, if correct, would have been an FAA violation?

25       A.   If correct, would have been an FAA

```
 1    contamination check at the time of taxi out, which
 2    is -- would not be the proper time to do that.
 3    Normally it's done when you're at the blocks with
 4    the airplane parked, not normally when it blocks
 5    out.  It's something, information you want to know
 6    before you leave rather than taxiing out.  So that
 7    was something that I remember that stuck out.
 8         Q.    Okay.  So that didn't have to do with a
 9    discrepancy, that had to do with something that you
10    felt his request was --
11         A.    Right.  That was like opinions or just
12    something that stuck out in my head.  This was the
13    first time I heard it, so I was giving my opinion at
14    the time of what I thought was out of place or out
15    of the norm.
16         Q.    Any other comments that you recall giving
17    as you listened to the tapes?
18         A.    Um, there was a couple, I believe, that
19    was, um, inconsistent with the NASA report that I
20    read that there was, during taxi out, when they
21    transferred him over from ground control to tower,
22    they asked Pat.
23               I recall Pat asking for them to pass along
24    the report to tower, since they're two different
25    frequencies.  And when they came back over to tower
```

14

```
 1    frequency, they said that they were -- they would
 2    pass out the report along when it came available.
 3            And then they asked if they were -- can
 4    they accept a departure, and then Pat responded with
 5    a yes, or affirmative, I can't recall which one it
 6    was, without hearing the report.  I found that a
 7    little odd.
 8        Q.   Okay.  Was the report in fact issued
 9    before take off?
10        A.   The report was issued before take off.
11    They asked the first time, would you be able to
12    accept the departure.  And the response back from
13    Pat was, yes.  And then they told him I believe to
14    go down in position and hold on the runway.
15            And then the report came back and said --
16    the tower came back and gave the report of the
17    runway conditions.  And let's see.  Came back with
18    the runway conditions and then said -- then that was
19    it.
20            And they came back and said in the same
21    breath that runway condition report, he read back
22    the runway condition report and then said the flight
23    number and then says, ready for take off, without
24    that delay, which in the NASA report said that there
25    was no pause or delay from the report of the
```

```
 1           Q.    Were you asked by anyone to document your

 2      impressions, your comments about the take off

 3      circumstances of that flight?

 4           A.    No, ma'am.

 5           Q.    Have you ever done that to this day?

 6           A.    No, ma'am.

 7           Q.    In the investigation, before Pat was

 8      terminated, do you know whether anyone obtained

 9      Brian Steele's recollections or perspective on what

10      happened on that flight?

11           A.    I was -- if there was, I was not a part of

12      that.

13           Q.    If when a contamination report came out

14      the captain had already advanced the throttles and

15      the take off roll had started, would you expect the

16      first officer to try to delay the take off?

17           A.    If he feels that it's threatening the

18      safety of the flight, yes, I would.  I would

19      expect -- there's different ways that you can do it,

20      but I would expect an intervention of some sort.  If

21      he's -- if that person, he or she, is concerned

22      about the safety of the flight.

23           Q.    And what would be a permissible sort of

24      intervention, assuming there's a well-founded

25      concern about the safety?
```

1          A.    Probably being the co-pilot, working the

2      radio transmissions with ATC, I would have probably

3      broadcast on the radio that we were 17,000 pounds

4      overweight and we could not leave, and that would

5      basically stop it right there.

6          Q.    Why did you just say 17,000 pounds

7      overweight, is that some information that you have

8      relating to this flight?

9          A.    There were some numbers that I saw about

10     the less core decrements in Fort Lauderdale.  Plus

11     training, ground school and all that we use that as

12     far as training purposes.

13         Q.    So you've used the FAA investigation

14     materials of this incident in training?

15         A.    No.  We just use it as contaminated

16     runway.  We do that every training session, as far

17     as ground school.  And snow, it could be ice,

18     whatever.  We use 17,000 pounds and 27 knots, so

19     it's just a generic as far as for training purposes.

20         Q.    And you train people if there's a report

21     of contamination of standing water less than a

22     quarter inch, you take those decrements?

23         A.    There's more to it.  It has to be between

24     an eighth of an inch and a quarter of an inch of

25     standing water to cause dynamic hydroplaning.  If

36

1    co-pilot, which does the weight and balance data for

2    the aircraft, enters it into a weight and balance

3    computer.

4        Q.   And do you know who the co-pilot was on

5    the flight in question in August?

6        A.   Patrick Major.

7        Q.   And it's Mr. Major's responsibility to

8    determine what the balance of the total weight of

9    the plane should be?

10       A.   He determines what it is.  What it should

11   be is determined through the runway analysis data.

12   And that is written on the load plan under a

13   performance area, and he provides that.  He does the

14   calculations, enters those numbers.  And then

15   whatever the computer displays, he writes down the

16   load plan of those weights and then presents that to

17   the captain for his signature.

18       Q.   Is it his responsibility only to present a

19   load plan that he believes is correct and complies

20   with FAA?

21       A.   That's correct.

22       Q.   And if in fact he is presented with the

23   plan, then he has the captain sign off on it?

24       A.   That's correct.

25       Q.   So it's initially his responsibility to

1    make sure the plane is not overloaded?

2         A.    Yes, ma'am.   That's correct.   Yes, ma'am.

3         Q.    Now, if in fact this flight, the

4    conditions changed or there were reasons for the

5    first officer, the co-pilot, to believe

6    circumstances have changed, did Mr. Major, other

7    than being the initial person to make the decision

8    anyway, have opportunities to raise this issue with

9    the pilot?

10        A.    Yes, ma'am.

11        Q.    Okay.   And what would have been the first

12   opportunity?

13        A.    Um, on the ramp, with the airplane parked

14   at the ramp, on the ground.

15        Q.    And how could that have been done?

16        A.    That could have been done with discussion

17   with the captain, of the conditions at the airport.

18   The condition should have been determined prior to

19   block out.   Before wheel movement.

20        Q.    And what conditions are those?

21        A.    If there was a condition of the runway, it

22   would have been posted on the ATIS, the hourly

23   weather broadcast.   It's on a frequency on the

24   airport.   And if there was any runway conditions

25   that would affect the safety of the flight, they

40

1          Q.    And then once they're ready for taxi,

2    before they push off, if the co-pilot believed that

3    the conditions were unsafe, does the co-pilot have

4    various options?

5          A.    Prior to push back?

6          Q.    Yes.

7          A.    Yes, ma'am.

8          Q.    And what are they?

9          A.    He could get off the airplane, the stairs

10   are still there.  If he has a dispute about the

11   runway contamination, if he found out from the

12   airport that it was actually contaminated, then he

13   has an opportune time to get up and get off the

14   airplane at that time and not take the flight.

15         Q.    Now, in your recollection of reviewing it,

16   and I realize you have not looked at his reports and

17   compared it with the FAA, it's not in front of you,

18   but do you recall finding conduct or conversations

19   that would have been inconsistent with someone who,

20   based upon their report, said that they were

21   considering throwing themselves on the throttles?

22              In other words, did the conduct that you

23   recall hearing, the conversation you heard in the

24   FAA tapes, was that consistent with a co-pilot, the

25   circumstances that a co-pilot would consider

1    throwing himself on the throttles of the plane?

2          MS. SHEA:  Objection.  Argumentative.

3    Lack of predicate.

4    BY MS. NORTON:

5          Q.   Do you understand my question?

6          A.   Yes.  There was a discrepancy of what I

7    heard on the tower recording versus what I saw in

8    the NASA report.

9          Q.   Okay.  And what were those discrepancies?

10         A.   Just the discrepancies of the NASA report

11   stating that there was no way of turning back, or no

12   way of getting -- there's no way, you're basically

13   now along for the ride.

14         Whereas it showed concern in the NASA

15   report, yet on the tower tape it seemed like, you

16   know, are you ready to take a departure, or can you

17   accept a departure.  There was no conversation of

18   us, no pause of conversation in -- according to the

19   NASA report, it seemed like there was conversation

20   in the cockpit about this during the taxi out.

21         Whereas the tower tapes indicated to me

22   that there was no -- there was no pause or delay,

23   there's just a yes, or an affirmative, and that was

24   it.

25         Q.   Would you have expected a pause?

42

```
 1          A.   Yes.

 2          Q.   If there had been conversation in the

 3     cockpit?

 4          A.   Yes, ma'am.  Um-hum.

 5          Q.   And why would you have expected the pause

 6     in the tape?

 7          A.   If the crew member had a legit concern as

 8     far as the safety of the flight.  I would expect

 9     them, if it's a co-pilot working the radios, to say

10     stand by or give me a minute.  And that would be a

11     time where the co-pilot would talk with the captain

12     and say, due to the present conditions, do you feel

13     like we should take a departure, can we accept a

14     departure.

15               And that would take at least five seconds.

16     And there was no pause or delay in that

17     transmission.  It was just a yes without any

18     conversation.

19          Q.   And no hesitancy?

20          A.   That's correct.

21          Q.   Any other discrepancies you found on the

22     tape?  As to what you could expect to find that in

23     fact the co-pilot was faced with the situation that

24     Mr. Major has outlined in his NASA --

25          A.   Yeah, there was a report where they gave
```

```
 1    the runway contamination report and they ended the
 2    transmission.  The co-pilot, Mr. Major, came back
 3    and said on the tape, or on the transmission to the
 4    tower, that he repeated the contamination report and
 5    then said the flight number and says, ready for take
 6    off.
 7             I would expect, you know, contamination
 8    report with a delay and then a conversation in the
 9    cockpit which would, to me, would take about ten or
10    20 seconds, depending, and then a response back
11    saying yes, we can, or no, we can't.  Depending on
12    that.
13             But there was none.  There was a read back
14    and a clearance, affirmative to go, ready for take
15    off, which I would expect a delay if there was a
16    conversation or if there was a concern for safety.
17        Q.   And if -- let's just assume for purposes
18    of my question that the pilot is still not listening
19    and the co-pilot has a true concern over the weight,
20    maybe conditions changed, whatever, are there any
21    other avenues at that point in time when you're on
22    the runway that the co-pilot could have taken?
23        A.   Yes, ma'am.
24        Q.   And what are they?
25        A.   He could --
```

44

```
 1                    MS. SHEA:  I'm going to object to the
 2      hypothetical.  It assumes facts not in evidence.
 3      Unless you're putting him on as an expert.
 4      BY MS. NORTON:
 5           Q.   Go ahead.
 6           A.   That would be transmitting to the tower
 7      the concerns of either their actual conditions at
 8      the time or just his concerns at the time.  If it
 9      was just that crew member's concern.  If it wasn't
10      the pilot command's concern of safety and it was the
11      co-pilot's, there is either, you know, saying no to
12      the captain, that the captain says we're going
13      anyway, then there's a way of getting out, by
14      responding to the ATC that you're not ready for
15      departure.  And they would cancel your take-off
16      clearance.
17           Q.   Could you say that we're overloaded?
18           A.   Yes.  You could say that, sure.
19           Q.   Now, were these the type of things that
20      you would have expected to find in the FAA tape if
21      in fact Mr. Major had the concern that he wants us
22      to believe he had in his August write ups?
23                    MS. SHEA:  Object to the form.
24                    MS. NORTON:  What's your objection?
25                    MS. SHEA:  He has not testified that he
```

```
 1      there was -- if there was I mean proper reasoning
 2      for it.  If it was determined that it wasn't, I
 3      would expect none.  If he had the right reason to.
 4      Or any other co-pilot.
 5           Q.   But if you disagreed with the reason, then
 6      there could have been serious implications?
 7           A.   That's correct.  That's correct.
 8           Q.   He could have been considered
 9      insubordinate?
10           A.   That's true, yes.
11           Q.   The conditions that are assumed in
12      producing weight and balance materials, are those
13      specified by the captain?
14           A.   I'm sorry, can you repeat that question,
15      please?
16           Q.   The conditions that are assumed in
17      producing performance materials, are those specified
18      by the captain?
19           A.   Are you saying that the weights or -- I
20      don't understand the question.
21           Q.   What -- all right.  What the acceptable
22      weight and speed will be, are those conditions
23      provided by the captain?
24           A.   Those are provided by the co-pilot to the
25      captain to review.  And if they're out of limits, he
```

1   would say so, or not sign -- or sign the load plan.

2      Q.   If the captain doesn't approve of the

3   underlying assumptions leading to production of the

4   weight and balance report, is it his prerogative to

5   refuse to sign it?

6      A.   That's correct.

7      Q.   What happens then?

8      A.   If he refuses to sign it, it should be --

9   there should be a reason for it.  If -- it should

10   never be presented to a captain, that should refuse

11   to sign it.  It should be presented under limits

12   and within CG.  If there's no discrepancies with

13   that load plan, there should be no reason for him

14   not to sign it.

15      Q.   Okay.  But if the captain does refuse to

16   sign it, isn't it true that the first officer has to

17   repeat production of a report until he comes up with

18   one to prove it?

19      A.   I don't know why that person would put a

20   report or hand a report without it being within

21   limits.

22         MS. SHEA:  Okay.  That's all I have.

23   Thank you.

24         MS. NORTON:  Nothing else.  I will get to

25   you by Wednesday noon on the attorney issue that

**13**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:  00-6070-Ferguson/Snow
L.T. Case No. 99-021746-11

PATRICK SCOTT MAJOR,

   Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,

   Defendant.

_____/



     500 East Broward Boulevard
     Fort Lauderdale, Florida
     Wednesday, January 24, 2001
     9:40 a.m. - 11:45 a.m.

APPEARANCES:

  HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
  500 East Broward Boulevard, Suite 1000
  Fort Lauderdale, Florida 33394
  By:  VALERIE SHEA, ESQ.
  Appearing on behalf of the Plaintiff.
  (954)527-2800

  ALLEN, NORTON & BLUE, P.A.
  121 Majorca Avenue, Suite 300
  Miami, Florida 33134
  By:  SUSAN POTTER NORTON, ESQ.
  Appearing on behalf of the Defendant.
  (305)445-7801

ALSO PRESENT:   Patrick Scott Major
     Lily Jules, Representative of Amerijet

      DEPOSITION
       OF
      AL JORSEY
    (Appearing Telephonically)

1   and say, Put me on the manifest. I am giving this

2   person a check line.

3       Q.   But you don't have a contract with a person,

4   though, at Amerijet as the Director of Training?

5       A.   No.  I didn't really before.  I am one of

6   two or three people that can give a line check at

7   Amerijet and they have to be done and they are - I

8   just do it on my own.

9       Q.   Who are the other two or three people that

10  are also --

11      A.   Clay Lane is a check captain, Tracy

12  Dickinson is a check captain, I believe John Macineer

13  is a check captain, Allen Jorsey, Jr. is a check

14  captain, and that's about it that I can think of.

15      Q.   But you all get the same list?

16      A.   Yeah.  They don't usually do line checks.

17  They usually leave them for me.

18      Q.   Oh, all right.  What is a line check?

19      A.   It's an observation and it's required by the

20  F.A.A. You have to have one.  You have to observe in

21  their month, either their due month or the month ahead

22  or their grace month, a line operation where they take

23  off and land.

24      Q.   To what members of the crew does that apply?

25      A.   It applies to the captain by regulation, but

1    the line check also includes the whole crew for crew
2    coordination.  And I only write a report usually on
3    the captain, but I can write a report on any member of
4    the crew.
5        Q.   Is that the form that follows a line check
6    and is called a Proficiency/Qualification Check?
7        A.   Yeah.  We have one that -- Let me get it and
8    I'll read off what it says.  The one that we used for
9    the captain is a form that says on the top of it --
10   Let me see.  I've got one here for you.
11            MS. NORTON:  Do you have a copy of that?
12            THE WITNESS:  It says, "Line Check Flight
13        Report Captain."  And on it, it has the captain's
14        name, the first officer's name, the flight
15        engineer's name, employee number, base; and then
16        it gives the flight that you observed, the
17        aircraft number, the stops, and then there is a
18        place for evaluating them on pre-flight, taxying,
19        takeoff, line and route, et cetera.
20   BY MS. SHEA:
21       Q.   All right.
22       A.   And then on the back it has some more.  And
23   when it gets all done it has a General Critique and an
24   Overall Evaluation.  And then it says, "Below average,
25   unsatisfactory.  I discussed it with them:  Yes, no,

```
 1   none.  Comments Noted, Pilot's initials, signature
 2   flight officer" - that's me - and my employee number
 3   and my base and my date.
 4        Q.   All right.  So that's what you would fill
 5   out on the captain, and of course it would also
 6   implicate the crew's behavior?
 7        A.   Right.
 8        Q.   Is there a time requirement within which
 9   that must be completed?  Do you have to do it at the
10   same time as the flight?
11        A.   Yeah, I do it as we're going along.
12        Q.   Okay.
13        A.   Or I take notes and then I transpose them
14   onto this form and then I have the captain sign it or
15   initial it and I show it to him.
16        Q.   I see.
17             I have two forms, Captain Jorsey, that are
18   on Amerijet letterhead or it's Amerijet's document.
19        A.   Um-hmm.
20        Q.   "Airman Proficiency/Qualification Check,"
21   one that you completed on Pat Major in May '98 and one
22   that you completed on Pat Major in May 1999.  Can you
23   just explain to me what that form refers to and what
24   the nature of that check is if you are familiar with
25   that.
```

```
 1   the simulator check?
 2        A.   I don't think we gave - I don't think they
 3   gave him the go-ahead there.  I do know that he was
 4   not recommended at that time by more than one, but
 5   that was the Director of Operation's decision to
 6   evaluate him.
 7        Q.   When you say "not recommended by more than
 8   one," was there any writing or voting?
 9        A.   No, we just discussed it.
10        Q.   Now, did you have an opinion that you
11   expressed at that meeting?
12        A.   Yes.
13        Q.   And what was that?
14        A.   That he not be upgraded.
15        Q.   Based on what?
16        A.   His performance.  I just didn't think he had
17   what it takes to be a captain.
18        Q.   Can you elaborate on that at all.
19        A.   Judgment, decision making.
20        Q.   And what was that -- This meeting was before
21   the May 1999 simulator check, correct?
22        A.   Yeah.  I had been on check rides with him
23   before and had him in the simulator, had him in the
24   class.
25        Q.   So you had him in classes.  How did he do on
```

```
 1   discuss with him his upgrade?
 2              MS. NORTON:  Object to the form of the
 3        question.
 4              THE WITNESS:  I don't remember.  I don't
 5        recall.
 6   BY MS. SHEA:
 7        Q.   Do you recall whether you ever told Pat that
 8   his political problems were going to keep him from
 9   getting upgraded and that he should get his rating and
10   go elsewhere?
11        A.   I believe I probably told him that.
12        Q.   But you didn't tell him that you were not
13   supporting him?
14        A.   No, I probably just made a general comment
15   that --
16        Q.   Did you ever tell him --
17              MS. NORTON:  Excuse me.  Would you please
18        let the witness finish his sentence.
19   BY MS. SHEA:
20        Q.   Did you ever tell him that Pete Steel would
21   not let you make captain?
22        A.   Probably did.
23        Q.   And you testified that there was a meeting
24   before Pat's simulator check at which you were opposed
25   to his upgrade bid and yet he was put in the process
```

1   to upgrade, correct?

2       A.    That's correct.

3       Q.    All right.  And whose decision was that, if

4   you know?

5       A.    I imagine Pete Steel.

6       Q.    And then you had the simulator check, you

7   did the written report, the one-page written report

8   that we have.  You didn't make any other written

9   report or memorandum or anything concerning Pat Major;

10  is that correct?

11      A.    I don't -- I wrote memos to Pete Steel, and

12  Pat Major in probably one of those or more memos was

13  mentioned.  Those memos were addressed with the title

14  of "To whom it should concern," and they were just my

15  comments and compiled notes of the trip, the PC check,

16  or whatever.

17      Q.    Okay.  That would be after the August 17th

18  flight?

19      A.    I have no idea.  There is some before that,

20  that he was mentioned.  I'm quite sure, but I don't

21  have copies of them.  They were cranked out and given

22  to Pete as Director of Operations and he probably put

23  them in the circular file after that.  I don't know.

24  They were just comments, not only on him but on

25  several people.  Just about on every trip I ever went

```
 1   and it was raining, heavy rain, and we proceeded to
 2   get to the airplane and we sat there while it poured
 3   rain for a while and then we taxied out and we
 4   departed for wherever we were going. I think it was
 5   Barbados or some place.
 6       Q.   When you said you recalled the flight very
 7   well, was there anything else that you specifically
 8   recall about the beginning pre-takeoff part of the
 9   flight?
10       A.   Well, we had to taxi position the airplane
11   so we could look at the weather. We taxied down the
12   runway so we could look at the runway because there
13   was a question of the amount of water on the runway,
14   and Pat Major had called for a report, we turned
15   around and observed the runway, reversed our course,
16   took another look at the weather, and off we went.
17       Q.   What, if any, conversation did you have
18   concerning the weather back at the gate before
19   pushback?
20       A.   Well, just that there was, you know, a lot
21   of thunderstorms around. It was a heavy rain and it
22   was pouring. Typical South Florida weather.
23       Q.   Okay. What, if any, concerns did Pat Major
24   voice concerning the potential need to take into
25   account contamination on the runway and setting weight
```

```
 1              MS. NORTON:  Object to the form of the
 2         question.
 3              THE WITNESS:  No, I wasn't hooked up on the
 4         radio all the time initially, because I was doing
 5         paperwork or something.  But also he did the
 6         weight and balance and made no reduction at that
 7         time.
 8    BY MS. SHEA:
 9         Q.   Do you recall any statements that Brian
10    Steel made in the plane prior to push-back to Pat
11    Major responding to Pat's concerns about the standing
12    water possibility?
13         A.   I don't recall any comment that he made, if
14    there was any.
15         Q.   Did you make a comment to Pat to the effect
16    that the runway was going to be treated as dry in the
17    absence of a report and that if he didn't like it he
18    could quit?
19         A.   I don't remember that statement, but that
20    would be my thought, yes.  You know, if you don't --
21    If you have a concern, then do something about it.
22         Q.   Do you recall whether your precise comment
23    to him was, Then go work somewhere else or leave?
24         A.   That may very well have been.  I don't
25    remember those exact words.
```

```
 1        Q.    Well, at what point do you think he should
 2   have been thrown off the plane?
 3        A.    Probably I would have thrown him off before
 4   we ever left the block.
 5        Q.    Because he asked about the contaminated
 6   runway?
 7        A.    No, he can ask, but he -- You know, if he
 8   was so adamant about having this runway condition, why
 9   didn't he do something about it?  Why didn't he demand
10   or get off the airplane or put it in the Weight and
11   Balance and then hand it to the captain to sign it?
12   But he went along with it.
13        Q.    So why should he have gotten thrown off the
14   plane if he went along?  That's what I'm a little
15   confused about.  I mean, you just said --
16        A.    His authority.
17        Q.    -- the captain should have just thrown him
18   right off the plane before he left the gate, and I
19   want to know exactly what he did that should have
20   gotten him booted off.
21        A.    Insubordination.
22        Q.    Okay. And that consisted of raising the
23   concerns about the --
24        A.    No, that's not what I said.
25        Q.    Okay.
```

```
 1        A.    No.   I didn't have it.
 2        Q.    Oh, you weren't furnished then?
 3        A.    I never saw it.
 4        Q.    Okay.   Now, when you're on the aircraft as a
 5   check airman, you are a representative of the F.A.A.
 6   in some capacity; is that correct?
 7        A.    Right.
 8        Q.    So --
 9        A.    I am an F.A.A. approved check captain for
10   Amerijet.
11        Q.    So does that give you an obligation to
12   disclose in the report any F.A.A. violations that come
13   to your attention during the course of a flight?
14        A.    That's true.
15        Q.    After this time that you were summoned in to
16   give your version of what had happened on this flight,
17   what was the next thing that you learned or found out
18   about as it related to Pat's complaint?
19        A.    I got a letter from John Roseburough.
20        Q.    And what did you do after you received that
21   letter?
22        A.    I called John Roseburough and I called --
23   Actually, I guess the company called me and said that
24   I was being removed as a check airman as of some date
25   whichever was like November 10th it's dated, but that
```

1   Lauderdale to describe for me the path of the aircraft

2   between the pushback and takeoff?

3        A.   Yes.

4        Q.   Could you describe that for me please.

5        A.   Well, we taxied out and we taxied east first

6   so that we could look at the runway - or look at the

7   weather on the weather radar, which we pointed to the

8   east and looked at the thunderstorms.  And as we

9   turned they were east and northeast predominantly, and

10  then we turned at some point.  I don't remember the

11  exact taxiway, but there was quite a few aircrafts

12  lined up waiting for takeoff on the taxiway.  We went

13  all the way down quite a ways and then got to another

14  taxiway, and then when we were clear to go, we had -

15  we taxied back down and that's when we observed the

16  runway and taxied and turned around and took off back

17  to the east.

18       Q.   You're not able to name runways or taxiways,

19  is that fair?

20       A.   I'm not what?

21       Q.   You're not able to name the specific runways

22  or the taxiways?

23       A.   Well, no, I don't know the --

24       Q.   Okay.

25       A.   Not off the chart.  I don't know what the

```
 1    fact that, you know, people didn't recommend him for
 2    upgrade and that --
 3         Q.    That Mr. Bassett had no confidence in him?
 4               MS. SHEA:   Object to the form of the
 5         question.
 6               THE WITNESS:   That's affirmed.
 7    BY MS. NORTON:
 8         Q.    That's affirmed?
 9         A.    This is true.
10         Q.    Okay.   Does it make a difference where the
11    water is standing if you're getting ready to take off
12    on the runway?
13         A.    Yeah.   If the water is outside the wheel
14    path of the airplane, it doesn't matter.   That
15    particular runway is a crown-grooved runway.   It
16    didn't really matter as long as the standing water is
17    not -- I mean, you can have standing water on the last
18    five feet of the runway and it's not going to make any
19    difference.
20         Q.    So the mere fact that there is some standing
21    water does not tell you much, does it?
22         A.    Doesn't tell me anything.
23         Q.    Were you and/or Captain Steel able to see
24    the runway?
25         A.    Oh, certainly.   We taxied right down it.
```

1          A.    Oh, yes, definitely.  I would have reported

2   it and I would not have gone.  I would have stopped

3   the flight.  If I felt that he was in violation or

4   that it was dangerous, I would have stopped the flight

5   before it ever took off.

6          Q.    And you also had the ability to see the

7   runway and to watch his actions at the time?

8          A.    Certainly.  That's why I was checking him.

9          Q.    You made some comment about Mr. Major about

10  having -- Let me find it.  Give me one second, sir.

11  "He was in business for himself."

12         A.    Right.

13         Q.    The comment was made that you would have

14  thrown him off the plane after I guess you backed off

15  at some point.

16         A.    Right.

17         Q.    And you said, He was in business for

18  himself.  He did not allow the Captain to make

19  decision or he didn't discuss with the Captain

20  beforehand.

21             What did you mean by "He was in business for

22  himself?"

23         A.    Well, he was taking everything on and

24  running the flight as if he was the captain.  He's not

25  the captain.

```
 1              Again, if I had any fault with Brian Steel,
 2   I would have faulted him for not being more assertive
 3   in having Pat Major do what Brain Steel wanted him to
 4   do or told him to do.  He didn't give him a chance
 5   to -- You know, there is one thing about cockpit
 6   resource management in this business, but somebody has
 7   to be in charge, and you can't have people in business
 8   for themselves as I say, as I call it.  It's like the
 9   engineer who puts something in the logbook before he
10   checks with the captain.  That's why the captain is
11   the captain.  That's why he makes the big bucks.  He
12   has the experience.  Now, he certainly takes input
13   from the others, but you can't let the co-pilot or the
14   engineer or anybody else fly your flight.
15         Q.   Did Mr. Major accept clearance in takeoff
16   without checking with the Captain?
17         A.   Yes.  He said, "Roger, clear for takeoff,"
18   and off we went.
19         Q.   Is that consistent or inconsistent with his
20   profess of concern now of being over weight?
21              MS. SHEA:  Object to the form.
22              THE WITNESS:  It's inconsistent.  If he was
23         concerned about it, you know -- I was a co-pilot
24         for a very long time, and in the airline that I
25         started with it took many years -- I flew with
```

```
 1          the old grumpy captains at Eastern Airlines who
 2          basically said, Sit on your hands and don't say
 3          anything or do anything until you call me
 4          captain.  But I have taken an airplane away from
 5          a captain because he was going to kill me.  And
 6          if Pat Major thought that the thing was dangerous
 7          or he had a problem, he should have gotten off,
 8          and taken the airplane away from him before we
 9          ever left.
10               MS. NORTON:  Counsel objected to the form of
11          my question.  Was it the word "profess,"
12          Counselor, or what was your objection?
13               MS. SHEA:  I can't remember.  The answer was
14          too long.
15               MS. NORTON:  All right.  Let me rephrase my
16          question.
17     BY MS. NORTON:
18          Q.   I'm going to ask you basically the same
19     question, Mr. Jorsey.
20               You indicated that Mr. Major accepted
21     takeoff clearance and took off without discussing it
22     with the captain.  Is that action consistent or
23     inconsistent with what he has stated to be his concern
24     for an over-weight plane?
25          A.   Well, it's inconsistent.
```

```
 1          Q.   Thank you.

 2          A.   If I understand the question right, yeah.

 3   It's not -- If he was so concerned, he wouldn't have

 4   accepted the clearance to takeoff.

 5          Q.   At that point could he have told the tower

 6   he was over weight?

 7          A.   Well, that would have certainly gotten my

 8   attention if I had been the captain, and I'm sure it

 9   would have gotten Brian Steel's, because now it's

10   broadcast all over the world that the airplane is over

11   weight.

12               MS. NORTON:   Thank you.   No other questions.

13                    REDIRECT EXAMINATION

14   BY MS. SHEA:

15          Q.   Sir, I gather from the nature of your

16   testimony you're not saying that Pat should have

17   intervened and not accepted the clearance if he had a

18   concern.

19          A.   Well, if he had a concern he should not have

20   accepted the clearance.

21          Q.   Even though he's --

22          A.   He should have asked the captain.   But, you

23   know, he said, "Roger, clear."

24          Q.   All right.   He's under the control of the

25   pilot in command and he should do what the pilot in
```

1    command wants him to do, correct?

2        A.    Well, to a point.

3        Q.    Okay.

4        A.    You know, you're not going - you don't let

5    the pilot come in and kill you.  If you think your

6    life is in danger or it's unsafe, or whatever, you

7    don't let that happen.  If you want to express your

8    concern, express it.  But otherwise don't write a

9    nasty letter later and try to change the facts to suit

10   the report.

11       Q.    But you would not consider it insubordinate

12   if Pat had said no to that clearance?

13       A.    No.  If he felt that he had a genuine

14   concern about the safety of the flight and in his mind

15   felt that was something that he would be against, I

16   would not - as a co-pilot he should not have accepted

17   the clearance, he should not have accepted taxying

18   out, and he should not have accepted taking off.

19       Q.    And you would not think that a pilot with a

20   well-founded concern in that regard should be

21   disciplined in any way for making such a decision?

22       A.    Well, if he wanted to walk off the airplane,

23   I wouldn't discipline him for walking off the

24   airplane, no.

25       Q.    Well --