UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 00-6070-CIV-FERGUSON/ SNOW

PATRICK SCOTT MAJOR,

    Plaintiff,

v.

AMERIJET INTERNATIONAL, INC.,

    Defendants.

_____/

## NOTICE OF FILING

Defendant, AMERIJET INTERNATIONAL;, INC., by and through its undersigned counsel, hereby gives notice of filing the following depositions in support of Defendant's Motion for Summary Judgment.

1.    Deposition of Patrick Scott Major, Vol. 1, February 15, 2001 with Exhibits 1 through 10.

2.    Continued Deposition of Patrick Scott Major, Vol. 2, February 19, 2001 with Exhibits 11 through 14-B.

3.    Deposition of John C. Roseborough, February 13, 2001 with Exhibits 39 through 46.

4.    Deposition of Derry S. Huff, November 8, 2000 with Exhibits 1 through 7.

5.    Continued Deposition of Derry S. Huff, January 8, 2001 with Exhibits 8 through 21.

6.    Deposition of David Bassett, February 19, 2001 with Exhibits 51 through 53.

7.    Deposition of John W. Washington, January 8, 2001 (no Exhibits)

77900_1

8.    Deposition of Al Jorsey, January 24, 2001 with Exhibit 25

Respectfully submitted,

Susan Potter Norton
Florida Bar No. 0201847
Stephen P. Santiago
Florida Bar No. 0964425

ALLEN, NORTON & BLUE, P.A.
121 Majorca, Suite 300
Coral Gables, FL 33134
Tel: (305) 445-7801
Fax: (305) 442-1578
snorton@anblaw.com
ssantiago@anblaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via World Courier, on this 12th day of March, 2001, upon:

Ms. Valerie Shea, Esq.
Heinrich Gordon Hargrove Weihe & James
500 East Broward Boulevard, Suite 1000
Ft. Lauderdale, Florida 33394

Attorney

`2

ALLEN, NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

**In The Matter Of:**

*Major    v.*
*Amerijet International*

---

*Patrick Scott Major*
*Vol. 1, February 15, 2001*

---

*Friedman, Lombardi & Olson*
*19 West Flagler St.*
*Miami, FL  33130*
*(305) 371-6677*

Original File pm021501, 225 Pages
Min-U-Script® File ID: 1650296419

**Word Index included with this Min-U-Script®**



Page 1

[1]     UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF FLORIDA
[2]       FORT LAUDERDALE DIVISION
[3]       CASE NO. 00-6070-CIV-FERGUSON
[4]
[5] PATRICK SCOTT MAJOR,
[6]       Plaintiff,
[7] vs.
[8] AMERIJET INTERNATIONAL, INC.,
[9]       Defendant
[10]
[11]        One East Broward Blvd.
            Fort Lauderdale, Florida
[12]          Friday, 9:45 a.m.
              February 15, 2001
[13]
[14]
[15]
[16]
[17]        VIDEOTAPED DEPOSITION
[18]              OF
[19]          PATRICK MAJOR
[20]   taken on behalf of the Defendant
       pursuant to a Notice of Taking Deposition
[21]
[22]
[23]
[24]
[25]

Page 2

[1] APPEARANCES:
[2]
        HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, by
[3]     VALERIE SHEA, ESQ
        Attorney for the Plaintiff
[4]
[5]     ALLEN, NORTON & BLUE, by
        SUSAN POTTER NORTON, ESQ. & STEPHEN SANTIAGO, ESQ.
[6]     Attorneys for the Defendant
[7]
        Also Present: Derry S. Huff
[8]
[9]
[10]
[11]
[12]
[13]
                        INDEX
[14]
        WITNESS              DIRECT   CROSS
[15]
        Patrick Scott Major      3    ..
[16]
[17]          EXHIBITS
[18]    Defendant's          Page
[19]       1              49
           2              112
[20]       3              114
           4              117
[21]       5              127
           6              130
[22]       7              145
           8              149
[23]       9              172
           10             214
[24]
[25]

Page 3

[1]                    **Thereupon:**
[2]               **PATRICK SCOTT MAJOR**
[3] was called as a witness by the Defendant, and having been
[4] duly sworn, was examined and testified as follows:
[5]               **DIRECT EXAMINATION**
[6]                 **BY MS. NORTON:**
[7]    **Q:** Mr. Major, we've obviously met at numerous
[8] depositions and you have attended I think at least seven
[9] or eight, however many have been taken by your counsel,
[10] but just for the record, I'm Susan Norton and with me is
[11] Steve Santiago. As you know, we do represent Amerijet in
[12] the lawsuit that you have brought against them.
[13]    My purpose today is to find out what the basis
[14] of your allegations are. It is not to ask you questions
[15] that are tricky or in any way to embarrass you. Okay.
[16]    Well, even though we also are on video –
[17]    **A:** Yes, ma'am.
[18]    **Q:** – you will still have to answer out loud.
[19]    **A:** Yes, ma'am.
[20]    **Q:** Because the video will pick it up, but the
[21] court reporter cannot.
[22]    It's also not meant to be an endurance contest.
[23] So if anytime you want to take a break, you want to
[24] stretch or you find you're getting tired or not
[25] concentrating, would you let me know?

Page 4

[1]    **A:** Thank you. Yes, I will.  ·
[2]    **Q:** I'll be happy to take a break. The only thing
[3] I would ask you is if there is a question pending, I
[4] would very much appreciate it if you would answer my
[5] question before we take the break.
[6]    **A:** I understand.
[7]    **Q:** We have your full name for the record, but why
[8] don't you state it and give me your address.
[9]    **MS. SHEA:** Just one thing before we launch
[10] into that, I received by hand delivery
[11] yesterday Defendant's Second Amended Response
[12] to Plaintiff's First Request to Produce, and I
[13] would just like to ask on the record what the
[14] documents that we received are representing to
[15] be and why we are being produced with them now
[16] as opposed to in response to our request of
[17] many months ago?
[18]    **MS. NORTON:** The documents we received
[19] were in response to your questions on a
[20] deposition and I do not know whether you had
[21] the remainder of the documents and just chose
[22] to produce certain ones at the deposition, and
[23] those were the upgrade training records.
[24]    Without going back and looking through the
[25] hundreds of pages we've produced, you did not

Page 5

[1] follow up and say, "These are all I have" or
[2] not, so I just produced to you the records we
[3] have from the training records, in case they
[4] had not been done, because I will be asking
[5] about them in this depo.
[6]    **MS. SHEA:** All right. So in other words,
[7] when I did a request to produce to you for all
[8] the training records, you don't know what you
[9] produced to me and you've yesterday produced
[10] something that you're not even – I don't even
[11] know what you're representing it to be –
[12] without having done any check to make sure
[13] whether I already had this or not?
[14]    **MS. NORTON:** No, that's not correct.
[15]    **MS. SHEA:** What is this set of documents
[16] that I got yesterday? And I will represent to
[17] you my client has not had a chance to review
[18] them.
[19]    **MS. NORTON:** The documents I had hand
[20] delivered to you yesterday were the complete
[21] training file. I don't know if you asked for
[22] it. We've produced over 600 pages, at least.
[23] Instead of going back through everything, and
[24] you did not raise the issue with us that we
[25] haven't produced the complete training records.

Page 6

[1] I never heard back from you that we hadn't, I
[2] just gave them to you as a courtesy.
[3]    **MS. SHEA:** I asked the training department
[4] director yesterday if I had the complete
[5] training records. I relied on your initial
[6] response to the request to produce.
[7]    **MS. NORTON:** No, what you showed him, you
[8] said "is this the complete" and he said no.
[9]    **MS. SHEA:** Correct.
[10]    **MS. NORTON:** That's why I went ahead and
[11] gave you everything, to make sure you do have
[12] them all.
[13]    **MS. SHEA:** So I just want to make sure I
[14] understand. Are you saying that you previously
[15] had given me his training records and this is a
[16] courtesy or are you saying you went back and
[17] realized you had not produced his training
[18] records and gave them to me yesterday by hand
[19] delivery right before his deposition?
[20]    **MS. NORTON:** I am saying that number one,
[21] I did not spend yesterday checking the 600
[22] pages to find out if I had or not.
[23]    Two, I do know that there's – I quickly
[24] checked through the correspondence and there
[25] was no objection from you or inquiry suggesting

Page 7

[1] they were not complete, but three, because I
[2] had his deposition today, in order to avoid any
[3] issues and since what you had asked in
[4] deposition suggested – and I don't know what
[5] you produced or chose to produce or not produce
[6] to the deponent, I went ahead and gave you all
[7] of them, to make sure you have them all.
[8]    **MS. SHEA:** Let me make abundantly clear
[9] that I consider his training file to be well
[10] within the first request to produce, that your
[11] responses to me many months ago –
[12]    **MS. NORTON:** Miss Shea, fine. File
[13] whatever you want to.
[14]    **MS. SHEA:** – that you did not produce the
[15] training file, and that you should not be
[16] permitted to produce those records at this time
[17] and rely on the absence of any explanation for
[18] this omission on your part.
[19]    **MS. NORTON:** Miss Shea, I don't think
[20] either the court reporter, the videographer or
[21] I are going to rule in your favor. So reserve
[22] that for the court and let's continue with the
[23] deposition.
[24]    **MS. SHEA:** I just want it on the record.
[25]    **MS. NORTON:** Fine. The record, whatever

Page 8

[1] it is, it is. You've got the documents.
[2]    **BY MS. NORTON:**
[3]    **Q:** Mr. Major, where are you currently living?
[4]    **A:** 1722 West Las Olas Boulevard.
[5]    **Q:** And how long have you lived there?
[6]    **A:** Fort Lauderdale. Almost 13 years.
[7]    **Q:** And by whom are you currently employed?
[8]    **A:** Miami Air International.
[9]    **Q:** And how long have you been employed by them?
[10]    **A:** Since August 21st, 19 – excuse me, of 2000.
[11]    **Q:** And what is your current position with them?
[12]    **A:** I'm a simulator instructor.
[13]    **Q:** And what do you instruct?
[14]    **A:** Captains and first officers.
[15]    **Q:** And how long have you held that position with
[16] them?
[17]    **A:** Since I began there.
[18]    **Q:** August 21st?
[19]    **A:** Correct.
[20]    **Q:** What is your current pay?
[21]    **A:** $48,000 per year.
[22]    **Q:** Have you received any increases?
[23]    **A:** No, ma'am.
[24]    **Q:** Are you scheduled to receive any increases?
[25]    **A:** Not that I'm aware of.

Page 9

[1]    **Q:** Are there annual pay increases on a routine
[2] basis?
[3]    **A:** I wouldn't know.
[4]    **Q:** You never asked?
[5]    **A:** Correct.
[6]    **Q:** And are you paid by the week or by the month?
[7]    **A:** Twice monthly.
[8]    **Q:** Hourly or salaried?
[9]    **A:** Salaried.
[10]    **Q:** And how many hours approximately do you work?
[11]    **A:** It varies.
[12]    **Q:** 4, 10, 20, a hundred?
[13]    **A:** I serve as a captain on the 727 in addition to
[14] my instructor duties, so it varies.
[15]    **Q:** Do you have any average?
[16]    **A:** No, ma'am.
[17]    **Q:** Do you keep a schedule?
[18]    **A:** There is a schedule provided to me. I do my
[19] best to keep up with it.
[20]    **Q:** And are there a number of days you're scheduled
[21] to work?
[22]    **A:** That varies.
[23]    **Q:** As you sit there now, you have no perception of
[24] an average number of hours that you work per week?
[25]    **A:** No. ma'am. There really isn't an average.

Page 10

[1] Some weeks it's been – as some of the work is done, some
[2] of the course generation work and research that I do is
[3] done off site in my home office. The hours I work might
[4] vary from 40 one week on site to 80 or a hundred in
[5] total.
[6]    **Q:** Do you receive any extra compensation when you
[7] are a captain on the 727?
[8]    **A:** No, ma'am.
[9]    **Q:** So that is included in your duties as
[10] instructor?
[11]    **A:** That is correct.
[12]    **Q:** Now, when you say you are a captain, I'm
[13] assuming that means that you are flying the plane, not
[14] acting as a captain in a simulator or instructor?
[15]    **A:** No, when I act as a captain, I'm flying the
[16] airplane.
[17]    **Q:** And that is different than the instruction
[18] portion?
[19]    **A:** Yes, ma'am.
[20]    **Q:** Is there any division between the two job
[21] functions that you can give us, 50/50, 20/80?
[22]    **A:** Since I became fully qualified as a captain,
[23] I've spent most of my time either in course generation or
[24] in the actual instructor duties.
[25]    **Q:** So you have flown less than you have been an

Page 15

[1]  **A:** Negative.

[2]  **Q:** Do you plan on staying with Miami Air

[3]  International at this point in time?

[4]  **A:** Yes, ma'am.

[5]  **Q:** Are you seeking employment elsewhere?

[6]  **A:** I have been approached, but I'm not seeking

[7]  anything.

[8]  **Q:** You're not seeking it. Who has approached you?

[9]  **A:** If I can correct that answer, I have sent and

[10]  submitted resumes from time to time to various job

[11]  opportunities that piqued my interest and my name on

[12]  various aviation professional web sites as a commercial

[13]  pilot.

[14]  **Q:** All right. But you indicated to me you have

[15]  been approached?

[16]  **A:** Yes, I have.

[17]  **Q:** Since you've been at Miami Air International,

[18]  which I understand was August 21st of 2000 –

[19]  **A:** That's correct.

[20]  **Q:** – who has approached you for other employment

[21]  opportunities?

[22]  **A:** I have had discussions with an airline in

[23]  Indianapolis, Indiana.

[24]  **Q:** And who is that?

[25]  **A:** Chautauqua.

Page 16

[1]  **Q:** Could you spell that, please?

[2]  **A:** I'd love to, yes. C-H-A-U-T-A-U-Q-U-A.

[3]  **Q:** And what was the nature of their inquiry?

[4]  **A:** The inquiry was in conjunction with a program

[5]  manager position on their regional jet operation.

[6]  **Q:** And what was the financial package they were

[7]  offering?

[8]  **A:** That is still under discussion.

[9]  **Q:** What is your understanding of the range of that

[10]  financial package?

[11]  **A:** Unsatisfactory.

[12]  **Q:** Have you declined any jobs since you left

[13]  Amerijet, let's say September 1st of 1999? And when I

[14]  say jobs, I'm speaking of full employment opportunities,

[15]  comparable employment opportunities. I'm not speaking of

[16]  a one-day charter or something like that.

[17]  **A:** Thank you for making that clear. No, ma'am, I

[18]  have not.

[19]  **Q:** At the time you were employed with Amerijet you

[20]  had, I believe at least two companies or maybe three.

[21]  You had Major Enterprises and you had Dolphin Airways or

[22]  Dolphin Travel, and then I believe there was also a

[23]  non-profit organization you had regarding low income on

[24]  Las Olas or the river. Do you know which one I'm

[25]  speaking of? That was at the very beginning.

Page 17

[1]  **A:** Yes, ma'am.

[2]  **Q:** Would you give me the proper name of those

[3]  three organizations and also tell me if there are any

[4]  others that you were a majority or sole shareholder in?

[5]  **A:** The last one you referred to is actually two

[6]  separate organizations. One is referred to as Riverside

[7]  Park Residents Association. The other one is Riverside

[8]  Renaissance. Neither of those companies are owned in any

[9]  part by me, but I am a founding member of Riverside

[10]  Renaissance and I served on the board of both companies.

[11]  **Q:** Is that a volunteer position without

[12]  compensation?

[13]  **A:** That is correct.

[14]  **Q:** Then could you give me the name of the

[15]  organizations in which you were either a majority or sole

[16]  shareholder?

[17]  **A:** Major Strategies, Inc., Incorporated. I formed

[18]  that in 1989. More recently, Dolphin Holiday Flying

[19]  Club, Incorporated, and Island Wings, Incorporated.

[20]  **Q:** Any other organizations that you have been a

[21]  shareholder and that are not publicly traded? I'm not

[22]  looking for stock you might own that's traded.

[23]  **A:** You're restricting my ownership, the time frame

[24]  to my period of employment or are you asking for

[25]  up-to-date?

Page 18

[1]  **Q:** No, I'm speaking of generally.

[2]  **A:** To date, are you asking for any companies I've

[3]  owned stock in?

[4]  **Q:** Well, when I'm saying stock, I'm not limiting

[5]  it to majority interest. I'm not trying to get interest

[6]  that you might have that is publicly traded on the New

[7]  York Stock Exchange.

[8]  **A:** Exclusive of that?

[9]  **Q:** Yes.

[10]  **A:** In addition to Major Strategies, Inc., I

[11]  currently own Patrick S. Major, Inc.

[12]  **Q:** Any others?

[13]  **A:** No, ma'am.

[14]  **Q:** Any others in the last 15 years?

[15]  **A:** I have owned and operated sole proprietorships

[16]  prior. I don't recall incorporating anything prior to

[17]  Major Strategies.

[18]  **Q:** What was the purpose of Major Strategies, Inc?

[19]  **A:** To – it was a flying school.

[20]  **Q:** And did you obtain or did you receive any

[21]  compensation from it at any time?

[22]  **A:** No, ma'am.

[23]  **Q:** You said a flying school. Who was your

[24]  targeted audience? What did you teach?

[25]  **A:** My targeted audience was people who wanted to

Page 19

[1] learn how to fly.

[2] **Q:** Learn how to fly what?

[3] **A:** Fixed wing, powered aircraft.

[4] **Q:** Any fixed wing?

[5] **A:** Any fixed wing. No, ma'am, not any fixed wing.

[6] **Q:** Was there a particular class or was it a

[7] particular group of fixed wings that you were

[8] particularly targeted; Cessnas as opposed to Boeings or

[9] Lockheeds as opposed to –

[10] **A:** The school was qualified to teach for pilot

[11] ratings from private pilot to airline transport pilot,

[12] including single and multi-engine instrument, commercial

[13] certified flight instructor, instrument flight instructor

[14] and multi-instrument flight instructor ratings.

[15] **Q:** Would that encompass instruction on, for

[16] example, a 727?

[17] **A:** No, ma'am, it would not.

[18] **Q:** So would you give me the names of some of the

[19] common planes that would fall within that jurisdiction

[20] you've outlined?

[21] **A:** A Cessna 150, 172 – these are all Cessnas now.

[22] 182 –

[23] **Q:** They would all be private, not airline

[24] transport?

[25] **A:** These are small airplanes that can be used in

Page 20

[1] either in a commercial or a private capacity.

[2] **Q:** Okay. And was there another individual, I'll

[3] say involved in the instruction or the formation of the

[4] school with you?

[5] **A:** Yes, ma'am, there were several.

[6] **Q:** In reading the material, I saw that there was

[7] an individual you referred to as having over 40,000 hours

[8] of experience?

[9] **A:** Yes, ma'am.

[10] **Q:** And who is that, please?

[11] **A:** That's Lieutenant Colonel Jim Johnston.

[12] **Q:** J-O-H-N-S-T-O-N?

[13] **A:** That's correct.

[14] **Q:** And where is Mr. Johnston today?

[15] **A:** He is, to my knowledge, at 1718 West Las Olas

[16] Boulevard.

[17] **Q:** And are you still in association with him?

[18] **A:** He's still my neighbor.

[19] **Q:** Do you still have any business associations

[20] with him?

[21] **A:** No, ma'am.

[22] **Q:** And when did you cease having any business

[23] affiliation with him?

[24] **A:** Jim gave up instructing four, five years ago.

[25] **Q:** And do you know why? Did he discuss it with

Page 21

[1] you?

[2] **A:** Yes, ma'am. He discussed it with me.

[3] **Q:** And what was the reason?

[4] **A:** He began to have minor seizures.

[5] **Q:** And where did Lt. Johnston obtain the majority

[6] of his hours, I'll say, to your knowledge?

[7] **A:** That's Lieutenant Colonel.

[8] **Q:** Lieutenant Colonel.

[9] **A:** Johnston. In the United States Air Force.

[10] **Q:** Anyone else that was substantially affiliated

[11] with Major Strategies, Inc?

[12] **A:** Substantially affiliated in the same way that

[13] Jim Johnston would have been?

[14] **Q:** Or similar.

[15] **A:** There were several flight instructors who came

[16] and went over the years.

[17] **Q:** And Dolphin Holiday Flying Club – I'm sorry,

[18] let me back up a minute to Major Strategies, Inc.

[19] Did you at any time receive any compensation from,

[20] I don't remember if you answered that or if I asked you.

[21] **A:** There may have been a time where I was actually

[22] paid as an employee, but most of any remuneration I

[23] received from Major Strategies was in the form of

[24] reimbursing me for loans made to the company.

[25] **Q:** How about Dolphin Holiday Flying Club, Inc.,

Page 22

[1] did you receive any compensation from that?

[2] **A:** Same answer.

[3] **Q:** That being that it was minimal, if any?

[4] **A:** Yes, ma'am.

[5] **Q:** And did you have any significant business

[6] associates that assisted you with that organization?

[7] **A:** Yes, ma'am.

[8] **Q:** And who were they?

[9] **A:** In fact, the business associate I'm about to

[10] name, whose name for some reason escaped me a moment ago,

[11] has helped me with all three of those flying oriented

[12] companies. His name is John Randall.

[13] **Q:** And do you know Mr. Randall's address?

[14] **A:** No, ma'am, I do not.

[15] **Q:** Do you know his phone number?

[16] **A:** No, ma'am, I do not.

[17] **Q:** Do you know where he resides now?

[18] **A:** I know vaguely that he lives west in Weston and

[19] we meet on a regular basis.

[20] **Q:** How do you get in touch with Mr. Randall?

[21] **A:** I call him.

[22] **Q:** And where do you have his phone number?

[23] **A:** Stored in my cell phone.

[24] **Q:** So do you have your cell phone with you?

[25] **A:** Yes, I do.

Page 23

[1] **Q:** Could you give me his number at a break,
[2] please?
[3] **A:** Be glad to.
[4] **Q:** Thank you.
[5] Are you in continuing association on a regular
[6] basis with Mr. Randall?
[7] **A:** Yes.
[8] **Q:** Now, Dolphin Holiday Flying Club, Inc., is that
[9] still in operation?
[10] **A:** Yes, it is.
[11] **Q:** Now, this is a corporation through the
[12] Secretary of State?
[13] **A:** Yes, it is.
[14] **Q:** And the corporation is still active?
[15] **A:** Yes, it is.
[16] **Q:** And the same with Major Strategies, Inc?
[17] **A:** That is correct.
[18] **Q:** And I think you also named Island Wings?
[19] **A:** Island Wings, yes, ma'am.
[20] **Q:** And what is Island Wings?
[21] **A:** Island Wings is a company whose, at the time
[22] that I owned it, sole asset was a Part 135 FAR, Federal
[23] Aviation Regulation Part 135, air carrier certificate.
[24] **Q:** And did you say at the time you owned it?
[25] **A:** Yes, I did.

Page 24

[1] **Q:** You no longer own Island Wings?
[2] **A:** That is correct.
[3] **Q:** You sold it or did it go defunct?
[4] **A:** No, I sold it.
[5] **Q:** And who did you sell it to?
[6] **A:** Fred Murphy and Carlos Jimenez.
[7] **Q:** And when did you sell it?
[8] **A:** October, 2000.
[9] **Q:** And what did you sell it for, the price?
[10] **A:** There was an exchange of $20,000. That's about
[11] all I can quantify.
[12] **Q:** In any of these three organizations did you
[13] take expense write-offs, capital investment write-offs on
[14] your income tax?
[15] **A:** I believe I did.
[16] **Q:** And that would be reflected on your income tax?
[17] **A:** Yes, it would.
[18] **Q:** Through any of these organizations were you
[19] supplied or did you lease cars, buildings, equipment,
[20] computers?
[21] **A:** I don't think I leased any cars. I may have
[22] leased a computer.
[23] **Q:** Cell phone?
[24] **A:** Yes.
[25] **Q:** Any other business expenses that you recall

Page 25

[1] taking through either of these three organizations?
[2] **A:** Business expenses?
[3] **Q:** Yes.
[4] **A:** Insofar as – I'm not sure I understand your
[5] question. A business in the nature of its operation has
[6] many expenses.
[7] **Q:** Let me rephrase it.
[8] Since September of '99 forward have you
[9] received any – and I'll use the term "benefit" or
[10] "asset" or – I guess benefit or asset will work –
[11] through any of these three corporations; i.e. cars,
[12] insurance, cell phones, travel?
[13] **A:** Since September of '99 – I think I get the
[14] import of your question.
[15] Since September of '99 I have flown the
[16] airplanes in conjunction with my responsibilities there,
[17] such as they are, which I perceive as a benefit. In
[18] other words, it's work. The other is cell phone.
[19] **Q:** The –
[20] **A:** The cellular phone.
[21] **Q:** Okay, thank you.
[22] When you were terminated August 31st,
[23] September 1st, '99, you were offered and I believe you
[24] accepted a placement service or the assistance of a
[25] career counseling or placement service?

Page 26

[1] **A:** That is correct, with a provision.
[2] **Q:** And the provision was that you do not seek
[3] something as a pilot?
[4] **A:** That is correct.
[5] **Q:** Did you utilize the service?
[6] **A:** I went to class there.
[7] **Q:** So by your answer, you are distinguishing that
[8] as utilizing it?
[9] **A:** The class was intended to, as I understood it,
[10] to equip me to obtain employment in any field I chose,
[11] provided it was not my chosen field. To that extent, the
[12] benefit of it was meaningless.
[13] **Q:** Did you decline or refuse to look for
[14] employment outside of the airline industry?
[15] **A:** No, I did not.
[16] **Q:** So you did seek employment?
[17] **A:** Yes, I did.
[18] **Q:** In human resources, for example?
[19] **A:** Yes, ma'am.
[20] **Q:** Did you utilize this placement service for that
[21] purpose?
[22] **A:** They were not a placement service, ma'am.
[23] **Q:** Okay, they were career counseling?
[24] **A:** That is correct.
[25] **Q:** And I asked you this, have you declined any

Page 27

[1] position outside of the airline industry since you left
[2] in September of '99?
[3] **A:** No, ma'am.
[4] **Q:** What was your last position in human resources?
[5] **A:** As a full time paid employee, my last position
[6] with human resources was director of human resources at
[7] Telus International.
[8] **Q:** Would you spell that?
[9] **A:** Telus Communications, I believe. T-E-L-U-S, as
[10] in "Sierra", Communications.
[11] **Q:** And where is that located?
[12] **A:** That doesn't exist any more.
[13] **Q:** When did it cease to exist?
[14] **A:** When it was merged and folded into several
[15] successor organizations.
[16] **Q:** And is there a surviving successor organization
[17] or surviving name of the successor organization?
[18] **A:** Yes, ma'am, there is.
[19] **Q:** And what is that?
[20] **A:** MCI World Com.
[21] **Q:** Was that the result of successive mergers or
[22] did Telus Communications go into MCI? I guess it was
[23] Western Union before it became MCI.
[24] **A:** I'm not sure of the history of MCI. I can
[25] speak to Telus. It was Teltec when I started working

Page 28

[1] there. It became Telus and acquired during my tenure
[2] there at least two other companies in the same business,
[3] then was acquired by an individual out of New York.
[4] **Q:** Well, let me ask you this, as opposed to the
[5] history of the company. At the time you left it what was
[6] the name of the organization?
[7] **A:** That's the name I gave you.
[8] **Q:** Was Telus?
[9] **A:** That's correct.
[10] **Q:** And why did you leave?
[11] **A:** To go into aviation.
[12] **Q:** And who was your last supervisor or to whom did
[13] you report; the position, rather?
[14] **A:** Dennis Sickle.
[15] **Q:** And where is his office or was his office at
[16] the time?
[17] **A:** His office was at the time the same place as
[18] mine. I believe that address was 1080 Northwest 163rd
[19] Avenue in North Miami.
[20] **Q:** And when did you leave?
[21] **A:** I believe it was around September, October –
[22] October of 1988.
[23] **Q:** And between October of 1988 and the time you
[24] joined Amerijet, which I believe was March of '91 –
[25] **A:** Yes, ma'am.

Page 29

[1] **Q:** – did you have any employment?
[2] **A:** Only insofar as I built my own companies.
[3] **Q:** Your employment at that point in time was
[4] self-employed?
[5] **A:** Yes, ma'am.
[6] **Q:** And would we have covered those organizations;
[7] Major Strategies –
[8] **A:** Yes.
[9] **Q:** During your employment with Telus, was there
[10] any change in management or supervision that you believed
[11] indicated a change in direction of the company that made
[12] you decide you wanted to leave? Do you understand my
[13] question?
[14] **A:** I think so. That would not be uncommon. I
[15] started thinking about leaving as we went through the
[16] acquisitions of other companies. As a director of human
[17] resources, there's a very interesting, engaging challenge
[18] with regard to merging work forces.
[19] **Q:** Mr. Major, it's quite obvious to anyone
[20] listening that you're extremely well educated and very
[21] articulate. I looked at your resume and I know that you
[22] have a college degree. Do you also have a masters?
[23] **A:** No, ma'am, I do not.
[24] **Q:** I said I think you have a college degree. Is
[25] that correct?

Page 30

[1] **A:** I do have a college degree. Yes, ma'am.
[2] **Q:** Eckerd College?
[3] **A:** Yes, ma'am.
[4] **Q:** And when did you obtain that?
[5] **A:** In 1986.
[6] **Q:** And did you also have some certification or
[7] specialty in human resources?
[8] **A:** Yes, I did.
[9] **Q:** And what is that?
[10] **A:** I obtained what was at the time called the
[11] accredited personnel management, the APM certification,
[12] in 1983 that became a PHR, professional in human
[13] resources designation, in 1987.
[14] **Q:** Did you at sometime find through the merger of
[15] Telus that you were working for people who were less
[16] qualified than you were?
[17] **A:** No, ma'am. I can't say that I can answer that
[18] question in the affirmative way.
[19] **Q:** Did you find that you had a different
[20] perception of management style than through the mergers
[21] evolved? Let me rephrase my question.
[22] Did you find the corporate culture changed?
[23] **A:** Not substantially, no, ma'am.
[24] **Q:** So what prompted the desire to change careers?
[25] **A:** I was 35 years old. I had always wanted to

---

Page 31

[1] fly. I had been successful at a couple of things, but
[2] none of them in flying.
[3] **Q:** Now, you had started flying in '81?
[4] **A:** Yes, ma'am. I believe that's correct.
[5] **Q:** And what did you obtain in '81?
[6] **A:** I soloed.
[7] **Q:** And then this was a hobby that grew?
[8] **A:** It has also been my primary fascination,
[9] aerospace, aviation, since I was a child.
[10] **Q:** Your father was in the Air Force?
[11] **A:** That is correct.
[12] **Q:** And what was his position?
[13] **A:** He was a major, had the rank of major. He did
[14] not retire. He left the service and made his own
[15] business. He was a B-17, B-25, B-24 instructor pilot.
[16] **Q:** And did he serve in World War II?
[17] **A:** Yes, ma'am.
[18] **Q:** Is your father still alive?
[19] **A:** No, ma'am.
[20] **Q:** I'm sorry. And I believe you have a brother?
[21] **A:** Yes, I do.
[22] **Q:** That also flew or does fly?
[23] **A:** That is correct.
[24] **Q:** He flew Chinooks?
[25] **A:** He flew Chinooks up until the middle of last

---

Page 32

[1] year with the 160th Task Force.
[2] **Q:** Is that an Army or Air Force or private –
[3] **A:** It's an Army Special Forces unit.
[4] **Q:** And what is his rank?
[5] **A:** He's a Chief Warrant Officer V.
[6] **Q:** Not trying to create any painful memories for
[7] you, but when did your father die?
[8] **A:** Thank you. 1984.
[9] **Q:** Do you have anyone else in your family other
[10] than your father and your brother who have flown as a
[11] career, as opposed to soloed once or twice, passengers?
[12] **A:** Not who are commercial pilots.
[13] **Q:** Where did you go to high school?
[14] **A:** To Tampa Catholic High School.
[15] **Q:** And let me ask you this, when did you graduate
[16] from Tampa Catholic?
[17] **A:** 1971.
[18] **Q:** And then when did you proceed to college?
[19] **A:** After I got out of the Army, in 197 – I
[20] actually started January, 1975.
[21] **Q:** College or the Army?
[22] **A:** College.
[23] **Q:** You indicated that you declined an appointment
[24] to West Point?
[25] **A:** The appointment was to the military academy

---

Page 33

[1] prep school, which would have led to West Point.
[2] **Q:** Is that automatic?
[3] **A:** I don't think it's automatic. I think you have
[4] to master that level.
[5] **Q:** You have to promote. And why did you decline
[6] that?
[7] **A:** I did not want to make the military a career.
[8] **Q:** Was that also at the height of Vietnam?
[9] **A:** Yes, it was.
[10] **Q:** Did that have any influence in your decision?
[11] **A:** I'm certain it did.
[12] **Q:** Prior to Amerijet, have you ever been
[13] terminated? And do you know what I mean by "terminated",
[14] involuntarily asked to leave, whether you resigned or
[15] not?
[16] **A:** Involuntarily asked to leave.
[17] **Q:** Involuntarily terminated or asked to leave or
[18] resigned to avoid being asked to leave?
[19] **A:** I believe I could characterize my departure at
[20] Teltec as being asked to leave. My memory is foggy on
[21] these things. I can with absolute certainly say I was
[22] fired from a hotel front desk clerk position in the 70's.
[23] **Q:** And what was the reason they gave?
[24] **A:** Pardon?
[25] **Q:** What was the reason they gave you?

---

Page 34

[1] **A:** They were unhappy with me for having insisted
[2] that they pay me the overtime I was entitled to.
[3] **Q:** And then in Teltec you said your memory was
[4] foggy?
[5] **A:** Yes.
[6] **Q:** But what do you recall was the reasons that
[7] they proffered?
[8] **A:** That what?
[9] **Q:** That they proffered, that they offered as to –
[10] **A:** That can best be described as a mutual
[11] agreement. I had been in discussion for some time with
[12] my immediate superior with regard to the overall
[13] satisfaction with my job and to how I might develop
[14] myself professionally, what else I might do.
[15] **Q:** Develop yourself professionally within that
[16] organization?
[17] **A:** I didn't really perceive at the time an
[18] opportunity to advance. I have actually offered – I was
[19] one of the suitors for the company.
[20] **Q:** By that you mean you were trying to buy it?
[21] **A:** Yes.
[22] **Q:** That was rather ambitious to buy what then
[23] became MCI, wasn't it?
[24] **A:** I think so.
[25] **Q:** And who was the supervisor who you had the

---

Page 35

[1] agreements with? Is that Dennis Sickle?

[2] **A:** Dennis Sickle.

[3] **Q:** I don't know if I asked you to spell that or

[4] not. Would you?

[5] **A:** S-I-C-K-L-E.

[6] **Q:** Were there any particular opportunities or

[7] areas of development at Teltec that you specifically

[8] wanted, other than ownership of the entire company which

[9] you mentioned?

[10] **A:** Well, that was just it and point of fact is I

[11] was ambivalent about owning it. The investor group that

[12] I had contacted who was helping me to proffer the offer

[13] were rather adamant that I be the chief executive and I

[14] wasn't certain that that was where I wanted to spend the

[15] rest of my working years.

[16] **Q:** Now, at this time you were director of human

[17] resources?

[18] **A:** That is correct.

[19] **Q:** Did you also have any financial

[20] responsibilities toward the company? Do you understand

[21] my question?

[22]     Did you oversee any of the financial aspects of

[23] the company?

[24] **A:** Insofar as the HR function included recruiting,

[25] all the benefits, salary administration, performance

Page 36

[1] appraisal, legal compliance, yes, ma'am.

[2] **Q:** What size was the organization? In other

[3] words, what was its gross on an annual basis?

[4] **A:** I believe at the time it would have been – you

[5] know, I'd be guessing to the answer.

[6] **Q:** Well, normally I would say please don't guess.

[7] However, if you were involved as an investor with

[8] consideration of a takeover, then I would go with your

[9] recollection as to the value of the organization.

[10] **A:** I believe it was around $75 million annually.

[11] **Q:** If you were asked to take over as chief

[12] executive, what training would you have in terms of the

[13] financial operations of a company or what did you

[14] anticipate acquiring prior to that time?

[15]     Do you understand my question?

[16] **A:** My degree is in business.

[17] **Q:** And do you have any –

[18] **A:** I felt qualified. I didn't know if it was

[19] something I wanted to do.

[20] **Q:** Okay. Had you been in the financial side of

[21] any organization, other than what you outlined that you

[22] had participated in as DHR?

[23] **A:** I had been – any company I've served in I've

[24] been very involved in its growth and development, change

[25] of its management style. Overall, just basically

Page 37

[1] bringing improvements to bear within the function of

[2] human resources.

[3]     To answer your question directly, I have been

[4] through a public offering with one company, a data

[5] processing company.

[6] **Q:** And what company was that?

[7] **A:** That was CCX.

[8] **Q:** And when was that?

[9] **A:** That would have been in 1984.

[10] **Q:** And what was your position with them?

[11] **A:** Director of human resources.

[12] **Q:** And why did you leave them?

[13] **A:** My father had passed away that year and that

[14] seemed the time to get home. My dad was in Little Rock

[15] or near Little Rock, Arkansas. My mother lives in Lutz,

[16] Florida, just north of Tampa. My brother and I both

[17] ended up back at the homestead. It's a sizeable

[18] obligation for her.

[19] **Q:** Did the public offering have any influence on

[20] your decision to leave, either the success or the failure

[21] of it?

[22] **A:** I thought we reached a point – I'd been there

[23] three years and we had accomplished what I set out to do

[24] and I felt like there was a sense of completion and it

[25] was a good time to go. Otherwise I would probably get

Page 38

[1] immersed for another three or four or five years.

[2] **Q:** And any other organizations that you believed

[3] you had some responsibility or all responsibility for the

[4] financial aspects of?

[5] **A:** I had a worm farm.

[6] **Q:** A worm?

[7] **A:** A worm farm, yes, ma'am.

[8] **Q:** W-O-R-M?

[9] **A:** Yes, ma'am.

[10] **Q:** Was this prior to 1980?

[11] **A:** Yes. It was when I was in college the first

[12] time.

[13] **Q:** Any other financial responsibilities associated

[14] with your employment? In other words, did you have any

[15] other positions that had the financial aspects of it?

[16] **A:** We certainly covered the worm farm. We did not

[17] name PCA International, where I started as a photographer

[18] and ended up as an HR professional.

[19] **Q:** And when was that?

[20] **A:** That was the period '77 to '81. I'm sorry,

[21] 1980, '80 or '81.

[22] **Q:** And why did you leave PCA International?

[23] **A:** To go to CCX.

[24]  **Q:** Were you recruited by CCX?

[25] **A:** I think I responded to an advertisement.

Page 39

[1] Q: Your decision to leave PCA, was that at all
[2] involved in lack of opportunities or a mutual agreement?
[3] A: That would have been both.
[4] Q: Have you ever been hospitalized – as I said at
[5] the beginning, as I ask some of these questions, it's not
[6] my intent to embarrass you at all, but have you ever been
[7] hospitalized for drug or alcohol abuse?
[8] A: No, ma'am.
[9] Q: Have you ever been hospitalized for any
[10] psychiatric treatment?
[11] A: No, ma'am.
[12] Q: Have you had any psychological testing in part
[13] of career placement, in part of counseling, or any
[14] aspect?
[15] A: Only insofar as my parents got me involved with
[16] a charter program when I was in high school over at the
[17] university. There was a lot of testing that went on
[18] there. I don't remember what the scope or nature was,
[19] except that it came back to me as sort of career
[20] counselling kind of stuff, and certainly in the military.
[21] Q: And what was the purpose of the charter school?
[22] A: Of the charter –
[23] Q: I'm sorry, charter program, is that what you
[24] said your parents got you involved in?
[25] A: The University of South Florida was very close

Page 40

[1] to where my parents lived and I presume in order to help
[2] both my brother, sister and I, all of us, with making
[3] decisions about our futures and so forth, they got us
[4] involved with a program that was with educators who were
[5] either educators in training or something like that.
[6] Q: Has any health care professional, I think is
[7] the current term, medical professional, suggested to you
[8] that any sort of counseling or testing would be
[9] appropriate or warranted?
[10] A: No, ma'am.
[11] Q: Have we discussed your entire education
[12] history?
[13] A: Oh, no, ma'am.
[14] Q: I'm sorry?
[15] A: Formal education?
[16] Q: Yes.
[17] A: Yes, ma'am.
[18] Q: And have we discussed your employment history,
[19] excluding college and the worm farm, up to the time of
[20] Amerijet?
[21] A: Yes.
[22] Q: And then after Amerijet, prior to Pan Am – is
[23] that where you are now, Pan Am Airways? Where are you?
[24] A: Miami Air.
[25] Q: Miami Air.

Page 41

[1] A: I'm at Miami Air.
[2] Q: Where did you go after? Did you go to Pan Am?
[3] A: Yes, ma'am. I first developed, increased my
[4] involvement with Pan Am. I was already certified as an
[5] instructor there and later was asked to take on the
[6] responsibilities of program manager on the 727.
[7] Q: Now, prior to that, did you have any other
[8] employment after you left Amerijet, other than maybe a
[9] day charter with Dolphin Air, and I'll get to that in a
[10] minute.
[11] A: No, ma'am.
[12] Q: When did you start Pan Am as an employee?
[13] A: January 1st, 2000.
[14] Q: And when were you offered the position with
[15] them?
[16] A: December, 2000. Oh, excuse me, December, 1999.
[17] Q: Was it your decision to wait until January to
[18] start or was that when the position opened?
[19] A: As I recall, that's when the position opened.
[20] Q: From September 1st until January 1st, what if
[21] any employment did you have?
[22] A: None.
[23] Q: Did you have any increase in charters or any
[24] increase in the operation of the three organizations you
[25] mentioned earlier?

Page 42

[1] A: No, ma'am.
[2] Q: Did you receive unemployment compensation?
[3] A: Yes.
[4] Q: When did you start looking for a position after
[5] you left Amerijet?
[6] A: I believe I started looking for a position – I
[7] had already been looking for positions. So it's not fair
[8] to say that I started.
[9] Q: You had been looking for a position?
[10] A: Yes. I got more actively involved, but I had
[11] been looking for a position actively since around
[12] February of 1999.
[13] Q: From the time period of February, '99 until
[14] your reporting to work January of 2000, did you decline
[15] any job opportunities?
[16] A: You know, I think I may have. I was offered a
[17] position as captain at a company called Sky Trek, which
[18] got named something else that I can't remember.
[19] Q: And why did you decline that?
[20] A: That didn't look like they were – first, it
[21] was in New Jersey and they didn't, on further
[22] investigation, look viable and to be completely candid,
[23] my family situation at that time was such that I needed
[24] to find employment in and around Fort Lauderdale.
[25] Q: From '99 until January, 2000, did you limit

Page 43

[1] your search for employment in the South Florida area?

[2] **A:** From when, ma'am?

[3] **Q:** From February, '99.

[4] **A:** No, ma'am.

[5] **Q:** Until January. Did you limit your employment

[6] search?

[7] **A:** No, ma'am. I really became more focused later.

[8] **Q:** When you started with Pan Am in January of

[9] 2000, what was your compensation?

[10] **A:** $50,000.

[11] **Q:** And is that annually as a salary?

[12] **A:** Annually, yes, ma'am.

[13] **Q:** And what were your expected job duties?

[14] **A:** I was to develop course ware and oversee the

[15] flight engineer and type rating instruction on the Boeing

[16] 727, which we had involved about at one time 50 flight

[17] instructors.

[18] **Q:** You said flight engineer, right, not white

[19] engineer?

[20] **A:** I did say – I meant to say flight engineer.

[21] **Q:** I didn't know if there was a specialty.

[22] Again, what roughly were your hours? Were they

[23] 40 to 60 a week?

[24] **A:** Yes, that was pretty standard.

[25] **Q:** And did you have any benefits?

Page 44

[1] **A:** Yes.

[2] **Q:** And what were they?

[3] **A:** I believe there might have been a life

[4] component, but that was about it or might have been.

[5] There was health, dental, and a 401(k) plan, which I

[6] don't believe I ever earned the opportunity to

[7] participate in.

[8] **Q:** In either the Pan Am position or the Miami Air

[9] position, are there benefits that you don't have or you

[10] did not have there that you did have at Amerijet?

[11] **A:** I really don't feel that I've looked into that

[12] with sufficient depth to give you a qualified answer.

[13] **Q:** Well, then from your answer it would seem that

[14] there are none that you're aware of?

[15] **A:** That would be correct.

[16] **Q:** And there are none that you have sought and

[17] were denied?

[18] **A:** Rephrase the question, please.

[19] **Q:** Well, there are none that you believe that you

[20] have sought; in other words, that you would have had at

[21] Amerijet and you've asked the company, either Pan Am or

[22] Miami Air, for and were denied?

[23] In other words, I used to have Christmas Day

[24] off and it was denied at Pan Am or Miami Air. There are

[25] none that you're aware of?

Page 45

[1] **A:** At Miami Air the vacation policy, I can state

[2] with some credibility, that their vacation policy is not

[3] nearly so generous as either what I was entitled to or

[4] what Amerijet customarily gives its employees.

[5] **Q:** And what is the policy at Miami Air?

[6] **A:** Miami Air, I earn basically a week of

[7] employment, and I could stand corrected on this, but I

[8] think I recall that I earn a week of vacation after my

[9] first full calendar year of employment there, no portion

[10] of which would be taken during that calendar year.

[11] **Q:** So after the first year then will it be

[12] comparable to Amerijet?

[13] **A:** Well, the first year would be August 21st of

[14] 2001. No, it would not.

[15] **Q:** Then what's the change?

[16] **A:** It would be after January 1 of 2002 that I

[17] would get a week of vacation. If my memory serves me,

[18] and it's something I haven't looked at in a very long

[19] time, I believe I was getting 15 days paid vacation at

[20] Amerijet.

[21] **Q:** And did that have anything to do with the

[22] difference in positions; i.e, you were a pilot/crew,

[23] while I understand at Miami Air you are more of a ground

[24] instructor?

[25] **A:** It's true I'm a management employee at Miami

Page 46

[1] Air. However, that part of the benefit is exactly the

[2] same as for flight officers.

[3] **Q:** Anything else other than the potential or the

[4] possibility of the one-week vacation that comes to mind?

[5] **A:** Not that comes quickly to mind, no.

[6] **Q:** How about Pan Am, would you have had vacation

[7] during the Pan Am?

[8] **A:** There is one other aspect that comes to mind,

[9] if you don't mind me saying. That is that the nature and

[10] the scope of my employment at Amerijet was such that

[11] vacation time could be creatively taken in and around the

[12] schedule.

[13] A person did not have to work – I did not have

[14] to work as many days. I might work more hours, but not

[15] as many days. I could take a bunch of days off without

[16] them being considered to be a vacation at Amerijet and

[17] then of course, could attach my vacation time to those.

[18] So what looked like 15 days vacation could become

[19] considerably more.

[20] Also, as I think I alluded to a moment ago, I

[21] didn't have to work as many days at Amerijet. At Miami

[22] Air and at Pan Am I was expected to be available for work

[23] on pretty much a customary five-day work week. It

[24] doesn't work out that way, but I'm expected –

[25] particularly at Pan Am I showed up every day, five days a

---

Page 47

[1] week, and sometimes on the weekends, whereas that would

[2] not have been expected of me at Amerijet.

[3]    **Q:** Well, Amerijet, as I said, you were crew/pilot,

[4] while I understand at Pan Am and Miami it's more of a

[5] management position?

[6]    **A:** Right. I'm a management employee.

[7]    **Q:** You were not at Amerijet?

[8]    **A:** That is correct.

[9]    **Q:** What was your salary at Amerijet the last year

[10] you were there?

[11]    **A:** The way the Amerijet pay system works I was on

[12] a guarantee of I believe 60 hours per four-week period at

[13] a rate of $55 per hour. That's the guarantee. The

[14] actual would be what I actually flew with various

[15] additions added onto it, such as a duty rig, an expense

[16] reimbursement and some others.

[17]    So to say salary, the best I can say is I don't

[18] know. I know that there are people who are working with

[19] me who are experts in this field and who could answer

[20] those questions directly.

[21]    **Q:** At $55 for 60 hours for four weeks, that's

[22] approximately $3,300 a month. So that comes out to

[23] roughly what, $37,000, $38,000, ballpark?

[24]    **A:** Well, that really would be shorting that

[25] transaction substantially, in that I never earned – I

---

Page 48

[1] never was paid only what my salary was.

[2]    Secondly, there are 26 pay periods and in the

[3] example you just described, there would be only 12.

[4] Excuse me, there would be 13 pay periods as opposed to

[5] 12. So that would add an additional month on.

[6]    In addition to that, there are the other

[7] aspects of the pay which are not direct compensation. I

[8] think I referred to them as duty rig. They come to you

[9] in the form of a check, either in your paycheck or

[10] another check, expense check, but it would all figure

[11] into what I think would logically be construed as income.

[12]    **Q:** Why did you leave Pan Am?

[13]    **A:** To go to work at Miami Air.

[14]    **Q:** And was it a mutual decision, were you asked to

[15] leave, did you get a better opportunity, more money?

[16] What happened?

[17]    **A:** I had become disenchanted. The position I was

[18] in had changed.

[19]    **Q:** And how had it changed?

[20]    **A:** My boss had left.

[21]    **Q:** And who had been your boss?

[22]    **A:** A fellow named Charles Williams.

[23]    **Q:** Do you know why he left?

[24]    **A:** Yes.

[25]    **Q:** Why?

---

Page 49

[1]    **A:** He had become disenchanted with upper

[2] management.

[3]    **Q:** And who became your new boss?

[4]    **A:** My new boss was Mary Sharpe or "Sharpe".

[5]    **Q:** And what is her position there?

[6]    **A:** I'm not sure.

[7]    **Q:** What was her position at the time she was your

[8] boss?

[9]    **A:** I'm not sure.

[10]    **Q:** Did she have any title at all?

[11]    **A:** I'm not sure.

[12]    **Q:** What do you recall about her in terms of job

[13] duties?

[14]    **A:** She was in a supervisory capacity over all of

[15] the operations at the Miami Pan Am facility.

[16]    **Q:** When did she become your boss?

[17]    **A:** I don't know.

[18]    **MS. NORTON:** Let's just mark this whole

[19] thing as Major 1 and I will draw your attention

[20] to that.

[21]    (The document referred to was marked for

[22] identification as Defendant's Exhibit 1.)

[23]    **THE WITNESS:** Excuse me, can we take a

[24] break?

[25]    **MS. NORTON:** Sure, absolutely.

---

Page 50

[1]    (Recess taken).

[2]    **BY MS. NORTON:**

[3]    **Q:** Mr. Major, let me go back a few minutes on a

[4] subject. Since 1999 have you seen any doctors, anyone in

[5] health care other than for a routine cold or something

[6] like that, annual checkup?

[7]    **A:** Yes.

[8]    **Q:** And who have you seen?

[9]    **A:** I went to a specialist, a colon and rectal

[10] specialist and –

[11]    **Q:** That was not in conjunction with your

[12] termination from Amerijet. That was just part of health

[13] care?

[14]    **A:** The only thing that would be – no, there was

[15] no causal relationship.

[16]    **Q:** Have you sought any sleeping pills or

[17] medications or sedatives or tranquilizers or any

[18] prescription from any health care professional that you

[19] would attribute the need for to Amerijet?

[20]    **A:** No, ma'am.

[21]    **Q:** Have you seen any psychologist or psychiatrist

[22] since 1999?

[23]    **A:** I believe I have in conjunction with my family

[24] relationship.

[25]    **Q:** Family counseling?

---

Page 51

[1] **A:** Yes.

[2] **Q:** Are you currently divorced?

[3] **A:** That is correct.

[4] **Q:** And when was your divorce final?

[5] **A:** August 23rd, 2000.

[6] **Q:** Do you in any way attribute the breakup of your

[7] marriage to your termination from Amerijet?

[8] **A:** No.

[9] **Q:** In your complaint, the amended complaint – and

[10] I realize these are drafted by lawyers, but let me just

[11] ask you, you have sued for what we call compensatory

[12] damages due to humiliation, embarrassment, etc. Can you

[13] quantify or can you list any particular objective impact

[14] on your personal life as a result of your termination

[15] from Amerijet?

[16] Do you understand my question?

[17] **A:** No.

[18] **MS. NORTON:** I didn't either. If you did,

[19] I was just going to say, would you explain it

[20] to me?

[21] **MS. SHEA:** I'll object to the form of that

[22] one.

[23] **Q:** Would you describe for me then what you mean by

[24] the humiliation and embarrassment you suffered from the

[25] loss of employment with Amerijet?

Page 52

[1] **A:** I would be hard pressed to do that without

[2] giving it a great deal of thought.

[3] **Q:** Well, you knew you were going to be deposed

[4] today, right?

[5] **A:** Yes.

[6] **Q:** Let me ask you this then. It did not impact

[7] your marriage, you haven't gone to see a doctor for –

[8] **A:** Excuse me, I did not say it did not impact my

[9] marriage.

[10] **Q:** All right.

[11] **A:** My employment with Amerijet figured prominently

[12] in my family relationship. It could be said to have

[13] dramatically impacted it. Did it cause my breakup, no.

[14] **Q:** Then how did it dramatically impact your

[15] marriage, in what way?

[16] Mr. Major, the reason I'm asking you this, I

[17] have no desire to get into the reason you and your wife

[18] may have broken up. The only way I'll have to get into

[19] it is if there's some impact or claim you are associating

[20] with Amerijet. Otherwise, it's none of my business and I

[21] don't care to know.

[22] So I'm not trying to dance on the head of a pin

[23] with you. It's just that if you're going to claim money

[24] damages from my client because of the way you believe you

[25] were treated and that that caused or impacted your

Page 53

[1] marriage dramatically and that caused you emotional

[2] distress and you're going to sue for it, I need to know

[3] about it. If you don't, I don't want to know.

[4] That may be clear as mud –

[5] **MS. SHEA:** Is there a question coming?

[6] **MS. NORTON:** Yes. I mean, I'm trying to

[7] explain to him I'm not trying to split hairs

[8] here.

[9] **Q:** So when I ask in what way did it "dramatically

[10] impact your marriage," that's what I'm seeking. How are

[11] you claiming it impacted your marriage?

[12] **MS. SHEA:** What emotional distress – what

[13] are the components of emotional distress he's

[14] claiming?

[15] **MS. NORTON:** Exactly, right.

[16] **MS. SHEA:** Why don't you rephrase the

[17] question then.

[18] **A:** If you'll ask – I'd love to answer your

[19] question and believe me, I don't want the questions to go

[20] any more far afield than you do.

[21] **Q:** In what way do you believe that Amerijet

[22] impacted your marriage? How?

[23] **A:** I believe the relationship was further strained

[24] by virtue of the disappointments that we shared with

[25] regard to my relationship with Amerijet.

Page 54

[1] **Q:** There were other stressors on your marriage,

[2] though. You're not claiming that Amerijet was the

[3] primary stressor?

[4] **A:** No. That's a very complex and dynamic

[5] situation, as you can imagine.

[6] **Q:** Is it your contention that your marriage would

[7] not have broken up had you became a captain and remained

[8] employed by Amerijet?

[9] **A:** I wouldn't begin to make a contention such as

[10] that.

[11] **Q:** Other than the obvious loss of income for

[12] October, November and December, did you suffer any other

[13] financial consequences from being unemployed from

[14] Amerijet?

[15] **A:** Yes, I did.

[16] **Q:** What are they?

[17] **A:** I am really not in a position to be able to

[18] enumerate them. I have people who are working with us

[19] who are going through looking at my circumstances and

[20] evaluating them quantitatively. They can more accurately

[21] describe it.

[22] **Q:** That's fine, I may ask them the same question,

[23] but I'd like to hear what you describe it as.

[24] **A:** The loss of income at that particular point had

[25] a ripple effect.

Major v. Amerijet International

Patrick Scott Major

-0607... Document 112    Entered on FLSD Docket 03/13/2001    Page ...

Page 55

[1]  **Q:** Did you lose your home?

[2]  **A:** No.

[3]  **Q:** Did you lose a car?

[4]  **A:** No.

[5]  **Q:** Did you lose any asset?

[6]  **A:** My good credit rating.

[7]  **Q:** Anything else?

[8]  **A:** I guess I would just refer you to my prior

[9] answer.

[10]  **Q:** No, I understand that. I'm asking you, though,

[11] as you sit there, do you recall any other loss?

[12]  **A:** No.

[13]  **Q:** At some point in time did your wife set up a

[14] separate residence?

[15]  **A:** Yes, she did.

[16]  **Q:** And when was that?

[17]  **A:** November of 1999.

[18]  **Q:** And did that require - well, let me ask you

[19] this. Was she employed?

[20]  **A:** Yes.

[21]  **Q:** And who did she work with?

[22]  **A:** At the time I believe it was called Ralin

[23] Medical.

[24]  **Q:** And did she contribute any income to your joint

[25] household prior to November of '99?

Page 56

[1]  **A:** Absolutely.

[2]  **Q:** After November of '99 did she cease to do that?

[3]  **A:** She actually ceased to do that prior to

[4] November of 1999.

[5]  **Q:** When did she cease to do that?

[6]  **A:** I believe it was July.

[7]  **Q:** Did that have any economic impact on your

[8] household?

[9]  **A:** Oh, yes.

[10]  **Q:** And did she become unemployed or did she just

[11] decide she was not going to make contributions to the

[12] joint household?

[13]  **A:** The latter.

[14]  **Q:** And what was her monthly income prior to

[15] November of '99 - excuse me, July of '99 - that she

[16] contributed to the household?

[17]  **A:** I believe it would have been about $4,000 a

[18] month. That was her gross pay.

[19]  **Q:** Did the loss of her income have any impact on

[20] your good credit rating?

[21]  **A:** Oh, yes.

[22]  **Q:** Were the subjects of the credit rating jointly

[23] held accounts?

[24]  **A:** Yes, some of them.

[25]  **Q:** And do you remember what they were?

Page 57

[1]  **A:** No.

[2]  **Q:** Were they general charge cards?

[3]  **A:** Yes, some of them.

[4]  **Q:** A mortgage?

[5]  **A:** Yes.

[6]  **Q:** And did she contribute to the payment of the

[7] mortgage prior to July of '99?

[8]  **A:** Yes.

[9]  **Q:** Is that one of the things she ceased to do

[10] after that?

[11]  **A:** That's correct.

[12]  **Q:** Did you at any time assume increased financial

[13] obligations after she established a separate household as

[14] of November of '99?

[15]  **A:** Insofar as the house became my total - my sole

[16] obligation, as opposed to having her participation with

[17] it. Insofar as raising my daughter, it became -

[18] particularly during those periods when she was with me,

[19] became my sole responsibility.

[20]  **Q:** And how old is your daughter?

[21]  **A:** 10, as of a couple days ago.

[22]  **Q:** And her name is Amey?

[23]  **A:** Amey.

[24]  **Q:** Does she reside with you primarily?

[25]  **A:** We have a joint - I forget the terms.

Page 58

[1]  **Q:** Joint custody?

[2]  **A:** Well, I understand custody is not a term they

[3] use in our state. It's joint residential responsibility,

[4] is what they call it. She's a week with me, a week with

[5] her mom, back and forth.

[6]  **Q:** How would your duties as a member of a crew -

[7] well, let me rephrase it.

[8]  Would your continued employment at Amerijet in

[9] the same capacity you'd had impacted negatively - not

[10] Amey.

[11]  **A:** Amey.

[12]  **Q:** Amey, staying with you?

[13]  **A:** Thank you. Would it have impacted negatively?

[14]  **Q:** Yes.

[15]  **A:** It would certainly make it a little harder to

[16] plan, but no. I go out of town with my current job.

[17]  **Q:** Have you at any time ever consulted with any

[18] psychic card reader?

[19]  **A:** Psychic card reader?

[20]  **Q:** Psychic or card.

[21]  **A:** I recall going to a psychic fair in Hollywood,

[22] where my now ex-wife had a display. She is actively

[23] involved in that sort of thing. And I believe while

[24] there I had someone do a reading of some kind.

[25]  **Q:** What was the result of your reading?

Page 59

[1]   **A:** I don't remember.

[2]   **Q:** And you say your wife – excuse me, your

[3] ex-wife, was actively involved. Is there an organization

[4] of psychics? In what way is she actively involved?

[5]   **A:** If only there were. She is an ordained

[6] minister and teaches something called transformational

[7] energy release.

[8]   **Q:** And what is transformational energy release?

[9]   **A:** I have no idea.

[10]  **Q:** You are quoted –

[11]  **A:** I'm sorry. I do have an idea, but I wouldn't

[12] be able to explain it to you effectively.

[13]  **Q:** After speaking with numerous crew members at

[14] Amerijet you have been credited with the ability to have

[15] out of body experiences. Is that accurate?

[16]  **A:** The question again is?

[17]  **Q:** Did you discuss having out of body experiences

[18] with any of the crew members at Amerijet?

[19]  **A:** I think I heard one question that I had had out

[20] of body experiences and the other question was did I

[21] discuss having out of body experiences. Perhaps I can

[22] answer them both.

[23]  **Q:** Go with the latter one instead of the first

[24] one.

[25]  **A:** In the context of flying with people 16 to 20

Page 60

[1] hours a day, we discuss a great many things. Sometimes

[2] we're stuck when the airplane is not moving for – my

[3] experience 10, 14 hours just in the cockpit, sitting on

[4] the ramp somewhere. So we've probably discussed any

[5] manner, any number of things.

[6]      As far as out of body experiences, I think we

[7] may have discussed that.

[8]  **Q:** Did you tell Mr. Huff that you've had out of

[9] body experiences?

[10]  **A:** I think I might have told Mr. Huff that I had

[11] what in some circles is described as out of body

[12] experiences. Whether in fact they are such a thing, I

[13] really don't know.

[14]  **Q:** What were you referring to as an out of body

[15] experience?

[16]  **A:** For me it's a very vivid dream. It happens

[17] when I'm asleep. It's different from a normal dream,

[18] from another dream. I say normal dream. These are

[19] unusual dreams, just very vivid, very – vivid is a good

[20] word. Since there is that distinction, I don't think –

[21] well, I think I answered the question.

[22]  **Q:** Well, what is it for you?

[23]  **A:** It's not – I read a lot and I'm very curious

[24] about everything that goes on in our environment, mostly –

[25] toward the areas of physics and aerospace, aviation. But

Page 61

[1] I'm also in a sense a spiritual person. I go to church,

[2] that kind of thing. So the literature we come across

[3] from time to time makes reference to what is called out

[4] of body experiences.

[5]  **Q:** Well, let me make this simple, Mr. Major. Did

[6] you tell Mr. Huff that from time to time or at times you

[7] can go out of the cockpit and look back in at yourself

[8] and others?

[9]   **A:** No, ma'am.

[10]  **Q:** Did you ever tell anyone that?

[11]  **A:** No, ma'am.

[12]  **Q:** Other than with Mr. Huff, did you discuss out

[13] of body experience with Mr. Cline?

[14]  **A:** Yes, ma'am.

[15]  **Q:** And whom else did you discuss it with?

[16]  **A:** I really couldn't say.

[17]  **Q:** You've discussed it on more than one occasion?

[18]  **A:** Oh, yes.

[19]  **Q:** What was the reaction from individuals when you

[20] discussed it with them, do you remember?

[21]  **A:** Interest, anything ranging from interest and

[22] intrigue to several instances, "Oh, I've had things like

[23] that happen" and other instances to being incredulous.

[24]  **Q:** The out of body experience, though, you also

[25] indicated occurred other than when you were sound asleep

Page 62

[1] in a dream; is that not correct?

[2]   **A:** No, I don't think that's correct.

[3]   **Q:** What do you remember telling Mr. Huff about it?

[4]   **A:** I don't.

[5]   **Q:** I believe the answer earlier, but let me just

[6] be sure for the record, is that you have not seen any

[7] health care professional since you left Amerijet for

[8] other than normal health maintenance or for reasons

[9] associated with other than Amerijet?

[10]  **A:** Say that again.

[11]  **Q:** Have you seen any health care professional

[12] since you left Amerijet for reasons that you attribute to

[13] Amerijet?

[14]  **A:** No, ma'am.

[15]  **Q:** For any emotional distress or anything as a

[16] result of Amerijet?

[17]  **A:** No, ma'am.

[18]  **Q:** Let me direct your attention now to Pan Am

[19] International Flight, and I believe before the first

[20] break I had marked as an Exhibit 1 –

[21]  **MS. SHEA:** You're going to start with

[22] sequential numbering for defendant?

[23]  **MS. NORTON:** Major 1.

[24]  **Q:** This is the entire file we received pursuant to

[25] a subpoena. Let me ask you to look at – I'd asked you

Page 63

[1] earlier about your contact with Miss Sharpe.

[2] A: Yes.

[3] Q: And let me ask you to turn back midway to a

[4] memo dated April 7th from Nidiam Conesa.

[5] A: Is there a page number?

[6] Q: No, unfortunately there's not.

[7] A: I see it.

[8] Q: There's several.

[9] A: I see April 7th.

[10] Q: Is it, "Mr. Major came to see me?" Is that the

[11] beginning of that sentence?

[12] A: It says, "I asked Ms. Sharpe regarding what

[13] Mr. Major had said."

[14] Q: One page back.

[15] A: "Mr. Major came to see me?"

[16] Q: Yes.

[17] A: I'm there.

[18] Q: *Do you recall this incident when you went to*

[19] *see him or her?* Is it a him or a her, Nidiam Conesa?

[20] A: It's a her.

[21] Q: And what was her position?

[22] A: Personnel manager, I think.

[23] Q: Do you remember going to see Miss Conesa

[24] regarding Miss Sharpe?

[25] A: Yes, I do.

Page 64

[1] Q: And before you read this or finish reading it,

[2] what do you recall being the reason for your visit and

[3] the nature of your discussion?

[4] A: What I recall is that Miss Sharpe came,

[5] presented herself at my desk and I was in a new desk. I

[6] had been moved recently. They created a new work area

[7] for program managers and she said that I would not be

[8] allowed to bring my personal laptop computer with me to

[9] work any more and have it on my desk.

[10]     I took pains to point out to her that the

[11] laptop computer for me replaces what had been a pad in

[12] keeping my list of things to do organized and so that I

[13] can forget what I have to do later, immerse myself in my

[14] current activity. And I wasn't successful in doing that.

[15] Q: And what happened?

[16] A: I think out of frustration that was -- out of

[17] frustration I went to see Nidiam.

[18] Q: I mean, as an employee didn't she have a right

[19] to ask you not to bring a personal laptop into work?

[20] A: I've never had an employer ask me not to bring

[21] a personal laptop. My frame of reference would have been

[22] that an employer would be overjoyed to see me bringing in

[23] an item that I obviously had invested some expense in

[24] obtaining and using it at their work for their benefit.

[25] Q: Did you mention that to her?

Page 65

[1] A: Yes.

[2] Q: And did you also remember a discussion

[3] regarding the way you were formatting various manuals

[4] that you were working on?

[5] A: Oh, yeah, that was part of our daily job. In

[6] course generation, you have manuals and so forth. We

[7] discussed that.

[8] Q: You have to speak up a little bit.

[9] A: We discussed that sort of thing for years. Are

[10] you saying with Miss Sharpe or Miss Conesa?

[11] Q: Yes, that she did not want you formatting them

[12] the way they were being formatted. She wanted you to

[13] change them?

[14] A: That was routine. The ending process was back

[15] and forth throughout the term that I was there.

[16] Q: So do you remember her discussing that with you

[17] or not?

[18] A: Oh, yes.

[19] Q: Did she give you strict instructions on how she

[20] wanted the manuals to be formatted, but you disagreed

[21] that it would -- that was the proper way? Do you

[22] remember any discussion along that line?

[23] A: Yes, but I'm not -- my memory is not real

[24] clear. Do you have a specific instance you want to refer

[25] me to?

Page 66

[1] Q: I'm asking just generally what you recall. It

[2] was ongoing or do you remember one or two particular

[3] times it was discussed?

[4] A: I recall that I had been asked to produce in a

[5] very short period of time documentation specific to

[6] certain activities at Pan Am International Flight Academy

[7] as it pertained to the certification under the FAR Part

[8] 142 that they operate under.

[9]     When that was done, I was praised and received

[10] accolades and so forth not only to the content, but to

[11] the format and so forth.

[12] Q: From who?

[13] A: From Miss Sharpe, from my boss, Chick Williams.

[14] I had also created what they call LOFT profiles

[15] and had done that in a way that was seen not to be very

[16] effective, but innovative and appropriate.

[17] Q: Do you remember her indicating that the

[18] instructors have asked her to take the manuals away from

[19] you?

[20] A: No.

[21] Q: Do you remember any discussion with her that

[22] she wanted them all formatted the same way?

[23] A: Oh, yes.

[24] Q: Do you remember advising her that that would

[25] not work, in your opinion?

Page 67

[1] **A:** Revising – I want to be clear. 727 manuals
[2] are one set of manuals. DC-8, 747 –
[3] **Q:** Mr. Major, I don't care what kind of manual.
[4] I'm just speaking generally. Do you remember her telling
[5] you that one manual or all the manuals? I don't care.
[6] That she wanted it done a specific way and you indicating
[7] that that would not work?
[8] **MS. SHEA:** Let me just object to you
[9] having interrupted him mid-answer.
[10] **Q:** Do you remember the discussion at all, whether
[11] it was on – what manuals it was on, I don't care.
[12] **MS. SHEA:** Objection, argumentative.
[13] **A:** I do not recall – I do not recall ever telling
[14] her it wouldn't work.
[15] **Q:** Do you remember any words to that effect?
[16] **A:** No.
[17] **Q:** Do you remember discussing it with her and
[18] suggesting that was not the best way to proceed?
[19] **A:** Oh, yes.
[20] **Q:** What do you recall about the conversation,
[21] specifically?
[22] **A:** There were several conversations ongoing, in
[23] which many of my suggestions were accepted and
[24] embellished and others were declined.
[25] **Q:** Do you remember questioning her ability and

Page 68

[1] competence with Nidiam Conesa?
[2] **A:** Yes, I do.
[3] **Q:** What can you recall about that conversation?
[4] **A:** I think I openly questioned – and when I say
[5] openly, I mean in the context of a private meeting with
[6] Nidiam Conesa – whether or not there had been a careful,
[7] deliberative assessment of Miss Sharpe's leadership,
[8] supervisory or management abilities, prior to her being
[9] given those responsibilities at Pan Am International
[10] Flight Academy.
[11] **Q:** As you're sitting there now, can you tell me
[12] what you said and what he responded in more of a
[13] conversation –
[14] **A:** There was no one else present in the room.
[15] **Q:** I'm sorry, what she said, Miss Conesa.
[16] **A:** And the question again is?
[17] **Q:** Can you tell me in more of a conversational
[18] nature, "I said·she said" format?
[19] **A:** No.
[20] **Q:** So you just remember the general –
[21] **A:** In general.
[22] **Q:** – tone?
[23] **A:** Uh-huh.
[24] **Q:** Do you recall a discussion with Miss Conesa in
[25] which you attributed the loss of Chick Williams to

Page 69

[1] Miss Sharpe?
[2] **A:** Yes.
[3] **Q:** And her managerial style?
[4] **A:** Yes.
[5] **Q:** Do you recall telling him that Miss Sharpe did
[6] not know how to treat people?
[7] **A:** There was no male present in the room.
[8] **Q:** Do you remember telling Miss Conesa that Miss
[9] Sharpe did not know how to treat people?
[10] **A:** I probably used words to that effect, yes.
[11] **Q:** That she had no brains?
[12] **A:** I doubt if I went that far.
[13] **Q:** You may have?
[14] **A:** I recall being pretty frustrated, but I usually
[15] stopped short of – that sounds pretty striking.
[16] **Q:** Do you remember suggesting that she did not
[17] know how to stand up for her employees?
[18] **A:** I may have, to make it simpler on you, gone
[19] through what I considered to be many of the
[20] characteristics or qualities of a leader and then as I
[21] saw them at the time and then made some – and offered an
[22] opinion with respect to that.
[23] **Q:** Why don't you tell me what you recall going
[24] through and offering an opinion on at this point?
[25] **A:** I think you've hit it.

Page 70

[1] **Q:** Then do you remember telling or excuse me, do
[2] you remember asking who was responsible for giving her
[3] that position and title?
[4] **A:** The question again?
[5] **Q:** Do you remember asking Miss Conesa who was
[6] responsible for giving Mary Sharpe that position and
[7] title?
[8] **A:** No, I don't.
[9] **Q:** Do you remember advising Miss Conesa that you
[10] had run your own company, that you knew how to treat
[11] people and address problems?
[12] **A:** I may have, yes, but I don't recall now.
[13] **Q:** Do you remember telling Miss Conesa that Miss
[14] Sharpe insists on having all the programs formatted the
[15] same way and it doesn't work that way?
[16] **A:** No. I recall part of my frustration being –
[17] **Q:** Do you remember advising that you had been in
[18] HR and that you know she's very wrong?
[19] **A:** Pardon me?
[20] **Q:** Do you remember advising Miss Conesa that you
[21] have been in HR and that you know that Miss Sharpe is
[22] very wrong?
[23] **A:** There are two parts to that.
[24] **Q:** Do you remember that conversation? Do you
[25] remember suggesting –

Page 71

[1]   A: I remember having the conversation with
[2] Miss Conesa, but I confess to some discomfort with trying
[3] to answer two questions with one response. Could you
[4] give me one?
[5]   Q: Which part of that was two questions?
[6]   A: Well, you said do you recall telling her one
[7] thing and then you said "and" something else.
[8]   Q: Do you remember telling Miss Conesa that you
[9] have been in HR?
[10]  A: Yes.
[11]  Q: And because you've been in HR, is the
[12] implication, you know that Miss Sharpe was very wrong?
[13]  A: I don't recall.
[14]  Q: It may have, it may not have?
[15]  A: I know I've had several discussions with
[16] Miss Conesa. I've been very open with everybody that I
[17] work with and any number of things might have come up.
[18]  Q: In terms of your critique of Miss Sharpe, can
[19] you be any more specific as to what you recall saying to
[20] Miss Conesa about Miss Sharpe?
[21]  A: I recall being frustrated with the exchange I
[22] just had with Miss Sharpe. I recall being frustrated
[23] with the person who hired me, my boss, who left as a
[24] direct consequence of her interaction with him and
[25] several of the others.

Page 72

[1]   I recall being very concerned that the
[2] organization where I worked was on the verge of losing a
[3] number of very good people, the program manager staff and
[4] instructors, because of this – not only the lady's style
[5] and demeanor, but the choices she was making.
[6]   Q: And what were the choices she was making that
[7] you were taking issue with?
[8]   A: Well, there were several, but I can't recall
[9] what they are.
[10]  Q: Do you remember any of them?
[11]  A: No.
[12]  Q: What led you to conclude, Mr. Major, that you
[13] were right and she was wrong?
[14]  A: That was my opinion at the time.
[15]  Q: I'm trying to find out what was your opinion
[16] based on? What do you recall observing, hearing, seeing,
[17] that led you to that opinion?
[18]  A: I don't recall specifically.
[19]  Q: Don't remember anything more specific?
[20]  A: No.
[21]  Q: Were you advised that other co-workers had
[22] complained about you having a personal laptop?
[23]  A: I was advised, yes.
[24]  - Q: And who advised you of that?
[25]  A: Miss Sharpe.

Page 73

[1]   Q: And is there any reason you believe that that
[2] did not occur?
[3]   A: Again, I can't imagine why anyone would have
[4] complained about me having a personal laptop. My office
[5] mate in my prior office had one. They were all over the
[6] building. I might have openly questioned the credibility
[7] of that statement.
[8]   Q: Did you receive personal E-mails during the day
[9] on your laptop?
[10]  A: When I took a break, I would get on it
[11] sometimes. Sometimes, not always, but sometimes.
[12]  Q: Did you advise her that you were going through
[13] a bad divorce and that you had to respond to your
[14] personal E-mails often on a "fast response?"
[15]  A: At that particular time it may well have been
[16] that that was the only way I could communicate with my –
[17] I guess at that point it would be my estranged wife and
[18] just by virtue of our work situations and so forth.
[19]   So it may very well have been that I had the
[20] line open and the E-mail server running in the
[21] background, such that if something came through, I could
[22] investigate whether or not it was from her and then if it
[23] was, then open it; in much the same way I would take a
[24] personal telephone call.
[25]  Q: Well, if you were flying you wouldn't get

Page 74

[1] personal E-mail and be able to respond to it immediately,
[2] would you?
[3]   A: That's one of the aspects of flying. This
[4] wasn't a flying trip.
[5]   Q: You did subsequently remove your laptop; is
[6] that correct?
[7]   A: Oh, yes.
[8]   Q: And you asked for the name of the person who
[9] had complained about it? Do you remember that?
[10]  A: I'm sure I did.
[11]  Q: And how did your relationship with Miss Sharpe
[12] proceed after this? This is after April 7 of 2000.
[13]  A: In the same way it proceeded before.
[14]  Q: And what is that?
[15]  A: Cordial.
[16]  Q: At some point in time you left Pan Am, right?
[17]  A: I did.
[18]  Q: And you resigned?
[19]  A: That is correct.
[20]  Q: And you resumed a consulting relationship?
[21]  A: With Pan Am?
[22]  Q: I believe that's what –
[23]  A: I gave them two weeks notice and I left to take
[24] the position with Miami Air. I believe officially that
[25] would have meant that my status went from that of a full

Page 75

[1] time employee to an independent contractor. I was still
[2] qualified there as a captain, first officer and flight
[3] engineer instructor for several of their client
[4] companies.
[5]     Q: But you resigned. So the independent
[6] contractor position was one that you held before January
[7] 1st of 2000?
[8]     A: That's correct.
[9]     Q: Between February of '99 and January of 2000,
[10] did you receive any compensation from Pan Am as an
[11] independent contractor?
[12]     A: Between – did you say in February?
[13]     Q: I picked February, '99.
[14]     A: And?
[15]     Q: When you began full time employment, which I
[16] believe you told me January 1st of 2000?
[17]     A: Yes, I'm sure I did.
[18]     Q: Did you receive 1099s from them?
[19]     A: I think so.
[20]     Q: Would there be any reason you wouldn't have?
[21]     A: Not that I can recall. I just – I think I
[22] remember seeing them. That's about as much as I can tell
[23] you.
[24]     Q: Between September 1st, '99 and January 1st,
[25] 2000 did you perform the function of independent

Page 76

[1] contractor with any other organization?
[2]     A: Between –
[3]     Q: September 1st of '99 and 2001, when you became
[4] full time employed by Pan Am.
[5]     A: 2001 would have been January just past and I
[6] haven't really had a relationship with Pan Am since I
[7] left them in August of 2000.
[8]     Q: I'm sorry, January 1st, 2000. 1/2000, I should
[9] have said. You indicated you went to work for Pan Am on
[10] January the 1st of 2000?
[11]     A: That is correct.
[12]     Q: Between the time you left Amerijet, which was
[13] September of '99, until you became full time employed by
[14] Pan Am, did you perform any services for compensation for
[15] any other organization?
[16]     A: No, ma'am.
[17]     Q: And do you recall performing any services for
[18] Pan Am during that time period?
[19]     A: Yes.
[20]     Q: And on what basis?
[21]     A: To be strictly accurate about it, I worked for
[22] a company that they employed to provide flight
[23] instruction service.
[24]     Q: What was the name of that company?
[25]     A: Major Strategies.

Page 77

[1]     Q: So they hired your corporation, which in turn
[2] contracted with you?
[3]     A: Right.
[4]     Q: And what was the nature of those services?
[5]     A: Flight instruction to flight engineers and
[6] first officers for companies such as Express One and
[7] other client companies.
[8]     Q: Was there a contract?
[9]     A: I believe there was.
[10]     Q: And what were the terms of the contract?
[11]     A: The terms of the contract specified the hourly
[12] rates that I received.
[13]     Q: And what were they?
[14]     A: I don't recall.
[15]     Q: You don't remember?
[16]     A: And I say that I received; that the company
[17] would receive. The company received those checks and
[18] cashed them.
[19]     Q: How many other contracts has Major Strategies
[20] had in the last two years?
[21]     A: I couldn't say.
[22]     Q: Have they had others?
[23]     A: Have they had others of this nature?
[24]     Q: Yes.
[25]     A: No.

Page 78

[1]     Q: Certainly this one has to stick out in your
[2] mind. You were unemployed by Amerijet at the time?
[3]     A: Yes, ma'am.
[4]     Q: And here Pan Am is offering you an hourly rate
[5] or excuse me, offering Major Strategies and you as the
[6] president of it are negotiating a contract, I presume?
[7]     A: It really wasn't a negotiation. We had a set
[8] fee, the specifics of which I don't recall.
[9]     Q: Do you remember how many hours it was for?
[10]     A: No, there were no minimum hours. It's just
[11] whenever the scheduling department called me and asked me
[12] if I was available, would I come.
[13]     Q: Did the scheduling department call you?
[14]     A: From time to time, yes.
[15]     Q: And approximately how many times from
[16] September 1st, '99 until January 1st, 2000 did they call
[17] you?
[18]     A: I would not have – I couldn't even estimate.
[19]     Q: Were you employed anywhere else during that
[20] time period?
[21]     A: No.
[22]     Q: Was it one time or ten times?
[23]     A: It was more than one. It might have been as
[24] many as ten. Could have been more.
[25]     Q: And were these multi-hour assignments?

Page 79

[1] A: Usually four hours.

[2] Q: And do you recall whether or not the hourly

[3] compensation was the same as, greater or less than you

[4] had made at Amerijet?

[5] A: When teaching captains, I believe it was more.

[6] When teaching flight engineers, it was less. When flying

[7] support, it was less even still.

[8] Q: Did they call and you were unable to perform

[9] the requested service? In other words, that you had a

[10] conflict?

[11] A: I don't recall.

[12] Q: So that may have happened?

[13] A: It may have, yes.

[14] (Off the record.)

[15] Q: Mr. Major, I see here in a Payroll Status

[16] Change Report, which is the very last of your packet, if

[17] you care to look at it, that you were paid – the day of

[18] termination, excuse me, is 8/25?

[19] A: You say it's the last page?

[20] Q: No, toward the last. It's not the last page.

[21] A: I have performance appraisal.

[22] Q: Were you paid through 8/25?

[23] A: Best I know. In fact, I think I got paid

[24] through November.

[25] Q: By Pan Am?

Page 80

[1] A: Yeah, and I wrote them a check, because they

[2] obviously – this had gone through.

[3] Q: At what point in time were you supposed to have

[4] been paid through, if you recall?

[5] A: Right about then.

[6] Q: November or August 25th?

[7] A: Through August, and that would have included my

[8] vacation.

[9] Q: I believe that would explain the obvious

[10] carryover.

[11] All right. In a few pages back in your memo to

[12] Dan Campbell dated August 11th, you indicate you're

[13] reverting back to an independent contractor status?

[14] A: That's correct.

[15] Q: And you're taking six days vacation?

[16] A: Yes.

[17] Q: And was the reason you left wholly attributed

[18] to or largely attributed to Miss Sharpe?

[19] A: I wouldn't say the reason I left was attributed

[20] to Miss Sharpe. I found what I perceived to be a better

[21] opportunity at Miami Air.

[22] Q: Why was it a better opportunity? I understand

[23] it's $2,000 less.

[24] A: Because I could fly.

[25] Q: Have you flown since December 19th?

Page 81

[1] A: Not since December 19th, but I will.

[2] Q: Let me ask you to look back to your exit

[3] interview.

[4] A: Give me a hint. Am I going in the right

[5] direction?

[6] Q: Yes, I believe you are. I think you're right

[7] there.

[8] A: This might even be it.

[9] Q: Now, did you fill this out?

[10] A: Yes.

[11] Q: That's your handwriting? It's dated 8/25?

[12] A: Yes.

[13] Q: And the reason you're leaving is company

[14] policies? Do you see where you checked that?

[15] A: No.

[16] Q: "Reason for leaving, dissatisfied with," right

[17] in the middle?

[18] A: Yes.

[19] Q: "Company policies". Is that your check mark or

[20] your X?

[21] A: No, that's mine, that's mine.

[22] Q: What policies were you dissatisfied with?

[23] A: If memory serves and again, this is last

[24] year – first of all, I didn't recall this form until you

[25] brought it out. I believe I'm referring to there that I

Page 82

[1] didn't get and for some time had not gotten in my own

[2] frame of reference a correlation between the objectives

[3] of the company as stated by the president in several

[4] meetings and the day-to-day operations of the company,

[5] the acquisitions it was making. I didn't see any rhyme

[6] or reason where I could fit in.

[7] Q: And you've also indicated you were dissatisfied

[8] with your use of your skills and experience; is that

[9] correct?

[10] A: What are you referring to?

[11] Q: Well, underneath "Aspects of Employment?"

[12] A: "Aspects of Employment." I see two columns.

[13] Q: You see "dissatisfied"?

[14] A: I see "very satisfied", "satisfied",

[15] "dissatisfied" and "very dissatisfied". I see four

[16] columns.

[17] Q: Look down. It says "Nature of Job"?

[18] A: Satisfied.

[19] Q: You were satisfied. Use of skills and

[20] experience you were dissatisfied; is that correct?

[21] A: Correct.

[22] Q: And you also were dissatisfied with the

[23] advancement opportunities?

[24] A: That is correct.

[25] Q: And you indicated you were dissatisfied with

Page 83

[1] the salary, the supervision, the working conditions and
[2] overall as a place to work?
[3]     **A:** Yes, I did.
[4]     **Q:** I cannot read your writing at the bottom of
[5] that. Would you read that, please?
[6]     **A:** "Relationship with supervisor strained. Were
[7] complaints taken to supervisor, yes. If yes, were they
[8] handled," is not answered. "Explain. Supervisor
[9] referred to here is Mary Sharpe. Dan Campbell can" – it
[10] looks like there's a word missing there – "in the last
[11] and showed promise as a capable leader and administrator,
[12] but still had to deal with ineffective policies from
[13] above."
[14]     I think that says, "Dan Campbell came in at the
[15] last and showed promise as a capable leader and
[16] administrator, but still had to deal with ineffective
[17] policies from above."
[18]     **MS. NORTON:** Let's go ahead and take a
[19] break.
[20]     (Whereupon at 12 p.m. a luncheon recess was
[21] taken until 1:10 p.m.)
[22]
[23]
[24]
[25]

---

Page 84

[1]              **AFTERNOON SESSION**
[2]              **BY MS. NORTON:**
[3]     **Q:** Mr. Major, I didn't ask you about your
[4] arrangement with your attorney. One of the things that
[5] you were seeking in this lawsuit is legal fees, should
[6] you prevail.
[7]     **A:** Yes, ma'am.
[8]     **Q:** Therefore, what is the financial arrangement
[9] that you have set out with your attorney? I don't want
[10] any discussions with them. I just want to know what you
[11] have agreed to pay.
[12]     **A:** What I've agreed to pay is contingent upon what
[13] is recovered.
[14]     **Q:** Is there any minimum hourly rate or hourly rate
[15] discussed?
[16]     **A:** If there was, I'm not remembering it.
[17]     **Q:** Did you sign an agreement?
[18]     **A:** Yes, I did.
[19]     **Q:** I think we've requested that. May have already
[20] received it even.
[21]     Have you ever been a party to any other
[22] lawsuit?
[23]     **A:** No.
[24]     **Q:** In any shape, excluding divorce?      ·   ·
[25]     **A:** I sometimes get those huge class action things

---

Page 85

[1] having to do with stockholders and purchasers, but I've
[2] never responded to them or anything.
[3]     **Q:** And have you ever been sued?
[4]     **A:** Yes.
[5]     **Q:** And by whom were you sued?
[6]     **A:** I cannot remember the individual's name. It
[7] was in conjunction with my work at –
[8]     **Q:** You're going to have to speak up. I'm sorry.
[9]     **A:** I'm struggling to remember the individual's
[10] name. He was a landlord in Riverside Park, who took
[11] issue with the activities of Riverside Park Residents
[12] Association.
[13]     **Q:** Were you personally named?
[14]     **A:** Yes.
[15]     **Q:** And what conduct or action or non-action was
[16] attributed to you?
[17]     **A:** I served on the board, the board of directors
[18] of Riverside Park Residents Association. It was an
[19] inter-city, mostly waterfront neighborhood that had taken
[20] it upon itself to improve the neighborhood.
[21]     **Q:** I'm sorry, my question to you then was you were
[22] not individually sued, you were sued in your capacity as
[23] member of the board?
[24]     **A:** I wouldn't really know the difference. My name
[25] was in it.

---

Page 86

[1]     **Q:** Other than being a member of the board, was any
[2] other conduct specifically alleged that you did?
[3]     **A:** No.
[4]     **Q:** Any other lawsuits that you have been a party
[5] to as a defendant or otherwise?
[6]     **A:** No, ma'am.
[7]     **Q:** Have you been a corporate rep or have you been
[8] a witness in any lawsuit? I know you had a history of
[9] human resources. In that capacity were you a participant
[10] in, if you will, any lawsuits?
[11]     **A:** I may have been, but – I may have been. I
[12] know there were lawsuits that came in where I worked, but
[13] no, I don't remember – don't remember any specifics.
[14]     **Q:** Other than with Amerijet or against Amerijet,
[15] have you filed any other EEOC charges against an
[16] employer?
[17]     **A:** No.
[18]     **Q:** At Miami Air International – Miami Air
[19] International, is that correct? Is that your current
[20] employer?
[21]     **A:** That's correct.
[22]     **Q:** Have there been any discussions between you and
[23] human resources and a supervisor regarding your
[24] performance?
[25]     **A:** Between me, human resources and a supervisor,

---

Page 87

[1] all inclusive?

[2] **Q:** No, between you and human resources or you and

[3] a supervisor regarding your performance?

[4] **A:** Negative, positive or –

[5] **Q:** Either way.

[6] **A:** Yes, I would consider that to be a normal part

[7] of my job.

[8] **Q:** Were any of the conversations constructive

[9] criticism?

[10] **MS. SHEA:** I'm going to object to the form

[11] of the question. You should ask him about the

[12] content of them, rather than characterizing

[13] them. Constructive criticism –

[14] **Q:** Were any of them negative?

[15] **A:** No.

[16] **Q:** Tell me the most recent one that you recall.

[17] **A:** I created a class and a computer program known

[18] as Powerpoint; a couple of them, actually. One on

[19] surface safety, to prevent runway incursions, another on

[20] cockpit or crew resource management.

[21] Throughout the creation of that there were

[22] several discussions with my superior on what would be

[23] included, how long the course should be, how long it

[24] needed to be, and then subsequent, some very gratifying

[25] feedback with regard to the response.

Page 88

[1] **Q:** Have you had an opportunity to review your

[2] personnel file at Miami Air International?

[3] **A:** No.

[4] **Q:** Have you been copied on any memos, evaluations,

[5] warnings, any documentation pertaining to you?

[6] **A:** No.

[7] **Q:** And who is your supervisor at Miami Air

[8] International?

[9] **A:** Rich Draina.

[10] **Q:** Can you spell that last name?

[11] **A:** D-R-A-I-N-A.

[12] **Q:** And how long has he been your direct

[13] supervisor?

[14] **A:** Since I began.

[15] **Q:** And to whom does he report?

[16] **A:** To Kurt Kamrad.

[17] **Q:** CURT?

[18] **A:** "K".

[19] **Q:** C-A-N-R-A-D, Canrad or Conrad?

[20] **A:** It's K-A-M-R-A-D, and I may be mistaken.

[21] That's the chief pilot. He could very well report

[22] directly to Jim Proia. Both of these individuals would

[23] be superior in the line of – chain of command to me.

[24] **Q:** While you were at Amerijet there were several

[25] unionization attempts; is that correct?

Page 89

[1] **A:** There were two.

[2] **Q:** One I believe occurred in 1998?

[3] **A:** That's correct.

[4] **Q:** And then when was the previous one?

[5] **A:** I believe that was around 1993 or four.

[6] **Q:** Other than your logbook, would you have kept

[7] any calendar, note pad, recollections, informal notes

[8] during your time at Amerijet?

[9] **A:** Oh, yes.

[10] **Q:** And what format would that take place?

[11] **A:** Primarily a schedule, a list each day, what I

[12] hoped to accomplish that day. It might list those items

[13] in some sort of priority, A, B or C as opposed to a

[14] sequential order, and then corresponding to the activity

[15] I might enter notes as to what exactly was accomplished,

[16] who I had the discussion with, if a discussion was in

[17] fact involved or what got done.

[18] **Q:** Have you produced all of those to your attorney

[19] that would pertain to this lawsuit?

[20] **A:** I believe I have.

[21] **Q:** Are there any that you have not produced?

[22] **A:** There may be. We're talking about 365 days

[23] over a period of eight and a half years. I am not

[24] certain that I have done an exhaustive search for each

[25] and every item that may pertain to this lawsuit, but I

Page 90

[1] believe I've given her everything that does.

[2] **Q:** Have you checked your laptop, your hard drive?

[3] **A:** Oh, yes, ma'am.

[4] **Q:** Your files. And have you changed laptops in

[5] the time period?

[6] **A:** In the eight and a half years?

[7] **Q:** Yes.

[8] **A:** Yes.

[9] **Q:** What would you have to do to do an exhaustive

[10] search?

[11] **A:** I'd have to go through page by page, entry by

[12] entry, reading them.

[13] **Q:** And you have not done that?

[14] **A:** I believe I have done – I believe that is

[15] substantially done.

[16] **Q:** But you're not sure that you have in fact

[17] produced everything; is that what you're saying?

[18] **A:** I'm suggesting that there may be some notes on

[19] my daily to do log that have not been produced that I

[20] don't even at this point know exist.

[21] **Q:** Because you haven't reviewed them to see: is

[22] that what you're saying?

[23] **A:** Right.

[24] **Q:** Would you have any floppy disks that would have

[25] material on them that you've not reviewed?

Page 91

[1]  **A:** No.

[2]  **Q:** You have generated a number of letters, notes,
[3]  memos regarding various issues while you were employed at
[4]  Amerijet and those have been produced. What is your
[5]  practice, your habit, on recording what would take place
[6]  in a meeting?

[7]  **A:** If I'm on my profile, what I like to do – and
[8]  this is in regard to everything that I do, I make a note
[9]  as to what I want to do and then what has been done and
[10]  when that particular entry is satisfied, an X mark gets
[11]  put next to it and the items that don't have an X mark go
[12]  onto another day, another page, or get eliminated
[13]  altogether.

[14]  **Q:** Let me rephrase my question. There are a
[15]  number of times when you have summarized or written a
[16]  follow-up letter to a meeting, okay. Do you take notes
[17]  in the meeting?

[18]  **A:** Rarely.

[19]  **Q:** How do you remember what took place in the
[20]  meeting? I mean, do you dictate it on the way home?

[21]  **A:** No, typically I get to my computer – my house
[22]  is only about a four minute drive from Amerijet's
[23]  headquarters or I go to a quiet place, wherever I am, set
[24]  up, open up my laptop and corresponding to the entry that
[25]  might have said, for instance, "10 o'clock meeting" and

Page 92

[1]  the name of the individual, I would write down as best I
[2]  could remember everything that I did remember about the
[3]  meeting.

[4]  **Q:** Because I've noted in many of your memos and
[5]  correspondence, you even detail conversations.

[6]  **A:** Yes.

[7]  **Q:** Is that your practice, to do that?

[8]  **A:** Yes, quotation marks on everything.

[9]  **Q:** Did you routinely summarize or record all
[10]  meetings?

[11]  **A:** No.

[12]  **Q:** How did you decide which ones –

[13]  **A:** Some I missed either by virtue of being too
[14]  busy or too compressed for time or what have you, but I'd
[15]  say the vast majority and perhaps all of the ones that I
[16]  felt were important got documented that way.

[17]  **Q:** Are you a frustrated novelist or writer?

[18]  **A:** I am a writer, yes.

[19]  **Q:** Do you write?

[20]  **A:** Yes.

[21]  **Q:** And other than the course work you might have
[22]  mentioned to me earlier, what do you write?

[23]  **A:** Anything I can.

[24]  **Q:** Do you write for newspaper articles or

[26]  magazines?

Page 93

[1]  **A:** I have. I haven't written for a magazine in a
[2]  long time. I write newsletters, I write just anything
[3]  that occurs to me. I write a lot of things, like I say,
[4]  everything I can.

[5]  **Q:** Do you submit it to anyone for publication?

[6]  **A:** Rarely.

[7]  **Q:** Have you submitted anything for publication?

[8]  **A:** Not in a long time.

[9]  **Q:** In the last 10 years?

[10]  **A:** Yes. If I have submitted anything for
[11]  publication in the last 10 years, it's by virtue of a
[12]  request.

[13]  **Q:** So what do you write for?

[14]  **A:** Anything that's of interest to me at the time
[15]  or that I can make a contribution to.

[16]  **Q:** What do you do with what you have written?

[17]  **A:** I store it and after it's sent in, I keep it.
[18]  I might go back and rewrite it later.

[19]  **Q:** That's what I'm trying to find out. Where do
[20]  you send it?

[21]  **A:** To whoever is going to publish it. I've never
[22]  considered myself a professional writer, in the sense
[23]  that you might have mentioned. I'm just a person who
[24]  enjoys the craft.

[25]  **Q:** I thought I'd asked if you've submitted

Page 94

[1]  anything for publication. You said not in a long time?

[2]  **A:** Right.

[3]  **Q:** But I thought you just said when I asked you
[4]  what do you do with what you've written, you said you
[5]  submit it. You send it in.

[6]  **A:** If it's been written by a request, for a
[7]  specific purpose.

[8]  **Q:** So you'll just sit down and write for fun and
[9]  enjoyment and keep it somewhere else?

[10]  **A:** Yes.

[11]  **Q:** You don't send it to anybody?

[12]  **A:** I might, but sometimes I might not.

[13]  **Q:** Do you do a newsletter?

[14]  **A:** No.

[15]  **Q:** Do you write any fiction?

[16]  **A:** No.

[17]  **Q:** Short stories?

[18]  **A:** No.

[19]  **Q:** So what is the general nature of your writings?
[20]  Are they self-introspective, are they analytical?

[21]  **A:** They could be technical, they could be – there
[22]  are some introspective pieces, although very few. I'd
[23]  say the vast majority of the stuff I've written lately
[24]  either would be – would be technical.

[25]  **Q:** And is that material that would be in

Page 95

[1] conjunction with work?

[2] **A:** Yes.

[3] **Q:** For many people, writing is uncomfortable.

[4] They tend to write less, while you tend to appear to have

[5] a very expansive style. You seem to enjoy writing, just

[6] on the documents I've read. Is that accurate in terms of

[7] your enjoyment?

[8] **A:** No.

[9] **Q:** So other than writing at work, and you're not

[10] getting paid because you don't submit it, you said,

[11] unless asked, what's the purpose of your writing?

[12] **A:** I enjoy the results I produce, in the same way

[13] that I might enjoy running. I don't really enjoy going

[14] out and putting myself to the effort of running, but I

[15] like the feeling I get as a result.

[16] **Q:** What's the result you get out of writing?

[17] **A:** Writing, I get a piece that's either at the

[18] very minimal, if I've done what I set out to do, it's on

[19] point and complete.

[20] **Q:** So the writing is an end unto itself?

[21] **A:** No. I'd only really just begun to answer the

[22] question.

[23]     At a minimum, it's on point and complete. In

[24] some instances it would promote a desirable change,

[25] change of a policy or a procedure, of awareness about a

Page 96

[1] situation or circumstance. It might be simply

[2] educational.

[3] **Q:** Let me - Mr. Major, how is it going to change

[4] and how is it going to educate if it's not published, if

[5] it's not delivered to someone, if it's not utilized?

[6] **A:** When you say "published", perhaps I'm taking a

[7] rather limited view of that. When you say "published",

[8] that means to me that it would be put into a widely

[9] circulated newspaper, magazine, what have you. A great

[10] deal of what I do is published in the strict definition

[11] of the term, but only insofar as it goes to a very

[12] limited audience.

[13] **Q:** Who does it go to?

[14] **A:** Superiors.

[15] **Q:** You're talking about at work?

[16] **A:** Anywhere.

[17] **Q:** Excluding what you do at work, excluding your

[18] job at work that requires writing, do you write outside

[19] of work?

[20] **A:** Yes.

[21] **Q:** And is that disclosed to anyone?

[22] **A:** I write letters, I write poetry in very many

[23] forms. I write what I guess would be construed as - I

[24] hesitate to use the word religious, but I think that's

[25] going to be the word we end up using, religious or

Page 97

[1] spiritually oriented - what I would consider to be

[2] insightful types of documents that I might use if I were

[3] at church giving the meditation that day or giving the

[4] talk. I would write that talk or that meditation.

[5]     Other than that, it would be a newsletter in

[6] conjunction with my activities either at work or at

[7] church or what have you.

[8] **Q:** Again, I'm excluding work.

[9] **A:** That's about it.

[10] **Q:** You joined Amerijet in I think March of '91?

[11] **A:** That's correct.

[12] **Q:** And you went through the flight engineer

[13] training program?

[14] **A:** That's correct.

[15] **Q:** What did that consist of, to the best of your

[16] memory?

[17] **A:** It consisted of orientation to the systems of

[18] the Boeing 727, the duties and responsibilities of flight

[19] engineers. I'm sure there was a basic indoctrination,

[20] which is a term specifically described in the Federal

[21] Aviation Regulations, required of all air carriers.

[22] **Q:** Do you have a copy of the FARs?

[23] **A:** Yes.

[24] **Q:** Would you receive a copy when you went to

[25] Amerijet, or is that just something you have?

Page 98

[1] **A:** No, you would not necessarily receive a copy as

[2] an employee of any airline or Amerijet, but as a

[3] professional pilot an awareness of them is considered to

[4] be essential to the occupation; not only awareness of the

[5] current ones, but the changes.

[6] **Q:** And would you as an owner in Island Wing or

[7] Dolphin Holiday, Inc. - Travel, Inc. have a copy of

[8] those or have you just - when did you acquire your FARs?

[9] **A:** I acquire them every year, because they change.

[10] **Q:** When did you first get your first set of FARs?

[11] **A:** 1989.

[12] **Q:** And you routinely update them?

[13] **A:** Yes. I either purchase a new book or recently

[14] there's a CD-Rom on which a person can avail themselves

[15] of all the publications of the FAA.

[16] **Q:** Flight engineer, did you have ground school?

[17] **A:** Correct.

[18] **Q:** And then you had an orientation into the

[19] systems?

[20] **A:** That was primarily the focus of ground school,

[21] was to -

[22] **Q:** What are the systems?

[23] **A:** There's electrical system, hydraulic, fuel, air

[24] conditioning, pressurization, navigational instruments,

[25] flight controls.

Page 99

[1] **Q:** Is that different than the limitations?

[2] **A:** There's – yes, that is different.

[3] **Q:** What are limitations?

[4] **A:** Limitations would be – that's basically it,

[5] they're limitations. They're defined limits in the

[6] operation of the aircraft.

[7] **Q:** What it can do and can't do?

[8] **A:** What it – right.

[9] **Q:** Is that, as a lay person –

[10] **A:** That would do it.

[11] **Q:** Would that be part of your training as a flight

[12] engineer or not?

[13] **A:** Oh, yes.

[14] **Q:** I'm sorry, you said, "Oh, yes." Why?

[15] **A:** Because that's required.

[16] **Q:** You went through that. Then what happened

[17] after you finished the ground school and the training

[18] initially? Did you have to go to some sort of check or

[19] test?

[20] **A:** Yes.

[21] **Q:** What was that?

[22] **A:** Oral exam and then a simulator check ride.

[23] **Q:** And who did the oral exam?

[24] **A:** I believe it was John Flynn.

[25] **Q:** Was he with Amerijet or the FAA?

Page 100

[1] **A:** He was with the FAA. .

[2] **Q:** And what was the oral exam on, do you remember?

[3] **A:** Everything we just described.

[4] **Q:** What was the simulator on?

[5] **A:** Simulator was on the actual procedures.

[6] **Q:** And then after you passed the oral exam, was

[7] there any requirement of flying training or anything

[8] before or were you a flight engineer?

[9] **A:** No. There was a requirement for what was

[10] called back then initial operating experience, where a

[11] rated flight engineer would operate under the supervision

[12] of another rated flight engineer who had the additional

[13] company authorization to serve as an IOE instructor.

[14] **Q:** Do you remember who that was?

[15] **A:** There were several.

[16] **Q:** Do you remember any of them?

[17] **A:** Yes.

[18] **Q:** Who?

[19] **A:** Brian Steele.

[20] **Q:** Anybody else? If you think of anyone else as

[21] we go along, tell me, please.

[22] **A:** I will.

[23] **Q:** Now, did you have to have recurrent training

[24] after that?

[25] **A:** Yes, ma'am.

Page 101

[1] **Q:** And how often was that?

[2] **A:** Once annually.

[3] **Q:** And did that consist of basically the same

[4] thing that you'd gone through at ground school initially?

[5] **A:** Regrettably, yes.

[6] **Q:** Can you remember any of the instructors?

[7] **A:** Yes.

[8] **Q:** And who were they?

[9] **A:** John Washington, Sr. and he would have been one

[10] of the IOE check airmen, as differentiated from

[11] instructor. He would be a check airman. That's John

[12] Washington, Sr.

[13] **Q:** Ed Cook?

[14] **A:** No, Ed Cook did not serve as a flight engineer

[15] instructor, to my recollection, although he had a lot to

[16] contribute when he was on it.

[17] **Q:** Now, when you were going through recurrent

[18] training would this be by yourself or would there be

[19] others with you or both?

[20] **A:** Both.

[21] **Q:** Do you remember –

[22] **A:** Excuse me, I'm want to correct that. It was

[23] hardly ever by myself. Normally at Amerijet, recurrent

[24] training might take place of three crew members in three

[25] different seats simultaneously.

Page 102

[1] **Q:** I'm sorry, I don't understand what you're

[2] saying.

[3] **A:** Well, there's three required crew in a Boeing

[4] 727.

[5] **Q:** Right.

[6] **A:** The captain, the first officer, and the flight

[7] engineer. Each are required to get recurrent training.

[8] **Q:** So they would do the whole crew at the same

[9] time?

[10] **A:** Yes, ma'am.

[11] **Q:** Would the same instructor conduct it?

[12] **A:** Frequently.

[13] **Q:** What were the topics that were covered?

[14] **A:** Normally it would be an instructor for the

[15] pilot crew, the captain and first officer, and a

[16] different instructor for two flight engineers – as many

[17] as two flight engineers, although as memory serves,

[18] typically it was just one flight engineer, because I

[19] would imagine it was just so much to cover.

[20] **Q:** Okay, and that would be 40 hours of ground

[21] school?

[22] **A:** Oh, no, no. That's just the simulator portion.

[23] In the ground school it would be any number of people.

[24] **Q:** In the –

[25] **A:** Recurrent training.

Page 103

[1] **Q:** Would you be separated out, pilots – I mean
[2] captains in one, first officers and flight engineers?
[3] **A:** No.
[4] **Q:** It would again be in one classroom, so to
[5] speak?
[6] **A:** Yes.
[7] **Q:** Was it always done by instructors or did you
[8] also have self-study or video tapes or TV instruction?
[9] **A:** There were videotapes and one year I believe
[10] they actually just issued a questionnaire with some 400
[11] questions on it.
[12] **Q:** Self-study?
[13] **A:** Open-ended questions, and the crew or all the
[14] people going through recurrent training that year would
[15] have demonstrated completion upon submitting those 400
[16] questions with the answers appended, and a designation as
[17] to where they found the answer in the various manuals at
[18] Amerijet.
[19] **Q:** And were you one of the ones that received that
[20] 400 – that questionnaire?
[21] **A:** Yes.
[22] **Q:** Do you still have a copy of that?
[23] **A:** I think I do.
[24] **Q:** I don't think you've produced that. Would you
[25] produce that if you have a copy?

Page 104

[1] **MS. SHEA:** Do a request.
[2] **Q:** Let's go backwards a minute. Let's start with
[3] May of '98, which I believe was your last recurrent
[4] training as a flight officer?
[5] **A:** That would be correct.
[6] **Q:** Do you remember who was in the crew or who was
[7] with you during the recurrent training?
[8] **A:** No.
[9] **Q:** Were you part of a crew that was going through
[10] recurrent training at that time?
[11] **A:** I think there might have been eight or nine
[12] people in that recurrent training.
[13] **Q:** And this is the simulator part would just have
[14] been the crew and then the instruction – well, an
[15] instructor would have been the eight or nine?
[16] **A:** Right There's the ground school portion and
[17] there's a simulator component. The simulator component
[18] normally involves a check, which is also required.
[19] **Q:** And would the pilot also – excuse me, would
[20] the captain also have had a check in the simulator?
[21] **A:** Oh, yes, ma'am.
[22] **Q:** And while the pilot was having the check in the
[23] simulator, would you as first officer have been along for
[24] the ride, so to speak?
[25] **A:** Yes.

Page 105

[1] long as you were first officer?
[2] long as you were first officer?
[3] **A:** Yes.
[4] **Q:** Do you remember the names of any of those
[5] individuals, any of the eight or nine that you were in
[6] the ground school with in May of '98?
[7] **A:** No.
[8] **Q:** Now, as a first officer you just had recurrent
[9] training once a year, is that correct, or would you have
[10] it more often than that?
[11] **A:** Once a year.
[12] **Q:** Were you able as a first officer, as a crew
[13] member, to sit in on other recurrent training if you
[14] wanted to?
[15] **A:** If I wanted to and if my schedule permitted.
[16] **Q:** Were you able to check out any videos if you
[17] wanted to?
[18] **A:** No, ma'am.
[19] **Q:** The videos were only for use during recurrent
[20] training?
[21] **A:** Well, they were for on-site viewing only, so
[22] one did not check them out. One could go watch them at
[23] the facility.
[24] **Q:** Do you remember any of the video titles?
[25] **A:** If you give me a second to organize myself.

Page 106

[1] **Q:** Maybe I should ask you for any of the topics
[2] rather than the titles.
[3] **A:** Topics would be the use of charts, regulations
[4] review, cockpit resource management, accident reviews,
[5] investigations, systems review. I think that covers it.
[6] **Q:** Do you remember some on wind shear?
[7] **A:** Oh, yes.
[8] **Q:** Do you remember any on systems – sorry, you
[9] said that. Hazmat, any on hazmat?
[10] **A:** No.
[11] **Q:** Any on limitations?
[12] **A:** No.
[13] **Q:** Do you remember any other topics?
[14] **A:** No.
[15] **Q:** From March, '91 when you joined Amerijet until
[16] sometime – well, sometime in '94 you raise the issue
[17] that you were not developing or being promoted as quickly
[18] or as fast as you would like to be. Do you remember
[19] that?
[20] **A:** Yes.
[21] **Q:** Tell me what you recall.
[22] **MS. SHEA:** Objection, vague.
[23] **A:** I recall I wasn't being promoted.
[24] **Q:** How did you raise it, to whom and when?
[25] **A:** I believe I raised it initially to the chief

Page 107

[1] pilot at the time.

[2] **Q:** And who was that?

[3] **A:** Ed Cook.

[4] **Q:** And do you remember the first time that you

[5] raised it?

[6] **A:** No, I don't.

[7] **Q:** Would it have been in '94 or would it have been

[8] earlier?

[9] **A:** It would have been earlier.

[10] **Q:** And do you remember what brought it to your

[11] attention or why, what caused you to raise the issue?

[12] **A:** By the time I finally moved from the flight

[13] engineer position to the first officer position, I had

[14] been a flight engineer for three years.

[15] **Q:** So you don't remember specifically at what

[16] point in time you first raised the issue?

[17] **A:** No.

[18] **Q:** Do you remember in what format you raised it

[19] with Ed Cook?

[20] **A:** More than likely a discussion.

[21] **Q:** Well, do you have any independent recollection

[22] of that or you're sort of assuming it was a discussion?

[23] **A:** I don't have any independent recollection of

[24] that.

[25] **Q:** Do you remember anything else about your

Page 108

[1] discussion with him on it, other than the fact that you

[2] raised it?

[3] **A:** I'm sorry –

[4] **Q:** Do you remember what you said?

[5] **MS. SHEA:** I'll object to the form. He's

[6] testified he doesn't have any independent

[7] recollection of such a discussion.

[8] **Q:** So you don't know if you raised it verbally or

[9] not?

[10] **A:** I'm certain I raised it verbally. I'm further

[11] certain if that didn't get me the results that I thought

[12] were appropriate, then I would address it in writing.

[13] **Q:** And do you recall doing so?

[14] **A:** I recall having done so, yes.

[15] **Q:** And do you recall when it was, in terms –

[16] **A:** No.

[17] **Q:** Do you remember receiving – was it a bid,

[18] upgrade bid to first officer? What was it at that time?

[19] **A:** Actually, I received a couple of upgrade bids

[20] to first officer. In the one instance the class was

[21] summarily cancelled the day I showed up.

[22] **Q:** And when was that?

[23] **A:** I couldn't be certain of the date.

[24] **Q:** And why was it summarily cancelled?

[25] **A:** I have no idea.

Page 109

[1] **Q:** Do you remember who was involved?

[2] **A:** Ed Cook.

[3] **Q:** Anybody else?

[4] **A:** Other individuals who were showing up for both

[5] new-hire training and upgrade training.

[6] **Q:** Is it your contention that it was cancelled

[7] because you showed up?

[8] **A:** No, ma'am.

[9] **Q:** You're not saying it was cancelled because of

[10] you?

[11] **A:** No, ma'am.

[12] **Q:** Was that before or after your discussion with

[13] Ed Cook sometime in the fall of '94?

[14] **MS. SHEA:** Object to the form, lack of

[15] time frame. Why would it be fall of '94?

[16] **A:** That may have been before '94 and I don't

[17] recall dating my discussion with Ed Cook in the fall of

[18] '94. I think it might have been sometime prior.

[19] **Q:** Do you remember when your first discussion with

[20] Ed Cook was on that subject?

[21] **A:** No, I don't.

[22] **Q:** Do you remember being offered the opportunity

[23] to upgrade on the Falcon?

[24] **A:** Yes, I do.

[25] **Q:** And you declined that?

Page 110

[1] **A:** I did.

[2] **Q:** And you declined it because you didn't want to

[3] have to go three weeks away from home without expenses

[4] paid for?

[5] **A:** That's part of the reason.

[6] **Q:** What was the other reason?

[7] **A:** I had some frame of reference with regard to

[8] what happens to flight crews out on the road with

[9] Amerijet, having been based in Miami. I had also been

[10] based in New Orleans and from time to time had accepted

[11] temporary assignments throughout the Amerijet system and

[12] the assignments away from Miami were unsatisfactory.

[13] **Q:** Okay. You didn't want to be assigned away from

[14] Miami?

[15] **A:** That was part of the reason and the other part,

[16] if I may, was that I had a sense that the Falcon program

[17] was soon to be dismantled.

[18] **Q:** But you were offered that opportunity?

[19] **A:** I was.

[20] **Q:** The class that you're talking about that was

[21] being discontinued, did that deal with Steve Schubert?

[22] **A:** Yes.

[23] **Q:** The aborted class?

[24] **A:** Yes.

[25] **Q:** Does the time period of April, '93, does

Page 111

[1] that –

[2] **A:** I wouldn't be able to speak to the time period.

[3] **Q:** But you were offered that upgrade at the time.

[4] Do you remember why that class was aborted, now that

[5] we've mentioned it?

[6] **A:** I wasn't privy to the decision.

[7] **Q:** So you never knew one way or the other?

[8] **A:** No.

[9] **Q:** You don't know why?

[10] **A:** No.

[11] **Q:** Do you know who Steve Schubert was?

[12] **A:** Oh, absolutely.

[13] **Q:** What was his role in the class?

[14] **A:** Steve Schubert was to have been made a first

[15] officer as well. He was the only other I think person in

[16] that class that was designated to upgrade from flight

[17] engineer to first officer.

[18] **Q:** Do you know who the instructor was supposed to

[19] have been for the class?

[20] **A:** No

[21] **Q:** Do you remember raising with Ed Cook the fact

[22] that you thought you should have been promoted before

[23] other people were promoted to first officer?

[24] **A:** Yes

[25] **Q:** Do you remember specifically who you thought

Page 112

[1] you should have been promoted ahead of?

[2] **A:** No.

[3] **Q:** As you sit here now, do you remember anybody

[4] you think you should have been promoted ahead of?

[5] **A:** From flight engineer to first officer, no.

[6] **Q:** Do you remember a discussion also or do you

[7] remember a discussion in '93 about you assuming the role

[8] of human resources for Amerijet?

[9] **A:** Yes, I do.

[10] **Q:** Do you remember advising them that if forced to

[11] choose between flying and human resources, you would take

[12] human resources?

[13] **A:** No, I don't recall that, although I might have

[14] said that at one point. I know that I came to another

[15] conclusion.

[16] **Q:** I'm sorry, you don't remember saying it, but

[17] you might have?

[18] **A:** I might have.

[19] **Q:** Let me show you what we're going to mark as

[20] Major Exhibit 2.

[21] (The document referred to was marked for

[22] identification as Defendant's Exhibit 2.)

[23] If you will look, Mr. Major, the fifth

[24] paragraph beginning with the sentence, "Let me --

[25] reiterate," do you see that?

Page 113

[1] **A:** On the first page? I see a paragraph beginning

[2] with the terms, "You expressed concern." That's the

[3] fifth paragraph.

[4] **Q:** Go ahead and read that. That's fine. Just

[5] read that out loud.

[6] **A:** "You expressed concern that human resources

[7] responsibilities might not mix well with flight officer

[8] duties, but at the same time intimated that Amerijet's

[9] budget constraints may not provide for the recommended

[10] level of HR staffing. First let me reiterate if it comes

[11] down to a choice between the two, I will choose human

[12] resources; on the one hand because I believe I can do the

[13] best job, and in part knowing full well that Amerijet's

[14] needs will continue to afford me various opportunities to

[15] fly."

[16] **Q:** Does that refresh your memory that in fact you

[17] did say that?

[18] **A:** Yes, yes.

[19] **Q:** Do you remember any discussion on that subject

[20] further?

[21] **A:** I know there was further discussion, but I

[22] don't remember what it was.

[23] **Q:** Let me show you what I'm going to mark as Major

[24] Exhibit 3.

[25] (The document referred to was marked for

Page 114

[1] identification as Defendant's Exhibit 3.)

[2] **Q:** Do you have that in front of you?

[3] **A:** Yes, I do.

[4] **Q:** Take a minute and look at that.

[5] **A:** Is there something specific you want –

[6] **Q:** No. I just wanted to ask you if that refreshes

[7] your memory as to any other discussions you might have

[8] had with Mr. Cook or Mr. Pete Steele about the subject of

[9] promotion to first officer.

[10] **A:** Any other discussions about that one in

[11] particular? I think that's pretty complete.

[12] **Q:** Well, my question to you is does that refresh

[13] your memory as to any other discussions?

[14] **A:** Insofar as it's described here, yes.

[15] **Q:** So it doesn't refresh it; you just remember

[16] writing this letter and what is detailed there?

[17] **A:** Right.

[18] **Q:** In this Exhibit 3, you seem to express

[19] frustration with the fact that they are hiring from the

[20] outside through Falcon and then coming into Boeing. Is

[21] that it?

[22] **A:** I think the letter is explicit. Initially the

[23] people were hired into the Falcon program as it's

[24] described here, with the explanation that they were two

[25] separate operations, each with its own upgrade policy.

Page 115

[1] They were just separate and distinct.

[2] Later and what was a marked departure from that
[3] policy and was perceived by many, including myself, as
[4] being an unfortunate retraction of Amerijet's earlier
[5] assurances to its flight crew, the Falcon program became
[6] a prerequisite for upgrade opportunities, certain upgrade
[7] opportunities in the Boeing, which had the effect of
[8] placing more senior employees behind less senior
[9] employees.

[10] **Q:** Well, look at your fourth paragraph, unless you
[11] count "thank you" as the beginning paragraph. "Despite
[12] the temptation of an employment pool rich with
[13] qualifications and experience, Amerijet's decision should
[14] reflect the loyalty of existing flight crew."

[15] In other words, it seems to me your complaint
[16] is that they're hiring qualified people from the outside
[17] rather than promoting from within?

[18] **A:** No, ma'am. I make reference to hiring from
[19] outside and how, were that had been done with the Boeing,
[20] particularly hiring captains directly into the left seat,
[21] much of that experience had proven very unsatisfactory
[22] from the company standpoint. So there was a reference
[23] made to that.

[24] There's also a reference made to – when I say
[25] loyalty of the existing flight crew, the seniority of

Page 116

[1] those individuals who were already significantly invested
[2] of the Boeing program.

[3] **Q:** Well, Mr. Major, there's no legal obligation to
[4] promote rather than hire from the outside, is there?

[5] **MS. SHEA:** Objection. You're asking him
[6] if there was a legal obligation?

[7] **Q:** You were in human resources for years. As
[8] human resources, weren't you responsible, you said
[9] earlier, for the legal enforcement of the laws?

[10] **A:** I don't think I made any reference here to
[11] legality. I think I made more reference here to a moral
[12] obligation to live up to their prior and often stated
[13] commitments to existing employees and the quote, unquote
[14] "common sense" of rewarding loyalty of long-term
[15] employees.

[16] **Q:** Well, assurances as you have perceived them?

[17] **A:** I think that goes without saying.

[18] **Q:** Okay. There's nothing in writing, a letter
[19] guaranteeing any particular procedure, is there?

[20] **A:** I wouldn't go that far.

[21] **Q:** Oh, there is one?

[22] **A:** There may very well be.

[23] **Q:** Are you aware of it?

[24] **A:** Specifically, no.

[25] **Q:** Subsequent to that, let me show you another –

Page 117

[1] mark this as Major Exhibit 4.

[2] (The document referred to was marked for
[3] identification as Defendant's Exhibit 4.)

[4] **THE WITNESS:** Perhaps it's a good time for
[5] a break.

[6] **MS. NORTON:** Okay, that's fine.

[7] (Discussion off the record.)

[8] **Q:** Mr. Major, just to make sure the record is
[9] clear, you had been in human resources for a number of
[10] years, correct?

[11] **A:** Correct.

[12] **Q:** You are familiar with the EEO laws, are you
[13] not?

[14] **A:** Yes.

[15] **Q:** In fact, you submitted a proposal to Amerijet
[16] in which you told them you could assure compliance with
[17] EEO laws?

[18] **A:** Yes.

[19] **Q:** And that listed – when I say EEO laws, I'm
[20] talking because of race, sex, age, national origin, you
[21] can't discriminate?

[22] **A:** Are you saying I can't discriminate?

[23] **Q:** Well, an employer is not supposed to
[24] discriminate.

[25] **A:** I understood.

Page 118

[1] **Q:** That's what we're talking about, right?

[2] **A:** Well, the proposal for the HR department, to be
[3] clear, was really intended more of a template that
[4] someone else would fulfill and as an orientation to
[5] management as to what they could and should expect out of
[6] that HR function.

[7] **Q:** And that does include compliance with the laws
[8] pertaining to equal employment opportunities?

[9] **A:** Correct.

[10] **Q:** In Exhibit 4 – do you have that in front of
[11] you?

[12] **A:** Yes.

[13] **Q:** If you will look at Exhibit 4 dated – it's a
[14] letter to Pete Steele, I believe, from you dated
[15] 10/19/94?

[16] **A:** I have a letter to Pete Steele and Ed Cook
[17] dated 9/29/94.

[18] **Q:** Okay, we've discussed that. I believe there's
[19] another one that we have to have marked.

[20] **A:** Actually, I believe we've marked the same thing
[21] as both three and four.

[22] **MS. NORTON:** Let's mark that.

[23] (The document referred to was marked for
[24] identification as Defendant's Exhibit 4.)

[25] **A:** I have a letter from Pete Steele or to Pete

Page 119

[1] Steele dated 10/19/94.

[2] **Q:** All right. And in this letter you now are
[3] raising the issue that more junior individuals are being
[4] promoted to first officer instead of you. Do you recall
[5] that?

[6] **A:** Yes.

[7] **Q:** Do you recall it independently of this letter?

[8] **A:** Yes.

[9] **Q:** And who specifically do you recall being
[10] promoted to first officer ahead of you that you contend
[11] was junior?

[12] **A:** I see one name here, and this is included in
[13] the document, John Washington Jr.

[14] **Q:** John Washington Jr. was more senior than you,
[15] was he not?

[16] **A:** No.

[17] **Q:** Are you saying that Mr. Washington had not been
[18] with Amerijet longer than you had?

[19] **A:** If you're speaking of John Washington Sr., yes.

[20] **Q:** Jr.

[21] **A:** No, John Washington Jr.'s seniority with regard
[22] to the flight crew was an issue that someone had asked
[23] about at one of the many meetings we had and as he
[24] indicated the other day in his own deposition, his
[25] seniority for flight crew purposes began with his full

Page 120

[1] time employment, which again, began sometime after mine.

[2] **Q:** The point is he had been with the company
[3] longer than you; is that right, Mr. Major?

[4] **MS. SHEA:** Objection, argumentative.

[5] **Q:** Do you know?

[6] **A:** I don't know.

[7] **Q:** Okay. So you don't know when he started
[8] working with Amerijet?

[9] **A:** I do know that he started with Amerijet after I
[10] got there.

[11] **Q:** Started working with Amerijet after you got
[12] there or became a pilot after you got there?

[13] **A:** That would be the most accurate way of putting
[14] it. John Washington Jr. became a pilot with Amerijet
[15] after I started working there.

[16] **Q:** But you don't –

[17] **A:** As a pilot, was junior to me and it shows up
[18] that way on the seniority list.

[19] **Q:** But you do not know what his date of employment
[20] with Amerijet was?

[21] **A:** No, other than what's on the seniority list.

[22] **Q:** Well, are you suggesting that that is junior to
[23] you?

[24] **A:** As I recall, it is junior to me, yes.

[25] **Q:** Do you remember what date it was?

Page 121

[1] **A:** No.

[2] **Q:** So whatever the record of his employment is
[3] would be reflected.

[4] Anybody else you recall being offered it?

[5] **A:** There were several individuals from the Falcon
[6] program, whose names I don't remember.

[7] **Q:** They had gone to the Falcon program or were
[8] employed into the Falcon program, do you remember?

[9] **A:** They were employed into the Falcon program,
[10] many in the same way that John Washington Jr. had been.

[11] **Q:** And that's the same Falcon program that you
[12] were offered a position in and for whatever reasons, some
[13] of which we discussed, you declined?

[14] **A:** Yes, ma'am.

[15] **Q:** There's not a different Falcon program?

[16] **A:** No, it's the same Falcon program.

[17] **Q:** And you don't remember their names?

[18] **A:** No, ma'am. The vast majority of them were left
[19] without a job.

[20] **Q:** Do you remember anyone else that you contend
[21] was junior?

[22] **A:** Only if their names are here. If their names
[23] are here, I'm sure they're accurate. Other than that,
[24] no.

[25] **Q:** Would you have any other way of researching it

Page 122

[1] and determining who you might be referring to?

[2] **A:** I might.

[3] **Q:** How would you do that?

[4] **A:** I would go back to an old seniority list.

[5] **Q:** Do you have such lists?

[6] **A:** I have several old seniority lists, but I've
[7] not been inclined to go back and look at them.

[8] **Q:** I don't believe you have produced those either
[9] to us.

[10] **A:** I don't believe I've produced them to my
[11] attorney either.

[12] **MS. NORTON:** I believe those would be
[13] encompassed by our previous request. I will
[14] verify it and see.

[15] **MS. SHEA:** If you could see. No use to
[16] discuss it now.

[17] **Q:** What other means would you have of determining
[18] if there was anyone that you contend is junior to you
[19] that was promoted ahead of you?

[20] **A:** By such as they exist, going back through the
[21] records that Amerijet has.

[22] **Q:** But those are not your records at this point?

[23] **A:** No.

[24] **Q:** You don't have any such records?

[25] **A:** No.

Page 123

[1] **Q:** Other than what you've outlined?

[2] **A:** No, and I'm not sure what I do have. I may

[3] have squirreled away in some old box somewhere a

[4] succession of seniority lists, some of which might add

[5] some insight to your line of questioning, but it's not a

[6] factor in my complaint and hasn't been brought up for

[7] that reason.

[8] **Q:** Sir, what is not a factor in your complaint?

[9] **A:** Well, my complaint, what you're talking about

[10] covers a period of – I don't believe, I don't know for

[11] sure, but I don't believe is encompassed in my complaint.

[12] **Q:** So you're not contending that this was a

[13] matter – when you say junior to you, you're not

[14] referring at all to age. You're merely referring to

[15] seniority?

[16] **A:** In '94 I would have been 41. Perhaps you're

[17] correct, perhaps this is another instance of age

[18] discrimination.

[19] **Q:** And you don't have any way of assessing the

[20] qualifications of any of these individuals, do you? You

[21] would never have flown with them as a flight engineer.

[22] You both would have been flight engineers, right?

[23] **A:** No. John Washington Jr. never actually served

[24] as a flight engineer. He was trained as a flight

[25] engineer and yes, I would not know, but I would have been

Page 124

[1] told or have been – insofar as like we're talking about

[2] such things, I have a vague idea or at least a rumored

[3] idea, rumored notion of what a person's qualifications

[4] and background are.

[5] **Q:** So you would have no knowledge of his

[6] qualifications?

[7] **A:** Right.

[8] **Q:** Thank you. It was shortly after you first

[9] raised this idea of age discrimination that you in fact

[10] were successfully upgraded to first officer, were you

[11] not?

[12] **MS. SHEA:** Object to the form of the

[13] question. I don't see that age discrimination

[14] is raised in this document, unless you do.

[15] **MS. NORTON:** He's already suggested it

[16] could be there.

[17] **MS. SHEA:** We'll let the testimony speak

[18] for itself on that.

[19] **MS. NORTON:** Fine.

[20] **Q:** After your letter of October of '94 you became

[21] first officer, correct?

[22] **A:** Yes, ma'am.

[23] **Q:** It was in November, I believe, you filled out a

[24] contract. Do you remember that?

[25] **A:** Sounds right.

Page 125

[1] **Q:** And do you remember who you upgraded with?

[2] **A:** What other first officers?

[3] **Q:** Yes.

[4] **A:** No, ma'am.

[5] **Q:** Do you remember if anybody else was in your

[6] training class?

[7] **A:** Yes, as a matter of fact I do. Ed Hoffman was

[8] in my training class.

[9] **Q:** And do you remember who the instructor was?

[10] **A:** There were several.

[11] **Q:** Do you remember who they were?

[12] **A:** No.

[13] **Q:** Do you remember any of their names?

[14] **A:** Some instruction was given by Ed Cook. That

[15] would have been simulator instruction. I don't remember

[16] who the ground school instructors were.

[17] **Q:** And was it 40 hours again of ground school or

[18] would that change?

[19] **A:** I don't know.

[20] **Q:** You don't remember?

[21] **A:** No.

[22] **Q:** Do you remember what the subject matters

[23] included were?

[24] **A:** Yes, ma'am. They're the same as described

[25] before. It's important to distinguish at this point they

Page 126

[1] would include differences insofar as they pertain to the

[2] 200 Series 727 as opposed to the 100.

[3] **Q:** And how long were you satisfied with the

[4] position of first officer before you contended you should

[5] be promoted to captain?

[6] **A:** I don't recall.

[7] **Q:** Do you remember raising it at all?

[8] **A:** I know I raised it.

[9] **Q:** Do you remember in what context?

[10] **A:** In what context?

[11] **Q:** How you raised it.

[12] **A:** Probably I initially started verbally, but I

[13] don't have any specific recollection as to when or how or

[14] with whom.

[15] **Q:** Do you remember correspondence in which you

[16] chastised Pete Steele for his management style?

[17] **MS. SHEA:** Object to the form,

[18] characterization, "chastised".

[19] **A:** I would venture that probably most of my

[20] correspondence had some kind of input with regard to

[21] either proposed solutions, alternative strategies,

[22] different styles.

[23] **Q:** Well, that suggests a constructive intent. Let

[24] me have this marked as Exhibit 5.

[25] (The document referred to was marked for

Page 127

[1] identification as Defendant's Exhibit 5.)
[2]  Let me ask you to take a look at the last
[3] paragraph on the first page of Exhibit 5, Mr. Major,
[4] starting with, "Frankly, you have been unyielding."
[5]  A: I'm looking at Exhibit 5. The last paragraph
[6] on the page begins with, "Pete, after more than five
[7] years, you know my intention" – or intent, sorry.
[8]  "Frankly" – yes.
[9]  Q: "You routinely alienate, deride and denigrate?"
[10]  A: Do you mind if I take a moment to familiarize
[11] myself with the paragraphs that lead up to that one?
[12]  Q: Please.
[13]  A: Do you have a question?
[14]  Q: Yes. Mr. Steele was your supervisor at the
[15] time?
[16]  A: He was second. He was above the chief pilot,
[17] who would have been my immediate supervisor.
[18]  Q: Do you think that is a rather argumentative,
[19] combatant style to address a supervisor?
[20]  A: Do I think it's an argumentative and combatant
[21] style?
[22]  Q: Yes.
[23]  A: Considering the nature of our relationship, no,
[24] ma'am.
[25]  Q: Well, you accuse somebody, "It's damn near

Page 128

[1] despotic." What would be the nature of your relationship
[2] that you believe this was appropriate?
[3]  A: I had been and we had been – we had enjoyed
[4] several frank discussions between Pete Steele, Ed Cook,
[5] most of the executive team and myself with respect to any
[6] manner of things; an orientation as to what is a 401(k),
[7] for instance, and how to go about enacting such a thing,
[8] an orientation into human resources and how to go about
[9] enacting that.
[10]  Q: Mr. Major, are you comparing a discussion on a
[11] neutral policy with the same way of telling somebody that
[12] they're "damned near despotic" and that they "routinely
[13] alienate, deride and denigrate people?"
[14]  A: I am at this point, as best I can, using the
[15] familiarity and understanding that had been developed
[16] over the prior five years to point out how recent
[17] changes, among them the rather draconian and retroactive
[18] change in vacation policy and hear a comment made to
[19] flight officers with respect to, "We can line pilots up
[20] around the block, people willing to work for free to take
[21] your jobs," and attempting to illustrate to Pete that the
[22] impact he was having on flight officers may very well not
[23] be the one he was hoping to have.
[24]  Q: Were you his supervisor?
[25]  A: No, ma'am.

Page 129

[1]  Q: Was it your job to take him to task?
[2]  A: Was it my job to take him to task?
[3]  Q: Yes.
[4]  A: Yes, ma'am.
[5]  Q: And you view yourself as the arbitrator of what
[6] is right?
[7]  A: No, ma'am. I don't view myself as the
[8] arbitrator of what is right.
[9]  Q: Have you been advised that you have been
[10] perceived as extremely argumentative?
[11]  A: Have I been?
[12]  Q: Yes.
[13]  A: From time to time.
[14]  Q: How about from the time of your employment with
[15] Amerijet?
[16]  A: I don't recall.
[17]  Q: Let me show you –
[18]  A: And I should say that the term "extremely
[19] argumentative" probably doesn't fit with what I've been
[20] described as.
[21]  Q: Well, how would you describe it?
[22]  A: Intense, focused, persuasive.
[23]  Q: Have you been told that you have a demeaning
[24] attitude toward your colleagues?
[25]  A: I don't recall.

Page 130

[1]  Q: You may have been?
[2]  A: I may have been, yes.
[3]  Q: Let me show you what's been marked as Exhibit
[4] 6.
[5]  (The document referred to was marked for
[6] identification as Defendant's Exhibit 6.)
[7]  Have you seen this letter before? Were you
[8] copied on it?
[9]  A: I think I have seen this letter before, yes,
[10] recently. I'm not sure it existed in my personnel file
[11] when I left Amerijet.
[12]  Q: Do you see the date of it, January 18th, 1992?
[13]  A: I do.
[14]  Q: And it's from William Cline?
[15]  A: Yes.
[16]  Q: He was a line captain/check airman?
[17]  A: Yes.
[18]  Q: This is I guess approximately 10 months into
[19] your employment?
[20]  A: Yes.
[21]  Q: And he indicates that you will not take any
[22] further help from him?
[23]  A: Yes.
[24]  Q: Do you recall any discussions or why he had
[25] that perception?

Page 131

[1] **A:** I can't speak for Mr. Cline.

[2] **Q:** Do you remember flying with him?

[3] **A:** Yes.

[4] **Q:** He said in the letter, "When I ask him about

[5] his feelings, i.e. not taking any further action from me,

[6] he verified this to me also." In other words, you

[7] confirmed that.

[8] Do you recall anything along that line?

[9] **MS. SHEA:** Let me just object to the form

[10] of the question. It's improper use of the

[11] document, since it's not the witness' document

[12] and he's not familiar with it.

[13] **A:** Where are you referring to exactly?

[14] **Q:** Never mind. I'm asking you if that comment

[15] refreshes your memory as to any conversation you may have

[16] had.

[17] **A:** No, ma'am.

[18] **Q:** If you look at the first paragraph, Mr. Cline

[19] is indicating that you will not accept further help from

[20] him and then goes on to say when he mentioned this to

[21] you, "he", meaning you, "verified this to me also."

[22] I'm asking you if you recall any conversation

[23] along that line?

[24] **MS. SHEA:** Object to the use of the

[25] document as it was used in that question.

---

Page 132

[1] Object to the form.

[2] **A:** I see the phrase you're referring to and no,

[3] ma'am, I do not.

[4] **Q:** Do you see here his reference. your systems

[5] knowledge is very weak?

[6] **MS. SHEA:** Same objection, use of the

[7] document.

[8] **MS. NORTON:** Miss Shea, you realize even

[9] in a court of law I can use any document to try

[10] to refresh a witness' memory? Thank you.

[11] **MS. SHEA:** Doesn't mean that you read it

[12] out loud in your question.

[13] **MS. NORTON:** Miss Shea – okay.

[14] **MS. SHEA:** That's my objection, it's not

[15] proper use of a document.

[16] **Q:** Do you see that?

[17] **A:** I see next to item number one, "Pat's systems

[18] knowledge is very weak."

[19] **Q:** Do you recall any discussion on that?

[20] **A:** Yes.

[21] **Q:** What happened?

[22] **A:** I recall several instances where Captain Cline

[23] would ask a question about a system and then would ask me

[24] to answer it. I would answer it and in some instances he

[25] would tell me that I was wrong.

---

Page 133

[1] We would spend the day in New Orleans trying to

[2] get some sleep. I would get up early and run, sometimes

[3] study, go out to the airplane early to study, and upon

[4] looking through the records and the documentation

[5] provided by Amerijet, would often find that in fact my

[6] initial response to Captain Cline had been correct.

[7] Captain Cline had never been a flight engineer.

[8] I would then take pains to show him how the

[9] comment or the description I had made had been correct

[10] and how his had been slightly askew.

[11] Captain Cline at that point in our relationship

[12] would simply deny having said what he said or what I

[13] remembered him saying, such that subsequently when those

[14] discussions took place, I would have to start the

[15] discussion by obtaining an agreement from him from

[16] exactly what his perception had been and what my

[17] perception had been and then showing the document, so

[18] that he could then see if he had been correct or if I had

[19] been incorrect.

[20] This is the mode and nature of a normal

[21] exchange with flight crew. We are off tasking and

[22] challenging each other with respect to systems knowledge.

[23] **Q:** Do you recall an incident where during taking

[24] off you made some comment like, "I think something's on

[25] fire?" I think it was in Jackson, Mississippi?

---

Page 134

[1] **A:** I remember that quite well.

[2] **Q:** And do you remember his discussion with you

[3] after you were airborne as to the critical nature during

[4] takeoff?

[5] **A:** Yes.

[6] **Q:** Tell me what you recall about that.

[7] **A:** I recall I was still a very junior flight

[8] engineer, very new to crew operations of any sort, and as

[9] we were accelerating for takeoff, I believe, I became

[10] aware of a very strong odor in the cockpit and mentioned

[11] it.

[12] **Q:** You smelled smoke?

[13] **A:** Yes. That could be very serious in an

[14] airplane. It's like a ship, there's not a whole lot of

[15] places to go.

[16] The captain may at that point want to visit in

[17] his own decision-making process whether or not he should

[18] abort the takeoff until the source of the fire is

[19] determined and then decide whether to deal with it, if

[20] it's on the aircraft or what system it's in the aircraft

[21] or whether he wants to continue the flight or obtain

[22] maintenance or what have you.

[23] This particular captain took issue with the

[24] notion that I brought it up.

[25] **Q:** And do you remember why he took issue with the

---

Page 135

[1] notion when you brought it up?

[2]   A: No, ma'am.

[3]   Q: Do you recall him telling you that when they

[4] landed there was smoke and he and the first officer had

[5] both discussed it and there was smoke in the pasture next

[6] to them?

[7]   A: I recall him saying that, yes.

[8]   Q: And that you somehow had just not picked up on

[9] it?

[10]   A: It wouldn't be somehow not picked up on it.

[11] The duties of a flight engineer are outside the aircraft

[12] for most of the time that it's on the ground, either

[13] obtaining fuel or –

[14]   Q: Mr. Major, were you in the cockpit when it

[15] landed?

[16]   A: Yes.

[17]   Q: Did they open the door with you in the cockpit

[18] so they could get out too?

[19]   A: It would usually be me opening the door.

[20]   Q: Would not the smoke be there when you landed,

[21] if that's when they were discussing it?

[22]   A: I'm not sure when they discussed it, because I

[23] was party to that discussion.

[24]   Q: I think that was his point, wasn't it, that you

[25] did not have any circumstantial awareness?

Page 136

[1]   Read the next line. He said, and I am reading

[2] this from him, "He said that he smelled something like a

[3] fire. It was actually a fire on the ground. The smoke

[4] smell had gotten in the aircraft when we opened the doors

[5] and the first officer and myself had smelled it when we

[6] got out. Apparently, Pat never noticed it. Obviously, I

[7] explained to him in no uncertain terms that he was not to

[8] ever do that again, when it did not involve the

[9] airplane."

[10]   MS. SHEA: If that's a question – let me

[11] just make an objection for the record. It's an

[12] improper use of the document.

[13]   Q: Does that refresh your memory as to the fact

[14] that –

[15]   A: It refreshes my memory as to his perception of

[16] the events, yes, ma'am.

[17]   Q: And are you saying he's wrong or you don't

[18] remember?

[19]   A: I'm saying I stick by my perception of the

[20] events, as I described them to you a moment ago.

[21]   Q: And what is that?

[22]   A: I think they're a matter of record now, ma'am.

[23] Do you want me to go back?

[24]   Q: Please. I'm just wondering how you remember

[25] something so definitively nine years ago.

Page 137

[1]   A: It was a very serious discussion and it was the

[2] first time that I ever smelled smoke in a cockpit. As I

[3] think I alluded to before, fire on an aircraft can be

[4] very serious. The captain had not taken pains to alert

[5] me that he was aware of a fire or smoke smell anywhere in

[6] our vicinity prior to takeoff.

[7]   Q: Mr. Major, I'm sorry. I'm missing this. If

[8] he's referencing here when you got out of the plane, you

[9] were in the crew that got out?

[10]   A: I don't know how he can speak to what I saw or

[11] smelled when I got out of the airplane, ma'am.

[12]   Q: Well, I think that was part of his concern.

[13] But you did land with him, is that correct?

[14]   A: Yes, ma'am.

[15]   Q: Did he also discuss with you the seriousness of

[16] aborting a flight during takeoff?

[17]   A: Oh, absolutely.

[18]   Q: If you look at the next paragraph, perhaps his

[19] perception of the discussions as to who was right and

[20] wrong was perceived a little bit differently than yours.

[21]   Paragraph three, Mr. "Major will argue when he

[22] is corrected or when explaining something to him when he

[23] knows little about the system or procedure."

[24]   Do you recall any discussion with Mr. Cline

[25] about that issue?

Page 138

[1]   MS. SHEA: Excuse me. Objection to the

[2] form, not proper use of the document,

[3] argumentative.

[4]   A: The question again, please?

[5]   Q: Do you recall any discussion with Captain Cline

[6] about the fact, "Mr. Major will argue when he is

[7] corrected or when explaining something to him when he

[8] knows little about the system or procedure?"

[9]   MS. SHEA: Same objection.

[10]   A: I think I've described the nature of those

[11] discussions a few minutes ago and how they came to pass

[12] and how I finally came to pass to deal with them more

[13] effectively.

[14]   Q: He attributes this argumentative nature and

[15] when corrected as being an impediment to your ability to

[16] improve as a crew member. Do you recall any discussion

[17] with him along that line?

[18]   MS. SHEA: Same objection, improper

[19] predicate, improper use of a document that is

[20] not drafted by this witness.

[21]   MS. NORTON: Okay.

[22]   A: In fact, Bill Cline has been very helpful to me

[23] in my efforts at Amerijet.

[24]   Q: Do you remember flying with Captain Cline in

[25] '98 or '99 and a discussion regarding the use of a

Page 139

[1] heading, a direct heading with lack of GPS clearance?

[2] **A:** Yes, I do.

[3] **Q:** And what do you recall about that?

[4] **A:** There had been – I had made a proposal to

[5] management in the form of an idea –

[6] **Q:** I'm sorry, my question is only what do you

[7] recall discussing with Captain Cline specifically about

[8] that?

[9] **A:** Well, about the idea. The idea was that we can

[10] by using basic electronic navigation equipment on board

[11] all of the aircraft navigate point to point direct

[12] anywhere we want, as long as we maintain the limitations

[13] specified by the class one authorization.

[14] **Q:** Do you remember him discussing with you that at

[15] the point in time you wanted to accept the heading, that

[16] he had not received GPS clearance?

[17] **A:** It was the practice of most captains at

[18] Amerijet, Bill Cline included.

[19] **Q:** Mr. Major, yes or no. Do you remember him

[20] discussing that with you?

[21] **A:** No, ma'am.

[22] **Q:** Did it not occur or do you just not remember

[23] it? It may be so, may be no?

[24] **A:** I can tell you what I remember, but you cut me

[25] off.

Page 140

[1] **Q:** No, my question is what you recall discussing

[2] with him, not with other captains.

[3] **A:** Okay. It was Bill Cline's practice, which is

[4] not inconsistent with other captains at Amerijet, to

[5] accept direct GPS navigated clearances, even though

[6] Amerijet had not received authorization from the FAA,

[7] which was common practice and Bill Cline did it too.

[8] He noticed that I took pains to draw a long

[9] line describing that same direct route on the charts in

[10] use and that I ignored the GPS for purposes of navigation

[11] where I was concerned.

[12] He made the comment that that was a good thing,

[13] because it could be demonstrated as our primary means of

[14] navigation and consistent and in compliance with the

[15] authorizations contained in the operations specifications

[16] for Amerijet's general operations manual, whereas the

[17] flying by GPS direct point to point was not.

[18] **Q:** Is that the same or different discussion you

[19] had with Al Jorsey, Sr. in August on the Brian Steele

[20] check ride?

[21] **A:** Al Jorsey was of the opinion on August 17th

[22] that –

[23] **Q:** Mr. Major, listen to my question. My question

[24] was, was that same or similar?

[25] **A:** No, it was similar.

Page 141

[1] **Q:** Thank you.

[2] Do you remember being advised in February of

[3] '97 that Dave Bassett had made the decision that you were

[4] not promotable to captain?

[5] **A:** I do.

[6] **Q:** And do you remember Ed Cook telling you that?

[7] **A:** I do.

[8] **Q:** And subsequent to that you raised the issue

[9] that the reason was because of age discrimination?

[10] **A:** I did.

[11] **Q:** You also raised it – well, let me ask you who

[12] did you discuss at the company, who did you discuss the

[13] fact that you believed you were discriminated against?

[14] Strike all that. Let me reask that question.

[15] That was horrible.

[16] Who did you tell at Amerijet that you believed

[17] you were being discriminated against because of your age?

[18] **A:** Anybody the discussion came up with.

[19] **Q:** Ed Cook?

[20] **A:** Yes.

[21] **Q:** Dave Bassett?

[22] **A:** Yes, but to be clear, that wasn't the only

[23] reason. I thought that was one of – not that there was

[24] more to it, but that I began to surmise that just by

[25] looking what was going on around me, that I thought

Page 142

[1] perhaps my faith in the people, my leaders, had been

[2] misplaced because the numbers were starting to add up.

[3] **Q:** Well, you had been raising the issue since you

[4] came with the company that you were not moving ahead as

[5] fast as you wanted to?

[6] **MS. SHEA:** Object to the form.

[7] **A:** I think over a period of five years now we've

[8] looked at three or four letters and yes, there were times

[9] where I felt like I was being –

[10] **Q:** I mean, early as 1993 you felt you were being

[11] held back, maybe even before that, right?

[12] **A:** Two years into my employment.

[13] **Q:** Then yes, right?

[14] **A:** Uh-huh.

[15] **Q:** You raised the issue of the age discrimination.

[16] When you were told that Dave Bassett did not believe you

[17] to be promotable, were you offered at that time the exit

[18] package, if you chose to take it?

[19] **A:** Yes, ma'am.

[20] **Q:** And it was subsequent to that that you told

[21] Mr. Steele or Mr. Bassett that you believed the reason

[22] you were being held back was because of your age?

[23] **A:** I'm not sure if it was before or after.

[24] **Q:** Well, on what basis did you rely to conclude it

[25] was your age and not your lack of qualifications?

Page 143

[1]  A: Because my qualifications were largely superior
[2] to those who had been promoted.
[3]  Q: Who had been promoted?
[4]  A: I don't recall specifically the names.
[5]  Q: Well, then how do you know if your
[6] qualifications were superior, Mr. Major?
[7]  A: Because at the time I knew the names and I knew
[8] their qualifications.
[9]  Q: Well, where do you have their names written
[10] down now?
[11]  A: I don't.
[12]  Q: So you don't know if you were more qualified or
[13] less qualified then, do you?
[14]  A: Well, at the time I did.
[15]  Q: And how did you make that decision?
[16]  A: On the one hand, I was senior.
[17]  Q: Well, that's just seniority.
[18]  A: That's just seniority.
[19]  Q: We're talking about qualifications and let me
[20] ask you that. As a human resource person, you know the
[21] company is not required to go by seniority, right?
[22]  A: In the absence – I think I made the comment on
[23] one of these things you just had me read, that in the
[24] absence of a bona fide promote by performance policy,
[25] seniority is widely regarded as the only other fair way

Page 144

[1] to make those choices.
[2]  Q: Mr. Major, the law does not require that
[3] seniority, does it?
[4]  A: I'm not talking from a legal standpoint.
[5]  Q: Well, that's what I asked you.
[6]  MS. SHEA: Objection, you asked from an HR
[7] standpoint.
[8]  A: I'm simply speaking from an issue of fairness
[9] and equity. The law doesn't often go there.
[10]  MS. NORTON: Would you read me back my
[11] question? I got sidetracked.
[12]  (The question referred to was read back by the
[13] reporter as above recorded.)
[14]  Q: Well, let me rephrase that.
[15] Let me direct your attention to something else
[16] real quickly. How were you advised that the decision had
[17] been made you were not promotable in 1997?
[18]  A: I came into a meeting with Ed Cook and Wayne
[19] Penny, where I had been – I was expecting to discuss
[20] promotional opportunities and was told, as you described
[21] a moment ago, and offered the exit package.
[22]  MS. NORTON: Let's have this marked
[23] Plaintiff's Exhibit 7.
[24]  MS. SHEA: It's not Plaintiff's. I don't
[25] know what we're doing, but it's not

Page 145

[1] Plaintiff's.
[2]  MS. NORTON: I'm sorry, Major's.
[3]  THE COURT REPORTER: Defendant's Exhibit
[4] 7.
[5]  MS. SHEA: I don't know. She didn't want
[6] to call it Defendant's exhibits either. I
[7] don't know what we're doing here.
[8]  MS. NORTON: I'm just calling it Major's
[9] Exhibit 7.
[10]  THE COURT REPORTER: It's Defendant
[11] Major – I'm sorry, it's not Defendant Major.
[12] It's Defendant's Exhibit 7.
[13]  MS. SHEA: Okay. Do it your way. Won't
[14] be a clear record, but –
[15]  (The document referred to was marked for
[16] identification as Defendant's Exhibit 7.)
[17]  Q: Mr. Major, would you look at that? I believe
[18] this is something that your attorney produced to me. In
[19] fact, I'm sure it's something your attorney produced to
[20] me, and it looks like your notes of the meeting on
[21] February 11th. Is that correct?
[22]  A: Yup.
[23]  Q: Did this conversation take place on
[24] February 11th, 1997?
[25]  A: I reckon it did, by virtue of the document

Page 146

[1] here.
[2]  Q: So then Tuesday, February 11th would have been
[3] the date of the meeting, not necessarily the date you
[4] wrote the memo?
[5]  A: More than likely, but it's not a memo. It's a
[6] note to myself, as I described it earlier. The date
[7] there shows the meeting. 15:30, asked me to come to a
[8] meeting.
[9]  Q: And Ed, Wayne and you were in the meeting room.
[10] Anybody else, to your recollection?
[11]  A: There was no one else.
[12]  Q: At this particular meeting, Ed told you that it
[13] was Dave's opinion that you would not be promoted now or
[14] in the foreseeable future. He didn't think you would
[15] make a good captain, but that you were welcome to
[16] continue on as first officer. Is that accurate?
[17]  A: I believe that is.
[18]  Q: Now, if you turn to the next page, it looks
[19] like on February 17 it looks like you were offered an
[20] exit package.
[21]  A: The exit package was offered the same day.
[22]  Q: The same day, okay. So is the 17th the eight
[23] days later that you had to sign or why the 17th?
[24]  A: The note on the 17th says – there's a small X
[25] and then the capital letters, "FU", Fox trot uniform,

Page 147

[1] "Wayne Penny re: release." That's follow up. That means
[2] follow up Wayne Penny with reference to a release.
[3]    **Q:** Okay.
[4]    **A:** He had provided to me a pile of legal
[5] documentation, asking me to waive all rights to any kind
[6] of age discrimination claim, etc., in order for me to
[7] be – to accept or to be offered, you could say, granted
[8] the exit package that you referred to earlier.
[9]    **Q:** Well, do you have any knowledge that the
[10] company routinely would offer an exit package at this
[11] level?
[12]    **A:** I do not.
[13]    **Q:** So they were offering you something that you
[14] would not normally receive, to your knowledge, if you
[15] chose to leave the company and accept it?
[16]    **A:** I don't have any idea.
[17]    **Q:** One way or the other?
[18]    **A:** I don't know.
[19]    **Q:** Okay. But you had the option of staying?
[20]    **A:** Yes.
[21]    **Q:** This was just a way if you wanted to leave?
[22]    **A:** If I wanted to leave and take the exit package,
[23] all I had to do was agree that I would never bring any
[24] kind of a claim with respect to their behavior toward me
[25] in applying for promotions.

Page 148

[1]    **Q:** Right. Now, you also could leave and file
[2] whatever charges you want, couldn't you?
[3]    **A:** Correct.
[4]    **Q:** So what they were offering is money if you
[5] chose to leave, in exchange for you signing a contract or
[6] agreement?
[7]    **A:** Correct.
[8]    **Q:** It was your option one way or the other?
[9]    **A:** Correct.
[10]    **Q:** Then it was subsequent to that – let's go off
[11] the record one second.
[12]    (Discussion off the record.)
[13]    **Q:** Mr. Major, do you recall sometime in February
[14] of '97 you also filed an EEOC charge alleging age
[15] discrimination for your failure to be promoted?
[16]    **A:** Yes, I did.
[17]    **Q:** Sometime after being advised you would not be a
[18] captain – or excuse me, after your conversation with Ed
[19] Cook February 11th, wherein he indicated that Dave
[20] Bassett did not consider you promotable, do you remember
[21] providing the company a letter that you had written
[22] previously in which you referenced that you were, in your
[23] opinion, being the victim of age discrimination?
[24]    **A:** No, I do not.
[25]    **Q:** Let me show you what I'm going to mark as Major

Page 149

[1] Exhibit 8.
[2]    (The document referred to was marked for
[3] identification as Defendant's Exhibit 8.)
[4]    If you would take a look at eight and I'll
[5] direct your attention to the top of the third page.
[6]    **A:** Do you want to give me time to read the entire
[7] letter?
[8]    **Q:** I don't think you need to read the entire
[9] letter for purposes of my question. I would like you to
[10] just look at the top of the third page and see if that
[11] refreshes your memory.
[12]    **A:** What I'm seeing so far is that this is a letter
[13] that I wrote in conjunction with other flight officers
[14] and if it's all right, I would like to familiarize myself
[15] with the context that you're going to refer to.
[16]    **MS. NORTON:** Well, let's just go off the
[17] record. It's a long letter.
[18]    (Off the record.)
[19]    **Q:** Okay, Mr. Major. Does that refresh your memory
[20] as to the fact that in correspondence subsequent to Ed
[21] Cook advising you that Dave Bassett did not believe you
[22] to be promotable, you advised the company that you
[23] believed it was based on your age?
[24]    **A:** This letter began December 18th, 1996. May
[25] very well have been substantially finished by then. It

Page 150

[1] had been written with and in conjunction with several
[2] other flight officers who shared my concern with regard
[3] to the items discussed here. Most of the references here
[4] are "our" and "us" as opposed to "I" or "me".
[5]    **Q:** Well, you didn't provide it to the company in
[6] December, did you, Mr. Major? If you look at the top of
[7] the page –
[8]    **A:** I think the company knew it was coming.
[9]    **Q:** That's not my question, Mr. Major.
[10]    **A:** I know.
[11]    **Q:** Look at the top of the page. It's dated
[12] February 27th.
[13]    **A:** It's important to point out, and I'm not sure
[14] where it came from, but the way I frequently set up my
[15] computer is that the date appears corresponding to the
[16] date it's actually printed out. This may not be the only
[17] copy of this.
[18]    **Q:** All right.
[19]    **A:** I think it says at the very front that it's
[20] December 18th, 1996.
[21]    **Q:** Read the first paragraph.
[22]    **A:** "I wrote this several months ago, originally
[23] addressing it to "The Leadership": You, Pete, Ed and
[24] Wayne, the operations chain of command. However, I chose
[25] to heed the advice of counsel and friends and resolved to

Page 151

[1] keep it to myself. In light of recent circumstances,
[2] that may have been an error. Please keep this – excuse
[3] me, please give this a thorough read and your heartfelt
[4] consideration."
[5]   Q: All right. And the reference to several months
[6] ago, February 27th to December – what is it, 16th, 6th?
[7]   A: It's December 18th is the date on here, yes.
[8]   Q: So if you provided it to the company
[9] February 27th, wouldn't that have been a couple months
[10] ago?
[11]   A: Right. It would have been almost exactly two
[12] months.
[13]   Q: So in fact, does that refresh your memory that
[14] you gave it to the company on February 27th?
[15]   A: The comment here is I wrote this several months
[16] ago.
[17]   Q: Okay, and you didn't give it to them.
[18]   A: I'm certain I didn't give it to them when I
[19] finished it. When I gave it to them, I don't know. As
[20] far as I've explained about the date, there's different
[21] dates on here. So I don't know when I gave it to them.
[22]   Q: Well, when you print letters out – you
[23] wouldn't have given it to them before you printed it out
[24] on your computer, would you?
[25]   A: No.

Page 152

[1]   Q: All right. Do you have any other copies of
[2] that of an earlier date that are being printed?
[3]   A: Oh, yes.
[4]   Q: That you printed out earlier?
[5]   A: Uh-huh.
[6]   Q: And where are they?
[7]   A: They'd be in my – I'm sure I printed out
[8] several copies before I ever finished writing it.
[9]   Q: Well, I meant of Exhibit 8. Do you have any
[10] other earlier copies of Exhibit 8, not earlier drafts of
[11] Exhibit 8?
[12]   A: I don't know. I know this document exists in
[13] my computer substantially as it exists here. If I were
[14] to print it out today, it would show the date – today's
[15] date.
[16]   Q: Do you have any earlier final copies printed
[17] out prior to February 27th that you gave the company?
[18]   A: I don't know.
[19]   Q: You don't know one way or the other?
[20]   A: That's correct.
[21]   Q: So as you sit there today, there's nothing that
[22] you have, to your knowledge, that in any way suggests
[23] that you gave that to the company prior to February 27th?
[24]   A: Your logic sounds sound.
[25]   Q: Well, is that correct?

Page 153

[1]   A: I don't have anything that I can give you that
[2] I could put my hands on right now that would say when
[3] this went to Dave Bassett or anyone else at Amerijet.
[4] All I can say is that it had been a work in progress for
[5] sometime that everyone knew was coming.
[6]   Q: Well, you can't testify to what everyone knew,
[7] Mr. Major.
[8]   A: Only those people who I worked on it with and
[9] I'm sure that I discussed it with some of the principals
[10] here.
[11]   Q: Mr. Major, my question to you is this: Do you
[12] have any document that says you gave that document to the
[13] company prior to February 27th, and that document being
[14] Exhibit 8?
[15]   A: No.
[16]   Q: Okay, thank you.
[17] Subsequent to their receipt of the document,
[18] what happened? Anything you recall?
[19]   A: I'm not sure.
[20]   Q: Any discussion with them?
[21]   A: I'm not sure I got a response. I take that
[22] back. I think I did get a response from Dave Bassett, as
[23] a matter of fact.
[24]   Q: And do you remember the nature of that
[25] response? Was it written?

Page 154

[1]   A: I believe it was written, yes.
[2]   Q: Now, it was subsequent to your complaints in
[3] that letter of age discrimination that in fact, you were
[4] awarded the bid to upgrade to captain, were you not?
[5]   A: Subsequent to this?
[6]   Q: Yes.
[7]   A: Yes.
[8]   Q: And in fact, in May of '98 I believe you
[9] submitted a bid for the position of captain?
[10]   A: Right. That's two years later.
[11]   Q: How do you figure May of '98 is two years after
[12] February of '97?
[13]   A: This is February, '97 – okay, I was thinking
[14] '96, December 18th, '96. Right, I had gone on – okay.
[15] In May of '98, that would be correct.
[16]   Q: What positions between February of '97 and May
[17] of '98, if any, did you submit a bid for? Let me
[18] rephrase that.
[19] Did you submit the bid for captain upgrade
[20] prior to May of '98?
[21]   A: Yes, ma'am.
[22]   Q: Okay, when?
[23]   A: Continuously. I had a discussion with – if
[24] memory serves, with – in fact, Ed came out to visit
[25] Dolphin Holiday and indicated that he was aware that I

Page 155

[1] still wanted to upgrade and he thought that that was
[2] possible; that if I continued to work as I had, that he
[3] might be able to arrange that.
[4]   Q: And when was this?
[5]   A: I believe that was fall of '97.
[6]   Q: And did you in fact submit your bid?
[7]   A: Yes. Every time there was an opening or that I
[8] had heard that there might be an upgrade, I submitted a
[9] request.
[10]   Q: And do you have copies of those requests?
[11]   A: I have copies of the ones that were made – the
[12] ones that were written requests prior to May of '98.
[13] There was no formalized bid policy.
[14]   Q: Okay. And do you remember who obtained the
[15] positions of captain prior to that?
[16]   A: Off the top of my head?
[17]   Q: Yes.
[18]   A: I remember several names.
[19]   Q: Can you tell me whom?
[20]   A: The list I'm about to give you would not be at
[21] all inclusive, but there would be John Washington Jr.,
[22] David Mitchell, Al Jorsey, Jr., Ray Manure – I think I
[23] might have referenced some in here as well.
[24]   Q: What is your basis for contending it was
[25] because of your age as opposed to Dave Bassett's

Page 156

[1] perception of your qualifications?
[2]   A: There could be on the one hand no dispute with
[3] regard to my qualifications. They're exemplary.
[4]   Q: On what basis, Mr. Major, other than your
[5] opinion?
[6]   A: On the basis that I had at the time all of the
[7] stated criteria, that some of the people who were
[8] promoted didn't even satisfy the - to captain, did not
[9] even satisfy the criteria for promotion to first officer.
[10]   Q: Who?
[11]   A: That would be John Washington Jr.
[12]   Q: Anybody else?
[13]   A: Not that comes immediately to mind.
[14] To further answer your question, all of the
[15] people who had been promoted were under age 40. The only
[16] people over age 40 being made captain were people who
[17] were hired from outside the company. The company was
[18] reluctant – appeared reluctant by virtue of its practice
[19] to provide such training to candidates over 40. The only
[20] other individual that I can recall having been given that
[21] opportunity had been discharged.
[22]   Q: Who were the other first officers over 40 that
[23] were applying for the position of captain?
[24]   A: I don't recall.
[25]   Q: Do you know if there were any?

Page 157

[1]   A: I think I made reference to some in here, so
[2] apparently I did.
[3]   Q: So in Exhibit 8?
[4]   A: Exhibit 8, yes.
[5]   Q: It would have them in there?
[6]   A: I don't think it says their names. It just
[7] says –
[8]   Q: But during this time period?
[9]   A: "Instead of creating a nurturing and empowering
[10] environment" – okay. To answer the question, I can't
[11] find the answer, but there's a reference made to first
[12] officers, other first officers not being promoted in
[13] there, and that's what I'm drawing that on.
[14]   Q: So whatever information you have would be
[15] contained in Exhibit 8? As you sit there now, you don't
[16] have any independent recollection of anyone else that was
[17] a first officer that was over 40 and applied for the
[18] position of captain and did not get it?
[19]   A: No, I do.
[20]   Q: Okay, who?
[21]   A: That would be Fred Edalatti.
[22]   Q: Fred – can you spell it?
[23]   A: F-R-E-D. Spell the last name?
[24]   Q: Yes, please.
[25]   A: E-D – I believe it's A - it's an Iranian

Page 158

[1] name. L-A-T-T-I.
[2]   Q: And do you know what the reasons were proffered
[3] that he did not get promoted?
[4]   A: I remember hearing Ed Cook describe an approach
[5] into Mexico City, one that I'm very familiar with. It's
[6] a very demanding, descending turning approach, and in the
[7] midst of the approach he, by his own account, launched
[8] into a critique of the captain at that point – that
[9] would have been Captain Edalatti who was in the left
[10] seat - with respect to having accepted a heading for –
[11] or a direct clearance for a specific geographic point
[12] that Ed had thought would put the airplane in jeopardy.
[13]   Q: I'm sorry, I thought you said Edalatti was in
[14] the left seat as captain?
[15]   A: He was in the left seat as captain.
[16]   Q: Then he had already been upgraded to captain?
[17]   A: No, ma'am. He was in the upgrade process.
[18]   Q: This was an IEO?
[19]   A: This would have been the final event of his
[20] IOE.
[21]   Q: And did he flunk it based on that?
[22]   A: Yes, ma'am.
[23]   Q: And what happened, did he resign or was he
[24] fired?
[25]   A: What Ed described was that – and I'm surmising

Page 159

[1] from what Ed described – he said after that critique,
[2] it's such a crucial part of the flight, it would have
[3] been in what's called a sterile cockpit environment, the
[4] individual was no longer capable of flying the approach,
[5] prompting –
[6]    Q: Mr. Major, my question was did he quit or was
[7] he fired?
[8]    A: You asked me what happened.
[9]    Q: Yes, that was my question. Did he quit or was
[10] he fired?
[11]    A: I don't know.
[12]    Q: Okay. Was he still there when you left?
[13]    A: He left the company immediately after that.
[14]    Q: Anyone else?
[15]    A: Not that comes right away to mind.
[16]    Q: The individuals that were hired that were over
[17] 40 into the captain position, they too had to go through
[18] an IOE?
[19]    A: Very reduced training program, yes, and a
[20] reduced IOE, yes.
[21]    Q: But that would also be conducted by Ed Cook?
[22]    A: Oh, no, hardly ever.
[23]    Q: Who would conduct it?
[24]    A: They would be conducted by any of several check
[25] airmen, depending on the needs of the company and the

Page 160

[1] urgency to get them qualified, they may be perfunctory in
[2] nature.
[3]    Q: Perfunctory? Aren't there specific FAR
[4] requirements as to what is required?
[5]    A: Oh, absolutely.
[6]    Q: But you are aware during this time period that
[7] individuals over 40 were hired into the captain seat?
[8]    A: I am.
[9]    Q: You went through recurrent training as a flight
[10] officer in May of '98; is that correct?
[11]    A: Yes.
[12]    Q: And then your bid was accepted for upgrade to
[13] captain in May of '98 and you went again to ground school
[14] for that position as an upgrade?
[15]    A: That's the way I recall it, yes.
[16]    Q: And that was another 40 hours?
[17]    A: I don't know.
[18]    Q: You don't remember?
[19]    A: No, ma'am, and up to this point I've been
[20] unable to find any documentation that it ever took place.
[21]    Q: And you have no recollection?
[22]    A: I recall being in the ground school.
[23]    Q: You've wanted this position for how many years
[24] and you don't remember the training you went through?
[25]    MS. SHEA: Objection, argumentative. You

Page 161

[1] mean the hours?
[2]    Q: Yes. You don't remember how long you attended
[3] class?
[4]    A: No, it's my job to show up and be there for all
[5] the time that I was supposed to be there. I didn't keep
[6] track.
[7]    Q: It's not on one of your to do lists or your
[8] daily schedules?
[9]    A: Showing up and going through it and what
[10] happened may very well be on it, but as far as tabulating
[11] the hours, it was of no consequence to me. What was of
[12] consequence to me is whether it was completed or not.
[13]    Q: Were you by yourself?
[14]    A: No.
[15]    Q: Who else was attending it with you?
[16]    A: There was another captain candidate and 1
[17] believe two or three first officer candidates.
[18]    Q: Do you remember who they were?
[19]    A: The captain candidate was Ed Hoffman. I only
[20] remember one of the first officer candidates and his name
[21] was Joe – last name escapes me.
[22]    Q: And would you have attended the ground school
[23] with these other individuals?
[24]    A: Oh, yes.
[25]    Q: I mean you all were in the same program?

Page 162

[1]    A: Yes.
[2]    Q: Was this the same program that you had just
[3] undergone through recurrent training?
[4]    A: No.
[5]    Q: How did it differ?
[6]    A: It would have been longer.
[7]    Q: But the first officers, the individuals trying
[8] to upgrade to first officer would be in the same program
[9] you were in?
[10]    A: Yes.
[11]    Q: So this was a repeat, for the most part, of
[12] what you had gone through when you upgraded to first
[13] officer?
[14]    A: That had been several years, so there was
[15] several substantive changes with respect to requirements.
[16]    Q: But the general content?
[17]    A: Yes.
[18]    Q: And do you recall whether or not the school was
[19] approximately 40 hours?
[20]    A: I don't recall how long it was.
[21]    Q: Do you know if it was longer or shorter than
[22] the recurrent training you had?
[23]    A: It was longer than the recurrent training.
[24]    Q: When did you finish it, do you remember
[25] month-wise?

**Page 163**

[1]    **A:** Assuredly, no. I remember it would have been
[2]    around June of that same year.
[3]    **Q:** And how soon after you finished that did you go
[4]    to the FAA oral with Barney?
[5]    **A:** I'm not certain.
[6]    **Q:** And Ed Hoffman, did he finish the course?
[7]    **A:** No.
[8]    **Q:** And when did he leave?
[9]    **A:** He just stopped showing up for the class.
[10]   **Q:** Do you know why?
[11]   **A:** No.
[12]   **Q:** Did the other first officers continue to show
[13]   up?
[14]   **A:** Yes.
[15]   **Q:** During this class were there any videos or was
[16]   it all instruction?
[17]   **A:** There were quite a few videos.
[18]   **Q:** Do you remember any of the videos?
[19]   **A:** They would have been in the same content of the
[20]   ones I described before.
[21]   **Q:** And after – what was the process from the last
[22]   day of ground school to appearing before the FAA
[23]   examiner, Barney Sonnen? What happened?
[24]   **A:** You want to know what happened to me or you
[25]   want to know the process?

**Page 164**

[1]    **Q:** Well, I want to know exactly what happened to
[2]    you.
[3]    **A:** I went to two or three – I believe it was
[4]    three, actually, simulator training periods and then had
[5]    an appointment for an oral exam with Barney Sonnen.
[6]    **Q:** Had you heard of Mr. Sonnen before?
[7]    **A:** Yes, I had.
[8]    **Q:** And who had told you about him or how had you
[9]    heard about him?
[10]   **A:** I believe Mike Peley told me about him.
[11]   **Q:** And had Mike Peley had him as an FAA examiner?
[12]   **A:** I think that's how that came up.
[13]   **Q:** And what did he tell you about him?
[14]   **A:** That he was fair and reasonable and no
[15]   surprises.
[16]   **Q:** Did you ask him anything else?
[17]   **A:** Not that I recall.
[18]   **Q:** Did you ask him what kind of questions he
[19]   asked?
[20]   **A:** I believe that was the nature of the
[21]   discussion, talking about where his emphasis is and that
[22]   sort of thing.
[23]   **Q:** Well, based on the FARs, you knew you had to
[24]   know certain things, right?
[25]   **A:** Yes. The FARs are – the practical test

**Page 165**

[1]    standards are pretty exhaustive. What they allow an
[2]    examiner to do is focus in on areas of individual
[3]    interest, to sample them, if you will.
[4]    **Q:** Well, you knew you would have to know
[5]    limitations, right?
[6]    **A:** Yes.
[7]    **Q:** And you knew you would have to know the
[8]    systems?
[9]    **A:** Yes.
[10]   **Q:** And limitations is just a mere matter of
[11]   memorizing, is it not?
[12]   **A:** Yes.
[13]   **Q:** Where did you go for the FAR oral?
[14]   **A:** It was at Amerijet's training office, training
[15]   room.
[16]   **Q:** And what did you wear?
[17]   **A:** I wore a uniform.
[18]   **Q:** What kind of uniform?
[19]   **A:** An Amerijet flight officer uniform.
[20]   **Q:** And do you know what time of day it was?
[21]   **A:** Without epaulettes, without bars of any kind.
[22]   **Q:** Any reason?
[23]   **A:** At that point I was a captain candidate. I
[24]   wanted to have a professional appearance, didn't want to
[25]   be overdressed.

**Page 166**

[1]    **Q:** What did first officers wear?
[2]    **A:** They wear – the sign of their rank is
[3]    three bars on each shoulder.
[4]    **Q:** Would it not have been proper for you to have
[5]    the rank of a first officer?
[6]    **A:** No, ma'am.
[7]    **Q:** Was there any reason you purposely did that?
[8]    **A:** I had seen several others do that on their
[9]    oral.
[10]   **Q:** And what do you recall about the meeting with
[11]   Mr. Sonnen?
[12]   **A:** I recall that I had set up my books and so
[13]   forth, references, my training records, at the front of
[14]   the class; that he came in a little late and a little
[15]   harried. He then asked me to join him at the back of the
[16]   class, so I moved my stuff back there.
[17]   Then he undertook to review my credentials, my
[18]   certificates and ratings, my medical, and then he handed
[19]   me back the airman application that I had given him,
[20]   stating that that was not required or sufficient and that
[21]   I would never need one of those again. I already had my
[22]   airline transport pilot rating.
[23]   **Q:** Do you remember him asking you how long you had
[24]   been at Amerijet?
[25]   **A:** No, I don't remember that.

Page 167

[1] **Q:** Do you remember him asking you any just general
[2] questions of kind of chit-chat, for lack of a better
[3] term?

[4] **A:** No, ma'am.

[5] **Q:** How long before he started conducting the oral
[6] exam?

[7] **A:** I believe the review of everything was probably
[8] 10 to 15 minutes.

[9] **Q:** Do you remember asking him, "Why do I have to
[10] know that", in response to some of the questions?

[11] **A:** No, ma'am.

[12] **Q:** Do you remember him asking you about the wings?

[13] **A:** Yes, ma'am.

[14] **Q:** And do you remember saying, "Why do I have to
[15] know that?"

[16] **A:** No, ma'am.

[17] **Q:** You could have said that or you just don't
[18] remember?

[19] **A:** I doubt that I would have said that.

[20] **Q:** You doubt?

[21] **A:** Yes. That doesn't sound like a character – an
[22] appropriate response or a response that I would make in a
[23] circumstance like that.

[24] **Q:** Do you remember arguing with him?

[25] **A:** No, ma'am.

Page 168

[1] **Q:** Do you remember him telling you you have to
[2] know all this because you're the pilot?

[3] **A:** No, ma'am.

[4] **Q:** Nothing like that?

[5] **A:** No, ma'am.

[6] **Q:** Do you remember telling him you didn't receive
[7] any training in wind shear?

[8] **A:** No, ma'am.

[9] **Q:** Do you remember him discontinuing it after 10
[10] minutes?

[11] **A:** Yes, ma'am.

[12] **Q:** Do you remember him telling you he's going to
[13] do you a favor and not pink slip you?

[14] **A:** No, ma'am.

[15] **Q:** What do you remember him telling you about
[16] that?

[17] **A:** I remember him finding that the required form
[18] out of the Amerijet files had not been completed. Pete
[19] Steele had signed only the airman's – the request for
[20] additional airman certification, which he had handed me
[21] back. The form that was to have been signed, which
[22] signified the instructor's certification of the
[23] completion of the training program and his recommendation
[24] for oral, for the FAA oral exam, had not been signed.

[25] **Q:** Are you indicating that the reason – let me

Page 169

[1] rephrase that. Is it your recollection that the reason
[2] the FAA oral was discontinued was because Pete Steele had
[3] not signed off on the documents?

[4] **A:** Yes, ma'am.

[5] **Q:** Did he tell you that the reason he was
[6] discontinuing it was because you didn't know anything?

[7] **A:** No, ma'am.

[8] **Q:** Did he not tell you that the reason is because
[9] you did not know the answers to limitations, wind shear?

[10] **A:** He had taken issue with my rendition of the
[11] circumstances which would indicate wind shear and he
[12] pulled out as proof a Delta document, something that
[13] comes from –

[14] **Q:** I'm sorry, as proof for what?

[15] **A:** Yes. He said, "This is what you should know,"
[16] and he pulled out a page, an 8 and a half by 11-inch page
[17] that was titled Delta International Airlines and said,
[18] "This is what you should know. Do you mean to tell me
[19] this is not what they're teaching?" And I said, "That's
[20] correct."

[21] **Q:** Is it your understanding then that if you had
[22] had the proper document signed, you would have
[23] successfully completed the FAA oral?

[24] **A:** I have no idea what would have happened.

[25] **Q:** But at the time it was discontinued it had

Page 170

[1] nothing to do with the quality of your answers? Let me
[2] rephrase that.

[3] Is it your understanding that at the time the
[4] FAA oral was discontinued, it had nothing to do with the
[5] accuracy or inaccuracy of your answers?

[6] **A:** Such as he had asked limitation questions, they
[7] had been answered correctly. Such as he had asked the
[8] wind shear question, the response was as I described.

[9] **Q:** But that was one question, is that correct?

[10] **A:** But just prior to that he had paged through the
[11] training records and seen the blank form that is now
[12] signed with Pete Steele's signature, signifying the same
[13] date.

[14] At that point he said, "We need to discontinue
[15] this," and I understood that and I said, "Why can't we
[16] continue it? We can get that signed." And he said, "I'm
[17] going to strongly urge you to discontinue this," and I
[18] understood that to be – he said there'll be no record
[19] that an oral exam has ever taken place, and that seemed
[20] ethical and appropriate to me under the circumstances.

[21] **Q:** What are those circumstances, Mr. Major?

[22] **A:** Circumstances were the required – he should
[23] not have begun the exam with the paperwork that had been
[24] provided to him.

[25] **Q:** Do you remember telling him that you had not

Page 171

[1] received any training on wind shear?

[2]    A: I did not tell him that.

[3]    Q: Do you remember him telling you that you were

[4] not qualified based on your knowledge?

[5]    A: I remember showing him in the manual the

[6] specific – the response to wind shear as I had described

[7] it when he had asked the question, and I remember him

[8] taking issue with that as it appears in the manual and I

[9] remember saying to him that, "I as a captain at Amerijet

[10] am responsible for Amerijet's policies. I cannot be

[11] responsible for Delta's policies and in fact, if I had

[12] answered you in a manner consistent with Delta's wind

[13] shear response procedures, I would have been wrong. As

[14] right as those may seem, they are not Amerijet's

[15] procedures."

[16]    Q: So you argued with him on the correctness of

[17] the answer you gave him?

[18]    MS. SHEA: Object to the form.

[19]    A: I responded to him as I described.

[20]    Q: So you argued with him on whether your answer

[21] was correct or not; is that what you're saying?

[22]    MS. SHEA: Object to the form.

[23]    A: Ma'am, the oral exam is a question and answer

[24] format. I wouldn't characterize it as an argument at

[25] all, but informational, and exchange of information.

Page 172

[1]    Q: Was it after your response then that he

[2] discontinued it?

[3]    A: It was subsequent to it, yes.

[4]    Q: How many other questions did he ask you after

[5] that?

[6]    A: I think there was a series of questions on

[7] hydraulics, on leading edge devices, on spoilers, but

[8] then he came across the blank page.

[9]    Q: Let me show you what I'm going to mark as Major

[10] Exhibit 9.

[11]    (The document referred to was marked for

[12] identification as Defendant's Exhibit 9.)

[13]    (Discussion off the record.)

[14]    Q: Mr. Major, have you had an opportunity to look

[15] at what I've had placed in front of you as Exhibit 9, I

[16] believe?

[17]    A: Yes, ma'am.

[18]    Q: And that is a copy from the FAA of Barry

[19] Sonnen's transmittal. Have you seen it before?

[20]    A: I have seen this before and I heard it was

[21] attributed to Barney Sonnen. I just don't see his name

[22] anywhere on here.

[23]    Q: Do you have any reason to believe, other than

[24] the fact you don't see his name on it, that it's not

[25] attributed to him?

Page 173

[1]    A: I know it is attributed to him.

[2]    Q: I'm sorry, that it was not prepared by him?

[3]    A: I have no reason to believe it wasn't prepared

[4] by him.

[5]    Q: So you're not doubting the authenticity of it,

[6] you just don't have any independent knowledge?

[7]    A: Correct.

[8]    Q: Is there a fax number at the top of that?

[9]    A: Yes. Well, yes, there is. It's said to be the

[10] third page of three pages.

[11]    It's FAA FSDO-17 and it gives a telephone

[12] number.

[13]    Q: And what were the initials you just said, FSDO?

[14]    A: I'm sorry, FSDO, which would be – it's a

[15] proper way of – it's an acronym, F-S-D-O, Flight

[16] Standards District Office.

[17]    Q: And is that where Mr. Sonnen would work?

[18]    A: I believe so, yes. 17 refers to Fort

[19] Lauderdale.

[20]    Q: And that's where he's assigned out of?

[21]    A: As I understood it then, yes.

[22]    Q: And 7/8/98, is that probably the date, to your

[23] best recollection, of the FAA oral?

[24]    A: I don't recall what day the FAA oral was.

[25]    Q: You don't remember that?

Page 174

[1]    A: No, I don't.

[2]    Q: Wasn't that a significant date in your life,

[3] Mr. Major?

[4]    A: Oh, yes, ma'am.

[5]    Q: And you don't remember when it was?

[6]    A: I recall most of the significant details. The

[7] date is not among them.

[8]    Q: You don't remember four days after the 4th of

[9] July an event that absolutely forestalled you from going

[10] to captain with Amerijet? You don't remember that?

[11]    MS. SHEA: Objection, argumentative and

[12] assumes facts not in evidence.

[13]    MS. NORTON: It's a major factor of

[14] credibility.

[15]    MS. SHEA: Objection, argumentative.

[16]    Q: You don't remember independently the day that

[17] you were discontinued by the FAA?

[18]    A: No, I don't.

[19]    MS. SHEA: And let me not agree with your

[20] attempt to testify about the date, because I

[21] don't think it's correct, but –

[22]    Q: Are you saying, Mr. Major, that it did not

[23] occur on 7/8 and that's why you don't remember it on that

[24] date or are you saying you don't remember when it was,

[25] just so the record is clear?

Page 175

[1] **A:** I don't remember when the oral exam took place.

[2] **Q:** Okay.

[3] **A:** I know it was on or around June or July, 1998.

[4] That's my best recollection, about two and a half years

[5] ago.

[6] **Q:** Let me direct your attention to the first

[7] paragraph and probably the second or third sentence. It

[8] begins, "During the next 15 minutes or so." Do you see

[9] that?

[10] **MS. SHEA:** I'm just going to object to the

[11] use of the document in this fashion, because

[12] it's not his document and he wasn't a carbon

[13] copy recipient. Unless you're using it to

[14] refresh your recollection –

[15] **MS. NORTON:** I am, Miss Shea.

[16] **MS. SHEA:** You're not conducting proper

[17] interrogation.

[18] **MS. NORTON:** Well, that's according to

[19] you. That's your objection.

[20] **MS. SHEA:** That's right.

[21] **Q:** Mr. Major, you see the line, "During the next

[22] 15 minutes or so Mr. Major missed questions on

[23] limitation, flight controls and wind shear?" Do you see

[24] that sentence?

[25] **A:** Yes.

Page 176

[1] **Q:** Is that true?

[2] **MS. SHEA:** Object to the form.

[3] **MS. NORTON:** What's your objection?

[4] **MS. SHEA:** The same thing. It's not his

[5] document. You cannot refresh his recollection.

[6] You can't use it that way. It's not correct.

[7] **Q:** Is that accurate, that you missed questions on

[8] limitations, flight controls and wind shear?

[9] **MS. SHEA:** Same objection.

[10] **A:** No.

[11] **Q:** You did not miss any questions on limitations?

[12] **A:** Not that I recall.

[13] **Q:** You didn't miss any questions on flight

[14] controls?

[15] **A:** No, ma'am.

[16] **Q:** The next sentence, "I asked him if he had

[17] received any simulator periods up to now," and you

[18] indicated you have. Do you remember that conversation?

[19] Is that correct?

[20] **A:** Yes, I do.

[21] **MS. SHEA:** Same objection to the use of

[22] the document. You should take the document

[23] away and ask him.

[24] **MS. NORTON:** Miss Shea, your objection is-  ...

[25] to the form of the question.

Page 177

[1] **MS. SHEA:** Correct.

[2] **Q:** Is that correct?

[3] **A:** I'm sorry.

[4] **Q:** I'm sorry. I can understand why you don't

[5] understand that question. Did you have any discussion

[6] with him as to whether or not you had had any simulator

[7] periods?

[8] **A:** Yes, I believe he did ask if I had had any

[9] simulator periods.

[10] **Q:** And you indicated you had? Does that --

[11] **A:** I'm sure I did.

[12] **Q:** You don't remember independently what you said

[13] at this point in time?

[14] **A:** I probably told him I had had three, but no, I

[15] don't remember –

[16] **Q:** You don't remember one way or the other?

[17] **A:** Exactly what I said, no.

[18] **Q:** Did you at any time tell him that you did not

[19] receive any wind shear training?

[20] **A:** That – did I tell him that?

[21] **Q:** Yes.

[22] **A:** I couldn't tell you if I did or not. I can

[23] only – I don't know.

[24] **Q:** Well, Mr. Major, you had received wind shear

[25] training, right?

Page 178

[1] **A:** No, ma'am, it would come later in the syllabus.

[2] **Q:** I'm sorry, I thought you had videos with the

[3] flight engineer and first officer?

[4] **A:** Oh, yes, ma'am. That's not specific to the

[5] Boeing 727.

[6] **Q:** But you had wind shear training?

[7] **A:** Not only had I had wind shear training, but

[8] there's specific reference, I think I indicated before,

[9] in Amerijet's manuals as to how to respond to wind shear.

[10] Mr. Sonnen was not happy with the procedures

[11] described in Amerijet's manuals, and he made that very

[12] clear by pulling out a Delta document which had – it was

[13] Delta procedures and said, "This is what it should be."

[14] and he asked me what Amerijet's was and where it was and

[15] I showed it to him.

[16] **Q:** Mr. Major, I don't want to get you off field

[17] here. My question to you is did you tell him you had not

[18] received any wind shear training?

[19] **A:** I don't recall. I don't think I did.

[20] **Q:** And my question is would you have said that

[21] when in fact you had wind shear training?

[22] **MS. SHEA:** Objection to the form.

[23] **A:** "Form" is a good word to apply here. There's

[24] wind shear training which involves the general threat

[25] presented by wind shear, the weather phenomenon, how it

Page 179

[1] comes to exist, and the impact it might have on an
[2] aircraft in flight, any aircraft in flight, since
[3] aircraft rely on flight air speed in order to maintain
[4] flight. Then there's – so that training I had certainly
[5] had. That was in ground school.
[6]     The simulator component to that, which would be
[7] an opportunity to practice the procedures described in
[8] the actual flight profiles, had not come to pass yet. So
[9] I'm going to say to you it's entirely likely I had told
[10] him I had not had that part of the training, but I
[11] certainly had had the other part and could discuss wind
[12] shear competently.
[13]    **Q:** Okay. Look at the next sentence, next
[14] paragraph. Here he says, "Because of his total lack of
[15] preparation for this oral and because I was led to
[16] believe that he did not receive training due him, (wind
[17] shear), I terminated the oral."
[18]    *Does that refresh your memory as to whether or*
[19] *not the oral was terminated because Pete Steele did not*
[20] *fill out a form or because you did not know the answers*
[21] *to the questions?*
[22]    **MS. SHEA:** Objection to the form.
[23]    **A:** I think we're using your document here,
[24] Mrs. Potter Norton and I'm saying that he goes on here at
[25] length about his several other reasons for why he –

Page 180

[1]    **Q:** Mr. Major, that wasn't my question to you. My
[2] question to you is very simple –
[3]    **A:** I see what you've referred to and I'm only
[4] saying that you referred to one sentence out of several
[5] and there are several others that he uses to describe his
[6] reasons for terminating.
[7]    **Q:** We'll get to those, Mr. Major. My question to
[8] you is this. Does that sentence refresh your memory as
[9] to whether or not the reason the oral was discontinued
[10] was because of Pete Steele supposedly not signing a
[11] document or because of your lack of knowledge?
[12]    **MS. SHEA:** Object to the form.
[13]    **A:** No, it was not.
[14]    **Q:** *You refer to the next sentence, let me be sure*
[15] I get that in there. "Mr. Major and I then proceeded to
[16] Mr. Steele's office, where we discussed Mr. Major's
[17] problem for about 20 minutes. Mr. Steele said he would
[18] give Mr. Major more training and see to it that he is
[19] better prepared the next time."
[20]    Does that refresh your memory as to whether it
[21] was your knowledge rather than Mr. Steele supposedly not
[22] signing a document that led to the discontinuation of the
[23] oral?
[24]    **MS. SHEA:** Objection to the form.
[25]    **A:** No, ma'am.

Page 181

[1]    **Q:** The next sentence, "I should point out that it
[2] was Mr. Steele who signed the application as the
[3] recommending instructor, even though Mr. Major stated to
[4] me that he was not given a pre-oral, in reply to my
[5] inquiry."
[6]    **A:** We did have that discussion.
[7]    **Q:** Does that refresh your memory as to whether it
[8] was your lack of knowledge rather than Mr. Steele not
[9] signing something that led to the discontinuation of your
[10] oral?
[11]    **A:** I cannot answer that question – I don't
[12] understand that question.
[13]    **Q:** What don't understand you about it, Mr. Major?
[14]    **A:** It appears to ask me an either/or, neither of
[15] which are correct.
[16]    **Q:** So now you do recall it wasn't the lack of
[17] signing a document that led to the discontinuation; is
[18] that what you're telling me?
[19]    **A:** No, ma'am.
[20]    **Q:** Is it still your testimony as you sit there
[21] under oath that it was because Pete Steele did not sign a
[22] document that the FAA oral was discontinued?
[23]    **A:** I cannot speak with any more of an indication I
[24] already have to what Mr. Sonnen's reasons were.
[25]    **Q:** Try yes or no. That works real well.

Page 182

[1]    **A:** I'm simply – but I can tell you that
[2] Mr. Sonnen asked me if I had received a pre-oral review
[3] and went on at some length about how that is required of
[4] all candidates who would present themselves for an oral
[5] with the FAA.
[6]    **Q:** Why would he want to know if you had a pre-oral
[7] review if it was just a document not signed, Mr. Major?
[8]    **A:** Because the document that wasn't signed was the
[9] same document that would certify that a pre-oral review
[10] had been conducted and had been completed satisfactorily.
[11]    **Q:** Then what document is he referring to here, if
[12] you know, that said that Pete Steele signed the
[13] application?
[14]    **A:** What Pete Steele signed, and he's being
[15] accurate here, Pete Steele signed an application, an
[16] Airman's Request for Certification, which customarily
[17] would follow in the same format. It's where an
[18] instructor attests to the ability of his student. He
[19] believes this person will pass the exam. That was what
[20] Pete Steele signed.
[21]    He did not sign the Amerijet form, the form
[22] required under Amerijet's program. The only form
[23] required under Amerijet's program, the airman
[24] certification form I referred to a moment ago, was not
[25] required, at least according to Barney Sonnen. He did

Page 183

[1] not sign that, but the block in there simply states
[2] something to the effect of, "I have reviewed the records
[3] and seen that the person has gotten all the training. I
[4] have thoroughly tested and can attest to the viability of
[5] this candidate."
[6]     **Q:** That's an Amerijet form, Mr. Major. It didn't
[7] stop your exam with the FAA.
[8]     **A:** I don't know how you can say that, ma'am.
[9]     **Q:** Well, because why would an Amerijet form that
[10] you just told me was internal Amerijet –
[11]     **A:** Oh, that form is one that was referred to just
[12] the other day in the flight operations training manual,
[13] which is an approved document by the FAA.
[14]     **Q:** It's approved. It's not required, Mr. Major,
[15] is it?
[16]     **A:** No, ma'am. It's required.
[17]     **Q:** It is required?
[18]     **A:** Yes, ma'am. It is approved and required.
[19] Because it's an approved document, it is required.
[20]     **Q:** So then let me understand this. It's your
[21] testimony under oath as you sit there right now today
[22] that the reason your FAA oral was discontinued is because
[23] Pete Steele did not sign that document?
[24]     **MS. SHEA:** Object to the form,
[25] mischaracterizes his testimony.

Page 184

[1]     **MS. NORTON:** That's what I'm asking.
[2]     **A:** I'll just say no.
[3]     **Q:** It is not your –
[4]     **MS. SHEA:** He's telling you the facts.
[5]     **A:** The facts are as I described them. Your
[6] attempts to diminish them or reduce them to some common
[7] denominator haven't worked yet. When they do, I'll
[8] respond in the affirmative.
[9]     **Q:** Mr. Major, my question is very simple. Do you
[10] believe the reason that Mr. Sonnen discontinued that FAA
[11] oral exam 10 to 15 minutes into it was because Pete
[12] Steele did not sign an Amerijet document saying you had
[13] been evaluated?
[14]     **A:** I believe that is a part of his reasoning, yes.
[15]     **Q:** What's the other part, Mr. Major?
[16]     **MS. SHEA:** Object to the form.
[17]     **A:** That he did not want to continue the oral that
[18] he should have never begun without having that signature,
[19] and further, he had found that the training that was
[20] commensurate and corresponded to that signature had not
[21] taken place.
[22]     It may very well be, and I'll never know, that
[23] if I had been able to say that the pre-oral review had
[24] happened and – that then he would have continued and we
[25] would have marched upstairs as we did a moment later and

Page 185

[1] simply gotten the required signature and that would have
[2] been the end of it.
[3]     **Q:** It wasn't the fact you didn't know what you
[4] were talking about?
[5]     **A:** Oh, no, ma'am.
[6]     **Q:** Okay. Do you to this day attribute the
[7] disruption then to Pete Steele?
[8]     **A:** I'm sorry?
[9]     **Q:** Do you to this day attribute the
[10] discontinuation of the FAA oral to Pete Steele?
[11]     **A:** No, ma'am.
[12]     **Q:** Then what do you attribute it to?
[13]     **A:** To the failure of the training department to
[14] provide for that specific and required part of the
[15] training
[16]     **Q:** And what part of the training is it, signing a
[17] document?
[18]     **A:** No, the pre-oral review.
[19]     **Q:** What's the purpose of the pre-oral review?
[20]     **A:** To prepare a person for the oral exam.
[21]     **Q:** It's to see if you know if you can pass the
[22] exam, right?
[23]     **A:** Well, I answered it the best I could, ma'am.
[24]     **Q:** Well, what's the purpose of it? If you're
[25] prepared, you're prepared, right?

Page 186

[1]     **A:** Well, it's both. If I may, you've gone through
[2] a period of time where you've been reviewing a lot of
[3] technical and in some cases arcane information, most –
[4] the vast majority of which doesn't apply to normal
[5] day-to-day operations of an aircraft, but is helpful from
[6] time to time and since the hours are required, you might
[7] as well get into it.
[8]     **Q:** Mr. Major, I'm sorry. Let me ask you this in a
[9] different way –
[10]     **A:** Can I finish, please?
[11]     **Q:** No, because we don't have hours here. Let me
[12] ask is this way and if you need to go through an
[13] explanation further, fine.
[14]     **A:** I was just about finished, ma'am.
[15]     **Q:** The purpose of the oral exam, not what it
[16] covers, but what it is to accomplish, is what?
[17]     **A:** The purpose of the oral exam is to certify and
[18] validate the assessment attested to by the training
[19] department of the company.
[20]     **Q:** Okay. It's to assess the adequacy of the
[21] training?
[22]     **A:** In part.
[23]     **Q:** Well, you're signing off that in fact, the
[24] training took place, right?
[25]     **A:** Yes.

Page 187

[1] **Q:** And in your case the training didn't take

[2] place, did it? That's why you believed that the failure

[3] to sign off was the major problem?

[4] **A:** I wouldn't agree with that, ma'am.

[5] **Q:** Let me direct you to the incident in August,

[6] 1999.

[7] **A:** You're directing me to what, ma'am?

[8] **Q:** August, 1999.

[9] **A:** To what in August of 1999?

[10] **Q:** Well, let me ask you. Do you remember flying

[11] with Brian Steele in August of 1999?

[12] **A:** Yes.

[13] **Q:** Do you remember flying with him what, the 17th

[14] or 18th of August?

[15] **A:** Yes, I do.

[16] **Q:** Tell me what you recall about that.

[17] **A:** What part of that would you like me to

[18] describe?

[19] **Q:** Tell me about the beginning of the flight.

[20] What time did you get there?

[21] **A:** I don't remember what time. I showed up before

[22] anyone else.

[23] **Q:** Did you show up in time to do the weights and

[24] balances?

[25] **A:** I showed up well before that. We were on call.

Page 188

[1] The flight was already eight or nine hours delayed.

[2] **Q:** All right. So you showed up and you filled out

[3] the weight and balance form?

[4] **A:** No, ma'am. First thing I did was went into the

[5] operations shack and called operations, which at the time

[6] was the protocol, to certify that I had arrived and to

[7] discuss the weather.

[8] **Q:** Okay. You said you arrived long before anybody

[9] else and before that was even started doing the weights

[10] and balances. Why would you worry about the weather that

[11] far in advance?

[12] **A:** The weather was unusually awful. The airport

[13] was surrounded by level three and level five

[14] thunderstorms and it's just rare. Usually you have them

[15] in one direction or another. They went around the whole

[16] field and the airport had been and was continuing to be

[17] deluged with what can only be described as a torrential

[18] downpour.

[19] I was concerned because the aircraft had been

[20] only recently certified for using those particular

[21] runways at the weights that we would be using them and

[22] with the flap setting we would be using –

[23] **Q:** Wait. How do you know what runway you would be

[24] using at that point in time?

[25] **A:** There's two runways and they're the same

Page 189

[1] length. In fact, they're the exact same piece of

[2] pavement.

[3] **Q:** And you said the airline had just been recently

[4] certified for using them?

[5] **A:** At the weights they were using, yes.

[6] **Q:** And who had done the certification?

[7] **A:** A company called Nav-Tech Performance

[8] Engineering.

[9] **Q:** Did you have any difficulty with the fact it

[10] had just been certified by Nav-Tech?

[11] **A:** I had reservations.

[12] **Q:** Were those certifications not approved by the

[13] FAA?

[14] **A:** I don't know. I know they were given to us.

[15] **Q:** By whom?

[16] **A:** By the operations department.

[17] **Q:** Well, are you saying that you don't know

[18] whether or not Nav-Tech certifications were approved by

[19] the FAA or not or you just don't know if those particular

[20] ones were?

[21] **A:** I don't have any personal frame of reference

[22] with regard to it either way.

[23] **Q:** Okay. So what was the basis for your

[24] reservation?

[25] **A:** The basis for my reservation was that

Page 190

[1] Amerijet's performance planning policy had been and

[2] continued to be that unless a tower report came out

[3] describing a runway as wet, then for Amerijet's

[4] performance planning purposes, it was dry.

[5]        This had become an issue on a prior flight,

[6] where in fact a longer runway was used or was

[7] contemplated being used and we – well, it just – that

[8] policy had been a matter of discussion between myself and

[9] others at Amerijet for some time.

[10] **Q:** But that policy had been improved up to that

[11] point in time by the FAA, had it not?

[12] **A:** I don't even know if the FAA was even aware

[13] that policy existed.

[14] **Q:** Well, it was part of what, the GOM?

[15] **A:** No, ma'am, it wouldn't be part of any. It was

[16] a standard operational procedure which is derived from

[17] the runway analysis and the other documents that were

[18] approved by the FAA. The documents provided –

[19] **Q:** I'm sorry, you said it's part of runway

[20] analysis that had been approved by the FAA?

[21] **A:** No, I didn't say that.

[22] **Q:** What did you say?

[23] **A:** I said it's derived from. I said it's a

[24] standard operational procedure derived from.

[25] **Q:** Then let me ask my question to you this way.

Page 191

[1] Had you seen that policy in writing?

[2]   A: No.

[3]   Q: So to what are you attributing the fact that it

[4] is a policy?

[5]   A: I had contacted various representatives in

[6] dispatch, which is a local source of information, a

[7] company source of information for that kind of thing. I

[8] had spoken with the chief pilot at the time, Derry Huff.

[9] I had spoken with Pete Steele.

[10]   Q: And they had confirmed that this was their

[11] policy?

[12]   A: Yes.

[13]   Q: That unless there's a report from the tower as

[14] to standing water –

[15]   A: To use their words, it could be flooded and

[16] they didn't care. If it didn't say so, then we were not

[17] to use the decrement.

[18]   Q: All right. So here you are at the airport and

[19] it's raining all around you and you've called dispatch or

[20] you've called the tower to find out the weather. Then

[21] what happens?

[22]   A: I called dispatch to ask if that policy was

[23] still in place, because what I could see was a ramp that

[24] was obviously covered with water and I knew from my work

[25] as an instructor and from my training as an airman that

Page 192

[1] water represents a significant hazard on an airport

[2] surface.

[3]   Q: But not at the ramp?

[4]   A: Not at the ramp.

[5]   Q: So what did you do after that?

[6]   A: At some point I went to the aircraft, picked up

[7] the transcribed weather broadcast and was told that they

[8] were using 9L, but that the wind was out of 270, three

[9] knots.

[10]   Q: Now, how far is this before push-off from the

[11] ramp?

[12]   A: I couldn't be clear, but normally – by the

[13] time I get out there it's normally 45 minutes to an hour.

[14]   Q: And so what we're talking about now is

[15] occurring approximately 45 minutes before takeoff?

[16]   A: Before planned takeoff, yes.

[17]   Q: Or before you push back from the ramp?

[18]   A: Right.

[19]   Q: Which?

[20]   A: The two are usually very closely related.

[21]   Q: Now, at some point in time did you fill out the

[22] weight and balance sheet?

[23]   A: Yes, but I waited.

[24]   Q: And what do you recall about that?

[25]   A: Well, I waited because by this time Al Jorsey

Page 193

[1] Sr. had arrived and we entered the discussion – I told

[2] him that I again felt I was being placed in a very

[3] difficult position; that I knew, as he recognized, that

[4] contaminated runways represent a very serious hazard to

[5] aviation. In fact, there are seven times as many

[6] accidents as a result of aborted takeoffs on wet runways

[7] than there are from dry and that Amerijet, despite my

[8] activism to promote a different policy, still maintained

[9] that if the tower didn't say there was water on the

[10] runway and in a specific amount referred to or referenced

[11] in its performance engineering documents, then as far as

[12] it was concerned, the runway was dry.

[13]   I believe that was a policy that represented a

[14] threat to aviation, a hazard to people on the ground and

[15] to me in particular.

[16]   Q: But you've discussed that with the chief pilot

[17] and with the director of operations and none of them

[18] shared your concern?

[19]   A: I wouldn't go that far, no, ma'am. I discussed

[20] it with each of them. Each of them had indicated that

[21] they shared my concern and promised to look into it and

[22] revise the policy as appropriate.

[23]   Q: Now, you indicated that the tower has to

[24] indicate the weather? Doesn't the weather exist

[25] regardless of what the tower says one way or the other?

Page 194

[1]   A: What airmen use in the conduct of the flight –

[2] remember we referred to limitations. Their conduct is

[3] determined for the most part, to a great extent, by

[4] virtue of the conditions at the field as reported by the

[5] trained weather observers from the National Weather

[6] Service and transcribed on the broadcast from the tower.

[7]   Q: Well, the tower doesn't decide what the weather

[8] is. The captain can look at it and override it, can't

[9] he?

[10]   A: Oh, no, ma'am.

[11]   Q: So the tower controls?

[12]   A: Yes, ma'am.

[13]   Q: So it's your testimony that if the tower says

[14] there's an inch of rain on the runway and you as captain

[15] are sitting there and you look out and you don't see an

[16] inch on the runway, that you can tell the tower that's

[17] not so and take off?

[18]   A: I could tell the tower that's not what I see.

[19] I had had a very similar circumstance with John

[20] Washington sometime before. The field was called below

[21] minimums for landing for him. He was a high minimums

[22] captain. I could see it 50 miles from the airport, which

[23] doesn't really indicate what the visibility is when you

[24] get there, mind you.

[25]   Q: Right.

Page 195

[1]   A: But if John Washington had wanted to, under the
[2] scenario you just described, he would say, "I see it.
[3] I'm going to land anyway." Had he, he would have been
[4] guilty of a violation of the Federal Aviation
[5] Regulations.
[6]     Instead we called the tower and asked for a
[7] revised report. Then they went out and got the revised
[8] report and then the weather was determined to be at a
[9] level which would permit a normal landing.
[10]     That did not take place in this instance.
[11]   Q: On the takeoff, though, as the pilot is sitting
[12] there, in the scenario you give me the pilot was not on
[13] the runway. The scenario I'm giving you is that the
[14] pilot is sitting there looking directly at it as opposed
[15] to the tower telling him, and I just want to know is it
[16] your position that the captain cannot override the tower
[17] or can override the tower?
[18]   A: It is my position that the captain cannot
[19] override the tower.
[20]     For example, ma'am, there's 25 percent of the
[21] runway is all that's required –
[22]   Q: No, you answered my question.
[23] So you are mentioning to Al Jorsey Sr. the
[24] weather conditions, is that what you were telling me?
[25]   A: I was recalling to Al Jorsey – Al and I had

Page 196

[1] several discussions with respect to a prior incident with
[2] this same captain, who seemed cavalier with regard to all
[3] manner of regulations and safety issues.
[4]   Q: And who is that?
[5]   A: Brian Steele.
[6]   Q: And what did Al Jorsey Sr. say?
[7]   A: He said, "Well, Pat, if you don't like it, you
[8] should just quit."
[9]   Q: What did you say?
[10]   A: I said, "That doesn't solve the problem."
[11]   Q: So then what happened? What next took place in
[12] terms of you I guess preparing for pushback and takeoff?
[13]   A: As I recall, at some point and I'm not sure if
[14] it was next, but there was a discussion with regard to a
[15] tail wind. There's an excellent example.
[16]     I go outside, I don't feel any wind. Probably
[17] nobody would. But the tower says the winds are 270 at
[18] three knots. The regulations require that I go to those
[19] same performance planning documents and take what amount
[20] to a very significant penalty for the fact there's wind
[21] on our tail as opposed to on our nose.
[22]     When I brought that up, both Al Jorsey and
[23] Brian Steele chided me for it and said something like –
[24] I don't recall exactly what they said. I just recall
[25] they chided me for being – for bringing it up.

Page 197

[1]   Q: They said something like, "Three miles an hour
[2] is no wind?"
[3]   A: They said, "We're not going to take" – what
[4] Brian said is, "We are not going to take a tail wind
[5] adjustment."
[6]   Q: And then what happened?
[7]   A: We waited, because there was no way I could do
[8] the weight and balance under the current conditions,
[9] couldn't do them correctly. It would be my
[10] responsibility, as described by Amerijet, to take the
[11] tail wind adjustment. Here I'm faced with a captain
[12] telling me not to take a tail wind adjustment.
[13]   Q: Did you make the alternative calculations?
[14]   A: They would amount to we couldn't take off.
[15]   Q: Well, did you make the alternative calculations
[16] on the document?
[17]   A: No. If I had, I'd have to go back and do it
[18] over again. I learned that I'm not going to put myself
[19] to the extra work. It's not going to get approved by the
[20] captain. I'm going to have to start over with a blank
[21] sheet of paper.
[22]   Q: Well, can't you put the ones that he wants and
[23] then the alternative ones?
[24]   A: No, ma'am.
[25]   Q: Why can't you do that?

Page 198

[1]   A: There's only one space left for the performance
[2] limit and once you've used it, any attempts to –
[3]   Q: You can't write outside of the lines?
[4]   A: It's just not the way it's done.
[5]   Q: Okay. Then what happens? All this time you're
[6] looking at the weather?
[7]   A: Excuse me, yes, ma'am. I'm keeping my ears to
[8] the ATIS, hoping it will change.
[9]   Q: Well, they're posted every hour, isn't it?
[10]   A: Well, it's posted whatever it changes
[11] significantly, and finally a change came around that the
[12] winds were out of 010 or 020, which would mean they're
[13] not on our tail, they're not on our nose, but they're
[14] really not going to require a performance decrement.
[15]   Q: So one aspect that you've been worried about,
[16] it didn't come true?
[17]   A: Right.
[18]   Q: Okay.
[19]   A: In that respect I reported to the captain that
[20] well, we don't have a tail wind any more, but the wind
[21] has shifted in direction some hundred degrees. That's
[22] indicative of conditions ripe for wind shear.
[23]   Q: So then what? So what did you say to him?
[24]   A: I think that's what I said.
[25]   Q: Well, I mean did you offer any solution or

Page 199

[1] concern other than just the announcement? Are you still
[2] on the ground now? You're not in the cockpit?
[3]    A: Yes. Well, we're at the ramp, at the gate.
[4] At some point corresponded to this the weights
[5] were delivered, and it may very well be and I have to say
[6] that I may not have been able to complete the weight and
[7] balance if I hadn't had the final weights for all the
[8] positions in the aircraft, the weights delineated on the
[9] weight and balance form by position.
[10]    Q: Okay.
[11]    A: I don't recall if I had them all when I first
[12] initiated this discussion or not.
[13]    Q: And now was it still raining?
[14]    A: At some point it actually had stopped and then
[15] I began to complete the weight and balance and used the
[16] wind as had been most recently described and that came
[17] out as normal.
[18]    At some point in there our discussion had
[19] entailed the decrement required by the Nav-Tech paperwork
[20] for when there's standing water on a runway.
[21]    Q: Now, did you put that on the weight and balance
[22] sheet in case there was standing water when you were
[23] ready to take off?
[24]    A: There isn't a provision for putting anything in
[25] case of anything else. There's only a provision for

Page 200

[1] putting the actual conditions.
[2]    Q: Did you make a recommendation that you write
[3] outside of the lines and put it in there?
[4]    A: My recommendation really went to delaying the
[5] takeoff for whatever period of time was required to get
[6] the runway dry.
[7]    Q: So the answer to my question is you did not put
[8] in or seek to put in the degradation in case there was
[9] standing water when you started to take off?
[10]    A: That would have been a futile gesture. Had I
[11] done that, we couldn't have taken off.
[12]    Q: You would have to come back in?
[13]    A: We wouldn't bother leaving the gate, not even
[14] bother completing the form.
[15]    Q: So then what happened? Did you discuss this
[16] with him at the time, with Brian Steele or with Al Jorsey
[17] or with Brett Weiss?
[18]    A: Yes.
[19]    Q: What did you say?
[20]    A: Brett Weiss was for the most part during, I
[21] would say, the vast majority of this discussion outside
[22] giving initial operating experience instruction to a
[23] student who had come to Amerijet by virtue of his
[24] enrollment in a training program at Aero Services.
[25]    Q: Did you go to Brett Weiss and say, "Look at

Page 201

[1] this, we've got to take a degradation. Help me talk with
[2] Brian, he won't listen to me", or something?
[3]    A: I'm certain Brett Weiss was privy to a
[4] sufficient portion of my conversation with both Brian
[5] Steele and Al Jorsey as to know what the circumstances
[6] were.
[7]    Q: Mr. Major, did you go to Mr. Weiss and say,
[8] "Brett, he's not listening to me, you go talk to him?"
[9]    A: No, ma'am.
[10]    MS. SHEA: Keep your answers short. We're
[11] going to need to leave shortly before five,
[12] so –
[13]    MS. NORTON: You want to finish tomorrow
[14] morning?
[15]    MS. SHEA: No.
[16]    Q: What did you say to Brett Weiss, you
[17] specifically, on this issue?
[18]    A: Most of what I said was directed to the
[19] captain, whose authority it was to make the final
[20] determination and to Al Jorsey.
[21]    Q: Okay. Let me ask you, what did you say to
[22] Brett Weiss?
[23]    A: I don't recall if I said anything addressed –
[24] I may have addressed Brett Weiss directly, but if I did,
[25] I don't recall it. I know he was there.

Page 202

[1]    Q: What did you say to Brian Steele directly?
[2]    A: I said I believe we should take – we should
[3] wait until the runway is dry, because taking the
[4] performance decrement that the conditions required would
[5] have put us overweight for takeoff.
[6]    Q: What did he say?
[7]    A: I think his characteristic response to
[8] something like that would have been something about –
[9]    Q: No, Mr. Major, you're speculating now.
[10]    A: What did he say, I don't know. But basically,
[11] he declined.
[12]    Q: He declined. But you don't remember what he
[13] said? You remember you didn't get the action you wanted,
[14] but you don't remember what he said; is that correct?
[15]    A: It was something like "no", with an expletive
[16] proceeding it.
[17]    Q: Now, how come you were flying with Brian
[18] Steele? Hadn't you had an incident with him in June
[19] where you didn't believe he was a safe pilot?
[20]    A: Yes, ma'am, and I had been assured by Derry
[21] Huff that he had had a session with Brian Steele. I
[22] think the term Derry used was, "We don't appreciate
[23] cowboys around here any more and you need to go by
[24] prudent, conservative pilot airmanship."
[25]    I had actually approached Derry to determine

Page 203

[1] that before I went again on an airplane with Brian
[2] Steele.
[3]    Q: Well, you were a senior as first officer,
[4] weren't you at this time?
[5]    A: I believe I was.
[6]    Q: So you could bid on various routes or not bid
[7] on them?
[8]    A: Yes, ma'am.
[9]    Q: And so you elected to ride with Mr. Steele?
[10]    A: I bidded on the routes. Who I ended up flying
[11] with is luck of the draw.
[12]    Q: Well, you don't want to fly with somebody you
[13] don't think is safe, do you?
[14]    A: Oh, no, ma'am.
[15]    Q: I mean the routes that you go on are not
[16] exactly tourist attractions, are they?
[17]    A: When I bid on a route, Miss Norton, that's all
[18] the information I have. I don't know who else is
[19] bidding on the same route in the other seats in the
[20] airplane.
[21]    Q: Mr. Major, you can go to scheduling and tell
[22] them you don't want to fly with somebody at your
[23] seniority level, can't you?
[24]    A: No, ma'am.
[25]    Q: Did you try it?

Page 204

[1]    A: That's not an option for Amerijet employees.
[2]    Q: Did you try it?
[3]    A: I was satisfied with Captain Huff's answer to
[4] my inquiry.
[5]    Q: Now, between the time period of February and
[6] August, how many times other than that June had you flown
[7] with Captain Steele?
[8]    A: I don't know.
[9]    Q: None?
[10]    A: I don't know.
[11]    Q: So one way or the other you don't have any
[12] independent recollection?
[13]    A: No.
[14]    Q: Do you know for a fact you did fly with him for
[15] any – and I understand that you would bid for a month at
[16] a time?
[17]    A: Yes, ma'am. I think for four weeks at a time.
[18]    Q: Do you have any independent recollection of
[19] flying with him?
[20]    A: No, ma'am.
[21]    Q: At some point in time did Ed Cook leave?
[22]    A: Yes, ma'am.
[23]    Q: And who replaced him?
[24]    A: Derry Huff.
[25]    Q: And at some point in time did you conclude that

Page 205

[1] Pete Steele was holding you back rather than Ed Cook?
[2]    A: I don't recall. I recall being very confused
[3] by the circumstances with regard to my efforts to
[4] upgrade.
[5]    Q: After the FAA oral was discontinued, okay, do
[6] you remember, going back to '98?
[7]    A: Uh-huh.
[8]    Q: Did you subsequently go to a training school as
[9] opposed to seeking training through Amerijet to get the
[10] captaincy?
[11]    A: Yes, I did.
[12]    Q: Where did you go first?
[13]    A: To Aero Services.
[14]    Q: And why did you leave Aero Services?
[15]    A: About a week into training – well, there were
[16] several reasons. We had one week of training. A group
[17] of individuals such as myself, some not employed, had had
[18] three different instructors; first one very
[19] knowledgeable, obviously, but couldn't really speak
[20] English.
[21]    Q: Do you remember his name?
[22]    A: Fernando something, but he had been pulled out
[23] to be put in another class that had requested the
[24] replacement of their instructor. Their instructor had
[25] been sent to us.

Page 206

[1]    Q: Who was that?
[2]    A: Bob Lian.
[3]    Q: Bob Lian?
[4]    A: I believe it's spelled L-I-A-N.
[5]    Q: And then you said there was a third instructor.
[6] What happened to Bob Lian?
[7]    A: There was someone else in between Fernando and
[8] Bob and I don't remember who it was. I think he was just
[9] there one day. My memory is not specific on that. That
[10] gave me cause for concern.
[11]    Q: Do you remember when you were enrolled in this
[12] class, what time period?
[13]    A: No, about October.
[14]    Q: And what happened?
[15]    A: Late in the week the Aero Services produced a
[16] contract that they told me it would be a condition of my
[17] continued enrollment to sign and gave it to me on
[18] Thursday or Friday.
[19]    Q: Do you remember the terms and conditions of
[20] that contract?
[21]    A: I remember thinking as I read it that it
[22] described all the circumstances under which they could
[23] keep my money without giving me what I paid for.
[24]    Q: And what was that?
[25]    A: Just about anything. They referred to, for

Page 207

[1] instance, a simulator schedule and they indicated in the
[2] proposed agreement, which had not been referred to at any
[3] time prior, certainly not when they took my money, that
[4] there would be produced prior to the first day of class a
[5] schedule, a training schedule, and that failure to live
[6] up to that schedule would result in additional charges.
[7]     Q: Okay. So it was just on those terms. And you
[8] refused to sign it, is that what happened?
[9]     A: I did. I faxed it to my attorney, to an
[10] attorney friend of mine, who said don't sign it.
[11]     Q: And what happened?
[12]     A: He advised me against signing it. I came to
[13] learn just from talking to people in the hallway that
[14] there was several who had been in the building for
[15] several months. They had paid for training, had gotten
[16] their ground school, but were unable to obtain simulator
[17] training.
[18]     The company sold not only training –
[19]     Q: I'm sorry, Mr. Major, I don't mean what
[20] happened to everybody. Did you leave, did you quit,
[21] did you ask for your money back?
[22]     A: They told me if I refused to sign the contract,
[23] they would give me my money back and I said that was
[24] fine, based upon what I knew at the time.
[25]     Q: And did you talk with anybody about getting

Page 208

[1] your money back?
[2]     A: I got my money back.
[3]     Q: Did you talk with anybody about it?
[4]     A: Oh, I'm certain I did.
[5]     Q: But you don't remember who?
[6]     A: I believe I spoke with Vito LaForgia.
[7]     Q: And what did Vito tell you?
[8]     A: "Fine".
[9]     Q: Is that all you remember occurring?
[10]     A: I remember Ed Cook presenting himself
[11] downstairs on the Friday prior to – it was either the
[12] Thursday or the Friday, that same day that their contract
[13] appeared and I remember, as I had started to describe a
[14] minute ago, learning there were people who were staying
[15] at their own expense up and down 36 Street who were
[16] unable to get simulator time, because Aero Services had
[17] overbooked it in drag training and was unable to give it
[18] to those people who had asked for complete training.
[19]     Q: But Mr. Vito LaForgia or Mr. Ed Cook didn't
[20] tell you anything else or discuss with you the return of
[21] your money in any other format?
[22]     A: No.
[23]     Q: Did either one of them tell you you were too
[24] argumentative in class?
[25]     A: No, I don't recall that.

Page 209

[1]     Q: Do you remember any discussion coming up about
[2] classes?
[3]     A: I don't recall.
[4]     Q: Do you remember any discussion about your
[5] demeanor in class?
[6]     A: No.
[7]     Q: Or questioning the instructors?
[8]     A: No.
[9]     Q: When you returned to Amerijet, what
[10] conversations, if any, did you have with anyone about
[11] continuation of promotion to captain?
[12]     A: When I returned to Amerijet when?
[13]     Q: I'm sorry, after your completion of the
[14] training at Pan Am.
[15]     A: I had been in constant contact with Amerijet
[16] representatives, Pete. Ed had left. That was presumably
[17] the reason for his visit to Aero Services.
[18]     Q: Did you accuse Pete of being deceptive to you
[19] when he wouldn't put you into IOE training immediately?
[20]     A: That wasn't – A, Pete did not decline to put
[21] me into IOE immediately and that meeting was not where –
[22] there's two questions there. I'm trying to answer both
[23] of them. Why don't you ask them one at a time. Ask them
[24] one at a time, please.
[25]     Q: Well, were you under the impression you would

Page 210

[1] go immediately into IOE?
[2]     A: Yes.
[3]     Q: And were you told that could not happen?
[4]     A: No.
[5]     Q: At any time?
[6]     A: No. In fact, we met and we were discussing an
[7] IOE schedule.
[8]     Q: And then did you have any conversations with
[9] Pete or did you have any correspondence to Pete where you
[10] accused him of being deceptive, duplicitous?
[11]     A: I did, yes.
[12]     Q: And what prompted that?
[13]     A: There had been a phone call to me during my
[14] training at Pan Am from Amerijet's most senior check
[15] airman.
[16]     Q: And who is that?
[17]     A: Al Jorsey.
[18]     Q: Al Jorsey Sr?
[19]     A: That is correct. Al Jorsey had represented to
[20] me that he was very supportive of my efforts to make
[21] captain and had been for some time; that he had in fact
[22] recommended me for captain as early as a year prior.
[23]     We had met several times during the course of
[24] my training. At this phone call, though, which was
[25] initiated by him, he said, "Pat, I'm just calling to tell

Page 211

[1] you that as soon as you get your type rating, you go work
[2] somewhere else," and I said, "No, I understand your
[3] concern, Al, but I've been working with Pete on this and
[4] with Juan Morales and things are going pretty well. I'm
[5] very happy, and I think things are going to work out
[6] fine."
[7]    He says, "Pat, I'm here to tell you Pete Steele
[8] is never going to let you make captain with Amerijet."
[9]    Q: Did you ask him why?
[10]    A: I don't recall if I did or not.
[11]    Q: Okay. Did he tell you why?
[12]    A: No.
[13]    Q: Did you ask Pete?
[14]    A: In the meeting you referred to a moment ago,
[15] Tracy Dickinson, Pete and I sat down and went through to
[16] the best of everyone's recollection, what's required –
[17]    Q: Mr. Major, did you ask Pete if he said that?
[18]    A: Yes, I did.
[19]    Q: That he would never let you make captain?
[20]    A: Yes, I did.
[21]    Q: And if he told Al Jorsey?
[22]    A: No, I did not use Al Jorsey's name.
[23]    Q: And what did you say to Pete Steele on that
[24] issue?
[25]    A: I asked Pete for a private conference and we

Page 212

[1] excused ourselves from the meeting with Tracy, where we
[2] were working on an IOE schedule. And I said, "Pete, I
[3] just wanted to bring to your attention that one of the
[4] senior check airmen contacted me the other day and
[5] suggested to me that as soon as I get my type rating, I
[6] should go work somewhere else," and I said I
[7] recognized – or words to this effect – "I recognize
[8] there may have been a perception for some time that check
[9] airmen would be doing you a favor to make it impossible
[10] for me to satisfactorily complete IOE under any
[11] circumstances. If that perception still exists, then you
[12] need to take steps to make sure that you expect a fair
[13] and accurate evaluation from your check airmen," which is
[14] all I asked for.
[15]    Q: And this is what you told him?
[16]    A: This is what I told him.
[17]    Q: And what did he say?
[18]    A: "What did you expect?"
[19]    Q: That was what he said?
[20]    A: That was his answer. It's like Elijah.
[21]    Q: And why did you have the perception that check
[22] airmen were doing him a favor?
[23]    A: I didn't have that perception. That was the –
[24] I simply wanted Pete to know that there was at least one
[25] check airman who believed that to be the case, that

Page 213

[1] believed that Pete Steele did not want me to captain no
[2] matter what. If that's the case, then all a check airman
[3] needs to do is say anything derogatory and I don't make
[4] captain.
[5]    Q: So you reacted on what Mr. Jorsey said. So
[6] what did Pete Steele say?
[7]    A: I believed I was doing the appropriate thing.
[8] I was taking it to the appropriate person involved, who
[9] had been so accused, confronting him directly and giving
[10] him a chance to respond.
[11]    Q: Well, that's not exactly how you confronted
[12] him, was it?
[13]    A: That's precisely how I confronted him.
[14]    Q: Do you remember the correspondence that you
[15] sent him on the issue?
[16]    A: I believe I wrote that the next day, ma'am.
[17]    Q: It was extremely petrolic, wasn't it, very
[18] harsh? Would that be a fair –
[19]    A: I don't think so.
[20]    Q: You don't?
[21]    A: I think it was accurate.
[22]    Q: Is that the one in which you suggested that Ed
[23] Cook could engage in workplace violence?
[24]    A: I don't recall. In fact, if my memory serves,
[25] those are two entirely different comments.

Page 214

[1]    Q: This conversation was after you had already
[2] gone through additional training when it was – your FAA
[3] was discontinued, right?
[4]    A: I don't know what you're referring to.
[5]    Q: Well, do you remember going through additional
[6] training after your FAA oral exam was discontinued?
[7]    A: Yes.
[8]    Q: And what was the reason given for the
[9] additional training?
[10]    A: The reason given to me was that the training
[11] department was facing a review by the FAA for a number of
[12] reasons and they wanted to make certain that they could
[13] document additional training before sending me back
[14] through.
[15]    Q: Why did they need to document additional
[16] training, Mr. Major, on you?
[17]    A: I just gave you the reason they gave me, ma'am.
[18] I don't know.
[19]    Q: If the reason you didn't pass the FAA oral exam
[20] was because Pete hadn't signed something, why would you
[21] need additional training, do you know?
[22]    A: I think it's pretty obvious from the
[23] documentation here that there's a – well, I don't know.
[24]    MS. NORTON: Let's have this marked as 10.
[25]    (The document referred to was marked for

Page 215

[1] identification as Defendant's Exhibit 10.)

[2]     A: Perhaps I can answer it this way. What

[3] happened with this letter and the discontinuance was it

[4] gave everybody a chance to, including Mr. Sonnen,

[5] including Pete Steele, to be covered. Pete Steele –

[6]     Q: To be covered? I'm sorry, what do you mean?

[7]     A: It gave Barney Sonnen a chance to withdraw from

[8] an exam that he should never have begun.

[9]     Q: Why should he never have begun it?

[10]     A: Because the documentation was not complete.

[11]     Q: That's the only reason?

[12]     A: Yes, ma'am.

[13]     Q: In this letter – do you see in front of you

[14] Exhibit 10?

[15]     A: Yes.

[16]     Q: Do you remember writing this?

[17]     A: Yes.

[18]     Q: In this, is it fact to characterize it that you

[19] attack Ed Cook, you attack Pete Steele, and you attack

[20] Barry Sonnen?

[21]     MS. SHEA: Objection, argumentative.

[22]     A: I can't characterize it that way.

[23]     Q: How would you characterize it?

[24]     A: I characterize it as my response after a very

[25] trying meeting that included Ed Cook, John Moktadier,

Page 216

[1] Tracy Dickinson, and Pete Steele, during which time Ed

[2] Cook became verbally abusive and became so animated and

[3] fierce that I was concerned that he was about to have

[4] another heart attack right in front of us.

[5]     Q: You also questioned whether or not Amerijet has

[6] "embroiled representatives of the FAA in his machinations

[7] against a dedicated and resilient flight officer

[8] employee."

[9]     Are you inquiring as to whether the FAA is in a

[10] conspiracy against you with Amerijet? Is that the nature

[11] of that?

[12]     A: There are – that would not be an accurate

[13] perception, no, ma'am.

[14]     Q: What would be an accurate perception?

[15]     A: FSDO-17 is comprised of individuals who work

[16] for the FAA. Amerijet is comprised of individuals who

[17] work for Amerijet. At the point I wrote this letter I

[18] was in a quandary. This document had been shown to me as

[19] a result of an oral exam which the examiner had indicated

[20] never existed. He had represented that to me and to Pete

[21] Steele. He represented that to me during the exam and to

[22] Pete Steele immediately after.

[23]     Pete Steele asked him to pink slip me. The man

[24] declined and said, "I can't do that. Put him through

[25] additional training, set him back up and we'll go again.

Page 217

[1] The man is capable and qualified, I'm sure he'll do

[2] fine." Then this was shown to me.

[3]     Q: Exhibit 9?

[4]     A: That's Exhibit 9, yes.

[5] At some part of the training, and Ed Cook used

[6] that to explain, said that, "We're going to need to

[7] document some serious training here in order to send you

[8] back, because this letter puts us on notice that our

[9] training department could be under review."

[10]     Q: Mr. Major, I'm sorry, but you're going way far

[11] afield. My question to you is was it your intent to

[12] raise the issue as to whether or not Barry Sonnen was in

[13] cahoots with Amerijet to deprive you of the upgrade?

[14]     A: I raised that as a possibility, yes, ma'am.

[15]     Q: In this letter you assert Ed Cook, Pete Steele,

[16] Barry Sonnen are all against you?

[17]     A: I believe Sonnen's name is Barney, ma'am.

[18]     Q: Mr. Sonnen, is that not right? What am I

[19] saying?

[20]     A: You're saying Barry.

[21]     Q: I'm sorry, Barney Sonnen. Did it ever occur to

[22] you, Mr. Major, that they just thought you weren't

[23] qualified?

[24]     A: No, ma'am.

[25]     Q: What basis do you have that we've not talked

Page 218

[1] about for contending it's because of your age, other than

[2] the fact that you are in a protected age group?

[3]     A: There were 11 or 12 junior flight officers less

[4] qualified than myself who were not only upgraded to the

[5] position of captain, but each of them were given a

[6] thorough and exhaustive pre-oral review.

[7]     Q: Were you present?

[8]     A: No, ma'am.

[9]     Q: Did you give the review?

[10]     A: No, ma'am.

[11]     Q: So how do you know it was thorough and

[12] exhaustive?

[13]     A: By talking to the individuals. I did sit on a

[14] portion of one or two of them.

[15]     Q: And who were they?

[16]     A: Or I would be in the office and walked by the

[17] training room while it's obvious that was what was going

[18] on. They're all the people that I think have been named

[19] in the complaint.

[20]     Q: Is there any other basis, contending that you

[21] were not promoted because of your age?

[22]     A: Well, let's see. It's either 11 or 12 people

[23] who were all under the age of 40 who had been provided

[24] the complete training –

[25]     Q: The one thing you're contending you were not

Major v.
Amerijet International

Patrick Scott Major

-0607...Document 112    Entered on FLSD Docket 03/23/2001 Pa...

[1] provided, the pre-oral exam or the pre-oral inquiry, is
[2] there any other aspects of training you weren't given
[3] that they were?
[4]    **A:** No provision had even been made to give me a
[5] pre-oral review.
[6]    **Q:** I understand your position on the pre-oral
[7] review. Is there any other aspect of the training that
[8] you believe you did not get and they did?
[9]    **A:** Only the completion of the training. I didn't
[10] get all of the captain training from Amerijet.
[11]    **Q:** Well, because of the pre-oral – because you
[12] were disqualified or discontinued by the FAA?
[13]    **A:** That's another interesting point. Amerijet's
[14] policies as stated were that a failure would produce
[15] retraining and another opportunity to take the oral. I
[16] had not failed and so here's a policy on the one hand and
[17] here's their behavior toward me on the other. The two
[18] did not correspond.
[19]    **Q:** Anything else?
[20]    **A:** Not that I can think of at this point.
[21]    **Q:** Did anybody say, "Pat Major, you're too old for
[22] captain?"
[23]    **A:** I'm trying to recall. I don't know that those
[24] exact words were used.
[25]    **Q:** Mr. Major, they were hiring in captains older

[1] than you, weren't they?
[2]    **A:** Yes, ma'am, but they were not providing
[3] training to captains of my age.
[4]    **Q:** In order to go on line they had to receive
[5] training on Amerijet's procedures, they had to go to
[6] ground school, they had to go through an IOE. They had
[7] training?
[8]    **A:** They were entitled to – as being current and
[9] qualified, coming from somewhere else already having been
[10] a captain, they were allowed to get them in at a much
[11] reduced expense and time requirement.
[12]    **Q:** Anything else that you rely upon for your
[13] contention that it was age discrimination that you
[14] haven't already told me? I'm not asking you to repeat
[15] what you've already said.
[16]    **A:** I can't think of anything at this point.
[17]    **MS. SHEA:** Are we about to wrap up?
[18]    **MS. NORTON:** No.
[19]    **MS. SHEA:** Well, we need to, because he
[20] has to pick up his daughter. It's been six
[21] hours plus, plus, plus.
[22]    **MS. NORTON:** No, we don't have six hours
[23] yet.
[24]    **THE WITNESS:** Ma'am, if it's 4:45 and we
[25] started at 9:30, I don't know how we couldn't

[1] have gotten six hours.
[2]    **MS. NORTON:** We don't have six hours of
[3] actual depo. No, we don't.
[4]    **MS. SHEA:** We need to leave in a few
[5] minutes. We can add up the time and have a
[6] debate about that later, but I think since it's
[7] now quarter to five –
[8]    **MS. NORTON:** Let's go off the record for a
[9] minute.
[10]    **MS. SHEA:** – and we were here at 9:30.
[11] that we've more than discharged our
[12] obligations.
[13]    **MS. NORTON:** I disagree, but let's just go
[14] off the record for a minute.
[15]    (Discussion off the record.)
[16]    **MS. NORTON:** Do you want to continue right
[17] now?
[18]    **MS. SHEA:** No, we can't.
[19]    **THE WITNESS:** I think we were off the
[20] record already.
[21]    **MS. SHEA:** I thought we were done for
[22] today.
[23]    **THE VIDEOGRAPHER:** We're just going back
[24] on record so she can do her statement. At this
[25] time we are returning to video record. It is

[1] 4:53 p.m.
[2]    **MS. NORTON:** I understand that the
[3] plaintiff has to leave to pick up his daughter
[4] and we'll reschedule this.
[5]    **MS. SHEA:** I'm not agreeing to that.
[6] That's your statement.
[7]    **THE VIDEOGRAPHER:** At this time this
[8] concludes this videotaped deposition. It is
[9] 4:53 p.m.
[10]    **MS. NORTON:** Then are you requiring I go
[11] to the Court or indicating you will continue
[12] this?
[13]    **MS. SHEA:** I am not agreeing to continue
[14] it. I will discuss it with you later than
[15] this. But I'm not agreeing at this moment to a
[16] continuation.
[17]    **MS. NORTON:** Well, when are you going to
[18] let me know whether you're agreeing or not?
[19] I'm available tomorrow morning, I'm available
[20] Saturday, I can do it Tuesday afternoon.
[21]    **MS. SHEA:** Discovery cutoff is Monday.
[22]    **MS. NORTON:** Well, then I'm definitely not
[23] releasing the Plaintiff. Then we'll just
[24] continue with the deposition.
[25]    **MS. SHEA:** We're off the record.

Page 223

[1] **MS. NORTON:** No, we're not. We're
[2] definitely on the record, Mr. Major, I'm
[3] sorry, but I can't release you then to go pick
[4] up your daughter. It's a quarter of five.
[5] **MS. SHEA:** We've been here since 9:30. I
[6] didn't call the breaks, I didn't take an hour
[7] for lunch.
[8] **MS. NORTON:** You did call some of the
[9] breaks and we've gone. We have five hours.
[10] **MS. SHEA:** Well, a six hour deposition
[11] would logically include some breaks for the
[12] witness.
[13] **MS. NORTON:** It's a five hour deposition.
[14] **MS. SHEA:** I'm just saying when you've
[15] been here for seven and half hours, then I
[16] think it's fair to say there's been a six hour
[17] deposition. If there's been all those
[18] breaks – I didn't ask for them, I haven't
[19] objected to questions, I haven't caused any
[20] interruptions.
[21] **MS. NORTON:** Miss Shea, we've not finished
[22] the depo. We have not finished the depo.
[23] **MS. SHEA:** I think we've complied.
[24] **MS. NORTON:** No, you haven't.
[25] **MS. SHEA:** Well, I have to make my jury

Page 224

[1] duty call, he has to do his thing. I'll
[2] discuss it with you tomorrow. He's not
[3] available tomorrow, and I'll let you know. If
[4] we can agree, then we can do it Monday before
[5] Dave Bassett, if you want to finish it then.
[6] **MS. NORTON:** That will be fine.
[7] **MS. SHEA:** One hour.
[8] **MS. NORTON:** And you can go as long as you
[9] want with Mr. Bassett in terms of the day, if
[10] you want.
[11] **MS. SHEA:** I'm not producing Mr. Major for
[12] more than the required amount under the rules.
[13] **MS. NORTON:** That's fine. I have no
[14] problem with that.
[15] **MS. SHEA:** I want it on the record exact
[16] how much deposition time, if this is the way
[17] we're going to play this, including the last
[18] five minutes.
[19] **THE VIDEOGRAPHER:** At this time we
[20] currently have three tapes that are recorded.
[21] One is an hour and 50 minutes, one is an hour
[22] and 40 minutes, and the current one is an hour
[23] and 38 minutes.
[24] **MS. NORTON:** Okay, fine. Off the record.
[25] (Whereupon, at 4:55 p.m., the deposition

Page 225

[1] was adjourned.)
[2]
[3]                    CERTIFICATE
[4]
    STATE OF FLORIDA              )
[5]                               ) ss.
    COUNTY OF DADE                )
[6]
[7]     I, ALICE TESLICKO, CSR, a Certified
    Shorthand Reporter and Notary Public for the State of
[8] Florida at Large, do hereby certify that I reported the
    deposition of Patrick Major, witness called
[9] by the Defendant in the above-styled cause, that
    the witness was duly sworn by me; and that the foregoing
[10] pages, numbered from 1 to 225, inclusive, constitute a
    true and correct transcription of my shorthand report of
[11] the deposition of said witness.
[12]     I further certify that I am not an attorney
    or counsel of any of the parties, nor a relative or
[13] employee or counsel connected with the action, nor
    financially interested in the action.
[14]
    WITNESS my hand and official seal in the
[15] City of Miami, County of Dade, State of Florida, this
    20th day of February, 2001.
[16]
[17]
[18]              ALICE J. TESLICKO, CSR
    My commission expires:
[19] December 14, 2002
[20]
[21]
[22]
[23]
[24]
[25]

Major v.
American International

Patrick Scott Major

4-06070-civ-...  Document 112    Entered on FLSD Docket 03/13/2001  Pa...

**$**

$2,000 80:23
$20,000 24:10
$3,300 47:22
$37,000 47:23
$38,000 47:23
$4,000 56:17
$48,000 8:21
$50,000 43:10
$55 47:13, 21
$75 36:10

**0**

010 198:12
020 198:12

**1**

1 45:16; 49:19, 22; 62:20, 23
1/2000 76:8
10 9:12; 57:21; 60:3; 91:25; 93:9, 11; 130:18; 167:8; 168:9; 184:11; 214:24; 215:1, 14
10/19/94 118:15; 119:1
100 126:2
1080 28:18
1099s 75:18
11 218:3, 22
11-inch 169:16
11th 80:12; 145:21, 24; 146:2; 148:19
12 48:3; 5, 83:20; 218:3, 22
13 8:6; 48:4
135 23:22, 23
14 60:3
142 66:8
15 18:14, 45:19; 46:18; 167:8; 175:8, 22; 184:11
150 19:21
15:30 146:7
16 59:25
160th 32:1
163rd 28:18
16th 151:6
17 146:19; 173:18
1718 20:15
172 19:21
1722 8:4
17th 140:21; 146:22, 23, 24; 187:13
182 19:22
18th 130:12; 149:24; 150:20; 151:7; 154:14; 187:14
19 8:10

197 32:19
1971 32:17
1975 32:20
1980 38:10, 21
1983 30:12
1984 32:8; 37:9
1986 30:5
1987 30:13
1988 28:22, 23
1989 17:18; 98:11
1992 130:12
1993 89:5; 142:10
1996 149:24; 150:20
1997 144:17; 145:24
1998 89:2; 175:3
1999 16:13; 41:16; 42:12; 50:4, 22; 55:17; 56:4; 187:6, 8, 9, 11
19th 11:11, 13, 14, 15; 12:1, 17; 80:25; 81:1
1:10 83:21
1st 16:13; 25:23; 41:13, 20, 20; 75:7, 16, 24, 24; 76:3, 8, 10; 78:16, 16

**2**

2 112:20, 22
20 9:12; 59:25, 180:17
20/80 10:21
200 126:2
2000 8:10; 15:18; 24:8; 41:13, 16; 42:14, 25; 43:9, 51:5; 74:12; 75:7, 9, 16, 25, 76:7, 8, 10, 78:16
2001 45:14; 76:3, 5
2002 45:16
21st 8:10, 18; 15:18, 45:13
23rd 51:5
25 195:20
25th 80:6
26 48:2
270 192:8; 196:17
27th 150:12; 151:6, 9, 14; 152:17, 23; 153:13

**3**

3 113:24; 114:1, 18
31st 25:22
35 30:25
36 208:15
365 89:22
38 224:23

**4**

4 9:12; 117:1, 3; 118:10, 13, 24
40 10:4; 43:23; 102:20;

125:17; 156:15, 16, 19, 22; 157:17; 159:17, 160:7, 16; 162:19; 218:23; 224:22
40,000 20:7
400 103:10, 15, 20
401(k 13:11; 44:5; 128:6
402s 11:18
41 123:16
45 192:13, 15
4:45 220:24
4:53 222:1, 9
4:55 224:25
4th 174:8

**5**

5 126:24; 127:1, 3, 5
50 43:16; 194:22; 224:21
50/50 10:21

**6**

6 130:4, 6
60 43:23; 47:12, 21
600 5:22; 6:21
6th 151:6

**7**

7 74:12; 144:23; 145:4, 9, 12, 16
7/8 174:23
7/8/98 173:22
70's 33:22
727 9:13; 10:7; 11:13, 14; 13:4; 19:16; 41:6; 43:16; 67:1; 97:18; 102:4; 126:2; 178:5
747 67:2
77 38:20
7th 63:4, 9

**8**

8 149:1, 3; 152:9, 10, 11; 153:14; 157:3, 4, 15; 169:16
8/25 79:18, 22; 81:11
80 10:4; 38:21
81 31:3, 5; 38:20, 21

**9**

9 172:10, 12, 15, 217:3, 4
9/29/94 118:17
91 28:24; 97:10; 106:15
93 110:25; 112:7
94 106:16; 107:7; 109:13, 15, 16, 18; 123:16; 124:20
96 154:14, 14

97 141:3; 148:14; 154:12, 13, 16, 155:5
98 104:3; 105:6; 138:25; 154:8, 11, 15, 17, 20, 155:12; 160:10, 13; 205:6
99 25:8, 13, 15, 23; 27:2; 42:13, 25; 43:3; 55:25; 56:2, 15, 15; 57:7, 14; 75:9, 13, 24; 76:3, 13; 78:16; 138:25
9:30 220:25; 221:10; 223:5
9L 192:8

**A**

abilities 68:8
ability 59:14; 67:25; 138:15; 182:18
able 54:17; 59:12; 74:1; 105:12, 16; 111:2; 155:3; 184:23; 199:6
abort 134:18
aborted 110:23; 111:4, 193:6
aborting 137:16
above 83:13, 17; 127:16; 144:13
absence 7:17; 143:22, 24
absolute 33:21
absolutely 49:25; 56:1; 111:12; 137:17; 160:5; 174:9
abundantly 7:8
abuse 39:7
abusive 216:2
academy 32:25; 66:6; 68:10
accelerating 134:9
accept 131:19; 139:15; 140:5; 147:7, 15
accepted 25:24; 67:23; 110:10; 158:10; 160:12
access 14:19
accident 106:4
accidents 193:6
accolades 66:10
accomplish 89:12, 186:16
accomplished 37:23; 89:15
according 175:18; 182:25
account 158:7
accounts 56:23
accredited 30:11
accuracy 170:5
accurate 59:15; 76:21; 95:6; 120:13; 121:23; 146:16; 176:7; 182:15; 212:13; 213:21; 216:12, 14
accurately 54:20
accuse 127:25; 209:18

accused 210:10, 213:9
acquire 98:8, 9
acquired 28:1, 3
acquiring 36:14
acquisitions 29:16; 82:5
acronym 173:15
across 61:2; 172:8
act 10:15
acting 10:11
action 84:25; 85:15, 131:5; 202:13
active 23:14
actively 42:10, 11; 58:22; 59:3, 4
activism 193:8
activities 66:6; 85:11; 97:6
activity 64:14; 89:14
actual 10:24; 47:14; 100:5; 179:8, 200:1; 221:3
actually 17:5; 21:21; 32:20; 34:18; 47:14; 56:3; 87:18; 103:10; 108:19; 118:20; 123:23; 136:3; 150:16; 164:4; 199:14; 202:25
adamant 35:13
add 48:5; 123:4; 142:2; 221:5
added 47:15
addition 9:13; 18:10; 48:6
additional 14:22, 25; 48:5; 100:12; 168:20; 207:6, 214:2, 5, 9, 13, 15, 21; 216:25
additions 47:15
address 4:8; 22:13, 28:18; 70:11, 108:12; 127:19
addressed 201:23, 24
addressing 150:23
adequacy 186:20
adjustment 197:5, 11, 12
administration 35:25
administrator 83:11, 16
advance 34:18, 188:11
advancement 82:23
advertisement 38:25
advice 150:25
advise 73:12
advised 72:21, 23, 24; 129:9; 141:2; 144:16; 148:17; 149:22; 207:12
advising 66:24; 70:9, 17, 20, 112:10; 149:21
Aero 200:24; 205:13, 14; 206:15; 208:16, 209:17
aerospace 31:9; 60:25
affiliated 21:10, 12
affiliation 20:23
affirmative 30:18; 184:8
afford 113:14

**afield** 53:20; 217:11

**AFTERNOON** 84:1; 222:20

**Again** 43:22; 59:16; 62:10; 68:16; 70:4, 73:3; 81:23; 97:8, 103:4; 120:1; 125:17; 136:8; 138:4; 160:13; 166:21; 193:2; 197:18; 203:1; 216:25

**against** 3:12; 86:14, 15; 141:13, 17; 207:12; 216:7, 10; 217:16

**age** 117:20; 123:14, 17; 124:9, 13; 141:9, 17; 142:15, 22, 25; 147:6; 148:14, 23; 149:23; 154:3; 155:25; 156:15, 16, 218:1, 2, 21, 23; 220:3, 13

**ago** 4:17; 7:11; 20:24; 22:10; 46:20; 57:21; 136:20, 25; 138:11, 144:21; 150:22, 151:6, 10, 16; 175:5; 182:24; 208:14; 211:14

**agree** 147:23; 174:19, 187:4; 224:4

**agreed** 84:11, 12

**agreeing** 222:5, 13, 15, 18

**agreement** 34:11; 39:2; 84:17, 133:15; 148:6; 207:2

**agreements** 35:1

**ahead** 6:10; 7:6; 83:18; 112:1, 4; 113:4; 119:10; 122:19; 142:4

**Air** 8:8; 11:21; 12:8, 13, 16, 23; 13:5, 16, 24; 14:10, 25, 15:2, 17; 21:9; 23:23; 31:10; 32:2; 40:24, 25; 41:1, 9; 44:8, 22, 24, 45:1, 5, 6, 23; 46:1, 22; 48:13; 74:24; 80:21; 86:18, 18; 88:2, 7; 97:21; 98:23; 179:3

**airborne** 134:3

**aircraft** 19:3; 99:6; 134:20, 20; 135:11; 136:4; 137:3; 139:11; 179:2, 2, 3, 186:5; 188:19; 192:6, 199:8

**airline** 15:22; 19:11, 23; 26:14; 27:1, 98:2, 166:22; 189:3

**Airlines** 169:17

**airman** 14:23; 101:11; 130:16; 166:19; 168:20; 182:23; 191:25, 210:15; 212:25; 213:2

**airman's** 168:19; 182:16

**airmanship** 202:24

**airmen** 101:10; 159:25; 194:1; 212:4, 9, 13, 22

**airplane** 10:16; 60:2, 133:3; 134:14; 136:9; 137:11; 158:12; 203:1, 20

**airplanes** 12:3, 4; 19:25;

25:16

**airport** 188:12, 16; 191:18; 192:1; 194:22

**Airways** 16:21; 40:23

**Al** 140:19, 21; 155:22; 192:25; 195:23, 25, 25; 196:6, 22; 200:16; 201:5, 20; 210:17, 18, 19; 211:3, 21, 22

**alcohol** 39:7

**alert** 137:4

**alienate** 127:9; 128:13

**alive** 31:18

**allegations** 3:14

**alleged** 86:2

**alleging** 148:14

**allow** 165:1

**allowed** 64:8; 220:10

**alluded** 46:20; 137:3

**Almost** 8:6; 151:11

**along** 65:22; 100:21; 104:23; 131:8, 23; 138:17

**already** 5:13; 41:4; 42:7; 84:19; 116:1; 124:15; 158:16; 166:21; 181:24; 188:1; 214:1; 220:9, 14, 15; 221:20

**alternative** 126:21; 197:13, 15, 23

**although** 94:22; 101:15; 102:17; 112:13

**altogether** 91:13

**always** 30:25, 73:11, 103:7

**ambitious** 34:22

**ambivalent** 35:11

**Amended** 41:1; 51:9

**Amerijet** 3:11; 16:13, 19; 28:24; 33:12; 40:20, 22, 41:8; 42:5; 44:10, 21; 45:4, 12, 20; 46:10, 16, 21; 47:2, 3, 7, 9, 11; 50:12, 19, 51:7, 15, 25; 52:11, 20; 53:21, 25; 54:2, 8, 14; 58:8; 59:14, 18; 62:7, 9, 12, 13, 16; 76:12; 78:2; 79:4; 86:14, 14; 88:24; 89:8; 91:4; 97:10, 25; 98:2; 99:25; 101:23; 103:18; 106:15; 110:9, 11; 112:8; 117:15; 119:18; 120:8, 9, 11, 14, 20; 122:21; 129:15; 130:11; 133:5; 138:23; 139:18; 140:4, 6; 141:16, 153:3; 165:19; 166:24; 168:18; 171:9; 174:10; 182:21; 183:6, 9, 10; 184:12; 190:9; 193:7; 197:10; 200:23; 204:1; 205:9; 209:9, 12, 15; 211:8; 216:5, 10, 16, 17; 217:13; 219:10

**Amerijet's** 91:22; 113:8, 13; 115:4, 13; 140:16; 165:14; 171:10, 14; 178:9, 11, 14; 182:22, 23; 190:1, 3; 210:14; 219:13; 220:5

**Amey** 57:22, 23; 58:10, 11, 12

**among** 128:17; 174:7

**amount** 193:10; 197:14; 224:12

**amounts** 196:19

**analysis** 190:17, 20

**analytical** 94:20

**animated** 216:2

**announcement** 199:1

**annual** 9:1; 36:3; 50:6

**annually** 36:10; 43:11, 12; 101:2

**answered** 21:20; 60:21; 83:8; 170:7, 171:12; 185:23; 195:22

**anticipate** 36:14

**anybody** 94:11; 100:20; 109:3; 112:3; 121:4; 125:5; 141:18; 146:10; 156:12, 188:8, 207:25; 208:3; 219:21

**Anyone** 21:10; 29:19; 32:9; 50:4; 61:10; 73:3; 93:5; 96:21; 100:20; 121:20; 122:18; 153:3; 157:16; 159:14; 187:22; 209:10

**anytime** 3:23

**anyway** 195:3

**anywhere** 78:19; 96:16; 137:5; 139:12, 172:22

**APM** 30:11

**Apparently** 136:6, 157:2

**appear** 95:4

**appearance** 165:24

**appeared** 156:18, 208:13

**appearing** 163:22

**appears** 150:15; 171:8; 181:14

**appended** 103:16

**application** 166:19, 181:2; 182:13, 15

**applied** 157:17

**apply** 178:23; 186:4

**applying** 147:25; 156:23

**appointment** 32:23, 25; 164:5

**appraisal** 36:1, 79:21

**appreciate** 4:4; 202:22

**approach** 158:4, 6, 7; 159:4

**approached** 15:6, 8, 15, 20; 202:25

**appropriate** 40:9; 66:16; 108:12; 128:2; 167:22; 170:20; 193:22; 213:7, 8

**approved** 183:13, 14, 18, 19; 189:12, 18; 190:18, 20; 197:19

**approximately** 9:10; 47:22, 78:15; 130:18; 162:19; 192:15

**April** 63:4, 9; 74:12; 110:25

**arbitrator** 129:5, 8

**arcane** 186:3

**area** 43:1; 64:6

**areas** 35:7; 60:25; 165:2

**argue** 137:21, 138:6

**argued** 171:16, 20

**arguing** 167:24

**argument** 171:24

**argumentative** 67:12; 120:4; 127:18, 20; 129:10, 19; 138:3, 14; 160:25; 174:11, 15; 208:24; 215:21

**Arkansas** 37:15

**Army** 32:2, 3, 19, 21

**around** 28:21; 36:10; 42:11, 24; 46:11; 89:5; 128:20; 141:25; 163:2; 175:3; 188:15; 191:19; 198:11, 202:23

**arrange** 155:3

**arrangement** 84:4, 8

**arrived** 188:6, 8; 193:1

**articles** 92:24

**articulate** 29:21

**askew** 133:10

**asleep** 60:17; 61:25

**aspect** 39:14; 46:8; 198:15; 219:7

**aspects** 35:22; 38:4, 15, 48:7; 74:3; 82:11, 12; 219:2

**assert** 217:15

**assess** 186:20

**assessing** 123:19

**assessment** 68:7; 186:18

**asset** 23:22, 25:10, 10; 55:5

**assigned** 110:13; 173:20

**assignments** 78:25, 110:11, 12

**assistance** 25:24

**assisted** 22:6

**associate** 22:9

**associated** 38:13; 62:9

**associates** 22:6

**associating** 52:19

**Association** 17:7; 20:17; 23:5; 85:12, 18

**associations** 20:19

**assume** 57:12

**assumes** 174:12

**assuming** 10:13; 107:22; 112:7

**assurances** 115:5; 116:16

**assure** 117:16

**assured** 202:20

**Assuredly** 163:1

**ATIS** 198:8

**attach** 46:17

**attack** 215:19, 19, 19,

216:4

**attempt** 174:20

**attempting** 128:21

**attempts** 88:25; 184:6; 198:2

**attended** 3:8; 161:2, 22

**attending** 161:15

**attention** 49:19; 62:18; 107:11; 144:15; 149:5; 175:6; 212:3

**attest** 183:4

**attested** 186:18

**attests** 182:18

**attitude** 129:24

**attorney** 84:4, 9; 89:18; 122:11; 145:18, 19, 207:9, 10

**attractions** 203:16

**attribute** 50:19; 51:6; 62:12; 185:6, 9, 12

**attributed** 68:25; 80:17, 18, 19; 85:16; 172:21, 25; 173:1

**attributes** 138:14

**attributing** 191:3

**audience** 18:24, 25; 96:12

**August** 8:10, 18; 15:18; 25:22; 45:13; 51:5; 76:7; 80:6, 7, 12; 140:19, 21; 187:5, 8, 9, 11, 14, 204:6

**authenticity** 173:5

**authority** 201:19

**authorization** 100:13; 139:13; 140:6

**authorizations** 140:15

**automatic** 33:2, 3

**avail** 98:14

**available** 46:22; 78:12; 222:19, 19, 224:3

**Avenue** 28:19

**average** 9:15, 24, 25

**aviation** 15:12, 23:23; 28:11; 31:9; 60:25: 97:21; 193:5, 14; 195:4

**avoid** 7:2; 33:18

**awarded** 154:4

**aware** 8:25; 44:14, 25; 116:23; 134:10; 137:5, 154:25; 160:6; 190:12

**awareness** 95:25; 98:3, 4; 135:25

**away** 37:13, 66:18; 110:3, 12, 13; 123:3; 159:15; 176:23

**awful** 188:12

**B**

**B** 89:13

**B-17** 31:15

**B-24** 31:15

**B-25** 31:15

**back** 4:24; 5:23; 6:1, 16; 21:13; 37:17; 39:19; 50:3; 58:5; 61:17; 63:3, 14; 65:14; 80:11, 13; 81:2; 93:18, 100:10; 105:1; 122:4, 7, 20, 136:23; 142:11, 22; 144:10, 12; 153:22; 166:15, 16, 19; 168:21; 192:17; 197:17; 200:12, 205:1, 6; 207:21, 23; 208:1, 2; 214:13; 216:25; 217:8; 221:23
**background** 73:21; 124:4
**backwards** 104:2
**bad** 73:13
**balance** 188:3; 192:22; 197:8; 199:7, 9, 15, 21
**balances** 187:24; 188:10
**ballpark** 47:23
**Barney** 163:4, 23; 164:5; 172:21; 182:25; 215:7; 217:17, 21
**Barry** 172:18; 215:20, 217:12, 16, 20
**bars** 165:21; 166:3
**based** 72:16; 110:9, 10; 149:23; 158:21; 164:23; 171:4; 207:24
**basic** 97:19; 139:10
**basically** 36:25; 45:6; 99:4; 101:3; 202:10
**basis** 3:13; 9:2; 22:19; 23:6, 36:3, 76:20; 142:24, 155:24, 156:4, 6; 189:23, 25; 217:25; 218:20
**Bassett** 141:3, 21; 142:16, 21; 148:20; 149:21; 153:3, 22; 224:5, 9
**Bassett's** 155:25
**bear** 37:1
**became** 10:22; 27:23; 28:1; 30:12, 34:23, 43:7; 49:3; 54:7; 57:15, 17, 19; 76:3, 13; 115:5; 120:12, 14; 124:20; 134:9; 216:2, 2
**become** 12:22; 13:10; 46:18; 48:17; 49:1, 16; 56:10; 190:5
**began** 8:17; 21:4; 75:15; 88:14; 119:25; 120:1; 141:24; 149:24; 199:15
**begin** 54:9
**beginning** 16:25; 39:5; 63:11; 112:24; 113:1, 115:11; 187:19
**begins** 127:6; 175:8
**begun** 95:21; 170:23; 184:18; 215:8, 9
**behavior** 147:24; 219:17
**behind** 115:8
**believe** 13:13; 16:20, 22; 24:15; 25:23; 27:9; 28:18, 21, 24; 31:4, 20; 33:19; 36:4, 10; 42:6; 44:3, 6, 19; 45:19; 47:12; 50:23; 52:24; 53:19, 21, 23;

55:22; 56:6, 17, 58:23; 62:5, 19; 73:1; 74:22, 24; 75:16; 77:9; 79:5; 80:9; 81:6, 25, 89:2, 5, 20; 90:1, 14, 14; 99:24, 103:9; 104:3, 106:25; 113:12; 118:14, 18, 20; 122:8, 10, 12; 123:10, 11; 124:23, 128:2; 134:9; 142:16; 145:17; 146:17; 149:21; 154:1, 8; 155:5; 157:25; 161:17; 164:3, 10, 20; 167:7; 172:16, 23; 173:3, 18; 177:8; 179:16; 184:10, 14; 193:13; 202:2, 19; 203:5; 206:4; 208:6; 213:16; 217:17, 219:8
**believed** 29:10; 38:2; 141:13, 16; 142:21; 149:23; 187:2; 212:25; 213 1, 7
**believes** 182:19
**below** 194:20
**benefit** 13:22; 14:2; 25:9, 10, 17; 26:12; 46:1; 64:24
**benefits** 13:5, 8; 14:13, 35:25; 43:25; 44:9
**best** 9:19; 34:10; 47:17; 67:18; 79:23; 92:1; 97:15; 113:13; 128:14, 173:23; 175:4; 185:23; 211:16
**better** 48:15; 80:20, 22, 167:2; 180:19
**bid** 108:17, 18, 154:4, 9, 17, 19; 155:6, 13; 160:12, 203:6, 6, 17; 204:15
**bidded** 203:10
**bidding** 203:13
**bids** 108:19
**Bill** 138:22; 139:18; 140:3, 7
**bit** 65:8; 137:20
**blank** 170:11; 172:8; 197:20
**block** 128:20; 183:1
**board** 17:10; 85:17, 17, 23; 86:1; 139:10
**Bob** 206:2, 3, 6, 8
**body** 59:15, 17, 20, 21; 60:6, 9, 11, 14; 61:4, 13, 24
**Boeing** 43:15; 97:18; 102:3; 114:20; 115:7, 19, 116:2; 178:5
**Boeings** 19:8
**bona** 143:24
**book** 98:13
**books** 166:12
**boss** 48:20, 21; 49:3, 4, 8, 16; 66:13; 71:23
**both** 17:10; 37:16; 39:3; 40:2; 59:22; 88:22; 101:19, 20; 109:4; 118:21; 123:22; 135:5; 186:1; 196:22; 201:4; 209:22
**bother** 200:13, 14

**bottom** 83:4
**Boulevard** 8:4; 20:16
**box** 123:3
**brains** 69:11
**break** 3:23; 4:2, 5; 23:1; 49:24; 62:20; 73:10; 83:19; 117:5
**breaks** 223:6, 9, 11, 18
**breakup** 51:6; 52:13
**Brett** 200:17, 20, 25; 201:3, 8, 16, 22, 24
**Brian** 100:19; 140:19; 187:11; 196:5, 23; 197:4; 200:16; 201:2, 4; 202:1, 17, 21; 203:1
**bring** 64:8, 19, 20; 147:23; 212:3
**bringing** 37:1; 64:22; 196:25
**broadcast** 192:7; 194:6
**broken** 52:18; 54:7
**brother** 31:20; 32:10; 37:16; 40:2
**brought** 3:12; 81:25; 107:10; 123:6; 134:24; 135:1; 196:22
**budget** 113:9
**building** 73:6; 207:14
**buildings** 24:19
**built** 29:2
**bunch** 46:15
**business** 20:19, 22; 22:5, 9; 24:25; 25:2, 5; 28:2; 31:15; 36:16; 52:20
**busy** 92:14
**buy** 34:20, 22

# C

**C** 89:13
**C-A-N-R-A-D** 88:19
**C-H-A-U-T-A-U-Q-U-A** 16:2
**cahoots** 217:13
**calculations** 197:13, 15
**calendar** 45:9, 10; 89:7
**call** 22:21; 51:11; 58:4, 66:14; 73:24; 78:13, 16, 79:8; 145:6; 187:25, 210:13, 24; 223:6, 8; 224:1
**called** 3:3; 30:10; 42:17, 55:22; 59:6; 61:3; 78:11; 100:10; 159:3, 188:5; 189:7; 191:19, 20, 22, 194:20; 195:6
**calling** 145:8; 210:25
**came** 21:15; 39:19; 63:10, 15; 64:4; 73:21, 83:14; 86:12; 112:14; 138:11, 12; 141:18; 142:4, 144:18; 150:14; 154:24; 164:12; 166:14; 172:8; 190:2; 198:11; 199:16; 207:12

**Campbell** 80:12; 83:9, 14
**can** 10:21; 11:12, 12:6; 15:9; 19:25; 24:11; 27:24, 30:17; 33:21; 34:10; 45:1. 47:17; 49:23; 51:12, 13: 54:5, 20; 59:21; 61:7, 64:13; 68:3, 11, 17; 71:18; 75:21, 22; 83:9; 88:10; 92:23; 93:4, 15; 98:14; 99:7; 101:6; 113:12; 128:14, 19; 132:9; 137:3, 10; 139:9, 24; 153:1, 4; 155:19; 156:20; 157:22; 170:16; 177:4, 22; 182:1; 183:4, 8; 185:21; 186:10; 188:17; 194:8, 16, 195:17, 203:21; 215:2; 219:20; 221:5, 24; 222:20; 224:4, 4, 8
**cancelled** 108:21, 24; 109:6, 9
**candid** 42:22
**candidate** 161:16, 19; 165:23; 183:5
**candidates** 156:19; 161:17, 20; 182:4
**Canrad** 88:19
**capable** 83:11, 15; 159:4; 217:1
**capacity** 13:3; 20:1; 49:14; 58:9; 85:22; 86:9
**capital** 24:13; 146:25
**captain** 9:13; 10:7, 12, 14, 15, 22; 11:16, 23; 12:13, 17, 23; 42:17; 54:7; 75:2; 102:6, 15; 104:20, 126:5; 132:22; 133:6, 7, 11; 134:16, 23; 137:4; 138:5, 24; 139:7, 141:4; 146:15; 148:18; 154:4, 9, 19; 155:15, 156:8, 16, 23; 157:18; 158:8, 9, 14, 15, 16; 159:17; 160:7. 13; 161:16, 19; 165:23; 171:9; 174:10; 194:8, 14, 22; 195:16, 18; 196:2; 197:11, 20; 198:19; 201:19; 204:3, 7; 209:11; 210:21, 22; 211:8, 19; 213:1, 4; 218:5; 219:10, 22; 220:10
**captain/check** 130:16
**captaincy** 205.10
**captained** 11:25; 12:3, 3
**Captains** 8:14; 79:5; 103:2; 115:20; 139:17; 140:2, 4; 219:25; 220:3
**car** 55:3
**carbon** 175:12
**card** 58:18, 19, 20
**cards** 57:2
**care** 14:9; 40:6; 50:5, 13, 18; 52:21; 62:7, 11; 67:3, 5, 11; 79:17, 191:16
**career** 25:25; 26:23, 32:11; 33:7; 39:13, 19
**careers** 30:24
**careful** 68:6

**Carlos** 24:6
**carrier** 23:23
**carriers** 97:21
**carryover** 80:10
**cars** 24:19, 21; 25:11
**case** 5:3; 11:7; 105:1; 187:1; 199:22, 25, 200:8, 212:25; 213:2
**cases** 186:3
**cashed** 77:18
**Catholic** 32:14, 16
**causal** 50:15
**cause** 52:13; 206:10
**caused** 52:25; 53:1; 107:11; 223:19
**cavalier** 196:2
**CCX** 37:7; 38:23, 24
**CD-Rom** 98:14
**cease** 20:22; 27:13, 56:2, 5
**ceased** 56:3; 57:9
**cell** 22:23, 24; 24:23; 25:12, 18
**cellular** 25.20
**certain** 4:22, 12:22, 33:11; 35:14; 66:6; 89:24; 108:10, 11, 23; 115:6; 151:18; 163:5; 164:24; 201:3; 208:4; 214:12
**certainly** 33:21; 38:16; 39:20, 58:15, 78:1, 179:4, 11; 207:3
**certificate** 23:23
**certificates** 166:18
**certification** 30:6, 11; 66:7; 168:20, 22; 182:16, 24; 189:6
**certifications** 189:12, 18
**certified** 19:13; 41:4; 188:20; 189:4, 10
**certify** 182:9; 186:17; 188:6
**Cessna** 11:17; 19:21
**Cessnas** 19:8, 21
**chain** 88:23, 150:24
**challenge** 29:17
**challenging** 133:22
**chance** 5:17; 213:10, 215:4, 7
**change** 29:10, 11; 30:24; 36:24; 45:15; 65:13; 79:16; 95:24, 25; 96:3; 98:9; 125:18; 128:18; 198:8, 11
**changed** 30.22; 48:18, 19; 90:4
**changes** 98:5; 128:17; 162:15; 198.10
**character** 167:21
**characteristic** 202:7
**characteristics** 69:20
**characterization** 126:18
**characterize** 33:19; 171:24; 215:18, 22, 23, 24

characterizing 87:12
charge 57:2; 148:14
charges 86:15; 148:2; 207:6
Charles 48:22
charter 16:16; 39:16, 21, 22, 23; 41:9
charters 41:23
charts 106:3; 140:9
chastised 126:16, 18
Chautauqua 15:25
check 5:12; 14:23; 48:9, 10, 10; 80:1; 81:19; 99:18, 22; 101:10, 11; 104:18. 20, 22; 105:16, 22; 140:20; 159:24; 210:14, 212:4, 8, 13, 21, 25; 213:2
checked 6:24; 81:14; 90:2
checking 6:21
checks 77:17
checkup 50:6
Chick 66:13; 68:25
chided 196:23, 25
Chief 32:5; 35:13; 36:11; 88:21; 106:25; 127:16; 191:8; 193.16
child 31:9
Chinooks 31:24, 25
chit-chat 167:2
choice 113:11
choices 72:5, 6; 144:1
choose 112:11; 113:11
chose 4:21; 7:5; 26:10; 142:18; 147:15; 148:5; 150.24
chosen 26:11
Christmas 44:23
church 61:1; 97:3, 7
circles 60:11
circulated 96:9
circumstance 96:1; 167:23; 194.19
circumstances 54:19; 151:1; 169:11; 170:20, 21, 22; 201:5; 205:3; 206:22; 212:11
circumstantial 135.25
City 158:5
claim 52:19, 23; 147:6, 24
claiming 53:11, 14, 54:2
claims 13:22; 14:2, 8
class 19:6; 26:6, 9; 84:25; 87:17; 108:20; 110:20, 23; 111:4, 13, 16, 19; 125:6, 8; 139:13; 161:3; 163:9, 15; 166:14, 16; 205:23; 206:12; 207:4; 208.24; 209:5
classes 209:2
classroom 103:4
clear 7:8; 16:17; 53:4. 65:24; 67:1; 117:9; 118:3; 141:22; 145:14; 174:25;

178:12; 192:12
clearance 139:1, 16; 158:11
clearances 140.5
clerk 33:22
client 5:17; 52:24; 75:3; 77:7
Cline 61:13; 130:14; 131:1, 18; 132:22; 133:6, 7, 11; 137:24; 138:5, 22, 24; 139:7, 18; 140:7
Cline's 140:3
close 39:25
closely 192:20
Club 17:19; 21:17, 25; 23:8
co-workers 72:21
cockpit 60:3; 61:7; 87:20; 106:4; 134:10; 135:14, 17; 137:2; 159:3; 199:2
cold 50:5
colleagues 129:24
college 29:22, 24; 30:1, 2; 32:18, 21, 22; 38:11; 40:19
colon 50:9
Colonel 20:11; 21:7, 8
columns 82:12, 16
Com 27:20
combatant 127:19, 20
coming 53:5, 114:20; 150:8; 153:5, 209:1; 220.9
command 88:23; 150.24
commensurate 184:20
comment 128:18; 131:14; 133:9, 24, 140:12; 143:22, 151:15
comments 213:25
commercial 15:12, 19.12; 20:1, 32:12
commitments 116.13
common 19:19; 116:14; 140:7; 184.6
communicate 73:16
Communications 27:9, 10, 22
companies 16:20; 17:8, 10; 18:2; 22:12; 28:2, 29:2, 16; 75:4; 77:6, 7
company 14:3, 9; 21:24; 23:21; 28:5; 29:11; 34:19; 35:8, 20, 23: 36:13, 23: 37:4, 5, 6; 42:17; 44:21; 70:10; 76:22, 24; 77:16, 17; 81:13, 19; 82:5. 4; 100:13; 115:22; 120.2; 141:12; 142:4; 143:21; 147:10, 15; 148.21; 149:22; 150:5, 8; 151:8, 14; 152:17, 23; 153:13; 156:17, 17, 159:13, 25; 186:19; 189 7; 191:7; 207:18
comparable 16:15; 45:12

comparing 128:10
compensation 10:6; 17:12; 18:21; 21:19; 22.1; 42:2; 43:9; 48:7; 75:10, 76:14; 79:3
compensatory 51:11
competence 68:1 .
competently 179:12
complained 72:22; 73:4; 74:9
complaint 51:9, 9; 115:15; 123:6, 8, 9, 11; 218:19
complaints 83:7: 154:2
complete 5:20, 25, 6:4, 8; 7:1; 95:19, 23; 114:11; 199:6, 15; 208:18: 212:10; 215:10; 218:24
completed 161:12; 168:18; 169:23; 182.10
completely 42:22
completing 200:14
completion 37:24; 103:15; 168:23; 209:13; 219:9
complex 54:4
compliance 36:1; 117:16; 118:7; 140:14
complied 223:23
component 13:13; 44:4; 104:17, 17; 179:6
components 53:13
compressed 92:14
comprised 216:15, 16
computer 24:22, 64:8, 11; 87:17; 91:21; 150:15; 151:24; 152:13
computers 24:20
concentrating 3.25
concern 113:2, 6, 137:12; 150:2, 193:18, 21; 199:1; 206:10; 211:3
concerned 72:1; 140:11; 188:19; 193:12; 216:3
conclude 72:12; 142:24; 204:25
concludes 222:8
conclusion 112:15
condition 206:16
conditioning 98:24
conditions 83:1; 194:4; 195:24; 197:8; 198:22; 200.1; 202:4; 206:19
conduct 85:15; 86:2; 102:11; 159:23; 194:1, 2
conducted 159:21, 24; 182:10
conducting 167:5; 175:16
Conesa 63:4, 19, 23; 65:10; 68:1, 6, 15, 24; 69:8; 70:5, 9, 13, 20, 71:2, 8, 16, 20
conference 211.25
confess 71:2

confirmed 131:7; 191:10
conflict 79:10
confronted 213:11, 13
confronting 213:9
confused 205:2
conjunction 12:15; 16:4; 25:16; 50:11, 23; 85:7. 95:1; 97:6; 149:13; 150:1
Conrad 88:19
consequence 71:24; 161:11, 12
consequences 54:13
conservative 202:24
consider 7:9; 87:6; 97:1; 148:20
considerably 46:19
consideration 36:8; 151:4
considered 46:16; 69:19; 93:22; 98:3
Considering 127:23
consist 97:15; 101:3
consisted 97:17
consistent 140:14; 171:12
conspiracy 216:10
constant 209:15
constraints 113:9
constructive 87:8, 13; 126:23
construed 48:11, 96:23
consulted 58:17
consulting 74:20
contact 63:1; 209:15
contacted 35:12, 191:5, 212:4
contained 140:15, 157:15
contaminated 193:4
contemplated 190:7
contend 119:10; 121:20; 122:18
contended 126:4
contending 123:12, 155:24; 218:1, 20, 25
content 66:10, 87:12, 162:16; 163:19
contention 54:6, 9; 109:6; 220:13
contest 3.22
context 59:25; 68:5; 126:9, 10; 149:15
contingent 84:12
continuation 209:11; 222:16
continue 7:22; 113:14; 134:21; 146:16, 163:12; 170:16; 184:17; 221:16; 222:11, 13, 24
continued 58:8; 155.2; 184:24, 190:2; 206:17
continuing 23:5; 188:10
Continuously 154:23

contract 77:8, 10, 11; 78:6; 124:24; 148:5; 206:16, 20; 207:22; 208:12
contracted 77:2
contractor 75:1, 6, 11, 76:1; 80:13
contracts 77:19
contribute 55:24; 57:6; 101:16
contributed 56:16
contribution 93:15
contributions 56:11
controls 98:25; 175:23; 176:8, 14; 194:11
conversation 67:20; 68:3, 13; 70:24; 71:1; 131:15, 22; 145:23, 148:18; 176:18; 201:4; 214:1
conversational 68:17
conversations 67:22; 87:8; 92:5, 209:10; 210:8
Cook 101:13, 14; 107:3, 19; 109:2. 13, 17, 20; 111:21; 114:8; 118:16; 125:14, 128:4; 141:6, 19; 144:18; 148:19; 149:21; 158:4; 159:21; 204:21, 205:1; 208:10, 19; 213:23; 215 19, 25, 216:2; 217:5, 15
copied 88:4; 130.8
copies 152:1, 8, 10, 16; 155:10, 11
copy 97:22, 24, 98:1, 7, 103.22, 25; 150.17; 172:18; 175:13
Cordial 74:15
corporate 30:22; 86.7
corporation 23:11, 14; 77:1
corporations 25.11
corrected 45:7; 137:22; 138:7, 15
correctly 170:7; 197:9
correctness 171:16
correlation 82:2
correspond 219:18
corresponded 184:20; 199:4
correspondence 6.24, 92:5; 126:15, 20, 149:20; 210:9, 213:14
corresponding 89:14; 91:24; 150:15
couldn't 61.16; 77:21, 78:18; 108.23; 148:2; 177:22; 192:12; 197:9, 14, 200:11; 205:19; 220:25
counsel 3:9; 150:25
counseling 25:25; 26.23; 39:13; 40:8; 50:25
counselling 39:20
count 115:11

Major v.
American International...

:-0607...dwkz Document 112    Entered on FLSD Docke...03.../...01/2001  Pa...

Patrick Scott Major
...3/...3/2001

**couple** 31:1; 57:21; 87:18; 108:19; 151:9

**course** 10:2, 23; 43:14; 46:17; 65:6; 87:23; 92:21; 163:6; 210:23

**court** 3:21; 7:20, 22; 132:9; 145:3, 10, 222:11

**courtesy** 6:2, 16

**cover** 102:19

**coverage** 14:9

**covered** 13:15, 18; 29:6; 38:16; 102:13; 191:24; 215:5, 6

**covers** 106:5; 123:10; 186:16

**cowboys** 202:23

**CPT** 11:5

**craft** 93:24

**create** 32:6

**created** 64:6; 66:14; 87:17

**creating** 157:9

**creation** 87:21

**creatively** 46:11

**credentials** 166:17

**credibility** 45:2; 73:6; 174:14

**credit** 55:6; 56.20, 22

**credited** 59:14

**crew** 58:6; 59:13, 18; 87:20; 101:24; 102:3, 8, 15; 103:13; 104:6, 9, 14; 105:12; 115:5, 14, 25; 119:22, 25; 133:21; 134:8, 137:9; 138:16

**crew/pilot** 47:3

**crews** 110:8

**criteria** 156:7, 9

**critical** 134:3

**criticism** 87:9, 13

**critique** 71:18, 158:8; 159:1

**crucial** 159:2

**culture** 30:22

**curious** 60:23

**current** 8:11, 20, 40:7; 58:16, 64:14; 86:19; 98:5, 197:8; 220:8; 224:22

**currently** 8:3, 7; 18:11, 51:2; 224:20

**CURT** 88:17

**custody** 58:1, 2

**customarily** 45:4; 182:16

**customary** 46:23

**cut** 139:24

**cutoff** 222:21

---

# D

**D-R-A-I-N-A** 88:11

**dad** 37:14

**daily** 65:5; 90:19; 161:8

---

**damages** 51:12; 52:24

**damn** 127:25

**damned** 128:12

**Dan** 80:12; 83:9, 14

**dance** 52:22

**data** 37:4

**date** 18:2; 108:23; 120:19, 25; 130:12; 146:3, 3, 6; 150:15, 16, 151:7, 20, 152:2, 14, 15; 170:13; 173:22; 174:2, 7, 20, 24

**dated** 63:4; 80:12; 81:11; 118:13, 14, 17; 119:1; 150:11

**dates** 151:21

**dating** 109:17

**daughter** 57:17, 20: 220:20; 222:3; 223:4

**Dave** 141:3, 21; 142:16; 148:19; 149:21, 153:3, 22, 155:25; 224:5

**Dave's** 146:13

**David** 155:22

**day** 41:9; 44:23; 46:25; 60:1; 73:8; 79:17; 89:11, 12; 91:12; 97:3; 108:21; 119:24; 133:1; 146:21, 22; 163:22; 165:20; 173:24, 174:16; 183:12; 185:6, 9; 206:9; 207:4; 208:12; 212:4; 213:16; 224:9

**day-to-day** 82:4; 186:5

**days** 9:20; 14:14, 14; 45:19, 46.14, 15, 15, 18, 21, 25; 57:21; 80:15, 89:22; 146:23; 174:8

**DC-8** 67:2

**deal** 52:2; 83:12, 16; 96:10; 110:21; 134:19; 138:12

**debate** 221:6

**December** 11:11, 13, 14, 15; 12:1, 17; 41:16, 16, 54:12; 80:25; 81:1; 149:24; 150:6, 20; 151:6, 7; 154:14

**deceptive** 209:18; 210:10

**decide** 29:12; 56.11; 92:12; 134:19; 194:7

**decided** 12:11

**decision** 33:10; 37:20; 39:1; 41:17; 48:14; 111:6; 115:13; 141:3; 143:15; 144:16

**decision-making** 134:17

**decisions** 40:3

**decline** 26:13, 33:5; 42:14, 19; 209:20

**declined** 16:12; 26:25, 32:23; 67:24; 109:25, 110:2; 121:13, 202:11, 12; 216:24

**decrement** 191:17; ' 198:14; 199:19, 202:4

**dedicated** 216:7

---

**deductible** 13:20, 21

**Defendant** 3:3; 62:22; 86:5; 145:10, 11

**Defendant's** 4:11; 49:22; 112:22, 114:1; 117:3; 118:24; 127:1; 130:6; 145:3, 6, 12, 16; 149:3, 172:12; 215:1

**defined** 99:5

**definitely** 222:22; 223:2

**definition** 96:10

**definitively** 136:25

**defunct** 24:3

**degradation** 200:8; 201:1

**degree** 29:22, 24; 30:1; 36:16

**degrees** 198:21

**delayed** 188:1

**delaying** 200:4

**deliberative** 68:7

**delineated** 199:8

**delivered** 5:20; 96:5; 199:5

**delivery** 4:10; 6:19

**Delta** 169:12, 17; 178:12, 13

**Delta's** 171:11, 12

**deluged** 188:17

**demanding** 158:6

**demeaning** 129:23

**demeanor** 72:5; 209:5

**demonstrated** 103:15; 140:13

**denied** 13:23; 14:3; 44:17, 22, 24

**denigrate** 127:9; 128:13

**Dennis** 28:14, 35:1, 2

**denominator** 184:7

**dental** 13:9; 44:5

**deny** 133:12

**department** 6:3; 78:11, 13; 118:2; 185:13; 186:19; 189:16, 214:11; 217:9

**departure** 33:19; 115:2

**depending** 159:25

**depo** 5:5; 221:3; 223:22, 22

**deponent** 7:6

**deposed** 52:3

**deposit** 14:24

**deposition** 4:20, 22; 6:19; 7:2, 4, 23; 119:24; 222:8, 24; 223.10, 13, 17; 224:16, 25

**depositions** 3:8

**deprive** 217:13

**depth** 44:12

**deride** 127:9; 128:13

**derived** 190:16, 23, 24

**derogatory** 213:3

**Derry** 191:8; 202:20, 22, 25; 204:24

---

**descending** 158:6

**describe** 51:23; 54:21, 23; 129:21; 158:4, 180:5; 187:18; 208:13

**described** 34:10; 48:3; 60:11; 97:20; 100:3; 114:14, 24; 125:24; 129:20; 136:20, 138:10, 144:20; 146:6; 158:25, 159:1; 163:20; 170:8; 171:6, 19; 178:11; 179:7; 184:5; 188:17; 195:2; 197:10; 199:16; 206:22

**describing** 140:9; 190:3

**description** 133:9

**designated** 111:16

**designation** 30:13; 103:16

**desirable** 95:24

**desire** 30:24; 52:17

**desk** 33:22; 64:5, 5, 9

**Despite** 115:11; 193:7

**despotic** 128:1, 12

**detail** 92:5

**detailed** 114:16

**details** 174:6

**determination** 201:20

**determine** 202:25

**determined** 134:19; 194:3; 195:8

**determining** 122:1, 17

**develop** 34:13, 15, 43:14

**developed** 41:3, 128:15

**developing** 106:17

**development** 35:7, 36:24

**devices** 172:7

**DHR** 36:22

**Dickinson** 211:15; 216.1

**dictate** 91:20

**die** 32:7

**differ** 162:5

**difference** 45:22; 85:24

**differences** 126:1

**different** 10:17; 30:19; 60:17; 99:1, 2; 101:25; 102:16, 121:15; 126:22, 140:18; 151:20; 186:9; 193:8; 205:18; 213:25

**differentiated** 101:10

**differently** 137:20

**difficult** 193:3

**difficulty** 189:9

**diminish** 184:6

**DIRECT** 3:5; 48:7, 62:18; 71:24; 88:12; 139:1, 11, 140:5, 9, 17; 144:15; 149:5; 158:11; 175:6; 187:5

**directed** 201:18

**directing** 187:7

**direction** 29:11; 81:5; 188:15; 198:21

**directly** 37:3; 47:20;

---

88:22; 115:20; 195:14; 201:24; 202:1; 213:9

**director** 6:4; 27:6; 29:16; 35:16; 37:11; 193:17

**directors** 85:17

**disagree** 221:13

**disagreed** 65:20

**disappointments** 53:24

**discharged** 156:21; 221:11

**disclosed** 96:21

**discomfort** 71:2

**discontinuance** 215:3

**discontinuation** 180:22; 181:9, 17; 185:10

**discontinue** 170:14, 17

**discontinued** 110:21; 169:2, 25; 170:4; 172:2; 174:17; 180:9; 181:22; 183:22; 184:10; 205:5; 214:3, 6; 219:12

**discontinuing** 168:9; 169:6

**discount** 14:18

**Discovery** 222:21

**discriminate** 117:21, 22, 24

**discriminated** 141:13, 17

**discrimination** 123:18; 124:9, 13; 141:9; 142:15, 147:6; 148:15, 23; 154:3; 220:13

**discuss** 20:25, 59:17, 21; 60:1; 61.12, 15; 122:16, 137:15, 141.12, 12; 144:19; 179:11, 188:7; 200:15; 208:20, 222:14; 224:2

**discussed** 21:2; 40:11, 18; 60:4, 7; 61:17, 20; 65:7, 9, 66:3; 84:15, 118:18; 121:13; 135:5, 22; 150:3; 153:9; 180:16; 193:16, 19

**discussing** 65:16, 67:17; 135:21; 139:7, 14, 20, 140:1; 210:6

**discussion** 16:8, 34:11; 64:3; 65:2, 22; 66:21; 67:10, 68:24; 89:16, 16; 107:20, 22; 108:1, 7; 109:12, 17, 19, 112:6, 7; 113:19, 21; 117:7, 128:10; 132:19; 133:15; 134:2; 135:23; 137:1, 24; 138:5, 16, 25; 140:18, 141:18; 148:12; 153:20, 154:23, 164:21; 172.13; 177:5, 181:6; 190:8, 193:1; 196:14; 199:12, 18, 200:21; 209:1, 4; 221:15

**discussions** 15:22, 71:15, 84:10; 86:22; 87:22; 114:7, 10, 13; 128:4; 130:24; 133:14; 137:19; 138:11, 196:1

disenchanted 48:17; 49:1
disks 90:24
dismantled 110:17
dispatch 191:6, 19, 22
display 58:22
dispute 156:2
disqualified 219:12
disruption 185:7
dissatisfied 81:16, 22; 82:7, 13, 15, 15, 20, 22, 25
distinct 115:1
distinction 60:20
distinguish 125.25
distinguishing 26:7
distress 53:2, 12, 13; 62:15
District 173.16
division 10:20; 12:10
divorce 51:4; 73:13; 84:24
divorced 51:2
doctor 52:7
doctors 50:4
document 49:21; 112:21; 113:25; 117:2; 118:23; 119:13; 124:14; 126:25; 130:5; 131:11, 11, 25; 132:7, 9, 15, 133:17; 136:12; 138:2, 19, 145:15, 25; 149:2; 152:12; 153:12, 12, 13, 17; 164:22; 172:11; 175:11, 12; 176:5, 22, 22; 178:12; 179:23; 180:11, 22; 181:17, 22; 182:7, 8, 9, 11; 183:13, 19, 23; 184:12; 185:17; 197:16; 214:13, 15, 25; 216:18; 217:7
documentation 66:5, 88.5; 133:4; 147:5; 160:20; 214:23, 215:10
documented 92:16
documents 4:14, 18, 21; 5:15, 19; 8:1; 95:6, 97:2; 169:3; 190:17, 18; 193:11; 196:19
Dolphin 16:21, 22; 17:18, 21:17, 25; 23:8; 41:9; 98:7; 154:25
done 5:4, 12; 10:1, 3; 11:17; 66:9, 15; 67:6; 89:17, 24; 90:13, 14, 15, 91:9; 95:18; 103:7; 108:14; 115:19; 189.6; 198:4; 200:11; 221:21
door 135:17, 19
doors 136:4
doubt 69:12; 167:19, 20
doubting 173:5
down 82:17; 92:1; 94:8; 113:11; 143:10; 208:15; 211:15
downpour 188:18
downstairs 208:11

draconian 128:17
drafted 51:10; 138:20
drafts 152:10
drag 208:17
Draina 88:9
dramatically 52:13, 14; 53:1, 9
draw 49:19; 140:8; 203:11
drawing 157:13
dream 60:16, 17, 18, 18; 62:1
dreams 60:19
drive 90:2, 91:22
drug 39:7
dry 190:4; 193:7, 12; 200:6; 202:3
due 51:12; 179:16
duly 3:4
duplicitous 210:10
During 14:4; 28:1; 29:9; 45:10; 46:7; 57:18; 73:8; 76:18; 78:19; 89:8; 104:7; 105:19; 133:23; 134:3; 137:16; 157:8; 160:6; 163:15; 175:8, 21; 200:20; 210:13, 23; 216:1, 21
duties 9:14; 10:9, 24; 11:2; 12:11; 43:13; 49:13; 58:6; 97:18; 113:8; 135:11
duty 47:15; 48:8, 224:1
dynamic 54:4

# E

E-D 157:25
E-mail 73:20, 74:1
E-mails 73:8, 14
each 89:11, 24, 102:7; 114:25, 133:22; 166:3; 193:20, 20; 218:5
earlier 41:25; 62:5; 63:1, 92:22; 107:8, 9; 115:4; 116:9; 146:6; 147:8; 152:2, 4, 10, 10, 16
early 133:2, 3; 142:10; 210:22
earn 45:6, 8
earned 44:6; 47:25
ears 198:7
Eckerd 30:2
economic 56:7
Ed 101:13, 14; 107:3, 19; 109:2, 13, 17, 20; 111:21; 118:16; 125:7, 14; 128:4; 141:6, 19; 144:18; 146:9, 12; 148:18; 149:20, 150:23; 154:24; 158:4, 12, 25; 159:1, 21; 161:19; 163:6; 204:21; 205:1; 208.10, 19; 209:16; 213:22; 215:19, 25; 216:1; 217:5, 15
Edalatti 157:21; 158:9, 13

edge 172:7
educate 96:4
educated 29:20
education 40:11, 15
educational 96:2
educators 40:4, 5
EEO 117:12, 17, 19
EEOC 86:15; 148:14
effect 54:25; 67:15; 69:10; 115:7, 183:2; 212.7
effective 66:16
effectively 59:12; 138:13
effort 95:14
efforts 138:23; 205:3, 210:20
eight 3:9; 89:23; 90:6; 104:11, 15; 105:5; 146:22; 149:4; 188:1
either 7:20; 10:23, 17:15; 20:1; 25:1; 37:20; 40.5, 44:8, 21; 45:3, 48:9; 51:18; 87:5; 92:13; 94:24; 95:17; 97:6; 98:13; 122:8, 11; 126:21; 135:12; 145:6; 189:22; 208:11, 23; 218:22
either/or 181:14
elected 203:9
electrical 98:23
electronic 139:10
eligible 13:10
Elijah 212.20
eliminated 91:12
else 14:7, 16; 21:10: 32:9; 34:14, 42:18, 46:3; 55:7; 61:15; 68:14; 71:7, 78:19; 94:9; 100:20, 20; 107:25, 109:3; 118:4, 121:4, 20; 125:5; 144:15; 146:10, 11, 153:3; 156:12, 157:16, 159:14, 161:15; 164:16; 187:22; 188:9; 199:25; 203:18, 206:7, 208:20; 211:2; 212:6, 219:19; 220:9, 12
elsewhere 15:5
embarrass 3:15, 39.6
embarrassment 51:12, 24
embellished 67.24
embroiled 216:6
emotional 53:1, 12, 13; 62:15
emphasis 164:21
employed 8:7, 9; 11:20; 16:19; 54:8; 55:19; 76:4, 13, 22; 78:19; 91:3, 121:8, 9; 205:17
employee 12:24; 13:1; 21:22; 27:5; 41:12; 45:25; 47:6, 64:18; 75:1. 98 2, 216.8
employees 45:4; 69:17. 115:8, 9; 116:13, 15; 204:1
employer 12:5; 64:20,

22; 86:16, 20; 117:23
employment 12:8, 16; 14:4; 15:5, 20; 16:14, 15; 17:24; 26:10, 14, 16; 29:1, 3, 9; 38:14; 40:18; 41:8, 21; 42:24, 43:1, 5; 45:7, 9, 46:10; 51:25; 52:11; 58:8; 75:15; 82:11, 12; 115:12; 118:8; 120:1, 19; 121.2; 129:14; 130:19, 142.12
empowering 157:9
enacting 128:7, 9
encompass 19:15
encompassed 122:13; 123:11
end 95:20; 96:25; 185:2
ended 37:17, 38:18; 203:10
ending 65:14
endurance 3:22
energy 59:7, 8
enforcement 116:9
engage 213:23
engaging 29:17
engineer 43:15, 18, 19, 20; 75:3; 97:12; 98:16; 99:12; 100:8, 11, 12, 101:14; 102:7, 18; 107 13, 14; 111:17; 112:5; 123:21, 24, 25; 133:7; 134:8; 135:11; 178:3
Engineering 189:8. 193:11
engineers 77:5; 79:6; 97:19; 102:16, 17; 103:2, 123:22
English 205 20
enjoy 95:5, 12, 13, 13
enjoyed 128:3
enjoyment 94 9; 95:7
enjoys 93:24
enrolled 206:11
enrollment 200:24; 206:17
entailed 199:19
enter 89:15
entered 193:1
Enterprises 16:21
entire 35:8; 40:11; 62:24; 149:6, 8
entirely 179:9, 213.25
entitled 34:2; 45:3; 220:8
entry 90:11, 12; 91:10, 24
enumerate 54:18
environment 60:24; 157:10; 159:3
epaulettes 165:21
equal 118:8
equip 26:10
equipment 13:2, 24:19; 139:10
equity 144:9
error 151:2
escaped 22:10

escapes 161:21
essential 98:4
established 57:13
estimate 78:18
estranged 73:17
etc 51:12; 147.6
ethical 170:20
evaluated 184:13
evaluating 54.20
evaluation 212:13
evaluations 88:4
even 3:16; 5:10, 10; 78:18; 79:7; 81:8; 84:20; 90:20; 92:5, 132:8; 140:5, 142:11; 156:8, 9; 181:3; 188:9; 190:12, 12; 200:13; 219:4
event 158:19; 174.9
events 136:16, 20
every 46:25; 89:25; 98:9; 155.7; 198:9
everybody 71:16; 207:20; 215:4
everyone 153:5, 6
everyone's 211:16
everything 5:23; 6:11; 60:24, 90:1, 17; 91.8; 92:2, 8; 93:4; 100:3; 167:7
evidence 174:12
evolved 30:21
ex-wife 58:22; 59:3
exact 189:1; 219:24, 224.15
exactly 46:1; 53:15, 89:15; 131:13; 133 16; 151:11; 164:1; 177:17; 196:24, 203:16; 213:11
exam 99:22, 23; 100:2, 6, 164:5. 167:6; 168.24; 170:19, 23; 171:23, 175:1; 182:19; 183:7; 184:11; 185:20, 22; 186:15, 17; 214:6, 19; 215:8; 216:19, 21, 219:1
EXAMINATION 3:5
examined 3:4
examiner 163:23; 164:11; 165:2; 216:19
example 19:16; 26:18. 48:3; 195:20, 196:15
excellent 196:15
except 39:19
Exchange 18:7; 24:10; 71.21; 133:21; 148.5, 171:25
excluding 40:19; 84:24; 96:17, 17; 97:8
Exclusive 18:8
excuse 8:10; 41.16; 48:4; 49:23; 52:8, 56:15; 59:2, 70:1; 78:5; 79:18; 101:22; 104:19; 138:1; 148:18; 151:2; 198:7
excused 212:1
executive 35:13; 36:12,

128:5
**exemplary** 156:3
**exhaustive** 89:24; 90:9,
165:1; 218:6, 12
**Exhibit** 49:22; 62:20;
112:20, 22; 113:24, 114:1,
18; 117:1, 3; 118:10, 13,
24; 126:24, 127:1, 3, 5;
130:3. 6; 144:23; 145 3, 9,
12, 16; 149:1, 3; 152:9, 10,
11; 153:14; 157:3, 4, 15;
172:10, 12, 15, 215:1, 14;
217:3, 4
**exhibits** 145:6
**exist** 27:12, 13; 90:20;
122:20; 179:1; 193:24
**existed** 130:10; 190:13;
216:20
**existing** 115:14, 25;
116:13
**exists** 152:12, 13; 212:11
**exit** 81:2; 142:17; 144:21;
146:20, 21; 147:8, 10, 22
**expansive** 95:5
**expect** 118:5; 212:12, 18
**expected** 43:13; 46:22,
24; 47:2
**expecting** 144:19
**expense** 24:13; 47:15;
48:10, 64:23; 208:15;
220:11
**expenses** 13:14; 24:25;
25:2, 6; 110:3
**experience** 20:8; 60:3,
15; 61:13, 24; 82:8, 20,
100:10; 115:13, 21,
200:22
**experiences** 59:15, 17,
20, 21; 60:6, 9, 12; 61:4
**experts** 47:19
**explain** 51:19; 53:7;
59:12; 80:9; 83:8; 217:6
**explained** 136:7, 151:20
**explaining** 137:22; 138.7
**explanation** 7:17;
114:24; 186:13
**expletive** 202:15
**explicit** 114:22
**Express** 77:6; 114:18
**expressed** 113:2, 6;
**extent** 14:23; 26:11;
194:3
**extra** 10:6; 197:19
**extremely** 29:20; 129:10,
18; 213:17

**F**

**F-R-E-D** 157:23
**F-S-D-O** 173:15
**FAA** 98:15; 99:25; 100:1,
140:6; 163:4, 22; 164:11;
168:24; 169:2, 23; 170:4;
172 18; 173:11, 23, 24;
174:17; 181:22; 182:5;

183:7, 13, 22; 184:10;
185:10; 189:13, 19;
190:11, 12, 18, 20; 205:5;
214:2, 6, 11, 19; 216:6, 9,
16, 219:12
**faced** 197:11
**facility** 49:15; 105:23
**facing** 214:11
**fact** 22:9; 35:10; 60:12,
79:23; 89:17; 90:16;
108:1; 111:21; 113:16,
114:19; 117:15, 124:9;
125:7; 133:5, 136:13;
138:6, 22, 141:13; 145:19;
149:20; 151:13; 153:23;
154:3, 8, 24; 155:6;
171:11; 172:24; 178:21;
185:3; 186:23; 189:1, 9;
190:6; 191:3; 193:5;
196:20; 204:14; 210:6, 21;
213:24; 215:18; 218:2
**factor** 123:6, 8; 174:13
**facts** 174:12; 184:4, 5
**failed** 219:16
**failure** 37:20; 148:15;
185:13; 187:2; 207:5;
219:14
**fair** 42:7; 58:21; 143:25;
164:14; 212:12; 213:18;
223:16
**fairness** 144:8
**faith** 142:1
**Falcon** 109:23; 110:16;
114:20, 23; 115:5; 121:5,
7, 8, 9, 11, 15, 16
**fall** 19:19; 109:13, 15, 17;
155:5
**familiar** 117:12, 131:12;
158:5
**familiarity** 128:15
**familiarize** 127:10;
149:14
**family** 32:9; 42:23; 50:23,
25; 52:12
**FAR** 23:22; 53:20; 60:6;
66:7; 69:12; 116:20;
149:12; 151:20; 160:3;
161:10; 165:13; 188:11;
192:10; 193:11, 19;
217:10
**farm** 38:5, 7, 16; 40:19
**FARs** 97:22; 98:8, 10;
164:23, 25
**fascination** 31:8
**fashion** 175:11
**fast** 73:14; 106:18; 142:5
**father** 31.10, 18; 32:7, 10;
37:13
**favor** 7:21; 168:13; 212:9,
22
**fax** 173:8
**faxed** 207:9
**February** 42:12, 13, 43:3;
75:9, 12, 13; 141:2;
145:21, 24; 146:2, 19;
148:13, 19; 150:12; 151:6,

9, 14; 152:17, 23; 153:13;
154:12, 13, 16; 204:5
**Federal** 23:22; 97:20:
195:4
**fee** 78:8
**feedback** 87:25
**feel** 44:11; 196.16
**feeling** 95:15
**feelings** 131:5
**fees** 84:5
**fellow** 48:22
**felt** 36:18; 37:24; 92 16;
142:9, 10; 193:2
**Fernando** 205:22; 206:7
**few** 50:3; 80:11; 94:22,
138:11; 163:17; 221:4
**fiction** 94:15
**fide** 143:24
**field** 26:10, 11; 47:19;
178:16, 188:16; 194:4, 20
**fierce** 216:3
**fifth** 112:23; 113:3
**figure** 48:10; 154:11
**figured** 52:11
**file** 5:21; 7:9, 12, 15;
62:24; 88:2; 130:10; 148:1
**filed** 86:15; 148.14
**files** 90:4; 168:18
**fill** 81:9; 179:20; 192:21
**filled** 124:23; 188:2
**final** 51:4, 152:16,
158:19, 199:7; 201:19
**finally** 107:12; 138:12;
198:11
**financial** 16:6, 10; 35:19,
22; 36:13, 20; 38:4, 13, 15;
54:13; 57:12; 84:8
**find** 3:13, 24; 6:22; 12:10;
14:7; 30:14, 19, 22; 42:24;
72:15; 93:19; 133:5;
157:11; 160:20; 191:20
**finding** 168:17
**fine** 7:12, 25; 54:22;
113:4; 117:6; 124:19;
186:13; 207:24; 208:8;
211:6; 217:2, 224:6, 13, 24
**finish** 64:1; 162:24;
163:6; 186:10; 201:13;
224:5
**finished** 99:17; 149:25;
151:19; 152:8; 163:3;
186:14; 223.21, 22
**fire** 133:25; 134.18;
136:3. 3; 137:3, 5
**fired** 33:22; 158:24;
159:7, 10
**First** 4:12; 7:10; 8:14;
38:11; 41:3; 42:20, 45:9,
11, 13; 46:7; 59:23; 62:19;
75 2; 77:6; 81:24, 98:10,
10; 102:6, 15; 103:2;
104:23; 105:2, 8, 12,
107:4, 13, 16; 108:18, 20,
109:19; 111:14, 17, 23;
112:5; 113:1, 10; 114:9,

119:4, 10, 124:8, 10, 21;
125:2; 126:4; 127:3;
131:18; 135:4; 136:5;
137:2; 146:16, 150:21;
156:9, 22; 157:11, 12, 17;
161:17, 20; 162:7, 8, 12,
163:12; 166:1, 5; 175:6;
178:3; 188:4; 199:11;
203:3; 205:12, 18, 207:4
**fit** 82:6; 129:19
**five** 20:24; 38:1; 46:25;
127:6; 128:16; 142:7;
188:13; 201:11; 221:7;
223:4, 9, 13; 224:18
**five-day** 46:23
**Fixed** 19:3, 4, 5, 5, 7
**flap** 188:22
**flew** 31:22, 24, 25; 47:14
**flight** 11:17; 19:13, 13,
14; 21:15; 43:15, 16, 18,
20; 46:2, 62:19; 66:6;
68:10; 75:2; 76:22; 77:5, 5;
79:6; 97:12, 18; 98:16, 25;
99:11; 100:8, 11, 12;
101:14; 102:6, 16, 17, 18;
103:2; 104:4; 107:12, 14;
110:8; 111:16; 112:5;
113:7; 115:5, 14, 25;
119:22, 25; 123:21, 22, 24,
24; 128:19, 22; 133:7, 21;
134:7, 21, 135:11; 137:16;
149:13; 150:2; 159:2;
160:9; 165:19, 173:15;
175:23; 176 8, 13; 178:3;
179:2, 2, 3, 4, 8; 183:12;
187:19; 188:1; 190:5;
194:1; 216:7; 218:3
**flooded** 191:15
**floppy** 90:24
**Florida** 37:16; 39:25;
43:1
**flown** 10:25, 11:14, 15;
12:17; 25:15; 32:10;
80:25; 123:21; 204:6
**flunk** 158:21
**fly** 12:23; 13:2; 19:1, 2;
31:1, 22; 80:24; 113:15,
203:12, 22; 204:14
**flying** 10:13, 15; 11:4. 6;
17:18; 18:19, 23; 21:17,
25; 22:11; 23:8; 31:2, 3;
59:25; 73.25, 74:3, 4; 79:6;
100:7; 112:11; 131:2;
138:24; 140:17; 159:4;
187:10, 13; 202:17;
203:10; 204:19
**Flynn** 99:24
**focus** 98:20; 165:2
**focused** 43:7; 129:22
**foggy** 33:20, 34:4
**folded** 27:14
**follow** 5:1, 147:1, 2;
182:17
**follow-up** 91:16
**follows** 3:4
**Force** 21:9; 31:10; 32:1, 2
**forced** 112.10

**forces** 29:18; 32:3
**foreseeable** 146:14
**forestalled** 174:9
**forget** 57:25; 64:13
**form** 21:23; 48:9; 51:21;
81:24; 87:10; 108:5;
109:14; 124:12; 126:17;
131:9; 132:1, 138:2,
139:5; 142:6, 168:17, 21;
170:11; 171:18, 22; 176:2,
25, 178:22, 23; 179:20, 22;
180:12, 24; 182:21, 21, 22,
24; 183:6, 9, 11, 24;
184:16; 188:3; 199:9;
200:14
**Formal** 40:15
**formalized** 155:13
**format** 66:11; 68 18;
89:10; 107:18; 171:24;
182:17; 208:21
**formation** 20:3
**formatted** 65:12, 20;
66:22; 70:14
**formatting** 65:3, 11
**formed** 17:17
**forms** 96:23
**Fort** 8:6; 42:24; 173:18
**forth** 40:3; 58:5, 65:6, 15;
66:10, 11, 73:18; 166:13
**forward** 25:8
**found** 80:20; 103:17;
184:19
**founding** 17:9
**four** 20:24; 38:1; 47:21;
79:1; 82:15; 89:5; 91:22;
118:21; 142:8; 174.8;
204:17
**four-week** 47:12
**fourth** 115:10
**Fox** 146:25
**frame** 17:23; 64:21; 82:2,
109:15; 110:7; 189:21
**frank** 128:4
**Frankly** 127:4, 8
**Fred** 24:6; 157:21, 22
**free** 128:20
**Frequently** 102:12;
150:14
**Friday** 206:18; 208:11, 12
**friend** 207:10
**friends** 150:25
**front** 33:22; 114:2;
118:10, 150:19; 166:13;
172:15; 215:13, 216.4
**frustrated** 69:14. 71:21,
22; 92:17
**frustration** 64:16, 17;
70:16; 114:19
**FSDO** 173:13, 14
**FSDO-17** 173.11; 216:15
**FU** 146:25
**fuel** 98:23; 135:13
**fulfill** 118:4
**full** 4:7; 16:14; 27:5; 45:9,

74:25; 75:15; 76:4, 13;
113:13; 119:25
**fully** 10:22
**fun** 94:8
**function** 35:24; 37:1;
75:25; 118:6
**functions** 10:21; 11:21
**further** 42:21; 53:23;
108:10; 113:20, 21;
130:22, 131:5, 19; 156:14;
184:19; 186:13
**futile** 200:10
**future** 146:14
**futures** 40:3

# G

**gate** 199:3; 200:13
**gave** 6:2, 11, 18; 7:6;
20:24, 28:7; 33:23, 25;
74:23; 151:14, 19, 21,
152:17, 23; 153:12;
171:17; 206:10, 17;
214:17, 17; 215:4, 7
**geared** 12:7
**general** 57:2; 68:20, 21;
94:19; 140:16; 162:16;
167:1; 178:24
**generally** 18:1; 66:1;
67:4
**generated** 91:2
**generation** 10:2, 23; 65:6
**generous** 45:3
**geographic** 158:11
**gesture** 200:10
**gets** 91:10
**given** 6:15; 68:9; 90:1;
125:14; 151:23; 156:20;
166:19; 181:4; 189:14;
214:8, 10; 218:5; 219:2
**gives** 45:4; 173:11
**giving** 52:2; 70:2, 6; 97:3,
3; 195:13; 200:22; 206:23;
213:9
**glad** 23:5
**goes** 60:24; 96:11;
116:17; 131:20; 179:24
**GOM** 190:14
**good** 37:25, 55:6; 56:20;
60:19; 72:3, 117:4;
140:12; 146:15; 178:23
**GPS** 139:1, 16; 140:5, 10,
17
**graduate** 32:15
**granted** 147:7
**gratifying** 87:24
**great** 52:2; 60:1; 96:9;
194:3
**greater** 79:3
**grew** 31:7
**gross** 36:3; 56:18
**ground** 11:3, 5; 12:11;
45:23, 98:16, 20; 99:17;
101:4; 102:20, 23; 104:16;

105:6; 125:16, 17; 135:12,
136:3; 160:13, 22; 161:22;
163:22; 179:5, 193:14,
199:2; 207:16; 220:6
**group** 19:7; 35:11;
205:16; 218:2
**growth** 36:24
**guarantee** 47:12, 13
**guaranteeing** 116:19
**guess** 25:10; 27:22, 36:6;
55:8; 73:17; 96:23;
130:18; 196:12
**guessing** 36:5
**guilty** 195:4

# H

**habit** 91:5
**hadn't** 6:1; 199:7; 202:18;
214:20
**hairs** 53:7
**half** 89:23; 90:6; 169:16;
175:4; 223:15
**hallway** 207:13
**hand** 4:10; 5:19; 6:18;
113:12; 143:16; 156:2;
219:16
**handed** 166:18; 168:20
**handled** 83:8
**handles** 14:9
**hands** 153:2
**handwriting** 81:11
**happen** 61:23; 210:3
**happened** 48:16; 64:15,
79:12; 99:16; 132:21;
153:18; 158:23; 159:8;
161:10, 163:23, 24; 164:1,
169:24; 184:24; 196:11;
197:6; 200:15; 206:6, 14;
207:8, 11, 20; 215:3
**happens** 60:16; 110:8,
191:21; 198:5
**happy** 4:2; 178:10; 211:5
**hard** 52:1; 90:2
**harder** 58:15
**hardly** 101:23; 159:22
**harried** 166:15
**harsh** 213:18
**hasn't** 123:6
**haven't** 5:25; 45:18, 52:7;
76:6; 90:21; 93:1; 184:7;
220:14; 223:18, 19, 24
**hazard** 192:1; 193:4, 14
**Hazmat** 106:9, 9
**head** 52:22; 155:16
**heading** 139:1, 1, 15;
158:10
**headquarters** 91:23
**Health** 13:9; 40:6; 44:5,
50:5, 12, 18; 62:7, 8, 11
**hear** 54:23; 128:18
**heard** 6:1; 59:19; 155:8;
164:6, 9, 172:20

**hearing** 72:16; 158:4
**heart** 216:4
**heartfelt** 151:3
**heavily** 11:3
**heed** 150:25
**height** 33:8
**held** 8:15, 56:23; 75:6.
142:11, 22
**help** 40:1; 130:22;
131:19; 201:1
**helped** 22:11
**helpful** 138:22; 186:5
**helping** 35:12
**here's** 219:16, 17
**herself** 64:5
**hesitate** 96:24
**high** 32:13, 14; 39:16;
194:21
**himself** 208:10
**hint** 81:4
**hire** 116:4
**hired** 71:23; 77:1; 114:23;
156:17; 159:16; 160:7
**hiring** 114:19; 115:16,
18, 20; 219:25
**history** 27:24; 28:5;
40:12, 18; 86:8
**hit** 69:25
**hobby** 31:7
**Hoffman** 125:7; 161:19;
163:6
**holding** 205:1
**Holiday** 17:18, 21:17, 25;
23:8; 98:7; 154:25
**holidays** 14:15
**Hollywood** 58:21
**home** 10:3; 37:14, 55:1,
91:20, 110:3
**homestead** 37:17
**hoped** 89:12
**hoping** 128:23; 198:8
**horrible** 141:15
**hospitalized** 39:4, 7, 9
**hotel** 33:22
**hour** 47:13; 192:13;
197:1; 198:9; 223:6, 10,
13, 16; 224:7, 21, 21, 22
**Hourly** 9:8; 77:11; 78:4;
79:2; 84:14, 14
**hours** 9:10, 24; 10:3;
11:12; 12:22, 23; 20:7;
21:6; 43:22; 46:14; 47:12,
21; 60:1, 3; 78:9, 10; 79:1,
102:20; 125:17; 160:16,
161:1, 11; 162:19; 186:6,
11; 188:1; 220:21, 22,
221:1, 2; 223:9, 15
**house** 57:15, 91:21
**household** 55:25; 56:8,
12, 16; 57:13
**HR** 35:24; 38:18; 70:18,
21; 71:9, 11; 113:10;
118:2, 6; 144:6
**Huff** 60:8, 10; 61:6, 12,

62:3; 191:8; 202:21;
204:24
**Huff's** 204:3
**huge** 84:25
**human** 26:18, 27:4, 6, 6;
29:16; 30:7, 12; 35:16;
37:2, 11; 86:9, 23, 25;
87:2; 112:8, 11, 12; 113:6,
11; 116:7, 8; 117:9; 128:8;
143:20
**humiliation** 51:12, 24
**hundred** 9:12, 10:4,
198:21
**hundreds** 4:25
**hydraulic** 98:23
**hydraulics** 172:7

# I

**i.e** 25:11; 45:22; 131:5
**idea** 59:9, 11; 108:25;
124:2, 3, 9; 139:5, 9, 9,
147:16; 169:24
**identification** 49:22;
112:22; 114:1; 117:3;
118:24; 127:1; 130:6;
145:16; 149:3; 172:12;
215:1
**IEO** 158:18
**ignored** 140:10
**II** 31:16
**illustrate** 128:21
**imagine** 54:5; 73:3,
102:19
**immediate** 34:12; 127:17
**immediately** 14:17; 74:1;
156:13; 159:13; 209:19,
21; 210.1; 216:22
**immerse** 64:13
**immersed** 38:1
**impact** 51:13; 52:6, 8, 14,
19; 53:10; 56:7, 19,
128:22; 179:1
**impacted** 52:13, 25,
53:11, 22; 58:9, 13
**impediment** 138:15
**implication** 71:12
**import** 25:14
**important** 92:16; 125:25;
150:13
**impossible** 212:9
**impression** 209:25
**improper** 131:10;
136:12, 138:18, 19
**improve** 85:20; 138:16
**improved** 190.10
**improvements** 37:1
**inaccuracy** 170:5
**Inc** 17:17; 18:10, 11, 18;
21:11, 18, 25; 23:8, 16,
98:7, 7
**inch** 194:14, 16
**incident** 63:18; 133:23;
187:5; 196:1; 202:18

**inclined** 122:7
**include** 118:7, 126:1;
223:11
**included** 10 9; 35:24;
80:7; 87:23; 119:12;
125:23; 139:18; 215:25
**including** 19:12; 115:3;
215:4, 5; 224:17
**inclusive** 87:1; 155:21
**income** 16:23; 24:14, 16,
48:11; 54:11, 24; 55:24;
56:14, 19
**inconsistent** 140:4
**Incorporated** 17:17, 19,
19
**incorporating** 18:16
**incorrect** 133:19
**increase** 41:23, 24
**increased** 41:3; 57:12
**increases** 8:22, 24; 9:1
**incredulous** 61:23
**incursions** 87:19
**independent** 75:1, 5, 11,
25; 80:13; 107:21, 23;
108:6; 157:16; 173:6;
204:12, 18
**independently** 119:7;
174:16; 177:12
**Indiana** 15:23
**Indianapolis** 15:23
**indicate** 80:12; 169:11;
193:24; 194:23
**indicated** 15:14; 29:11;
32:23; 61:25; 76:9; 82:7,
25; 119:24; 148:19;
154:25; 176 18; 177:10,
178:8, 193:20, 23, 207:1;
216.19
**indicates** 130:21
**indicating** 66:17, 67:6;
131:19; 168:25; 222:11
**indication** 181:23
**indicative** 198:22
**individual** 20:2, 7; 28:3;
92:1, 156:20; 159:4; 165:2
**individual's** 85:6, 9
**individually** 85:22
**individuals** 61:19; 88:22,
105:5, 109:4; 116:1;
119:3; 121:5; 123:20;
159:16; 160:7; 161:23;
162:7; 205:17, 216:15, 16,
218:13
**indoctrination** 97:19
**industry** 26:14; 27:1
**ineffective** 81:12, 16
**influence** 33:10; 37:19
**informal** 89:7
**information** 157:14;
171:25; 186:3; 191:6, 7,
203:18
**informational** 171:25
**initial** 6:5; 100:10; 133:6;
200:22
**initially** 99:18; 101:4;

106:25; 114:22; 126:12
**initials** 173:13
**initiated** 199:12; 210:25
**innovative** 66:16
**input** 126:20
**inquiring** 216:9
**inquiry** 6:25; 16:3, 4; 181:5; 204:4; 219:1
**insight** 123:5
**insightful** 97:2
**insisted** 34:1
**insists** 70:14
**Insofar** 25:4; 29:2; 35:24; 39:15; 57:15, 17; 96:11; 114:14; 124:1; 126:1
**instance** 65:24; 91:25; 108:20; 123:17; 128:7; 195:10; 207:1
**instances** 61:22, 23; 95:24; 132:22, 24
**Instead** 5:23; 59:23; 119:4; 157:9; 195:6
**instruct** 8:13
**instructing** 11:3; 20:24
**instruction** 10:17; 11:5, 17; 12:12; 19:15; 20:3; 43:15, 76:23; 77:5; 103:8, 104:14; 125:14, 15; 163:16; 200:22
**instructions** 65:19
**instructor** 8:12; 9:14, 10:10, 14, 24; 11:1, 23; 14:22, 19:13, 13, 14; 31:15; 41:5; 45:24; 75:3; 100:13, 101:11, 15; 102:11, 14, 16, 104:15; 111:18; 125:9; 181:3, 182:18; 191:25. 205:24, 24; 206:5
**instructor's** 168:22
**instructors** 21:15, 43:17; 66:18; 72:4; 101:6; 103:7; 125:16; 205:18; 209:7
**instrument** 19:12, 13
**instruments** 98:24
**insurance** 3:9, 12, 13, 15; 14:3, 9; 25:12
**intended** 26:9; 118.3
**Intense** 129:22
**intent** 39:6; 126:23; 127:7; 217:11
**intention** 127:7
**inter-city** 85:19
**interaction** 71:24
**interest** 15:11; 18:5, 5; 61:21, 21; 93:14; 165:3
**interesting** 29:17; 219:13
**internal** 183:10
**International** 8:8; 11:21; 12:8, 13, 16, 24, 13:6, 16; 15:3, 17, 27:7; 38:17, 22; 62:19, 66:6; 68:9; 86:18, 19; 88:2, 8; 169:17
**interrogation** 175:17

**interrupted** 67:9
**interruptions** 223:20
**interview** 81:3
**intimated** 113:8
**into** 4:10; 27:14, 22; 28:11; 44:11; 48:11; 52:17, 18; 64:19; 96:8; 98:18; 114:20, 23; 115:20; 121:8, 9; 128:8; 130:18; 142:12; 144:18; 158:5, 8; 159:17; 160:7; 184:11, 186:7; 188:4; 193:21; 205:15; 209:19, 21; 210:1
**intrigue** 61:22
**introspective** 94:22
**invested** 64:23; 116:1
**investigate** 73:22
**investigation** 42:22
**investigations** 106:5
**investment** 24:13
**investor** 35:11; 36:7
**involuntarily** 33:14, 16, 17
**involve** 136:8
**involved** 20:3; 36:7, 24; 39:2, 15, 24; 40:4; 42:10; 43:16; 58:23, 59:3, 4, 89:17; 109:1; 213:8
**involvement** 41:4
**involves** 14:18; 178:24
**IOE** 12:22; 100:13; 101:10; 158:20; 159:18, 20; 209:19, 21; 210:1, 7, 212:2, 10; 220:6
**Iranian** 157:25
**Island** 17:19; 23:18, 19, 20, 21; 24:1; 98:6
**issue** 5:24; 72:7; 85:11; 106:16; 107:11, 16; 119:3, 22; 134:23, 25; 137:25; 141:8; 142:3, 15; 144:8; 169:10; 171:8; 190:5; 201:17; 211:24; 213:15; 217:12
**issued** 103:10
**issues** 7:3; 91:3; 196:3
**item** 64:23, 89:25; 132:17
**items** 89:12; 91:11; 150:3
**itself** 85:20; 95:20; 124:18

**J**

**J-O-H-N-S-T-O-N** 20:12
**Jackson** 133:25
**January** 32:20; 41:13, 17, 20; 42:14, 25; 43:5, 8; 45:16; 75:6, 9, 16, 24; 76:5, 8, 10; 78:16; 130:12
**jeopardy** 158:12
**Jersey** 42:21
**jet** 16:5
**Jim** 20:11, 24; 21:13; 88:22

**Jimenez** 24:6
**job** 10:20; 11:2, 21; 15:10; 34:13; 42:15; 43:13; 49:12; 58:16; 65:5; 82:17, 87:7; 96.18; 113:13; 121:19; 129:1, 2; 161:4
**jobs** 16:12, 14; 128.21
**Joe** 161:21
**John** 22:12; 99:24; 101:9, 11; 119:13, 14, 19, 21; 120:14, 121:10; 123:23, 155:21; 156:11; 194:19; 195:1; 215:25
**Johnston** 20:11, 14, 21:5, 9, 13
**join** 166:15
**joined** 28:24; 97:10; 106:15
**joint** 55:24; 56.12; 57:25; 58:1, 3
**jointly** 56:22
**Jorsey** 140:19, 21, 155:22; 192:25, 195:23, 25; 196:6, 22; 200:16; 201:5, 20; 210.17, 18, 19; 211:21; 213:5
**Jorsey's** 211:22
**Jr** 119:13, 14, 20; 120:14; 121:10; 123:23; 155:21, 22; 156:11
**Jr.'s** 119:21
**Juan** 211:4
**July** 56:6, 15, 57:7; 174:9; 175:3
**June** 163:2; 175:3, 202:18, 204:6
**junior** 119:3, 11; 120:17, 22, 24; 121:21; 122:18; 123:13; 134:7; 218:3
**jurisdiction** 19:19
**jury** 223:25

**K**

**K** 88:18
**K-A-M-R-A-D** 88:20
**Kamrad** 88:16
**keep** 9:17, 19; 93:17; 94:9; 151:1, 2; 161:5; 201:10; 206.23
**keeping** 64:12; 198:7
**kept** 89:6
**kind** 39:20; 58:24; 61:2, 67:3; 126:20; 147:5, 24, 164:18, 165:18, 21; 167:2; 191:7
**knew** 52:3; 70:10; 111:7; 143:7, 7; 150:8; 153:5, 6; 164:23; 165:4, 7; 191:24, 193:3; 207.24
**knots** 192:9; 196:18
**knowing** 113:13
**knowledge** 13:19; 14:1; 20:15; 21:6; 124:5; 132:5, 18; 133:22; 147:9, 14;

152:22; 171:4; 173:6; 180:11, 21, 181:8
**knowledgeable** 205:19
**known** 87:17
**knows** 137:23; 138:8
**Kurt** 88:16

**L**

**L-A-T-T-I** 158:1
**L-I-A-N** 206:4
**lack** 39:2; 109:14, 139:1; 142:25; 167:2; 179:14; 180:11; 181:8, 16
**lady's** 72:4
**LaForgia** 208:6, 19
**land** 137:13; 195:3
**landed** 135:4, 15, 20
**landing** 194:21; 195:9
**landlord** 85:10
**laptop** 64:8, 11, 19, 21; 72:22; 73:4, 9; 74:5; 90:2; 91:24
**laptops** 90:4
**largely** 80:18; 143:1
**Las** 8:4; 16:24; 20:15
**last** 17:5; 18:14, 27:4, 5; 28:12; 31:25, 47:9; 77:20; 79:16, 19, 20, 20; 81:23; 83:10, 15; 88:10; 93:9, 11, 104:3; 127:2, 5; 157:23; 161:21, 163:21; 224 17
**late** 164:14; 206:15
**lately** 94.23
**later** 41.5, 43:7; 64:13; 93:18; 115:2; 146:23; 154:10; 178:1; 184:25; 221:6; 222:14
**latter** 56:13; 59.23
**Lauderdale** 8:6, 42:24; 173:19
**launch** 4:9
**launched** 158:7
**law** 132:9; 144:2, 9
**laws** 116:9; 117:12, 17, 19; 118:7
**lawsuit** 3:12; 84:5, 22; 86:8; 89:19, 25
**lawsuits** 86:4, 10, 12
**lawyers** 51:10
**lay** 99:9
**lead** 127:11
**leader** 69:20; 83:11, 15
**leaders** 142:1
**leadership** 68:7; 150.23
**leading** 172:7
**learn** 19:1, 2; 207:13
**learned** 197:18
**learning** 208:14
**lease** 24:19
**leased** 24:21, 22
**least** 3:8; 5:22; 16:20; 28:2; 124:2; 182:25;

212:24
**leave** 28:10, 20; 29:12; 33:14, 16, 17, 18, 20; 37:12, 20; 38:22; 39:1; 48:12, 15; 147:15, 21, 22. 148:1, 5; 163:8; 201:11; 204:21; 205:14; 207:20; 221:4; 222:3
**leaving** 29:15; 81:13, 16; 200:13
**led** 33:1, 72:12, 17, 179:15; 180:22; 181:9, 17
**left** 16:12; 27:1; 28:5; 31:14; 41:8; 42:5; 48:20, 23; 62:7, 12; 71:23; 74:16, 23; 76:7, 12; 80:17, 19; 115:20; 121:18; 130:11; 158:9, 14, 15; 159:12, 13; 198:1; 209:16
**legal** 81:4; 84:5; 116:3, 6, 9; 144:4; 147:4
**legality** 116:11
**length** 179:25, 182:3; 189:1
**less** 10.25; 30:15, 79:3, 6, 7; 80:23; 95:4; 115:8; 143:13; 218:3
**letter** 91:16; 114:16, 22: 116:18; 118:14, 16, 25; 119:2, 7; 124:20; 130:7, 9; 131:4, 148:21; 149:7, 9, 12, 17, 24; 154:3; 215:3, 13; 216:17; 217:8, 15
**letters** 91:2; 96:22; 142:8, 146:25; 151:22
**level** 33:4; 113:10; 147:11; 188:13, 13; 195:9; 203:23
**Lian** 206:2, 3, 6
**Lieutenant** 20:11; 21:7, 8
**life** 13:12, 13; 44:3, 51:14; 174.2
**light** 151:1
**likely** 107:20, 146:5. 179:9
**limit** 42:25; 43:5; 198:2
**limitation** 170:6; 175:23
**limitations** 99:1, 3, 4, 5; 106:11; 139:12; 165:5, 10, 169:9; 176:8, 11; 194:2
**limited** 96:7, 12
**limiting** 18:4
**limits** 99:5
**line** 65:22; 73:20; 88:23; 123:5; 128:19; 130:16; 131:8, 23; 136:1; 138:17; 140:9; 175:21; 220:4
**lines** 198:3; 200:3
**list** 51:13; 64:12; 89:11, 12; 120:18, 21, 122:4; 155:20
**listed** 117.19
**listen** 140:23; 201:2
**listening** 29:20; 201:8
**lists** 122:5, 6; 123:4; 161:7

literature 61:2
Little 37:14, 15; 58:15, 65:8; 130:7, 20, 23; 138:8; 166:14, 14
live 116:12; 207:5
lived 8:5; 40:1
lives 22:18; 37:15
living 8:3
loans 21:24
local 191:6
located 27:11
Lockheeds 19:9
LOFT 66:14
log 90:19
logbook 89:6
logged 11:13
logic 152:24
logically 48:11; 223:11
long 8:5, 9, 15; 45:18; 87:23, 23; 88:12; 93:2, 8; 94:1; 105:2; 126:3, 139:12; 140:8; 149:17; 161:2; 162.20; 166:23; 167:5; 188:8; 224:8
long-term 116:14
longer 24:1; 119:18; 120:3; 159:4; 162:6, 21, 23; 190:6
look 26:13, 42:20, 22; 61:7; 62:25; 79.17, 81 2; 82:17; 112:23; 114:4, 115:10; 118:13; 122:7; 127:2; 131:18; 137.18; 145:17; 149:4, 10; 150:6, 11, 172:14, 179:13; 193:21; 194:8, 15; 200.25
looked 29:21, 44:11; 45:18; 46:18, 142.8
looking 4:24; 17:22; 42:4, 6, 7, 9, 11, 54 19; 127 5; 133.4; 141:25; 195:14; 198:6
looks 83:10; 145:20, 146:18, 19
lose 55:1, 3, 5
losing 72:2
loss 11:25, 54:11, 24; 55:11; 56:19; 68.25
lot 39.17; 60:23; 93:3; 101:15; 134:14; 186:2
loud 3:18; 113:5; 132:12
love 16:2; 53:18
low 16:23
loyalty 115:14, 25; 116:14
Lt 21:5
luck 203:11
lunch 223:7
luncheon 83:20
Lutz 37:15

**M**

ma'am 3:17, 19; 8:23; 9:16, 25; 10:8, 19; 11:9, 24; 12:2, 14; 13:7, 17, 19, 24; 14:12; 15:4; 16:17; 17:1; 18:13, 22; 19:5, 17; 20:5, 9, 21; 21:2; 22:4, 7, 14, 16; 23:19; 26:19, 22; 27:3, 18; 28:25; 29:5, 23; 30:1, 3, 17, 23; 31:4, 17, 19; 36:1; 38:7, 9; 39:8, 11, 40:10, 13, 17; 41:3, 11; 42:1; 43:2, 4, 7, 12; 50:20; 61:9, 11, 14; 62:14, 17, 76:16; 78:3, 84:7; 86:6; 90:3; 100:25; 102:10; 104:21; 105:18; 109:8, 11; 115:18; 121:14, 18; 124:22; 125:4, 24, 127:24; 128:25; 129:4, 7; 131:17; 132:3; 135:2; 136:16, 22; 137:11, 14, 139:21; 142:19; 154:21; 158:17, 22; 160:19; 166:6; 167:4, 11, 13, 16, 25; 168:3, 5, 8, 11, 14; 169:4, 7; 171:23; 172:17; 174:4; 176:15; 178:1, 4; 180:25; 181:19; 183:8, 16, 18; 185:5, 11, 23; 186:14; 187:4, 7; 188:4; 190:15; 193:19; 194:10, 12; 195:20; 197:24; 198:7; 201:9; 202:20; 203:8, 14, 24; 204:17, 20, 22, 213:16; 214:17; 215:12; 216:13; 217:14, 17, 24; 218:8, 10, 220:2, 24
machinations 216:6
magazine 93:1; 96:9
magazines 92:25
maintain 139:12; 179:3
maintained 193:8
maintenance 62:8; 134:22
MAJOR 3:2, 7; 8:3; 11:19; 16:21; 17:17; 18:10, 11, 17, 18; 21:11, 18, 23; 23:16; 29:7, 19; 31:13, 13; 49:19; 50:3, 52:16; 61:5; 62:23; 63:10, 13, 15; 67:3; 72:12; 76:25; 77:19; 78:5; 79:15; 84:3; 96.3. 112:20, 23; 113:23; 116:3; 117:1, 8; 120:3; 127:3; 128:10; 135:14; 137:7, 21; 138:6; 139:19; 140:23; 143:6; 144:2; 145:11, 11, 17; 148:13, 25; 149:19; 150:6, 9; 153:7, 11; 156:4; 159:6; 170:21; 172:9, 14; 174:3, 13, 22; 175:21, 22; 177:24; 178:16; 180.1, 7, 15, 18; 181:3, 13; 182:7; 183:6, 14; 184:9, 15; 186:8; 187:3; 201:7; 202:9; 203:21; 207:19; 211:17; 214:16; 217:10, 22;

219:21, 25; 223:2; 224:11
Major's 145:2, 8; 180:16
majority 17:4, 15; 18:5; 21:5; 92:15; 94:23; 121:18; 186:4; 200:21
makes 61:3
making 16:17, 40:2; 72:5, 6; 82:5
male 69 7
man 216:23; 217:1
management 29:10; 30:11, 20; 36:25; 45:25; 47:5, 6; 49:2; 68:8; 87:20; 106:4; 118:5; 126:16; 139:5
manager 16:5; 41:6; 63:22; 72:3
managerial 69:3
managers 64:7
manner 60:5; 128:6; 171 12; 196:3
manual 67:3, 5, 140:16; 171:5, 8; 183:12
manuals 65:3, 6, 20; 66:18; 67:1, 2, 5, 11; 103:17; 178:9, 11
Manure 155:22
many 3:9; 4:17; 7:11; 9:10; 14:21; 25:6; 46:14, 15, 21; 60:1; 67:23; 69:19; 77:19; 78:9, 15, 24; 92:4; 95:3; 96:22, 102.16; 115:3; 119:23; 121:10; 160.23, 172:4; 193:5; 204:6
March 28 24, 97.10, 106:15
marched 184:25
mark 49:18; 81:19; 91.10, 11, 112:19; 113:23; 117 1, 118:22; 148:25; 172:9
marked 49:21; 62:20; 112:21; 113:25; 115:2; 117:2; 118:19, 20, 23, 126:24, 25; 130:3, 5; 144:22; 145:15; 149:2; 172:11, 214:24, 25
marks 92:8
marriage 51:7; 52:7, 9, 15; 53:1, 10, 11, 22; 54:1, 6
Mary 49:4. 70.6, 83.9
master 33:4
masters 29.22
mate 73.5
material 20:6; 90:25; 94:25
matter 123:13; 125:7; 136.22; 153:23; 165:10, 190.8; 213 2
matters 125:22
may 13:10; 21 21; 24:21; 42:16; 52:18; 53:4; 54:22; 60:7; 69:13, 18; 70:12; 71:14, 14; 73:15, 19; 79:12, 13; 84:19; 86:11,

11; 88:20; 89:22, 25; 90:18; 104:3; 105:6; 109:16; 110:16; 113:9; 116:22; 123.2; 128:22; 130.1, 2; 131:15; 134.16; 139:23, 23; 149:24; 150:16; 151:2; 154:8, 11, 15, 16, 20; 155:12, 160:1, 10, 13; 161:10; 171:14; 184:22, 186:1; 199 5, 6; 201:24; 212:8
maybe 16.20, 41:8; 106:1; 142:11
MCI 27:20, 22, 23, 24; 34:23
mean 33:13; 34:20; 51:23; 53:6; 64:18; 68:5; 91:20; 103:1; 132:11; 142:10; 161:1, 25; 169:18; 198:12, 25; 203:15; 207:19; 215:6
meaning 131.21
meaningless 26:12
means 10:13; 96:8; 122:17; 140:13; 147:1
meant 3:22; 43:20; 74:25; 152:9
medical 13:14, 15; 14:9; 40:7; 55:23; 166:18
medications 50:17
meditation 97:3, 4
meet 22.19
meeting 68:5; 91:6, 16, 17, 20, 25; 92:3; 144:18; 145:20, 146:3, 7, 8, 9, 12; 166:10; 209:21; 211:14; 212:1; 215.25
meetings 82:4; 92.10; 119:23
member 17:9; 58:6, 85:23, 86.1; 105.13, 138:16
members 59:13, 18, 101:24
memo 63:4; 80.11; 146:4, 5
memories 32:6
memorizing 165:11
memory 33:20; 34:3; 45:17; 65:23; 81:23; 97:16; 102.17; 113:16; 114:7, 13; 131:15; 132:10; 136:13, 15; 149:11, 19; 151.13; 154:24; 179:18; 180:8. 20; 181:7; 206:9; 213:24
memos 88:4; 91:3; 92:4
mention 64:25
mentioned 35:9; 41.25; 92:22; 93:23; 111:5; 131:20; 134.10
mentioning 195.23
mere 165:10
merely 123:14
merged 27:14
merger 30:14

mergers 27:21; 30:20
merging 29:18
met 3:7; 210.6, 23
Mexico 158:5
Miami 8:8; 11:21; 12:8, 13, 16, 23; 13:5, 16, 24; 14:10, 25, 15:2, 17; 28:19; 40.24, 25, 41:1, 44:8, 22, 24, 45:1, 5, 6, 23, 25; 46:21; 47:4, 48:13; 49:15: 74:24; 80 21; 86:18, 18; 88:2, 7, 110:9, 12, 14
mid-answer 67:9
middle 31.25, 81:17
midst 158:7
midway 63.3
might 10:3; 17:22; 18:6; 34:13, 14; 44:3, 4; 46:14, 60:10; 71:17; 73:6; 78:23; 81:8; 89:12, 15; 91:25; 92:21; 93:18, 23; 94.12, 12; 95:13; 96:1; 97:2, 101:24; 104:11; 109:18; 112:13, 17, 18; 113:7; 114:7, 122:1, 2; 123:4; 155:3, 8, 23; 179:1; 186:9
Mike 164:10, 11
miles 194:22; 197.1
military 32:25; 33.7, 39:20
million 36:10
mind 14:17, 46:4, 5, 8, 9; 78:2; 127:10; 131:14, 156:13; 159:15; 194:24
mine 28:18; 81:21, 21; 120:1, 207.10
minimal 22.3; 95:18
minimum 78:10, 84 14. 95:23
minimums 194 21. 21
minister 59:6
minor 21:4
minute 21:18; 41:10; 91:22; 104:2; 114:4; 208:14, 221:9, 14
minutes 50:3; 138:11; 167:8; 168 10, 175:8, 22; 180:17; 184:11; 192:13, 15; 221:5; 224:18, 21, 22, 23
mischaracterizes 183:25
misplaced 142:2
Miss 7:12, 19; 63:1, 23, 24; 64:4; 65:10, 10; 66:13; 68:7, 15, 24; 69:1, 5, 8, 8: 70:5, 9, 13, 13, 20, 21; 71:2, 8, 12, 16, 18, 20, 20, 22; 72:25; 74:11; 80:18, 20; 132:8, 13; 175:15; 176:11. 13, 24, 203:17; 223:21
missed 92:13, 175:22; 176:7
missing 83:10; 137:7
Mississippi 133:25

mistaken 88:20
misunderstood 11:19
Mitchell 155:22
mix 113:7
mode 133:20
Moktadier 215:25
mom 58:5
moment 11:6; 22:10;
46:20; 127:10; 136:20;
144:21; 182:24; 184:25;
211:14; 222:15
Monday 222:21; 224:4
money 48:15; 52:23;
148:4; 206:23; 207:3, 21,
23; 208:1, 2, 21
month 9:6; 47:22; 48:5;
56:18; 204:15
month-wise 162:25
monthly 9:7; 56:14
months 4:17; 7:11;
130:18; 150:22; 151:5, 9,
12, 15; 207:13
moral 116:11
Morales 211:4
more 11:2; 17:18; 27:12,
42:10, 43:7; 45:23; 46:14,
19; 47:4; 48:15; 53:20;
54:20; 61:17; 64:9; 68:12,
17; 71:19; 72:19; 78:23,
24; 79:5; 105:10; 107:20.
115:8; 116:11; 118:3;
119:3, 14; 127:6; 138:12.
141:24; 143:12; 146:5;
180:18; 181:23; 198.20:
202:23; 221:11, 224:12
morning 201:14; 222:19
mortgage 57:4, 7
most 10:23; 21:42; 87:16,
120:13; 126:19; 128:5,
135:12; 139:17; 150:3;
162:11; 174:6; 186:3;
194:3; 199:16; 200:20;
201:18; 210:14
mostly 60:24; 85:19
mother 37:15
moved 64:6; 107:12;
166:16
moving 60:2; 142:4
Mrs 179:24
much 4:4; 46:23; 73:23;
75:22; 102:19; 115:21;
220:10; 224:16
mud 53:4
multi-engine 19:12
multi-hour 78:25
multi-instrument 19:14
Murphy 24:6
mutual 34:10; 39:2; 48:14
myself 34:14; 64:13;
93:22; 95:14; 101:23;
105:25; 115:3; 127:11;
128:5; 129:7; 136:5;
146:6; 149:14; 151:1;
190:8; 197:18; 205:17;
218:4

# N

name 4:7; 15:11; 17:2,
14; 22:10, 10, 12; 27:17;
28:6, 7; 38:17; 57:22; 74:8;
76:24; 85:6, 10, 24; 88:10;
92:1; 119:12; 157:23;
158:1, 161:20, 21; 172:21.
24, 205:21; 211:22;
217:17
named 23:18; 42:18,
48:22; 85:13; 218:18
names 19:18; 105:4;
121:6, 17, 22, 22; 125:13;
143:4, 7, 9; 155:18; 157:6
national 117:20, 194:5
nature 16:3; 25:5; 39:18;
46:9; 64:3, 68:18; 77:4, 23;
82:17; 94:19; 127:23;
128:1; 133:20; 134:3;
138:10, 14; 153:24; 160:2;
164:20; 216:10
Nav-Tech 189:7, 10, 18;
199:19
navigate 139:11
navigated 140:5
navigation 139:10;
140:10, 14
navigational 98:24
near 37:15; 127:25;
128:12
nearly 45:3
necessarily 98:1; 146:3
need 50:19; 53:2; 149:8;
166:21, 170:14; 186:12;
201:11, 202:23, 212:12;
214:15, 21; 217:6; 220:19;
221:4
needed 42:23; 87:24
needs 113:14, 159:25,
213:3
Negative 15:1, 87.4, 14
negatively 58:9, 13
negotiating 78:6
negotiation 78:7
neighbor 20:18
neighborhood 85:19, 20
Neither 17:8; 181:14
neutral 128:11
New 18:6; 28:3; 42:21;
49:3, 4; 64:5, 6; 98:13;
110:10; 133:1; 134:8
new-hire 109:5
newsletter 94:13; 97:5
newsletters 93:2
newspaper 92:24, 96:9
next 91:11; 132:17;
135:5; 136:1; 137:18;
146:18; 175:8, 21; 176:16;
179:13, 13; 180:14, 19;
181:1; 196:11, 14; 213:16
Nidium 63:4, 19; 64:17;
68:1, 6
nine 104:11, 15; 105:5;

136:25; 188:1
nobody 196:17
non-action 85:15
non-profit 16:23
None 12:18, 19; 31:2;
41:22; 44:14, 16, 19, 25;
52:20; 193:17; 204:9
normal 60:17, 18; 62:8,
87:6; 133:20; 186:4,
195:9; 199:17
normally 36:6; 101:23;
102:14; 104:18; 147:14;
192:12, 13
North 28:19; 37:16
Northwest 28:18
NORTON 3:6, 10; 4:18;
5:14, 19; 6:7, 10, 20; 7:12,
19, 25; 8:2; 49:18, 25;
50:2; 51:18; 53:6, 15,
62:23, 83:18; 84:2; 117:6;
118:22; 122:12; 124:15,
19, 132:8, 13; 138:21;
144:10, 22; 145:2, 8;
149:16; 174:13; 175:15,
18; 176:3, 24; 179:24;
184:1; 201:13; 203.17;
214:24; 220:18, 22; 221:2,
8, 13, 16; 222:2, 10, 17,
22, 223:1, 8, 13, 21, 24;
224:6, 8, 13, 24
nose 196:21, 198:13
note 89:7; 91:8, 146:6, 24
noted 92:4
notes 89:7, 15; 90:18;
91:2, 16; 145:20
nothing 116.18, 152:21;
168:4; 170:1, 4
notice 74:23; 217:8
noticed 136:6; 140:8
notion 124:3, 134:24;
135:1
novelist 92:17
November 54:12; 55:17,
25; 56:2, 4, 15; 57:14;
79:24; 80:6; 124:23
number 6:20; 9:20, 24;
11:12; 12:22; 22:15, 22,
23:1; 60:5; 63:5; 71:17;
72:3; 91:2, 15; 102:23;
117:9; 132:17; 173:8, 12;
214:11
numbering 62:22
numbers 142:2
numerous 3:7; 59:13
nurturing 157:9

# O

o'clock 91:25
oath 181:21; 183:21
object 51:21; 67:8, 87:10;
108:5; 109:14; 124:12;
126:17; 131:9, 24; 132:1;
142:6; 171:18, 22; 175:10;
176:2; 180:12; 183:24;

184:16
objected 223:19
objection 6:25; 67:12;
106:22; 116:5; 120:4;
132:6, 14; 136:11; 138:1,
9, 18; 144:6; 160:25;
174:11, 15; 175:19; 176:3,
9, 21, 24; 178:22; 179:22;
180.24; 215:21
objective 51:13
objectives 82:2
obligation 37:18; 57:16;
116:3, 6, 12
obligations 57:13;
221:12
observers 194:5
observing 72:16
obtain 18:20; 21:5; 26:10;
30:4; 31:5; 134:21, 207:16
obtained 30:10; 155:14
obtaining 64:24; 133:15;
135:13
obvious 29:19; 54:11;
80:9; 214:22; 218:17
obviously 3:7; 64:23,
80:2; 136:6; 191:24;
205:19
occasion 61:17
occupation 98:4
occur 73:2; 139:22;
174:23; 217:21
occurred 61:25; 89:2
occurring 192:15; 208:9
occurs 93:3
October 24:8, 28:21, 22,
23; 54:12; 124:20; 206:13
odor 134:10
off 10:3; 44:24; 46:15;
79:14; 117:7; 133:21, 24;
139:25; 148:10, 12;
149:16, 18; 155:16; 169:3;
172:13; 178:16; 186:23;
187:3; 194:17; 197:14;
199:23; 200:9, 11, 221:8,
14, 15, 19; 222:25, 224.24
offer 35:12; 147:10;
198:25
offered 25:23; 34:9, 18;
41:14; 42:16; 69:21,
109:22; 110:18; 111:3;
121:4, 12, 142:17; 144:21;
146:19, 21; 147:7
offering 16:7; 37:4, 19;
69:24; 78:4, 5; 147:13;
148:4
office 10:3; 28:15, 15, 17;
73:4, 5; 165:14, 173:16;
180.16; 218.16
Officer 32:5; 75:2; 102:6,
15; 104:4, 23; 105:2, 8, 12;
107:13; 108:18, 20;
111:15, 17, 23; 112:5;
113:7; 114:9; 119:4, 10;
124:10, 21; 126:4; 135:4;
136:5; 146:16; 156:9,
157:17; 160:10; 161:17,

20; 162:8, 13; 165:19;
166:5; 178:3; 203:3; 216:7
officers 4:14; 46:2; 77:6;
103:2; 125:2; 128:19, 22;
149:13; 150:2; 156:22;
157:12, 12; 162:7; 163:12;
166:1; 218:3
officially 74:24
often 73:14; 101:1;
105:10; 116:12, 133:5;
144:9
Olas 8:4; 16:24; 20.15
old 30:25; 57:20; 122:4, 6;
123:3; 219:21
older 219:25
omission 7:18
on-site 105:21
once 32:11; 101 2, 105:9.
11; 198:2
one 4:9; 6:20; 10:4; 16:24;
17:5, 6, 7; 34:19; 37:4,
43:16; 46:8; 51:22; 57:9;
59:19, 23, 24; 61:17;
63:14; 66:2; 67:2, 5; 68:14;
71:3, 4, 6; 73:5; 74:3; 75:6,
77:6; 78:1, 22, 23; 84:4;
87:16, 18; 89:2, 4; 101:9;
102:18; 103:2, 4, 9, 19;
105.22, 22; 108:20; 111:7;
112:14; 113:12; 114:10,
116:21; 118:19; 119:12,
23; 127:11; 128:23,
132:17; 139:13, 141:23;
143:16, 23; 146:11;
147:17; 148 8, 11; 152:19;
156:2; 158:5; 161:7, 20;
166:21; 170:9; 177:16,
180:4; 183:11; 188:15;
193:25; 198:1, 15; 204:11;
205.16, 18; 206:9, 208:23;
209:23, 24; 212:3, 24,
213:22; 218:14, 25;
219:16; 224:7, 21, 21, 22
one-day 16:16
one-week 46:4
ones 4:22; 92:12, 15;
98:5; 103:19; 155:11, 12;
163:20; 189.20; 197:22,
23
ongoing 66:2; 67:22
only 4:2; 12:7; 29:2;
39:15; 48:1, 3; 50:14;
52:18; 59:5; 66:10; 72:4;
73:16; 91:22; 95:21;
96.11; 98:4; 105:19, 21.
111:15, 121:22; 139:6,
141:22; 143:25; 150:16;
153:8; 156:15, 19; 161:19,
168:19; 177:23; 178:7;
180:3; 182:22; 188:17, 20;
198:1; 199:25; 207:18,
215:11; 218:4; 219:9
onto 47:15; 91:12
open 71:16; 73:20, 23;
91:24; 135:17
Open-ended 103:13
opened 41:18, 19; 136:4
opening 135:19; 155:7

Major v.
Avis/Zi International
Patrick Scott Major
06070
Document 112     Entered on FLSD Docket 03/13/2001   Page
01/3/February 05, 2001

openly 68:4, 5; 73:6
operate 66:8; 100:11
operated 18:15
operating 100:10;
200:22
operation 16:5; 23:9;
25:5; 41:24; 99:6
operational 190:16, 24
operations 36:13; 49:15;
82:4; 114:25; 134:8;
140:15, 16; 150:24;
183:12; 186:5; 188:5, 5;
189:16; 193.17
opinion 66:25, 69:22, 24;
72:14, 15, 17; 140:21;
146:13; 148:23; 156:5
opportunities 15:11, 21;
16:14, 15; 35:6; 39:2;
42:15; 82:23; 113:14;
115:6, 7; 118:8; 144:20
opportunity 34:18; 44:6;
48:15; 80:21, 22, 88:1;
109:22; 110:18; 156:21;
172:14; 179:7; 219:15
opposed 4:16; 11:6;
19:8, 9; 28:4; 32:11; 48:4;
57:16; 89:13; 126:2;
150:4; 155:25; 195:14;
196:21; 205:9
option 147:19; 148:8;
204:1
Oral 99:22, 23; 100:2, 6;
163:4; 164:5; 165:13;
166:9; 167:5; 168:24, 24;
169:2, 23; 170:4, 19;
171:23, 173:23, 24; 175:1,
179:15, 17, 19; 180:9, 23,
181:10, 22; 182:4; 183:22;
184:11, 17, 185:10, 20;
186:15, 17; 205:5; 214:6.
19; 216:19; 219:15
ordained 59:5
order 7:2; 40:1; 89:14;
147:6; 179:3, 217:7; 220:4
organization 16:23;
22:6; 27:16, 17; 28:6;
34:16; 36:2, 9, 21; 59:3;
72:2; 76:1, 15
organizations 17:3, 6,
15, 20; 24:12, 18; 25:1;
27:15; 29:6; 38:2; 41:24
organize 105:25
organized 64:12
orientation 97:17; 98:18;
118:4; 128:6, 8
oriented 22:11; 97:1
origin 117:20
originally 150.22
Orleans 110:10; 133:1
others 12:5; 17:4; 18:12,
14; 47:16; 61:8; 67:24;
71:25; 77:22, 23; 101:19,
166:8; 180:5; 190:9
otherwise 14.20; 37:25;
52:20; 86:5
ourselves 212:1

out 3:13, 18; 6:22; 12:10;
14:7; 28:3; 32:19; 37:23;
46:24, 47:22; 58:16,
59:15, 17, 19, 21; 60:6, 8,
11, 14; 61:3, 7, 12, 24;
64:10, 16, 16; 72:15; 78:1;
81:9, 25; 84:9; 93:19;
95:14, 16, 18; 103:1;
105:16, 22; 110:8; 113:5;
118:5; 124:23; 128:16;
132:12; 133:3; 135:18;
136:6; 137:8, 9, 11;
150:13, 16; 151:22, 23;
152:4, 7, 14, 17; 154:24;
168:18, 169:12, 16,
173:20; 178:12; 179:20;
180:4; 181:1; 188:2;
190:2; 191.20; 192:8, 13,
21; 194:15; 195:7; 198.12;
199:17; 205:22; 211.5
outlined 19:20; 36:21,
123:1
outside 26:14; 27:1;
96:18; 114:20; 115:16, 19;
116:4; 135:11, 156:17;
196:16; 198:3; 200:3, 21
over 5:22; 20:7; 21:16;
36:11; 39:16; 49:14; 73:5;
89:23; 128:16; 142:7;
156:16, 19, 22; 157:17,
159:16; 160:7; 197:18, 20
overall 34:12; 36:25; 83:2
overbooked 208:17
overdressed 165:25
overjoyed 64:22
override 194:8; 195:16,
17, 19 '
oversee 35:22: 43:14
overtime 34:2
overweight 202:5
own 17:22; 18:11, 24:1,
29:2; 31:14, 70:10; 82:1;
114:25; 119:24; 134:17;
158:7; 208.15
owned 17:8; 18:3, 15;
23:22, 24
owner 98:6
ownership 12:5, 17:23,
35:8
owning 35:11

## P

p.m 83:20, 21; 222 1, 9;
224:25
package 16:6, 10;
142:18; 144:21; 146.20,
21; 147:8, 10, 22
packet 79:16
pad 64:11; 89:7
page 63:5, 14; 79:19, 20;
90:11, 11; 91:12; 113:1;
127:3, 6; 146:18; 149:5.
10; 150:7, 11; 169:16, 16;
172:8; 173:10
paged 170:10

pages 4:25; 5:22, 6.22,
80:11; 173:10
paid 9:6; 12:24; 13:1;
14:10, 14; 21:22; 27:5;
45:19; 48:1; 79:17, 22, 23;
80:4; 95:10; 110:4;
206:23; 207:15
painful 32:6
pains 64:10, 133:8,
137:4; 140:8
Pan 40:22, 23; 41:2, 4, 12;
43:8; 44:8, 21, 24; 46:6,
22, 25; 47:4; 48:12; 49:15;
62:18; 66:6; 68:9; 74:16,
21; 75:10; 76:4, 6, 9, 14,
18, 78:4; 79:25; 209:14,
210:14
paper 197:21
paperwork 170:23,
199:19
paragraph 112.24;
113:1, 3; 115:10, 11;
127:3, 5; 131:18; 137:18,
21; 150:21; 175:7; 179:14
paragraphs 127:11
Pardon 33:24; 70:19
parents 39:15, 24; 40.1
Park 17:7; 85:10, 11, 18
part 7:18; 12:11, 12; 17:9;
23:22, 23; 39:12, 13; 46:1;
50:12; 65:5; 66:7; 70:16,
71:5; 87:6; 99:11; 104:9,
13; 110:5, 15, 15; 113:13;
137:12; 159:2; 162:11;
179:10, 11; 184:14, 15,
185:14, 16; 186:22,
187:17; 190:14, 15, 19;
194:3; 200.20; 217:5
participant 86:9
participate 44:7
participated 36 22
participation 13:11;
57:16
particular 19:6, 7; 35:6;
51:13; 54.24; 66:2; 73.15;
91:10; 114:11; 116:19;
134:23; 146:12; 188.20,
189:19; 193:15
particularly 19:8; 46.25;
57:18; 115:20
parts 70:23
party 84:21; 86:4, 135:23
pass 138:11, 12; 179:8;
182:19; 185:21; 214:19
passed 13:10; 37:13;
100:6
passengers 32:11
past 76:5
pasture 135:5
Pat 136:6; 196:7; 210:25,
211:7; 219:21
Pat's 132:17
PATRICK 3:2; 18:11
pavement 189:2
pay 84:20; 9:1; 14:24; 34:2;
47:11; 48:2, 4, 7; 56:18;

84:11, 12
paycheck 48:9
payment 57:6
Payroll 79 15
PCA 38:17, 22; 39:1
Peley 164:10, 11
penalty 196:20
pending 4:3
Penny 144:19; 147:1, 2
people 18:25; 30.15;
47:18; 54:18; 59:25; 69:6,
9; 70:11; 72:3; 95:3;
102:23; 103:14; 104:12;
111:23; 114:23; 115:16,
128:13, 20; 142:1; 153:8;
156:7, 15, 16, 16, 193:14,
207:13, 208:14, 18;
218:18, 22
per 8:21; 9:24; 47:12, 13
perceive 25:17; 34:17
perceived 80:20; 115:3,
116.16; 129:10; 137:20
percent 195:20
percentage 11:2
perception 9:23; 30:20;
130:25, 133:16, 17,
136:15, 19; 137:19; 156:1;
212:8, 11, 21, 23, 216 13,
14
perform 75.25; 76:14;
79:8
performance 35:25;
79:21; 86:24; 87:3;
143.24; 189:7; 190:1, 4;
193:11; 196:19; 198.1, 14;
202:4
performing 76:17
perfunctory 160:1, 3
Perhaps 59:21; 92:15;
96:6; 117:4; 123:16, 17;
137:18; 142:1; 215:2
period 17:24; 38.20;
42:13; 47:12; 66:5; 76:18;
78:20; 89.23; 90:5;
110:25; 111:2; 123:10;
142:7, 157 8; 160:6,
186:2; 200:5; 204:5;
206:12
periods 48:2, 4; 57:18;
164:4; 176.17; 177.7, 9
permit 195:9
permitted 7:16; 105:15
person 46:13; 61:1;
71:23; 74:8; 93:23; 98:14,
99:9; 111:15; 143:20;
182:19; 183:3; 185:20;
213.8
person's 124:3
personal 14:14; 51:14;
64:8, 19, 21; 72:22; 73:4,
8, 14, 24; 74:1; 189:21
personally 85:13
personnel 30:11, 63:22;
88:2; 130:10
persuasive 129:22
pertain 89:19, 25; 126.1

pertained 66:7
pertaining 88:5; 118:8
Pete 114:8; 118:14, 16,
25, 25; 126:16; 127:6;
128:4, 21; 150:23; 168:18;
169:2; 170:12; 179:19;
180:10; 181:21; 182:12,
14, 15, 20; 183:23; 184:11;
185:7, 10; 191:9; 205:1;
209:16, 18, 20, 210:9, 9;
211:3, 7, 13, 15, 17, 23,
25; 212.2, 24; 213:1, 6;
214:20; 215:5, 5, 19;
216:1, 20, 22, 23; 217:15
petrolic 213:17
phenomenon 178:25
phone 22:15, 22, 23, 24;
24:23; 25:18, 20; 210:13,
24
phones 25:12
photographer 38:17
PHR 30:12
phrase 132:2
physics 60:25
PIC 11:13
pick 3:20; 220:20; 222:3;
223:3
picked 75:13; 135:8, 10,
192:6
piece 95:17; 189:1
pieces 94:22
pile 147:4
pills 50:16
pilot 15:13; 19:10, 11, 11;
26:3; 31:15; 88.21; 98:5;
102:15; 104:19, 22; 107:1,
120:12, 14, 17; 127:16,
166:22; 168:2; 191:8;
193:16; 195:11, 12, 14;
202:19, 24
pilot/crew 45:22
pilots 32:12, 103:1,
128:19
pin 52:22
pink 168:13, 216:23
piqued 15:11
place 14.24, 28:17; 83:2;
89:10, 91:5, 19, 23;
101:24; 133:14, 145:23;
160:20, 170:19, 175:1,
184:21; 186:24; 187:2;
191:23; 195:10; 196:11
placed 172:15; 193:2
placement 25.24, 25,
26:20, 22; 39:13
places 134:15
placing 115:8
plaintiff 222:3, 23
Plaintiff's 4:12; 144:23,
24; 145.1
plan 15:2; 44:5; 58.16
plane 10:13, 137:8
planes 11:25; 12:16;
19:19
planned 192:16

Major v.
American Jyet International
-06070.WLVV Document 112
Entered on FLSD Docket 03...3.2001
Patrick Scott Major
Vol. 1, February 09, 2001  Pa

**planning** 190:1, 4; 196:19

**play** 224:17

**please** 16:1; 20:10; 23:2; 36:6; 44:18; 83:5; 100:21; 127:12; 136:24; 138:4; 151:2, 3; 157:24; 186:10; 209:24

**plus** 220:21, 21, 21

**poetry** 96:22

**point** 13:9; 15:3; 29:3; 32:24; 33:1; 35:10; 37:22; 54:24; 55:13; 64:10; 69:24; 73:17; 74:16; 80:3; 90.20; 95:19, 23; 107:16; 112:14; 120:2; 122:22; 125:25; 128:14, 16; 133:11; 134:16; 135:24; 139:11, 11, 15, 140:17, 17; 150:13; 158:8, 11; 160:19; 165:23; 170:14; 177:13; 181:1; 188:24; 190:11; 192:6, 21; 196:13; 199:4, 14, 18; 204:21, 25; 216:17; 219:13, 20; 220:16

**policies** 81:14, 19, 22; 83:12, 17; 171:10, 11, 219:14

**policy** 45:1, 2, 5; 95:25; 114:25; 115:3; 128:11, 18; 143.24; 155.13; 190.1, 8, 10, 13, 191:1, 4, 11, 22; 193:8, 13, 22; 219:16

**pool** 115:12

**portion** 10:18; 45:9, 102:22; 104:16; 201:4; 218:14

**position** 8:11, 15; 16:5; 17:11, 27:1, 4, 5; 28:13; 31:12; 33:22; 37:10, 41:14, 18, 19; 42:4, 6, 9, 11, 17; 44:8, 9; 47:5; 48:17; 49:5, 7, 54:17; 63:21; 70:3, 6; 74:24; 75:6; 107:13, 13; 121:12; 126:4; 154:9; 156:23; 157:18; 159:17; 160:14, 23; 193:3; 195:16, 18; 199:9; 218:5; 219:6

**positions** 38:15; 42:7; 45:22; 154:16; 155:15; 199:8

**positive** 87:4

**possibility** 46:4; 217:14

**possible** 155:2

**posted** 198:9, 10

**potential** 46:3

**Potter** 179:24

**powered** 19:3

**Powerpoint** 87:18

**practical** 164:25

**practice** 91:5; 92:7; 139:17; 140:3, 7; 156:18; 179:7

**praised** 66:9

**pre-oral** 181:4; 182:2, 6, 9; 184:23; 185:18, 19;
218:6; 219:1, 1, 5, 6, 11

**precisely** 213:13

**predicate** 138:19

**prep** 33:1

**preparation** 179:15

**prepare** 185:20

**prepared** 173:2, 3, 180.19; 185:25, 25

**preparing** 196:12

**prerequisite** 115:6

**prescription** 50:18

**present** 68:14; 69:7; 182:4; 218:7

**presented** 64:5; 178:25

**presenting** 208:10

**president** 78:6; 82:3

**pressed** 52:1

**pressurization** 98:24

**presumably** 209:16

**presume** 40:1; 78:6

**pretty** 43:24; 46:23; 69:14, 15; 114:11; 165:1, 211:4; 214:22

**prevail** 84:6

**prevent** 87:19

**previous** 89.4; 122:13

**previously** 6:14; 148:22

**price** 24:9

**Primarily** 11:23; 57.24; 89:11; 98:20

**primary** 31:8; 54:3, 140:13

**principals** 153:9

**print** 151:22; 152:14

**printed** 150:16; 151:23; 152:2, 4, 7, 16

**prior** 18:16, 16, 33:12; 36:14; 38:10, 40:22; 41:7, 55:8, 25; 56:3, 14; 57:7, 68:8; 73:5; 109:18; 116:12; 128:16; 137.6, 152:17, 23; 153:13; 154:20; 155:12, 15; 170:10; 190:5; 196:1, 207:3, 4; 208:11; 210.22

**priority** 89:13

**private** 19:11, 23; 20:1; 32:2; 68:5; 211:25

**privy** 111:6; 201:3

**probably** 37:25; 60:4; 69:10; 126:12, 19; 129:19; 167:7; 173:22; 175:7; 177:14; 196:16

**problem** 180:17; 187:3; 196:10; 224:14

**problems** 70.11

**procedure** 95:25; 116:19; 137:23; 138:8; 190:16, 24

**procedures** 100:5; 171:13, 15; 178:10, 13, 179:7; 220:5

**proceed** 32:18; 67:18; 74:12

**proceeded** 74:13; 180:15

**proceeding** 202:16

**process** 65:14; 134:17; 158:17; 163:21, 25

**processing** 37:5

**Produce** 4:12, 22; 5:7, 6.6, 7:5, 5, 10, 14, 16, 66:4; 95:12; 103:25, 219:14

**produced** 4:15, 25; 5:2, 9, 9, 22, 25; 6:17; 7:5; 89:18, 21; 90:17, 19; 91.4; 103:24; 122:8, 10; 145:18, 19; 206:15; 207:4

**producing** 224:11

**professional** 15:12; 30:12; 38:18; 40:6, 7, 50:18; 62:7, 11; 93:22; 98:3; 165:24

**professionally** 34:14, 15

**proffer** 35:12

**proffered** 34:7, 9; 158:2

**profile** 91:7

**profiles** 66:14; 179:8

**program** 13:11; 16:4; 39:16, 23; 40:4; 41:6; 64:7; 72:3; 87:17; 97:13; 110:16; 114:23, 115:5; 116:2; 121:6, 7, 8, 9, 11, 15, 16; 159:19; 161:25, 162.2, 8; 168:23, 182:22, 23; 200:24

**programs** 70.14

**progress** 153:4

**Proia** 88:22

**prominently** 52:11

**promise** 83:11, 15

**promised** 193:21

**promotable** 141:4; 142:17; 144:17; 148:20; 149:22

**promote** 33:5; 95:24; 116:4; 143:24, 193:8

**promoted** 106:17, 23; 111:22, 23; 112:1, 4; 119:4, 10; 122:19; 126:5; 143:2, 3, 146:13; 148:15; 156:8, 15, 157:12, 158:3; 218:21

**promoting** 115 17

**promotion** 114:9, 156:9, 209:11

**promotional** 144:20

**promotions** 147:25

**prompted** 30:24; 210:12

**prompting** 159:5

**proof** 169:12, 14

**proper** 17:2, 65:21; 132:15; 138:2; 166:4; 169:22; 173:15, 175:16

**proposal** 117:15; 118:2; 139:4

**proposed** 126:21; 207:2

**proprietorships** 18:15
protected 218:2

**protocol** 188:6

**proven** 115:21

**provide** 76:22; 113:9, 150:5; 156:19; 185:14

**provided** 9:18; 26:11; 133:5; 147:4, 151:8; 170:24; 190:18; 218:23; 219:1

**providing** 148:21; 220.2

**provision** 26:1, 2; 199.24, 25; 219:4

**prudent** 202:24

**psychiatric** 39:10

**psychiatrist** 50:21

**psychic** 58:18, 19, 20, 21

**psychics** 59.4

**psychological** 39:12

**psychologist** 50:21

**public** 37:4, 19

**publication** 93:5, 7, 11, 94:1

**publications** 98:15

**publicly** 17:21; 18:6

**publish** 93.21

**published** 96:4, 6, 7, 10

**pulled** 169:12, 16; 205:22

**pulling** 178:12

**purchase** 98:13

**purchasers** 85:1

**purpose** 3:13; 18:18; 26:21; 39:21; 94:7; 95:11, 185:19, 24; 186:15, 17

**purposely** 166:7

**purposes** 119:25; 140:10; 149:9, 190:4

**pursuant** 62:24

**push** 192:17

**push-off** 192:10

**pushback** 196:12

**put** 91:11; 96:8; 153:2; 158:12; 197:18, 22; 199:21; 200:3, 7, 8, 202:5, 205:23; 209:19, 20; 216:24

**puts** 217:8

**putting** 95:14; 120:13; 199:24; 200:1

**Q**

**qualifications** 12:6; 14:22; 115:13; 123:20; 124:3, 6; 142:25; 143:1, 6, 8, 19; 156:1, 3

**qualified** 10:22, 11:8, 10, 19:10; 30:16; 36:18; 44:12; 75:2; 115:16; 143:12, 13; 160:1; 171:4; 217:1, 23; 218:4, 220:9

**qualify** 12:22

**qualities** 69:20

**quality** 170:1
**quandary** 216:18

**quantify** 24:11; 51:13

**quantitatively** 54:20

**quarter** 221:7; 223:4

**questioned** 68:4; 73:6; 216:5

**questioning** 67:25; 123:5; 209:7

**questionnaire** 103:10, 20

**quickly** 6:23; 46:5; 106:17; 144:16

**quiet** 91:23

**quit** 159:6, 9; 196:8; 207:20

**quite** 29 19; 134:1; 163:17

**quotation** 92:8

**quote** 116:13

**quoted** 59:10

**R**

**race** 117:20

**rain** 194:14

**raining** 191:19; 199:13

**raise** 5:24; 106.16, 24, 107:11; 217:12

**raised** 106:25; 107:5, 16, 18; 108:2, 8, 10; 124:9, 14; 126:8, 11, 141:8, 11, 142:15; 217:14

**raising** 57:17; 111:21, 119:3; 126:7; 142:3

**Ralin** 55:22

**ramp** 60:4; 191:23; 192:3, 4, 11, 17; 199:3

**Randall** 22:12, 20; 23.6

**Randall's** 22:13

**range** 16:9

**ranging** 61:21

**rank** 31:13; 32:4; 166:2, 5

**rare** 188:14

**Rarely** 91:18; 93.6

**rate** 47:13; 78:4; 84:14, 14

**rated** 100:11, 12

**rates** 77:12

**rather** 12:24; 28:13; 34:22; 35:13; 87:12; 96:7; 106:2; 115:17; 116:4; 127:18; 128:17; 180:21, 181:8; 205.1

**rating** 43.15; 55:6; 56.20, 22, 166:22; 211:1; 212:5

**ratings** 19:11, 14, 166:18

**Ray** 155:17

**re** 147:1

**reached** 37:22

**reacted** 213:5

**reaction** 61:19

**read** 60:23; 64:1; 83:4, 5; 95:6; 113:4, 5; 132:11;

Major   v.
America International

Document 112

Entered on FLSD Docket 03/13/2001   Pa

Patrick Scott Major
Vol. 3, February 13, 2001
-06070...

136:1; 143:23; 144:10, 12; 149:6, 8; 150:21; 151:3, 206:21

**reader** 58:18, 19

**reading** 20:6; 58:24, 25; 64:1; 90:12; 136:1

**ready** 199:23

**real** 65:23, 144:16; 181:25

**realize** 51:10; 132:8

**realized** 6:17

**really** 9:25; 34:17; 43:7; 44:11; 47:24; 54:17; 60:13; 61:16; 76:6; 78:7; 85:24; 95:13, 21; 118:3; 194:23; 198:14; 200:4; 205:19

**reask** 141:14

**reason** 21:3; 22:10, 33:23, 25; 52:16, 17; 64:2; 73:1; 75:20; 80:17, 19; 81:13, 16; 82:6; 110:5, 6, 15; 123:7; 141:9, 23; 142:21; 165:22; 166:7; 168:25; 169:1, 5, 8; 172:23; 173:3; 180:9; 183:22; 184:10; 209:17; 214:8, 10, 17, 19, 215:11

**reasonable** 164:14

**reasoning** 184:14

**reasons** 34:6; 62:8, 12; 121:12; 158:2; 179:25; 180:6; 181:24; 205:16; 214:12

**recall** 18:16; 24:25; 34:6, 41:19; 45:8; 49:12; 55:11; 58:21; 63:18; 64:2, 4; 66:1, 4; 67:13, 13, 20; 68:3, 24; 69:5, 14, 23; 70:12, 16; 71:6, 13, 19, 21, 22; 72:1, 8, 16, 18; 75:21; 76:17; 77:14; 78:8; 79:2, 11; 80:4; 81:24; 87:16; 106:21, 23, 108:13, 14, 15; 109:17; 112:13; 119:4, 7, 9; 120:24; 121:4; 126:6, 129:16, 25; 130:24; 131:8, 22; 132:19, 22; 133:23; 134:6, 7; 135:3, 7; 137:24; 138:5, 16, 139:3, 7; 140:1; 143:4; 148:13; 153:18; 156:20, 24; 160:15, 22; 162:18, 20, 164:17; 166:10, 12; 173:24; 174:6; 176:12; 178:19; 181:16; 187:16; 192:24; 196:13, 24, 24; 199:11; 201:23, 25; 205:2, 2; 208:25; 209:3; 211:10; 213:24; 219:23

**recalling** 195:25

**receipt** 153:17

**receive** 8:24; 10:6; 13:5, 8, 12, 14, 14, 11, 13, 18, 20, 18:20; 21:19; 22:1; 42:2; 73:8; 75:10, 18; 77:17; 97:24; 98:1; 147:14; 168:6; 177:19; 179:16; 220:4

**received** 4:10, 14, 18; 8:22; 21:23; 25:9; 62:24; 66:9; 77:12, 16, 17; 84:20; 103:19; 108:19; 139:16; 140:6; 171:1; 176:17; 177:24; 178:18; 182.2

**receiving** 108:17

**recent** 87:16; 128:16; 151:1

**recently** 17:18; 64:6; 98:13; 130:10; 188:20; 189:3; 199:16

**Recess** 50:1; 83:20

**recipient** 175:13

**reckon** 145:25

**recognize** 212:7

**recognized** 193:3; 212:7

**recollection** 36:9; 101:15; 107:21, 23; 108:7; 126:13; 146:10; 157:16, 160:21; 169:1; 173:23; 175:4, 14; 176:5; 204:12, 18; 211:16

**recollections** 89:7

**recommendation** 168:23; 200:2, 4

**recommended** 113:9; 210:22

**recommending** 181:3

**record** 3:10; 4:7, 13; 7:24, 25; 62:6; 79:14; 92:9; 117:7, 8; 121:2; 136:11, 22; 145:14; 148:11, 12; 149:17, 18; 170:18; 172:13; 174:25; 221:8, 14, 15, 20, 24, 25; 222:25; 223:2; 224:15, 24

**recorded** 144:13; 224:20

**recording** 91:5

**records** 4:23; 5:2, 3, 8, 25; 6:5, 15, 18; 7:16; 122:21, 22, 24; 133:4; 166:13; 170:11; 183:2

**recovered** 84:13

**recruited** 38:24

**recruiting** 35:24

**rectal** 50:9

**recurrent** 100:23; 101:17, 23; 102:7, 25; 103:14; 104:3, 7, 10, 12; 105:8, 13, 19; 160:9; 162:3, 22, 23

**reduce** 184:6

**reduced** 159:19, 20; 220:11

**refer** 55:8; 65:24; 149:15; 180:14

**reference** 61:3; 64:21; 82:2; 110:7; 115:18, 22, 24; 116:10, 11; 132:4; 147:2; 151:5; 157:1, 11; 178:8; 189:21

**referenced** 148:22; 155:23; 193:10

**references** 150:3; 166:13

**referencing** 137:8

**referred** 17:5, 6; 20:7; 48:8; 49:21; 83:9; 112:21; 113:25; 117:2; 118:23; 126:25; 130:5; 144:12; 145:15; 147:8; 149:2, 172:11; 180:3, 4; 182:24; 183:11; 193:10; 194:2; 206:25; 207:2; 211:14, 214:25

**referring** 60:14; 81:25; 82:10; 122:1; 123:14, 14; 131:13; 132:2; 182:11; 214:4

**refers** 173:18

**reflect** 115:14

**reflected** 24:16; 121:3

**refresh** 113:16; 114:12, 15; 132:10; 136:13; 149:19; 151:13; 175:14; 176:5; 179:18; 180:8, 20; 181:7

**refreshes** 114:6; 131:15; 136:15; 149:11

**refuse** 26:13

**refused** 207:8, 22

**regard** 29:18; 34:12; 53:25; 87:25; 91:8; 110:7; 119:21; 126:20; 150:2; 156:3; 189:22; 196:2, 14; 205:3

**regarded** 143:25

**regarding** 16:23; 63:12, 24; 65:3; 86:23; 87:3; 91:3; 138:25

**regardless** 193:25

**regional** 16:5

**Regrettably** 101:5

**regular** 22:19; 23:5

**Regulation** 23:23

**Regulations** 97:21; 106:3; 195:5; 196:3, 18

**reimbursement** 47:16

**reimbursing** 21:24

**reiterate** 112:25; 113:10

**related** 192:20

**relationship** 50:15, 24; 52:12; 53:23, 25; 74:11, 20; 76:6; 83:6; 127:23; 128:1; 133:11

**release** 59:7, 8, 147:1, 2; 223:3

**releasing** 222:23

**relied** 6:5

**religious** 96:24, 25

**reluctant** 156:18, 18

**rely** 7:17; 142:24; 179:3; 220:12

**remainder** 4:21

**remained** 54:7

**remember** 21:20; 39:18; 42:18; 56:25; 59:1; 61:20; 62:3, 63:23; 65:2, 16, 22; 66:2, 17, 21, 24; 67:4, 10, 15, 17, 25; 68:20, 69:8, 16;

70:1, 2, 5, 9, 13, 17, 20, 24, 25; 71:1, 8; 72:10, 19; 74:9; 75:22; 77:15; 78:9; 85:6, 9; 86:13, 13; 91:19; 92:2, 2; 100:2, 14, 16; 101:6, 21; 104:6; 105:4, 24; 106:6, 8, 13, 18; 107:4, 10, 15, 18, 25; 108:4, 17, 109:1, 19, 22; 111:4, 21, 25; 112:3, 6, 7, 10, 16; 113:19, 22; 114:15; 120:25; 121:6, 8, 17, 20; 124:24; 125:1, 5, 9, 11, 13, 15, 20, 22; 126:7, 9, 15, 131:2; 134:1, 2, 25; 136:18, 24; 138:24; 139:14, 19, 22, 24; 141:2, 6, 148:20; 153:24; 155:14, 18; 158:4; 160:18, 24; 161:2, 18, 20, 162:24, 163:1, 18; 166:23, 25; 167:1, 9, 12, 14, 18, 24; 168:1, 6, 9, 12, 15, 17; 170:25; 171:3, 5, 7, 9; 173:25; 174:5, 8, 10, 16, 23, 24; 175:1; 176:18; 177:12, 15, 16; 187:10, 13, 21; 194:2; 202:12, 13, 14; 205:6, 21; 206:8, 11, 19, 21; 208:5, 9, 10, 13; 209:1, 4, 213:14; 214:5; 215:16

**remembered** 133:13

**remembering** 84:16

**remove** 74:5

**remuneration** 21:22

**Renaissance** 17:8, 10

**rendition** 169:10

**rep** 86:7

**repeat** 162:11; 220:14

**rephrase** 11:1; 25:7, 30:21; 44:18; 53:16; 58:7; 91:14, 144:14, 154:18; 169:1; 170:2

**replaced** 204:23

**replacement** 205.24

**replaces** 64:11

**reply** 181:4

**report** 28:13; 79:16, 88:15, 21; 190:2; 191:13; 195:7, 8

**reported** 194:4; 198.19

**reporter** 3:21; 7:20; 144:13, 145:3, 10

**reporting** 42:14

**represent** 3:11; 5:16; 193:4

**representatives** 191:5; 209:16; 216:6

**represented** 193:13; 210:19; 216:20, 21

**representing** 4:14; 5:11

**represents** 192:1

**Request** 4:12, 16; 5:7; 6:6; 7:10; 93:12; 94:6; 104:1; 122:13; 155:9; 168:19; 182:16

**requested** 79:9; 84:19;

205:23

**requests** 155:10, 12

**require** 55:18; 144:2, 196:18; 198:14

**required** 97:21; 99:15, 102:3, 7; 104:18; 143:21, 160:4; 166:20; 168:17; 170:22; 182:3, 22, 23, 25; 183:14, 16, 17, 18, 19; 185:1, 14; 186:6; 195:21; 199:19; 200:5; 202:4, 211:16; 224:12

**requirement** 100:7, 9, 220:11

**requirements** 160:4; 162:15

**requires** 96:18

**requiring** 222:10

**reschedule** 222:4

**research** 10:2

**researching** 121:25

**reservation** 189:24, 25

**reservations** 189:11

**reserve** 7:21

**reside** 57:24

**residence** 55:14

**residential** 58:3

**Residents** 17:7; 85:11, 18

**resides** 22:17

**resign** 158:23

**resigned** 33:14, 18, 74:18; 75:5

**resilient** 216:7

**resolved** 150:25

**resource** 87:20; 106:4, 143:20

**resources** 26:18; 27:4, 6, 6; 29:17; 30:7, 13; 35:17; 37:2, 11, 86:9, 23, 25; 87:2; 112:8, 11, 12, 113:6, 12; 116:7, 8; 117:9; 128:8

**respect** 69:22; 128:5, 19; 133:22; 147:24; 158:10, 162:15; 196:1; 198:19

**respects** 14:21

**respond** 73:13; 74:1; 178:9; 184:8; 213:10

**responded** 38:25; 68:12; 85:2; 171:19

**Response** 4:11, 16, 19; 6:6; 71:3; 73:14; 87:25; 133:6; 153:21, 22, 25; 167:10, 22, 22; 170:8; 171:6, 13; 172:1; 202:7; 215:24

**responses** 7:11; 11:20; 35:20; 38:13; 41:6; 68:9; 97:18; 113:7

**responsibilities** 25:16; 35:20; 38:13; 41:6; 68:9; 97:18; 113:7

**responsibility** 38:3, 3; 57:19; 58:3; 197:10

**responsible** 70:2, 6; 116:8; 171:10, 11

**rest** 35:15

Major v. ... Omni ... International ... Document 112 ... Entered on FLSD Docket 03/13/2001 Pa...

Patrick Scott Major
... February 6, 2001

restricted 14:5

restricting 17:23

result 27:21; 51:14; 58:25; 62:16; 95:15, 16; 193:6; 207:6; 216:19

results 95:12; 108:11

resume 29:21

resumed 74:20

resumes 15:10

retire 31:14

retraction 115:4

retraining 219:15

retroactive 128:17

return 208:20

returned 209:9, 12

returning 221:25

reverting 80:13

review 5:17; 88:1; 106:4, 5; 166:17; 167:7; 182:2, 7, 9; 184:23; 185:18, 19; 214:11; 217:9; 218:6, 9; 219:5, 7

reviewed 90:21, 25; 183:2

reviewing 186:2

reviews 106:4

revise 193:22

revised 195:7, 7

Revising 67:1

rewarding 116:14

rewrite 93:18

rhyme 82:5

Rich 88:9, 115:12

ride 99:22; 104:24; 140:20; 203:9

rig 47:15; 48:8

right 5:6; 6:19; 15:14; 43:18; 47:6; 52:4, 10; 53:15; 64:18; 72:13; 74:16; 77:3; 80:5, 11; 81:4, 6, 16; 90:23; 94:2; 99:8; 102:5; 104:16; 114:17; 118:1; 119:2; 120:3; 123:22; 124:7, 25; 129:6, 8; 137:19; 142:11, 13; 143:21; 148:1; 149:14; 150:18; 151:5, 11; 152:1; 153:2; 154:10, 14; 159:15, 164:24; 165:5; 171:14; 175:20; 177:25; 183:21; 185:22, 25; 186:24; 188:2, 191:18; 192:18; 194:25; 198:17; 214:3; 216:4, 217:18; 221:16

rights 147:5

ripe 198:22

ripple 54:25

river 16:24

Riverside 17:6, 7, 9, 85:10, 11, 18

road 110:8

Rock 37:14, 15

role 111:13; 112:7

room 68:14; 69:7; 146:9; 165:15; 218:17

roughly 43:22; 47:23

route 140:9; 203:17, 19

routes 203:6, 10, 15

routine 9:1; 50:5; 65:14

routinely 92:9; 98:12; 127:9; 128:12; 147:10

rule 7:21

rules 224:12

rumored 124:2, 3

run 70:10; 133:2

running 73:20; 95:13, 14

runway 87:19; 188:23; 190:3, 6, 17, 19, 193:10, 12; 194:14, 16; 195:13, 21; 199:20; 200:6; 202:3

runways 188:21, 25; 193:4, 6

## S

S 18:11

S-I-C-K-L-E 35:5

safe 202:19; 203:13

safety 87:19; 196:3

said-she 68:18

salaried 9:8, 9

salary 35:25; 43:11; 47:9, 17; 48:1; 83:1

same 21:12; 22:2; 23:16; 28:2, 17, 46:2; 54:22; 58:9; 66:22; 70:15, 73:23; 74:13; 79:3; 95:12; 101:3, 102:8, 11, 113:8; 118:20; 121:10, 11, 16; 125:24; 128:11; 132:6; 138:9, 18, 140:9, 18, 24; 146:21, 22; 161:25; 162:2, 8; 163:2, 19; 170:12; 176:4, 9, 21; 182:9, 17; 188:25; 189:1; 196:2, 19; 203:19; 208:12

sample 165:3

Santiago 3:11

sat 211:15

satisfaction 34:13

satisfactorily 182:10; 212:10

satisfied 82:14, 14, 18, 19; 91:10; 126:3, 204:3

satisfy 156:8, 9

Saturday 222:20

saw 20:6; 69:21; 137:10

saying 6:14, 16, 20, 18:4; 46:9; 65:10; 71:19; 90:17, 22; 102:2; 109:9; 112:16, 116:17; 117:22; 119:17; 133:13; 135:7; 136:17, 19; 167:14; 171:9, 21; 174:22, 24; 179:24; 180:4; 184:12, 189:17; 217:19, 20; 223:14

scenario 195:2, 12, 13

schedule 9:17, 18; 46:12, 89:11; 105:15; 207:1, 5, 5, 6; 210:7; 212:2

scheduled 8:24; 9:20

schedules 161:8

scheduling 78:11, 13; 203:21

school 18:19, 23; 19:10; 20:4; 32:13, 14; 33:1, 39:16, 21; 98:16, 20; 99:17; 101:4; 102:21, 23; 104:16; 105:6; 125:16, 17, 160:13, 22; 161:22; 162:18; 163:22; 179:5; 205:8; 207:16; 220:6

Schubert 110:21, 111:11, 14

scope 39:18; 46:10

SCOTT 3:2

search 43:1, 6; 89:24; 90:10

seat 115:20; 158:10, 14, 15; 160:7

seats 101:25; 203:19

Second 4:11, 105:25; 127:16; 148:11; 175:7

Secondly 48:2

Secretary 33:12

sedatives 50:17

seeing 72:16; 75:22; 149:12

seek 26:2, 16; 200:8

seeking 15:5, 6, 8; 53:10; 84:5; 205:9

seem 44:13, 95:5, 114:18; 171:14

seemed 37:14, 170:19; 196:2

seems 115:15

seizures 21:4

self-employed 29:4

self-introspective 94:20

self-study 103:8, 12

sell 24:5, 7, 9

send 93:20; 94:5, 11, 217:7

sending 214:13

senior 115:8, 8; 119:14; 143:16; 203:3; 210:14; 212:4

seniority 115:25, 119:21, 25; 120:18, 21; 122:4, 6; 123:4, 15, 143:17, 18, 21, 25; 144:3; 203:23

sense 37:24; 61:1; 93:22; 110:16; 116:14

sent 15:9, 93:17; 205:25; 213:15

sentence 63:11; 112:24; 175:7, 24; 176:16; 179:13; 180:4, 8, 14; 181:1

separate 17:6; 55:14; 57:13; 114:25; 115:1

separated 103:1

September 16:13; 25:8, 13, 15, 23; 27:2; 28:21; 41:20; 75:24; 76:3, 13; 78:16

sequential 62:22; 89:14

Series 126:2; 172:6

serious 134:13; 137:1, 4; 193:4; 217:7

seriousness 137:15

serve 9:13; 31:16, 100:13; 101:14

served 17:10; 36:23. 85:17; 123.23

server 73:20

serves 45:17; 81:23; 102:17; 154:24; 213:24

service 25:24, 25; 26:5, 20, 22; 31:14; 76:23; 79:9; 194:6

services 76:14, 17; 77:4; 200:24; 205:13, 14; 206:15; 208:16; 209:17

SESSION 84:1; 202:21

set 5:15, 37:23; 55:13; 67:2; 78:7; 84:9; 91:23, 95:18; 98:10; 150:14; 166:12; 216:25

setting 188:22

seven 3:8; 193:5; 223:15

several 20:5; 21:15; 27:14, 61:22; 63:8; 67:22; 71:15, 25; 72:8; 75:3; 82:3; 87:22; 88:24; 100:15; 121:5; 122:6; 125:10, 128:4; 132:22; 150:1, 22; 151:5, 15; 152:8; 155:18, 159:24; 162:14, 15, 166:8; 179:25; 180:4, 5; 196:1; 205:16; 207:14, 15; 210:23

sex 117.20

shack 188:5

shape 84:24

shared 53:24; 150:2; 193:18, 21

shareholder 17:4, 16, 21

Sharpe 49:4, 4; 63:1, 12, 24; 64:4; 65:10; 66:13; 69:1, 5, 9, 70:6, 14, 21, 71:12, 18, 20, 22; 72:25; 74:11; 80:18, 20; 83:9

Sharpe's 68:7

SHEA 4:9; 5:6, 15; 6:3, 9, 13; 7:8, 12, 14, 19, 24; 51:21; 53:5, 12, 16; 62:21; 67:8, 12, 87:10; 104:1; 106:22; 108:5; 109:14, 116:5; 120:4; 122:15; 124:12, 17; 126:17; 131:9, 24; 132:6, 8, 11, 13, 14; 136:10, 138:1, 9, 18; 142:6; 144:6, 24; 145:5, 13; 160:25; 171:18, 22; 174:11, 15, 19; 175:10, 15, 16, 20; 176:2, 4, 9, 21, 24; 177:1; 178:22; 179:22; 180:12, 24; 183:24; 184:4, 16; 201:10, 15; 215:21; 220:17, 19; 221:4, 10, 18, 21; 222:5, 13, 21, 25; 223:5, 10, 14, 21, 23, 25; 224:7, 11, 15

shear 106:6; 168:7; 169:9, 11, 170:8; 171:1, 6, 13; 175:23; 176:8; 177:19, 24; 178:6, 7, 9, 18, 21, 24, 25; 179:12, 17; 198:22

sheet 192:22; 197:21, 199:22

shifted 198:21

ship 134:14

short 66:5; 69:15; 94:17; 201:10

shorter 162:21

shorting 47:24

shortly 124:8, 201:11

shoulder 166:3

show 112:19; 113:23; 116:25; 129:17; 130:3; 133:8; 148:25; 152:14; 161:4; 163:12; 172:9; 187:23

showed 6:7; 46:25; 83:11, 15; 108:21; 109:7; 178:15; 187:21, 25; 188:2

showing 109:4; 133:17; 161:9; 163:9; 171:5

shown 216:18; 217:2

shows 120:17; 146:7

sick 14:14

Sickle 28:14; 35:1, 2

side 36:20

sidetracked 144:11

Sierra 27:10

sign 84:17; 146:23; 166:2, 181:21; 182:21, 183:1, 23; 184:12; 187:3, 206:17; 207:8, 10, 22

signature 170:12, 184:18, 20; 185:1

signed 168:19, 21, 24; 169:3, 22; 170:12, 16; 181:2; 182:7, 8, 12, 14, 15, 20; 214:20

significant 22:5; 174:2, 6; 192:1; 196:20

significantly 116:1; 198:11

signified 168:22

signifying 170:12

signing 148:5; 180:10, 22; 181:9, 17; 185:16; 186:23; 207:12

similar 21:14; 140:24, 25, 194:19

simple 61:5; 180:2; 184:9

simpler 69:18

simply 96:1; 133:12; 144:8; 182:1; 183:1, 185:1; 212:24

simulator 8:12; 10:14; 11:5; 14:18; 99:22; 100:4, 5; 102:22; 104:13, 17, 17, 20, 23; 125:15; 164:4; 176:17; 177:6, 9; 179:6; 207:1, 16; 208:16

simultaneously 101:25

**single** 19:12

**sister** 40:24

**sit** 9:23; 55:11; 94:8; 105:13; 112:3; 152:21; 157:15; 181:20; 183:21; 218:13

**site** 10:3, 4

**sites** 15:12

**sitting** 60:3; 68:11; 194:15; 195:11, 14

**situation** 42:23; 54:5; 96:1

**situations** 73:18

**six** 80:15; 220.20, 22; 221:1, 2, 223:10, 16

**size** 36:2

**sizeable** 37:17

**skills** 82:8, 19

**Sky** 42:17

**sleep** 133:2

**sleeping** 50:16

**slightly** 133:10

**slip** 168:13; 216:23

**small** 19:25; 146:24

**smell** 136:4; 137:5

**smelled** 134:12; 136:2, 5; 137.2, 11

**smoke** 134:12; 135:4, 5, 20; 136:3; 137:2, 5

**sold** 24:3, 4, 207.18

**sole** 17:4, 15; 18:15; 23:22; 57:15, 19

**soloed** 31:6; 32:11

**solution** 198:25

**solutions** 126:21

**solve** 196:10

**somebody** 127.25, 128:11; 203:12, 22

**somehow** 135:8, 10

**someone** 58.24, 96:5; 118.4, 119.22, 206:7

**something** 5:10; 14:7; 16:16; 26:3; 36:19; 40:5; 42.18; 45:18; 50:5; 59:6; 71:7; 73:21; 97:25; 114:5; 136:2, 25; 137.22; 138:7; 144.15, 145.18, 19, 147:13; 169:12; 181:9; 183:2; 196:23; 197·1; 201:2; 202:8, 8, 15, 205:22; 214:20

**something's** 133.24

**sometime** 30:14; 106:16, 16; 109·13, 18; 120:1; 148:13, 17; 153:5; 194:20

**sometimes** 47:1; 60:1; 73:11, 11, 11; 84:25; 94:12; 133:2

**somewhere** 60·4; 94:9; 123:3; 211:2; 212:6; 220:9

**Sonnen** 163:23; 164:5, 6; 166:11; 172.21; 173:17; 178:10; 182:2, 25; 184:10; 215:4, 7, 20; 217:12, 16, 18, 21

**Sonnen's** 172:19; 181:24; 217:17

**soon** 110:17; 163:3. 211:1; 212:5

**sorry** 11:19; 21.17, 31:20; 38:20; 39:23; 40·14; 59:11, 68:15; 76:8; 85:8, 21; 99:14; 102:1, 106:8; 108:3; 112:16; 127:7; 137:7; 139:6; 145:2, 11; 158:13; 169:14; 173:2, 14; 177:3, 4; 178:2, 185:8; 186:8; 190:19; 207:19; 209:13; 215:6, 217:10, 21; 223.3

**sort** 39.19; 40:8; 58:23; 65:9, 89:13; 99:18; 107:22; 134:8; 164:22

**sought** 13:15; 44:16, 20, 50:16

**sound** 61:25; 152:24; 167:21

**sounds** 69:15; 124:25; 152:24

**source** 134:18; 191:6, 7

**South** 39:25; 43:1

**space** 198:1

**speak** 27:25, 65:8; 85·8, 103:5, 104:24; 111.2, 124:17; 131:1; 137:10, 181:23; 205:19

**speaking** 16:14, 15, 25; 18:1; 59:13; 67:4; 119:19; 144:8

**Special** 32:3

**specialist** 50:9. 10

**specialty** 30:7; 43.21

**specific** 65·24; 66:5; 67:6; 71:19; 72:19; 94.7, 114:5; 126:13; 158:11. 160:3; 171.6, 178:4, 8, 185:14; 193:10; 206:9

**specifically** 35:7; 67:21; 72.18; 86:2; 97:20; 107:15; 111:25, 116:24; 119:9; 139.7; 143:4; 201:17

**specifications** 140:15

**specifics** 78:8; 86:13

**specified** 77:11; 139:13

**speculating** 202:9

**speed** 179:3

**spell** 16:1; 27:8; 35.3, 88:10; 157:22, 23

**spelled** 206:4

**spend** 6:21; 35.14. 133:1

**spent** 10:23

**spiritual** 61:1

**spiritually** 97:1

**split** 53:7

**spoilers** 172:7

**spoke** 208:6

**spoken** 191:8, 9

**squirreled** 123:3

**Sr** 101:9, 12; 119:19;

140:19; 193:1; 195:23; 196:6; 210:18

**staff** 72:3

**staffing** 113:10

**stand** 45:7; 69·17

**standard** 43:24; 190:16, 24

**standards** 165:1, 173:16

**standing** 191:14; 199:20, 22; 200:9

**standpoint** 115:22; 144.4, 7

**start** 41.12, 18; 42:4; 62:21; 104:2; 133:14; 197:20

**started** 27:25; 29:15; 31:3; 32:20; 38:17; 42:6, 8; 43:8; 120:7, 9, 11, 15, 126.12; 167:5; 188:9; 200:9; 208:13; 220:25

**starting** 127:4; 142:2

**state** 4:8; 23·12; 45:1; 58:3

**stated** 82:3; 116:12; 156:7; 181:3; 219:14

**statement** 73:7, 221:24; 222:6

**States** 21.9, 183:1

**stating** 166:20

**status** 74:25; 79:15; 80:13

**staying** 15.2, 58:12; 147:19; 208:14

**Steele** 100:19; 114.8; 118:14, 16, 25; 119:1; 126:16; 127:14; 128:4; 140:19; 142:21; 168:19; 169:2; 179:19; 180:10, 17, 21, 181 2, 8, 21, 182:12, 14, 15, 20; 183:23; 184·12; 185:7, 10; 187:11; 191:9, 196:5, 23; 200:16; 201:5, 202:1, 18, 21; 203:2, 9; 204:7; 205:1; 211:7, 23; 213:1, 6; 215:5, 5, 19; 216:1, 21, 22, 23; 217:15

**Steele's** 170:12; 180:16

**steps** 212:12

**sterile** 159:3

**Steve** 3:11; 110.21; 111:11, 14

**stick** 78:1, 136:19

**still** 3:18; 14:21; 16:8; 20:17, 18, 19; 23:9; 14; 31:18; 75:1; 79:7; 83:12, 16; 103:22; 134:7; 155·1; 159:12; 181:20; 191:23; 193:8; 199:1, 13; 212:11

**stock** 17:22; 18:3, 4, 7

**stockholders** 85:1

**stop** 183:7

**stopped** 69:15; 163:9; 199:14

**store** 93:17

**Stored** 22:23

**stories** 94:17

**strained** 53:23; 83:6

**Strategies** 17:17; 18.10, 17, 18; 21:11, 18, 23, 23:16; 29:7; 76:25, 77 19; 78:5; 126:21

**Street** 208:15

**stressor** 54:3

**stressors** 54:1

**stretch** 3:24

**strict** 65:19; 96:10

**strictly** 76:21

**Strike** 141:14

**striking** 69:15

**strong** 134:10

**strongly** 170:17

**struggling** 85:9

**stuck** 60:2

**student** 182:18; 200:23

**study** 133:3, 3

**stuff** 39:20; 94:23; 166:16

**style** 30:20; 36:25; 69:3; 72:4; 95:5, 126:16; 127:19, 21

**styles** 126:22

**subject** 50:4; 109:20; 113:19; 114:8; 125.22

**subjects** 56:22

**submit** 93:5; 94:5; 95:10, 154:17, 19; 155:6

**submitted** 13:23; 14:2, 8; 15:10; 93:7, 10, 25; 117:15; 154:9; 155:8

**submitting** 103:15

**subpoena** 62:25

**subsequent** 87:24. 116:25; 141:8; 142:20; 148:10; 149:20; 153.17; 154:2, 5; 172:3

**subsequently** 74:5; 133:13; 205:8

**substantially** 21.10, 12, 30:23; 47:25; 90.15; 149:25; 152:13

**substantive** 162:15

**success** 37:20

**successful** 31:1; 64:14

**successfully** 124:10; 169:23

**succession** 123·4

**successive** 27:21

**successor** 27:15, 16, 17

**sue** 53:2

**sued** 51:11; 85:3. 5. 22, 22

**suffer** 54.12

**suffered** 51:24

**sufficient** 44:12; 166:20; 201:4

**suggested** 7:4; 40.7; 124:15, 212:5; 213:22

**suggesting** 6:25; 67:18; 69:16; 70:25; 90:18; 120:22

**suggestions** 67:23

**suggests** 126:23; 152:22

**suitors** 34:19

**summarily** 108:21, 24

**summarize** 92:9

**summarized** 91:15

**superior** 34:12; 87:22; 88:23; 143:1, 6

**Superiors** 96:14

**supervision** 29:10, 83.1; 100:11

**supervisor** 28:12; 34:25; 83:6, 7, 8; 86:23, 25; 87:3; 88:7, 13; 127·14, 17, 19; 128:24

**supervisory** 49:14; 68:8

**supplied** 24:19

**support** 79:7

**supportive** 210.20

**supposed** 80:3; 111:18; 117:23; 161:5

**supposedly** 180:10, 21

**sure** 5:12; 6:11, 13; 7:7; 25:4; 27:24; 49:6, 9, 11, 25; 62:6; 74:10, 75:17; 90:16; 97:19; 117:8; 121:23; 123:2, 11; 130:10, 135:22; 142:23; 145:19, 150:13; 152:7; 153:9, 19, 21; 177:11, 180:14; 196:13; 212:12; 217·1

**surface** 87:19; 192:2

**surmise** 141:24

**surmising** 158:25

**surprises** 164:19

**surrounded** 188:13

**surviving** 27:16, 17

**Susan** 3:10

**sworn** 3:4

**syllabus** 178·1

**system** 47:11, 98:23, 110:11; 132:23; 134:20, 137:23; 138:8

**systems** 97:17; 98:19, 22; 106:5, 8; 132:4, 17; 133:22; 165:8

# T

**T-E-L-U-S** 27:9

**tabulating** 161:10

**tail** 196:15, 21, 197:4, 11, 12; 198:13, 20

**takeoff** 134:4, 9, 18; 137:6, 16; 192:15, 16; 195:11; 196.12; 200:5; 202:5

**takeoffs** 193.6

**takeover** 36:8

**talk** 97:4, 4, 201:1, 8; 207:25, 208:3

**talked** 217:25

**talking** 89:22, 96:15; 110:20; 117:20, 118:1; 123:9; 124:1; 143:19;

0607-VM Document 112     Entered on FLSD Docket 03/19/2001 Pa

144:4; 164:21; 185:4;
192:14; 207:13; 218:13
**Tampa** 32:14, 16; 37:16
**tapes** 103:8; 224:20
**targeted** 18:24, 25; 19:8
**Task** 32:1; 129:1, 2
**tasking** 133:21
**tax** 24:14, 16
**teach** 12:6, 18:24; 19:10
**teaches** 59:6
**teaching** 79:5, 6; 169:19
**team** 128:5
**technical** 94:21, 24;
186:3
**telephone** 73:24; 173:11
**telling** 62:3; 67:4, 13;
69:5, 8; 70:1, 13; 71:6, 8;
128:11; 135:3; 141:6;
168:1, 6, 12, 15; 170:25;
171:3; 181:18; 184:4;
195:15, 24; 197:12
**Teltec** 27:25; 33:20; 34:3;
35:7
**Telus** 27:7, 9, 22, 25;
28:1, 8; 29:9; 30:15
**template** 118:3
**temporary** 110:11
**temptation** 115:12
**ten** 78:22, 24
**tend** 95:4, 4
**tenure** 28:1
**term** 25:9; 40:7; 58:2;
65:15; 96:11; 97:20;
129:18; 167:3; 202:22
**terminated** 25:22; 33:13,
13, 17; 179:17, 19
**terminating** 180:6
**termination** 50:12, 51:7,
14; 79:18
**terms** 36:12; 49:12;
57:25; 71:18; 77:10, 11;
95:6; 108:15; 113:2;
136:7; 196:12; 206:19;
207:7; 224:9
**test** 99:19; 164:25
**tested** 183:4
**testified** 3:4; 108:6
**testify** 153:6; 174:20
**testimony** 124:17;
181:20; 183:21, 25,
194:13
**testing** 39:12, 17; 40:8
**themselves** 98:14; 182:4
**there'll** 170:18
**Therefore** 84:8
**Thereupon** 3:1
**They'd** 152:7
**they're** 99:5, 5; 115:16;
121:23; 125:24; 128:12;
136:22; 156:3; 169:19;
188:25; 189:1; 198:9, 12,
13, 13; 218:18
**thinking** 29:15; 154:13;
206:21

**third** 149:5, 10; 173:10;
175:7; 206:5
**thorough** 151:3; 218:6,
11
**thoroughly** 183:4
**though** 3:16; 54:2; 55:10;
61:24; 140:5; 181:3;
195:11, 210:24
**thought** 37:22; 52:2;
93:25; 94:3; 108:11;
111:22, 25; 141:23, 25;
155:1; 158:12, 13; 178:2,
217:22; 221:21
**threat** 178:24; 193:14
**three** 7:1; 16:20, 17:3;
22:11; 24:12; 25:1, 11;
37:23; 38:1; 41:24;
101:24, 24; 102:3; 107:14;
110:3; 118:21; 137:21;
142:8; 161:17; 164:3, 4;
166:3; 173:10; 177:14,
188:13; 192:8; 196:18;
197:1; 205:18; 224:20
**throughout** 65:15;
87:21; 110:11
**thunderstorms** 188:14
**Thursday** 206:18;
208:12
**times** 61:6; 66:3; 78:15,
22; 91:15; 142:8; 193:5;
204:6; 210:23
**tired** 3:24
**title** 49:10; 70:3, 7
**titled** 169:17
**titles** 105:24; 106:2
**today** 3:13; 7:2, 20:14;
52:4; 152:14, 21; 183:21,
221:22
**today's** 152:14
**told** 60:10; 75:16, 117:16;
124:1; 129:23; 142:16, 20;
144:20; 146:12; 164:8, 10;
177:14; 179:9; 183:10;
192:7; 193:1; 206:16;
207:22; 210:3; 211:21;
212:15, 16; 220:14
**tomorrow** 201:13;
222:19; 224:2, 3
**tone** 68:22
**took** 64:10; 73:10, 85:10;
91:19; 133:14; 134:23, 25;
140:8; 160:20, 175:1;
186:24; 196:11; 207:3
**top** 149:5, 10; 150:6, 11;
155:16; 173:8
**topics** 102:13; 106:1, 3,
13
**torrential** 188:17
**total** 10:5; 57:15; 179:14
**touch** 22:20
**tourist** 203:16
**toward** 12:7; 35:20;
60:25; 79:20; 129:24;
147:24, 219:17
**tower** 190:2; 191:13, 20;
193:9, 23, 25, 194:6, 7, 11,

13, 16, 18; 195:6, 15, 16,
17, 19; 196:17
**town** 58:16
**track** 161:6
**Tracy** 211:15; 212:1;
216:1
**traded** 17:21, 22; 18:6
**trained** 14:22, 123:24;
194:5
**training** 4:23; 5:3, 8, 21,
25, 6:3, 5, 15, 17; 7:9, 15;
12:25; 13:1; 14:19, 19, 21,
25; 36:12; 40:5; 97:13;
99:11, 17, 100:7, 23,
101:18, 24; 102:7, 25;
103:14; 104:4, 7, 10, 12;
105:9, 13, 20; 109:5, 5;
125:6, 8; 156:19; 159:19;
160:9, 24, 162:3, 22, 23;
164:4; 165:14, 14; 166:13;
168:7, 23; 170:11; 171:1;
177:19, 25; 178:6, 7, 18,
21, 24; 179:4, 10, 16;
180:18; 183:3, 12; 184:19;
185:13, 15, 16; 186:18, 21,
24; 187:1; 191:25; 200:24;
205:8, 9, 15, 16; 207:5, 15,
17, 18; 208:17, 18; 209:14,
19; 210:14, 24; 214:2, 6, 9,
10, 13, 16, 21; 216:25;
217:5, 7, 9; 218:17, 24,
219:2, 7, 9, 10; 220:3, 5, 7
**tranquilizers** 50:17
**transaction** 47:25
**transcribed** 192:7; 194:6
**transformational** 59:6, 8
**transmittal** 172:19
**transport** 19:11, 24;
166:22
**Travel** 16:22; 25:12; 98:7
**treat** 69:6, 9; 70:10
**treated** 52:25
**treatment** 39:10
**Trek** 42:17
**tricky** 3:15
**trip** 74:4
**trot** 146:25
**true** 45:25; 176:1; 198:16
**try** 132:9, 181:25; 203:25;
204:2
**trying** 12:2, 10; 14:6;
18:5; 32:6; 34:20; 52:22,
53:6, 7; 71:2; 72:15; 93:19;
133:1; 162:7; 209:22;
215:25; 219:23
**Tuesday** 146:2; 222:20
**turn** 63:3; 77:1; 146:18
**turning** 158.6
**TV** 103:8
**Twice** 9:7; 32:11
**Two** 6:23; 10:20; 11:21,
16:20, 17:5; 28:2; 66:2;
70:23, 71:3, 5; 74:23,
77:20; 82:12; 89:1;
102:16, 17; 113:11;
114:24; 142:12; 151:11;

154:10, 11; 161:17; 164:3;
175:4; 188:25; 192:20;
209:22; 213:25, 218:14;
219:17
**type** 43:15; 211:1; 212:5
**types** 97:2
**typically** 91:21; 102:18

## U

**unable** 79:8; 160:20;
207:16; 208:16, 17
**uncertain** 136:7
**uncomfortable** 95:3
**uncommon** 29:14
**under** 13:15; 16:8; 66:7,
8; 100:11, 156:15; 170:20;
181:21; 182:22, 23,
183:21; 195:1; 197:8;
206:22; 209:25; 212:10;
217:9; 218:23; 224:12
**undergone** 162:3
**underneath** 82:11
**understood** 11:20;
12:12; 26:9; 117:25;
170:15, 18; 173:21
**undertook** 166:17
**unemployed** 54:13;
56:10; 78:2
**unemployment** 42:2
**unfortunate** 115:4
**unfortunately** 63:6
**unhappy** 34:1
**uniform** 146:25, 165:17,
18, 19
**Union** 27:23
**unionization** 88:25
**unit** 32:3
**United** 21:9
**university** 39:17, 25
**unless** 95:11; 115:10;
124:14; 175:13; 190:2;
191:13
**unquote** 116:13
**Unsatisfactory** 16:11;
110:12; 115:21
**unto** 95:20
**unusual** 60:19
**unusually** 188:12
**unyielding** 127:4
**up** 3:20; 5:1, 9:19, 20:24;
21:18; 31:25; 37:17;
38:18; 40:19; 46:25;
52:18, 54:7; 55:13, 65:8;
69:17; 71:17; 85:8; 91:24,
24; 96:25; 108:21; 109:4,
7; 116:12; 120:17; 123:6;
127:11, 128:19; 133:2;
134:24; 135:1, 8, 10,
141:18; 142:2; 147:1, 2;
150:14; 160:19; 161.4, 9;
163:9, 13, 164:12; 166:12;
176:17; 187:21, 23, 25;
188:2; 190:10; 192:6;
196:22, 25; 203:10, 207:6,

208:15; 209:11; 216:25;
220:17, 20; 221:5; 222:3,
223:4
**up-to-date** 17:25
**update** 98:12
**upgrade** 4:23; 108:18,
19; 109:5, 23; 111:3, 16,
114:25; 115:6, 6; 154:4,
19; 155:1, 8; 158:17;
160:12, 14; 162:8; 205:4,
217:13
**upgraded** 124:10, 125:1;
158:16; 162:12; 218:4
**upon** 84:12, 85 20;
103:15, 133:3; 207:24;
220.12
**upper** 49:1
**upstairs** 184:25
**urge** 170:17
**urgency** 160:1
**use** 25:9; 58:3; 82:8, 19;
96:24, 97:2; 105:19;
106:3; 122:15; 131:10, 24;
132:6, 9, 15; 136:12;
138:2, 19, 25; 140:10,
175:11; 176:6, 21; 191:15,
17; 194:1; 211:22
**used** 19:25; 44:23, 69:10;
131:25; 190:6, 7; 198:2;
199:15; 202:22; 217:5;
219:24
**uses** 180:5
**using** 64:24, 96:25;
128:14, 139:10; 175:13;
179:23; 188:20, 21, 22, 24,
189:4, 5; 192:8
**usually** 69:14; 79 1;
135:19, 188:14; 192:20
**utilize** 26:5, 20
**utilized** 96:5
**utilizing** 26:8

## V

**V** 32:5
**vacation** 14:11; 45:1, 2,
8, 17, 19; 46:4, 6, 11, 16,
17, 18; 80:8, 15; 128:18
**vague** 106:22; 124:2
**vaguely** 22:18
**validate** 186:18
**value** 36.9
**varies** 9:11, 14, 22
**variety** 12:4
**various** 15:10, 12; 47:14,
65:3; 91:3; 103:17;
113:14; 191:5; 203:6
**vary** 10:4
**vast** 92:15; 94:23;
121:18; 186:4, 200:21
**venture** 14:9
**verbally** 108:8, 10;
126:12; 216:2
**verge** 72:2
**verified** 131:6, 21



**verify** 122:14

**viability** 183:4

**viable** 42:22

**vicinity** 137:6

**victim** 148:23

**video** 3:16, 20; 103:8; 105:24; 221:25

**videographer** 7:20, 221:23; 222:7, 224:19

**videos** 105:16, 19; 163:15, 17, 18; 178:2

**videotaped** 222:8

**videotapes** 103:9

**Vietnam** 33:8

**view** 96:7; 129:5, 7

**viewing** 105:21

**violation** 195:4

**violence** 213:23

**virtue** 53:24; 73:18; 92:13; 93:11; 145:25; 156:18; 194:4, 200:23

**visibility** 194:23

**visit** 64:2; 134:16; 154:24; 209:17

**Vito** 208:6, 7, 19

**vivid** 60:16, 19, 19

**volunteer** 17:11

## W

**W-O-R-M** 38:8

**wait** 41:17, 188:23; 202:3

**waited** 192:23, 25; 197:7

**waive** 147:5

**walked** 218:16

**wants** 134:21, 197:22

**War** 31:16

**ware** 43:14

**warnings** 88:5

**Warrant** 32:5

**warranted** 40:9

**Washington** 101:9, 12, 119:13, 14, 17, 19, 21; 120:14; 121:10; 123:23; 155:21; 156:11, 194:20; 195:1

**watch** 105:22

**water** 191:14, 24; 192:1; 193:9; 199:20, 22; 200:9

**waterfront** 85:19

**way** 3:15; 21:12; 30:18; 46:24; 47:11; 51:6; 52:15, 18, 24; 53:9, 21, 59:4; 65:3, 12, 21, 66:15, 22, 67:6, 18, 70:15, 15; 73:16, 23; 74:13; 87:5; 91:20; 92:16; 95:12, 105:1; 111:7; 120:13, 18; 121:10, 25; 123:19; 128:11; 143:25; 145:13; 147:17, 21; 148:8; 150:14; 152:19, 22, 160:15; 173:15; 176:6; 177:16; 186:9, 12; 189:22; 190:25; 193:25, 197:7,

**198**:4; 204:11; 215:2, 22, 217:10; 224:16

**Wayne** 144:18; 146:9; 147:1, 2; 150:24

**weak** 132:5, 18

**wear** 165:16; 166:1, 2

**weather** 178:25; 188:7, 10, 12; 191:20; 192:7; 193:24, 24; 194:5, 5, 7, 195:8, 24; 198:6

**web** 15:12

**week** 9:6, 24; 10:4; 43:23, 45:6, 8, 17; 46:23; 47:1, 58:4, 4, 205:15, 16; 206:15

**weekends** 47:1

**weeks** 10:1; 47:21, 74:23; 110:3; 204:17

**weighed** 11:3

**weight** 188:3; 192:22; 197:8; 199:6, 9, 15, 21

**weights** 187:23; 188:9, 21; 189:5; 199:4, 7, 8

**Weiss** 200:17, 20, 25; 201:3, 7, 16, 22, 24

**welcome** 146:15

**weren't** 116:8, 203:4; 217:22; 219:2; 220:1

**West** 8:4; 20:15; 22:18; 32:24; 33:1

**Western** 27:23

**Weston** 22:18

**wet** 190:3; 193:6

**what's** 45:15; 95:11, 16, 120:21; 130:3; 159:3, 176:3, 184:15; 185:19, 24; 211:16

**whenever** 78:11

**whereas** 47:1; 140:16

**wherein** 148:19

**Whereupon** 83:20; 224:25

**wherever** 91:23

**white** 43:18

**whole** 49:18; 102:8, 134:14; 188:15

**wholly** 80:17

**whose** 22:10; 23:21; 121:6; 201:19

**widely** 96:8; 143:25

**wife** 52:17; 55:13; 59:2; 73:17

**will** 3:18, 20; 4:1; 5:4, 16; 25:10; 45:11; 49:19; 81:1; 86:10; 100:22; 112:23; 113:11, 14; 118:13, 122:13; 130:21; 131:19; 137:21; 138:6; 165:3; 182:19; 198:8; 222:11, 14; 224:6

**William** 130:14

**Williams** 48:22; 66:13; 68:25

**willing** 128:20

**wind** 106:6; 168:7; 169:9, 11; 170:8; 171:1, 6, 12;

175:23; 176:8; 177:19, 24, 178:6, 7, 9, 18, 21, 24, 25; 179:11, 16; 192:8; 196:15, 16, 20; 197:2, 4, 11, 12; 198:20, 20, 22; 199:16

**winds** 196:17; 198:12

**wing** 19:3, 4, 5, 5; 98:6

**Wings** 17:19; 19:7; 23:18, 19, 20, 21, 24:1; 167:12

**withdraw** 215:7

**within** 7:10, 19:19; 34:15; 37:1; 115:17

**Without** 4:24; 5:12; 17:11; 46:15; 52:1; 110:3; 116:17; 121:19; 165:21, 21, 184:18; 206:23

**witness** 3:3; 49:23; 86:8, 117:4; 131:11; 132:10; 138:20, 220:24; 221:19; 223:12

**wondering** 136:24

**word** 60:20; 83:10; 96:24, 25; 178:23

**words** 5:6; 25:18; 36:3; 38:14; 44:20, 23; 67:15; 69:10; 79:9; 115:15; 131:6; 191:15; 212:7, 219:24

**wore** 165:17

**work** 9:10, 21, 24; 10:1, 2, 3; 25:10, 18; 29:18; 42:14; 46:13, 14, 14, 21, 22, 23, 24; 48:13; 55:21; 64:6, 9, 19, 24, 66:25; 67:7, 14; 70:15, 71:17; 73:18; 76:9; 83:2; 85:7; 92:21; 95:1, 9; 96:15, 17, 18, 19; 97:6, 8; 128:20; 153:4; 155:2, 173:17; 191:24, 197:19; 211:1, 5; 212:6; 216:15, 17

**worked** 72:2; 76:21; 86:12, 153:8, 184:7

**working** 27:25, 30:15; 35:15; 47:18; 54:18; 65:4; 83:1; 120:8, 11, 15; 211:3; 212:2

**workplace** 213:23

**works** 47:11; 181:25

**World** 27:20; 31:16

**worm** 38:5, 6, 7, 16; 40:19

**worried** 198:15

**worry** 188:10

**wrap** 220:17

**write** 92:1, 19, 22, 24; 93:2, 2, 3, 13; 94:8, 15, 95:4, 96:18, 22, 22, 23; 97:4; 198:3; 200:2

**write-offs** 24:13, 13

**writer** 92:17, 18; 93:22

**writing** 83:4; 95:3, 5, 9, 11, 16, 17, 20; 96:18; 108:12; 114:16; 116:18; 152:8, 191:1; 215:16

**writings** 94:19

**written** 91:15; 93:1, 16; 94:4, 6, 23; 143:9; 148:21;

150:1, 153:25; 154:1; 155:12

**wrong** 70:18, 22; 71:12, 72:13; 132:25; 136:17; 137:20; 171:13

**wrote** 80:1; 146:4; 149:13; 150:22; 151:15; 213:16; 216:17

## X

**X** 81:20; 91:10, 11, 146:24

## Y

**yeah** 65:5; 80:1

**year** 8:21; 32:1; 37:13; 45:9, 10, 11, 13; 46:7; 47:9; 81:24; 98:9; 103:9, 14; 105:9, 11; 163:2, 210:22

**years** 8:6, 18:14, 20:24; 21:16; 30:25; 35:15; 37:23; 38:1; 65:9; 77:20; 89:23; 90:6; 93:9, 11, 107:14; 116:7; 117:10; 127:7; 128:16; 136:25; 142:7, 12; 154:10, 11; 160:23; 162:14; 175:4

**yesterday** 4:11; 5:9, 16, 20; 6:4, 18, 21

**York** 18:7; 28:3

**yours** 137:20

**Yup** 145:22

**COBRA NOTIFICATION FORM**  *Employer copy*

CS-205C/3/99

> **Employer:** If you have any questions, please call CobraServ at: 800-488-8757.

**1) TO:**

Please Print

Name(s): Patrick Major

Address: 1722 W. Las Olas Blvd

City: Ft. Lauderdale  State: FL  ZIP Code: 33312

*Note:* Address to both employee and spouse (if spouse is covered). If any covered spouse/covered dependent(s) reside at a separate address, a Notice must be sent to the separate address, as well. (The address area fits a standard window envelope.)

**2a) Date of Notice:** 08252000

**2b) Date of Qualifying Event:** 08252000

**2c) Benefits Termination Date:** 08312000

**3a) Company Name:** Pan Am Intl Flight Academy

**3b) Company Division Code:** 

**3c) Company ID or Unit Code:** 

**3d) CobraServ Account #:** 65036784

**3e) Gender:** ● Male  ○ Female

**4) Individual's Social Security #:** 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

**5) Employee ID # (if applicable):** 

**6) Benefit Class # (see COBRA Rate Sheet):** B03

**7) Family Status** (choose ONE and fill in circle completely)

○ Individual (1)  ○ Individual + 1 (2)  ○ Family (3)  ○ Individual + Spouse (9)  ○ Individual + Child (14)  ● Individual + Children (15)

**8) Does employee have FSA (Flexible Spending Account)?**  ○ No  ● Yes  If yes, monthly amount is: $ 71.41

**9) If the individual experiencing the Qualifying Event is not the employee, please complete the following employee information:**

Employee Social Security #: 

Dependent's Relationship to Employee (fill in appropriate circle):  ○ (Spo)use  ○ (Dau)ghter  ○ (Son)

**10) COBRA Qualifying Event Causing Loss of Coverage** (choose ONE and fill in circle completely)

*Continuation of coverage for 18 months:*

● Employee's termination of employment (Code 1)
○ Employee's reduction of hours (Code 2)

*Continuation of coverage for 36 months:*

○ Death of covered employee/retiree (Code 3)
○ Divorce/legal separation (Code 4)
○ Ineligibility of dependent child (Code 6)
○ Covered employee/retiree becomes entitled to Medicare, dependents may elect continuance of identical coverage (Code 5)

○ Retiree, spouse or child of retiree loses coverage within one year before or after commencement of proceedings under Title 11 (bankruptcy), United States Code (Code 7).

**11) Prepared by** (Please print, *in black or blue ball point pen,* clearly.)

Last Name: ULLMANN  First Name: MICHELE

**12) Preparer's Telephone Number:**

Area Code:   Telephone Number: 

**Employer: Retain this copy for your records.**

DEFENDANT'S EXHIBIT

UNIVERSAL INDIVIDUAL APPLICATION FOR GROUP INSURANCE/MEMBERSHIP

**Blue Cross Blue Shield of Florida**

HEALTH OPTIONS.

FLORIDA COMB D LIFE
INSURANCE COMPANY, INC.

BLUE SHADED AREAS TO BE COMPLETED BY GROUP ADMINISTRATOR   PLEASE PRINT CAREFULLY.

| 1. Type of Product □ Traditional | 2. Health/Life | 3. Group Number | 4. Division Number | 5. Pkg. No. | 6. Effective Date | 7. Class No. | 8. Annual Gross Salary | 9. Paid |
|---|---|---|---|---|---|---|---|---|
| □ Health Options □ PPO □ Care Manager | Health Only □ Life Only □ | 9257002 | | | | | S | □ Hourly |
| □ Elect Care □ Other | COBRA | | | | | | | □ Salary |

| 10. Term Life | 11. AD & D | 12. □ YES Amt | 13. □ YES Amt | 14. □ YES Amt | 15. □ YES Amt | 16. □ YES Amt | 17. □ YES |
|---|---|---|---|---|---|---|---|
| □ YES □ NO | □ YES □ NO | Supplemental Term Life □ NO S | Supplemental AD & D □ NO S | STD Benefit □ NO S | LTD Benefit □ NO S | Dependent Life □ NO S | Other Benefits □ NO S |

| 18. Full-Time Hire Date | 19. Name of Group Employer | 20. Occupation | 21. Applicant's Social Security No. |
|---|---|---|---|
| MO 01 DAY 01 YEAR 00 | PAZZA | Fluter/Chef Instr B-720 | 28-02-9531 |

| 22. Last Name | First Name | M.I | 23. Birthdate | 24. Street Address | 25. City | State |
|---|---|---|---|---|---|---|
| Major | Patrick | S | MO 10 DAY 02 YEAR 1957 | 1122 W Loudan Blvd | FLL | FL |

| 26. Zip | 27. County | 28. Employee Number | 29. Location Number | 30. Home Phone # | 31. Business Phone # |
|---|---|---|---|---|---|
| 33312 | Broward | | | 954 763-7019 | 305 824-6620 |

| 32. Marital Status | 33. Type of Health Coverage | 34. Type of Dental Coverage* | 35. Sex |
|---|---|---|---|
| □ Single □ Divorced □ Separated □ Married □ Widowed | □ Employee ☑ Employee/Family □ Employee/Spouse □ Employee/Children* | *Only available where offered | □ Employee ☑ Employee/Family □ Employee/Spouse □ Employee/Children* | *Only available where offered | ☑ Male □ Female |

| 36. LIST ELIGIBLE FAMILY MEMBERS TO BE COVERED. A copy of the court order must be attached for dependents in court-ordered custody or guardianship of the certificate holder. | (Please Print.) If more space is required, attach a separate sheet with additional information. | 37. * Applicant's Primary Care Phy.(s) For Health Options, Care Manager & Elect Care Coverage/Membership. (Last Name, First Name) | PCP # | Current Patient | DO NOT WRITE HERE |
|---|---|---|---|---|---|
| | | | | Yes No | |

IMPORTANT: If the Health Options or Elect Care product was selected, a Primary Care Physician must be selected from the Health Options, Inc. provider directory for each proposed member BEFORE coverage can become effective. (See Boxes 37 & 38)

Gerald Kurtendall 7346 X

| Relation To You | First Name and Middle Initial Last Name (if not the same) | Social Security Number | Birthdate Mo. Day Yr. | Check if: Supported By You & Living With You Full-time Part-time Student Disabled | 38. * Dependent's Primary Care Phy.(s) For Health Options, Care Manager & Elect Care Coverage/Membership. (Last Name, First Name) | PCP # |
|---|---|---|---|---|---|---|
| Spouse | Beth B. Major | 12 12 1159 | | | | 2226 X |
| Son ☑ Daughter | Amey C. Major | 229 08 91 | □ YES □ NO □ YES □ NO □ YES □ NO □ YES ☑ NO | Donald E. Marcus | 2226 X |
| Son □ Daughter □ | | | □ YES □ NO □ YES □ NO □ YES □ NO □ YES □ NO | | |
| Son □ Daughter □ | | | □ YES □ NO □ YES □ NO □ YES □ NO □ YES □ NO | | |

39. Is the full-time / part-time student's address different from yours? If so, please list his /her name.

| 40. | Primary Life Insurance Beneficiary(s) | Last Name Major, Audrey Last Name | First Gurney First | X | M.I. B | Relation to You Wife % Share 100 |
|---|---|---|---|---|---|---|
| | | | | | M.I. | Relation to You % Share |
| 41. | Contingent Life Insurance Beneficiary(s) | Last Name Major Last Name | First Carl First | | M.I. H | Relation to You Father % Share 100 |
| | | | | | M.I. | Relation to You % Share |

**OTHER CARRIER LIABILITY INFORMATION**

42. If you, or your dependents, currently have coverage or had any coverage within the past 30 days, which this coverage replaces, please fill out and attach a Prior Coverage Affidavit form (Form 10250).

43. Are you or any member of your family covered by any other health plan?   If yes, complete the appropriate section(s) below.
□ Yes □ No   If more space is required, attach separate sheet with additional information.

| 44. HEALTH | 45. □ ADDITIONAL HEALTH OR □ DENTAL | 46. MEDICARE |
|---|---|---|
| Insured's / Member's Name   Date of Birth | Insured's / Member's Name   Date of Birth | Beneficiary Name   Beneficiary Name |
| Employment Status □ Active □ Retired   Name of Employer | Employment Status □ Active □ Retired   Name of Employer | Entitlement Reason □ Age 65 or older □ End Stage Renal Disease □ Other Disability | Entitlement Reason □ Age 65 or older □ End Stage Renal Disease □ Other Disability |
| Policy #   Effective Date   Type of Coverage □ Single □ Family | Policy #   Effective Date   Type of Coverage □ Single □ Family | Medicare HIC Number | Medicare HIC Number |
| Name of Insurance Company   Phone # ( ) | Name of Insurance Company   Phone # ( ) | Part A Effective Date | Part A Effective Date |
| City, State and Zip Code of Claims Center | City, State and Zip Code of Claims Center | Part B Effective Date | Part B Effective Date |
| Does the above insurance cover "all" family members including yourself? □ Yes □ No  If no, please list the names of all dependents not covered | Does the above insurance cover "all" family members including yourself? □ Yes □ No  If no, please list the names of all dependents not covered | | |

FOR A NEW EMPLOYEE WHO CURRENTLY HAS A BLUE CROSS AND BLUE SHIELD CONTRACT

47. If you currently have a Blue Cross and Blue Shield contract, please provide the information below.

Insured's / Member's Name ___   Insured's / Member's Contract Number ___

Name of Blue Cross and Blue Shield Plan (if not Florida): ___

48. Have you, or anyone in your family, ever been or is now a member of Health Options, Inc.?  □ YES □ NO   Who? ___

If married, provide name, address and phone number of spouse's employer ___

| 49. ACCEPTANCE OF ANY COVERAGE/MEMBERSHIP | 50. REFUSAL OF ANY/ALL COVERAGE/MEMBERSHIP |
|---|---|
| I have read and understand the Acceptance of Any Coverage/ Membership on the reverse side of this form. | Read and sign below only if you wish to refuse Any or All coverage offered by Blue Cross and Blue Shield of Florida, Inc. ("BCBSF") Health Options Inc. ("HOI") and Florida Combined Life Insurance Company, Inc. ("FCL") or other affiliated carrier. I do not wish to apply for coverage/membership. I understand that, if I decide to apply at a later time, that coverage/membership may not be available until the next open enrollment period or I may be required to provide evidence of insurability. |
| Signature of Applicant / Employee   Date 01-31-00 | □ BCBSF Health Insurance □ FCL Coverage □ Dental □ Health Options □ Elect Care □ Care Manager □ Other ___ |
| | Signature of Applicant / Employee ___   Date ___ |

Salary Redirection Agreement

EMPLOYER: _____                    CAFETERIA PLAN YEAR:    /    /    -    /    /

Social Security Number: _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_ _____    If new employee, indicate eligibility date: _____
NAME: (Last) _Major_ _____ (First) _Patrick_ _____ (Middle Initial) _S_
ADDRESS: _1722_ _w les oks Dkd_ CITY/STATE: _PLL_ _____ _PA_    ZIP: _33712_

Payroll Mode:  ( ) Weekly  (✗) Biweekly  ( ) SemiMonthly  ( ) Monthly    Date of first deduction: _02·04·00_

On a separate benefit enrollment form(s), I have enrolled for certain insurance coverage(s) and understand that an amount equal to the total amount of premium and/or contribution for coverage(s) (including Medical and Dependent Care FSA plans) elected less any nonelective employer contribution allocable thereto will be withheld from my salary, continuing for each pay period until this agreement is amended or terminated. The amount of my required contribution is set forth on a schedule that has been provided to me. In the event of a rate change, I authorize a corresponding change in the amount deducted from my salary without signing a new Salary Redirection Agreement. If the rate change is brought on by the third-party carrier (insurance company), the premium increase or decrease can be deducted pre-tax. However, if this change is brought on by my employer, the increase must be deducted after-tax. I understand that my actual take-home pay may be higher or lower depending on the coverage I select. In addition, pre-tax contributions reduce my compensation for Social Security tax purposes, therefore, my Social Security benefits could be decreased. I elect to receive the following coverage(s) under the Flexible Benefits Plan as elected in the pre-tax column. Any previous election and Salary Redirection Agreement under the Flexible Benefits Plan relating to the same benefits as selected below are hereby revoked. My employer's deduction of premium/contribution amounts hereunder shall evidence acceptance of this Agreement.

Check the desired coverage(s) below:

|  | Pre-tax | After-tax |  | Pre-tax | After-tax |
|---|---|---|---|---|---|
| Medical Coverage | ✓ |  | Accident Insurance |  |  |
| Dental Insurance |  |  | Short-Term Disability Insurance |  |  |
| Vision Care Insurance |  |  | Long-Term Disability Insurance |  |  |
| Cancer Insurance |  |  | Hospital Indemnity Insurance |  |  |
| Intensive Care Insurance |  |  | Other accident or health plan(s) under |  |  |
| Group Term Life Insurance |  |  | Section 106 of the IRS Code |  |  |
| (if family coverage, must be after-tax) |  |  | List: |  | Intensive |
| Specified Health Event |  |  |  |  |  |

**Complete the following elections only if participating in a Medical or Dependent Care FSA Plan:**

Medical FSA plan:        ($ _____ per pay period) x ( _____ number of deductions) = $ _____ Annual Election

Dependent Care FSA plan: ($ _____ per pay period) x ( _____ number of deductions) = $ _____ Annual Election

**I understand and agree that (initial all):**

INITIAL  On or after the first day of the plan year, I cannot change or revoke this Salary Redirection Agreement with respect to pre-tax premiums before the next anniversary date of the plan unless a "change in status" occurs (as defined under the Internal Revenue Code), and the change is caused by and consistent with the "change in status." I understand that I cannot revoke any pre-tax election based on a Right to Examine provision as may be contained in any insurance plan or policy issued to me.

INITIAL  Execution of this Salary Redirection Agreement does not begin coverage under the component benefit plans or policies. New coverage will not become effective until the first day of the plan year. The terms and conditions and actual coverage effective date of the underlying coverage will be determined under the separate benefit plans or insurance policies. Prior to the anniversary date each year, I will be offered the opportunity to add, drop or change coverage for the following plan year. If I do not complete and return a new Salary Redirection Agreement form at that time, benefit plans or policies currently in effect will continue. Elections under the Medical and Dependent Care FSA plans will not continue without my completing and submitting a new Salary Redirection Agreement prior to the beginning of each plan year.

INITIAL  Paying for coverage on a pre-tax basis may cause insurance claim payments under health and medical coverage to be subject to federal and state taxes if claim payments (combining the total from all health and medical policies/plans) are in excess of medical expenses. Paying for disability income policies with pre-tax premiums will cause the benefits payable thereunder to be taxable. Such coverage may be funded on an after-tax basis to preserve the excludability of policy benefits.

INITIAL  FOR MEDICAL AND DEPENDENT CARE FSA PARTICIPANTS: I verify that I have received a summary of the tax rules, operational guidelines and reimbursement procedures for use in Medical and Dependent Care FSA plans. I understand the plan document will control notwithstanding any contrary oral representation by any person.I understand that reimbursement will be available only for eligible expenses, and I agree to notify the employer if I receive reimbursement for an expense that does not qualify. I also agree, upon demand, to indemnify and reimburse the employer for any liability it may incur for failure to withhold taxes from any reimbursement I receive for non-qualified expenses, up to the amount of additional tax owed by me. Furthermore, I understand that any account surplus at the end of the year shall be retained by the employer to offset administrative expenses or future costs, and the obligation to make reimbursements is the responsibility of my employer and not any service provider hired by the employer to assist in processing claims. I understand that I may be responsible for a monthly service fee for Medical and Dependent Care FSA plans and authorize my employer to payroll deduct any required service fee amount.

**WAIVER OF PRE-TAX PREMIUMS UNDER THE FLEXIBLE BENEFITS PLAN:**

I certify that the features and benefits under the Flexible Benefits Plan have been explained to me completely. I elect to waive all pre-tax benefits under the plan, and I understand that certain benefits may be elected on an after-tax basis. Except for a change in status, I understand that I cannot elect pre-tax benefits until the next anniversary date, and that any after-tax coverage shall be outside the plan.

INITIAL

EMPLOYEE SIGNATURE: _____                    DATE: _01-31-00_

AFLAC Administrative Services • FLEX ONE! • A Service of American Family Life Assurance Company of Columbus (AFLAC)
Worldwide Headquarters: 1932 Wynnton Road • Columbus, Georgia 31999 • 800-323-5391 • Fax 706-660-7751

M-0019    Copy — White (FLEX ONE)    Yellow (Employee)    Pink (Employer)    Gold (Associate)    6/99

WELCOME TO OUR COMPANY!

This questionnaire is solely for the purpose of providing your employer with information for the Special Disability Trust Fund (Second Injury Fund) in appropriate cases. The questionnaire is not being used as the basis for deciding whether to employ you.

**THIS FORM IS TO BE USED ONLY AFTER AN OFFER OF EMPLOYMENT HAS BEEN MADE TO YOU.**

Name: _____ *Patrick Scott Major* _____     Height: _27"_     Weight: _185 Lbs_

Soc. Sec.: _265_ - _06_ - _9531_

INSTRUCTIONS: Answer YES or NO to the following questions. If your answer is YES list the approximate date of injury or treatment and give the details (doctor, hospital, city, state, etc.) in the space for details. Be sure to specify which numbered questions you are providing the details for in the right-hand column.

### DO YOU HAVE OR HAVE YOU EVER HAD:

### DETAILS:

1.  A back injury? _yes_                          *1974- US ARMY - Asymptomatic*
2.  A herniated intervertebral disc in your back? _NO_
3.  Back surgery for removal of a disc? _NO_
4.  A neck injury? _NO_
5.  A herniated disc in your neck? _NO_
6.  Neck surgery for removal of a disc? _NO_
7.  A knee injury? _NO_ Which knee? ___
8.  Surgery on either of your knees? _NO_
    Which knee? _NO_
9.  A shoulder injury? _NO_ Which shoulder? _NO_
10. Surgery on either of your shoulders? _NO_
    Which shoulder? _NO_
11. An elbow injury? _NO_ Which elbow? ___
12. Surgery on either of your elbows? _NO_
    Which elbow? ___
13. Arthritis or rheumatism? _NO_
14. Amputation of your foot, leg, arm, hand, finger,
    or toe? _NO_
15. Epilepsy? _NO_
16. Diabetes? _NO_
17. Cardiac disease (heart trouble)? _NO_
18. Marie-Strumpell disease (Ankylosing spondylitis)? _NO_
19. Total loss of sight of one or both eyes or a partial
    loss of corrected vision of more than 75 percent
    bilaterally? _NO_
20. Residual disability from poliomyelitis? _NO_
21. Cerebral palsy? _NO_
22. Multiple sclerosis? _NO_
23. Parkinson's disease? _NO_

24. A vascular disorder? ___ NO

25. Psychoneurotic disability following treatment in a recognized medical or mental institution for a period in excess of 6 months? ___ NO _____

26. Hemophilia? ___ NO _____

27. Chronic osteomyelitis? ___ NO _____

28. Ankylosis of a major weight-bearing joint? ___ NO _____

29. Hyperinsulinism? ___ NO _____

30. Muscular dystrophy? ___ NO _____

31. Thrombophlebitis? ___ NO _____

32. Total deafness? ___ NO _____

33. Have you ever been classified as mentally retarded? ___ NO _____

34. Any permanent physical condition which constitutes a 20-percent impairment of a member or of the body as a whole? ___ yes ___ 20 % disability from VA - for back injury 1974

35. Are you now or have you ever been obese (30% or more over normal body weight)? ___ NO _____

36. Rheumatic fever? ___ NO _____

37. High blood pressure? ___ NO _____

38. Varicose veins or leg ulcer? ___ NO _____

39. Tuberculosis? ___ NO _____

40. Allergies or asthma? ___ NO _____

41. Skin trouble? ___ NO _____

42. Reaction to serum or drug? ___ NO _____

43. Kidney or bladder trouble? ___ NO _____

44. Ulcers? ___ NO _____

45. Head injury? ___ NO _____

46. Cancer? ___ NO _____

47. Rupture (a hernia)? ___ yes ___ Which side? ___ left
    Was surgery performed? ___ yes ___    1981

48. Any injury, operation or any disability not covered by the above questions? ___ broken head bone    1974 - W Mike

49. Is there any question you do not understand? ___ NO ___ Which question? ___

All statements and information given in this application are true, to the best of my knowledge and belief.

Name of Applicant (Printed) ___ Patrick Scott Major

Name of Applicant (Signed) _____

---

TO BE COMPLETED BY EMPLOYER

Reviewed by: _____ Title: Spur HR    Date: 1-4-00

1302 Rev 6/97

## American Dental Plan, Inc.
### Group Enrollment Form

COMPUTER USE ONLY

COMPLETE ALL NON-SHADED AREAS, SIGN AND DATE. PLEASE PRINT OR TYPE.

| | LAST NAME | FIRST | INITIAL | DATE OF BIRTH | SEX | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| EMPLOYEE | Major | Patrick | S | 10 02 73 | | 265 06 9531 |

STREET ADDRESS: 1122 W Las olas Blvd   APT#

HOME PHONE

CITY: Ft Lauderdale   STATE: FL   ZIP: 33312   WORK PHONE: 305 524 6620

DATE EMPLOYED: 01-01-00   EMPLOYER (GROUP): Pan Am Flt Acad.   GROUP #: 15238

CHOOSE DENTAL OFFICE: 948

| | LAST NAME | FIRST | INITIAL | DATE OF BIRTH | SEX |
|---|---|---|---|---|---|
| SPOUSE | N/A | | | | |
| CHILD 1 | Abbey Major | AMITY | C | 02 09 91 | C |
| CHILD 2 | | | | | |
| CHILD 3 | | | | | |
| CHILD 4 | | | | | |
| CHILD 5 | | | | | |

EFFECTIVE DATE 1ST OF THE MONTH: 4-1-00   PREMIUM AMOUNT   AMOUNT PAID   PLAN #

☐ Individual
☐ Member and 1 dependent
☐ Family

Sign / Date

**EMPLOYER COPY**

## AUTHORIZATION FOR RELEASE OF ANTI-DRUG AND ALCOHOL MIS-USE PREVENTION PROGRAM RECORDS

I, _Pat Maloy_ , authorize and direct _Island Wings_ to release any records pertaining to

me and created and maintained by _Island Wings_ that fall within any of the categories below to:

_____

Name of recipient

_Pan Am International Flight Academy_
Company name

_5000 NW 36 Street Miami FL 33122_
Company address

1.  Results of all drug and alcohol tests taken by me under the auspices of the Federal
    Aviation Administration's (FAA) Anti-Drug and Alcohol Misuse Prevention Program
    regulations.

2.  Records documenting a refusal to submit to required random, reasonable cause/suspicion,
    post-accident, or follow-up drug or alcohol testing.

3.  Records of any determinations that I engaged in alcohol misuse in violation of FAA
    regulations.

4.  Records pertaining to any substance abuse professional evaluations conducted and
    rehabilitation undertaken by me following a violation of FAA regulations.

I request that information be disclosed in writing only, by mail or secure facsimile; provided,
however, that if no records exist that are responsive to this release, that information may be
disclosed telephonically.

Further disclosure of this information within (Recipient's co. name) _Pan Am_ is
authorized only to the extent such disclosure is necessary to determine whether I should be
employed by (Recipient's co. name) _Pan Am_ in a safety-sensitive position.

_____

Signature of individual

_0 8/07/00_
Date

This release expires 6 months from the above date.

```
HP LaserJet 3100
Printer/Fax/Copier/Scanner
```

```
SEND CONFIRMATION REPORT for
PAIFA
305 874 6600
Aug-15-00   1:29PM
```

| Job | Start Time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|-----|-----------|-------|-------------------|------|-------|------|--------|
| 797 | 8/15  1:28PM | 0'53" | 9547766693 | Send ......... | 2/ 2 | EC 96 | Completed ..................... |

Total    0'53"    Pages Sent: 2    Pages Printed: 0



# Fax

| To: | Island Wings | From: | Natasha Strong |
|-----|-----|-----|-----|
| | Records Dept. | | |
| Fax: | 954-776-6693 | Pages: | 2 including cover |
| Phone: | 954-776-1626 | Date: | August 11, 2000 |
| Re: | | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

The information contained in this transmission is legally privileged and confidential, intended only for the use of the person named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of the communication is strictly prohibited. If you receive this communication in error, please notify us immediately by telephone (collect) and destroy the transmission. Thank you.



# Fax

| To: | Island Wings | **From:** | Natasha Strong |
|---|---|---|---|
| | Records Dept. | | |
| **Fax:** | 954-776-6693 | **Pages:** | 2 including cover |
| **Phone:** | 954-776-1626 | **Date:** | August 11, 2000 |
| **Re:** | | **CC:** | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment** ☐ **Please Reply**   ☐ **Please Recycle**

The information contained in this transmission is legally privileged and confidential, intended only for the use of the person named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you receive this communication in error, please notify us immediately by telephone (collect) and destroy the transmission. Thank you.

## EMPLOYEE ACKNOWLEDGMENT OF RECEIPT
## AND UNDERSTANDING

I hereby acknowledge that I have received and read a summary of the PAN AM INT'L FLIGHT ACADEMY 's FAA Anti Drug Plan Policy and the Alcohol Misuse Prevention Program, a summary of the drugs which may alter or affect a drug test and I have received orientation materials. I have had an opportunity to have all aspects of this material fully explained to me. I understand that the full text of this company's Drug Free Work Place policy is available upon request from personnel or department specified. I also understand that I must abide by the policy as a condition of employment, and any violation may result in disciplinary action up to and including discharge.

Furthermore, I understand that during my employment I may be required to submit to Random, Post-Accident, Reasonable Suspicion Drug and Alcohol Testing as well as annual training and any other Federal or State requirements. I understand that submission to drug testing is a condition of employment and violating these condition could be violating Federal Drug Testing regulations 49 CFR PART 40.

The undersigned further states that he or she has read the foregoing acknowledgment and knows the contents thereof and signs the same of his or her own free will.

NAME _Patrick Major_ / _[signature]_   _08/02/00_
　　　　　(PRINT)　　　　　　(SIGNATURE)　　　　DATE

WITNESS_____ /_____   __/__/____
　　　　　　(PRINT)　　　　　(SIGNATURE)　　　　DATE

# EMPLOYEE CONSENT & RELEASE

## EMPLOYEE DRUG-TESTING CONSENT AND RELEASE _____

Pursuant to my continued employment, I understand that Pan Am International Flight Academy (the Company) requires all employees to submit to and pass a drug test under certain conditions as part of its Drug-Free workplace Program. I hereby consent to submit to a urinalysis or other tests as required by the Company for the purposes of testing for the presence of illegal drugs or alcohol abuse. I agree that a clinic or laboratory, approved by the Florida Agency for Health Care Administration, may collect and test any specimens I provide for these tests. I further agree to authorize the release of the results of these tests to the Medical Review Officer employed or retained by the Company. to the Manager of Human Resources of the Company. and to such other management personnel as may require this information on a need-to-know basis. My understanding is that any information derived from these tests will be confidential between the laboratory, the company, and the Medical Review Officer, except as otherwise provided by law. If I place the test or its results in issue in any administrative. legal. or other proceeding. I acknowledge that I waive my right to confidentiality.

I further agree to release and hold the Company, its agents, employees and assigns, including the laboratory collecting and conducting these tests, harmless from any liability arising in whole or in part out of the collection or testing of the specimens I provide or from the use of the information derived from these tests in consideration of my employment application.

I have carefully read this Consent and Release form and understand it completely. I understand that failure to comply with any of the requirements of the Company's Drug and Alcohol Abuse Policy, including my refusal to read and sign this Consent and Release, will be grounds for dismissal. I am signing this form voluntarily and have not been coerced nor placed under duress by any person.

| *Employee* | | *Witness 1* | |
|---|---|---|---|
| Date: | 02-02-00 | Print Name: | Adcan Cuesc |
| Employee Name: | Patrick Mymn | Signature: | Co |
| Employee Signature: | Pet4UL | *Witness 2* | |
| Social Security #. | 26606957I | Print Name: | |
| | | Signature: | |

# NOTICE TO EMPLOYEES

NOTICE TO EMPLOYEES – DRUG-FREE WORKPLACE_____

Pan Am International Flight Academy intends to promote and establish a Drug-Free Workplace Program in order to maximize productivity; enhance our competitive position in the marketplace, and reach the levels of success we desire without experiencing the costs, delays, and tragedies associated with work-related accidents resulting from drug or alcohol abuse by employees. A Drug-Free Workplace means that all of our employees must remain drug-free both on and off the job and refrain from using alcohol on the job. The Company discourages alcohol abuse or the use of illegal drugs and employees who engage in the use of illegal drugs or alcohol abuse face the risk of termination and forfeiture of workers' compensation benefits. This Drug-Free Workplace program is in conformity with Chapter 440.102, Florida Statutes, its implementing regulations, and Federal law.

Because the Company also feels that drug use and alcohol abuse are treatable diseases, the company announces its intention to undertake a drug and alcohol education program as well as an Employee Assistance Program to encourage rehabilitation. In connection with these programs, the Company intends to immediately begin testing all applicants for employment with the Company for the use of illegal drugs or alcohol abuse. The e tests will be administered in compliance with both Chapter 440.102, Florida Statutes and Federal law and will be conducted only by a testing laboratory approved by the Florida Agency for Health Care Administration.

Further, the Company intends to undertake drug testing of existing employees under those conditions outlined in the Company's Drug and Alcohol Abuse Policy Statement. This testing will begin no sooner than sixty (60) days from the effective date of July 18, 1997.

Employees will have an opportunity to confidentially report to the Medical Review Office (MRO) the use of prescription or non-prescription medications both before and after being tested. All employees will receive a list of common medications which may alter or affect a drug test. Employees will also be given the names, addresses, and telephone numbers of local alcohol and drug rehabilitation programs and access to an employee assistance program.

Any employee who fails a drug test may challenge or explain the result within five working days after receiving written notification of the test result. An employee will also have an opportunity to request a retest at the employee's expense. If an employee's explanation or challenge is unsatisfactory, the employee may contest the drug test results pursuant to rules adopted by the Department of Labor and Employment Security or the Agency for Health Care Administration. The employee also has the responsibility to notify the laboratory or clinic conducting the drug test of any administrative or civil action

| NOTICE TO EMPLOYEES |
| --- |

brought involving the drug test conducted by that laboratory or clinic. The employee also has a right to consult the testing laboratory or clinic for technical information regarding prescription and non-prescription medication. In addition, each employee will be given a list of substances to be tested prior to administration of the drug tests. All test results will remain confidential except as allowed by law.

The Company will provide all employees with a copy of the Company's Drug and Alcohol Abuse Policy Statement prior to commencement of its drug testing program.

*Employee*

Employee Name: _Patrick Maye_

Employee Signature: _____

Title: _Chief Twsm 727_

Date: _02·02-00_

*Witness 1*

Print Name: _____

Signature: _____

*Witness 2*

Print Name: _____

Signature: _____

2

MEMORANDUM

TO:        FILE

FROM:     NIDIAM CONESA

DATE:     May 5, 2000

RE:        PAT MAJOR

Mr. Major saw me in the lunchroom today and asked how was Ms. Sharpe feeling lately. I asked him why and he said because she has left him alone. That after they spoke nothing has happened.

He said he had given her a document outlining his accomplishments hoping that Ms. Sharpe would speak with him to acknowledge his qualifications and skills.

He gave me a copy of the document.

Ms. Sharpe mentioned to me that she had received it and didn't know what to do with it. I told her that he wanted a meeting with her. But, I don't think it happened.

**Pat Major**

!!AY - 5 2000

1722 WEST LAS OLAS BLVD. • FORT LAUDERDALE, FL 33312 Human Resources
VOICE / FAX (954) 763-7019 • Pmajor4178@aol.com

Greetings, and thank you for this opportunity to introduce myself. This profile is intended to provide you a chance to assess the depth and breadth of my capabilities beyond the limitations of a standard resume and may assure the optimal outcome. Thank you for your interest in learning about me.

I have more than fifteen years human resources, executive and leadership experience solving a broad range of organizational, administrative and operational challenges with nearly eleven years in commercial aviation. After three years in the US Army, I began professional life as photographer, earned promotion through several supervisory, leadership and executive positions, obtained a bachelor's degree in business management and national accreditation as a professional in human resources (PHR), then became an airline pilot by creating a flight training center and air carrier business in Ft. Lauderdale, Florida.

Throughout my professional life I have been tasked to create and implement solutions to a broad range of business challenges. For instance, upon assignment as personnel and administrative manager in Arkansas, the six state area which comprised PCA International's Little Rock region was the lowest performer of forty-six in the company. Within six months, it became number one and received a rare "Satisfactory Plus" administrative audit.

At Conway Communications Exchange, which is today traded as "Acxiom", I created the recruitment and selection processes, employee benefits programs, salary administration plans, performance appraisal systems, personnel policies and record retention procedures, as well as its employee and leadership training, security, and crisis management programs... establishing the organizational basis for a successful Public Offering (IPO).

When named director of human resources for Teltec Communications (later named Telus, then ATC, LLDA, and now part of MCI Worldcom), it had a turnover rate of 84%, health insurance premiums slated to rise 80%, and the human resources function had disintegrated; only one secretary remained where previously there had been a staff of six. I rebuilt the department, devised a performance-based salary administration plan, implemented a 401K employee retirement and profit sharing program, and increased employee health benefits while actually reducing insurance expense. Despite two failed buyouts and two mergers, I cut employee turnover to less than 25% in two years.

But I always wanted to fly. So, I created a flight school and air carrier company in Ft. Lauderdale. Since establishing Dolphin Holiday and Island Wings, I have earned 7,700 hours flight experience while acquiring Single and Multi-Engine Commercial, Instrument, and Flight Instructor certificates, as well as Turbojet Flight Engineer, Airline Transport Pilot, Airframe & Powerplant Mechanic and the Boeing 727 Type Rating. I am an FAR Part 142 Certified B-727 Pilot and Flight Engineer Instructor as well as 727 Program Manager at Pan Am International Flight Academy (a flight training utility serving the airline industry, private enterprise, the US Air Force, Reserves, and the Air National Guard) and have flown the Boeing 727 in FAR Part 121 Air Carrier operations throughout the US, Latin America, Northern South America and the Caribbean for more than eight years.

Throughout my ten years in commercial aviation, I have been consulted frequently for my organizational and administrative expertise. I helped Amerijet International revise pay and benefit policies, install its 401K employee retirement and profit sharing plan, and provided company executives a template for implementing the human resources function. Additionally, I served as committee chair of the Policies and Procedures Focus Group helping solve procedural, operational and administrative challenges corresponding to rapid growth amid dynamic changes in the international air cargo industry. I also drafted an Airmanship Appraisal System by adapting Advanced Crew Resource Management (ACRM), assessment and training techniques created by the National Aeronautics and Space Administration (NASA), the US Air Force and the Federal Aviation Administration (FAA). In all, my team crafted a complete range of pilot employment, performance appraisal, pay and scheduling policies which helped sustain the company's non-union status.

I was a member of the Human Resources Management Society for eleven years chairing the Arkansas Personnel Association's Accreditation Committee.      I chaired the Overall Advisory Committee for the Arkansas Vocational/Technical Competency Certification Project, a revitalization and refinement to that state's educational system, served the Greater Miami Chamber of Commerce, and chaired for the Personnel Association of Greater Miami. Additionally, I have served as director for my neighborhood residents' association (most improved neighborhood in the US, 1993), and Board President for Unity Church of Ft. Lauderdale where I remain active in fund-raising and other activities.

I am an adroit senior executive and leadership professional especially adept at creating, implementing and refining innovative solutions to complex business challenges. I have served more than fifteen years as a human resources executive in retail and technology companies, helped solve operational, organizational and procedural challenges facing a leading air carrier, created my own flight training and air carrier enterprise (these companies operate under professional management and were recently sold), and have applied state of the art leadership and teaching methods to develop superbly trained transport category instructors and airman at Pan Am International Flight Academy.

Let us meet to discuss how I can best help you.


Warmest Regards,


Pat Major

# Pat Major

1722 WEST LAS OLAS BLVD. ◆ FORT LAUDERDALE, FL 33312
VOICE / FAX (954) 763-7019 ◆ Pmajor4178@aol.com

## Objective

A challenging executive-leadership and/or training-oriented captain/check airman position with a growing, innovative, air carrier.

## Airman Ratings and Certifications

B-727 Type, CFI, CFII, MEI, FEX and A&P.  FAR Part 142 Certified Captain, First Officer and Flight Engineer Instructor. Boeing 727. Unrestricted First Class Medical. FCC Radio Operator's License.

| Total Flight Hours | 7,687 | PIC | 2,106 | SIC | 3,003 |
| Flight Engineer | 2,562 | Multi-Engine | 6,827 | Instructor | 569 |
| Simulator | 226 | Cross Country | 6,981 | Night | 3,097 |
| Instrument | 2,905 | Turbojet | 5,807 | Turbo Prop | 17 |

## Employment History

### PAN AM INTERNATIONAL FLIGHT ACADEMY, Miami, Florida                    2000-Pres.

#### *Transport Category Flight Training:  Boeing 727  Program Manager*

The fastest growing transport category flight training utility in the world...serving the airline industry, private enterprise, the US Air Force, Reserves, and the Air National Guard.  I create curriculum and courseware, administer teaching and assessment methodologies, interact with sales in a client satisfaction and quality control capacity, and supervise B-727 pilot and flight engineer instructors.

### ISLAND WINGS & DOLPHIN HOLIDAY, Fort Lauderdale, Florida                    1989–1999

#### *Chief Executive Officer, Air Carrier*

I built this company from scratch creating a comprehensive approach to flight training and aircraft rental. Established a multi-engine, multi-pilot, unrestricted (FAR Part 135) air carrier, with Bahamian Landing Rights, US Customs Bond & Hazmat Authorization.  Presently under professional management.

### AMERIJET INTERNATIONAL, INC., Fort Lauderdale, Florida                    1991–1999

#### *FAR Part 121 Airline:  Pilot and Flight Engineer*

Understudied the operational, organizational and administrative infrastructure of a leading regional air freight carrier in order to learn first-hand the challenges   facing commercial aviation and air transportation companies. Chairman, Policies and Procedures Committee: a collaboration between management and flight officers to identify, prioritize and solve administrative, operational and procedural opportunities.

### TELUS COMMUNICATIONS, INC. (now part of MCI Worldcom), Miami, Florida                    1986–1988

#### *Long Distance Telephone Company,  Human Resources Director*

Rebuilt a fractured HR department, implemented a performance-based salary administration plan, a 401K employee retirement and profit sharing program, and increased employee health benefits while reducing insurance expenses by more than 15%.  Cut employee turnover from 85% to 25% in less than two years.

**MAJOR RESOURCES**, Tampa, FL                                                  1984–1986

*Consulting Company*

Various management consulting assignments while completing business degree. Revised the consumer finance, capitalization and staffing formulas of a portrait photography retailer. Proposed to Feed Depot, Inc., Tampa, FL the operational formula describing the company today known as Pet Supermarket.

**CCX NETWORK, INC.** (now Acxiom, Inc.), Conway, Arkansas                      1981–1984

*Direct Marketing Data Processing Service Bureau: Human Resources Director*

Created the recruitment and selection processes, employee benefits programs, salary administration plans, performance appraisal systems, personnel policies and record retention procedures, as well as its employment and leadership training, security, and crisis management programs... establishing the organizational basis for a successful public offering in 1984.

**PCA INTERNATIONAL, INC.**, Little Rock, Arkansas                             1977–1981

*Retail Portrait Photography, Regional Human Resources and Administrative Manager*

Little Rock was the lowest performing region of 46 in the company. Following six months concerted effort by a team of new leaders, it became number one and received a rare "Satisfactory Plus" administrative audit.

## Accreditations

PHR: Professional in Human Resources, Human Resources Accreditation Institute: 1983 and 1987.
Single and multi-engine instrument and commercial certified flight instructor with flight engineer, airframe and powerplant mechanic, airline transport pilot and Boeing 727 type ratings.   7,700 Hrs flight experience in a variety of reciprocating engine and turbojet aircraft.
Part 142 Certified, Category II Training Captain and Simulator Instructor for Boeing 727 Pilots and Flight Engineers.

## Education

**BA–Business Management**, Eckerd College, St. Petersburg, FL    3.68 GPA, Graduated with "Distinction".

## Affiliations

President Emeritus, Unity Church of Ft. Lauderdale Board of Trustees.
Founding Director, Riverside Renaissance: a community renovation project.
1991–1993:  Director, Riverside Park Resident's Association (RPRA): most improved neighborhood in the nation, 1993.
 Committee Chair,  RPRA's Neighborhood Police Program and Safety Committee.
1988:  Committee Chair, Personnel Association of Greater Miami (PAGM).
1984:  Committee Chair, Professional Accreditation, Arkansas Personnel Association.
1983 & '84: Committee Chair, Overall Advisory Committee, Arkansas Vocational/Technical
 Competency Certification Project, University of Central Arkansas, Conway.

## Military

E-5, Regular Army: Headquarters Combat Developments Command, Ft. Belvoir, VA.    Army Commendation, Marksman, and Safety Awards. Honorable Discharge.  Vietnam Era/Disabled Vet.

MEMORANDUM

TO:        FILE

FROM:      NIDIAM CONESA

DATE:      APRIL 7, 2000

RE:        PAT MAJOR


I asked Ms. Sharpe regarding what Mr. Major had said on the completion of manuals. She said that he was given strict instructions on how the manuals needed to be formatted and he would change it because he felt it would look better. Her goal is to have all the manuals with the same format since it makes it easy to read and to comply with the FAA.

She said that even the instructors have asked to take the manuals away from him because he is so bad.

I asked her if anyone has explained to him what he is doing wrong because he thinks he is doing a great job. She responded no. She doesn't think he would take criticism very well.

In the mean time Ms. Sharpe has all the documents completed by Mr. Major that have not been used because of his personal changes.

MEMORANDUM

TO:      FILE

FROM:    NIDIAM CONESA

DATE:    APRIL 7, 2000

RE:      PAT MAJOR

Mr. Major came to see me after Ms. Sharpe spoke with him. He was red of anger.

He criticized Ms. Sharpe's managerial manners, said that she didn't know how to treat people, that she had no brains, didn't know how to stand up for her employees. He wanted to know who was responsible for giving her that position and title.

He said on her account the academy had lost Chick Williams and very soon was to loose Stephen Pandolfo. He said he has run his own company and he knows how to treat people and how to address problems.

He mentioned that he has been given programs to write and has never seen them out of Ms. Sharpe's office. That she insists in having all the programs formatted the same way and it doesn't work that way.

He was very upset on how he was spoken to and he said that having been in HR he knows she was very wrong.

MEMORANDUM

TO:        FILE

FROM:      NIDIAM CONESA

DATE:      APRIL 7, 2000

RE:        PAT MAJOR

Mary Sharpe came to see me regarding Pat Major's personal laptop usage.  She said he had told her that he was going through a bad divorce and he received important personal emails during the day that required a fast response.  Ms. Sharpe told him that if it wasn't excessive she would approve of it.

As a result Mr. Major had a laptop on his desk while he worked on the PC provided by the Company.

Other co-workers complained to Ms. Sharpe on why he had two computers and she came to me to ask how to handle it.

I told her that she had authorized the usage as long as it wasn't excessive and apparently it had started to be just that.  Ms. Sharpe wanted to take care of this problem before it escalated.

She met with Mr. Major and told him that effective immediately he could no longer use the laptop.  That he needed to remove it from his desk.  He became defensive and asked the name of the person who had complained.

Ultimately he complied and removed the laptop.

RECEIVED

AUG 1 1 2000

Human Resources



# Time Off Request Form

Employee Name: _Pat Maja_

From Date: _08/18_   To Date: _21 → 25 Dec_   Number of Days: _8/6_

### Reason:

- ☒ Vacation {Maximum 10 days}
- ☐ Discretionary {Maximum 2 days}
- ☐ Holiday Discretionary {Maximum 2 days}
- ☐ Comp. Time (Simulator Services ONLY)
- ☐ Bereavement
- ☐ Sick
- ☐ Other _____

*Employee Signature:* _____   _08/24/00_
                                        *Date*

*Supervisor Approval:* _____   _8/10/00_
                                         *Date*

*Comments:*

Please return the completed form to Human Resources (Room 138 B)
at least 7 days before the date of the request –Vacations, Discretionary, Comp. Time

RECE.

JUL 2 5 2000

Human Resources



# Time Off Request Form

Employee Name:  Patrick Taylor

From Date:  07/24   To Date:  07/27   Number of Days:  2

## Reason:

☐     **Vacation  {Maximum 10 days}**

☐     **Discretionary  {Maximum 2 days}**

☐     **Holiday Discretionary  {Maximum 2 days}**

☐     **Comp. Time (Simulator Services ONLY)**

☐     **Bereavement**

☒     **Sick**

*Employee Signature:* _____   07/25/00
                                              *Date*

*Supervisor Approval:* _____   7/25/00
                                              *Date*

*Comments:*

**Please return the completed form to Human Resources (Room 138 B)
at least 7 days before the date of the request –Vacations, Discretionary, Comp. Time**

# EMPLOYEE AGREEMENT

EMPLOYEE AGREEMENT AND ACKNOWLEDGEMENT_____
*All employees must sign after receiving policy.*

I hereby acknowledge that I have received and read a copy of the Pan Am International Flight Academy (the Company's) Drug and Alcohol Abuse Policy. I recognize the Company may modify or supplement this Policy at any time and that I will continue to be subject to the conditions of any modified or supplemented Policy. I understand that I may be required to submit to drug testing if required by this Policy and to execute a Release and Consent to this drug testing. I further understand that this Acknowledgement and Agreement will become a permanent part of my employee personnel file and that any failure to comply with the requirements of the Company's Drug and Alcohol Abuse Policy, including my refusal to sign this Employee Agreement and Acknowledgment, will be grounds for dismissal

| *Employee* | | *Witness 1* | |
|---|---|---|---|
| Date: | 0 2 - 0 2 - 00 | Print Name: | |
| Employee Name: | Patrick Mge | Signature: | |
| Employee Signature: | | *Witness 2* | |
| Social Security #: | 265 - 06 - 5152 | Print Name: | |
| | | Signature: | |



# Time Off Request Form

**Employee Name:** _Major, Patrick_

**From Date:** _07/03/00_ **To Date:** _07/03/00_ **Number of Days:** _1_

**Reason:**

☐    **Vacation {Maximum 10 days}**

☒    **Discretionary {Maximum 2 days}**

☒    **Holiday Discretionary {Maximum 2 days}**

☐    **Comp. Time (Simulator Services ONLY)**

☐    **Bereavement**

☐    **Sick**

*Employee Signature:* _____    _06/30/00_
                                                  *Date*

*Supervisor Approval:* _____    _6/30/00_
                                                  *Date*

*Comments:*

**Please return the completed form to Human Resources (Room 138 B)**
**at least 7 days before the date of the request –Vacations, Discretionary, Comp. Time**



# Time Off Request Form

**Employee Name:** PATRICK MAJOR

From Date: June 5,00  To Date: _____  Number of Days: 1

**Reason:**

☐    **Vacation**  {Maximum 10 days}
☐    **Discretionary**  {Maximum 2 days}
☐    **Holiday Discretionary**  {Maximum 2 days}
☐    **Comp. Time (Simulator Services ONLY)**
☐    **Bereavement**
☒    **Sick**

*Employee Signature:* _____    06-06-00
                                                        *Date*

*Supervisor Approval:* _____    06-06-00
                                                        *Date*

*Comments:*


**Please return the completed form to Human Resources (Room 138 B)
at least 7 days before the date of the request –Vacations, Discretionary, Comp. Time**



# Time Off Request Form

Employee Name: Patrick Major

From Date: June 11th   To Date: _____   Number of Days: 1

**Reason:**

☐  **Vacation** {Maximum 10 days}

☒  **Discretionary** {Maximum 2 days}

☒  **Holiday Discretionary** {Maximum 2 days}

☐  **Comp. Time (Simulator Services ONLY)**

☐  **Bereavement**

☐  **Sick**

*Employee Signature:* _____   06-06-00
                                              *Date*

*Supervisor Approval:* _____   06.06-00
                                              *Date*

*Comments:*

Please return the completed form to Human Resources (Room 138 B)
at least 7 days before the date of the request –Vacations, Discretionary, Comp. Time

# Form W-4 (1999)

**Purpose.** Complete Form W-4 so your employer can withhold the correct Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7, and sign the form to validate it. Your exemption for 1999 expires February 16, 2000.

**Note:** *You cannot claim exemption from withholding if (1) your income exceeds $700 and includes more than $250 of unearned income (e.g., interest and dividends) and (2) another person can claim you as a dependent on their tax return.*

**Basic instructions.** If you are not exempt, complete the Personal Allowances Worksheet. The worksheets on page 2 adjust your withholding allowances based on itemized deductions, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply. They will help you figure the number of withholding allowances you are entitled to claim. However, you may claim fewer allowances.

**Child tax and higher education credits.** For details on adjusting withholding for these and other credits, see Pub. 919, Is My Withholding Correct for 1999?

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, you should consider making estimated tax payments using Form 1040-ES. Otherwise, you may owe additional tax.

Two earner/two-job situations. Complete all ... s that apply. If you have ... more than one job, figure the total number of ... .owances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding will usually be most accurate when all allowances are claimed on the Form W-4 prepared for the highest paying job and zero allowances are claimed for the others.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your estimated total annual tax. Get Pub. 919 especially if you used the Two-Earner/Two-Job Worksheet and your earnings exceed $150,000 (Single) or $200,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 for a new social security card.

---

## Personal Allowances Worksheet

| | | |
|---|---|---|
| A | Enter "1" for **yourself** if no one else can claim you as a dependent . . . . . . . . . . . . . . . . . . . | A _____ |
| B | Enter "1" if: { • You are single and have only one job; or<br>• You are married, have only one job, and your spouse does not work; or<br>• Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less. } | B _____ |
| C | Enter "1" for your **spouse.** But, you may choose to enter -0- if you are married and have either a working spouse or more than one job. (This may help you avoid having too little tax withheld.) . . . . . . . . . . . . . . . | C _____ |
| D | Enter number of **dependents** (other than your spouse or yourself) you will claim on your tax return . . . . . . . . | D _____ |
| E | Enter "1" if you will file as **head of household** on your tax return (see conditions under **Head of household** above) . | E _____ |
| F | Enter "1" if you have at least $1,500 of **child or dependent care expenses** for which you plan to claim a credit . . | F _____ |
| G | **Child Tax Credit:** • If your total income will be between $20,000 and $50,000 ($23,000 and $63,000 if married), enter "1" for each eligible child. • If your total income will be between $50,000 and $80,000 ($63,000 and $115,000 if married), enter "1" if you have two eligible children, enter "2" if you have three or four eligible children, or "3" if you have five or more eligible children . . | G _____ |
| H | Add lines A through G and enter total here. **Note:** This amount may be different from the number of exemptions you claim on your return. ▶ | H _____ |

For accuracy, complete all worksheets that apply.
- If you plan to **itemize** or **claim adjustments to income** and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.
- If you are **single,** have **more than one job** and your combined earnings from all jobs exceed $32,000, OR if you are married and have a **working spouse** or **more than one job** and the combined earnings from all jobs exceed $55,000, see the Two-Earner/Two-Job Worksheet on page 2 to avoid having too little tax withheld.
- If **neither** of the above situations applies, **stop here** and enter the number from line H on line 5 of Form W-4 below.

---

*Cut here and give the certificate to your employer. Keep the top part for your records.*

---

| Form **W-4**<br>Department of the Treasury<br>Internal Revenue Service | **Employee's Withholding Allowance Certificate**<br>▶ For Privacy Act and Paperwork Reduction Act Notice, see page 2. | OMB No. 1545-0010<br>19**99** |
|---|---|---|

| 1 | Type or print your first name and middle initial | Last name | | 2 Your social security number |
|---|---|---|---|---|
| | Patrick S | Major | | 26 7 06 9 53 1 |

| 3 Home address (number and street or rural route) | 3 ☐ Single ☒ Married ☐ Married, but withhold at higher Single rate. |
|---|---|
| 1722 West Car Olas Blvd | **Note:** *If married, but legally separated, or spouse is a nonresident alien, check the Single box.* |

| City or town, state, and ZIP code | 4 If your last name differs from that shown on your social security card, check |
|---|---|
| FL  FL  33312 | here. **You must call 1-800-772-1213 for a new card** . . . ▶ ☐ |

| 5 | Total number of allowances you are claiming (from line H above or from the worksheets on page 2 if they apply) . | 5 | 13 |
|---|---|---|---|
| 6 | Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . . . . . | 6 | $ |

7 I claim exemption from withholding for 1999, and I certify that I meet **BOTH** of the following conditions for exemption:
- Last year I had a right to a refund of **ALL** Federal income tax withheld because I had **NO** tax liability **AND**
- This year I expect a refund of **ALL** Federal income tax withheld because I expect to have **NO** tax liability.

If you meet both conditions, write "EXEMPT" here . . . . . . . . . . . . . ▶ | 7 |

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate, or I am entitled to claim exempt status.

**Employee's signature**
(Form is not valid unless you sign it) ▶ *Patrick S Major*    Date ▶ 01-04-2000

| 8 Employer's name and address (Employer: Complete 8 and 10 only if sending to the IRS) | 9 Office code (optional) | 10 Employer identification number |
|---|---|---|

Cat. No. 10220Q

**Deductions and Adjustments Worksheet**

Note: *Use this worksheet only if you plan to itemize deductions or claim adjustments to income on your 1999 tax return.*

1. Enter an estimate of your 1999 itemized deductions. These include qualifying home mortgage interest, charitable contributions, state and local taxes (but not sales taxes), medical expenses in excess of 7.5% of your income, and miscellaneous deductions. (For 1999, you may have to reduce your itemized deductions if your income is over $126.600 ($63,300 if married filing separately). Get Pub. 919 for details.) . . 1 $ _____

2. Enter:
   - $7,200 if married filing jointly or qualifying widow(er)
   - $6,350 if head of household
   - $4,300 if single
   - $3,600 if married filing separately

   . . . . . . . . . . 2 $ _____

3. Subtract line 2 from line 1. If line 2 is greater than line 1, enter -0- . . . . . . . . . 3 $ _____
4. Enter an estimate of your 1999 adjustments to income, including alimony, deductible IRA contributions, and student loan interest . . 4 $ _____
5. Add lines 3 and 4 and enter the total . . . . . . . . . . . . . . . . . . . . 5 $ _____
6. Enter an estimate of your 1999 nonwage income (such as dividends or interest) . . . . . . . 6 $ _____
7. Subtract line 6 from line 5. Enter the result, but not less than -0- . . . . . . . . . . 7 $ _____
8. Divide the amount on line 7 by $3,000 and enter the result here. Drop any fraction . . . . . . . 8 _____
9. Enter the number from Personal Allowances Worksheet, line H, on page 1 . . . . . . . . . 9 _____
10. Add lines 8 and 9 and enter the total here. If you plan to use the Two-Earner/Two-Job Worksheet, also enter this total on line 1 below. Otherwise, stop here and enter this total on Form W-4, line 5, on page 1 . . . . . 10 _____

## Two-Earner/Two-Job Worksheet

Note: *Use this worksheet only if the instructions for line H on page 1 direct you here.*

1. Enter the number from line H on page 1 (or from line 10 above if you used the Deductions and Adjustments Worksheet) . . 1 _____
2. Find the number in Table 1 below that applies to the LOWEST paying job and enter it here . . . . 2 _____
3. If line 1 is GREATER THAN OR EQUAL TO line 2, subtract line 2 from line 1. Enter the result here (if zero, enter -0-) and on Form W-4, line 5, on page 1. DO NOT use the rest of this worksheet . . . . . 3 _____

Note: *If line 1 is LESS THAN line 2, enter -0- on Form W-4, line 5, on page 1. Complete lines 4–9 to calculate the additional withholding amount necessary to avoid a year end tax bill.*

4. Enter the number from line 2 of this worksheet . . . . . . . . . . 4 _____
5. Enter the number from line 1 of this worksheet . . . . . . . . . . 5 _____
6. Subtract line 5 from line 4 . . . . . . . . . . . . . . . . . . 6 _____
7. Find the amount in Table 2 below that applies to the HIGHEST paying job and enter it here . . . . 7 $ _____
8. Multiply line 7 by line 6 and enter the result here. This is the additional annual withholding amount needed 8 $ _____
9. Divide line 8 by the number of pay periods remaining in 1999. (For example, divide by 26 if you are paid every other week and you complete this form in December 1998.) Enter the result here and on Form W-4, line 6, page 1. This is the additional amount to be withheld from each paycheck . . . . . . . . . 9 $ _____

### Table 1: Two-Earner/Two-Job Worksheet

| Married Filing Jointly | | | | All Others | | | |
|---|---|---|---|---|---|---|---|
| If wages from LOWEST paying job are— | Enter on line 2 above | If wages from LOWEST paying job are— | Enter on line 2 above | If wages from LOWEST paying job are— | Enter on line 2 above | If wages from LOWEST paying job are— | Enter on line 2 above |
| $0 - $4,000 | 0 | 40,001 - 45,000 | 8 | $0 - $5,000 | 0 | 65,001 - 80,000 | 8 |
| 4,001 - 7,000 | 1 | 45,001 - 54,000 | 9 | 5,001 - 11,000 | 1 | 80,001 - 100,000 | 9 |
| 7,001 - 12,000 | 2 | 54,001 - 62,000 | 10 | 11,001 - 16,000 | 2 | 100,001 and over | 10 |
| 12,001 - 18,000 | 3 | 62,001 - 70,000 | 11 | 16,001 - 21,000 | 3 | | |
| 18,001 - 24,000 | 4 | 70,001 - 85,000 | 12 | 21,001 - 25,000 | 4 | | |
| 24,001 - 28,000 | 5 | 85,001 - 100,000 | 13 | 25,001 - 40,000 | 5 | | |
| 28,001 - 35,000 | 6 | 100,001 - 110,000 | 14 | 40,001 - 50,000 | 6 | | |
| 35,001 - 40,000 | 7 | 110,001 and over | 15 | 50,001 - 65,000 | 7 | | |

### Table 2: Two-Earner/Two-Job Worksheet

| Married Filing Jointly | | All Others | |
|---|---|---|---|
| If wages from HIGHEST paying job are— | Enter on line 7 above | If wages from HIGHEST paying job are— | Enter on line 7 above |
| $0 - $50,000 | $400 | $0 - $30,000 | $400 |
| 50,001 - 100,000 | 770 | 30,001 - 60,000 | 770 |
| 100,001 - 130,000 | 850 | 60,001 - 120,000 | 850 |
| 130,001 - 240,000 | 1,000 | 120,001 - 250,000 | 1,000 |
| 240,001 and over | 1,100 | 250,001 and over | 1,100 |

Privacy Act and Paperwork Reduction Act Notice. We ask for the information on this form to carry out the Internal Revenue laws of the United States. The Internal Revenue Code requires this information under sections 3402(f)(2)(A) and 5109 and their regulations. Failure to provide a properly completed form will result in your being treated as a single person who claims no withholding allowances, providing fraudulent information may also subject you to penalties. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, and the District of Columbia for use in administering their tax laws.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by Code section 6103.

The time needed to complete this form will vary depending on individual circumstances. The estimated average time is. Recordkeeping 46 min., Learning about the law or the form 10 min.. Preparing the form 1 hr., 10 min. If you have comments concerning the accuracy of these time estimates or suggestions for making this form simpler, we would be happy to hear from you. You can write to the Tax Forms Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001. DO NOT send the tax form to this address. Instead, give it to your employer.

**TO BE COMPLETED BY EMPLOYEE**

| NAME Patrick Major | JOB TITLE Phone MGR 727 |
|---|---|
| PLOYEE NO. | DEPARTMENT |

| NEW EMPLOYER | JOB TITLE |
|---|---|

| DUTY DESCRIPTION | |

| STARTING DATE / / | NO. OF HOURS WEEKLY | SALARY $_____ PER _____ |
|---|---|---|

| FORWARDING ADDRESS | |

**RESIGNATION**

REASON FOR LEAVING
DISSATISFIED WITH:

- [ ] TYPE OF WORK
- [ ] WORKING ENVIRONMENT
- [X] COMPANY POLICIES

OR:
- [ ] OFFERED BETTER POSITION
- [ ] RETURNING TO SCHOOL

- [ ] WORK HOURS
- [ ] SALARY
- [ ] _____

- [ ] RELOCATION
- [ ] FAMILY

- [ ] CO-WORKERS
- [ ] SUPERVISION
- [ ] _____

- [ ] MEDICAL REASONS
- [ ] PERSONAL REASONS

COMMENTS

The following questions are designed to assist us in maintaining a positive work environment. Your comments will be kept confidential and will not affect your future employment opportunities.

Check which best explains your feelings about the aspects of your employment experience.

| ASPECTS OF EMPLOYMENT | VERY SATISFIED | SATISFIED | DISSATISFIED | VERY DISSATISFIED | ASPECTS OF EMPLOYMENT | VERY SATISFIED | SATISFIED | DISSATISFIED | VERY DISSATISFIED |
|---|---|---|---|---|---|---|---|---|---|
| NATURE OF JOB | | X | | | Salary | | | X | |
| USE OF SKILLS AND EXPERIENCES | | | X | | Benefits | | X | | |
| PERFORMANCE EVALUATIONS | | X | | | Supervision | | | X | |
| TRAINING PROGRAMS | | X | | | Working Conditions | | | X | |
| ADVANCEMENT OPPORTUNITIES | | | X | | Overall as a place to work | | X | X | |

| RELATIONSHIP WITH SUPERVISOR | Strained |
|---|---|

Were complaints taken to Supervisor [X] Yes [ ] No   If yes, were they handled? [ ] Yes [ ] No

EXPLAIN
Supervisor referred to here " Mary Sharpe. Dan Campbell can ___ in the last and showed Alumira as a capable leader +

COMMENTS
administrator but still had to deal w/ ineffective policies from above

APLOYEE _____   DATE 08/25/00

Exit Interview

| DATE EMPLOYEE WAS HIRED | 1 / 3 /00 | EXIT DATE | 8 /25 /00 | DATE NOTICE WAS GIVEN | 8 /10 /00 |
| VACATION DAYS USED | 6 | VACATION DAYS LEFT | 0 | SICK DAYS TAKEN | : 3 |

### REASON FOR EMPLOYEE'S DEPARTURE

☐ DISMISSAL            ☐ MUTUAL AGREEMENT        ☐ PERMANENT LAYOFF      ☒ RESIGNATION

☐ RETIREMENT          ☐ TEMPORARY LAYOFF        ☐ TRANSFER             ☐ OTHER

Would you recommend for rehire?    ☐ Yes    ☐ No

Reason for Dismissal (if applicable)

☐ Unsatisfied Performance                    ☐ Unacceptable Conduct

☐ Unacceptable Attendance Record             ☐ Repeated Drug/Alcohol Abuse

☐ _____

EXPLAIN FURTHER (IF NEEDED)

| YOUR UNDERSTANDING OF EMPLOYEE'S DEPARTURE |
| COMMENTS ON WORK PERFORMANCE |

### CHECKLIST

| | DATE | INITIALS | | DATE | INITIALS |
|---|---|---|---|---|---|
| NOTIFY PAYROLL | | | UNEMPLOYMENT INSURANCE | | |
| NOTIFY INSURANCE CARRIER | | | RETIRE PLAN | | |
| NOTIFY CREDIT UNION | | | AUTHORIZE RELEASE OF INFO | | |
| RETURN KEYS | | | VACATION/BENEFIT PAYMENT | | |
| RETURN COMPANY CREDIT CARDS | | | PROFIT SHARING | | |
| RETURN ENTREE CARD/I.D. BADGE | | | | | |
| GROUP INSURANCE CONVERSION (COBRA) | | | | | |
| COBRA LETTER | 8/25/00 | chu | | | |

SUPERVISOR _____   TITLE _____

INTERVIEWER _____   TITLE HR Die   DATE 8/25/00


**PAN AM**
**INTERNATIONAL FLIGHT ACADEMY®**

## Application For Employment

**INSTRUCTIONS**

Please answer all questions, where applicable, completely and truthfully to the best of your knowledge and belief. Type or print in ink as carefully as possible. While not necessary or required, you may submit additional information by way of letter, resume or the like to supplement your answers.

**PERSONAL INFORMATION**

| Date | Position Applying For | | Date You Can Start | Salary Desired |
|---|---|---|---|---|
| 01-04-2000 | Chief Instr  B-727 | | Already have | 150 k |

| Last Name | First | Middle | Social Security No. |
|---|---|---|---|
| Major | Patrick | Scott | 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 |

| Present Address: Street No. | City | State | Zip | Telephone - Daytime 614-152 ) |
|---|---|---|---|---|
| 1722 West Las Olas Blvd | FLL | FL | 33312 | 954  Home 763-7019 |

| Previous Address: Street No. | City | State | Zip | Telephone |
|---|---|---|---|---|
| 1512 NW 5th ct | FLL  FL | FL | 33312 | same |

| In Case of an Emergency Notify | Address | Telephone 954-876-3018 |
|---|---|---|
| Beth Major | Lee Chour | Lk  954  777-9005  #4132 |

| Do you have the legal right to remain and work in the United States? ☑Yes ☐ No (If yes, proof may be required upon employment) | Type of Visa, if any | Are you at least 18 years of age? ☑Yes ☐ No |
|---|---|---|

| Have you ever applied to or worked for this company? ☑Yes ☐ No  If "Yes," List Dates  Independent Contr | Position  B-727 Instructor | Supervisor's Name  Chich Williams |
|---|---|---|

Have you ever been convicted of a felony? Conviction will not necessarily disqualify you from employment.
☐ Yes ☑ No

**Type of Employment Sought:**

☑ Full Time Regular        ☐ Full Time Temporary          Do you have a shift restriction?  ☑ No ☐ Yes Please Specify
☐ Part Time Regular       ☐ Part Time Temporary
☐ Other (Please Specify)_____          Do you have an overtime restriction?  ☑ No ☐ Yes Please Specify

**EDUCATIONAL BACKGROUND**

| Name of school | Location | Did You Graduate? | Diploma/Degree | Major |
|---|---|---|---|---|
| **High School** Tampa Catholic | TPA  FL | ☑ Yes ☐ No | H.S. | College Prep |
| **College** Eckerd College | PTE  FL | ☑ Yes ☐ No | Bachelor | Business / English |
| **Post Graduate** | | ☐ Yes ☐ No | | |
| **Other** | | ☐ Yes ☐ No | | |
| | | ☐ Yes ☐ No | | |

**PROFESSIONAL, COMMUNITY OR EXTRACURRICULAR ACTIVITIES**

List any participation in professional, community or extracurricular activities or organizations which you feel further indicate your qualifications for the position for which you are applying. You may exclude organizations names which indicate race, color, religion, sex, national origin, age, marital or veteran status, or disability.

See resume: President Unity Church of FLL, Board of trustees

Founding Director Riverland Renaissance, community Renovation

Director, RPNA, Riverside Park Residents Assoc

Committee chair, RPNA Neighborhood Police Liaison

See resume - more to fill

## EMPLOYMENT

List all of your employment, beginning with your present or most recent employment. Include military service assignments, if applicable.

| Dates (Month/Year) | Employer Name, Address & Telephone | Position Title and Responsibility | Current/Last Salary |
|---|---|---|---|
| 02/91 – 09/99 | Amerijet Intl | Flight Officer aboard B-727 | 50,000 – |
| Supervisor's Name: Jerry Hull / Pete Steel | | | Reason for Leaving: They Stane d / Me |
| 10/86 – 10/88 | Teltec Communicator | Dir of H.R. | 48,000 |
| Supervisor's Name: Kennit Sickle | | | Reason for Leaving: To Fly |
| 10-84 / 10-86 | Major Resources | Pres – HR Consulting | |
| Supervisor's Name: Me | | | Reason for Leaving: Finished College degree |
| 10/81 – 10/84 | CCX Network | Dir of HR | 75,000 |
| Supervisor's Name: Charles Morgan | | | Reason for Leaving: All go Finish College degree |

## REFERENCES (INDIVIDUALS QUALIFIED TO GIVE AN OPINION OF YOUR ABILITY AND EXPERIENCE)

| Name/Relationship | Employer | Position | Address And Telephone |
|---|---|---|---|
| Nina McCleary | McCleary + Melton PA | CPA | 914. 587- 5441 |
| Gene Squires | Personal Fried | | 561 498- 4488 |

## GENERAL CONDITIONS

This application is not to be interpreted as a contract of employment or as a promise of continued employment.

Pan Am International Flight Academy has established and maintains a Drug-Free Workplace Program. This program is in conformity with chapter 440.102, Florida Statutes, its implementing regulations, and Federal Law. As part of this program, offers of employment are expressly conditioned upon passing a drug test. I have read and understand that I will be required to submit to a pre-employment drug screen prior to employment.

I authorize the company and its agents to investigate my suitability for employment except as specified below. I further authorize the people or companies contacted to give the company and its agents any and all pertinent information they may have, personal or otherwise, and release all parties from any damage that may result from furnishing the information. The following people or companies, or both, may not be contacted during the pre-employment process:

_____

I release the Company and its agents from liability arising out of, incident to, or in connection with such inquiries.

I acknowledge that the Company retains the right to establish and enforce with full discretion any and all rules and regulations. I recognize that any employment and compensation can be terminated for any reason with or without notice, at any time, at the option of either Company or myself. I also understand that the terms and conditions of my employment may be changed for any reason with or without notice at any time by the Company. I understand that no representative of the Company, other than the President's designated representatives, has any authority to enter into any contract or agreement contrary to the foregoing, and then only if such commitment is in a signed written document.

I certify that all the information submitted by me on this application is true and accurate. I understand that if any false information, misrepresentation of facts, or omissions are discovered, my application may be rejected and, if I am employed, my employment may be terminated.

Applicant's Signature

Date: 01-04-1999



**Patrick Major**

Profile

I have twenty-five years leadership experience solving a broad range of business and organizational challenges.

I earned human resources accreditation in 1983, and a business degree in 1986.

When assigned personnel and administrative manager in Little Rock, Arkansas, that six-state region had been PCA International's lowest performer of forty-six in the company; within six months, it was number one. At CCX Network, I created the HR function, including: recruiting and selection, employee benefits, salary administration, legal compliance, leadership training, security, and crisis management programs... helping forge a successful public offering in 1983. When named Teltec Communications' human resource director, that company had 84% turnover, health premiums slated to rise 80%, and a fractured HR department. Despite two failed buyouts and two mergers, I cut employee turnover in half, enhanced health benefits, and reduced insurance expense by more than $400,000.

In 1989, I began the air carrier and flight school known as Island Wings and Dolphin Holiday. I have earned 7,300 hours flight experience as well as single and multi-engine instrument and commercial, single and multi-engine/instrument flight instructor, turbojet flight engineer, airline transport pilot, airframe and powerplant mechanic, and Boeing 727 airman certifications.

I am in excellent physical condition.

I was a member of the American Society of Personnel Administrators for eleven years chairing the Arkansas Personnel Association's Accreditation Committee in 1983. I was Chairman for the State of Arkansas' Vocational/Technical Competency Certification Project, served the Greater Miami Chamber of Commerce, and chaired for the Personnel Association of Greater Miami. I also served as director for my residents' association, chairing its neighborhood police program, and Board President for Unity Church of Ft. Lauderdale.

I am a well-rounded executive... especially adroit articulating uniquely effective relationships between companies, customers, vendors and employees...and a meticulous and disciplined professional airman fascinated by the organizational and human resource issues facing the airline industry.



**Patrick Major**

Twenty-five years leadership experience, accredited human resource professional, single and multi-engine commercial and instrument pilot, CFI, CFII, MEI, FEX, ATP, A&P, as well as the B-727 Type. Current 1st Class Medical. FCC Radio Operator's license.

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Flight Experience: | 7,270 | PIC: | 1,897 | Actual Instrument: | 2,568 |
| Multi Engine (pilot only): | 3,869 | SIC (mostly 727): | 2,809 | Night: | 2,969 |
| Single Engine: | 859 | FEX (B-727): | 2,541 | Simulator: | 154 |
| Total Turbojet | 5,402 | Dual Received | 636 | Dual Given: | 539 |

## EMPLOYMENT HISTORY

| | |
|---|---|
| 10/89 - Present | President, Major Strategies, Dolphin Holiday and Island Wings, Inc. (flight school and Part 135 air carrier in Ft. Lauderdale, FL). |
| 03/91 - Present | Flight Officer, Amerijet International, Inc. (SO 3.5 yrs., FO since Nov. 1994). |
| 10/86 - 10/88 | Human Resources Director, Teltec Communications, Inc. (long distance). |
| 10/84 - 10/86 | President, Major Resources (HR consulting). |
| 10/81 - 10/84 | Personnel Director, CCX Network, Inc. (data processing). |
| 06/77 - 10/81 | Personnel and Administrative Manager, PCA International, Inc. (portrait photography). |

## MILITARY

| | |
|---|---|
| 1971 - 1974 | US Army: E-5, Army Commendation Medal, Honorable Discharge, Vietnam-Era. |

## EDUCATION

| | | |
|---|---|---|
| 1986 | BA, Business Management (3.68 GPA) | Eckerd College, St. Petersburg, FL |
| 1974-1977 | Honor Student, English Major | University of South Florida, Tampa. |
| 1971 | High School | Tampa Catholic, Tampa, FL |

## ACCREDITATIONS

| | |
|---|---|
| 1983 | PHR: Professional in Human Resources, Personnel Accreditation Institute. |
| 1991 | State of Florida **Notary Public**. |

## COMMUNITY ACTIVITIES

| | |
|---|---|
| 03/97-06/98 | President, Unity Church of Ft. Lauderdale board of trustees. |
| 1990 | Founding Director, Riverside Renaissance, community renovation project. |
| 1987-1991 | Director, Riverside Park Resident's Association (RPRA). |
| 1988 | Committee Chair, RPRA's Neighborhood Police Program and Safety Committee. |
| 1987 | Committee Chair, Personnel Association of Greater Miami (PAGM). |
| 1984 | Committee Chair, Professional Accreditation, Arkansas Personnel Association. |
| 1983 | Committee Chair, Overall Advisory Committee, Arkansas Vocational/Technical Competency Certification Project, University of Central Arkansas, Conway. |

## HOBBIES

Distance running, martial arts, computers, physics, flight instruction, sailing, writing, public speaking.

**1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312**
**Voice & Fax: (954) 763-7019, C-PH (954) 614-1507, Email: Pmajor4178@aol.com**



*BOEING 727*

*From the Desk of Pat Major*

Memo To: Dan Campbell
Date: 08-11-00
Subject: Reversion to Independent Contractor Status

Greetings Dan,

I began full-time employment at Pan Am International Flight Academy January 01, 2000. Under the direction and encouragement of Chick Williams, and with the assistance of Don Neary and his staff, I created six (6) LOFT and LOE profiles for each of the 727 simulators. Afterwards, in preparation for an upcoming FAA Inspection, I produced lesson plans and core curricula for the "Old" Pan Am 727 program. Then, a completely new set of lesson plans and core curricula for the "New" Boeing program. Significantly, the lesson plans I submitted for both the Pan Am and Boeing-based curricula conformed to the FAA definition for the term, as described in the *Fundamentals of Instruction (FOI)* advisory circular, providing the additional advantages of an equipment-required work-list to aid in classroom preparation as well as objectives and completion standards for each course of instruction. Because the lesson plans I proposed did not strictly conform with the form or content of prior submissions then under consideration by the FAA, I also provided a separate set of course outlines complying with the format predominantly in use...thereby giving PAIFA's FAA liaison a choice in which format to submit for approval.

Corresponding to the production of the course outlines, lesson plans and curricula, I conceptualized and produced a *B-727 Study Guide And Informational Handout* containing a brief history of the 727, daily quizzes, study and reference information pertaining to systems ground training, as well as weight and balance computation, performance planning and the exterior preflight inspection.

Once the lesson plans were complete, I wrote the Trump specialty program.

Next, I created three different sets of lesson plans and core curricula, then pieced together information from a variety of sources to produce a *Flight Crew Training, Performance, and Weight & Balance Manual* for the L-1011, an aircraft I had never studied or flown, all the while negotiating with Lockheed to provide courseware, AOM's and QRH's specific to the simulator PAIFA intended to use.

As the L-1011 project neared completion, I turned my attention to producing a 230-megabyte, Powerpoint® based, *Aircraft Familiarization, Preliminary Safety Check and Preflight Inspection Tutorial* containing nearly 200 computer enhanced digital photographs illustrating key components of the B-727 aircraft exterior... all in conformity with the Boeing Aircraft Manufacturing Company's preliminary safety check and preflight inspection procedures. I also produced a preflight inspection exam, examiners guide, assessment and scoring system to aid in objectively evaluating each airman's knowledge and proficiency in conducting the preliminary safety check and preflight inspection. I created the concepts, shot, edited and enhanced the digital photographs, and designed the format, protocols and methods to be used in all aspects of the project. Significantly, PAIFA's FAA Training Center Program Manager approved both programs in their originally submitted form without any changes or modifications.

More recently, I collaborated with sales department personnel, instructors, TCE's and you in resolving the ethical dilemma PAIFA faced in training and checking certain under-qualified


foreign airmen. I applied to become certified as a pilot and flight engineer training center evaluator (TCE), trained fourteen instructors on the preflight inspection (walk-around) program, and recruited, assessed, selected and introduced fifteen new flight engineer and pilot instructors to the PAIFA instructor certification process.

In all, it has been a productive, enlightening and intense seven and a half months.

Friday, August 18, I will commence a six-day vacation with a planned date of return Monday, August 28. On that day, I request my status revert from employee to independent contractor. I request continuance of my family health and dental benefits under the auspices of PAIFA's COBRA compliance program.

Dan, I have enjoyed the brief opportunity to work closely with you, but seek more flexibility in my work schedule. Hopefully, as an independent contractor, I can attain the flexibility I seek while completing the steps necessary to become certified as a pilot and FE TCE and continuing to instruct pilots, flight engineers and instructors on an as-needed, as-available, basis.

I am grateful for the position I have enjoyed at PAIFA and for my employment here the last eight months. I have met many wonderfully inspired and dedicated aviation training professionals and formed associations that I look forward to nourishing throughout the remainder of my career.

Warmest Personal Regards,

Patrick Major

Cc: Mary Sharpe
    Lou Andris
    The Human Resources Department
    File



# PAYROLL/STATUS CHANGE

**EFFECTIVE DATE OF CHANGE:** 08/25/2000

⌐ New Hire                    ⌐ Separation                    ⌐ Change

---

**Employee Name:** Patrick Major

**Social Security No.:** 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

**Address:** 1722 West Las Olas Blvd.

**Address:**

**City:** Ft. Lauderdale

**State:** FL

**County:** Broward

**Zip Code:** 33312-

**Date of Birth:** 10/2/53

**Employee ID:** 220

**Date of Hire:** 1/3/00

**Date of Termination:** 8/25/00

**Department:** 260    Instructors

**Location:** FLA

**Title:** 727 Chief Instructor

|  | *Annual* | *Bi-weekly* | *Hourly* |
|---|---|---|---|
| **Salary:** | 50,000.00 | 1,923.08 | 24.0385 |

**W-4 Deduction:** M-9

**Comments:** terminate effective 08/25/2000, will revert to independent contractor status effective 08/28/2000.

⌐ B. Harvey        ⌐ M. Ladner        ⌐ V. Cutrone        ⌐ PR            ⌐ HR



## PAYROLL/STATUS CHANGE

**EFFECTIVE DATE OF CHANGE:**   1-3-00

☒ New Hire                    ☐ Separation                    ☐ Change

---

**Employee Name:** Patrick Major

**Social Security No.:** 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

**Address:** 1722 West Las Olas Blvd.

**Address:**

**City:** Ft. Lauderdale

**State:** FL

**County:** Broward

**Zip Code:** 33312-

**Date of Birth:** 10/2/53

**Employee ID:** 220

**Date of Hire:** 1/3/00

**Date of Termination:**

**Department:** 260     Instructors

**Location:** FLA

**Title:** 727 Chief Instructor

**Salary:** 50,000.00

**W-4 Deduction:** M-9

**Comments:** Pay 5 days

☐ B. Harvey      ☐ M. Ladner    ☐ V. Cutrone    ☐ PR        ☐ HR

1/3/00  ℗

# ACKNOWLEDGEMENT STATEMENT

The policies stated in the Employee Handbook are intended to give the employee an indication of how most employment situations are normally handled. In no way is the language of the handbook intended to create "contractual conditions of employment."

## STATEMENT

I have read the policies and programs outlined in this Personnel Handbook. Specifically, I have read the Code of Ethics stated therein. I understand that I must adhere to these policies.

I also understand that the information in this handbook is confidential and for the use of our staff only. It will, at all times, remain the property of Pan Am International Flight Academy, Inc. Should employment be terminated for any reason, this handbook must be returned to the Company.

I further understand that:

Policies and the handbook may be updated from time to time as described herein.

The Company has a probationary period of ninety (90) days for all employees. During this probationary period the Company or I may end the relationship without notice or cause.

The Company is an "employment-at-will" employer. This basically means that at anytime during my employment I may resign, if it is in my best interest. Employment-at-will also means that PAIFA may terminate an employee at any time, for any reason or no reason at all. By signing this statement I acknowledge that I have received and read, not necessarily agree with, our personnel handbook and this statement.

_Patrick Mya_
Employee Name (Please Print)

_02 - 02 - 00_
(Date)

Employee Signature

Witness By
Employee's Supervisor or the Supervisor of Human Resources

05/10/99

40

# EMPLOYEE EVALUATION FORM Human Resources

**PAN AM INTERNATIONAL FLIGHT ACADEMY.**

| EMPLOYEE | Patrick Major | TITLE | 727 Chief Inst. |
|---|---|---|---|
| DEPARTMENT | | EMPLOYEE NO. | |

| DATE OF PRESENT POSITION | 1 / 3 / 00 | DATE OF LAST EVALUATION | / / | NEXT SCHEDULED EVALUATION | / / |
|---|---|---|---|---|---|

## REASON FOR EVALUATION

☐ ANNUAL  ☐ MERIT  ☐ UNSATISFACTORY PERFORMANCE

☐ END OF PROBATION  ☐ PROMOTION  ☒ OTHER 3mo. evaluation 4-3-00

ISTRUCTIONS: Evaluate employee's work performance as it pertains to the current job requirements.
Circle the letter that best describes the employee's performance since the last evaluation. Add comments if necessary. (N/A if Not Applicable)

- Excellent     A - Above Average     S - Satisfactory     D - Decreased Performance     U - Unsatisfactory

| FACTORS | SINCE LAST EVALUATION | COMMENTS |
|---|---|---|
| **AVAILABILITY** The degree to which an employee is prompt, follows rules concerning break and meal periods and overall attendance. | (E) A S D U | |
| **ADHERENCE TO POLICY** The degree to which an employee follows safety rules and other regulations. | (E) A S D U | |
| **BEHAVIOR PATTERN** The stability, politeness, personal appearance and judgement shown in the job. | (E) A S D U | |
| **CREATIVITY** The degree to which an employee suggests ideas, discovers new and better ways of accomplishing goals. | (E) A S D U | |
| **DEPENDABILITY** The degree to which an employee can be relied upon to complete a job. | (E) A S D U | |
| **INDEPENDENCE** The degree of work accomplished with little or no supervision. | (E) A S D U | |
| **INITIATIVE** The degree to which an employee searches out new tasks and expands abilities professionally and personally. | (E) A S D U | |

CONTINUED ON REVERSE SIDE

## EMPLOYEE PERFORMANCE EVALUATION

| FACTORS | SINCE LAST EVALUATION | COMMENTS |
|---|---|---|
| INTERPERSONAL RELATIONSHIPS The willingness and ability to communicate, cooperate, and work with co-workers, supervisors, and customers. | E A S D U | |
| KNOWLEDGE OF JOB Useful technical skills and information used at work. | E A S D U | |
| PRODUCTIVITY The accuracy of work finished in a specific amount of time | E A S D U | |
| QUALITY The accuracy, detail, and acceptability of work accomplished. | E A S D U | |

E - Excellent    A - Above Average    S - Satisfactory    D - Decreased Performance    U - Unsatisfactory

NEW ACCOMPLISHMENTS OR ABILITIES SINCE LAST EVALUATION: *Accepts difficult tasks on other projects other than his own and produces excellent work — Other means*

AREAS WHICH NEED IMPROVEMENT

RECOMMENDATIONS FOR CAREER DEVELOPMENT - SCHOOLING, SEMINARS, ETC.

Rate Employee's Performance overall in comparison to the Job Requirements involved with his/her position.

☑ EXCELLENT          ☐ AVERAGE          ☐ UNSATISFACTORY

☐ ABOVE AVERAGE     ☐ BELOW AVERAGE    ☐ NOT RATED

COMMENTS

Individual was evaluated on _____ / _____ / _____          Employee's Signature _____

Follow up evaluation requested ☐ Yes ☐ No          Follow Up Date _____

Evaluator _____          Date 4-19-00

Evaluator's Supervisor _____          Date 4-19-00

# 𝔓atrick 𝔖. 𝔐ajor, ℙ𝔥ℝ

### Human Resources Professional

## MEMO

To: Ann Prochaska, Pete Steele, Irv Shumacher and Pam Rollins
From: Pat Major
Date: 11-23-93
Subject: HR Implementation Meeting, 11-18-93

Thank you for the time invested in speaking with me regarding the proposed implementation of a human resources management function at Amerijet.

The purpose of our meeting was to investigate key issues regarding HR implementation and to afford you an opportunity to evaluate the prospect of my role in it. Accordingly, our discussion entailed a complete range of topics including human resources from a traditional perspective as well as the specific needs of Amerijet.

While much of our discussion focused on employee relations, you indicated particular interest and need for implementation of the recruiting and employee selection portions of my proposal: specifically, the applicant and new-hire orientation, background investigation, and security enhancement programs. Also, you affirmed a near-term interest in a formalized pay-for-performance salary administration plan. But I gauged your response to manager and supervisor training, and organizational development, as somewhat cool... perhaps to be implemented later.

In addition to accountability for benefits and employee records, legal compliance, and employment policy (including updating the employee handbook), you proposed that Amerijet's Human Resources Department might also be tasked with responsibility for payroll, independent contractor records, drug avoidance, and safety awareness coordination, including OSHA compliance and safety training, as well as administration of Amerijet's hearing preservation program. We agreed that these activities are compatible.

You expressed concern that human resources responsibilities might not mix well with flight officer duties, but, at the same time, intimated that Amerijet's budget constraints may not provide for the recommended level of HR staffing. First, let me reiterate, if it comes down to a choice between the two, I will <u>choose</u> human resources: on the one hand because I believe I can do the best job, and, in part, knowing full well that Amerijet's needs will continue to afford me various opportunities to fly. But I want to stress my position that the role of management, particularly HR management, is to be out and about the organization...with its finger on the pulse, so to speak. I believe failure to do this effectively is largely responsible for the circumstances prevailing upon employee relations at most airlines. Additionally, by combining the duties of flight officer with that of HR director, while getting a management official out and about the organization on a regular basis, Amerijet can keep its costs down, reducing HR direct expenses by nearly half, and realize a more thorough job for less money than the traditional, less effective, approach.

Thirdly, you raised the issue of availability. In my plan, a coordinator and clerk will be on hand and available to line personnel, managers and supervisors on a full-time basis. And, no matter where I am, I will never be more than a phone call away from you or any Amerijet employee. Many believe the best predictor of future performance is past performance. In 1992, I actually worked more hours than any other Amerijet second officer. And, never have I declined to fly due to outside business obligations. Yet, in the two and a half years I have worked for

**084**



Amerijet I have presided over the development of an aircraft rental and flight training organization that has experienced a compound annual growth rate in excess of 45%. In the transition to human resources director I will give up my interest in that firm to devote my full attention to Amerijet. I have demonstrated the capacity to handle two very different jobs well. Now I seek to focus my efforts in order to produce even better results: for me, for my fellow managers and employees, and for Amerijet. I feel I have found a home here and look forward to making this additional contribution.

The comments, questions and insights you shared with me last week combined to create an informative and educational experience. I find you to be thoughtful, sincere, and talented... each bringing a unique perspective to the challenge of leadership at Amerijet. I look forward to working closely with you.

As always, I'm available at your convenience. Feel free to contact me any time.

cc: Dave Bassett

085

# Patrick Scott Major

Peter Steele, Vice President
Edward Cook, Chief Pilot
Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

09-29-94

Dear Pete and Ed,

Thank you for the time and effort invested in speaking with me Thursday and Friday.

I initiated our discussion as a result of frustration with Amerijet's employment and upgrade policies: specifically, the decisions to place new-hires in the Falcon, then promote them to the Boeing ahead of flight crew who already have Boeing experience and greater tenure with the company.

I sought the meeting with you, not for an explanation, but for a new decision. Having invested three and a half years in and on the Amerijet career path, and ready to advance, I asked for the opportunity to upgrade to Boeing first officer.

Pete and I met Thursday evening. Then, the three of us met Friday afternoon. Our discussions included topics ranging from professionalism in our work group, to the feasibility of implementing a merit pay and performance appraisal system, as well as other items of mutual interest and concern.

You explained that, upon inception, Amerijet was uncertain of the long term viability of the Falcon operation. So, you selected new-hires to staff it. Your decision produced the additional advantage of reducing training time and expense by obviating the need to upgrade Boeing flight crew to the Falcon, then to screen, hire, and train replacements for the Boeing. We remembered that initial consternation among Boeing flight officers had been deflected by emphasizing separation of the two operations. Later, however, Falcon experience became a prerequisite for upgrade on the Boeing. This effectively downgraded those of us previously invested in Amerijet...a condition confirmed when Falcon flight crew were promoted to captain and first officer aboard the Boeing.

Peter asked how I felt about Falcon captains being promoted to Boeing captain. As my concerns previously focused on the first officer position, I hadn't given it much thought. Upon reflection, however, I now recognize that the same values and logic apply to captains as they do to first officers. Despite the temptation of an employment pool rich with qualifications and experience, Amerijet's decisions should reflect the loyalty of existing flight crew. Besides, Amerijet has previously experimented with highly qualified flight crew possessed of significant experience obtained elsewhere...with less than satisfactory results. While your perspective, Pete and Ed, emphasizes the relative inexperience of many Amerijet employees, it overlooks the inherent opportunity to mold a class of flight officer uniquely suited to the needs of our company. More on that later.

You stated that Amerijet policies make no distinction between first and second officers. Rather, the entire class is regarded as flight crew. Indeed, this view is supported by Amerijet's pay practices. Secondly, despite appearances, you said there will be zero net effect of having Falcon crew placed ahead of me on the career path. In fact, you said the experience I am gaining by serving as second officer on the Boeing, combined with pilot in



DEFENDANT'S
EXHIBIT 27 C
3 ir
1/01 · 2/15/01

1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312
(305) 763-7019

091

command, first officer, and decision-making experience obtained elsewhere, is much more valuable to Amerijet than the knowledge and experience I would gain by serving as first officer aboard the 727. You said it is more likely for me to upgrade directly to the captain's position than a Boeing first officer possessed of little PIC experience who is not actively gaining experience outside our company.

Two ideas arise:

While Amerijet's second officer recurrent training program emphasizes 727 systems and operational procedures, it ignores instrument flying skills. The company expects its second officers to retain and even enhance their instrument flying skills through individual effort and experience obtained elsewhere during off-duty hours. Perhaps, in doing so, we are overlooking the opportunity to more effectively direct and monitor flight officer professional development.

By installing a multi-engine flight simulator in a room adjacent the CPT, Amerijet could more effectively screen flight officer candidates and submit second officers to IFR practice and review. By conducting recurrent training twice each year, as opposed to only once, additional training for first and second officers could focus on the finer elements of instrument flying, regulations, weather and the General Operations Manual (GOM), as well as the development of resource management skills. Captains could receive supervisory and management skills training, be exposed to administrative policies and procedures, and participate in the development of a flight crew performance evaluation program. In so doing, Amerijet could more effectively direct, develop, and evaluate first and second officers while assuring itself a more reliable and more qualified resource of ready-to-upgrade employees, and empower captains to make a greater contribution in the conduct of our enterprise. Upgrade training could then focus on issues more specific to flying the Boeing. I've heard you bristle, "Amerijet is not a flying school.". But if Amerijet teaches what its flight officers most need to know, then it must be. And, why not? If Amerijet is not actively directing, encouraging, and evaluating the professional development of its employees, then who is?

Secondly: mindful of our discussion last week, I reaffirm my request to upgrade to first officer. However, now that I know it is possible to upgrade directly from second officer to Captain, I seek that opportunity as well...with this proviso: once type-rated on the Boeing, I would like to obtain a minimum of 500 hours experience in the right seat before being asked to actually serve as PIC. Incidentally, once rated in the aircraft, I can log as PIC all hours where I am sole manipulator of the controls: the capacity to upgrade to captain only candidates produced through our own, superior, in-house training and development programs, who nonetheless possess significant levels of type-specific PIC experience, could prove valuable during insurance negotiations.

Alternatively (or even concurrently), I request the opportunity to obtain type specific training and a rating in the Citation. Not only would I feel more qualified to make a contribution in that aircraft, such an outcome will afford Amerijet the opportunity to utilize the Citation to meet business needs without requiring the pilot services of David Bassett or you, Pete, to fly the aircraft.

I want to reiterate to both of you my thanks for our discussion last week. Perhaps, together, we have produced some ideas that will result in positive action to more effectively develop and evaluate employees... and which will better empower Amerijet to meet present challenges as well as future demand.

092

L.PSteele&ECook.09-29-94, page 3

Feel free to copy this document wherever and whenever it might be useful in communicating these ideas to others.

As always, with warmest regards,


Patrick Scott Major
Second Officer,
Amerijet International, Inc.

093

## Patrick Scott Major

Pete Steele, Vice President
Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

10-19-94

Dear Pete,

In speaking with you today I learned that you intend to respond to my letter
of September 27, but need to complete the new AOM first. I'm pleased that
you are giving my comments and suggestions heartfelt consideration and I
am patient enough not to interfere with that process. But there is an
important point I only recently realized that you will probably want to factor
into your thoughts.

After consulting my Amerijet correspondence files and my personal notes,
I am certain that except for the aborted class I attended with Steve Schubert
in April, 1993, I have never been offered an opportunity to upgrade to first
officer on the Boeing 727.

The only other chance I ever had to upgrade was on the Falcon. An
important factor in reaching the decision to decline that opportunity was
the commitment from you and Ed that, "You will have right of first refusal
on any future first officer upgrade opportunities". Additionally,
considering my family and homeowner responsibilities, Ed recommended
that I continue to decline to upgrade until I could hold a Miami base.
Despite this, five junior flight officers have been upgraded to Boeing first
officer ahead of me. Two of them are now based in Miami and one enjoys
what may be a desirable position in New York. I have not been approached
even once.

I did not, and do not, take issue with the upgrade of John Washington (Jr.).
The way I see it, he has worked for Amerijet quite a bit longer than me and
is arguably entitled to whatever position you want to offer him. Besides, he
is an excellent pilot and a fine human being.

Nor was I overly concerned when Boeing first officer positions were
awarded to people who would be based out of town for three weeks at a
time...at their own expense...not an experience my family or its budget
could withstand. Everyone else down the seniority list was polled before
those positions were awarded. So, no harm was done. But these two most
recent decisions merit revision.

I like, admire and respect you, Pete. None of my comments are intended to
convey anything else. But I feel very strongly about this. If I did not pursue
it, if I did not try to make clear my perspective and that of other flight officer
employees, I think my sense of personal integrity would suffer and the
character of the relationship we have cultivated for three and a half years

1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312
(305) 763-7019

094



(through the 401K, the union threat, and the formulation of a strategy for implementing an HR department) would diminish. I am proud that we can discuss such sensitive issues professionally and on friendly terms.

I have attempted to persuade you and offered suggestions. But ultimately, this is your call. I realize upgrade training is time consuming and that sometimes the right thing is more expensive and less expedient than nearly all of the alternatives. But there is a significant difference between expense and cost. For instance, what is the cost of alienating people who see themselves as dedicated and loyal employees deeply invested in the Amerijet career path? What is the cost if they should perceive a violation of their trust and faith?

In China, the hieroglyphic for the word "Crises" is actually two symbols joined: one symbol means danger, the other means opportunity. Perhaps the challenge facing Amerijet is to avoid the potential crises by capitalizing on the opportunity imbedded within...an opportunity to set things right, or perhaps even to innovate creative solutions to its long term needs. That is the character and intent of my suggestions to you. Although I'm not always comfortable with the import and the intensity of our exchange, I'm proud to be part of the process.

Warmest regards,


Patrick Scott Major
Second Officer,
Amerijet International, Inc.

Patrick Scott Major


Vice President and Director of Operations
Pete Steele, Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

09-21-96

Greetings Pete:

I was surprised to hear by voice-mail today that you were "...Disappointed" at the "...Lack of response..." to your memo regarding the upcoming change in Amerijet pay practices.

I am pleased about the prospect for a simpler means to pay 'overage', but I don't want to be paid only once each four weeks, nor have met anyone who does. Following on the heels of the change in vacation pay, who would have thought there was any point in discussing it? Like its predecessor, your memo on pay presented the change as a fait accompli.

Instead of stimulating and generating the production of constructive ideas, the vast majority of flight officer efforts to contribute to or even respond to Amerijet's policy development process have, at best, produced only patronizing pacification; at worst, the result has been defensiveness, resentment and/or recrimination.

You've been very clear and consistent, Pete: Flight officers can either accept their lot as decreed by the evil empire, or lump it. "We can line-up pilots around the block, people willing to work for free to take your jobs..." (your quote, pilot meeting: 06-23-96). So, I'm not surprised that flight officers have opted to react instead of respond to you. Who would volunteer for the abuse encountered in trying to present a suggestion, let alone make a point? The percentages just aren't there....and, I'm pretty thick-skinned (if not thick-headed, too).

Pete, after more than five years, you know my intent. Frankly, you have been unyielding. You routinely alienate, deride and denigrate your flight officer cadre. You seem to have a significant portion of Amerijet resources at your disposal, and the authority to use it. Yet, instead of creating and enacting the realization of your own unique vision for a superior flight operations division, you're content to simply get by, day to day, habitually opting for the path of least resistance. You ask your flight officers to take responsibility, but won't, yourself, admit a mistake. And worse, when convenient, your subordinate managers mimic your style. It's damn near despotic, Pete. The hard truth is, if you're not creating and enacting your own goals for this division, then what you get is what you got.

104



DEFENDANT'S
EXHIBIT

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Home: (954-763-7019), Office: (954) 776-7766, Fax (954) 776-6693

Amerijet could be a great place to work. It could be the focus of many a productive and proud career. But, the common wisdom is, "...Show up, do your job, and find another one as fast as you can."

If you are genuinely interested in changing that perception, I'm here to help.

Sincerely,

Patrick Scott Major
First Officer



**INTERNATIONAL, INC.**

January 18, 1992

AMERIJET INTERNATIONAL, INC.
498 SW 34TH STREET
FORT LAUDERDALE FL    33315

ATTN:  PETER A. STEELE - V.P. of Operations

RE:  PAT MAJOR - Unprofessional and Lack of Knowledge

Dear Pete,

   I have flown with Mr. Pat Major for several months now at the station of
MSY.  While I have continued to help and further his knowledge and skill up
to this point, Pat will not take any more help from myself.  I happened to
find this out, sad to say, from another S/O.  When I asked him about his
feelings, he verified this to me also.  While I feel that I have honestly
tried consistently to teach this individual, his skill level and
understanding of the aircraft has barely improved since he going through
ground school.  Here are some specifics:

   1.  Pat's system knowledge is very weak.  If everything goes wrong on a
   flight, the two front crewmembers are on their own.  This means that one
   has to fly and talk, and the other has to get up or at least devote his
   entire attention to the back.  Even when things go normal, I have
   constantly caught Pat throwing wrong switches and on several occasions
   crossfeeding fuel incorrectly.  I have had some minor occurrences and
   found Pat to start to throw wrong switches even before calling for any
   action.  Had I not done so, we would have been without a system
   unnecessarily.  There have also been an occasion where he never knew he
   lost a system until someone told him to turn the switches back on to
   restore the system.  I find this extremely dangerous, and takes one or
   more crewmembers out of the loop.  This also disrupts the normal flow
   patterns which can cause mistakes.

   2.  Pat does not speak clearly or loudly enough for the front crewmembers
   to hear.  Another Captain and myself along with the First Officers he has
   flown with have tried to tell him on numerous occasions that he cannot be
   heard or understood.  While this may help for the rest of the particular
   flight, it usually does not go past the landing.  The next flight or the
   next day's flight will be just as bad.  This also can cause mistakes and
   be dangerous if he says something of importance which would be helpful and
   no one hear him.  Also, it could be just as detrimental if he mumbles when
   it is not necessary to disrupt the flow.  An example of this - I was
   flying the leg and just as we reached $V_1/V_r$ Pat said something like "I
   think something's on fire."  We continued as nothing was indicated to me
   that anything was on fire.  When we reached a safe altitude, I asked what
   he meant.  He said that he smelled something like a fire.  It was actually
   a fire on the ground.  The smoke smell had gotten in the aircraft when we
   opened the doors and the First Officer and myself had smelled it when we

000266



**INTERNATIONAL, INC.**

got out. Apparently, Pat never noticed until $V_1/Vr$ and called it out. Obviously, I explained to him in no uncertain terms that he was not to ever do that again when it did not involve the airplane, especially at $V_1/Vr$. There was no doubt he understood. Another example came when we were shooting a low IFR approach. At 150' above the DH, Pat mumbled something. It distracted both pilots momentarily but finished the approach without any problems. When asked what was being said, Pat said that he was merely saying that the Approach Lights were in sight. In fact, the only lights that were seen at this time were the first three sequence flashers. I felt that, because the First Officer was flying, he did not have enough visibility to look up and continue the approach safely. I called the lights and shortly thereafter the runway in sight when I felt that he could visualize what was happening. I explained to Pat that when he says something, if it is not audible, it is a distraction. This can be dangerous as seen by the above example. This is not the type of distraction that is safe close to the ground such as in this example. There are many more examples, but the picture is clear.

**3.** I have brought this to the attention of Ed Cook, and he has seen it also in his dealings with Pat, that Mr. Major will argue when he is corrected or when explaining something to him when he knows little about the system or procedure. I have maintained my patience and composure for quite some time, but I find it rather difficult to continue to help this individual on a professional basis. I do not feel that sending him with someone else would be fair, as Greg Kroll and I have talked about this at great length. This has been given a great deal of thought as I do not like to see anyone do poorly, but Greg and I feel that this problem is beyond a crew situation. Along with this is Mr. Major's inability to "fit in" with or get along with his peers. This has been brought to my attention in various ways and by a wide variety of people. Also, Pat displays a demeaning attitude toward load crews which carries over into his dealings with them. I have actually been made aware that one group of load crews had stolen something thinking it was Pat Major's. They damaged the item and when they found out it was one of our other crewmember's property, they apologized and explained what had happened. It happens almost everywhere we go, Pat's reputation gets worse as he deals with more and more people. This is not a professional attitude for one of my crewmembers to take. One person put it very well saying that Pat has the unique ability to shut any one of Amerijet's flight down with his unprofessional attitude and lack of skill/experience. This unwillingness to improve or inability to improve can certainly impede on Amerijet's reputation with its customers.

**4.** One last item of concern is Mr. Major's apparent inability to concentrate or stay "in the cockpit" on a regular basis. As a Captain, I cannot, as I have experienced, count on him to be with me during the flight. His mind seems to wander while in flight and, as you know, this cannot be effective for keeping the crews and the aircraft safe.

I am not sure as to the remedy for this individual, but it is apparent

000267



**INTERNATIONAL, INC.**

that it is beyond a crew situation. This is why I have brought this to your attention. If you have any suggestions as to how either Captain Greg Kroll or my self can help this situation, since we are the ones who fly with him the most, please contact us. This letter has been coming for some time, but as Captains, we have tried to remedy this situation and have exhausted our avenues. If I can be of further assistance, please let me know.

Sincerely,

William J. Cline
Line Captain/Check Airman

000268

**Tuesday, February 11, 1997**

15:30 Ed Cook called. Asked me to come meet with him in 1/2 hour. Said I would cancel two pending appointments and get there as quickly as I could. Upon arrival witnessed Ed giving a reference for Steve Shubert. Said, "Seemed to prefer night freight. He l d marital problems resulting in divorce. But now he is . . . . . . . . . . . . . . . . . now he's out on i  street.

We bullshitted u: Wayne Penny showed up.. then the following discuss .. ensued:

Ed: I have had several discussions with Dave Bassett. Dave has appointe himself safety officer of the company and he approves all promotions to captain. Dave feels the captain is responsible for a $9-$10,000,000 business. Dave does not feel comfortable with you as a candidate for captain. He has no specific basis for this. But having flown with you (he's never seen me fly) on many trips on the Citation, he does not feel inclined to promote you now or in the foreseeable future. Dave cannot describe what would have to happen or what period of time would need to pass in order to change his impression. He just doesn't feel you would make a good captain. You are welcome to continue working here. We have no reason to fire you. You may stay on as first officer for the remainder of your career. But you may never make captain. So, that said, I'll turn the meeting over to Wayne.

Wayne: Pat, as you know, we've been discussing this for some time. And Ed and I feel you would not be happy to remain a First Officer indefinetly. So we have devised an Exit Incentive: you may leave your Amerijet employment of your own accord and the company will pay you one week's severance for each year of employment plus all your accrued vacation and personal days. Of course you'll need to sign a release.

Ed: And you just heard me give a reference. You can say what ever you want to about why you left. We will have nothing but good to say about you.

Me: Thank you for taking the time to share this with me and for devising this alternative. I do not agree with Dave's assessment.

Wayne: we knew you wouldn't. I would have been dissappointed in you, otherwise.

Me: Technical Questions. Will the six weeks be at guarantee or at my average rate of earnings.

Wayne: What's your average.

Me: About 90 hours.

Wayne: I'll check into it. It shouldn't be a problem.

Me: What sort of release.

Wayne: that you were not coerced or threatened, that you could have remained working here indefinitely. Release from litigation. That sort of thing.

Me: How much notice will you need.

Ed: none. Would start imediately.

Wayne: Also, all this would start next week. We would continue to pay you through the week. Your severence package would begin next week. But remember. Noone is forcing you to resign. We just feel you would be very unhappy to remain here as a first officer with no opportunities for advancement. Me: to Ed: what is Dave's preference?

Ed: I don't know that he has one.

249


DEFENDANT'S
EXHIBIT
7
Major 2/15/01

Me: What about you?

Ed: I think you would be very unhappy. Your business is really starting to take off. You've just abo t got your second aircraft up and running. You really should think about focusing your attention. Knowing you, I just think you'd be real unhappy stayi:  n here.

Ed: What do you need to do?

Discussion ensued a: d we agreed on Thursday at 4:30.

Me: I'd like to take  morrow off to think about this. Can you get someone to replace me for tomo.. ow's flight?

Ed. Yes.

Me: Then, I will be in touch with you Thursday afternoon.

We shook hands all around and I left. I stopped by Pete's office on my way out to say "Hi". Dean was in there.

When I got back to the truck, I called Ed to confirm that he would notify dispatch for my unavailability for tomorrow's flight.

**Monday, February 17, 1997**

xFly with AJT.

xHome to sleep.

xTo DHFC: PU 38X Airworthiness Certificate on way in.

xFU Wayne Penny re release.

  21 days to make decision from day offer presented. After that, recinded.

  Monies: $5130 gross wages, 90 hours at $38.00, less taxes, 401K. Net: $3,100.

  Confidentiality both ways.

  After signing 7 days to void.

  Dave: no intention to meet with me. "If Pat wants to stay with us, great, if not great." Tomorrow.

David Bassett, President
Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

> I wrote this several months ago, originally addressing it to "The Leadership": you,
> Pete, Ed and Wayne... the operations "Chain of command." However, I chose to heed
> the advice of counsel and friends, and resolved to keep it to myself. In light of recent
> circumstances, that may have been an error. Please give this a thorough read and your
> heartfelt consideration.

December 18, 1996

Dear Sir,

As I contemplated writing, I found myself empathizing with Amerijet's anonymous letter
writers. Perhaps their intention was to instigate change while ensuring their comments
were evaluated solely on merit, avoiding recrimination and disapproval; often the only
results achieved by expressing ideas that are not in keeping with a company's self-concept.
Anonymously, important messages can be conveyed without personal risk. Few letters are
more carefully scrutinized. But the affront is considerable, implying employees cannot
trust their leaders, and reflects a certain cowardice upon the writer.

I believe that: 1) a thought worth writing deserves a signature, 2) I can help, and 3) as a
flight officer willing to accept a pay check every two weeks, I should serve to the extent of
my ability...whether or not that contribution is immediately appreciated.

That said, here goes: These comments are offered in accordance with Amerijet's open door
policy on behalf of its flight officer employees.

I am deeply concerned by Amerijet's recent difficulty distinguishing issues from
personalities. And, by its apparent determination to incite and inflame the ire of flight
officers; "I can line-up pilots around the block willing to work for free to take your jobs."
This to a group of more than 45 flight officers gathered from across the nation for the
purpose of working with management to solve their work-place problems. Some wondered
if the company was not deliberately provoking its pilots to organize, then exert concerted
activity to force it to be fair. Having spent most of my adult life avoiding unions, I am
disturbed by the prospect of having my work relationship defined by third-party
opportunists.

Instead of creating a nurturing and empowering environment that unleashes the will and
dedication of talented employees, Amerijet leadership threatens its flight officers with
reprisal, recrimination, and loss of income or advancement opportunities. As a result,
performance is rendered through a sieve of seething resentment, and hovers around the
lowest levels of mediocrity. That flight officers are not openly hostile and vindictive, and
that counterproductive behavior has not been more conspicuous, is a tribute to the
professionalism of the group, not to the success of the company's methods. The common
wisdom is, "Keep your head down, your mouth shut, and get another job as quickly as you
can." ...This among vital professional employees excessively expensive to replace.

But, I am told, "This is the way Dave Bassett wants it."

**106**

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Home: (954) 763-7019, Office: (954) 776-7766; Fax: (954) 776-6693

DEFENDANT'S
EXHIBIT
2/15/01

Is that true?

Work is the primary component of American life... occupying more time, effort and energy than all other conscious pursuits combined. Family, personal, community, social, educational, and church activities, in total, occupy less time than a forty hour work-week; and, who works only forty hours? The work-place, then, as well as the content and construct of our work lives, ought to describe our highest ideals for one another. Some might protest that the ends justify any means. But it is our means that define us, our means that reveal our true values and the depth our convictions.

The irony is, not only are the solutions simple and inexpensive, but Amerijet could easily become a pretty decent place to invest a flying career. Instead of facing high rates of turnover, and expensive training and replacement costs, it could build a depth of valuable experience among its flight staff.

Consider Our perspective: Amerijet's senior flight officers willingly contributed well beyond reasonable expectation when adverse conditions threatened. We were on call 24 hours each day, six and seven days a week, for years... without pay. We used jump-seat privileges to reduce Amerijet's travel expenses, waited weeks, if not months, for per-diem payments and expense checks, charged air-fare and hotel accommodations to our personal credit cards, and forfeited scheduled time-off to help ensure Amerijet's recovery. In short, we invested personally and substantially in Amerijet's success.

Yet, Amerijet's pay practices reward us with some of the lowest rates in the industry, and a work-to-pay ratio of less than 50%. Flight officers routinely experience delays for freight, maintenance or weather, without compensation, and unscheduled overnights entail lifestyle disruptions of twenty-four or more hours each; again, without additional consideration.

Recurrent training requires more than forty hours work without even credit toward "guarantee"...punishing those who would otherwise earn extra and distorting management's tally of "Unearned Income."

Captains are asked to evaluate flight crew for promotion, yet have not received even rudimentary company training in leadership, supervision, or employee appraisal; nor are there standards of performance to guide them.

The flight simulator is viewed as a tool of reprisal. Once a flight officer is in position, little training takes place...only check rides; the severity of which seems metered by management's perception of the employee's willingness to go-along and get-along.

And, the Miami schedule is nothing short of brutal[1]. Despite the NTSB's published alarm over the failure of the FAA to restrict international duty times, citing fatigue as causal or contributory in several recent accidents, Amerijet requires its flight officers to operate continuously for time-periods well in excess of the limits of human endurance. Sixteen to eighteen hour work-days are the norm. Extra sections and delays routinely increase that to twenty-four hours or more. Clearing customs twice on some flights adds two extra hours, without pay. And, there is the additional requirement for pilots to shepherd ill-prepared Amerijet passengers through the process(es). Then, they set out in their cars for the long drive home.

---

[1] Thank you for your recent efforts in this regard.

-06070-WJZ    Document 112    Entered on FLSD Docket 03/13/2001    Pa

L. AJT Leadership. February 20, 1997, page 3

Now that Amerijet is prospering, instead of eliminating these hardships and rewarding flight officers in other ways, the company retroactively reduced earned vacation pay, down-graded health-care benefits and, within the past twelve months, passed-over nearly half its senior first officers in order to upgrade to captain four relative new hires: Al Jorsey, David Mitchell, David Bruns and John Washington, Jr...all in their 20's & 30's; indeed, the youngest of these fails to satisfy the company's published criteria for advancement to first officer, let alone captain. Yet, nearly all of those denied advancement are 40 years of age or older, have greater tenure, and possess experience levels well above Amerijet's promotion criteria. Not only are these actions perceived as capricious and arbitrary, they seem to underscore an entrenched pattern of discrimination at Amerijet. Of 60 flight officers ranging from new-hire to more than fifteen years seniority, not one is female or African-American.

And still, rather than investing in the training and development of flight officers who contributed so readily, Amerijet continues to hire captains from outside the organization: in one instance, unleashing on several unsuspecting flight crew an alcoholic who frequently flew under the influence.

Yet, when leadership fails to plan effectively and staffing levels fall short, who compensates for it? When a captain hired from outside the company is thrust into the unfamiliar rigor of Amerijet operations, who brings him up to speed? What group of Amerijet employees routinely salve Amerijet's communications and logistical, training and maintenance snafus?

"If you don't like it, leave. Get another job. Be my guest! No one is holding you back." These comments are management's typical response to flight officer efforts to improve their lot.

Few transitions in life create more trauma and emotional anguish than a job change...even a voluntary one. Fact is, job changes rank next to "Death In The Immediately Family" as life experiences likely to create the most harsh and protracted mental and emotional anguish. One gives up the known for the unknown, friends for strangers, and comfort for discommodation. Often, life's other most trying experiences are involved...family moves, financial hardships, and more. Why, then, should Amerijet employees change jobs simply because their leadership has a problem? Why, indeed, when they must know it is within their power to change things... with management's cooperation, or without, through intra-company exchange or outside pressure? Leadership's demeanor toward flight officers challenges them to take action.

If Amerijet's employment practices do not substantially improve, soon, the company could find its attention diverted away from the growth of a leading regional air-freight utility and entrenched in a legal and labor-relations quagmire. Amerijet leadership has made the mistake of discounting the contribution of its flight officers far too long and, while congratulating itself for the company's success, has earned the ire of one of its most valuable resources.

No one likes a threat. That's not what this is. I am simply providing insight from beyond the executive suite. If I didn't make this extra effort, some dear friends and a good company could get hurt.

On the bright side, you may begin immediately to solve this by resolving to discipline your management team to training and promotion policies, pay practices and leadership

108

behaviors which make outside intervention unnecessary, and by convincing flight officers of your genuine intent, not only through meetings, but in your day-to-day choices.

. . . . . . .

David, my efforts to provoke change at Amerijet are intended to help us all enjoy a brighter future together. I thought you understood that. I am deeply hurt by the notion that you feel angered and threatened by my efforts to contribute above and beyond the requirements of my position.

Warmest Regards,

Pat Major
First Officer

ↄ

TRANSMITTAL

DATE OF PRINTING : 7/08/98
PAGE : 1

Record ID: SO179812722                              Comment Section

Primary Area: J   Key Word: 109      Opinion: I

Comment Text:

MR MAJOR APPEARED BEFORE ME TO TAKE AN ORAL EXAMINATION FOR A TYPE RATING ON
THE B-727.   HE WAS AN UPGRADE PILOT, HAVING SPENT A TOTAL OF SEVEN YEARS IN
THE POSITIONS OF FLIGHT ENGINEER AND FIRST OFFICER ON THE B-727.MR MAJOR HAD
BEEN RECOMMENDED BY PETE STEELE, THE D.O. OF AMERIJET. DURING THE NEXT
FIFTEEN MINUTES OR SO, MR MAJOR MISSED QUESTIONS ON LIMITATIONS, FLIGHT
CONTROLS, AND WIND SHEAR.   I ASKED HIM IF HE HAD RECEIVED ANY SIMULATOR
PERIODS UP TO NOW, AND HE STATED THAT HE HAD.   I THEN ASKED HIM IF THE
INSTRUCTION INCLUDED WIND SHEAR, AND HE CATEGORICALLY STATED THAT HE DID NOT
RECEIVE ANY WIND SHEAR TRAINING.
   BECAUSE OF HIS TOTAL LACK OF PREPARATION FOR THIS ORAL, AND BECAUSE I WAS
LED TO BELIEVE THAT HE DID NOT RECEIVE TRAINING DUE HIM (WIND SHEAR), I
TERMINATED THE ORAL.   MR MAJOR AND I THEN PROCEEEDED TO MR. STEELE'S OFFICE
WHERE WE DISCUSSED MR MAJOR'S PROBLEM FOR ABOUT 20 MINUTES.
MR STEELE SAID HE WOULD GIVE MR MAJOR MORE TRAINING AND SEE TO IT THAT HE
IS BETTER PREPARED THE NEXT TIME.   (I SHOULD POINT OUT THAT IT WAS MR STEELE
WHO SIGNED THE  APPLICATION  AS THE RECOMMENDING INSTRUCTOR, EVEN THOUGH MR
MAJOR STATED TO ME THAT HE WAS NOT GIVEN A PRE-ORAL IN REPLY TO MY INQUIRY)
IT IS MY FEELING THAT WHEN  A QUALIFIED INDIVIDUAL IN AN AIRLINE SIGNS AS
THE RECOMMENDING INSTRUCTOR, HE SHOULD ASCERTAIN THAT THE APPLICANT IS
THOROUGHLY PREPARED FOR THE TEST, ORAL, SIMULATOR, OR AIRCRAFT.   THE
RECOMMENDATION   SHOULD NEVER BE MADE IN A PERFUNCTORY MANNER IN THE ABSENCE
OF A  PROPER      EVALUATION AS  IT WAS IN THIS CASE.





**Pat Major**

Pete Steele, Vice President, Operations
Amerijet International, Inc.
498 SW 34th Street
Ft. Lauderdale, FL 33315

09-11-98

Dear Pete,

I want to thank you, once again, for your very welcome expression of support and encouragement during the meeting with Ed Cook, Tracy Dickinson and John Moktadier, Friday, July 24.

Despite their presence and participation, the training department is confused regarding what was agreed that day (see L.PSteele.08-25-98). Upon reflection, my training for captain has served to surface several issues that correlate strongly with problems ensnaring Amerijet Flight Officer Relations. Following is a recap from certain portions of that meeting as well as pertinent background. Familiarity with the information contained here will save considerable time when we meet. Your forbearance and consideration is warmly appreciated.

I complained that an oral-exam preparation and review session had been omitted from my upgrade training prior to scheduling a type rating oral exam with the FAA. As a result, Chief Pilot Ed Cook advised me to expect one Friday, July 24, during eight hours I was to spend with Tracy Dickinson. Instead, the day prior, I learned Tracy knew nothing of Ed's plans. Then, after waiting close by for nearly two and a half hours, I was exposed to a series of exam questions by Tracy, Ed and John. Much of the exchange sampled precisely what I asked for and needed. Following eighty minutes, though, the session was over. I had been exposed to approximately sixty questions: answering four incorrectly. Even so, afterwards, Ed indicated to you that he, Tracy and John did not feel I was prepared to take an oral exam with the FAA. Under these circumstances, our meeting began.

You expressed concern that three people from the training department believed I was not ready to take the oral exam. Yet, by their own account, neither Ed, Tracy, nor John had prepared a means to quantify my knowledge, had any notion how many questions were asked, any record of my performance, nor could they identify specific areas for improvement. Their "Assessment", such as it was, was far below the minimum expected of novice flight instructors, let alone check airmen and a chief pilot from an FAR Part 121 Air Carrier.

When you asked what I thought of it, I replied that while much of the exchange had been helpful, as an assessment it was, "...Pretty pathetic". Further, I believed the conclusion was both contrived and unfair. When I said that two of the evaluators seemed to be acceding to the wishes of their superior, the statement went completely unchallenged. You paused, looking to each for a response, but neither said a word. At that point you offered, "I'll sign you off right now."

I reiterated my understanding I was to undergo a full day of pre-oral training that day, not an assessment. Further, Ed Cook's demeanor presented as one trying to trap me or trip me, as opposed to help prepare me for an upcoming exam. As an example, I described how, while in the midst of answering Tracy's question regarding yaw damper inoperative speeds for both 100 and 200 series aircraft, as I recalled a series of numbers by rote, Ed interrupted with, "You are flying at flight level 350. What's your true airspeed?" After stumbling to switch patterns of thought and calculate the answer, I answered correctly. But not before misstating it (that is among those I count as incorrect). Ed demanded, "That number should come to your mind like slipping on ice."

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
H: (954) 763-7019, C-Ph: (954) 614-1507

149



DEFENDANT'S
EXHIBIT
10
2/15/01

Ed's question nor his statement is as revealing as his tone, demeanor and timing. Why did he ask the question at that moment? In the pre-oral and during the meeting with you, Ed was both angry and abusive toward me. He lost his temper several times; twice standing and shouting his face contorted and red as he pointed menacingly hurling invective and insults.

One exchange was particularly interesting. After I answered Tracy's questions regarding Amerijet procedures for initial application of wing anti-ice, Tracy followed with several more regarding second-stage climb and takeoff performance. Ed interrupted, interjecting a description of severe icing conditions producing heavy airframe ice accumulation immediately after takeoff. First, he asked, "How would you as a pilot know ice is building up on the aircraft?" I told him. Then he asked, "What's our procedure?" I replied that Amerijet does not have a procedure for turning on wing anti-ice prior to the first power reduction. Indeed, take-off performance analysis stipulate wing anti-ice OFF throughout the takeoff run, lift-off, gear-retraction, climb, and flap retraction schedule. Ed protested that Amerijet does, in fact, have such a procedure, then criticized me for not knowing it. In front of you, he repeated the performance: "That's the trouble with you! You sit there on your high horse using ten dollar words and you don't know sh...".

I had told Ed earlier, and reiterated again, that if safety of flight required the application of wing anti-ice that soon, I would by all means use it....by captain's emergency prerogative. Then I explained how... describing a process that was acceptable to everyone present. But then Ed criticized my suitability for captain because I said Amerijet does not have such a procedure documented in its manuals.

I have found no check airman or training department representative who can direct me to a reference for turning on wing anti ice prior to the first power reduction (that is, beyond captain's prerogative). In your office, Ed indicated the procedure is described in the performance manual.

That is more than a mistake, Pete. It is exemplary of devious demeanor endemic to Captain Cook's leadership style. Ed contrives "Facts" that simply don't exist, as described above, or draws on arcane knowledge, as depicted below, in order to undermine confidence and self-esteem. Ed exploits his subordinates' tendency to defer to the "Better judgment" and "Greater knowledge" of their superiors by manipulating facts and events to engender doubt and vulnerability, luring them to suspend their own judgment... thus removing resistance and gaining cooperation; if he can get away with it. If not, he resorts to temper-tantrums, invective, and more direct forms of abuse.

That's classic control and manipulation pathology, Pete. Abetted by the fractured dislocation of flight officer employees, and a corresponding lack of oversight, the result is institutionalized codependency.... resentment to which comprises the root of Amerijet's problems with its flight officer cadre. Recently Amerijet asked for pilot feedback regarding their general impressions of management. Such a survey will help generate an overall (dis)approval rating. But even dramatic improvements in pay, benefits, scheduling, crew meals even, won't have a lasting effect as long as the underlying problems remain.

Ed Asked, "In flight above level 250 your outboard ailerons suddenly become operational. Following right-hand control yoke input, which way will the aircraft roll?" That is a fascinating question considering the implications of a malfunction extensive enough to release the outboard aileron mechanical lockout with flaps fully retracted, associated problems linked to that type of failure, the implications of high altitude/low air-density aerodynamics, speed of the aircraft, wing twisting moment, and the effect flight spoiler action will produce in conjunction with control wheel input. The subject is not broached in any training department materials, lectures, video tapes, or slide programs, or in any other flight training reference I have been able to locate. When I asked other captains, training department personnel, and two check airmen, they chuckled wryly and asked, "Who asked you that?"

Indeed, it's doubtful there is anyone at Amerijet even minimally qualified to explore the question in any detail. Yet, Ed employed it to underscore a gap in my knowledge and undermine my sense of preparedness and self-confidence. He identified an area not covered by the training and documentation, nor anticipated by Amerijet Alternate, Abnormal or Emergency procedures, then criticized me for not having the answer. If, as Ed stated, a jet pilot should know the answer to that question, then why is it not covered in Amerijet's training programs...or anticipated in our procedures?

I asked Ed why he resents me so. To get this fully, you need the basis for that question.    **150**

You recall, Pete, early in my employment here, I helped the executive committee install a 401K employee benefit and implement one or two suggestions regarding pay and benefit policies.    In the same vein, November 11, 1992, I followed-up a telephone conversation by writing Ed a letter describing several instances of careless, unlawful or dangerous handling of hazardous materials loaded aboard Amerijet aircraft at the Miami cargo facility; I included loading document copies depicting hazardous freight shipped on a single pallet that is forbidden on the same aircraft. In only one instance out of six was hazmat actually loaded in the location it was reported aboard the aircraft.

I was trying to help, and said so. I figured we would all be better off if the chief pilot had a chance to resolve the problem before the FAA came across it on inspection. Rather than do anything about hazmat handling, though, Ed chose to label me a trouble maker and punish me for my efforts. In the weeks that followed, I was coerced to spend five days and nights in the crew bunk trailer in Toledo, taking baths at the local health club several miles away, and using rest room facilities in the hangar next door, while others on out-of-base assignments enjoyed the comfort of hotels. Then Ed denied me upgrade for nearly three years while several others, junior, younger and less qualified, were promoted in my place.    As I feared, hazmat violations continued until the FAA withdrew Amerijet's authorization to carry it.

Beginning with my first weeks here, I strived to contribute the best of my ability to enhance company operations.    It does not matter that Amerijet does not compensate me directly for this. I take a pay check; the company gets my best in return.  Besides, the way I see it, safety is everybody's job, all the time... the least we can do for each other and our families.

Instead of cultivating my efforts, though, Ed began a campaign to punish me and ultimately eliminate my employment. At one point he said, "You are too intelligent to be a pilot. You don't think like anyone else, you don't talk like anyone else. You look at things differently from everyone else. People think you are weird. You just don't fit in. Why don't you leave?" That tactic must have worked well with others.

Why should I leave a good job with many desirable traits and circumstances? Why should I change my life and living conditions, leave my waterfront home, uproot my family and disrupt my personal, social, church and community relations because the company where I work has a temporary leadership problem? No matter what, things change; usually for the better. I decided to see it through.

Last year, two weeks after calling to Ed's attention a potentially serious flaw in Amerijet weight and balance calculations, he invited me to his office. Director of Human Resources Wayne Penny joined us. Instead of discussing the weight and balance problem though, they strongly encouraged me to take a lump sum "Exit incentive", two months pay at my average rate, and leave the company. "You will have no opportunity for upgrade now or in the future, perhaps never. David Bassett is safety officer and has deemed you unworthy of promotion." Incredulous, I asked Ed the reasons for Dave's conclusion. "The company president does not have to have a reason. That's just the way it is". To qualify for the exit-incentive, I was to abdicate all rights to legal redress. This, again while a score of junior, younger, and less qualified first officers were upgraded to captain in my place.

In my voice mail to him two weeks prior, I told Ed I had discovered "Index" errors that could result in faulty weight and balance calculations. Some of the miscalculations were of such magnitude that flight crews could unwittingly take an out-of-CG (center of gravity) aircraft airborne. I even sent a chart precisely illustrating the problem. All he needed to do was pass the information to maintenance who could respond with an update page for the weight and balance manual and new placards for the aircraft. Aside from the offer to leave though, there was no follow-up. To the best of my knowledge the errors still exist. Coincidentally, my voice mail to Ed preceded the Fine Air crash by six months. The NTSB found that DC-8 out of CG by 3%...the identical error I found on Amerijet aircraft.

Earlier this year, Ed visited my company's offices at Ft. Lauderdale Executive Airport. At lunch, he confided: "...You have somehow pissed off the old man. I keep telling you to maintain a low profile, keep your mouth shut and your head down.  You obviously want to work here, otherwise you would have taken the exit incentive I offered last year. I have been having pangs of conscience lately.  So, I have been working on it for you, behind the scenes. I don't know what you did to get so crosswise with him, but I think I may have a shot at getting you rehabilitated with the old man and getting you promoted to captain. I'll see what I can do. You just have give me some time." After lunch, as we toured my company's new facility, Ed gently probed to see what "Special" low rate he could get on the Piper Arrow for a vacation he planned to Kitty Hawk....

**151**

You, Pete, are in a better position than I to assess the validity of Ed's references regarding "The old man."

Three months ago, in an IDEAS Program memo to Ed, I quantified the value of direct routing Amerijet aircraft. Some captains won't fly direct anywhere. Indeed, some will not deviate from routes on the flight release even when alternatives can save hundreds of miles and thousands of dollars. By flying straight lines as opposed to airways, by using a combination of dead reckoning and pilotage (within the limits of non-RNAV Class II navigation) Amerijet flight crews could significantly reduce flight times. I illustrated that "Eliminating the slivers" sufficient to reduce flight times a mere fifteen minutes on half the trips out of Miami would result in a 1.17 million dollar annual contribution directly to the bottom line: same revenue, less expense. Reducing turn-times at out-stations and producing fifteen minute lower block times out of Miami could provide for two more island flights each week. Combining the two,... you get the idea. I figured Ed got it, too. I hoped the illustrations would help facilitate expedited installation, training, and approval for GPS navigation systems in Amerijet Aircraft, that it might encourage discussion concerning how to more effectively negotiate direct routing across international airspace boundaries, and incite better utilization of satellite and computer-based communications systems to enhance day-to-day flight operations. Instead, well, what you saw in your office July 24, is how it goes.

Lashing back is always an alternative, Pete. And, yes, in view of the circumstances I, my family, and other employees continue to face, I have considered it. But, as stated in my June letter to fellow pilots in an effort to dissuade them from electing union representation, I would rather work things through, directly, and rebuild an underlying presumption of trust and cooperation. Lawsuits, the court system: Forcing a company to do anything, is a last resort only...appropriate only when all other efforts have failed.

I have been employed at Amerijet more than seven years, and things have improved. Even so, I am certain, were it not for the recently instituted policy of upgrading by seniority, I would not have been considered for upgrade now. Having reviewed my experiences here, it is clear, Ed Cook's recent contrivances are an amplification of his earlier efforts to eliminate me as a flight officer employee.

Does he resent me because I am not obsequious to him in the same way he is to his superiors... routinely forsaking integrity to avoid confrontation and gain approval?

I am sensitive to the notion that I am the one complaining, so I must be the problem. Also, that in going to the trouble to illustrate this in such detail, I must be out to get Ed. I truly have looked to myself first for the solution, Pete. In fact, I have invested the better part of seven and half years adjusting my behavior and attempting to accommodate Ed's shifting demands. I have wondered, as you might, why would anyone behave that way toward anyone else? How does one rationalize irrational behavior? How can I explain to you what makes no sense to me? I have long believed there are good people here doing the best they can...that everything vill eventually work out. So, I have been patient...even worked fervently to avoid the coercive involvement of a union, twice. But now the pathology has become so apparent, it must be addressed.

Do you think mine is an isolated case, Pete, or are you beginning to recognize these issues elsewhere in Ed's demeanor toward other flight officer employees... many of whom are no longer around? Is there a correlation between Ed's behavior and Amerijet's challenges with regard to its flight officer cadre,... with regard to the FAA?

To an upgrade class, June 05, Ed stated, "We had it all set to go...a pay raise, back to the old sixty-hour guarantee, duty rig, no more contracts. I was going to set up a series of pilot committees to work on scheduling, safety and pay. It was all set, believe me. I thought on the boss's desk. But now, due to the upcoming union election, we can't do a thing. Now, our hands are tied. The first thing you have to do is get rid of the union?" Was there an implied promise there, Pete; one, by virtue of your comments to the pilot meeting, Sunday, May 14, in which you conspired? One that has since been reneged upon in the eyes of flight officer employees?

The extravagances of a man unconstrained by scruples, are really quite remarkable. I pause to consider what else Ed might do, or try to do, to me personally, professionally, in the context of daily flight operations, in the simulator, throughout my continuing efforts to make captain, and after. It's not a comfortable feeling. Be advised, Ed Cook's background and demeanor neatly describe the profile of an individual prone to violence in the workplace.

152

In your letter, you referred to my "...Last oral with the FAA and your pre-oral with the training department." Let us get that straight. During the discussion, June 24, whether or not to discontinue the oral exam, the FAA Examiner stated emphatically there would be no record the meeting ever took place. He reiterated precisely the same comments to you when the three of us met in Ed Cook's office (Ed was away on vacation), then again to me, privately before he left: "There will be no record. It's a discontinuance. It is as if it never happened. That's what 'Discontinuance' means."

By his own account, the examiner was not prepared to present a type rating oral. Neither of us were happy with our progress. Due to the examiner's suggestion and assurances, I agreed to discontinue: No fault, no gain. Having witnessed several hundred airmen (and women) attain all manner of ratings, I am not unfamiliar with the term. Barney Sonin did not "Pink Slip" me. I did not "Fail". An oral exam simply never happened. We agreed: "We'll come back and go at this better another day." You and I agreed that day would be after my vacation. Then, after the July 24, meeting with the training department we deferred the oral until I flew the line for one schedule period (4 weeks). Now, it has been put off indefinitely. Indeed, the human resources department is under the impression I voluntarily withdrew from the upgrade program until next year! My efforts to restart the process through Tracy Dickinson, as you directed, and through Ed, have been ignored.

I sense more duplicity, Pete. Let's look at how this plays out.

The FAA examiner was incredulous when he learned I had not had pre-oral training from a qualified check airman. All the flight engineer candidates had it. All other captain candidates had it. The examiner demanded of me, "Why the hell not? It's required by FAR!" Indeed, my training records did not even contain the required endorsement to present myself for the oral exam in the first place.

When I asked about a pre-oral review during the days leading up to my meeting with the FAA, Tracy told me to expect Ed Cook to provide it. But Ed was away on vacation (all the while insisting I cancel my year-old plans to tour Italy with twenty members of my family, or face never making captain: "I don't recommend you put this off. You may not get another chance").

Upon return from his vacation, Ed was visibly disturbed to learn Tracy Dickinson had rearranged the simulator and check-ride schedule to accommodate mine. Then, in our meeting, June 25, the morning after the aborted oral, Ed exclaimed, "It is not Amerijet's policy to provide captain candidates pre-oral training!" Further: "Company policy views a discontinued oral exam a failure on the part of the trainee". During the telephone portion of the meeting which included you and Juan Morales, your words contradicted his: "Nobody said that. All we are trying to do is see where we go next?"

As we began, Ed had asked me to give him my upgrade training records. They were blank save three simulator sessions; two with Ed, one with Bill Cline: All had been successful. How is it that those records now reflect an endorsement for the oral...an endorsement which by definition implies the satisfactory completion of a pre-oral review? And, Pete, how could it be that despite the FAA inspector's promises to both you and I, on the heels of Ed's return from vacation, Amerijet received a letter from its principle operations inspector (POI) critical of the training department... which referred specifically to the non-existent oral exam and me? How come none, that's right, none of the letters I have referred to in this text are contained in any Amerijet employment file concerning me?

Did a key Amerijet official attempt to embroil representatives of the FAA in his machinations against a dedicated and resilient flight officer employee? What happened to the hazmat letter and documentation? What happened to the letters warning of "seething resentment growing amongst flight officer employees", recommending specific solutions and attempting to improve the circumstances? What happened to the letters protesting others, less qualified, junior and younger than me gaining advancement ahead of my peers and I? What happened to the weight and balance letter, my suggestions for improving training department resources and activities, eliminating the slivers, and depicting the implementation of an effective HR department? Why aren't they with my employment records?

Pete, some at Amerijet misconstrue patience, courtesy and eagerness to serve as signs of weakness and contrary indications of leadership qualities and ability. I have learned that neither courtesy nor an occasional please and thank you diminish authority one iota. Quite the contrary, they enhance it. I come from a long line of ocean sailing ship masters. My father was an Air Force officer and pilot, my brother flies modified Chinooks in the Army's Task Force. I earned my first real dollar at seven years of age, published a newspaper at ten, and first went to sea at fifteen. I turned

down an appointment to the United States Military Academy Prep School and enrollment at West Point choosing to apply myself as an enlisted man (a Viet Nam Era Veteran), then in several corporate, professional, community, educational, social and spiritual settings. I passed the human resources accreditation exam at the senior level in 1983, and obtained a degree in business management in 1986, graduating with distinction. Meanwhile, I built several of my own companies and guided others in salvaging and growing theirs. I am a seven thousand hour pilot and flight instructor with a flawless safety record and experience in a wide variety of single and multi, reciprocating engine, turboprop and turbojet aircraft. Additionally, I am not only a flight engineer, airline transport pilot and certified flight instructor with instrument and multi-engine ratings, I am a licensed airframe and power plant mechanic. Many of these ratings were achieved in my spare time, at my own expense, while employed here at Amerijet. I have appeared on local and national television as a spokesman for general aviation, the airline industry, as well as the environment, and have worked for years with exemplary professionals in the air carrier and flight training industries... professionals who have observed first-hand my performance in actual flight, flight simulators and during interpersonal, professional, and instructional situations... many of whom have sampled directly my knowledge of Boeing 727 systems and operational formula. I have apprenticed myself, here, for seven years, gaining more than five thousand hours experience in Amerijet Boeing 727 flight operations, and have received numerous written and verbal commendations from customers, captains, station personnel and other operations employees.

I am an experienced and knowledgeable leadership professional fully aware of the issues about which I speak. This situation has deprived me of income and opportunity. It harms my family, as well as other Amerijet Flight Officers and their loved ones...many of whom can not articulate these issues to you the way I have.

I need my job here and enjoy the work, Pete. I would like to see this through to a solution that benefits everyone. This is what needs to happen next:

. As it is unlikely I will gain effective or equitable treatment through a training department and a flight standards district office jaundiced by Ed Cook's machinations, I ask that Amerijet authorize me to arrange type training at an approved 142 school, at its expense, under the same contract provisions to which I have already agreed. Upon completion, I will present myself ready to commence initial operating experience (IOE).

. As I have been victimized for advocacy regarding safety, regulatory compliance, and for my efforts on behalf of other Amerijet flight officer employees...twice punitively delayed in gaining promotion, I ask that Amerijet extend to me differential back pay for income lost during two years, each: second to first officer and from first officer to captain.

. Meanwhile, Ed's activities with regard to flight officer employees, and particularly with me, must be much more closely supervised. Ed possesses considerable knowledge, talent and ability. It would be a shame for Amerijet to suffer further harm from his undesirable tendencies or to incur the operational disruption his departure and the orientation of a replacement would represent. Ed Cook needs discipline, followed by counseling, psychotherapy, with specific regard to his manipulative and controlling demeanor toward employees and obsequious acquiescence to authority. Is he ill? Will he respond to treatment? Or are Ed's acts purposely malicious?

My hope, Pete, is that Amerijet will take these steps because they are an appropriate way to make amends to one who has been maligned far too long, and who, nonetheless, has helped the company identify, articulate and solve the scourge underlying Amerijet's relations with its flight officer employees. This is the right way to begin to build a healthy and effective, fully functioning flight operations and training division free from coercive manipulation and abuse of power.

Pete, I hope this is the beginning of a solution. Whenever I can be of further assistance, do not hesitate to contact me. Thank you for your attention and your continued support. I remain your dedicated employee.

Warmest Regards,

154

Patrick Scott Major
Captain Candidate

cc: Juan Morales, SPHR, Senior Director of Human Resources

## In The Matter Of:

*Major     v.*
*Amerijet International*

*Patrick Scott Major*
*Vol. 2, February 19, 2001*

*Friedman, Lombardi & Olson*
*19 West Flagler St.*
*Miami, FL  33130*
*(305) 371-6677*

*Original File pm021901. 42 Pages*
*Min-U-Script® File ID: 3564826156*

## Word Index included with this Min-U-Script®

Page 226



[1]     IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF FLORIDA
[2]        FORT LAUDERDALE DIVISION
[3]
[4]        Case No. 00-6070-CIV-FERGUSON
        Magistrate Judge Snow
[5]
[6]
PATRICK SCOTT MAJOR,
[7]
    Plaintiff,
[8]
  vs.
[9]
AMERIJET INTERNATIONAL, INC.,
[10]
    Defendant.
[11]
[12]
[13]
[14]     One E. Broward Blvd.,
        Ft. Lauderdale, Florida,
[15]     Monday, 9:04 a.m.,
        February 19, 2001
[16]
[17]
[18]
[19]      CONTINUED
[20]      VIDEOTAPED
[21]      DEPOSITION
[22]      of
[23]      PATRICK SCOTT MAJOR
[24]    taken on behalf of the Defendant
     pursuant to a Notice of Taking Deposition
[25]

Page 227

[1] APPEARANCES:

[2]

     HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A., by,

[3]     VALERIE SHEA, ESQ., of counsel,

     Attorneys for Plaintiff.

[4]

     ALLEN, NORTON & BLUE, P.A., by,

[5]     SUSAN POTTER NORTON, ESQ.

     and

[6]     STEPHEN P. SANTIAGO, ESQ., of counsel,

     Attorneys for Defendant.

[7]

     ALSO PRESENT: Derry Huff, Corporate Representative

[8]     for Amerijet International, Inc.

[9]

[10]

[11]

[12]

       INDEX

[13]

   WITNESS  DIRECT  CROSS  REDIRECT  RECROSS

[14]

   PATRICK MAJOR      (Continued)

[15] (By Mrs. Norton)     228

   (By Mrs. Shea)       264

[16]

[17]

[18]

       EXHIBITS

[19]

   DEFENDANT'S EXHIBITS    FOR IDENTIFICATION

[20]

      No. 11        Pg. 229

[21]   No. 12        Pg. 231

      No. 13        Pg. 239

[22]   No. 14        Pg. 251

      No. 14-B       Pg. 251

[23]

[24]

[25]

Page 228

[1] THE VIDEOGRAPHER: This is the continuation of
[2] videotaped deposition of Patrick Scott Major in the matter of
[3] Major vs. Amerijet. The date is February 19, 2001. The time is
[4] 9:04 a.m.
[5] (Continued) DIRECT EXAMINATION
[6] BY MRS. NORTON:
[7] Q: Good morning. This is a continuation of your depo
[8] from Thursday. I'm sure you remember that, correct, Mr. Major?
[9] A: Yes.
[10] Q: You are still under oath.
[11] A: Right.
[12] Q: Just as if you were sworn in this morning.
[13] A: Yes, ma'am.
[14] Q: And I say that not in any way suggesting one way or
[15] the other, but only just to remind you that even though you were
[16] not sworn this morning it is a continuation so you remain sworn.
[17] Okay?
[18] A: I understand.
[19] Q: Let me direct your attention to August 17th, 18th and
[20] that situation regarding what you perceived to be was a
[21] contaminated runway. Do you know what I'm talking about?
[22] A: Yes, ma'am.
[23] Q: You as First Officer, my understanding is that it's
[24] your responsibility to fill out the weight and balance sheet and
[25] then have it signed by the Captain. Is that correct?

Page 229

[1] A: That is correct.
[2] Q: Did you in fact fill out a weight and balance sheet?
[3] A: Yes, I did.
[4] Q: Let me show you what I've marked as Major No. 11 and
[5] ask you if you can identify that for me. It is in two pieces
[6] And before you identify it, I would ask you to flip the first
[7] page and compare it to the second so it lines up.
[8] A: Okay. May I separate it?
[9] Q: Absolutely.
[10] MRS. NORTON: Then let's have the record reflect that
[11] Bates stamp 000313 and 000314 together will compose Exhibit
[12] No. 11.
[13] [Thereupon, the document referred to was marked as
[14] Defendant's Exhibit No. 11, for Identification.]
[15] A: Part of that number is missing on this one, part of
[16] the 3
[17] Okay.
[18] Q: Is that, is what I put before you as No. 11, is that
[19] in fact the weight and balance load plan that you prepared and
[20] Captain Steele signed on August 18th?
[21] A: I don't know, but it's got my name on it. It's got
[22] part of the date missing. It has the – like I said, it's got
[23] my handwriting.
[24] Q: Well, look at the very top.
[25] A: Uh-huh.

Page 230

[1] Q: Do you see that? Flight No. 827?
[2] A: That I see.
[3] Q: FLL, Ft. Lauderdale to?
[4] A: To POS, Port of Spain, yes, ma'am.
[5] Q: Is that where you were flying?
[6] Is it August 18th or August 17th?
[7] A: It's August 17th.
[8] Q: Look at the very top. Does that not look like a one
[9] or lines that could be a one and a seven, August '99?
[10] A: Yes, ma'am. Those lines could be a one and a seven.
[11] Q: Look at the crew. Steele, Major, Weiss, Al Jorsey and
[12] then another name. Do you recall any other flight in August of
[13] '99 when Al Jorsey was flying with you?
[14] A: No, ma'am.
[15] Q: Look at the, at page 314 and note the takeoffweight.
[16] A: Yes.
[17] Q: 192,298.
[18] A: Yes, ma'am.
[19] Q: My recollection is that that's exactly what you
[20] referred to in your letter of recounting the incident of August
[21] 18th. Do you remember that?
[22] A: I remember the letter, yes.
[23] Q: Is there any reason for you to believe that this in
[24] fact is not the weight and balance load plan for August 17,
[25] 1999?

Page 231

[1] A: No, ma'am
[2] Q: Is this the only weight and balance plan that you
[3] filled out?
[4] A: I think so.
[5] Q: Did you fill out any other prior to submitting this to
[6] Brian Steele?
[7] A: I may have, I don't remember.
[8] Q: Well, how would you remember?
[9] A: How would I remember?
[10] Q: Uh-huh.
[11] A: It's not uncommon to fill out several before a flight
[12] departs.
[13] Q: Is this the first one you presented to Brian Steele?
[14] A: I don't know.
[15] Q: You don't have any recollection one way or the other?
[16] A: No, ma'am
[17] [Thereupon, a following document was marked as
[18] Defendant's Exhibit No. 12, for Identification.]
[19] Q: Do you remember any conversation with Captain Steele
[20] regarding this particular weight and balance plan, this Exhibit
[21] No. 12?
[22] A: Yes, ma'am
[23] Q: What do you recall?
[24] A: I recall the discussion as I described it previously
[25] Q: Would you please tell me exactly what you remember?

Page 232

[1]  A: I recall having mentioned early on that there was a

[2]  tail wind.

[3]  Q: Mr. Major, we don't have a lot of time and I'm gonna

[4]  have to direct your attention. I'm not trying to cut you short,

[5]  but I don't need how to make the watch when I ask the time,

[6]  okay? What I want is what conversation you had specifically on

[7]  this weight and balance plan with Captain Steele.

[8]  A: Ma'am, that would have been included in the weight and

[9]  the – I think I mentioned last Thursday that a tail wind would

[10] represent a significant decrement or reduction in the maximum

[11] allowable takeoffweight as indicated on this plan.

[12]  Q: Mr. Major, did you go up to Captain Steele and tell

[13] him that?

[14]  A: Yes, ma'am.

[15]  Q: I want to know what you told Captain Steele, not

[16] background.

[17]  A: I cannot recall word for-word.

[18]  Q: Okay.

[19]  A: What I mentioned to Captain Steele and Captain Jorsey,

[20] that the ATIS I had just received included a three-knot tail

[21] wind, which if memory serves, would have reduced our maximum

[22] allowable takeoffweight by some 3,600 pounds.

[23]  Q: So Captain Jorsey and Captain Steele were standing

[24] side-by-side when you presented this exhibit on the weight and

[25] load balance to Captain Steele?

Page 233

[1]  A: This would have been the – this is the time where I

[2]  am obtaining information for the purpose of completing the

[3]  weight and balance. Certain of that information is verified,

[4]  discussed in creating this weight and balance so that there

[5]  aren't any surprises when I hand it to him. There's a general

[6]  agreement as to what's gone into it.

[7]  Q: I want to know what your conversation with him was

[8]  specifically though on what I've marked –

[9]  A: Best I can recall, I said there's a tail wind, winds

[10] are 270 at three knots, they're using runway nine left. That

[11] would result in a 3,600 pound runway decrement. Brian Steele's

[12] response was something on the order of, we're not going to take

[13] that, and Al Jorsey clucked or made a sound as if it was absurd

[14] for me even to mention such a thing.

[15]  Q: And so you handed him this document, the weight and

[16] balance plan that you had already completed for him to sign it

[17] and that's what they said?

[18]  A: No, ma'am. That would have – I would have had at

[19] that point the weight and balance form in front of me. I would

[20] have been listening to the transcribed weather broadcast over my

[21] headset writing it down on a pad that I keep, that I kept next

[22] to me on a spot provided for it next to the window.

[23]  Q: Are you able to be anymore specific as to any specific

[24] conversation you had with Captain Steele when you handed him the

[25] load plan weight and balance sheet? That's my question.

Page 234

[1]  A: Subsequent to that there was discussion with respect

[2]  to the water all around the airport and on the – it was pretty

[3]  obvious it was on the approach end of the runway, which is all

[4]  we could see from where we were and there was –

[5]  Q: Mr. Major, do you understand my question to you? I

[6]  want to know if you can tell me –

[7]  A: You want to know the discussion that was –

[8]  Q: If you can tell me what you said to Captain Steele

[9]  when you handed him –

[10]  A: I'm attempting to do that, ma'am. I'm obviously not

[11] doing what you want.

[12]  Q: No, you're not.

[13]  A: Okay.

[14]  Q: Do you recall what you said to Captain Steele when you

[15] handed him this document to sign, if anything, if you recall?

[16]  A: At that –

[17]  Q: Did you say anything?

[18]  A: At that moment in time when it's handed to him?

[19]  Q: Yes.

[20]  A: No, ma'am.

[21]  Q: No, you didn't say anything or, no, you can't recall?

[22]  A: I can't recall.

[23]  Q: Okay.

[24]  A: I have been attempting to describe the conversation

[25] that would have surrounded that act, would have gone before,

Page 235

[1]  during and after and that did in fact go before, during and

[2]  after and up until the time of departure, but I've been unable

[3]  to –

[4]  Q: No. My question was –

[5]  A: – to go into detail into that.

[6]  Q: – when you handed him the form to sign, forget what

[7]  took place before, forget what took place afterwards, my

[8]  question to you specifically is, when you gave him the form to

[9]  sign - well, number one, did you give him the form to sign?

[10]  A: Well, I probably did, yes, ma'am, and I've –

[11]  Q: Is that your practice?

[12]  A: To give him the form to sign?

[13]  Q: That you would normally take it yourself to the

[14] Captain?

[15]  A: I sit right next to him. I just hand it across to

[16] him.

[17]  Q: So you did hand it across to him to sign?

[18]  A: Yes, ma'am.

[19]  Q: And were you in the cockpit at the time?

[20]  A: Yes, ma'am.

[21]  Q: And were you still at the ramp?

[22]  A: Yes, ma'am.

[23]  Q: And do you recall anything at that time when you hand

[24] it to him?

[25]  And he signed it?

Page 236

[1] **A:** Yes, ma'am.

[2] **Q:** Did he give it back to you?

[3] **A:** I suppose he did.

[4] **Q:** Well, would he normally give it back or would he hand

[5] it to someone else?

[6] **A:** He would normally – well, there you go. He would

[7] normally take a copy, which would be left with the ramp agent

[8] and then hand the original back to the flight engineer. He may

[9] have, I don't recall exactly how it was distributed that

[10] morning, whether he handed it back to me, to the flight

[11] engineer, to the ramp agent that might have been waiting in the

[12] cockpit

[13] **Q:** What is your obligation, if any, once he hands it back

[14] to you? What do you do with it?

[15] **A:** If I haven't already, in most cases it's my practice

[16] to have already done it, I would create the Bug Card or make the

[17] appropriate entries on the Bug Card, which is used to derive our

[18] reference speeds for takeoff.

[19] **Q:** Do you recall specifically doing that with regard to

[20] this particular weight and balance sheet?

[21] **A:** I don't recall specifically.

[22] **Q:** You don't remember one way or the other?

[23] **A:** Hu-huh.

[24] **Q:** When he handed it back to you, did he say anything?

[25] **A:** No, ma'am.

Page 237

[1] **Q:** That you recall?

[2] **A:** No. It was just a very strained cockpit at that

[3] point.

[4] **Q:** Did you discuss the weight and balance plan

[5] specifically as you had filled it out with Captain Jorsey?

[6] **A:** Captain Jorsey was privy to the – first off, I had

[7] discussed my concerns with Captain Jorsey before Brian Steele

[8] came in the cockpit. Captain Jorsey was privy to the entire

[9] conversation that ensued with Brian Steele once Brian Steele

[10] entered the cockpit. There was – the circumstances were pretty

[11] obvious to both of them.

[12] **Q:** After he handed you the completed weight and balance

[13] plan that he had signed –

[14] **A:** I'm not sure he did, ma'am.

[15] **Q:** After he signed the form, whether he handed it to you

[16] or anybody else, what conversations, if any, do you recall

[17] taking place from that point until push-back from the ramp

[18] regarding the contaminated runway or your perception of what was

[19] a contaminated runway?

[20] **A:** There was some reference to, we'll have to take off –

[21] I think I mentioned it started to rain again and it stopped

[22] momentarily, one of the other, either Brian or Al Jorsey

[23] referenced, we'll just have to take off between the water

[24] droplets.

[25] **Q:** Was that said more than once or just once, taking off

Page 238

[1] between the water droplets?

[2] **A:** It may have been said several times actually.

[3] **Q:** The same comment?

[4] **A:** Yes, ma'am.

[5] **Q:** Do you remember?

[6] **A:** No, ma'am

[7] **Q:** Do you remember specifically that that conversation

[8] took place in the cockpit?

[9] **A:** Yes, ma'am.

[10] **Q:** What other conversation, again, regarding the runway,

[11] do you remember taking place in the cockpit before push-back?

[12] **A:** In interest of time I'm attempting to remember what

[13] we've discussed as actually taking place in the cockpit and what

[14] we haven't discussed as it corresponds to my memory.

[15] Suffice to say, there was repeated conversation with

[16] respect to my concerns regarding the weather and the surrounding

[17] area. We were surrounded by three-to-five thunderstorms and the

[18] contamination on the airport.

[19] **Q:** Mr. Major, you say that, but your report is contrary

[20] to that. Your report that you prepared suggests that two

[21] conversations, one, that you recommended and, two, that you

[22] noted, it does not reference repeated conversations.

[23] **MRS. SHEA:** Object to the form of the question

[24] **Q:** Let me show you a copy of that

[25] **MRS. NORTON:** We're gonna skip Exhibit No. 12 for a

Page 239

[1] minute here and go to No. 13, so the record is clear. I'll give

[2] you a minute to read this if you'd like. Let's go off the

[3] record while he reads the document.

[4] [Thereupon, the document referred to was marked as

[5] Defendant's Exhibit No. 13, for Identification.]

[6] THE VIDEOGRAPHER: At this time we're going off video

[7] record, it is 9:19 a.m.

[8] [Recess Taken.]

[9] THE VIDEOGRAPHER: At this time we are returning to

[10] video record, it is 9.24 a.m.

[11] **Q:** (By Mrs. Norton:) Mr. Major, did you have an

[12] opportunity to read what I have marked as Major Exhibit No. 13?

[13] **A:** Yes, ma'am.

[14] **Q:** Which I believe is your report dated August 18th?

[15] **A:** That is correct.

[16] **Q:** Of the flight that took place on August 17th?

[17] **A:** Yes, ma'am.

[18] **Q:** of '99? Is that correct?

[19] **A:** Yes, ma'am.

[20] **Q:** After reviewing that, do you recall any other

[21] conversations that took place in the cockpit?

[22] **A:** Yes, ma'am. The discussions were, as I have largely

[23] described and probably will continue to describe at length in

[24] far more in-depth questioning, but the purpose here was not to

[25] give a blow-by-blow replay quoting each person's every comment,

---

Page 240

[1] it was just to summarize the events.

[2]   **Q:** I understand that, Mr. Major, that's why I'm asking

[3] you what took place exactly as you recall it in the cockpit.

[4]   **MRS. SHEA:** I'm just gonna object to the form of the

[5] question because he's tried to tell you and then you interrupt

[6] him and you don't want to hear about making a watch –

[7]   **MRS. NORTON:** Exactly.

[8]   **MRS. SHEA:** – et cetera, so.

[9]   **MRS. NORTON:** I want to know the conversations, not

[10] the background explanation as to why he's telling me. In other

[11] words, I want, I said to Brian, and not a background description

[12] setting the scene is my point.

[13]   **MRS. SHEA:** It has not been very clear.

[14]   **MRS. NORTON:** Fine.

[15]   **MRS. SHEA:** But you accused him of contradicting his

[16] report and he's now explained those reports as summaries, so.

[17]   **MRS. NORTON:** Would you read back my last question

[18] before I gave him the document?

[19]   [Thereupon, the court reporter read back the previous

[20] question as above recorded.]

[21]   **Q:** For purpose of clarification, let me just ask you,

[22] does your report note repeated conversations in the cockpit?

[23]   **A:** As I understand it, yes, ma'am

[24]   **Q:** Where are those conversations referred? Would you

[25] just give me the page and the paragraphs that you're referring

---

Page 241

[1] to?

[2]   **A:** There is on the page number that is four zeros

[3] followed by a five and a three describes or summarizes the

[4] question, the discussion with the check airman.

[5]   **Q:** Now, realizing that you did not perhaps write every

[6] single word you said or can recall to the check airman, do you

[7] recall any other conversations you had with Captain Jorsey that

[8] are not reflected here as you sit there now?

[9]   **A:** The conversation, I think of it as one conversation

[10] all pertaining to our performance planning for that particular

[11] takeoff on that day, went over a period of minutes. It could

[12] have been as long as 45 minutes –

[13]   **Q:** Mr. Major –

[14]   **A:** – and there were several –

[15]   **Q:** – do you remember any of the words you said?

[16]   **MRS. SHEA:** He isn't finished with his answer

[17]   **A:** I can recall having said, for instance, when I got new

[18] weather, that the wind had changed. That on the one hand the

[19] wind had changed around, headed to a northeasterly direction,

[20] which eliminated the requirement that I had previously mentioned

[21] and that had been derided with respect to a tail wind decrement.

[22]   **Q:** Did you explain that to him?

[23]   **A:** Yes, ma'am. I further explained that that vast of a

[24] wind direction change, especially corresponding to the weather

[25] in the surrounding area, tended to indicate conditions ripe for

---

Page 242

[1] wind shear.

[2]   **Q:** What did he say?

[3]   **A:** My best recollection of most of Captain Jorsey's and

[4] Captain Brian's responses to me with respect to most of these

[5] concerns was outright ridicule.

[6]   **Q:** First, let me ask you exactly what Captain Jorsey said

[7] that you have now characterized as outright ridicule.

[8]   **A:** One of Captain Jorsey's comments and, forgive me, I

[9] don't recall if they are included here, was that if I didn't

[10] like the Amerijet's interpretations of its policies, I should

[11] quit and go to work somewhere else.

[12]   **Q:** Let me ask you that. What policy were you talking

[13] about there?

[14]   **A:** The policy that – it's actually a practice – that

[15] Amerijet dispatch had just confirmed to me moments before I

[16] walked out to the airplane, unless there is a tower report, an

[17] official tower report containing the specific wording "standing

[18] water", then as far as Amerijet's performance planning

[19] procedures are concerned, the runway is dry.

[20]   **Q:** And you took exception to that practice?

[21]   **A:** I had been for several months –

[22]   **Q:** Mr Major, did you take exception to it or not? Yes

[23] or no?

[24]   **A:** – engaged in an effort to promote a change to that

[25] policy.

---

Page 243

[1]   **Q:** Mr. Major, can you answer my question? Did you take

[2] exception to it or did you not?

[3]   **A:** I don't think taking exception – well, yes. I took

[4] exception to it.

[5]   **Q:** Okay.

[6]   **A:** It's just a very strong word for what I considered to

[7] be a collaborative effort to promote a change in enhancing

[8] safety.

[9]   **Q:** Did you disagreed with it?

[10]   **A:** Yes, I disagreed with it.

[11]   **Q:** Is that the practice that you have referred to as, in

[12] your complaint, as in violation and, again, I realize lawyers do

[13] write these. So let me ask you.

[14]   **A:** Thank you.

[15]   **Q:** This is the amended complaint. Paragraph 35 states.

[16] and I will show this to you

[17]   **MRS. SHEA:** I'm gonna object to the use of the

[18] complaint with the witness in the absence of a predicate that

[19] it's his document. Same objection.

[20]   **MRS. NORTON:** Fine, Mrs. Shea.

[21]   **Q:** It says here that Paragraph 34, and I'm gonna show

[22] this to you, but I'm gonna read it first. "Major objected to

[23] and refused to participate in activities and practices of

[24] Amerijet specifically on June 8th and August 17, 1999. Major

[25] objected to Amerijet's overweight takeoff under unsafe

---

Page 244

[1] conditions, a practice of Amerijet that violates Federal

[2] Regulations."

[3]    It's the last phrase, "practice that violates Federal

[4] Regulations", and I'm asking you, is it that practice you just

[5] described, regarding a runway as dry unless the tower reports

[6] there's standing water, that you were referring to there?

[7]    **MRS. SHEA:** I'm gonna object to this whole question as

[8] unproper. The question you asked him previously was proper

[9] because it did not try to incorporate a pleading in the case,

[10] which is not his pleading which you've highlighted a paragraph

[11] of, but I'm gonna object to this question and form.

[12]    **Q:** Do you understand my question, Mr. Major?

[13]    **A:** No, ma'am, you're gonna have to restate it.

[14]    **Q:** The very last sentence there refers to a practice of

[15] Amerijet that you believe violates FAA or, excuse me, is in

[16] violation of the FAA?

[17]    **A:** Yes, ma'am.

[18]    **Q:** And I wanted to know, is it this practice of regarding

[19] the runway as dry unless the tower actually reports there's

[20] standing water, that you believe to be in violation?

[21]    **MRS. SHEA:** Objection to the form and the use of the

[22] document.

[23]    **A:** I believe it is in violation, yes, ma'am.

[24]    **Q:** Is there any other practice that you are referring to

[25] in Paragraph 34?

Page 245

[1]    **A:** In Paragraph 34?

[2]    **MRS. SHEA:** Objection to the use of the document.

[3] That is a totally unproper question, you know it.

[4]    **Q:** Let me rephrase my question.

[5] Is there any other practice of Amerijet that you

[6] believe violates Federal Regulations?

[7]    **A:** There are several.

[8]    **Q:** Would you tell me what they are?

[9]    **A:** I cannot give you an all inclusive list, but there is

[10] a - I have several times come across weights on the aircraft or

[11] loaded on the aircraft and then reported to flight crew in an

[12] amount greatly reduced from their actual weight which would have

[13] the effect of making the airplane overweight for takeoff and

[14] enabling the air carrier to get more revenue for a flight

[15] without the air crew's knowledge that they may be placing

[16] themselves in danger.

[17]    **Q:** So overweight flights?

[18]    **A:** Overweight flights would be one.

[19]    **Q:** Any others?

[20]    **A:** Hazardous materials.

[21]    **Q:** Anything else?

[22]    **A:** Duty days.

[23]    **Q:** Anything else?

[24]    **A:** That's all I can remember at this point.

[25]    **Q:** Let's take duty days. When is the last time that you

Page 246

[1] brought that to the attention of anyone in management at

[2] Amerijet?

[3]    **A:** That was part and parcel of a collaborative effort

[4] that I had recommended between a series of committees created by

[5] the company's President and the company's Executive Committee,

[6] the result of which was entirely satisfactory in respect to that

[7] flight crews would not be put on call or be asked to work in

[8] excess of 16 hours.

[9]    **Q:** So that was resolved in a way that you found to be

[10] satisfactory?

[11]    **A:** At least in written word, yes, ma'am.

[12]    **Q:** Okay.

[13]    **A:** At the time I believe the company's intentions were

[14] sincere.

[15]    **Q:** How about the hazmat?

[16]    **A:** Hazardous materials had been a ongoing problem that I

[17] had attempted to help resolve as early back - as far back as I

[18] believe November of 1992.

[19]    **Q:** Okay.

[20]    **A:** And had - I had been concerned that, just from a

[21] business standpoint as a source of revenue, Amerijet losing its

[22] authority to carry hazardous materials might represent a

[23] significant impact to its ability to generate a profit.

[24]    **Q:** In the last four years prior to your separation from

[25] the company, do you recall specifically raising that at any

Page 247

[1] time?

[2]    **A:** Yes, ma'am.

[3]    **Q:** When and to whom?

[4]    **A:** At this particular juncture I couldn't tell you

[5] exactly when. It would have been to the Chief Pilot or to the

[6] Director of Operations -

[7]    **Q:** Do you remember who that was?

[8]    **A:** - in written or verbal form.

[9] No, ma'am.

[10]    **Q:** Okay.

[11]    **A:** Ultimately they got their, Amerijet, just to bring

[12] that to a close, I know you're pacing and rushing through,

[13] Amerijet had its authority to carry hazmat rescinded and did not

[14] get it back for several months as a result of a whole series of

[15] violations that the FAA found with it on its own.

[16]    **Q:** Did you raise it after that time?

[17]    **A:** After that time the - I recall being - in fact, I

[18] just think I mentioned or I think I remember seeing something in

[19] my file where one of the management officials at Amerijet —

[20]    **Q:** Mr Major, did you raise it after that time? It's a

[21] simple question

[22]    **A:** I complained when I —

[23]    **Q:** Do you know -

[24]    **A:** Yes

[25]    **Q:** - if you raised it after that time or not?

Page 248

[1]  **A:** Yes.

[2]  **Q:** Then what's the answer?

[3]  **A:** I'm answering it.

[4]  **Q:** Yes you did? Is that right?

[5]  **A:** Yes, ma'am.

[6]  **Q:** In what form did you raise it, written or verbal?

[7]  **A:** I raised on the flight deck as we prepared for

[8] departure one day when I found that there was —

[9]  **Q:** Is that verbal?

[10]  **A:** Yes, ma'am.

[11]  **Q:** And to whom did you raise it?

[12]  **A:** I raised it to the flight crew and to the ramp

[13] personnel.

[14]  **Q:** Who was the flight crew?

[15]  **A:** I don't recall.

[16]  **Q:** Do you remember the Captain?

[17]  **A:** No, ma'am.

[18]  **Q:** Did you at any time subsequent to that raise it?

[19]  **A:** At any time subsequent to that?

[20]  **Q:** Uh-huh.

[21]  **A:** Any time that I found hazardous materials stored and

[22] improperly or in conjunction with other hazardous materials that

[23] it's not allowed I raised it. It was a matter of course  It

[24] happened quite often.

[25]  **Q:** Do you remember specifically any time raising it or is

Page 249

[1] this just your general practice, if there's something wrong

[2] you're gonna bring it to somebody's attention?

[3]  **A:** It's my job.

[4]  **Q:** On the overweight, other than what has been reflected

[5] in these documents regarding your write-up of the June incident

[6] and of the August flight, where obviously you're contending it's

[7] overweight, have you raised the issue of Amerijet being

[8] overweight in any other documents in writing that you're aware

[9] of?

[10]  **A:** Yes, ma'am.

[11]  **Q:** In which ones and when?

[12]  **A:** The document I can refer you to would regard a flight

[13] to Mexico City where the item in positions, placed in two

[14] positions, straddling two positions, I believe it was four and

[15] five, it's a long item, had stamped on the side of it that it

[16] weighs nearly 13,000 pounds.

[17]  **Q:** Let me ask you this then. When was that?

[18]  **A:** I couldn't tell you exactly.

[19]  **Q:** '95, '94, '93, '98?

[20]  **A:** No, it would be '99, '98.

[21]  **Q:** And there would be a recordation in the file?

[22]  **A:** Oh, there's a record, yes, ma'am.

[23]  **Q:** And who did you raise it to?

[24]  **A:** Pete Steele.

[25]  **Q:** Anyone else?

Page 250

[1]  **A:** Yes, ma'am, I'm sure I raised it to several people.

[2] The Captain  I would have copied the letter to the Chief Pilot.

[3]  **Q:** Anyone else?

[4]  **A:** Not that I can specifically recall.

[5]  **Q:** Other than the NASA letter, have you forwarded any

[6] other letters to federal agencies that you also provided to the

[7] company? Do you understand my question?

[8]  **A:** No, ma'am.

[9]  **Q:** The NASA report, it's my understanding that you did

[10] send it to Pete Steele or to Derry Huff, I'm sorry, to Derry

[11] Huff?

[12]  **A:** I believe I sent it to both.

[13]  **Q:** And you also forwarded it to NASA?

[14]  **A:** Yes, ma'am.

[15]  **Q:** Are there any other letters or documents that you gave

[16] to the company and gave to a federal government or state

[17] government agency?

[18]  **A:** There were – yes, ma'am  I, around about April of

[19] '99, I wrote to the Department of Transportation IG's office

[20] complaining of a practice that Amerijet used, would seem to use

[21] the Pilot Records Improvement Act to coerce in fear of records

[22] reprisal, for lack of a better term, to coerce flight crew to go

[23] along and get along with conditions that they might otherwise

[24] not engage in.

[25]  **Q:** Let me show you what I'm gonna mark as Major No. 14.

Page 251

[1] Would you like to review that?

[2]  **A:** Yes, please.

[3]  **MRS. NORTON:** Let's go off the record while he reviews

[4] that, please.

[5]  [Thereupon, the document referred to was marked as

[6] Defendant's Exhibit Nos. 14 and 14-B, for Identification.]

[7] THE VIDEOGRAPHER: At this time we're going off video

[8] record, it is 9:42 a.m.

[9]  [Recess Taken.]

[10] THE VIDEOGRAPHER: At this time we are returning to

[11] video record, it is 9:49 a.m.

[12]  **Q:** (By Mrs. Norton.) Mr. Major, I presented you with a

[13] copy of 14-B, Exhibit No. 14-B, which is Bates stamped 221 to

[14] 242 and there are letters on your stationary that reference the

[15] Pilot Records Improvement Act  Are these the ones you referred

[16] to earlier?

[17]  **A:** Yes, ma'am.

[18]  **MRS. SHEA:** Objection.

[19]  **Q:** I don't see any blind copy or any copy or any letter

[20] in that addressed to anyone at Amerijet.

[21]  **A:** No, ma'am.

[22]  **Q:** Did you in fact provide them a copy?

[23]  **A:** No, ma'am.

[24]  **Q:** Mr. Major, back to August 17th. Did you ever get out

[25] or see a side and say, look, I don't care what Brian Steele is

Page 252

[1] saying, listen to me, I'm serious about this or words to that
[2] effect?
[3]    **A:** That is precisely what I did when he entered the
[4] cockpit.
[5]    **Q:** What did you verbatim say to him?
[6]    **A:** Ma'am, I'm not gonna be able to recall verbatim what I
[7] said to him over a year and-a-half ago.
[8]    **Q:** Have you already told me then what you've said to him?
[9]    **A:** I have summarized it to the extent of saying – the
[10] only thing I can add is that I made it very clear that I was
[11] concerned. I called to his attention all of the research that I
[12] had recently done and could remember on the point. I had
[13] recalled to him specifically the conversation with dispatch. I
[14] recalled to him the conversation I had with Derry Huff assuring
[15] me that he had had a private conference with Brian Steele and
[16] that water was to be taken into consideration as a consequence
[17] of the June 8th incident.
[18]    **Q:** Did you call Derry Huff?
[19]    **A:** No, ma'am, I did not.
[20]    **Q:** Did you tell them you wanted off the plane?
[21]    **A:** No, ma'am, I did not.
[22]    **Q:** Did you mention to them that you were gonna get off
[23] the plane if they didn't pay attention to you?
[24]    **A:** No, ma'am, I did not.
[25]    **Q:** You accepted takeoff from the tower when the tower

Page 253

[1] made the weather report. Do you recall that?
[2]    **A:** I recall that the airplane was already throttles up,
[3] brakes released and accelerating for takeoff when the tower
[4] issued that report or issued that clearance, excuse me.
[5]    **Q:** You say ready for takeoff. Why did you not tell the
[6] tower you were overweight, we cannot take takeoff, we're
[7] overweight?
[8]    **A:** It frankly didn't occur to me.
[9]    **Q:** Okay.
[10]    **MRS. NORTON:** Let's go off the record just a minute.
[11] I'm about finished.
[12]    **THE VIDEOGRAPHER:** At this time we're going off video
[13] record, it is 9:52 a.m.
[14]    [Recess Taken.]
[15] THE VIDEOGRAPHER: At this time we are returning to
[16] video record, it is 9:55 a.m.
[17]    **Q:** (By Mrs. Norton:) Mr. Major, why did you just not get
[18] off the plane?
[19]    **A:** It would have cost me my job.
[20]    **Q:** Don't you remember Derry Huff telling you just in June
[21] that he had gotten off the plane?
[22]    **A:** Yes, ma'am, I do.
[23]    **Q:** Did you think of that as an alternative, just to get
[24] off the ramp and leave?
[25]    **A:** I did.

Page 254

[1]    **Q:** But you didn't do it?
[2]    **A:** No, ma'am.
[3]    **Q:** You have indicated that you were subject to
[4] harassment, workplace harassment and you referenced the stalking
[5] with Tim Greene, all right, and the fact that you had filed an
[6] EEOC charge on age discrimination. Other than what we've talked
[7] about, are there any other incidents that come to your mind?
[8]    **A:** I referenced the allegation of stalking.
[9]    **Q:** Okay.
[10]    **A:** Are there any other incidents –
[11]    **Q:** That you were harassed by the company.
[12]    **A:** Ma'am, I was denied promotion for several years while
[13] an assortment of flight officers, junior and less qualified,
[14] were promoted in my place.
[15]    **Q:** Can you tell me anyone that you considered junior and
[16] less qualified?
[17]    **A:** I think I enumerated as many as I could remember in
[18] prior testimony.
[19]    **Q:** Do you remember any as you sit there now?
[20]    **A:** I remember several as I sit here now.
[21]    **Q:** Would you give me their names?
[22]    **A:** Ray Maneure. I believe it's spelled M-a-n-e-u-r-e.
[23] Tim Greene. David Mitchell. Pat McManis. John Washington,
[24] Junior Several others whose names escape me at the moment.
[25]    **Q:** In regarding Tim Greene, do you have any knowledge of

Page 255

[1] any evidence that Mr. Greene did not come to the company? In
[2] other words – do you understand my question?
[3]    **A:** No.
[4]    **Q:** Did you hear Mr. Morales' testimony, you were in the
[5] room, when Mr. Morales indicated that Tim Greene had come to, he
[6] and Juan Morales and Derry Huff complaining about your actions.
[7] Do you have any evidence that that's not true?
[8]    **A:** I know that – I know that the company took – I know
[9] that there was absolutely no basis upon what the company was
[10] told as it had been related to me by both Derry Huff and by Juan
[11] Morales. And then they pulled down and read the statute with
[12] respect to stalking and there was no comparison between what Tim
[13] Greene had complained about and the term itself.
[14]    **Q:** And to your knowledge, what did Tim Greene complain
[15] about?
[16]    **A:** He had complained that I had been describing what had
[17] been forwarded to me as a matter of public record by an attorney
[18] of his in a Christmas card, which was a brag sheet essentially,
[19] on how he had won for Tim Greene a multi-million-dollar, and his
[20] wife, a multi-million-dollar lawsuit as a consequence of an
[21] illegal charter that Amerijet had engaged in to move a flight
[22] crew from Ft. Lauderdale to Dothan, Alabama.
[23]    **Q:** And the letter from the attorney said it was an
[24] illegal charter?
[25]    **A:** No, ma'am.

Page 256

[1]  **Q:** And where did you pick up the term illegal charter?

[2]  **A:** I think that would accurately describe the events.

[3]  **Q:** Who – well, that remains to be seen. But where did

[4]  you learn the term? Where did you hear that it was an illegal

[5]  charter? From whom?

[6]  **A:** I was reasonably familiar with the facts as they

[7]  pertain to the incident.

[8]  **Q:** So that is your understanding or your perception of

[9]  it, no one told you that?

[10]  **A:** That's my professional opinion, yes, ma'am.

[11]  **Q:** And Mr. Greene won an award and you were describing

[12]  this to people or telling them about it?

[13]  **A:** I used it as an example to dissuade flight crew

[14]  members from forming or from joining a union. I wanted to

[15]  impress upon them that there were several alternatives available

[16]  to them short of bringing in an outside third-party which could

[17]  produce and perhaps even better and more quickly produce the

[18]  results they sought than by –

[19]  **Q:** Mr. Major.

[20]  **A:** – bringing in the Teamsters Union.

[21]  **Q:** Let me ask it this way then. Other than Mr. Morales

[22]  and Mr. Huff talking with you about this and indicating that,

[23]  you know, if it ceased and deceased they would remove anything

[24]  from your file, were you subject to any other penalty?

[25]  **A:** Ma'am, a charge of stalking in a pilot's personnel

Page 257

[1]  file, when you're a threat that one personnel proffered that

[2]  day, could have been a career-ending event.

[3]  **Q:** It was not in your personnel file, though, was in

[4]  Mr Major?

[5]  **A:** He indicated it would go there if I continued to act

[6]  in a manner, which is completely consistent with my right with

[7]  respect to promoting safety in the workplace.

[8]  **Q:** Okay, talking about how Mr. Greene got a

[9]  multi-million-dollar award.

[10]  Is there any other actions on the part of Amerijet

[11]  that you contend created a unpleasant work environment or

[12]  hostile environment for you?

[13]  **A:** There were several, ma'am, but I don't carry them

[14]  around as excess baggage. I'm sure there's – I've made note of

[15]  most of them and you've been given copies of most of my

[16]  correspondence and my notes and my files.

[17]  **Q:** What would you do to refresh your memory?

[18]  **A:** I would go back through some of my notes.

[19]  **Q:** There's nothing that stands out now?

[20]  **A:** Nothing that comes to mind at the moment.

[21]  **Q:** Well, you knew you were gonna finish your deposition

[22]  today, right?

[23]  **A:** Yes, ma'am.

[24]  **Q:** We sat on Thursday for a while, then you had the

[25]  weekend. So you knew you were gonna be asked additional

Page 258

[1]  questions, right?

[2]  **A:** Yes, ma'am.

[3]  **Q:** And nothing comes to mind now?

[4]  **MRS. SHEA:** Objection. Asked and answered.

[5]  **A:** Well, suffice to say, ma'am, the overall tone from

[6]  Amerijet at that point was one of denial and degrading.

[7]  **Q:** I've also placed in front of you –

[8]  **A:** I can think of one exactly, yes.

[9]  **Q:** Okay. Tell me, please.

[10]  **A:** Director of Operations Pete Steele had indicated in a

[11]  January pilot meeting that the FAA had determined that the

[12]  condition of freight and this had been ongoing –

[13]  **Q:** Can you give me a year?

[14]  **A:** This would have been January of 1999.

[15]  **Q:** Okay.

[16]  **A:** The condition of freight, the pallets, the restraining

[17]  devices used to secure the freight in the aircraft were part and

[18]  parcel an aircraft's air worthiness and were the responsibility

[19]  of the flight crew to determine were sound and good, installed

[20]  correctly and so forth. Consistent with that he indicated that

[21]  all freight must be loaded in such a way as to balance on the

[22]  pallet or within ten percent of what is referred to as the

[23]  pallets center of gravity.

[24]  There was a flight to Port of Spain some time

[25]  subsequent to that –

Page 259

[1]  **Q:** Mr. Major, I'm sorry, how are you being harassed by

[2]  this? Don't give me the background. Tell me how you were

[3]  harassed.

[4]  **MRS. SHEA:** I'm gonna object to the question.

[5]  **A:** Well, I'm gonna need to finish the –

[6]  **Q:** Mr. Major, how were you harassed by it?

[7]  **MRS. SHEA:** Objection. That wasn't even a question,

[8]  that was harassment.

[9]  **A:** When I provided to the company a report including

[10]  pictures that not only had freight not been loaded in a manner

[11]  consistent with the directive from the Director of Operations,

[12]  the Captain –

[13]  **Q:** When did you write that?

[14]  **A:** – on that flight that day, which would have been –

[15]  I'm sorry, I can't answer the question if you're gonna keep

[16]  interrupting me.

[17]  **Q:** Well, Mr Major, I need the question answered. I

[18]  don't need a citation on it. Who was the Captain?

[19]  **A:** I believe it was Brian Steele

[20]  **Q:** Would that have been in June?

[21]  **A:** It may have actually been on the same flight, but I

[22]  couldn't recall and it may not have been Brian Steele

[23]  Point in fact is, the freight had been planned to be

[24]  loaded in such a way that once we got to Port of Spain and

[25]  before we went onto another destination the freight would be

Page 260

[1] loaded all on one side of the pallet.

[2]     **Q:** And who did you complain to about that?

[3]     **A:** I brought this to the attention of the then Chief

[4] Pilot or Acting Chief Pilot, as he has since been described,

[5] which would have Derry Huff.

[6]     **Q:** And what did he say?

[7]     **A:** He at first thanked me for the input and then ignored

[8] it all together.

[9]     **Q:** Anything else that you recall as being, in your mind,

[10] harassment or creating a hostile workplace?

[11]     **A:** Not that I can recall at this time.

[12]     **Q:** Let me show you what I've marked as Defendant's

[13] Exhibit No. 12. Do you see that in front of you?

[14]     **A:** Yes, ma'am.

[15]     **Q:** In your write-up of your letter of June, I'm sorry, of

[16] August 18th regarding the August 17th, you have questioned or

[17] you have asked for interpretations or further clarifications on

[18] the runway analysis. Is that Exhibit No. 12 the runway analysis

[19] that you are seeking further clarification on or is there

[20] another one?

[21]     **A:** I'm not sure what this runway analysis relates to,

[22] ma'am. Is this runway analysis supposed to relate to this

[23] weight and balance form?

[24]     **Q:** Yes.

[25]     **A:** It does not.

Page 261

[1]     **Q:** Is it the wrong airport?

[2]     **A:** It's the wrong flap setting.

[3]     **Q:** What's the flap setting for the one at Miami?

[4]     **A:** Flaps 20.

[5]     **Q:** Flaps what?

[6]     **A:** 20.

[7]     **Q:** 20. Okay.

[8]     **A:** This says Ft. Lauderdale, ma'am, not Miami.

[9]     **Q:** The one that - is this the Nav-Tech format that you

[10] were seeking clarification on?

[11]     **A:** Correct.

[12]     **Q:** So although this is the wrong analysis, there would

[13] have been flaps 20?

[14]     **A:** That is correct.

[15]     **Q:** And that would be the same form and information that

[16] you sought clarification?

[17]     **A:** It would be the same form, but would be different

[18] information.

[19]     **Q:** And what was the clarification you sought on that?

[20]     **A:** To what question are you referring specifically?

[21]     **Q:** Well, do you independently recall?

[22]     **A:** No, ma'am, I don't.

[23]     **Q:** "In light of the apparent information gap in the

[24] runway analysis." It's on page 53 and I was just curious as to

[25] what apparent information gap in the runway analysis you would

Page 262

[1] be referring to. Do you see that? It's in the last full

[2] paragraph.

[3]     **A:** Yes, ma'am.

[4]     **Q:** On page 53.

[5]     **A:** Uh-huh. Yes, ma'am.

[6]     **Q:** And what would be the apparent information gap that

[7] you're referring to?

[8]     **A:** The information gap would be that Boeing itself

[9] recommends a substantial decrement to both V1 and the maximum

[10] performance limited takeoffweight on a specific runway. If that

[11] runway can be characterized as containing water but cannot be

[12] described as standing, that would be. I believe, a 7,000 pound

[13] minimum decrement and the normal V1 speed reduction consistent

[14] with the standing water was more than a quarter inch.

[15]     **Q:** So your dissatisfaction with the Nav-Tech would be

[16] that it did not refer to a degradation to be taken? Where was

[17] the information gap, is what I'm asking, Mr. Major?

[18]     **A:** The information gap was between the changes in the

[19] Federal Aviation Regulations specifically with takeoff planning

[20] on wet runways, which it changed in 1998, requiring air carriers

[21] to include runway conditions wet or dry that Amerijet had not

[22] sought to comply with.

[23]     **Q:** And you're saying they were applicable to the 727?

[24]     **A:** Yes, ma'am.

[25]     **Q:** And that's the apparent information gap you're

Page 263

[1] referring to?

[2]     **A:** That and that there's - the other part of the

[3] information gap is that Amerijet itself had a policy which

[4] required a flight crew to obtain or to have been given an

[5] official report describing the runway as contaminated, otherwise

[6] taking a performance degradation was not permitted. Taking a

[7] safety reduction in weight would not be permitted.

[8]     **Q:** Would that normally be reflected though on the runway

[9] analysis?

[10]     **A:** It would be in the - normally where one would find

[11] comments such as this in a performance engineering schedule such

[12] as Nav-Tech would be in the information and instructional pages

[13] in the beginning of Volume I.

[14]     **Q:** Of the runway analysis?

[15]     **A:** Yes, ma'am.

[16]     **MRS. NORTON:** Let's go off the record.

[17]     **THE VIDEOGRAPHER:** At this time we're going off video

[18] record, it is 10:10 a.m.

[19]     [Recess Taken.]

[20] THE VIDEOGRAPHER: At this time we are returning to

[21] video record, it is 10:13 a.m.

[22]     **MRS. NORTON:** I have no other questions.

[23]     **A:** If I may just continue to - as we were off the record

[24] I just noticed -

[25]     **THE VIDEOGRAPHER:** We are not off the record, we are

Page 264

[1] on.

[2]     **MRS. NORTON:** We're on.

[3]     **A:** As we were off the record I noticed that the gap that

[4] you're asking about is specifically referred to in the prior

[5] paragraph

[6]     **Q:** Okay.

[7]     **A:** With respect to a significant performance planning

[8] maximum gross weight degradation for landing, that is applied

[9] simply when the conditions on the runway can be characterized as

[10] wet. On the takeoff side, that wet must be further and more

[11] specifically described to be standing water less than

[12] one-quarter-inch. That is the gap I believe this document

[13] refers to and my other comments standing as well.

[14]     **Q:** Do you remember who the dispatcher was?

[15]     **A:** No, ma'am. I believe his name though is included in

[16] some of my notes.

[17]     **Q:** Anything else, Mr. Major?

[18]     **A:** No, ma'am

[19]     **Q:** Anything else you want to clarify?

[20]     **MRS. SHEA:** No. I have two questions on cross. Are

[21] you finished?

[22]     **MRS. NORTON:** I'm finished

[23]               **CROSS EXAMINATION**

[24]                **BY MRS. SHEA:**

[25]     **Q:** Sir, are you familiar with a matter in which you were

Page 265

[1] a named party called Harris vs. Major?

[2]     **A:** Yes, ma'am.

[3]     **Q:** You didn't mention that in the questioning on direct

[4] about lawsuits in which you had been involved. Is there a

[5] reason why not?

[6]     **A:** That wasn't a lawsuit.

[7]     **Q:** Would you just briefly describe the nature of that

[8] action?

[9]     **A:** My at the time – my wife's at the time, what could

[10] best be described as guru, had begun to engage in a personal

[11] relationship with my, as I say, my then wife. My then wife had

[12] either had begun to file for or had filed for divorce. The

[13] spiritual counselor that she had engaged in this affair with

[14] became – went to the courthouse and wrote up a document that

[15] requested a restraining order be placed against me for reasons

[16] that I don't understand and which ultimately was dismissed

[17]     **Q:** That action was dismissed?

[18]     **A:** Yes, ma'am. On its merits.

[19]     **Q:** When you were asked the other day regarding factors or

[20] considerations which caused you to believe that your promotion

[21] was substantially motivated by age discrimination, were there

[22] any salary or wage issues that you considered sparing on that?

[23]     **A:** Oh, yes, ma'am.

[24]     **Q:** Could you just elaborate on that, please?

[25]     **A:** When Amerijet hired outside the company for captains,

Page 266

[1] which it did largely for those captains as of record who were

[2] over 40 years old, it was able to hire those captains at $70.00

[3] per hour for the pay planning and use of time as well as train

[4] them as current and qualified, would save them considerable time

[5] and expense in putting them on the line and having them

[6] contribute to the overall profit of the organization.

[7]     Additionally, by promoting junior, that is to say

[8] flight officers with less seniority than me, in some cases as

[9] many as five or six years or seven years less, the company was

[10] able to save substantial amounts of money, in some cases as much

[11] as $10,000 per individual per year with respect to their direct

[12] compensation once they became captains. They would have had to

[13] pay me more as a consequence of my tenure with the company.

[14]     **MRS. SHEA:** That's all my questions on cross.

[15]     **MRS. NORTON:** No questions.

[16] [Thereupon, the taking of deposition was concluded at

[17] 10:18 a m.]

[18]

[19]

[20]

                        **PATRICK MAJOR**

[21]

[22]     Sworn to and subscribed

     before this ___ _____

[23] day of _____, 2001.

[24]

     Notary Public

[25] State of Florida at Large

Page 267

[1]      STATE OF FLORIDA)
         COUNTY OF BROWARD)
[2]
[3]
         I, JEANNIE L. IMRISEK, a Notary Public in and for the
[4]   State of Florida at Large, do hereby certify that, pursuant to a
      Notice of Taking Deposition in the above-entitled cause, PATRICK
[5]   MAJOR, was by me first duly cautioned and sworn to testify the
      whole truth, and upon being carefully examined testified as is
[6]   hereinabove shown, and the testimony of said witness was reduced
      to typewriting under my personal supervision and that the said
[7]   deposition constitutes a true record of the testimony given by
         the witness.
[8]
[9]   I further certify that the said deposition was taken
      at the time and place specified hereinabove and that I am
[10]  neither of counsel nor solicitor to either of the parties in
      said suit nor interested in the event of the cause.
[11]
[12]  WITNESS my hand and official seal in the City of Ft.
      Lauderdale, County of Broward, State of Florida, this 20th day
[13]     of February, 2001.
[14]
[15]
                 JEANNIE L. IMRISEK
[16]             Comm. No. CC 611297
                 Exp. April 19, 2001
[17]            Bonded by Pichard Ins.
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

# $

**$10,000** 266:11
**$70.00** 266:2

# 0

**000313** 229:11
**000314** 229:11

# 1

**10:10** 263:18
**10:13** 263:21
**10:18** 266:17
**11** 229:4, 12, 14, 18
**12** 231:18, 21; 238:25;
260:13, 18
**13** 239:1, 5, 12
**13,000** 249:16
**14** 250:25; 251:6
**14-B** 251:6, 13, 13
**16** 246:8
**17** 230:24; 243:24
**17th** 228:19; 230:6, 7;
239:16; 251:24, 260:16
**18th** 228:19, 229:20;
230:6, 21, 239:14; 260:16
**19** 228:3
**192,298** 230:17
**1992** 246:18
**1998** 262:20
**1999** 230:25, 243:24,
258:14

# 2

**20** 261:4, 6, 7, 13
**2001** 228:3; 266:23
**221** 251:13
**242** 251:14
**270** 233:10

# 3

**3** 229:16
**3,600** 232:22; 233:11
**314** 230:15
**34** 243:21; 244:25; 245:1
**35** 243:15

# 4

**40** 266:2
**45** 241:12

# 5

**53** 261:24; 262:4

# 7

**7,000** 262:12
**727** 262:23

# 8

**827** 230:1
**8th** 243:24; 252:17

# 9

**93** 249:19
**94** 249:19
**95** 249:19
**98** 249:19, 20
**99** 230:9, 13; 239:18;
249:20; 250:19
**9:04** 228:4
**9:19** 239:7
**9:24** 239:10
**9:42** 251:8
**9:49** 251:11
**9:52** 253:13
**9:55** 253:16

# '

# A

**a.m** 228:4, 239:7, 10;
251:8, 11; 253:13, 16;
263:18, 21; 266:17
**ability** 246:23
**able** 233:23; 252:6;
266:2, 10
**above** 240:20
**absence** 243:18
**Absolutely** 229:9; 255:9
**absurd** 233:13
**accelerating** 253:3
**accepted** 252:25
**accurately** 256:2
**accused** 240:15
**across** 235:15, 17;
245:10
**act** 234:25; 250:21;
251:15; 257:5
**Acting** 260:4
**action** 265:8, 17
**actions** 255:6; 257:10
**activities** 243:23
**actual** 245:12
**actually** 238:2, 13;
242:14; 244:19; 259:21
**add** 252:10
**additional** 257:25

**Additionally** 266:7
**addressed** 251:20
**affair** 265:13
**afterwards** 235:7
**again** 237:21; 238:10,
243:12
**against** 265:15
**age** 254:6; 265:21
**agencies** 250:6
**agency** 250:17
**agent** 236:7, 11
**ago** 252:7
**agreement** 233:6
**air** 245:14, 15; 258:18;
262:20
**aircraft** 245:10, 11;
258:17
**aircraft's** 258:18
**airman** 241:4, 6
**airplane** 242:16; 245:13,
253:2
**airport** 234:2; 238:18;
261:1
**AI** 230:11, 13; 233:13;
237:22
**Alabama** 255:22
**allegation** 254:8
**allowable** 232:11, 22
**allowed** 248:23
**along** 250:23, 23
**already** 233:16; 236:15,
16; 252:8; 253:2
**alternative** 253:23
**alternatives** 256:15
**although** 261:13
**amended** 243:15
**Amerijet** 228:3, 242:15;
243:24, 244:1, 15; 245:5,
246:2, 21; 247:11, 13, 19,
249:7; 250:20, 251:20,
255:21, 257:10; 258:6;
262:21; 263:3; 265:25
**Amerijet's** 242:10, 18;
243:25
**amount** 245:12
**amounts** 266:10
**analysis** 260:18, 18, 21,
22; 261:12, 24, 25, 263:9,
14
**and-a-half** 252:7
**answered** 258:4; 259:17
**answering** 248:3
**anybody** 237:16
**anymore** 233:23
**anyone** 246:1; 249:25,
250:3; 251:10; 254:15
**apparent** 261:23, 25,
262:6, 25
**applicable** 262:23
**applied** 264:8
**approach-end** 234:3
**appropriate** 236:17
**April** 250:18

**area** 238:17; 241:25
**around** 234:2; 241:19;
250:18; 257:14
**assortment** 254:13
**assuring** 252:14
**ATIS** 232:20
**attempted** 246:17
**attempting** 234:10, 24;
238:12
**attention** 228:19; 232:4;
246:1; 249:2; 252:11, 23;
260:3
**attorney** 255:17, 23
**August** 228:19; 229:20;
230:6, 6, 7, 9, 12, 20, 24;
239:14, 16; 243:24; 249:6;
251:24; 260:16, 16
**authority** 246:22; 247:13
**available** 256:15
**Aviation** 262:19
**award** 256:11; 257:9
**aware** 249:8

# B

**back** 236:2, 4, 8, 10, 13,
24; 240:17, 19; 246:17, 17;
247:14; 251:24; 257:18
**background** 232:16,
240:10, 11; 259:2
**baggage** 257:14
**balance** 228:24; 229:2,
19; 230:24; 231:2, 20;
232:7, 25; 233:3, 4, 16, 19,
25; 236:20, 237:4, 12;
258:21; 260:23
**basis** 255:9
**Bates** 229:11; 251:13
**became** 265:14; 266:12
**beginning** 265:15
**begun** 265:10, 12
**believe** 230:23; 239:14;
244:15, 20, 23; 245:6;
246:13, 18; 249:14;
250:12; 254:22; 259:19;
262:12; 264:12, 15;
265:20
**Best** 233:9; 242:3; 265:10
**better** 250:22; 256:17
**blind** 251:19
**blow-by-blow** 239:25
**Boeing** 262:8
**both** 237:11; 250:12;
255:10; 262:9
**brag** 255:18
**brakes** 253:3
**Brian** 231:6, 13; 233:11;
237:7, 9, 9, 22; 240:11;
251:25; 252:15; 259:19,
22
**Brian's** 242:4
**briefly** 265:7
**bring** 247:11; 249:2
**bringing** 256:16, 20

**broadcast** 233:20
**brought** 246:1; 260:3
**Bug** 236:16, 17
**business** 246:21

# C

**call** 246:7; 252:18
**called** 252:11; 265:1
**came** 237:8
**can** 229:5; 233:9; 234:6,
8, 241:6, 17; 243:1,
245:24; 249:12, 250:4;
252:10; 254:15; 258:8, 13;
260:11; 262:11; 264:9
**Captain** 228:25, 229:20;
231:19, 232:7, 12, 15, 19,
19, 23, 23, 25; 233:24;
234:8, 14; 235:14; 237:5,
6, 7, 8; 241:7; 242:3, 4, 6,
8; 248:16; 250:2; 259:12,
18
**captains** 265:25; 266:1,
2, 12
**Card** 236:16, 17; 255:18
**care** 251:25
**career-ending** 257:2
**carrier** 245:14
**carriers** 262:20
**carry** 246:22, 247:13;
257:13
**case** 244:9
**cases** 236:15; 266:8, 10
**caused** 265:20
**ceased** 256:23
**center** 258:23
**Certain** 233:3
**cetera** 240:8
**change** 241:24, 242:24;
243:7
**changed** 241:18, 19;
262:20
**changes** 262:18
**characterized** 242:7;
262:11; 264:9
**charge** 254:6; 256:25
**charter** 255:21, 24;
256:1, 5
**check** 241:4, 6
**Chief** 247:5; 250:2; 260:3,
4
**Christmas** 255:18
**circumstances** 237:10
**citation** 259:18
**City** 249:13
**clarification** 240:21,
260:19, 261:10, 16, 19
**clarifications** 260:17
**clarify** 261:9
**clear** 239:1; 240:13,
252:10
**clearance** 253:4
**close** 247:12

clucked 233:13
cockpit 235:19; 236:12; 237:2, 8, 10; 238:8, 11, 13; 239:21; 240:3, 22; 252:4
coerce 250:21, 22
collaborative 243:7; 246:3
comment 238:3, 239:25
comments 242:8, 263:11; 264:13
Committee 246:5
committees 246:4
company 246:25; 250:7, 16; 254:11; 255:1, 8, 9; 259:9; 265:25; 266:9, 13
company's 246:5, 5, 13
compare 229:7
comparison 255:12
compensation 266:12
complain 255:14; 260:2
complained 247:22; 255:13, 16
complaining 250:20; 255:6
complaint 243:12, 15, 18
completed 233:16, 237:12
completely 257:6
completing 233:2
comply 262:22
compose 229:11
concerned 242:19; 246:20; 252:11
concerns 237:7; 238:16; 242:5
concluded 266:16
condition 258:12, 16
conditions 241:25, 244:1; 250:23; 262:21; 264:9
conference 252:15
confirmed 242:15
conjunction 248:22
consequence 252:16; 255:20; 266:13
considerable 266:4
consideration 252:16
considerations 265:20
considered 243:6; 254:15; 265:22
consistent 257:6; 258:20; 259:11, 262:13
containing 242:17; 262:11
contaminated 228:21, 237:18, 19; 263:5
contamination 238:18
contend 257:11
contending 249:6
continuation 228:1, 7, 16
continue 239:23; 263:23
Continued 228:5, 257:5

contradicting 240:15
contrary 238:19
contribute 266:6
conversation 231:19; 232:6; 233:7, 24; 234:24; 237:9; 238:7, 10, 15, 241:9, 9; 252:13, 14
conversations 237:16; 238:21, 22; 239:21, 240:9, 22, 24; 241:7
copied 250:2
copies 257:15
copy 236:7; 238:24; 251:13, 19, 19, 22
correctly 258:20
correspondence 257:16
corresponding 241:24
corresponds 238:14
cost 253:19
couldn't 247:4; 249:18; 259:22
counselor 265:13
course 248:23
court 240:19
courthouse 265:14
create 236:16
created 246:4; 257:11
creating 233:4; 260:10
crew 230:11; 245:11; 248:12, 14; 250:22, 255:22; 256:13; 258:19; 263:4
crew's 245:15
crews 246:7
cross 264:20, 23; 266:14
curious 261:24
current 266:4
cut 232:4

# D

danger 245:16
date 228:3, 229:22
dated 239:14
David 254:23
day 241:11; 248:8; 257:2; 259:14; 265:19; 266:23
days 245:22, 25
deceased 256:23
deck 248:7
decrement 232:10; 233:11, 241:21; 262:9, 13
Defendant's 229:14; 231:18; 239:5; 251:6; 260:12
degradation 262:16; 263:6; 264:8
degrading 258:6
denial 258:6
denied 254:12
Department 250:19
departs 231:12

departure 235:2; 248:8
depo 228:7
deposition 228:2; 257:21; 266:16
derided 241:21
derive 236:17
Derry 250:10, 10; 252:14, 18; 253:20; 255:6, 10, 260:5
describe 234:24; 239:23; 256:2; 265:7
described 231:24; 239:23; 244:5; 260:4; 262:12; 264:11; 265:10
describes 241:3
describing 255:16; 256:11; 263:5
description 240:11
destination 259:25
detail 235:5
determine 258:19
determined 258:11
devices 258:17
different 261:17
DIRECT 228:5, 19, 232:4; 265:3; 266:11
direction 241:24
directive 259:11
Director 247:6; 258:10; 259:11
disagreed 243:9, 10
discrimination 254:6; 265:21
discuss 237:4
discussed 233:4; 237:7; 238:13, 14
discussion 231:24; 234:1, 7; 241:4
discussions 239:22
dismissed 265:16, 17
dispatch 242:15, 252:13
dispatcher 264:14
dissatisfaction 262:15
dissuade 256:13
distributed 236:9
divorce 265:12
document 229:13; 231:17; 233:15; 234:15, 239:3, 4; 240:18; 243:19; 244:22; 245:2; 249:12, 251:5; 264:12, 265:14
documents 249:5, 8; 250:15
done 236:16; 252:12
Dothan 255:22
down 233:21; 255:11
droplets 237:24; 238:1
dry 242:19; 244:5, 19; 262:21
during 235:1, 1
Duty 245:22, 25

# E

each 239:25
earlier 251:16
early 232:1; 246:17
EEOC 254:6
effect 245:13; 252:2
effort 242:24; 243:7; 246:3
either 237:22; 265:12
elaborate 265:24
eliminated 241:20
else 236:5; 237:16; 242:11; 245:21, 23, 249:25; 250:3; 260:9; 264:17, 19
enabling 245:14
engage 250:24; 265:10
engaged 242:24; 255:21; 265:13
engineer 236:8, 11
engineering 263:11
enhancing 243:7
ensued 237:9
entered 237:10; 252:3
entire 237:8
entirely 246:6
entries 236:17
enumerated 254:17
environment 257:11, 12
escape 254:24
especially 241:24
essentially 255:18
et 240:8
even 228:15; 233:14, 256:17; 259:7
event 257:2
events 240:1; 256:2
every 239:25; 241:5
evidence 255:1, 7
exactly 230:19; 231:25, 236:9; 240:3, 7, 242:6; 247:5; 249:18; 258:8
EXAMINATION 228:5; 264:23
example 256:13
exception 242:20, 22; 243:2, 3, 4
excess 246:8; 257:14
excuse 244:15, 253:4
Executive 246:5
Exhibit 229:11, 14, 231:18, 20, 232:24; 238:25; 239:5, 12; 251:6, 13; 260:13, 18
expense 266:5
explain 241:22
explained 240:16; 241:23
explanation 240:10
extent 252:9

# F

FAA 244:15, 16, 247:15; 258:11
fact 229:2, 19; 230:24; 235:1; 247:17, 251:22; 254:5, 259:23
factors 265:19
facts 256:6
familiar 256:6; 264:25
far 239:24; 242:18; 246:17
fear 250:21
February 228:3
Federal 244:1, 3; 245:6, 250:6, 16; 262:19
file 247:19; 249:21; 256:24; 257:1, 3; 265:12
filed 254:5; 265:12
files 257:16
fill 228:24; 229:2; 231:5, 11
filled 231:3; 237:5
find 263:10
Fine 240:14; 243:20
finish 257:21; 259:5
finished 241:16; 253:11; 264:21, 22
First 228:23; 229:6; 231:13, 237:6; 242:6, 243:22; 260:7
five 241:3; 249:15, 266:9
flap 261:2, 3
Flaps 261:4, 5, 13
Flight 230:1, 12; 231:11, 236:8, 10; 239:16; 245:11, 14; 246:7; 248:7, 12, 14; 249:6, 12; 250:22, 254:13; 255:21; 256:13, 258:19, 24; 259:14, 21; 263:4; 266.8
flights 245:17, 18
flip 229:6
FLL 230:3
Florida 266:25
flying 230:5, 13
followed 241:3
following 231:17
forget 235:6, 7
forgive 242:8
form 233:19; 235:6, 8, 9, 12; 237:15; 238:23; 240:4, 244:11, 21; 247:8; 248:6, 260:23; 261:15, 17
format 261:9
forming 256:14
forth 258:20
forwarded 250:5, 13; 255:17
found 246:9; 247:15; 248:8, 21
four 241:2; 246:24; 249:14

**frankly** 253:8

**freight** 258:12, 16, 17, 21; 259:10, 23, 25

**front** 233:19; 258:7, 260:13

**Ft** 230:3; 255:22; 261:8

**full** 262:1

**further** 241:23; 260:17, 19; 264:10

# G

**gap** 261:23, 25; 262:6, 8, 17, 18, 25; 263:3; 264:3, 12

**gave** 235:8; 240:18, 250:15, 16

**general** 233:5; 249:1

**generate** 246:23

**given** 257:15; 263:4

**gonna** 232:3, 238:25; 240:4; 243:17, 21, 22; 244:7, 11, 13; 249:2; 250:25; 252:6, 22; 257:21, 25; 259:4, 5, 15

**Good** 228:7, 258:19

**government** 250:16, 17

**gravity** 258:23

**greatly** 245:12

**Greene** 254:5, 23, 25; 255:1, 5, 13, 14, 19; 256:11; 257:8

**gross** 264:8

**guru** 265:10

# H

**hand** 233:5; 235:15, 17, 23; 236:4, 8, 241:18

**handed** 233:15, 24; 234:9, 15, 18; 235:6; 236:10, 24; 237:12, 15

**hands** 236:13

**handwriting** 229:23

**happened** 248:24

**harassed** 254:11; 259:1, 3, 6

**harassment** 254:4, 4; 259:8; 260:10

**Harris** 265:1

**haven't** 236:15; 238:14

**Hazardous** 245:20; 246:16, 22; 248:21, 22

**hazmat** 246:15; 247:13

**headed** 241:19

**heading** 241:19

**headset** 233:21

**hear** 240:6; 255:4; 256:4

**help** 246:17

**highlighted** 244:10

**hire** 266:2

**hired** 265:25

**hostile** 257:12; 260:10

**hour** 266:3

**hours** 246:8

**Hu-huh** 236:23

**Huff** 250:10, 11; 252:14, 18; 253:20; 255:6, 10; 256:22; 260:5

# I

**Identification** 229:14; 231:18, 239:5; 251:6

**identify** 229:5, 6

**IG's** 250:19

**ignored** 260:7

**illegal** 255:21, 24; 256:1, 4

**impact** 246:23

**impress** 256:15

**improper** 244:8; 245:3

**improperly** 248:22

**Improvement** 250:21; 251:15

**in-depth** 239:24

**inch** 262:14

**incident** 230:20; 249:5; 252:17; 256:7

**incidents** 254:7, 10

**include** 262:21

**included** 232:8, 20, 242:9; 264:15

**including** 259:9

**inclusive** 245:9

**incorporate** 244:9

**independently** 261:21

**indicate** 241:25

**indicated** 232:11; 254:3; 255:5; 257:5; 258:10, 20

**indicating** 256:22

**individual** 266:11

**information** 233:2, 3; 261:15, 18, 23, 25; 262:6, 8, 17, 18, 25; 263:3, 12

**input** 260:7

**installed** 258:19

**instance** 241:17

**instructional** 263:12

**intentions** 246:13

**interest** 238:12

**interpretations** 242:10; 260:17

**interrupt** 240:5

**interrupting** 259:16

**into** 233:6; 235:5, 5; 252:16

**involved** 265:4

**issue** 249:7

**issued** 253:4, 4

**issues** 265:22

**item** 249:13, 15

**itself** 255:13; 262:8; 263:3

# J

**January** 258:11, 14

**job** 249:3; 253:19

**John** 254:23

**joining** 256:14

**Jorsey** 230:11, 13; 232:19, 23; 233:13; 237:5, 6, 7, 8, 22; 241:7; 242:6

**Jorsey's** 242:3, 8

**Juan** 255:6, 10

**juncture** 247:4

**June** 243:24; 249:5; 252:17; 253:20; 259:20; 260:15

**junior** 254:13, 15, 24; 266:7

# K

**keep** 233:21; 259:15

**kept** 233:21

**knew** 257:21, 25

**knots** 233:10

**knowledge** 245:15; 254:25; 255:14

# L

**lack** 250:22

**landing** 264:8

**Large** 266:25

**largely** 239:22; 266:1

**last** 232:9; 240:17; 244:3, 14; 245:25; 246:24; 262:1

**Lauderdale** 230:3; 255:22; 261:8

**lawsuit** 255:20; 265:6

**lawsuits** 265:4

**lawyers** 243:12

**learn** 256:4

**least** 246:11

**leave** 253:24

**left** 233:10; 236:7

**length** 239:23

**less** 254:13, 16; 264:11, 266:8, 9

**letter** 230:20, 22; 250:2, 5; 251:19, 255:23; 260:17

**letters** 250:6, 15; 251:14

**light** 261:23

**limited** 262:10

**line** 266:5

**lines** 229:7; 230:9, 10

**list** 245:9

**listen** 252:1

**listening** 233:20

**load** 229:19; 230:24; 232:25; 233:25

**loaded** 245:11; 258:21; 259:10, 24; 260:1

**long** 241:12; 249:15

**look** 229:24; 230:8, 8, 11, 15; 251:25

**losing** 246:21

**lot** 232:3

# M

**M-a-n-e-u-r-e** 254:22

**ma'am** 228:13, 22; 230:4, 10, 14, 18; 231:1, 16, 22; 232:8, 14; 233:18; 234:10, 20; 235:10, 18, 20, 22; 236:1, 25; 237:14; 238:4, 6, 9; 239:13, 17, 19, 22; 240:23; 241:23; 244:13, 17, 23; 246:11; 247:2, 9; 248:5, 10, 17; 249:10, 22, 250:1, 8, 14, 18; 251:17, 21, 23; 252:6, 19, 21, 24; 253:22; 254:2, 12; 255:25, 256:10, 25; 257:13, 23; 258:2, 5; 260:14, 22; 261:8, 22; 262:3, 5, 24; 263:15; 264:15, 18; 265:2, 18, 23

**Major** 228:2, 3, 8; 229:4; 230:11; 232:3, 12, 234:5; 238:19; 239:11, 12; 240:2; 241:13; 242:22; 243:1, 22, 24; 244:12; 247:20; 250:25; 251:12, 24; 253:17; 256:19; 257:4; 259:1, 6, 17; 262:17; 264:17; 265:1; 266:20

**making** 240:6; 245:13

**management** 246:1; 247:19

**Maneure** 254:22

**manner** 257:6; 259:10

**many** 254:17; 266:9

**mark** 260:25

**marked** 229:4, 13; 231:17; 233:8; 239:4, 12, 251:5; 260:12

**materials** 245:20; 246:16, 22; 248:21, 22

**matter** 228:2; 248:23; 255:17; 264:25

**maximum** 232:10, 21; 262:9, 264:8

**May** 229:8; 231:7, 236:8; 238:2; 245:15; 259:21, 22; 263:23

**McManis** 254:23

**meeting** 258:11

**members** 256:14

**memory** 232:21; 238:14; 257:17

**mention** 233:14; 252:22; 265:3

**mentioned** 232:1, 9, 19; 237:21; 241:20; 247:18

**merits** 265:18

**Mexico** 249:13

**Miami** 261:3, 8

**might** 236:11; 246:22; 250:23

**mind** 254:7; 257:20; 258:3; 260:9

**minimum** 262 13

**minute** 239:1, 2; 253:10

**minutes** 241:11, 12

**missing** 229:15, 22

**Mitchell** 254:23

**moment** 234:18, 254:24, 257.20

**momentarily** 237:22

**moments** 242:15

**money** 266:10

**months** 242:21, 247:14

**Morales** 255:4, 5, 6, 11; 256:21

**more** 237:25, 239:24; 245:14; 256:17; 262:14, 264:10; 266:13

**morning** 228:7, 12, 16; 236:10

**most** 236:15; 242:3, 4; 257:15, 15

**motivated** 265:21

**move** 255:21

**MRS** 228:6; 229:10; 238:23, 25; 239:11; 240:4, 7, 8, 9, 13, 14, 15, 17; 241:16; 243:17, 20, 20; 244:7, 21; 245:2; 251:3, 12, 18; 253:10, 17; 258:4; 259:4, 7; 263:16, 22; 264:2, 20, 22, 24; 266:14, 15

**much** 266:10

**multi-million-dollar** 255:19, 20; 257:9

**must** 258:21; 264:10

# N

**name** 229:21; 230:12; 264:15

**named** 265:1

**names** 254:21, 24

**NASA** 250:5, 9, 13

**nature** 265:7

**Nav-Tech** 261:9; 262:15; 263:12

**nearly** 249:16

**need** 232:5; 259:5, 17, 18

**new** 241:17

**next** 233:21, 22; 235:15

**nine** 233:10

**normal** 262:13

**normally** 235:13; 236:4, 6, 7; 263:8, 10

**northeasterly** 241:19

**NORTON** 228:6; 229:10; 238:25; 239:11; 240:7, 9, 14, 17; 243:20; 251:3, 12; 253:10, 17; 263:16, 22; 264:2, 22, 266:15

**Nos** 251:6
**Notary** 266:24
**note** 230:15; 240:22;
257:14
**noted** 238:22
**notes** 257:16, 18; 264:16
**nothing** 257:19, 20;
258:3
**noticed** 263:24; 264:3
**November** 246:18
**number** 229:15; 235:9;
241:2

# O

**oath** 228:10
**Object** 238:23; 240:4;
243:17; 244:7, 11; 259:4
**objected** 243:22, 25
**objection** 243:19;
244:21; 245:2; 251:18;
258:4; 259:7
**obligation** 236:13
**obtain** 263:4
**obtaining** 233:2
**obvious** 234:3; 237:11
**obviously** 234:10; 249:6
**occur** 253:8
**off** 237:6, 20, 23, 25,
239:2, 6; 251:3, 7; 252:20,
22; 253:10, 12, 18, 21, 24,
263:16, 17, 23, 25; 264:3
**office** 250:19
**Officer** 228:23
**officers** 254:13; 266:8
**official** 242:17; 263:5
**officials** 247:19
**often** 248:24
**old** 236:2
**once** 236:13; 237:9, 25,
25; 259:24; 266:12
**one** 228:14; 229:15;
230:8, 9, 10; 231:13, 15;
235:9; 236:22; 237:22;
238:21; 241:9, 18; 242:8;
245:18; 247:19; 248:8;
256:9; 257:1; 258:6, 8;
260:1, 20; 261:3, 9; 263:10
**one-quarter-inch**
264:12
**ones** 249:11; 251:15
**ongoing** 246:16; 258:12
**only** 228:15; 231:2;
252:10, 259:10
**onto** 259:25
**Operations** 247:6;
258:10; 259:11
**opinion** 256:10
**opportunity** 239:12
**order** 233:12; 265:15
**organization** 266:6
**original** 236:8
**others** 245:19; 254:24

**otherwise** 250:23; 263:5
**out** 228:24, 229:2; 231:3,
5, 11; 237:5; 242:16;
251:24; 257:19
**outright** 242:5, 7
**outside** 256:16; 265:25
**over** 233:20; 241:11;
252:7; 266:2
**overall** 258:5; 266:6
**overweight** 243:25;
245:13, 17, 18; 249:4, 7, 8;
253:6, 7
**own** 247:15

# P

**pacing** 247:12
**pad** 233:21
**page** 229:7; 230:15;
240:25; 241:2; 261:24;
262:4
**pages** 263:12
**pallet** 258:22; 260:1
**pallets** 258:16, 23
**Paragraph** 243:15, 21;
244:10, 25; 245:1; 262:2;
264:5
**paragraphs** 240:25
**parcel** 246:3; 258:18
**Part** 229:15, 15, 22;
246:3; 257:10; 258:17;
263:2
**participate** 243:23
**particular** 231:20;
236:20; 241:10; 247:4
**party** 265:1
**Pat** 254:23
**Patrick** 228:2; 266:20
**pay** 252:23; 266:3, 13
**penalty** 256:24
**people** 250:1; 256:12
**per** 266:3, 11, 11
**perceived** 228:20
**percent** 258:22
**perception** 237:18;
256:8
**performance** 241:10;
242:18; 262:10; 263:6, 11;
264:7
**perhaps** 241:5; 256:17
**period** 241:11
**permitted** 263:6, 7
**person's** 239.25
**personal** 265:10
**personnel** 248:13;
256:25; 257:1, 3
**pertain** 256:7
**pertaining** 241:10
**Pete** 249.24; 250:10;
258:10
**phrase** 244:3
**pick** 256:1
**pictures** 259:10

**pieces** 229:5
**Pilot** 247:5; 250:2, 21;
251:15; 258:11; 260:4, 4
**pilot's** 256:25
**place** 235:7, 7; 237:17;
238:8, 11, 13, 239:16, 21;
240:3; 254:14
**placed** 249:13, 258:7;
265:15
**placing** 245:15
**plan** 229:19; 230:24;
231:2, 20; 232:7, 11;
233:16, 25; 237:4, 13
**plane** 252:20, 23; 253:18,
21
**planned** 259:23
**planning** 241:10; 242:18;
262:19; 264:7; 266:3
**pleading** 244:9, 10
**please** 231:25; 251:2, 4;
258:9; 265:24
**point** 233:19; 237:3, 17;
240:12, 245:24; 252:12;
258:6; 259.23
**policies** 242:10
**policy** 242 12, 14, 25;
263:3
**Port** 230:4; 258:24;
259:24
**POS** 230:4
**positions** 249:13, 14, 14
**pound** 233:11, 262:12
**pounds** 232:22; 249:16
**practice** 235:11; 236:15;
242:14, 20; 243:11; 244:1,
3, 4, 14, 18, 24; 245:5:
249:1; 250:20
**practices** 241:1
**precisely** 252:3
**predicate** 243:18
**prepared** 229:19;
238:20; 248:7
**presented** 231:13;
232:24; 251:12
**President** 246:5
**pretty** 234:2; 237:10
**previous** 240:19
**previously** 231:24;
241:20, 244:8
**prior** 231:5; 246:24;
254:18; 264:4
**private** 252:15
**privy** 237:6, 8
**probably** 235:10; 239:23
**problem** 246:16
**procedures** 242:19
**produce** 256:17, 17
**professional** 256:10
**proffered** 257:1
**profit** 246:23; 266:6
**promote** 242:24; 243:7
**promoted** 254:14
**promoting** 257:7; 266:7

**promotion** 254:12,
265:20
**proper** 244:8
**provide** 251:22
**provided** 233:22; 250:6;
259:9
**public** 255:17, 266:24
**pulled** 255:11
**purpose** 233:2; 239:24,
240:21
**push-back** 237:17;
238:11
**put** 229:18, 246:7
**putting** 266:5

# Q

**qualified** 254:13, 16;
266:4
**quarter** 262:14
**questioned** 260:16
**questioning** 239:24;
265:3
**quickly** 256:17
**quit** 242:11
**quite** 248:24
**quoting** 239:25

# R

**rain** 237:21
**raise** 247:16, 20; 248:6,
11, 18; 249:23
**raised** 247:25; 248:7. 12,
23, 249:7; 250:1
**raising** 246:25; 248:25
**ramp** 235:21; 236:7, 11;
237:17; 248:12; 253:24
**Ray** 254:22
**read** 239:2, 12; 240:17,
19; 243:22, 255:11
**reads** 239:3
**ready** 253:5
**realize** 243:12
**realizing** 241:5
**reason** 230:23; 265:5
**reasonably** 266:6
**reasons** 265:15
**recall** 230:12; 231:23, 24;
232:1, 17, 233:9; 234:14,
15, 21, 22; 235:23; 236:9,
19, 21; 237:1, 16; 239:20,
240:3; 241:6, 7, 17; 242:9:
246:25; 247:17; 248:15,
250:4; 252:6; 253:1, 2,
259:22; 260:9, 11; 261:21
**recalled** 252:13, 14
**received** 232:20
**recently** 252:12
**Recess** 239:8; 251:9;
253:14; 263:19
**recollection** 230:19;
231:15; 242:3

**recommended** 238:21;
246:4
**recommends** 262:9
**record** 229:10; 239:1, 3,
7, 10, 249:22; 251 3, 8, 11;
253:10, 13, 16; 255:17;
263:16, 18, 21, 23, 25;
264:3; 266:1
**recordation** 249:21
**recorded** 240:20
**Records** 250:21, 21,
251:15
**recounting** 230:20
**reduced** 232:21; 245:12
**reduction** 232:10;
262:13; 263:7
**refer** 249:12; 262:16
**reference** 236:18;
237:20; 238:22; 251:14
**referenced** 237:23,
254:4, 8
**referred** 229:13; 230:20;
239:4; 240:24; 243:11;
251:5, 15; 258:22; 264:4
**referring** 240:25; 244:6,
24; 261:20; 262:1, 7; 263:1
**refers** 244:14; 264:13
**reflect** 229:10
**reflected** 241:8; 249:4;
263:8
**refresh** 257:17
**refused** 243:23
**regard** 236:19; 249:12
**regarding** 228:20;
231:20; 237:18; 238:10,
16; 244:5, 18; 249:5;
254:25; 260:16; 265:19
**Regulations** 244:2, 4;
245:6; 262:19
**relate** 260:22
**related** 255:10
**relates** 260:21
**relationship** 265:11
**released** 255:3
**remain** 228:16
**remains** 256:3
**remember** 228:8;
230:21, 22; 231:7, 8, 9, 19,
25; 236:22; 238:5, 7, 11,
12; 241:15; 245:24. 247:7,
18; 248:16, 25; 252:12;
253:20; 254:17, 19, 20;
264:14
**remind** 228:15
**remove** 256:23
**repeated** 238:15, 22;
240:22
**rephrase** 245:4
**replay** 239:25
**report** 238:19, 20;
239:14; 240:16, 22;
242:16, 17; 250:9, 253:1,
4; 259:9; 263:5
**reported** 245:11
**reporter** 240:19

**reports** 240:16; 244:5, 19
**represent** 232:10; 246:22
**reprisal** 250:22
**requested** 265:15
**required** 263:4
**requirement** 241:20
**requiring** 262:20
**rescinded** 247:13
**research** 252:11
**resolve** 246:17
**resolved** 246:9
**respect** 234:1; 238:16; 241:21; 242:4; 246:6; 255:12; 257:7; 264:7; 266:11
**response** 233:12
**responses** 242:4
**responsibility** 228:24; 258:18
**restate** 244:13
**restraining** 258:16; 265:15
**result** 233:11; 246:6; 247:14
**results** 256:18
**returning** 239:9, 251:10; 253:15; 263:20
**revenue** 245:14, 246:21
**review** 251:1
**reviewing** 239:20
**reviews** 251:3
**ridicule** 242:5, 7
**Right** 228:11; 235:15; 248:4; 254:5; 257:6, 22; 258:1
**ripe** 241:25
**room** 255:5
**runway** 228:21, 233:10, 11; 234:3; 237:18, 19, 238:10; 242:19; 244:5, 19; 260:18, 18, 21, 22; 261:24, 25; 262:10, 11, 21; 263:5, 8, 14; 264:9
**runways** 262:20
**rushing** 247:12

## S

**safety** 243:8; 257:7; 263:7
**salary** 265:22
**same** 238:3; 243:19; 259:21; 261:15, 17
**sat** 257:24
**satisfactory** 246:6, 10
**save** 266:4, 10
**saying** 252:1, 9, 262:23
**scene** 240:12
**schedule** 263:11
**Scott** 228:2
**second** 229:7
**secure** 258:17

**seeing** 247:18
**seeking** 260:19; 261:10
**seem** 250:20
**send** 250:10
**seniority** 266:8
**sent** 250:12
**sentence** 244:14
**separate** 229:8
**separation** 246:24
**series** 246:4; 247:14
**serious** 252:1
**serves** 232:21
**setting** 240:12; 261:2, 3
**seven** 230:9, 10, 266:9
**several** 231:11; 238:2; 241:14; 242:21; 245:7, 10, 247:14; 250:1; 254:12, 20, 24; 256:15; 257:13
**SHEA** 238:23; 240:4, 8, 13, 15, 241:16, 243:17, 20, 244:7, 21; 245:2; 251:18; 258:4; 259:4, 7, 264:20, 24; 266:14
**shear** 242:1
**sheet** 228:24; 229:2; 233:25; 236:20, 255:18
**short** 232:4; 256:16
**show** 229:4; 238:24; 243:16, 21; 250:25; 260:12
**side** 249:15; 251:25; 260:1, 264:10
**side-by-side** 232:24
**sign** 233:16; 234:15, 235:6, 9, 9, 12, 17
**signed** 228:25; 229:20; 235:25; 237:13, 15
**significant** 232:10; 246:23; 264:7
**simple** 247:21
**simply** 264:9
**sincere** 246:14
**single** 241:6
**sit** 235:15; 241:8; 254:19, 20
**situation** 238:20
**six** 266:9
**skip** 238:25
**somebody's** 249:2
**someone** 236:5
**something** 233:12, 247:18; 249:1
**somewhere** 242:11
**sorry** 250:10; 259:1, 15, 260:15
**sought** 256:18; 261:16, 19, 262:22
**sound** 233:13; 258:19
**source** 246:21
**Spain** 230:4; 258:24; 259:24
**sparing** 265:22
**specific** 233:23, 23;

242:17; 262:10
**specifically** 232:6; 233:8; 235:8; 236:19, 21; 237:5; 238:7; 243:24; 246:25; 248:25; 250:4, 252:13; 261:20; 262:19; 264:4, 11
**speed** 262:13
**speeds** 236:18
**spelled** 254:22
**spiritual** 265:13
**spot** 233:22
**stalking** 254:4, 8, 255:12; 256:25
**stamp** 229:11
**stamped** 249:15, 251:13
**standing** 232:23; 242:17, 244:6, 20; 262:12, 14; 264:11, 13
**standpoint** 246:21
**stands** 257:19
**started** 237:21
**state** 250:16; 266:25
**states** 243:15
**stationary** 251:14
**statute** 255:11
**Steele** 229:20; 230:11, 231:6, 13, 19; 232:7, 12, 15, 19, 23, 25; 233:24; 234:8, 14; 237:7, 9, 9; 249:24; 250:10; 251:25; 252:15; 258:10; 259:19. 22
**Steele's** 233 11
**still** 228:10, 235:21
**stopped** 237:21
**stored** 248:21
**straddling** 249:14
**strained** 237:2
**strong** 243:6
**subject** 254:3; 256:24
**submitting** 231:5
**subscribed** 266:22
**Subsequent** 234:1; 248:18, 19; 258:25
**substantial** 262:9; 266:10
**substantially** 265:21
**Suffice** 238:15; 258:5
**suggesting** 228:14
**suggests** 238:20
**summaries** 240:16
**summarize** 240:1
**summarized** 252:9
**summarizes** 241:3
**suppose** 236:3
**supposed** 260:22
**sure** 228:8; 237:14; 250:1; 257:14; 260:21
**surprises** 233:5
**surrounded** 234 25; 238:17
**surrounding** 238:16;

241:25
**sworn** 228:12, 16, 16, 266:22

## T

**tail** 232:2, 9, 20; 233:9; 241:21
**takeoff** 236:18; 241:11; 243:25; 245:13; 252:25, 253:3, 5, 6; 262:19; 264:10
**takeoffweight** 230:15; 232:11, 22; 262:10
**talked** 254:6
**talking** 228:21; 242:12; 256:22; 257:8
**Teamsters** 256:20
**telling** 240:10; 253:20; 256:12
**ten** 258:22
**tended** 241:25
**tenure** 266:13
**term** 250:22; 255:13; 256:1, 4
**testimony** 254:18; 255:4
**thanked** 260:7
**themselves** 245:16
**Thereupon** 229:13; 231:17; 239:4; 240:19, 251:5; 266:16
**they're** 233:10
**third-party** 256:16
**though** 228:15, 233:8, 257:3; 263:8; 264:15
**threat** 257 1
**three** 233:10; 241:3
**three-knot** 232:20
**three-to-five** 228:17
**throttles** 253:2
**thunderstorms** 238:17
**Thursday** 228:8; 232:9; 257:24
**Tim** 254:5, 23, 25, 255 5, 12, 14, 19
**times** 238:2; 245:10
**today** 257:22
**together** 229:11; 260:8
**told** 232:15; 252:8; 255:10; 256:9
**tone** 258:5
**took** 235:7, 7; 238:8, 239:16, 21; 240:3; 242:20; 243:3; 255:8
**top** 229:24; 230:8
**totally** 245:3
**tower** 242:16, 17; 244:5, 19; 252:25, 25; 253:3, 6
**train** 266:3
**transcribed** 233:20
**Transportation** 250:19
**tried** 240:5
**true** 255:7
**try** 244:9

241:25

**trying** 232:4
**two** 229:5, 238:20, 21, 249:13, 14; 264:20

## U

**Ultimately** 247:11; 265:16
**unable** 235:2
**uncommon** 231:11
**under** 228:10; 243:25
**union** 256:11, 14
**unless** 242:16; 244:5, 19
**unpleasant** 257.11
**unsafe** 243:25
**up** 229:7; 232:12; 235:2, 253:2, 256:1; 265:14
**upon** 256:15
**use** 243:17; 244:21; 245:2, 250:20, 266:3
**used** 236:17, 250:20, 256:13; 258:17
**using** 233:10

## V

**V1** 262:9, 13
**vast** 241:23
**verbal** 247:8; 248:6, 9
**verbatim** 252 5, 6
**verified** 233:3
**video** 239:6, 10; 251:7, 11; 253:12, 16; 263:17, 21
**VIDEOGRAPHER** 228:1, 239:6, 9; 251:7, 10; 253:12, 15; 263:17, 20, 25
**videotaped** 228:2
**violates** 244:1, 3, 15, 245:6
**violation** 243:12; 244:16, 20, 23
**violations** 247:15
**Volume** 263:13
**vs** 228:3; 265:1

## W

**wage** 265:22
**waiting** 236:11
**walked** 242:16
**Washington** 254:23
**watch** 232:5; 240:6
**water** 234:2; 237:23; 238:1; 242:18, 244:6, 20; 252:16; 262:11, 14; 264:11
**way** 228:14, 14, 231:15, 236:22; 246:9; 256:21; 258:21; 259:24
**weather** 233:20, 238:16; 241:18, 24; 253:1
**weekend** 257.25



**weight** 228:24; 229:2, 19.
230:24; 231:2. 20; 232:7,
8, 24; 233:3, 4, 15, 19, 25;
236:20; 237:4, 12; 245:12,
260:23, 263:7; 264:8
**weights** 245:10; 249:16
**Weiss** 230:11
**wet** 262:20, 21, 264:10,
10
**what's** 233:6, 248:2;
261:3
**whole** 244:7; 247:14
**whose** 254:24
**wife** 255:20; 265:11, 11
**wife's** 265:9
**will** 229:11; 239:23;
243:16
**wind** 232:2, 9, 21; 233:9;
241:18, 19, 21, 24; 242:1
**window** 233:22
**winds** 233:9
**within** 258:22
**without** 245:15
**witness** 243:18
**won** 255:19; 256:11
**word** 241:6; 243:6;
246:11
**word-for-word** 232:17
**wording** 242:17
**words** 240:11; 241:15;
252:1; 255.2
**work** 242:11; 246:7;
257:11
**workplace** 254:4; 257:7:
260:10
**worthiness** 258:18
**write** 241:5, 243:13;
259:13
**write-up** 249:5; 260:15
**writing** 233:21; 249:8
**written** 246:11; 247:8;
248:6
**wrong** 249:1, 261:1, 2, 12
**wrote** 250:19; 265:14

## Y

**year** 252:7, 258.13;
266:11
**years** 246:24; 254:12;
266:2, 9. 9

## Z

**zeros** 241:2

**Lawyer's Notes**



ACN# /039:
FROM _F.LL_ TO _PBS_
ALT ARPT(s) _SJ/Bc_

---- Max. Cumulative Load 34,100 lbs. ----

INTERNATIONAL

| 1 PSJ | 2 PSJ | 3 | 4 PSJ | 5 PSJ |
|---|---|---|---|---|
| ULD: 25643K | ULD: 14725K | ULD: | ULD: 14941K | ULD: 25062K |
| DEST: EDE | DEST: FDF | DEST: | DEST: FDE | DEST: FDF |
| WT: 3180 | WT: 3360 | WT: | WT: 3060 | WT: 3640 |
| 3900# MAX | 4880# MAX | 4720# MAX | 4880# MAX | 4320# MAX |

FORWARD HOLD

| 1A | 1B | 1C | 1D |
|---|---|---|---|
| DEST: DUNK | DEST: | DEST: PBS | DEST: PBS |
| WT: 60 | WT: | WT: 515 | WT: 515 |
| TOTAL WT: 650 | | | |
| (6000# max.) | | | |
| 2+1A 5440# | 3+1B 6000# | 4+1C 6200# | 5+1D 6000# |

CAPTAIN _B. Stre_
F/O _D. Meyer_
S/O _R. Walter_

ACM
1) _D. Casey_
2) _D. Hamburg_
3)
4)

COMAT
ITEM(s) _Eng. Oil_ (14)
WEIGHT _425.60_ lbs

Form #0-200A
DATE: 04/23/99

AIRCRAFT COPY

PENGAD-Bayonne, N. J.

DEFENDANT'S
EXHIBIT
_____

000



# B-727-200C LOAD PLAN
## 12-POSITION WEIGHT & BALANCE

Max. Cumulative Load 34,951 lbs.

| 6 PLT<br>ULD: 14717R<br>DEST: BOS<br>WT: 5400<br>5540# MAX | 7 p/p<br>ULD: 13711H<br>DEST: BOS<br>WT: 3100<br>8000# MAX | 8 PLT<br>ULD: 14075V<br>DEST: BOE<br>WT: 7730<br>8000# MAX | 9 PLT<br>ULD: 02345N<br>DEST: EDE<br>WT: 3640<br>5540# MAX | 10 PLT<br>ULD: 03561W<br>DEST: EDE<br>WT: 4160<br>4240# MAX | 11 PLT<br>ULD: 24414W<br>DEST: PTP<br>WT: 3410<br>3000# MAX | 12 PLT<br>ULD: 05643W<br>DEST: PTP<br>WT: 3070<br>3000# MAX |
|---|---|---|---|---|---|---|

| | 2A<br>DEST:<br>WT: 1480 | 2B<br>DEST:<br>WT: | 2C<br>DEST:<br>WT: 1600 | 2D<br>DEST: PTP<br>WT: 800 |
|---|---|---|---|---|
| | 9-2A 8000# | 10-2B 4240# | 11-2C 8000# | 12-2D 3000# |

TOTAL WT.
AFT HOLD

B.O.W.  97,308

CARGO TOTAL  17,280

ZFW  140,988

ZFW MAC  21.2

TAKEOFF WT  192,288

TAKEOFF CG  16.5

STAB TRIM  6.6

FUEL BURN  37,200

LANDING WT  155,088

51.3

MAXIMUM ALLOWABLE TAKEOFF WEIGHT  192,95
(PERFORMANCE)

RUNWAY  9L
WIND  Clm   TEMP  22 F or C°
FLAP SETTING  20

| (STRUCTURAL LIMITS) | |
|---|---|
| MAX TAXI WEIGHT | 192.7 |
| ZERO FUEL WEIGHT | 139.0 |
| MAX LDG WEIGHT 30° | 164.0 |
| 40° | |

CAPTAIN'S SIGNATURE
Sign in accordance with
FAR 121.693, 121.697, 121.443, 121.445

'Y' - WHITE    •    STATION COPY - YELLOW

000314

**AMERIJET INTERNATIONAL**    FORT LAUDERDALE, FL
**B-727-200    JT8D-15**    HOLLYWOOD INTL

KFLL    09L    FLAPS    15

| PACKS | ON | TORA | = | 9001 |
|---|---|---|---|---|
| NOSE BRKS OFF | | TODA | = | 9001 |
| 210 MPH TIRE | | ASDA | = | 9001 |
| ELEV = | 11 | GRAD | = | -.01% |

| TEMP F | ZERO C | CLIMB WIND | A/C OFF (+) | POS MAX EPR | WIL 7/0 | GD EPR | BAG WIND | ANTI-ICE ZERO CLIMB WIND | A/C OFF LIMIT (+) |
|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2062 R 2090 | 23 R 2.10 | 90 2.07 | 2037 | 2065 | 23 | | |
| 0 | -18 | 2043 R 2090 | 22 R 2.10 | 91 2.07 | 2018 | 2065 | 21 | | |
| 10 | -12 | 2023 R 2090 | 21 R 2.10 | 92 2.07 | 1998 | 2065 | 21 | | |
| 20 | -7 | 2003 R 2090 | 21 R 2.10 | 93 2.07 | 1978 | 2065 | 21 | | |
| 30 | -1 | 1986 R 2090 | 20 R 2.10 | 94 2.07 | 1961 | 2065 | 20 | | |
| 32 | 0 | 1982 R 2090 | 20 R 2.10 | 94 2.07 | 1957 | 2065 | 20 | | |
| 34 | 1 | 1979 R 2090 | 19 R 2.10 | 94 2.07 | 1954 | 2065 | 19 | | |
| 36 | 2 | 1976 R 2090 | 19 R 2.10 | 95 2.07 | 1951 | 2065 | 19 | | |
| 38 | 3 | 1972 R 2090 | 19 R 2.10 | 95 2.07 | 1947 | 2065 | 19 | | |
| 40 | 4 | 1968 R 2090 | 18 R 2.10 | 95 2.07 | 1944 | 2065 | 18 | | |
| 42 | 6 | 1965 R 2090 | 19 R 2.10 | 95 2.07 | 1940 | 2065 | 19 | | |
| 44 | 7 | 1962 R 2090 | 19 R 2.10 | 95 2.07 | 1937 | 2065 | 19 | | |
| 46 | 8 | 1959 R 2090 | 19 R 2.10 | 95 2.07 | 1934 | 2065 | 19 | | |
| 48 | 9 | 1956 R 2090 | 19 R 2.10 | 96 2.07 | 1931 | 2065 | 19 | | |
| 50 | 10 | 1952 R 2090 | 20 R 2.10 | 96 2.07 | 1927 | 2065 | 19 | | |
| 52 | 11 | 1949 R 2090 | 20 R 2.10 | 96 2.07 | | | | | |
| 54 | 12 | 1946 R 2090 | 19 R 2.10 | 96 2.07 | | | | | |
| 56 | 13 | 1943 R 2090 | 20 R 2.10 | 96 2.07 | | | | | |
| 58 | 14 | 1939 R 2090 | 20 R 2.10 | 97 2.07 | | | | | |
| 60 | 16 | 1922 R 2090 | 33 R 2.10 | 97 2.07 | | | | | |
| 62 | 17 | 1920 R 2090 | 31 R 2.10 | 97 2.07 | | | | | |
| 64 | 18 | 1918 R 2090 | 30 R 2.10 | 97 2.07 | | | | | |
| 66 | 19 | 1916 R 2090 | 28 R 2.10 | 97 2.07 | | | | | |
| 68 | 20 | 1914 R 2090 | 27 R 2.10 | 98 2.07 | | | | | |
| 70 | 21 | 1913 R 2090 | 25 R 2.10 | 98 2.07 | | | | | |
| 72 | 22 | 1910 R 2090 | 24 R 2.10 | 98 2.07 | | | | | |
| 74 | 23 | 1909 R 2090 | 21 R 2.10 | 98 2.07 | | | | | |
| 76 | 24 | 1907 R 2090 | 20 R 2.10 | 98 2.07 | | | | | |
| 78 | 26 | 1905 R 2090 | 18 R 2.10 | 98 2.07 | | | | | |
| 80 | 27 | 1904 R 2090 | 16 R 2.10 | 99 2.07 | | | | | |
| 82 | 28 | 1901 R 2090 | 14 R 2.10 | 99 2.07 | | | | | |
| 84 | 29 | 1892 R 2084 | 22 R 2.10 | 99 2.07 | | | | | |
| 86 | 30 | 1881 R 2071 | 20 R 2.08 | 99 2.07 | | | | | |
| 88 | 31 | 1869 R 2054 | 19 R 2.07 | 99 2.07 | | | | | |
| 90 | 32 | 1856 R 2037 | 17 R 2.06 | 99 2.07 | | | | | |
| 92 | 33 | 1846 R 2019 | 16 R 2.05 | 98 2.06 | | | | | |
| 94 | 34 | 1835 R 2001 | 14 R 2.04 | 98 2.05 | | | | | |
| 96 | 36 | 1823 R 1983 | 13 R 2.03 | 98 2.04 | | | | | |
| 98 | 37 | 1812 R 1965 | 12 R 2.02 | 98 2.03 | | | | | |
| 100 | 38 | 1800 R 1947 | 11 R 2.01 | 98 2.02 | | | | | |
| 102 | 39 | 1788 R 1930 | 12 R 2.00 | 97 2.01 | | | | | |
| 104 | 40 | 1776 R 1913 | 13 R 1.99 | 97 2.00 | | | | | |
| 106 | 41 | 1763 R 1896 | 15 R 1.98 | 97 1.99 | | | | | |
| 108 | 42 | 1751 R 1879 | 16 R 1.97 | 97 1.98 | | | | | |
| 110 | 43 | 1739 R 1862 | 17 R 1.96 | 97 1.96 | | | | | |
| 112 | 44 | 1727 R 1845 | 18 R 1.95 | 97 1.95 | | | | | |
| 114 | 46 | 1715 R 1828 | 19 R 1.94 | 96 1.94 | | | | | |
| 116 | 47 | 1704 R 1811 | 19 R 1.93 | 96 1.93 | | | | | |
| 118 | 48 | 1692 R 1794 | 20 R 1.92 | 96 1.92 | | | | | |
| 120 | 49 | 1680 R 1777 | 21 R 1.90 | 96 1.91 | | | | | |

*= CHECK MAX STRUCTURAL WT

**NOTES**

1. CTR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.04    +.03
   ICE ON     +.01    NONE

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON   +.04

3. FLAP RETRACT HT(OCH)
   = 811 FINEL

4. OBST: HT(FT AGL) DIST(NM)
   50    1.01

DATE: 12/09/92

**GROSS WEIGHT CORRECTIONS**

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
   1 DEGREE HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    321 LBS/KT EFF HEAD W
       SUB FROM ZERO WIND  1322 LBS/KT EFF TAIL W

ADJUST ZERO WIND CLIMB FOR --
   *WIND   *RUNWAY SHORTENING   *ANTI-SKID INOP
   *RUNWAY CONTAMINATION   *HEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
   *HEL PERFORMANCE DECREMENTS

**RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS**

| | STANDING | REDUCE | REDUCE |
|---|---|---|---|
| | WATER | ZERO | V1 |
| DRY | SLUSH OR | WIND W | SPEED |
| SNOW | WET SNOW | BY: | BY: |
| -IN- | -IN- | -LBS- | -LBS- |
| | < 1/4 | 14000 | 31 |
| 3 1/2 TO 6 | 1/4 TO 1/2 | 28000 | 26 |
| | ICE | 14000 | 31 |
| ANTI-SKID INOP | | 6300 | 21 |

**LANDING DATA**    PACKS ON

| | | DRY | | | | WET | | | | SUB LB/F | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| INDC FLAP LENGTH | ANTI SKID | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | APT CRIT TEMP | ABOVE CRIT TEMP | MAX OPER TEMP |
| 30 | 8432 GPER | *204200 | 290 | 0 | 1356 | *205600 | 210 | 0 | 3257 | | | |
| 30 | 8432 INOP | *175700 | 970 | 0 | 3307 | *156200 | 950 | 0 | 3311 | 120 | 0 | 120 |
| 30 | 8423 GPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 INOP | *175500 | 970 | 0 | 3358 | *156600 | 950 | 0 | 3345 | | | |



DEFENDANT'S EXHIBIT

000211

COMPUFLIGHT INC.

NASA, Aviation Safety Reporting System (ASRS report).
Report Date: 08-18-1999, Incident Date: 08-17-99
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs., Ratings: Boeing 727 Type, CFI, CFII,
MEI, A&P, FEJ, with approximately 150 hours flight experience in the last ninety days.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors:    Thunderstorms in vicinity, rainshowers overhead, contaminated
runway; conditions ripe for windshear.

## Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ.    Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening. When I arrived,
the field was under heavy rainshowers. Anticipating a Max-weight performance-limited
takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the *Navtech* runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff decision made
June 08, 1999 out of MIA. On that rainy morning, a Continental 727 had taxied into
position and hold RW-12, then declined takeoff clearance... requesting full length 9L,
instead. The night before it had rained ten inches. It was raining at the time. While
Tower had not provided a runway condition report, the runways were obviously wet.
Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way.
Without prompting from the captain, I declined, reminding Tower that our flight required
full-length 9L. The captain chastised me for refusing RW-12 against his wishes (even
though we had just finished discussing that the runway analysis did not support it, even
on a dry day, even if we believed the weights reported by ramp personnel).    The captain
insisted I radio-back Tower and accept RW-12.    I demurred.    After a brief but intense
discussion, AJT 823 finally departed full-length 9L using nearly all available runway before
finally breaking ground.  9L in MIA is 1,300' longer than MIA RW-12; clearly, had we
taken 12, there may have been an accident. However, my refusal to accept RW-12 became
the subject of a complaint by the captain which was investigated by Amerijet's acting chief
pilot.  I was exonerated for my actions that day, but it was a profoundly uncomfortable
experience...especially in light of a pending age discrimination charge against the employer
(it has promoted nine junior, younger, less-qualified first officers to captain ahead of me),
management's acts of retaliation for the charge, and the company's protracted pattern of
punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory
compliance (duty times, hazmat and weight & balance), and the equitable treatment of
pilot employees...myself among them.  The new (acting) chief pilot seemed intent on
making a difference.  At the conclusion of his investigation, he stated, "Not only did you
do the right thing, but I would have done the same thing myself. I have, in fact, walked off
an aircraft when a captain refused to get it deiced."



DEFENDANT'S
EXHIBIT
13

000052

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), as is the case in all Amerijet Runway Analysis, there are no weight decrements for wet runways that do not specifically contain "Standing water". Consequently, flight crews, the training department and dispatch personnel consider all runways "Dry" for performance planning purposes unless there exists a contamination report that contains the specific words, "Standing Water". I have noted that some Boeing 727 performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot reduction to the Max-weight V1 speed for runways that are, "...well-soaked with water but do not have large areas of actual standing water". As of August 17, 1999, such questions had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 200' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they were June 08. The dispatcher I queried reported to me that to his understanding Amerijet performance analysis do not contain weight-limiting decrements unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers seem to imply a braking degradation, and perhaps an impediment to acceleration as well, resulting from wet runway surfaces... irrespective of whether or not the runway contains "Standing water". "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights.", I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' on the runway, it's dry."

As aircraft 397AJ was loaded for departure, I explained my question to the check airman, who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safer solution and accept the "Standing Water ≤ 1/4" weight and V1 reduction for our flight. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain dismissed my concern, "We'll have to takeoff between water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers. He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst in the cross-groove channels worn by successive landing and departing aircraft. No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a Max EPR, packs-off, takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect a packs-off takeoff.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch'. AJT 827 is cleared for takeoff, turn right heading one zero zero". As Tower began its transmission, the captain had advanced the throttles. The takeoff clearance was then issued without pause or delay. The captain had released the brakes before I could reply to the runway report and clearance. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. AJT 827 used all available runway. The captain rotated well inside the alternating red and white lights at the departure end of the runway and the main wheels broke ground at the last possible instant. The aircraft crossed the airport boundary at less than 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation."

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits specified in Amerijet's Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked, incredulous. "Do you realize how incongruent that sounds coming from a check airman that just encouraged a flight crew to takeoff from a contaminated runway into possible windshear fifteen thousand pounds overweight? Even if I am wrong about navigating direct, ...and I don't think I am, one could get you violated, the other will get you killed. What is safe about that?" I shook my head.

AJT flight 827 exceeded aircraft performance limitations and violated FAA regulations in disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway in an aircraft that weighed fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the inevitable consequences eventually bestowed upon any air carrier which actively cultivates a culture of non-compliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on runways that are obviously contaminated, but cannot be described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning materials, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the contamination report.

My mistake August 17, was in letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the brother of its vice president, director of operations and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Had I done so before the aircraft taxied out of the ramp for take-off, I may have avoided the circumstances which placed my crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

NasaRpt: 8/19/99, 4:42 PM
Incident date: 08-17-99

After transmitting its report, Tower might have asked, "AJT 827, State your intentic
There had been no prior report indicating "Standing Water" on the runway.
controller could have surmised that the Amerijet crew might want to reconsider :
circumstances before commencing takeoff.  At very least, it would have presentec
opportunity for me to key the mike and request permission to taxi clear of the runway.
resulting criticism from the check airman and captain much preferred when compare
the risk of an overweight departure into possible windshear...and to the more stri
actions required to prevent takeoff once initiated.  But that was not the contro:
responsibility.

While I went well beyond the call of reasonableness in repeatedly voicing my concern
the chief pilot, dispatch, the captain and the check airman, prior to the flight, as well
everyone in my crew immediately before the incident, I did not do everything possib
prevent Amerijet flight 827 from taking off August 17. I should not have allowec
aircraft to depart. Would forcibly aborting the take-off from the right seat have presen
less dangerous scenario than what we encountered? Who can say? I decided again
Should I have pressed the push-to-talk on my radio and transmitted over the open t
frequency while commanding the captain to abort the takeoff...embarrassing him int
Honestly, that did not occur to me until later. Would it have worked? I made a judg
call and elected not to intervene once the takeoff roll began.

Contributing factors included my excessive deference to management, not only
regard to the presence of the check airman, but pertaining to the recency of what, despi
outcome, can only be characterized as a rebuke subsequent to a similar experience sli
more than sixty days prior, as well the protracted reprimand implied by a successic
denials for promotional, professional, training and income opportunities as a result c
age and on-going concern for regulatory compliance and flight safety at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past,
concerned what might happen the next time a runway is wet and an aircraft prepares
performance limited takeoff. I have addressed it specifically with the chief pilots
acting and interim), the directors of operations, dispatch and training. I provided th
copy of this report and recommended that it be forwarded in its entirety to the air
designated safety officer (its CEO). The overwhelming corporate imperative has been
the job done at any cost; to punish those who stand in the way by denying
promotional and professional opportunities, abusing them in the simulator if
be...exploiting the PRIA to soil their careers while sending an unmistakably clear me
to other flight crew who might consider showing similar unwelcome concern for
safety and regulatory compliance.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did n
done. That is the reason for this report. I hope it will do someone, somewhere,
good.

Respectfully submitted,



### Patrick Major

**Fax Letter**

This fax contains **3** pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

**Fax To:** Al Cook, Office of the Inspector General, United States Department of Transportation
**Fax Phone:** (202) 366-7749, **Voice Phone:** (202) 366-1959, (800) 424-9071.
**From:** Pat Major
**Date:** April 09, 1999
**Subject:** Pilot Records Improvement Act of 1996, 49 USC 44936 (F).

Please investigate, identify and eliminate the threat to flight safety represented by abuse of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) (PRIA). Insidiously, air carriers may routinely exploit the law in order to coerce pilot complicity in unwise, illegal, or unsafe flight practices. Pilots acting on behalf of safety and regulatory compliance, exercising their rights with regard to equity in the workplace, or participating in protected concerted activity to improve working conditions and pay, may face records corruption and defilement by employers retaliating against them. The PRIA provides unethical employers a means of coercion and revenge while affording little recourse to victimized flight officer employees. As a result, a law crafted to improve air safety may be having precisely the opposite effect.

In the past, flight officers disagreeing with an employer's policies, practices or procedures had a range of options available. The PRIA, however, has armed employers with an extraordinarily coercive tool of recrimination and reprisal. Simulator, or proficiency check (PC), abuse has been a pattern and practice among air carriers for some time; many a management grudge has been "Settled" during the PC by humiliating flight officers reluctant to look the other way when safety or regulatory compliance is compromised. The PRIA represents a means whereby employers can convert that practice into career annihilation.

My personal experience with Amerijet International, Inc. a Ft. Lauderdale based regional freight carrier, is a good example. Beginning in 1992, I called to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the dispute internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to Captain, forever. That denial, alone, following eight years employment, seriously undermines my career prospects; not only with Amerijet, but as I attempt to seek employment elsewhere. Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). Once notified that age discrimination charges had been filed, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity. Then promised to soil my records. This is a guilefully coercive exploitation of the PRIA.

221

**DEFENDANT'S EXHIBIT**
14

Please investigate and instigate appropriate amendments to the Pilot Records Improvement Act of 1996, 49 USC 44936 (F). Also, please advise as to what other Federal and State authorities can help set right the malfeasance routinely faced by employees of Amerijet International, Inc.

Sincerely, and with warmest personal regard,

Patrick Scott Major
First Officer, Amerijet International, Inc.



### Patrick Major

**Fax Letter**

This fax contains 2 pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

**Fax To:** Region 12, Regional Director: Rochelle Kentov, Enterprise Plaza, Suite 530, 201 E. Kennedy Boulevard, Tampa, Florida 33602-5824
**Fax Phone:** (813) 228-2874, **Local Phone:** (813) 228-2641
**From:** Pat Major
**Date:** April 09, 1999
**Subject:** Violation of Right to Protected Concerted Activity by Amerijet International, Inc.

I believe Amerijet International, Inc. a Ft. Lauderdale based regional freight air carrier, has violated my right to engage in protected concerted activity.

In 1992, I began calling to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. Additionally, I sought to help eliminate Amerijet's long-standing practice of discrimination against women and African Americans, and to work together with other crewmen, within the chain of leadership, to help create effective training and evaluation methodologies, as well as tools to replace capricious, arbitrary and often cruel practices toward flight officer employees. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the problem internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to captain, forever. That denial, following eight years employment, seriously undermined my career; not only with Amerijet, but as I seek employment elsewhere.

Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). But once notified that age discrimination charges were under investigation, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity, then promised to soil my records, demanding that all such activity immediately stop. This is a guilefully coercive exploitation of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) [PRIA] and a blatant violation of my rights.

Concerning the charge of "Stalking:" Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership. Once notified of the investigation by EEOC, however, Amerijet took the position that my discussion with other flight officers concerning the other crewman's civil court verdict and jury award constituted "Stalking".

224

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

Nothing I did even remotely approximates the most liberal application of that term. Due to provisions of the PRIA, however, that charge could be disclosed to potential future airline employers. Stalking is deviant behavior widely regarded as emblematic of psychological instability and unfathomable risk. Once a potential employer saw such an item in the records requested and produced as required by the PRIA, my application would be set aside and a reject letter sent out the very existence of the charge, although baseless, effectively eliminating my chances for airline employment elsewhere. As a result, Amerijet's retaliation may lock me out of the airline industry, forever. What started as one man trying to make a difference may well become a solitary employee squashed by a powerful employer unconstrained by any regard for truth, the rights of others, fairness, or the laws of the land.

I am an eight year Amerijet employee with an unblemished safety record and no history of violations or other certificate action. I have received numerous commendations from company representatives, customers and pilot employees. I am regarded by some as an expert in my field. Yet, Amerijet has denied me training, opportunity and pay, even seeking to embroil representatives of the FAA in their actions against me. Intending to dissuade me from concerted activities promoting safety, regulatory compliance and equitable treatment of flight officer employees, Amerijet's actions have degenerated into outright coercion and deceit.

I need guidance, soon. Considering all that has passed, dare I risk continued exposure to this employer? I work aboard aircraft operating in international airspace, landing in foreign countries, off-loading and on-loading freight, then returning to Miami International Airport. Having taken such a desperate step as to accuse me of stalking, what additional treachery awaits?

Be advised, this employer has publicly disparaged and criticized me through current and former employees. Their actions have already impeded my ability to generate income elsewhere. Amerijet management appears resolute not only in creating an employment environment hostile and injurious to me, but in eliminating any chance I might have to fly anywhere else. The purpose is to make an example of me to others who might consider taking action on behalf of safety, regulatory compliance and fairness toward other employees.

The circumstances are grievous and my options seem to decrease with each passing day. Please, I need your help. Contact me, directly.

Sincerely, and with warmest personal regard,


Patrick Scott Major
First Officer, Amerijet International, Inc.

225



Patrick Major

**Fax Letter**
This fax contains 2 pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

**Fax To:** National Mediation Board, 1425 K Street, NW, Washington, DC 20572
**Fax Phone:** (202) 692-5086, **Local Phone:** , (202) 523-5920
**From:** Pat Major
**Date:** April 18, 1999
**Subject:** Violation of Right to Protected Concerted Activity by Amerijet International, Inc.

To whom this may concern,

I believe Amerijet International, Inc. a Ft. Lauderdale based FAR Part 121 air carrier, has violated my right to engage with other employees in protected concerted activity.

During a meeting with Chief Pilot Derry Huff and Corporate Director of Human Resources Juan Morales, April 02, 1999, Amerijet labeled as "Stalking" my involvement in protected concerted activity. During the meeting, Juan Morales read to me the legal definition of stalking, promised to soil my employment records, and demanded that all such activity immediately stop.

Concerning the charge, exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow Amerijet pilots that there are means perhaps more desirable than unionization which can produce lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice previously helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership; I believed remaining non-union was preferred if a condition of mutual trust could be restored between the company and its pilots. However, since narrowly averting union election last July, Amerijet management has demonstrated an extraordinary capacity for duplicity. Once notified that I filed an age discrimination charge with the Miami office of the EEOC, Amerijet took the position that discussions among flight officers concerning a civil court verdict and jury award pertaining to the other employee constituted "Stalking" said employee.

Nothing I did even remotely approximates the most liberal application of the term. I did not invade anyone's privacy, harass anyone, attempt unwelcome contact, or otherwise commit any act defining "Stalking". I engaged other employees in discussions concerning matters of public record in an effort to devise strategy intended to gain improvements in pay, benefits, working conditions and flight safety: items which comprise a source of seething discontent among Amerijet International flight crew.

226

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

From Amerijet's perspective, the charge of stalking represents an elegant solution... if they get away with it. Due to the Pilot Records Improvement Act of 1996, 49 USC 44936 [F] (PRIA), the charge may be disclosed to potential future airline employers during required background and records checks. Stalking is deviant behavior widely regarded as emblematic of psychological instability. Once a potential employer sees such an item in the records, my application will be set aside and a reject letter sent out: the very existence of the charge, though baseless, effectively eliminating my chances for airline employment elsewhere.       Consequently, Amerijet International's retaliation may lock me out of the airline industry, forever.   What began as one man trying to make a difference working within the organization to provoke constructive change benefiting all, may very well result in the annihilation of a career by an employer unconstrained by regard for the rights of others, fairness, or the laws of the land.

I believe Amerijet's purpose is to make an example of me to other pilots who might consider engaging in concerted activity to improve working conditions, benefits and pay, or who might take action on behalf of safety, regulatory compliance, and equity in the workplace.   My understanding is that while unionization is the most popular method of asserting rights established by the National Railway and Labor Relations Acts, the right to concerted activity is protected with or without the advent of a labor union. Is that correct?

With deepest appreciation for a swift and effective response,


Patrick Major
First Officer
Amerijet International, Inc.





**Patrick Major**

**Fax Letter**

This fax contains **3** pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

Fax To: Al Cook, Office of the Inspector General, United States Department of Transportation
Fax Phone: (202) 366-7749, **Voice Phone:** (202) 366-1959, (800) 424-9071.
From:    Pat Major
Date:    April 09, 1999
Subject: Pilot Records Improvement Act of 1996, 49 USC 44936 (F).

Please investigate, identify and eliminate the threat to flight safety represented by abuse of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) (PRIA). Insidiously, air carriers may routinely exploit the law in order to coerce pilot complicity in unwise, illegal, or unsafe flight practices. Pilots acting on behalf of safety and regulatory compliance, exercising their rights with regard to equity in the workplace, or participating in protected concerted activity to improve working conditions and pay, may face records corruption and defilement by employers retaliating against them. The PRIA provides unethical employers a means of coercion and revenge while affording little recourse to victimized flight officer employees. As a result, a law crafted to improve air safety may be having precisely the opposite effect.

In the past, flight officers disagreeing with an employer's policies, practices or procedures had a range of options available. The PRIA, however, has armed employers with an extraordinarily coercive tool of recrimination and reprisal. Simulator, or proficiency check (PC), abuse has been a pattern and practice among air carriers for some time; many a management grudge has been "Settled" during the PC by humiliating flight officers reluctant to look the other way when safety or regulatory compliance is compromised. The PRIA represents a means whereby employers can convert that practice into career annihilation.

My personal experience with Amerijet International, Inc. a Ft. Lauderdale based regional freight carrier, is a good example. Beginning in 1992, I called to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the dispute internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to Captain, forever. That denial, alone, following eight years employment, seriously undermines my career prospects; not only with Amerijet, but as I attempt to seek employment elsewhere. Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). Once notified that age discrimination charges had been filed, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity. Then promised to soil my records. This is a guilefully coercive exploitation of the PRIA.

221

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

Concerning the charge of "Stalking:" Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice helped Amerijet avoid union election by helping persuade flight officers to seek solutions directly within the chain of leadership. Once notified of the investigation by EEOC, however, Amerijet took the position that my discussion of a civil court verdict and jury award constituted "Stalking". Nothing I did even remotely approximates the most liberal application of that term. However, due to provisions of the PRIA, that charge could be disclosed to potential future airline employers. Stalking is deviant behavior widely regarded as emblematic of psychological instability and unfathomable risk. Once a potential employer saw such an item in the records requested and produced as required by the PRIA, my application would be set aside and a reject letter sent out: the very existence of the charge, however baseless, effectively eliminating my chances for airline employment elsewhere. As a result, I may be locked out of the airline industry, forever. What started as one man trying to make a difference may well become a solitary employee squashed by a powerful employer unconstrained by any regard for truth, the rights of others, fairness, or the laws of the land.

I am an eight year Amerijet employee with an unblemished safety record and no history of violations or other certificate action. I have received numerous commendations from company representatives, customers and pilot employees. I am regarded by some as an expert in my field. Yet, Amerijet has denied me training, opportunity and pay, even embroiling FAA inspectors in their actions against me. Originally intending to dissuade me from activities promoting safety, regulatory compliance and equitable treatment of flight officer employees, Amerijet's actions have degenerated into a protracted pattern of treachery, coercion and deceit. The option afforded this employer by the PRIA is not helping.

Another example is an Amerijet employee who protested to the company president after enduring a public and abusive critique from a training department supervisor. Two months later, that same employee found himself facing the supervisor's superior for his annual PC; the originally scheduled check-airman was replaced minutes before the check ride began. Not only did the flight officer lose his job, his records were tarnished as a result.

While its origin was well-intentioned, The PRIA affords unethical airline executives an unparalleled tool of coercion which places flight officers in the dangerous quandary of having to choose between circumstances which may either threaten their lives or ruin their careers. Pilots refusing duty beyond reasonable limits (e.g. Amerijet and the Federal Aviation Administration, Flight Standards District Office [FAA FSDO #17] overseeing its supplemental air carrier certificate interpret Part 121 duty time regulations to indicate that pilots flying to, from and between foreign destinations may remain continuously on duty for up to six days at a time so long as their actual flight time does not exceed twelve hours within twenty-four), pilots refusing to fly due to insufficient rest between duty periods, who identify and seek to remedy regulatory infractions and threats to air safety, or those who participate in concerted activity to improve working conditions, pay and benefits, may very well find themselves out of a career.

What remedy protects pilot careers when employers choose to coercively exploit the PRIA? What redress is there for safety conscious flight officer employees retaliated against by airlines executives who can engage not only the PRIA but FAA officials in their guileful machinations?

222

Please investigate and instigate appropriate amendments to the Pilot Records Improvement Act of 1996, 49 USC 44936 (F).  Also, please advise as to what other Federal and State authorities can help set right the malfeasance routinely faced by employees of Amerijet International, Inc.

Sincerely, and with warmest personal regard,

Patrick Scott Major
First Officer, Amerijet International, Inc.



**Patrick Major**

**Fax Letter**

This fax contains 2 pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

Fax To:  Region 12, Regional Director: Rochelle Kentov, Enterprise Plaza, Suite 530, 201 E. Kennedy Boulevard, Tampa, Florida 33602-5824

Fax Phone: (813) 228-2874, Local Phone: (813) 228-2641

From:   Pat Major

Date:   April 09, 1999

Subject: Violation of Right to Protected Concerted Activity by Amerijet International, Inc.

I believe Amerijet International, Inc. a Ft. Lauderdale based regional freight air carrier, has violated my right to engage in protected concerted activity.

In 1992, I began calling to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. Additionally, I sought to help eliminate Amerijet's long-standing practice of discrimination against women and African Americans, and to work together with other crewmen, within the chain of leadership, to help create effective training and evaluation methodologies, as well as tools to replace capricious, arbitrary and often cruel practices toward flight officer employees. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the problem internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to captain, forever. That denial, following eight years employment, seriously undermined my career; not only with Amerijet, but as I seek employment elsewhere.

Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). But once notified that age discrimination charges were under investigation, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity, then promised to soil my records, demanding that all such activity immediately stop. This is a guilefully coercive exploitation of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) [PRIA] and a blatant violation of my rights.

Concerning the charge of "Stalking:" Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership. Once notified of the investigation by EEOC, however, Amerijet took the position that my discussion with other flight officers concerning the other crewman's civil court verdict and jury award constituted "Stalking".

2 2 4

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

Nothing I did even remotely approximates the most liberal application of that term. Due to provisions of the PRIA, however, that charge could be disclosed to potential future airline employers. Stalking is deviant behavior widely regarded as emblematic of psychological instability and unfathomable risk. Once a potential employer saw such an item in the records requested and produced as required by the PRIA, my application would be set aside and a reject letter sent out: the very existence of the charge, although baseless, effectively eliminating my chances for airline employment elsewhere. As a result, Amerijet's retaliation may lock me out of the airline industry, forever. What started as one man trying to make a difference may well become a solitary employee squashed by a powerful employer unconstrained by any regard for truth, the rights of others, fairness, or the laws of the land.

I am an eight year Amerijet employee with an unblemished safety record and no history of violations or other certificate action. I have received numerous commendations from company representatives, customers and pilot employees. I am regarded by some as an expert in my field. Yet, Amerijet has denied me training, opportunity and pay, even seeking to embroil representatives of the FAA in their actions against me. Intending to dissuade me from concerted activities promoting safety, regulatory compliance and equitable treatment of flight officer employees, Amerijet's actions have degenerated into outright coercion and deceit.

I need guidance, soon. Considering all that has passed, dare I risk continued exposure to this employer? I work aboard aircraft operating in international airspace, landing in foreign countries, off-loading and on-loading freight, then returning to Miami International Airport. Having taken such a desperate step as to accuse me of stalking, what additional treachery awaits?

Be advised, this employer has publicly disparaged and criticized me through current and former employees. Their actions have already impeded my ability to generate income elsewhere. Amerijet management appears resolute not only in creating an employment environment hostile and injurious to me, but in eliminating any chance I might have to fly anywhere else. The purpose is to make an example of me to others who might consider taking action on behalf of safety, regulatory compliance and fairness toward other employees.

The circumstances are grievous and my options seem to decrease with each passing day. Please, I need your help. Contact me, directly.


Sincerely, and with warmest personal regard,


Patrick Scott Major
First Officer, Amerijet International, Inc.

225



**Patrick Major**

**Fax Letter**
This fax contains 2 pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

Fax To: National Mediation Board, 1425 K Street, NW, Washington, DC 20572
Fax Phone: (202) 692-5086, **Local Phone:** , (202) 523-5920
**From:** Pat Major
**Date:** April 18, 1999
**Subject:** Violation of Right to Protected Concerted Activity by Amerijet International, Inc.

To whom this may concern,

I believe Amerijet International, Inc. a Ft. Lauderdale based FAR Part 121 air carrier, has violated my right to engage with other employees in protected concerted activity.

During a meeting with Chief Pilot Derry Huff and Corporate Director of Human Resources Juan Morales, April 02, 1999, Amerijet labeled as "Stalking" my involvement in protected concerted activity. During the meeting, Juan Morales read to me the legal definition of stalking, promised to soil my employment records, and demanded that all such activity immediately stop.

Concerning the charge, exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow Amerijet pilots that there are means perhaps more desirable than unionization which can produce lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice previously helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership; I believed remaining non-union was preferred if a condition of mutual trust could be restored between the company and its pilots. However, since narrowly averting union election last July, Amerijet management has demonstrated an extraordinary capacity for duplicity. Once notified that I filed an age discrimination charge with the Miami office of the EEOC, Amerijet took the position that discussions among flight officers concerning a civil court verdict and jury award pertaining to the other employee constituted "Stalking" said employee.

Nothing I did even remotely approximates the most liberal application of the term. I did not invade anyone's privacy, harass anyone, attempt unwelcome contact, or otherwise commit any act defining "Stalking". I engaged other employees in discussions concerning matters of public record in an effort to devise strategy intended to gain improvements in pay, benefits, working conditions and flight safety: items which comprise a source of seething discontent among Amerijet International flight crew.

226

From Amerijet's perspective, the charge of stalking represents an elegant solution... if they get away with it. Due to the Pilot Records Improvement Act of 1996, 49 USC 44936 [F] (PRIA), the charge may be disclosed to potential future airline employers during required background and records checks. Stalking is deviant behavior widely regarded as emblematic of psychological instability. Once a potential employer sees such an item in the records, my application will be set aside and a reject letter sent out: the very existence of the charge, though baseless, effectively eliminating my chances for airline employment elsewhere.     Consequently, Amerijet International's retaliation may lock me out of the airline industry, forever.     What began as one man trying to make a difference working within the organization to provoke constructive change benefiting all, may very well result in the annihilation of a career by an employer unconstrained by regard for the rights of others, fairness, or the laws of the land.

I believe Amerijet's purpose is to make an example of me to other pilots who might consider engaging in concerted activity to improve working conditions, benefits and pay, or who might take action on behalf of safety, regulatory compliance, and equity in the workplace.     My understanding is that while unionization is the most popular method of asserting rights established by the National Railway and Labor Relations Acts, the right to concerted activity is protected with or without the advent of a labor union.  Is that correct?

With deepest appreciation for a swift and effective response,


Patrick Major
First Officer
Amerijet International, Inc.

227



### Patrick Major

**Fax Letter**
This fax contains 2 pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

**Fax To: Senator Bob Graham,** 524 Hart Senate Office Building, Washington, D.C. 20510
**Fax Phone:** (202) 224-2237, **Local phone:** (813) 228-2476
**From:** Pat Major
**Date:** April 09, 1999
**Subject:** Pilot Records Improvement Act of 1996, 49 USC 44936 (F).

Please investigate, identify and eliminate the threat to flight safety represented by abuse of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) [PRIA]. Insidiously, air carriers may routinely exploit the law in order to coerce pilot complicity in unwise, illegal, or unsafe flight practices. Pilots acting on behalf of safety and regulatory compliance, exercising their rights with regard to equity in the workplace, or participating in protected concerted activity to improve working conditions and pay, may face records corruption and defilement by employers retaliating against them. The PRIA provides unethical employers a means of coercion and revenge while affording little recourse to victimized flight officer employees. As a result, a law crafted to improve air safety may be having precisely the opposite effect.

In the past, flight officers disagreeing with an employer's policies, practices or procedures had a range of options available. The PRIA, however, has armed employers with an extraordinarily coercive tool of recrimination and reprisal. Simulator, or proficiency check (PC), abuse has been a pattern and practice among air carriers for some time; many a management grudge has been "Settled" during the PC by humiliating flight officers reluctant to look the other way when safety or regulatory compliance is compromised. The PRIA represents a means whereby employers can convert that practice into career annihilation.

My personal experience with Amerijet International, Inc. a Ft. Lauderdale based regional freight carrier, is a good example. Beginning in 1992, I called to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the dispute internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to captain, forever. That denial, alone, following eight years employment, seriously undermines my career prospects; not only with Amerijet, but as I attempt to seek employment elsewhere. Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). Once notified that age discrimination charges had been filed, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity, then promised to soil my records. This is a guilefully coercive exploitation of the PRIA.

Concerning the charge of "Stalking:" Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety, regulatory compliance, working conditions, benefits and pay.  Indeed, I had twice helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership.  Once notified of the investigation by EEOC, Amerijet took the position that my discussion of a civil court verdict and jury award constituted "Stalking".  Nothing I did even remotely approximates the most liberal application of that term.  However, due to provisions of the PRIA, that charge could be disclosed to potential future airline employers.  Stalking is deviant behavior widely regarded as emblematic of psychological instability and unfathomable risk.  Once a potential employer saw such an item in the records requested and produced as required by the PRIA, my application would be set aside and a reject letter sent out: the very existence of the charge, however baseless, effectively eliminating my chances for airline employment elsewhere.  As a result, I may be locked out of the airline industry, forever.  What started as one man trying to make a difference may well become a solitary employee squashed by a powerful employer unconstrained by any regard for truth, the rights of others, fairness, or the laws of the land.

Another example is an Amerijet employee who protested to the company president after enduring an abusive public critique from a training department supervisor.  Two months later, that same employee found himself facing the supervisor's superior for his annual PC; the originally scheduled check-airman was replaced minutes before the check ride began.  Not only did the flight officer lose his job, his records were tarnished as a result.

While its origin was well-intentioned, The PRIA affords unethical airline executives an unparalleled tool of coercion which places flight officers in the dangerous quandary of having to choose between circumstances which may either threaten their lives or ruin their careers.  Pilots refusing duty beyond reasonable limits (e.g. Amerijet and the Federal Aviation Administration Flight Standards District Office [FAA FSDO #17] overseeing its supplemental air carrier certificate, interpret Part 121 duty time regulations to indicate that pilots flying to, from and between foreign destinations may remain continuously on duty for up to six days at a time so long as their actual flight time does not exceed twelve hours within twenty-four), pilots refusing to fly due to insufficient rest between duty periods, who identify and seek to remedy regulatory infractions and threats to air safety, or those who participate in concerted activity to improve working conditions, pay and benefits, may very well find themselves out of a career.

What remedy protects pilot careers when employers choose to coercively exploit the PRIA? What redress is there for safety conscious flight officer employees retaliated against by airlines executives who engage not only the PRIA but FAA officials in their guileful machinations? Please investigate and instigate appropriate amendments to the Pilot Records Improvement Act of 1996, 49 USC 44936 (F).  Also, please advise as to what other Federal and State authorities can help set right the malfeasance routinely faced by employees of Amerijet International, Inc.

Sincerely, and with warmest personal regard,

230

Patrick Scott Major
First Officer, Amerijet International, Inc.

**United States Senate**

WASHINGTON, DC 20510

COMMITTEES
FLORIDA
ENERGY AND NATURAL RESOURCES
ENVIRONMENT AND PUBLIC WORKS
FINANCE
VETERANS AFFAIRS
SELECT COMMITTEE O INTELLIGENCE

June 1, 1999

Mr. and Mrs. Patrick Scott Major
1722 West Las Olas Boulevard
Fort Lauderdale, Florida 33312

Dear Patrick & Beth:

Thank you for contacting my office with your views on aviation issues.

As you are aware, the Pilot Records Improvement Act of 1996 (PRIA) requires air carriers to request a pilot applicant's flight and legal records when addressing any employment related issue. This initiative, however, specifically prohibits air carriers from using this information for purposes of defamation or invasion of privacy against any employee.

Patrick, while there is currently no legislation pending in Congress which would amend PRIA, please be assured that I will have your comments in mind should any legislation regarding this law be presented before the full Senate for review. I will continue to closely monitor any negative effects this law may have on our nation's aviation employees, and I appreciate your sharing your concerns with me regarding this important issue.

With kind regards,

Sincerely,

United States Senator

BG/js

228



Patrick Major

**Fax Letter**
This fax contains 2 pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

**Fax To:** Senator Connie Mack , 517 Hart Senate Office Building, Washington, DC 20510
**Fax Phone:** (202) 224-8022, **Local phone:** (813) 225-7683
**From:** Pat Major
**Date:** April 09, 1999
**Subject:** Pilot Records Improvement Act of 1996, 49 USC 44936 (F).

Please investigate, identify and eliminate the threat to flight safety represented by abuse of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) [PRIA]. Insidiously, air carriers may routinely exploit the law in order to coerce pilot complicity in unwise, illegal, or unsafe flight practices. Pilots acting on behalf of safety and regulatory compliance, exercising their rights with regard to equity in the workplace, or participating in protected concerted activity to improve working conditions and pay, may face records corruption and defilement by employers retaliating against them. The PRIA provides unethical employers a means of coercion and revenge while affording little recourse to victimized flight officer employees. As a result, a law crafted to improve air safety may be having precisely the opposite effect.

In the past, flight officers disagreeing with an employer's policies, practices or procedures had a range of options available. The PRIA, however, has armed employers with an extraordinarily coercive tool of recrimination and reprisal. Simulator, or proficiency check (PC), abuse has been a pattern and practice among air carriers for some time; many a management grudge has been "Settled" during the PC by humiliating flight officers reluctant to look the other way when safety or regulatory compliance is compromised. The PRIA represents a means whereby employers can convert that practice into career annihilation.

My personal experience with Amerijet International, Inc. a Ft. Lauderdale based regional freight carrier, is a good example. Beginning in 1992, I called to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the dispute internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to captain, forever. That denial, alone, following eight years employment, seriously undermines my career prospects; not only with Amerijet, but as I attempt to seek employment elsewhere. Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). Once notified that age discrimination charges had been filed, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity, then promised to soil my records. This is a guilefully coercive exploitation of the PRIA.

231

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

Concerning the charge of "Stalking:". Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership. Once notified of the investigation by EEOC, Amerijet took the position that my discussion of a civil court verdict and jury award constituted "Stalking". Nothing I did even remotely approximates the most liberal application of that term. However, due to provisions of the PRIA, that charge could be disclosed to potential future airline employers. Stalking is deviant behavior widely regarded as emblematic of psychological instability and unfathomable risk. Once a potential employer saw such an item in the records requested and produced as required by the PRIA, my application would be set aside and a reject letter sent out: the very existence of the charge, however baseless, effectively eliminating my chances for airline employment elsewhere. As a result, I may be locked out of the airline industry, forever. What started as one man trying to make a difference may well become a solitary employee squashed by a powerful employer unconstrained by any regard for truth, the rights of others, fairness, or the laws of the land.

Another example is an Amerijet employee who protested to the company president after enduring an abusive public critique from a training department supervisor. Two months later, that same employee found himself facing the supervisor's superior for his annual PC; the originally scheduled check-airman was replaced minutes before the check ride began. Not only did the flight officer lose his job, his records were tarnished as a result.

While its origin was well-intentioned, The PRIA affords unethical airline executives an unparalleled tool of coercion which places flight officers in the dangerous quandary of having to choose between circumstances which may either threaten their lives or ruin their careers. Pilots refusing duty beyond reasonable limits (e.g. Amerijet and the Federal Aviation Administration Flight Standards District Office [FAA FSDO #17] overseeing its supplemental air carrier certificate, interpret Part 121 duty time regulations to indicate that pilots flying to, from and between foreign destinations may remain continuously on duty for up to six days at a time so long as their actual flight time does not exceed twelve hours within twenty-four), pilots refusing to fly due to insufficient rest between duty periods, who identify and seek to remedy regulatory infractions and threats to air safety, or those who participate in concerted activity to improve working conditions, pay and benefits, may very well find themselves out of a career.

What remedy protects pilot careers when employers choose to coercively exploit the PRIA? What redress is there for safety conscious flight officer employees retaliated against by airlines executives who engage not only the PRIA but FAA officials in their guileful machinations? Please investigate and instigate appropriate amendments to the Pilot Records Improvement Act of 1996, 49 USC 44936 (F). Also, please advise as to what other Federal and State authorities can help set right the malfeasance routinely faced by employees of Amerijet International, Inc.

Sincerely, and with warmest personal regard,

232

Patrick Scott Major
First Officer, Amerijet International, Inc.



**Patrick Major**

Office of Systems Safety
Attn: Sally Steele, ASY300
800 Independence Ave., Southwest
Washington, DC 20591
(800) 255-1111

04-14-1999

Dear Ms Steele,

Al Cook, at DOT'S Office of the Inspector General, suggested I send to you the information
described below. I invite you to contact me at your convenience.

———————

Please investigate, identify and eliminate the threat to flight safety represented by abuse of the
Pilot Records Improvement Act of 1996, 49 USC 44936 (F) (PRIA). Insidiously, air carriers may
routinely exploit the law in order to coerce pilot complicity in illegal, unwise or unsafe flight
practices. Pilots acting on behalf of safety and regulatory compliance, exercising their right to
equity in the workplace, or participating in protected concerted activity to improve working
conditions and pay, may face records corruption and defilement by employers retaliating
against them. PRIA provides unethical employers a means of exploitation and revenge while
affording little recourse to victimized flight officer employees. As a result, a law crafted to
improve air safety may be having the opposite effect.

In the past, flight officers disagreeing with an employer's policies, practices or procedures had a
range of options available. PRIA, however, has armed employers with an extraordinarily
coercive tool of recrimination and reprisal. Simulator, or proficiency check (PC), abuse has been
a pattern and practice among air carriers for some time; many a management grudge has been
"Settled" during the PC by humiliating flight officers reluctant to look the other way when
safety or regulatory compliance is compromised. The PRIA represents a means whereby
employers can routinely convert that practice into career annihilation.

My personal experience with Amerijet International, Inc. a Ft. Lauderdale based regional freight
carrier, is a good example. Beginning in 1992, I called to the attention of chief pilot Ed Cook
certain hazardous materials, weight and balance and other regulatory infractions. My purpose
was to improve air safety and prevent future violations. As a result, I became the target of age
discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the
dispute internally. However, at my last stop, Company President, Chairman, and Chief
Executive Officer, David Bassett expressed his entrenched commitment to punish me for my
actions by denying me promotion to Captain, forever. That denial alone, following eight years

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

233

employment, seriously undermines my career prospects; not only with Amerijet, but as I attempt to seek employment elsewhere. Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC).    Once notified that age discrimination charges had been filed, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity, then promised to soil my employment records with the charge. This is a guilefully coercive exploitation of the PRIA, exemplary of a manner and method which may routinely occur throughout the airline industry...especially at smaller companies where employees cannot be effectively represented by labor unions.

Concerning the charge of "Stalking:" Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety    regulatory compliance, working conditions, benefits and pay.   Indeed, I had twice helped A    rijet avoid union election by persuading flight officers to seek solutions directly within    chain of leadership.  I believe remaining non-union is preferred where mutual trust and    ect can be reestablished between the company at its employees. Once notified of the age    imination investigation by EEOC, however, Amerijet took the position that my discuss    the other flight officer's civil court verdict and jury award constituted "Stalking". Nothing    d remotely approximates the most liberal application of that term.  However, due to p    ns of the PRIA, that charge will be disclosed to potential future airline employers. Sta    is deviant behavior widely regarded as emblematic of psychological instability; one  a po-    employer sees such an item in the records requested and produced as requir- a by    PRIA, my application would be set aside and a reject letter sent out the very e  stence    he charge, however baseless, effectively eliminating my chances for airline emplo  nent ·    ..ere.  As a result, Amerijet has exacted coercive revenge...I may be locked out of the    industry, forever.    What started as one man trying to make a difference may  ll be    a solitary employee squashed by a powerful employer unconstrained by any regard  r tru    e rights of others, fairness, or the laws of the land.

Mine may not be an isolated case.  As an eight year employee with an unblem    d safety record and no history of violations or other certificate action, I have receive    merous commendations from company representatives, customers and pilot employees. I a    garded by some as an expert in my field. Yet, Amerijet has denied me training, opportunity and pay, even embroiling FAA inspectors in their actions against me.  Originally intending to dissuade me from promoting safety, regulatory compliance and equitable treatment of flight officer employees, the company's actions have degenerated into a protracted pattern of treachery, coercion and deceit. The malevolent option PRIA affords this employer can be extrapolated throughout the airline industry;   instead of promoting safety, regulatory compliance, or contributing together to improve working conditions, benefits and pay, flight officer employees can be forced to abide unfathomable risk...the result of the law thus diametrically opposed to its intent.

Another example of coercive exploitation of the PRIA is an Amerijet employee who complained to the company president after enduring a very public and abusive critique from a training department supervisor.  Two months later, that same employee found himself facing the supervisor's superior for his PC; the originally scheduled check-airman replaced minutes before the check ride began. Not only did the flight officer lose his job, his records were tarnished as a result.    234

Originating from the best intentions of a legislature resolute to improve air safety, PRIA affords unethical airline executives an unparalleled tool of coercive exploitation...placing flight officers in the dangerous quandary of having to choose between circumstances which may either threaten their lives or ruin their careers.    Pilots refusing duty beyond reasonable limits (e.g. Amerijet and the FAA Flight Standards District Office [FSDO #17] overseeing its supplemental air carrier certificate interpret Part 121 duty time regulations to indicate that pilots flying to, from and between international destinations may remain on duty continuously for up to six days at a time so long as their actual flight time does not exceed twelve hours within twenty-four), pilots refusing to fly due to insufficient rest between duty periods, who identify and seek to remedy regulatory infractions and threats to air safety, or those who participate in concerted activity to improve working conditions, pay and benefits, may very well find themselves out of a career.

What remedy protects pilot careers when employers choose to coercively exploit the PRIA? What redress is there for safety conscious flight officer employees retaliated against by airline executives engaging FAA officials in guileful machinations against them?

Please investigate and instigate appropriate amendments to the Pilot Records Improvement Act of 1996, 49 USC 44936 (F).   Also, specifically, please advise as to what other Federal and State authorities can help set right the malfeasance routinely faced by employees of Amerijet International, Inc.

Sincerely, and with warmest personal regard,


Patrick Scott Major
First Officer, Amerijet International, Inc.

235



### Patrick Major

**Fax Letter**

This fax contains 2 pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

**Fax To:** National Labor Relations Board Resident Office, Federal Building, Room 1320, Miami, Florida 33130-1608
**Fax Phone:** (305) 536-5320, **Local phone:** (305) 536-5391
**From:** Pat Major
**Date:** April 09, 1999
**Subject:** Pilot Records Improvement Act of 1996, 49 USC 44936 (F).

I believe Amerijet International, Inc. a Ft. Lauderdale based regional freight air carrier, has violated my right to engage in protected concerted activity.

In 1992, I began calling to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. Additionally, I sought to help eliminate Amerijet's long-standing practice of discrimination against women and African Americans, and to work together with other crewmen, within the chain of leadership, to help create effective training and evaluation methodologies, as well as tools to replace capricious, arbitrary and often cruel practices toward flight officer employees. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the problem internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to captain, forever. That denial, following eight years employment, seriously undermined my career; not only with Amerijet, but as I seek employment elsewhere.

Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). But once notified that age discrimination charges were under investigation, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity, then promised to soil my records, demanding that all such activity immediately stop. This is a guilefully coercive exploitation of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) [PRIA] and a blatant violation of my rights.

Concerning the charge of "Stalking:" Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership. Once notified of the investigation by EEOC, however, Amerijet took the position that my discussion with other flight officers concerning the other crewman's civil court verdict and jury award constituted "Stalking".

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

238

Nothing I did even remotely approximates the most liberal application of that term. Due to provisions of the PRIA, however, that charge could be disclosed to potential future airline employers. Stalking is deviant behavior widely regarded as emblematic of psychological instability and unfathomable risk. Once a potential employer saw such an item in the records requested and produced as required by the PRIA, my application would be set aside and a reject letter sent out: the very existence of the charge, although baseless, effectively eliminating my chances for airline employment elsewhere. As a result, Amerijet's retaliation may lock me out of the airline industry, forever. What started as one man trying to make a difference may well become a solitary employee squashed by a powerful employer unconstrained by any regard for truth, the rights of others, fairness, or the laws of the land.

I am an eight year Amerijet employee with an unblemished safety record and no history of violations or other certificate action. I have received numerous commendations from company representatives, customers and pilot employees. I am regarded by some as an expert in my field. Yet, Amerijet has denied me training, opportunity and pay, even seeking to embroil representatives of the FAA in their actions against me. Intending to dissuade me from concerted activities promoting safety, regulatory compliance and equitable treatment of flight officer employees, Amerijet's actions have degenerated into outright coercion and deceit.

I need guidance, soon. Considering all that has passed, dare I risk continued exposure to this employer? I work aboard aircraft operating in international airspace, landing in foreign countries, off-loading and on-loading freight, then returning to Miami International Airport. Having taken such a desperate step as to accuse me of stalking, what additional treachery awaits?

Be advised, this employer has publicly disparaged and criticized me through current and former employees. Their actions have already impeded my ability to generate income elsewhere. Amerijet management appears resolute not only in creating an employment environment hostile and injurious to me, but in eliminating any chance I might have to fly anywhere else. The purpose is to make an example of me to others who might consider taking action on behalf of safety, regulatory compliance and fairness toward other employees.

The circumstances are grievous and my options seem to decrease with each passing day. Please, I need your help. Contact me, directly.

Sincerely, and with warmest personal regard,

Patrick Scott Major
First Officer, Amerijet International, Inc.

239



United States Government

**NATIONAL LABOR RELATIONS BOARD**

Region 12

First Bank of America Plaza, Suite 530

201 E. Kennedy Blvd.

Tampa, Florida 33602                                    Telephone (813) 228-2641

April 28, 1999

Patrick Major
1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312

                              Re:    Prospective Charge

Dear Mr. Major:

Please excuse the delay in responding to your letter requesting advise on a situation involving your employment with Amerijet.

The National Labor Relations Board has no jurisdiction over the railway and airline industry and thus we are unable to assist you. However, while the National Mediation Board, which addresses representation questions and election questions under the Railway Labor Act, 45 USC Section 151 et seq. (i.e. railway and airline industries) does not have unfair labor practice jurisdiction, they may be of some assistance to you. Their address and telephone number is as follows:

    National Mediation Board
    1301 K Street NW
    Suite 250 East
    Washington, DC 20572
    Phone: 202 523 5920

                                    Sincerely,

                                    Patricia Prettyman
                                    Field Examiner

in advising

236

 United States Government

## NATIONAL LABOR RELATIONS BOARD

Region 12 - Miami Resident Office

51 S.W. First Avenue - Room 1320

Miami, FL 33130-1608

Telephone: 305/536-5391
Fax:        305/536-5320

April 12, 1999

Patrick Scott Major
1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312

Re: Inquiry

Dear Mr. Major:

We are in receipt of your letter dated April 9, 1999 and are responding accordingly. It appears that your claim would fall under the jurisdiction of the National Mediation Board (NMB) since your Employer is subject to the Railway Labor Act (RLA) and not the National Labor Relations Act (NLRA). Section 2(2) of the NLRA, under which our agency has jurisdiction, specifically excludes those employers who are common carriers by air engaged in interstate or foreign commerce. Therefore, we believe that it would be prudent for you to pursue your claim with the NMB, whose address and telephone number is as follows:

> National Mediation Board
> 1425 K Street, N.W.
> Washington, DC 20572
> (202) 523-5920        *FAX  202  692  5086*

Should you have any further inquiries, please do not hesitate to contact our office.

Sincerely,

Jennifer Burgess-Solomon
Field Attorney

237



### Patrick Major

**Fax Letter**

This fax contains **2** pages. If not complete, contact me at (954) 763-7019, or (954) 614-1507.

Fax To: Hon. Alcee Hastings, 2701 West Oakland Park Blvd #200, Oakland Park, FL 33311
Fax Phone: (954) 735-9444, **Local phone:** (954) 733-2800 **Washington Phone:** (202) 225-1313
**From:** Pat Major
**Date:** April 09, 1999
**Subject:** Pilot Records Improvement Act of 1996, 49 USC 44936 (F).

Please investigate, identify and eliminate the threat to flight safety represented by abuse of the Pilot Records Improvement Act of 1996, 49 USC 44936 (F) [PRIA]. Insidiously, air carriers may routinely exploit the law in order to coerce pilot complicity in unwise, illegal, or unsafe flight practices. Pilots acting on behalf of safety and regulatory compliance, exercising their rights with regard to equity in the workplace, or participating in protected concerted activity to improve working conditions and pay, may face records corruption and defilement by employers retaliating against them. The PRIA provides unethical employers a means of coercion and revenge while affording little recourse to victimized flight officer employees. As a result, a law crafted to improve air safety may be having precisely the opposite effect.

In the past, flight officers disagreeing with an employer's policies, practices or procedures had a range of options available. The PRIA, however, has armed employers with an extraordinarily coercive tool of recrimination and reprisal. Simulator, or proficiency check (PC), abuse has been a pattern and practice among air carriers for some time; many a management grudge has been "Settled" during the PC by humiliating flight officers reluctant to look the other way when safety or regulatory compliance is compromised. The PRIA represents a means whereby employers can convert that practice into career annihilation.

My personal experience with Amerijet International, Inc. a Ft. Lauderdale based regional freight carrier, is a good example. Beginning in 1992, I called to the attention of the chief pilot certain hazardous materials, weight and balance and other regulatory infractions. My purpose was to help develop systems that would improve air safety and prevent future violations. As a result, I became the target of age discrimination and reprisal. I exhausted the chain of leadership in an effort to resolve the dispute internally. However, at my last stop, Company President, Chairman, and Chief Executive Officer, David Bassett expressed his entrenched commitment to deny me promotion to captain, forever. That denial, alone, following eight years employment, seriously undermines my career prospects; not only with Amerijet, but as I attempt to seek employment elsewhere. Accordingly, I sought redress though the Miami Office of the Equal Employment Opportunity Commission (EEOC). Once notified that age discrimination charges had been filed, Amerijet retaliated by labeling as "Stalking" my involvement in protected concerted activity, then promised to soil my records. This is a guilefully coercive exploitation of the PRIA.

**241**

1722 West Las Olas Blvd. Ft. Lauderdale, FL 33312
Personal Voice and Fax: (954) 763-7019,
C-Ph: (954) 614-1507, Email: pmajor4178@aol.com

Concerning the charge of "Stalking:" Exemplifying the recent success of another flight officer, I had strived to demonstrate to fellow pilots that there are means perhaps more effective than unionization which can produce desired and lasting improvements in safety, regulatory compliance, working conditions, benefits and pay. Indeed, I had twice helped Amerijet avoid union election by persuading flight officers to seek solutions directly within the chain of leadership. Once notified of the investigation by EEOC, Amerijet took the position that my discussion of a civil court verdict and jury award constituted "Stalking". Nothing I did even remotely approximates the most liberal application of that term. However, due to provisions of the PRIA, that charge could be disclosed to potential future airline employers. Stalking is deviant behavior widely regarded as emblematic of psychological instability and unfathomable risk. Once a potential employer saw such an item in the records requested and produced as required by the PRIA, my application would be set aside and a reject letter sent out: the very existence of the charge, however baseless, effectively eliminating my chances for airline employment elsewhere. As a result, I may be locked out of the airline industry, forever. What started as one man trying to make a difference may well become a solitary employee squashed by a powerful employer unconstrained by any regard for truth, the rights of others, fairness, or the laws of the land.

Another example is an Amerijet employee who protested to the company president after enduring an abusive public critique from a training department supervisor. Two months later, that same employee found himself facing the supervisor's superior for his annual PC; the originally scheduled check-airman was replaced minutes before the check ride began. Not only did the flight officer lose his job, his records were tarnished as a result.

While its origin was well-intentioned, The PRIA affords unethical airline executives an unparalleled tool of coercion which places flight officers in the dangerous quandary of having to choose between circumstances which may either threaten their lives or ruin their careers. Pilots refusing duty beyond reasonable limits (e.g. Amerijet and the Federal Aviation Administration Flight Standards District Office [FAA FSDO #17] overseeing its supplemental air carrier certificate, interpret Part 121 duty time regulations to indicate that pilots flying to, from and between foreign destinations may remain continuously on duty for up to six days at a time so long as their actual flight time does not exceed twelve hours within twenty-four), pilots refusing to fly due to insufficient rest between duty periods, who identify and seek to remedy regulatory infractions and threats to air safety, or those who participate in concerted activity to improve working conditions, pay and benefits, may very well find themselves out of a career.

What remedy protects pilot careers when employers choose to coercively exploit the PRIA? What redress is there for safety conscious flight officer employees retaliated against by airlines executives who engage not only the PRIA but FAA officials in their guileful machinations? Please investigate and instigate appropriate amendments to the Pilot Records Improvement Act of 1996, 49 USC 44936 (F). Also, please advise as to what other Federal and State authorities can help set right the malfeasance routinely faced by employees of Amerijet International, Inc.

Sincerely, and with warmest personal regard,

242

Patrick Scott Major
First Officer, Amerijet International, Inc.



ALCEE L. HASTINGS

COMMITTEE ON
INTERNATIONAL RELATIONS

SELECT COMMITTEE
ON INTELLIGENCE

## Congress of the United States
### House of Representatives
#### Washington, DC 20515-0923
June 18, 1999

Mr. Patrick S. Major
1722 W Las Olas Boulevard
Fort Lauderdale, Florida 33312-7517

Dear Mr. Major:

Thank you for emailing me regarding the Pilot Records Improvement Act. I appreciate the time you took to share your concerns with me, and I welcome the opportunity to respond.

As you know, the Pilot Records Improvement Act became public law in 1996. It requires air carriers to request and receive a pilot applicant's record for the previous five years with respect to the current airman certificate, including any summary of legal enforcement actions; employment; and motor vehicle driving. Moreover, section 502 of this act prohibits any Federal or State court action for defamation or invasion of privacy against any carrier or person with respect to the furnishing or use of such records. To that end, I understand that it would be possible for airlines to abuse these provisions, and I sympathize with your position.

Currently there is no legislation that addresses your concerns and this specific issue. However should such legislation be considered before the full House of Representatives, I will surely keep your views in mind.

Once again, thank you for your letter. If I may be of further assistance with this matter, or any other of mutual concern, please do not hesitate to contact me. With warm regards, I remain,

Sincerely,

Alcee L. Hastings
Member of Congress

ALH:sl

**240**

PRINTED ON RECYCLED PAPER

```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF FLORIDA

      CASE NO.  00-6070-Ferguzon/Snow

PATRICK SCOTT MAJOR,          )  L.T. CASE NO.
                              )  99-021746-11
          Plaintiff,          )
                              )
vs.                           )
                              )
AMERIJET INTERNATIONAL, INC., )
                              )
          Defendant.          )
. . . . . . . . . . . . . . . .)

             1050 Lee Wagener Blvd.
             Fort Lauderdale, Florida
             Tuesday, February 13, 2001
             9:10 a.m. - 11:35 a.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

          ---------------------------------

               DEPOSITION

                   OF

           JOHN C. ROSEBOROUGH

          ---------------------------------

DOWNTOWN REPORTING    (954) 522-3576
```

---

Page 2

I N D E X

                                        Page

DIRECT EXAMINATION                        3
BY VALERIE SHEA, ESQ.
Heinrich, Gordon, Hargrove, Weihe & James, P.A.
500 East Broward Blvd. - Suite 1000
Fort Lauderdale, FL  33394

CROSS-EXAMINATION                        78
BY SUSAN POTTER NORTON, ESQ.
Allen, Norton & Blue, P.A.
121 Majorca Avenue - Suite 300
Coral Gables, FL  33134

REDIRECT EXAMINATION                     84
BY MS. SHEA

RECROSS-EXAMINATION                      91
BY MS. NORTON

REDIRECT EXAMINATION                     94
BY MS. SHEA

RECROSS-EXAMINATION                      96
BY MS. NORTON

          E X H I B I T S

                          MARKED FOR
                          IDENTIFICATION

Plaintiff's Exhibit 39          22

Plaintiff's Exhibit 40          41

Plaintiff's Exhibit 41          47

Plaintiff's Exhibit 42          52

Plaintiff's Exhibit 43          54

Plaintiff's Exhibit 44          59

Plaintiff's Exhibit 45          59

Plaintiff's Exhibit 46          75
      (Exhibits retained by Attorney Shea.)

---

Page 3

1          Deposition of JOHN C. ROSEBOROUGH, a
2  witness of lawful age, taken by the Plaintiff for
3  the purpose of discovery and for use as evidence in
4  the above-entitled cause, wherein PATRICK SCOTT
5  MAJOR is the Plaintiff, and AMERIJET INTERNATIONAL,
6  INC. is the Defendant, pending In The United States
7  District Court, For the Southern District Of
8  Florida, pursuant to notice heretofore filed, before
9  BEVERLY J. GRAMM, Registered Professional Reporter
10 and Notary Public in and for the State of Florida at
11 Large, at the offices of FAA Flight Standards
12 District Office 17, Fort Lauderdale Jet Center,
13 Suite 201, 1050 Lee Wagener Boulevard, Fort
14 Lauderdale, Florida, on the 13th day of February,
15 2001, commencing at 9:10 o'clock a.m.
16          ------------------------------
17 THEREUPON,
18              JOHN C. ROSEBOROUGH
19 a witness named in the notice heretofore filed,
20 being of lawful age, and being first duly sworn in
21 the above cause, testified on his oath as follows:
22              DIRECT EXAMINATION
23 BY MS. SHEA:
24     Q.  Sir, can you tell us your full name,
25 please, and where you work?

---

Page 4

1     A.  John C. Roseborough, at FAA Fort
2  Lauderdale FSDO.
3     Q.  What's FSDO?
4     A.  Flight Standards District Office.
5     Q.  FAA is?
6     A.  Federal Aviation Administration.
7     Q.  All right.  And where is your office
8  located?
9     A.  At the Fort Lauderdale-Hollywood
10 International Airport.
11    Q.  All right.  And what does the Flight
12 Standard District Office of the FAA do here at Fort
13 Lauderdale Airport?
14    A.  We oversee airlines, aircraft operators,
15 airmen and any aviation enterprise that we regulate.
16    Q.  All right.  Is that restricted to airlines
17 that are based here in Fort Lauderdale or does it
18 encompass all the airlines that use the airport?
19    A.  All the airlines that use the airport.  We
20 have geographic responsibility for.
21    Q.  And what is your job here?
22    A.  I'm a principal operations inspector.
23    Q.  Is that also known as POI?
24    A.  That's correct.
25    Q.  And what do you do, sir, as principal

Page 5

1 operations inspector?
2    A. I oversee the operations of airlines for
3 which I am assigned to ensure that their training
4 programs and their operational procedures are in
5 accord with federal aviation regulations, FAR.
6    Q. All right. Let's break that down a little
7 bit. You're assigned a number of airlines, so there
8 are other POIs for other airlines?
9    A. That's correct.
10    Q. And your job responsibilities are for the
11 training portions of those airlines?
12    A. Training portions of their pilots, their
13 flight engineers and if they have flight attendants,
14 their flight attendants.
15    Q. All right. And operations, what does that
16 encompass?
17    A. All movements of the aircraft for the
18 purpose of flight. Their general operations manual,
19 their weight and balance manual, certain portions of
20 their fueling manual, their minimum equipment lists.
21 Everything that is operationally involved with the
22 carrier.
23    Q. All right. So your job is to ensure
24 compliance with the scheme of federal regulations
25 and laws?

Page 6

1    A. That's correct.
2    Q. Okay. Now, you are not responsible for
3 the maintenance aspects of the aircraft; is that
4 right?
5    A. That's correct. That's correct.
6    Q. All right. Any other major areas of an
7 airlines operation that does not come under your
8 division?
9    A. Um, could you clarify your question?
10    Q. Well, maintenance is one major aspect of
11 the airlines.
12    A. Maintenance is one, avionics is one.
13 Avionics is -- an avionics inspector maintains it
14 and airworthiness inspector.
15    Q. But in terms of understanding what you
16 oversee, it would be most of what the airline does
17 in its day-to-day operations?
18    A. The flying of the aircraft, the pilots,
19 the flight engineers and the flight attendants if
20 it's a passenger airline.
21    Q. All right. Back in August of 1999, what
22 airlines were you assigned to be POI to?
23    A. Amerijet and Custom Air Transport.
24    MS. NORTON: I'm sorry, Counsel, I didn't
25 hear your year.

Page 7

1    MS. SHEA: Back in August of 1999.
2    MS. NORTON: '99, okay. Thank you.
3 Excuse me.
4 BY MS. SHEA:
5    Q. Has that changed since then?
6    A. In addition to those two, I have Gulf and
7 Caribbean, which operates Convair 580's out of
8 Rincon and Puerto Rico, down to the Dominican
9 Republic. I also have a dispatcher school which
10 certifies dispatchers under FAR. Part of that's
11 Sheffield School of Aeronautics, which I have had
12 for years.
13    Q. All right. When did Amerijet first become
14 an airline over which you had this supervision?
15    A. I don't know when they first became an
16 airline. I assumed responsibility for them in May
17 of 1998.
18    Q. Was that at or about the time that
19 Amerijet moved its operations from Miami to Fort
20 Lauderdale?
21    A. No. They have been here for some period
22 of time.
23    Q. I see. All right, sir. In or about
24 August of 1999, did you receive a report of a
25 possible FAA or FAR violation concerning Amerijet?

Page 8

1    A. I really don't know. You'd have to be
2 more specific.
3    Q. All right. Did you receive a report in or
4 about August of 1999, concerning a possible
5 overweight takeoff by an Amerijet aircraft at Fort
6 Lauderdale Airport?
7    A. Written or verbal?
8    Q. Well, I don't know. So I -- did you
9 receive an oral report?
10    A. At some point in time, I don't recall
11 when, Mr. Major asked to speak with me. And we met
12 I believe in this conference room and we had a
13 discussion that was guaranteed to stay off the
14 record, meaning that everything said in this room
15 was to stay in this room.
16    Q. All right. You can't date that
17 conversation?
18    A. No, ma'am, I can't.
19    Q. All right. So would you consider that an
20 oral report of a possible violation?
21    MS. NORTON: Object to the form of the
22 question.
23    A. I don't -- I do not recall the
24 circumstances of that meeting. I granted this man
25 the opportunity to tell me something that concerned

| Page 9 | Page 11 |
|---|---|

**Page 9**

1  him, with the understanding that what was said would
2  stay in this room, would not go out. I asked him at
3  the time to put in writing what his concerns were
4  and to send them to me and upon receipt I would
5  conduct an investigation.
6  BY MS. SHEA:
7      Q. All right. Did there come a time after
8  that meeting when you received a written report from
9  Mr. Major?
10      A. There did. It was about October the 4th,
11  I believe.
12      Q. Of 1999?
13      A. Yes, ma'am.
14      Q. All right. And did you thereafter conduct
15  an investigation?
16      A. No, ma'am, I did not. The report came in
17  perhaps on the Friday before that Monday. The
18  Saturday night before that Monday my mother passed
19  away, so that Monday, which I had walk-in duty, to
20  accommodate all people that come in the office on
21  all phone calls, I noticed that a report in a brown
22  envelope had come from Mr. Major. I did not examine
23  the contents.
24      I spent the day resolving walk-ins and
25  making reservations for my family to travel to San

**Page 11**

1  resolved and prepared for adjudication by our
2  regional counsel's office in Atlanta.
3      Q. All right. So you did prepare a written
4  investigation?
5      A. I did an investigation, I prepared an
6  enforcement investigative report, with items
7  approved to substantiate the findings within that
8  investigation.
9      Q. All right. And are you -- were you the
10  author of the enforcement investigation report?
11      A. Yes.
12      Q. Do I detect anything from the tone of your
13  testimony that you felt Mr. Major was out of line or
14  that you resented having this report --
15          MS. NORTON: I object to the form of the
16  question.
17  BY MS. SHEA:
18      Q. -- made to you?
19          MS. NORTON: And I detect exactly the
20  opposite, a very precise delivery. I object to any
21  characterization by counsel.
22          THE WITNESS: Ask your question again,
23  Miss Shea.
24  BY MS. SHEA:
25      Q. Do you have any resentment towards Mr.

**Page 10**

1  Antonio for my mother's funeral. The funeral was on
2  Wednesday, we returned on Thursday and I had been
3  on -- then I was on scheduled annual leave for the
4  next two or three weeks.
5      When I came back from annual leave, I
6  determined that Mr. Major must have become impatient
7  because he forwarded his complaint to the Office of
8  the Inspector General of the Secretary of
9  Transportation. And at that time an investigation
10  was conducted.
11      Q. All right. How did you become aware that
12  the Office of Inspector General of the Department of
13  Transportation was conducting an investigation?
14      A. It was in written form.
15      Q. A notification to you from them?
16      A. Something like that. I don't recall the
17  exact situation. As I said, my mother died about
18  that time and I have very vague memory of specifics
19  around Mr. Major.
20      Q. All right. What, if anything, were you
21  asked to do in terms of the investigation?
22      A. I was directed to do the investigation
23  that I would otherwise have done had it not been
24  forwarded to the secretary. And I did conduct the
25  investigation, and the investigation is being

**Page 12**

1  Major for having made the report?
2      A. Not for making the report, but for
3  bringing this action. Because what was discussed in
4  this room was to stay in this room, and this man did
5  not honor his word in that regard.
6      Q. Oh, great. Let's hear about that. What
7  transpired in this room that you feel was breached
8  by his making a report?
9          MS. NORTON: Object to the form of the
10  question.
11      A. Not by him making a report. I told him
12  that I would go forward with nothing, I would not
13  implicate him in any way except by his written
14  request and I would use only those items of
15  information that he provided me in writing. I
16  requested that he take nothing out of this room
17  himself, which he has done.
18  BY MS. SHEA:
19      Q. What did he allege -- what did he
20  allegedly take out of this room?
21      A. If he had taken nothing, we would not be
22  having this deposition.
23      Q. Then what did he take out of this room?
24  What's your sworn testimony under oath that my
25  client removed from a conference room in the FAA

Page 13

1  office in Fort Lauderdale Airport?
2  A. The discussion itself.
3  Q. Okay. No documents?
4  A. No.
5  Q. All right. What did you tell him in that
6  room that he allegedly took out of this room, what
7  statements?
8  A. I really don't remember the dialogue of
9  the conversation that occurred, except that it
10 pertained to his perception of an overweight takeoff
11 by Amerijet.
12 Q. Well, he had a perception of an overweight
13 takeoff that he discussed with you. This was your
14 first notification or knowledge of this incident;
15 correct?
16 A. As I recall, it was.
17 Q. Amerijet had not made any report to you
18 concerning the same flight?
19 A. Not that I can recall.
20 Q. Okay. So when Mr. Major expressed his
21 perception concerning a possible overweight takeoff,
22 what was your response to him?
23 A. Put it in writing and send it to me.
24 Q. All right. Now, what is it -- and he did
25 that.

Page 14

1  A. That's what was received on about October
2  the 4th, that I didn't have a chance to look at
3  until the latter part of the month when it had
4  already been turned over to the Office of Secretary.
5  Q. So the Secretary of Transportation. So
6  what is it that you claim he took out of this
7  office?
8  A. I requested -- he requested that I grant
9  him an off the record conversation, and I said
10 that's fine. I said that's fine, I have done this
11 before, with the understanding that what is said in
12 this room stays in this room. And that being said,
13 the issues involved with that meeting are being
14 discussed today. That was not supposed to occur.
15 Q. Well, if you grant an off-the-record
16 meeting, that would be out of protecting him, not
17 you; right?
18 A. It was both ways. He was to not go
19 forward with anything that I may have said, I was
20 not to go forward with anything that he said.
21 Q. So you feel as though there's a chain of
22 command issue here that he --
23    MS. NORTON: Object to the form of the
24 question.
25 A. He should have gotten my permission before

Page 15

1  he contacted you in regard to the meeting that we
2  had.
3  BY MS. SHEA:
4  Q. So before he sought legal advice he should
5  have gotten permission from you?
6  A. In regard to the meeting that we had, yes.
7  Q. Well, what basis do you have for stating
8  that the meeting that he had with you is in any way
9  a factor in this lawsuit?
10 A. I'm not saying that it is.
11 Q. You don't have any information --
12 A. I'm saying that the very fact that we had
13 a meeting that has been raised in this deposition is
14 that he did not honor his word to me.
15 Q. You felt that you extracted a commitment
16 from him that he would address a report only --
17 A. It was not extracted, it was given.
18 Q. That he would not discuss this matter with
19 anyone other than you?
20 A. That's correct.
21 Q. But you were not going to do anything
22 about it until you got a written report; correct?
23 A. And I didn't.
24 Q. And he certainly didn't -- you're not
25 accusing my client of waiting until your mother's

Page 16

1  unfortunate passing to slip this report in, are you?
2  A. No. What I stated is the report arrived
3  at a very unfortunate time, and before I could get
4  to it, it appears to me that he grew impatient and
5  wanted immediate action, so he forwarded it to the
6  Secretary of Transportation, the Office of the
7  Attorney -- or the Office of the Inspector General.
8  Q. And that makes you angry?
9     MS. NORTON: Object to the form of the
10 question.
11 A. Not -- it doesn't make me angry.
12 BY MS. SHEA:
13 Q. You seem as though you're angry.
14    MS. NORTON: Object to the form of the
15 question. I don't detect any anger.
16 A. I'm angry --
17    MS. NORTON: Let the record reflect,
18 you're characterizing stuff, Counsel. And I can put
19 an opposite characterization down.
20 BY MS. SHEA:
21 Q. Sir, you started to say I'm angry. Please
22 tell me why you are angry.
23 A. I am not happy that Mr. Major brought up a
24 meeting that was not supposed to have been divulged.
25 Q. How did -- what are you talking about that

Page 17

1  he brought up this meeting?
2      A. What are you deposing me for, this
3  meeting?
4      Q. I'll represent to you, I've never heard of
5  this meeting ever before today. So tell me what's
6  the basis for your statement that Pat Major divulged
7  to anyone a meeting that you claim was to be
8  confidential, what's the basis of that statement?
9      A. What are the issues of the deposition?
10      Q. I'm not answering any more of your
11  questions, you're here to answer mine. But you've
12  given sworn testimony under oath that this lawsuit
13  violated a meeting that was confidential between you
14  and Pat Major. I want you to tell me the factual
15  basis for that statement, because I don't know what
16  you're talking about.
17      MS. NORTON: Miss Shea, Mr. Roseborough is
18  not here represented by counsel and I don't think
19  it's appropriate for you to sit here and poke your
20  finger at him. There's a way of asking questions
21  and there's a was not to. And I object on the
22  record.
23      MS. SHEA: I'm offended.
24      MS. NORTON: Well, I'm offended by your
25  using your finger and pointing it at him repeatedly

Page 18

1  like that. So for mutually -- if we're mutually
2  offended, why don't you rephrase the question.
3  BY MS. SHEA:
4      Q. I don't mean to intimidate you, but I do
5  need to ask you for the basis of your sworn
6  testimony that you just offered, that you had a
7  meeting with Pat Major that was supposed to be
8  confidential and that he's breached that
9  confidentiality.
10      A. It is my perception that this deposition
11  is a result of that meeting that occurred that was
12  to remain off the record. If that is not true, then
13  I have a misperception.
14      Q. Okay. You'll concede that?
15      MR. MAJOR: I accept your apology.
16      A. Yes, ma'am, I will concede that.
17  BY MS. SHEA:
18      Q. You don't have any file materials, any
19  documents that you've seen --
20      A. No, ma'am. All this is, is my subpoena
21  and a note that I am not to waive for my review
22  rights.
23      Q. That's fine. But this will go better if
24  you let me finish my question before you start to
25  answer it.

Page 19

1      A. Certainly.
2      Q. Have you had a file in these matters?
3  Obviously, in this whole investigation.
4      A. There is a file that resides in Atlanta
5  and we have an office file, that's correct.
6      Q. All right. And there's nothing in that
7  file that you've reviewed that involves any
8  disclosure of this meeting by Mr. Major?
9      A. I haven't reviewed that file since I had
10  completed it and sent it to Atlanta.
11      Q. But there's nothing as we sit here today
12  that you're thinking of that you consider a
13  violation of the confidentiality that you agreed to?
14      A. No, ma'am.
15      Q. All right. And even though this report
16  that originally came to you ended up having a
17  duplicate copy forwarded to someone else, you would
18  have investigated it anyway; right?
19      A. That's correct.
20      Q. Okay. So regardless of whether the
21  Department of Transportation ever got involved, you
22  as the principal operations inspector for Amerijet,
23  having gotten a written report alleging the
24  violation Mr. Major alleged, would have done exactly
25  what you did?

Page 20

1      A. Would have done the same investigation.
2      MS. NORTON: Object the form of the
3  question.
4      A. The same investigation in the same, exact
5  manner.
6  BY MS. SHEA:
7      Q. So other than your perception that Mr.
8  Major breached the privacy of a meeting that you
9  wanted --
10      A. No. He asked for the meeting, not me.
11      Q. Right. But you're upset about the privacy
12  of the meeting.
13      MS. NORTON: Object to the
14  characterization. Object to the form of the
15  question. Excuse me.
16      A. I'm disappointed and I'm somewhat taken
17  aback by it.
18  BY MS. SHEA:
19      Q. If it happened. If there was a breach of
20  that meeting.
21      A. That's correct.
22      Q. All right. And you as a government
23  official are upset that meeting was not private
24  why? If in fact that was the case.
25      A. Because it was an off-the-record meeting.

Page 21

1  Q. Well, why would a government official
2  who's charged with the safety and operational
3  compliance of the airline want an off-the-record
4  meeting?
5  A. I did not. This gentleman did.
6  Q. All right. So if it was for his
7  protection that it was off the record, why would you
8  be upset if it was discussed later? Assuming that
9  it was.
10  A. I think I've already responded to that.
11  MS. NORTON: Object. Asked and answered.
12  BY MS. SHEA:
13  Q. All right. So we've established you don't
14  know whether it was ever discussed by Mr. Major
15  again. Have you ever seen anything written by Pat
16  Major, attributed to Pat Major, credited to Pat
17  Major, which discusses this meeting?
18  A. Not that I can recall.
19  Q. All right. So this enforcement
20  investigation report is a form of report that you're
21  familiar with doing, that you've done other ones
22  before?
23  A. I've done hundreds of them.
24  Q. I'm sorry, hundreds?
25  A. Yes, ma'am.

Page 22

1  Q. And what is the method of proceeding? How
2  do you do an enforcement investigation report?
3  A. You examine, inspect all of the peripheral
4  data, all of the determined data known to exist. In
5  this instance that would involve information from
6  the Fort Lauderdale air traffic control tower,
7  information from Amerijet's records, which they are
8  required by 121 to maintain, statements from all of
9  the crew members involved and statements from any
10  eyewitnesses.
11  Q. Did you take all of those steps in regard
12  to Pat Major's written report?
13  A. Yes, I did.
14  Q. And when you have gathered all that
15  information, what, if any, responsibilities do you
16  have to assess it or evaluate it?
17  A. I take what information I gather and based
18  upon my experience and my knowledge and my exposure
19  to training that I've had within the FAA. I apply a
20  certain credibility factor, then arrive at a
21  determination of a prima facie case.
22  If I feel that there is a prima facie case
23  for which the administrator can produce a
24  preponderance of the evidence, then I go forward and
25  I complete the report, complete with items of proof

Page 23

1  in a specific form, in accordance with a 2150 order,
2  which is our compliance and enforcement order.
3  I present the report to my supervisor, who
4  then forwards it to the office manager, who then
5  forwards it to Atlanta for review by the flight
6  standards division, who then forwards it to the
7  regional counsel's office for their review,
8  processing and eventual adjudication.
9  Q. Once it leaves your hands, what, if any,
10  ongoing responsibilities do you have in an
11  investigation?
12  A. Only to follow up if the flight standards
13  division or the regional attorney wants additional
14  items of proof, additional information, or anything
15  that I have not supplied.
16  Q. All right. So if I understand you
17  correctly, you gather all the information and you
18  make an initial weighing or assessment about whether
19  there's enough to justify putting together a full --
20  A. That's correct.
21  MS. NORTON: Object to the form of the
22  question.
23  BY MS. SHEA:
24  Q. -- enforcement investigation report?
25  A. Yes, ma'am.

Page 24

1  MS. NORTON: Object to the form of the
2  question.
3  BY MS. SHEA:
4  Q. And if I call that an EIR, is that a
5  shorthand term for that report?
6  A. Yes, ma'am.
7  Q. Did you open one or more files concerning
8  Pat Major's report?
9  A. Yes. There was one opened on Pat Major,
10  there was one opened on Allen Jorsey, there was one
11  opened on Brett Wise, there was one opened on the
12  captain, Brian Steele, and there was one opened on
13  Amerijet itself.
14  Q. All right. And out of that group, were
15  there any matters, individuals as to whom you
16  determined that there was not sufficient evidence of
17  a violation to justify doing a full EIR?
18  A. Correct. There was also one opened on
19  Peter Steele. There was no action against Peter
20  Steele, there was no action against Allen Jorsey and
21  there was no action against Pat Major because he was
22  the reporter of the incident.
23  Q. What about Al Jorsey, what was the basis
24  for the no action against him?
25  A. He was not in a position to exercise

Page 25

1  operational control. He was not in a position to
2  overrule the commands of the pilot or to assume
3  command of the aircraft.
4       Q. And the same question for Peter Steele?
5       A. Peter Steele was the director of
6  operations and there was no close tie that could
7  involve him to a level of legal action.
8       Q. All right. And what was your assessment
9  as it related to Brett Wise?
10      MS. NORTON: I'm going to object to any
11  testimony of an ongoing investigation. I mean, the
12  matter is not final, as to my knowledge.
13      THE WITNESS: No, ma'am, it's not.
14      MS. SHEA: I don't know either, but I'm
15  asking about his -- he said after -- okay. Go
16  ahead, just make your objection.
17      MS. NORTON: I don't think you can get
18  into an ongoing investigation.
19      MS. SHEA: Well, that's not your
20  determination to make.
21      MS. NORTON: Well, I know. But I'm going
22  to object to this whole line.
23      MS. SHEA: Okay.
24      MS. NORTON: And take it to court if you
25  try to use it. I don't know what their internal

Page 26

1  policy is.
2       MS. SHEA: There's no reason to have this
3  colloquy in the record. Just make your objection.
4       MS. NORTON: I object to it.
5       THE WITNESS: Ask again your question,
6  please, Miss Shea.
7  BY MS. SHEA:
8       Q. Okay. All right, sir. Did you prepare a
9  full EIR, enforcement investigation report, with
10  respect to Brett Wise?
11      A. Yes, ma'am.
12      Q. Same question for Brian Steele.
13      A. Yes, ma'am.
14      Q. And the same question for Amerijet.
15      A. Yes, ma'am.
16      Q. So in your opinion, there was prima facie
17  evidence that violations of one or more FAR's had
18  occurred.
19      A. On a technical basis.
20      Q. Is that a yes?
21      A. I would like to --
22      MS. NORTON: No, it's a --
23      A. I would like to qualify. There was
24  evidence that a technical violation had occurred.
25  It's my professional opinion that no actual

Page 27

1  violation occurred.
2  BY MS. SHEA:
3       Q. Would you explain that, please?
4       A. Mr. Major's allegation was that the
5  aircraft departed from a water-contaminated runway.
6  Water of less than a quarter of an inch, as I
7  recall. And because the tower had made a request to
8  Broward County Aviation Department to operate a
9  vehicle down the runway and report back to them of
10  the quantity of water on the runway, which that
11  vehicle did, and they made a statement that there
12  was some standing water of less than a quarter of an
13  inch, that now becomes a notum to airmen.
14      And that is given in air trans -- or an
15  ATIS report. I forget what ATIS -- air terminal
16  information system report. That report would stand
17  as a fact unless it was challenged by a flight crew.
18  The flight crew in question had taxied back, taxied
19  the full length of the runway, as I recall.
20      The captain, the check airman, the flight
21  engineer, felt that the runway was not contaminated
22  along its full length but that there were patches of
23  water. Had Brian Steele challenged the tower on
24  their notum, they would have rescinded it and there
25  would not have been an issue because he did not

Page 28

1  challenge it, the tower report of standing water
2  less than a quarter of an inch remained, which
3  would, in and of itself, constitute a contaminated
4  runway.
5       If that were the case, the contaminated
6  runway of less than a quarter of an inch of standing
7  water would require a reduction in the takeoff
8  safety speed or decision speed of V-1, and it
9  required reduction and a required reduction in the
10  amount of gross takeoff weight that the aircraft
11  could sustain.
12      Q. All right. So again, what's the basis for
13  your testimony that there was a technical but not an
14  actual violation, did you make a finding that the
15  runway --
16      A. I determined that --
17      Q. -- that the runway was not contaminated?
18      A. Yes, ma'am. I determined in my mind that
19  it was not contaminated. However, the report from
20  the tower that -- being that it was not challenged,
21  would take precedence. Therefore, to the letter of
22  the law, there was a violation and the report had to
23  go forward. And I had to process it as though it
24  were a violation.
25      Q. Well, you said to the letter of the law.

1   There was a violation.
2          MS. NORTON: Object to the form of the
3   question.
4          A. As I mentioned, had the pilot contested
5   the tower's record based upon his own observation,
6   there would have been no violation.
7   BY MS. SHEA:
8          Q. Right. But there was a violation here.
9          MS. NORTON: Object to the form of the
10  question. Asked and answered.
11         A. Yes, ma'am.
12  BY MS. SHEA:
13         Q. And did your report reflect your analysis
14  of the fact that this was a mere technical and not
15  in fact a --
16         A. I don't recall.
17         Q. Well, you would have put that in your
18  report; correct?
19         A. I don't recall if I put that in my report
20  or not.
21         Q. You would have wanted your report to be as
22  comprehensive and accurate as possible; correct?
23         A. I would want it to be as comprehensive and
24  accurate as possible. I don't recall if I put that
25  in my report.

1          Q. All right. The bottom line with your
2   report was that there was a violation, and your
3   report so concluded?
4          A. Yes.
5          Q. Did your report note that there had been a
6   back taxi of 100 percent of the runway?
7          A. It would have been in Brian Steele's
8   response to my letter of investigation to him. And
9   I suspect that it would have been in the report. It
10  really wouldn't matter regardless of what he said
11  because had -- unless he had challenged the tower
12  and they had recanted their report of the condition
13  of the runway, what they say stands.
14         Q. No question about that?
15         A. That's correct.
16         Q. Okay. And the reason for this federal
17  aviation -- well, let's back up a minute. The
18  Federal Aviation Regulation that was implicated as
19  possibly being violated was what?
20         A. If deals with the performance capability
21  of the aircraft, given that standing water on a
22  runway will degrade the performance, the
23  acceleration performance of the aircraft.
24         Q. So you need to make adjustments in weight
25  and you need to go -- you need to take off some

1   weight and you need to go slower?
2          A. No. You take off some weight to enable
3   the aircraft to depart in a shorter range of space.
4   You take off speed. The V-1 speed is the point at
5   which the crew, upon the loss of an engine or other
6   major catastrophe, determines to continue the
7   takeoff or abort.
8          At V-1 if they lose an engine and they
9   start their abort procedure, which is to apply
10  brakes, to pull back the power and apply the
11  spoilers, which destroy lift, they would be able to
12  stop before running off the end of the runway.
13         If at that point they were to continue,
14  they would be guaranteed by the certification
15  standard to be able to continue to climb and to
16  continue their flight. So by reducing that speed it
17  enables the aircraft to reach a reduced speed at a
18  point on the runway prior to the distance that it
19  would normally achieve at the faster V-1 speed.
20         Which at the faster V-1 speed, if they
21  lost an engine, they may not have to break energy in
22  order to stop before running off the end of the
23  runway.
24         Q. All right. So the weight and speed
25  degradations that are called for by federal

1   regulation, if there's wet runways, are safety
2   based; is that fair to say?
3          A. Yes. But let me clarify. It's not per se
4   by federal regulation, it's by performance manuals
5   that are approved for use by federal regulation.
6          Q. Right. In other words, the federal
7   government doesn't generate all the specific
8   formulas for every model of aircraft and every
9   weight, et cetera?
10         A. That's correct.
11         Q. Right. But is there a federal regulation
12  which obliges flight crews to defer to what weight
13  and speed degradations are called for by their own
14  airplane's performance manual?
15         A. Yes. That's correct.
16         Q. Okay. All right. You mentioned a while
17  ago that if you don't administratively dismiss or
18  stop processing a report against an individual,
19  you'll go on and prepare a full report that has
20  items of proof?
21         A. In essence.
22         Q. Okay. And those are called IOPs as well?
23         A. Items of proof.
24         Q. Okay.
25         A. They're not an exhibit until they are

JOHN ROSEBOROUGH    Condensed It™    MAJOR S/AMERIJET

1  entered as an exhibit in a court of law.
2  Q. All right. But they're submitted by you
3  in an effort to gather together everything that you
4  consider creates a prima facie case?
5  A. They are used to substantiate each charge
6  or statement that is made to be considered in a
7  factual manner.
8  Q. All right. After you prepared enforcement
9  investigation reports on this incident with respect
10  to certain individuals in the company and forwarded
11  them to your supervisor, who I guess in turn
12  forwarded them to Atlanta, what, if any, involvement
13  have you had in this particular proceeding, or these
14  proceedings?
15  A. None.
16  Q. Do you know the current state of any
17  investigation?
18  A. No.
19  MS. SHEA: We're making consecutive
20  deposition exhibits, so I'd like us to mark this
21  next exhibit as Exhibit 39, please.
22  (Plaintiff's Exhibit 1, enforcement
23  investigative report, was marked for
24  identification.)
25  MS. NORTON: Are you refusing to let me

1  see the document before you show it to the witness?
2  MS. SHEA: I'm going to ask the witness to
3  identify it.
4  MS. NORTON: Don't you have another copy?
5  MS. SHEA: I don't have another copy.
6  MS. NORTON: And I asked you to see if I
7  could see it.
8  MS. SHEA: I'm going to ask the witness to
9  identify it. And you will have an ample chance to
10  look at it before you complete your portion of the
11  deposition.
12  BY MS. SHEA:
13  Q. Sir, would you please take a look at
14  Exhibit 39 and tell me if you can identify that.
15  A. This is the report as it would have been
16  entered into the enforcement investigative system,
17  which would contain -- this appears to contain my
18  report to Amerijet per se.
19  Q. Your report. Your --
20  A. This involves -- this is the enforcement
21  investigative report against Amerijet. None of the
22  other participants.
23  Q. Right. All right. So it's the
24  investigative -- enforcement investigative report
25  pertaining to Amerijet?

1  A. That's correct.
2  Q. All right. Would you just look at the
3  second page of that exhibit, please?
4  A. (Witness complies.)
5  MS. NORTON: Mr. Roseborough, do you mind
6  if I look over your shoulder? Since I haven't seen
7  these documents and counsel hasn't provided me a
8  copy of them.
9  THE WITNESS: Not at all, ma'am.
10  MS. SHEA: Are you representing that you
11  do not have a copy of the enforcement investigative
12  report?
13  MS. NORTON: Miss Shea, I don't know what
14  you handed him.
15  MS. SHEA: Well, he just identified it.
16  MS. NORTON: May I?
17  THE WITNESS: Yes.
18  MS. NORTON: Thank you.
19  BY MS. SHEA:
20  Q. Sir, could you take a moment and look at
21  page 2 of that document, which says Section B,
22  summary of facts.
23  A. Yes, ma'am.
24  Q. Are you the author of that page?
25  A. Yes, ma'am.

1  Q. All right. Would you take a moment and
2  look at section D of the report which follows IOP
3  number 8.
4  A. Which part would you like me to look at?
5  Q. I'd just like to ask you, there's two
6  pages there, they're marked number 4 and number 5.
7  A. Yes, ma'am.
8  Q. Are you the author of those pages?
9  A. Yes, ma'am.
10  Q. All right, sir. And if you would turn
11  back to page 3 of the report.
12  A. (Witness complies.)
13  Q. Which is item C, see sections items of
14  proof -- strike that. Page 3, which is section C,
15  items of proof.
16  A. Yes.
17  Q. Did you gather all of this information and
18  compile the items of proof?
19  A. Yes. Yes, ma'am.
20  Q. All right. If you would turn to IOP
21  number 2, which is four pages out of the federal
22  regulations.
23  A. Yes, ma'am.
24  Q. Did you review the federal regulations and
25  extract and mark the pertinent ones?

Page 37

1   A. Yes.
2   Q. All right. IOP number 3, is that the
3   report from Pat Major?
4   A. It's the envelope that the report came in,
5   yes.
6   Q. All right. Well, IOP number 3 altogether,
7   which is multi page.
8   A. Yes, ma'am.
9   Q. All right. IOP number 4 --
10  A. Yes, ma'am.
11  Q. -- indicates you requested the tower
12  tapes?
13  A. That's correct.
14  Q. And IOP number 5, is that a transcript of
15  the tower tapes that were made at your request?
16  A. That's correct.
17  Q. Okay. What is IOP number 6?
18  A. It's out of Amerijet's adverse weather,
19  clear operating procedures.
20  Q. And that is part of what is -- relates to
21  the performance manual, which is FAA approved?
22  A. FAA approved or FAA accepted.
23  Q. Accepted, okay. Okay. IOP number 7.
24  A. Okay. That is an FAA-approved section of
25  Amerijet's performance manual.

Page 38

1   Q. All right. It actually has your approval
2   on it some months prior to the incident; is that
3   right?
4   A. That's correct. 20 May 1999.
5   Q. All right. And what is IOP number 8?
6   A. This is from the weight and balance
7   manual, which is also approved. And it lists the
8   aircraft by N number, or registration number, and
9   the maximum takeoff weight of the aircraft.
10  Q. And why was that pertinent to your
11  investigation?
12  A. Because that establishes a baseline from
13  which any degradations would have to be applied.
14  Q. All right. Would you turn back to page 2,
15  section B, summary of the facts.
16  A. Okay.
17  Q. And read aloud the third paragraph of that
18  section, please.
19  A. The aircraft was taking off at a weight
20  17,000 pounds greater than allowed and indicated V-1
21  air speed 28 knots faster than allowed for
22  conditions, thus degrading the performance
23  capability.
24  Q. All right, sir. By virtue of being
25  operated in that manner, did the flight violate

Page 39

1   federal aviation regulations in the air?
2   A. Yes, ma'am, by that statement it did.
3   Q. You indicated in section D that you did
4   not receive a response from Dave Bassett at Amerijet
5   to the potential violation? Do you see that?
6   A. I see that. These in the last sentence.
7   Q. All right. You indicate Mr. Bassett was
8   sent two letters of investigation, LOI. What is a
9   letter of investigation?
10  A. It's -- there should be one in here, as a
11  matter of fact. It's a letter that describes the
12  event. Let's see. It's IOP 14. 13 and 14. 13 was
13  an LOI sent registered mail, certified return
14  receipt, and 14 is the same letter sent by regular
15  mail.
16      And it apprises the recipient of the date,
17  the time, the location, the aircraft and the
18  activity, where it departed, where it was going.
19  And it gives that individual all of the peripheral
20  data in connection with the activity. It advises
21  that the matter is under investigation and it offers
22  the -- the person an opportunity to submit a written
23  statement in their behalf or to speak with us in the
24  same manner.
25  Q. All right. And this is part of your

Page 40

1   routine in preparing investigation; is that correct?
2   A. That's correct.
3   Q. So are all of the people who were
4   implicated in this potential violation did get a
5   letter?
6   A. That's correct.
7   Q. And then in some instances, based on the
8   response and your judgment, you stopped the
9   investigation as to them?
10  A. That's correct.
11  Q. Okay. But in Amerijet's case, you
12  completed the report without benefit of a response
13  to this letter?
14  A. That's correct.
15      MS. SHEA: Would you mark this Exhibit 40,
16  please.
17      MS. NORTON: Do you have a copy of that
18  one for me?
19      MS. SHEA: No.
20      MS. NORTON: Are we going to take a
21  position that in depositions we're not going to give
22  each other copies of anything? Because I can go
23  with that with Mr. Major's depo if that's how you
24  want to do it.
25      MS. SHEA: I don't have a copy of that for

Page 41

1 you.
2 (Plaintiff's Exhibit 40, EIR on Brian
3 Steele, was marked for identification.)
4 MS. SHEA: Excuse me. Let me show it to
5 the witness.
6 MS. NORTON: You've already shown this to
7 the witness, Miss Shea.
8 BY MS. SHEA:
9 Q. Can you take a look at that?
10 A. It's the EIR on Brian Steele.
11 Q. Could you take a look at Exhibit 40 and
12 see if you can identify it? That was the question.
13 Would you look at page 2 of that exhibit, which is
14 the summary of facts. Are you the author of that?
15 A. Yes, ma'am.
16 Q. All right. And would you please look at
17 the section, D section which follows the items of
18 proof and tell me if you are the author of that
19 section.
20 A. Yes, ma'am.
21 Q. And the items of proof that are in there,
22 are they the same as the Amerijet report except with
23 respect to the letter of intent and the response to
24 that?
25 A. They should be essentially the same. They

Page 42

1 appear to be the same. I would say they are the
2 same.
3 Q. All right, sir.
4 A. With one exception. With Mr. Steele, he
5 did give me a response --
6 Q. Correct.
7 A. -- to the LOI.
8 Q. All right, sir. Would you turn to section
9 B on page 2.
10 A. Okay.
11 Q. And did you reach an opinion or conclusion
12 that the aircraft on that date was taking off at a
13 weight 17,000 pounds greater than allowed at an
14 indicated V-1 air speed 28 knots faster than allowed
15 for conditions, thus degrading the performance
16 capability?
17 A. Yes, ma'am, I did.
18 Q. All right. And by virtue of the aircraft
19 taking off in that manner, did you reach a
20 conclusion that Brian Steele operated contrary to
21 federal aviation regulations?
22 A. That's what I stated here.
23 Q. And what did you include in your text of
24 your report with respect to the violation of Captain
25 Steele on section B there, the last paragraph, if

Page 43

1 you could read that out loud.
2 A. It says, by virtue of the above, Captain
3 Brian A. Steele further operated contrary to -- the
4 for is stricken out, no pilot may operate an
5 aircraft in a careless or reckless manner so as to
6 endanger the life or property and also contrary to
7 FAR, no person may operate an aircraft in a careless
8 or reckless manner so as to endanger the life or
9 property of another.
10 Q. All right, sir. Could you turn to section
11 D at the end of that report.
12 A. Yes.
13 Q. And I'd like you to read aloud the third
14 paragraph of that section D, please.
15 A. The one that starts out, IOP 9, 10 and 12.
16 IOP 9, 10 and 12, identify Captain Brian A. Steele
17 as the pilot in command of the subject flight, as
18 stipulated in FAR 121 530, 121.537 B, as in boy, D
19 as in delta, and E as in Edward, the pilot in
20 command is responsible for the safety aspects of
21 flight, including the safety of other crew members.
22 His abdication of those duly appointed
23 responsibilities places him in violation of specific
24 FAR.
25 Q. Okay. Could you read the last paragraph

Page 44

1 of your report that starts out IOP 15.
2 A. IOP 15 is Captain Steele's response to the
3 LOI containing information which presents his
4 perspective that the runway was not covered with
5 standing water of one-quarter inch or less. The
6 Fort Lauderdale air traffic control tower, ATCT,
7 recording IOP 4 and 5, however, contradicts his
8 statement for the period in question.
9 Q. All right, sir. Does that refresh your
10 recollection as to your determination that there was
11 an actual as well as technical violation of the
12 FAR's on that date?
13 MS. NORTON: Object to the form of the
14 question.
15 A. It --
16 MS. SHEA: Let me rephrase the question
17 because there was an objection.
18 BY MS. SHEA:
19 Q. Sir, you did not include anything in your
20 report there concerning what you testified to
21 earlier today?
22 A. No, I did not.
23 Q. Okay. Is there a reason why not?
24 A. Because Captain Steele made no issue of
25 the control tower.

1  Q. Okay.

2  A. Had that been in their transcript, then it

3  would have been in my report. But since he didn't

4  challenge their statement establishing a

5  contaminated runway, all I can do is mention that he

6  said it, but their formal report which stands as a

7  pilot -- or as a factual report takes precedence.

8  Q. Sir, please look at IOP number 15, which

9  is Brian Steele's letter to you.

10  A. Okay.

11  Q. Does -- what, if any, reference does that

12  letter make to back taxiing the entire length of the

13  runway?

14  A. It starts about halfway down in the second

15  sentence, it says after normal engine start we

16  requested taxi. Taxi instructions were taxi, hold

17  short of Bravo and contacted tower for back taxi

18  instructions.

19  When we then contacted the tower and were

20  instructed to taxi to Bravo 2 and back taxi on to

21  the runway in position for takeoff. Then we were

22  told to back taxi on the runway, First Officer Major

23  acknowledged the clearance and also asked for the

24  runway condition report, but it was not available at

25  that time.

1  I instructed him we had the runway

2  conditions from ground control and it was reported

3  wet. During the back taxi on the runway, I observed

4  no standing water on the runway, therefore requiring

5  no reduction to weight or V-1.

6  Q. Where all in what you just read does it

7  state flight crew and the aircraft taxied the entire

8  length of that runway?

9  A. I don't know that it does, ma'am.

10  Q. It doesn't, does it, sir?

11  A. No.

12  Q. So what, if any, information did you have

13  that the back taxi was for the entire length of the

14  runway as you previously testified this morning?

15  MS. NORTON: Object. The record will

16  reflect for himself -- for itself what he testified

17  to. That's not my recollection.

18  A. He would back taxi from where he entered

19  the runway at Bravo 2, which I don't recall exactly

20  where that is. And from that point he would have

21  taxied the full length of the runway that was

22  available to him.

23  BY MS. SHEA:

24  Q. That may have been some small -- from

25  takeoff --

1  A. I would have to look at an airport chart.

2  Q. All right.

3  A. At this point. That's been a year and a

4  half ago.

5  Q. All right. So wherever Bravo 2 is?

6  A. Yes.

7  Q. Is what percent of the runway he taxied,

8  which may have been significantly less than a

9  hundred percent; correct?

10  A. I don't know.

11  Q. You don't know, all right.

12  A. I don't recall.

13  Q. Okay. And this was not something that you

14  explored in any detail back then?

15  MS. NORTON: Object to the form of the

16  question.

17  A. It was a nonissue.

18  BY MS. SHEA:

19  Q. Right, because there was a violation.

20  A. It didn't matter what the man said because

21  he didn't challenge the tower, the tower's report

22  would stand.

23  MS. SHEA: All right. Please mark this

24  Exhibit 41.

25  (Plaintiff's Exhibit 41, report on Brett

1  Wise, was marked for identification.)

2  BY MS. SHEA:

3  Q. Sir, please take a look at Exhibit 41 and

4  tell me if you can identify that.

5  A. That's the report on Brian Wise.

6  Q. Brett Wise?

7  A. Brett Wise, yes. Yes, Brett Wise.

8  Q. Please look at page 2, section B. Are you

9  the author of that?

10  A. Yes, ma'am.

11  Q. And please look at section D.

12  A. (Witness complies.)

13  Q. At the back of the report. Are you the

14  author of those two pages?

15  A. Yes, ma'am.

16  Q. All right. Turning to section B, did

17  you -- what, if any, conclusion did you reach with

18  respect to whether Brett Wise, who was the flight

19  engineer, had violated an FAR regulation?

20  A. The extent that all three crew members,

21  Mr. Steele, Mr. Wise and Mr. Major, were on board,

22  that they were all three involved in the violation.

23  Q. So you concluded that the flight was

24  operated in a careless or reckless manner so as to

25  endanger the life or property of another; is that

Page 49

1  correct?
2  A. That's what it states here.
3  Q. All right. And that would be a violation
4  by the three flight member -- the flight -- three
5  flight crew members, including Brett Wise?
6  A. Yes, ma'am.
7  Q. All right. Please look at section D of
8  your report, page 5. Could you read aloud the last
9  paragraph of that report?
10  A. Mr. Wise was sent two letters of
11  investigation. LOI, one via certified mail, which
12  was returned unclaimed, and one via regular mail, to
13  which he responded. His response is identified as
14  IOP 16, but fails to offer any additional
15  information. Instead, tending to contradict the
16  facts as established by the preponderance of other
17  items of proof submitted and included herein.
18  Q. Referring to Mr. Wise's letter, which is
19  IOP number 16, if you need to, can you please tell
20  me what it was that you found contradictory about
21  Mrs. -- Mr. Wise's letter and the facts as
22  established by the preponderance of the other items
23  of proof?
24  A. This statement that he back taxied the
25  runway, he saw a wet runway, he did not see any

Page 50

1  standing water. Which contradicts the notum from
2  the tower, which is preeminent unless it is
3  protested.
4  Q. Had Captain Steele challenged the tower as
5  you suggest he might have, what portion of the
6  runway would he have had to personally observe in
7  order to convince or override a runway report?
8  A. In my own experience is the only way that
9  I can answer your question. I would have called the
10  tower and said I just back taxied the runway, the
11  runway is wet. However, there is no standing water
12  that would create a hazard. And the tower would
13  rescind their notum and we report it as a wet
14  runway.
15  Keeping in mind that the person that took
16  the wet runway report is not knowledgeable, it's an
17  airport person that isn't cognizant of an airline's
18  operating parameters. It's like -- it's like
19  anybody going out there and looking at the runway,
20  yes, it's wet. Yeah, there's water there. The
21  captain would have much greater credibility than the
22  airport worker unless that person was an engineer or
23  an airport design person.
24  Q. Well, my question, sir, was, quite simply,
25  what percent of the runway would that captain have

Page 51

1  to visually observe, personally observed in order to
2  make a credible challenge to the tower report?
3  A. I would say any portion.
4  Q. Five percent?
5  A. Yes, ma'am. I don't know of a specific
6  amount.
7  Q. And do you know by whom the standing water
8  report was prepared on the date in question? The
9  credentials or qualifications of that individual?
10  A. No, I don't. It may be in the report. I
11  don't recall at the time. But it was as reported by
12  Broward County Aviation Department to the tower.
13  And it may yet be in here. Ramp one, I do not know
14  who ramp one was. Ramp one splits less than
15  one-quarter inch grade drainage, slight standing
16  water, about six feet on either side of center line.
17  Q. So that's an authorized individual to
18  assess runway water conditions; is that fair to say?
19  MS. NORTON: Object to the form of the
20  question.
21  A. You could be an authorized individual if
22  you worked for Broward County and you have a ramp
23  driving privilege.
24  BY MS. SHEA:
25  Q. All right. Was that a report from an

Page 52

1  authorized person, to your knowledge, as you
2  prepared your enforcement investigation report?
3  A. It was a person acceptable to the tower.
4  Q. Correct. So you have no reason to think
5  that was not an authorized or accepted report?
6  A. It was really not an issue with regard to
7  my investigation.
8  Q. Right. Because once the report's out
9  there, it's out there?
10  A. Yes, ma'am.
11  Q. All right. Let me show you what was
12  previously marked as Exhibit 10 to the depositions.
13  Can you identify that document?
14  A. It's a letter from Captain Allen Jorsey.
15  Q. Do you know whether it was in response to
16  a letter of intent similar to what you've described
17  with respect to Amerijet?
18  A. It appears to be in response to a letter
19  of investigation that I had sent to Mr. Jorsey.
20  MS. SHEA: Let's me ask the court reporter
21  to mark the next exhibit 42, please.
22  (Plaintiff's Exhibit 42, letter, was
23  marked for identification.)
24  BY MS. SHEA:
25  Q. Would you please look at what was marked

Page 53

1 Exhibit 42. Can you identify that, please?
2 A. It's a letter that I wrote to Captain
3 Steele. Yes, I recognize this.
4 Q. All right. What was the subject of the
5 letter that's Exhibit 42?
6 A. It's standard operating procedure when a
7 check airman is under investigation his letter of
8 authority be rescinded, pending completion of the
9 investigation.
10 Q. All right. Being that he had responded,
11 he being Al Jorsey, had responded to your letter of
12 intent back in November, why was the suspension of
13 the check airman status letter going out a month
14 later? If you know.
15 A. The matter had not been fully closed, I
16 would suspect. And until it was closed and a letter
17 was sent to Captain Jorsey that he had no
18 culpability in the matter, the letter would stay
19 surrendered. I believe it has since been
20 reinstated.
21 Q. Well, my question was just since the
22 letter of intent --
23 A. You mean the letter of investigation?
24 Q. Letter of investigation.
25 A. Yes, ma'am.

Page 54

1 Q. Would have dated back to the first week of
2 November or so. Was there a reason why his
3 privileges were not suspended until mid December?
4 A. The letter of investigation is step one of
5 an investigative process. The letter of
6 investigation doesn't constitute a basis for
7 anything other than an opportunity to determine
8 additional facts of the matter.
9 The fact that it went out November --
10 well, this is a letter to Captain Allen Jorsey. I
11 don't -- or this is his response to me November
12 15th. I do not know why this is dated December
13 15th. Since I do a hundred percent of my own
14 correspondence, it's very possible that I misdated
15 it.
16 Q. Though it may have actually been in
17 November that his privileges were suspended?
18 A. That could be.
19 MS. SHEA: Would you mark Exhibit 43,
20 please.
21 (Plaintiff's Exhibit 43, letter, was
22 marked for identification.)
23 BY MS. SHEA:
24 Q. Do you recognize Exhibit 43?
25 A. Yes.

Page 55

1 Q. What is that?
2 A. This is a letter that informs Mr. Jorsey
3 that the investigation has not established a
4 violation of the federal regulations on his part and
5 closes the latter.
6 Q. All right. And what was the basis for
7 your determination?
8 A. Mr. Jorsey, having passed the age of 60,
9 could not sit in a required pilot position on an
10 aircraft operated under CFR 14 FAR Part 121.
11 Further, he was not required to be there as Captain
12 Brian Steele, for whom he was performing a line
13 check, was not out of currency. Therefore, he was
14 an observer.
15 Q. Okay. All right. Again, I just -- if the
16 documents don't refresh your recollection, that's
17 fine. I just was wondering whether, again, the
18 timing was such that the privileges were suspended.
19 It really looks like you were winding up the
20 investigation.
21 A. Sometimes -- I don't even remember when
22 the report finally went out of here, but everything
23 doesn't take place in as expedient a manner as
24 possible due to other workload items, as can be seen
25 in our criminal justice system.

Page 56

1 Q. In what capacity was Captain Al Jorsey on
2 the flight that day? You mentioned as an observer,
3 but does he have any FAA credentials or
4 authorization?
5 A. He is a check airman, he is authorized
6 jump seat privileges only, and as such, he was on
7 board to do a line check, an annual line check for
8 Captain Steele. As I stated, Captain Steele was not
9 out of currency.
10 Q. Was that a factor in the investigation
11 decision?
12 A. It was a factor because he was on board
13 and I needed to determine what he may have seen or
14 what his involvement may have been. The same as
15 sending a letter of investigation to Peter Steele,
16 as director of operations, because there are certain
17 aspects of a flight that are the joint
18 responsibility of the captain and the director of
19 operations.
20 However, regional counsel's office in
21 Atlanta said that there is no precedent to establish
22 tying in director of operations in such a manner.
23 Therefore, they would not go forward with it. And
24 based upon their direction, he was sent a letter of
25 no established violation on his part, the same as

1  Mr. Jorsey was.
2       Q. Is Mr. Jorsey, as an FAA authorized check
3  airman, supposed to be well versed in federal
4  aviation regulations?
5       A. Yes, ma'am.
6       Q. So you would think that he would know --
7  be able to identify violations; correct?
8       A. Yes, ma'am.
9       Q. And you did not receive any report or --
10 report of a violation prior to Pat Major's report
11 from any party concerning this flight?
12      A. No, ma'am. His statement here is that the
13 runway was wet, that it constituted no issue from
14 his -- from his point of view. The same as the
15 other two crew members. However, as I stated, the
16 tower's report would stand unless challenged. Since
17 it was not challenged, it is a violation of the FAR.
18      Q. A fact which is not conceded by Mr. Jorsey
19 in his letter.
20      A. He says it was not a violation.
21      Q. Which statement is inconsistent with the
22 federal regulations we've discussed today?
23         MS. NORTON: Object to the form of the
24 question.
25      A. It's inconsistent with the standing

1  report.
2  BY MS. SHEA:
3       Q. What, if any, conversations did you ever
4  have with Al Jorsey concerning any other performance
5  issues regarding Pat Major?
6       A. None that I can recall.
7       Q. What, if any, conversations did you ever
8  have with Al Jorsey concerning whether Amerijet
9  could accept direct headings in navigation, in
10 class 1 navigation in the absence of a GPS system?
11      A. I remember some discussions. And with no
12 GPS on board, in class 2 air space, they cannot go
13 direct. They have to be able to position
14 themselves, as I recall. I don't remember the exact
15 particulars of the discussion.
16      Q. Okay. So I take it you're recalling one
17 particular discussion?
18      A. One particular discussion with someone. I
19 don't even remember if it was Captain Jorsey said.
20      Q. All right. And the substance of what you
21 would have said would have been as you just said it
22 here today, in class 2 air space, in the absence of
23 GPS, Amerijet could not accept a direct heading --
24      A. That's correct. You'd have to know where
25 you are, you'd have to be able to establish your

1  position.
2       Q. What about in class 1 air space?
3       A. In class 1 air space you still have to be
4  able to establish your position wherever you are.
5       Q. Well, what, if any, discussion did you
6  have with anyone at Amerijet concerning the ability
7  of the aircraft in class 1 air space to accept a
8  direct heading without GPS?
9       A. I don't recall.
10      Q. You don't recall that at all?
11      A. (Witness shakes head.)
12      Q. So did you ever give Amerijet an opinion
13 that in class 1 air space, a direct heading could
14 not be accepted?
15      A. If I did, it would have been in written
16 form. And I don't recall.
17         MS. SHEA: Okay. Could you mark the next
18 exhibit, please.
19         (Plaintiff's Exhibit 44, letter dated
20 11/22/99, Was marked for identification.)
21         MS. SHEA: Actually, you can mark two,
22 please.
23         (Plaintiff's Exhibit 45, letter dated 3/6,
24 was marked for identification.)
25 BY MS. SHEA:

1       Q. Sir, let me hand you what's been marked
2  Plaintiff's Exhibit 44. Can you identify that?
3       A. I recognize the letter. It's to me and
4  it's dated November 22nd, 1999.
5       Q. Who is it from?
6       A. Peter Steele, vice president of
7  operations.
8       Q. All right. And he denies -- he states
9  that Amerijet finds no infractions of FAR's;
10 correct?
11      A. That's correct.
12      Q. And could you read the second paragraph of
13 that letter out loud?
14      A. Currently, the training department and I
15 are working towards any possibilities of improvement
16 with regard to contaminated runway conditions. I
17 would appreciate any guidance or suggestions you
18 could offer us in this matter. I look forward to
19 your response.
20      Q. All right. Did you make any response to
21 this correspondence as it related to Amerijet's
22 policies for contaminated runway conditions?
23      A. Typically, I would respond. I don't
24 recall if I did.
25      Q. Do you recall what the -- what Amerijet's

Page 61

1  policies were previous to Pat Major's report of this
2  violation on August 17th, 1999?
3      A. As I recall, their takeoff performance
4  requirements in their performance section were very
5  sparse. There were -- there was a potential to have
6  a better clarified policy which would be less
7  restrictive than the process that they had.
8      Q. Okay. I may need you to translate that a
9  little bit. Is it fair to say that under Amerijet's
10  policies, unless there was a report of standing
11  water, that the air -- the runways were to be deemed
12  or considered dry?
13      A. Less than a certain amount of water. And
14  their procedure didn't provide for any variance
15  between a certain amount of standing water and a wet
16  runway, as I recall.
17      Q. Right. So when you indicated they were
18  restrictive, you mean either there was no report of
19  standing water, so they were considered
20  uncontaminated, which may not necessarily be the
21  case?
22      A. In essence, when the report came out less
23  than a quarter inch of standing water, they could,
24  through engineering data, provide different levels,
25  say, three-sixteenths, one-eighth, one-sixteenth and

Page 62

1  wet runway, so that they could have derivations from
2  that for less restriction. But they didn't have
3  that in their manual. They didn't have a procedure
4  for mitigating a standard reduction.
5      Q. Or likewise, the procedure which would
6  allow a captain to take a degradation even in the
7  absence of an official report of standing water.
8      MS. NORTON: Object to the form of the
9  question.
10      A. Um, the captain can always take a
11  degradation. He can always reduce the weight, he
12  can always reduce the air speed. I don't really
13  understand your question.
14  BY MS. SHEA:
15      Q. Did Amerijet, to -- does Amerijet now, or
16  did it then, to your knowledge, have any policy
17  which explicitly authorized captains to exercise
18  that kind of judgment and discretion in taking
19  degradations based on their own assessment of water?
20  Even when there was no report.
21      A. I think I understand what you're asking.
22  The way that I would answer it is their performance
23  data requires a specific degradation for a specific
24  set of conditions. They can be more restrictive
25  because that's the captain's command authority.

Page 63

1  They cannot be less restrictive than that time
2  dictated by the FAA-approved manuals which have
3  tabulated data provided by an engineering source.
4      Q. Okay. Let me try asking my question one
5  more time. I don't think I asked it very well.
6  From your familiarity with Amerijet's manuals, would
7  you agree that there is no express provision which
8  authorizes or -- which authorizes captains of
9  aircraft to make weight or speed degradations based
10  on observations of runway conditions in the absence
11  of contamination reports?
12      MS. NORTON: Object to the form of the
13  question.
14      A. There is information in their manual which
15  states that if the runway is wet, as I recall, they
16  consider it a dry runway unless it has a certain
17  amount of standing water.
18  BY MS. SHEA:
19      Q. Okay. What is -- what is or what are the
20  Part 125 criteria with respect to what portion of a
21  runway has to have standing water in order for the
22  runway to be deemed contaminated?
23      A. It's -- part 121 is an operating
24  regulation. Part 125 is a certification. Rules
25  of -- certification rules fall under the purview of

Page 64

1  an airport inspector or an engineering type person.
2  And I would have to read the FAR, which is dozens
3  and dozens of pages long, to locate the specific
4  import of your question.
5      Q. So you're unfamiliar with any FAR which
6  states that if a runway surface is, for example, 25
7  percent covered with standing water, the runway is
8  deemed contaminated?
9      MS. NORTON: Object to the form of the
10  question.
11      A. I'm familiar that FAR's exist. I can't go
12  from memory to the specific FAR.
13  BY MS. SHEA:
14      Q. All right. Just looking at -- just
15  momentarily back to Exhibit 44, do you know whether
16  Pete Steele, in the training department at Amerijet,
17  made any changes in Amerijet's policies with respect
18  to contaminated runway conditions?
19      A. I don't recall seeing anything in that
20  regard.
21      Q. Could you just look also at Exhibit 45 and
22  tell me if you can identify it.
23      A. It's a letter to Pete Steele on March 6th
24  that informs him that the investigation has not
25  established a violation on his part and he may

Page 65

1 consider the matter closed.
2 Q. All right. That's the letter that I
3 believe you referenced earlier in your testimony,
4 you exercised your administrative judgment to
5 dispose of the matter against him?
6 A. This one was not my administrative, this
7 one was determined by legal counsel in Atlanta.
8 Q. I'm sorry. I mischaracterized your
9 testimony. You mentioned earlier that you were told
10 there was no precedent in Atlanta for prosecution of
11 a violation.
12 A The report came back and it had a memo on
13 it, as I recall. And I had spoken with I believe
14 Miss Juliana Winters is the FAA attorney that is
15 handling that case, that there was no issues
16 involved. And they had coordinated with northwest
17 mountain region, where I used to work, with their
18 regional attorney staff there, and there could be
19 determined no precedent for involving Captain Steele
20 in the issue.
21 Q. All right, sir. Other than with respect
22 to Pete Steele, have you had any occasion to
23 participate in any way in the investigation reports
24 that you forwarded to Atlanta?
25 A. No.

Page 66

1 Q. Is the air carrier inspector's handbook a
2 reference source or an authorized source that you're
3 subject to?
4 A. It's information, the 8400.10 is
5 information on how to accommodate many areas of my
6 particular work functions. It's not regulatory in
7 nature, it's guidance.
8 Q. But you consider it an authoritative
9 source in terms of conducting your duties?
10 A. More or less.
11 Q. Do you know what the air carrier
12 inspector's handbook provides with respect to
13 descriptions of runway conditions, wet or dry?
14 A. That order being hundreds of pages thick,
15 no, I do not. I would have to go and look it up.
16 Q. Okay. Are you familiar with the passage
17 in that document which states, unless the runway is
18 dry, it's considered wet?
19 A. If you say there's such a statement, it
20 sounds reasonable.
21 Q. Okay. Well, my question is are you
22 familiar with that.
23 ⸱⸱ A. I can't say that I am. I would have to
24 look at that particular section. But that's
25 reasonable to me.

Page 67

1 Q. Are you aware of any policy or procedure
2 in effect at Amerijet which reflects that unless the
3 runway is dry it's considered wet?
4 MS. NORTON: Object to the form of the
5 question.
6 A. No. I'm aware of unless the runway is wet
7 it's -- and a certain amount, it's considered dry.
8 As I recall.
9 BY MS. SHEA:
10 Q. That's Amerijet's policy?
11 A. Yes, ma'am.
12 Q. Okay. You indicate that you became
13 assigned to Amerijet in May of 1998.
14 A. Correct.
15 Q. And what, if any, involvement did you have
16 with respect to training candidates for upgrade to
17 the position of captain as of May 1998?
18 A. I have nothing to do with it. The program
19 as it exists was approved by my predecessor or
20 predecessors, and I would have no involvement except
21 to ensure that their upgrade program met the
22 standards, since it had been approved by my
23 predecessors. I would construe that it was in
24 compliance with the FAR.
25 Q. And what role does your office have with

Page 68

1 respect to the upgrade process for flight crew
2 members seeking to upgrade to captain position?
3 A. Upon the person completing the ground
4 simulator and the appropriate airplane portions of
5 the training, the company would make contact with
6 this office to schedule an inspector to accommodate
7 an oral exam, followed by a simulator check, then
8 followed by an airplane ride. And such requests are
9 generally made to me, and then I accommodate the
10 request by locating an inspector that can perform
11 the function.
12 Q. All right. Do you -- when you say locate
13 an inspector, are those FAA employees?
14 A. That's correct.
15 Q. All right. So Amerijet, for example,
16 would advise you personally that they have a
17 candidate ready for this testing?
18 A. That's correct.
19 Q. And you would assign an inspector to --
20 A. I would request assistance from an
21 inspector that is current and qualified in the type
22 of aircraft involved.
23 Q. So that may depend on the aircraft, et
24 cetera.
25 A. That's correct.

Page 69

1 Q. And would you assign one inspector that
2 would do the oral, the simulator and the airplane
3 ride or could that all be done by different people?
4 A. Since it's done on three occasions, it
5 could be the same person or three different people.
6 Q. What, if any, paperwork would you have
7 required from Amerijet back in that time frame with
8 respect to being assured that a candidate had
9 received proper training?
10 A. I typically wouldn't receive anything.
11 But upon the inspector appearing at the test site or
12 the applicant appearing at the test site in the case
13 of this office, the applicant would have forms and
14 records that substantiate he completed the upgrade
15 program.
16 He had the certificate ratings and
17 documents necessary to be eligible to take the test.
18 The examining inspector would be the one that would
19 validate the accurateness of that information.
20 Q. Are you aware if there's any sign off that
21 an executive of the company is supposed to make with
22 respect to vouching for or providing an evaluation
23 of a candidate's qualifications?
24 A. Within the training manual there is a
25 requirement for a person to be recommended,

Page 70

1 essentially establishing that they have completed
2 the training. That would normally transpire. And
3 then the person would be tested following a request
4 from the company.
5 Q. Do you audit or supervise in any way the
6 training records that Amerijet maintains with
7 respect to flight crews?
8 A. Yes.
9 Q. What are the required items? What
10 would -- what is it that you would inspect for?
11 A. They have attendance records for the
12 different classes. They have basic ground school,
13 they have equipment ground school, they have
14 emergency ground school, they have hazardous
15 materials, they have specialty programs.
16 Like now they have I believe GPS approval
17 for class 1 air space. They have a program to do a
18 pilot totally in a simulator. Simulator used
19 totally for flight engineers. Those records would
20 show completion of those different phases of
21 training, both in ground, simulator, and aircraft,
22 is appropriate.
23 There would be a different form for each
24 one. Their repertoire of forms is fairly extensive,
25 as are most carriers. And they all generally have a

Page 71

1 signature by the applicant and a signature by a
2 company representative who is listed in the training
3 manual as a person who may so sign such a piece of
4 paper.
5 Q. All right. Well, aside from the upgrade
6 situation, there -- you would expect Amerijet to
7 maintain accurate and complete training records for
8 its individual pilots; correct?
9 A. That's correct.
10 Q. And that's required by the FAR's?
11 A. Yes.
12 Q. And is that something that you
13 periodically, or through someone who works for you,
14 do inspect?
15 A. Every year they're inspected. Perhaps not
16 all of them, but a sampling of them.
17 Q. Okay. And you look to make sure that
18 everyone has currency and other training that might
19 be required?
20 A. That's correct.
21 Q. Okay. And when there is upgrade training
22 involved, is that also required to be documented?
23 A. Yes.
24 Q. What, if any, involvement did you have
25 concerning Pat Major's attempts to upgrade to

Page 72

1 captain at Amerijet?
2 A. A request through me. I requested
3 somebody to accommodate it. Barnie Sonin was the
4 inspector, he went to Amerijet to test Mr. Major.
5 Q. Did you ever meet with Mr. Major
6 personally? Prior to --
7 A. I don't believe so.
8 Q. -- August 1999.
9 A. I think I probably met with him before
10 then. He would come over here and drop in or I
11 would see him downstairs in the lobby, that kind of
12 thing.
13 Q. Nothing concerning his captain candidacy?
14 A. Not that I can recall.
15 Q. If I understood your prior testimony then,
16 there was a request made for you to schedule someone
17 to shepherd him through -- or administer the FAA
18 part of the upgrade, but you did not personally see
19 any of the paperwork on that or validate his
20 preparation?
21 A. There wouldn't be any reason for me to.
22 Q. Do you remember who contacted you
23 concerning him?
24 A. Not really. Typically, it would have been
25 the chief pilot or someone in the training

Page 73

1  department.
2      Q. You have no recollection of who contacted
3  you specifically to schedule Pat Major for FAA --
4      A. No, I do not.
5      Q. All right. Following your assignment of
6  Barnie Sonin to perform the FAA part of the upgrades
7  process, what, if any, involvement did you have
8  regarding Pat Major's upgrade effort?
9      A. I don't recall anything to do with Pat
10 Major. I typically, since Pat Major failed to meet
11 the standard and Barnie discontinued the check, my
12 typical response with every carrier I've ever worked
13 with is to query the company on certain issues that
14 I would have determined at the time, and informed
15 them that continued performance of that nature would
16 negatively impact the approvals of their training
17 program and perhaps the check airmen or the
18 instructors that would recommend a person.
19     Q. What, if any, investigation did you make
20 in to who had recommended Pat Major and what
21 training he had received prior to being set for the
22 oral?
23     A. I don't recall.
24     Q. Did you make an investigation you don't
25 recall or did you not investigate it?

Page 74

1      A. I really don't remember. Since I
2  investigate just about everything, I would suspect
3  that I did look into the matter. I believe, as I
4  recall, that Pete Steele had recommended him.
5      Q. Did you assemble a file on the matter or
6  anything of that nature?
7      A. No. I would think that Mr. Sonin would
8  have whatever file there is. The only thing that I
9  would have is I do track the status of the training
10 program and graduates from the training program that
11 succeed or fail in certification rights, which Mr.
12 Major's was, as well as proficiency checks and
13 things of that nature.
14     Because the company has to maintain a
15 pass-fail rate in the neighborhood of 80 percent the
16 first time through in order to get reductions in
17 training. So I do track that, especially with the
18 carrier, when I first start working with them.
19     Q. Reductions in training, that a financial
20 issue or --
21     A. What?
22     Q. Reductions in training, what does that
23 refer to?
24     A. Regulation provides for training programs
25 that have a very high success rate and that have

Page 75

1  introduced innovative training methods that they can
2  have the norms that are set as minimums by the FAA
3  to be reduced. And there are specific criteria for
4  doing so within FAR 121 400 series is the training
5  group of regulations.
6      Q. So the company can save money if they have
7  a high pass rate, they can reduce their training?
8      A. Yes, ma'am.
9      Q. Now, you indicated that Pat Major did
10 not -- or failed to meet the standard. You're aware
11 that he was not given a pink slip or a formal
12 failure --
13     A. That's correct.
14     Q. -- of his oral examination?
15     A. I'm aware of that.
16     Q. Barnie Sonin exercised his discretion and
17 discontinued the exam?
18     A. That's correct.
19     Q. Are you aware of any FAA examination that
20 Pat Major failed during his tenure at Amerijet?
21     A. Not that I can recall.
22         MS. SHEA: Can you mark that, please.
23         (Plaintiff's Exhibit 46, notification, was
24 marked for identification.)
25 BY MS. SHEA:

Page 76

1      Q. Sir, could you please take a look at
2  Exhibit 46? Can you identify that?
3      A. I recognize this.
4      Q. What is Exhibit 46, please?
5      A. Well, this is a notification to Captain
6  Cook, then chief pilot, that a notice had been made
7  of a trend toward mediocrity in Amerijet's pilot
8  training checking upgrade program.
9      Q. Was that letter actually sent by you to
10 Amerijet?
11     A. Yes, ma'am, it was.
12     Q. And did it accurately reflect your
13 assessment of Amerijet's training program as it
14 relates to its upgrade?
15         MS. NORTON: Object to the form of the
16 question.
17     A. It represents my -- it represented my
18 impression of the company based upon the entire
19 training program, not solely the upgrade.
20 BY MS. SHEA:
21     Q. All right. Subsequent to this time frame,
22 what, if any, involvement did you ever have
23 concerning Pat Major's upgrade efforts at Amerijet?
24     A. None.
25     Q. You never discussed him with executives

Page 77

1    or --
2        A. I may have discussed him with executives.
3    I would typically discuss the failure of any
4    applicant for upgrade with regard to why was the
5    person put up, why was it not ensured that they
6    would be competent to pass the test.
7        But it's incumbent upon the applicant as
8    well as the company. An applicant is aware of what
9    is expected of them upon sitting for an oral
10   examination or a simulator test or an airplane ride.
11   So that's a shared responsibility.
12       Q. My question -- well, I gather -- I asked
13   you a few minutes ago if you'd ever discussed with
14   Pat Major any aspects of his upgrade efforts.
15       A. I would have discussed it to the extent
16   that it appears in here. Mr. Major was one personal
17   or the latest person that didn't accommodate the
18   testing environment satisfactorily and that
19   something needed to be done in that regard. And I
20   gave them a vehicle for which to apprise me of any
21   upcoming checks. So that we could ensure that
22   things were done to my satisfaction.
23       Q. All right. But do you have any specific
24   recollection of conversations with Pete Steele, Dave
25   Bassett, Ed Cook, Derry Huff, or anyone else at

Page 78

1    Amerijet concerning Pat Major's upgrade efforts or
2    his particular situation following the time of that
3    letter?
4        A. No.
5        Q. Did you -- have you had any correspondence
6    with Brian Steele concerning the investigation
7    subsequent to your forwarding the EIR to Atlanta?
8        A. Not that I can recall.
9        Q. Are you the subject of or have you or are
10   you the subject of any type of inquiry or
11   investigation by the inspector general's office or
12   any other office concerning your conduct with
13   respect to the investigation of Pat Major's
14   complaint?
15       A. Not that I'm aware of.
16       MS. SHEA: That's all the questions I have
17   for you, Mr. Roseborough. Thank you.
18       MS. NORTON: I have a few, Mr.
19   Roseborough.
20       CROSS-EXAMINATION
21   BY MS. NORTON:
22       Q. The documentation, I believe it's 39, 40
23   and 41, what is the date on those documents?
24       MS. SHEA: Objection. Compound.
25       A. This doesn't really have -- this has date

Page 79

1    occurred, date known to FAA.
2    BY MS. NORTON:
3        Q. Okay. What's the date known to FAA, sir?
4        A. October 18th, 1999.
5        Q. All right. And is that Exhibit 39 or 41?
6        A. Thirty-nine.
7        Q. Thirty-nine. Are the dates on 40 and 41
8    the same?
9        A. Yes, ma'am.
10       Q. You referenced earlier an off-the-record
11   conversation between yourself and Mr. Major. I have
12   no intent of even asking about that, but is my
13   assumption correct that you did not relay that
14   conversation to Amerijet or anyone at Amerijet;
15   would that be correct?
16       A. What was discussed in that meeting stayed
17   in that meeting, except what Mr. Major provided in
18   writing to go forward with.
19       Q. Prior to the receipt of Mr. Major's
20   letter, which I understand was received here
21   approximately October 4th of '98, was the FAA aware
22   of any violation or alleged violation on the part of
23   Amerijet by Mr. Major?
24       A. I can't state for certain. Mr. Major may
25   have contacted us in that regard. I don't recall.

Page 80

1    Unless it's in a formal -- formal letter or
2    something of that nature, we really wouldn't process
3    it as a violation.
4        Mr. Major may have contacted us or
5    Amerijet may have contacted us that such and such
6    occurred and provided us information and we would
7    examine that information in the light of all that we
8    had available to us and make some determination. I
9    can't recall for certain.
10       Q. But had that occurred, that would have
11   been a different incident, it wouldn't have been
12   this incident referring to the weight and balances
13   takeoff in August?
14       MS. SHEA: Object to the form.
15   BY MS. NORTON:
16       Q. Is that correct?
17       A. It may have been, it may not have been. I
18   can't recall.
19       Q. Is the first notice that the FAA has of
20   the incident regarding the weights and balances and
21   contaminated runway, would that be October 18th?
22       A. Yes, ma'am.
23       MS. SHEA: Objection. Form.
24   BY MS. NORTON:
25       Q. There would be nothing prior to that, to

Page 81

1 your knowledge, prior to that time?
2 A. I don't have anything that I can recall
3 that came in, in any kind of official capacity prior
4 to this document here.
5 Q. Okay.
6 A. There -- if I could just say, the 10/18
7 date would be the date that I opened the
8 investigation, because that would have been the date
9 that I would have examined the documents that Mr.
10 Major provided.
11 Q. And it would have been after the opening
12 of the investigation you would have contacted
13 Amerijet, is that your policy and procedure?
14 A. I would think so, yes, ma'am. That's
15 what -- that's been my standard operating procedure.
16 Q. You wouldn't have any reason to contact
17 them about an investigation you hadn't opened, would
18 you, sir?
19 A. No.
20 Q. Okay. Mr. Major was terminated in August
21 of '99. And you had previously asked counsel of the
22 allegations in the complaint and one of them is he's
23 alleging that he was discharged because of his age.
24 And the other -- and refused to be upgraded because
25 of his age.

Page 82

1 And the second part of that is he's saying
2 that we discharged him because he blew the whistle
3 on us to the FAA. So the timing is why I was asking
4 you that.
5 MS. SHEA: I'm going to object and move to
6 strike that whole little dissertation. That's not a
7 question. That's not proper.
8 MS. NORTON: Fine.
9 BY MS. NORTON:
10 Q. Is there a difference between direct --
11 accepting a direct heading and accepting a heading?
12 A. Accepting a heading would be typical upon
13 departure. Departure control would give you a
14 heading and you would hold that heading until you
15 were given another heading or cleared on course. A
16 direct heading is generally -- or generally applies
17 to a point or destination.
18 Q. Is one -- is the direct associated with
19 the GPS?
20 A. It could be associated with the GPS.
21 However, oftentimes air traffic control will give a
22 person a direct heading and air traffic control will
23 monitor their progress and location. [illegible]
24 Q. Let me see if I can state this correctly.
25 Would a class 1 not been able to accept a direct

Page 83

1 clearance on a GPS unless they were GPS approved?
2 A. They would have to be GPS approved or they
3 would have to be able to keep their position
4 established throughout the course of flight.
5 Q. Okay. The training records prior to May
6 of '98, or prior to July of '98, they would have
7 been approved or accepted by the FAA. would they
8 not?
9 A. They would have by the then principal
10 operations inspector.
11 Q. And that would include -- included in
12 those records would have included the course of the
13 areas of study that had to be reviewed either
14 through recurrent training or upgrade training?
15 A. Yes, ma'am.
16 MS. NORTON: Excuse me one minute, please.
17 (Pause.)
18 BY MS. NORTON:
19 Q. As I understand the basis for your
20 determination that a recommendation of a violation
21 is that, in effect, Brian Steele did not counteract
22 the tower with the weather conditions or the runway
23 report as he noted it.
24 A. That's correct.
25 MS. NORTON: Thank you. I have no other

Page 84

1 questions.
2 REDIRECT EXAMINATION
3 BY MS. SHEA:
4 Q. Sir, could you look at IOP number 3, page
5 2 of Exhibit 39.
6 A. What part of this?
7 Q. This is a letter to you --
8 A. Yes, but what part of this IOP?
9 Q. Are you on page 2?
10 A. Um-hum.
11 Q. All right. Do you see paragraph two where
12 it indicates in Pat's correspondence to you, "I
13 reported the incident to the director of operations
14 and chief pilot, as required by Amerijet's GOM ".
15 Do you see that?
16 A. It's not in quotes, but I --
17 Q. I just wanted to make it clear in case
18 it's --
19 A. I see that.
20 Q. Is there in Amerijet's general operations
21 manual a requirement that a flight crew member
22 report a possible violation or a perceived violation
23 to the director of operations and chief pilot?
24 A. There typically is in all GOM's for all
25 airlines.

Page 85

1    Q. And is the director of operations an FAA
2 designee in that capacity?
3    A. No. The director of operations is an
4 employee of the company.
5    Q. All right. Same question for chief pilot.
6 What, if any, FAA authority does a chief pilot have
7 with respect to receipt of reports of perceived
8 violations?
9      MS. NORTON: Object to the form of the
10 question.
11    A. Either person, a director of operations
12 and/or a chief pilot is listed in the general
13 operations manual, GOM. And it delineates the
14 duties, responsibilities, authorities and work
15 functions that those people do.
16      That manual is accepted by the FAA as
17 describing the standard of operating procedures of
18 the carrier. As it states that they will do
19 something, they are expected to do so. It, however,
20 is not a required document. And if they fail to
21 follow that protocol, it is not a violation of the
22 federal aviation regulations.
23 BY MS. SHEA:
24    Q. All right. Do you know if Amerijet's GOM
25 has a protocol that a director of operations or

Page 86

1 chief pilot who receives a report of a perceived
2 violation will make a report to the FAA?
3    A. There is such a stipulation, as I recall,
4 within Amerijet's GOM.
5    Q. All right. And Pat's letter goes on in
6 line two of paragraph two that he had recommended
7 the safety officer be notified as well. Is the
8 safety officer an FAA designee?
9    A. No. The safety officer I believe at
10 Amerijet is David Bassett. There are five positions
11 that are required by federal aviation regulation
12 119.65. Those positions are mandated by regulation,
13 but they do not work for the FAA. They are the
14 director of operations, the chief pilot, the
15 director of maintenance, the director of quality
16 control and a safety officer or a director of
17 safety.
18    Q. All right, sir. And the director of
19 safety, who in Amerijet's case was Dave Bassett,
20 does the GOM provide that a safety officer in
21 receipt of a report of a perceived violation will
22 report it to the FAA?
23      MS. NORTON: Object to the form of the
24 question.
25    A. It may so state. And if it did so state,

Page 87

1 then it may have been provided.
2 BY MS. SHEA:
3    Q. Okay. Are you familiar with -- strike the
4 question. Pat goes on to state that he had sent a
5 letter to NASA's ASRS, Aviation Safety Reporting
6 System. Are you familiar with that agency?
7    A. Yes, ma'am.
8    Q. What is that?
9    A. The National Aviation Space
10 Administration.
11    Q. All right. And what is the ASRS?
12    A. Aviation Safety Reporting System provides
13 a forum where any airman or any aviation entity can
14 report to NASA the events surrounding an aviation
15 occurrence anonymously. The information is signed,
16 but the information that could identify the reporter
17 is sterilized prior to NASA's release.
18      The ASRS program is designed to enhance
19 the national air space system without implicating
20 the person providing the information. To make
21 things safer without that person being culpable.
22    Q. And without pilots suffering reprisals for
23 having made safety violations; is that fair to say?
24    A. They would not be culpable.
25      MS. NORTON: Object to the form of the

Page 88

1 question.
2 BY MS. SHEA:
3    Q. All right. Pat's letter goes on to state,
4 Amerijet's GOM further requires that it's POI be
5 notified. Is that a true statement, that
6 Amerijet's --
7    A. As I recall, it does require that.
8      MS. SHEA: Okay. All right, sir. That's
9 all the questions I have.
10      MR. MAJOR: Can we take a break for a
11 minute?
12      MS. SHEA: Yes. We'll step outside for a
13 minute.
14      (Recess was taken.)
15      MS. SHEA: Sorry, I just have a couple
16 more.
17 BY MS. SHEA:
18    Q. Sir, what does GOM stand for when we talk
19 about Amerijet's GOM?
20    A. General operations manual.
21    Q. All right. And to what extent are flight
22 crew members governed in the performance of their
23 duties by the general operations manual?
24    A. It provides the dress that they have,
25 their reporting for duty, their dress requirements,

Page 89

1  that they can't go scuba diving, that they can't
2  drink within a certain amount of flight time
3  alcoholic beverages, their personal conduct. Things
4  of that nature.
5      Q. Basically, it's binding on them, is that
6  fair to say?
7      A. It's binding on them as regards to the
8  company.
9      Q. And the GOM, or the general operations
10  manual, is on file with the FAA?
11      A. That's correct.
12      Q. But it has no regulatory effect?
13      A. It's an accepted manual. It's not a
14  manual that directly regulates the airline.
15      Q. All right. But it must be FAA filed and
16  accepted?
17      A. That's correct.
18      Q. All right.
19      A. The acceptance is that it doesn't
20  contradict any federal aviation regulations.
21      Q. Right. And as you say, some airlines may
22  do the minimum, some may have lots of extra
23  provisions?
24      A. That's correct.
25      Q. And you don't care if they have extra

Page 90

1  safeguards, as long as they are consistent with the
2  FAR's?
3      A. Yes, ma'am.
4      Q. All right. Are you aware of whether Pat
5  Major had made any reports to the Department of
6  Transportation Inspector General's Office before the
7  August 1999 incident regarding a concern that he had
8  about contaminated runways and --
9      A. I don't recall any such report or being
10  apprised of any such report.
11      Q. Sir, would you agree that a flight crew
12  that's authorized to navigate by means other than
13  GPS may use those other means to navigate a direct
14  clearance as long as they abide by the limits of
15  their authorization?
16      MS. NORTON: Object to the form of the
17  question.
18      A. I don't understand the question.
19  BY MS. SHEA:
20      Q. Okay. Would you agree that if a flight
21  crew member is authorized to navigate by means other
22  than GPS, they can navigate by those means as long
23  as they don't exceed their personal limitations or
24  authorizations?
25      A. All means of navigation for an air carrier

Page 91

1  are approved in operations specifications, which are
2  a legal document. It specifically stipulates what
3  they may and may not do.
4      Q. So if a member of a crew is authorized to
5  navigate a direct clearance, they may do so in the
6  absence of GPS as long as they stay within their own
7  authorization?
8      A. It's not a member of the crew, it's the
9  airline itself. If the airline does not have the
10  approval specifically implied, they may not use it.
11      Q. All right. The operation specifications
12  that you mentioned, those are regulatory in nature?
13      A. Yes, ma'am.
14      Q. Even though they're part of the GOM?
15      A. Copies are contained in the GOM, but they
16  are a stand-alone document.
17      MS. SHEA: All right. That's it. Thank
18  you for your time.
19      MS. NORTON: I'm sorry, but I have a few
20  follow ups.
21      RECROSS-EXAMINATION
22  BY MS. NORTON:
23      Q. Exhibit 39.
24      A. Yes, ma'am.
25      Q. That was a letter, I believe, that Mr.

Page 92

1  Major wrote. What's the date of that letter?
2      A. October 1st, 1999.
3      Q. The reference in there to NASA, that is an
4  organization that has no enforcement powers, does
5  it?
6      A. No enforcement powers in regard to this
7  issue.
8      Q. Thank you. And this issue being what's
9  raised in his letter of October 1st?
10      A. Yes, ma'am.
11      Q. The -- what constitutes a contaminated
12  runway, the one-quarter of an inch less, whether the
13  degradation should be taken that you referenced
14  earlier, that it could have had more definition.
15  And let's see, I think you said it could have been
16  one-sixteenth of an inch, three-sixteenths of an
17  inch. You went on to describe various ways it could
18  be more detailed. Do you recall that in general?
19      A. Yes, ma'am.
20      Q. The policy, though, that was in effect at
21  the time that Amerijet used, had that been approved
22  by the FAA?
23      A. I believe that it had in their performance
24  data, which there are portions of here. This
25  particular page is not an approved page, but what it

Page 93

1 says is adverse weather, takeoff and climb, it's --
2 this is chapter 4, section 1-A, subject 55, adverse
3 weather, takeoff and climb. Takeoff limitations,
4 takeoff should not be attempted if the following
5 limitations are exceeded, water more than
6 one-quarter inch deep.
7      And then it's -- it's deeper than that.
8 And it has certain stipulations here. It doesn't
9 have a lot of definitive information. It does have
10 an item from Daniel Liu, aircraft performance
11 engineer, which is page 2 of 3, with item 6. It
12 talks about wet runway. A runway is considered wet
13 when it is well soaked but without significant areas
14 of standing water, depth less than one-eighth inch,
15 or 3 millimeters of standing water.
16      A runway is considered to be well soaked
17 when there is sufficient moisture on the runway
18 surface to cause it to appear reflective. The
19 information that they have is not, in my estimation,
20 or in my estimation, at the time, as generous as it
21 could have been because the data can be computed by
22 an engineering firm that is contracted to do that
23 kind of work.
24      Q. Such a firm like Navtech?
25      A. Yes, ma'am. I believe that's who provided

Page 94

1 this data, or provided some of this data. They
2 have -- there is a letter here from Daniel Liu,
3 Navtech System Support Incorporated.
4      MS. NORTON: Thank you.
5      THE WITNESS: I think there was an
6 implication, if I may interject this, with regard to
7 the second paragraph of page 2, of item approved
8 three that Mr. Major alleges that a report from the
9 safety officer would have been sent to the POI. I
10 think that I should interject that if a report were
11 sent it would have contained a NASA form. And any
12 information as contained in that NASA form really
13 could not be used to initiate an enforcement
14 investigation.
15      REDIRECT EXAMINATION
16 BY MS. SHEA:
17      Q. All right, sir. That information could be
18 used with respect to implementing new safety and
19 performance policies; is that correct?
20      A. That's correct. And that would be carried
21 on by NASA through a bridge with the FAA in
22 Washington, as I recall.
23      Q. And is there a law regulation with which
24 you're familiar which can subject a crew member to
25 disciplinary action for a willful violation,

Page 95

1 notwithstanding effort to take safe harbor in the
2 NASA reporting system?
3      MS. NORTON: Object to the form of the
4 question.
5 BY MS. SHEA:
6      Q. If you know.
7      A. The NASA reporting system, as I mentioned,
8 provides for information that may not otherwise be
9 divulged. If a pilot, in the conduct of an aviation
10 act, feels that he or she may have violated some
11 regulatory FAR or protocol, they may file a NASA
12 report in a method to forestall whatever legal
13 action the FAA may take.
14      There are two issues. One, if the act
15 were determined to be deliberate, the NASA report
16 would have no finding, would be not accepted. Even
17 it is in fact accepted, the pilot may still, on
18 paper, lose his license for a period of time
19 adjudicated, but he will not actually surrender.
20      This places the airman in a very awkward
21 situation because he does not, or she does not have
22 an awareness that their certificate shows suspended,
23 or whatever, when in reality, under the Pilot
24 Records Improvement Act, when a prospective carrier
25 requests all back records, it will show a standing

Page 96

1 violation.
2      MS. SHEA: Okay. Thank you. All right.
3 We're finished. Thank you, sir.
4      THE WITNESS: You're quite welcome.
5      RECROSS-EXAMINATION
6 BY MS. NORTON:
7      Q. In response to your last question, though,
8 that does not change the fact the report may be
9 used, but NASA is not an enforcement agency?
10      MS. SHEA: Object to the form.
11      A. Only within NASA, national aviation and
12 space, the space program they enforce.
13 BY MS. NORTON:
14      Q. But not reports such as we've been
15 discussing here?
16      A. That's correct.
17      MS. NORTON: Thank you. I have no other
18 questions. I understand that you wanted to read
19 your earlier statement.
20      MS. SHEA: Don't waive the right to review
21 it.
22      THE WITNESS: Yes.
23      MS. SHEA: Let's just do it on the record.
24 When it's transcribed, and I will order it, if it's
25 all right with Amerijet's counsel, then send me the

| Page 97 | Page 99 |

Page 97

```
1   original, the copy with an errata sheet. I'll send
2   it to Mr. Roseborough directly, he can return the
3   errata sheet to us, rather than hold up the whole
4   finalization of the transcript by requiring him to
5   go to the court reporter's office.
6           MS. NORTON: I have no problem certainly
7   not having him going to the court reporter's office,
8   but I would like to get a copy statement you do.
9           MS. SHEA: Oh, sure.
10          MS. NORTON: So I would prefer that you
11  don't get both copies and I not get one.
12          MS. SHEA: That's fine. Send me the
13  errata sheet with the original and a copy, I will do
14  a letter to Mr. Roseborough. I'll copy Miss Norton,
15  giving him the errata sheet, asking him to send a
16  copy to each of us when he's completed it.
17          THE WITNESS: Will it require a notary?
18          MS. NORTON: I don't think so.
19          MS. SHEA: I don't remember. We'll waive
20  it.
21          MS. NORTON: I think we can stipulate that
22  we can waive that. Just so the record is clear, the
23  copy you're sending me is a copy of your letter to
24  him.
25          MS. SHEA: Right.
```

Page 99

```
1                   CERTIFICATE OF OATH
2
3   STATE OF FLORIDA          )
4   COUNTY OF BROWARD         )
5
6
7           I, the undersigned authority, certify that
8   JOHN C. ROSEBOROUGH personally appeared before me
9   and was duly sworn.
10
11          WITNESS my hand and official seal the 21st
12  day of February, 2001.
13
14
15
16
17          Beverly J. Gramm
18          BEVERLY J. GRAMM, RPR
19          Notary Public - State of Florida
            My Commission Expires: 12/19/03
20
21
22          BEVERLY J. GRAMM
23          My Comm. Exp. 12/19/03
24
25
```

Page 98

```
1           MS. NORTON: I will receive a copy of his
2   depo at the same time you receive it.
3           MS. SHEA: If you order it.
4           MS. NORTON: That's what I'm doing.
5           MS. SHEA: Otherwise, she won't work for
6   me any more.
7           THE COURT REPORTER: Did you want
8   condensed transcript and ASCII with that, Attorney
9   Norton?
10          MS. NORTON: Yes.
11          (Deposition concluded at 11:15 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 100

```
1                 REPORTER'S DEPOSITION CERTIFICATE
2
3   STATE OF FLORIDA          )
4   COUNTY OF BROWARD         )
5
6           I, BEVERLY J. GRAMM, Registered
7   Professional Reporter, certify that I was authorized
8   to and did stenographically report the deposition of
9   JOHN C. ROSEBOROUGH, that a review of the transcript
10  was requested; and that the transcript is a true and
11  complete record of my stenographic notes.
12          I further certify that I am not a
13  relative, employee, attorney or counsel of any of
14  the parties, nor am I a relative or employee of any
15  of the parties' attorneys or counsel connected with
16  the action, nor am I financially interested in the
17  action.
18
19          DATED this 21st day of February, 2001.
20
21          Beverly J. Gramm
22          BEVERLY J. GRAMM, RPR
            Notary Public - State of FLorida
23          My Commission Expires: 12/19/03
24
25
```

Page 101

```
 1        DOWNTOWN REPORTING
          337 East Las Olas Boulevard
 2        Fort Lauderdale, Florida 33301
              (954) 522-3376
 3
            February 21, 2001
 4
   John C. Roseborough
 5 C/O Susan Potter Norton, Esq.
   Allen, Norton & Blue, P.A.
 6 121 Majorca Avenue - Suite 300
   Coral Gables, Florida 33134
 7
   Re: Patrick Scott Major vs. Amerijet International
 8
   Dear Mr. Roseborough:
 9
   At the conclusion of your deposition given in the
10 above-styled cause you indicated you wished to read
   and sign the transcript.
11
   This letter is to advise you that the transcript of
12 your deposition is now ready.  You may call (954)
   522-3376 to schedule an appointment to read and sign
13 your deposition transcript, however, if you are a
   party in this action and your attorney has ordered a
14 copy of this transcript, you may wish to read his
   copy and forward to us a photostatic copy of your
15 signed correction sheet.
16 If you would like to waive your signature at this
   time, please so advise.  If not, please be advised
17 that your transcript will be available for your
   signature for two weeks from the date of this
18 letter.
19 Thank you.
20        Sincerely yours,
21        Beverly J. Gramm
          Beverly J. Gramm
22
23 cc: Valerie Shea, Esquire
24
25
```

Page 102

```
 1        AFFIDAVIT
 2 STATE OF FLORIDA    )
 3 COUNTY OF BROWARD   )
 4    I, _____, being
   first duly sworn, do hereby acknowledge that I did
 5 read a true and certified copy of my deposition
   which was taken in the case of Patrick Scott Major
 6 vs. Amerijet International, on February 13, 2001,
   and the corrections I desire to make are as
 7 indicated on the attached Errata Sheet.
 8        Done and signed the _____ day of
 9 _____, 2001.
10        _____
11
          CERTIFICATE
12
   STATE OF FLORIDA    )
13
   COUNTY OF BROWARD   )
14        Before me personally appeared
15 _____, to me well known and
   known to me to be the person described in and who
16 executed the foregoing instrument and acknowledged
   to and before me that he executed the said
17 instrument in the capacity and for the purpose
   therein expressed.
18        Witness my hand and official seal,
19 this _____ day of _____, 2001.
20
21
22
23
24        _____
25
```

Page 103

```
 1        TO BE EXECUTED BY THE NOTARY
          IF THE DEPONENT DOES NOT SIGN:
 2
 3
 4 I hereby certify that a letter with reference to
   reading and signing deposition was mailed to the
 5 witness on _____, 2001, and that:
 6 (  ) Witness refused to sign, giving the
   following reason:
 7
 8
 9
10
11
12 (  ) Neither the witness nor his attorney has
   responded to request to read and sign.
13
14
15
16
17
18 (Date)          (Notary Public)
19
20
21
   MY COMMISSION NO. _____
22 MY COMMISSION EXPIRES _____
23
24
25
```

Page 104

```
 1    E R R A T A   S H E E T
 2 STATE OF FLORIDA    )
 3 COUNTY OF BROWARD   )
 4    I, _____, the
   undersigned deponent, have this date read the
 5 foregoing pages of my deposition numbered 1 through
   104, and with the suggestions noted below, if any,
 6 these constitute a true and accurate transcription
   of my deposition given on the 13th of February,
 7 2001, at the time and place stated therein.
 8 PAGE NO.  LINE NO    SUGGESTION/REASON
 9
10 .........  .........  .............................
11 .........  .........  .............................
12 .........  .........  .............................
13 .........  .........  .............................
14 .........  .........  .............................
15 .........  .........  .............................
16 .........  .........  .............................
17 .........  .........  .............................
18 .........  .........  .............................
19 .........  .........  .............................
20 .........  .........  .............................
21 .........  .........  .............................
22 .........  .........  .............................
23 .........  .........  .............................
24 .........  .........  .............................
25 .........  .........  .............................
```

'98 [3]   79:21   83:6
83:6
'99 [2]   7:2   81:21
00-6070-Ferguson/Snow
   [1]   1:0
1 [9]   33:22   58:10
59:2   59:3   59:7
59:13   70:17   82:25
104:5
1-A [1]   93:2
10 [5]   1:0   3:15
43:15   43:16   52:12
10/18 [1]   81:6
100 [1]   30:6
1000 [1] 2:4
104 [1]   104:5
1050 [2]   1:0   3:13
11 [2]   1:0   98:11
11/22/99 [1]   59:20
119.65 [1]   86:12
12 [2]   43:15   43:16
12/19/03 [2]   99:19
100:23
121 [7]   2:7   22:8
43:18   55:10   63:23
75:4   101:6
121.537 [1]   43:18
125 [2]   63:20   63:24
13 [4]   1:0   39:12
39:12   102:6
13th [2]   3:14   104:6
14 [4]   39:12   39:12
39:14   55:10
15 [5]   1:0   44:1
44:2   45:8   98:11
15th [2]   54:12   54:13
16 [2]   49:14   49:19
17 [1]   3:12
17,000 [2]   38:20
42:13
17th [1]   61:2
18th [2]   79:4   80:21
1998 [3]   7:17   67:13
67:17
1999 [12]   6:21
7:1   7:24   8:4
9:12   38:4   60:4
61:2   72:8   79:4
90:7   92:2
1st [2]   92:2   92:9
2 [15]   35:21   36:21
38:14   41:13   42:9
45:20   46:19   47:5
48:8   58:12   58:22
84:5   84:9   93:11
94:7
20 [1]   38:4
2001 [10]   1:0
3:15   99:12   100:19
101:3   102:6   102:8
102:19   103:5   104:7
201 [1]   3:13
21 [1]   101:3
2150 [1] 23:1

21st [2]   .:11   100:19
22nd [1]   60:4
25 [1]   64:6
28 [2]   38:21   42:14
3 [8]   2:3   36:11
36:14   37:2   37:6
84:4   93:11   93:15
3/6 [1]   59:23
300 [2]   2:7   101:6
33 [1]   2:17
33134 [2]   2:8
101:6
33301 [1]   101:2
33394 [1]   2:5
337 [1]   101:1
39 [7]   2:17   33:21
34:14   78:22   79:5
84:5   91:23
4 [4]   36:6   37:9
44:7   93:2
40 [6]   2:18   40:15
41:2   41:11   78:22
79:7
400 [1]   75:4
41 [8]   2:18   2:19
47:24   47:25   48:3
78:23   79:5   79:7
42 [5]   2:20   52:21
52:22   53:1   53:5
43 [4]   2:21   54:19
54:21   54:24
44 [4]   2:22   59:19
60:2   64:15
45 [3]   2:23   59:23
64:21
46 [4]   2:24   75:23
76:2   76:4
47 [1]   2:19
4th [3]   9:10   14:2
79:21
5 [4]   36:6   37:14
44:7   49:8
500 [1]   2:4
52 [1]   2:20
522-3376 [3]   1:0
101:2   101:12
530 [1]   43:18
54 [1]   2:21
55 [1]   93:2
580's [1]   7:7
59 [2]   2:22   2:23
6 [2]   37:17   93:11
60 [1]   55:8
6th [1]   64:23
7 [1]   37:23
75 [1]   2:24
78 [1]   2:6
8 [2]   36:3   38:5
80 [1]   74:15
84 [1]   2:9
8400.10 [1]   66:4
9 [4]   1:0   3:15
43:15   43:16

91 [1]   2:10
94 [1]   2:12
954 [3]   1:0   101:2
101:12
96 [1]   2:13
99-021746-11 [1]
1:0
a.m [4]   1:0   1:0
3:15   98:11
aback [1]   20:17
abdication [1]   43:22
abide [1] 90:14
ability [1]   59:6
able [8]   31:11   31:15
57:7   58:13   58:25
59:4   82:25   83:3
abort [2] 31:7   31:9
above [2]   3:21
43:2
above-entitled [1]
3:4
above-styled [1]
101:10
absence [5]   58:10
58:22   62:7   63:10
91:6
acceleration [1] 30:23
accept [5]   18:15
58:9   58:23   59:7
82:25
acceptable [1]   52:3
acceptance [1]   89:19
accepted [10]   37:23   52:5   59:14
83:7   85:16   89:13
89:16   95:16   95:17
accepting [3]   82:11
82:11   82:12
accommodate [6]
9:20   66:5   68:6
68:9   72:3   77:17
accord [1]   5.5
accordance [1]   23:1
accurate [4]   29:22
29:24   71:7   104:6
accurately [1]   76:12
accurateness [1]
69:19
accusing [1]   15:25
achieve [1]   31:19
acknowledge [1]
102:4
acknowledged [2]
45:23   102:16
act [3]   95:10   95:14
95:24
action [12]   12:3
16:5   24:19   24:20
24:21   24:24   25:7
94:25   95:13   100:16
100:17   101:13
activity [2]   39:18
39:20
actual [3]   26:25
28:14   44:11

addition [1]   7:6
additional [4]   23:13
23:14   49:14   54:8
address [1]   15:16
adjudicated [1] 95:19
adjudication [2] 11:1
23:8
adjustments [1] 30:24
administer [1]   72:17
Administration [2]
4:6   87:10
administrative [2]
65:4   65:6
administratively [1]
32:17
administrator [1]
22:23
adverse [3]   37:18
93:1   93:2
advice [1]   15:4
advise [3]   68:16
101:11   101:16
advised [1]   101:16
advises [1]   39:20
Aeronautics [1] 7:11
AFFIDAVIT [1]
102:1
again [6] 11:22   21:15
26:5   28:12   55:15
55:17
against [7]   24:19
24:20   24:21   24:24
32:18   34:21   65:5
age [5]   3:2   3:20
55:8   81:23   81:25
agency [2]   87:6
96:9
ago [4]   32:17   47:4
77:13
agree [3] 63:7   90:11
90:20
agreed [1]   19:13
ahead [1]   25:16
air [23]   6:23   22:6
27:14   27:15   38:21
39:1   42:14   44:6
58:12   58:22   59:2
59:3   59:7   59:13
61:11   62:12   66:1
66:11   70:17   82:21
82:22   87:19   90:25
aircraft [29]   4:14
5:17   6:5   9:18
8:5   25:3   27:5
28:10   30:21   30:23
31:3   31:17   32:8
38:8   38:9   38:19
39:17   42:12   42:18
43:5   43:7   46:7
55:10   59:7   63:9
68:22   68:23   70:21
93:10
airline [8]   6:16
6:20   7:14   7:16
21:3   89:14   91:9
91:9
airline's [1]   50:17

airlines [13]   4:14
4:16   4:18   4:19
5:2   5:7   5:8
5:11   6:7   6:11
6:22   84:25   89:21
airman [7]   27:20
53:7   53:13   56:5
57:3   87:13   95:20
airmen [4]   4:15
27:13   73:17
airplane [4]   68:4
68:8   69:2   77:10
airplane's [1]   32:14
airport [11]   4:10
4:13   4:18   4:19
8:6   13:1   47:1
50:17   50:22   50:23
64:1
airworthiness [1]
6:14
AJ [5]   24:23   53:11
56:1   58:4   58:8
alcoholic [1]   89:3
allegation [1]   27:4
allegations [1]   81:22
allege [1]   12:19
alleged [2]   19:24
79:22
allegedly [2]   12:20
13:6
alleges [1]   94:8
alleging [2]   19:23
81:23
Allen [7]   1:0
2:7   24:10   24:20
52:14   54:10   101:5
allow [1]   62:6
allowed [4]   38:20
38:21   42:13   42:14
along [1] 27:22
aloud [1]   38:17
43:13   49:8
altogether [1]   37:6
always [3]   62:10
62:11   62:12
Amerijet [47]   1:0
3:5   6:23   7:13
7:19   7:25   8:5
13:11   13:17   19:22
24:13   26:14   34:18
34:21   34:25   39:4
41:22   52:17   58:8
58:23   59:6   59:12
60:9   62:15   62:15
64:16   67:2   67:13
68:15   69:7   70:6
71:6   72:1   72:4
75:20   76:10   76:23
78:1   79:14   79:14
79:23   80:5   81:13
86:10   92:21   101:7
102:6
Amerijet's [21]   22:7
37:18   37:25   40:11
60:21   .60:25   61:9
63:6   64:17   67:10
76:7   76:13   84:14
84:20   85:24   86:4

86:19    88:4    88:6
88:19    96:25

**amount [7]**    28:10
51:6    61:13    61:15
63:17    67:7    89:2

**ample [1]**    34:9

**analysis [1]**    29:13

**anger [1] 16:15**

**angry [6]**
16:11    16:13    16:16
16:21    16:22

**annual [3]**    10:3
10:5    56:7

**anonymously [1]**
87:15

**answer [4]**    17:11
18:25    50:9    62:22

**answered [2]**    21:11
29:10

**answering [1]**    17:10

**Antonio [1]**    10:1

**anyway [1]**    19:18

**apology [1]**    18:15

**appear [2]**    42:1
93:18

**APPEARANCES [1]**
1:0

**appeared [2]**    99:8
102:14

**appearing [4]**    1:0
1:0    69:11    69:12

**applicant [6]**    69:12
69:13    71:1    77:4
77:7    77:8

**applied [1]**    38:13

**applies [1]**    82:16

**apply [3]**    22:19
31:9    31:10

**appointed [1]**    43:22

**appointment [1] 101:12**

**appreciate [1]**    60:17

**apprise [1]**    77:20

**apprised [1]**    90:10

**apprises [1]**    39:16

**appropriate [3]**    17:19
68:4    70:22

**approval [3]**    38:1
70:16    91:10

**approvals [1]**    73:16

**approved [14]**    11:7
32:5    37:21    37:22
38:7    67:19    67:22
83:1    83:2    83:7
91:1    92:21    92:25
94:7

**areas [4] 6:6**    66:5
83:13    93:13

**arrive [1]**    22:20

**arrived [1]**    16:2

**ASCII [1]**    98:8

**aside [1] 71:5**

**aspect [1]**    6:10

**aspects [6]**    6:3
43:20    56:17    77:14

**ASRS [3]**    87:5
87:11    87:18

**assemble [1]**    74:5

**assess [2]**    22:16
51:18

**assessment [4]**    23:18
25:8    62:19    76:13

**assign [2]**    68:19
69:1

**assigned [4]**    5:3
5:7    6:22    67:13

**assignment [1]**    73:5

**assistance [1]**    68:20

**associated [2]**    82:18
82:20

**assume [1]**    25:2

**assumed [1]**    7:16

**Assuming [1]**    21:8

**assumption [1]**    79:13

**assured [1]**    69:8

**ATCT [1]**    44:6

**ATIS [2] 27:15**    27:15

**Atlanta [10]**    11:2
19:4    19:10    23:5
33:12    56:21    65:7
65:10    65:24    78:7

**attached [1]**    102:7

**attempted [1]**    93:4

**attempts [1]**    71:25

**attendance [1]**    70:11

**attendants [3]**    5:13
5:14    6:19

**attorney [9]**    2:25
16:7    23:13    65:14
65:18    98:8    100:13
101:13    103:12

**attorneys [1]**    100:15

**attributed [1]**    21:16

**audit [1] 70:5**

**August [9]**    6:21
7:1    7:24    8:4
61:2    72:8    80:13
81:20    90:7

**author [7]**    11:10
35:24    36:8    41:14
41:18    48:9    48:14

**authoritative [1]**
66:8

**authorities [1]**    85:14

**authority [4]**    53:8
62:25    85:6    99:7

**authorization [3]**
56:4    90:15    91:7

**authorizations [1]**
90:24

**authorized [12]**    51:17
51:21    52:1    52:5
56:5    57:2    62:17
66:2    90:12    90:21
91:4    100:7

**authorizes [2]**    63:8
63:8

**available [4]**    45:24
46:22    80:8    101:17

**Avenue [2]**    2:7

**101:6**

**aviation [20]**    4:6
4:15    5:5    27:8
30:17    30:18    39:1
42:21    51:12    57:4
85:22    86:11    87:5
87:9    87:12    87:13
87:14    89:20    95:9
96:11

**avionics [3]**    6:12
6:13    6:19

**aware [11]**    10:11
67:1    67:6    69:20
75:10    75:15    75:19
77:8    78:15    79:21
90:4

**awareness [1]**    95:22

**away [1] 9:19**

**awkward [1]**    95:20

**B [8]**    2:15    35:21
38:15    42:9    42:25
43:18    48:8    48:16

**balance [2]**    5:19
38:6

**balances [2]**    80:12
80:20

**Barnie [4]**    72:3
73:6    73:11    75:16

**based [9]**
22:17    29:5    32:2
40:7    56:24    62:19
63:9    76:18

**baseline [1]**    38:12

**basic [1] 70:12**

**basis [11]**    15:7
17:6    17:8    17:15
18:5    24:23    26:19
28:12    54:6    55:6
83:19

**Bassett [5]**    39:4
39:7    77:25    86:10
86:19

**became [2]**    7:15
67:12

**become [3]**    7:13
10:6    10:11

**becomes [1]**    27:13

**behalf [3]**    1:0
1:0    39:23

**below [1]**    104:5

**benefit [1]**    40:12

**better [1]**    18:23
61:6

**between [4]**    17:13
61:15    79:11    82:10

**beverages [1]**    89:3

**Beverly [5]**    3:9
99:18    100:6    100:22
101:21

**binding [2]**    89:5
89:7

**bit [2]**    5:7    61:9

**blew [1] 82:2**

**Blue [3] 1:0**    2:7
101:5

**Blvd [2] 1:0**    2:4

**boaru [4]**    48:21
56:7    56:12    58:12

**bottom [1]**    30:1

**Boulevard [2]**    3:13
101:1

**boy [1]    43:18**

**brakes [1]**    31:10

**Bravo [4]**    45:17
45:20    46:19    47:5

**breach [1]**    20:19

**breached [3]**    12:7
18:8    20:8

**break [3] 5:6**    31:21
88:10

**Brett [9] 24:11**    25:9
26:10    47:25    48:6
48:7    48:7    48:18
49:5

**Brian [14]**    24:12
26:12    27:23    30:7
41:2    41:10    42:20
43:3    43:16    45:9
48:5    55:12    78:6
83:21

**bridge [1]**    94:21

**bringing [1]**    12:3

**brought [2]**    16:23
17:1

**Broward [9]**    2:4
27:8    51:12    51:22
99:4    100:4    102:3
102:13    104:3

**brown [1]**    9:21

**C [9]**    1:0    3:1
3:18    4:1    36:13
36:14    99:8    100:9
101:4

**C/O [1]    101:5**

**calls [1] 9:21**

**candidacy [1]**    72:13

**candidate [2]**    68:17
69:8

**candidate's [1]    69:23**

**candidates [1]**    67:16

**cannot [2]**    58:12
63:1

**capability [3]**    30:20
38:23    42:16

**capacity [4]**    56:1
81:3    85:2    102:17

**captain [28]**    24:12
27:20    42:24    43:2
43:16    44:2    44:24
50:4    50:21    50:25
52:14    53:2    53:17
54:10    55:11    56:1
56:8    56:8    56:18
58:19    62:6    62:10
65:19    67:17    68:2
72:1    72:13    76:5
73:17

**captain's [1]**    62:25

**captains [2]**    62:17
63:8

**care [1]    89:25**

**careless [3]**    43:5
43:7    48:24

**Caribbean [1]**    7:7

**carried [1]**    94:20

**carrier [8]**    5:22
66:1    66:11    73:12
74:18    85:18    90:25
95:24

**carriers [1]**    70:25

**case [14] 1:0**    1:0
20:24    22:21    22:22
28:5    33:4    40:11
61:21    65:15    69:12
84:17    86:19    102:5

**catastrophe [1]**    31:6

**cc [1]    101:23**

**center [2]**    3:12
51:16

**certain [13]**    5:19
22:20    33:10    56:16
61:13    61:15    63:16
67:7    73:13    79:24
80:9    89:2    93:8

**certainly [3]**    15:24
19:1    97:6

**certificate [5]**    69:16
95:22    99:1    100:1
102:11

**certification [4] 31:14**
63:24    63:25    74:11

**certified [3]**    39:13
49:11    102:5

**certifics [1]**    7:10

**certify [4]**    99:7
100:7    100:12    103:4

**cetera [2]**    32:9
68:24

**CFR [1]    55:10**

**chain [1] 14:21**

**challenge [4]**    28:1
45:4    47:21    51:2

**challenged [7]**    27:17
27:23    28:20    30:11
50:4    57:16    57:17

**chance [2]**    14:2
34:9

**change [1]**    96:8

**changed [1]**    7:5

**changes [1]**    64:17

**chapter [1]**    93:2

**characterization [3]**
11:21    16:19    20:14

**characterizing [1]**
16:18

**charge [1]**    33:5

**charged [1]**    21:2

**chart [1] 47:1**

**check [11]**    27:20
53:7    53:13    55:13
56:5    56:7    56:7
57:2    68:7    73:11
73:17

**checking [1]**    76:8

**checks [2]**    74:12
77:21

**chief [9] 72:25**    76:6
84:14    84:23    85:5
85:6    85:12    86:1

JOHN ROSEBOROUGH                                    Condensed!™                        circumstances / descriptions

86:14                     concern[1]          90:7      90:8      92:11      11:2,    16:18   17:18   Dave[1] 39:4      77:24
circumstances[1]          concerned[1]        8:25      contamination[1]               35:7    65:7   81:21   86:19
8:24                      concerning[17] 7:25            63:11                          96:25  100:13  100:15   David[1]          86:10
claim[2]            14:6    8:4    13:18   13:21   contents[1]        9:23    counsel's[3]        11:2   day-to-day[1]     6:17
17:7                       24:7   44:20   57:11   contested[1]       29:4     23:7    56.20           deals[1] 30:20
clarified[1]        61:6    58:4   58:8    59:6    continue[4]        31:6    counteract[1]     83:21   Dear[1] 101:8
clarify[2]          6:9     71:25  72:13   72:23    31:13   31:15   31:16   County[8]         27:8    December[2]       54:3
32:3                       76:23  78:1    78:6     continued[1]       73:15   51:12   51:22   99:4    54:12
class[9] 58:10      58:12   78:12                   contracted[1]      93:22   100:4   102:3   102:13   decision[2]       28:8
58:22   59:2       59:3    concerns[1]          9:3    contradict[2]      49:15   104:3                   56:11
59:7    59.13      70:17   concluded[1]    30:3    89:20                      couple[1]          88:15   deemed[3]         61:11
82:25                     48:23   98:11            contradictory[1]            course[3]          82:15   63:22   64:8
classes[1]          70:12   conclusion[4]     42:11    49:20                      83:4    83:12           deep[1] 93:6
clear[3] 37:19      84:17   42:20   48:17   101:9    contradicts[2]     44:7    court[8] 1:0        3:7    deeper[1]         93:7
97:22                     condensed[1]     98:8     50:1                       25:24   33:1    52:20   93:7
clearance[4]        45:23   condition[2]     30:12    contrary[3]        42:20   97:5    97:7    98:7    Defendant[3]      1:0
83:1    90:14      91:5    45:24                    43:3    43:6            covered[1]         44:4    1:0      3:6
cleared[1]          82:15   conditions[11] 38:22    control[9]         22:6    64:7                   defer[1] 32:12
client[2]           12:25   42:15   46:2    51:18    25:1    44:6    44:25   create[1]          50:12   definition[1]     92:14
15:25                     60:16   60:22   62:24    46:2    82:13   82:21   creates[1]         33:4    definitive[1]     93:9
climb[3]            31:15   63:10   64:18   66:13    82:22   86:16           credentials[2]     51:9    degradation[4]    62:6
93:1    93:3              63:22                     Convair[1]         7:7     56:3                   62:11   62:23   92:13
close[1] 25:6             conduct[6]          9:5     conversation[5]            credibility[2]     22:20   degradations[5]
closed[3]           53:15   9:14    10:24   10:13    8:17    13:9    14:9    50:21                   31:25   32:13   38:13
53:16   65:1              89:3    95:9             79:11   79:14           credible[1]        51:2    62:19   63:9
closes[1]           55:5    conducted[1]     10:10    conversations[3]            credited[1]        21:16   degrade[1]        30:22
cognizant[1]        50:17   conducting[2]    10:13    58:3    58:7    77:24   CROSS-EXAMINATION         degrading[2]      38:22
colloquy[1]         26:3    66:9                     convince[1]        50:7    [2]      2:6    78:20   42:15
command[5]          14:22   conference[2]    8:12    Cook[2] 76:6      77:25   18:1                 deliberate[1]     95:15
25:3    43:17      43:20   12:25                    coordinated[1]  65:16   culpability[1]     53:18   delineates[1]     85:13
62:25                     confidential[3] 17:8      copies[3]          40:22   culpable[2]        87:21   delivery[1]       11:20
commands[1]         25:2    17:13   18:8            91:15   97:11           87:24                   delta[1] 43:19
commencing[1]3:15         confidentiality[2]         copy[19]           19:17   currency[3]        55:13   denies[1]         60:8
Commission[4]99:19        18:9    19:13            34:4    34:5    35:8    56:9    71:18           depart[1]         31:3
100:23  103:21  103:22    connected[1]    100:15    35:11   40:17   40:25   current[2]         33:16   departed[2]       27:5
commitment[1] 15:15       connection[1]    39:20    97:1    97:8    97:13   68:21                   39:18
company[12]         33:10   consecutive[1] 33:19    97:14   97:14   97:23   Custom[1]          6:23    department[8]     10:12
68:5    69:21      70:4    consider[6]          8:19    97:23   98:1   101:14   D[9]      2:1    36:2    19:21   27:8    51:12
71:2    73:13      74:14   19:12   33:4    63:16   101:14  101:14  102:5   39:3    41:17   43:11   60:14   64:16   73:1
75:6    76:18      77:8    65:1    66:8            Coral[2]2:8       101:6   43:14   43:18   48:11   90:5
85:4    89:8              considered[8]         33:6    correct[54]         4:24    49:7                 departure[2]      82:13
competent[1]        77:6    61:12   61:19   66:18    5:9     6:1     6:5    Daniel[2]          93:10   82:13
compile[1]          36:18   67:3    67:7    93:12    6:5     13:15   15:19   94:2                  depend[1]         68:23
93:16                     15:22   19:5    19:19   data[10] 22:4      22:4    depo[2] 40:23       98:2
complaint[3]        10:7    consistent[1]     90:1     20:21   23:20   24:18   39:20   61:24   62:23   deponent[2]       103:1
78:14   81:22              constitute[3]     28:3     23:10   32:15   35:1    63:3    92:24   93:21   104:4
complete[5]         22:25   54:6    104:6          37:13   37:16   38:4    94:1    94:1            deposing[1]       17:2
22:25   34:10      71:7    constituted[1]   57:13    40:1    40:2    40:6    date[16] 8:16       39:16   deposition[18]    1:0
100:11                    constitutes[1]    92:11    40:10   40:14   42:6    42:12   44:12   51:8    3:1     12:22   15:13
completed[5]        19:10   construe[1]          67:23    47:9    49:1    52:4    78:23   78:25   79:1    17:9    18:10   33:20
40:12   69:14      70:1    81:16                    57:7    58:24   60:10   79:3    81:7    81:7    34:11   93:11  100:1
97:16                     contact[2]          68:5     60:11   67:14   68:14   81:8    92:1   101:17   100:8  101:9  101:12
completing[1] 68:3        contacted[9]         15:1     68:18   68:25   71:8    103:18  104:4           101:13  102:5  103:4
completion[2]       53:8    45:17   45:19   72:22    71:9    71:20   75:13   dated[6]54:1      54:12   104:5   104:6
70:20                     73:2    79:25   80:4     75:18   79:13   79:15   59:19   59:23   60:4    depositions[2]    40:21
compliance[4]       5:24    80:5    81:12          80:16   83:24   89:11   100:19                   52:12
21:3    23:2       67:24   contain[2]          34:17    89:17   89:24   94:19   dates[1] 79:7       depth[1]93:14
complies[3]         35:4    34:17                   94:20   96:16           date[16] 8:16       39:16   derivations[1]    62:1
36:12   48:12              contained[3]         91:15    correction[1]     101:15   42:12   44:12   51:8    Derry[1]          77:25
Compound[1]    78:24      94:11   94:12            corrections[1]    102:6   78:23   78:25   79:1    describe[1]       92:17
comprehensive[2]          containing[1]     44:3     correctly[2]       23:17   79:3    81:7    81:7    described[2]      52:16
29:22   29:23             contaminated[14]          82:24                     81:8    92:1   101:17   102:15
computed[1]         93:21   27:21   28:3    28:6    correspondence[4]         103:18  104:4           describes[1]      39:11
concede[2]     18:14      28:17   28:19   45:5     54:14   60:21   78:5    dated[6]54:1      54:12   describing[1]     85:17
18:16                     60:16   60:22   63:22    84:12                      59:19   59:23   60:4    descriptions[16:13
conceded[1]         57:18   64:8    64:18   80:21    counsel[10]         6:24    100:19

design [1] 50:23
designed [1] 87:18
designee [2] 85:2
  86:8
desire [1] 102:6
destination [1] 82:17
destroy [1] 31:11
detail [1] 47:14
detailed [1] 92:18
detect [3] 11:12
  11:19 16:15
determination [6]
  22:21 25:20 44:10
  55:7 80:8 83:20
determine [2] 54:7
  56:13
determined [9] 10:6
  22:4 24:16 28:16
  28:18 65:7 65:19
  73:14 95:15
determines [1] 31:6
dialogue [1] 13:8
dictated [1] 63:2
died [1] 10:17
difference [1] 82:10
different [7] 61:24
  69:3 69:5 70:12
  70:20 70:23 80:11
direct [15] 2:3
  3:22 58:9 58:13
  58:23 59:8 59:13
  82:10 82:11 82:16
  82:18 82:22 82:25
  90:13 91:5
directed [1] 10:22
direction [1] 56:24
directly [2] 89:14
  97:2
director [15] 25:5
  56:16 56:18 56:22
  84:13 84:23 85:1
  85:3 85:11 85:25
  86:14 86:15 86:15
  86:16 86:18
disappointed [1]
  20:16
discharged [2] 81:23
  82:2
disciplinary [1] 94:25
disclosure [1] 19:8
discontinued [2]
  73:11 75:17
discovery [1] 3:3
discretion [2] 62:18
  75:16
discuss [2] 15:18
  77:3
discussed [11] 12:3
  13:13 14:14 21:8
  21:14 57:22 76:25
  77:2 77:13 77:15
  79:16
discusses [1] 21:17
discussing [1] 96:15
discussion [6] 8:13

discussions [1] 58:11
dismiss [1] 32:17
dispatcher [1] 7:9
dispatchers [1] 7:10
dispose [1] 65:5
dissertation [1] 82:6
distance [1] 31:18
District [7] 1:0
  1:0 3:7 3:7
  3:12 4:4 4:12
diving [1] 89:1
division [1] 6:8
  23:6 23:13
divulged [3] 16:24
  17:6 95:9
document [8] 34:1
  35:21 52:13 66:17
  81:4 85:20 91:2
  91:16
documentation [1]
  78:22
documented [1] 71:22
documents [7] 13:3
  18:19 35:7 55:16
  69:17 78:23 81:9
doesn't [8] 16:11
  32:7 46:10 54:6
  55:23 78:25 89:19
  93:8
Dominican [1] 7:8
done [12] 10:23 12:17
  14:10 19:24 20:1
  21:21 21:23 69:3
  69:4 77:19 77:22
  102:8
down [5] 5:6 7:8
  16:19 27:9 45:14
downstairs [1] 72:11
DOWNTOWN [2]
  1:0 101:1
dozens [2] 64:2
  64:3
drainage [1] 51:15
dress [1] 88:24 88:25
drink [1] 89:2
driving [1] 51:23
drop [1] 72:10
dry [6] 61:12 63:16
  66:13 66:18 67:3
  67:7
due [1] 55:24
duly [4] 3:20 43:22
  99:9 102:4
duplicate [1] 19:17
during [2] 46:3
  75:20
duties [3] 66:9
  85:14 88:23
duty [2] 9:19 88:25
E [6] 2:1 2:15
  43:19 104:1 104:1
  104:1
East [2] 2:4 101:1

Ed [1] 77:25
Edward [1] 43:19
effect [4] 67:2
  83:21 89:12 92:20
effort [1] 33:3
  73:8 95:1
efforts [1] 76:23
  77:14 78:1
EIR [6] 24:4 24:17
  26:9 41:2 41:10
  78:7
either [5] 25:14
  51:16 61:18 83:13
  85:11
eligible [1] 69:17
emergency [1] 70:14
employee [3] 85:4
  100:13 100:14
employees [1] 68:13
enable [1] 31:2
enables [1] 31:17
encompass [2] 4:18
  5:16
end [3] 31:12 31:22
  43:11
endanger [3] 43:6
  43:8 48:25
ended [1] 19:16
energy [1] 31:21
enforce [1] 96:12
enforcement [18]
  11:6 11:10 21:19
  22:2 23:24 23:24
  26:9 33:8 33:22
  34:16 34:20 34:24
  35:11 52:2 92:4
  92:6 94:13 96:9
engine [4] 31:5
  31:8 31:21 45:15
engineer [4] 27:21
  48:19 50:22 93:11
engineering [4] 61:24
  63:3 64:1 93:22
engineers [3] 5:13
  6:19 70:19
enhance [1] 87:18
ensure [1] 5:3
  5:23 67:21 77:21
ensured [1] 77:5
entered [3] 33:1
  34:16 46:18
enterprise [1] 4:15
entire [4] 45:12
  46:7 46:13 76:18
entity [1] 87:13
envelope [1] 9:22
  37:4
environment [1] 77:18
equipment [2] 5:20
  70:13
errata [5] 97:1
  97:3 97:13 97:15
  102:7
especially [1] 74:17
Esq [3] 2:3 2:6

Esquire [3] 1:0
  1:0 101:23
essence [2] 32:21
  61:22
essentially [2] 41:25
  70:1
establish [3] 56:21
  58:25 59:4
established [7] 21:13
  49:16 49:22 55:3
  56:25 64:25 83:4
establishes [1] 38:12
establishing [2] 45:4
  70:1
estimation [2] 93:19
  93:20
et [2] 32:9 68:23
evaluate [1] 22:16
evaluation [1] 69:22
event [1] 39:12
events [1] 87:14
eventual [1] 23:8
evidence [5] 3:3
  22:24 24:16 26:17
  26:24
exact [3] 10:17 20:4
  58:14
exactly [1] 11:19
  19:24 46:19
exam [2] 68:7 75:17
examination [9] 2:3
  2:9 2:12 3:22
  75:14 75:19 77:10
  84:2 94:15
examine [3] 9:22
  22:3 80:7
examined [1] 81:9
examining [1] 69:18
example [2] 64:6
  68:15
exceed [1] 90:23
exceeded [1] 93:5
except [5] 12:13
  13:9 41:22 67:20
  79:17
exception [1] 42:4
Excuse [4] 7:3
  20:15 41:4 83:16
executed [3] 102:16
  102:16 103:1
executive [1] 69:21
executives [2] 76:25
  77:2
exercise [2] 24:25
  62:17
exercised [2] 65:4
  75:16
exhibit [42] 2:17
  2:18 2:19 2:20
  2:21 2:22 2:23
  2:24 32:25 33:1
  33:21 33:21 33:22
  34:14 35:3 40:15
  41:2 41:11 41:13

47:24 47:25 48:3
  52:12 52:21 52:22
  53:1 53:5 54:19
  54:21 54:24 59:18
  59:19 59:23 60:2
  64:15 64:21 75:23
  76:2 76:4 79:5
  84:5 91:23
exhibits [2] 2:17
  33:20
exist [2] 22:4 64:11
exists [1] 67:17
expect [1] 71:6
expected [2] 77:9
  85:19
expedient [1] 55:23
experience [2] 22:18
  50:8
Expires [3] 99:19
  100:23 103:22
explain [1] 27:3
explicitly [1] 62:17
explored [1] 22:18
exposure [1] 22:18
express [1] 63:7
expressed [2] 13:20
  102:17
extensive [1] 70:24
extent [3] 48:20
  77:15 88:21
extra [2] 89:22 89:25
extract [1] 36:25
extracted [2] 15:15
  15:17
eyewitnesses [1]
  22:10
FAA [37] 3:11
  4:1 4:5 4:12
  7:25 12:25 22:19
  37:21 37:22 37:22
  56:3 57:2 65:14
  68:13 72:17 73:3
  73:6 75:2 75:19
  79:1 79:3 79:21
  80:19 82:3 83:7
  85:1 85:6 85:16
  86:2 86:8 86:13
  86:22 89:10 89:15
  92:22 94:21 95:13
FAA-approved [2]
  37:24 63:2
facie [4] 22:21 22:22
  26:16 33:4
fact [10] 15:12 20:24
  27:17 29:14 29:15
  39:11 54:9 57:18
  95:17 96:8
factor [4] 15:9
  22:20 56:10 56:12
facts [6] 35:22 38:15
  41:14 49:16 49:21
  54:8
factual [3] 17:14
  33:7 45:7
fail [2]... 74:11 - 85:20
failed [3] 73:10
  75:10 75:20

fails [1] 49.14

failure [2]      75:12
77:3

fair [5]   32:2      51:18
61:9      87:23      89:6

fairly [1]      70:24

fall [2]   3:24      65:19

familiar [7]      21:21
64:11   66:16      66:22
87:3   87:6      94:24

familiarity [1]      63:6

family [1]      9:25

FAR [15] 5:5      7:10
7:25   43:7      43:18
43:24   48:19      55:10
57:17   64:2      64:5
64:12   67:24      75:4
95:11

FAR's [6]      26:17
44:12   60:9      64:11
71:10   90:2

faster [4]      31:19
31:20   38:21      42:14

February [7]      1:0
3:14   99:12      100:19
101:3   102:6      103:16

federal [20]      4:6
5:5   5:24      30:16
30:18   31:25      32:4
32:5   32:6      32:11
36:21   36:24      39:1
42:21   55:4      57:3
57:22   85:22      86:11
89:20

feels [1] 95:10

feet [1] 51:16

felt [3]   11:13      15:15
27:21

few [3]   77:13      78:18
91:19

file [10]   18:18      19:2
19:4   19:5      19:7
19:9   74:5      74:8
89:10   95:11

filed [3] 3:8      3:19
89:15

files [1] 24:7

final [1] 25:12

finalization [1] 97:4

finally [1]      55:22

financial [1]      74:19

financially [1] 100:16

finding [2]      28:14
95:16

findings [1]      11:7

finds [1] 60:9

fine [6]   14:10      14:10
18:23   55:17      82:8
97:12

finger [2]      17:20
17:25

finish [1]      18:24

finished [1]      96:3

firm [2] 93:22      93:24

first [10] 3:20      7:13
7:15   13:14      45:22

54:1   . .16      74:18
80:19   102:4

five [2]   51:4      86:10

FL [2]   2:5      2:8

flight [38]      3:11
4:4   4:11      5:13
5:13   5:14      5:18
6:19   6:19      13:18
23:5   23:12      27:17
27:18   27:20      31:16
32:12   38:25      43:17
43:21   46:7      48:18
48:23   49:4      49:4
49:5   56:2      56:17
57:11   68:1      70:7
70:19   83:4      84:21
88:21   89:2      90:11
90:20

Florida [14]      1:0
1:0   3:8      3:10
3:14   99:3      99:19
100:3   100:22      101:2
101:6   102:2      102:12
104:2

flying [1]      6:18

follow [3]      23:12
85:21   91:20

followed [2]      68:7
68:8

following [5]      70:3
73:5   78:2      93:4
103:6

follows [3]      3:21
36:2   41:17

foregoing [2]      102:16
104:5

forestall [1]      95:12

forget [1]      27:15

form [36]      8:21
10:14   11:15      12:9
14:23   16:9      16:14
20:2   20:14      21:20
23:1   23:21      24:1
29:2   29:9      44:13
47:15   51:19      57:23
59:16   62:8      63:12
64:9   67:4      70:23
76:15   80:14      80:23
85:9   86:23      87:25
90:16   94:11      94:12
95:3   96:10

formal [4]      45:6
75:11   80:1      80:1

forms [2]      69:13
70:24

formulas [1]      32:8

Fort [14]   1:0      2:5
3:12   3:13      4:1
4:9   4:12      4:17
7:19   8:5      13:1
22:6   44:6      101:2

forum [1]      87:13

forward [9]      12:12
14:19   14:20      22:24
28:23   56:23      60:18
79:18   101:14

forwarded [7]      10:7
10:24   16:5      19:17
33:10   33:12      65:24

forwarding [1]      78:7

forwards [3]      23:4
23:5   23:6

found [1]      49:20

four [1]   36:21

frame [2]      69:7
76:21

Friday [1]      9:17

FSDO [2]      4:2
4:3

fueling [1]      5:20

full [7]   23:19      24:17
26:9   27:19      27:22
32:19   46:21

fully [1] 53.15

function [1]      68:11

functions [2]      66:6
85:15

funeral [2]      10:1
10:1

Gables [2]      2:8
101:6

gather [5]      22:17
23:17   33:3      36:17
77:12

gathered [1]      22:14

general [10]      5:18
10:8   10:12      16:7
84:20   85:12      88:20
88:23   89:9      92:18

general's [2]      78:11
90:6

generally [4]      68:9
70:25   82:16      82:16

generate [1]      32:7

generous [1]      93:20

gentleman [1]      21:5

geographic [1]      4:17

given [8] 15:17      17:12
27:14   30:21      75:11
82:15   101:9      104:13

giving [2]      97:15
103:6

goes [3] 86:5      87:4
88:3

GOM [11]      84:14
85:13   85:24      86:4
86:20   88:4      88:18
88:19   89:9      91:14
91:15

GOM's [1]      84:24

Gordon [2]      1:0
2:4

governed [1]      88:22

government [3]      20:22
21:1   32:7

GPS [3] 58:10      58:12
58:23   59:8      70:16
82:19   82:20      83:1
83:1   83:2      90:13
90:22   91:6

grade [1] 51:15

graduates [1]      74:10

Gramm [5]      3:9
99:18   100:6      100:22

forwarding [1] 78:7

101:2.

grant [2] 14:8      14:15

granted [1]      8:24

great [1] 12:6

greater [3]      38:20
42:13   50:21

grew [1] 16:4

gross [1] 28:10

ground [6]      46:2
68:3   70:12      70:13
70:14   70:21

group [2]      24:14
75:5

guaranteed [2]      8:13
31:14

guess [1] 33:11

guidance [2]      60:17
66:7

Gulf [1] 7:6

H [2]      2:15      104:1

half [1]   47:4

halfway [1]      45:14

hand [3] 60:1      99:11
102:18

handbook [2]      66:1
66:12

handed [1]      35:14

handling [1]      65:15

hands [1]      23:9

happy [1]      16:23

harbor [1]      95:1

Hargrove [2]      1:0
2:4

hazard [1]      50:12

hazardous [1]      70:14

head [1] 59:11

heading [11]      58:23
59:8   59:13      82:11
82:11   82:12      82:14
82:14   82:15      82:16
82:22

headings [1]      58:9

hear [2]   6:25      12:6

heard [1] 17:4

Heinrich [2]      1:0
2:4

hereby [2]      102:4
103:4

herein [1]      49:17

heretofore [2]      3:8
3:19

high [2]   74:25      75:7

himself [2]      12:17
46:16

hold [3]   45:16      82:14
97:3

honor [2]      12:5
15:14

Huff [1] 77:25

hundred [2]      47:9
54:13

hundreds [3]      21:23
21:24   66:14

identification [9]
2:16   33:24      41:3
48:1   52:23      54:22
59:20   59:24      75:24

identified [2]      35:15
49:13

identify [13]      34:3
34:9   34:14      41:12
43:16   48:4      52:13
53:1   57:7      60:2
64:22   76:2      87:16

immediate [1]      16:5

impact [1]      73:16

impatient [2]      10:6
16:4

implementing [1]
94.18

implicate [1]      12:13

implicated [2]      30:18
40:4

implicating [1]   87:19

implication [1]   94:6

implied [1]      91:10

import [1]      64:4

impression [1]   76:18

improvement [2]
60:15   95:24

INC [2]   1:0      3:6

inch [12]   27:6      27:13
28:2   28:6      44:5
51:15   61:23      92:12
92:16   92:17      93:6
93:14

incident [9]      13:14
14:22   33:9      38.2
80:11   80:12      80:20
84:13   90:7

include [3]      42:23
44:19   83:11

included [3]      49:17
83:11   83:12

including [2]      43:21
49:5

inconsistent [2] 57:21
57:25

Incorporated [1]
94:3

incumbent [1]      77:7

indicate [2]      39:7
67:12

indicated [7]      38:20
39:3   42:14      61:17
75:9   101:10      102:7

indicates [1]      37:11
84:12

individual [6]      32:18
39:19   51:9      51:17
51:21   71:8

individuals [2]   24:15
33:10

information [27]
12:15   15:11      20:5
22:7   22:15      22:17
23:14   23:17      27:16
36:17   44:3      46:12
49:15   63:14      66:4
66:5   69:19      69:21

JOHN ROSEBOROUGH Condensel™ info/mact matter

80:7    87:15    87:16
87:20   93:9    93:19
94:12   94:17   95:8

**informed** [1]    73:14
**informs** [2]    55:2
64:24
**infractions** [1]    60:9
**initial** [1]    23:18
**initiate** [1]    94:13
**innovative** [1]    75:1
**inquiry** [1]    78:10
**inspect** [3]    22:3
70:10   71:14
**inspected** [1]    71:15
**inspector** [1]    4:22
5:1    6:13    6:14
10:8   10:12   16:7
19:22   64:1    68:6
68:10   68:13   68:19
68:21   69:1    69:11
69:18   72:4    78:11
83:10   90:6
**inspector's** [2]    66:1
66:12
**instance** [1]    22:5
**instances** [1]    40:7
**Instead** [1]    49:15
**instructed** [2]    45:20
46:1
**instructions** [2]    45:16
45:18
**instructors** [1]    73:18
**instrument** [2]    102:16
102:17
**intent** [5]    41:23
52:16   53:12   53:22
79:12
**interested** [1]    100:16
**interject** [2]    94:6
94:10
**internal** [1]    25:25
**International** [5]
1:0    3:5    4:10
101:7   102:6
**intimidate** [1]    18:4
**introduced** [1]    75:1
**investigate** [2]    73:25
74:2
**investigated** [1] 19:18
**investigation** [56]
9:5    9:15    10:9
10:13   10:21   10:22
10:25   10:25   11:4
11:5    11:8    11:10
19:3    20:1    20:4
21:20   22:2    23:11
23:24   25:11   25:18
26:9    30:8    33:9
33:17   38:11   39:8
39:9    39:21   40:1
40:9    49:11   52:2
52:7    52:19   53:7
53:9    53:23   53:24
54:4    54:6    55:3
55:20   56:10   56:15
64:24   65:23   73:19
73:24   78:6    78:11

**investigative** [8]
11:6    33:23   34:16
34:21   34:24   34:24
35:11   54:5
**involve** [2]    22:5
25:7
**involved** [8]    5:21
14:13   19:21   22:9
48:22   65:16   68:22
71:22
**involvement** [7] 33:12
56:14   67:15   67:20
71:24   73:7    76:22
**involves** [2]    19:7
34:20
**involving** [1]    65:19
**IOP** [20]    36:2    36:20
37:2    37:6    37:9
37:14   37:17   37:23
38:5    39:12   43:15
43:16   44:1    44:2
44:7    45:8    49:14
44:19   84:4    84:8
**IOPs** [1]    32:22
**issue** [9] 14:22   27:25
44:24   52:6    57:13
65:20   74:20   92:7
92:8
**issues** [6]    14:13
17:9    58:5    65:15
73:13   95:14
**item** [4]    36:13    93:10
93:11   94:7
**items** [15]    11:6
12:14   23:14   23:14
32:20   32:23   36:13
36:15   36:18   41:17
41:21   49:17   49:22
55:24   70:9
**itself** [5] 13:2    24:13
28:3    46:16   91:9
**J** [5]    9:3    99:18
100:6   100:22   101:21
**James** [2]    1:0
2:4
**Jet** [1]    3:12
**job** [3]    4:21    5:10
5:23
**John** [7]    1:0    3:1
3:18    4:1    99:8
100:9   101:4
**joint** [1]    56:17
**Jorsey** [17]    24:10
24:20   24:23   52:14
52:19   53:11   53:17
54:10   55:2    55:8
56:1    57:1    57:2
57:18   58:4    58:8
58:19
**judgment** [3]    40:8
62:18   65:4
**Juliana** [1]    65:14
**July** [1]    83:6
**jump** [1]    56:6
**justice** [1]    55:25

**justify** [2]    23:19
24:17
**keep** [1]    83:3
**Keeping** [1]    50:15
**kind** [4]    62:18    72:11
81:3    93:23
**knots** [2] 38:21   42:14
**knowledge** [6]    13:14
22:18   25:12   52:1
62:16   81:1
**knowledgeable** [1]
50:16
**known** [6]    4:23
22:4    79:1    79:3
102:15   102:15
**L.T** [1]    1:0
**Large** [1]    3:11
**Las** [1]    101:1
**last** [5]    39:6    42:25
43:25   49:8    96:7
**latest** [1] 77:17
**latter** [2] 14:3    55:5
**Lauderdale** [13]    1:0
2:5    3:12    3:14
4:2    4:13    4:17
7:20    8:6    13:1
22:6    44:6    101:2
**Lauderdale-Hollywood**
[1]    4:9
**law** [4]    28:22    28:25
33:1    94:23
**lawful** [2]    3:2
3:20
**laws** [1]  5:25
**lawsuit** [2]    15:9
17:12
**leave** [2] 10:3    10:5
**leaves** [1]    23:9
**Lee** [2]    1:0    3:13
**legal** [5] 15:4    25:7
65:7    91:2    95:12
**length** [6]    27:19
27:22   45:12   46:8
46:13   46:21
**less** [15] 27:6    27:12
28:2    28:6    44:5
47:8    51:14   61:6
61:13   61:22   62:2
63:1    66:10   92:12
93:14
**letter** [58]    28:21
28:25   30:8    39:9
39:11   39:14   40:5
40:13   41:23   45:9
45:12   49:18   49:21
52:14   52:16   52:18
52:22   53:2    53:5
53:7    53:11   53:13
53:16   53:18   53:22
53:23   53:24   54:4
54:5    54:10   54:21
55:2    56:15   56:24
57:19   59:19   59:23
60:3    60:13   64:23
65:2    76:9    78:3
79:20   80:1    84:7
86:5    87:5    88:3

**91:2**    92:1    92:9
94:2    97:14   97:23
101:11   101:18   103:4

**letters** [1]    39:8
49:10
**level** [1] 25:7
**levels** [1]    61:24
**license** [1]    95:18
**life** [3]    43:6    43:8
48:25
**lift** [1]    31:11
**light** [1] 80:7
**likewise** [1]    62:5
**limitations** [3]    90:23
93:3    93:5
**limits** [1]    90:14
**line** [9]    11:13   25.22
30:1    51:16   55:12
56:7    56:7    86:6
104:8
**listed** [2]    71:2
85:12
**lists** [2]  5:20    38:7
**Liu** [2]    93:10   94:2
**lobby** [1]    72:11
**locate** [1]    64:3
68:12
**located** [1]    4:8
**locating** [1]    68:10
**location** [2]    39:17
82:23
**LOI** [5]    39:8    39:13
42:7    44:3    49:11
**look** [27] 14:2    34:10
34:13   35:2    35:6
35:20   36:2    36:4
41:9    41:11   41:13
41:16   45:8    47:1
48:3    48:8    48:11
49:7    52:25   60:18
64:21   66:15   66:24
71:17   74:3    76:1
84:4
**looking** [2]    50:19
64:14
**looks** [1] 55:19
**lose** [2]    31:8    95:18
**loss** [1]    31:5
**lost** [1]    31:21
**lots** [1]    89:22
**loud** [2]    43:1    60:13
**ma'am** [52]    8:18
9:13    9:16    18:16
18:20   19:14   21:25
23:25   24:6    25:13
26:11   26:13   26:15
28:18   29:11   35:9
35:23   35:25   36:7
36:9    36:19   36:23
37:8    37:10   39:2
41:15   41:20   42:17
46:9    48:10   48:15
49:6    51:5    52:10
53:25   57:5    57:8
57:12   67:11   75:8
76:11   79:9    80:22
81:14   83:15   87:7

**90:3**    91:13   91:24
92:10   92:19   93:25
**mail** [4]    39:13   39:15
49:11   49:12
**mailed** [1]    103:4
**maintain** [3]    22:8
71:7    74:14
**maintains** [2]    6:13
70:6
**maintenance** [4] 6:3
6:10    6:12    86:15
**major** [54]    1:0
3:5    6:6    6:10
8:11    9:9    9:22
10:6    10:19   11:13
12:1    13:20   16:23
17:6    17:14   18:7
18:15   19:8    19:24
20:8    21:14   21:16
21:16   21:17   24:9
24:21   31:6    37:3
45:22   48:21   58:5
72:4    72:5    73:3
73:10   73:10   73:20
75:9    75:20   77:14
77:16   79:11   79:17
79:23   79:24   80:4
81:10   81:20   88:10
90:5    92:1    94:8
101:7   102:5
**Major's** [13]    22:12
24:8    27:4    40:23
57:10   61:1    71:25
73:8    74:12   76:23
78:1    78:13   79:19
**Majorca** [2]    2:7
101:6
**makes** [1]    16:8
**man** [3]    8:24    12:4
47:20
**manager** [1]    23:4
**mandated** [1]    86:12
**manner** [10]    20:5
33:7    38:25   39:24
42:19   43:5    43:8
48:24   55:23   56:22
**manual** [19]    5:18
5:19    5:20    32:14
37:21   37:25   38:7
62:3    63:14   69:24
71:3    84:21   85:13
85:16   88:20   88:23
89:10   89:13   89:14
**manuals** [1]    32:4
63:2    63:6
**March** [1]    64:23
**mark** [9] 33:20   36:25
40:15   47:23   52:21
54:19   59:17   59:21
75:22
**marked** [13]    2:16
33:23   36:6    41:3
48:1    52:12   52:23
52:25   54:22   59:20
59:24   60:1    75:24
**materials** [2]    18:18
70:15
**matter** [11]    15:18
25:12   30:10   39:11

mine [1] .11
39:21  47:20  53:15
53:18  54.8   60:18
65:1   65:5   74:3
74:5

matters [2]  19:2
24:15

maximum [1]  38:9

may [46] 7:16  14:19
31:21  35:16  38:4
43:4   43:7   46:24
47:8   51:10  51:13
54:16  56:13  56:14
61:8   61:20  64:25
67:13  67:17  68:23
71:3   77:2   79:24
80:4   80:5   80:17
80:17  83:5   86:25
87:1   89:21  89:22
90:13  91:3   91:3
91:5   91:10  94:6
95:8   95:10  95:11
95:13  95:17  96:8
101:12 101:14

mean [4] 18:4  25:11
53:23  61:18

meaning [1]  8:14

means [5]  90:12
90:13  90:21  90:22
90:25

mediocrity [1]  76:7

meet [3] 72:5  73:10
75:10

meeting [27]  8:24
9:8   14:13  14:16
15:1  15:6   15:8
15:13 16:24  17:1
17:3  17:5   17:7
17:13 18:7   18:11
19:8  20:8   20:10
20:12 20:20  20:23
20:25 21:4   21:17
79:16 79:17

member [6]  8:24
84:21  90:21  91:4
91:8   94:24

members [7]  22:9
43:21  48:20  49:5
57:15  68:22  88:22

memo [1]  65:12

memory [2]  10.18
64:12

mention [1]  45:5

mentioned [6]  29:4
32:16  56:2   65:9
91:12  95:7

mere [1] 29:14

met [3]  8:11  67:21
72:9

method [2]  22:1
95:12

methods [1]  75:1

Miami [1]  7:19

mid [1]  54:3

might [2]  50:5
71:18

millimeters [1] 93:15

mind [1] 28:18  35:5
50:15

minimum [2]  5:20
89:22

minimums [1]  75:2

minute [4]  30:17
83:16  88:11  88:13

minutes [1]  77:13

mischaracterized [1]
65:8

misdated [1]  54:14

misperception [1]
18:13

Miss [17] 11:23  17:17
26:6  35:13  41:7
65:14  97:14

mitigating [1]  62:4

model [1]  32:8

moisture [1]  93:17

moment [2]  35:20
36:1

momentarily [1]
64.15

Monday [3]  9:17
9:18   9:19

money [1]  75:6

monitor [1]  82:23

month [2]  14:3
53:13

months [1]  38:2

morning [1]  46:14

most [2] 6:16  70:25

mother [2]  9:18
10:17

mother's [2]  10.1
15:25

mountain [1]  65:17

move [1] 82:5

moved [1]  7:19

movements [1]  5:17

Mrs [1]  49:21

MS [165] 2:9  2:11
2:12  2:14  3:23
6:24  7:1   7:2
7:4   8:21  9:6
11:15 11:17 11:19
11:24 12:9  12:13
14:23 15:3  16:9
16:12 16:14 16:17
16:20 17:17 17:23
17:24 18:3  18:17
20:2  20:6  20:13
20:18 21:11 21:12
23:21 23:23 24:1
24:3  25:10 25:14
25:17 25:19 25:21
25:23 25:24 26:2
26:4  26:7  26:22
27:2  29:2  29:7
29:9  29:12 33:19
33:25 34:2  34:4
34:5  34:6  34:8
34:12 35:5  35:10
35:13 35:15 35:16
35:18 35:19 40:15
40:17 40:19 40:20
40:25 41:4  41:6
41:8  44:13 44:16

44:18  46:15  46:23
47:15  47:18  47:23
48:2   51:19  51:24
52:20  52:24  54:19
54:23  57:23  58:2
59:17  59:21  59:25
62:8   62:14  63:12
63:18  64:9   64:13
67:4   67:9   75:22
75:25  76:15  76:20
78:16  78:18  78:21
78:24  79:2   80:14
80:15  80:23  80:24
82:5   82:8   82:9
83:16  83:18  83:25
84:3   85:9   85:23
86:23  87:2   87:25
88:2   88:8   88:12
88:15  88:17  90:16
90:19  91:17  91:19
91:22  94:4   94:12
95:3   95:5   96:2
96:6   96:10  96:13
96:17  96:20  96:23
97:6   97:9   97:10
97:12  97:18  97:19
97:21  97:25  98:1
98:3   98:4   98:5
98:10

multi [1] 37:7

must [2] 10.6  89:15

mutually [2]  18:1
18:1

N [2]  2:1   38:8

name [1] 3:24

named [1]  3:19

NASA [11]  87:14
92:3   94:11  94:12
94:21  95:2   95:7
95:11  95:15  96:9
96:11

NASA's [2]  87:5
87:17

national [3]  87:9
87:19  96:11

nature [7]  66:7
73:15  74:6  74:13
80:2   89:4   91:12

navigate [5]  90:12
90:13  90:21  90:22
91:5

navigation [3]  58:9
58:10  90:25

Navtech [2]  93:24
94:3

necessarily [1]  61:20

necessary [1]  69:17

need [7] 18:5  30:24
30:25  30:25  31:1
49:19  61:8

needed [2]  56:13
77:19

negatively [1]  73:16

neighborhood [1]
74:15

Neither [1]  103:12

never [2] 17:4  76:25

new [1]  94:18

next [1] 10:4  33:21
52:21  59:17

night [1] 9:18

None [4] 33:15  34:21
58:6   76:24

nonissue [1]  47:17

nor [3]  100:14  100:16
103:12

normal [1]  45:15

normally [2]  31:19
70:2

norms [1]  75:2

northwest [1]  65:16

Norton [83]  1:0
1:0   2:6   2:7
2:11  2:14  6:24
7:2   8:21  11:15
11:19  12:9  14:23
16:9  16:14  16:17
17:17  17:24  20:2
20:13  21:11  23:21
24:1   25:10  25:22
26:4  29:2   29:9
44:13  46:15  47:15
51:19  57:23  62:8
63:12  64:9  67:4
76:15  80:14  82:5
85:9   86:23  87:25
90:16  95:3   96:10

objection [5]  25:16
26:3   44:17  78:24
80:23

obliges [1]

observation [1]  29:5

observations [1]
63:10

observe [2]  50:6
51:1

observed [2]  46:3
51:1

observer [2]  55:14
56:2

Obviously [1]  19:3

occasion [1]  65:22

occasions [1]  69:4

occur [1] 14:14

occurred [8]  13:9
18:11  26:18  26:24
27:1   79:1  80:6
80:10

occurrence [1]  87:15

October [7]  9:10
14:1   79:4  79:21
80:21  92:2  92:9

off [13]  8:13  14:9
18:12  21.7  30:25
31:2   31:4  31:12
31:22  38:19  42:12
42:19  69:20

off-the-record [4]
14:15  20:25  21:3
79:10

offended [3]  17:23
17:24  18:2

offer [2] 49:14  60:18

offered [1]  18:6

offers [1]  39:21

office [25]  3:12
4:4.   4:7.  4:12
9:20   10.7  10:12
11:2   13:1  14:4

Norton [83]
75:9   101:12

number [17]  5:7
36:3   36:6  36:6
36:21  37:2  37:6
37:9   37:14  37:17
37:23  38:5  38:8
38:8   45:8  49:19
84:4

numbered [1]  104:5

o'clock [1]  3:15

oath [4]  3:21  12:24
17:12  99:1

object [37]  8:21
11:15  11:20  12:9
14:23  16:9  16:14
17:21  20:2  20:13
20:14  21:11  23:21
24:1   25:10  25:22
26:4   29:2  29:9
44:13  46:15  47:15
51:19  57:23  62:8
63:12  64:9  67:4
76:15  80:14  82:5
85:9   86:23  87:25
90:16  95:3  96:10

notary [6]  3:10
97:17  99:19  100:22
103:1  103:18

note [2]  18:21  30:5

noted [2] 83:23  104:5

notes [1] 100:11

nothing [8]  12.12
12:16  12:21  19:6
19:11  67:18  72:13
80:25

notice [4]  9:18
3:19   76:6  80:19

noticed [1]  9:21

notification [4] 10:15
13:14  75:23  76:5

notified [2]  86:7
88:5

notum [4]  27:13
27:24  50:1  50:13

notwithstanding [1]
95:1

November [6]  53:12
54:2   54:9  54:11
54:17  60:4

now [7]  6:2  13:24
27:13  62:15  70:16

14:7   16:6   16:7
19:5   23:4   23:7
56:20   67:25   68:6
69:13   78:11   78:12
90:6   97:5   97:7

**officer** [7]   45:22
86:7   86:8   86:9
88:16   86:20   94:9

**offices** [1]   3:11

**official** [6]   20.23
21:1   62:7   81:3
99:11   102:18

**oftentimes** [1]   82:21

**Olas** [1]   101:1

**once** [2]   23:9   52:8

**one** [35]   6:10   6:12
6:12   24:7   24:9
24:10   24:10   24:11
24:12   24:18   26:17
39:10   40:18   42:4
43:15   49:11   49:12
51:13   51:14   51:14
54:4   58:16   58:18
63:4   65:6   65:7
69:1   69:18   70:24
77:16   81:22   82:18
83:16   95:14   97:11

**one-eighth** [2]   61:25
93:14

**one-quarter** [4]   44:5
51:15   92:12   93:6

**one-sixteenth** [2]
61:25   92:16

**ones** [2]   21:21   36:25

**ongoing** [3]   23:10
25:11   25:18

**open** [1]   24:7

**opened** [3]   24:9
24:10   24:11   24:11
24:12   24:18   81:7
81:17

**opening** [1]   81:11

**operate** [3]   27:8
43:4   43:7

**operated** [5]   38:25
42:20   43:24
55:10

**operates** [1]   7:7

**operating** [6]   37:19
50:18   53:6   63:23
81:15   85:17

**operation** [2]   6:7
91:11

**operational** [3]   5:4
21:2   25:1

**operationally** [1]
5:21

**operations** [27]   4:22
5:1   5:2   5:15
5:18   6:17   7:19
19:22   25:6   56:16
56:19   56:22   60:7
83:10   84:13   84:20
84:23   85:1   85:3
85:11   85:13   85:25
86:14   88:20   88:23
89:9   91:1

**operators** [1]   4.14

**opinion** [1]   26:16
26:25   42:11   59:12

**opportunity** [3]   8:25
39:22   54:7

**opposite** [2]   11:20
16:19

**oral** [7]   8:9   8:20
68:7   69:2   73:22
75:14   77:9

**order** [10]   23:1
23:2   31:22   50:7
51:1   63:21   66:14
74:16   96:24   98:3

**ordered** [1]   101:13

**organization** [1] 92:4

**original** [2]   97:1
97:13

**originally** [1]   19:16

**otherwise** [3]   10:23
95:8   98:5

**outside** [1]   88:12

**override** [1]   50:7

**overrule** [1]   25:2

**oversee** [3]   4:14
5:2   6:16

**overweight** [4]   8:5
13:10   13:12   13:21

**own** [6]   29:5   32:13
50.8   54:13   62:19
91:6

**P.A** [5]   1:0   1:0
2:4   2:7   101:5

**page** [19] 2:2   35:3
35:21   35:24   36:11
36:14   37:7   38:14
41:13   42:9   48:8
49:8   84:4   84:9
92:25   92:25   93:11
94:7   104:8

**pages** [7]   36:6
36:8   36:21   48:14
64:3   66:14   104:5

**paper** [2] 71:4   95:18

**paperwork** [2]   69:6
72:19

**paragraph** [9]   38:17
42:25   43:14   43:25
49:9   60:12   84:11
86:6   94:7

**parameters** [1]   50:18

**part** [19] 7:10   14:3
36:4   37:20   39:25
55:4   55:10   56:25
63:20   63:23   63:24
64:25   72:18   73:6
79:22   82:1   84:6
84:8   91:14

**participants** [1] 34:22

**participate** [1]   65:23

**particular** [7]   33:13
58:17   58:18   66:5
66:24   78:2   92:25

**particulars** [1]   50:18

**parties** [1]   100:14

**parties'** [1]   100:15

**party** [2] 57:11   101:13

**pass** [2]   75:7   77:6

**pass-fail** [1]   74:15

**passage** [1]   66:16

**passed** [2]   9:18
55:8

**passenger** [1]   6:20

**passing** [1]   16:1

**Pat** [28]   17:6   17:14
18:7   21:15   21:16
21:16   22:12   24:8
24:9   24:21   37:3
57:10   58:5   61:1
71:25   73:3   73:8
73:9   73:10   73:20
75:9   75:20   76:23
77:14   78:1   78:13
87:4   90:4

**Pat's** [3] 84:12   86:5
88:3

**patches** [1]   27:22

**Patrick** [4]   1:0
3:4   101:7   102:5

**Pause** [1]   83:17

**pending** [2]   3:6
53:8

**people** [5]   9:20
40:3   69:3   69:5
85:15

**per** [2]   32:3   34:18

**perceived** [4]   84:22
85:7   86:6   86:21

**percent** [8]   30:6
47:7   47:9   50.25
51:4   54:13   64:7
74:15

**perception** [5]   13:10
13:12   13:21   18:10
20:7

**perform** [2]   68:10
73:6

**performance** [18]
30:20   30:22   30:23
32:4   32:14   37:21
37:25   38:22   42:15
58:4   61:3   61:4
62:22   73:15   88:22
92:23   93:10   94:19

**performing** [1]   55:12

**perhaps** [3]   9:17
71:15   73:17

**period** [3]   7:21
44:8   95:18

**periodically** [1] 71:13

**peripheral** [2]   22:3
39:19

**permission** [2]   14:25
15:5

**person** [22]   39:22
43:7   50:15   50:17
50:22   50:23   52:1
52:3   64:1   68:3
69:5   69:25   70:3
71:3   73:18   77:5
77:17   82:22   85:11
87:20   87:21   102:15

**personal** [3]   77:16
89:3   90:23

**personally** [7]   50:6
51:1   68:16   72:6
72:18   99:8   102:14

**perspective** [1]   44:4

**pertained** [1]   13:10

**pertaining** [1]   34:25

**pertinent** [2]   36:25
38:10

**Pete** [5]   64:16   64:23
65:22   74:4   77:24

**Peter** [6] 24:19   24:19
25:4   25:5   56:15
60:6

**phases** [1]   70:20

**phone** [1]   9:21

**photostatic** [1]   101:14

**piece** [1] 71:3

**pilot** [21] 25:2   29:4
43:4   43:17   43:19
45:7   55:9   70:18
72:25   76:6   76:7
84:14   84:23   85:5
85:6   85:12   86:1
86:14   95:9   95:17
95:23

**pilots** [5]   5:12
6:18   71:8   87:22

**pink** [1]   75:11

**place** [2] 55:23   104:7

**places** [2]   43:23
95:20

**Plaintiff** [4]   1:0
1:0   3:2   3:5

**Plaintiff's** [17]   2:17
2:18   2:19   2:20
2:21   2:22   2:23
2:24   33:22   41:2
47:25   52:22   54:21
59:19   59:23   60:2
75:23

**POI** [4]   4:23   6:22
88:4   94:9

**point** [8] 8:10   31:4
31:13   31:18   46:20
47:3   57:14   82:17

**pointing** [1]   17:25

**POIs** [1] 5:8

**poke** [1]   17:19

**policies** [5]   60:22
61:1   61:10   64:17
94:19

**policy** [7]   26:1
61:6   62:16   67:1
67:10   81:13   92:20

**portion** [4]   34:10
50:5   51:3   63:20

**portions** [5]   5:11
5:12   5:19   68:4
92:24

**position** [11]   24:25
25:1   40:21   45:21
55:9   58:13   59:1
59:4   67:17   68:2
83:3

**positions** [2]   86:10
86:12

**possibilities** [1] 60:15

**possible** [9]   7:25
8:4   8.20   13:21
29:22   29:24   54:14
55:24   84:22

**possibly** [1]   30:19

**possibly** [1]   30:19

**potential** [3]   39:5
40:4   61:5

**Potter** [1]   1:0
2:6   101:5

**pounds** [2]   38:20
42:13

**power** [1]   31:10

**powers** [2]   92:4
92:6

**precedence** [2]   28:21
45:7

**precedent** [3]   56:21
65:10   65:19

**precise** [1]   11:20

**predecessor** [1] 67:19

**predecessors** [2]
67:20   67:23

**preeminent** [1]   50:2

**prefer** [1]   97:10

**preparation** [1] 72:20

**prepare** [3]   11:3
26:8   32:19

**prepared** [5]   11:1
11:5   33:8   51:8
52:2

**preparing** [1]   40:1

**preponderance** [3]
22:24   49:16   49:22

**present** [1]   23:3

**presents** [1]   44:3

**president** [1]   60:6

**previous** [1]   61:1

**previously** [3]   46:14
52:12   81:21

**prima** [4]   22:21
22:22   26:16   33:4

**principal** [4]   4:22
4:25   19:22   83:9

**privacy** [2]   20:8
20:11

**private** [1]   20:23

**privilege** [1]   51:23

**privileges** [4]   54:3
54:17   55:18   56:6

**problem** [1]   97:6

**procedure** [8]   31:9
53:6   61:14   62:3
62:5   67:1   81:13
81:15

**procedures** [3]   5:4
37:19   85:17

**proceeding** [2]   22:1
33:13

**proceedings** [1] 33:14

**process** [6]   28:23
54:5   61:7   68:1
73:7   80:2

**processing** [2]   23:8
32:18

**produce** [1]   22:23

**professional [1] 3:9**
26:25   100:7

**proficiency [1] 74:12**

**program [12]**      67:18
67:21   69:15   70:17
73:17   74:10   74:10
76:8    76:13   76:19
87:18   96:12

**programs [3]**      5:4
70:15   74:24

**progress [1]**      82:23

**proof [11]**       22:25
23:14   32:20   32:23
36:14   36:15   36:18
41:18   41:21   49:17
49:23

**proper [2]**       69:9
82:7

**property [3]**     43:6
43:9    48:25

**prosecution [1] 65:10**

**prospective [1] 95:24**

**protecting [1]**   14:16

**protection [1]**   21:7

**protested [1]**    50:3

**protocol [3]**     85:21
85:25   95:11

**provide [3]**      61:14
61:24   86:20

**provided [9]**     12:15
35:7    63:3    79:17
80:6    81:10   87:1
93:25   94:1

**provides [5]**     66:12
74:24   87:12   88:24
95:8

**providing [2]**    69:22
87:20

**provision [1]**    63:7

**provisions [1]**   89:23

**Public [4]**       3:10
99:19  100:22  103:18

**Puerto [1]**       7:8

**pull [1]**  31:10

**purpose [1]**      3:3
5:18   102:17

**pursuant [1]**     3:8

**purview [1]**      63:25

**put [7]**   9:3    13:23
16:18   29:17   29:19
29:24   77:5

**putting [1]**      23:19

**qualifications [2]**
51:9    69:23

**qualified [1]**    68:21

**qualify [1]**      26:23

**quality [1]**      86:15

**quantity [1]**     27:10

**quarter [5]**      27:6
27:12   28:2    28:6
61:23

**query [1]**        73:13

**questions [6]**    17:11
17:20   78:16   84:1
88:9    96:18

**quite [2]   .24**  96:4

**quotes [1]**       84:16

**R [2]**    104:1   104:1

**raised [2]**       15:13
92:9

**ramp [4] 51:13**   51:14
51:14   51:22

**range [1] 31:3**

**rate [3]   74:15**  74:25
75:7

**rather [1]**       97:3

**ratings [1]**      69:16

**Re [1]   101:7**

**reach [4] 31:17**  42:11
42:19   48:17

**read [15] 38:17**  43:1
43:13   43:25   46:6
49:8    60:12   64:2
96:18  101:10  101:12
101:14  102:5  103:12
104:4

**reading [1]**     103:4

**ready [2] 68:17**  101:12

**reality [1]**     95:23

**really [11]**      8:1
13:8    30:10   52:6
55:19   62:12   72:24
74:1    78:25   80:2
94:12

**reason [8]**       26:2
30:16   44:23   52:4
54:2    72:21   81:16
103:6

**reasonable [2]**  66:20
66:25

**recalling [1]**   58:16

**recanted [1]**    30:12

**receipt [5]**      9:4
39:14   79:19   85:7
86:21

**receive [8]**      7:24
8:3     8:9     39:4
57:9    69:10   98:1
98:2

**received [5]**     9:8
14:1    69:9    73:21
79:20

**receives [1]**     86:1

**Recess [1]**       88:14

**recipient [1]**    39:16

**reckless [3]**     43:5
43:8    48:24

**recognize [4]**    53:3
54:24   60:3    76:3

**recollection [5]  44:10**
46:17   55:16   73:2
77:24

**recommend [1] 73:18**

**recommendation [1]**
83:20

**recommended [4]**
69:25   73:20   74:4
86:6

**record [12]**      8:14
14:9    16:17   17:22
18:12   21:7    26:3

**regulations [12] 5:5**

**29:5     46:15   96:23**
97:22  100:11

**recording [1]**    44:7

**records [10]**     22:7
69:14   70:6    70:11
70:19   71:7    83:5
83:12   95:24   95:25

**RECROSS-EXAMINATION**
[4]    2:10    2:13
91:21   96:5

**recurrent [1]**    83:14

**REDIRECT [4] 2:9**
2:12    84:2    94:15

**reduce [3]**       62:11
62:12   75:7

**reduced [2]**      31:17
75:3

**reducing [1]**     31:16

**reduction [5]**    28:7
28:9    28:9    46:5
62:4

**reductions [3]**   74:16
74:19   74:22

**refer [1] 74:23**

**reference [4]**    45:11
66:2    92:3   103:4

**referenced [3]**   65:3
79:10   92:13

**referring [2]**    49:18
80:12

**reflect [4]**      16:17
29:13   46:16   76:12

**reflective [1]**   93:18

**reflects [1]**     67:2

**refresh [2]**      44:9
55:16

**refused [2]**      81:24
103:6

**refusing [1]**     33:25

**regard [12]**      12:5
15:1    15:6    22:11
52:6    60:16   64:20
77:4    77:19   79:25
92:6    94:6

**regarding [4]**    58:5
73:8    80:20   90:7

**regardless [2]**   19:20
30:10

**regards [1]**      89:7

**region [1]**       65:17

**regional [5]**     11:2
23:7    23:13   56:20
65:18

**registered [3]**   3:9
39:13  100:6

**registration [1]  38:8**

**regular [2]**      39:14
49:12

**regulate [1]**     4:15

**regulates [1]**    89:14

**regulation [11]**  30:18
32:1    32:4    32:5
32:11   48:19   63:24
74:24   86:11   86:12
94:23

**5:24     36:22   36:24**
39:1    42:21   55:4
57:4    57:22   75:5
85:22   89:20

**regulatory [4]**   66:6
89:12   91:12   95:11

**reinstated [1]**   53:20

**related [2]**      25:9
60:21

**relates [2]**      37:20

**relative [2]**    100:13
100:14

**relay [1] 79:13**

**release [1]**      87:17

**remain [1]**       18:12

**remained [1]**     28:2

**remember [8]**     13:8
55:21   58:11   58:14
58:19   72:22   74:1
97:19

**removed [1]**      12:25

**repeatedly [1]**   17:25

**repertoire [1]**   70:24

**rephrase [2]**     18:2
44:16

**report [114]**     7:24
8:3     8:9     8:20
9:8     9:16    9:21
11:6    11:10   11:14
12:1    12:2    12:8
12:11   13:17   15:16
15:22   16:1    16:2
19:15   19:23   21:20
21:20   22.2    22:12
22:25   23:3    23:24
24:5    24:8    26:9
27:9    27:15   27:16
27:16   28:1    28:19
28:22   29:13   29:18
29:19   29:21   29:25
30:2    30:3    30:5
30:9    30:12   32:18
32:19   33:23   34:15
34:18   34:19   34:21
34:24   35:12   36:2
36:11   37:3    37:4
40:12   41:22   42:24
43:11   44:1    44:20
45:3    45:6    45:7
45:24   47:21   47:25
48:5    48:13   49:8
49:9    50:7    50:13
50:16   51:2    51:8
51:10   51:25   52:2
52:5    55:22   57:9
57:10   57:10   57:16
58:1    61:1    61:10
61:18   61:22   62:7
62:20   65:12   83:23
84:22   86:1    86:2
86:21   86:22   87:14
90:9    90:10   94:8
94:10   95:12   95:15
96:8   100:8

**report's [1]**     52:8

**reported [3]**     46:2
51:11   84:13

**reporter [6]**     3:9

**24:22   52:20**     87:16
98:7   100:7

**reporter's [3]**   97:5
97:7   100:1

**reporting [7]**    1:0
87:5    87:12   88:25
95:2    95:7   101:1

**reports [6]**      33:9
63:11   65:23   85:7
90:5    96:14

**represent [1]**    17:4

**representative [1]**
71:2

**represented [2]**  17:18
76:17

**representing [1] 35:10**

**represents [1]**   76:17

**reprisals [1]**    87:22

**Republic [1]**     7:9

**request [9]**      12:14
27:7    37:15   68:10
68:20   70:3    72:2
72:16  103:12

**requested [7]**    12:16
14:8    14:8    37:11
45:16   72:2   100:10

**requests [2]**     68:8
95:25

**require [3]**      28:7
88:7    97:17

**required [11]**    22:8
28:9    28:9    55:9
55:11   69:7    70:9
71:10   71:19   71:22
84:14   85:20   86:11

**requirement [2] 69:25**
84:21

**requirements [2]**
61:4    88:25

**requires [2]**     62:23
88:4

**requiring [2]**    46:4
97:4

**rescind [1]**      50:13

**rescinded [2]**    27:24
53:8

**resented [1]**     11:14

**resentment [1]**   11:25

**reservations [1] 9:25**

**resides [1]**      19:4

**resolved [1]**     11:1

**resolving [1]**    9:24

**respect [18]**     26:10
33:9    41:23   42:24
48:18   52:17   63:20
64:17   65:21   66:12
67:16   68:1    69:8
69:22   70:7    78:13
85:7    94:18

**respond [1]**      60:23

**responded [5]**    21:10
49:13   53:10   53:11
103:12

**response [16]**    13:22
30:8    39:4    40:8
40:12   41:23   42:5

44:2    49:13    52:18    54:11    60:19
60:20    73:12    96:7

**responsibilities** [5]
5:10    22:15    23:10
43:23    85:14

**responsibility** [4]
4:20    7:16    56:18
77:11

**responsible** [2]  6:2
43:20

**restricted** [1]    4:16
**restriction** [1]    62:2
**restrictive** [4]    61:7
61:18    62:24    63:1
**result** [1]    18:11
**retained** [1]    2:25
**return** [2]    39:13
97:2

**returned** [2]    10.2
49:12
**review** [6]    18.21
23:5    23:7    36.24
96:20    100:9
**reviewed** [3]    19:7
19:9    83:13
**Rico** [1]  7:8
**ride** [3]  68:8    69:3
77:10
**right** [115]    4:7
4:11    4:16    5:6
5:15    5:23    6:4
6:6    6:21    7:13
7:23    8:3    8:16
8:19    9:7    9:14
10:11    10:20    11:3
11:9    13:5    13:24
14:17    19:6    19:15
19:18    20:11    20:22
21:6    21:13    21:19
23:16    24:14    25.8
26:8    28:12    29:8
30:1    31:24    32:6
32:11    32:16    33:2
33:8    34:23    34:23
35:2    36:1    36:10
36:20    37:2    37:6
37:9    38:1    38:3
38:5    38:14    38:24
39:7    39:25    41:16
42:3    42:8    42:18
43:10    44:9    47:2
47:5    47:11    47:19
47:23    48:16    49:3
49:7    51:25    52:8
52:11    53:4    53:10
55:6    55:15    58:20
60:8    60:20    61:17
64:14    65:2    65:21
68:12    68:15    71:5
73:5    76:21    77:23
79:5    84:11    85:5
85:24    86:5    86:18
87:11    88:3    88:8
88:21    89:15    89:18
89:21    90:4    91:11
91:17    94:17    96:2
96:20    96:25    97:25
**rights** [2]    18:22
74:11

**Rincon** [1]    7:8
**role** [1]  67:25
**room** [15]
8:14    8:15    9:2
12:4    12:4    12:7
12:16    12:20    12:23
12:25    13:6    13:6
14:12    14:12
**Roseborough** [14]
1:0    3:1    3:18
4.1    17:17    35:5
78:17    78:19    97:2
97:14    99:8    100:9
101:4    101:8
**routine** [1]    40:1
**RPR** [2]  99:18    100:22
**rules** [2] 63:24    63:25
**running** [2]    31:12
31:22

**runway** [64]    27:5
27:9    27:10    27:19
27:21    28:4    28:6
28.15    28:17    30:6
30:13    30:22    31:12
31:18    31:23    44:4
45:5    45:13    45:21
45:22    45:24    46:1
46:3    46:4    46:8
46:14    46:19    46:21
47:7    49:25    49:25
50:6    50:7    50:10
50:11    50:14    50:16
50:19    50:25    51:18
57:13    60:16    60:22
61:16    62:1    63:10
63:15    63:16    63:21
63:22    64:6    64:7
64:18    66:13    66:17
67:3    67:6    80:21
83:22    92:12    93:12
93:12    93:16    93:17
**runways** [3]    32:1
61:11    90:8
**S** [2]    2:15    104:1
**safe** [1]  95:1
**safeguards** [1]    90:1
**safer** [1] 87:21
**safety** [17]    21:2
28:8    32:1    43:20
43:21    86:7    86:8
86:9    86:16    86:17
86:19    86:20    87:5
87:12    87:23    94:9
94:18
**sampling** [1]    71:16
**San** [1]  9:25
**satisfaction** [1] 77:22
**satisfactorily** [1]
77:18
**Saturday** [1]    9:18
**save** [1]  75:6
**saw** [1]  49:25
**says** [5] 35:21    43:2
45:15    57:20    93:1
**schedule** [4]    68:6
72:16    73:3    101:12
**scheduled** [1]    10:3
**scheme** [1]    5:24

**school** [5]    7:8    7:9
7:11    70:12    70:13
70:14
**Scott** [4] 1:0    3:4
101:7    102:5
**scuba** [1]    89:1
**se** [2]    32:3    34:18
**seal** [1] 99:11    102:18
**seat** [1]  56:6
**second** [5]    35:3
45:14    60:12    82:1
94:7
**secretary** [5]    10:8
10:24    14:4    14:5
16:6
**section** [21]    35:21
36:2    36:14    37:24
38:15    38:18    39:3
41:17    41:17    41:19
42:8    42:25    43:10
43:14    44:8    48:11
48:16    49:7    61:4
66:24    93:2
**sections** [1]    36:13
**see** [17]    7:23    34:1
34:6    34:7    36:13
36:5    39:6    39:12
41:12    49:25    72:11
72:18    82:24    84:11
84:15    84:19    92:15
**seeing** [1]    64:19
**seeking** [1]    68:2
**seem** [1] 16:13
**send** [6]    9:4    13:23
96:25    97:1    97:12
97:15
**sending** [2]    56:15
97:23
**sent** [12] 19:10    39:8
39:13    39:14    49:10
52:19    53:17    56:24
76:9    87:4    94:9
94:11
**sentence** [2]    39.6
45:15
**series** [1]    75:4
**set** [3]    62:24    73:21
75:2
**shakes** [1]    59:11
**shared** [1]    77:11
**Shea** [99]    2:3
2:9    2:12    2:25
3:23    7:4    7:4
9:6    11:17    11:23
11:24    12:18    15:3
16:12    16:20    17:17
17:23    18:3    18:17
20:6    20:18    21:12
23:23    24:3    25:14
25:19    25:23    26:2
26:6    26:7    27:2
29:7    29:12    33:19
34:2    34:5    34:8
34:12    35:10    35:13
35:15    35:19    40:15
40:19    40:25    41:4
41:7    41:8    44:16
44:18    46:23    47:18

47:22    48:2    51:24
52:20    52:24    54:19
54:23    58:2    59:17
59:21    59:25    62:14
63:18    64:13    67:9
75:22    75:25    76:20
78:16    78:24    80:14
80:23    82:5    84:3
85:23    87:2    88:2
88:8    88:12    88:15
88:17    90:19    91:17
94:16    95:5    96:2
96:10    96:20    96:23
97:9    97:12    97:19
97:25    98:3    98:5
101:23
**sheet** [6] 97:1    97:3
97:13    97:15    101:15
102:7
**Sheffield** [1]    7:11
**shepherd** [1]    72:17
**short** [1] 45:17
**shorter** [1]    31:3
**shorthand** [1]    24:5
**shoulder** [1]    35:6
**show** [5] 34:1    41:4
52:11    70:20    95:25
**shown** [1]    41:6
**shows** [1]    95:22
**side** [1]  51:16
**sign** [7]  69:20    71:3
101:10    101:12    103:1
103:6    103:12
**signature** [4]    71:1
7:1    101:16    101:17
**signed** [3]    87:15
101:15    102:8
**significant** [1]    93:13
**significantly** [1]
47:8
**signing** [1]    103:4
**similar** [1]    52:16
**simply** [1]    50:24
**simulator** [7]    68:4
68:7    69:2    70:18
70:18    70:21    77:10
**Sincerely** [1]    101:20
**sit** [3]    17:19    19:11
55:9
**site** [2]  69:11    69:12
**sitting** [1]    7:4
**situation** [4]    10:17
71:6    78:2    95:21
**six** [1]    51:16
**slight** [1]    51:15
**slip** [2]   16:1    75:11
**slower** [1]    31:1
**small** [1] 46:24
**soaked** [2]    93:13
93:16
**solely** [1]    76:19
**someone** [5]    19:17
58:18    71:13    72:16
72:25
**Sometimes** [1]    55:21

**somewhat** [1]    20:16

**Sonin** [4]    72:3
73:6    74:7    75:16
**sorry** [5] 6:24    21:24
65:8    88:15    91:19
**sought** [1]    15:4
**sounds** [1]    66:20
**source** [4]    63:3
66:2    66:2    66:9
**Southern** [2]    1:0
3:7
**space** [12]    31:3
58:12    58.22    59:2
59:3    59:7    59:13
70:17    87:9    87:19
96:12    96:12
**sparse** [1]    61:5
**speak** [2]    8:11
39:23
**specialty** [1]    70:15
**specific** [11]    8:2
23:1    32:7    43:23
51:5    62:23    62:23
64:3    64:12    75:3
77:23
**specifically** [3] 73:3
91:2    91:10
**specifications** [2]
91:1    91:11
**specifics** [1]    10:18
**speed** [24]    28:8
28:8    31:4    31:4
31:16    31:17    31:19
31:20    31:24    32:13
38:21    42:14    62:12
63:9
**spent** [1] 9:24
**splits** [1] 51:14
**spoilers** [1]    31:11
**spoken** [1]    65:13
**staff** [1] 65:18
**stand** [4] 27:16    47:22
57:16    88:18
**stand-alone** [1] 91:16
**standard** [8]    4:12
31:15    53:6    62:4
73:11    75:10    81:15
85:17
**standards** [5]    3:11
4:4    23:6    23:12
67:22
**standing** [22]    27:12
28:1    28:6    30:21
44:5    46:4    50:1
50:11    51:7    51:15
57:25    61:10    61:15
61:19    61:23    62:7
63:17    63:21    64:7
93:14    93:15    95:25
**stands** [2]    30:13
45:6
**start** [4]  18:24    31:9
45:15    74:18
**started** [1]    16:21
**starts** [3] 43:15    44:1
45:14

**State** [16] 3:10 53:16
46:7 79:24 82:24
86:25 86:25 87:4
88:3 99:3 99:19
100:3 100:22 102:2
102:12 104:2

**statement** [16] 17:6
17:8 17:15 27:11
33:6 39:2 39:23
44:8 45:4 49:24
57:12 57:21 66:19
88:5 96:19 97:8

**statements** [3] 13:7
22:8 22:9

**states** [8] 1:0
3:6 49:2 60:8
63:15 64:6 66:17
85:18

**stating** [1] 15:7

**status** [2] 53:13
74:9

**stay** [6] 8:13 8:15
9:2 12:4 53:18
91:6

**stayed** [1] 79:16

**stays** [1] 14:12

**Steele** [31] 24:12
24:19 24:20 25:4
25:5 26:12 27:23
41:3 41:10 42:4
42:20 42:25 43:3
43:16 44:24 48:21
50:4 53:3 55:12
56:8 56:8 56:15
60:6 64:16 64:23
65:19 65:22 74:4
77:24 78:6 83:21

**Steele's** [3] 30:7
44:2 45:9

**stenographic** [1]
100:11

**stenographically** [1]
100:8

**step** [2] 54:4 88:12

**steps** [1] 22:11

**sterilized** [1] 87:17

**still** [2] 59:3 95:17

**stipulate** [1] 97:21

**stipulated** [1] 43:18

**stipulates** [1] 91:2

**stipulation** [1] 86:3

**stipulations** [1] 93:8

**stop** [3] 31:12 31:22
32:18

**stopped** [1] 40:8

**stricken** [1] 43:4

**strike** [3] 36:14
82:6 87:3

**study** [1] 183:13

**stuff** [1] 16:18

**subject** [7] 43:17
53:4 66:3 78:9
78:10 93:2 94:24

**submit** [1] 39:22

**submitted** [2] 33:2
49:17

**subpoe....** [1] 18:20

**subsequent** [2] 76:21
78:7

**substance** [1] 58:20

**substantiate** [3] 11:7
33:5 69:14

**succeed** [1] 74:11

**success** [1] 74:25

**such** [13] 55:18 56:6
56:22 66:19 68:8
71:3 80:5 80:5
86:3 90:9 90:10
93:24 96:14

**suffering** [1] 87:22

**sufficient** [2] 24:16
93:17

**suggest** [1] 50:5

**SUGGESTION/REASON**
[1] 104:8

**suggestions** [2] 60:17
104:5

**Suite** [4] 2:4 2:7
3:13 101:6

**summary** [3] 35:22
38:15 41:14

**supervise** [1] 70:5

**supervision** [1] 70:14

**supervisor** [2] 23:3
33:11

**supplied** [1] 23:15

**Support** [1] 94:3

**supposed** [5] 14:14
16:24 18:7 57:3
69:21

**surface** [2] 64:6
93:18

**surrender** [1] 95:19

**surrendered** [1] 53:19

**surrounding** [1] 87:4

**Susan** [3] 1:0
2:6 101:5

**suspect** [3] 30:9
53:16 74:2

**suspended** [4] 54:3
54:17 55:18 95:22

**suspension** [1] 53:12

**sustain** [1] 28:11

**sworn** [6] 3:20
12:24 17:12 18:5
99:9 102:4

**system** [10] 27:16
34:16 55:25 58:10
87:6 87:12 87:19
94:3 95:2 95:7

**T** [3] 2:15 104:1
104:1

**tabulated** [1] 63:3

**takeoff** [16] 8:5
13:10 13:13 13:21
28:7 28:10 31:7
38:9 45:21 46:25
61:3 80:13 93:1
93:3 93:3 93:4

**takes** [1] 45:7

**taking** [4] 38:19

**talks** [1] 93:12

**tapes** [2] 37:12 37:15

**taxi** [11] 30:6 45:16
45:16 45:16 45:17
45:20 45:20 45:22
46:3 46:13 46:18

**taxied** [7] 27:18
27:18 46:7 46:25
47:7 49:24 50:10

**taxiing** [1] 45:12

**technical** [5] 26:19
26:24 28:13 29:14
44:11

**tending** [1] 49:15

**tenure** [1] 75:20

**term** [1] 24:5

**terminal** [1] 27:15

**terminated** [1] 81:20

**terms** [3] 6:15 10:21
66:9

**test** [6] 69:11 69:12
69:17 72:4 77:6
77:10

**tested** [1] 70:3

**testified** [4] 3:21
44:20 46:14 46:16

**testimony** [9] 11:13
12:24 17:12 18:6
25:11 28:13 65:3
65:9 72:15

**testing** [2] 68:17
77:18

**text** [1] 42:23

**Thank** [1] 7:2
35:18 78:17 83:25
91:17 92:8 94:4
96:2 96:3 96:17

**themselves** [1] 58:14

**thereafter** [1] 9:14

**therefore** [4] 28:21
46:4 55:13 56:23

**therein** [2] 102:17
104:7

**THEREUPON** [1]
3:17

**thick** [1] 66:14

**thinking** [1] 19:12

**third** [2] 38:17 43:13

**Thirty-nine** [2] 79:6
79:7

**three** [8] 10:4 14:5
48:22 49:4 49:4
69:4 69:5 94:8

**three-sixteenths** [1]
61:25 92:16

**through** [8] 61:24
71:13 72:2 72:17
74:16 83:14 94:21
104:5

**throughout** [1] 83:4

**Thursday** [1] 10:2

**tie** [1] 25:6

**timing** [2] 55:14

**42:12 42:19 62:18**

**today** [6] 14:14
17:5 19:11 44:21
57:22 58:22

**together** [2] 23:19
33:3

**tone** [1] 11:12

**took** [3] 13:6 14:6
50:15

**totally** [2] 70:18
70:19

**toward** [1] 76:7

**towards** [2] 11:25
60:15

**tower** [21] 22:6
27:7 27:23 28:1
28:20 30:11 37:11
37:15 44:6 44:25
45:17 45:19 47:21
50:2 50:4 50:10
50:12 51:2 51:12
52:3 83:22

**tower's** [2] 29:5
47:21 57:16

**track** [2] 74:9 74:17

**traffic** [4] 22:6
44:6 82:21 82:22

**training** [35] 5:3
5:11 5:12 22:19
60:14 64:16 67:16
68:5 69:9 69:24
70:2 70:6 70:21
71:2 71:7 71:18
71:21 72:25 73:16
73:21 74:9 74:10
74:17 74:19 74:22
74:24 75:1 75:4
75:7 76:8 76:13
76:19 83:5 83:14
83:14

**trans** [1] 27:14

**transcribed** [1] 96:24

**transcript** [11] 37:12
45:2 97:4 98:8
100:9 100:10 101:11 101:13 101:14
101:17

**transcription** [1]
104:6

**translate** [1] 61:8

**transpire** [1] 70:2

**transpired** [1] 12:7

**Transport** [1] 6:23

**Transportation** [6]
10:9 10:13 14:5
16:6 19:21 90:6

**travel** [1] 9:25

**trend** [1] 76:7

**true** [5] 18:12 88:5
100:10 102:5 104:6

**try** [2] 25:25 63:4

**Tuesday** [1] 1:0

**turn** [6] 33:11 36:10
36:20 38:14 42:8
43:10

**turned** [1] 14:4

**Turning** [1] 48:16

**two** [13] 7:6 10:4
36:5 39:8 49:10
49:10 57:15 59:21
84:11 86:6 86:6
95:14 101:17

**tying** [1] 56:22

**type** [3] 64:1 68:21
78:10

**typical** [1] 73:12
82:12

**typically** [6] 60:23
69:10 72:24 73:10
77:3 84:24

**Um-hum** [1] 84:10

**unclaimed** [1] 49:12

**uncontaminated** [1]
61:20

**under** [10] 6:7
7:10 12:24 55:10
39:21 53:7 55:10
61:9 63:25 95:23

**undersigned** [2] 99:7
104:4

**understand** [7] 23:16
62:13 62:21 79:20
83:19 90:18 96:18

**understood** [1] 72:15

**unfamiliar** [1] 64:5

**unfortunate** [2] 16:1
16:3

**United** [2] 1:0
3:6

**unless** [12] 27:17
30:11 50:2 50:22
57:16 61:10 63:16
66:17 67:2 67:6
80:1 83:1

**up** [9] 16:23 17:1
19:16 23:12 30:17
55:19 66:15 77:5
97:3

**upcoming** [1] 77:21

**upgrade** [18] 67:16
67:21 68:1 68:2
69:14 71:5 71:21
71:25 72:18 73:8
76:8 76:14 76:19
76:23 77:4 77:11
78:1 83:14

**upgraded** [1] 81:24

**upgrades** [1] 73:6

**ups** [1] 91:20

**upset** [3] 20:11 20:23
21:8

**used** [7] 33:5 65:17
70:18 92:21 94:13
94:18 96:9

**using** [1] 17:25

**V-1** [8] 28:8 31:4
31:8 31:19 31:20
38:20 42:14 44:5

**vague** [1] 10:18

**Valerie** [1] 1:0
2:3 101:23

**validate** [2] 69:19
72:19

**variance** [1] 61:14

**various** [1]        92:17

**vehicle** [3]        27:9
27:11    77:20

**verbal** [1]          8:7

**versed** [1]         57:3

**via** [2]    49:11    49:12

**vice** [1]    60:6

**view** [1]  57:14

**violate** [1]        38:25

**violated** [4]       17:13
30:19    48:19    95:10

**violation** [41]      7:25
8:20     19:13    19:24
24:17    26:24    27:1
28:14    28:22    28:24
29:1     29:6     29:8
30:2     39:5     40:4
42:24    43:23    44:11
47:19    48:22    49:3
55:4     56:25    57:10
57:17    57:20    61:2
64:25    65:11    79:22
79:22    80:3     83:20
84:22    84:22    85:21
86:2     86:21    94:25
96:1

**violations** [4]      26:17
57:7     85:8     87:23

**virtue** [3]          38:24
42:18    43:2

**visually** [1]        51:1

**vouching** [1]       69:22

**vs** [3]      1:0      101:7
102:6

**Wagener** [2]         1:0
3:13

**waiting** [1]        15:25

**waive** [5]          18:21
96.20    97:19    97:22
101:16

**walk-in** [1]         9:19

**walk-ins** [1]        9:24

**wants** [1]          23:13

**Washington** [1]  94:22

**water** [28]          27:6
27:10    27:12    27:23
28:1     28:7     30:21
44:5     46:4     50:1
50:11    50:20    51:7
51:16    51:18    61:11
61:13    61:15    61:19
61:23    62:7     62:19
63:17    63:21    64:7
93:5     93:14    93:15

**water-contaminated**
[1]      27:5

**ways** [2]  14:18    92:17

**weather** [4]         37:18
83:22    93:1     93:3

**Wednesday** [1]  10:2

**week** [1]  54:1

**weeks** [2]           10:4
101:17

**weighing** [1]       23:18

**weight** [16]         5:19
28:10    30:24    31:1

31:2     ...24     32:9
32:12    38:6     38:9
38:19    42:13    46:5
62:11    63:9     80:12

**weights** [1]         80:20

**Weihe** [2]           1:0
2:4

**welcome** [1]        96:4

**wet** [17]  32:1      46:3
49:25    50:11    50:13
50:16    50:20    57:13
61:15    62:1     63:15
66:13    66:18    67:3
67:6     93:12    93:12

**wherein** [1]         3:4

**wherever** [2]       47:5
59:4

**whistle** [1]        82:2

**whole** [4]          19:3
25:22    82:6     97:3

**willful** [1]        94:25

**winding** [1]        55:19

**Winters** [1]        65:14

**Wise** [12]          24:11
25:9     26:10    48:1
48:5     48:6     48:7
48:7     48:18    48:21
49:5     49:10

**Wise's** [2]         49:18
49:21

**wish** [1]  101:14

**wished** [1]        101:10

**within** [8]         11:7
22:19    69:24    75:4
86:4     89.2     91:6
96:11

**without** [6]        40:12
59:8     87:19    87:21
87:22    93:13

**witness** [25]        3:2
3:19     11:22    25:13
26:5     34:1     34:2
34:8     35:4     35:9
35:17    36:12    41:5
41:7     48:12    59:11
94:5     96:4     96:22
97:17    99:11    102:18
103:5    103:6    103:12

**wondering** [1]      55:17

**word** [2]  12:5      15:14

**words** [1]          32:6

**worked** [2]         51:22
73:12

**worker** [1]         50:22

**workload** [1]       55:24

**works** [1]          71:13

**writing** [4]         9:3
12:15    13:23    79:18

**written** [11]        8:7
9:8      10:14    11:3
12:13    15:22    19:23
21:15    22:12    39:22
59:15

**wrote** [2]          53:2
92:1

**X** [2]     2:1      2:15

**year** [3]  6:25      47:3
71:15

**years** [1] 7:12

**yet** [1]   51:13

**yourself** [1]       79:11

RIS: FO 2150-1

```
|----------------------------------------------------------------|
| ENFORCEMENT INVESTIGATIVE REPORT  |  Report Number   Related Number |
| (Read Order 2150.3 for instructions) |  2000SO170009           |
|----------------------------------------------------------------|
|                ALLEGED VIOLATOR IDENTIFICATION                 |
|----------------------------------------------------------------|
| 1. Name AMERIJET INTERNATIONAL INC                             |
|    DBA Name                                    Send CP         |
|    Designator PCSA    | 2. Address (Include zip code)  of      |
|                       | PERETZ, STEPHEN I ESQ ASV             |
|                       | KLUGER PERETZ AND KAPLAN  see         |
|                       | 1970 MIAMI CENTER      related        |
|                       | MIAMI          FL 33131   case        |
|----------------------------------------------------------------|
| Telephone Number ( ) -  | 3. Date of Birth  / /  | 4. Sex     |
|----------------------------------------------------------------|
| 5. FAA Cert. # | 6. FAA Certificate Type                       |
|   PCSA059B     | SCHED AIR CARRIER 121 &/O                      |
|----------------------------------------------------------------|
| 7. Aviation Employer                                           |
|----------------------------------------------------------------|
|    AIRCRAFT, ENGINE, PROPELLER, COMPONENT OR APPLIANCE INVOLVED |
|----------------------------------------------------------------|
| 8. Make BOEING | 9. Model 727      | 10. Ident. Number 397AJ   |
|                |                   |     ACFT SN               |
|----------------------------------------------------------------|
| 11. Owner Name    AMERIJET INTERNATIONAL INC                   |
|                   | 12. Address (Include zip code)             |
|                   |    498 S W 34TH ST                         |
|                   |                                            |
|                   |    FORT LAUDERDALE      FL 33315           |
|----------------------------------------------------------------|
|                      ALLEGED VIOLATION                         |
|----------------------------------------------------------------|
| 13. Date Occurred | 14. Time | 15. Date Known to FAA | 16. Region of Discov |
|    1999/08/17     |  19:40   |     1999/10/18        |        SO            |
|----------------------------------------------------------------|
| 17. Location  FT LAUDERDALE-HOLLYW  FT LAUDERDALE  FL   Sec Cat 1 |
|               FT LAUDERDALE                                     |
|               Airport ID  FLL                                  |
|----------------------------------------------------------------|
```



PLAINTIFF'S
EXHIBIT
39

2

EIR 00SO170009

## SECTION B - SUMMARY OF FACTS

█████████████████████ on Tuesday, August 17, 1999, during the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time), B-727, N397AJ operated as Amerijet flight 827, a Supplemental Air Carrier operating under FAR Part 121, departed the Fort Lauderdale-Hollywood International Airport Runway 9 Left with Standing Water Less than one quarter (1/4) of an inch on the runway. (IOP 1, page 3; IOP 3, pp. 5 -10; IOP 4 - 5.)

The flight was operated without adjusting the maximum takeoff weight to that required by the Airplane Performance Manual, contrary to the Airplane Operating Manual. The aircraft weight and V1 degredations required for this flight, as the aircraft was configured, for runways with standing water of less than one quarter inch were 17,000 pounds and 28 knots. (IOP 3, pp. 5 - 10; IOP 6 - 12.)

The aircraft was taken off at a weight 17,000 pounds greater than allowed and at an indicated V1 airspeed 28 knots faster than allowed for conditions thus degrading the performance capability. (IOP 6 and 12.)

By virtue of the above, the flight was further operated█████████████████ "in a careless or reckless manner so as to endanger the life or property of another".

3

EIR 00SO170009

SECTION C - ITEMS OF PROOF

| IOP | #PAGES | DESCRIPTION |
|-----|--------|-------------|
| 1 | 3 | VIS PERSONNEL LIST AND OPERATOR INFORMATION |
| 2 | 4 | COPIES OF PERTINENT FAR PARTS 1, 121 AND 91 |
| 3 | 10 | LETTER OF COMPLAINT FROM PATRICK S. MAJOR |
| 4 | 2 | REQUEST FOR ATC TAPE FROM FLL ATCT AND TAPE |
| 5 | 2 | TYPED TRANSCRIPT OF ATCT TAPE |
| 6 | 3 | PAGES - AOM, NAVTECH, PERFORMANCE MANUAL |
| 7 | 4 | PERFORMANCE MANUAL PAGES |
| 8 | 2 | PAGES FROM WEIGHT AND BALANCE MANUAL |
| 9 | 1 | AIRCRAFT LOG BOOK MAINTENANCE LOG PAGE |
| 10 | 1 | AMERIJET FLIGHT RELEASE |
| 11 | 1 | WEATHER SHEET |
| 12 | 1 | B-727-200C LOAD PLAN/WEIGHT AND BALANCE |
| 13 | 2 | CERTIFIED LOI SENT TO PRESIDENT DAVID G. BASSETT |
| 14 | 2 | LOI SENT TO DAVID G. BASSETT VIA REGULAR MAIL |
| 15 | 5 | AMERIJET VIOLATION HISTORY |

```
+-----------------------------------------------------------------------+
¦  ISIS Air Operator (VIS) Report      Air Operator Directory Information ¦
¦ Air Operator: PCSA      AMERIJET INTERNATIONAL INC                     ¦
¦                                                                        ¦
¦ Title:     Main Maint Location     MML    AMERIJET INTERNATIONAL INCORPORA ¦
¦ Name:                                     498 SW 34TH STREET           ¦
¦ VIS Title:                                                             ¦
¦ Phone:    -    -    Ext    FTS    -       FORT LAUDERDALE    FL 33315  ¦
+-----------------------------------------------------------------------+
¦ Title:                             DOS    AMERIJET INTERNATIONAL INCORPORA ¦
¦ Name:      BASSETT, DAVID G.               498 S.W. 34TH STREET        ¦
¦ VIS Title: PRESIDENT/GENERAL MANAGER/DIRE                              ¦
¦ Phone: 954-359-7670 Ext      FTS    -      FORT LAUDERDALE    FL 33315 ¦
+-----------------------------------------------------------------------+
¦ Title:     General Manager         MGR                                 ¦
¦ Name:      BASSETT, DAVID G.                                           ¦
¦ VIS Title: PRESIDENT/GENERAL MANAGER                                   ¦
¦ Phone: 954-359-0077 Ext      FTS    -                                  ¦
+-----------------------------------------------------------------------+
```

1 OF 3

**I.O.P.# 1**

```
+-------------------------------------------------------------------------------+
! Title:                           DOS    AMERIJET INTERNATIONAL INCORPORA !
! Name:     BASSETT, DAVID G.              498 SW 34TH STREET               !
! VIS Title: GENERAL MANAGER/SAFETY OFFICER                                 !
! Phone: 954-359-0077 Ext      FTS    -    FORT LAUDERDALE    FL 33315       !
+-------------------------------------------------------------------------------+
! Title:     Director of Oper      DOP                                      !
! Name:      STEELE, PETER A.                                               !
! VIS Title: VICE PRESIDENT OF OPERATIONS                                   !
! Phone: 954-359-0077 Ext 777  FTS    -                                     !
+-------------------------------------------------------------------------------+
! Title:     Dir of Maintenance    DMT                                      !
! Name:      VENUTO, JOSEPH                                                 !
! VIS Title: DIRECTOR OF MAINTENANCE                                        !
! Phone: 954-359-0077 Ext      FTS    -                                     !
+-------------------------------------------------------------------------------+
! Title:     Dir of Maintenance    DMT                                      !
! Name:      SCHUMACHER, IRVING F.                                          !
! VIS Title: VICE PRESIDENT OF MAINTENANCE                                  !
! Phone: 954-359-0077 Ext      FTS    -                                     !
+-------------------------------------------------------------------------------+
```

2 OF 3

I.O.P. # 1

```
ISIS Air Operator (VIS) Report Air Operator Aircraft Inventory Info
Air Operator: PCSA        AMERIJET INTERNATIONAL INC
                          Max.  Max.  Flt.   129  |------- FAR 135 -------|
                          Pass. Pass. Att.   Mnt.                      Com- |
AIC            Qty   FAR  Demo. Appr. Number Pgm. Class Turb. VFR Day muter |
===            ===== ===  ===== ===== ====== === ===== ===== === === ===== |
B-727-200      10    121
```

3 OF 3

**I.O.P. #** 1

"Medical certificate" means acceptable evidence of physical fitness on a form prescribed by the Administrator.

"Military operations area" (MOA) means an airspace that is established outside Class A airspace to separate or segregate certain nonhazardous military activities from IFR Traffic and to identify for VFR traffic where these activities are conducted.

"Minimum descent altitude" means the lowest altitude, expressed in feet above mean sea level, to which descent is authorized on final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure, where no electronic glide slope is provided.

"Minor alteration" means an alteration other than a major alteration.

"Minor repair" means a repair other than a major repair.

"Navigable airspace" means airspace at and above the minimum flight altitudes prescribed by or under this chapter, including airspace needed for safe takeoff and landing.

"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time.

"Nonprecision approach procedure" means a standard instrument approach procedure in which no electronic glide slope is provided.

"Operate," with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in §91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).

"Operational control," with respect to a flight, means the exercise of authority over initiating, conducting, or terminating a flight.

"Overseas air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct or furtherance of a business or vocation, in commerce between a place in any State or the United States, or the District of Columbia, and any place in a territory or possession of the United States; or between a place in a territory or possession of the United States, and a place in any other territory or possession of the United States.

"Overseas air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce —
(1) Between a place in a State or the District of Columbia and a place in a possession of the United States; or
(2) Between a place in a possession of the United States and a place in another possession of the United States;
whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Over-the-top" means above the layer of clouds or other obscuring phenomena forming the ceiling.

"Parachute" means a device used or intended to be used to retard the fall of a body or object through the air.

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

"Pilotage" means navigation by visual reference to landmarks.

"Pilot in command" means the person who:
(1) Has final authority and responsibility for the operation and safety of the flight;
(2) Has been designated as pilot in command before or during the flight; and
(3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight.

"Pitch setting" means the propeller blade setting as determined by the blade angle measured in a manner, and at a radius, specified by the instruction manual for the propeller.

"Positive control" means control of all air traffic, within designated airspace, by air traffic control.

"Powered-lift" means a heavier-than-air aircraft capable of vertical takeoff, vertical landing, and low speed flight that depends principally on engine-driven lift devices or engine thrust for lift during these flight regimes and on nonrotating airfoil(s) for lift during horizontal flight.

"Precision approach procedure" means a standard instrument approach procedure in which an electronic glide slope is provided, such as ILS and PAR.

1 OF 4

I.O.P. # 2



© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED.

## SUBPART T — FLIGHT OPERATIONS

### 121.531 APPLICABILITY

This subpart prescribes requirements for flight operations applicable to all certificate holders, except where otherwise specified.

### 121.533 RESPONSIBILITY FOR OPERATIONAL CONTROL: DOMESTIC OPERATIONS

(a) Each certificate holder conducting domestic operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
   (1) Monitoring the progress of each flight;
   (2) Issuing necessary information for the safety of the flight; and
   (3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

### 121.535 RESPONSIBILITY FOR OPERATIONAL CONTROL: FLAG OPERATIONS

(a) Each certificate holder conducting flag operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
   (1) Monitoring the progress of each flight;
   (2) Issuing necessary instructions and information for the safety of the flight; and
   (3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(f) No pilot may operate an aircraft in a careless or reckless manner so as to endanger life or property.

### 121.537 RESPONSIBILITY FOR OPERATIONAL CONTROL: SUPPLEMENTAL OPERATIONS

(a) Each certificate holder conducting supplemental operations —
   (1) Is responsible for operational control; and
   (2) Shall list each person authorized by it to exercise operational control in its operator's manual.

(b) The pilot in command and the director of operations are jointly responsible for the initiation, continuation, diversion, and termination of a flight in compliance with this chapter and the operations specifications. The director of operations may delegate the functions for the initiation, continuation, diversion, and termination of a flight but he may not delegate the responsibility for those functions.

(c) The director of operations is responsible for canceling, diverting, or delaying a flight if in his opinion or the opinion of the pilot in command the flight cannot operate or continue to operate safely as planned or released. The director of operations is responsible for assuring that each flight is monitored with respect to at least the following:
   (1) Departure of the flight from the place of origin and arrival at the place of destination, including intermediate stops and any diversions therefrom.
   (2) Maintenance and mechanical delays encountered at places of origin and destination and intermediate stops.
   (3) Any known conditions that may adversely affect the safety of flight.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and aircraft. The pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(e) Each pilot in command of an aircraft is responsible for the preflight planning and the operation of the flight in compliance with this chapter and the operations specifications.

I.O.P. # 2

2 OF 4

© JEPPESEN SANDERSON, INC., 1996. ALL RIGHTS RESERVED.

**SUBPART G — ADDITIONAL EQUIPMENT AND OPERATING REQUIREMENTS FOR LARGE AND TRANSPORT CATEGORY AIRCRAFT**

**91.601    APPLICABILITY**

This subpart applies to operation of large and transport category U.S.-registered civil aircraft.

**91.603    AURAL SPEED WARNING DEVICE**

No person may operate a transport category airplane in air commerce unless that airplane is equipped with an aural speed warning device that complies with §25.1303 (c)(1).

**91.605    TRANSPORT CATEGORY CIVIL AIRPLANE WEIGHT LIMITATIONS**

(a) No person may take off any transport category airplane (other than a turbine-engine-powered airplane certificated after September 30, 1958) unless —
　(1) The takeoff weight does not exceed the authorized maximum takeoff weight for the elevation of the airport of takeoff;
　(2) The elevation of the airport of takeoff is within the altitude range for which maximum takeoff weights have been determined;
　(3) Normal consumption of fuel and oil in flight to the airport of intended landing will leave a weight on arrival not in excess of the authorized maximum landing weight for the elevation of that airport; and
　(4) The elevations of the airport of intended landing and of all specified alternate airports are within the altitude range for which maximum landing weights have been determined.

(b) No person may operate a turbine-engine-powered transport category airplane certificated after September 30, 1958, contrary to the Airplane Flight Manual, or take off that airplane unless —
　(1) The takeoff weight does not exceed the takeoff weight specified in the Airplane Flight Manual for the elevation of the airport and for the ambient temperature existing at the time of takeoff;
　(2) Normal consumption of fuel and oil in flight to the airport of intended landing and to the alternate airports will leave a weight on arrival not in excess of the landing weight specified in the Airplane Flight Manual for the elevation of each of the airports involved and for the ambient temperatures expected at the time of landing;
　(3) The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet). Wet runway distances associated with grooved or porous friction course runways, if provided in the Airplane Flight Manual, may be used only for runways that are grooved or treated with a porous friction course (PFC) overlay, and that the operator determines are designed, constructed, and maintained in a manner acceptable to the Administrator.
　(4) Where the takeoff distance includes a clearway, the clearway distance is not greater than one-half of —
　　(i) The takeoff run, in the case of airplanes certificated after September 30, 1958, and before August 30, 1959; or
　　(ii) The runway length, in the case of airplanes certificated after August 29, 1959.

(c) No person may take off a turbine-engine-powered transport category airplane certificated after August 29, 1959, unless, in addition to the requirements of paragraph (b) of this section —
　(1) The accelerate-stop distance is no greater than the length of the runway plus the length of the stopway (if present); and
　(2) The takeoff distance is no greater than the length of the runway plus the length of the clearway (if present); and
　(3) The takeoff run is no greater than the length of the runway.

I.O.P. # 2
3 OF 4

Ⓐ *Amend #256 eff 3-20-98*

© JEPPESEN SANDERSON, INC., 1990, 1998. ALL RIGHTS RESERVED.



(d) Any person taking off or landing a helicopter certificated under *part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting height-speed envelope established for that helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

## 91.11 PROHIBITION AGAINST INTERFERENCE WITH CREWMEMBERS

No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

## 91.13 CARELESS OR RECKLESS OPERATION

(a) *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

(b) *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

## 91.15 DROPPING OBJECTS

No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property. However, this section does not prohibit the dropping of any object if reasonable precautions are taken to avoid injury or damage to persons or property.

## 91.17 ALCOHOL OR DRUGS

(a) No person may act or attempt to act as a crewmember of a civil aircraft —
(1) Within 8 hours after the consumption of any alcoholic beverage;
(2) While under the influence of alcohol;
(3) While using any drug that affects the person's faculties in any way contrary to safety; or
(4) While having .04 percent by weight or more alcohol in the blood.

(b) Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.

(c) A crewmember shall do the following:
(1) On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when.—
(i) The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
(ii) The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.
(2) Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates percentage by weight of alcohol in the blood.

4 OF 4

I.O.P. # 2

*(Not published herein — Ed.)*

© JEPPESEN SANDERSON, INC., 1990. ALL RIGHTS RESERVED.



John C. Mascaro, Jr.
Principal Operations Inspector
FAA, FSDO
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315

RECEIVED BY
OCT 7 1997
FEDERAL AVIATION ADMINISTRATION
FSDO
FT. LAUDERDALE

1 OF 10

I.O.P. # 3



Patrick & Beth Major



**Patrick Major**

John C. Roseborough
Principal Operations Inspector
Federal Aviation Administration
Flight Standards district Office - 17
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315
Voice: (954) 356-7523, Extension 154
Fax    (954) 356-7531

10-01-99

Dear John,

Following is the text of three memo's-and letters regarding Amerijet Flight 827, 08-17-99, which you and I discussed, Thursday, September 16th.

I reported the incident to the director of operations and chief pilot as required by Amerijet's GOM, recommending the safety officer be notified as well, then sent a report to NASA's ASRS (Aviation Safety Reporting System). Amerijet's GOM further requires that its POI be notified: Thirty days after the incident, you told me it had yet to be reported by anyone other than me.

John, the termination of my employment is a classic whistle blower scenario; the only event between my being an employee in good standing and being fired because Amerijet had, "...lost confidence in my abilities as an airman..." is the complaint regarding a takeoff 15,000Lbs over the maximum performance limit for conditions at the field. That is the subject of a complaint to the DOT Inspector's General's Office. But, I am most concerned that if Amerijet does not immediately change its policies regarding takeoff from wet runways, someone is going to get hurt. The question is, will the FAA take action before that happens, or wait until newspaper headlines, carnage, catastrophe and public outrage leave it no other choice.

If I can be of further assistance, do not hesitate to contact me. The cellular phone is the best way to reach me.

Warmest Regards,

Patrick Major

$Z$ OF 10

**I.O.P. #_3_**



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP, 08-17-99.


Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

Warmest Regards,

Pat

3 OF 10



**I.O.P. # 3**



**Patrick Major**

**FAX**
The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.

**FAX To:** David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
**Date:** 08-25-99
**Subject:** NASA ASRS Report

Greetings Dave,

Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence you would ever see it if I did not submit it to you directly.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, accept my apologies.

Warmest Regards,

Pat

$4$ OF $10$



**I.O.P. #$3$**



Copy for Qthw Raxborayh,  **Patrick Major**
POI, FAA, FIDO-17

## NASA, Aviation Safety Reporting System
### (ASRS report)

Report Date: 08-18-1999, Incident Date: 08-17-99  ⟵
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs.,
Ratings: Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, FAR Part 142 Certified Pilot and Flight
Engineer Instructor/Boeing 727.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors: Thunderstorms in vicinity, rainshowers overhead, contaminated runway;
conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening. When I arrived, the
field was under heavy rainshowers. Anticipating a max-weight performance-limited takeoff
on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the Navtech runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff controversy
which took place June 08, 1999, out of MIA. On that rainy morning, a Continental 727 had
taxied into position and hold RW-12, then declined takeoff clearance... requesting full length
9L, instead. The night before it had rained ten inches. It was raining at the time. While
Tower had not provided a runway condition report, the runways were obviously wet. Amerijet
flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without
prompting from the captain, I declined, reminding Tower that our flight required full-length 9L.
The captain chastised me for refusing RW-12 against his wishes (even though we had just
finished discussing that the runway analysis did not support it, even on a dry day, even if we
believed the weights reported by ramp personnel). The captain insisted I radio-back Tower
and accept RW-12. I demurred. After a brief discussion, AJT 823 finally departed full-length
9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300'
longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.



5 OF 10

**I.O.P. #3**

However, my refusal to accept RW-12 became the subject of a disciplinary complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation against me for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. 9L FLL is 355 feet shorter than 12 in MIA. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), regardless how wet a runway, Amerijet flight crews are taught by the training department and warned by dispatch personnel to consider all runways "Dry" for performance planning purposes unless there exists a contamination report containing the specific words, "Standing Water." Though there are frequent storms in the area, rarely are contamination reports conducted at South Florida Airports. Most airlines encourage their crews to simply accept the "Standing Water less than 1/4"" penalty...reasoning that the penalty applies to depths as shallow as 1/8"... and is clearly the safest option. Some Boeing performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot max-weight V1 speed reduction for runways that are, "...well-soaked with water but do not have large areas of actual standing water." But absent a contamination report specifically including the term "Standing Water", Amerijet considers all runways dry. Considering drag induced as aircraft tires displace water on the runway surface, additional drag produced by water spraying against the fuselage and wings, as well as reduced braking implications, that policy could be a recipe for disaster. As of August 17, 1999, these concerns had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 355' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they had been June 08. Even so, the dispatcher I queried reported to me that to his understanding Amerijet performance policies do not observe weight penalties unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers imply a braking degradation and an impediment to acceleration when runway surfaces are wet ... irrespective of whether or not the runway contains "Standing water:" "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights," I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' actually reported on the runway, it's dry."

6 OF 10

I.O.P. # 3

As aircraft 397AJ was loaded for departure, I explained my question to the check airman who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safest solution and accept the "Standing Water ≤ 1/4" weight and V1 penalty. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain jokingly dismissed my concern, "We'll have to takeoff between the water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.    He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available."    The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower".    Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us ... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway surface.    The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst adjacent the channels of accumulated rubber left by successive landing and departing aircraft. No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a packs-off takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect it.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch. AJT 827 is cleared for takeoff, turn right heading one zero zero." As Tower began its transmission, the captain advanced the throttles and released the brakes. Probably because the aircraft was already rolling, tower issued the takeoff clearance without pause or delay. Before I could even begin to reply to the report and clearance, the aircraft was accelerating down the runway.    Previously, I thought I would have a chance to prevent

the takeoff when the controller inevitably asked, "AJT 827, state your intentions." He did not. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. Perhaps, I should have. I feared an aborted takeoff on a wet runway with the captain and I fighting over the controls could have been just as dangerous. If all three engines operated normally, if no windshear was encountered, perhaps the takeoff would be safer than a mutiny-abort on a wet runway in driving rain. AJT 827 used all available runway. The captain rotated well inside the ← alternating red and white lights at an indicated airspeed five knots below V1. The main wheels broke ground at the last possible instant and the aircraft crossed the airport boundary at approximately 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts. I called-out the fluctuations then held my breath, praying for altitude.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation." (referring to the GPS installed in the aircraft, but not approved in the ops specs).

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits of Class II navigation described in the Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked. "Do you realize how incongruent that sounds coming from a check airman who just goaded a flight crew into taking off from a contaminated runway into possible windshear fifteen thousand pounds over the maximum performance limit? Even if I am wrong about navigating direct, ...and I don't think I am, one could get us violated, the other will get us killed. What is safe about that?"

AJT flight 827 exceeded aircraft limitations and violated FAA regulations in flagrant disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway weighing fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the consequences inevitably bestowed upon any air carrier which actively cultivates a culture of noncompliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on

8 OF 10    **I.O.P. # 3**

runways that are obviously contaminated, but have not been officially described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning policies, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the official report.

Among my many mistakes August 17, was letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Although it should not have been necessary, due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the 'sacred cow' brother of its vice president, director of operations, and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Admittedly, that was the captain's job, but had I insisted on such a plan before the aircraft taxied out of the ramp for takeoff, I may have avoided the circumstances which placed me and the rest of the crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff once such a report was issued. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...as well as the strident actions required to prevent takeoff once initiated. But with the aircraft already rolling, Tower probably figured he had his answer.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the check airman and captain prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Would that have worked? Honestly, that did not occur to me until later. I made a judgment call and elected not to intervene once the takeoff roll began. Not a day passes that I don't relive the possible consequences of my choice.

Contributing factors included my deference to authority in the cockpit, not only with regard to the presence of a check airman who I held in high regard, and that particular captain (most other captains would not have been out there to start with), but pertaining to the recency of

9 OF 10    **I.O.P. #3**

what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and ongoing concern for flight safety and regulatory compliance at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way, impervious to the legitimacy of their concerns, by denying them promotional and professional opportunities, abusing them in the simulator if need be, terminating their employment and exploiting the PRIA (Pilot Records Improvement Act, 1996) to soil their careers... while sending an unmistakably clear message to other flight crew lest they, too, consider showing unwelcome interest in flight safety.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

Copy for John Roseborough
Pot, FAA, FSDO - 17

10-01-95

10 OF 10
1.0.P. # 3



# **Memorandum**

U.S. Department
of Transportation
**Federal Aviation**
**Administration**

Ft. Lauderdale International ATC Tower
4150 S.W. 12 Terrace
Ft. Lauderdale, Fl. 33315

Subject **INFORMATION:** Tape Request

Date: October 25, 1999

From: Manager

Reply To
Attn. of: FLL-2

Ft. Lauderdale Int'l ATC Tower

To: Manager, Ft Lauderdale FSDO-17

Per telephone request of October 22, 1999, the following tape recording is enclosed.

Ft. Lauderdale ATC Tower
August 17, 1999 UTC
Ground Control 2340 UTC-0000 UTC
Local Control North 2340 UTC – 0000 UTC

Please advise if we can be of any further assistance.

Ronald S. Boyd

1 OF 2
**I.O.P. #** 4

4

FORT LAUDERDALE INTERNATIONAL AIR TRAFFIC CONTROL TOWER
CERTIFIED RE-RECORDING OF AMERIJET (PCSA) FLIGHT 827 OCCURRING
AUGUST 17, 1999 DURING THE TIME PERIOD FROM 2340 UTC - 0000 UTC
(1940 - 2000 LOCAL DAYLIGHT SAVINGS TIME).

THE RE-RECORDING WAS PREPARED BY MICHAEL T. JONES, SUPPORT
SPECIALIST AT THE FORT LAUDERDALE-HOLLYWOOD AIR TRAFFIC
CONTROL TOWER.

THE COUNTER NUMBERS BELOW REPRESENT EITHER AMERIJET OR
FORT LAUDERDALE ATC VOICE COMMUNICATIONS AS PERTAIN TO AMJ
FLIGHT 827. MOST OTHER VOICE COMMUNICATIONS HAVE NOT BEEN
IDENTIFIED WITH COUNTER NUMBERS. DUE TO THE EXTRANEOUS NOISE
EMITTED IN THE SIDETONE OF THE RE-RECORDING, A CLEARER VOICE
TRANSMISSION/RENDITION CAN BE HEARD WHEN PLAYED ON A STEREO
RECORDER/PLAYER WITH THE VOLUME ON ONE SIDE TURNED LOWER.

| COUNTER (APPROX.) | DIALOGUE | BY |
|---|---|---|
| 129 | DELAY AHEAD? | AMJ |
| 138 | RWY CONDITION WET, NO REPORTS | ATC |
| 146 | WE'RE GONNA NEED A STANDING WATER REPORT | ATC |
| 168 | AMJ 827 REQUESTS TAXI | AMJ |
| 171 | AMJ 827 HOLD SHORT OF TAXIWAY BRAVO, STAND BY | ATC |
| 183 | RAMP 1 CALLS FLL ATCT | |
| 194 | AMJ 827 CALLS ASKING FOR THE CURRENT WINDS | AMJ |
| 198 | AMJ 827, WILL YOU BE ABLE TO DEPART | ATC |
| 203 | AMJ 827, TAXI TO RUNWAY 9 LEFT | ATC |
| 239 | RAMP ONE CALLS | |
| 241 | PROCEED | ATC |
| 243 | AJT IS ASKED IF THEY CAN ACCEPT DEPARTURE | ATC |
| 276 | RAMP ONE CALLS | |

279 RAMP ONE ADVISES LESS THAN ¼ INCH, GOOD DRAINAGE,
SLIGHT STANDING WATER ABOUT 6 FEET ON EITHER SIDE OF
CENTERLINE

349 CONVECTIVE SIGMET 51E AVAILABLE          ATC

I.O.P. #5

1 OF 2



5

**433** LOCAL CONTROL, NORTH POSITION COMMUNICATIONS BEGIN

**464** DELTA 312 HEAVY (LOCKHEED L-1011, TRISTAR)
**466** DELTA 312, CLEARED FOR TAKEOFF                     ATC

**512** US AIR 2335 CALLS TO INQUIRE ABOUT WHAT WEATHER ATC SHOWS WITHIN 15 MILES OF FLL. ATC ADVISES THAT MAIN BODY OF STORM WILL BE AVOIDED WITH A 110 DEGREE HEADING AFTER TAKEOFF (20 DEGREES RIGHT OF TAKEOFF HEADING)

**584** AMJ827 CALLS                                       AMJ
**585** AMJ 827, ARE YOU READY FOR DEPARTURE                ATC

**586** YES SIR, 827, YOU'LL PASS ON THAT RUNWAY REPORT WHEN YOU GET IT, RIGHT?                                 AMJ

**587** YES, HE'S OUT THERE INSPECTING IT RIGHT NOW         ATC

**589** AMJ 827, GO OUT B2 AND BACK TAXI INTO POSITION AND HOLD                                                   ATC

**607** AMJ 827, HE REPORTS THERE'S SOME STANDING WATER LESS THAN A QUARTER ON AN INCH                           ATC

**609** SOME STANDING WATER LESS THAN A QUARTER OF AN INCH, AMJ 827 READY FOR TAKEOFF                           AMJ

**610** AMJ 827 RUNWAY 9 LEFT CLEARED FOR TAKEOFF, TURN RIGHT HEADING 110                                       ATC

**611** RIGHT HEADING 110, CLEARED FOR TAKEOFF, AMJ 827, THANK YOU MUCH.                                        AMJ

**832** CHANGE YOUR CODE TO 1153                           ATC
**833** 1123, 827                                          AMJ

THANK YOU, CONTACT MIAMI DEPARTURE                      ATC



I.O.P. # 5

2 OF 2

:-06070WJ2 — Document 112    Entered on FLSD Docket 03/13/2001      Pa

| CHAPTER | 4 - OPERATION. PROCEDURES | REFERENCE: | 4:1:55 |
| SECTION | 1A - OPERATING PROCEDURES | ISSUED: | 09-01-85 |
| SUBJECT | 55 - ADVERSE WEATHER TAKEOFF AND CLIMB | SUPERSEDES: | 0 |
| | | PAGE: | 1 |

ADVERSE WEATHER TAKEOFF AND CLIMB - Reference 4:1:55

Takeoff Limitations

Takeoff should not be attempted if the following limitations are exceeded:

- Dry snow more than 6 inches deep.

- Slush or wet snow more than 1/2 inch deep.

- Water more than 1/4 inch deep.

When values less than the aforementioned limits exist, check Performance Manual for appropriate reductions to maximum takeoff gross weight.

> CAUTION: DURING TAKEOFF, SNOW AND SLUSH PICKED UP BETWEEN THE NOSE-
> WHEEL TIRES MAY BE THROWN BACK AND PACKED INTO THE RAM AIR
> INLET, CAUSING BOTH AIR CONDITIONING PACKS TO TRIP OFF.  TO
> REDUCE THE POSSIBILITY OF THIS OCCURRING, THE RAM AIR DOORS
> MAY BE POSITIONED TO THE FULL CLOSED POSITIONS JUST PRIOR TO
> TAKEOFF.

Airplane Control

Exercise extreme caution in crosswinds.  Normally, it is recommended that a runway more into the wind be requested when crosswind components over 15 kts are reported on known slippery runways.

> CAUTION: ENSURE THAT PARKING BRAKE IS RELEASED BEFORE STARTING
> TAKEOFF ROLL ON ICE OR SNOW COVERED RUNWAYS.

Setting Takeoff Thrust

Align the airplane with the runway before increasing thrust. If engine anti-ice is being used for takeoff, ensure that engine thrust is increased to the highest practicable setting (80% N1 recommended) for 10 to 15 seconds before setting takeoff thrust.  Observe stable engine operation before brake release.

Engine inlet ice can affect EPR indications.  When takeoff thrust is set in icing conditions, crosscheck all engine instruments.  Ensure that the indications are reasonable and that no engine limits are exceeded.  Specifically, compare the N1 readings with the anticipated value and be prepared to reject the takeoff if a discrepancy exists between the EPR and N1 readings.

If the airplane starts to slide on ice or snow, release the brakes and begin the takeoff roll, but ensure that the instrument crosscheck is accomplished, including the comparison of the EPR and N1 readings.  Apply firm nosedown elevator pressure to aid nose wheel steering effectiveness.  Don't allow the lag in nose wheel steering effectiveness to cause over-controlling on slippery surfaces.

I.O.P. # 6



NAVTECH

The Runway Analysis provides data for takeoff and landing performance in adverse weather conditions for the B727-200 powered by JT8D-15/17 engines. Data are presented for operations on wet, standing water and snow covered runways in accordance with the guidelines and recommendations of FAA.

**WET RUNWAY** – A runway is considered wet when it is well soaked but without significant areas of standing water (depth less than 1/8 inch or 3mm of standing water). A runway is considered to be well soaked when there is sufficient moisture on the runway surface to cause it to appear reflective.

**RUNWAY CONTAMINATED BY STANDING WATER, SLUSH OR SNOW** – A runway is considered contaminated when at least 25% of the runway within the required length and width being used is covered by slush, standing water or snow greater than 3mm of equivalent water depth.

> • *Additional consideration: If the contaminates are lying on that portion of the runway where the high speed part of the takeoff roll will occur, it MAY BE appropriate to consider the runway contaminated.*

Daniel Liu

Aircraft Performance Engineer
Navtech Systems Support Inc.

**I.O.P. # _6_**

**Navtech Systems Support Inc.**
175 Columbia Street West, Suite 102     Waterloo, Ontario, Canada, N2L 5Z5     Phone (519) 747-1170     Fax (519) 747-1827

SITA - YYZNSCR   AFTN - CYYZXNSX   ARINC - YKFNSCR

2 OF 3

**AMERIJET INTERNATIONAL**   **FORT LAUDERDALE, FL**

**B-727-200   JT8D-15**   **HOLLYWOOD INTL**

**KFLL   09L**   **FLAPS   20**

| TEMP F C | ZERO WIND | CLIMB LIMIT | A/C OFF (+) | POD MAX EPR | N1% T/O | GO FOR ARND EPR | ENG ANTI-ICE ZERO WIND | A/C CLIMB LIMIT | OFF (+) |
|---|---|---|---|---|---|---|---|---|---|
| -10 -23 | 2000 C | 1980 | 0 C | 2.09 | 90 | 2.07 | 1975 | 1957 | 0 |
| 0 -18 | 2000 C | 1980 | 0 C | 2.09 | 91 | 2.07 | 1983 | 1957 | 0 |
| 10 -12 | 2000 C | 1980 | 0 C | 2.09 | 92 | 2.07 | 1983 | 1957 | 0 |
| 20 -7 | 2000 C | 1980 | 0 C | 2.09 | 93 | 2.07 | 1983 | 1957 | 0 |
| 30 -1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 32 0 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 34 1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 36 2 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 38 3 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 40 4 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 42 6 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 44 7 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 46 8 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 48 9 | 1999 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1982 | 1957 | 0 |
| 50 10 | 1996 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1979 | 1957 | 0 |
| 52 11 | 1993 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 54 12 | 1990 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 56 13 | 1987 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 58 14 | 1984 C | 1980 | 0 C | 2.09 | 97 | 2.07 | | | |
| 60 16 | 1979 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 62 17 | 1975 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 64 18 | 1971 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 66 19 | 1967 R | 1969 | 2 R | 2.09 | 97 | 2.07 | | | |
| 68 20 | 1963 R | 1969 | 6 R | 2.09 | 98 | 2.07 | | | |
| 70 21 | 1961 R | 1969 | 8 R | 2.09 | 98 | 2.07 | | | |
| 72 22 | 1960 R | 1969 | 9 R | 2.09 | 98 | 2.07 | | | |
| 74 23 | 1958 R | 1969 | 11 R | 2.09 | 98 | 2.07 | | | |
| 76 24 | 1956 R | 1969 | 13 R | 2.09 | 98 | 2.07 | | | |
| 78 26 | 1952 R | 1969 | 14 R | 2.09 | 98 | 2.07 | | | |
| 80 27 | 1949 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 82 28 | 1946 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 84 29 | 1942 R | 1970 | 15 R | 2.09 | 99 | 2.07 | | | |
| 86 30 | 1928 R | 1951 | 15 R | 2.08 | 99 | 2.07 | | | |
| 88 31 | 1917 R | 1936 | 14 R | 2.07 | 99 | 2.07 | | | |
| 90 32 | 1906 R | 1921 | 13 R | 2.06 | 99 | 2.07 | | | |
| 92 33 | 1895 R | 1906 | 11 R | 2.05 | 98 | 2.06 | | | |
| 94 34 | 1884 R | 1891 | 7 R | 2.04 | 98 | 2.05 | | | |
| 96 36 | 1861 R | 1861 | 0 R | 2.02 | 98 | 2.04 | | | |
| 98 37 | 1849 C | 1847 | 0 C | 2.01 | 98 | 2.03 | | | |
| 100 38 | 1837 C | 1832 | 0 C | 2.01 | 98 | 2.02 | | | |
| 102 39 | 1826 C | 1818 | 0 C | 2.00 | 97 | 2.01 | | | |
| 104 40 | 1814 C | 1803 | 0 C | 1.99 | 97 | 2.00 | | | |
| 106 41 | 1803 C | 1789 | 0 C | 1.98 | 97 | 1.99 | | | |
| 108 42 | 1792 C | 1774 | 0 C | 1.97 | 97 | 1.98 | | | |
| 110 43 | 1781 C | 1759 | 0 C | 1.96 | 97 | 1.96 | | | |
| 112 44 | 1770 C | 1744 | 0 C | 1.95 | 97 | 1.95 | | | |
| 114 46 | 1748 C | 1715 | 0 C | 1.93 | 96 | 1.94 | | | |
| 116 47 | 1736 C | 1701 | 0 C | 1.92 | 96 | 1.93 | | | |
| 118 48 | 1724 C | 1687 | 0 C | 1.92 | 96 | 1.92 | | | |
| 120 49 | 1712 C | 1672 | 0 C | 1.91 | 96 | 1.91 | | | |

| PACKS | ON | TORA = | 9000 |
|---|---|---|---|
| NOSE BRKS | OFF | TODA = | 9000 |
| 210 MPH | TIRE | ASDA = | 9000 |
| ELEV = | 11 | GRAD = | -.01% |

----NOTES----

1. CTR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.03    +.01
   ICE ON    NONE    -.02

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON    +.04

3. FLAP RETRACT HT (OCH)
   = 811 FTMSL

4. OBST: HT(FT AGL) DIST(NM)
   50    1.81

DATE: 12/09/92

**GROSS WEIGHT CORRECTIONS**

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
1 DEGREE F HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    0 LBS/KT EFF HEAD W
SUB FROM ZERO WIND 1301 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
*WIND    *RUNWAY SHORTENING    *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
*MEL PERFORMANCE DECREMENTS

**RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS**

| | | STANDING WATER | REDUCE ZERO | REDUCE V1 |
|---|---|---|---|---|
| | DRY | SLUSH OR | WIND W | SPEED |
| | SNOW | WET SNOW | BY: | BY: |
| | -IN- | -IN- | -LBS- | -KNOTS- |
| | | < 1/4 | 17000 | 28 |
| 3 1/2 TO 6 | 1/4 TO 1/2 | | 30000 | 25 |
| | ICE | | 17000 | 28 |
| ANTI-SKID INOP | | | 8500 | 18 |

\* = CHECK MAX STRUCTURAL WT

**LANDING DATA**   PACKS ON

| | | | DRY | | | WET | | | | SUB LB/F | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LNDG FLAP | ANTI LENGTH SKID | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | APT CRIT TEMP | ABOVE CRIT TEMP | MAX OPER TEMP |
| 30 | 8423 OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 143 | 0 | 120 |

3 OF 3    **I.O.P. # 6**

NAVTECH SYSTEMS

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

## REDUCED EPR

Reduced takeoff thrust is the takeoff EPR computed using an assumed temperature. Assumed temperature is the HIGHEST TEMPERATURE on the Runway Analysis Chart that a take-off could be made at the ACTUAL Gross take-off weight of the aircraft. It will not be lower than maximum climb EPR.

Maximum takeoff thrust is the takeoff EPR computed using the airport temperature and pressure altitude.

Use reduced takeoff thrust whenever practicable to reduce turbine inlet temperature and engine EGT during takeoff.

DO NOT USE reduced takeoff thrust for any of the following conditions:

When takeoff runway has standing water, ice, slush, or snow;

When headwind adjustment has been used to increase allowable takeoff weight;

When takeoff is to be made with a tailwind;

When main gear antiskid is inoperative;

When anti-ice is on;

When airport temperature is below +6°F (-14°C);

When mixed engines are installed;

When wind shear is reported or expected;

When conducting a two engine ferry;

When deicing fluid has been used.

l OF 4

**I.0.P. #** 7



FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

| | |
|---|---|
| Chapter: | 11:2:0 |
| Page: | 8a |
| Issued: | 03/19/99 |
| Revision: | 6 |

REDUCED TAKEOFF THRUST EXAMPLE

AMERIJET INTERNATIONAL    FORT LAUDERDALE, FL
B-727-200    JT8D-15    HOLLYWOOD INTL

KFLL    09L    FLAPS    15

| | | | | A/C FOD MX% GO | | ENG ANTI-ICE A/C | | PACKS ON | TORA = | 9001 |
| TEMP | ZERO | CLIMB | OFF MAX FOR ARND | | | ZERO CLIMB OFF | | NOSE BRKS OFF | TODA = | 9001 |
| F C | WIND | LIMIT | (+) EPR T/O EPR | | | WIND LIMIT (+) | | 210 MPH TIRE | ASDA = | 9001 |
| | | | | | | | | ELEV = | 11 GRAD = | -.01% |

| -10 -23 | 2062 R 2090 | 23 R 2.10 | 90 2.07 | 2037 2065 | 23 |
| 0 -18 | 2043 R 2090 | 21 R 2.10 | 91 2.07 | 2018 2065 | 21 |
| 10 -12 | 2023 R 2090 | 21 R 2.10 | 92 2.07 | 1998 2065 | 21 |
| 20 -7 | 2003 R 2090 | 21 R 2.10 | 93 2.07 | 1978 2065 | 21 |
| 30 -1 | 1986 R 2090 | 20 R 2.10 | 94 2.07 | 1961 2065 | 20 |
| 32 0 | 1982 R 2090 | 20 R 2.10 | 94 2.07 | 1957 2065 | 20 |
| 34 1 | 1979 R 2090 | 19 R 2.10 | 94 2.07 | 1954 2065 | 19 |
| 36 2 | 1976 R 2090 | 19 R 2.10 | 95 2.07 | 1951 2065 | 19 |
| 38 3 | 1972 R 2090 | 19 R 2.10 | 95 2.07 | 1947 2065 | 19 |
| 40 4 | 1969 R 2090 | 18 R 2.10 | 95 2.07 | 1944 2065 | 18 |
| 42 6 | 1965 R 2090 | 19 R 2.10 | 95 2.07 | 1940 2065 | 19 |
| 44 7 | 1962 R 2090 | 19 R 2.10 | 95 2.07 | 1937 2065 | 19 |
| 46 8 | 1959 R 2090 | 19 R 2.10 | 95 2.07 | 1934 2065 | 19 |
| 48 9 | 1956 R 2090 | 19 R 2.10 | 96 2.07 | 1931 2065 | 19 |
| 50 10 | 1952 R 2090 | 20 R 2.10 | 96 2.07 | 1927 2065 | 20 |
| 52 11 | 1949 R 2090 | 20 R 2.10 | 96 2.07 | | |
| 54 12 | 1946 R 2090 | 19 R 2.10 | 96 2.07 | | |
| 56 13 | 1943 R 2090 | 20 R 2.10 | 96 2.07 | | |
| 58 14 | 1939 R 2090 | 20 R 2.10 | 97 2.07 | | |
| 60 16 | 1922 R 2090 | 33 R 2.10 | 97 2.07 | | |
| 62 17 | 1920 R 2090 | 31 R 2.10 | 97 2.07 | | |
| 64 18 | 1918 R 2090 | 30 R 2.10 | 97 2.07 | | |
| 66 19 | 1916 R 2090 | 28 R 2.10 | 97 2.07 | | |
| 68 20 | 1914 R 2090 | 27 R 2.10 | 98 2.07 | | |
| 70 21 | 1912 R 2090 | 25 R 2.10 | 98 2.07 | | |
| 72 22 | 1910 R 2090 | 24 R 2.10 | 98 2.07 | | |
| 74 23 | 1909 R 2090 | 21 R 2.10 | 98 2.07 | | |
| 76 24 | 1907 R 2090 | 20 R 2.10 | 98 2.07 | | |
| 78 26 | 1905 R 2090 | 18 R 2.10 | 98 2.07 | | |
| 80 27 | 1904 R 2090 | 16 R 2.10 | 99 2.07 | | |
| 82 28 | 1901 R 2090 | 16 R 2.10 | 99 2.07 | | |
| 84 29 | 1892 R 2088 | 22 R 2.10 | 99 2.07 | | |
| 86 30 | 1881 R 2071 | 20 R 2.08 | 99 2.07 | | |
| 88 31 | 1869 R 2054 | 19 R 2.07 | 99 2.07 | | |
| 90 32 | 1858 R 2037 | 17 R 2.06 | 99 2.07 | | |
| 92 33 | 1846 R 2019 | 15 R 2.05 | 98 2.06 | | |
| 94 34 | 1835 R 2001 | 14 R 2.04 | 98 2.05 | | |
| 96 36 | 1823 R 1983 | 13 R 2.03 | 98 2.04 | | |
| 98 37 | 1812 R 1965 | 12 R 2.02 | 98 2.03 | | |
| 100 38 | 1800 R 1947 | 11 R 2.01 | 98 2.02 | | |
| 102 39 | 1788 R 1930 | 12 R 2.00 | 97 2.01 | | |
| 104 40 | 1776 R 1913 | 13 R 1.99 | 97 2.00 | | |
| 106 41 | 1763 R 1896 | 15 R 1.98 | 97 1.99 | | |
| 108 42 | 1751 R 1879 | 16 R 1.97 | 97 1.98 | | |
| 110 43 | 1739 R 1862 | 17 R 1.96 | 97 1.96 | | |
| 112 44 | 1727 R 1845 | 18 R 1.95 | 97 1.95 | | |
| 114 46 | 1715 R 1828 | 19 R 1.94 | 96 1.94 | | |
| 116 47 | 1704 R 1811 | 19 R 1.93 | 96 1.93 | | |
| 118 48 | 1692 R 1794 | 20 R 1.92 | 96 1.92 | | |
| 120 49 | 1680 R 1777 | 21 R 1.90 | 96 1.91 | | |

NOTES:

1. CTR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.04    +.03
   ICE ON    +.01    NONE

2. FOD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON    +.04

3. FLAP RETRACT HT(OCH)
   = 811 FDMSL

4. OBST: HT(FT AGL) DIST(NM)
   50    1.81

DATE: 12/09/92

GROSS WEIGHT CORRECTIONS

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
    1 DEGREE HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    321 LBS/KT EFF HEAD W
       SUB FROM ZERO WIND   1322 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR —
   *WIND    *RUNWAY SHORTENING    *ANTI-SKID INOP
   *RUNWAY CONTAMINATION *REL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR—
   *REL PERFORMANCE DECREMENTS

RUNWAY CONTAMINATION AND ANTI - SKID INOP
    DECREMENTS

| | STANDING | REDUCE | REDUCE |
| | WATER | ZERO | V1 |
| DRY | SLUSH OR | WIND W | SPEED |
| SNOW | WET SNOW | BY: | BY: |
| -IN- | -IN- | -LBS- | -LBS- |
| | < 1/4 | 14000 | 31 |
| 3 1/2 TO 6 | 1/4 TO 1/2 | 28000 | 26 |
| | ICE | 14000 | 31 |
| | ANTI-SKID INOP | 6300 | 21 |

LANDING DATA    PACKS ON

| | | | DRY | | | | WET | | | | | SUB LB/F | | |
| | | MAX WT | | | | MAX WT | | | | APT | ABOVE | MAX |
| LNDG | ANTI | ZERO | HW | CRIT | TW | ZERO | HW | CRIT | TW | CRIT | CRIT | OPER |
| FLAP | LENGTH SKID | WIND | ADJ | TW | ADJ | WIND | ADJ | TW | ADJ | TEMP | TEMP | TEMP |
| 30 | 8432 OPER | *204200 | 290 | 0 | 2358 | *205400 | 210 | 0 | 3257 | | | |
| 30 | 8432 INOP | *175700 | 970 | 0 | 3107 | *156600 | 950 | 0 | 3311 | 120 | 0 | 120 |
| 30 | 8423 OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | | | |

* = CHECK MAX STRUCTURAL WT

COMPUFLIGHT INC.

2 OF 4    I.O.P. # 7


## REDUCED EPR INSTRUCTIONS

Reduced takeoff thrust is the takeoff EPR computed using an assumed temperature. Assumed temperature is the HIGHEST TEMPERATURE on the Runway Analysis Chart that a take-off could be made at the ACTUAL Gross take-off weight of the aircraft. It will not be lower than maximum climb EPR.

Maximum takeoff thrust is the takeoff EPR computed using the airport temperature and pressure altitude.

Use reduced takeoff thrust whenever practicable to reduce turbine inlet temperature and engine EGT during takeoff.

DO NOT USE reduced takeoff thrust for any of the following conditions:

When takeoff runway has standing water, ice, slush, or snow;

When headwind adjustment has been used to increase allowable takeoff weight;

When takeoff is to be made with a tailwind;

When main gear antiskid is inoperative;

When anti-ice is on;

When airport temperature is below +6°F (-14°C);

When mixed engines are installed;

When wind shear is reported or expected;

When conducting a two engine ferry;

When deicing fluid has been used.

3 OF 4

I.O.P. # 7

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

0 8 APR 1999

**ＡＭＥＲＩＪＥＴ**
INTERNATIONAL

REDUCED EPR INSTRUCTIONS

AMERIJET INT'L      FT. LAUDERDALE, FLA.

B-727-100 JT8D-7    -HOLLYWOOD INTL

DATE 02/15/90    KFLL 13      FLAPS 15

| TDP °F | ZERO °C WIND | CLIMB LIMIT | A/C OFF (+) | MAX T/O EPR | MIL-GO FOR T/O | ENG AMO EPR | ANTI-ICE ZERO WIND | A/C CLIMB LIMIT (+) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | B-727-100 PA-JT8D-7 PACKS ON | | KFLL 13 LENGTH = 4928 ELEV = 11 GRAD = .03 | |
| -10 -23 | 1633 R | 1802 | 8 R | 1.96 | 87 | | | | | | |
| 0 -17 | 1618 R | 1802 | 8 R | 1.96 | 88 | | | | | | |
| 10 -12 | 1605 R | 1802 | 8 R | 1.96 | 88 | | | | | | |
| 20 -6 | 1592 R | 1802 | 8 R | 1.96 | 89 | | | | | | |
| 30 -1 | 1575 R | 1802 | 8 R | 1.96 | 90 | | | | | | |
| 32 0 | 1572 R | 1803 | 8 R | 1.96 | 91 | | | | | | |
| 34 1 | 1549 R | 1802 | 8 R | 1.96 | 91 | | | | | | |
| 36 2 | 1546 R | 1802 | 8 R | 1.96 | 91 | | | | | | |
| 38 3 | 1562 R | 1802 | 8 R | 1.96 | 91 | | | | | | |
| 40 4 | 1559 R | 1802 | 8 R | 1.96 | 91 | | | | | | |
| 42 5 | 1557 R | 1802 | 8 R | 1.96 | 91 | | | | | | |
| 44 6 | 1555 R | 1802 | 8 R | 1.96 | 92 | | | | | | |

(The detailed numeric table continues with temperature, EPR, and thrust columns.)

Front Section
B727 – 100/7
Revision: 2
4/19/90

TO OBTAIN REDUCED THRUST EPR SETTING
USE EXAMPLE AND FIND NORMAL EPR:

STEP:
  1. Then enter chart at actual
    aircraft take-off weight.
    Note the **temperature** and
    **EPR**.

STEP
  2. Compare against the EPR from
    the maximum climb thrust for
    bug sheet chart 11:3:6 use
    actual field temperature.

STEP
  3. Use the highest EPR for re-
    duced thrust. Thrust reduc-
    tion may not exceed 25% of
    the normal take-off thrust.
    (This is equivalent to a
    0.30 EPR reduction).

STEP
  4. Use temperature in step 1 to
    determine V-speeds.  11:3:1
    DECREMENTS

| | STANDING WATER, SLUSH OR WET SNOW -IN- | REDUCE ZERO BY: -IN- | REDUCE V1 WIND M SPEED -KTS- |
|---|---|---|---|
| DRY SNOW | | | |

| | < 1/4 | 18800 | 25 |
| 1 1/2 TO 6 1/4 TO 1/2 | | 14800 | 22 |
| ICE | | 18800 | 31 |
| ANTI-SKID DROP | | 6000 | 14 |

V1 FOR HIGH GROSS WTS. - S.L. < 80°F

| WT | 1700 | 1740 | 1780 | 1820 | 1860 | 1900 |
|---|---|---|---|---|---|---|
| V1 | 136 | 138 | 140 | 142 | 144 | 146 |

EXAMPLE

FT. LAUDERDALE RWY 13 - 60°F
ACTUAL GROSS T/O WT - 140,000
NORMAL TAKE-OFF THRUST = 1.96 EPR
STEP 1. = 140,000 LBS = 102°F AND 1.87 EPR
STEP 2. = MAX CLIMB THRUST (@ 15°C) (60°F)
      FOR BUG SHEET = 1.83
STEP 3. = 1.87 EPR IS THE REDUCED EPR
NOTE: THIS IS LESS THAN 0.30 REDUCTION FROM
    NORMAL TAKE-OFF THRUST 1.96 EPR.
STEP 4 = V SPEEDS @ 102°F = 123KT V1 138 KT V2

| | SUB | |
|---|---|---|
| | L/OFF ABOVE MAX | |
| F | CRIT OPER | |
| P | TEMP TEMP | |
| | 0 120 | |

4 OF 4

I.O.P. # 7

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR



Issued:   09/01/99
Revision:  65

## WEIGHT AND BALANCE MANUAL

### WEIGHT AND BALANCE

#### FLEET WEIGHT LIMITATIONS

| FLEET WEIGHT LIMITATIONS | N994AJ → N397AJ ← N395AJ | | |
| --- | --- | --- | --- |
| | N495AJ | N797AJ | |
| Maximum Taxi Weight - (AFM) | 197,700 | 197,700 | 197,700 |

Maximum Taxi Weight is a structural limit for taxiing

| | | | |
| --- | --- | --- | --- |
| MAXIMUM TAKE-OFF WEIGHT | 197,000 | 197,000 | 197,000 |

This is the maximum allowable gross weight at brake release, just prior to takeoff roll

**MAXIMUM IN-FLIGHT WEIGHT (AFM)**

| | FLAPS UP | **NOTE | 196,000 | **NOTE |
| --- | --- | --- | --- | --- |
| | FLAPS 30 | **NOTE | 164,000 | **NOTE |
| | FLAPS 40 | **NOTE | 142,500 | **NOTE |

**MAXIMUM LANDING WEIGHT - (AFM)**

| | FLAPS 30 | 164,000 | 164,000 | *164,000 |
| --- | --- | --- | --- | --- |
| | FLAPS 40 | 142,500 | 142,500 | (*EMERGENCY USE ONLY) |

| | | | |
| --- | --- | --- | --- |
| MAXIMUM ZERO FUEL WEIGHT - | 155,000 | 155,000 | 155,00 |

**NOTE: N994J maximum in-flight weight - 196,000.

**NOTE: N395AJ maximum in-flight weight - 196,000.

**NOTE: N495AJ maximum in-flight weight - 196,000.

*NOTE: QW Landing Data

2 OF 2

### AMERIJET FLEET LIMITATIONS

Maximum Operating Airspeed of Vmo equals 350 knots indicated airspeed (KIAS), or code "B" [350 knots equivalent airspeed (KIAS)].

**I.O.P. # 8**

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
16 SEP 1999



WEIGHT AND BALANCE MANUAL

General Information

| Aircraft No. | B.O.W Weight | Moment |
|---|---|---|
| N794AJ | 93,316 | 88178325 |
| N994AJ | 94,139 | 88105202 |
| N395AJ | 93,883 | 88124473 |
| N495AJ | 92,711 | 87181149 |
| N895AJ | 93,005 | 88056640 |
| N196AJ | 92,819 | 87773553 |
| N296AJ | 93,379 | 87734708 |
| N397AJ | 93,308 | 88534151 |
| N797AJ | 92,868 | 88022669 |
| N598AJ | 92,772 | 87088635 |

1 OF 2

I.O.P. # 8

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
1 6 SEP 1999

AMERICAN INTERNATIONAL

AIRCRAFT LOG BOOK — AIRCRAFT MAINTENANCE LOG    FORM M1    A/C TYPE B757    AIRCRAFT # 3917    FLIGHT CODE 4

| Employee No. | Name | | Discrepancies (please print) | No. | Corrective Action | STN | Mechanic |
|---|---|---|---|---|---|---|---|
| 2025 | B | Stehle | In Transit check DR | 3 12 | In Transit check complete | FL | Wm Angeles |
| 803 | P | Major | | | | | |
| 4540 | O | Ram singh | | | | | |
| 18571 | B | Wise | | | | | |
| 42091 | A | Tices SR | | | | | |

**I.O.P. #9**

AMERIJET FLIGHT RELEASE

ARTCC XISN1 (IMA) MAIN 305-716-1588    DATA 305-716-1648
00/17/99 (2 DATE)  TIME 20557    TRIP/DATE 827/17    AIRCRAFT JI/AJ    B727/B    ETD 2200
*RUN FT LAUDERDALE  TO PORT OF SPAIN
FILED ROUTE:  78V ASSS DOP-N 6449 POS
PLANNED ROUTE 78V TOA ZLS-N IMDEE GTK ASSS DOP-N 6449 POS
TOTAL DISTANCE  1459.9    DIRECT DISTANCE  1413.9   3.7    ALTERNATE    GNNG (I59 N) / 277 DEBJ

| | | |
|---|---|---|
| PLANNED BURN | 17.2 | 3:20 |
| ALTERNATE | 6.3 | 0:30 |
| 10% EXTRA FUEL | 3.5 | 0:20 |
| RESERVE | 4.1 | 0:30 |
| HOLDING FUEL | 0.0 | 0:00 |
| TAXI FUEL | 0.5 | |
| REQUIRED FUEL | 31.6 | 4:40 |
| BOF | 14.9 | |
| EXTRA FUEL | 0.0 | 0:00 |
| BLOCK FUEL | 31.6 | 4:40 |

MACH .77
INDICATED AIRSPEED 300
TRUE AIRSPEED 470
FLIGHT LEVEL 290
ZERO FUEL WEIGHT 141.8
TAKE OFF WEIGHT 152.9
LANDING FUEL 13.9
LANDING WEIGHT 135.7
TOTAL BURN 38.1 (INCLUDES TAXI)

PREPARED BY:    KIT TIWARI
CAPTAIN        AWIAN STEELE
FIRST OFFICER:  PAT PAJUN
SECOND OFFICER: AWEIT WISE
DISPATCHER/FUEL  A.JORSEY
               U.MARSIMAN

FOR EACH 10.0 OVER PLANNED TAKE OFF WEIGHT BURN WILL BE 1.5 OVER PLANNED BURN
PLANNED CARGO  49.1  MAX CARGO  50.2
CRUISE DAT -30 (ISA + 12)

DM1 NUMBER  DATE  MEL REF
8342    07/18/1998    34-32    DOCS DEFERRED PER MOD UNDER VANOUT GVMN
8463    07/31/1998    24-6    4-3 GNS DIFFERENTIAL PRESS
NO. 194.2  NEL IS BASED ON STRUCTURAL LIMITS ONLY NO AIRPORT DATA ON FILE FOR FT LAUDERDALE
WINDS: (24/76)BEKOT 40/6  (20/63)HARDY 120/5  (14/63)PELNA 70/10

| FROM/TO | FREQ | LFB | XTG | TIME REM | GS | TIME | TOT TIME | BURN | TOT BURN | FUEL REM |
|---|---|---|---|---|---|---|---|---|---|---|
| KFLL  118  D  119  78V | 116.7 | 31 | 1409 | | 320 | | | | | TAKEOFF FUEL 31.1 |
| 78V  116 | *F18* | 17 | 1371 | | 450 | | | | | |
| *F18* | TOC | 69 | 1322 | 2:55 | 320 | 9:26 | 0:26 | 6.3 | 6.3 | 44.8 |
| TOC  D  112  TOA | 112.7 | 22 | 1301 | 2:52 | 471 | 9:03 | 0:29 | 0.3 | 6.8 | 44.3 |
| TOA  126  D  126  ZLS-N | 526.0 | 148 | 1153 | 2:33 | 472 | 9:13 | 0:47 | 3.7 | 10.5 | 40.6 |
| ZLS-N  119  D  119  IMDEE | | 55 | 1098 | 2:25 | 469 | 9:07 | 0:54 | 1.4 | 11.7 | 39.3 |
| IMDEE  119  D  120  GTK | 114.2 | 207 | 891 | 1:59 | 467 | 9:27 | 1:21 | 5.1 | 16.9 | 34.6 |
| GTK  132  A  133  COCOU | | 38 | 858 | 1:55 | 464 | 9:04 | 1:25 | 0.8 | 17.7 | 33.4 |
| COCOU  133  A  133  GRADI | | 69 | 790 | 1:47 | 465 | 9:09 | 1:32 | 1.7 | 19.4 | 31.8 |
| GRADI  134  A  134  HARDY  *F1794* | | 55 | 735 | 1:39 | 465 | 9:07 | 1:41 | 1.3 | 20.7 | 30.4 |
| HARDY  134  A  135  IDAHO | | 80 | 654 | 1:29 | 465 | 9:10 | 1:51 | 1.9 | 22.6 | 28.5 |
| IDAHO  135  A  135  DOP-N | 391.0 | 84 | 570 | 1:18 | 465 | 9:11 | 2:08 | 2.0 | 24.6 | 26.3 |
| DOP-N  159  A  160  VANNA | | 11 | 559 | 1:17 | 465 | 9:01 | 2:04 | 0.3 | 24.9 | 25.3 |
| VANNA  160  A  160  GESSO | | 58 | 501 | 1:09 | 465 | 9:07 | 2:11 | 1.4 | 26.3 | 24.9 |
| GESSO  160  A  160  HENLT | | 40 | 461 | 1:04 | 465 | 9:05 | 2:16 | 1.6 | 27.8 | 23.3 |
| HENLT  161  A  161  ANNER | | 49 | 412 | 0:58 | 466 | 9:06 | 2:23 | 1.2 | 28.4 | 22.8 |
| ANNER  157  A  158  ANODA | | 85 | 327 | 0:47 | 465 | 9:11 | 2:34 | 2.0 | 30.4 | 20.8 |
| ANODA  160 | *F1* | 4 | 323 | 0:46 | 466 | | 2:34 | 0.1 | 30.4 | 20.7 |
| *F1* | A  160  PELNA | | 61 | 262 | 0:38 | 467 | 9:08 | 2:42 | 1.4 | 31.8 | 19.3 |
| PELNA -162-B- 163  PERRY | | 64 | 198 | 0:30 | 467 | 9:09 | 3:80 | 1.9 | 33.6 | 17.8 |
| PERRY  164  B  164  PERRA | | 97 | 101 | 0:18 | 468 | 9:12 | 3:03 | 2.2 | 35.5 | 16.6 |
| PERRA  163  TOD | | 14 | 87 | 0:16 | 470 | 9:02 | 3:06 | 0.6 | 35.8 | 15.3 |
| TOD  A  162  POS | 116.9 | 79 | 8 | | 326 | | DESCENT | 1.4 | | |
| POS  019  D  019  TTPP | | 8 | -0 | | 326 | | 3:20 | | 37.2 | 13.5 |

| | | | | | |
|---|---|---|---|---|---|
| KFLL  N26:04.3 / W80:09.1 | 78V  N25:42.2 / W79:17.7 | TOA  N25:01.7 / W77:27.0 | ZLSN  N23:34.8 / W75:15.8 |
| IMDEE  N23:08.3 / W74:22.4 | GTK  N21:26.4 / W71:08.1 | COCOU  N21:08.9 / W70:39.3 | GRADI  N20:31.1 / W69:27.* |
| HARDY  N20:00.4 / W48:49.0 | IDAHO  N19:15.6 / W67:38.4 | DOPN  N18:28.1 / W66:24.7 | VANNA  N18:19.0 / W66:18.8 |
| GESSO  N17:29.6 / W63:46.7 | HENLT  N16:55.1 / W65:24.3 | ANNER  N16:13.0 / W64:58.0 | ANODA  N15:03.1 / W64:08.1 |
| PELNA  N14:08.0 / W63:33.0 | PERRY  N13:13.0 / W63:00.0 | PERRA  N11:48.3 / W62:11.4 | POB  N10:27.8 / W61:23.6 |
| TTPP  N10:33.6 / W61:20.9 | SVAD  N10:54.9 / W63:57.9 | | |

ACTUAL BLOCK FUEL OUT _____    ACTUAL BLOCK FUEL IN _____    TOTAL BURN _____

*** PRICES ARE AMERIJET CONTRACT FUEL 520 _____  15.7    36.3

Fuel cost at KFLL $0.60 Fuel cost at TTPP $0.68  Tanker fuel as needed for operational reasons no difference in cost.

RELEASED BY _____    TIME OF RELEASE _____
I CERTIFY THAT I HAVE COMPLETED ALL AIRPORT AND ROUTE PREFLIGHT AS REQUIRED BY FAR 121.443
CAPTAIN _____

FIR BOUNDARIES:  KZMA 0:13  TJZS 1:41  TTZP 2:34

KFLL/TTPP

D.P.# 10

```
. . AO2 SLP159 CB DSNT A  DS T03060033 56022=
KFLL 172053Z 03009KT 109  FEW035CB SCT050 BCT150 SC  50 30/23
    03000 RMM AO2 SLP159 CB WC H T03000330 T 
        02000Z 06006KT 000  FEW010 SCT010 SCT100 A02 306 6
TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 171900Z 08006KT 9999 FEW010CB BKN280 31/25 Q1012 NOSIG=
TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
    Q1013 TEMPO SHRA=
TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
TFFF 171900Z 08012KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
    32/24 Q1014 NOSIG
    CB (S/WNW)=
TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
    32/24 Q1014 NOSIG
    CB (WNW)=
SVMG NO CURRENT REPORT.
SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

------------
FORECASTS
------------

MIA
KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
    BECMG 2122 09005KT NSW SCT025 BKN250
    FM0100 VRB04KT P6SM SCT025 SCT250
    BECMG 0406 VCSH
    FM1500 09010KT P6SM FEW030 SCT250=
FLL
KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
    BECMG 2122 NSW SCT025 BKN250
    FM0100 VRB04KT P6SM SCT025 SCT250
    BECMG 0406 VCSH
    FM1500 09010KT P6SM FEW030 SCT250=
TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
    3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
TTPP 171000Z 171212 08010G20KT 9999 SCT020
    BKN300 PROB30 TEMPO 5000 SHRA FEW010CB BKN015
    PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
    BECMG 2223 08005KT=
TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
    TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
    TEMPO 0010 00000KT
    BECMG 1012 11012KT=
TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
    TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
    TEMPO 0010 00000KT
    BECMG 1012 11012KT=
TGPY 171600Z 171818 NIL=
TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
    SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
    1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 ST050=
```



I.O.P. #11



# B-727-200C LOAD PLAN
## 12-POSITION WEIGHT & BALANCE

DATE: 17th Aug 09
FLIGHT NO. 827
ACN# N317
FROM: FLL TO PUS
ALT ARPT(s): SUNG

AMERIJET INTERNATIONAL

Max. Cumulative Load 34,951 lbs.

Max. Cumulative Load 34,100 lbs.

| 1 pas ULD: 256631k DEST: EDE WT: 3150 | 2 pas ULD: 147215 DEST: FDE WT: 3360 | 3 ULD: DEST: WT: | 4 pas ULD: 14941k DEST: FDE WT: 3060 | 5 pas ULD: 250871k DEST: FDF WT: 3060 | 6 pas ULD: 134729 DEST: PUS WT: 5460 | 7 pp ULD: 122713k DEST: PUS WT: 3160 | 8 pas ULD: 134221k DEST: PUS WT: 7730 | 9 pas ULD: 234514 DEST: EDE WT: 3640 | 10 pas ULD: 234129 DEST: EDE WT: 4160 | 11 pas ULD: 241Jk DEST: PTE WT: 3410 | 12 ULD: 1tJk DEST: PTE WT: 2070 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3800# MAX | 4880# MAX | | 4880# MAX | 4320# MAX | 5840# MAX | 8000# MAX | 8000# MAX | 5840# MAX | 4240# MAX | 5280# MAX | 30000# MAX |

51.3

AFT HOLD
TOTAL WT

| 2A DEST: WT: 1490 | 2B DEST: WT: | 2C DEST: WT: 1602 | 2D DEST: WT: 220 |
|---|---|---|---|
| 9-2A 8000# | 10-2B 4240# | 11-2C 8000# | 12-2D 3000# |

(8000#)

FORWARD HOLD 12C (6000# max.)
TOTAL WT.

| 1A DEST: PUS WT: 60 | 1B DEST: WT: | 1C DEST: PUS WT: 515 | 1D DEST: PUS WT: 515 |
|---|---|---|---|
| 2-1A 5440# | 3-1B 8000# | 4-1C 5200# | 5-1D 8000# |

B.O.W. 93,808
CARGO TOTAL 47,290
ZFW 144,998 212.6
ZFW MAC.
TAKEOFF WT. 192,220
TAKEOFF CG
STAB TRIM
FUEL BURN 207,013
LANDING WT 207,013

MAXIMUM ALLOWABLE TAKEOFF WEIGHT (PERFORMANCE)

RUNWAY 9L
WIND TEMP
FLAP SETTING

(STRUCTURAL LIMITS)
MAX TAXI WEIGHT
ZERO FUEL WEIGHT
MAX LDG WEIGHT

CAPTAIN'S SIGNATURE
Sign in accordance with
FAR 121.693, 121.697, 121.413, 121.415

AIRCRAFT COPY - WHITE    STATION COPY - YELLOW
COMAT    ITEM    WEIGHT

CAPTAIN
S/O
F/O
AGM

Form 10-200A
DATE: 04/23/09

*11/10/99*
*SUPERVISOR*

November 10, 1999

**CERTIFIED-RETURN RECEIPT**

Mr. David G. Bassett, President
Amerijet International Incorporated
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Mr. Bassett:

LETTER OF INVESTIGATION

File Number: 2000SO170009

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1 OF 2

**I.O.P. # 13**

2

File: 8030.1

WP: H:\AMERIJET\LOIBAS02.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

Thank you for using Return Receipt Service.

**SENDER:**
- □ Complete items 1 and/or 2 for additional services
- □ Complete items 3, 4a, and 4b.
- □ Print your name and address on the reverse of this form so that we can return this card to you.
- □ Attach this form to the front of the mailpiece, or on the back if space does not permit.
- □ Write "Return Receipt Requested" on the mailpiece below the article number.
- □ The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. □ Addressee's Address
2. □ Restricted Delivery

3. Article Addressed to:

MR. DAVID G. BASSETT, PRESIDENT
AMERIJET INTERNATIONAL INCORP.
498 S.W. 34th STREET
FORT LAUDERDALE, FLORIDA 33315

4a. Article Number
P 372 062 005

4b. Service Type
- □ Registered          ☒ Certified
- □ Express Mail        □ Insured
- ☒ Return Receipt for Merchandise  □ COD

7. Date of Delivery

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature (Addressee or Agent)

PS Form 3811, December 1994          102595-99-B-0223    Domestic Return Receipt

Is your RETURN ADDRESS completed on the reverse side?

P 372 062 005

**Receipt for
Certified Mail**

No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

Sent to
DAVID BASSETT

Street and No.
498 S.W. 34th ST.

P.O., State and ZIP Code
FT. LAUDERDALE FL 33315

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

SENT 11/10/99

PS Form 3800, June 1991

**I.O.P. # 13**

2 OF 2


*11/10/99*
*SUPERVISOR*

November 10, 1999

Mr. David G. Bassett, President
Amerijet International Incorporated
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Mr. Bassett:

### LETTER OF INVESTIGATION

File Number: 2000SO170009

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

**I.O.P. # 14**

1 OF 2

2

File: 8030.1

WP: H:\AMERIJET\LOIBAS01.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

I.O.P. # A

2 OF 2

Code: PCSA    Violator Name: AMERIJET INTERNATIONAL INC

| No. of open Violations | No. of closed Violations | No. of reopen Violations | No. of pending Violations | Total |
|---|---|---|---|---|
| 3 | 40 | 0 | 0 | 43 |

```
-------------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
               LVL2  LVL1       MMENU       PRINT       RETRN        LOGOF
PRESS 'ENTER' KEY TO PROCEED
```

1 OF 5

I.O.P. # 15

```
                  TS Enforcement Information    Response
            Enforcement records meeting criteria  : PCSA    thru: 14
Jump to: VIOL. DATE    _____    Sort column: 1 A Crit.: _    of: 43
-------------------------------------------------------------------------
   Viol.Date    Status   Rgn     Case #     Related Case #   FAR's Violated (1)
   ----------   ------   ---   ------------  --------------   ------------------
 _ 1984-06-30   CLOSED   SO    1995SO170035                   121.401
 _ 1984-10-17   CLOSED   SO    1986SO620045                   91.29A
 _ 1984-10-17   CLOSED   SO    1986SO620046                   91.29A
 _ 1985-08-27   CLOSED   SO    1986SO620047                   39.3
 _ 1985-10-30   CLOSED   SO    1995SO170034                   121.434
 _ 1985-11-22   CLOSED   SO    1986SO620049                   91.29A
 _ 1985-12-09   CLOSED   SO    1986SO620044                   91.29A
 _ 1986-02-24   CLOSED   SO    1986SO620017                   91.29A
 _ 1986-04-01   CLOSED   SO    1986SO620043                   135.419G
 _ 1986-04-01   CLOSED   SO    1986SO620050                   121.371A
 _ 1986-04-01   CLOSED   SO    1986SO620042                   43.11A7
 _ 1987-02-04   CLOSED   SO    1987SO620015                   91.29A
 _ 1987-04-13   CLOSED   SO    1987SO620059                   135.65
 _ 1988-01-01   CLOSED   SO    1988SO170033                   43.13A
-------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1      MMENU       PRINT       RETRN         LOGOF
Mark with 'X' to select; and F2 to execute.
```

2 OF 5

I.O.P. # 15

```
                        Enforcer 12 records meeting criteria   : FCSA          thru: 28
Jump to: VIOL. DATE    _____      Sort column: 1 A Crit.: _        of: 43
------------------------------------------------------------------------------
   Viol.Date  Status  Rgn     Case #     Related Case #    FAR's Violated (1)
   ---------  ------  ---   ------------  --------------    ------------------
   1988-01-25  CLOSED  SO   1988SO170032                      43.13
   1988-03-24  CLOSED  SO   1988SO170048                      121.627C
   1988-07-16  CLOSED  SO   1988SO620149                      121.380
   1988-07-18  CLOSED  SO   1988SO620148                      121.133B
   1988-07-19  CLOSED  SO   1988SO620146                      121.427B2
   1988-07-19  CLOSED  SO   1988SO620147                      121.133B
   1988-08-08  CLOSED  SO   1988SO620161                      43.13
   1988-08-20  CLOSED  SO   1988SO620164                      43.13A
   1988-08-22  CLOSED  SO   1988SO170047                      43.13A
   1988-08-28  CLOSED  SO   1988SO620162                      43.13
   1988-09-01  CLOSED  SO   1988SO170046                      121.361
   1988-09-02  CLOSED  SO   1988SO620163                      43.13A
   1988-09-22  CLOSED  SO   1988SO620181                      39.3
   1989-09-28  CLOSED  WP   1989WP090194                      121.123
------------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1      MMENU       PRINT        RETRN       LOGOF
Mark with 'X' to select; and F2 to execute.
```

3 OF 5

I.O.P. # 15

```
                      Enforce Int records meeting criteria  r: PCSA    thru: 43
        to: VIOL. DATE  _____      Sort column: 1 A Crit.: _      of: 43
--------------------------------------------------------------------------------
    Viol.Date    Status   Rgn      Case #      Related Case #   FAR's Violated (1)
    ----------   ------   ---    ------------  --------------   ------------------
    1998-01-08   CLOSED   SO     1998SO740239                   175.20A
      _
      _
      _
      _
      _
      _
      _
      _
      _
      _
      _
      _
--------------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1         MMENU         PRINT         RETRN      LOGOF
Mark with 'X' to select; and F2 to execute.
```

5 OF 5

I.O.P. # 15



4

00SO170009

## SECTION D - FACTS AND ANALYSIS

### FACTS

On Monday, October 4, 1999, the investigating Inspector found on his desk a letter **(IOP 3)** *from the First Officer (Patrick Major EIR # 00SO170013) of the* subject flight detailing the events which led to the investigation herein. This correspondence had followed a conference between the complainant and the investigating Inspector some weeks before in which the Inspector had requested the account to be put in writing. Due to a death in the family that occurred two days prior (Saturday, October 2nd), and walk in duty on October 4th, the letter could not be given due consideration. During the Inspectors resulting absence for the funeral of his mother and use or lose annual leave, the correspondent directed his concerns to the Department of Transportation's Inspector General, hence the investigation now in progress.

On Tuesday, August 17, 1999, between the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern ·Daylight Savings Time) Amerijet B-727, N397AJ (a FAR 121 Supplemental Air Carrier, **IOP 1, page 3),** operating as Amerijet (AMJ) Flight # 827 departed Runway 9L (9 Left) at Fort Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida **(IOP 3, 4, 5, and 9)** when there was less than one quarter (1/4) of an inch of standing water on the departure runway as reported by the FLL FAA Air Traffic Control Tower (ATCT) following a runway contamination/condition check accomplished by the FLL Airport Authority identified on the ATCT tape recording **(IOP 4)** as "Ramp One". The airport runway contamination/condition report in detail represented that there was "less than ¼ inch, good drainage, slight standing water about six (6) feet on either side of centerline". This report was subsequently provided to the Flightcrew of AMJ 827 by the FLL ATCT as "some standing water less than a quarter of an inch" prior to a takeoff clearance being given to the flight, and was acknowledged by the pilot **(ATCT Tape counter number 607, IOP 4).**

Amerijet AOM in Chapter 4, Section 1A, Subject 55 [4:1:55**(IOP 6, page 1)**] directs that for takeoff limitations other than as listed on this page, the user **"check Performance Manual for appropriate reductions to maximum takeoff gross weight" (IOP 6, page 3).** Even though the NAVTECH page **(IOP 6, page 2)** provides additional information as to wet runways and standing water of less than one eighth (1/8) inch, the information as contained on the Amerijet International B-

727-200, JT8D-15 Performance Chart for Fort Lauderdale runway 9L with Flaps 20 (IOP 6, page 3) is applicable. This chart requires a weight reduction of 17,000 pounds and a V1 airspeed reduction of 28 knots from the data as expressed on the B-727-200c Load Plan (IOP 12) rendering the figures of weight reduction from 192,298 to 175,298 pounds. The aircraft thus departed 17,000 pounds above its maximum gross takeoff weight as corrected for contaminated runway conditions, and therefore contrary to ███████████████████████ (IOP 2, pages 3 and 4).

FAR Part 1 (IOP 2, page 1) clearly defines the terms "Operate", "Operational Control" and "Person", as follows. The terms state in pertinent part, "Operate" means use, cause to use or authorize to use aircraft; "Operational Control" means the exercise of authority over initiating, conducting or terminating a flight"; "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them".

IOP 1, pp. 1 and 2, identify Mr. David G. Basset as the President/General Manager/Safety Officer representing Amerijet and, therefore, a person accommodating the terms expressed above in concert with the company. As stipulated in ███████████ "Each certificate holder conducting supplemental operations - (1) is responsible for operational control." The company through Mr. Bassett exercises Operational Control, hence, the flight as identified above was "operated" by Amerijet International Incorporated contrary ███████████████████████████

Amerijet International Incorporated has a violation history covering the years from 1984 through 1998 with forty (40) closed and three (3) open violations (IOP 15).

Mr. Bassett was sent two (2) Letters of Investigation (LOI), one via certified mail and one via regular mail and to date has failed to respond to either (IOP 13 and 14).



RIS: FO 2150-1

```
|-----------------------------------------------------------------------|
| ENFORCEMENT INVESTIGATIVE REPORT   |  Report Number   Related Number  |
| (Read Order 2150.3 for instructions) |  2000SO170011    2000SO170009  |
|-----------------------------------------------------------------------|
|             ALLEGED VIOLATOR IDENTIFICATION                           |
|-----------------------------------------------------------------------|
| 1. Name  STEELE, BRIAN A                                              |
|    DBA Name                                                           |
|    Designator           | 2. Address (Include zip code)              |
|                         |                                            |
|                         |                                            |
|                         |                                            |
|                         |                                            |
|-----------------------------------------------------------------------|
| Telephone Number (   )  -      | 3.                      | 4. Sex  M  |
|-----------------------------------------------------------------------|
| 5. FAA Cert. # | 6. FAA Certificate Type                             |
|    265456264   | AIRLINE TRANSPORT PILOT                             |
|-----------------------------------------------------------------------|
| 7. Aviation Employer   AMERIJET INTERNATIONAL INC                    |
|-----------------------------------------------------------------------|
|    AIRCRAFT, ENGINE, PROPELLER, COMPONENT OR APPLIANCE INVOLVED      |
|-----------------------------------------------------------------------|
| 8. Make  BOEING | 9. Model  727      | 10. Ident. Number  397AJ      |
|                 |                    |     ACFT SN                     |
|-----------------------------------------------------------------------|
| 11. Owner Name     AMERIJET INTERNATIONAL INC                        |
|                    | 12. Address (Include zip code)                 |
|                    |                                                |
|                    |                                                |
|                    |                                                |
|-----------------------------------------------------------------------|
|                   ALLEGED VIOLATION                                   |
|-----------------------------------------------------------------------|
| 13. Date Occurred | 14. Time | 15. Date Known to FAA | 16. Region of Discov |
|     1999/08/17    |  19:40   |     1999/10/08        |        SO            |
|-----------------------------------------------------------------------|
| 17. Location  FT LAUDERDALE-HOLLYW   FT LAUDERDALE    FL    Sec Cat 1 |
|               FT LAUDERDALE                                           |
|               Airport ID  FLL                                        |
|-----------------------------------------------------------------------|
```



PLAINTIFF'S
EXHIBIT
40

2

EIR 00SO170011

## SECTION B - SUMMARY OF FACTS

████████████████████████ on Tuesday, August 17, 1999, during the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time), Captain Brian A. Steele was in command of B-727, N397AJ **(IOP 9, 10 and 12).** This aircraft was operated as Amerijet flight 827, a Supplemental Air Carrier operating under FAR Part 121, which departed the Fort Lauderdale-Hollywood International Airport Runway 9 Left with Standing Water Less than one quarter (1/4) of an inch on the runway. **(IOP 1, page 3; IOP 3, pp. 5 -10; IOP 4 - 5.)**

Captain Steele was operating subject to the responsibility as conveyed under ████ ██████████ **(IOP 2, page 3) during flight time (defined in FAR 1, IOP 2, page 1).**

The flight was operated without adjusting the maximum takeoff weight to that required by the Airplane Performance Manual, contrary to the Airplane Operating Manual. The aircraft weight and V1 degredations required for this flight, as the aircraft was configured, for runways with standing water of less than one quarter inch were 17,000 pounds and 28 knots. **(IOP 3, pp. 5 - 10; IOP 6 - 12.)**

The aircraft was taken off at a weight 17,000 pounds greater than allowed and at an indicated V1 airspeed 28 knots faster than allowed for conditions thus degrading the performance capability. **(IOP 6 and 12.)**

By virtue of the above, Captain Brian A. Steele further operated <u>**contrary to**</u> ████ ████ <u>**"No pilot may operate an aircraft in a careless or reckless manner, so as to endanger life or property"**</u> **and also contrary to FAR** ████ **"No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another".**

EIR 00SO170011

SECTION C - ITEMS OF PROOF

| **IOP** | **#PAGES** | **DESCRIPTION** |
|---------|------------|-----------------|
| 1 | 3 | VIS OPERATOR INFORMATION |
| 2 | 6 | COPIES OF PERTINENT FAR PARTS 1, 121 AND 91 |
| 3 | 10 | LETTER OF COMPLAINT FROM PATRICK S. MAJOR |
| 4 | 2 | REQUEST FOR ATC TAPE FROM FLL ATCT AND TAPE |
| 5 | 2 | TYPED TRANSCRIPT OF ATCT TAPE |
| 6 | 3 | PAGES - AOM, NAVTECH, PERFORMANCE MANUAL |
| 7 | 4 | ISIS AIRMAN INFORMATION/VIOLATION HISTORY |
| 8 | 2 | PAGES FROM WEIGHT AND BALANCE MANUAL |
| 9 | 1 | AIRCRAFT LOG BOOK MAINTENANCE LOG PAGE |
| 10 | 1 | AMERIJET FLIGHT RELEASE |
| 11 | 1 | WEATHER SHEET |
| 12 | 1 | B-727-200C LOAD PLAN/WEIGHT AND BALANCE |
| 13 | 2 | LOI SENT VIA CERTIFIED MAIL |
| 14 | 2 | LOI SENT VIA REGULAR MAIL |
| 15 | 2 | RESPONSE TO LOI |

```
+---------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report  Air Operator Vital Information      |
+---------------------------------------------------------------------+
| Air Operator:  PCSA     AMERIJET INTERNATIONAL INC                  |
|                                                                     |
|                                                                     |
| Air Operator Vital Info--- Validation Date: 1999 08 25              |
| Primary DBA                                                         |
|                                                                     |
| Other DBA                                                           |
|                                                                     |
|                                                                     |
|                                                                     |
|                                                                     |
| Address:  AMERIJET INTERNATIONAL INC  City:   FT LAUDERDALE         |
|           498 SW 34TH STREET          State:  FL                    |
|                                       Zip:    33315                 |
| Phone:    954-359-0077  Ext. 11                                     |
+---------------------------------------------------------------------+
```

```
+---------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report  Air Operator Regulatory Information |
+---------------------------------------------------------------------+
| Air Operator:  PCSA     AMERIJET INTERNATIONAL INC     CHDO:  SO17  |
|                                                                     |
| Exemp. Auth:                  Other Deviat. Auth: N                 |
| FAR Regulation: 121           Crew Training:      CONTRACT OUT MOD/AMT |
| National Use:                 Examining Auth:                       |
| HAZMAT: N    Applicable Airports:                                   |
|                                                                     |
|                                                                     |
|                                                                     |
|                                                                     |
|                                                                     |
|                                                                     |
|                                                                     |
+---------------------------------------------------------------------+
```

I.O.P. #__1__

1/2

```
+-----------------------------------------------------------------------+
|  ISIS Air Operator (VIS) Report  FAA Region/District Office Information |
+-----------------------------------------------------------------------+
| Air Operator:  PCSA       AMERIJET INTERNATIONAL INC        CHDO:  SO17 |
|                                                                         |
| Regions of Operation:                                                   |
|                                                         OPS DO:  SO17    |
|                                                         MTC DO:  SO17    |
|                                                         AVI DO:  SO17    |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
+-----------------------------------------------------------------------+
```

```
+-----------------------------------------------------------------------+
|  ISIS Air Operator (VIS) Report  Air Operator Certificate Information   |
+-----------------------------------------------------------------------+
| Air Operator:  PCSA       AMERIJET INTERNATIONAL INC                    |
|                                                                         |
| Air Operator Cert Info----- Cert#:  PCSA059B                            |
|                                                                         |
| Cert Type:  AIR CARRIER          Cert Status:  ACTIVE                   |
| Issued:    1975 11 28 Prev Cert#:  AT70515                              |
| Stat Dt:   1990 01 25    Exp Dt:                                        |
|                                                                         |
| Certificated Kinds Of Operations---------------                        |
|                                                                         |
| Certified---121:      SUPPLEMENTAL C.O.     125:                        |
|             135-Fix:                         135-Roto:                   |
|             137:                                                        |
+-----------------------------------------------------------------------+
```

I.O.P. # 1
2/2

"Flap extended speed" means the highest speed permissible with wing flaps in a prescribed extended position.

"Flash resistant" means not susceptible to burning violently when ignited.

"Flight crewmember" means a pilot, flight engineer, or flight navigator assigned to duty in an aircraft during flight time.

"Flight level" means a level of constant atmospheric pressure related to a reference datum of 29.92 inches of mercury. Each is stated in three digits that represent hundreds of feet. For example, flight level 250 represents a barometric altimeter indication of 25,000 feet; flight level 255, an indication of 25,500 feet.

"Flight plan" means specified information, relating to the intended flight of an aircraft, that is filed orally or in writing with air traffic control.

"Flight time" means:

(1) Pilot time that commences when an aircraft moves under its own power for the purpose of flight and ends when the aircraft comes to rest after landing; or



(2) For a glider without self-launch capability, pilot time that commences when the glider is towed for the purpose of flight and ends when the glider comes to rest after landing.

"Flight visibility" means the average forward horizontal distance, from the cockpit of an aircraft in flight, at which prominent unlighted objects may be seen and identified by day and prominent lighted objects may be seen and identified by night.

"Foreign air carrier" means any person other than a citizen of the United States, who undertakes directly, by lease or other arrangement, to engage in air transportation.

"Foreign air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct or furtherance of a business or vocation, in commerce between a place in the United States and any place outside thereof; whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Foreign air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce between a place in the United States and any place outside of the United States, whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Forward wing" means a forward lifting surface of a canard configuration or tandem-wing configuration airplane. The surface may be a fixed, movable, or variable geometry surface, with or without control surfaces.

"Glider" means a heavier-than-air aircraft that is supported in flight by the dynamic reaction of the air against its lifting surfaces and whose free flight does not depend principally on an engine.

"Go-around power or thrust setting" means the maximum allowable in-flight power or thrust setting identified in the performance data.

"Ground visibility" means prevailing horizontal visibility near the earth's surface as reported by the United States National Weather Service or an accredited observer.

"Gyrodyne" means a rotorcraft whose rotors are normally engine-driven for takeoff, hovering, and landing, and for forward flight through part of its speed range, and whose means of propulsion, consisting usually of conventional propellers, is independent of the rotor system.

"Gyroplane" means a rotorcraft whose rotors are not engine-driven except for initial starting, but are made to rotate by action of the air when the rotorcraft is moving; and whose means of propulsion, consisting usually of conventional propellers, is independent of the rotor system.

"Helicopter" means a rotorcraft that, for its horizontal motion, depends principally on its engine-driven rotors.

"Heliport" means an area of land, water, or structure used or intended to be used for the landing and takeoff of helicopters.

"Idle thrust" means the jet thrust obtained with the engine power control lever set at the stop for the least thrust position at which it can be placed.

"IFR conditions" means weather conditions below the minimum for flight under visual flight rules.

"IFR over-the-top," with respect to the operation of aircraft, means the operation of an aircraft over-the-top on an IFR flight plan when cleared by air traffic control to maintain "VFR conditions" or "VFR conditions on top."

"Indicated airspeed" means the speed of an aircraft as shown on its pitot static airspeed indicator calibrated to reflect standard atmosphere adiabatic compressible flow at sea level uncorrected for airspeed system errors.

I.O.P. # 2      1/6

© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED.

"Medical certificate" means acceptable evidence of physical fitness on a form prescribed by the Administrator.

"Military operations area" (MOA) means an airspace that is established outside Class A airspace to separate or segregate certain nonhazardous military activities from IFR Traffic and to identify for VFR traffic where these activities are conducted.

"Minimum descent altitude" means the lowest altitude, expressed in feet above mean sea level, to which descent is authorized on final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure, where no electronic glide slope is provided.

"Minor alteration" means an alteration other than a major alteration.

"Minor repair" means a repair other than a major repair.

"Navigable airspace" means airspace at and above the minimum flight altitudes prescribed by or under this chapter, including airspace needed for safe takeoff and landing.

"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time.

"Nonprecision approach procedure" means a standard instrument approach procedure in which no electronic glide slope is provided.

"Operate," with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in §91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).

"Operational control," with respect to a flight, means the exercise of authority over initiating, conducting, or terminating a flight.

"Overseas air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct of furtherance of a business or vocation, in commerce between a place in any State of the United States, or the District of Columbia, and any place in a territory or possession of the United States; or between a place in a territory or possession of the United States, and a place in any other territory or possession of the United States.

"Overseas air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce —
(1) Between a place in a State or the District of Columbia and a place in a possession of the United States; or
(2) Between a place in a possession of the United States and a place in another possession of the United States;

whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Over-the-top" means above the layer of clouds or other obscuring phenomena forming the ceiling.

"Parachute" means a device used or intended to be used to retard the fall of a body or object through the air.

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

"Pilotage" means navigation by visual reference to landmarks.

"Pilot in command" means the person who:
(1) Has final authority and responsibility for the operation and safety of the flight;
(2) Has been designated as pilot in command before or during the flight; and
(3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight.

"Pitch setting" means the propeller blade setting as determined by the blade angle measured in a manner, and at a radius, specified by the instruction manual for the propeller.

"Positive control" means control of all air traffic, within designated airspace, by air traffic control.

"Powered-lift" means a heavier-than-air aircraft capable of vertical takeoff, vertical landing, and low speed flight that depends principally on engine-driven lift devices or engine thrust for lift during these flight regimes and on nonrotating airfoil(s) for lift during horizontal flight.

"Precision approach procedure" means a standard instrument approach procedure in which an electronic glide slope is provided, such as ILS and PAR.

I.O.P. # 2    2/6

**Ⓐ** *Amend #47 eff 8-4-97*

© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED.

## SUBPART T — FLIGHT OPERATIONS

### 121.531 APPLICABILITY

This subpart prescribes requirements for flight operations applicable to all certificate holders, except where otherwise specified.

### 121.533 RESPONSIBILITY FOR OPERATIONAL CONTROL: DOMESTIC OPERATIONS

(a) Each certificate holder conducting domestic operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
(1) Monitoring the progress of each flight;
(2) Issuing necessary information for the safety of the flight; and
(3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

### 121.535 RESPONSIBILITY FOR OPERATIONAL CONTROL: FLAG OPERATIONS

(a) Each certificate holder conducting flag operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
(1) Monitoring the progress of each flight;
(2) Issuing necessary instructions and information for the safety of the flight; and
(3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(f) No pilot may operate an aircraft in a careless or reckless manner so as to endanger life or property.

### 121.537 RESPONSIBILITY FOR OPERATIONAL CONTROL: SUPPLEMENTAL OPERATIONS

(a) Each certificate holder conducting supplemental operations —
(1) Is responsible for operational control; and
(2) Shall list each person authorized by it to exercise operational control in its operator's manual.

(b) The pilot in command and the director of operations are jointly responsible for the initiation, continuation, diversion, and termination of a flight in compliance with this chapter and the operations specifications. The director of operations may delegate the functions for the initiation, continuation, diversion, and termination of a flight but he may not delegate the responsibility for those functions.

(c) The director of operations is responsible for canceling, diverting, or delaying a flight if in his opinion or the opinion of the pilot in command the flight cannot operate or continue to operate safely as planned or released. The director of operations is responsible for assuring that each flight is monitored with respect to at least the following:
(1) Departure of the flight from the place of origin and arrival at the place of destination, including intermediate stops and any diversions therefrom.
(2) Maintenance and mechanical delays encountered at places of origin and destination and intermediate stops.
(3) Any known conditions that may adversely affect the safety of flight.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and aircraft. The pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(e) Each pilot in command of an aircraft is responsible for the preflight planning and the operation of the flight in compliance with this chapter and the operations specifications.

**I.O.P. #** 2   3/6

❹ Amend #253 eff 2-26-96

© JEPPESEN SANDERSON, INC. 1996. ALL RIGHTS RESERVED.

(f) No pilot may operate an aircraft in a careless or reckless manner, so as to endanger life or property.

## 121.538 AIRPLANE SECURITY

Certificate holders conducting operations under this part shall comply with the applicable security requirements in Part 108 of this chapter.

## 121.539 OPERATIONS NOTICES

Each certificate holder shall notify its appropriate operations personnel of each change in equipment and operating procedures, including each known change in the use of navigation aids, airports, air traffic control procedures and regulations, local airport traffic control rules, and known hazards to flight, including icing and other potentially hazardous meteorological conditions and irregularities in ground and navigation facilities.

## 121.541 OPERATIONS SCHEDULES: DOMESTIC AND FLAG AIR CARRIERS

In establishing flight operations schedules, each certificate holder conducting domestic or flag operations shall allow enough time for the proper servicing of aircraft at intermediate stops, and shall consider the prevailing winds enroute and the cruising speed of the type of aircraft used. This cruising speed may not be more than that resulting from the specified cruising output of the engines.

## 121.542 FLIGHT CREWMEMBER DUTIES

(a) No certificate holder shall require, nor may any flight crewmember perform, any duties during a critical phase of flight except those duties required for the safe operation of the aircraft. Duties such as company required calls made for such nonsafety related purposes as ordering galley supplies and confirming passenger connections, announcements made to passengers promoting the air carrier or pointing out sights of interest, and filling out company payroll and related records are not required for the safe operation of the aircraft.

(b) No flight crewmember may engage in, nor may any pilot in command permit, any activity during a critical phase of flight which could distract any flight crewmember from the performance of his or her duties or which could interfere in any way with the proper conduct of those duties. Activities such as eating meals, engaging in nonessential conversations within the cockpit and nonessential communications between the cabin and cockpit crews, and reading publications not related to the proper conduct of the flight are not required for the safe operation of the aircraft.

(c) For the purposes of this section, critical phases of flight includes all ground operations involving taxi, takeoff and landing, and all other flight operations conducted below 10,000 feet, except cruise flight.

*STERILE COCKPIT*

NOTE — Taxi is defined as "movement of an airplane under its own power on the surface of an airport."

## 121.543 FLIGHT CREWMEMBERS AT CONTROLS

(a) Except as provided in paragraph (b) of this section, each required flight crewmember on flight deck duty must remain at the assigned duty station with seat belt fastened while the aircraft is taking off or landing, and while it is enroute.

(b) A required flight crewmember may leave the assigned duty station —
(1) If the crewmember's absence is necessary for the performance of duties in connection with the operation of the aircraft;
(2) If the crewmember's absence is in connection with physiological needs; or
(3) If the crewmember is taking a rest period, and relief is provided —
(i) In the case of the assigned pilot in command during the enroute cruise portion of the flight, by a pilot who holds an airline transport pilot certificate and an appropriate type rating, is currently qualified as pilot in command or second in command, and is qualified as pilot in command of that aircraft during the enroute cruise portion of the flight. A second in command qualified to act as a pilot in command enroute need not have completed the following pilot in command requirements: The 6-month recurrent flight training required by §121.433(c)(1)(iii); the operating experience required by §121.434; the takeoffs and landings required by §121.439; the line check required by §121.440; and the 6-month proficiency check or simulator training required by §121.441(a)(1); and
(ii) In the case of the assigned second in command, by a pilot qualified to act as second in command of that aircraft during enroute operations. However, the relief pilot need not meet the recent experience requirements of §121.439(b).

## 121.545 MANIPULATION OF CONTROLS

No pilot in command may allow any person to manipulate the controls of an aircraft during flight nor may any person manipulate the controls during flight unless that person is —
(a) A qualified pilot of the certificate holder operating that aircraft.

I.O.P. # 2  4/6

**SUBPART G — ADDITIONAL EQUIPMENT AND OPERATING REQUIREMENTS
FOR LARGE AND TRANSPORT CATEGORY AIRCRAFT**

**91.601    APPLICABILITY**

This subpart applies to operation of large and transport category U.S.-registered civil aircraft.

**91.603    AURAL SPEED WARNING DEVICE**

No person may operate a transport category airplane in air commerce unless that airplane is equipped with an aural speed warning device that complies with §25.1303 (c)(1).

**91.605    TRANSPORT CATEGORY CIVIL AIRPLANE WEIGHT LIMITATIONS**

(a)  No person may take off any transport category airplane (other than a turbine-engine-powered airplane certificated after September 30, 1958) unless —

    (1)  The takeoff weight does not exceed the authorized maximum takeoff weight for the elevation of the airport of takeoff;

    (2)  The elevation of the airport of takeoff is within the altitude range for which maximum takeoff weights have been determined;

    (3)  Normal consumption of fuel and oil in flight to the airport of intended landing will leave a weight on arrival not in excess of the authorized maximum landing weight for the elevation of that airport; and

    (4)  The elevations of the airport of intended landing and of all specified alternate airports are within the altitude range for which maximum landing weights have been determined.

(b)  No person may operate a turbine-engine-powered transport category airplane certificated after September 30, 1958, contrary to the Airplane Flight Manual, or take off that airplane unless —

    (1)  The takeoff weight does not exceed the takeoff weight specified in the Airplane Flight Manual for the elevation of the airport and for the ambient temperature existing at the time of takeoff;

    (2)  Normal consumption of fuel and oil in flight to the airport of intended landing and to the alternate airports will leave a weight on arrival not in excess of the landing weight specified in the Airplane Flight Manual for the elevation of each of the airports involved and for the ambient temperatures expected at the time of landing;

    (3)  The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet). Wet runway distances associated with grooved or porous friction course runways, if provided in the Airplane Flight Manual, may be used only for runways that are grooved or treated with a porous friction course (PFC) overlay, and that the operator determines are designed, constructed, and maintained in a manner acceptable to the Administrator.

    (4)  Where the takeoff distance includes a clearway, the clearway distance is not greater than one-half of —

       (i)  The takeoff run, in the case of airplanes certificated after September 30, 1958, and before August 30, 1959; or

       (ii)  The runway length, in the case of airplanes certificated after August 29, 1959.

(c)  No person may take off a turbine-engine-powered transport category airplane certificated after August 29, 1959, unless, in addition to the requirements of paragraph (b) of this section —

    (1)  The accelerate-stop distance is no greater than the length of the runway plus the length of the stopway (if present); and

    (2)  The takeoff distance is no greater than the length of the runway plus the length of the clearway (if present); and

    (3)  The takeoff run is no greater than the length of the runway.

**I.O.P. #2    5/6**

© JEPPESEN SANDERSON, INC., 1990, 1998. ALL RIGHTS RESERVED.



(d)  Any person taking off or landing a helicopter certificated under *part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting height-speed envelope established for that helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

## 91.11    PROHIBITION AGAINST INTERFERENCE WITH CREWMEMBERS

No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

## 91.13    CARELESS OR RECKLESS OPERATION

(a)  *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.
(b)  *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

## 91.15    DROPPING OBJECTS

No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property. However, this section does not prohibit the dropping of any object if reasonable precautions are taken to avoid injury or damage to persons or property.

## 91.17    ALCOHOL OR DRUGS

(a)  No person may act or attempt to act as a crewmember of a civil aircraft —
(1)  Within 8 hours after the consumption of any alcoholic beverage;
(2)  While under the influence of alcohol;
(3)  While using any drug that affects the person's faculties in any way contrary to safety; or
(4)  While having .04 percent by weight or more alcohol in the blood.
(b)  Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.
(c)  A crewmember shall do the following:
(1)  On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when —
(i)  The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
(ii)  The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.
(2)  Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates percentage by weight of alcohol in the blood.

**I.O.P. # 2**          6/6

---

*(Not published herein — Ed.)

© JEPPESEN SANDERSON, INC., 1990. ALL RIGHTS RESERVED.

Hand Delivered

John C. Macbarush
Principal Operations Inspector
FAA, FSDO
1050 Lee Wagener Blvd Suite 201
Ft Lauderdale, FL 33315

Edward DeRienzo

RECEIVED BY
OCT 4 1999
FEDERAL AVIATION ADMINISTRATION
FSDO
FT. LAUDERDALE


Patrick & Beth Major



**I.O.P. # 3**

1/10



**Patrick Major**

John C. Roseborough
Principal Operations Inspector
Federal Aviation Administration
Flight Standards district Office - 17
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315
Voice: (954) 356-7523, Extension 154
Fax    (954) 356-7531

10-01-99

Dear John,

Following is the text of three memo's and letters regarding Amerijet Flight 827, 08-17-99, which you and I discussed, Thursday, September 16th.

I reported the incident to the director of operations and chief pilot as required by Amerijet's GOM, recommending the safety officer be notified as well, then sent a report to NASA's ASRS (Aviation Safety Reporting System). Amerijet's GOM further requires that its POI be notified: Thirty days after the incident, you told me it had yet to be reported by anyone other than me.

John, the termination of my employment is a classic whistle blower scenario; the only event between my being an employee in good standing and being fired because Amerijet had, "...lost confidence in my abilities as an airman..." is the complaint regarding a takeoff 15,000Lbs over the maximum performance limit for conditions at the field. That is the subject of a complaint to the DOT Inspector's General's Office. But, I am most concerned that if Amerijet does not immediately change its policies regarding takeoff from wet runways, someone is going to get hurt. The question is, will the FAA take action before that happens, or wait until newspaper headlines, carnage, catastrophe and public outrage leave it no other choice.

If I can be of further assistance, do not hesitate to contact me. The cellular phone is the best way to reach me.

Warmest Regards,

Patrick Major

**I.O.P. # 3**

2/10



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
         Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP, 08-17-99.


Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

*I respectfully suggest you submit a copy to Amerijet's safety officer.*

Warmest Regards,

Pat

I.O.P. # 3
3/10





**Patrick Major**

FAX
The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.

FAX To: David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
Date: 08-25-99
Subject: NASA ASRS Report

Greetings Dave,

Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence you would ever see it if I did not submit it to you directly.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, accept my apologies.

Warmest Regards,

Pat

**I.O.P. # 3**
**4/10**



Copy for John Rascborayh,    **Patrick Major**
POI, FAA, FSDO-17

## NASA, Aviation Safety Reporting System
## (ASRS report)

Report Date: 08-18-1999, Incident Date: 08-17-99
Time: 23:40z, Location: KFLL.
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs.,
Ratings: Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, FAR Part 142 Certified Pilot and Flight Engineer Instructor/Boeing 727.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors: Thunderstorms in vicinity, rainshowers overhead, contaminated runway; conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International, Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed through the area and were forecast to continue throughout the evening. When I arrived, the field was under heavy rainshowers. Anticipating a max-weight performance-limited takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated interpretation regarding the Navtech runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff controversy which took place June 08, 1999, out of MIA. On that rainy morning, a Continental 727 had taxied into position and hold RW-12, then declined takeoff clearance... requesting full length 9L, instead. The night before it had rained ten inches. It was raining at the time. While Tower had not provided a runway condition report, the runways were obviously wet. Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without prompting from the captain, I declined, reminding Tower that our flight required full-length 9L. The captain chastised me for refusing RW-12 against his wishes (even though we had just finished discussing that the runway analysis did not support it, even on a dry day, even if we believed the weights reported by ramp personnel). The captain insisted I radio-back Tower and accept RW-12. I demurred. After a brief discussion, AJT 823 finally departed full-length 9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300' longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.



**I.O.P. # 3**

However, my refusal to accept RW-12 became the subject of a disciplinary complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation against me for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. 9L FLL is 355 feet shorter than 12 in MIA. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), regardless how wet a runway, Amerijet flight crews are taught by the training department and warned by dispatch personnel to consider all runways "Dry" for performance planning purposes unless there exists a contamination report containing the specific words, "Standing Water." Though there are frequent storms in the area, rarely are contamination reports conducted at South Florida Airports. Most airlines encourage their crews to simply accept the "Standing Water less than 1/4"" penalty...reasoning that the penalty applies to depths as shallow as 1/8"... and is clearly the safest option.    Some Boeing performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot max-weight V1 speed reduction for runways that are, "...well-soaked with water but do not have large areas of actual standing water."    But absent a contamination report specifically including the term "Standing Water", Amerijet considers all runways dry. Considering drag induced as aircraft tires displace water on the runway surface, additional drag produced by water spraying against the fuselage and wings, as well as reduced braking implications, that policy could be a recipe for disaster. As of August 17, 1999, these concerns had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 355' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they had been June 08. Even so, the dispatcher I queried reported to me that to his understanding Amerijet performance policies do not observe weight penalties unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers imply a braking degradation and an impediment to acceleration when runway surfaces are wet ... irrespective of whether or not the runway contains "Standing water." "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights," I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' actually reported on the runway, it's dry."

I.O.P. # 3
6/10

As aircraft 397AJ was loaded for departure, I explained my question to the check airman who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safest solution and accept the "Standing Water ≤ 1/4" weight and V1 penalty. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain jokingly dismissed my concern, "We'll have to takeoff between the water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers. He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us ... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway surface. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst adjacent the channels of accumulated rubber left by successive landing and departing aircraft. No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a packs-off takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect it.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch. AJT 827 is cleared for takeoff, turn right heading one zero zero." As Tower began its transmission, the captain advanced the throttles and released the brakes. Probably because the aircraft was already rolling, tower issued the takeoff clearance without pause or delay. Before I could even begin to reply to the report and clearance, the aircraft was accelerating down the runway. Previously, I thought I would have a chance to prevent

I.O.P. # 3
7/10

the takeoff when the controller inevitably asked, "AJT 827, state your intentions." He did not. Suddenly, I was isolated and out of options.    Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. Perhaps, I should have. I feared an aborted takeoff on a wet runway with the captain and I fighting over the controls could have been just as dangerous.    If all three engines operated normally, if no windshear was encountered, perhaps the takeoff would be safer than a mutiny-abort on a wet runway in driving rain.  AJT 827 used all available runway.    The captain rotated well inside the alternating red and white lights at an indicated airspeed five knots below V1.    The main wheels broke ground at the last possible instant and the aircraft crossed the airport boundary at approximately 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.  I called-out the fluctuations then held my breath, praying for altitude.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that?  This airline is not approved for GPS navigation." (referring to the GPS installed in the aircraft, but not approved in the ops specs).

"By knowing where I am, then drawing a straight line on my chart and navigating."  I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits of Class II navigation described in the Ops Specs.  I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked.  "Do you realize how incongruent that sounds coming from a check airman who just goaded a flight crew into taking off from a contaminated runway into possible windshear fifteen thousand pounds over the maximum performance limit?  Even if I am wrong about navigating direct, ...and I don't think I am, one could get us violated, the other will get us killed.  What is safe about that?"

AJT flight 827 exceeded aircraft limitations and violated FAA regulations in flagrant disregard for the most basic of air safety principles and CRM (cockpit resource management).  It took off from a contaminated runway weighing fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the consequences inevitably bestowed upon any air carrier which actively cultivates a culture of noncompliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on



**I.O.P. # 3**
8/10

runways that are obviously contaminated, but have not been officially described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning policies, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the official report.

Among my many mistakes August 17, was letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Although it should not have been necessary, due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the 'sacred cow' brother of its vice president, director of operations, and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Admittedly, that was the captain's job, but had I insisted on such a plan before the aircraft taxied out of the ramp for takeoff, I may have avoided the circumstances which placed me and the rest of the crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff once such a report was issued. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...as well as the strident actions required to prevent takeoff once initiated. But with the aircraft already rolling, Tower probably figured he had his answer.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the check airman and captain prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Would that have worked? Honestly, that did not occur to me until later. I made a judgment call and elected not to intervene once the takeoff roll began. Not a day passes that I don't relive the possible consequences of my choice.

Contributing factors included my deference to authority in the cockpit, not only with regard to the presence of a check airman who I held in high regard, and that particular captain (most other captains would not have been out there to start with), but pertaining to the recency of



I.O.P. # 3

what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and ongoing concern for flight safety and regulatory compliance at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way, impervious to the legitimacy of their concerns, by denying them promotional and professional opportunities, abusing them in the simulator if need be, terminating their employment and exploiting the PRIA (Pilot Records Improvement Act, 1996) to soil their careers... while sending an unmistakably clear message to other flight crew lest they, too, consider showing unwelcome interest in flight safety.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

Copy for John Roseborough
POI, FAA, FSDO - 17

10-01-95

I.O.P. # 3
10/10

# Memorandum

U.S. Department
of Transportation
**Federal Aviation**
**Administration**

Ft. Lauderdale International ATC Tower
4150 S.W. 12 Terrace
Ft. Lauderdale, Fl. 33315

---

Subject **INFORMATION:** Tape Request

Date: October 25, 1999

Reply To
From: Manager                                                Attn. of: FLL-2

Ft. Lauderdale Int'l ATC Tower

To: Manager, Ft Lauderdale FSDO-17

Per telephone request of October 22, 1999, the following tape recording is enclosed.

Ft. Lauderdale ATC Tower
August 17, 1999 UTC
Ground Control 2340 UTC-0000 UTC
Local Control North 2340 UTC – 0000 UTC

Please advise if we can be of any further assistance.

Ronald S. Boyd

**I.O.P. # 4**
**1/2**

COPY OF FCC ATET
TAPE AJT 827
8/17/99
ORIGINAL WITH
2...........9
10:10 21:00 LOCAL
2:10 01:00 UTC

I.O.P. # 1

4

FORT LAUDERDALE' INTERNATIONAL AIR TRAFFIC CONTROL TOWER CERTIFIED RE-RECORDING OF AMERIJET (PCSA) FLIGHT 827 OCCURRING AUGUST 17, 1999 DURING THE TIME PERIOD FROM 2340 UTC - 0000 UTC (1940 - 2000 LOCAL DAYLIGHT SAVINGS TIME).

THE RE-RECORDING WAS PREPARED BY MICHAEL T. JONES, SUPPORT SPECIALIST AT THE FORT LAUDERDALE-HOLLYWOOD AIR TRAFFIC CONTROL TOWER.

THE COUNTER NUMBERS BELOW REPRESENT EITHER AMERIJET OR FORT LAUDERDALE ATC VOICE COMMUNICATIONS AS PERTAIN TO AMJ FLIGHT 827. MOST OTHER VOICE COMMUNICATIONS HAVE NOT BEEN IDENTIFIED WITH COUNTER NUMBERS. DUE TO THE EXTRANEOUS NOISE EMITTED IN THE SIDETONE OF THE RE-RECORDING, A CLEARER VOICE TRANSMISSION/RENDITION CAN BE HEARD WHEN PLAYED ON A STEREO RECORDER/PLAYER WITH THE VOLUME ON ONE SIDE TURNED LOWER.

| COUNTER (APPROX.) | DIALOGUE | BY |
|---|---|---|
| 129 | DELAY AHEAD? | AMJ |
| 138 | RWY CONDITION WET, NO REPORTS | ATC |
| 146 | WE'RE GONNA NEED A STANDING WATER REPORT | ATC |
| 168 | AMJ 827 REQUESTS TAXI | AMJ |
| 171 | AMJ 827 HOLD SHORT OF TAXIWAY BRAVO, STAND BY | ATC |
| 183 | RAMP 1 CALLS FLL ATCT | |
| 194 | AMJ 827 CALLS ASKING FOR THE CURRENT WINDS | AMJ |
| 198 | AMJ 827, WILL YOU BE ABLE TO DEPART | ATC |
| 203 | AMJ 827, TAXI TO RUNWAY 9 LEFT | ATC |
| 239 | RAMP ONE CALLS | |
| 241 | PROCEED | ATC |
| 243 | AJT IS ASKED IF THEY CAN ACCEPT DEPARTURE | ATC |
| 276 | RAMP ONE CALLS | |

279  RAMP ONE ADVISES LESS THAN ¼ INCH, GOOD DRAINAGE, SLIGHT STANDING WATER ABOUT 6 FEET ON EITHER SIDE OF CENTERLINE

349  CONVECTIVE SIGMET 51E AVAILABLE                  ATC

I.O.P. # 5

1/2

5

433    LOCAL CONTROL, NORTH POSITION COMMUNICATIONS BEGIN

464    DELTA 312 HEAVY (LOCKHEED L-1011, TRISTAR)
466    DELTA 312, CLEARED FOR TAKEOFF                    ATC

512    US AIR 2335 CALLS TO INQUIRE ABOUT WHAT WEATHER ATC SHOWS WITHIN 15 MILES OF FLL. ATC ADVISES THAT MAIN BODY OF STORM WILL BE AVOIDED WITH A 110 DEGREE HEADING AFTER TAKEOFF (20 DEGREES RIGHT OF TAKEOFF HEADING)

584    AMJ827 CALLS                                       AMJ
585    AMJ 827, ARE YOU READY FOR DEPARTURE               ATC

586    YES SIR, 827, YOU'LL PASS ON THAT RUNWAY REPORT WHEN YOU GET IT, RIGHT?                              AMJ

587    YES, HE'S OUT THERE INSPECTING IT RIGHT NOW        ATC

589    AMJ 827, GO OUT B2 AND BACK TAXI INTO POSITION AND HOLD                                              ATC

607    AMJ 827, HE REPORTS THERE'S SOME STANDING WATER LESS THAN A QUARTER ON AN INCH                      ATC

609    SOME STANDING WATER LESS THAN A QUARTER OF AN INCH, AMJ 827 READY FOR TAKEOFF                       AMJ

610    AMJ 827 RUNWAY 9 LEFT CLEARED FOR TAKEOFF, TURN RIGHT HEADING 110                                   ATC

611    RIGHT HEADING 110, CLEARED FOR TAKEOFF, AMJ 827, THANK YOU MUCH.                                     AMJ

832    CHANGE YOUR CODE TO 1153                          ATC
833    1123, 827                                         AMJ

       THANK YOU, CONTACT MIAMI DEPARTURE                ATC

**I.O.P. # 5**
2/2


GOM. VOL—3

| | | REFERENCE: | 4:1:55 |
|---|---|---|---|
| CHAPTER | 4 - OPERATIONS PROCEDURES | ISSUED: | 09-01-85 |
| SECTION | 1A - OPERATING PROCEDURES | SUPERSEDES: | 0 |
| SUBJECT | 55 - ADVERSE WEATHER TAKEOFF AND CLIMB | PAGE: | 1 |

ADVERSE WEATHER TAKEOFF AND CLIMB - Reference 4:1:55

Takeoff Limitations

Takeoff should not be attempted if the following limitations are exceeded:

- Dry snow more than 6 inches deep.

- Slush or wet snow more than 1/2 inch deep.

- Water more than 1/4 inch deep.

When values less than the aforementioned limits exist, check Performance Manual for appropriate reductions to maximum takeoff gross weight.

> CAUTION: DURING TAKEOFF, SNOW AND SLUSH PICKED UP BETWEEN THE NOSE-
> WHEEL TIRES MAY BE THROWN BACK AND PACKED INTO THE RAM AIR
> INLET, CAUSING BOTH AIR CONDITIONING PACKS TO TRIP OFF. TO
> REDUCE THE POSSIBILITY OF THIS OCCURRING, THE RAM AIR DOORS
> MAY BE POSITIONED TO THE FULL CLOSED POSITIONS JUST PRIOR TO
> TAKEOFF.

Airplane Control

Exercise extreme caution in crosswinds. Normally, it is recommended that a runway more into the wind be requested when crosswind components over 15 kts are reported on known slippery runways.

> CAUTION: ENSURE THAT PARKING BRAKE IS RELEASED BEFORE STARTING
> TAKEOFF ROLL ON ICE OR SNOW COVERED RUNWAYS.

Setting Takeoff Thrust

Align the airplane with the runway before increasing thrust. If engine anti-ice is being used for takeoff, ensure that engine thrust is increased to the highest practicable setting (80% N1 recommended) for 10 to 15 seconds before setting takeoff thrust. Observe stable engine operation before brake release.

Engine inlet ice can affect EPR indications. When takeoff thrust is set in icing conditions, crosscheck all engine instruments. Ensure that the indications are reasonable and that no engine limits are exceeded. Specifically, compare the N1 readings with the anticipated value and be prepared to reject the takeoff if a discrepancy exists between the EPR and N1 readings.

If the airplane starts to slide on ice or snow, release the brakes and begin the takeoff roll, but ensure that the instrument crosscheck is accomplished, including the comparison of the EPR and N1 readings. Apply firm nosedown elevator pressure to aid nose wheel steering effectiveness. Don't allow the lag in nose wheel steering effectiveness to cause over-controlling on slippery surfaces.

I.O.P. # 6
1/3



NAVTECH

The Runway Analysis provides data for takeoff and landing performance in adverse weather conditions for the B727-200 powered by JT8D-15/17 engines. Data are presented for operations on wet, standing water and snow covered runways in accordance with the guidelines and recommendations of FAA.

**WET RUNWAY** – A runway is considered wet when it is well soaked but without significant areas of standing water (depth less than 1/8 inch or 3mm of standing water). A runway is considered to be well soaked when there is sufficient moisture on the runway surface to cause it to appear reflective.

**RUNWAY CONTAMINATED BY STANDING WATER, SLUSH OR SNOW** – A runway is considered contaminated when at least 25% of the runway within the required length and width being used is covered by slush, standing water or snow greater than 3mm of equivalent water depth.

> • *Additional consideration: If the contaminates are lying on that portion of the runway where the high speed part of the takeoff roll will occur, it MAY BE appropriate to consider the runway contaminated.*

Daniel Liu

Aircraft Performance Engineer
Navtech Systems Support Inc.

**I.O.P. # 6**

2/3

**Navtech Systems Support Inc.**
175 Columbia Street West, Suite 102       Waterloo, Ontario, Canada, N2L 5Z5       Phone (519) 747-1170       Fax (519) 747-1827

SITA - YYZNSCR   AFTN - CYYZXNSX   ARINC - YKFNSCR

**AMERIJET INTERNATIONAL**    **FORT LAUDERDALE, FL**

**B-727-200   JT8D-15**      **HOLLYWOOD INTL**

**KFLL   09L**        **FLAPS   20**

| TEMP | | ZERO WIND | CLIMB LIMIT | A/C POD OFF (+) | N1% MAX EPR | GO FOR ARND T/O EPR | ENG ANTI-ICE ZERO WIND | A/C CLIMB LIMIT | A/C OFF (+) |
|---|---|---|---|---|---|---|---|---|---|
| F | C | | | | | | | | |
| -10 | -23 | 2000 C | 1980 | 0 C | 2.09 | 90 2.07 | 1975 | 1957 | 0 |
| 0 | -18 | 2000 C | 1980 | 0 C | 2.09 | 91 2.07 | 1983 | 1957 | 0 |
| 10 | -12 | 2000 C | 1980 | 0 C | 2.09 | 92 2.07 | 1983 | 1957 | 0 |
| 20 | -7 | 2000 C | 1980 | 0 C | 2.09 | 93 2.07 | 1983 | 1957 | 0 |
| 30 | -1 | 2000 C | 1980 | 0 C | 2.09 | 94 2.07 | 1983 | 1957 | 0 |
| 32 | 0 | 2000 C | 1980 | 0 C | 2.09 | 94 2.07 | 1983 | 1957 | 0 |
| 34 | 1 | 2000 C | 1980 | 0 C | 2.09 | 94 2.07 | 1983 | 1957 | 0 |
| 36 | 2 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 38 | 3 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 40 | 4 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 42 | 6 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 44 | 7 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 46 | 8 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 48 | 9 | 1999 C | 1980 | 0 C | 2.09 | 96 2.07 | 1982 | 1957 | 0 |
| 50 | 10 | 1996 C | 1980 | 0 C | 2.09 | 96 2.07 | 1979 | 1957 | 0 |
| 52 | 11 | 1993 C | 1980 | 0 C | 2.09 | 96 2.07 | | | |
| 54 | 12 | 1990 C | 1980 | 0 C | 2.09 | 96 2.07 | | | |
| 56 | 13 | 1987 C | 1980 | 0 C | 2.09 | 96 2.07 | | | |
| 58 | 14 | 1984 C | 1980 | 0 C | 2.09 | 97 2.07 | | | |
| 60 | 16 | 1979 C | 1969 | 0 C | 2.09 | 97 2.07 | | | |
| 62 | 17 | 1975 C | 1969 | 0 C | 2.09 | 97 2.07 | | | |
| 64 | 18 | 1971 C | 1969 | 0 C | 2.09 | 97 2.07 | | | |
| 66 | 19 | 1967 R | 1969 | 2 R | 2.09 | 97 2.07 | | | |
| 68 | 20 | 1963 R | 1969 | 6 R | 2.09 | 98 2.07 | | | |
| 70 | 21 | 1961 R | 1969 | 8 R | 2.09 | 98 2.07 | | | |
| 72 | 22 | 1960 R | 1969 | 9 R | 2.09 | 98 2.07 | | | |
| 74 | 23 | 1958 R | 1969 | 11 R | 2.09 | 98 2.07 | | | |
| 76 | 24 | 1956 R | 1969 | 13 R | 2.09 | 98 2.07 | | | |
| 78 | 26 | 1952 R | 1969 | 14 R | 2.09 | 98 2.07 | | | |
| 80 | 27 | 1949 R | 1969 | 14 R | 2.09 | 99 2.07 | | | |
| 82 | 28 | 1946 R | 1969 | 14 R | 2.09 | 99 2.07 | | | |
| 84 | 29 | 1942 R | 1970 | 15 R | 2.09 | 99 2.07 | | | |
| 86 | 30 | 1928 R | 1951 | 15 R | 2.08 | 99 2.07 | | | |
| 88 | 31 | 1917 R | 1936 | 14 R | 2.07 | 99 2.07 | | | |
| 90 | 32 | 1906 R | 1921 | 13 R | 2.06 | 99 2.07 | | | |
| 92 | 33 | 1895 R | 1906 | 11 R | 2.05 | 98 2.06 | | | |
| 94 | 34 | 1884 R | 1891 | 7 R | 2.04 | 98 2.05 | | | |
| 96 | 36 | 1861 R | 1861 | 0 R | 2.02 | 98 2.04 | | | |
| 98 | 37 | 1849 C | 1847 | 0 C | 2.01 | 98 2.03 | | | |
| 100 | 38 | 1837 C | 1832 | 0 C | 2.01 | 98 2.02 | | | |
| 102 | 39 | 1826 C | 1818 | 0 C | 2.00 | 97 2.01 | | | |
| 104 | 40 | 1814 C | 1803 | 0 C | 1.99 | 97 2.00 | | | |
| 106 | 41 | 1803 C | 1789 | 0 C | 1.98 | 97 1.99 | | | |
| 108 | 42 | 1792 C | 1774 | 0 C | 1.97 | 97 1.98 | | | |
| 110 | 43 | 1781 C | 1759 | 0 C | 1.96 | 97 1.96 | | | |
| 112 | 44 | 1770 C | 1744 | 0 C | 1.95 | 97 1.95 | | | |
| 114 | 46 | 1748 C | 1715 | 0 C | 1.93 | 96 1.94 | | | |
| 116 | 47 | 1736 C | 1701 | 0 C | 1.92 | 96 1.93 | | | |
| 118 | 48 | 1724 C | 1687 | 0 C | 1.92 | 96 1.92 | | | |
| 120 | 49 | 1712 C | 1672 | 0 C | 1.91 | 96 1.91 | | | |

**PACKS** ON   TORA = 9000
**NOSE BRKS** OFF   TODA = 9000
210 MPH TIRE   ASDA = 9000
ELEV = 11   GRAD = -.01%

----NOTES----

1. CTR ENG EPR: MOD-A   NON-MOD
   ICE OFF    +.01    +.01
   ICE ON    NONE    -.02

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON   NONE
   PACKS OFF ICE OFF/ON   +.04

3. FLAP RETRACT HT (OCH)
   = 811 FTMSL

4. OBST: HT (FT AGL) DIST (NM)
   50    1.81

DATE: 12/09/92

**GROSS WEIGHT CORRECTIONS**

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
1 DEGREE F HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    0 LBS/KT EFF HEAD W
SUB FROM ZERO WIND   1301 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
*WIND *RUNWAY SHORTENING *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
*MEL PERFORMANCE DECREMENTS

**RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS**

| | STANDING WATER SLUSH OR WET SNOW -IN- | REDUCE ZERO V1 BY: -LBS- | REDUCE V1 SPEED BY: -KNOTS- |
|---|---|---|---|
| DRY SNOW -IN- | < 1/4 | 17000 | 28 ← |
| | 3 1/2 TO 6   1/4 TO 1/2 | 30000 | 25 |
| | ICE | 17000 | 28 |
| | ANTI-SKID INOP | 8500 | 18 |

* = CHECK MAX STRUCTURAL WT

**LANDING DATA**     PACKS ON

| LNDG FLAP | LENGTH | ANTI SKID | DRY MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | WET MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | APT CRIT TEMP | SUB LB/F ABOVE CRIT TEMP | MAX OPER TEMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 143 | 0 | 120 |

3/3     **I.O.P.# 6**

NAVTECH SYSTEMS

```
+(WCAISM1)---------------------------------------------------------------+
¦ ISIS Airman Report            CAIS Information - Basic Information      ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:   ███████████████           ¦
+-----------------------------------------------------------------------+
¦ Name:  STEELE, BRIAN A                               Name-Sfx:         ¦
¦                                                                        ¦
¦ ███████████████████████████████████████████████████████               ¦
¦                                                                        ¦
¦ Status:            Info:      Name/Address Source:  Airm               ¦
¦                                                                        ¦
¦ Date of Address Update: 1999 05 15  Citizenship:  USA                  ¦
¦                                                                        ¦
¦ Street: █████████                        County:  083                  ¦
¦                                                                        ¦
¦ City:  ████████        State: ████ Zip: ████████                       ¦
¦ Country:                                                               ¦
```

%b49W3L.02-- ---->1 , ..lbaa
+--=0=-0=v=n-n0cx0+-00000-1-1------------------------------------------+
   THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.

```
+(WCAISM3)---------------------------------------------------------------+
¦ ISIS Airman Report                    CAIS Information - Medical        ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:            Information       ¦
+-----------------------------------------------------------------------+
¦ Medical Information for: STEELE, BRIAN A                                ¦
¦  Class:            First                                                ¦
¦  Certificate Desc.:  CLEAR                                              ¦
¦                                                                        ¦
¦                                                                        ¦
¦  Medical Date:  1999 05 18  Medical ID#:  99097461    Pathology:       ¦
¦                                                                        ¦
¦  Restriction:                                                          ¦
¦                                                                        ¦
¦                                                                        ¦
¦                                                                        ¦
+-----------------------------------------------------------------------+
```
   THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.

1/4

I.O.P. # 7

```
+(WCAISM2)------------------------------------------------------------+
¦ ISIS Airman Report                    CAIS Information - Certificate ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:            Information     ¦
+---------------------------------------------------------------------+
¦  Pilot Information for:        STEELE          BRIAN A               ¦
¦  Cert-Level:  AIRLINE TRANSPORT PILOT                               ¦
¦  Rating/Level:                                                      ¦
¦   AIRPLANE MULTIENGINE LAND/AIRLINE TRANSPORT PILOT                 ¦
¦   AIRPLANE SINGLE ENGINE LAND/PRIVATE PILOT                         ¦
¦                                                                     ¦
¦                                                                     ¦
¦  Type Rating/Level:                                                 ¦
¦   B-727/AIRLINE TRANSPORT PILOT                                     ¦
¦                                                                     ¦
¦                                                                     ¦
¦                                                                     ¦
¦                                                                     ¦
¦  Date of Issue: 1995 04 20   Update Date:  1995 10 12               ¦
¦           Seal: Blue         Cert Status:  Active                   ¦
+---------------------------------------------------------------------+
```

```
+(WCAISM2)------------------------------------------------------------+
¦ ISIS Airman Report                    CAIS Information - Certificate ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:            Information     ¦
+---------------------------------------------------------------------+
¦  Acft Mechanic Info           STEELE          BRIAN A               ¦
¦  Cert-Level:  MECHANIC                                              ¦
¦  Rating/Level:                                                      ¦
¦   AIRFRAME/MECHANIC                                                 ¦
¦   POWERPLANT/MECHANIC                                               ¦
¦                                                                     ¦
¦                                                                     ¦
¦  Type Rating/Level:                                                 ¦
¦                                                                     ¦
¦                                                                     ¦
¦                                                                     ¦
¦                                                                     ¦
¦  Date of Issue: 1985 01 07   Update Date:  1995 10 12               ¦
¦           Seal: Black        Cert Status:  Active                   ¦
+---------------------------------------------------------------------+
```

2/4
I.O.P.# 2



```
+(WCAISM2)---------------------------------------------------------------+
¦ ISIS Airman Report                      CAIS Information - Certificate  ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:            Information       ¦
+------------------------------------------------------------------------+
¦  Flt Engineer Info          STEELE         BRIAN A                      ¦
¦  Cert-Level:  FLIGHT ENGINEER                                           ¦
¦  Rating/Level:                                                          ¦
¦   TURBOJET POWERED/FE                                                   ¦
¦                                                                         ¦
¦                                                                         ¦
¦                                                                         ¦
¦  Type Rating/Level:                                                     ¦
¦                                                                         ¦
¦                                                                         ¦
¦                                                                         ¦
¦                                                                         ¦
¦                                                                         ¦
¦  Date of Issue: 1986 07 16   Update Date:  1995 10 12                   ¦
¦           Seal: Black        Cert Status:  Active                       ¦
+------------------------------------------------------------------------+
```

ISIS ACCIDENT/INCIDENT (AID) REPORT


NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 265456264
ISIS ACCIDENT/INCIDENT (AID) REPORT


NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 265456264
ISIS ACCIDENT/INCIDENT (AID) REPORT


NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 265456264

3/4

I.O.P. # 2

ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00265456264
ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00265456264
ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00265456264

4/4

I.O.P. # 7

## WEIGHT AND BALANCE MANUAL

### General Information

| Aircraft No. | B.O.W Weight | Moment |
|---|---|---|
| N794AJ | 93,316 | 88178325 |
| N994AJ | 94,139 | 88105202 |
| N395AJ | 93,883 | 88124473 |
| N495AJ | 92,711 | 87181149 |
| N895AJ | 93,005 | 88056640 |
| N196AJ | 92,819 | 87773553 |
| N296AJ | 93,379 | 87734708 |
| N397AJ | 93,308 | 88534151 |
| N797AJ | 92,868 | 88022669 |
| N598AJ | 92,772 | 87088635 |

**I.O.P. # 8**

1/2

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

1 6 SEP 1999

Issued: 09/01/99
Revision: 65

WEIGHT AND BALANCE MANUAL

WEIGHT AND BALANCE

FLEET WEIGHT LIMITATIONS

| FLEET WEIGHT LIMITATIONS | | N994AJ<br>N495AJ | N397AJ<br>N797AJ | N395AJ |
|---|---|---|---|---|
| Maximum Taxi Weight -<br>(AFM) | | 197,700 | 197,700 | 197,700 |
| Maximum Taxi Weight is a structural<br>limit for taxiing | | | | |
| MAXIMUM TAKE-OFF WEIGHT | | 197,000 | 197,000 | 197,000 |
| This is the maximum allowable gross<br>weight at brake release, just prior<br>to takeoff roll | | | | |
| MAXIMUM IN-FLIGHT WEIGHT<br>(AFM) | FLAPS UP | **NOTE | 196,000 | **NOTE |
| | FLAPS 30 | **NOTE | 164,000 | **NOTE |
| | FLAPS 40 | **NOTE | 142,500 | **NOTE |
| MAXIMUM LANDING WEIGHT -<br>(AFM) | FLAPS 30 | 164,000 | 164,000 | *164,000 |
| | FLAPS 40 | 142,500 | 142,500 | (*EMERGENCY USE ONLY) |
| MAXIMUM ZERO FUEL WEIGHT - | | 155,000 | 155,000 | 155,00 |

**NOTE: N994J maximum in-flight weight - 196,000.

**NOTE: N395AJ maximum in-flight weight - 196,000.

**NOTE: N495AJ maximum in-flight weight - 196,000.

*NOTE: QW Landing Data

**I.O.P. # 8**

**2/2**

AMERIJET FLEET LIMITATIONS

Maximum Operating Airspeed of Vmo equals 350 knots indicated airspeed (KIAS), or code "B" [350 knots equivalent airspeed (KIAS)].

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
1 6 SEP 1999

AIRCRAFT LOG BOOK  AIRCRAFT MAINTENANCE LOG          FORM M1          A/C TYPE B737   AIRCRAFT # 39170   FLIGHT CODE 4

DISCREPANCIES (PLEASE PRINT) — In transit check OK

| EMPLOYEE NO. | KT | OPERATING & ALL DEADHEAD CREW MEMBERS | T O | NO. | DISCREPANCIES (PLEASE PRINT) | NO | CORRECTIVE ACTION | STN | MECHANIC |
|---|---|---|---|---|---|---|---|---|---|
| 7025 | B | STEBE | | | In transit check OK | In transit check complete | | FL | |
| 803 | P | Major | 1 | | | | | | |
| | D | Ramsingh | 1 | | | | | | |
| 7853 | B | Wise | | | | | | | |
| 72209 | A | Sp | | | | | | | |

I.O.P. # 9

52010

IFR (INTERNATIONAL) ROUTE STORED IN AMERIJET COMPUTER

ARTCC MIAMI (ZMA) MAIN 305-716-1588     DATA 305-716-1648

00/17/99 (Z DATE)   TIME 2055Z   TRIP/DATE 827/17   AIRCRAFT 39/RJ   8727/B   ETD 2200

*HOW FT LAUDERDALE   TO PORT OF SPAIN

FILED ROUTE:   ZBV A555 DOP-N G449 POS

PLANNED ROUTE ZBV ZQR 7L5-N INDEE BTK A555 DOP-N G449 POS

TOTAL DISTANCE  1459.9   DIRECT DISTANCE  1413.9   3.7   ALTERNATE   SAMS 1155 N

PLANNED BURN   77.2   3:20

ALTERNATE   6.3   0:30   MACH .77

10% EXTRA FUEL   3.5   0:20   INDICATED AIRSPEED 300

RESERVE   4.1   0:30   TRUE AIRSPEED 470

HOLDING FUEL   0.0   0:00   FLIGHT-LEVEL 290

TAXI FUEL   0.5   ZERO FUEL WEIGHT 141.8

REQUIRED FUEL   51.6   4:40   TAKE OFF WEIGHT 192.9

BOF   13.9   LANDING FUEL  13.9

EXTRA FUEL   0.0   0:00   LANDING WEIGHT 155.7

BLOCK FUEL   51.6   4:40   TOTAL BURN  38.1 (INCLUDES TAXI)

FOR EACH 10.0 OVER PLANNED TAKE OFF WEIGHT BURN WILL BE 1.5 OVER PLANNED BURN

PLANNED CARGO   49.1   MAX CARGO  50.2

CRUISE OAT -30 (ISA + 12)

DM1 NUMBER   DATE   REL REF

8542   07/18/1988   24-22   DOCS DEFERRED PER MDO UNDER PACKLY OVM

9466   03/31/1996   31-1   3.2 GMO DIFFERENTIAL VALVES

MR. 194.2   MEL IS BASED ON STRUCTURAL LIMITS ONLY NO AIRPORT DATA ON FILE FOR FT LAUDERDALE

WINDS:  (24/76)BEHUT 40/6  (20/69)HARDY 120/5  (14/63)PELMA 70/10

PREPARED BY:   KIT TIMARI
CAPTAIN:   BRIAN STEELE
FIRST OFFICER:   PAT MAJUM
SECOND OFFICER: RHETT WISE
DISPATCHER: A. JORSEY
U. KANGTMAN

| FROM/TO | FREQ | LEG | MTG | TIME REM | GS | TIME | TOT TIME | BURN | TOT BURN | FUEL REM |
|---|---|---|---|---|---|---|---|---|---|---|
| KFLL   118 D 119   ZBV | 116.7 | 51 | 1499 | | 380 | | | | | TAKEOFF FUEL 51.1 |
| ZBV   116 | *F1R* | *K2M** | 17 | 1391 | | 59 | | | | |
| *F1R* | | TOC | 69 | 1322 | 2:55 | 380 | 0126 | 0:05 | 6.3 | 6.3 | 44.8 |
| TOC   D 112   ZQR | 112.7 | 22 | 1301 | 2:52 | 471 | 0103 | 0:09 | 0.5 | 6.8 | 44.3 |
| ZQR   126 D 126   7L5-N | 326.0 | 148 | 1153 | 2:33 | 472 | 0119 | 0:17 | 3.7 | 10.5 | 40.6 |
| 7L5-N  119 D 119   INDEE | | 55 | 1098 | 2:26 | 459 | 0107 | 0:14 | 1.4 | 11.9 | 39.3 |
| INDEE  119 D 120   BTK | 114.2 | 207 | 891 | 1:59 | 467 | 0127 | | 5.1 | 16.9 | 34.6 |
| BTK   132 A 133   COCBU | | 32 | 858 | 1:55 | 464 | 0104 | 0:08 | 0.8 | 17.7 | 34.1 |
| COCBU  133 A 133   GRRD1 | | 69 | 790 | 1:47 | 465 | 0109 | | 1.7 | 19.4 | 31.6 |
| GRRD1  134 A 134   HARDY | *T7J9* | 55 | 735 | 1:39 | 465 | 0107 | | 1.3 | 20.7 | 30.4 |
| HARDY  134 A 135   IDAHO | | 80 | 654 | 1:29 | 465 | 0110 | 1:13 | 1.9 | 22.6 | 28.3 |
| IDAHO  135 A 135   DOP-N | 391.0 | 84 | 570 | 1:18 | 465 | 0111 | 2:02 | 2.0 | 24.6 | 26.3 |
| DOP-N  159 A 160   VERMA | | 11 | 559 | 1:17 | 465 | 0101 | 2:04 | 0.3 | 24.9 | 25.3 |
| VERMA  160 A 160   GESSO | | 58 | 501 | 1:09 | 465 | 0107 | 2:11 | 1.4 | 26.3 | 24.9 |
| GESSO  160 A 160   HENLT | | 40 | 461 | 1:04 | 465 | 0105 | 2:16 | 1.4 | 27.8 | 23.9 |
| HENLT  161 A 161   AMNER | | 49 | 412 | 0:58 | 466 | 0108 | 2:23 | 1.8 | 28.4 | 22.8 |
| AMNER  157 A 158   AMDRA | | 85 | 327 | 0:47 | 465 | 0111 | 2:34 | 2.0 | 30.4 | 20.8 |
| AMDRA  160 | *F1R* | *T7J9* | 4 | 323 | 0:46 | 466 | | 2:34 | 0.1 | 30.4 | 20.7 |
| *F1R*  A 160   PELMA | | 61 | 262 | 0:38 | 467 | 0108 | 2:42 | 1.4 | 31.8 | 19.3 |
| PELMA  162 A 163   PERRY | | 64 | 198 | 0:30 | 467 | 0606 | 3:00 | 1.8 | 33.6 | 17.8 |
| PERRY  164 A 164   PERRA | | 97 | 101 | 0:18 | 468 | 0:12 | 3:08 | 2.2 | 35.5 | 15.6 |
| PERRA  163 | TDD | | 14 | 87 | 0:16 | 470 | 0102 | 3:04 | 0.4 | 35.8 | 15.3 |
| TDD   A 162   POS | 116.9 | 79 | 8 | | 326 | | DESCENT | 1.4 | | |
| POS   019 D 019   TTPP | | 8 | -0 | | 326 | | 3:10 | | 37.2 | 13.5 |

KT1: N26:04.3 / W80:09.1   ZBV N25:42.2 / W79:17.7   ZQR N23:01.7 / W77:27.0   ZLSN N23:34.8 / W75:15.0

INDEE N23:08.3 / W74:23.4   BTK N21:26.4 / W71:08.1   COCBU N21:08.9 / W70:39.3   GRRD1 N20:31.1 / W69:37.5

HARDY N20:00.4 / W68:49.0   IDAHO N19:15.6 / W67:38.4   DOPN N18:28.1 / W66:18.7   VERMA N18:19.0 / W66:16.8

GESSO N17:29.6 / W65:46.7   HENLT N16:55.1 / W65:24.5   AMNER N16:12.0 / W64:58.0   AMDRA N15:04.1 / W64:06.1

PELMA N14:08.0 / W63:33.0   PERRY N13:13.0 / W63:00.0   PERRA N11:48.3 / W62:11.4   POS N10:27.8 / W61:23.6

TTPP N10:23.6 / W61:20.9   SVMD N10:54.9 / W63:57.9

ACTUAL BLOCK FUEL OUT _____   ACTUAL BLOCK FUEL IN _____   TOTAL BURN _____

.. PRICES ARE AMERIJET CONTRACT FUEL 520

Fuel cost at KFLL $0.60 Fuel cost at TTPP $0.60   Tanker fuel as needed for operational reasons = No difference in cost.

RELEASED BY _____   TIME OF RELEASE _____

I CERTIFY THAT I HAVE COMPLETED ON AIRPORT AND ROUTE PREFLIGHT AS REQUIRED BY FAR 121.443

CAPTAIN _____

FIR BOUNDARIES:  KDMA 0:18  TJZS 1:41  TTZP 2:34

KFLL/TTPP

D.P.# 10

```
    . . AO2 SLP159 CB DSNT A  DS T03060233 36022=
    KFLL 172053Z 03009KT 10   FEW035CB SCT050 SCT150      0 30/23
      03000  RMK AO2 SLP159 CB VC E T03000230 58015
    TTPP 172102Z 06006KT 9999 FEW006 SCT260 32/24 Q1013 NOSIG 03/13/2001
    TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
    TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
    TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
    TTPP 171800Z 08006KT 9999 FEW010 BKN280 31/25 NOSIG=
    TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
      Q1013 TEMPO SHRA=
    TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
    TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
    TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
    TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
    TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
    TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
    TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
    TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
    TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
    TFFF 171900Z 08012KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
    TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
    TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
    TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
    TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
      Q1014 NOSIG
      CB (S)=
    TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
      Q1014 NOSIG
      CB (S)=
    TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
      Q1014 NOSIG
      CB (S)=
    TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
      32/24 Q1014 NOSIG
      CB (S/WNW)=
    TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
      32/24 Q1014 NOSIG
      CB (WNW)=
    SVMG NO CURRENT REPORT.
    SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
    SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

    ------------
    FORECASTS
    ------------

    MIA
    KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
      BECMG 2122 09005KT NSW SCT025 BKN250
      FM0100 VRB04KT P6SM SCT025 SCT250
      BECMG 0406 VCSH
      FM1500 09010KT P6SM FEW030 SCT250=
    FLL
    KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
      BECMG 2122 NSW SCT025 BKN250
      FM0100 VRB04KT P6SM SCT025 SCT250
      BECMG 0406 VCSH
      FM1500 09010KT P6SM FEW030 SCT250=
    TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
      3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
    TTPP 171000Z 171212 08010G20KT 9999 SCT020
      BKN300  PROB30 TEMPO 5000 SHRA FEW010CB BKN015
      PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
      BECMG 2223 08005KT=
    TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
      TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
      TEMPO 0010 00000KT
      BECMG 1012 11012KT=
    TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
      TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
      TEMPO 0010 00000KT
      BECMG 1012 11012KT=
    TGPY 171600Z 171818 NIL=
    TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
      SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
      1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 ST050=
```

I.O.P. # 11



**06070-WJZ   Document 11... Entered on FLSD Docket... Pa...**

DATE: 12th Aug 99
FLIGHT NO: 827
ACN# A337
FROM: ELL TO: PVS
ALT ARPT(s): SVMI

# B-727-200C LOAD PLAN
## 12-POSITION WEIGHT & BALANCE

**AMERIJET INTERNATIONAL**

------ Max. Cumulative Load 34,100 lbs. ------

| 1 PAS | 2 PAS | 3 | 4 PAS | 5 PAS | 6 PAS | 7 PP | 8 PAS | 9 PAS | 10 PAS | 11 PAS | 12 PAS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULD: 25640K | ULD: 1497JK | ULD: | ULD: 1494JK | ULD: 25093K | ULD: 13472K | ULD: 13221K | ULD: 13402K | ULD: 12245K | ULD: 23413K | ULD: 24147K | ULD: 25217K |
| DEST: EDE | DEST: EDE | DEST: | DEST: EDE | DEST: EDF | DEST: PAS | DEST: PAS | DEST: PTE | DEST: EDE | DEST: EDE | DEST: PTE | DEST: PTE |
| WT: 3180 | WT: 3360 | WT: | WT: 3060 | WT: 3640 | WT: 5400 | WT: 3100 | WT: 7730 | WT: 3640 | WT: 4160 | WT: 3410 | WT: 2070 |
| 39008 MAX | 48008 MAX | 47208 MAX | 48808 MAX | 43208 MAX | 58408 MAX | 80008 MAX | 80008 MAX | 58408 MAX | 42408 MAX | 52808 MAX | 30008 MAX |

------ Max. Cumulative Load 34,951 lbs. ------

**FORWARD HOLD**

| 1A | 1B | 1C | 1D |
|---|---|---|---|
| DEST: SVMI | DEST: | DEST: PAS | DEST: PAS |
| WT: 60 | WT: | WT: 575 | WT: 575 |

TOTAL WT: 1150 (60008 max.)

2+1A 54408   3+1B 80008   4+1C 52008   5+1D 80008

**AFT HOLD**

| 2A | 2B | 2C | 2D |
|---|---|---|---|
| DEST: | DEST: | DEST: | DEST: PAS |
| WT: 1480 | WT: | WT: 1080 | WT: 540 |

TOTAL WT: (60008 MAX)

9+2A 80008   10+2B 42408   11+2C 80008   12+2D 30008

B.O.W. 93,708
CARGO TOTAL 47,290
ZFW 140,998
ZFW %MAC 21.6
TAKEOFF WT 172,270
TAKEOFF CG 27.6/5
STAB TRIM
FUEL BURN
LANDING WT

**STRUCTURAL LIMITS**

MAX TAXI WEIGHT
ZERO FUEL WEIGHT
MAX LDG WEIGHT

MAXIMUM ALLOWABLE TAKEOFF WEIGHT
(PERFORMANCE)

RUNWAY
WIND   TEMP
FLAP SETTING

CAPTAIN'S SIGNATURE:
Sign in accordance with
FAR 121.693, 121.697, 121.743, 121.745

CAPTAIN
3)
ACM
1)
2)
3)

COMAT
ITEM(S)
WEIGHT

Form NO: 200A
DATE: 04/23/99

AIRCRAFT COPY: WHITE   STATION COPY: YELLOW

*11/10/99*
*SUPERVISOR*

November 10, 1999

## CERTIFIED-RETURN RECEIPT

Captain Brian A. Steele

Dear Captain Steele:

### LETTER OF INVESTIGATION

File Number: 2000SO170011

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Captain (pilot in command) on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1/2

**I.O.P. # 13**

2

File: 8030.1

WP: H:\AMERIJET\LOISTL02A.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

Z 593 221 205

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| Sent to | |
|---|---|
| BRIAN STEELE | |
| Street & Number | |
| Post Office, State, & ZIP Code | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |
| | SENT 11/10/99 |

PS Form **3800**, April 1995

---

**SENDER:**
☐ Complete items 1 and/or 2 for additional services.
Complete items 3, 4a, and 4b.
☐ Print your name and address on the reverse of this form so that we can return this card to you.
☐ Attach this form to the front of the mailpiece, or on the back if space does not permit.
☐ Write "Return Receipt Requested" on the mailpiece below the article number.
☐ The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery

| 3. Article Addressed to: | 4a. Article Number |
|---|---|
| CAPTAIN BRIAN A. STEELE | Z 593 221 205 |
| | 4b. Service Type |
| | ☐ Registered    ☒ Certified |
| | ☐ Express Mail    ☐ Insured |
| | ☒ Return Receipt for Merchandise  ☐ COD |
| | 7. Date of Delivery  11/15/95 |
| 5. Received By: *(Print Name)* | 8. Addressee's Address *(Only if requested and fee is paid)* |
| 6. Signature *(Addressee or Agent)* | |

PS Form 3811, December 1994    102595-99-B-0223    Domestic Return Receipt

Thank you for using Return Receipt Service.

2/

*972*
*11/10/99*
*SUPERVISOR*

November 10, 1999

Captain Brian A. Steele



Dear Captain Steele:

### LETTER OF INVESTIGATION

File Number: 2000SO170011

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Captain (pilot in command) on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

**I.O.P. # 14    1/2**

2

File: 8030.1

WP: H:\AMERIJET\LOISTL01A.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

**I.O.P. # 14** 2/2

November 20, 1999

Captain Brian A. Steele



Mr. John Roseborough
Principal Operations Inspector
Federal Aviation Administration
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

*Rcd 11/23/99 @0800 pmc*

Re:    File Number 2000SO170011

Dear Inspector Roseborough,

On August 17, 1999, I was the Captain on Amerijet Flight #827 along with the rest of the crew, First Officer Patrick Major and Flight Engineer Brett Wise. Captain Allen Jorsey, Sr. (Senior Check Airman) was jumpseating to perform an annual PIC Line Check. I reported for duty at the aircraft at bout 2230Z for a 2330Z departure. At about 2315Z, a rain shower passed over the airport. While it was raining, Captain Jorsey and I stood in the crew entryway of the aircraft and discussed some of the operational limitations and other Line Check procedures.

As we prepared for departure the rain had stopped and I requested the ground crew to push us back on the Amerijet ramp facing east so I could turn on the weather radar and see if there were any storms in our departure path. There were storms to the north and the one that passed over us to the south; however, to the east our departure path was clear of any weather. Before starting engines, I told First Officer Major to contact ground control to see if there were any delays for our departure. Because I noticed three to four aircraft waiting for departure on runway 9 Left. First Officer Major also requested the runway condition. The Tower replied there are no delays, the condition of the runway was wet and informed us that aircraft are holding at the end of 9 Left for pilots discretion with reference to weather. After normal engine start we requested taxi, taxi instructions were taxi out and hold short of Bravo and contact the Tower for back taxi instructions. We then contacted the Tower and were instructed to taxi to Bravo 2 and back taxi on to the runway in position for takeoff. When we were told to back taxi on to the runway, First Officer Major acknowledged the clearance and also asked for the runway condition report but it was not available at that time. I instructed him we had the runway conditions from ground control and it was reported wet. During the back taxi on the runway, I observed no standing water on the runway. Therefore requiring no reduction to weight or V1.

**I.O.P. # 15    1/2**

We were cleared for takeoff and used normal takeoff thrust and normal climb thrust as per Amerijet's procedures. We departed Fort Lauderdale at 2347Z. The performance, runway analysis and weight and balance I used for the departure were within all the limitations specified in the Amerijet procedures.

Sincerely,

Brian A. Steele

**I.O.P. # 15  2/2**

00SO170011

## SECTION D - FACTS AND ANALYSIS

### FACTS

On Monday, October 4, 1999, the investigating Inspector found on his desk a letter (IOP 3) from the First Officer (Patrick Major EIR # 00SO170013) of the subject flight detailing the events which led to the investigation herein. This correspondence had followed a conference between the complainant and the investigating Inspector some weeks before in which the Inspector had requested the account to be put in writing. Due to a death in the family that occurred two days prior (Saturday, October 2nd), and walk in duty on October 4th, the letter could not be given due consideration. During the Inspectors resulting absence for the funeral of his mother and use or lose annual leave, the correspondent directed his concerns to the Department of Transportation's Inspector General, hence the investigation now in progress.

On Tuesday, August 17, 1999, between the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time) Amerijet B-727, N397AJ (a FAR 121 Supplemental Air Carrier, IOP 1, pp. 1 and 2), operating as Amerijet (AMJ) Flight # 827 departed Runway 9L (9 Left) at Fort Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida (IOP 3, 4, 5, 9, and 10) when there was less than one quarter (1/4) of an inch of standing water on the departure runway as reported by the FLL FAA Air Traffic Control Tower (ATCT) following a runway contamination/condition check accomplished by the FLL Airport Authority identified on the ATCT tape recording (IOP 4) as "Ramp One". The airport runway contamination/condition report in detail represented that there was "less than ¼ inch, good drainage, slight standing water about six (6) feet on either side of centerline". This report was subsequently provided to the Flightcrew of AMJ 827 by the FLL ATCT as "some standing water less than a quarter of an inch" prior to a takeoff clearance being given to the flight, and was acknowledged by the pilot (ATCT Tape counter number 607, IOP 4).

Amerijet AOM in Chapter 4, Section 1A, Subject 55 [4:1:55(IOP 6, page 1)] directs that for takeoff limitations other than as listed on this page, the user "check Performance Manual for appropriate reductions to maximum takeoff gross weight" (IOP 6, page 3). Even though the NAVTECH page (IOP 6, page 2) provides additional information as to wet runways and standing water of less than one eighth (1/8) inch, the information as contained on the Amerijet International B-

727-200, JT8D-15 Performance Chart for Fort Lauderdale runway 9L with Flaps 20 **(IOP 6, page 3)** is applicable. This chart requires a weight reduction of 17,000 pounds and a V1 airspeed reduction of 28 knots from the data as expressed on the B-727-200c Load Plan **(IOP 12)** rendering the figures of weight reduction from 192,298 to 175,298 pounds. The aircraft thus departed 17,000 pounds above its maximum gross takeoff weight as corrected for contaminated runway conditions, and therefore contrary to ▮▮▮▮▮▮▮▮
**(IOP 2, pp. 4 - 6 and IOP 3 - 6, 7 - 12).**

**FAR Part 1 (IOP 2, page 1)** clearly defines the terms **"Operate", "Operational Control" and "Person"**, as follows. The terms state in pertinent part, "Operate" means use, cause to use or authorize to use aircraft; "Operational Control" means the exercise of authority over initiating, conducting or terminating a flight; "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

**IOP 9, 10 AND 12,** identify Captain Brian A. Steele as the Pilot in Command of the subject flight. As stipulated in **FAR 121.537(b)(d) and (e)**, the pilot in command is responsible for the safety aspects of flight including the safety of other crewmembers. His abdication of those duly appointed responsibilities places him in violation of specific FAR, ▮▮▮▮▮▮▮▮

As a Captain for Amerijet he becomes a person accommodating the terms expressed in FAR Part 1 as exercising operational control in concert with the company.    As stipulated in **FAR 121.537(a)**, **"Each certificate holder conducting supplemental operations - (1) is responsible for operational control."** The company through Captain Brian A. Steele exercises Operational Control, hence, the flight as identified above was "operated" by Captain Steele under the authority and responsibility of ▮▮▮▮▮▮▮ **and, therefore** contrary to ▮▮▮▮▮▮▮ contrary to ▮▮▮▮▮▮▮ and contrary to ▮▮▮ ▮▮▮▮ **(IOP 1 - 12).**

Captain Brian A. Steele does not have a violation history **(IOP 7).**

Captain Steele was sent two (2) Letters of Investigation (LOI), one via certified mail and one via regular mail **(IOP 13 and 14).**

**IOP 15** is Captain Steele's response to the LOI containing information which presents his perspective that the runway was not covered with standing water of ¼

6

inch or less. The FLL ATCT re-recording **(IOP 4 and 5)**, however, contradicts his
statement for the period in question.

Ksur 1/26/00

IS: FO 2150-1

| ENFORCEMENT INVESTIGATIVE REPORT | Report Number 2000SO170014 | Related Number |
|---|---|---|

### ALLEGED VIOLATOR IDENTIFICATION

WISE, BRETT OGDEN
DBA Name
Designator

2. Address (Include zip code)

( )  -                                           ·M

| 5. FAA Cert. # 344567857 | 6. FAA Certificate Type FLIGHT ENGINEER | |
|---|---|---|

AMERIJET

### AIRCRAFT, ENGINE; PROPELLER, COMPONENT OR APPLIANCE INVOLVED

| BOEING | 727 | 397AJ |
|---|---|---|
| | ACFT SN | |

AMERIJET

12. Address (Include zip code)

### ALLEGED VIOLATION

| 13. Date Occurred 1999/08/17 | 14. Time 19:40 | 15. Date Known to FAA 1999/10/18 | 16. Region of Discov SO |
|---|---|---|---|

FT LAUDERDALE-HOLLYW    FT LAUDERDALE    FL                1
FT LAUDERDALE
           FLL



PLAINTIFF'S EXHIBIT
41
2/13/01

EIR 00SO170014

## SECTION B - SUMMARY OF FACTS

██████████████████████ on Tuesday, August 17, 1999, during the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time), B-727, N397AJ operated as Amerijet flight 827, a Supplemental Air Carrier operating under FAR Part 121, departed the Fort Lauderdale-Hollywood International Airport Runway 9 Left with Standing Water Less than one quarter (1/4) of an inch on the runway. (IOP 1, pp. 1 and 2; IOP 3, pp. 5 -10; IOP 4 - 5.)

The flight was operated without adjusting the maximum takeoff weight to that required by the Airplane Performance Manual, contrary to the Airplane Operating Manual. The aircraft weight and V1 degredations required for this flight, as the aircraft was configured, for runways with standing water of less than one quarter inch were 17,000 pounds and 28 knots. (IOP 3, pp. 5 - 10; IOP 6 - 12.)

The aircraft was taken off at a weight 17,000 pounds greater than allowed and at an indicated V1 airspeed 28 knots faster than allowed for conditions thus degrading the performance capability. (IOP 6 and 12.)

By virtue of the above, the flight was further operated████████████████████ "in a careless or reckless manner so as to endanger the life or property of another".

3

EIR 00SO170014

SECTION C - ITEMS OF PROOF

| IOP | #PAGES | DESCRIPTION |
|---|---|---|
| 1 | 2 | VIS OPERATOR INFORMATION |
| 2 | 3 | COPIES OF PERTINENT FAR PARTS 1, 121 AND 91 |
| 3 | 10 | LETTER OF COMPLAINT FROM PATRICK S. MAJOR |
| 4 | 2 | REQUEST FOR ATC TAPE FROM FLL ATCT AND TAPE |
| 5 | 2 | TYPED TRANSCRIPT OF ATCT TAPE |
| 6 | 3 | PAGES - AOM, NAVTECH, PERFORMANCE MANUAL |
| 7 | 3 | ISIS AIRMAN INFORMATION/VIOLATION HISTORY |
| 8 | 2 | PAGES FROM WEIGHT AND BALANCE MANUAL |
| 9 | 1 | AIRCRAFT LOG BOOK MAINTENANCE LOG PAGE |
| 10 | 1 | AMERIJET FLIGHT RELEASE |
| 11 | 1 | WEATHER SHEET |
| 12 | 1 | B-727-200C LOAD PLAN/WEIGHT AND BALANCE |
| 13 | 3 | FLIGHT ENGINEERS LOCAL ADDRESS |
| 14 | 2 | LOI SENT VIA CERTIFIED MAIL - RETURNED UNCLAIMED |
| 15 | 2 | LOI SENT VIA REGULAR MAIL |
| 16 | 1 | RESPONSE TO LOI |

```
+------------------------------------------------------------------------+
|  ISIS Air Operator (VIS) Report  Air Operator Vital Information        |
+------------------------------------------------------------------------+
| Air Operator:  PCSA    AMERIJET INTERNATIONAL INC                      |
|                                                                        |
|                                                                        |
| Air Operator Vital Info--- Validation Date: 1999 08 25                 |
| Primary DBA                                                            |
|                                                                        |
| Other DBA                                                              |
|                                                                        |
|                                                                        |
|                                                                        |
|                                                                        |
| Address:  AMERIJET INTERNATIONAL INC  City:   FT LAUDERDALE            |
|           498 SW 34TH STREET          State:  FL                       |
|                                       Zip:    33315                    |
| Phone:    954-359-0077  Ext. 11                                        |
+------------------------------------------------------------------------+
```

```
+------------------------------------------------------------------------+
|  ISIS Air Operator (VIS) Report  Air Operator Regulatory Information   |
+------------------------------------------------------------------------+
| Air Operator:  PCSA  ·  AMERIJET INTERNATIONAL INC        CHDO:  SO17  |
|                                                                        |
|                                                                        |
| Exemp. Auth:                    Other Deviat. Auth: N                  |
| FAR Regulation: 121             Crew Training:      CONTRACT OUT MOD/AMT|
| National Use:                   Examining Auth:                        |
| HAZMAT: N     Applicable Airports:                                     |
|                                                                        |
|                                                                        |
|                                                                        |
|                                                                        |
|                                                                        |
|                                                                        |
|                                                                        |
+------------------------------------------------------------------------+
```

1/2          I.O.P. # 1

"Medical certificate" means acceptable evidence of physical fitness on a form prescribed by the Administrator.

"Military operations area" (MOA) means an airspace that is established outside Class A airspace to separate or segregate certain nonhazardous military activities from IFR Traffic and to identify for VFR traffic where these activities are conducted.

"Minimum descent altitude" means the lowest altitude, expressed in feet above mean sea level, to which descent is authorized on final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure, where no electronic glide slope is provided.

"Minor alteration" means an alteration other than a major alteration.

"Minor repair" means a repair other than a major repair.

"Navigable airspace" means airspace at and above the minimum flight altitudes prescribed by or under this chapter, including airspace needed for safe takeoff and landing.

"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time.

"Nonprecision approach procedure" means a standard instrument approach procedure in which no electronic glide slope is provided.

"Operate," with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in §91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).

"Operational control," with respect to a flight, means the exercise of authority over initiating, conducting, or terminating a flight.

"Overseas air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct of furtherance of a business or vocation, in commerce between a place in any State of the United States, or the District of Columbia, and any place in a territory or possession of the United States; or between a place in a territory or possession of the United States, and a place in any other territory or possession of the United States.

"Overseas air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce —

(1) Between a place in a State or the District of Columbia and a place in a possession of the United States; or

(2) Between a place in a possession of the United States and a place in another possession of the United States;

whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Over-the-top" means above the layer of clouds or other obscuring phenomena forming the ceiling.

"Parachute" means a device used or intended to be used to retard the fall of a body or object through the air.

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

"Pilotage" means navigation by visual reference to landmarks.

"Pilot in command" means the person who:

(1) Has final authority and responsibility for the operation and safety of the flight;

Ⓐ (2) Has been designated as pilot in command before or during the flight; and

(3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight.

"Pitch setting" means the propeller blade setting as determined by the blade angle measured in a manner, and at a radius, specified by the instruction manual for the propeller.

"Positive control" means control of all air traffic, within designated airspace, by air traffic control.

"Powered-lift" means a heavier-than-air aircraft capable of vertical takeoff, vertical landing, and Ⓐ low speed flight that depends principally on engine-driven lift devices or engine thrust for lift during these flight regimes and on nonrotating airfoil(s) for lift during horizontal flight.

"Precision approach procedure" means a standard instrument approach procedure in which an electronic glide slope is provided, such as ILS and PAR.

1/3

I.O.P. # 2

© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED

## SUBPART G — ADDITIONAL EQUIPMENT AND OPERATING REQUIREMENTS FOR LARGE AND TRANSPORT CATEGORY AIRCRAFT

**91.601   APPLICABILITY**

This subpart applies to operation of large and transport category U.S.-registered civil aircraft.

**91.603   AURAL SPEED WARNING DEVICE**

No person may operate a transport category airplane in air commerce unless that airplane is equipped with an aural speed warning device that complies with §25.1303 (c)(1).

**91.605   TRANSPORT CATEGORY CIVIL AIRPLANE WEIGHT LIMITATIONS**

(a)   No person may take off any transport category airplane (other than a turbine-engine-powered airplane certificated after September 30, 1958) unless —
   (1)   The takeoff weight does not exceed the authorized maximum takeoff weight for the elevation of the airport of takeoff;
   (2)   The elevation of the airport of takeoff is within the altitude range for which maximum takeoff weights have been determined;
   (3)   Normal consumption of fuel and oil in flight to the airport of intended landing will leave a weight on arrival not in excess of the authorized maximum landing weight for the elevation of that airport; and
   (4)   The elevations of the airport of intended landing and of all specified alternate airports are within the altitude range for which maximum landing weights have been determined.

(b)   No person may operate a turbine-engine-powered transport category airplane certificated after September 30, 1958, contrary to the Airplane Flight Manual, or take off that airplane unless —
   (1)   The takeoff weight does not exceed the takeoff weight specified in the Airplane Flight Manual for the elevation of the airport and for the ambient temperature existing at the time of takeoff;
   (2)   Normal consumption of fuel and oil in flight to the airport of intended landing and to the alternate airports will leave a weight on arrival not in excess of the landing weight specified in the Airplane Flight Manual for the elevation of each of the airports involved and for the ambient temperatures expected at the time of landing;
   (3)   The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet). Wet runway distances associated with grooved or porous friction course runways, may be used only for runways that are grooved or treated with a porous friction course (PFC) overlay, and that the operator determines are designed, constructed, and maintained in a manner acceptable to the Administrator.
   (4)   Where the takeoff distance includes a clearway, the clearway distance is not greater than one-half of —
      (i)   The takeoff run, in the case of airplanes certificated after September 30, 1958, and before August 30, 1959; or
      (ii)   The runway length, in the case of airplanes certificated after August 29, 1959.

(c)   No person may take off a turbine-engine-powered transport category airplane certificated after August 29, 1959, unless, in addition to the requirements of paragraph (b) of this section —
   (1)   The accelerate-stop distance is no greater than the length of the runway plus the length of the stopway (if present); and
   (2)   The takeoff distance is no greater than the length of the runway plus the length of the clearway (if present); and
   (3)   The takeoff run is no greater than the length of the runway.

2/3          **I.O.P. # 2**

**Ⓐ** Amend #256 eff 3-20-98

(d) Any person taking off or landing a helicopter certificated under *part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting height-speed envelope established for that helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

**91.11   PROHIBITION AGAINST INTERFERENCE WITH CREWMEMBERS**

No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

**91.13   CARELESS OR RECKLESS OPERATION**

(a) *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

(b) *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

**91.15   DROPPING OBJECTS**

No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property. However, this section does not prohibit the dropping of any object if reasonable precautions are taken to avoid injury or damage to persons or property.

**91.17   ALCOHOL OR DRUGS**

(a) No person may act or attempt to act as a crewmember of a civil aircraft —
(1) Within 8 hours after the consumption of any alcoholic beverage;
(2) While under the influence of alcohol;
(3) While using any drug that affects the person's faculties in any way contrary to safety; or
(4) While having .04 percent by weight or more alcohol in the blood.
(b) Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.
(c) A crewmember shall do the following:
(1) On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when —
(i) The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
(ii) The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.
(2) Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates percentage by weight of alcohol in the blood.

3/3        **I.O.P. #2**

© JEPPESEN SANDERSON, INC. 1990. ALL RIGHTS RESERVED

Hand Delivered

John C. Maslowski
Principal Operation Inspector
FAA FSDO #13
1050 Lee Wagener Blvd. Suite 201
Ft. Lauderdale, FL 33315

RECEIVED BY

OCT 1 1999

FEDERAL AVIATION ADMINISTRATION
FSDO
FT. LAUDERDALE

Hand Delivered



Patrick & Beth Major

I.O.P. # 3
1/10



**Patrick Major**

John C. Roseborough
Principal Operations Inspector
Federal Aviation Administration
Flight Standards district Office - 17
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315
Voice: (954) 356-7523, Extension 154
Fax   (954) 356-7531

10-01-99

Dear John,

Following is the text of three memo's and letters regarding Amerijet Flight 827, 08-17-99, which you and I discussed, Thursday, September 16th.

I reported the incident to the director of operations and chief pilot as required by Amerijet's GOM, recommending the safety officer be notified as well, then sent a report to NASA's ASRS (Aviation Safety Reporting System). Amerijet's GOM further requires that its POI be notified: Thirty days after the incident, you told me it had yet to be reported by anyone other than me.

John, the termination of my employment is a classic whistle blower scenario; the only event between my being an employee in good standing and being fired because Amerijet had, "...lost confidence in my abilities as an airman..." is the complaint regarding a takeoff 15,000Lbs over the maximum performance limit for conditions at the field. That is the subject of a complaint to the DOT Inspector's General's Office. But, I am most concerned that if Amerijet does not immediately change its policies regarding takeoff from wet runways, someone is going to get hurt. The question is, will the FAA take action before that happens, or wait until newspaper headlines, carnage, catastrophe and public outrage leave it no other choice.

If I can be of further assistance, do not hesitate to contact me. The cellular phone is the best way to reach me.

Warmest Regards,

Patrick Major

**I.O.P. #** 3

2/10



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
Pete Steele, Director of Operations and Interim Chief Pilot.

**Date:** 08-18-99

**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP, 08-17-99.

Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

Warmest Regards,

Pat

**I.O.P. # 3**

3/10





**Patrick Major**

**FAX**
The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.

**FAX To:** David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
**Date:** 08-25-99
**Subject:** NASA ASRS Report

Greetings Dave,

Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence you would ever see it if I did not submit it to you directly.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, accept my apologies.

Warmest Regards,

Pat

**I.O.P. # 3**
**4 / 10**





Copy for Qtw Naschorayh,   **Patrick Major**
PoI, FAA, FSDO -17

### NASA, Aviation Safety Reporting System
### (ASRS report)

**Report Date:** 08-18-1999, Incident Date: 08-17-99 ⟵
**Time:** 23:40z, Location: KFLL,
**Type of Operation:** FAR Part 121, Supplemental Air Carrier-Cargo Only.
**Type of Aircraft:** B-727/200, Advanced, w/Pemco Cargo Door Modification
**Engines:** JT8D-15 (3).
**Reported by:** First Officer, Flight Experience: 7,700hrs.,
**Ratings:** Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, FAR Part 142 Certified Pilot and Flight
Engineer Instructor/Boeing 727.
**Flight Phase:** Takeoff, Airspace: Class C.
**Weather Factors:** Thunderstorms in vicinity, rainshowers overhead, contaminated runway;
conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening. When I arrived, the
field was under heavy rainshowers. Anticipating a max-weight performance-limited takeoff
on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the Navtech runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff controversy
which took place June 08, 1999, out of MIA. On that rainy morning, a Continental 727 had
taxied into position and hold RW-12, then declined takeoff clearance... requesting full length
9L, instead. The night before it had rained ten inches. It was raining at the time. While
Tower had not provided a runway condition report, the runways were obviously wet. Amerijet
flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without
prompting from the captain, I declined, reminding Tower that our flight required full-length 9L.
The captain chastised me for refusing RW-12 against his wishes (even though we had just
finished discussing that the runway analysis did not support it, even on a dry day, even if we
believed the weights reported by ramp personnel). The captain insisted I radio-back Tower
and accept RW-12. I demurred. After a brief discussion, AJT 823 finally departed full-length
9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300'
longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.



**I.0.P. # 3**

However, my refusal to accept RW-12 became the subject of a disciplinary complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation against me for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

In both my report and addendum to the chief pilot concerning the June-08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. 9L FLL is 355 feet shorter than 12 in MIA. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), regardless how wet a runway, Amerijet flight crews are taught by the training department and warned by dispatch personnel to consider all runways "Dry" for performance planning purposes unless there exists a contamination report containing the specific words, "Standing Water." Though there are frequent storms in the area, rarely are contamination reports conducted at South Florida Airports. Most airlines encourage their crews to simply accept the "Standing Water less than 1/4"" penalty...reasoning that the penalty applies to depths as shallow as 1/8"... and is clearly the safest option. Some Boeing performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot max-weight V1 speed reduction for runways that are, "...well-soaked with water but do not have large areas of actual standing water." But absent a contamination report specifically including the term "Standing Water", Amerijet considers all runways dry. Considering drag induced as aircraft tires displace water on the runway surface, additional drag produced by water spraying against the fuselage and wings, as well as reduced braking implications, that policy could be a recipe for disaster. As of August 17, 1999, these concerns had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 355' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they had been June 08. Even so, the dispatcher I queried reported to me that to his understanding Amerijet performance policies do not observe weight penalties unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers imply a braking degradation and an impediment to acceleration when runway surfaces are wet ... irrespective of whether or not the runway contains "Standing water." "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights," I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' actually reported on the runway, it's dry."

**I.O.P. #3**

6/10

As aircraft 397AJ was loaded for departure, I explained my question to the check airman who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safest solution and accept the "Standing Water ≤ 1/4" weight and V1 penalty. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain jokingly dismissed my concern, "We'll have to takeoff between the water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers. He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us ... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway surface. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst adjacent the channels of accumulated rubber left by successive landing and departing aircraft. No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a packs-off takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect it.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch. AJT 827 is cleared for takeoff, turn right heading one zero zero'." As Tower began its transmission, the captain advanced the throttles and released the brakes. Probably because the aircraft was already rolling, tower issued the takeoff clearance without pause or delay. Before I could even begin to reply to the report and clearance, the aircraft was accelerating down the runway. Previously, I thought I would have a chance to prevent

**I.O.P. # 3**

7/10

the takeoff when the controller inevitably asked, "AJT 827, state your intentions." He did not. Suddenly, I was isolated and out of options.    Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. Perhaps, I should have. I feared an aborted takeoff on a wet runway with the captain and I fighting over the controls could have been just as dangerous.    If all three engines operated normally, if no windshear was encountered, perhaps the takeoff would be safer than a mutiny-abort on a wet runway in driving rain. AJT 827 used all available runway.    The captain rotated well inside the alternating red and white lights at an indicated airspeed five knots below V1.    The main wheels broke ground at the last possible instant and the aircraft crossed the airport boundary at approximately 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.  I called-out the fluctuations then held my breath, praying for altitude.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that?  This airline is not approved for GPS navigation." (referring to the GPS installed in the aircraft, but not approved in the ops specs).

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits of Class II navigation described in the Ops Specs.  I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked. "Do you realize how incongruent that sounds coming from a check airman who just goaded a flight crew into taking off from a contaminated runway into possible windshear fifteen thousand pounds over the maximum performance limit? Even if I am wrong about navigating direct, ...and I don't think I am, one could get us violated, the other will get us killed.  What is safe about that?"

AJT flight 827 exceeded aircraft limitations and violated FAA regulations in flagrant disregard for the most basic of air safety principles and CRM (cockpit resource management).  It took off from a contaminated runway weighing fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the consequences inevitably bestowed upon any air carrier which actively cultivates a culture of noncompliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on

**I.O.P. #3**

runways that are obviously contaminated, but have not been officially described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning policies, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the official report.

Among my many mistakes August 17, was letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Although it should not have been necessary, due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the 'sacred cow' brother of its vice president, director of operations, and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Admittedly, that was the captain's job, but had I insisted on such a plan before the aircraft taxied out of the ramp for takeoff, I may have avoided the circumstances which placed me and the rest of the crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff once such a report was issued. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...as well as the strident actions required to prevent takeoff once initiated. But with the aircraft already rolling, Tower probably figured he had his answer.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the check airman and captain prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Would that have worked? Honestly, that did not occur to me until later. I made a judgment call and elected not to intervene once the takeoff roll began. Not a day passes that I don't relive the possible consequences of my choice.

Contributing factors included my deference to authority in the cockpit, not only with regard to the presence of a check airman who I held in high regard, and that particular captain (most other captains would not have been out there to start with), but pertaining to the recency of



I.O.P. # 3

what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and ongoing concern for flight safety and regulatory compliance at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way, impervious to the legitimacy of their concerns, by denying them promotional and professional opportunities, abusing them in the simulator if need be, terminating their employment and exploiting the PRIA (Pilot Records Improvement Act, 1996) to soil their careers... while sending an unmistakably clear message to other flight crew lest they, too, consider showing unwelcome interest in flight safety.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

Copy for John Roseborough
POI, FAA, FSDO - 17

10-01-95

I.O.P. # 3
10/10

# Memorandum

**U.S. Department
of Transportation
Federal Aviation
Administration**

Ft. Lauderdale International ATC Tower
4150 S.W. 12 Terrace
Ft. Lauderdale, Fl. 33315

Subject **INFORMATION:** Tape Request

Date: October 25, 1999

Reply To
From: Manager                                                                   Attn. of:  FLL-2

Ft. Lauderdale Int'l ATC Tower

To: Manager, Ft Lauderdale FSDO-17

Per telephone request of October 22, 1999, the following tape recording is enclosed.

Ft. Lauderdale ATC Tower
August 17, 1999 UTC
Ground Control 2340 UTC-0000 UTC
Local Control North 2340 UTC – 0000 UTC.

Please advise if we can be of any further assistance.

Ronald S. Boyd

**I.O.P. # 4**
**1/2**

4

FORT LAUDERDALE INTERNATIONAL AIR TRAFFIC CONTROL TOWER CERTIFIED RE-RECORDING OF AMERIJET (PCSA) FLIGHT 827 OCCURRING AUGUST 17, 1999 DURING THE TIME PERIOD FROM 2340 UTC - 0000 UTC (1940 - 2000 LOCAL DAYLIGHT SAVINGS TIME).

THE RE-RECORDING WAS PREPARED BY MICHAEL T. JONES, SUPPORT SPECIALIST AT THE FORT LAUDERDALE-HOLLYWOOD AIR TRAFFIC CONTROL TOWER.

THE COUNTER NUMBERS BELOW REPRESENT EITHER AMERIJET OR FORT LAUDERDALE ATC VOICE COMMUNICATIONS AS PERTAIN TO AMJ FLIGHT 827. MOST OTHER VOICE COMMUNICATIONS HAVE NOT BEEN IDENTIFIED WITH COUNTER NUMBERS. DUE TO THE EXTRANEOUS NOISE EMITTED IN THE SIDETONE OF THE RE-RECORDING, A CLEARER VOICE TRANSMISSION/RENDITION CAN BE HEARD WHEN PLAYED ON A STEREO RECORDER/PLAYER WITH THE VOLUME ON ONE SIDE TURNED LOWER.

| COUNTER (APPROX.) | DIALOGUE | BY |
|---|---|---|
| 129 | DELAY AHEAD? | AMJ |
| 138 | RWY CONDITION WET, NO REPORTS | ATC |
| 146 | WE'RE GONNA NEED A STANDING WATER REPORT | ATC |
| 168 | AMJ 827 REQUESTS TAXI | AMJ |
| 171 | AMJ 827 HOLD SHORT OF TAXIWAY BRAVO, STAND BY | ATC |
| 183 | RAMP 1 CALLS FLL ATCT | |
| 194 | AMJ 827 CALLS ASKING FOR THE CURRENT WINDS | AMJ |
| 198 | AMJ 827, WILL YOU BE ABLE TO DEPART | ATC |
| 203 | AMJ 827, TAXI TO RUNWAY 9 LEFT | ATC |
| 239 | RAMP ONE CALLS | |
| 241 | PROCEED | ATC |
| 243 | AJT IS ASKED IF THEY CAN ACCEPT DEPARTURE | ATC |
| 276 | RAMP ONE CALLS | |

279 RAMP ONE ADVISES LESS THAN ¼ INCH, GOOD DRAINAGE, SLIGHT STANDING WATER ABOUT 6 FEET ON EITHER SIDE OF CENTERLINE

349 CONVECTIVE SIGMET 51E AVAILABLE                ATC

I.O.P. # 5

1/2

5

433    LOCAL 'CONTROL, NORTH POSITION COMMUNICATIONS BEGIN

464    DELTA 312 HEAVY (LOCKHEED L-1011, TRISTAR)
466    DELTA 312, CLEARED FOR TAKEOFF                    ATC

512    US AIR 2335 CALLS TO INQUIRE ABOUT WHAT WEATHER ATC
SHOWS WITHIN 15 MILES OF FLL. ATC ADVISES THAT MAIN BODY
OF STORM WILL BE AVOIDED WITH A 110 DEGREE HEADING AFTER
TAKEOFF (20 DEGREES RIGHT OF TAKEOFF HEADING)

584    AMJ827 CALLS                                      AMJ
585    AMJ 827, ARE YOU READY FOR DEPARTURE              ATC

586    YES SIR, 827, YOU'LL PASS ON THAT RUNWAY REPORT
WHEN YOU GET IT, RIGHT?                               AMJ

587    YES, HE'S OUT THERE INSPECTING IT RIGHT NOW       ATC

589    AMJ 827, GO OUT B2 AND BACK TAXI INTO POSITION AND
HOLD                                                  ATC

607    AMJ 827, HE REPORTS THERE'S SOME STANDING WATER
LESS THAN A QUARTER ON AN INCH                        ATC

609    SOME STANDING WATER LESS THAN A QUARTER OF AN
INCH, AMJ 827 READY FOR TAKEOFF                       AMJ

610    AMJ 827 RUNWAY 9 LEFT CLEARED FOR TAKEOFF, TURN
RIGHT HEADING 110                                     ATC

611    RIGHT HEADING 110, CLEARED FOR TAKEOFF, AMJ 827,
THANK YOU MUCH.                                       AMJ

832    CHANGE YOUR CODE TO 1153                          ATC
833    1123, 827                                         AMJ

       THANK YOU, CONTACT MIAMI DEPARTURE                ATC

I.O.P. # 5
2/2

**AmeriJet**

| | | GOM. VOL—3 | |
|---|---|---|---|
| CHAPTER | 4 – OPERATIONS PROCEDURES | REFERENCE: | 4:1:55 |
| SECTION | 1A – OPERATING PROCEDURES | ISSUED: | 09-01-85 |
| SUBJECT | 55 – ADVERSE WEATHER TAKEOFF AND CLIMB | SUPERSEDES: | 0 |
| | | PAGE: | 1 |

ADVERSE WEATHER TAKEOFF AND CLIMB - Reference 4:1:55

Takeoff Limitations

Takeoff should not be attempted if the following limitations are exceeded:

- Dry snow more than 6 inches deep.

- Slush or wet snow more than 1/2 inch deep.

- Water more than 1/4 inch deep.

When values less than the aforementioned limits exist, check Performance Manual for appropriate reductions to maximum takeoff gross weight.

> CAUTION: DURING TAKEOFF, SNOW AND SLUSH PICKED UP BETWEEN THE NOSE-WHEEL TIRES MAY BE THROWN BACK AND PACKED INTO THE RAM AIR INLET, CAUSING BOTH AIR CONDITIONING PACKS TO TRIP OFF. TO REDUCE THE POSSIBILITY OF THIS OCCURRING, THE RAM AIR DOORS MAY BE POSITIONED TO THE FULL CLOSED POSITIONS JUST PRIOR TO TAKEOFF.

Airplane Control

Exercise extreme caution in crosswinds. Normally, it is recommended that a runway more into the wind be requested when crosswind components over 15 kts are reported on known slippery runways.

> CAUTION: ENSURE THAT PARKING BRAKE IS RELEASED BEFORE STARTING TAKEOFF ROLL ON ICE OR SNOW COVERED RUNWAYS.

Setting Takeoff Thrust

Align the airplane with the runway before increasing thrust. If engine anti-ice is being used for takeoff, ensure that engine thrust is increased to the highest practicable setting (80% N1 recommended) for 10 to 15 seconds before setting takeoff thrust. Observe stable engine operation before brake release.

Engine inlet ice can affect EPR indications. When takeoff thrust is set in icing conditions, crosscheck all engine instruments. Ensure that the indications are reasonable and that no engine limits are exceeded. Specifically, compare the N1 readings with the anticipated value and be prepared to reject the takeoff if a discrepancy exists between the EPR and N1 readings.

If the airplane starts to slide on ice or snow, release the brakes and begin the takeoff roll, but ensure that the instrument crosscheck is accomplished, including the comparison of the EPR and N1 readings. Apply firm nosedown elevator pressure to aid nose wheel steering effectiveness. Don't allow the lag in nose wheel steering effectiveness to cause over-controlling on slippery surfaces.

**I.O.P. # 6**

**1/3**

NAVTECH

The Runway Analysis provides data for takeoff and landing performance in adverse weather conditions for the B727-200 powered by JT8D-15/17 engines. Data are presented for operations on wet, standing water and snow covered runways in accordance with the guidelines and recommendations of FAA.

<u>WET RUNWAY</u> – A runway is considered wet when it is well soaked but without significant areas of standing water (depth less than 1/8 inch or 3mm of standing water). A runway is considered to be well soaked when there is sufficient moisture on the runway surface to cause it to appear reflective.

<u>RUNWAY CONTAMINATED BY STANDING WATER, SLUSH OR SNOW</u> – A runway is considered contaminated when at least 25% of the runway within the required length and width being used is covered by slush, standing water or snow greater than 3mm of equivalent water depth.

> • *Additional consideration: If the contaminates are lying on that portion of the runway where the high speed part of the takeoff roll will occur, it MAY BE appropriate to consider the runway contaminated.*

Daniel Liu

Aircraft Performance Engineer
Navtech Systems Support Inc.

**I.O.P. # 6**
**2/3**

**Navtech Systems Support Inc.**
175 Columbia Street West, Suite 102     Waterloo, Ontario, Canada, N2L 5Z5     Phone (519) 747-1170     Fax (519) 747-1827

SITA - YYZNSCR    AFTN - CYYZXNSX    ARINC - YKFNSCR

AMERIJET INTERNATIONAL    FORT LAUDERDALE, FL

B-727-200   JT8D-15      HOLLYWOOD INTL

KFLL   09L       **FLAPS**   **20**

| | | | | | A/C | POD | N1% | GO | ENG | ANTI-ICE | A/C | PACKS ON | TORA = 9000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEMP | | ZERO | CLIMB | OFF | MAX | FOR | ARND | ZERO | CLIMB | OFF | NOSE BRKS OFF | TODA = 9000 |
| F | C | WIND | LIMIT | (+) | EPR | T/O | EPR | WIND | LIMIT | (+) | 210 MPH TIRE | ASDA = 9000 |

ELEV = 11    GRAD = -.01%

| TEMP F | C | ZERO WIND | CLIMB LIMIT | A/C OFF (+) | POD MAX EPR | N1% FOR T/O | GO ARND EPR | ENG ZERO WIND | ANTI-ICE CLIMB LIMIT | A/C OFF (+) |
|---|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2000 C | 1980 | 0 C | 2.09 | 90 | 2.07 | 1975 | 1957 | 0 |
| 0 | -18 | 2000 C | 1980 | 0 C | 2.09 | 91 | 2.07 | 1983 | 1957 | 0 |
| 10 | -12 | 2000 C | 1980 | 0 C | 2.09 | 92 | 2.07 | 1983 | 1957 | 0 |
| 20 | -7 | 2000 C | 1980 | 0 C | 2.09 | 93 | 2.07 | 1983 | 1957 | 0 |
| 30 | -1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 32 | 0 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 34 | 1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 36 | 2 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 38 | 3 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 40 | 4 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 42 | 6 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 44 | 7 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 46 | 8 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 48 | 9 | 1999 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1982 | 1957 | 0 |
| 50 | 10 | 1996 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1979 | 1957 | 0 |
| 52 | 11 | 1993 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 54 | 12 | 1990 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 56 | 13 | 1987 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 58 | 14 | 1984 C | 1980 | 0 C | 2.09 | 97 | 2.07 | | | |
| 60 | 16 | 1979 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 62 | 17 | 1975 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 64 | 18 | 1971 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 66 | 19 | 1967 R | 1969 | 2 R | 2.09 | 97 | 2.07 | | | |
| 68 | 20 | 1963 R | 1969 | 6 R | 2.09 | 98 | 2.07 | | | |
| 70 | 21 | 1961 R | 1969 | 8 R | 2.09 | 98 | 2.07 | | | |
| 72 | 22 | 1960 R | 1969 | 9 R | 2.09 | 98 | 2.07 | | | |
| 74 | 23 | 1958 R | 1969 | 11 R | 2.09 | 98 | 2.07 | | | |
| 76 | 24 | 1956 R | 1969 | 13 R | 2.09 | 98 | 2.07 | | | |
| 78 | 26 | 1952 R | 1969 | 14 R | 2.09 | 98 | 2.07 | | | |
| 80 | 27 | 1949 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 82 | 28 | 1946 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 84 | 29 | 1942 R | 1970 | 15 R | 2.09 | 99 | 2.07 | | | |
| 86 | 30 | 1928 R | 1951 | 15 R | 2.08 | 99 | 2.07 | | | |
| 88 | 31 | 1917 R | 1936 | 14 R | 2.07 | 99 | 2.07 | | | |
| 90 | 32 | 1906 R | 1921 | 13 R | 2.06 | 99 | 2.07 | | | |
| 92 | 33 | 1895 R | 1906 | 11 R | 2.05 | 98 | 2.06 | | | |
| 94 | 34 | 1884 R | 1891 | 7 R | 2.04 | 98 | 2.05 | | | |
| 96 | 36 | 1861 R | 1861 | 0 R | 2.02 | 98 | 2.04 | | | |
| 98 | 37 | 1849 C | 1847 | 0 C | 2.01 | 98 | 2.03 | | | |
| 100 | 38 | 1837 C | 1832 | 0 C | 2.01 | 98 | 2.02 | | | |
| 102 | 39 | 1826 C | 1818 | 0 C | 2.00 | 97 | 2.01 | | | |
| 104 | 40 | 1814 C | 1803 | 0 C | 1.99 | 97 | 2.00 | | | |
| 106 | 41 | 1803 C | 1789 | 0 C | 1.98 | 97 | 1.99 | | | |
| 108 | 42 | 1792 C | 1774 | 0 C | 1.97 | 97 | 1.98 | | | |
| 110 | 43 | 1781 C | 1759 | 0 C | 1.96 | 97 | 1.96 | | | |
| 112 | 44 | 1770 C | 1744 | 0 C | 1.95 | 97 | 1.95 | | | |
| 114 | 46 | 1748 C | 1715 | 0 C | 1.93 | 96 | 1.94 | | | |
| 116 | 47 | 1736 C | 1701 | 0 C | 1.92 | 96 | 1.93 | | | |
| 118 | 48 | 1724 C | 1687 | 0 C | 1.92 | 96 | 1.92 | | | |
| 120 | 49 | 1712 C | 1672 | 0 C | 1.91 | 96 | 1.91 | | | |

----NOTES----

1. CTR ENG EPR: MOD-A   NON-MOD
   ICE OFF     +.03      +.01
   ICE ON     NONE      -.02

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON    +.04

3. FLAP RETRACT HT(OCH)
   = 811 PTMSL

4. OBST: HT(FT AGL) DIST(NM)
      50        1.81

DATE: 12/09/92

### GROSS WEIGHT CORRECTIONS

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE 1 DEGREE F HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    0 LBS/KT EFF HEAD W
        SUB FROM ZERO WIND 1301 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
*WIND- *RUNWAY SHORTENING   *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
*MEL PERFORMANCE DECREMENTS

### RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS

| | STANDING WATER SLUSH OR WET SNOW -IN- | REDUCE ZERO WIND W BY: -LBS- | REDUCE V1 SPEED BY: -KNOTS- |
|---|---|---|---|
| DRY SNOW -IN- | | | |
| | < 1/4 | 17000 | 28 ← |
| 3 1/2 TO 6 | 1/4 TO 1/2 | 30000 | 25 |
| | ICE | 17000 | 28 |
| | ANTI-SKID INOP | 8500 | 18 |

---

**LANDING DATA**       PACKS ON

| | | | --------- DRY --------- | | | | --------- WET --------- | | | | | SUB LB/F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MAX WT | | | | | MAX WT | | | | APT | ABOVE | MAX |
| LNDG | ANTI | | ZERO | HW | CRIT | TW | ZERO | HW | CRIT | TW | CRIT | CRIT | OPER |
| FLAP | LENGTH | SKID | WIND | ADJ | TW | ADJ | WIND | ADJ | TW | ADJ | TEMP | TEMP | TEMP |
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 143 | 0 | 120 |

* = CHECK MAX STRUCTURAL WT

3/3      **I.O.P.# 6**

.Page     1                                                     99-11-04  10:03:47

```
+(WCAISM1)---------------------------------------------------------+
¦ ISIS Airman Report              CAIS Information - Basic Information ¦
¦ Cert Pfx:     Cert No: 344567857  Cert Sfx:                      ¦
+-----------------------------------------------------------------+
¦ Name:  WISE, BRETT OGDEN                          Name-Sfx:      ¦
¦                                                                  ¦
¦ Status:          Info:     Name/Address Source:  Airm            ¦
¦ Date of Address Update: 1993 05 04   Citizenship:  USA           ¦
¦ Street:                              County:  059                ¦
¦ City:                     State:      Zip:                       ¦
¦ Country:                                                         ¦
¦ TOT CIVIL HOURS: 04600                                           ¦
+-----------------------------------------------------------------+
```
  THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.

```
+(WCAISM3)---------------------------------------------------------+
¦ ISIS Airman Report                      CAIS Information - Medical ¦
¦ Cert Pfx:     Cert No: 344567857  Cert Sfx:            Information ¦
+-----------------------------------------------------------------+
¦ Medical Information for: WISE, BRETT OGDEN                       ¦
¦   Class:           First                                         ¦
¦   Certificate Desc.:  CLEAR                                      ¦
¦                                                                  ¦
¦   Medical Date:  1999 03 11   Medical ID#:  99046910   Pathology: ¦
¦                                                                  ¦
¦   Restriction:                                                   ¦
¦                                                                  ¦
¦                                                                  ¦
¦                                                                  ¦
+-----------------------------------------------------------------+
```
  THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.



1/3          I.O.P. # 7

```
+(WCAISM2)----------------------------------------------------------------+
¦ ISIS Airman Report                        CAIS Information - Certificate ¦
¦ Cert Pfx:     Cert No: 344567857  Cert Sfx:              Information·     ¦
+-------------------------------------------------------------------------+
¦ Pilot Information for:          WISE              BRETT OGDEN             ¦
¦ Cert-Level:  COMMERCIAL PILOT                                            ¦
¦ Rating/Level:                                                            ¦
¦  AIRPLANE SINGLE ENGINE LAND/COMMERCIAL PILOT                            ¦
¦  AIRPLANE MULTIENGINE LAND/COMMERCIAL PILOT                              ¦
¦  INSTRUMENT AIRPLANE/COMMERCIAL PILOT                                    ¦
¦                                                                          ¦
¦ Type Rating/Level:                                                       ¦
¦                                                                          ¦
¦                                                                          ¦
¦                                                                          ¦
¦                                                                          ¦
¦ Date of Issue: 1998 09 28   Update Date:  1998 09 28                     ¦
¦          Seal: Blue         Cert Status:  Active                         ¦
+-------------------------------------------------------------------------+
```

```
+(WCAISM2)----------------------------------------------------------------+
¦ ISIS Airman Report                        CAIS Information - Certificate ¦
¦ Cert Pfx:     Cert No: 344567857  Cert Sfx:              Information      ¦
+-------------------------------------------------------------------------+
¦ Flt Engineer Info              WISE              BRETT OGDEN             ¦
¦ Cert-Level:  FLIGHT ENGINEER                                             ¦
¦ Rating/Level:                                                            ¦
¦  TURBOJET POWERED/FE                                                     ¦
¦                                                                          ¦
¦                                                                          ¦
¦ Type Rating/Level:                                                       ¦
¦                                                                          ¦
¦                                                                          ¦
¦                                                                          ¦
¦                                                                          ¦
¦ Date of Issue: 1998 09 28   Update Date:  1998 09 28                     ¦
¦          Seal: Black        Cert Status:  Active                         ¦
+-------------------------------------------------------------------------+
```

2/3          I.O.P. # 2

ISIS ACCIDENT/INCIDENT (AID) REPORT

NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 344567857
ISIS ACCIDENT/INCIDENT (AID) REPORT

NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 344567857

ISIS ENFORCEMENT (EIS) REPORT

NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00344567857
ISIS ENFORCEMENT (EIS) REPORT

NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00344567857

ISIS INSPECTION REPORT

NO INSPECTION RECORDS FOUND USING CERTIFICATE: 344567857
ISIS INSPECTION REPORT

NO INSPECTION RECORDS FOUND USING CERTIFICATE: 344567857

**I.O.P. #** 2

3/3

## WEIGHT AND BALANCE MANUAL

### General Information

| Aircraft No. | B.O.W Weight | Moment |
|---|---|---|
| N794AJ | 93,316 | 88178325 |
| N994AJ | 94,139 | 88105202 |
| N395AJ | 93,883 | 88124473 |
| N495AJ | 92,711 | 87181149 |
| N895AJ | 93,005 | 88056640 |
| N196AJ | 92,819 | 87773553 |
| N296AJ | 93,379 | 87734708 |
| N397AJ | 93,308 | 88534151 |
| N797AJ | 92,868 | 88022669 |
| N598AJ | 92,772 | 87088635 |

**I.O.P. # 8**

1/2



FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

1 6 SEP 1999

```
        . . A02 SLP159 CB DSNT APRDS T03060233 56022=
 KFLL 172053Z 03009KT 10SM FEW035CB SCT050 BCT150 SCT250 30/23,
       03000 RMK A02 SLP159 CB UC 8 T03000220 56015=
 TTPP 172100Z 06006KT 9999 FEW015CB SCT150 SCT150 30/23, NOSIG=
 TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
 TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
 TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
 TTPP 171900Z 08006KT 9999 FEW010CB BKN280 31/25 Q1012 NOSIG=
 TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
      Q1013 TEMPO SHRA=
 TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
 TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
 TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
 TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
 TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
 TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
 TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
 TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
 TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
 TFFF 171900Z 08012KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
 TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
 TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
 TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
 TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
      Q1014 NOSIG
      CB (S)=
 TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
      Q1014 NOSIG
      CB (S)=
 TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
      Q1014 NOSIG
      CB (S)=
 TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
      32/24 Q1014 NOSIG
      CB (S/WNW)=
 TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
      32/24 Q1014 NOSIG
      CB (WNW)=
 SVMG NO CURRENT REPORT.
 SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
 SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

 ------------
 FORECASTS
 ------------

 MIA
 KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
      BECMG 2122 09005KT NSW SCT025 BKN250
      FM0100 VRB04KT P6SM SCT025 SCT250
      BECMG 0406 VCSH
      FM1500 09010KT P6SM FEW030 SCT250=
 FLL
 KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
      BECMG 2122 NSW SCT025 BKN250
      FM0100 VRB04KT P6SM SCT025 SCT250
      BECMG 0406 VCSH
      FM1500 09010KT P6SM FEW030 SCT250=
 TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
      3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
 TTPP 171000Z 171212 08010G20KT 9999 SCT020 BKN300 PROB30 TEMPO 5000 SHRA FEW010CB BKN015
      PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
      BECMG 2223 08005KT=
 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
      TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
      TEMPO 0010 00000KT
      BECMG 1012 11012KT=
 TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
      TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
      TEMPO 0010 00000KT
      BECMG 1012 11012KT=
 TGPY 171600Z 171818 NIL=
 TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
      SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
      1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 ST050=
```



I.O.P. # 11

**B-727-200C LOAD PLAN**

**12-POSITION WEIGHT & BALANCE**

DATE: 17th Aug 99
FLIGHT NO. 827
ACN# N317
FROM FLL TO PaS
ALT ARPT(s): SVHG

AmeriJet INTERNATIONAL

------ Max. Cumulative Load 34,100 lbs. ------ | ------ Max. Cumulative Load 34,951 lbs. ------

| 1 PAS | 2 PAS | 3 | 4 PAS | 5 PAS | 6 PAS | 7 GP | 8 PAS | 9 PAS | 10 PAS | 11 PAS | 12 PAS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULD: 25049K | ULD: 1472TK | ULD: | ULD: 1494TK | ULD: 25091K | ULD: 114014 | ULD: 13221A | ULD: 13602K | ULD: 23452K | ULD: 23413A | ULD: 24110K | ULD: 25112K |
| DEST: EDE | DEST: EDE | DEST: | DEST: EDE | DEST: EDF | DEST: PaS | DEST: PaS | DEST: PiP | DEST: EDE | DEST: PiP | DEST: PiP | DEST: PiP |
| WT: 3190 | WT: 3368 | WT: | WT: 3060 | WT: 3640 | WT: 5460 | WT: 310 | WT: 7730 | WT: 3640 | WT: 4160 | WT: 3410 | WT: 3070 |
| 39000# MAX | 48000# MAX | 47200# MAX | 48000# MAX | 43200# MAX | 58400# MAX | 80000# MAX | 80000# MAX | 58400# MAX | 42400# MAX | 52800# MAX | 30000# MAX |

FORWARD HOLD | AFT HOLD

TOTAL WT. 1150 (6000# max.) | TOTAL WT. (6000# max.)

| 1A | 1B | 1C | 1D | | 2A | 2B | 2C | 2D |
|---|---|---|---|---|---|---|---|---|
| DEST: CAYK | DEST: | DEST: PaS | DEST: 575 | | DEST: | DEST: | DEST: 1600 | DEST: |
| WT: 60 | WT: | WT: 575 | WT: 575 | | WT: 1420 | WT: | WT: 1600 | WT: |
| 2+1A 5440# | 3+1B 8000# | 4+1C 5200# | 5+1D 8000# | | 9+2A 8000# | 10+2B 4240# | 11+2C 8000# | 12+2D 3000# |

51.3

B.O.W. 93,808
CARGO TOTAL 47,290
ZFW 146,998

ZFW % MAC
TAKEOFF WT.
TAKEOFF CG
STAB TRIM
FUEL BURN
LANDING WT.

MAXIMUM ALLOWABLE TAKEOFF WEIGHT (PERFORMANCE)

RUNWAY
WIND
TEMP
FLAP SETTING

STRUCTURAL LIMITS
MAX TAXI WEIGHT
ZERO FUEL WEIGHT
MAX LDG WEIGHT

CAPTAIN'S SIGNATURE
Sign in accordance with
FAR 121.693, 121.697, 121.213, 121.135

CAPTAIN
1) 
2) 
3) 
4) 
ACM

COMAT
TEMS(9)
WEIGHT

AIRCRAFT COPY - WHITE    STATION COPY - YELLOW

Form 0-200A
DATE: 04/23/99

AIRCRAFT LOG BOOK   AIRCRAFT MAINTENANCE LOG      FORM M1      A/C TYPE B757   AIRCRAFT # 3917   FLIGHT CODE 4

| EMPLOYEE NO. | INT | NAME | DISCREPANCIES (PLEASE PRINT) | NO. | CORRECTIVE ACTION | STN | MECHANIC |
|---|---|---|---|---|---|---|---|
| 1025 | B | Steele | In transit check De | In transit check complete | FLL | |
| 803 | P | Major | | | | |
| 4 | O | Ramsingh | | | | |
| 7851 | B | Wise | | | | |
| 42093 | A | Torrey Sr | | | | |

OPERATING IN ALL DEADHEAD CREW MEMBERS

VOR CHECK

I.O.P. # 9

52010

IFR (INTERNATIONAL) ROUTE STORED IN AMERIJET COMPUTER

ARTCC MIAMI (CWO) MAIN 305-716-1588    DATA 305-716-1648

00/17/99 (1 DATE)    TIME 20551    TRIP/DATE 827/17    AIRCRAFT 3910U    8727/A    ETD 2300

FROM FT LAUDERDALE    TO PORT OF SPAIN

FILER ROUTE:    Z8V R555 DOP-M G449 POS

PLANNED ROUTE Z8V ZQR ZLS-M INDEE GTK R555 DOP-M G449 POS

TOTAL DISTANCE   1459.9  DIRECT DISTANCE   1413.9    3.7    ALTERNATE    SVNG (155 N) 27/277 DEG)

PLANNED BURN   37.2 ___ 3120

| ALTERNATE | 6.3 | 0:30 | | MACH .77 |
| 10% EXTRA FUEL | 3.5 | 0:29 | INDICATED AIRSPEED 300 | |
| RESERVE | 4.1 | 0:30 | TRUE AIRSPEED 470 | |
| HOLDING FUEL | 0.0 | 0:00 | FLIGHT-LEVEL 290 | |
| TAXI FUEL | 0.5 | | ZERO FUEL WEIGHT 141.8 | |
| REQUIRED FUEL | 51.6 | 4:40 | TAKE OFF WEIGHT 192.5 | |
| RDF | 13.5 | | LANDING FUEL 13.9 | |
| EXTRA FUEL | 0.0 | 0:00 | LANDING WEIGHT 155.7 | |
| BLOCK FUEL | 51.6 | 4:40 | TOTAL BURN 38.1 (INCLUDES TAXI) | |

PREPARED BY: KII TIMMAI
CAPTAIN: BRIAN STEELE
FUEL OFFICER: PAT MANN
SECOND OFFICER: RHETT WISE
CREW/DOW/AUX: A. JORSEY
D. WAMBTHAN

FOR EACH 10.0 OVER PLANNED TAKE OFF WEIGHT BURN WILL BE 1.5 OVER PLANNED BURN

PLANNED CARGO   49.1    MAX CARGO  50.2

CRUISE DAT -30 (ISA + 12)

DW) MANAGER    DATE    MLL REF

8342    07/18/1998    24-22    DOCS DEFERRED PER MOD UNDER 96MR7 0244

9466    07/24/1998    24-1    A 2 DIG DIFFERENCE/JA 19555

NO. 194.2   NO. 15 BASED ON STRUCTURAL LIMITS ONLY NO AIRPORT DATA ON FILE FOR FT LAUDERDALE

WINDS: (24/76)BEHOT 40/6  (20/69)HARDY 120/5  (14/63)PELMA 70/10

| FROM/TO | FREQ | LFB | ATB | TIME ALM | GS | TIME | TOT TIME | BURN | TOT BURN | FUEL REM |
|---|---|---|---|---|---|---|---|---|---|---|
| KFLL | 113 D 119 | Z8V | 116.7 | 31 | 1409 | 320 | | | | TAKEOFF FUEL 51.1 |
| Z8V | 116 | +FIR+ | RKZAG+ | 17 | 1391 | 320 | | | | |
| +FIR+ | | TOC | | 69 | 1392 | 2:55 | 320 | 0:26 | 0:26 | 6.3 | 6.3 | 44.8 |
| TOC | D 112 | ZQR | 112.7 | 22 | 1301 | 2:32 | 471 | 0:03 | 0:29 | 0.5 | 6.8 | 44.3 |
| ZQR | 126 D 126 | ZLS-N | 526.0 | 148 | 1153 | 2:33 | 472 | 0:19 | 0:47 | 3.7 | 10.5 | 40.6 |
| ZLS-N | 119 D 119 | INDEE | | 55 | 1098 | 2:26 | 469 | 0:07 | 0:54 | 1.4 | 11.9 | 39.3 |
| INDEE | 119 D 120 | GTK | 114.2 | 207 | 891 | 1:59 | 467 | 0:27 | 1:21 | 5.1 | 16.9 | 34.5 |
| GTK | 132 A 133 | COCOU | | 32 | 858 | 1:55 | 466 | 0:04 | 1:25 | 0.8 | 17.7 | 33.6 |
| COCOU | 133 A 133 | GMODI | | 69 | 790 | 1:47 | 465 | 0:09 | 1:34 | 1.7 | 19.4 | 31.6 |
| GMODI | 134 A 134 | HARDY | +FIR+ | 55 | 735 | 1:39 | 465 | 0:07 | 1:41 | 1.3 | 20.7 | 30.4 |
| HARDY | 134 A 135 | IDAHO | | 80 | 654 | 1:29 | 465 | 0:10 | 1:51 | 1.9 | 22.6 | 28.3 |
| IDAHO | 135 A 135 | DOP-N | 391.0 | 84 | 570 | 1:18 | 465 | 0:11 | 2:02 | 2.0 | 24.6 | 26.3 |
| DOP-N | 159 A 160 | VAMMA | | 11 | 559 | 1:17 | 465 | 0:01 | 2:04 | 0.3 | 24.9 | 26.3 |
| VAMMA | 160 A 160 | GESSO | | 58 | 501 | 1:09 | 465 | 0:07 | 2:11 | 1.4 | 26.3 | 24.9 |
| GESSO | 160 A 160 | HENLT | | 40 | 461 | 1:04 | 465 | 0:05 | 2:16 | 1.6 | 27.8 | 23.9 |
| HENLT | 161 A 161 | ANNER | | 49 | 412 | 0:58 | 466 | 0:06 | 2:23 | 1.2 | 28.4 | 22.8 |
| ANNER | 157 A 158 | ANDRA | | 85 | 327 | 0:47 | 465 | 0:11 | 2:34 | 2.0 | 30.4 | 20.8 |
| ANDRA | 160 | +FIR+ | +TTP+ | 4 | 323 | 0:46 | 466 | | 2:34 | 0.1 | 30.4 | 20.7 |
| +FIR+ | A 160 | PELMR | | 61 | 262 | 0:38 | 467 | 0:08 | 2:42 | 1.4 | 31.8 | 19.3 |
| PELMR | 162 A 163 | PERRY | | 64 | 198 | 0:30 | 467 | 0:09 | 3:00 | 1.8 | 33.6 | 17.8 |
| PERRY | 164 A 164 | PERBA | | 97 | 101 | 0:18 | 468 | 0:12 | 3:03 | 2.2 | 35.5 | 15.6 |
| PERBA | 163 | TQO | | 14 | 87 | 0:16 | 470 | 0:02 | 3:04 | 9.4 | 35.8 | 15.3 |
| TQO | A 162 | POS | 116.9 | 79 | 8 | | 324 | | DESCENT | 1.4 | | |
| MS | 019 D 019 | TTPP | | 8 | -0 | | 324 | | 3:18 | | 37.2 | 13.5 |

KFLL N26:04.3 / W80:09.1    Z8V N25:42.8 / W77:17.7    ZQR N25:01.7 / W77:27.0    ZLSN N23:34.8 / W75:15.8

INDEE N25:08.3 / W74:23.4    GTK N21:26.4 / W71:08.1    COCOU N21:08.9 / W70:39.3    GMODI N20:31.1 / W69:37.9

HARDY N20:00.4 / W48:49.0    IDAHO N19:15.6 / W67:38.4    DOPN N18:28.1 / W66:24.7    VAMMA N18:19.0 / W66:18.8

GESSO N17:25.6 / W65:46.7    HENLT N16:55.1 / W65:24.5    ANNER N16:13.0 / W64:58.0    ANDRA N15:04.1 / W64:08.1

PELMR N14:08.0 / W63:33.0    PERRY N13:13.0 / W63:00.0    PERBA N11:48.3 / W62:11.4    POS N10:27.8 / W61:23.6

TTPP N10:23.6 / W61:20.9    SVNG N10:54.9 / W63:57.9

ACTUAL BLOCK FUEL OUT _____ ACTUAL BLOCK FUEL IN _____    TOTAL BURN _____

-El PRICES ARE AMERIJET CONTRACT FUEL 520    15.7    36.3

Fuel cost at KFLL $0.60 Fuel cost at TTPP $0.68    Tanker fuel as needed for operational reasons. No difference in cost.

RELEASED BY _____    TIME OF RELEASE 2145Z

I CERTIFY THAT I HAVE COMPLETED ALL AIRPORT AND ROUTE PREFLIGHT AS REQUIRED BY FAR 121.443

CAPTAIN _____

FIR BOUNDARIES:  KZMA 0:13  TJTS 1:41  TTZP 2:34

KFLL/TTPP

D.P.# 10

```
     . . .A02 SLP159 CB DSNT A  DS T03060233 S6022=
     KFLL 172053Z 03009KT 10S  FEW035CB SCT050 BCT150 SG    0 30/23,
         A3000 RMK A02 SLP159 CB VC F T030    26 5601 B       
     UPP 1 00Z  006KT 6501GEW0CB  01 280 35 24 620 Noste
TTPP 172000Z 07007KT   FEW012CB SCT280 32/24 Q101 NOSIG=
TTPP 172000Z 07007KT   FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT   FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 171900Z 08006KT 9999 FEW010CB BKN280 31/25 Q1012 NOSIG=
TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
     Q1013 TEMPO SHRA=
TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
TFFF 171900Z 08010KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
     32/24 Q1014 NOSIG
     CB (S/WNW)=
TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
     32/24 Q1014 NOSIG
     CB (WNW)=
SVMG NO CURRENT REPORT.
SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

------------
FORECASTS
------------

MIA
KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
     BECMG 2122 09005KT NSW SCT025 BKN250
     FM0100 VRB04KT P6SM SCT025 SCT250
     BECMG 0406 VCSH
     FM1500 09010KT P6SM FEW030 SCT250=
FLL
KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
     BECMG 2122 NSW SCT025 BKN250
     FM0100 VRB04KT P6SM SCT025 SCT250
     BECMG 0406 VCSH
     FM1500 09010KT P6SM FEW030 SCT250=
TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
     3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
TTPP 171000Z 171212 08010G20KT 9999 SCT020    BKN015
     BKN300  PROB30 TEMPO 5000 SHRA FEW010CB BKN015
     PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
     BECMG 2223 08005KT=
TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
     TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
     TEMPO 0010 00000KT
     BECMG 1012 11012KT=
TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
     TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
     TEMPO 0010 00000KT
     BECMG 1012 11012KT=
TGPY 171600Z 171818 NIL=
TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
     SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
     1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 SCT050=
```



**A.O.P.# 11**






**INTERNATIONAL, INC.**

November 10, 1999

Mr. John Roseborough
Federal Aviation Administration
Flight Standards District Office
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:   B. Wise Information

Dear Mr. Roseborough:

The following is the requested information pertaining to Flight Engineer Brett Wise:

Brett O. Wise                              Certificate #:  344567857

If you have any questions or require additional information, please contact me. Thanking you
in advance for your assistance.

Sincerely,

Peter A. Steele
Vice President of Operations
Amerijet International, Inc.

1/3                              **I.O.P. # 13**

CARGO IS OUR BUSINESS



## AMERIJET INTERNATIONAL

### FACSIMILE TRANSMITTAL SHEET

DATE: November 10, 1999

COMPANY: FAA

ATTN OF: John Roseborough

FAX NO: (954) 356-7531

**COMMENTS:**

FROM: Terri Sargent

NUMBER OF PAGES INCLUDING COVER SHEET: 2

2/3

**AMERIJET INTERNATIONAL**
**498 SW 34TH STREET**
**FORT LAUDERDALE, FL 33315**
**PHONE:(954)359-7766**
**FAX: (954) 359-6954**

**I.O.P. # 13**



November 10, 1999

Mr. John Roseborough
Federal Aviation Administration
Flight Standards District Office
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:   B. Wise Information

Dear Mr. Roseborough:

The following is the requested information pertaining to Flight Engineer Brett Wise:

Brett O. Wise                                    Certificate #:  344567857

If you have any questions or require additional information, please contact me. Thanking you
in advance for your assistance.

Sincerely,

Peter A. Steele
Vice President of Operations
Amerijet International, Inc.

3/3 .                                            **I.O.P. # 13**

*11/10/99*
*GML*
*SUPERVISOR*

November 10, 1999

**CERTIFIED-RETURN RECEIPT**

· Mr. Brett O. Wise

Dear Mr. Wise:

### LETTER OF INVESTIGATION

File Number: 2000SO170014

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Flight Engineer on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1/2

**I.O.P. # 4**

File  8030 1

WP  HAMERUE INFOWP302 DOC

SO FSDO 17 J ROSEBOROUGH JR ❦

Z 593 221 208

Receipt for Certified Mail

BRETT WISE

CERTIFIED

Z 593 221 208

MAIL

DCR #4 FT LAUDERDALE, FL  333 11-10-99  20:47

Mr. BRETT O. WISE

RETURNED TO SENDER

PLEASE CHECKED
Unclaimed ✓ Refused
Attempted Not Known
Insufficient Address
No such Number Street
No such Office in State
Do not remail in this envelope

2nd Notice

Federal Aviation Administration
Flight Standards District Office
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL  33315

Official Business
Penalty for Private Use, $300

I.O.P. # 14
2/2

42

*PO2*
*Ome*
*11/10/99*
*SUPERVISOR*

November 10, 1999

Mr. Brett O. Wise

Dear Mr. Wise:

### LETTER OF INVESTIGATION

File Number: 2000SO170014

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Flight Engineer on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1/2

**I.O.P. # 15**

2

File: 8030.1

WP: H:\AMERIJET\LOIWIS01.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

2/2

I.O.P. # 15

*Red 11/23/99*
*@ 0800 Jm*

November 18, 1999

Mr. Brett O. Wise

Mr. John Roseborough
Principal Operations Inspector
Federal Aviation Administration
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:     File Number 2000SO170011

In regards to your letter which I received about Amerijet Flight #827 on August 17, 1999, I remember that it had rained that day which is pretty much normal for Florida at that time of the year. Also, I recall that we back taxied down the runway to see for ourselves the actual condition of the runway. I was standing in the aircraft giving a new flight engineer IOE and I could see out of both windows. At no time during my observation was there standing water on the runway we used for takeoff. It was a wet runway which does not impose any penalty.

The decision was made that a normal takeoff and climb was to be used and all flight crewmembers agreed. At no time did I hear the First Officer challenge the Captain's decision.

We have all had training in CRM and Captain Steele in my opinion is a high qualified pilot which would have no problem discussing the matter with a flight crew if any danger or concern was apparent.

Sincerely,

Brett O. Wise

**I.O.P. # 16**

00SO170014

## SECTION D - FACTS AND ANALYSIS

### FACTS

On Monday, October 4, 1999, the investigating Inspector found on his desk a letter (IOP 3) from the First Officer (Patrick Major EIR # 00SO170013) of the subject flight detailing the events which led to the investigation herein. This correspondence had followed a conference between the complainant and the investigating Inspector some weeks before in which the Inspector had requested the account to be put in writing. Due to a death in the family that occurred two days prior (Saturday, October 2nd), and walk in duty on October 4th, the letter could not be given due consideration. During the Inspectors resulting absence for the funeral of his mother and use or lose annual leave, the correspondent directed his concerns to the Department of Transportation's Inspector General, hence the investigation now in progress.

On Tuesday, August 17, 1999, between the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time) Amerijet B-727, N397AJ (a FAR 121 Supplemental Air Carrier, IOP 1, pp. 1 and 2), operating as Amerijet (AMJ) Flight # 827 departed Runway 9L (9 Left) at Fort Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida (IOP 3, 4, 5, 9 and 12) when there was less than one quarter (1/4) of an inch of standing water on the departure runway as reported by the FLL FAA Air Traffic Control Tower (ATCT) following a runway contamination/condition check accomplished by the FLL Airport Authority identified on the ATCT tape recording (IOP 4) as "Ramp One". The airport runway contamination/condition report in detail represented that there was "less than ¼ inch, good drainage, slight standing water about six (6) feet on either side of centerline". This report was subsequently provided to the Flightcrew of AMJ 827 by the FLL ATCT as "some standing water less than a quarter of an inch" prior to a takeoff clearance being given to the flight, and was acknowledged by the pilot (ATCT Tape counter number 607, IOP 4).

Amerijet AOM in Chapter 4, Section 1A, Subject 55 [4:1:55(IOP 6, page 1)] directs that for takeoff limitations other than as listed on this page, the user "check Performance Manual for appropriate reductions to maximum takeoff gross weight" (IOP 6, page 3). Even though the NAVTECH page (IOP 6, page 2) provides additional information as to wet runways and standing water of less than one eighth (1/8) inch, the information as contained on the Amerijet International B-

727-200, JT8D-15 Performance Chart for Fort Lauderdale runway 9L with Flaps 20 **(IOP 6, page 3)** is applicable. This chart requires a weight reduction of 17,000 pounds and a V1 airspeed reduction of 28 knots from the data as expressed on the B-727-200c Load Plan **(IOP 12)** rendering the figures of weight reduction from 192,298 to 175,298 pounds. The aircraft thus departed 17,000 pounds above its maximum gross takeoff weight as corrected for contaminated runway conditions, and therefore ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮(IOP 2, pages 3 and 4).

FAR Part 1 **(IOP 2, page 1)** clearly defines the terms **"Operate"**, **"Operational Control"** and **"Person"**, as follows. The terms state in pertinent part, "Operate" means use, cause to use or authorize to use aircraft; "Operational Control" means the exercise of authority over initiating, conducting or terminating a flight; "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

**IOP 9 and 12,** identify Mr. Brett Ogden Wise as the Flight Engineer, a flightcrew member required by aircraft certification and operational requirements and accommodating the terms expressed above in concert with the company, as a person. As stipulated in FAR 91.605(b)(3), **"No person may operate a turbine powered airplane certificated after September 30, 1958, contrary to the Flight Manual, or take off that airplane unless - (3) The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff...........from wet runways"** (IOP **2, page 3).**

Flight Engineer Wise, in performing his duties as a required flightcrew member, was a person who "operated an aircraft in a careless or reckless manner so as to endanger the life or property of another", contrary to ▮▮▮▮▮▮▮OP 1 - 12).

Mr. Wise does not have a violation history **(IOP 7, page 3).**

Mr. Wise was sent two (2) Letters of Investigation (LOI), one via certified mail which was returned unclaimed, and one via regular mail, to which he respond. His response is identified as IOP 16, but fails to offer any additional information, instead tending to contradict the facts as established by the preponderance of other IOP submitted and included herein.

FAA FLIGHT STANDARDS DISTRICT OFFICE 17
FT. LAUDERDALE JET CENTER
1050 LEE WAGENER BLVD., SUITE 201
FT. LAUDERDALE, FL 33315
(954) 356-7520 X154

December 15, 1999

Captain Peter A. Steele
Vice President of Operations
Amerijet International Incorporated
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Captain Steele:

Return of Check Airman Letter

In consideration that Captain Allen Jorsey Sr. is the subject of a
violation investigation involving Amerijet flight 827 occurring August
17, 1999, in which he was performing as Check Airman, we hereby direct
that his Check Airman letter of authority be returned upon receipt of
this letter.  Upon resolution of the violation, Captain Jorsey may be
reconsidered for the letter to be reissued.

Our Vital Information Subsystem Check Airman Ancillary data base files
will be amended to show that Captain Jorsey is inactive effective on the
date of this letter, therefore he may not perform in that capacity from
this date forward.  A copy of this letter will be transmitted via FAX.

A postage paid envelope is enclosed with this letter for return of the
letter of Check Airman authorization issued on behalf of Captain Jorsey
on September 30, 1997.  Your expedient response in this matter will be
appreciated.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure.



PLAINTIFF'S
EXHIBIT

003545

FAA FLIGHT STANDARDS DISTRICT OFFICE 17
FT. LAUDERDALE JET CENTER
1050 LEE WAGENER BLVD., SUITE 201
FT. LAUDERDALE, FL 33315
(954) 356-7520  X164

December 21, 1999

Mr. Allen Jorsey, Sr.
6304 Zekan Lane
Springfield, Virginia 22150-1014

Dear Mr. Jorsey:

### File Number: 00SO170012

On November 10, 1999, you were advised that the Federal Aviation Administration
was investigating an incident which occurred on August 17, 1999, at the Fort
Lauderdale-Hollywood International Airport, Fort Lauderdale, Florida. The specific
incident involved Amerijet International's Boeing 727-200, N397AJ which was
operated as Amerijet 827.

This letter is to inform you that our investigation has not established a violation of
the Federal Aviation Regulations on your part, and therefore, you may consider
the matter closed. Thank you for your cooperation during our investigation.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure:  PRIVACY ACT NOTICE



PLAINTIFF'S
EXHIBIT
43
2/13/01

003544



November 22, 1999


Mr. John Roseborough
Federal Aviation Administration
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:    File # 2000SO170010


Dear Inspector Roseborough,

This is in response to your letter of investigation dated November 10, 1999. After a complete
investigation of the incident described, Amerijet finds no infractions to the FARs as stated. Three
of the crewmembers involved have stated that they observed no standing water on the runway at
the time of takeoff. They do admit that the runway was wet but did not require an adjustment to
weight or V1.

Currently, the Training Department and I are working towards any possibilities of improvement
with regard to contaminated runway conditions. I would appreciate any guidance or suggestions
you could offer us in this matter.

I look forward to your response.

Sincerely,

Peter A. Steele
Vice President of Operations
Amerijet International, Inc.



PLAINTIFF'S
EXHIBIT
44
2/13/01

003546

CARGO IS OUR BUSINESS

FAA FLIGHT STANDARDS DISTRICT OFFICE 17
FT. LAUDERDALE JET CENTER
1050 LEE WAGENER BLVD, SUITE 201
FT. LAUDERDALE, FL 33315
(954) 356-7520 X184

March 6, 2000

Captain Peter A. Steele
Vice President of Operations
Amerijet International Incorporated
1401 S.W. 39th Street
Fort Lauderdale, Florida 33315

Dear Captain Steele:

### File Number: 2000SO170010

On November 10, 1999, you were advised that the Federal Aviation Administration was investigating an incident which occurred on August 17, 1999, at the Fort Lauderdale-Hollywood International Airport, Fort Lauderdale, Florida. The specific incident involved Amerijet International's Boeing 727-200, N397AJ which was operated as Amerijet 827.

This letter is to inform you that our investigation has not established a violation of the Federal Aviation Regulations on your part, and therefore, you may consider the matter closed. Thank you for your cooperation during our investigation.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE



PLAINTIFF'S
EXHIBIT
45
2/13/01

003524

# Draft

July 8, 1998

Captain N. Edward Cook
Chief Pilot
Amerijet International, Inc.
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Captain Cook:

Captain Upgrade/Training Quality

Recently, we have noticed what appears to be a trend toward mediocrity (at best) in Amerijet's pilot training/checking/upgrade program. An oral exam recently conducted by an Inspector from this office detected a very lackadaisical attitude and great lack of preparation on the part of the applicant. The specifics to this particular account pertain to Mr. Patrick Scott Major, certificate number 265069531. Mr. Major appeared to lack any decorum normally associated with, and expected from, a professional pilot in his approach to embracing the testing environment. The lack of knowledge demonstrated by this applicant during the oral portion of his evaluation/test was so poor that the activity was terminated during the first ten (10) minutes.

The incident as described above is not an isolated instance, and while not necessarily the norm, is indicative of a departure from excellence that should be the goal within any FAR 121 operational environment. It is with that in mind that this office now requires notification in writing within five (5) business days following the second failure of any portion of the testing phase, either certification or proficiency of any airman at Amerijet, and prior to scheduling any further testing. Any third attempt must be observed by an FAA Inspector provided from this office who will evaluate the applicant's entitlement to hold a pilot certificate as provided for under the reexamination authority of the FAA. Further, Check Airmen and/or Instructors who knowingly recommend applicants who perform in a manner substandard to the norm, and contrary to Amerijet's Training Program will be considered for termination from that activity.

Please ensure this information receives due dissemination within Amerijet, among the Check Airman and Instructor contingent, and provide copies of any bulletins generated in that accord.

Sincerely,

John C. Roseborough
Principal Operations
Inspector



PLAINTIFF'S
EXHIBIT
46
2/13/01

000275

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,            )  L.T. CASE NO.
                               )  99-021746-11
        Plaintiff,             )
                               )
vs.                            )
                               )
AMERIJET INTERNATIONAL, INC.,  )
                               )
        Defendant.             )
- - - - - - - - - - - - - - - -)

                337 East Las Olas Boulevard
                Fort Lauderdale, Florida
                November 8, 2000
                10:30 o'clock a.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY: VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY: SUSAN POTTER NORTON, ESQUIRE
       - and -
    DANIEL BRESSLER, ESQUIRE
Appearing on behalf of the Defendant

- - - - - - - - - - - - - - - - - - - - - - -

                DEPOSITION

                    OF

                DERRY S HUFF

- - - - - - - - - - - - - - - - - - - - - - -

    DOWNTOWN REPORTING    (954) 522-3376

---

Page 2

                I N D E X

                                      Page

DIRECT EXAMINATION                      3
BY MS. SHEA

                E X H I B I T S

                        MARKED FOR
                        IDENTIFICATION

Plaintiff's Exhibit 1        109
Plaintiff's Exhibit 2        109
Plaintiff's Exhibit 3        113
Plaintiff's Exhibit 4        120
Plaintiff's Exhibit 5        125
Plaintiff's Exhibit 6        127
Plaintiff's Exhibit 7        144

---

Page 3

1   Deposition of DERRY S. HUFF, a witness of
2   lawful age, taken by the Plaintiff for the purpose
3   of discovery and for use as evidence in the
4   above-entitled cause, wherein PATRICK SCOTT MAJOR is
5   the Plaintiff, and AMERIJET INTERNATIONAL, INC. is
6   the Defendant, pending In The United States District
7   Court For The Southern District of Florida, pursuant
8   to notice heretofore filed, before BEVERLY J. GRAMM,
9   Registered Professional Reporter and Notary Public
10  in and for the State of Florida at Large, at the
11  offices of Downtown Reporting, 337 East Las Olas
12  Boulevard, Fort Lauderdale, Florida, on the 8th day
13  of November, 2000, commencing at 10:30 o'clock a.m.
14  --------------------------
15  THEREUPON,
16      DERRY S. HUFF
17  a witness named in the notice heretofore filed,
18  being of lawful age, and being first duly sworn in
19  the above cause, testified on his oath as follows:
20      DIRECT EXAMINATION
21  BY MS. SHEA:
22      Q. Sir, would you tell us your name and where
23  you live, please?
24      A. Derry Huff. I live in North Miami.
25      MS. NORTON: The usual stipulations as to

---

Page 4

1   objections and as to the form of the question?
2      MS. SHEA: That's fine.
3      MS. NORTON: For the rest of the depos,
4   also.
5      MS. SHEA: Sure.
6      MS. NORTON: Thank you.
7   BY MS. SHEA:
8      Q. What's your address in North Miami?
9      A. 2060 North Hibiscus Drive, North Miami,
10  Florida, 33181.
11     Q. All right. And you're employed?
12     A. With Amerijet.
13     Q. And what's your place of work?
14     A. I'm not sure of our new address. The
15  corporate office is 2800 Andrews Avenue.
16     Q. South Andrews Avenue?
17     A. I believe so, yeah.
18     Q. In Fort Lauderdale?
19     A. Yes.
20     Q. And what is your position?
21     A. Director of operations.
22     Q. When did you become director of
23  operations?
24     A. Approximately May of this year.
25     Q. And who did you replace?

**Page 5**

1   A. Pete Steele.
2   Q. And he left at that time?
3   A. Yes, he did.
4   Q. Was there a gap or did you replace him
5   immediately on his departure?
6   A. There was a gap.
7   Q. Do you recall when Mr. Steele left?
8   A. No, I don't.
9   Q. Do you know how long the gap was?
10  A. Several weeks.
11  Q. All right. Now, you understand that
12  you're here today as -- in two capacities in this
13  case, as a representative of Amerijet on certain
14  subjects and that I've also set your deposition
15  individually. Are you aware of that?
16  A. Yes.
17  Q. So with your counsel's permission, I'm
18  hoping that we can do it in one deposition. If
19  there becomes a need, then we can take a separate
20  deposition of you personally after the corporate
21  deposition. But I'm going to ask you roughly about
22  the subjects.
23  MS. NORTON: I don't have an objection in
24  concept. The objection I would have is to the
25  extent that information as to his personal knowledge

**Page 6**

1   or not as corporate rep would be mixed in with what
2   is corporate rep.
3   If you want to clarify the corporate rep
4   first and then continue on into his, my only concern
5   is to the extent that you tend to use anything as
6   the corporate rep.
7   MS. SHEA: I don't know how to deal with
8   that, either, other than ask the questions and see
9   how it comes out.
10  MS. NORTON: Well, I think there are
11  specific issues you asked about as corporate rep
12  knowledge.
13  MS. SHEA: Right.
14  MS. NORTON: So if you want to go with
15  those first or last to clarify it. Other than that,
16  I don't have an objection in concept.
17  MS. SHEA: Right. Okay. We'll see how we
18  do then.
19  BY MS. SHEA:
20  Q. And what were you previous to being
21  director of operations?
22  A. Chief pilot.
23  Q. And for what period of time were you chief ..
24  pilot?
25  A. From October of 1999.

**Page 7**

1   Q. To May of 2000?
2   A. Correct.
3   Q. And what were you before October of 1999?
4   A. A captain.
5   Q. And how long have you been a captain at
6   Amerijet, what period of time?
7   A. Up to the point of becoming chief pilot.
8   Q. Right. How far back from then?
9   A. Three years previous to that.
10  Q. And when did you start with the company?
11  A. December of 1989.
12  Q. As a flight engineer?
13  A. Correct.
14  Q. And when did you become a first officer?
15  A. Approximately three years after that date.
16  Q. All right. And you became a captain in
17  approximately the fall of 1996?
18  A. Yes.
19  Q. Were you chief pilot at Amerijet at any
20  time in 1999, before October?
21  A. I was -- I was a candidate for chief pilot
22  and I applied to the FAA for permission to be chief
23  pilot. That is, acting in the capacity of
24  fulfilling most of the duties associated with that
25  of a chief pilot.

**Page 8**

1   Q. So is the answer to my question yes or no?
2   A. That's the answer to your question.
3   Q. Well, my question was were you chief pilot
4   before October 1999?
5   A. No, I was not.
6   Q. Who had conferred on you the permission
7   that you had to act in some respects as chief pilot?
8   A. Director of operations.
9   Q. Which was Pete Steele?
10  A. Correct.
11  Q. Before October 1999, did you hold yourself
12  out to pilots and others at Amerijet as chief pilot?
13  MS. NORTON: Object to the form of the
14  question. What do you mean hold yourself out?
15  MS. SHEA: Okay. Fair enough. Let me
16  rephrase that.
17  BY MS. SHEA:
18  Q. Sir, prior to October 1999, did you
19  address pilot -- other pilots in writing at Amerijet
20  using the title of chief pilot to describe yourself?
21  A. Yes, I did.
22  Q. And was that an accurate description at
23  the time?
24  A. No, it was not.
25  Q. And was Pete Steele aware that you were

Page 9

1   doing that?

2    A. Yes, he was.

3    Q. In fact, before October 1999, you did not

4   have the requisite three years as a captain to be a

5   chief pilot; is that correct?

6    A. That is correct.

7    Q. I'd like to ask you some questions about

8   Amerijet's operation. What is the business of

9   Amerijet?

10   A. We're a transportation company.

11   Q. All right. Air carrier?

12   A. Correct.

13   Q. All cargo?

14   A. Yes.

15   Q. No passengers?

16   A. Correct.

17   Q. All right. And is there a kind of -- a

18   type of cargo in which you specialize?

19   A. Not specifically, no.

20   Q. Is there an area of operations in which

21   you specialize? A geographic area.

22   A. North America, Central America and the

23   Caribbean.

24   Q. And how old a company is Amerijet?

25   A. Approximately 26 years.

Page 11

1   Amerijet moved its flight operations from Miami to

2   Ft. Lauderdale and then when they moved back to

3   Miami?

4    A. I believe that we moved from Miami to Fort

5   Lauderdale late June of 1999, and that we returned

6   to Miami sometime in -- sometime around June. Maybe

7   a month before or a month after.

8    Q. Of 2000?

9    A. Of 2000.

10   Q. Okay. And why was that done? If you

11   know.

12   A. We had -- it was basically done to

13   accommodate customs clearance for cargo.

14   Q. Customs?

15   A. Correct.

16   Q. Okay. But your administrative offices are

17   still in Fort Lauderdale?

18   A. Yes.

19   Q. And how many pilots did Amerijet employ as

20   of about a year ago, September 1999? If you know.

21   A. I could-- well, I don't know specifically.

22   Somewhere around 29 crews, I believe.

23   Q. Twenty-nine crews of three?

24   A. Correct.

25   Q. So 80, 90?

Page 10

1   Q. A private company?

2   A. Yes.

3   Q. And at or about a year ago, September

4   1999, how many aircraft were in the fleet owned by

5   Amerijet? If you know.

6   A. At the time I believe it was ten.

7   Q. And are they all Boeing 727s?

8   A. Yes.

9   Q. And they are, obviously, 727s that have

10   been fitted for cargo carriage?

11   A. That's correct.

12   Q. Has the number in the fleet changed since

13   then?

14   A. Yes, it has. We now have 12.

15   Q. And where is Amerijet's flight -- where

16   are Amerijet's flight operations based today?

17   A. Miami.

18   Q. When did -- strike the question. Where

19   were they based in September 1999?

20   A. I believe in September of 1999 they were

21   in Ft. Lauderdale.

22   Q. And was there a time prior to that when

23   they were in Miami?

24   A. Yes.

25   Q. Could you tell me if you recall when

Page 12

1   A. Eighty-seven pilots, somewhere around

2   there.

3   Q. All right. And do you now have additional

4   crews because of the new aircraft?

5   A. Yes, we do.

6   Q. And when we say pilots, we're talking

7   about captains, first officers and flight engineers;

8   correct?

9   A. That's correct.

10   Q. And I'd like to ask you a couple of

11   questions about the organization. Is Dave Bassett

12   the president and CEO of the company?

13   A. Yes, he is.

14   Q. He has been that for quite some time?

15   A. Yes, he has.

16   Q. And are you a direct report to him?

17   A. No, I'm not.

18   Q. Who do you report to?

19   A. I report to Mark Stewart.

20   Q. And what is Mark Stewart's position?

21   A. Senior vice president of the airline.

22   Q. And is he in charge of specific

23   operational aspects?

24   A. He is basically responsible for

25   coordinating the flight operations on the

06070-WJZ Document 112 Entered on FLSD Docket 03/13/2001 Pa

DERRY HUFF
CondenseIt™
MAJOR V. AMERIJET
Page 13
Page 15

**Page 13**

1 maintenance side of the airline.

2 Q. When you were a chief pilot, who did you

3 report to?

4 A. Pete Steele.

5 Q. Who is chief pilot currently?

6 A. David Samer.

7 Q. I'm sorry, spell the last name.

8 A. S A M ER.

9 Q. And when was he appointed chief pilot?

10 A. He was appointed in October of 2000.

11 Q. Was there an acting chief pilot between

12 May and October, or did you continue to fill that

13 role?

14 A. There was a chief pilot assigned.

15 Q. There was someone else?

16 A. Yes.

17 Q. Who was the interim one?

18 A. Captain Clay Lynn.

19 Q. And did he leave the company?

20 A. No, he's still with the company.

21 Q. He was just acting?

22 A. He was, correct.

23 Q. Was he submitted to the FAA to --

24 A. Yes, he was.

25 Q. Was he not accepted?

**Page 14**

1 A. He was approved.

2 Q. Why did he not remain chief pilot?

3 A. He was not interested in being a full-time

4 chief pilot. It was just a temporary measure while

5 we looked for a new chief pilot.

6 Q. Okay. When was the first time -- strike

7 the question. Who was the last chief pilot before

8 you at Amerijet?

9 A. Ed Cook.

10 Q. Do you know when he left the company?

11 A. December of 1999.

12 Q. '99?

13 A. '98. Yes, it would be '98.

14 Q. And when was the first time that you as a

15 candidate with some of the duties of a chief pilot

16 began to act in that capacity?

17 A. I believe late February of 1999.

18 Q. So between December and late February

19 1999, you were not acting unofficially or otherwise

20 as chief pilot?

21 A. That's correct.

22 Q. Okay. What, if any, responsibilities did

23 you have prior to February 1999, as it related to

24 accepting or processing upgrade bids to captain at

25 Amerijet?

**Page 15**

1 A. I had no responsibility.

2 Q. What, if any, knowledge do you have

3 concerning any upgrade efforts made by Pat Major

4 prior to February 1999, at Amerijet?

5 A. I have no specific knowledge.

6 Q. Okay. I may ask you later if you have any

7 information as a personal, in a personal capacity.

8 But as I understand it then, you would not have any

9 knowledge from the company relating to any

10 applications or upgrade bids that Mr. Major made

11 before February 1999; is that correct?

12 MS. NORTON: I'm not sure about your

13 question. I object to the form. You might ask him

14 later, you're not sure now. I'm sorry, would you

15 rephrase the question? I object to the form of the

16 question.

17 MS. SHEA: Sure. All right.

18 BY MS. SHEA:

19 Q. Do you have any knowledge -- do you have

20 any knowledge in your capacity as a corporate

21 witness of any promotional efforts made by Pat Major

22 in -- prior to February 1999?

23 A. Not specifically, no.

24 Q. Okay. What knowledge do you have of those

25 efforts at all?

**Page 16**

1 MS. NORTON: On a personal?

2 MS. SHEA: Yes.

3 A. The only knowledge I would have on a

4 personal basis, as line pilot I knew that he had

5 attempted and not upgraded. That's all I know.

6 BY MS. SHEA:

7 Q. And I'm going to ask you a few questions

8 to try to identify some subject areas then, and I

9 may come back to some of those. As of February 1999

10 through the end of Pat Major's employment at

11 Amerijet, do you have knowledge of any efforts that

12 he made to upgrade or to become a captain?

13 A. I know that he expressed interest in

14 upgrading.

15 Q. To you?

16 A. Yes.

17 Q. What other knowledge do you have about

18 that?

19 A. Regarding his interest in upgrading?

20 Q. Right. Again, I'd like to kind of

21 identify some subjects and then I may come back to

22 it in a little more detail. But is it fair to say

23 that Pat Major expressed an interest to you after

24 late February 1999, in being upgraded to captain?

25 A. Yes.

1  Q. Okay. Did that take the form of
2  submitting a bid, or bids?
3  A. I don't recall specifically.
4  Q. Okay. You don't recall one way or the
5  other?
6  A. Correct.
7  Q. Okay. Do you recall making a response to
8  Mr. Major concerning his interest in upgrading in
9  1999?
10  A. No, I don't recall.
11  Q. Did you respond to him, or you just don't
12  recall what you said?
13  A. I don't recall responding to him. I know
14  that we had a conversation. I can recall discussing
15  it with him, and I told Pat that he would be given
16  the same opportunity that everybody else has been
17  given.
18  Q. Okay. And you made that statement after
19  February of 1999?
20  A. Yes.
21  Q. And to your knowledge, that was a true
22  statement at the time, that he would be given an
23  equal chance?
24  A. Yes.
25  Q. Did you discuss his interest in upgrading

1  the process before but not made the cut, so to
2  speak?
3  A. That's correct.
4  Q. Okay. But did he -- what, if anything,
5  did he say to you with respect to whether Pat would
6  be considered eligible to rebid?
7  A. I don't recall.
8  Q. Well, is it fair to say he did not tell
9  you Pat was eliminated from consideration?
10  A. I just -- I don't have any recollection of
11  anything other than the fact that we discussed it.
12  Q. Okay. But based on the fact that you told
13  Pat that he'd be given a shot at it, you did not
14  hear anything to the contrary from Pete Steele; is
15  that fair to say?
16  MS. NORTON: Object to the form of the
17  question.
18  A. Would you repeat the question, please.
19  BY MS. SHEA:
20  Q. Based on the fact that, as you testified a
21  few minutes ago, you told Pat that he would be given
22  a chance in 1999, is it fair to say that you didn't
23  hear anything to the contrary from Pete Steele?
24  MS. NORTON: Object to the form of the
25  question.

Page 18      Page 20

1  with Pete Steele or Dave Bassett in 1999?
2  A. I'm sure that I did, yes.
3  Q. Okay. And did they verify that Pat Major
4  would be given an equal chance to be upgraded in
5  1999?
6  MS. NORTON: Object to the form of the
7  question.
8  A. Would you repeat the question, please.
9  MS. SHEA: Let me rephrase that. That's
10  compound, too.
11  BY MS. SHEA:
12  Q. But did you specifically discuss Major's
13  interest in upgrading with Pete Steele in 1999?
14  A. Yes.
15  Q. Okay. And what, if any, response did you
16  obtain from Pete Steele regarding Pat Major's
17  interest?
18  A. That -- basically, that Pat had been
19  through the process and had not fulfilled the
20  obligations required to upgrade.
21  Q. Was that specifically regarding a type
22  rating or other criteria?
23  A. I don't recall the specifics of the
24  conversation.
25  Q. So he told you that Pat had been through

1  A. What I told Pat was that he would be
2  treated, he would be afforded the same opportunities
3  that all the other crew members were afforded.
4  BY MS. SHEA:
5  Q. Okay. And that was after you had
6  discussed Pat's particular situation with Pete
7  Steele?
8  A. That was before I talked to Pete Steele.
9  And basically, my conversation with Pete Steele was
10  that Pat had been afforded that opportunity already.
11  Q. So how, if at all, did that change what
12  you had told Pat Major?
13  A. It didn't change anything.
14  Q. Okay. It did not mean he was eliminated
15  in 1999?
16  A. What it meant was that what I told Pat was
17  that he would be afforded the opportunities that
18  everybody else was afforded and that when I talked
19  to the director of operations, he informed me that
20  Pat had already been afforded those opportunities,
21  since that was prior to my coming in to the office.
22  I didn't have any knowledge of that. Other than the
23  fact that he had been in the system.
24  Q. Okay. So did you relay to Pat Major that
25  he would in fact not be given any further

1  opportunities?
2      A. I don't recall any further discussion with
3  Pat on the matter.
4      Q. Okay. Did Pete intend for you to tell
5  Pat -- or strike the question. Did Pete express to
6  you that Pat would not be given an opportunity in
7  1999?
8      A. I don't recall.
9      Q. Okay. What, if any, conversations did you
10 have with Dave Bassett concerning Pat Major's
11 interest in being upgraded in 1999?
12     MS. NORTON: Object to the form.
13 Conversations he had in '99 or conversations with
14 Dave Barrett regarding Pat's interest in '99?
15     MS. SHEA: I'll rephrase it.
16 BY MS. SHEA:
17     Q. What, if any, conversations did you have
18 in 1999 with Dave Bassett concerning Pat Major's
19 current interest in being upgraded?
20     A. I believe that Dave discussed with me,
21 prior to writing a letter to Pat regarding his
22 interest in upgrading, his concerns over Pat's
23 ability to be a captain.
24     Q. Can you date that conversation?
25     A. No, I cannot.

Page 22

1      Q. What was the substance of your
2  conversation with Dave concerning Pat at that time?
3      A. Basically, Dave expressed to me his
4  serious reservations about Pat being a captain,
5  based on his observations of Pat in the cockpit.
6      Q. His personal, direct observations?
7      A. That's correct.
8      Q. Do you recall what those reservations were
9  that he expressed to you?
10     A. Basically --
11     MS. NORTON: Object to the form of the
12 question. Go ahead.
13     A. He didn't feel that Pat conducted himself
14 in a professional manner and that he wasn't a
15 capable captain.
16 BY MS. SHEA:
17     Q. Do you know when Dave had made these
18 observations?
19     A. Yes. During the time that Pat had flown
20 with Dave as a co-pilot in his corporate aircraft.
21     Q. Do you have any idea when that was?
22     A. Sometime in the mid 1990s.
23     Q. All right. So that conversation between
24 you and Dave was, you recall, in the context that
25 Dave was going to write a letter to Pat?

Page 23

1      A. That's correct.
2      Q. Okay. And was that before or after Pat
3  had expressed to you his interest in upgrading?
4      A. I can't really put a time frame on when
5  that happened. It was sometime before Dave wrote
6  the letter to Pat.
7      Q. Was it before you were acting as chief
8  pilot or after?
9      A. I would believe it would be sometime
10 after.
11     Q. And do you know whether Pat sought any
12 upgrade opportunities after this letter from Dave
13 Bassett?
14     A. I don't recall.
15     Q. What does bid lock refer to?
16     A. Bid lock?
17     Q. Right.
18     A. I'm not sure what it refers to.
19     Q. That's not a term you're familiar with at
20 Amerijet?
21     A. No.
22     Q. In 1999 was there a formal bid process for
23 upgrading to captain?
24     A. Yes.
25     Q. And what did that consist of?

Page 24

1      A. Basically, it consisted of the pilot's
2  seniority within the company and his meeting certain
3  requirements, experience and his passing an
4  interview process to upgrade to the promotion.
5      Q. Okay.
6      A. And successful completion of the training
7  program.
8      Q. All right. And you had to do all of these
9  things in order to be eligible to bid for an
10 upgrade, or did you do it after you were in the
11 process?
12     A. You could bid for an upgrade. Bidding for
13 an upgrade was the first step in the process.
14     Q. And what would the next step be?
15     A. The next step would be interviewing.
16     Q. With who?
17     A. With a panel.
18     Q. And what would be the step after that?
19     A. The step after that would be training.
20     Q. Okay. And then what would be the next
21 step?
22     A. Completing a check ride.
23     Q. All right. What would be the next step?
24     A. Completing an IOE, which is initial
25 operating experience, which is done in the aircraft,

Page 25

1  with a qualified check airman.
2      Q. All right. And what would be the next
3  step?
4      A. That the last step was an en route check
5  with the FAA, an observation ride.
6      Q. All right. Do you know how far Pat Major
7  had gone in the process prior to your assuming any
8  of the duties of chief pilot?
9      A. No.
10     Q. Did you make any investigation of that?
11     A. No.
12     Q. Does Amerijet have a policy that limits
13  the number of bids that a first officer interested
14  in becoming a captain can make?
15     A. We have a policy that states that if a
16  crew member does not successfully complete an
17  upgrade opportunity, that he is basically locked out
18  for a one year period.
19     Q. Okay. So they might be disqualified for a
20  year, but then they could renew a bid?
21     A. That's correct.
22     Q. Was Pat Major in that category?
23     A. I don't know.
24     Q. So did Pat submit to you when you were
25  acting as chief pilot any paperwork which would

Page 26

1  formally start the bid process?
2      A. I don't recall.
3      Q. And other than telling Pat that he would
4  be treated the same as anyone else, you don't recall
5  anything that you said to him while you were acting
6  as chief pilot as it relates to promotional
7  opportunities?
8      A. No.
9      Q. Is there a reason why you did not inquire
10  of him or discuss with him about Dave Bassett's
11  letter?
12     A. That letter was from the owner of the
13  company to Pat. I don't recall discussing it with
14  him. We may have, I don't recall.
15     Q. You would not say to Pat, I'm sorry, I
16  can't process your bid because of what the owner of
17  the company has said?
18         MS. NORTON: Object to the form.
19  BY MS. SHEA:
20     Q. As opposed to saying you'll be treated the
21  same as everyone else.
22         MS. NORTON: Object to the form of the
23  question.
24     A. I don't recall the specifics of any
25  question.

Page 27

1  BY MS. SHEA:
2      Q. Okay. Outside of the promotion process
3  and the bid process, are pilots at Amerijet
4  evaluated or assessed for their skills on any
5  regular basis?
6      A. Outside of the promotional process?
7      Q. Right.
8      A. Yes, they are.
9      Q. Okay. What does that consist of?
10     A. They come in, every crew member comes in
11  once a year for training. Additional recurrent
12  training it's called, at the -- during which they
13  receive a simulator check. And at any time during
14  their -- during the year flying a line, a captain
15  can perform a performance evaluation on a crew
16  member.
17     Q. Is that performance evaluation by a
18  captain called a proficiency report?
19     A. Yes, it is.
20     Q. And are those done in any kind of routine
21  basis or is it just discretionary?
22     A. Discretionary.
23     Q. And as I understand it, those can be done
24  either at the captain's behest or at the request of
25  the subordinate crew member; is that correct?

Page 28

1      A. That's correct. If the captain agrees to
2  do one.
3      Q. What happens to proficiency reports, do
4  they become part of one's training record?
5      A. No, they do not.
6      Q. Okay. Is it true that at Amerijet you
7  maintain training records and personnel files
8  separately?
9      A. That's correct.
10     Q. Why is that?
11     A. Basically, we do that as part of --
12  because they're really two different things. The
13  training records are a record of the actual training
14  performance of a crew member and relate to basically
15  the letter of the law, so to speak, of his
16  performance, whereas the personnel file is really
17  HR-related material. And it doesn't really have any
18  bearing on the training records.
19     Q. Okay. Is there any kind of regulatory
20  requirement that you're aware of that training
21  records be maintained in a certain fashion?
22     A. Yes.
23     Q. Okay. So proficiency reports are
24  preserved but not in a training file as such?
25     A. That's correct.

DERRY HUFF
06070-WJZ Document 112 Entered on FLSD Docket 03/13/2001 Pa
CondenseIt™
MAJOR V. AMERIJET
Page 29
Page 31

**Page 29**

1    Q. Okay. Do you know whether in 1999 Pat
2    Major did have the qualifications to be considered
3    for an upgrade to captain at Amerijet, the training
4    and the other objective qualifications?
5      A. No, I do not.
6    Q. You never undertook to determine that?
7      A. I didn't -- I never processed Pat as a
8    candidate for upgrade.
9    Q. Okay. So you never undertook to verify
10   whether or not he met the eligibility
11   qualifications?
12     A. No, I did not.
13   Q. Do you know of any, as we sit here today,
14   that he did not meet?
15     A. I have no idea what he met and did not
16   meet. I did not review his qualifications.
17   Q. Okay. Was seniority a factor for or
18   consideration in promotions at Amerijet?
19     A. Yes.
20   Q. Did Pat have the seniority to be
21   considered for captain in 1999?
22     A. I have no idea.
23   Q. You don't know where he was on the
24   seniority list?
25     A. No. I would imagine that he was high on

**Page 30**

1    the seniority list. And he probably did have that,
2    but I don't know specifically where he was.
3    Q. Okay. Do you have any -- strike the
4    question. Have you ever been in the cockpit with
5    Pat, with Dave Bassett at the same time, in the
6    corporate jet?
7      A. No.
8    Q. Where in Amerijet's written materials
9    would there be any statement of criteria for
10   promotions to captain at the company?
11     A. Basically, just internal memorandums.
12   Q. The upgrade bids themselves?
13     A. Those would be handled the same, yes.
14   Q. Okay. And what kind of internal
15   memoranda?
16     A. Well, the upgrade bid would be something
17   submitted by the crew member.
18   Q. But in terms of Amerijet's statements of
19   requirements to be upgraded, other than in the
20   upgrade bids, is there any part of a manual or any
21   other written policies, that you're aware of, that
22   would inform candidates of what the criteria were?
23     A. There were written, written requirements
24   for upgrade, yes, that were done. In a memo form,
25   but not maintained in any manual.

**Page 31**

1    Q. Okay. How would I ask for those if I were
2    to ask for those?
3      A. I would ask for the upgrade requirements
4    at that particular time.
5    Q. And were those memoranda circulated to all
6    pilots or just --
7      A. Yes.
8      THE WITNESS: Can I take a break?
9      MS. SHEA: Sure.
10     (Recess was taken.)
11  BY MS. SHEA:
12   Q. Sir, is the panel with whom a captain
13   candidate interviews always the same?
14     A. No.
15   Q. Who is it in general?
16     A. Generally, it's the director trainee,
17   chief pilot and some representatives of his peer
18   group.
19   Q. Okay. Who's the current director of
20   training at Amerijet?
21     A. John Washington.
22   Q. And how long has he been that?
23     A. I'm not certain. The last year, maybe.
24  Year and a half.
25   Q. Who did he replace?

**Page 32**

1      A. Tracey Dickinson.
2    Q. All right. And John Washington is a line
3    pilot; correct?
4      A. He was a line pilot.
5    Q. Okay.
6      A. He's director of training today.
7    Q. I see. So you have reduced
8    responsibilities or do you stop your line flying?
9      A. It's a different position.
10   Q. Okay. One of the categories on the
11   depositions that -- for the corporate representative
12   deposition was number seven, any and all criteria
13   for hiring and/or promoting to the position of
14   captain at Amerijet in effect between the calendar
15   years 1996 and 1999.
16     As I understand your testimony, you really
17   are not able to address that for any time prior to
18   early 1999?
19     A. That's correct.
20   Q. Okay. Have we exhausted what you know
21   about the criteria for promotion to the position of
22   captain at Amerijet in 1999?
23     A. Yes.
24   Q. Okay. Do you know of any other criteria
25   for 1999 that we've not discussed, that the

Page 33

1 progression that you testified to, the steps?
2   A. No.
3   Q. Okay. And did you oversee in 1999 any
4 successful upgrade bids? Did you see anyone
5 appointed captain?
6      MS. NORTON: Object to the form of the
7 question. As corporate rep did he see anyone?
8      MS. SHEA: Let me rephrase it.
9 BY MS. SHEA:
10   Q. Following your taking over the
11 responsibilities of chief pilot in February 1999,
12 during the rest of the year 1999, were there
13 upgrades to captain, promotions from within at
14 Amerijet?
15   A. I don't recall specifically.
16   Q. Do you know if there were some, but you
17 don't recall who, or you're not sure whether there
18 were any?
19   A. I'm not sure whether there were any or
20 not.
21   Q. Who decides -- strike the question. Who
22 decided in 1999 when there would be upgrade bids
23 solicited? In other words, that positions were
24 available.
25   A. Pete Steele.

Page 34

1   Q. The director of operations?
2   A. Correct.
3   Q. That's not a determination that you made
4 as acting chief pilot?
5   A. No.
6   Q. Sir, one of the categories on the
7 corporate notice was number six, plaintiff's
8 February 1999 EEOC charge, including the identity of
9 everyone at Amerijet who was aware of the charge and
10 any response to it.
11      Were you aware in February 1999, that Pat
12 Major had filed a charge with the EEOC?
13   A. I believe that I was aware, yes.
14   Q. Okay. How did you become aware of that?
15   A. I don't recall.
16      MS. NORTON: This may simplify it. We're
17 not offering him on that issue.
18      MS. SHEA: Okay.
19      MS. NORTON: Six and seven are not -- he's
20 not being offered as a corporate rep.
21      MS. SHEA: Are you offering someone else
22 on those issues, that I will be deposing?
23      MS. NORTON: I will let you know.
24      MS. SHEA: Okay. So anything that you
25 would know about that would not be as corporate rep?

Page 35

1      MS. NORTON: Exactly.
2      MS. SHEA: Should I inquire at this point?
3 If you don't mind.
4      MS. NORTON: Be my guest.
5      MS. SHEA: All right.
6 BY MS. SHEA:
7   Q. How did you become aware that Pat Major
8 had filed a charge with the EEOC?
9   A. I don't recall.
10   Q. Do you remember when you became aware of
11 it?
12   A. No.
13   Q. Do you remember any individuals at
14 Amerijet with whom you discussed that information?
15   A. No.
16   Q. Did you prepare any materials in response
17 to that charge?
18   A. No.
19   Q. Do you know whether you became aware of
20 that charge at or about the time it was filed, or
21 was it after the fact?
22   A. I don't recall.
23   Q. Okay.
24   A. Actually, my answer to that is no, I
25 wasn't aware of any of the details of it, other than

Page 36

1 the fact that it happened. That's all I know about
2 it.
3   Q. And other than just hearing it?
4   A. Just hearing it.
5   Q. Around Amerijet?
6   A. Yes.
7   Q. All right. Did you know what the nature
8 was of the EEOC charge?
9   A. No.
10   Q. Did you at -- strike the question. Did
11 knowing about the EEOC charge affect you at all as
12 acting chief pilot and supervisor of Pat Major?
13   A. No.
14   Q. I may have overstated that. Would you
15 characterize yourself at that time as his
16 supervisor?
17   A. At what time is this?
18   Q. During the time that you were acting chief
19 pilot and Pat was a line pilot at Amerijet.
20   A. Yes, I was.
21   Q. Were you informed as Pat Major's
22 supervisor of the EEOC charge?
23   A. No.
24   Q. Did you ever discuss the charge with Pat
25 Major?

Page 37

1    A. l don't believe so, no.
2    Q. Do you know what, if any, resolution there
3  was to that charge while he was still employed at
4  Amerijet?
5    A. No.
6    Q. You don't know one way or the other
7  whether it was resolved?
8    A. No.
9    Q. Okay. I'd like to ask you some questions
10  about the decision to terminate Patrick Major's
11  employment with Amerijet, and you were produced as
12  the most knowledgeable person with Amerijet on that
13  subject. So let me ask you some questions about
14  that. Who decided to terminate Pat Major?
15    A. Pete Steele.
16    Q. And do you recall the date that Pat was
17  terminated?
18    A. No, I don't.
19    Q. Do you recall approximately?
20    A. No.
21    Q. All right. Why was he terminated?
22    A. He was terminated due to our loss of
23  confidence in his abilities as an airman.
24    Q. Okay. What prompted that? What brought
25  about that assessment in that decision?

Page 38

1    A. We felt that Pat was a safety hazard to
2  the airline.
3    Q. Based on what?
4    A. Based upon a letter that he had written in
5  the form of a NASA report.
6    Q. So the discussion concerning Pat and the
7  decision to terminate him was prompted by the NASA
8  report?
9        MS. NORTON: Object to the form of the
10  question. Go ahead.
11    A. It was prompted by a specific sentence
12  in -- contained within the report.
13  BY MS. SHEA:
14    Q. So it was an aspect of the report?
15    A. Correct.
16    Q. And what were all the factors that were
17  discussed in that and that were part of that
18  decision?
19    A. The statement within the letter written by
20  Pat in which he stated that he had seriously
21  considered throwing himself upon the throttles of
22  the airplane as it was rolling down the runway,
23  which we considered to -- would have resulted in
24  certain tragedy.
25        And the fact that based upon a review of

Page 39

1  the tower tapes versus his record of the account and
2  his letter that there was significant differences
3  which either resulted from his -- either he really
4  believes it happened that way or he was deliberately
5  distorting the facts.
6    Q. Okay. Let's look a little bit at the
7  underlying scenario. What was it that Pat was
8  complaining about in the NASA report?
9    A. Pat was concerned about departing on a wet
10  runway.
11    Q. Okay. And by way of simple explanation,
12  are there considerations that need to be taken into
13  account when an aircraft takes off from a runway
14  that's wet rather than dry?
15    A. Yes, there is.
16    Q. And what is that basic consideration?
17    A. The basic consideration that if a runway
18  is considerably contaminated by varying degrees,
19  which are specified in our performance manuals, that
20  there's a weight degradation taken on the airplane
21  to allow for a higher safety margin.
22    Q. Degradation --
23    A. A weight decrease. Decrease the weight on
24  the airplane.
25    Q. All right. To allow a greater safety

Page 40

1  margin?
2    A. Correct.
3    Q. Okay. All right. Just to break that down
4  a little bit. As I understand it, Boeing, as the
5  manufacturer of the 727, puts out a performance
6  manual, is that the performance manual that you're
7  referring to?
8    A. No, I'm not.
9    Q. Okay. What is the performance manual that
10  you're referring to?
11    A. We use a performance manual generated by a
12  company called NavTech.
13    Q. Which is a private company that you
14  contract with?
15    A. Correct. And they have approved a manual
16  system.
17    Q. Okay. Would they go out and study
18  specific airports?
19    A. They -- I don't know how they -- I don't
20  know how they generate a performance manual.
21    Q. But in any event, this private company
22  generates performance manuals that will tell you if
23  a runway is contaminated to a certain degree what
24  weight reductions you need to make?
25    A. That's correct.

**Page 41**

1  Q. Does that NavTech manual also prescribe
2  speed reductions that should be taken under certain
3  circumstances of contamination?
4  A. That's correct.
5  Q. Okay. And am I correct in understanding
6  that the basic reason that you would reduce speed
7  and reduce weight is because there's going to be
8  less friction generated between the aircraft wheel
9  and the runway if it's wet than if it's dry, and
10 therefore, you're going to have to --
11 A. There's going to be more friction
12 generated.
13 Q. Okay. More friction?
14 A. So yes, it is a factor, friction.
15 Q. Okay. And how does reducing weight and
16 the speed offset the effect of that increase in
17 friction?
18 A. Basically, what it does is -- actually, I
19 misstated myself earlier when I said it provides a
20 great safety margin. What it does is provide the
21 same safety margin for the contaminated runway. And
22 that's exactly what it does. It basically reduces
23 the take off. It reduces the -- it actually extends
24 the amount of runway required based on the
25 contamination level and by doing so, levels the

**Page 43**

1  decision speed before your rotation speed.
2  Q. Okay.
3  A. It decreases your decision speed. You
4  make a decision speed earlier in the takeoff roll.
5  Q. Okay. Is there any issues that this is a
6  safety consideration?
7  MS. NORTON: Object to the form of the
8  question. I'm sorry. What do you mean issue?
9  MS. SHEA: Okay. Is -- fair objection.
10 Let me restate it.
11 BY MS. SHEA:
12 Q. Is the NavTech performance manual
13 specifications a safety-related specification?
14 A. It's inasmuch as everything that's
15 generated in the performance manual is safety
16 generated, the performance manual is the limitations
17 of the aircraft. And those are based on a certain
18 safety margin, yes.
19 Q. Okay. So if you exceed those performance
20 limitations for that aircraft, you may be operating
21 in an unsafe fashion?
22 A. That would be correct.
23 Q. Okay. Now, how did you become aware of
24 Pat's complaint that we've been referring to as the
25 NASA report?

**Page 42**

1  playing field, so to speak.
2  Q. Right. So you're trying to adjust for the
3  fact that it's wet and not dry. But in simple
4  terms, that's because you need less weight and more
5  runway to achieve a --
6  A. Less weight or more runway.
7  MS. NORTON: Object to the form of the
8  question. Go ahead.
9  BY MS. SHEA:
10 Q. Okay. Less weight or more runway?
11 A. Correct.
12 Q. I see. So if you take the weight off,
13 then you're back to the level playing field with the
14 dry runway?
15 A. Correct.
16 Q. Okay. And how does the speed reduction
17 work?
18 A. The speed reduction is, again, based upon
19 the level of contamination, it is a -- it is a
20 deduction from the rotation speed of the aircraft to
21 a decision speed. So you reach your decision speed
22 of go, no go prior to your rotation speed. And in
23 most cases that would be the same number, that when
24 you make a reduction like this it becomes two
25 separate numbers. So that you actually reach your

**Page 44**

1  MS. NORTON: Object to the form of the
2  question.
3  A. Pat called me. Either beeped me or called
4  me, to tell me about it.
5  BY MS. SHEA:
6  Q. All right. And what did he say and what
7  did you say? If you recall.
8  A. He told me that he had a flight that he
9  was very concerned about and that he had written a
10 NASA report concerning the incident.
11 Q. Okay. And what, if any, response did you
12 make to him?
13 A. I told him that was fine and that if he
14 would forward that in to me, that I would
15 investigate the situation.
16 Q. Did he tell you at that time whether he
17 had actually filed it with NASA?
18 A. I believe that at the time he told me he
19 had sent it to NASA, yes, I believe so.
20 Q. Okay. How did you get the report?
21 A. He faxed it in to us.
22 Q. And what did you do with it once you
23 received it?
24 A. I didn't actually receive it. I was not
25 in the office that week.

1    Q. Where were you, on vacation or just off
2    the schedule?
3        A. I was out of town.
4        Q. Okay. All right. So you spoke to him
5    after the flight. Was that while you were out of
6    town or was that before you departed?
7        A. That was while I was out of town.
8        Q. Okay. And then you just said fax it to me
9    at the office?
10       A. Yes.
11       Q. Do you know if any action was taken on it
12   before you returned?
13       A. Yes.
14       Q. Okay. What do you know about that?
15       A. Pat was suspended from the schedule.
16       Q. Were you part of any telephone conferences
17   or other conferences about that?
18       A. No.
19       Q. Did you do any investigation or any review
20   of this report between the date that Pat called you
21   and his being suspended from the schedule?
22       A. Yes.
23       Q. Okay. What did you do?
24       A. Well, I'm sorry. Between the time that he
25   called me.

1        A. We investigated the letter.
2        Q. Okay. What, if any, investigation had
3    already been done?
4        A. I don't know.
5        Q. Okay. When you say we investigated the
6    letter, is that you and Pete Steele?
7        A. Yes, we were all involved in it. And John
8    Washington.
9        Q. Anyone else?
10       A. Not that I recall.
11       Q. Mark Stewart?
12       A. I don't believe so, no.
13       Q. Dave Bassett?
14       A. Not to my recollection.
15       Q. And forgive me if I've asked you this
16   already, but do you know what, if anything, had been
17   done by the others that caused them to suspend Pat
18   Major while you were still out?
19       A. Other than reading the letter, that's all
20   I know.
21       Q. All right. So when you say we
22   investigated it once you got back, what did that
23   consist of?
24       A. It consisted of listening to the tower
25   tapes.

1        Q. Right.
2        A. And he was being suspended.
3        Q. And when he was being suspended.
4        A. No, I did not.
5        Q. Okay. Do you know who decided to suspend
6    him?
7        A. Yes. Pete Steele.
8        Q. Okay. So when you came back to work --
9    strike the question. How long were you away from
10   Amerijet?
11       A. I was away until the following Monday.
12       Q. Okay. Do you remember what day of the
13   week the flight was that Pat complained about?
14       A. I believe it was a Wednesday or a
15   Thursday.
16       Q. Okay.
17       A. The previous week.
18       Q. But it's your recollection by the time you
19   came back he was already suspended?
20       A. That's correct.
21       Q. All right. Even you had not talked to
22   Pete Steele or anyone else inside Amerijet about
23   that?
24       A. That's correct.
25       Q. What happened on your return?

1        Q. Okay. Had those already been obtained?
2        A. They were not actually obtained at the
3    time. We requested production of them, I believe.
4    But we did actually listen to them in the tower.
5        Q. All right. So you, Derry Huff, got the
6    tower tapes?
7        A. We requested the tower tapes.
8        Q. Okay. In other words, they weren't
9    available when you returned from va -- or from being
10   out of town?
11       A. They were available for us to listen to,
12   but we were not given a hard copy of the tapes.
13       Q. When did you listen to them?
14       A. Sometime early in that week.
15       Q. Okay. So you actually went over to the
16   aviation authority and listened to them?
17       A. Yes.
18       Q. Who was part of that?
19       A. I believe it was Pete Steele, John
20   Washington and myself.
21       Q. Okay. And are you able to testify as to
22   the discrepancy between what was in Pat's complaint
23   and what you heard when you went to the aviation
24   authority?
25       MS. NORTON: Object to the form of the

**Page 49**

1  question. Go ahead and answer.
2      MS. SHEA: I'll rephrase it.
3  BY MS. SHEA:
4      Q. Was there anything about your listening to
5  the tower tapes that you found significant?
6      A. Yes. The content -- just flat out that
7  the content of the letter was not the same as the
8  content of the audiotapes.
9      Q. Okay. Do you recall any material way in
10  which it differed?
11      A. There was significant discrepancies
12  between the sequence of events, the reported
13  material.
14      Q. Okay. Was there a -- an advisory or a
15  bulletin, whatever you would call it, from the tower
16  of standing water of less than one quarter inch
17  before the Amerijet plane was given take off
18  permission?
19      MS. NORTON: Object to the form of the
20  question. What time frame? Immediately before,
21  days before, hours before?
22      MS. SHEA: Well, on the tape that you
23  listened to.
24      MS. NORTON: Okay.
25      A. As far as I can recall, there was a report

**Page 50**

1  given immediately prior to the takeoff clearance.
2  BY MS. SHEA:
3      Q. Okay. Was that consistent with Pat
4  Major's complaint?
5      A. No, it was not. I don't believe so.
6      Q. Okay. Do you recall what Pat's complaint,
7  the sequence that Pat's complaint had that was at
8  odds with the tower tapes?
9      A. No, not specifically.
10      Q. Okay. Any other items in the sequence
11  that you heard on the tower tapes that you found
12  inconsistent with Pat's report?
13      A. As I said, there were several
14  inconsistencies. I don't know the specifics of them
15  at this time.
16      Q. Okay. You can't --
17      A. I don't recall the specifics of them.
18      Q. Did you document those at all?
19      A. We have a transcript of it.
20      Q. You got that after the fact?
21      A. After the -- yes.
22      Q. As you three sat and listened to it, did
23  you take any notes or create any documents of what
24  you were hearing and how you felt it was at variance
25  with Pat's complaint?

**Page 51**

1      A. Yes, we did.
2      Q. What became of those notes?
3      A. At what time are you talking about these
4  notes being done?
5      Q. Contemporaneously with going over to the
6  aviation authority and listening to them.
7      A. Yes, we did take notes. I have no idea
8  what became of those notes.
9      Q. Did you prepare any kind of file
10  memorandum or any kind of document to summarize the
11  variances or the inconsistencies?
12      A. I did not, no.
13      Q. Do you know whether John did or Pete
14  Steele did?
15      A. I do not know.
16      Q. Okay. Have you seen any document at
17  Amerijet, whether in Pat's file or otherwise, that
18  sets forth what you consider, what Amerijet
19  considers to be the inconsistencies between the
20  tower tapes and Pat's complaint?
21      MS. NORTON: That was used at the time.
22      MS. SHEA: Well, used at the time or --
23      MS. NORTON: Not in preparation for this
24  litigation.
25      MS. SHEA: No.

**Page 52**

1      MS. NORTON: Okay.
2      MS. SHEA: I would exclude that, but I
3  would say either at the time or perhaps during the
4  FAA inquiry.
5      A. Not that I recall specifically, no.
6  BY MS. SHEA:
7      Q. So you can't think of such a document?
8      A. I remember, I remember taking notes on the
9  sequence of events on the tower tape, comparing
10  notes to the letter, but I don't -- other than that,
11  I'm not aware of anything.
12      Q. Either that you did or that anybody else
13  did that was involved.
14      A. Correct.
15      Q. Okay. So there came a time later on when
16  you did get copies of the tower tapes?
17      A. Yes.
18      Q. Okay. And prepared a transcript?
19      A. Correct.
20      Q. All right. What else was done in terms of
21  investigation once you returned to Amerijet?
22      A. We reviewed our runway analysis
23  procedures.
24      Q. Okay. For what purpose?
25      A. To basically review what, if any,

1  performance degradation there would have been due to
2  the circumstances on the runway.
3     Q. Okay. And again, it was you, John and
4  Pete collectively?
5     A. Correct.
6     Q. And what, if any, conclusions did you
7  make?
8     A. We concluded that there was no error.
9     Q. And why was that?
10       MS. NORTON: Object to the form of the
11 question. Why was there no error?
12 BY MS. SHEA:
13    Q. What was the basis for that conclusion
14 that there was no error?
15    A. Because departure that they did fell
16 within the parameters of the performance solution
17 that they had created.
18    Q. All right. In forming that conclusion,
19 was it your assumption that it was a dry departure
20 analysis?
21    A. That's correct.
22    Q. Okay. So the parameters were appropriate
23 for dry runway conditions?
24    A. That's correct.
25    Q. Okay. And why did you analyze this as a

1  dry departure analysis rather than a standing water
2  of less than one quarter inch?
3     A. Because the captain's observation of the
4  runway determined that the standing water was in the
5  last quarter of the departure runway, which
6  basically negated its viability. It took it out of
7  the picture.
8     Q. Okay. Is there a citation in the
9  performance manual that allows that type of
10 determination to be made?
11    A. That is -- that is covered in the
12 definitions section of the performance manual.
13    Q. Can you cite me to something on that?
14    A. No, I can't.
15    Q. All right. So let me see if I understand
16 this. You found from the tower tapes that the
17 report of runway contamination consisting of
18 standing water of less than a quarter inch was
19 conveyed by dispatch to the flight before it took
20 off?
21    A. Repeat the question, please.
22    Q. Okay. You found from listening to the
23 tower tapes that the report of standing water of
24 less than a quarter inch was conveyed to the flight
25 crew before the take off; is that correct?

1        MS. NORTON: Object to the form of the
2  question.
3     A. That is correct.
4  BY MS. SHEA:
5     Q. So the weight and speed
6  degradations would be obligatory under the
7  performance manual, would they not?
8     A. No, they would not.
9     Q. And that is why? What is the basis for
10 your opinion that they were not at that point
11 mandatory?
12    A. It was reported as less than a quarter of
13 an inch. And the runway was dry, three-quarters of
14 the runway was dry.
15    Q. Okay. So it's your testimony as the
16 corporate rep of Amerijet that you collectively
17 decided that you -- the performance manual
18 reductions did not need to be taken because the
19 captain visually observed that there was no actual
20 standing water for the first three-quarters of the
21 runway?
22    A. That's correct.
23    Q. Okay. And what, if any, documentation did
24 you get from the captain of this flight concerning
25 that observation?

1     A. I believe that we have a report from the
2  captain that was issued to the FAA. But I don't
3  recall exactly what it is.
4     Q. That would have been months later?
5     A. Correct.
6     Q. Before Pat Major was terminated, what, if
7  any, documentation did you get from the captain of
8  the flight?
9     A. I don't recall.
10    Q. Okay. And the decision maker to terminate
11 Pat Major for the situation was Pete Steele, the
12 director?
13    A. That's correct.
14    Q. And the captain in this case was who?
15    A. Brian Steele.
16    Q. And what, if any, relationship does he
17 have to the director of operation, Steele?
18    A. He's the brother. They're brothers.
19    Q. Is it your testimony that there is a
20 definition section of the performance manual which
21 allows a captain to not take a weight reduction or a
22 speed reduction in a contamination situation if
23 their observations are different than the official
24 report?
25    A. There is covered in the definition section

1 of the performance manual the -- what is defined as
2 being standing water, what percentage of the runway,
3 yes.
4     Q. Okay. And do you recall, does that say
5 something about it has to be close to the aircraft
6 or it doesn't count, or something like that?
7         MS. NORTON: Object to the form of the
8 question.
9     A. Repeat the question, please.
10        MS. NORTON: I think the reg speaks for
11 itself. The definitions speak for themself.
12 BY MS. SHEA:
13    Q. It's the definition section of the
14 performance manual that defines standing water of
15 one quarter inch in a way that's consistent with
16 allowing the captain to decide whether there really
17 is standing water?
18    A. The captain gets -- the captain can
19 ascertain the condition of the runway.
20    Q. Okay.
21    A. But that is not included in the
22 performance manual.
23    Q. Okay.
24    A To my knowledge.
25    Q. So the captain can choose not to take a

1 tower dispatched advisory of that nature as given?
2    A. That's correct.
3    Q. What if the opposite occurs? What, if
4 any, policy does the performance manual have with
5 respect to when a captain sees contamination that
6 may not be reported by the tower or by an official
7 report?
8    A. That's the captain's duty to accommodate
9 whatever situation is presented to him.
10    Q. So even if a tower has not reported
11 contamination, if a captain observes it, he should
12 take the same degradation that would be called for
13 if there was an official report?
14    A. That's correct.
15    Q. Okay. Is that stated in the definition
16 section of the performance manual?
17    A. No, that's not.
18    Q. Is there a provision in the performance
19 manual that allows a -- strike the question. Does
20 Amerijet have a policy that allows a pilot in
21 command to disregard a runway analysis or an
22 official report because he disagrees with it?
23    A. The captain of a flight has the final
24 authority over its operation, as long as it's within
25 the confines of our operating procedures.

1    Q. Okay. But my question is, is there a
2 written procedure somewhere which states that a
3 captain can disregard a runway analysis or an
4 official contamination report if he disagrees with
5 it? He or she.
6    A. Not specifically, to my knowledge.
7    Q. I guess there's no shes yet. Okay. What,
8 if any, other investigation was done before Pat
9 Major was terminated?
10    A. Would you repeat the question, please?
11    Q. Okay. You testified that you listened to
12 the tower reports and you reviewed the runway
13 analysis and you as a group reached a conclusion
14 that the captain could disregard that report which I
15 suppose means that you had some conversation with
16 Captain Steele.
17        MS. NORTON: Object to the form of the
18 question.
19        MS. SHEA: Okay.
20    A. We had a conversation -- we had a
21 conversation with the captain, the flight engineer
22 and the most swaying conversation we had was the
23 check airman that was on board.
24 BY MS. SHEA:
25    Q. And this was all before Pat Major was

1 terminated?
2    A. That's correct.
3    Q. All right. So that he was, Brian Steele,
4 Al Jorsey. Do you recall who the flight engineer
5 was?
6    A. I believe it was Brett Wise.
7    Q. And they -- what was the contribution of
8 Al Jorsey to the investigation?
9    A. Other than an oral report, he submitted a
10 written performance report.
11    Q. Okay. And did that address the degree of
12 water or lack of water on the runway?
13    A. I don't recall specifically what it
14 addressed.
15    Q. What was the contribution of Brett Wise to
16 the investigation?
17    A. Other than his accounting of what
18 happened, I don't recall any specific.
19    Q. Did he do a written report?
20    A. I don't recall if he did or not.
21    Q. Okay. And was Al Jorsey's report part of
22 what was relied upon in making the decision to
23 terminate Mr. Major?
24    A. That was part of that decision, yes.
25    Q. But you don't recall the contents of it as

Page 61

1  it relates to the specific issue of whether the
2  aircraft was being operated within correct
3  parameters?
4  A. Generally speaking, that the aircraft did
5  operate within the normal safety margin and that he
6  found Pat, Pat's performance to be poor.
7  Q. Do you recall in what objective way he
8  found Pat's performance to be poor?
9  A. His observing as a check airman.
10  Q. So beyond that, do you recall any
11  specifics, like raised his voice or disregarded, or
12  do you recall anything in specific that Al Jorsey
13  was critical of?
14  A. He specifically, I recall that he was
15  critical of Pat's acceptance of a clearance from
16  Miami center, that we were not authorized to accept.
17  Q. Miami, I thought you were at Fort
18  Lauderdale that day, that flight.
19  A. Miami center covers from Jacksonville to
20  almost San Juan.
21  Q. Okay. All right. Al Jorsey was critical
22  of Pat's acceptance of a clearance from them?
23  A. Correct.
24  Q. Okay. Why, do you know?
25  A. It was in violation of our company

Page 62

1  procedures.
2  Q. How so?
3  A. We're not authorized to perform what the
4  clearance was and he accepted the clearance.
5  Q. Okay. Can you be any more specific about
6  that?
7  A. Pat accepted a clearance to go direct to
8  an intersection that he wasn't capable of navigating
9  to.
10  Q. Okay. So this is after the takeoff?
11  A. That's correct.
12  Q. Okay. What, if any, criticisms did check
13  airman Jorsey have -- make of Pat relative to the
14  takeoff conditions?
15  A. I don't recall any specific.
16  Q. And what, if any, observations did Al
17  Jorsey make in his report concerning the degree of
18  contamination of the runway?
19  A. I don't recall any specific comments to
20  it.
21  Q. Okay. All right. And you don't recall
22  Brian Steele doing any written report before Pat
23  Major was let go?
24  A. I don't recall if there was one made or
25  not.

Page 63

1  Q. All right. What else, if anything,
2  transpired before Pat Major was terminated?
3  A. Prior to his termination, after the
4  decision was made?
5  Q. Well, after this investigation that you've
6  described was under way, was there any further
7  investigation, or have you described it in full?
8  A. That's pretty much the whole thing.
9  Q. Did you have any meetings with the FAA?
10  A. No, we did not.
11  Q. All right.
12  A. That I was involved in, we did not.
13  Q. Okay. And a decision was made to
14  terminate Pat. Was that made in a meeting?
15  A. That was made -- I don't recall exactly
16  when it was made. It was made by the director of
17  operations.
18  Q. Well, did you give him advice and consent
19  on it, so to speak? Did you give him an opinion?
20  A. I agreed with his decision.
21  Q. If the weight reduction had been taken on
22  the flight in question in accordance with the runway
23  analysis, would that have involved a substantial
24  delay of the flight?
25  MS. NORTON: Object to the form of the

Page 64

1  question.
2  MS. SHEA: What, substantial?
3  MS. NORTON: No.
4  A. There was no -- in accordance with the
5  runway analysis, there was no weight degradation to
6  be made.
7  BY MS. SHEA:
8  Q. Well, having a situation in which cargo
9  were to be offloaded, that would have caused a delay
10  in the flight; is that correct?
11  A. Re -- would you repeat it, please.
12  Q. We are in a situation in which cargo had
13  to be offloaded, that would cause a delay in the
14  flight; is that correct?
15  A. It could conceivably cause a delay. It
16  may or may not. Depending on when the airplane was
17  loaded and when the departure time was.
18  Q. Does Amerijet charge its cargo customers
19  by the pound, like I pay FedEx or UPS?
20  A. Generally speaking, yes.
21  Q. Is it fair to say that Amerijet tries to
22  fly its planes as close as possible up to the
23  maximum cargo capacity to increase revenues?
24  A. It depends on the customer. But generally
25  speaking, yes.

1  Q. Was the flight in question the one about
2  which Pat Major complained at full capacity for
3  cargo and fuel?
4     A. I have no idea.
5     Q. All right. Did Pete Steele ask you to
6  prepare the letter to Pat and give you the wording
7  for that letter?
8     MS. NORTON: Object to the form of the
9  question.
10    A. We did discuss the wording of the letter,
11 yes.
12 BY MS. SHEA:
13    Q. Okay. Was that you, Pete and John or just
14 you and Pete?
15    A. That was I believe Pete, myself. And I
16 believe at that time we had engaged legal counsel at
17 that point.
18    Q. Okay. Now, was Pat's -- Pat Major's
19 complaint that we're calling the NASA complaint, the
20 first time that he had taken up with you
21 specifically concerns relating to runway
22 contamination?
23    MS. NORTON: Object to the form of the
24 question. You're calling it the NASA report.
25    MS. SHEA: Okay.

1     MS. NORTON: I mean, we've not agreed that
2  that's the name for it.
3     MS. SHEA: All right. Fair enough. Let's
4  back up.
5  BY MS. SHEA:
6     Q. The report that triggered Pat being
7  terminated, how would you describe it?
8     MS. NORTON: Object to the form of the
9  question.
10    A. The report?
11 BY MS. SHEA:
12    Q. Right.
13    A. How would I describe the report?
14    Q. Right.
15    A. I would describe it as a letter that Pat
16 was sending to NASA, told me he was sending to NASA.
17    Q. So if I call it the NASA report, we'll
18 know what I'm talking about; is that fair?
19    A. That's fine.
20    Q. Because you don't recall the date of it.
21 That's why I'm looking for another designation. Is
22 that fair?
23    A. That's fine.
24    Q. Okay. Was this incident, that flight, and
25 the report that followed from it, the first time

1  that you and Pat had an exchange concerning runway
2  contamination?
3     A. No, it was not.
4     Q. Okay. What -- on what previous occasion
5  or occasions had you and Pat Major spoken or had
6  contact about that subject?
7     A. We discussed a previous flight that Pat
8  had with the same captain I believe a few months
9  earlier.
10    MS. NORTON: Can we take a break before we
11 get into that subject?
12    MS. SHEA: Sure.
13    (Recess was taken.)
14 BY MS. SHEA:
15    Q. All right. We were talking about the
16 earlier incident in which you and Pat Major had been
17 in contact about a contaminated runway. And that
18 concerned a flight that Pat Major had with Brian
19 Steele as well; is that correct?
20    A. Um-hum.
21    Q. You have to answer yes or --
22    A. Yes, sorry.
23    Q. And what was the nature of that incident?
24    MS. NORTON: Object to the form of the
25 question.

1     MS. SHEA: Okay. I'll restate that.
2  BY MS. SHEA:
3     Q. What did you come to learn about the
4  earlier flight with Pat Major and Brian Steele?
5     A. My recollection of the events about the
6  previous flight are that Pat and Brian both wrote
7  letters to me basically complaining about each
8  other's actions on the flight. And I investigated
9  it and discussed the situation with both of them.
10    Q. Okay. Do you remember whose letter came
11 first?
12    A. I believe it was Captain Steele's.
13    Q. Okay. And when you said you investigated
14 it and discussed it, was it you alone or did you
15 involve Pete Steele or John Washington or anyone
16 else at that time?
17    A. No. I handled this on my own, as I
18 recall.
19    Q. All right. Once you discussed the matter
20 with each of them, did you take any action on that
21 matter?
22    A. Other than counseling them both on the
23 situation.
24    Q. Okay.
25    A. That's the action I took.

1   Q. Okay. You counseled them individually?
2   A. Correct.
3   Q. What was the nature of your counseling
4 with Captain Steele?
5   A. Basically, at the time I -- my advice to
6 him was that if he was having a problem with
7 insubordinate crew members, that he should in an
8 instance like that return to the gate and replace
9 the crew member at that time.
10   Q. Did you form any opinion yourself as to
11 Pat Major's conduct on that occasion, whether it
12 constituted insubordination?
13   A. I felt that Pat was -- I did feel that Pat
14 was insubordinate, yes.
15   Q. And in what regard?
16   A. In the regard that he overrode the
17 captain's decision. Tried to override the captain's
18 decision.
19   Q. Okay. And is that a violation of Amerijet
20 policy?
21   A. Yes, it is.
22   Q. Was Pat disciplined for that violation?
23   A. No, he was not. He was counseled.
24   Q. Nothing was entered in his file about
25 that?

1   A. Not to my knowledge.
2   Q. What did your counseling with Pat consist
3 of? Pat Major.
4   A. I reviewed with him the -- his obligations
5 in preparing a flight and the considerations taken
6 in choosing a runway for departure.
7   Q. Did you make any comment to him to the
8 effect that you agreed with what he had done or that
9 you did not fault him for what he had done?
10   A. No. The comment that I made to Pat -- no,
11 I didn't make any comment like that.
12   Q. What did you comment to him, if anything?
13   A. I told him that if he had concerns about
14 the performance that he was generating, performance
15 wouldn't balance the plan that he was generating,
16 that he should address those at the gate while he
17 was performing -- while he's computing that
18 performance and resolve any discrepancies, he thinks
19 he might have at that time.
20   Q. What, if any, discussion did you have with
21 Pat on that occasion concerning runway
22 contamination?
23   A. I don't recall centering our discussion on
24 runway contamination.
25   Q. Okay. What, if any, suggestions or

1 recommendations did Pat Major make with respect to
2 whether Amerijet should have a policy concerning
3 wet -- distinguishing wet and dry runways?
4   A. I don't recall specifically anything like
5 that.
6   Q. Do you recall in general his suggesting
7 that Amerijet should consider a policy?
8   A. I don't recall that.
9   Q. You don't recall one way or the other?
10   A. I do not recall that.
11   Q. In your investigation into the incident or
12 into the situation that happened previously between
13 Pat Major and Brian Steele, do you recall what
14 airport was involved?
15   A. I believe it was Miami.
16   Q. And do you recall what the weather
17 conditions were the day of the flight in question?
18   A. No.
19   Q. Did you form any opinion when you
20 investigated that matter as to whether or not weight
21 degradation should have been taken or needed to be
22 taken on that particular flight for that particular
23 flight?
24   A. Yes, I did. I remember reviewing the case
25 and not having any problem with the way that Pat had

1 computed the departure performance.
2   Q. Okay. But did Pat and Brian have a --
3 Brian Steele have a disagreement as to whether a
4 weight degradation needed to be taken on that
5 occasion?
6   A. Not to my knowledge.
7   Q. Was -- has Amerijet at any time, to your
8 knowledge, prior to August 1999, considered having a
9 wet runway policy that would cause degradations to
10 be taken if a captain observes rain, even if there
11 may not be an official report?
12   MS. NORTON: Object to the form of the
13 question. Go ahead.
14   A. We have a policy in place. It states we
15 have a runway analysis manual, and based upon that
16 runway analysis manual and the observations made at
17 the airport, the crew, the captain signs a weight
18 and balance form. That is computed by the first
19 officer.
20 BY MS. SHEA:
21   Q. Is there an Amerijet policy which gives
22 captains the latitude to take the weight and speed
23 reductions, even if not -- even if there's no
24 official report of standing water that would trigger
25 the NavTech analysis?

1     MS. NORTON: Object to the form of the
2 question. Go ahead.
3     A. The captain has the final authority on the
4 safety of the flight.
5 BY MS. SHEA:
6     Q. Okay. So my question is, is there an
7 Amerijet policy which specifically authorizes that
8 particular conduct or no?
9     A. Not specifically, no.
10     Q. When the letter to Pat Major was being
11 worded, was the decision made not to state any
12 grounds for the termination, other than this
13 generalized loss of confidence?
14     A. That was the reason for his termination.
15     Q. But you've testified today that it was
16 based on one sentence of the report and the
17 discrepancies in the tower tape. My question was,
18 was there consideration given to being more specific
19 in the letter and then it taken out?
20     A. Not that I recall.
21     Q. Well, you signed the letter; right?
22     A. That's correct.
23     Q. What -- I'm a little confused about you
24 said Pete made the decision, but then you signed the
25 letter.

1     A. I wrote the letter.
2     Q. Right. So what did you mean by loss of
3 confidence?
4     A. I then -- I mean that we felt that Pat --
5 we could not entrust Pat with the responsibilities
6 of operating our aircraft any further.
7     Q. Okay. And were there -- and other than
8 the sentence in his NASA report and the
9 discrepancies in the tower tapes, were there any
10 factors that led you to collectively decide that you
11 could not entrust Pat with the responsibility of
12 operating aircraft any further?
13     A. There were other issues leading up to
14 that, yes.
15     Q. What were those?
16     A. Just general observations that, a couple
17 general observations that I made of Pat.
18     Q. You'll agree that there's nothing in his
19 file that shows he's anything other than a pilot in
20 good standing at Amerijet up till this disciplinary
21 suspension, would you not?
22     A. I don't know what the full contents of
23 this file entail.
24     Q. Well, did you review them before you
25 decided to terminate an eight and a half year

1 employee?
2     A. No. We pretty much -- we terminated him
3 based on the actions that present themselves.
4     Q. Which was what you've testified to arose
5 out of the NASA report?
6     A. Correct.
7     MS. NORTON: Object to the form of the
8 question.
9 BY MS. SHEA:
10     Q. You wouldn't have terminated him because
11 he made a NASA report, would you?
12     A. Absolutely not.
13     Q. What, if any, reaction did you have to the
14 fact that he reported to NASA the conduct that he
15 was complaining about?
16     A. I had no problem with that.
17     Q. Any other pilots that you know of at
18 Amerijet that have filed that kind of report?
19     A. Yes.
20     Q. Okay. In what situations?
21     A. Generally, I can think of one other
22 instance in which a pilot filed a NASA report after
23 he had -- he knew that he had committed a violation.
24     Q. Was that before or after this incident?
25     A. That was before incident.

1     Q. And his report was limited to his personal
2 behavior? He personally committed a violation?
3     A. Well, he committed a violation with the
4 company aircraft.
5     Q. Okay. Did he accuse the company of any
6 wrongdoing unrelated to his own conduct?
7     A. No, he did not.
8     Q. Okay. Was that employee disciplined in
9 any way?
10     A. No.
11     Q. He was not terminated or otherwise
12 disciplined?
13     A. No.
14     Q. General observations that you had made of
15 Pat, anything objective or specific you can tell me
16 about, or is it just a feeling?
17     A. I can recall a couple of specific
18 instances in which my confidence in him was eroded
19 considerably.
20     Q. All right. And were these part of your
21 decision process or your contribution to that
22 decision in August 1999, or are they ones that
23 you've thought about since then?
24     A. I would say that they definitely
25 contributed to my overall feeling of confidence

1  about Pat.
2     Q. All right. And what were those?
3     A. One was an instance in which Pat was
4  operating as a co-pilot for me while as a line
5  captain in which he was flying the aircraft and we
6  were descending into Grenada, the island of Grenada,
7  and he basically completely missed the island.
8        I tried on several attempts to tactfully
9  point out to him that he was going to miss the
10 island by about 30 miles, and he didn't get the
11 picture until finally I had to take the airplane and
12 conclude the flight.
13    Q. When was that?
14    A. I don't know when that specifically was.
15 Sometime during my time as a captain.
16    Q. So that could have been at least a year
17 before his termination?
18    A. It could have been.
19    Q. Okay. You don't know, you can't be any
20 more specific about the time?
21    A. No, I cannot.
22    Q. Okay. Any documentation of that?
23    A. No.
24    Q. Any other instances?
25    A. Yes. I can remember one other instance.

1  There was a conversation between Pat and I on a
2  flight, a nighttime flight returning from the
3  Caribbean, in which I asked Pat about the rumors
4  that I had heard about his discussions about
5  out-of-body experiences.
6        And I asked him, you know, if he knew that
7  there were these rumors going around and what did he
8  have to say about it. And he basically told me that
9  it was very true and that he had experienced them
10 quite regularly and described an instance that he
11 had recently in which he had been flying and felt
12 himself exit the cockpit of the airplane and view
13 himself flying from outside the cockpit.
14    Q. Okay. And can you be any more specific
15 about when that was?
16    A. No.
17    Q. Anybody else part of this conversation
18 other than you and Pat Major?
19    A. Whoever the crew, the other crew member
20 was in the cockpit at the time. And I have no idea
21 who it was.
22    Q. Any documentation of that? In time frame.
23    A. Sometime while I was line captain.
24    Q. Okay. Do you know whether Pat was the
25 first officer or a flight engineer at that time?

1     A. He was a first officer.
2     Q. Any other episodes that caused you to have
3  personal loss of confidence in Pat?
4     A. There was one other instance, that was
5  during the time that Pat had come in to discuss a
6  stalking claim that was filed by another employee
7  against Pat. And that was with Juan Morales, myself
8  and Pat, during which he basically rambled on for
9  probably close to an hour and a half.
10       At times, as far as I was concerned,
11 incoherently. And I was absolutely shocked at that
12 time as to his state of mind.
13    Q. Okay. Do you recall when that episode
14 was?
15    A. Not specifically, no.
16    Q. A year?
17    A. Sometime in 1999.
18    Q. And you were involved in this episode as
19 acting chief pilot?
20    A. That's correct.
21    Q. Okay. And what prompted the meeting with
22 Pat?
23    A. It was an accusation by another crew
24 member that Pat was stalking him.
25    Q. Was that term used by the other crew

1  member or was that a term that was --
2     A. That was how it was reported to us, that
3  he was being stalked.
4     Q. And who was that?
5     A. Tim Green.
6     Q. And did he tell you what he meant by
7  stalked? Strike the question. Did you personally
8  meet with Tim Green concerning this?
9     A. Tim Green came to me with it, yes.
10    Q. And told you that he was being stalked?
11    A. Yes.
12    Q. Okay. That was the word he used?
13    A. That was the word he used.
14    Q. And I assume you said what do you mean by
15 stalked?
16    A. Yes.
17    Q. What did he say?
18    A. He proceeded to describe to me how he had
19 been closely following circumstances in his life and
20 intruding into his personal business and sharing
21 with other employees within the company, to include
22 documentation, copies of documentation and I believe
23 repeated phone calls to Tim Green's house
24 concerning -- concerning the subject, and that Tim
25 had asked him on several occasions to stop, to stop

| | | | |
|---|---|---|---|
| 1 | the behavior. And he had not done so. | 1 | A. A summary of the meeting. |
| 2 | Q. Did Tim make a written complaint? | 2 | Q. Okay. Was -- did that become part of |
| 3 | A. I don't recall that if he did or not. | 3 | Pat's file? |
| 4 | Q. Okay. Do you recall the personal business | 4 | A. I don't know if it's in Pat's file or not. |
| 5 | of Tim's that he was objecting to Pat's interest in? | 5 | Q. What did you do with that after you |
| 6 | A. I believe that some of it centered around | 6 | created it? |
| 7 | an injury that Tim had received while traveling on | 7 | A. I submitted it to the human resources, to |
| 8 | company business. | 8 | Juan Morales. |
| 9 | Q. He got something like almost a $4 million | 9 | Q. Did it have opinions in it or did it just |
| 10 | judgment? | 10 | recount who said what? |
| 11 | A. Really? | 11 | A. I don't recall the specifics of the |
| 12 | Q. Is that -- have you heard that? | 12 | letter. |
| 13 | A. I have no idea. | 13 | Q. Okay. Did you make any recommendations in |
| 14 | Q. Never heard that before? | 14 | it regarding any discipline or any measures to be |
| 15 | A. No. | 15 | taken, either involving Pat or involving Tim Green? |
| 16 | Q. What else, if anything, do you know about | 16 | A. I don't recall the specifics of the |
| 17 | the subject that Pat was interested in? Pat Major | 17 | letter. |
| 18 | was interested in. | 18 | Q. Well, did you form an opinion that |
| 19 | A. I don't recall any other specifics of the | 19 | anything should be done concerning the situation? |
| 20 | accusation. | 20 | A. The result of the meeting was that -- was |
| 21 | Q. It was a workers' compensation injury, as | 21 | that we had asked Pat to cease his behavior and that |
| 22 | you know it. | 22 | was the end of it. |
| 23 | A. I don't recall the specifics of the rest | 23 | Q. No further complaints from Tim Green? |
| 24 | of it. | 24 | A. No. |
| 25 | Q. An injury. Anyone else involved in this | 25 | Q. So to your knowledge, Pat did refrain from |

| | | | |
|---|---|---|---|
| | Page 82 | | Page 84 |
| 1 | investigation or this -- accepting this complaint | 1 | whatever it was that Tim had objected to following |
| 2 | other than you? | 2 | your meeting? |
| 3 | A. Juan Morales. | 3 | A. To my -- I had no further complaints from |
| 4 | MS. NORTON: Object to the form of the | 4 | Tim Green. |
| 5 | question. | 5 | Q. Okay. Other than phone calls to his home, |
| 6 | BY MS. SHEA: | 6 | did Tim Green recount any direct contact with Pat |
| 7 | Q. Who was Juan Morales? | 7 | Major that he was objecting to? |
| 8 | A. He was the director of human resources. | 8 | MS. NORTON: Other than what he's already |
| 9 | Q. And did Tim make this report to the two of | 9 | said. |
| 10 | you or did you involve Juan after Tim Green came to | 10 | A. I believe that Tim stated that he had been |
| 11 | you? | 11 | confronted by Pat on the airport ramp on occasion. |
| 12 | A. He made the report to the two of us. | 12 | BY MS. SHEA: |
| 13 | Q. Is Juan still with the company? | 13 | Q. So Pat had, according to Tim, confronted |
| 14 | A. No, he's not. | 14 | him on the ramp and telephoned him at home? |
| 15 | Q. Where did he go? | 15 | A. That's correct. |
| 16 | A. I believe that he's working at DHL. | 16 | Q. All right. Okay. Anything else that Tim |
| 17 | Q. Okay. What, if any -- strike the | 17 | recounted to you that would comprise what he called |
| 18 | question. You said you brought Pat in for a | 18 | stalking, that you recall? |
| 19 | meeting, and his response to this accusation caused | 19 | A. No. |
| 20 | you to question his state of mind. | 20 | Q. And other than it being something when an |
| 21 | A. That's correct. | 21 | injury that he, Tim, had received, do you recall |
| 22 | Q. Did you make any documentation of the | 22 | what it was that was the subject of what Pat was |
| 23 | complaint or of your meeting with Pat? | 23 | supposedly interested in about Tim? |
| 24 | A. Yes, I did. | 24 | A. No. |
| 25 | Q. What did that consist of? | 25 | Q. Okay. All right. So this episode did not |

DERRY HUFF Condenselt™ MAJOR V. AMERIJET

1 cause you to lose confidence in Pat sufficient to
2 take any steps of discipline against him?
3     A. Which episode are you referring to?
4     Q. This, the Tim Green complaint.
5     A. No. We confronted him. We confronted Pat
6 with the accusation and informed him of the fact
7 that he had been asked to stop by the person, and we
8 asked him officially to stop the behavior.
9     Q. Okay. And he, to your knowledge, did stop
10 the behavior?
11     A. All I know is I didn't have any further
12 complaints about it.
13     Q. But my question is this didn't cause you
14 to lose confidence in Pat Major's flying ability
15 sufficient to do anything about that?
16     A. It caused me concern about his judgment.
17 And his reaction to our request further caused me
18 more concern about my judgment, due to the fact
19 that he rambled on about various subjects completely
20 unrelated to anything we were discussing and went on
21 for a good hour and a half.
22     Q. You felt that he overreacted to this
23 issue?
24     MS. NORTON: Object to the form of the
25 question.

1 being made a captain at Amerijet?
2     A. Would you repeat the question, please?
3     Q. Well, you testified earlier that the only
4 thing you told Pat about upgrade opportunities was
5 that he'd be given an equal chance. Do you recall
6 that?
7     A. That's correct.
8     Q. Okay. Did this episode with Juan Morales
9 and Tim Green's complaint and Pat Major's reaction
10 to it, did that cause you to tell Pat anything
11 differently concerning his prospects of being made a
12 captain?
13     A. No.
14     Q. Okay. Any other episodes that you can
15 testify to contributed to your loss of confidence?
16     A. Other than those instances I just talked
17 about, it would be his behavior with Brian Steele on
18 the first flight that we discussed and his letter.
19     Q. And the other part of the letter, as I
20 recall, said loss of confidence in your abilities to
21 perform the duties of an airman.
22     What were the duties of -- is that a term
23 of art, the duties of an airman, or is that an
24 Amerijet term? Or what did you mean by that?
25     A. That's a term of art.

1     A. I felt that his reaction was bizarre.
2 BY MS. SHEA:
3     Q. Because he brought up subjects that you
4 did not consider relevant when he was responding to
5 it?
6     A. Yes.
7     Q. And because of the length of the
8 discussion?
9     A. Yes.
10     Q. Okay. Anything else that you thought was
11 bizarre?
12     A. Just his -- his emotional state as he was
13 talking.
14     Q. Did he bring up with you at that time
15 anything concerning his EEOC complaint?
16     A. Not to my knowledge.
17     Q. Do you recall when this meeting took place
18 relative to when Pat was seeking upgrade
19 opportunities to captain?
20     MS. NORTON: Object to the form of the
21 question.
22     A. No, I don't.
23 BY MS. SHEA:
24     Q. Did this incident with Pat cause you to
25 tell him anything different about his prospects for

1     Q. Okay.
2     A. It describes the overall function of an
3 airman.
4     Q. Okay. And what were the factors that
5 caused you to lose confidence in Pat Major's ability
6 to perform those duties?
7     MS. NORTON: Other than what he's already
8 said.
9     MS. SHEA: Why don't we break for lunch.
10     (Lunch recess was taken.)
11     MS. NORTON: Before we go back on the
12 record, do you have ASCII?
13     THE COURT REPORTER: Yes.
14     MS. NORTON: And do you have the --
15     THE COURT REPORTER: Condensed?
16     MS. NORTON: Yes. And the index.
17     THE COURT REPORTER: And you'd like a
18 full-size copy in addition to that?
19     MS. NORTON: Yes. If she orders it
20 transcribed.
21 BY MS. SHEA:
22     Q. All right. Mr. Huff, are duties as an
23 airman -- what are the duties as an airman that you
24 concluded Pat Major was not performing to your
25 confidence level?

1    A. Overall, basically, his judgment as an
2  airman, which affects all of his duties.
3    Q. Can you again tell me the factors of his
4  judgment that you felt were not consistent with the
5  duties of an airman?
6    A. The line in his letter specifically where
7  he states that he considered throwing himself upon
8  the throttles of the aircraft as it's rolling down
9  the runway is a key factor in our decision. You
10  know, in our analysis of his judgment.
11    Q. Okay. He didn't throw himself across the
12  throttles; right?
13    A. No, he didn't. Thank God, or we would
14  have had a disaster on our hands.
15    Q. Right. Obviously, you're not suggesting
16  that he should have forcibly prevented the takeoff?
17    A. No. He suggested that.
18    Q. Right. Right. He didn't do it --
19    A. The fact that he suggested it --
20    Q. -- right?
21    A. -- was enough of a concern to us that we
22  had to remove him from the flying schedule.
23    Q. Even though he said in his letter --
24    A. Said in his letter that he seriously
25  considered doing it. And that is of such grave

1  concern to us that we cannot afford to let him fly
2  on our aircraft.
3    Q. And that was the discussion between you,
4  Pete Steele and John Washington?
5    A. That was the center of all of our
6  discussions.
7    Q. All right. These other episodes that
8  you've mentioned that span a period of years, none
9  of those, other than the Tim Green episode, were
10  documented; correct? And Brian Steele, the earlier
11  flight with Brian Steele?
12    A. That's correct.
13    Q. Okay. And none of those independently
14  caused you to question his judgment or lose
15  confidence in him to the point of even documenting
16  it, much less letting him go?
17    MS. NORTON: Object to the form of the
18  question.
19    A. That's correct.
20  BY MS. SHEA:
21    Q. Okay. Is it fair to say that you had
22  positive experiences with Pat Major as a crew member
23  and as a fellow pilot in Amerijet over the years as
24  well?
25    A. I had uneventful experiences with Pat,

1  yes.
2    Q. Okay. Did you not work together on a
3  committee that was devoted to revamping some
4  policies and procedures in Amerijet?
5    A. I worked on separate committee from Pat,
6  but we both were part of a committee. Of different
7  committees.
8    Q. You felt he was a contributing member of
9  that committee?
10    A. Absolutely. Pat was very involved in
11  trying to improve the working conditions at
12  Amerijet.
13    Q. And in fact, you were aware that Pat had
14  sided with management in opposing an effort by the
15  Teamsters to come in?
16    A. Absolutely.
17    Q. And you regarded that as a positive
18  quality?
19    A. Absolutely. In those respects, Pat was,
20  you know, a very good employee. He was an asset to
21  the pilot group. But as far as the safe operation
22  of our aircraft, he proved to us that that was -- he
23  put enough doubt in our mind that we had to remove
24  him from the flying schedule.
25    Q. Based on this one line in this report?

1    A. That's correct.
2    Q. When you met with him about Tim Green and
3  the stalking issue, and you said that Pat talked
4  about a variety of different subjects, do you recall
5  what those subjects were?
6    A. I can recall a few.
7    Q. Which ones do you recall?
8    A. He went on for some time about a
9  conspiracy that the government had against him with
10  regards to planting drugs in his baggage on the
11  aircraft.
12    Q. What else?
13    A. That was really what stuck out in my mind.
14  It took up a majority of his conversation.
15    Q. Do you remember any of the details of what
16  he was alleging or discussing at that time?
17    A. It was very rambled conversation. I don't
18  remember specifics of it.
19    Q. Did he at that time discuss the effort to
20  unionize Amerijet in his position on that?
21    A. Not that I recall.
22    Q. Did you and/or Juan Morales have occasion
23  to confront him with a statute at that meeting, of
24  Florida law?
25    MS. NORTON: Object to the form of the

| Page 93 | Page 95 |
|---|---|

Page 93

1  question.
2      A. We did inform him as to the definition of
3  stalking.
4  BY MS. SHEA:
5      Q. Do you recall what that definition is?
6      A. No, I don't.
7      Q. But did you -- I think I asked you this
8  before, but did you make any opinion as to whether
9  the conduct that was described by Tim Green met the
10  definition of stalking under Florida law?
11      A. I made the -- based upon the definition
12  that we were supplied with, the -- we did inform him
13  of the definition. We did inform him of the fact
14  that no matter what, that Tim had asked him to cease
15  doing what he was doing. And he continued to do it.
16  And that in any case, that we were asking him to
17  simply stop, to cease what he was doing.
18      Q. So did an attorney provide the definition
19  of stalking?
20      A. Yes, they did.
21      Q. And if you felt that he was guilty of
22  stalking, would you have terminated him at that
23  time?
24      MS. NORTON: Object to the form of the
25  question. Calls for speculation.

Page 94

1      A. I don't know.
2  BY MS. SHEA:
3      Q. Well, I mean, you obviously consulted
4  legal counsel about it. You called them and you
5  took it very seriously.
6      A. We didn't want to go that road with Pat at
7  the time. We wanted Pat to continue working at
8  Amerijet. And we simply asked him to stop what he
9  was doing.
10      Q. But clearly, if you and the human
11  resources director felt that you had a pilot that
12  was guilty of violating a Florida statute by
13  stalking someone, that would have been grounds for
14  discipline; correct?
15      A. We believe that -- at the time we believed
16  that Pat probably didn't understand the gravity of
17  what he was doing, and we brought him in to educate
18  him and tell him that Tim had asked him to stop
19  doing this, that this was the definition of stalking
20  and that if he would please cease doing so, that
21  that would be all of it, that would be fine with us,
22  we could just leave it at that.
23      Q. I'd like an answer. There was no
24  documentation of any of this, other than --
25      A. The report that I generated about it.

Page 95

1      Q. Right. Right.
2      A. That was the documentation.
3      Q. Okay.
4      A. And I don't know if Juan created one as
5  well or not.
6      Q. That did not find its way into Pat's file,
7  you decided not to put that in Pat's file; is that
8  correct?
9      A. I don't know where that's contained at
10  this point.
11      MS. SHEA: Counsel, again, I've done a
12  very comprehensive document request for anything
13  that had to do -- for anything that had to do with
14  the decision to terminate my client. I've never
15  seen Al Jorsey report -- any written report of this
16  incident. I've never seen any notes from the
17  investigation before the termination.
18      So if those documents exist, they're
19  certainly within the scope of my request and I'd
20  like their production. And I may need to redepose
21  on them if there are indeed documents other than
22  what has been produced so far. Those are just the
23  ones I'm talking of off the top of my head.
24      MS. NORTON: I will look into the matter.
25  I will look into the nature of your request. I'll

Page 96

1  look into what exists and what doesn't. So I'm
2  neither affirming nor denying. I'll investigate
3  that.
4      MS. SHEA: Fair enough.
5  BY MS. SHEA:
6      Q. Okay. The day came that Pat Major was
7  going to be terminated, how did that come about?
8  Did you call for the meeting or was there a meeting
9  at which he was terminated?
10      A. I asked Pat to come into the office, yes.
11      Q. Okay. Why did you ask him to come in?
12      A. I asked him to come in to terminate him.
13      Q. Okay. And you also gave him a letter, you
14  handed it to him?
15      A. Yes.
16      Q. Okay. And you taped the meeting?
17      A. That's correct.
18      Q. And it's what legal counsel tells you to
19  do when there's sensitive terminations?
20      MS. NORTON: Object to the form of the
21  question. Object to this inquiring, Counsel, of
22  conversations between legal counsel and the witness.
23  Attorney-client privilege.
24      MS. SHEA: I have deposition testimony in
25  my other case that whenever their attorney tells

1  them it's legally sensitive, they tape the
2  conversation. So I'm just --
3      MS. NORTON: Well, that was not my case.
4  I'm sitting here in this one.
5  BY MS. SHEA:
6      Q. Why did he decide to take that particular
7  termination?
8      A. I was advised to do so by legal counsel.
9      Q. And you don't tape every termination?
10     A. No, I do not.
11     Q. And do you have -- John Washington was in
12  as a witness?
13     A. That's correct.
14     Q. Okay. Why were you the designated firing
15  person as opposed to Pete Steele?
16     MS. NORTON: Object to the form of the
17  question.
18     A. Pete Steele designated me to do it.
19  BY MS. SHEA:
20     Q. Okay. And you wouldn't make this decision
21  on your own?
22     MS. NORTON: Object to the form of the
23  question. Which decision?
24  BY MS. SHEA:
25     Q. To fire Pat Major.

1      A. No.
2      Q. Because technically, you were still a line
3  pilot yourself; correct?
4      A. I would only make that decision based upon
5  discussing it with other management in the company.
6      Q. Okay. Do you know whether the FAA was
7  doing any kind of investigation by this point?
8      A. I'm not aware of any.
9      Q. What is Cockpit Resource Management, or
10  CRM?
11     A. CRM is Cockpit Resource Management, and it
12  is basically the theory of the management within the
13  cockpit.
14     Q. Is that something that's required training
15  for a flight crew at Amerijet?
16     A. Yes, it is.
17     Q. And does that training relate to having
18  pilots in command accept advice and information and
19  input from other crew members?
20     A. Yes, it does.
21     Q. Okay. What, if any, consideration did you
22  give in the case of this flight with Pat Major and
23  Brian Steele to CRM and what CRM training might --
24  what bearing CRM training might have on the
25  situation?

1      MS. NORTON: Object to the form of the
2  question. Which flight?
3  BY MS. SHEA:
4      Q. The flight that was --
5      A. The throwing himself on the throttles
6  flight?
7      Q. Well, you can call it that if you like,
8  but the August flight.
9      A. That's what he called it. What you
10  called -- all right. I gave it ample consideration.
11     Q. Okay. And how did you consider it? What
12  was your thought process on that?
13     A. Basically, my thought process was to how
14  each one of the crew members on the flight performed
15  their duties and their responsibilities to prepare
16  for the flight and how the communication between the
17  crew members occurred, concerns about the flight,
18  whether that occurred and how it occurred and the
19  results of those communications.
20     Q. And in Pat Major's case -- strike the
21  question. What did you conclude with respect to
22  Captain Steele's conduct and whether or not he had
23  followed the principles of CRM?
24     A. Concluded that Brian followed the
25  principles of CRM.

1      Q. How?
2      MS. NORTON: Object to the form of the
3  question.
4  BY MS. SHEA:
5      Q. In what way?
6      MS. NORTON: My objection or are you
7  asking him a question?
8      MS. SHEA: I'm rephrasing.
9      MS. NORTON: Okay.
10  BY MS. SHEA:
11     Q. In what way?
12     A. That Brian took -- that there was concerns
13  raised in the cockpit that Brian addressed them,
14  evaluated the decision and made a decision and was
15  it correct or not.
16     Q. So you don't fault Pat Major for raising
17  the issue?
18     A. I don't fault him for raising the issue.
19  I do fault him if the issue was a significant
20  issue for him, that he should not have -- he should
21  not have participated in the flight.
22     He was concerned, that concerned about the
23  safety of the flight that he was considering
24  throwing himself on the throttles while it was
25  rolling down the runway, and he was aware of these

Page 101

1  conditions while he was still parked at the gate,
2  that if it is that serious of a concern to him, that
3  he should have gotten off the airplane and would
4  have gotten off the airplane at that time.
5  Q. Well, what if he did -- what if his
6  concern arose during the taxi, after the push back,
7  what then should Pat Major have done, other than
8  articulate his concerns to the captain, if anything?
9       MS. NORTON: Object to the form of the
10 question.
11 A. He should articulate his question to the
12 captain. And for this specific instance, the
13 conditions had improved since the time that he had
14 performed the weight and balance.
15 BY MS. SHEA:
16 Q. What do you base that on?
17 A. The fact that the crew members told me
18 that it was raining while they were loading the
19 airplane, and it was not raining during their
20 departure.
21 Q. All right. And that's not documented at
22 all, as I understand it, at or before the time that
23 Pat was terminated.
24 A. I'm not -- I'm not -- I don't know what's
25 documented, if that's specifically documented or

Page 102

1  not.
2  Q. All right. But we do agree that there was
3  no tower report at the time of push back, the tower
4  report came between push back and takeoff?
5  A. The tower report could have been obtained
6  at any time and should have been obtained at the
7  ramp, if there is a question of it. But you can ask
8  for a tower report at any time.
9  Q. All right. Do you critique Pat Major for
10 not asking for a tower report at the push back?
11 A. Yes. If that was a concern of his.
12 Q. I'm sorry, before the push back. Did you
13 give any consideration to what other aircraft in the
14 taxiway were doing and how they were reacting to the
15 weather conditions?
16 A. Yes, we did.
17 Q. What consideration did you give to that?
18 A. We asked, basically, why the other
19 aircraft were holding and how it was that they
20 departed prior to the other aircraft.
21 Q. Again, you asked this informally of
22 Captain Steele and Brett Wise and Al Jorsey.
23      MS. NORTON: Object to the form of the
24 question.
25 A. We asked the -- we asked the tower and we

Page 103

1  visited them, to review the tapes. And we did ask
2  the crew members as well.
3  BY MS. SHEA:
4  Q. And you did verify that other aircraft
5  were holding?
6  A. That's correct. They were holding for
7  weather that was north of the field. They would be
8  turning into after departure.
9  Q. Did you document that?
10 A. No, we did not.
11 Q. Did you document the meteorological
12 conditions at the airport yourself?
13 A. I was not there to document the
14 meteorological conditions at the airport.
15 Q. Do you fault Pat Major for not demanding
16 to be let off the airplane once it had pushed back?
17 A. If he -- if the captain disagreed with his concern,
18 or was he under an obligation at that point to be
19 governed by the pilot in command?
20      MS. NORTON: Object to the form of the
21 question. Go ahead.
22 A. Pat, once the flight was under way, Pat
23 was under an obligation of the pilot's command, yes.
24 BY MS. SHEA:
25 Q. Okay. So other than -- assuming that his

Page 104

1  concern arose after push back, other than informing
2  Captain Steele of that concern, there's nothing that
3  Amerijet contends he could have done or should have
4  done differently?
5  A. No.
6  Q. And Captain Steele you did not fault
7  because he reported to you that his visual
8  observation was inconsistent with the tower report
9  that there was not standing water?
10 A. His visual observation was in addition to
11 the tower report.
12 Q. Okay. Well, explain that. Because I
13 thought the tower report leads you right to the
14 performance manual?
15 A. The tower report reported some standing
16 water. His observation was that some standing water
17 was at the last quarter of the runway and that's
18 where some standing water was.
19 Q. Okay. The tower tape described where the
20 water was on the field, or did it just describe the
21 conditions summarily?
22 A. The tower -- what the tower report was,
23- that there was some standing water, less than a
24 quarter of an inch.
25 Q. All right. What, if anything -- strike

1 the question. Did you have any conversations with
2 Pat Major between when he was taken off the schedule
3 and when you called him in to fire him?
4 A. I don't recall.
5 Q. What, if any, activity was undertaken by
6 the FAA with respect to this incident?
7 MS. NORTON: Object to the form of the
8 question.
9 MS. SHEA: Let me rephrase it.
10 BY MS. SHEA:
11 Q. As it relates to Amerijet, what, if any,
12 FAA activity followed this incident?
13 A. The FAA issued a letter of investigation
14 on the incident.
15 Q. To the company?
16 A. Yes.
17 Q. Did that come from John Roseborough?
18 A. No, it did not.
19 Q. Who did it come from?
20 A. I believe it came from a regional office
21 in Atlanta.
22 Q. Do you remember whether that came out?
23 A. No, I don't.
24 Q. What, if any, role did you have in
25 responding to that?

1 A. None.
2 Q. Was it responded to?
3 A. I don't know.
4 Q. Okay. What, if any, activity by the FAA
5 followed that issuance of the letter of
6 investigation?
7 MS. NORTON: Object to the form of the
8 question.
9 A. Would you rephrase the question, please,
10 or restate it?
11 BY MS. SHEA:
12 Q. Sure. As it relates to Amerijet, what
13 followed the FAA letter of investigation?
14 A. I'm sorry, one more time, please.
15 Q. Sure. As it relates to Amerijet, after
16 the FAA issued the letter of investigation, what
17 happened?
18 A. We received the letter, and I don't know
19 what was done with it. I don't know what kind of
20 response we made to it.
21 Q. All right. Do you know what, if any,
22 finding the FAA ultimately made in the investigation
23 as it relates to Amerijet?
24 A. The only portion of it that I know is that
25 our POI investigated the incident and issued a

1 letter absolving the senior -- the check airman on
2 board the aircraft, after reviewing the facts, found
3 that there was no violations and issued a letter
4 stating so.
5 Q. That would be to Al Jorsey?
6 A. That's correct.
7 Q. Do you know what, if any, correspondence
8 was issued from the FAA involving Brian Steele?
9 A. As far as I know, there's been none.
10 Q. Is there an investigation open regarding
11 Brian Steele?
12 A. There is. The original letter of
13 investigation is still open.
14 Q. And do you know what, if any, penalty was
15 assessed against the company?
16 A. No.
17 Q. Did Amerijet take any actions to review or
18 revisit any of its policies about runway
19 contamination following the incident with Pat Major?
20 A. We did review our policies.
21 Q. Okay. Any revisions or changes of
22 policies?
23 A. Not that I'm aware of.
24 Q. Well, you would be aware if there was
25 revision of policies; correct?

1 A. Of a policy, yes.
2 Q. Okay. So there's no new policy at
3 Amerijet on runway contamination or runway analysis
4 as it relates to contaminated runways?
5 A. No.
6 Q. You've been produced as the person at
7 Amerijet with the most knowledge of the FAA
8 investigation and any associated penalties
9 concerning this incident.
10 But as I understand you, you don't know
11 what, if any, penalties were assessed against
12 Amerijet?
13 A. That's correct.
14 MS. SHEA: Miss Norton, do you have anyone
15 else that you might produce that would be able to
16 testify on that subject?
17 MS. NORTON: Yes.
18 MS. SHEA: Okay.
19 BY MS. SHEA:
20 Q. All right. So as far as you know, Mr.
21 Huff, Mr. Jorsey was cleared, Brian Steele, there's
22 still an open investigation on, and you don't know
23 what happened as it pertains to the air certificate
24 holder itself; is that correct?
25 A. That's correct. As far as I know, it's an

Page 109

1  open investigation.
2      MS. SHEA: I have a few documents I'd like
3  to mark.
4      (Plaintiff's Exhibit 1, letter dated
5  8/30/99, was marked for identification.)
6      (Plaintiff's Exhibit 2, runway analysis,
7  was marked for identification.)
8  BY MS. SHEA:
9      Q. Sir, let me show you Exhibit 1, which is
10  Amerijet 309. Do you recognize that document?
11      MS. NORTON: Do you have another copy?
12      MS. SHEA: I don't.
13      MS. NORTON: Let's just look at it
14  together.
15      A. Yes, I do.
16  BY MS. SHEA:
17      Q. Okay. And what is that?
18      A. That was the termination letter for Pat.
19      Q. It's the letter that we've been discussing
20  that you wrote?
21      A. Correct.
22      Q. With input from others. The attorney
23  and --
24      A. Yes.
25      Q. All right. Do you know what day you met

Page 110

1  with Pat and actually terminated him relative to
2  when the letter was written?
3      A. I believe it was the day after. I had
4  called Pat and asked him to come in the day before,
5  and he was not available to come in.
6      Q. All right. Let me hand you what's been
7  marked Plaintiff's 2. It's several pages, so if you
8  could take a look at that.
9      A. Okay.
10      Q. Do you recognize that?
11      A. Yes.
12      Q. And what is that?
13      A. That looks like a runway analysis produced
14  by NavTech.
15      Q. Okay. Were you involved in excerpting
16  that runway analysis to produce it in this case?
17      A. No, I was not.
18      Q. Okay. Do you know whether that -- the
19  first sheet, let's call it Number 2, the first sheet
20  of Number 2 --
21      MS. NORTON: Let me look at the exhibit,
22  please. Do you have another copy of this?
23      MS. SHEA: I do. But I was going to use
24  it. Off the record.
25      (Discussion held off the record.)

Page 111

1  BY MS. SHEA:
2      Q. All right. You can use either copy. It
3  doesn't matter to me, they're the same ones, just an
4  enlarged copy. Do you know whether the top document
5  of Exhibit 2 that relates to Fort Lauderdale,
6  Florida, dated December 9, 1992, was that the runway
7  analysis in effect in August 1999?
8      A. No idea.
9      MS. NORTON: I'm sorry, Counsel. Where do
10  you see a date? I apologize.
11      THE WITNESS: In the middle right.
12      MS. NORTON: Oh, here. Got it. Thank
13  you.
14  BY MS. SHEA:
15      Q. Do you know if there was a more current
16  one in effect?
17      A. No, I don't.
18      Q. Okay. Do you know whether the Boeing
19  performance manual and the NavTech analysis are the
20  same?
21      A. No, I don't.
22      Q. Okay. It's possible there's a little
23  difference between those -- them?
24      A. It's probable, yes.
25      Q. Okay. In which case Amerijet followed the

Page 112

1  NavTech?
2      A. That's correct.
3      Q. The second page is for Miami Airport. Do
4  you see that?
5      A. Yes.
6      Q. And that's dated October 20, 1999?
7      A. That's correct.
8      Q. Okay. So is it fair to say that this
9  would not have been the one in effect for the
10  incident in June 1999, the flight involving Captain
11  Steele and Pat Major?
12      A. Yes, it is.
13      Q. Okay. Can you just look at the third
14  sheet then, which is also from Miami, which is dated
15  back in '92. And my question is do you know
16  know if that was in effect in 1999, or do you know
17  whether there was a more recent version?
18      A. No, I do not know.
19      Q. And do you know who pulled these --
20  prepared these documents to be part of this case?
21      A. No, I don't.
22      Q. Where are these NavTech analyses kept?
23  Are these on each of the aircraft?
24      A. Yes, they are.
25      Q. Is the performance manual also on the

| | |
|---|---|
| 1 aircraft? | 1 pushed back, would there have been any potential |
| 2 A. Yes, it is. | 2 discipline? |
| 3 Q. Is there also an aircraft operating manual | 3 A. He would have undoubtedly been sent in for |
| 4 or is that the same as the performance manual? | 4 retraining so that he would understand how to |
| 5 A. That's a separate manual. | 5 perform a performance problem on aircraft. But |
| 6 Q. Okay. Is that promulgated by the | 6 other than that, no. It's the type of behavior we |
| 7 manufacturer also? | 7 would support rather than condemn. |
| 8 A. No. That's created by Amerijet. | 8 Q. Well, did you tell him back in June 1999, |
| 9 Q. Okay. And that incorporates parts of the | 9 that not only did you do the right thing, but I |
| 10 performance manual? | 10 would have done the same thing myself? |
| 11 A. No, it does not. | 11 A. I don't -- I do not believe that I told |
| 12 Q. Separate subjects? | 12 him that, no. |
| 13 A. Correct. | 13 Q. Okay. But based on the answer that you |
| 14 Q. Is that a document that's filed with the | 14 just gave me, is that consistent with something that |
| 15 FAA? | 15 you would have told him, was that walking off the |
| 16 A. Portions of it. | 16 airplane would be acceptable? |
| 17 (Plaintiff's Exhibit 3, Incident | 17 MS. NORTON: Object to the form of the |
| 18 Description, was marked for identification.) | 18 question. I mean, there's no predicate to what the |
| 19 BY MS. SHEA: | 19 issue was. |
| 20 Q. I'd like to ask you a few questions about | 20 A. Could you state the question again. |
| 21 the report of August 1999. Let me hand you what | 21 BY MS. SHEA: |
| 22 I've marked as Exhibit 3, which is Amerijet 52 | 22 Q. Would his walking off the airplane on June |
| 23 through 57. Take a look through that and tell me if | 23 8, 1999 have been acceptable? |
| 24 you recognize that. Do you recognize this document? | 24 A. Absolutely, it would have been acceptable |
| 25 A. It looks similar to the document that Pat | 25 if they had concerns about the flight. |

Page 114
Page 116

| | |
|---|---|
| 1 gave us as a copy of the letter that he sent in. | 1 Q. Even if they were unfounded? |
| 2 Q. Okay. And can you point me to the | 2 A. Absolutely. |
| 3 language in here that you've referenced in your | 3 Q. That would not be considered |
| 4 deposition testimony concerning throwing himself on | 4 subordination? |
| 5 the throttle? | 5 A. That would not. |
| 6 A. Two references. The first on page 3 that | 6 Q. Is there a policy on that, a written |
| 7 reads, despite the circumstances, I did not forcibly | 7 policy, that says that a first officer or flight |
| 8 retire the throttles, stand on the brakes or | 8 engineer who has concerns about a pilot is |
| 9 otherwise interfere with the captain's choice to | 9 authorized, without any disciplinary repercussions, |
| 10 takeoff. And where he says on the page -- | 10 to leave the flight? |
| 11 Q. You can refer to the number on the bottom | 11 A. That's part of our cockpit resource |
| 12 if you want. | 12 management training. |
| 13 A. On number 56, when he says, would forcibly | 13 Q. So the difference is whether you push back |
| 14 aborting the takeoff from the right seat have | 14 or not, if you haven't pushed back you can get off |
| 15 presented a less dangerous scenario than what we | 15 any time, as a crew member? |
| 16 encountered? Who can say? | 16 MS. NORTON: Object to the form of the |
| 17 Q. So that's two excerpts out of six single | 17 question. |
| 18 space, typed pages are what made you conclude that | 18 A. The difference is, on both of these |
| 19 you couldn't be? | 19 circumstances, Pat was the one responsible for |
| 20 A. In the culminating point, yes. | 20 generating the weight and balance performance |
| 21 Q. And we know that he did not in fact make | 21 report. Pat did that at the gate. And if he had |
| 22 any more effort to retard the throttles? | 22 serious questions about it, that was the time for |
| 23 A. Yes, we do know that. | 23 him to raise those issues. |
| 24 Q. And if I understand your testimony | 24 And if he raised them and produced them to |
| 25 correctly, had he gotten off the plane before it | 25 the captain and the captain ignored his concerns, |

1  then he should have -- then he and I firmly believed
2  that he was right, that he should get off the
3  airplane.
4  BY MS. SHEA:
5  Q. But that's not what you concluded is the
6  course of action that Pat should have followed here
7  because you didn't agree that the concerns were well
8  founded; is that correct?
9  A. No.
10  MS. NORTON: Object to the form of the
11  question. Go ahead.
12  A. That's not correct.
13  BY MS. SHEA:
14  Q. Okay. All right. Did you conclude that
15  Pat Major's concerns were well-founded?
16  A. No, I did not.
17  Q. Therefore, if he'd gotten off at the gate,
18  he would not have been doing so for a well-based
19  reason; correct?
20  A. If he was concerned about it, that was
21  reason enough for him to get off the flight.
22  Whether or not he was right or not would have been a
23  training concern.
24  Q. And under no circumstances is a
25  disciplinary concerned?

1  A. Not unless it was a repeated thing where
2  they were not -- they were not following their
3  training. But if somebody is weak in an area of
4  training, we provide additional training.
5  Q. But if --
6  A. The idea is to promote safety. If a crew
7  member has a concern, he isn't disciplined because
8  he took a stance for safety, for a safety reason.
9  If he didn't understand it, then we will give him
10  training so that he understands it for the future.
11  Q. Okay. And in a situation in which the
12  concern arises after push back, then CRM requires
13  the pilot to listen to articulated concerns, but it
14  requires the first officer to obey those concerns?
15  MS. NORTON: Object to the form of the
16  question.
17  BY MS. SHEA:
18  Q. To obey the pilot in command?
19  A. CRM encourages all the crew members to
20  work together to perform a safe flight.
21  Q. Right. But if the -- if a concern that's
22  articulated by a first officer is overruled by a
23  pilot, then the first officer is required to defer
24  to the pilot?
25  A. That's correct.

1  Q. Okay. And that's what Pat did on August
2  17th, 1999; correct?
3  A. That is correct.
4  Q. And you wouldn't penalize him just because
5  he made a complaint about that after the fact, would
6  you?
7  A. No.
8  Q. Okay. So the idea that he raised in a
9  six-page report rhetorically that retarding the
10  throttles was one option that he did not pursue,
11  that was the basis for his losing his job at
12  Amerijet after eight and a half years?
13  MS. NORTON: Object to the form of the
14  question.
15  A. He voiced in that letter that he seriously
16  considered doing that.
17  BY MS. SHEA:
18  Q. And that reference to serious
19  consideration is, you're referring to one of those
20  two excerpts that you read previously?
21  A. That's correct.
22  Q. Okay. But obviously, you're not saying
23  that after push back a first officer is supposed to
24  demand to be let off a plane?
25  A. A first officer certainly could demand to

1  be let off an airplane.
2  Q. Well, that's not why Pat Major was let go
3  from Amerijet, because he didn't insist on being let
4  off the plane; correct?
5  A. That's correct.
6  Q. And it is the first officer's obligation
7  to defer to the pilot in command after push back,
8  isn't it?
9  A. That's correct.
10  (Plaintiff's Exhibit 4, Notice of Proposed
11  Civil Penalty, was marked for identification.)
12  BY MS. SHEA:
13  Q. Let me show you exhibit 4. It's marked
14  589 through 596.
15  MS. NORTON: Do you have another copy?
16  MS. SHEA: No.
17  MS. NORTON: Can we go off the record?
18  (Discussion held off the record.)
19  BY MS. SHEA:
20  Q. Did you have a chance to look at Exhibit
21  4?
22  A. Yes, I did.
23  Q. Have you ever seen that before?
24  A. No.
25  Q. Okay. And do you know -- strike the

Page 121

1 question. Have you discussed with Dave Bassett the
2 contents of this Notice of Proposed Civil Penalty?
3 A. I've never seen it before. And I haven't
4 discussed it with anybody, no.
5 Q. Okay. Do you see the reference on page 1
6 of Exhibit 4 to item 4, which states, Chapter 4,
7 Section 1 (A) of the Aircraft Operating Manual
8 places limitations on takeoff in water less than one
9 quarter of an inch deep, in accordance with the
10 Airplane Performance Manual?
11 A. Yes, I do.
12 Q. As we were discussing the Airplane
13 Operating Manual is the Amerijet document.
14 A. That is an Amerijet manual, yes.
15 Q. All right. And the Airplane Performance
16 Manual is the Boeing manual; correct?
17 A. No. That's also an Amerijet generated
18 document.
19 Q. All right. And does the Airplane
20 Performance Manual incorporate the NavTech runway
21 analysis?
22 A. It's supplemental to.
23 Q. All right. So item 4 refers to when there
24 is standing water less than a quarter inch deep, you
25 follow the degradations in the airplane performance

Page 122

1 manual?
2 A. I don't know what it refers to. I would
3 have to read it.
4 Q. What would you have to read?
5 A. I'd have to read Chapter 4, Section 1 (A).
6 Q. All right. And do you see item 5 that
7 refers to, the Airplane Performance Manual requires
8 a reduction?
9 A. Yes, I do.
10 Q. Do you know whether that statement is
11 accurate?
12 A. I believe it to be inaccurate.
13 Q. Okay. What do you believe is inaccurate
14 about it?
15 A. The fact that there was a reduction
16 necessary.
17 Q. Okay. And again, that would be because of
18 your earlier testimony that the captain has the
19 ability to disagree with or override a tower report?
20 A. That's correct.
21 Q. Okay. And is there -- it's the definition
22 section of the airplane performance manual that you
23 assert supports that?
24 A. The runway analysis manual.
25 Q. The runway analysis manual from NavTech?

Page 123

1 A. Correct.
2 Q. That's not an Amerijet document?
3 A. That's correct.
4 Q. Okay. And is it true that at the time 827
5 departed Fort Lauderdale there was no reduction in
6 the maximum gross weight?
7 A. That's correct.
8 Q. Were you -- you were the official chief
9 pilot at the time that this report came in; correct?
10 A. That's correct.
11 Q. And in your capacity as chief pilot of
12 Amerijet, wouldn't it be important to you to know of
13 proposed civil penalties against the airline for a
14 matter such as this?
15 A. Not necessarily, no.
16 Q. Why not?
17 A. That's something for the director of
18 operations to handling.
19 Q. I'm just curious why they would keep --
20 why they would keep this from you. Can you answer
21 that?
22 MS. NORTON: Object to the form of the
23 question.
24 A. I don't believe that it was kept from me.
25 I believe that it was, you know, it's a letter

Page 124

1 issued by the FAA stating their opinion of what
2 happened and we, I'm sure, have or will -- would
3 respond to it and tell them why their statement is
4 inaccurate.
5 BY MS. SHEA:
6 Q. All right. But you don't know anything
7 about whether that was done or by whom?
8 A. No, I do not.
9 Q. What does the director of operations do?
10 What's your job at Amerijet?
11 A. Basically, the director of operations is
12 responsible for overseeing the safe operation of the
13 airline.
14 Q. All right.
15 A. And he's the liaison between the FAA and
16 the company.
17 Q. And you've been in that position since May
18 of 2000?
19 A. That's correct.
20 Q. And you still never have been showed or
21 informed anything about this issue?
22 A. That's correct.
23 Q. Can you explain that?
24 A. No, I cannot.
25 Q. Sir, I'd like to ask you some questions

Page 125

1  from Amerijet's interrogatory answers. I can mark
2  this as an exhibit. Let me mark these as
3  Plaintiff's Exhibit 5.
4      (Plaintiff's Exhibit 5, Defendant's
5  Response to Plaintiff's First Set of Interrogatories
6  to Defendant, was marked for identification.)
7  BY MS. SHEA:
8      Q. Can you take a look at those and tell me
9  if you can identify those.
10     A. Sure.
11     Q. Do you see your signature on this?
12     A. Yes, I do.
13     Q. Have you seen that document before?
14     A. Yes.
15     Q. Okay. And did you participate in
16  preparing the answers to them?
17     A. Yes.
18     Q. Okay. Do you know what input Pete Steele
19  had into the answers?
20     A. No.
21     Q. What about Tracey Dickinson?
22     A. No.
23     Q. Is he still with the company?
24     A. Yes, he is.
25     Q. What is he doing now?

Page 126

1      A. He's a line captain.
2      Q. So he rotated out of the training?
3      A. Yes.
4      Q. All right. There's a question here,
5  number two, that says do you contend -- do you see
6  that -- that Major was not qualified to be a captain
7  at Amerijet in February 1999?
8      A. Yes, I see that.
9      Q. And I thought from your earlier testimony
10 today -- well, strike the question. Was -- let me
11 just ask this question again. Do you contend that
12 Pat Major was not qualified to be a captain at
13 Amerijet in February 1999?
14     A. Yes.
15     Q. Although you didn't tell him that.
16     A. I told Pat that he would be given an
17 opportunity, just like everybody else. He had
18 already had an opportunity and failed, so at that
19 point he was not qualified to do it.
20     Q. All right. But you didn't tell him that?
21     A. He knew that. He failed the upgrade
22 training.
23     Q. Not to beat a dead horse, but you did not
24 tell him that; correct? You just told him he'd get
25 an equal chance?

Page 127

1      A. I don't recall the specific conversation.
2      Q. All right. In this answer it says, the
3  following persons have information regarding
4  plaintiff, that would be Captain -- Mr. Major's lack
5  of qualifications. Did you --
6      A. I'm sorry, where are you at?
7      Q. Still on this answer to number two.
8      A. Okay.
9      Q. Following persons have information
10 regarding plaintiff's lack of qualifications, and
11 then it lists a bunch of documents and people. Did
12 you compile this information for this response?
13     A. No, I did not.
14     MS. SHEA: Okay. I'd like to show you
15 what I'll mark as composite Exhibit 6.
16     (Plaintiff's Exhbit 6, Incident
17 Description, was marked for identification.)
18 BY MS. SHEA:
19     Q. Which is, for you, it said see documents
20 Bates stamped certain items. Do you see that,
21 number 6?
22     A. Um-hum.
23     MS. NORTON: Do you have a copy of that?
24     MS. SHEA: Just that one.
25     MS. NORTON: Okay. Let's take a minute.

Page 128

1      MS. SHEA: Off the record.
2      (Discussion held off the record.)
3  BY MS. SHEA:
4      Q. All right, sir. Okay. Sir, on Exhibit 6
5  I compiled the documents that are by -- referenced
6  by your name in item six of the response to answer
7  to interrogatory number two. The document, the
8  first document being the NASA report, would not be
9  material to Amerijet's decision that Pat Major was
10 not qualified to be a captain because it was long
11 after that time frame; isn't that correct?
12     A. That's correct.
13     Q. Okay. And when you testified a minute ago
14 that he'd failed in his bid to become captain, what
15 was the -- what's the failure to which you're
16 referring?
17     A. Actually, I'm not -- as I told you before,
18 I'm not aware of the specifics of his training,
19 other than the fact that he h had attempted and did
20 not and had not passed.
21     Q. Amerijet's variety of criteria or
22 something else?
23     A. He attempted an upgrade and did not pass,
24 that's all I can tell you.
25     Q. Have you looked at his training records

1  yourself?
2      A. No.
3      Q. So do you know of any pink slip or failure
4  of any FAA-administered test?
5      A. I'm not aware of -- I'm not familiar with
6  any of that information.
7      Q. His training records would have to include
8  failures of FAA imposed tests; is that correct?
9          MS. NORTON: I'm sorry, I couldn't hear
10  your question.
11  BY MS. SHEA:
12     Q. I said training records would have to
13  include failures of FAA-imposed tests, would they
14  not?
15     A. That's correct.
16     Q. Okay. And you don't know whether there
17  are any -- whether there's anything like that
18  pertaining to Pat Major one way or the other?
19     A. That's correct.
20     Q. And you'd refer me to Pete Steele for that
21  information?
22     A. Yes, I would.
23     Q. All right. Documents 131 to 135 in that
24  packet appear to me to just be administrative
25  relating to his termination. Do those have anything

1  to do with whether or not Pat Major was qualified to
2  be a captain at Amerijet?
3      A. No.
4      Q. Okay. Document 274, is that a document
5  that you've seen before?
6      A. No, it is not.
7      Q. So you didn't place any reliance on that
8  document in any of your assessment of Pat Major?
9      A. No, I did not.
10     Q. And 309 is just the termination letter
11  that you authored; is that correct?
12     A. That is correct.
13     Q. Okay. So if there's any documents that
14  reflect Pat Major is not qualified to be a captain
15  in Amerijet, you have not seen them?
16     A. I don't know. I'm not aware of any.
17     Q. Okay. Let me ask you, can you please take
18  a look at question four in that set. Identify who
19  made the decision to terminate Major and all the
20  factors which went into it and identify all
21  documents which support the termination.
22         We've talked about that at some length.
23  Other than the documents that you've identified
24  today and the factors that you've identified today,
25  are you aware of any -- any other ingredients in the

1  mix that led to the decision to terminate Pat Major?
2      A. No.
3      Q. Can you please look at question six.
4      A. Okay.
5      Q. Identify each person you know or reason
6  whether you believe to have knowledge of the
7  following matters. The decision to terminate Major,
8  other than yourself, Pete Steele and John
9  Washington, do you know of anyone who has
10  information about that decision. Other than counsel
11  I suppose.
12     A. Anyone that has information about that
13  decision?
14     Q. Right. That was part of that decision.
15         MS. NORTON: There's different questions.
16     A. The people I mentioned that are the people
17  that made the decision to terminate.
18  BY MS. SHEA:
19     Q. The decision not to promote Pat Major to
20  captain in February 1999, do you know who has
21  information about that?
22     A. That would be Ed Cook, Pete Steele.
23     Q. What about the decision not to promote
24  Major to captain in response to bid requests between
25  April 1998 and February 1999?

1      A. I'd refer you to the same people.
2      Q. Likewise for D, about Major's efforts to
3  be promoted?
4      A. Yes.
5      Q. Please look at number seven. Do you
6  contend Amerijet terminated Major because it lacked
7  confidence in him as an airman?
8          Have you identified all the factors and
9  all the documents that Amerijet based its
10  termination decision on?
11         MS. NORTON: Object to the form of the
12  question.
13     A. Yes
14         MS. SHEA: What was the objection to form?
15  I mean, that's a corporate rep question.
16         MS. NORTON: Well, to the extent you asked
17  him as record keeper. But he already said he didn't
18  make the decision. He' greed with it.
19         MS. SHEA: Right.
20         MS. NORTON: So my objection is there's no
21  foundation for that. There's no predicate for
22  knowledge. You know, he knows the decision.
23         MS. SHEA: Well, typically, the corporate
24  rep knows --
25         MS. NORTON: Well, he's already testified

Page 133

1  to what he knows and the reasons. But to answer
2  whether or not there's anything else.
3       MS. SHEA: Well, help me rephrase the
4  question, because I don't want it to be objected to.
5  That was a corporate rep question. So I mean, sir,
6  you've been produced as --
7       MS. NORTON: I think he's answered it in
8  terms of the extent that the other people
9  participated. So obviously, he can't testify as to
10  all of the thoughts that went to their decision,
11  particularly the one that already he said made the
12  decision, you know. So I guess we can produce Pete
13  Steele as a corporate rep or John Washington, but on
14  those issues.
15      MS. SHEA: Yes, I'm not trying to overstep
16  his knowledge, I just want to make sure I'm being
17  thorough on that issue.
18  BY MS. SHEA:
19      Q. So other than what you've testified to
20  today, do you know of any factors underlying the
21  decision to terminate Pat Major?
22      A. I believe I covered most of them today.
23      Q. And likewise on documents, have you
24  identified all the documents that you're aware of
25  that related to that?

Page 134

1       A. As far as I know.
2       Q. Question eight, do you contend that Major
3  acted in inappropriately in any way in connection
4  with the June 8th, 1999 incident which was the
5  flight with Captain Steele. The answer to that was
6  pretty vague. I just want to make sure I'm clear on
7  that. Did Amerijet fault Pat Major?
8       A. Yes.
9       Q. And consider that he acted
10  inappropriately?
11      A. Yes.
12      Q. And who made -- you're the person that's
13  making that determination?
14      A. Yes.
15      Q. Okay. And the basis, the essence of it is
16  what?
17      A. That he didn't -- he basically was
18  insubordinate to the captain.
19      Q. And how was he insubordinate?
20      A. He did not follow the captain's
21  instructions as to runway choice. Basically, that's
22  it.
23      Q. All right. But that episode did not
24  result in any kind of informal or formal reprimand
25  or discipline?

Page 135

1       MS. NORTON: Object to the form.
2       A. It resulted in a formal counseling session
3  with him.
4  BY MS. SHEA:
5       Q. What do you mean when you say formal
6  counseling? There's no record of it.
7       A. We discussed the circumstances and how he
8  should have, could have better handled the
9  situation, how he should have handled the situation.
10      Q. Is human resources typically involved when
11  there is "formal counseling of an employee"?
12      A. No.
13      Q. Okay. Is there any documentation that's
14  typically associated with that?
15      A. No.
16      Q. What makes it formal counseling as opposed
17  to informal counseling if there's no human resources
18  involvement and no documentation?
19      A. Because it was an actual conversation
20  between the two of us rather than I told somebody to
21  tell him.
22      Q. But it was no more formal than that?
23      A. Correct.
24      Q. And in terms of question nine, do you
25  contend that Major acted inappropriately in any way

Page 136

1  in connection with the August 17th incident? If
2  your answer is yes, identify who made this
3  determination and its substance. What's your
4  response to that question?
5       A. Yes.
6       Q. In what respect?
7       MS. NORTON: Other than what he's already
8  discussed?
9       MS. SHEA: Well, in summary.
10      A. In summary, he continued to not understand
11  the calculation of performance issues. He accepted
12  a clearance that he was unauthorized to accept.
13  BY MS. SHEA:
14      Q. That's the navigational issue?
15      A. Correct.
16      Q. Okay. Was that part of the reason why he
17  was terminated?
18      A. That was part of the report from the check
19  airman on the day's flight, yes.
20      Q. And when you say he was not authorized to
21  accept that clearance, what was unauthorized about
22  his acceptance?
23      A. He wasn't trained to do the maneuver he
24  was accepting.
25      Q. Is that documented?

**DOWNTOWN REPORTING**                                    Page 133 - Page 136

Page 137

1  A. Yes, it is.
2  Q. How do I determine that documentation?
3  A. The lack of the documentation.
4  Q. What training did he lack?
5  A. GPS training.
6  Q. Do you know whether he had the training
7  and the ability to manually navigate that route?
8  A. That is not -- that is not an acceptable
9  response to that clearance.
10  Q. Well, my question was do you know when he
11  had the training and expertise to perform the
12  calculations without a GPS?
13  A. There is no training or expertise to do
14  that.
15  Q. You're talking about --
16  A. Not approved to do it.
17  Q. You're talking about ability to navigate?
18  A. And I'm talking about the ability to
19  accept a legal clearance which obligates him to use
20  a form of navigation as a GPS.
21  Q. So it's your contention that accepting a
22  Class 1 navigational clearance is illegal unless the
23  aircraft is presently operating under GPS?
24  A. To accept a direct clearance is not
25  authorized, that is correct.

Page 138

1  Q. Not authorized unless --
2  A. For the distance of the clearance that he
3  accepted.
4  Q. And can you cite me to an Amerijet policy
5  or an FAA regulation on that?
6  A. No, I cannot.
7  Q. And do you remember what the distance was?
8  A. It was to direct to Dorado, which is in
9  Puerto Rico. Just outside of San Juan, Puerto.
10  Q. What is Class 1 navigation?
11  A. Class 1 navigation is navigating within
12  the realm of normal navigational facilities.
13  Q. And what's Class 2?
14  A. Operating outside of those capabilities.
15  Q. And which class was this clearance in?
16  A. The air space he was being cleared through
17  was 1 would have to refer. I could speculate on
18  that at this point.
19  Q. Was there in effect at the time an
20  Amerijet policy which specifically prescribed direct
21  point-to-point navigation within the guidelines of
22  Class 1?
23  A. Within the guidelines of Class 1, yes.
24  Q. Okay. What is that policy?
25  A. That they were authorized to accept direct

Page 139

1  clearance within the guidelines of Class 1.
2  Q. That's the Amerijet rule policy?
3  A. I couldn't quote it for you.
4  Q. Okay. And in terms of an FAA, is there
5  one you can cite to, or no?
6  A. I could not cite it, no.
7  Q. All right. Other than not understanding
8  the calculation of the clearance and accepting the
9  clearance that he was not authorized to accept, do
10  you contend that Pat Major acted inappropriately in
11  any way in the cockpit on August 17th?
12  A. He proceeded to have an argument over
13  whether or not he could receive that clearance.
14  Q. This is, again, after takeoff; right?
15  A. That's correct.
16  Q. I just wanted to make sure you understood
17  my earlier question. I asked you, did Amerijet have
18  a policy that proscribed, like forbad, direct
19  point-to-point navigation within the guidelines of
20  Class 1? I wasn't sure, maybe you thought I said
21  prescribed.
22  A. Yes, I think I did misunderstand your
23  question.
24  Q. Let me rephrase it. Did Amerijet at the
25  time have a policy that specifically prohibited that

Page 140

1  point-to-point guidelines within Class 1?
2  A. The policy of Amerijet is the aircraft
3  must be operated in accordance with the approved
4  operation specifications that we are approved to
5  operate under. And those are detailed in the GOM.
6  Q. And what was wrong with what Pat did here,
7  it was outside the approved operation
8  specifications?
9  A. That's correct.
10  Q. For the aircraft or for the navigational
11  system?
12  A. For the airline.
13  Q. And would you be able to find the
14  citations for those?
15  A. Certainly.
16  Q. What about accepting that clearance was
17  outside the authorization of Class 1?
18  A. I'm sorry, the question again.
19  Q. Are you able to tell me what about his
20  accepting that clearance took it out of the
21  authorization?
22  A. He was not legally able to navigate that
23  route, based on the equipment inside the aircraft
24  and his training to date.
25  Q. All right. And that's, again, you don't

Page 141

1  know what, if any, expertise or training he had in
2  manual navigation?
3      A. That's not part of the operations
4  procedures of Amerijet. He's not allowed to operate
5  outside of the procedures of Amerijet.
6      Q. Okay. And only with GPS would that have
7  been acceptable for Amerijet?
8      A. That's correct.
9      Q. And Amerijet wasn't using GPS at the time
10  in that case?
11      A. That's correct.
12      Q. And there's -- it's your belief that in
13  the Amerijet manual there will be a provision that
14  will state that an Amerijet pilot may not accept a
15  heading of that nature, of clearance?
16          MS. NORTON: Object to the form of the
17  question. Go ahead.
18      A. The operation specifications state what we
19  may accept.
20  BY MS. SHEA:
21      Q. Okay. And those are --
22      A. Spelled out specifically.
23      Q. Okay. And nothing else is acceptable?
24      A. That's correct.
25      Q. Other than Al Jorsey's letter, which we

Page 142

1  haven't seen in this case, was there any other
2  documented investigation into that issue?
3      A. No. Not to my knowledge.
4      Q. All right. Have you told me everything
5  that you contend Pat Major did wrong during the
6  August 17th incident?
7          MS. NORTON: Without repeating previous
8  testimony or with repeating previous testimony?
9          MS. SHEA: In our summary here.
10          MS. NORTON: The record will speak for
11  that.
12      A. I believe throughout the deposition I've
13  covered everything that he did he wrong.
14  BY MS. SHEA:
15      Q. Okay. Amerijet asserted as a defense that
16  defendant promoted persons to captain who were older
17  than plaintiff. Is that something that you have
18  knowledge of?
19      A. State the question again, please.
20      Q. Were persons older than Pat Major promoted
21  from within to captain during the time that -- in
22  the particular bids in which he was participating,
23  do you know about that one way or the other? ...
24          MS. NORTON: Object to the form of the
25  question.

Page 143

1      A. I don't have specific information as to
2  that.
3  BY MS. SHEA:
4      Q. Okay. Can you name anyone that was
5  promoted in 1998 or 1999 from within who was older
6  than Pat Major?
7      A. Not specifically. I can think of -- I
8  could name several people that were hired off the
9  street.
10      Q. Right. Okay. But in terms of promotions,
11  can you name anyone?
12      A. Not specifically.
13      Q. Okay. Can you look at the document
14  labeled 132. It's in the packet I gave you a few
15  minutes ago. Whose signature is on that?
16      A. Pete Steele.
17      Q. Pete Steele, okay. And then you signed
18  the one, 131, that was the termination notice?
19      A. That's correct.
20      Q. And is it your testimony that you weren't
21  aware of Pat Major's suspension when it was
22  happening because you were still out of town?
23      A. That's correct.
24          MS. SHEA: Let me show you a document I'll
25  mark Exhibit 7, which I'll represent is an attempt

Page 144

1  by my office to transcribe the tape of the
2  termination meeting. So I brought it as a tool, and
3  I obviously would not expect you to waive any
4  objections to accuracy or you authenticity.
5      But I'd like to ask you a couple of
6  questions about statements that appear to have been
7  made by you at that meeting.
8      (Plaintiff's Exhibit 7, Transcription of
9  9/1/99 Termination Meeting, was marked for
10  identification.)
11  BY MS. SHEA:
12      Q. Have you had a chance since --
13          MS. NORTON: Can we go off the record one
14  second?
15          MS. SHEA: Sure.
16          (Discussion held off the record.)
17          MS. SHEA: I have a question pending.
18          MS. NORTON: Well, I know. But I didn't
19  want you to start into this because to me, that
20  would be more prejudicial to you than if I -- do you
21  want to ask one question? I didn't want you to get
22  into all this.
23          MS. SHEA: I've been taking this
24  deposition for five hours, I probably have another
25  hour to go. I'm entitled to under the rules. This

Page 145

1  date was preset in advance, I understand.
2       MS. NORTON: Completely.
3       MS. SHEA: I need to finish it today.
4  I've got my client here today, he's got a very
5  demanding schedule and I need to finish the
6  deposition today.
7       MS. NORTON: You can't today, because he
8  needs to seen an eye specialist, he's head of the
9  cornea department. We're moving for a continuance.
10 We're moving for a continuance.
11      MS. SHEA: You hold discussion up knowing
12 that your client was going to walk out of here at
13 3:30 and not bringing that to my attention at all,
14 and I do not consider that to be good faith on your
15 part.
16      If you knew this at lunchtime, then we
17 needed to have that conversation before you started
18 telling me that I need to file a motion for
19 protective order on my compliant on my client.
20      MR. BRESSLER: We really thought you were
21 going to be done. You're absolutely right, we
22 apologize.
23      MS. NORTON: It was not intentional.
24      MS. SHEA: We all agreed that it was going
25 to be an all day deposition.

Page 146

1       MS. NORTON: That's right. And I didn't
2  even know until lunch that he had this appointment.
3       MS. SHEA: Somebody should have let me
4  know so I could be --
5       MS. NORTON: We went to lunch at 1:10.
6       MS. SHEA: We didn't need to go to lunch.
7       MS. NORTON: I'm not going to let a
8  witness sit here without lunch for that long. And
9  there was a fire drill. The bottom line is it's
10 done. I apologize. You can take whatever action
11 you want.
12      I'm not saying you're through with him. I
13 understand you have a right. And it will probably
14 take you more than an hour when we come back because
15 you're going to have to back up on a few issues, I
16 understand that. But I'm not going to make him miss
17 his eye appointment.
18      MS. SHEA: I would like to continue his
19 deposition before we take any of the other
20 depositions.
21      MS. NORTON: Fine. Do you want to do it
22 on the 14th?
23      MS. SHEA: I don't know. What is the
24 schedule?
25      MS. NORTON: That's when you have

Page 147

1  everybody else set.
2       MS. SHEA: This is the only one that was
3  set for this day, that Pat is here, that we blocked
4  the day for it.
5       MS. NORTON: I thought Pat is here on the
6  14th. We talked about the 14th. He's here for the
7  14th.
8       MS. SHEA: I don't want to talk about the
9  14th, I want to talk about method. They said six
10 hours. You were holding it to me under the
11 federals, I said swell.
12      MS. NORTON: I did not know, Valerie.
13      MS. SHEA: After five hours you're telling
14 me he's like leaving this second.
15      MS. NORTON: Shoot me. I'm sorry. If I
16 could have given you a 35 or 40 minute warning. We
17 got in, I thought we were going to be finished. And
18 when I realized what time it was, it's 3:30. His
19 appointment is at 3:30.
20      MS. SHEA: You should have told me at
21 lunchtime. Don't ever ask me again how long it's
22 going to be. I'm doing my best to move through it.
23 I don't control that.
24      MS. NORTON: I know that. And when I
25 asked you that, I didn't know he had an appointment.

Page 148

1  So if you want him on the 14th --
2       MS. SHEA: It's not excused as far as I'm
3  concerned. You guys are walking out and I do not
4  appreciate it and I don't consider it professional
5  at all and I'm not agreeing to it.
6       THE COURT REPORTER: Would you like a
7  transcript of this?
8       MS. SHEA: Yes, I'd like this transcribed.
9       (Deposition recessed at 3:30 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 149

CERTIFICATE OF OATH

1
2
3
4    STATE OF FLORIDA        )
5    COUNTY OF BROWARD       )
6
7
8         I, the undersigned authority, certify that
9    DERRY S. HUFF personally appeared before me and was
10   duly sworn.
11
12        WITNESS my hand and official seal the 10th
13   day of November, 2000.
14
15
16
17
18         *Beverly J. Gramm*
19   BEVERLY J. GRAMM, RPR
     Notary Public - State of Florida
20   My Commission Expires: 12/19/03
21
22
23
24
25

---

Page 150

REPORTER'S DEPOSITION CERTIFICATE

1
2
3    STATE OF FLORIDA        )
4    COUNTY OF BROWARD       )
5
6         I, BEVERLY J. GRAMM, Registered
7    Professional Reporter, certify that I was authorized
8    to and did stenographically report the deposition of
9    DERRY S. HUFF, that a review of the transcript was
10   not requested; and that the transcript is a true and
11   complete record of my stenographic notes.
12        I further certify that I am not a
13   relative, employee, attorney or counsel of any of
14   the parties, nor am I a relative or employee of any
15   of the parties' attorneys or counsel connected with
16   the action, nor am I financially interested in the
17   action.
18
19        DATED this 10th day of November, 2000.
20         *Beverly J. Gramm*
21   BEVERLY J. GRAMM, RPR
     Notary Public - State of Florida
22   My Commission Expires: 12/19/03
23
24
25

---

Page 151

**$4** [1]     81:9

**'92** [1]    112:15

**'98** [2]    14:13    14:13

**'99** [3]    14:12    21:13
21:14

**00-6070-Ferguson/Snow**
[1]    1:0

**1** [16]    2:8    109:4
109:9    121:5    121:7
122:5    137:22    138:10
138:11    138:22    138:23
139:1    139:20    140:1
140:17    146:5

**10** [3]    1:0    3:13
146:5

**109** [2]    2:8    2:9

**10th** [2]    149:12    150:19

**113** [1]    2:10

**12** [1]    10:14

**12/19/03** [2]    149:20
150:23

**120** [1]    2:11

**125** [1]    2:12

**127** [1]    2:13

**131** [2]    129:23    143:18

**132** [1]    143:14

**135** [1]    129:23

**144** [1]    2:14

**14th** [6]    146:22    147:6
147:6    147:7    147:9
148:1

**17th** [4]    119:2    136:1
139:11    142:6

**1989** [1]    7:11

**1990s** [1]    22:22

**1992** [1]    111:6

**1996** [2]    7:17    32:15

**1998** [2]    131:25    143:5

**1999** [61]    6:25
7:3    7:20    8:4
8:11    8:18    9:3
10:4    10:19    10:20
11:5    11:20    14:11
14:17    14:19    14:23
15:4    15:11    15:22
16:9    16:24    17:9
17:19    18:1    18:5
18:13    19:22    20:15
21:7    21:11    21:18
23:22    29:1    29:21
32:15    32:18    32:22
32:25    33:3    33:11
33:12    33:22    34:8
34:11    72:8    76:22
79:17    111:7    112:6
112:10    112:16    113:21
115:8    115:23    119:2
126:7    126:13    131:20
131:25    134:4    143:5

**2** [7]    2:9    109:6
110:7    110:19    110:20
111:5    138:13

**20** [1]    112:6

**2000** [9] 1:0    3:13
7:1    11:8    11:9
13:10    124:18    149:13
150:19

**2060** [1]    ...?

**26** [1]    9:25

**274** [1]    130:4

**2800** [1] 4:15

**29** [1]    11:22

**3** [9]    2:3    2:10
113:17    113:22    114:6
145:13    147:18    147:19
148:9

**30** [7]    1:0    3:13
77:10    145:13    147:18
147:19    148:9

**309** [2]    109:10    130:10

**33181** [1]    4:10

**337** [2]    1:0    3:11

**35** [1]    147:16

**4** [9]    2:11    120:10
120:13    120:21    121:6
121:6    121:6    121:23
122:5

**40** [1]    147:16

**5** [4]    2:12    122:6
125:3    125:4

**52** [1]    113:22

**522-3376** [1]    1:0

**56** [1]    114:13

**57** [1]    113:23

**589** [1]    120:14

**596** [1]    120:14

**6** [5]    2:13    127:15
127:16    127:21    128:4

**7** [3]    2:14    143:25
144:8

**727** [1]    40:5

**727s** [2] 10:7    10:9

**8** [2]    1:0    115:23

**8/30/99** [1]    109:5

**80** [1]    11:25

**827** [1]    123:4

**8th** [2]    3:12    134:4

**9** [1]    111:6

**9/1/99** [1]    144:9

**90** [1]    11:25

**954** [1]    1:0

**99-021746-11** [1]
1:0

**a.m.** [2]    1:0    3:13

**abilities** [2]    37:23
87:20

**ability** [7]    21:23
85:14    88:5    122:19
137:7    137:17    137:18

**able** [6]    32:17    48:21
108:15    140:13    140:19
140:22

**aborting** [1]    114:14

**above** [1]    3:19

**above-entitled** [1]
3:4

**absolutely** [8]    75:12
79:11    91:10    91:16
91:19    115:24    116:2

**absolving** [1]    107:1

**accept** [10]    61:16
98:18    136:12    136:21
137:19    137:24    138:25
139:9    141:14    141:19

**acceptable** [6]    115:16
115:23    115:24    137:8
141:7    141:23

**acceptance** [3]    61:15
61:22    136:22

**accepted** [5]    13:25
62:4    62:7    136:11
138:3

**accepting** [7]    14:24
82:1    136:24    137:21
139:8    140:16    140:20

**accommodate** [2]
11:13    58:8

**accordance** [4]    63:22
64:4    121:9    140:3

**according** [1]    84:13

**account** [2]    39:1
39:13

**accounting** [1]    60:17

**accuracy** [1]    144:4

**accurate** [2]    8:22
122:11

**accusation** [4]    79:23
81:20    82:19    85:6

**accuse** [1]    76:5

**achieve** [1]    42:5

**act** [2]    8:7    14:16

**acted** [4] 134:3    134:9
135:25    139:10

**acting** [11]    7:23
13:11    13:21    14:19
23:7    25:25    26:5
34:4    36:12    36:18
79:19

**action** [7]    45:11
68:20    68:25    117:6
146:10    150:16    150:17

**actions** [3]    68:8
75:3    107:17

**activity** [3]    105:5
105:12    106:4

**actual** [3]    28:13
55:19    135:19

**addition** [2]    88:18
104:10

**additional** [3]    12:3
27:11    118:4

**address** [6]    4:8
4:14    8:19    32:17
60:11    70:16

**addressed** [2]    60:14
100:13

**adjust** [1]    42:2

**administrative** [2]
11:16    129:24

**advance** [1]    145:1

**advice** [3]    63:18
69:5    98:18

**advised** [1]    97:8

**advisory** [2]    49:14
58:1

**affec...** [1]    36:11

**affects** [1]    89:2

**affirming** [1]    96:2

**afford** [1]    90:1

**afforded** [6]    20:2
20:3    20:10    20:17
20:18    20:20

**again** [14]    16:20
42:18    53:3    89:3
95:11    102:21    115:20
122:17    126:11    139:14
140:18    140:25    142:19
147:21

**against** [6]    79:7
85:2    92:9    107:15

**age** [2]    3:2    3:18

**ago** [5]    10:3    11:20
19:21    128:13    143:15

**agree** [3] 74:18    102:2
117:7

**agreed** [4]    63:20
66:1    70:8    145:24

**agreeing** [1]    148:5

**agrees** [1]    28:1

**ahead** [9]    22:12
38:10    42:8    49:1
72:13    73:2    103:21
117:11    141:17

**air** [3]    9:11    108:23
138:16

**aircraft** [34]    10:4
12:4    22:20    24:25
39:13    41:8    42:20
43:17    43:20    57:5
61:2    61:4    74:6
74:12    76:4    77:5
89:8    90:2    91:22
92:11    102:13    102:19
102:20    103:4    107:2
112:23    113:1    113:3
115:5    121:7    137:23
140:2    140:10    140:23

**airline** [6]    12:21
13:1    38:2    123:13
124:13    140:12

**airman** [15]    25:1
37:23    59:23    61:9
62:13    87:21    87:23
88:3    88:23    88:23
89:2    89:5    107:1
132:7    136:19

**airplane** [21]    38:22
39:20    39:24    64:16
77:11    78:12    101:3
101:4    101:19    103:16
115:16    115:22    117:3
120:1    121:10    121:12
121:15    121:19    121:25
122:7    122:22

**airport** [6]    71:14
72:17    84:11    103:12
103:14    112:3

**airports** [1]    40:18

**Al** [10]    60:4    60:8
60:21    61:12    61:21
62:16    95:15    102:22
107:5    141:25

**alleging** [1]    92:16

**ALLEN** [1]    1:0

**allow** [2]    39:21
39:25

**allowed** [1]    141:4

**allowing** [1]    57:16

**allows** [4]    54:9
56:21    58:19    58:20

**almost** [2]    61:20
81:9

**alone** [1] 68:14

**always** [1]    31:13

**America** [2]    9:22
9:22

**Amerijet** [101]    1:0
3:5    4:12    5:13
7:6    7:19    8:12
8:19    9:9    9:24
10:5    11:1    11:19
14:8    14:25    15:4
16:11    23:20    25:12
27:3    28:6    29:3
29:18    31:20    32:14
32:22    33:14    34:9
35:14    36:5    36:19
37:4    37:11    37:12
46:10    46:22    49:17
51:17    51:18    52:21
55:16    58:20    64:18
64:21    69:19    71:2
71:7    72:7    72:21
73:7    74:20    75:18
87:1    87:24    90:23
91:4    91:12    92:20
94:8    98:15    104:3
105:11    106:12    106:15
106:23    107:17    108:3
108:7    108:12    109:10
111:25    113:8    113:22
119:12    120:3    121:13
121:14    121:17    123:2
123:12    124:10    126:7
126:13    130:2    130:15
132:6    132:9    134:7
138:4    138:20    139:2
139:17    139:24    140:2
141:4    141:5    141:7
141:9    141:13    141:14
142:15

**Amerijet's** [8]    9:8
10:15    10:16    30:8
30:18    125:1    128:9
128:21

**amount** [1]    41:24

**ample** [1]    9:16

**analyses** [1]    112:22

**analysis** [21]    52:22
53:20    54:1    58:21
59:3    59:13    63:23
64:5    72:5    72:16
72:25    89:10    108:3
109:6    110:13    110:16
111:7    111:19    121:21
122:24    122:25

**analyze** [1]    53:25

**Andrews** [2]    4:15
4:16

**answer** [14]    8:1
8:2    35:24    49:1

answered [1] chief
67:21 94:23 113:13
123:20 127:2 127:7
128:6 133:1 134:5
136:2

answered [1] 133:7

answers [1] 125:1
125:16 125:19

apologize [3] 111:10
145:22 146:10

appear [2] 129:24
144:6

APPEARANCES [1]
1:0

appeared [1] 149:9

Appearing [2] 1:0
1:0

applications [1] 15:10

applied [1] 7:22

appointed [3] 13:9
13:10 33:5

appointment [4] 146:2
146:17 147:19 147:25

appreciate [1] 148:4

appropriate [1] 53:22

approved [6] 14:1
40:15 137:16 140:3
140:4 140:7

April [1] 131:25

area [3] 9:20 9:21
118:3

areas [1] 16:8

argument [1] 139:12

arises [1] 118:12

arose [3] 75:4 101:6
104:1

art [2] 87:23 87:25

articulate [2] 101:8
101:11

articulated [2] 118:13
118:22

ascertain [1] 57:19

ASCII [1] 88:12

aspect [1] 38:14

aspects [1] 12:23

assert [1] 122:23

asserted [1] 142:15

assessed [3] 27:4
107:15 108:11

assessment [2] 37:25
130:8

asset [1] 91:20

assigned [1] 13:14

associated [3] 7:24
108:8 135:14

assume [1] 80:14

assuming [2] 25:7
103:25

assumption [1] 53:19

Atlanta [1] 105:21

attempt [1] 143:25

attempted [3] 16:5
128:19 128:23

attempts [1] 77:8

attentic [1] 145:13

attorney [4] 93:18
96:25 109:22 150:13

Attorney-client [1]
96:23

attorneys [1] 150:15

audiotapes [1] 49:8

August [9] 72:8
76:22 99:8 113:1
113:21 119:1 136:1
139:11 142:6

authenticity [1] 144:4

authored [1] 130:11

authority [6] 48:15
48:24 51:6 58:24
73:3 149:8

authorization [2]
140:17 140:21

authorized [9] 61:16
62:3 116:9 136:20
137:25 138:1 138:25
139:9 150:7

authorizes [1] 73:7

available [1] 33:24
48:9 48:11 110:5

Avenue [2] 4:15
4:16

aviation [3] 48:16
48:23 51:6

aware [25] 5:15
8:25 28:20 30:21
34:9 34:11 34:13
34:14 35:7 35:10
35:19 35:25 43:23
52:11 91:13 98:8
100:25 107:23 107:24
128:18 129:5 130:16
130:25 133:24 143:21

away [2] 46:9 46:11

B [1] 2:6

baggage [1] 92:10

balance [4] 70:15
72:18 101:14 116:20

Barrett [1] 21:14

base [1] 101:16

based [20] 10:16
10:19 19:12 19:20
22:5 38:3 38:4
38:25 41:24 42:18
43:17 72:15 73:16
75:3 91:25 93:11
98:4 115:13 132:9
140:23

basic [1] 39:16 39:17
41:6

basis [7] 16:4 27:5
27:21 53:13 55:9
119:11 134:15

Bassett [8] 12:11
18:1 21:10 21:18
23:13 30:5 47:13
121:1

Bassett's [1] 26:10

Bates [1] 127:20

bearing [2] 28:18
98:24

beat [1] 126:23

became [3] 7:16
35:10 35:19 51:2
51:8

become [9] 4:22
7:14 16:12 28:4
34:14 35:7 43:23
83:2 128:14

becomes [2] 5:19
42:24

becoming [2] 7:7
25:14

beeped [1] 44:3

began [1] 14:16

behalf [2] 1:0
1:0

behavior [7] 76:2
81:1 83:21 85:8
85:10 87:17 115:6

behest [1] 27:24

belief [1] 141:12

believes [1] 39:4

best [1] 147:22

better [1] 135:8

between [21] 13:11
14:18 22:23 32:14
41:8 45:20 45:24
48:22 49:12 51:19
71:12 78:1 90:3
96:22 99:16 102:4
105:2 111:23 124:15
131:24 135:20

BEVERLY [4] 3:8
149:19 150:6 150:22

beyond [1] 61:10

bid [13] 17:2 23:15
23:16 23:22 24:9
24:12 25:20 26:1
26:16 27:3 30:16
128:14 131:24

Bidding [1] 24:12

bids [9] 19:14 24:12
17:2 25:13 30:12
32:20 33:4 33:22
142:22

bit [2] 39:6 40:4

bizarre [2] 86:1
86:11

blocked [1] 147:3

BLUE [1] 1:0

board [2] 59:23
107:2

Boeing [4] 10:7
40:4 111:18 121:16

bottom [2] 114:11
146:9

Boulevard [2] 1:0
3:12

brakes [1] 114:8

break [4] 31:8 40:3
67:10 88:9

BRESSLER [2] 1:0
145:20

Brett [3] 60:6 60:15
102:22

Brian [19] 56:15
60:3 62:22 67:18

68:... 68:6 71:13
72:22

cargo [9] 9:13 9:18
10:10 11:13 64:8
64:12 64:18 64:23
65:3

Caribbean [2] 9:23
78:3

carriage [1] 10:10

carrier [1] 9:11

case [15] 1:0 1:0
5:13 56:14 71:24
93:16 96:25 97:3
98:22 99:20 110:16
111:25 112:20 141:10
142:1

cases [1] 42:23

categories [2] 32:10
34:6

category [1] 25:22

caused [8] 47:17
64:9 79:2 82:19
85:16 85:17 88:5
90:14

cease [4] 83:21 93:14
93:17 94:20

center [3] 61:16
61:19 90:5

centered [1] 81:6

centering [1] 70:23

Central [1] 9:22

CEO [1] 12:12

certain [9] 5:13
24:2 28:21 31:23
38:24 40:23 41:2
43:17 127:20

certainly [1] 95:19
119:25 140:15

certificate [3] 108:23
149:1 150:1

certify [1] 149:8
150:7 150:12

chance [7] 17:23
18:4 19:22 87:5
120:2 126:25 144:12

change [2] 20:11
20:13

changed [1] 10:12

changes [1] 107:21

Chapter [2] 121:6
122:5

characterize [1] 36:15

charge [1] 12:22
34:8 34:9 34:12
35:8 35:17 35:20
36:8 36:11 36:20
36:24 37:3 64:18

check [9] 24:22
25:1 25:4 27:13
59:23 61:9 62:12
107:1 136:18

chief [35] 6:22
6:23 7:7 7:19
7:21 7:22 7:25
8:3 8:7 8:12
8:20 9:5 13:2
13:5 13:9 13:11
13:14 14:2 14:4

| | | |
|---|---|---|
| 14:5 14:7 14:15 | commit. [3] 75:23 | 22:2 38:6 44:10 | 82:2... |
| 14:20 23:7 25:8 | 76:1 76:3 | 55:24 62:17 67:1 | copy [9] 48:12 88:18 |
| 25:25 26:6 31:17 | committee [4] 91:3 | 70:21 71:2 80:8 | consisted [2] 24:1 | 109:11 110:22 111:2 |
| 33:11 34:4 36:12 | 91:5 91:6 91:9 | 80:24 80:24 83:19 | 47:24 | 111:4 114:1 120:15 |
| 36:18 79:19 123:8 | committees [1] 91:7 | 86:15 87:11 108:9 | consistent [4] 50:3 | 127:23 |
| 123:11 | communication [1] | 114:4 | 57:15 89:4 115:14 | cornea [1] 145:9 |
| choice [2] 114:9 | 99:16 | concerns [13] 21:22 | consisting [1] 54:17 | corporate [20] 4:15 |
| 134:21 | communications [1] | 65:21 70:13 99:17 | conspiracy [1] 92:9 | 5:20 6:1 6:2 |
| choose [1] 57:25 | 99:19 | 100:12 101:8 115:25 | constituted [1] 69:12 | 6:3 6:6 6:11 |
| choosing [1] 70:6 | company [27] 7:10 | 116:8 116:25 117:7 | consulted [1] 94:3 | 15:20 22:20 30:6 |
| circulated [1] 31:5 | 9:10 9:24 10:1 | 117:15 118:13 118:14 | contact [3] 67:6 | 32:11 33:7 34:7 |
| circumstances [7] | 12:12 13:19 13:20 | conclude [4] 77:12 | 67:17 84:6 | 34:20 34:25 54:16 |
| 41:3 53:2 80:19 | 14:10 15:9 24:2 | 99:21 114:18 117:14 | contained [2] 38:12 | 132:15 132:23 133:5 |
| 114:7 116:19 117:24 | 26:13 26:17 30:10 | concluded [4] 53:8 | 95:9 | 133:13 |
| 135:7 | 40:12 40:13 40:21 | 88:24 99:24 117:5 | contaminated [5] | correct [121] 7:2 |
| citation [1] 54:8 | 61:25 76:4 76:5 | conclusion [3] 53:13 | 39:18 40:23 41:21 | 7:13 8:10 9:5 |
| citations [1] 140:14 | 80:21 81:8 82:13 | 53:18 59:13 | 67:17 108:4 | 9:6 9:12 9:16 |
| cite [4] 54:13 138:4 | 98:5 105:15 107:15 | conclusions [1] 53:6 | contamination [15] | 10:11 11:15 11:24 |
| 139:5 139:6 | 124:16 125:23 | condemn [1] 115:7 | 41:3 41:25 42:19 | 12:8 12:9 13:22 |
| civil [3] 54:13 121:2 | comparing [1] 52:9 | Condensed [1] 88:15 | 54:17 56:22 58:5 | 14:21 15:11 17:6 |
| 123:13 | compensation [1] | condition [1] 57:19 | 58:11 59:4 62:18 | 19:3 22:7 23:1 |
| claim [1] 79:6 | 81:21 | conditions [10] 53:23 | 65:22 67:2 70:22 | 25:21 27:25 28:1 |
| clarify [2] 6:3 | compile [1] 127:12 | 62:14 71:17 91:11 | 70:24 107:19 108:3 | 28:9 28:25 32:3 |
| 6:15 | compiled [1] 128:5 | 101:1 101:13 102:15 | Contemporaneously | 32:19 34:2 38:15 |
| class [11] 137:22 | complained [2] 46:13 | 103:12 103:14 104:21 | [1] 115 | 40:2 40:15 40:25 |
| 138:10 138:11 138:13 | 65:2 | conduct [6] 69:11 | contend [7] 126:5 | 41:4 41:5 42:11 |
| 138:15 138:22 138:23 | complaining [3] 39:8 | 73:8 75:14 76:6 | 126:11 132:6 134:2 | 42:15 43:22 46:20 |
| 139:1 139:20 140:1 | 68:7 75:15 | 93:9 99:22 | 135:25 139:10 142:5 | 46:24 52:14 52:19 |
| 140:17 | complaint [16] 43:24 | conducted [1] 22:13 | contends [1] 104:3 | 53:5 53:21 53:24 |
| Clay [1] 13:18 | 48:22 50:4 50:6 | conferences [2] 45:16 | content [3] 49:6 | 54:25 55:3 55:22 |
| clear [1] 134:6 | 50:7 50:25 51:20 | 45:17 | 49:7 49:8 | 56:5 56:13 58:2 |
| clearance [22] 11:13 | 65:19 65:19 81:2 | conferred [1] 8:6 | contention [1] 137:21 | 58:14 60:2 61:2 |
| 50:1 61:15 61:22 | 82:1 82:23 85:4 | confidence [14] 37:23 | contents [3] 60:25 | 61:23 62:11 64:10 |
| 62:4 62:4 62:7 | 86:15 87:9 119:5 | 73:13 74:3 76:18 | 74:22 121:2 | 64:14 67:19 69:2 |
| 136:12 136:21 137:9 | complaints [3] 83:23 | 76:25 79:3 85:1 | context [1] 22:24 | 73:22 75:6 79:20 |
| 137:19 137:22 137:24 | 84:3 85:12 | 85:14 87:15 87:20 | continuance [2] 145:9 | 82:21 84:15 87:7 |
| 138:2 138:15 139:1 | complete [2] 25:16 | 88:5 88:25 90:15 | 145:10 | 90:10 90:12 90:19 |
| 139:8 139:9 139:13 | 150:11 | 132:7 | continue [4] 6:4 | 92:1 94:14 95:8 |
| 140:16 140:20 141:15 | completely [3] 77:7 | confines [1] 58:25 | 13:12 94:7 146:18 | 96:17 97:13 98:3 |
| cleared [2] 108:21 | 85:19 145:2 | confront [1] 92:23 | continued [2] 93:15 | 100:15 103:6 107:6 |
| 138:16 | Completing [2] 24:22 | confronted [4] 84:11 | 136:10 | 107:25 108:13 108:24 |
| clearly [1] 94:10 | 24:24 | 84:13 85:5 85:5 | contract [1] 40:14 | 108:25 109:21 112:2 |
| client [4] 95:14 | completion [1] 24:6 | confused [1] 73:23 | contrary [2] 19:14 | 112:7 113:13 117:8 |
| 145:4 145:12 145:19 | compliant [1] 145:19 | connected [1] 150:15 | 19:23 | 117:12 117:19 118:25 |
| close [3] 57:5 64:22 | composite [1] 127:15 | connection [2] 134:3 | contributed [2] 76:25 | 119:2 119:3 119:21 |
| 79:9 | compound [1] 18:10 | 136:1 | 87:15 | 120:4 120:5 120:9 |
| closely [1] 80:19 | comprehensive [1] | consent [1] 63:18 | contributing [1] 91:8 | 121:16 122:20 123:1 |
| co-pilot [2] 22:20 | 95:12 | consider [7] 51:18 | contribution [3] 60:7 | 123:3 123:7 123:9 |
| 77:4 | comprise [1] 84:17 | 71:7 86:4 99:11 | 60:15 76:21 | 123:10 124:19 124:22 |
| cockpit [11] 22:5 | computed [2] 72:1 | 134:9 145:14 148:4 | control [1] 147:23 | 126:24 128:11 128:12 |
| 30:4 78:12 78:13 | 72:18 | considerably [2] | conversation [18] | 129:8 129:15 129:19 |
| 78:20 98:9 98:11 | computing [1] 70:17 | 39:18 76:19 | 17:14 18:24 20:9 | 130:11 130:12 135:23 |
| 98:13 100:13 116:11 | conceivably [1] 64:15 | consideration [11] | 21:24 22:2 22:23 | 136:15 137:25 139:15 |
| 139:11 | concept [2] 5:24 | 19:9 29:18 39:16 | 59:15 59:20 59:21 | 140:9 141:8 141:11 |
| collectively [3] 53:4 | 6:16 | 39:17 43:6 73:18 | 59:22 78:1 78:17 | 141:24 143:19 143:23 |
| 55:16 74:10 | concern [15] 6:4 | 98:21 99:10 102:13 | 92:14 92:17 97:2 | correctly [1] 114:25 |
| coming [1] 20:21 | 85:16 85:18 89:21 | 102:17 119:19 | 127:1 135:19 145:17 | correspondence [1] |
| command [6] 58:21 | 90:1 101:2 101:6 | considerations [2] | conversations [6] | 107:7 |
| 98:18 103:19 103:23 | 102:11 103:17 104:1 | 39:12 70:5 | 21:9 21:13 21:13 | counsel [11] 65:16 |
| 118:18 120:7 | 104:2 117:23 118:7 | considered [10] 19:6 | 21:17 96:22 105:1 | 94:4 95:11 96:18 |
| commencing [1] 3:13 | 118:12 118:21 | 29:2 29:21 38:21 | conveyed [2] 54:19 | 96:21 96:22 97:8 |
| comment [4] 70:7 | concerned [9] 39:9 | 38:23 72:8 89:7 | 54:24 | 111:9 131:10 150:13 |
| 70:10 70:11 70:12 | 44:9 67:18 79:10 | 89:25 116:3 119:16 | Cook [2] 14:9 131:22 | 150:15 |
| comments [1] 62:19 | 100:22 100:22 117:20 | considering [1] 100:23 | coordinating [1] | counsel's [1] 5:17 |
| Commission [2] 149:20 | 117:25 148:3 | considers [1] 51:19 | 12:25 | counseled [2] 69:1 |
| 150:23 | concerning [20] 15:9 | consist [5] 23:25 | copies [2] 52:16 | 69:23 |
| | 17:8 21:10 21:18 | 27:9 47:23 70:2 | 80:22 | counseling [8] 68:22 |
| | | | | 69:3 70:12 135:2 |
| | | | | 135:6 135:11 135:16 |
| | | | | 135:17 |
| | | | | count [1] 57:6 |
| | | | | COUNTY [2] 149:5 |

150:5

**couple** [4]          12:10
74:16   76:17   144:5
**course** [1]          117:6
**Court** [6]           1:0
3:7   88:13   88:15
88:17   148:6
**covered** [4]         54:11
56:25   133:22   142:13
**covers** [1]          61:19
**create** [1]          50:23
**created** [4]         53:17
83:6   95:4   113:8
**crew** [25] 20:3      25:16
27:10   27:15   27:25
28:14   30:17   54:25
69:7   69:9   72:17
78:19   78:19   79:23
79:25   90:22   98:15
98:19   99:14   99:17
101:17   103:2   116:15
118:6   118:19
**crews** [1]           11:22
11:23   12:4
**criteria** [7]        18:22
30:9   30:22   32:12
32:21   32:24   128:21
**critical** [3]        61:13
61:15   61:21
**criticisms** [1]      62:12
**critique** [1]        102:9
**CRM** [9] 98:10       98:11
98:23   98:23   98:24
99:23   99:25   118:12
118:19
**culminating** [1] 114:20
**curious** [1]         123:19
**current** [3]         21:19
31:19   111:15
**customer** [1]        64:24
**customers** [1]       64:18
**customs** [2]         11:13
11:14
**cut** [1]   19:1
**D** [2]    2:1         132:2
**dangerous** [1]       114:15
**DANIEL** [1]          1:0
**date** [8]  7:15      21:24
37:16   45:20   66:20
111:10   140:24   145:1
**dated** [5] 109:4     111:6
112:6   112:14   150:19
**Dave** [18]           12:11
18:1   21:10   21:14
21:18   21:20   22:2
22:3   22:17   22:20
22:24   22:25   23:5
23:12   26:10   30:5
47:13   121:1
**David** [1]           13:6
**day's** [1] 136:19
**days** [1] 49:21
**dead** [1] 126:23
**deal** [1]  6:7
**December** [4]        7:11
14:11   14:18   111:6

**decide** [1]          57:16
**decided** [6]         33:22
37:14   46:5   55:17
74:25   95:7
**decides** [1]         33:21
**decision** [44]       37:10
37:25   38:7   38:18
42:21   42:21   43:1
43:3   43:4   56:10
60:22   60:24   63:4
63:13   63:20   69:17
69:18   73:11   73:3
76:21   76:22   89:9
95:14   97:20   97:23
98:4   100:14   100:14
128:9   130:19   131:1
131:7   131:10   131:13
131:14   131:17   131:19
131:23   132:10   132:18
132:22   133:10   133:12
133:21
**decrease** [2]        39:23
39:23
**decreases** [1]       43:3
**deduction** [1]       42:20
**deep** [2] 121:9      121:24
**defendant** [5]       1:0
1:0   3:6   125:6
142:16
**Defendant's** [1] 125:4
**defense** [1]         142:15
**defer** [2] 118:23    120:7
**defined** [1]         57:1
**defines** [1]         57:14
**definitely** [1]      76:24
**definition** [12]     56:20
56:25   57:13   58:15
93:2   93:5   93:10
93:11   93:13   93:18
94:19   122:21
**definitions** [2]     54:12
57:11
**degradation** [7] 39:20
39:22   53:1   58:12
64:5   71:21   72:4
**degradations** [3]
55:6   72:9   121:25
**degree** [3]          40:23
60:11   62:17
**degrees** [1]         39:18
**delay** [4] 63:24     64:9
64:13   64:15
**deliberately** [1] 39:4
**demand** [2]          119:24
119:25
**demanding** [2]   103:15
145:5
**denying** [1]         96:2
**departed** [3]        45:6
102:20   123:5
**departing** [1]       39:9
**department** [1]      145:9
**departure** [10]
53:15   53:19   54:1
54:5   64:17   70:6
72:1   101:20   103:8

**Depending** [1]       64:16
**depos** [1]           4:3
**deposing** [1]        34:22
**deposition** [17]     1:0
3:1   5:14   5:18
5:20   5:21   32:12
96:24   114:4   142:12
144:24   145:6   145:25
146:19   148:9   150:1
150:8
**depositions** [2]     32:11
146:20
**Derry** [7]           1:0
3:1   3:16   3:24
48:5   149:9   150:9
**descending** [1]      77:6
**describe** [6]        8:20
66:7   66:13   66:15
80:18   104:20
**described** [5]       63:6
63:7   78:10   93:9
104:19
**describes** [1]       88:2
**description** [3]     8:22
113:18   127:17
**designated** [2]      97:14
97:18
**designation** [1]  66:21
**despite** [1]         114:7
**detail** [1]          16:22
**detailed** [1]        140:5
**details** [2]         35:25
92:15
**determination** [1]
34:3   54:10   134:13
136:3
**determine** [2]       29:6
137:2
**determined** [1]      54:4
**devoted** [1]         91:3
**DHL** [1] 82:16
**Dickinson** [2]       32:1
125:21
**differed** [1]        49:10
**difference** [3]   111:23
116:13   116:18
**differences** [1]     39:2
**different** [7]       28:12
32:9   56:23   86:25
91:6   92:4   131:15
**differently** [1]     87:11
104:4
**direct** [11]         2:3
3:20   12:16   22:6
62:7   84:6   137:24
138:8   138:20   138:25
139:18
**director** [17]       4:21
4:22   6:21   8:8
20:19   31:16   31:19
32:6   34:1   56:12
56:17   63:16   82:8
94:11   123:17   124:9
124:11
**disagree** [1]        122:19
**disagreed** [1]       103:17

**disa_ _ement** [1]
72:3
**disagrees** [2]       58:22
59:4
**disaster** [1]        89:14
**disciplinary** [3] 74:20
116:9   117:25
**discipline** [5]      83:14
85:2   94:14   115:2
134:25
**disciplined** [4]     69:22
76:8   76:12   118:7
**discovery** [1]       3:3
**discrepancies** [4]
49:11   70:18   73:17
74:9
**discrepancy** [1] 48:22
**discretionary** [2]
27:21   27:22
**discuss** [7]         17:25
18:12   26:10   36:24
65:10   79:5   92:19
**discussed** [15]      19:11
20:6   21:20   32:25
35:14   38:17   67:7
68:9   68:14   68:19
87:18   121:1   121:4
135:7   136:8
**discussing** [7]      17:14
26:13   85:20   92:16
98:5   109:19   121:12
**discussion** [11]     21:2
38:6   70:20   70:23
86:8   90:3   110:25
120:18   128:2   144:16
145:11
**discussions** [2] 78:4
90:6
**dispatch** [1]        54:19
**dispatched** [1]      58:1
**disqualified** [1] 25:19
**disregard** [3]       58:21
59:3   59:14
**disregarded** [1]  61:11
**distance** [2]        138:2
138:7
**distinguishing** [1]
71:3
**distorting** [1]      39:5
**District** [4]        1:0
1:0   3:6   3:7
**document** [24]       50:18
51:10   51:16   52:7
95:12   103:9   103:13
103:13   109:10   111:4
113:14   113:24   113:25
121:13   121:18   123:2
125:13   128:7   128:8
130:4   130:4   130:8
143:13   143:24
**documentation** [13]
55:23   56:7   72:12
78:22   80:22   80:22
82:22   94:24   95:2
135:13   135:18   137:2
137:3
**documented** [6] 90:10

101:21   101:25   101:25
136:25   142:2
**documenting** [1]
90:15
**documents** [15] 50:23
95:18   95:21   109:2
112:20   127:11   127:19
128:5   129:23   130:13
130:21   130:23   132:9
133:23   133:24
**doesn't** [4]          28:17
57:6   96:1   111:3
**done** [24] 11:10     11:12
24:25   27:20   27:23
30:24   47:3   47:17
51:4   52:20   59:8
70:8   70:9   81:1
83:19   95:11   101:7
104:3   104:4   106:19
115:10   124:7   145:21
146:10
**Dorado** [1]          138:8
**doubt** [1]           91:23
**down** [4] 38:22      40:3
89:8   100:25
**Downtown** [2]        1:0
3:11
**drill** [1] 146:9
**Drive** [1]           4:9
**drugs** [1] 92:10
**dry** [10] 39:14      41:9
42:3   42:14   53:19
53:23   54:1   55:13
55:14   71:3
**due** [2] 37:22       53:1
85:18
**duly** [2] 3:18       149:10
**during** [14]         22:19
27:12   27:13   27:14
33:12   36:18   52:3
77:15   79:5   79:8
101:6   101:19   142:5
142:21
**duties** [12]         7:24
14:15   25:8   87:21
87:22   87:23   88:6
88:22   88:23   89:2
89:5   99:15
**duty** [1] 58:8
**E** [2]    2:1         2:6
**early** [2] 32:18     48:14
**East** [2]  1:0       3:11
**Ed** [2]   14:9       131:22
**educate** [1]         94:17
**EEOC** [7]            34:8
34:12   35:8   36:8
36:11   36:22   86:15
**effect** [8]          32:14
41:16   70:8   111:7
111:16   112:9   112:16
138:19
**effort** [3]          91:14
92:19   114:22
**efforts** [5]         15:3
15:21   15:25   16:11
132:2
**eight** [3] 74:25     119:12

134:2

**Eighty-seven** [1]
12:1

**either** [9]        6:8
27:24   39:3    39:3
44:3    52:3    52:12
83:15   111:2

**eligibility** [1]    29:10

**eligible** [2]       19:6
24:9

**eliminated** [2]    19:9
20:14

**emotional** [1]     86:12

**employ** [1]        11:19

**employed** [2]      4:11
37:3

**employee** [7]      75:1
76:8    79:6    91:20
135:11  150:13  150:14

**employees** [1]     80:21

**employment** [2] 16:10
37:11

**en** [1]     25:4

**encountered** [1] 114:16

**encourages** [1]  118:19

**end** [2]    16:10   83:22

**engaged** [1]       65:16

**engineer** [5]      7:12
59:21   60:4    78:25
116:8

**engineers** [1]     12:7

**enlarged** [1]      111:4

**entail** [1]        74:23

**entered** [1]       69:24

**entitled** [1]      144:25

**entrust** [2]       74:5
74:11

**episode** [7]       79:13
79:18   84:25   85:3
87:8    90:9    134:23

**episodes** [3]      79:2
87:14   90:7

**equal** [4] 17:23    18:4
87:5    126:25

**equipment** [1]    140:23

**ER** [1]    13:8

**eroded** [1]        76:18

**error** [3] 53:8     53:11
53:14

**ESQUIRE** [3]      1:0
1:0     1:0

**essence** [1]      134:15

**evaluated** [2]     27:4
100:14

**evaluation** [2]    27:15
27:17

**event** [1] 40:21

**events** [3]        49:12
52:9    68:5

**everybody** [4]     17:16
20:18   126:17  147:1

**evidence** [1]      3:3

**exactly** [4]       35:1
41:22   56:3    63:15

**EXAM...ATION** [2]
2:3     3:20

**exceed** [1]       43:19

**excerpting** [1]  110:15

**excerpts** [2]    114:17
119:20

**exchange** [1]     67:1

**exclude** [1]      52:2

**excused** [1]     148:2

**exhausted** [1]    32:20

**Exhbit** [1]      127:16

**exhibit** [25]      2:8
2:9     2:10    2:11
2:12    2:13    2:14
109:4   109:6   109:9
110:21  111:5   113:17
113:22  120:10  120:13
120:20  121:6   125:2
125:3   125:4   127:15
128:4   143:25  144:8

**exist** [1] 95:18

**exists** [1]        96:1

**exit** [1]  78:12

**expect** [1]       143:3

**experience** [2]   24:3
24:25

**experienced** [1] 78:9

**experiences** [3] 78:5
90:22   90:25

**expertise** [3]   137:11
137:13  141:1

**Expires** [2]    149:20
150:23

**explain** [2]    104:12
124:23

**explanation** [1] 39:11

**express** [1]      21:5

**expressed** [5]   16:13
16:23   22:3    22:9
23:3

**extends** [1]     41:23

**extent** [4]       5:25
6:5     132:16  133:8

**eye** [2]  145:8   146:17

**FAA** [22]         7:22
13:23   25:5    52:4
56:2    63:9    98:6
105:6   105:12  105:13
106:4   106:13  106:16
106:22  107:8   108:7
113:15  124:1   124:15
129:8   138:5   139:4

**FAA-administered** [1]
129:4

**FAA-imposed** [1]
129:13

**facilities** [1]  138:12

**fact** [22] 9:3    19:11
19:12   19:20   20:23
20:25   35:21   36:1
38:25   42:3    50:20
75:14   85:6    85:18
89:19   91:6    93:13
101:17  114:21  119:5
122:15  128:19

**factor** [3]        29:17

41:14   89:9

**factors** [8]       38:16
74:10   88:4    89:3
130:20  130:24  132:8
133:20

**facts** [2] 39:5    107:2

**failed** [3]       126:18
126:21  128:14

**failure** [2]      128:15
129:3

**failures** [2]     129:8
129:13

**fair** [13] 8:15    16:22
19:8    19:15   19:22
43:9    64:21   66:3
66:18   66:22   90:21
96:4    112:8

**faith** [1] 145:14

**fall** [1]  7:17

**familiar** [2]     23:19
129:5

**far** [11]  7:8     25:6
49:25   79:10   91:21
95:22   107:9   108:20
108:25  134:1   148:2

**fashion** [2]       28:21
43:21

**fault** [7] 70:9    100:16
100:18  100:19  103:15
104:6   134:7

**fax** [1]   45:8

**faxed** [1]         44:21

**February** [16]    14:17
14:18   14:23   15:4
15:11   15:22   16:9
16:24   17:19   33:11
34:8    34:11   126:7
126:13  131:20  131:25

**federals** [1]     147:11

**FedEx** [1]        64:19

**feeling** [2]      76:16
76:25

**fell** [1]  53:15

**fellow** [1]        90:23

**felt** [11] 38:1    50:24
69:13   74:4    78:11
85:22   86:1    89:4
91:8    93:21   94:11

**few** [6]   16:9    19:21
67:8    92:6    109:2
113:20  143:14  146:15

**field** [4] 42:1    42:13
103:7   104:20

**file** [12] 28:16   28:24
51:9    51:17   69:24
74:19   74:23   83:3
83:4    95:6    95:7
145:18

**filed** [10]3:8     3.17
34:12   35:8    35:20
44:17   75:18   75:22
79:6    113:14

**files** [1] 28:7

**fill** [1]  13:12

**final** [2] 58:23   73:3

**finally** [1]       77:11

**fina...ally** [1]  150:16

**finding** [1]     106:22

**fine** [6]  4:2     44:13
66:19   66:23   94:21
146:21

**finish** [2]       145:3
145:5

**finished** [1]    147:17

**fire** [3]  97:25   105:3
146:9

**firing** [1]       97:14

**firmly** [1]       117:1

**first** [29] 3:18   6:4
6:15    7:14    12:7
14:6    14:14   24:13
25:13   55:20   65:20
66:25   68:11   72:18
78:25   79:1    87:18
110:19  110:19  114:6
116:7   118:14  118:22
118:23  119:23  119:25
120:6   125:5   128:8

**fitted** [1] 10:10

**five** [2]  144:24  147:13

**flat** [1]  49:6

**fleet** [2] 10:4    10:12

**flight** [59]        7:12
10:15   10:16   11:1
12:7    12:25   44:8
45:5    46:13   54:19
54:24   55:24   56:8
58:23   59:21   60:4
61:18   63:22   63:24
64:10   64:14   65:1
66:24   67:7    67:18
68:4    68:6    68:8
70:5    71:17   71:22
71:23   73:4    77:12
78:2    78:2    78:25
87:18   90:11   98:15
98:22   99:2    99:4
99:6    99:8    99:14
99:16   99:17  100:21
100:23  103:22 112:10
115:25  116:7  116:10
117:21  118:20 134:5
136:19

**Florida** [14]      1:0
1:0     3:7     3:10
3:12    4:10    92:24
93:10   94:12  111:6
149:4   149:20 150:3
150:22

**flown** [1]         22:19

**fly** [2]   64:22   90:1

**flying** [8]       27:14
32:8    77:5    78:11
78:13   85:14   89:22
91:24

**follow** [2]      121:25
134:20

**followed** [8]     66:25
99:23   99:24  105:12
106:5   106:13 111:25
117:6

**following** [9]    33:10
46:11   80:19   84:1
107:19  118:2  127:3
127:9   131:7

**follows** [1]      3:19

**forbad** [1]      139:18

**forcibly** [3]     89:16
114:7   114:13

**forgive** [1]      47:15

**form** [65]         4:1
8:13    15:13   15:15
17:1    18:6    19:16
19:24   21:12   22:11
26:18   26:22   30:24
33:6    38:5    38:9
42:7    43:7    44:1
48:25   49:19   53:10
55:1    57:7    59:17
63:25   65:8    65:23
66:8    67:24   69:10
71:19   72:12   72:18
73:1    75:7    82:4
83:18   85:24   86:20
90:17   92:25   93:24
96:20   97:16   97:22
99:1    100:2   101:9
102:23  103:20  105:7
106:7   115:17  116:16
117:10  118:15  119:13
123:22  132:11  132:14
135:1   137:20  141:16
142:24

**formal** [7]       23:22
134:24  135:2   135:5
135:11  135:16  135:22

**formally** [1]      26:1

**forming** [1]      53:18

**Fort** [8]  1:0     3:12
4:18    11:4    11:17
61:17   111:5   123:5

**forth** [1] 51:18

**forward** [1]      44:14

**found** [7]         49:5
50:14   54:16   54:22
61:6    61:8    107:2

**foundation** [1]  132:21

**founded** [1]      117:8

**four** [1]  130:18

**frame** [4]         23:4
49:20   78:22   128:11

**friction** [5]      41:8
41:11   41:13   41:14
41:17

**Ft** [2]    10:21   11:2

**fuel** [1]  65:3

**fulfilled** [1]     18:9

**fulfilling** [1]    7:24

**full** [3]  63:7    65:2
74:22

**full-size** [1]     88:18

**full-time** [1]     14:3

**function** [1]      88:2

**future** [1]       118:10

**gap** [3]   5:4     5:6
5:9

**gate** [5]  69:8    70:16
101:1   116:21  117:17

**general** [5]       31:15
71:6    74:16   74:17
76:14

**generalized** [1]  73:13

**DERRY HUFF**

generally [5]    31:16
    61:4    64:20    64:24
    75:21
generate [1]    40:20
generated [7]    40:11
    41:8    41:12    43:15
    43:16    94:25    121:17
generates [1]    40:22
generating [3]    70:14
    70:15    116:20
geographic [1]    9:21
given [16]    17:15
    17:17    17:22    18:4
    19:13    19:21    20:25
    21:6    48:12    49:17
    50:1    58:1    73:18
    87:5    126:16    147:16
God [1]    89:13
GOM [1]    140:5
gone [1]    25:7
good [4]    74:20    85:21
    91:20    145:14
GORDON [1]    1:0
governed [1]    103:19
government [1]    92:9
GPS [6]    137:5    137:12
    137:20    137:23    141:6
    141:9
GRAMM [4]    3:8
    149:19    150:6    150:22
grave [1] 89:25
gravity [1]    94:16
great [1]    41:20
greater [1]    39:25
greed [1] 132:18
Green [12]    80:5
    80:8    80:9    82:10
    83:15    83:23    84:4
    84:6    85:4    90:9
    92:2    93:9
Green's [2]    80:23
    87:9
Grenada [2]    77:6
    77:6
gross [1] 123:6
grounds [2]    73:12
    94:13
group [3]    31:18
    59:13    91:21
guess [2] 59:7    133:12
guest [1] 35:4
guidelines [5]    138:21
    138:23    139:1    139:19
    140:1
guilty [2]    93:21
    94:12
guys [1] 148:3
h [2]    2:6    128:19
half [5]    31:24    74:25
    79:9    85:21    119:12
hand [3]    110:6    113:21
    149:12
handed [1]    96:14
handled [4]    30:13
    68:17    135:8    135:9

handlit [1]    123:18
hands [1]    89:14
happening [1]    143:22
hard [1]    48:12
HARGROVE [1]
    1:0
hazard [1]    38:1
He' [1]    132:18
he'd [5]    19:13    87:5
    117:17    126:24    128:14
head [2]    95:23    145:8
heading [1]    141:15
hear [3]    19:14    19:23
    129:9
heard [5] 48:23    50:11
    78:4    81:12    81:14
hearing [3]    36:3
    36:4    50:24
HEINRICH [1]    1:0
held [4]    110:25    120:18
    128:2    144:16
help [1]    133:3
heretofore [2]    3:8
    3:17
Hibiscus [1]    4:9
high [1]    29:25
higher [1]    39:21
himself [9]    22:13
    38:21    78:12    78:13
    89:7    89:11    99:5
    100:24    114:4
hired [1] 143:8
hiring [1]    32:13
hold [3]    8:11    8:14
    145:11
holder [1]    108:24
holding [4]    102:19
    103:5    103:6    147:10
home [2] 84:5    84:14
hoping [1]    5:18
horse [1] 126:23
hour [4]    79:9    85:21
    144:25    146:14
hours [4] 49:21    144:24
    147:10    147:13
house [1]    80:23
HR-related [1]    28:17
Huff [9]    1:0    3:1
    3:16    3:24    48:5
    88:22    108:21    149:9
    150:9
human [5]    82:8
    83:7    94:10    135:10
    135:17
idea [10] 22:21    29:15
    29:22    51:7    65:4
    78:20    81:13    111:8
    118:6    119:8
identification [8]
    2:7    109:5    109:7
    113:18    120:11    125:6
    127:17    144:10
identified [4]    130:23
    130:24    132:8    133:24

identify [7]    16:8
    16:21    125:9    130:18
    130:20    131:5    136:2
identity [1]    34:8
ignored [1]    116:25
illegal [1]    137:22
imagine [1]    29:25
immediately [3] 5:5
    49:20    50:1
important [1]    123:12
imposed [1]    129:8
improve [1]    91:11
improved [1]    101:13
inaccurate [3]    122:12
    122:13    124:4
inappropriately [4]
    134:3    134:10    135:25
    139:10
inasmuch [1]    43:14
INC [2]    1:0    3:5
inch [9]    49:16    54:2
    54:18    54:24    55:13
    57:15    104:24    121:9
    121:24
incident [21]    44:10
    66:24    67:16    67:23
    71:11    75:24    75:25
    86:24    95:16    105:6
    105:12    105:14    106:25
    107:19    108:9    112:10
    113:17    127:16    134:4
    136:1    142:6
include [3]    80:21
    129:7    129:13
included [1]    57:21
including [1]    34:8
incoherently [1] 79:11
inconsistencies [3]
    50:14    51:11    51:19
inconsistent [2] 50:12
    104:8
incorporate [1]    121:20
incorporates [1] 113:9
increase [2]    41:16
    64:23
indeed [1]    95:21
independently [1]
    90:13
index [1]    88:16
individually [2] 5:15
    69:1
individuals [1]    35:13
inform [4]    30:22
    93:2    93:12    93:13
informal [2]    134:24
    135:17
informally [1]    102:21
information [13]
    5:25    15:7    35:14
    98:18    127:3    127:9
    127:12    129:6    129:21
    131:10    131:12    131:21
    143:4
informed [4]    20:19
    36:21    85:6    124:21

info[.. .]ing [1]    104:1
ingredients [1]    130:25
initial [1]    24:24
injury [4]    81:7
    81:21    81:25    84:21
input [3] 98:19    109:22
    125:18
inquire [2]    26:9
    35:2
inquiring [1]    96:21
inquiry [1]    52:4
inside [2]    46:22
    140:23
insist [1] 120:3
instance [7]    69:8
    75:22    77:3    77:25
    78:10    79:4    101:12
instances [3]    76:18
    77:24    87:16
instructions [1] 134:21
insubordinate [4]
    69:7    69:14    134:18
    134:19
insubordination [1]
    69:12
intend [1]    21:4
intentional [1]    145:23
interest [13]    16:13
    16:19    16:23    17:8
    17:25    18:13    18:17
    21:11    21:14    21:19
    21:22    23:3    81:5
interested [6]    14:3
    25:13    81:17    81:18
    84:23    150:16
interfere [1]    114:9
interim [1]    13:17
internal [2]    30:11
    30:14
INTERNATIONAL
    [2]    1:0    3:5
Interrogatories [1]
    125:5
interrogatory [2]
    125:1    128:7
intersection [1] 62:8
interview [1]    24:4
interviewing [1]
    24:15
interviews [1]    31:13
intruding [1]    80:20
investigate [2]    44:15
    96:2
investigated [7] 47:1
    47:5    47:22    68:8
    68:13    71:20    106:25
investigation [24]
    25:10    45:19    47:2
    52:21    59:8    60:8
    60:16    63:5    63:7
    71:11    82:1    95:17
    98:7    105:13    106:6
    106:13    106:16    106:22
    107:10    107:13    108:8
    108:22    109:1    142:2
involve [2]    68:15

info[..]ing [1]    104:1
82:10
involved [10]    47:7
    52:13    63:12    63:23
    71:14    79:18    81:25
    91:10    110:15    135:10
involvement [1] 135:14
involving [4]    83:15
    83:15    107:8    112:10
IOE [1]    24:24
island [3]    77:6
    77:7    77:10
issuance [1]    106:5
issue [14]    34:17
    43:8    61:1    85:23
    92:3    100:17    100:18
    100:19    100:20    115:19
    124:21    133:17    136:14
    142:2
issued [7]    56:2
    105:13    106:16    106:25
    107:3    107:8    124:1
issues [8]    6:11
    34:22    43:5    74:13
    116:23    133:14    136:11
    146:15
item [4]    121:6    121:23
    122:6    128:6
items [2] 50:10    127:20
itself [2] 57:11    108:24
J [4]    3:8    149:19
    150:6    150:22
Jacksonville [1] 61:19
JAMES [1]    1:0
jet [1]    30:6
job [2]    119:11    124:10
John [13] 31:21    32:2
    47:7    48:19    51:13
    53:3    65:13    68:15
    90:4    97:11    105:17
    131:8    133:13
Jorsey [10]    60:4
    60:8    61:12    62:13
    62:13    62:17    95:15
    102:22    107:5    108:21
Jorsey's [2]    60:21
    141:25
Juan [11] 61:20    79:7
    82:3    82:7    82:10
    82:13    83:8    87:8
    92:22    95:4    138:9
judgment [7]    81:10
    85:16    85:18    89:1
    89:4    89:10    90:14
June [6]    11:5    11:6
    112:10    115:8    115:22
    134:4
keep [2]    123:19    123:20
keeper [1]    132:17
kept [2]    112:22    123:24
key [1]    89:9
kind [11] 9:17    16:20
    27:20    28:19    30:14
    51:9    51:10    75:18
    98:7    106:19    134:24
knew [5] 16:4    75:23
    78:6    126:21    145:16

DERRY HUFF

**knowing** [2]   36:11
145:11

**knowledge** [27]   5:25
6:12   15:2   15:5
15:9   15:19   15:20
15:24   16:3   16:11
16:17   17:21   20:22
57:24   59:6   70:1
72:6   72:8   83:25
85:9   86:16   108:7
131:6   132:22   133:16
142:3   142:18

**knowledgeable** [1]
37:12

**knows** [3]   132:22
132:24   133:1

**L.T** [1]   1:0

**labeled** [1]   143:14

**lack** [5]   60:12   127:4
127:10   137:3   137:4

**lacked** [1]   132:6

**language** [1]   114:3

**Large** [1]   3:10

**Las** [2]   1:0   3:11

**last** [7]   6:15   13:7
14:7   25:4   31:23
54:5   104:17

**late** [4]   11:5   14:17
14:18   16:24

**latitude** [1]   72:22

**Lauderdale** [10]   1:0
3:12   4:18   10:21
11:2   11:5   11:17
61:18   111:5   123:5

**law** [3]   28:15   92:24
93:10

**lawful** [2]   3:2
3:18

**leading** [1]   74:13

**leads** [1]   104:13

**learn** [1]   68:3

**least** [1]   77:16

**leave** [2]   13:19   94:22
116:10

**leaving** [1]
147:14

**led** [2]   74:10   131:1

**left** [3]   5:2   5:7
14:10

**legal** [6]   65:16   94:4
96:18   96:22   97:8
137:19

**legally** [2]   97:1
140:22

**length** [2]   86:7
130:22

**less** [14]   41:8   42:4
42:6   42:10   49:16
54:2   54:18   54:24
55:12   90:16   104:23
114:15   121:8   121:24

**letter** [50]   21:21
22:25   23:6   23:12
26:11   26:12   28:15
38:4   38:19   39:2
47:1   47:6   47:19
49:7   52:10   65:6
65:7   65:10   66:15

68:10   .10   73:19
73:21   73:25   74:1
83:12   83:17   87:18
87:19   89:6   89:23
89:24   96:13   105:13
106:5   106:13   106:16
106:18   107:1   107:3
107:12   109:4   109:18
109:19   110:2   114:1
119:15   123:25   130:10
141:25

**letters** [1]   68:7

**letting** [1]   90:16

**level** [4]   41:25   42:13
42:19   88:25

**levels** [1]   41:25

**liaison** [1]   124:15

**life** [1]   80:19

**likewise** [2]   132:2
133:23

**limitations** [3]   43:16
43:20   121:8

**limited** [1]   76:1

**limits** [1]   25:12

**line** [13]   16:4   27:14
32:2   32:4   32:8
36:19   77:4   78:23
89:6   91:25   98:2
126:1   146:9

**list** [2]   29:24   30:1

**listen** [4]   48:4
48:11   48:13   118:13

**listened** [4]   48:16
49:23   50:22   59:11

**listening** [4]   47:24
49:4   51:6   54:22

**lists** [1]   127:11

**litigation** [1]   51:24

**live** [2]   3:23   3:24

**loaded** [1]   64:17

**loading** [1]   101:18

**lock** [2]   23:15   23:16

**locked** [1]   25:17

**look** [15]   39:6   95:24
95:25   96:1   109:13
110:8   110:21   112:13
113:23   120:20   125:8
130:18   131:3   132:5
143:13

**looked** [2]   14:5
128:25

**looking** [1]   66:21

**looks** [2]   110:13   113:25

**lose** [4]   85:1   85:14
88:5   90:14

**losing** [1]   119:11

**loss** [6]   37:22   73:13
74:2   79:3   87:15
87:20

**lunch** [6]   88:9
88:10   146:2   146:5
146:6   146:8

**lunchtime** [1]
147:21   145:16

**Lynn** [1]   13:18

**M** [1]   13:8

**maintain** [1]   28:7

**maintained** [2]   28:21
30:25

**maintenance** [1]   13:1

**Major** [72]   1:0
3:4   15:3   15:10
15:21   16:23   17:8
18:3   20:12   20:24
25:6   25:22   29:2
34:12   35:7   36:12
36:25   37:14   47:18
56:6   56:11   59:9
59:25   60:23   62:23
63:2   65:2   67:5
67:16   67:18   68:4
70:3   71:1   71:13
73:10   78:18   81:17
84:7   88:24   90:22
96:6   97:25   98:22
100:16   101:7   102:9
103:15   105:2   107:19
112:11   120:2   126:6
126:12   128:9   129:18
130:1   130:8   130:14
130:19   131:1   131:7
131:19   131:24   132:6
133:21   134:2   134:7
135:25   139:10   142:5
142:20   143:6

**Major's** [18]   16:10
18:12   18:16   21:10
21:18   36:21   37:10
50:4   65:18   69:11
85:14   87:9   88:5
99:20   117:15   127:4
132:2   143:21

**majority** [1]   92:14

**maker** [1]   56:10

**makes** [1]   135:16

**management** [6]   91:14
98:5   98:9   98:11
98:12   116:12

**mandatory** [1]   55:11

**maneuver** [1]   136:23

**manner** [1]   22:14

**manual** [46]   25:16
30:25   40:6   40:6
40:9   40:11   40:15
40:20   41:1   43:12
43:15   43:16   54:9
54:12   55:7   55:17
56:20   57:1   57:14
57:22   58:4   58:16
58:19   72:15   72:16
104:14   111:19   112:25
113:3   113:4   113:5
113:10   121:7   121:10
121:13   121:14   121:16
121:16   121:20   122:1
122:7   122:22   122:24
122:25   141:2   141:13

**manually** [1]   137:7

**manuals** [2]   39:19
40:22

**manufacturer** [2]
40:5   113:7

**margin** [1]   39:21
40:1   41:20   41:21
43:18   61:5

**mark** [8]   12:19   12:20

47::   109:3   125:1
125:2   127:15   143:25

**marked** [11]   2:7
109:5   109:7   110:7
113:18   113:22   120:11
120:13   125:6   127:17
144:9

**material** [4]   28:17
49:9   49:13   128:9

**materials** [2]   30:8
35:16

**matter** [8]   21:3
68:19   68:21   71:20
93:14   95:24   111:3
123:14

**matters** [1]   131:7

**maximum** [2]   64:23
123:6

**may** [18]   4:24   7:1
13:12   15:6   16:9
16:21   26:14   34:16
36:14   43:20   58:6
64:16   64:16   72:11
95:20   124:17   141:14
141:19

**mean** [13]   8:14
20:14   43:8   66:1
74:2   74:4   80:14
87:24   94:3   115:18
132:15   133:5   135:5

**means** [1]   59:15

**meant** [2]   20:16
80:6

**measure** [1]   14:4

**measures** [1]   83:14

**meet** [3]   29:14   29:16
80:8

**meeting** [16]   24:2
63:14   79:21   82:19
82:23   83:1   83:20
84:2   86:17   92:23
96:8   96:8   96:16
144:2   144:7   144:9

**meetings** [1]   63:9

**member** [14]   25:16
27:10   27:16   27:25
28:14   30:17   69:9
78:19   79:24   80:1
90:22   91:8   116:15
118:7

**members** [8]   20:3
69:7   98:19   99:14
99:17   101:17   103:2
118:19

**memo** [1]   30:24

**memoranda** [2]   30:15
31:5

**memorandum** [1]
51:10

**memorandums** [1]
30:11

**mentioned** [2]   90:8
131:16

**met** [5]   29:10   29:15
92:2   93:9   109:25

**meteorological** [2]
103:11   103:14

**method** [1]   147:9

**Miami** [15]   3:24
4:8   4:9   10:17
10:23   11:1   11:3
11:4   11:6   61:16
61:17   61:19   71:15
112:3   112:14

**mid** [1]   22:22

**middle** [1]   111:11

**might** [6]   15:13
25:19   70:19   98:23
98:24   108:15

**miles** [1]   77:10

**million** [1]   81:9

**mind** [5]   35:3   79:12
82:20   91:23   92:13

**minute** [3]   127:25
128:13   147:16

**minutes** [2]   19:21
143:15

**miss** [3]   77:9   108:14
146:16

**missed** [1]   77:7

**misstated** [1]   41:19

**misunderstand** [1]
139:22

**mix** [1]   131:1

**mixed** [1]   6:1

**Monday** [1]   46:11

**month** [2]   11:7
11:7

**months** [2]   56:4
67:8

**Morales** [6]   79:7
82:3   82:7   83:8
87:8   92:22

**most** [6]   7:24   37:12
42:23   59:22   108:7
133:22

**motion** [1]   145:18

**move** [1]   147:22

**moved** [3]   11:1
11:2   11:4

**moving** [2]   145:9
145:10

**MS** [268]   2:3   3:21
3:25   4:2   4:3
4:5   4:6   4:7
5:23   6:7   6:10
6:13   6:14   6:17
6:19   8:13   8:15
8:17   15:12   15:17
15:18   16:1   16:2
16:6   18:6   18:9
18:11   19:16   19:19
19:24   20:4   21:12
21:15   21:16   22:11
22:16   26:18   26:19
26:22   27:1   31:9
31:11   33:6   33:8
33:9   34:16   34:18
34:19   34:21   35:2
35:4   35:5   35:6
38:9   38:13   42:7
42:9   43:7   43:9
43:11   44:1   44:5
48:25   49:2   49:3
49:19   49:22   49:24

| | | | |
|---|---|---|---|
| 50:2 51:21 51:22 | 38:7 :8 43:25 | 75:7 82:4 84:8 | **obj** :d [2] 84:1 |
| 51:23 51:25 52:1 | 44:10 44:17 44:19 | 85:24 86:20 88:7 | 133:4 |
| 52:2 52:6 53:10 | 65:19 65:24 66:16 | 88:11 88:14 88:16 | **objecting** [2] 81:5 |
| 53:12 55:1 55:4 | 66:16 66:17 74:8 | 88:19 90:17 92:25 | 84:7 |
| 57:7 57:10 57:12 | 75:5 75:11 75:14 | 93:24 95:24 96:20 | **objection** [7] 5:23 |
| 59:17 59:19 59:24 | 75:22 128:8 | 97:3 97:16 97:22 | 5:24 6:16 43:9 |
| 63:25 64:2 64:3 | **nature** [6] 36:7 | 99:1 100:2 100:6 | 100:6 132:14 132:20 |
| 64:7 65:8 65:12 | 58:1 67:23 69:3 | 100:9 101:9 102:23 | **objections** [2] 4:1 |
| 65:23 65:25 66:1 | 95:25 141:15 | 103:20 105:7 106:7 | 144:4 |
| 66:3 66:5 66:8 | **navigate** [3] 137:7 | 108:14 108:17 109:11 | **objective** [3] 29:4 |
| 66:11 67:10 67:12 | 137:17 140:22 | 109:13 110:21 111:9 | 61:7 76:15 |
| 67:14 67:24 68:1 | **navigating** [2] 62:8 | 111:12 115:17 116:16 | **obligates** [1] 137:19 |
| 68:2 72:12 72:20 | 138:11 | 117:10 118:15 119:13 | **obligation** [3] 103:18 |
| 73:1 73:5 75:7 | **navigation** [6] 137:20 | 120:15 120:17 123:22 | 103:23 120:6 |
| 75:9 82:4 82:6 | 138:10 138:11 138:21 | 127:23 127:25 129:9 | **obligations** [2] 18:20 |
| 84:8 84:12 85:24 | 139:19 141:2 | 131:15 132:11 132:16 | 70:4 |
| 86:2 86:20 86:23 | **navigational** [4] 136:14 | 132:20 132:25 133:7 | **obligatory** [1] 55:6 |
| 88:7 88:9 88:11 | 137:22 138:12 140:10 | 135:1 136:7 141:16 | **observation** [6] 25:5 |
| 88:14 88:16 88:19 | **NavTech** [10] 40:12 | 142:7 142:10 142:24 | 54:3 55:25 104:8 |
| 88:21 90:17 90:20 | 41:1 43:12 72:25 | 144:13 144:18 145:2 | 104:10 104:16 |
| 92:25 93:4 93:24 | 110:14 111:19 112:1 | 145:7 145:23 146:1 | **observations** [9] |
| 94:2 95:11 95:24 | 112:22 121:20 122:25 | 146:5 146:7 146:21 | 22:5 22:6 22:18 |
| 96:4 96:5 96:20 | **necessarily** [1] 123:15 | 146:25 147:5 147:12 | 56:23 62:16 72:16 |
| 96:24 97:3 97:5 | **necessary** [1] 122:16 | 147:15 147:24 | 74:16 74:17 76:14 |
| 97:16 97:19 97:22 | **need** [10] 5:19 39:12 | **Notary** [3] 3:9 | **observed** [1] 55:19 |
| 97:24 99:1 99:3 | 40:24 42:4 55:18 | 149:20 150:22 | **observes** [2] 58:11 |
| 100:2 100:4 100:6 | 95:20 145:3 145:5 | **notes** [9] 50:23 51:2 | 72:10 |
| 100:8 100:9 100:10 | 145:18 146:6 | 51:4 51:7 51:8 | **observing** [1] 61:9 |
| 101:9 101:15 102:23 | **needed** [3] 71:21 | 52:8 52:10 95:16 | **obtain** [1] 18:16 |
| 103:3 103:20 103:24 | 72:4 145:17 | 150:11 | **obtained** [4] 48:1 |
| 105:7 105:9 105:10 | **needs** [1] 145:8 | **nothing** [4] 69:24 | 48:2 102:5 102:6 |
| 106:7 106:11 108:14 | **negated** [1] 54:6 | 74:18 104:2 141:23 | **obviously** [6] 10:9 |
| 108:17 108:18 108:19 | **neither** [1] 96:2 | **notice** [6] 3:8 | 89:15 94:3 119:22 |
| 109:2 109:8 109:11 | **never** [8] 29:6 29:7 | 3:17 34:7 120:10 | 133:9 144:3 |
| 109:12 109:13 109:16 | 29:9 81:14 95:14 | 121:2 143:18 | **occasion** [6] 67:4 |
| 110:21 110:23 111:1 | 95:16 121:3 124:20 | **November** [4] 1:0 | 69:11 70:21 72:5 |
| 111:9 111:12 111:14 | **new** [4] 4:14 12:4 | 3:13 149:13 150:19 | 84:11 92:22 |
| 113:19 115:17 115:21 | 14:5 108:2 | **now** [7] 5:11 10:14 | **occasions** [2] 67:5 |
| 116:16 117:4 117:10 | **next** [5] 24:14 24:15 | 12:3 15:14 43:23 | 80:25 |
| 117:13 118:15 118:17 | 24:20 24:23 25:2 | 65:18 125:25 | **occurred** [3] 99:17 |
| 119:13 119:17 120:12 | **nighttime** [1] 78:2 | **number** [14] 10:12 | 99:18 99:18 |
| 120:15 120:16 120:17 | **nine** [1] 135:24 | 25:13 32:12 34:7 | **occurs** [1] 58:3 |
| 120:19 123:22 124:5 | **none** [4] 90:8 90:13 | 42:23 110:19 110:20 | 140:3 |
| 125:7 127:14 127:18 | 106:1 107:9 | 114:11 114:13 126:5 | **October** [10] 6:25 |
| 127:23 127:24 127:25 | **nor** [3] 96:2 150:14 | 127:7 127:21 128:7 | 7:3 7:20 8:4 |
| 128:1 128:3 129:9 | 150:16 | 132:5 | 8:11 8:18 9:3 |
| 129:11 131:15 131:18 | **normal** [2] 61:5 | **numbers** [1] 42:25 | 13:10 13:12 112:6 |
| 132:11 132:14 132:16 | 138:12 | **o'clock** [2] 1:0 | **odds** [1] 50:8 |
| 132:19 132:20 132:23 | **north** [56] 3:24 4:8 | 3:13 | **off** [31] 39:13 41:23 |
| 132:25 133:3 133:7 | 4:9 4:9 9:22 | **oath** [2] 3:19 149:1 | 42:12 45:1 49:17 |
| 133:15 133:18 135:1 | 103:7 | **obey** [2] 118:14 118:18 | 54:20 54:25 95:23 |
| 135:4 136:7 136:9 | **Norton** [120] 1:0 | **object** [56] | 101:3 101:4 103:16 |
| 136:13 141:16 141:20 | 1:0 3:25 4:3 | 15:13 15:15 18:6 | 105:2 110:24 110:25 |
| 142:7 142:9 142:10 | 4:6 5:23 6:10 | 19:16 19:24 21:12 | 114:25 115:15 115:22 |
| 142:14 142:24 143:3 | 6:14 8:13 15:12 | 22:11 26:18 26:22 | 116:14 117:2 117:17 |
| 143:24 144:11 144:13 | 16:1 18:6 19:16 | 33:6 38:9 42:7 | 117:21 119:24 120:1 |
| 144:15 144:17 144:18 | 19:24 21:12 22:11 | 43:7 44:1 48:25 | 120:4 120:17 120:18 |
| 144:23 145:2 145:3 | 26:18 26:22 33:6 | 49:19 53:10 55:1 | 128:1 128:2 143:8 |
| 145:7 145:11 145:23 | 34:16 34:19 34:23 | 57:7 59:17 63:25 | 144:13 144:16 |
| 145:24 146:1 146:3 | 35:1 35:4 38:9 | 65:8 65:23 66:8 | **offered** [1] 34:20 |
| 146:5 146:6 146:7 | 42:7 43:7 44:1 | 67:24 72:12 73:1 | **offering** [2] 34:17 |
| 146:18 146:21 146:23 | 48:25 49:19 49:24 | 75:7 82:4 85:24 | 34:21 |
| 146:25 147:2 147:5 | 51:21 51:23 52:1 | 86:20 90:17 92:25 | **office** [7] 4:15 |
| 147:8 147:12 147:13 | 53:10 55:1 57:7 | 93:24 96:20 96:21 | 20:21 44:25 45:9 |
| 147:15 147:20 147:24 | 57:10 59:17 63:25 | 97:16 97:22 99:1 | 96:10 105:20 144:1 |
| 148:2 148:8 | 64:3 65:8 65:23 | 100:2 101:9 102:23 | **officer** [11] 7:14 |
| **must** [1] 140:3 | 66:1 66:8 67:10 | 103:20 105:7 106:7 | 25:13 72:19 78:25 |
| **N** [1] 2:1 | 67:24 72:12 73:1 | 115:17 116:16 117:10 | 79:1 116:7 118:14 |
| **name** [7] 3:22 13:7 | | 118:15 119:13 123:22 | |
| 66:2 128:6 143:4 | | 132:11 135:1 141:16 | |
| 143:8 143:11 | | 142:24 | |
| **named** [1] 3:17 | | | |
| **NASA** [18] 38:5 | | | |

| | | | |
|---|---|---|---|
| | | | 118:22 118:23 119:23 |
| | | 133:4 | 119:25 |
| | | **objecting** [2] 81:5 | **officer's** [1] 120:6 |
| | | 84:7 | **officers** [1] 12:7 |
| | | **objection** [7] 5:23 | **offices** [2] 3:11 |
| | | 5:24 6:16 43:9 | 11:16 |
| | | 100:6 132:14 132:20 | **official** [9] 56:23 |
| | | **objections** [2] 4:1 | 58:6 58:13 58:22 |
| | | 144:4 | 59:4 72:11 72:24 |
| | | **objective** [3] 29:4 | 123:8 149:12 |
| | | 61:7 76:15 | **officially** [1] 85:8 |
| | | **obligates** [1] 137:19 | **offloaded** [2] 64:9 |
| | | **obligation** [3] 103:18 | 64:13 |
| | | 103:23 120:6 | **offset** [1] 41:16 |
| | | **obligations** [2] 18:20 | **Olas** [2] 1:0 3:11 |
| | | 70:4 | **old** [1] 9:24 |
| | | **obligatory** [1] 55:6 | **older** [3] 142:16 142:20 |
| | | **observation** [6] 25:5 | 143:5 |
| | | 54:3 55:25 104:8 | **once** [7] 27:11 44:22 |
| | | 104:10 104:16 | 47:22 52:21 68:19 |
| | | **observations** [9] | 103:16 103:22 |
| | | 22:5 22:6 22:18 | **one** [39] 5:18 13:17 |
| | | 56:23 62:16 72:16 | 17:4 25:18 28:2 |
| | | 74:16 74:17 76:14 | 32:10 34:6 37:6 |
| | | **observed** [1] 55:19 | 49:16 54:2 57:15 |
| | | **observes** [2] 58:11 | 62:24 65:1 71:9 |
| | | 72:10 | 73:16 75:21 77:3 |
| | | **observing** [1] 61:9 | 77:25 79:4 91:25 |
| | | **obtain** [1] 18:16 | 95:4 97:4 99:14 |
| | | **obtained** [4] 48:1 | 106:14 111:16 112:9 |
| | | 48:2 102:5 102:6 | 116:19 119:10 119:19 |
| | | **obviously** [6] 10:9 | 121:8 127:24 129:18 |
| | | 89:15 94:3 119:22 | 133:11 139:5 142:23 |
| | | 133:9 144:3 | 143:18 144:13 144:21 |
| | | **occasion** [6] 67:4 | 147:2 |
| | | 69:11 70:21 72:5 | **one's** [1] 28:4 |
| | | 84:11 92:22 | **ones** [4] 76:22 92:7 |
| | | **occasions** [2] 67:5 | 95:23 111:3 |
| | | 80:25 | **open** [4] 107:10 107:13 |
| | | **occurred** [3] 99:17 | 108:22 109:1 |
| | | 99:18 99:18 | **operate** [3] 61:5 |
| | | **occurs** [1] 58:3 | 140:5 141:4 |
| | | 140:3 | **operated** [2] 61:2 |
| | | **October** [10] 6:25 | 140:3 |
| | | 7:3 7:20 8:4 | **operating** [11] 24:25 |
| | | 8:11 8:18 9:3 | 43:20 58:25 74:6 |
| | | 13:10 13:12 112:6 | 74:12 77:4 113:3 |
| | | **odds** [1] 50:8 | 121:7 121:13 137:23 |
| | | **off** [31] 39:13 41:23 | 138:14 |
| | | 42:12 45:1 49:17 | **operation** [8] 9:8 |
| | | 54:20 54:25 95:23 | 56:17 58:24 91:21 |
| | | 101:3 101:4 103:16 | 124:12 140:4 140:7 |
| | | 105:2 110:24 110:25 | 141:18 |
| | | 114:25 115:15 115:22 | **operational** [1] 12:23 |
| | | 116:14 117:2 117:17 | **operations** [15] 4:21 |
| | | 117:21 119:24 120:1 | 4:23 6:21 8:8 |
| | | 120:4 120:17 120:18 | 9:20 10:16 11:1 |
| | | 128:1 128:2 143:8 | 12:25 20:19 34:1 |
| | | 144:13 144:16 | 63:17 123:18 124:9 |
| | | **offered** [1] 34:20 | 124:11 141:3 |
| | | **offering** [2] 34:17 | **opinion** [7] 55:10 |
| | | 34:21 | 63:19 69:10 71:19 |
| | | **office** [7] 4:15 | 83:18 93:8 124:1 |
| | | 20:21 44:25 45:9 | **opinions** [1] 83:9 |
| | | 96:10 105:20 144:1 | **opportunities** [8] |
| | | **officer** [11] 7:14 | 20:2 20:17 20:20 |
| | | 25:13 72:19 78:25 | 21:1 23:12 26:7 |
| | | 79:1 116:7 118:14 | 86:19 87:4 |

**opportunity** [6]  17:16
20:10  21:6  25:17
126:17  126:18
**opposed** [3]        26:20
97:15  135:16
**opposing** [1]       91:14
**opposite** [1]       58:3
**option** [1]         119:10
**oral** [1]  60:9
**order** [2] 24:9  145:19
**orders** [1]         88:19
**organization** [1] 12:11
**original** [1]       107:12
**otherwise** [4]      14:19
51:17  76:11  114:9
**out-of-body** [1] 78:5
**outside** [8]        27:2
27:6  78:13  138:9
138:14  140:7  140:17
141:5
**overall** [3]        76:25
88:2  89:1
**overreacted** [1] 85:22
**override** [2]       69:17
122:19
**overrode** [1]       69:16
**overruled** [1]      118:22
**oversee** [1]        33:3
**overseeing** [1]     124:12
**overstated** [1]     36:14
**overstep** [3]       13:15
**own** [2] 68:17  76:6
97:21
**owned** [1]          10.4
**owner** [2]          26:12
26:16
**P.A** [2]  1:0       1:0
**p.m** [1]  148:9
**packet** [2]         129:24
143:14
**page** [5] 2:2       112:3
114:6  114:10  121:5
**pages** [1]          110:7
114:18
**panel** [2] 24:17    31:12
**paperwork** [1]      25:25
**parameters** [3]     53:16
53:22   61:3
**parked** [1]         101:1
**part** [20] 28:4     28:11
30:20  38:17  45:16
48:18  60:21  60:24
76:20  78:17  83:2
87:19  91:6  112:20
116:11  131:14  136:16
136:18  141:3  145:15
**participate** [1] 125:15
**participated** [2] 100:21
133:9
**participating** [1]
142:22
**particular** [7]     20:6
31:4  71:22  71:22
73:8  97:6  142:22

**particu...** -y [1] 133:11
**parties** [1]        150:14
**parties'** [1]       150:15
**parts** [1] 113:9
**pass** [1] 128:23
**passed** [1]         128:20
**passengers** [1]  9:15
**passing** [1]        24:3
**Pat** [190] 15:3     15:21
16:10  16:23  17:15
18:3  18:16  18:18
18:25  19:5  19:9
19:13  19:21  20:1
20:10  20:12  20:16
20:20  20:24  21:3
21:5  21:6  21:10
21:18  21:21  22:2
22:4  22:5  22:13
22:19  22:25  23:2
23:6  23:11  25:6
25:22  25:24  26:3
26:13  26:15  29:1
29:7  29:20  30:5
34:11  35:7  36:12
36:19  36:21  36:24
37:14  37:16  38:1
38:6  38:20  39:7
39:9  44:3  45:15
45:20  46:13  47:17
50:3  56:6  56:11
59:8  59:25  61:6
62:7  62:13  62:22
63:2  63:14  65:2
65:6  65:18  66:6
66:15  67:1  67:5
67:7  67:16  67:18
68:4  68:6  69:11
69:13  69:13  69:22
70:2  70:3  70:10
70:21  71:1  71:13
71:25  72:2  73:10
74:4  74:5  74:11
74:17  76:15  77:1
77:3  78:1  78:3
78:18  78:24  79:3
79:5  79:7  79:8
79:22  79:24  81:17
81:17  82:18  82:23
83:15  83:21  83:25
84:6  84:11  84:13
84:22  85:1  85:5
85:14  86:18  86:24
87:4  87:9  87:10
88:5  88:24  90:22
90:25  91:5  91:10
91:13  91:19  92:3
94:6  94:7  94:16
96:6  96:10  97:25
98:22  99:20  100:16
101:7  101:23  102:9
103:15  103:22  103:22
105:2  107:19  109:18
110:1  110:4  112:11
113:25  116:19  116:21
117:6  117:15  119:1
120:2  126:12  126:16
128:9  129:18  130:1
130:8  130:14  131:1
131:19  133:21  134:7
139:10  140:6  142:5
142:20  143:6  143:21
147:3  147:5

**Pat's** [21]  20:6
21:14  21:22  43:24
48:22  50:6  50:7
50:12  50:25  51:17
51:20  61:6  61:8
61:15  61:22  65:18
81:5  83:3  83:4
95:6  95:7
**Patrick** [3]        1:0
3:4  37:10
**pay** [1]  64:19
**peer** [1]  31:17
**penalize** [1]       119:4
**penalties** [3]      108:8
108:11  123:13
**penalty** [3]        107:14
120:11  121:2
**pending** [2]        3:6
144:17
**people** [6]         127:11
131:16  131:16  132:1
133:8  143:8
**percentage** [1]  57:2
**perform** [7]
62:3  87:21  88:6
115:5  118:20  137:11
**performance** [49]
27:15  27:17  28:14
28:16  39:19  40:5
40:6  40:9  40:11
40:20  40:22  43:12
43:15  43:16  43:19
53:1  53:16  54:9
54:12  55:7  55:17
56:20  57:1  57:14
57:22  58:4  58:16
58:18  60:10  61:6
61:8  70:14  70:14
70:18  72:1  104:14
111:19  112:25  113:4
113:10  115:5  116:20
121:10  121:15  121:20
121:25  122:7  122:22
136:11
**performed** [2]  99:14
101:14
**performing** [2]  70:17
88:24
**perhaps** [1]        52:3
**period** [4]         6:23
7:6  25:18  90:8
**permission** [4]  5:17
7:22  8:6  49:18
**person** [6]         37:12
85:7  97:15  108:6
131:5  134:12
**personal** [10]      5:25
15:7  15:7  16:1
16:4  22:6  76:1
79:3  80:20  81:4
**personally** [4]  5:20
76:2  80:7  149:9
**personnel** [2]  28:7
28:16
**persons** [4]        127:3
127:9  142:16  142:20
**pertaining** [1] 129:18
**pertains** [1]       108:23

**Pete,** [5] 1:0      8:9
8:25  13:4  18:1
18:13  18:16  19:14
19:23  20:6  20:8
20:9  21:4  21:5
33:25  37:15  46:7
46:22  47:6  48:19
51:13  53:4  56:11
65:5  65:13  65:14
65:15  68:15  73:24
90:4  97:15  97:18
125:18  129:20  131:8
131:22  133:12  143:16
143:17
**phone** [2]          80:23
84:5
**picture** [2]        54:7
77:11
**pilot** [55] 6:22    6:24
7:7  7:19  7:21
7:23  7:25  8:3
8:7  8:12  8:19
8:20  9:5  13:2
13:5  13:9  13:11
13:14  14:2  14:4
14:5  14:7  14:15
14:20  16:4  23:8
25:8  25:25  26:6
31:17  32:3  32:4
33:11  34:4  36:12
36:19  36:19  58:20
74:19  75:22  79:19
90:23  91:21  94:11
98:3  103:19  116:8
118:13  118:18  118:23
118:24  120:7  123:9
123:11  141:14
**pilot's** [2]        24:1
103:23
**pilots** [9]         8:12
8:19  11:19  12:1
12:6  27:3  31:6
75:17  98:18
**pink** [1]  129:3
**place** [4] 4:13     72:14
86:17  130:7
**places** [1]         121:8
**plaintiff** [6]      1:0
1:0  3:2  3:5
127:4  142:17
**plaintiff's** [19]  2:8
2:9  2:10  2:11
2:12  2:13  2:14
34:7  109:4  109:6
110:7  113:17  120:10
125:3  125:4  125:5
127:10  127:16  144:8
**plan** [1] 70:15
**plane** [4] 49:17    114:25
119:24  120:4
**planes** [1]         64:22
**planting** [1]       92:10
**playing** [2]        42:1
42:13
**POI** [1] 106:25
**point** [13]         7:7
35:2  55:10  65:17
77:9  90:15  95:10
98:7  103:18  114:2
114:20  126:19  138:18

**point-to-point** [3]
138:21  139:19  140:1
**policies** [6]       30:21
91:4  107:18  107:20
107:22  107:25
**policy** [22]        25:12
25:15  58:4  58:20
69:20  71:2  71:7
72:9  72:14  72:21
73:7  108:1  108:2
116:6  116:7  138:3
138:20  138:24  139:2
139:18  139:25  140:2
**poor** [2] 61:6      61:8
**portion** [1]        106:24
**Portions** [1]       113:16
**position** [7]       4:20
12:20  32:9  32:13
32:21  92:20  124:17
**positions** [1]      33:23
**positive** [2]       90:22
91:17
**possible** [2]       64:22
111:22
**potential** [1]      115:1
**POTTER** [1]  1:0
**pound** [1]          64:19
**predicate** [2]      115:18
132:21
**prejudicial** [1] 144:20
**preparation** [1] 51:23
**prepare** [4]        35:16
51:9  65:6  99:15
**prepared** [2]       52:18
112:20
**preparing** [2]      70:5
125:16
**prescribe** [1]      41:1
**prescribed** [2]     138:20
139:21
**present** [1]        75:3
**presented** [2]      58:9
114:15
**presently** [1]      137:23
**preserved** [1]      28:24
**preset** [1]         145:1
**president** [2]      12:12
12:21
**pretty** [3]         63:8
75:2  134:6
**prevented** [1]      89:16
**previous** [8]       6:20
7:9  46:17  67:4
67:7  68:6  142:7
142:8
**previously** [2]     71:12
119:20
**principles** [2]     99:23
99:25
**private** [3]        10:1
40:13  40:21
**privilege** [1]      96:23
**probable** [1]       111:24
**problem** [4]        69:6
71:25  75:16  115:5

procedure [1]  59:2
procedures [6]  52:23
  58:25   62:1   91:4
  141:4   141:5
proceeded [2]  80:18
  139:12
process [15]  18:19
  19:1   23:22   24:4
  24:11   24:13   25:7
  26:1   26:16   27:2
  27:3   27:6   76:21
  99:12   99:13
processed [1]  29:7
processing [1]  14:24
produce [3]  108:15
  110:16   133:12
produced [6]  37:11
  95:22   108:6   110:13
  116:24   133:6
production [2]  48:3
  95:20
professional [4] 3:9
  22:14   148:4   150:7
proficiency [3]  27:18
  28:3   28:23
program [1]  24:7
progression [1]  33:1
prohibited [1]  139:25
promote [3]  118:6
  131:19   131:23
promoted [4]  132:3
  142:16   142:20   143:5
promoting [1]  32:13
promotion [3]  24:4
  27:2   32:21
promotional [3] 15:21
  26:6   27:6
promotions [4]  29:18
  30:10   33:13   143:10
prompted [4]  37:24
  38:7   38:11   79:21
promulgated [1] 113:6
proposed [3]  120:10
  121:2   123:13
proscribed [1]  139:18
prospects [2]  86:25
  87:11
protective [1]  145:19
proved [1]  91:22
provide [3]  41:20
  93:18   118:4
provides [1]  41:19
provision [2]  58:18
  141:13
Public [3]  3:9
  149:20  150:22
Puerto [2]  138:9
  138:9
pulled [1]  112:19
purpose [2]  3:2
  52:24
pursuant [1]  3:7
pursue [1]  119:10
push [10] 101:6  102:3
  102:4  102:10  102:12

104:1   o:13  118:12
119:23  120:7
pushed [3]  103:16
  115:1   116:14
put [3]   23:4   91:23
  95:7
puts [1]  40:5
qualifications [6]
  29:2   29:4   29:11
  29:16   127:1   127:10
qualified [7]  25:1
  126:6   126:12  126:19
  128:10  130:1   130:14
quality [1]  91:18
quarter [11]  49:16
  54:2   54:5   54:18
  54:24   55:12   57:15
  104:17  104:24  121:9
  121:24
questions [11]  6:8
  9:7   12:11   16:7
  37:9   37:13   113:20
  116:22  124:25  131:15
  144:6
quite [2] 12:14   78:10
quote [1] 139:3
rain [1]  72:10
raining [2]   101:18
  101:19
raise [1] 116:23
raised [4]   61:11
  100:13  116:24  119:8
raising [2]   100:16
  100:18
rambled [3]   79:8
  85:19   92:17
ramp [3] 84:11   84:14
  102:7
rather [4]   39:14
  54:1   115:7  135:20
rating [1]   18:22
Re [1]   64:11
reach [2] 42:21   42:25
reached [1]   59:13
reacting [1]   102:14
reaction [4]   75:13
  85:17   86:1   87:9
read [4]  119:20  122:3
  122:4   122:5
reading [1]   47:19
reads [1] 114:7
realized [1]   147:18
really [10]   23:4
  28:12   28:16   28:17
  32:16   39:3   57:16
  81:11   92:13  145:20
realm [1]   138:12
reason [8]   26:9
  41:6   73:14  117:19
  117:21  118:8  131:5
  136:16
reasons [1]   133:1
rebid [1] 19:6
receive [3]   27:13
  44:24   139:13

received [4]   44:23
  81:7   84:21  106:18
recent [1]   112:17
recently [1]   78:11
recess [3]   31:10
  67:13   88:10
recessed [1]   148:9
recognize [4]   109:10
  110:10  113:24  113:24
recollection [4]  19:10
  46:18   47:14   68:5
recommendations [1]
  71:1   83:13
record [16]   28:4
  28:13   39:1   88:12
  110:24  110:25  120:17
  120:18  128:1   128:2
  132:17  135:6  142:10
  144:13  144:16  150:11
records [7]   28:7
  28:13   28:18   28:21
  128:25  129:7  129:12
recount [2]   83:10
  84:6
recounted [1]   84:17
recurrent [1]   27:11
redepose [1]   95:20
reduce [2]   41:6
  41:7
reduced [1]   32:7
reduces [2]   41:22
  41:23
reducing [1]   41:15
reduction [9]   42:16
  42:18   42:24   56:21
  56:22   63:21  122:8
  122:15  123:5
reductions [4]   40:24
  41:2   55:18   72:23
refer [5] 23:15  114:11
  129:20  132:1  138:17
reference [2]   119:18
  121:5
referenced [2]   114:3
  128:5
references [1]   114:6
referring [6]   40:7
  40:10   43:24   85:3
  119:19  128:16
refers [4]   23:18
  121:23  122:2  122:7
reflect [1]   130:14
refrain [1]   83:25
reg [1]   57:10
regard [2]   69:15
  69:16
regarded [1]   91:17
regarding [9]   16:24
  18:16   18:21   21:14
  21:21   83:14  107:10
  127:3   127:10
regards [1]   92:10
regional [1]   105:20
Registered [2]   3:9
  150:6

regu.  . [1]   27:5
regularly [1]   78:10
regulation [1]  138:5
regulatory [1]   28:19
relate [2]   28:14
  98:17
related [2]   14:23
  133:25
relates [8]   26:6
  61:1   105:11  106:12
  106:15  106:23  108:4
  111:5
relating [3]   15:9
  65:21  129:25
relationship [1] 56:16
relative [5]   62:13
  86:18   110:1  150:13
  150:14
relay [1] 20:24
relevant [1]   86:4
reliance [1]   130:7
relied [1]   60:22
remain [1]   14:2
remember [12]   35:10
  35:13   46:12   52:8
  52:8   68:10   71:24
  77:25   92:15   92:18
  105:22  138:7
remove [2]   89:22
  91:23
renew [1]   25:20
rep [13]  6:1   6:2
  6:3   6:6   6:11
  33:7   34:20   34:25
  55:16  132:15  132:24
  133:5  133:13
repeat [7]   18:8
  19:18   54:21   57:9
  59:10   64:11   87:2
repeated [2]   80:23
  118:1
repeating [2]   142:7
  142:8
repercussions [1]
  116:9
rephrase [10]   8:16
  15:15   18:9   21:15
  33:8   49:2  105:9
  106:9  133:3  139:24
rephrasing [1]   100:8
replace [4]   4:25
  5:4   31:25   69:8
report [70]   12:16
  12:18   12:19   13:3
  27:18   38:5   38:8
  38:12   38:14   39:8
  43:25   44:10   44:20
  45:20   49:25   50:12
  54:17   54:23   56:1
  56:24   58:7   58:13
  58:22   59:4   59:14
  60:9   60:10   60:19
  60:21   62:17   62:22
  65:24   66:6   66:10
  66:13   66:17   66:25
  72:11   72:24   73:16
  74:8   75:5   75:11

75:18   75:22   76:1
  82:9   82:12   91:25
  94:25   95:15   95:15
  102:3   102:4  102:5
  102:8  102:10  104:8
  104:11  104:13  104:15
  104:22  113:21  116:21
  119:9  122:19  123:9
  128:8   136:18  150:8
reported [8]   49:12
  55:12   58:6   58:10
  75:14   80:2  104:7
  104:15
Reporter [6]   3:9
  88:13   88:15   88:17
  148:6   150:7
REPORTER'S [1]
  150:1
Reporting [2]   1:0
  3:11
reports [3]   28:3
  28:23   59:12
represent [1]  143:25
representative [2]
  5:13   32:11
representatives [1]
  31:17
reprimand [1]  134:24
request [5]   27:24
  85:17   95:12   95:19
  95:25
requested [3]   48:3
  48:7   150:10
requests [1]   131:24
required [6]   18:20
  41:24   98:14  118:23
requirement [1] 28:20
requirements [4]
  24:3   30:19   30:23
  31:3
requires [3]   118:12
  118:14  122:7
requisite [1]   9:4
reservations [2] 22:4
  22:8
resolution [1]   37:2
resolve [1]   70:18
resolved [1]   37:7
resource [3]   98:9
  98:11  116:11
resources [5]   82:8
  83:7   94:11  135:10
  135:17
respect [6]   19:5
  58:5   71:1   99:21
  105:6  136:6
respects [2]   8:7
  91:19
respond [2]   17:11
  124:3
responded [1]  106:2
responding [3]  17:13
  86:4  105:25
response [13]   17:7
  18:15   34:10   35:16
  44:11   92:19  106:20
  125:5  127:12  128:6

131:24   136:4   137:9

**responsibilities [5]**
14:22    32:8    33:11
74:5     99:15

**responsibility [2]**
15:1     74:11

**responsible [3]** 12:24
116:19   124:12

**rest [1]**   4:3    33:12
81:23

**restate [3]**          43:10
68:1     106:10

**result [2]**           83:20
134:24

**resulted [3]**         38:23
39:3     135:2

**results [3]**          99:19

**retard [1]**           114:22

**retarding [1]**        119:9

**retire [1]** 114:8

**retraining [1]**       115:4

**return [2]**           46:25
69:8

**returned [4]**         11:5
45:12    48:9    52:21

**returning [1]**        78:2

**revamping [1]**        91:3

**revenues [1]**         64:23

**review [9]**           29:16
38:25    45:19   52:25
74:24    103:1   107:17
107:20   150:9

**reviewed [3]**    52:22
59:12    70:4

**reviewing [2]**    71:24
107:2

**revision [1]**         107:25

**revisions [1]**        107:21

**revisit [1]**          107:18

**rhetorically [1]** 119:9

**Rico [1]** 138:9

**ride [2]** 24:22    25:5

**right [100]**          4:11
5:11     6:13    6:17
7:8      7:16    9:11
9:17     12:3    15:17
16:20    22:23   23:17
24:8     24:23   25:2
25:6     27:7    32:2
35:5     36:7    37:21
39:25    40:3    42:2
44:6     45:4    46:1
46:21    47:21   48:5
52:20    53:18   54:15
60:3     61:21   62:21
63:1     63:11   65:5
66:3     66:12   66:14
67:15    68:19   73:21
74:2     76:20   77:2
84:16    84:25   88:22
89:12    89:15   89:18
89:18    89:20   90:7
95:1     95:1    99:10
101:21   102:2   102:9
104:13   104:25  106:21
108:20   109:25  110:6
111:2    111:11  114:14

115:9    ../:2    117:14
117:22   118:21  121:15
121:19   121:23  122:6
124:6    124:14  126:4
126:20   127:2   128:4
129:23   131:14  132:19
134:23   139:7   139:14
140:25   142:4   143:10
145:21   146:1   146:13

**road [1]** 94:6

**role [2]**    13:13    105:24

**roll [1]**    43:4

**rolling [3]**          38:22
89:8     100:25

**Roseborough [1]**
105:17

**rotated [1]**          126:2

**rotation [3]**         42:20
42:22    43:1

**roughly [1]**          5:21

**route [3]** 25:4       137:7
140:23

**routine [1]**          27:20

**RPR [2]** 149:19   150:22

**rule [1]** 139:2

**rules [1]** 144:25

**rumors [2]**           78:3
78:7

**runway [53]**          38:22
39:10    39:13   39:17
40:23    41:9    41:21
42:4     42:5    42:6
42:10    42:14   52:22
53:2     53:23   54:4
54:5     54:17   55:13
55:14    55:21   57:2
57:19    58:21   59:3
59:12    60:12   62:18
63:22    64:5    65:21
67:1     67:17   70:6
70:21    70:24   72:9
72:15    72:16   89:9
100:25   104:17  107:18
108:3    108:3   109:6
110:13   110:16  111:6
121:20   122:24  122:25
134:21

**runways [2]**          71:3
108:4

**S [7]**       1:0      2:6
3:1      3:16    13:8
149:9    150:9

**safe [3]** 91:21   118:20
124:12

**safety [14]**          38:1
39:21    39:25   41:20
41:21    43:6    43:15
43:18    61:5    73:4
100:23   118:6   118:8
118:8

**safety-related [1]**
43:13

**Samer [1]**            13:6

**San [2]** 61:20    138:9

**sat [1]**  50:22

**says [5]** 114:10   114:13
116:7    126:5   127:2

**scenario [2]**         39:7

114:15

**schedule [8]**         45:2
45:15    45:21   89:22
91:24    105:2   145:5
146:24

**scope [1]**            95:19

**SCOTT [2]**            1:0
3:4

**seal [1]** 149:12

**scat [1]** 114:14

**second [3]**           112:3
144:14   147:14

**section [8]**          54:12
56:20    56:25   57:13
58:16    121:7   122:5
122:22

**see [16]**    6:8      6:17
32:7     33:4    33:7
42:12    54:15   111:10
112:4    121:5   122:6
125:11   126:5   126:8
127:19   127:20

**seeking [1]**          86:18

**sees [1]**  58:5

**sending [2]**          66:16
66:16

**senior [2]**           12:21
107:1

**seniority [5]**        24:2
29:17    29:20   29:24
30:1

**sensitive [2]**        96:19
97:1

**sent [3]** 44:19    114:1
115:3

**sentence [3]**         38:11
73:16    74:8

**separate [5]**         5:19
42:25    91:5    113:5
113:12

**separately [1]**       28:8

**September [4]**        10:3
10:19    10:20   11:20

**sequence [4]**         49:12
50:7     50:10   52:9

**serious [4]**          22:4
101:2    116:22  119:18

**seriously [4]**        38:20
89:24    94:5    119:15

**session [1]**          135:2

**set [5]**     5:14     125:5
130:18   147:1   147:3

**sets [1]**  51:18

**seven [3]**            32:12
34:19    132:5

**several [6]**          5:10
50:13    77:8    80:25
110:7    143:8

**sharing [1]**          80:20

**SHEA [152]**           1:0
2:3      3:21    4:2
4:5      4:7     6:7
6:13     6:17    6:19
8:15     8:17    15:17
15:18    16:2    16:6
18:9     18:11   19:19
20:4     21:15   21:16

114:15

22:1(    26:19   27:1
31:9     31:11   33:8
33:9     34:18   34:21
34:24    35:2    35:5
35:6     38:13   42:9
43:9     43:11   44:5
49:2     49:3    49:22
50:2     51:22   51:25
52:2     52:6    53:12
55:4     57:12   59:19
59:24    64:2    64:7
65:12    65:25   66:3
66:5     66:11   67:12
67:14    68:1    68:2
72:20    73:5    75:9
82:6     84:12   86:2
86:23    88:9    88:21
90:20    93:4    94:2
95:11    96:4    96:5
96:24    97:5    97:19
97:24    99:3    100:4
100:8    100:10  101:15
103:3    103:24  105:9
105:10   106:11  108:14
108:18   108:19  109:2
109:8    109:12  109:16
110:23   111:1   111:14
113:19   115:21  117:4
117:13   118:17  119:17
120:12   120:16  120:19
124:5    125:7   127:14
127:18   127:24  128:1
128:3    129:11  131:18
132:14   132:19  132:23
133:3    133:15  133:18
135:4    136:9   136:13
141:20   142:9   142:14
143:3    143:24  144:11
144:15   144:17  144:23
145:3    145:11  145:24
146:3    146:6   146:18
146:23   147:2   147:8
147:13   147:20  148:2
148:8

**sheet [3]** 110:19   110:19
112:14

**shes [1]** 59:7

**shocked [1]**          79:11

**Shoot [1]**            147:15

**shot [1]** 19:13

**show [4]** 109:9    120:13
127:14   143:24

**showed [1]**           124:20

**shows [1]**            74:19

**side [1]** 13:1

**sided [1]** 91:14

**signature [2]**        125:11
143:15

**signed [3]**           73:21
73:24    143:17

**significant [4]**      39:2
49:5     49:11   100:19

**signs [1]** 72:17

**similar [1]**          113:25

**simple [2]**           39:11
42:3

**simplify [1]**         34:16

**simply [2]**           93:17
94:8

**simulator [1]**        27:13

**single [1]**           114:17

**sit [2]**     29:13    146:8

**sitting [1]**          97:4

**situation [15]**       20:6
44:15    56:11   56:22
58:9     64:8    64:12
68:9     68:23   71:12
83:19    98:25   118:11
135:9    135:9

**situations [1]**       75:20

**six [6]**     34:7     34:19
114:17   128:6   131:3
147:9

**six-page [1]**         119:9

**skills [1]** 27:4

**slip [1]** 129:3

**solicited [1]**        33:23

**solution [1]**         53:16

**someone [3]**          13:15
34:21    94:13

**sometime [9]**         11:6
11:6     22:22   23:5
23:9     48:14   77:15
78:23    79:17

**somewhere [3]**        11:22
12:1     59:2

**sorry [13]**           13:7
15:14    26:15   43:8
45:24    67:22   102:12
106:14   111:9   127:6
129:9    140:18  147:15

**sought [1]**           23:11

**South [1]**            4:16

**Southern [2]**         1:0
3:7

**space [2]** 114:18  138:16

**span [1]** 90:8

**speak [6]**            19:2
28:15    42:1    57:11
63:19    142:10

**speaking [3]**         61:4
64:20    64:25

**speaks [1]**           57:10

**specialist [1]**       145:8

**specialize [2]**       9:18
9:21

**specific [19]**        6:11
12:22    15:5    38:11
40:18    60:18   61:1
61:12    62:5    62:15
62:19    73:18   76:15
76:17    77:20   78:14
101:12   127:1   143:1

**specifically [26]**9:19
11:21    15:23   17:3
18:12    18:21   30:2
33:15    50:9    52:5
59:6     60:13   61:14
65:21    71:4    73:7
73:9     77:14   79:15
89:6     101:25  138:20
139:25   141:22  143:7
143:12

**specification [1]**
43:13

**specifications** [4] 87:17
43:13  140:4  140:8
141:18

**specifics** [11]  18:23
26:24  50:14  50:17
61:11  81:19  83:11
83:11  83:16  92:18
128:18

**specified** [1]  39:19

**speculate** [1]  138:17

**speculation** [1]  93:25

**speed** [16]  41:2
41:6  41:16  42:16
42:18  42:20  42:21
42:21  42:22  43:1
43:1  43:3  43:4
55:5  56:22  72:22

**spell** [1] 13:7

**Spelled** [1]  141:22

**spoke** [1]  45:4

**spoken** [1]  67:5

**stalked** [4]  80:3
80:7  80:10  80:15

**stalking** [10]  79:2
79:24  84:18  92:3
93:3  93:10  93:19
93:22  94:13  94:19

**stamped** [1]  127:20

**stance** [1]  118:8

**stand** [1] 114:8

**standing** [17]  49:16
54:1  54:4  54:18
54:23  55:20  57:2
57:14  57:17  72:24
74:20  104:9  104:15
104:16  104:18  104:23
121:24

**start** [3]  7:10  26:1
144:19

**started** [1]  145:17

**state** [13] 3:10  73:11
79:12  82:20  86:12
115:20  141:14  141:18
142:19  149:4  149:20
150:3  150:22

**statement** [6]  17:18
17:22  30:9  38:19
122:10  124:3

**statements** [2]  30:18
144:6

**states** [7]  1:0
3:6  25:15  59:2
72:14  89:7  121:6

**stating** [2]  107:4
124:1

**statute** [1]  92:23
94:12

**Steele** [55]  5:1
5:7  8:9  8:25
13:4  18:1  18:13
18:16  19:14  19:23
20:7  20:8  20:9
33:25  37:15  46:7
46:22  47:6  48:19
51:14  56:11  56:15
56:17  59:16  60:3
62:22  65:5  67:19
68:4  68:15  69:4

**specifications** ... see above

**still** [13]  11:17  13:20
37:3  47:18  82:13
98:2  101:1  107:13
108:22  124:20  125:23
127:7  143:22

**stipulations** [1]  3:25

**stop** [9]  32:8  80:25
80:25  85:7  85:8
85:9  93:17  94:8
94:18

**street** [1] 143:9

**strike** [14]  10:18
14:6  21:5  30:3
33:21  36:10  46:9
58:19  80:7  82:17
99:20  104:25  120:25
126:10

**stuck** [1] 92:13

**study** [1] 140:17

**subject** [8]  16:8
37:13  67:6  67:11
80:24  81:17  84:22
108:16

**subjects** [8]  5:14
5:22  16:21  85:19
86:3  92:4  92:5
113:12

**submit** [1]  25:24

**submitted** [4]  13:23
30:17  60:9  83:7

**submitting** [1]  17:2

**subordinate** [1] 27:25

**subordination** [1]
116:4

**substance** [2]  22:1
136:3

**substantial** [2]  63:23
64:2

**successful** [2]  24:6
33:4

**successfully** [1] 25:16

**such** [4]  28:24  52:7
89:25  123:14

**sufficient** [2]  85:1
85:15

**suggested** [2]  89:17
89:19

**suggesting** [2]  71:6
89:15

**suggestions** [1]  70:25

**summarily** [1]  104:21

**summarize** [1]  51:10

**summary** [4]  83:1
136:9  136:10  142:9

**supervisor** [2]  36:12
36:16  36:22

**supplemental** [1]
121:22

**supplied** [1]  93:12

**support** [2]  115:7
130:21

**supports** [1]  122:23

**suppose** [2]  59:15
131:11

**supposed** [1]  119:23

**supposedly** [1]  84:23

**SUSAN** [1]  1:0

**suspend** [2]  46:5
47:17

**suspended** [5]  45:15
45:21  46:2  46:3
46:19

**suspension** [2]  74:21
143:21

**swaying** [1]  59:22

**swell** [1] 147:11

**sworn** [2]  3:18
149:10

**system** [3]  20:23
40:16  140:11

**T** [1]  2:6

**tactfully** [1]  77:8

**takeoff** [10]  43:4
50:1  62:10  62:14
89:16  102:4  110:10
114:14  121:8  139:14

**takes** [1] 39:13

**taking** [3]  33:10
52:8  144:23

**tape** [7]  49:22  52:9
73:17  97:1  97:9
104:19  144:1

**taped** [1] 96:16

**tapes** [14]  39:1
47:25  48:6  48:7
48:12  49:5  50:8
50:11  51:20  52:16
54:16  54:23  74:9
103:1

**taxi** [1]  101:6

**taxiway** [1]  102:14

**Teamsters** [1]  91:15

**technically** [1] 98:2

**telephone** [1]  45:16

**telephoned** [1]  84:14

**telling** [3]
145:18  149:9  26:3

**tells** [2]  96:18  96:25

**temporary** [1]  14:4

**ten** [1,.,  10:6

**tend** [1]  6:5

**term** [6]  23:19  79:25
80:1  87:22  87:24
87:25

**terminate** [14]  37:10
37:14  38:7  56:10
60:23  63:14  74:25
95:14  96:12  130:19
131:1  131:7  131:17
133:21

**terminated** [18]  37:17
37:21  37:22  56:6
59:9  60:1  63:2
66:7  75:2  75:10
76:11  93:22  96:7
96:9  101:23  110:1
132:6  136:17

**termination** [15] 63:3
73:12  73:14  77:17
95:17  97:7  97:9
109:18  129:25  130:10
130:21  132:10  143:18
144:2  144:9

**terminations** [1] 96:19

**terms** [7] 30:18  42:4
52:20  133:8  135:24
139:4  143:10

**test** [1]  129:4

**testified** [10]  3:19
19:20  33:1  59:11
73:15  75:4  87:3
128:13  133:25  133:19

**testify** [4]  48:21
87:15  108:16  133:9

**testimony** [11]  32:16
55:15  56:19  96:24
114:4  114:24  122:18
126:9  142:8  142:8
143:20

**tests** [2]  129:8  129:13

**Thank** [3]  4:6
89:13  111:12

**themself** [1]  57:11

**themselves** [2]  30:12
75:3

**theory** [1]  98:12

**therefore** [2]  41:10
117:17

**THEREUPON** [1]
3:15

**thinks** [1]  70:18

**third** [1] 112:13

**thorough** [1]  133:17

**thought** [11]  61:17
76:23  86:10  99:12
99:13  104:13  126:9
139:20  145:20  147:5
147:17

**thoughts** [1]  133:10

**three** [5] 7:9  7:15
9:4  11:23  50:22

**three-quarters** [2]
55:13  55:20

**throttle** [1]  114:5

**throttles** [8]  38:21
89:8  89:12  99:5

**ten** ... see above

**100:24  114:8  114:22
119:10

**through** [9]  16:10
18:19  18:25  113:23
113:23  120:14  138:16
146:12  147:22

**throughout** [1]  142:12

**throw** [1]  89:11

**throwing** [5]  38:21
89:7  99:5  100:24
114:4

**Thursday** [1]  46:15

**Tim** [26]  80:5  80:8
80:9  80:23  80:24
81:2  81:7  82:9
82:10  83:15  83:23
84:1  84:4  84:6
84:10  84:13  84:16
84:21  84:23  85:4
87:9  90:9  92:2
93:9  93:14  94:18

**Tim's** [1]  81:5

**times** [1] 79:10

**title** [1]  8:20

**today** [14]  5:12
10:16  29:13  32:6
73:15  126:10  130:24
130:24  133:20  133:22
145:3  145:4  145:6
145:7

**together** [3]  91:2
109:14  118:20

**too** [1]  18:10

**took** [9]  54:6  54:19
68:25  86:17  92:14
94:5  100:12  118:8
140:20

**tool** [1]  144:2

**top** [2]  95:23  111:4

**tower** [34]  39:1
47:24  48:4  48:6
48:7  49:5  49:15
50:8  50:11  51:20
52:9  52:16  54:16
54:23  58:1  58:6
58:10  59:12  73:17
74:9  102:3  102:3
102:5  102:8  102:10
102:25  104:8  104:11
104:13  104:15  104:11
104:22  104:22  122:19

**town** [5] 45:3  45:6
45:7  48:10  143:22

**Tracey** [2]  32:1
125:21

**tragedy** [1]  38:24

**trained** [1]  136:23

**trainee** [1]  31:16

**training** [37]  24:6
24:19  27:11  27:12
28:4  28:7  28:13
28:13  28:18  28:20
28:24  29:3  31:20
32:6  98:14  98:17
98:23  98:24  116:12
117:23  118:3  118:4
118:4  118:10  126:2
126:22  128:18  128:25

129:7  129:12  137:4
137:5  137:6  137:11
137:13  140:24  141:1
transcribe [1]  144:1
transcribed [2]  88:20
148:8
transcript [5]  50:19
52:18  148:7  150:9
150:10
Transcription [1]
144:8
transpired [1]  63:2
transportation [1]
9:10
traveling [1]  81:7
treated [3]  20:2
26:4  26:20
tried [2] 69:17  77:8
tries [1] 64:21
trigger [1]  72:24
triggered [1]  66:6
true [5]  17:21  28:6
78:9  123:4  150:10
try [1]  16:8
trying [3]  42:2
91:11  133:15
turning [1]  103:8
Twenty-nine [1]
11:23
two [12] 5:12  28:12
42:24  82:9  82:12
114:6  114:17  119:20
126:5  127:7  128:7
135:20
type [4] 9:18  18:21
54:9  115:6
typed [1]  114:18
typically [3]  132:23
135:10  135:14
ultimately [1]  106:22
Um-hum [2]  67:20
127:22
unauthorized [2]
136:12  136:21
under [12]  41:2
55:6  63:6  93:10
103:18  103:22  103:23
117:24  137:23  140:5
144:25  147:10
underlying [2]  39:7
133:20
undersigned [1] 149:8
understand [16] 5:11
15:8  27:23  32:16
40:4  54:15  94:16
101:22  108:10  114:24
115:4  118:9  136:10
145:1  146:13  146:16
understands [1] 118:10
understood [1]  139:16
undertaken [1]  105:5
undertook [2]  29:6
29:9
undoubtedly [1] 115:3
uneventful [1]  90:25

unfounded [1]  116:1
unionize [1]  92:20
United [2]  1:0
3:6
unless [3]  118:1
137:22  138:1
unofficially [1] 14:19
unrelated [2]  76:6
85:20
unsafe [1]  43:21
up [11]  7:7  64:22
65:20  66:4  74:13
74:20  86:3  86:14
92:14  145:11  146:15
upgrade [24]  14:24
15:3  15:10  16:12
18:20  23:12  24:4
24:10  24:12  24:13
25:17  29:3  29:8
30:12  30:16  30:20
30:24  31:3  33:4
33:22  86:18  87:4
126:21  128:23
upgraded [6]  16:5
16:24  18:4  21:11
21:19  30:19
upgrades [1]  33:13
upgrading [8]  16:14
16:19  17:8  17:25
18:13  21:22  23:3
23:23
UPS [1]  64:19
used [5]  51:21  51:22
79:25  80:12  80:13
using [2] 8:20  141:9
usual [1] 3:25
va [1]  48:9
vacation [1]  45:1
vague [1]  134:6
Valerie [2]  1:0
147:12
variance [1]  50:24
variances [1]  51:11
variety [2]  92:4
128:21
various [1]  85:19
varying [1]  39:18
verify [3]  18:3
29:9  103:4
version [1]  112:17
versus [1]  39:1
viability [1]  54:6
vice [1]  12:21
view [1] 78:12
violating [1]  94:12
violation [6]  61:25
69:19  69:22  75:23
76:2  76:3
violations [1]  107:3
visited [1]  103:1
visual [2]  104:7
104:10
visually [1]  55:19
voice [1] 61:11

voiced [1]  119:15
vs [1]  1:0
waive [1]  144:3
walk [1] 145:12
walking [3]  115:15
115:22  148:3
warning [1]  147:16
Washington [9] 31:21
32:2  47:8  48:20
68:15  90:4  97:11
131:9  133:13
water [20]  49:16
54:1  54:4  54:18
54:23  55:20  57:2
57:14  57:17  60:12
60:12  72:24  104:9
104:16  104:16  104:18
104:20  104:23  121:8
121:24
weak [1] 118:3
weather [3]  71:16
102:15  103:7
Wednesday [1]  46:14
week [4] 44:25  46:13
46:17  48:14
weeks [1]  5:10
weight [21]  39:20
39:23  39:23  40:24
41:7  41:15  42:4
42:6  42:10  42:12
55:5  56:21  63:21
64:5  71:20  72:4
72:17  72:22  101:14
116:20  123:6
WEIHE [1]  1:0
well-based [1]  117:18
well-founded [1]
117:15
wet [7]  39:9  39:14
41:9  42:3  71:3
71:3  72:9
wheel [1]  41:8
whereas [1]  28:16
wherein [1]  3:4
whole [1]  63:8
Wise [3] 60:6  60:15
102:22
within [19]  24:2
33:13  38:12  38:19
53:16  58:24  61:2
61:5  80:21  95:19
98:12  138:11  138:21
138:23  139:1  139:19
140:1  142:21  143:5
without [4]  116:9
137:12  142:7  146:8
witness [9]  3:1
3:17  15:21  31:8
96:22  97:12  111:11
146:8  149:12
word [2] 80:12  80:13
worded [1]  73:11
wording [2]  65:6
65:10
words [2]  33:23
48:8

worked [1]  91:5
workers' [1]  81:21
write [1] 22:25
writing [2]  8:19
21:21
written [15]  30:8
30:21  30:23  30:23
38:4  38:19  44:9
59:2  60:10  60:19
62:22  81:2  95:15
110:2  116:6
wrong [3]  140:6
142:5  142:13
wrongdoing [1] 76:6
wrote [4]  23:5
68:6  74:1  109:20
X [2]  2:1  2:6
year [13] 4:24  10:3
11:20  25:18  25:20
27:11  27:14  31:23
31:24  33:12  74:25
77:16  79:16
years [8] 7:9  7:15
9:4  9:25  52:15
90:8  90:23  119:12
yet [1]  59:7
yourself [9]  8:11
8:14  8:20  36:15
69:10  98:3  103:12
129:1  131:8



INTERNATIONAL, INC.

August 30, 1999

Patrick Major
1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312

Dear Pat,

Due to Amerijets loss of confidence in you abilities to perform the duties of
an airman, we are terminating your employment effective immediately. We
wish you the best of luck in your future pursuits.

Sincerely,

Derry S. Huff
Chief Pilot
Amerijet International

PLAINTIFF'S
EXHIBIT

ℬℋ 11/8/00

498 S.W. 34TH STREET, FORT LAUDERDALE, FL 33315    (954) 359-0077    FAX: (954) 359-7871  000309

AMERIJET INTERNATIONAL    FORT LAUDERDALE, FL

B-727-200   JT8D-15    HOLLYWOOD INTL

KFLL    09L    FLAPS   15

| TEMP F | C | ZERO WIND | CLIMB LIMIT | A/C POD OFF (+) | N1t MAX EPR | GO ARND T/O EPR | ENG ANTI-ICE ZERO WIND | A/C CLIMB LIMIT | A/C (+) |
|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2062 R | 2090 | 23 R | 2.10 | 90 | 2.07 | 2037 | 2065 | 23 |
| 0 | -18 | 2043 R | 2090 | 21 R | 2.10 | 91 | 2.07 | 2018 | 2065 | 21 |
| 10 | -12 | 2023 R | 2090 | 21 R | 2.10 | 92 | 2.07 | 1998 | 2065 | 21 |
| 20 | -7 | 2003 R | 2090 | 21 R | 2.10 | 93 | 2.07 | 1978 | 2065 | 21 |
| 30 | -1 | 1986 R | 2090 | 20 R | 2.10 | 94 | 2.07 | 1961 | 2065 | 20 |
| 32 | 0 | 1982 R | 2090 | 20 R | 2.10 | 94 | 2.07 | 1957 | 2065 | 20 |
| 34 | 1 | 1979 R | 2090 | 19 R | 2.10 | 94 | 2.07 | 1954 | 2065 | 19 |
| 36 | 2 | 1976 R | 2090 | 19 R | 2.10 | 95 | 2.07 | 1951 | 2065 | 19 |
| 38 | 3 | 1972 R | 2090 | 19 R | 2.10 | 95 | 2.07 | 1947 | 2065 | 19 |
| 40 | 4 | 1969 R | 2090 | 18 R | 2.10 | 95 | 2.07 | 1944 | 2065 | 18 |
| 42 | 6 | 1965 R | 2090 | 19 R | 2.10 | 95 | 2.07 | 1940 | 2065 | 19 |
| 44 | 7 | 1962 R | 2090 | 19 R | 2.10 | 95 | 2.07 | 1937 | 2065 | 19 |
| 46 | 8 | 1959 R | 2090 | 19 R | 2.10 | 95 | 2.07 | 1934 | 2065 | 19 |
| 48 | 9 | 1956 R | 2090 | 19 R | 2.10 | 96 | 2.07 | 1931 | 2065 | 19 |
| 50 | 10 | 1952 R | 2090 | 20 R | 2.10 | 96 | 2.07 | 1927 | 2065 | 20 |
| 52 | 11 | 1949 R | 2090 | 20 R | 2.10 | 96 | 2.07 | | | |
| 54 | 12 | 1946 R | 2090 | 19 R | 2.10 | 96 | 2.07 | | | |
| 56 | 13 | 1942 R | 2090 | 20 R | 2.10 | 96 | 2.07 | | | |
| 58 | 14 | 1939 R | 2090 | 20 R | 2.10 | 97 | 2.07 | | | |
| 60 | 16 | 1922 R | 2090 | 33 R | 2.10 | 97 | 2.07 | | | |
| 62 | 17 | 1920 R | 2090 | 31 R | 2.10 | 97 | 2.07 | | | |
| 64 | 18 | 1918 R | 2090 | 30 R | 2.10 | 97 | 2.07 | | | |
| 66 | 19 | 1916 R | 2090 | 28 R | 2.10 | 97 | 2.07 | | | |
| 68 | 20 | 1914 R | 2090 | 27 R | 2.10 | 98 | 2.07 | | | |
| 70 | 21 | 1912 R | 2090 | 25 R | 2.10 | 98 | 2.07 | | | |
| 72 | 22 | 1910 R | 2090 | 24 R | 2.10 | 98 | 2.07 | | | |
| 74 | 23 | 1909 R | 2090 | 21 R | 2.10 | 98 | 2.07 | | | |
| 76 | 24 | 1907 R | 2090 | 20 R | 2.10 | 98 | 2.07 | | | |
| 78 | 26 | 1905 R | 2090 | 18 R | 2.10 | 98 | 2.07 | | | |
| 80 | 27 | 1904 R | 2090 | 16 R | 2.10 | 99 | 2.07 | | | |
| 82 | 28 | 1901 R | 2090 | 16 R | 2.10 | 99 | 2.07 | | | |
| 84 | 29 | 1892 R | 2088 | 22 R | 2.10 | 99 | 2.07 | | | |
| 86 | 30 | 1881 R | 2071 | 20 R | 2.08 | 99 | 2.07 | | | |
| 88 | 31 | 1869 R | 2054 | 19 R | 2.07 | 99 | 2.07 | | | |
| 90 | 32 | 1858 R | 2037 | 17 R | 2.06 | 99 | 2.07 | | | |
| 92 | 33 | 1846 R | 2019 | 16 R | 2.05 | 98 | 2.06 | | | |
| 94 | 34 | 1835 R | 2001 | 14 R | 2.04 | 98 | 2.05 | | | |
| 96 | 36 | 1823 R | 1983 | 13 R | 2.03 | 98 | 2.04 | | | |
| 98 | 37 | 1812 R | 1965 | 12 R | 2.02 | 98 | 2.03 | | | |
| 100 | 38 | 1800 R | 1947 | 11 R | 2.01 | 98 | 2.02 | | | |
| 102 | 39 | 1788 R | 1930 | 12 R | 2.00 | 97 | 2.01 | | | |
| 104 | 40 | 1776 R | 1913 | 13 R | 1.99 | 97 | 2.00 | | | |
| 106 | 41 | 1763 R | 1896 | 15 R | 1.98 | 97 | 1.99 | | | |
| 108 | 42 | 1751 R | 1879 | 16 R | 1.97 | 97 | 1.98 | | | |
| 110 | 43 | 1739 R | 1862 | 17 R | 1.96 | 97 | 1.96 | | | |
| 112 | 44 | 1727 R | 1845 | 18 R | 1.95 | 97 | 1.95 | | | |
| 114 | 46 | 1715 R | 1828 | 19 R | 1.94 | 96 | 1.94 | | | |
| 116 | 47 | 1704 R | 1811 | 19 R | 1.93 | 96 | 1.93 | | | |
| 118 | 48 | 1692 R | 1794 | 20 R | 1.92 | 96 | 1.92 | | | |
| 120 | 49 | 1680 R | 1777 | 21 R | 1.90 | 96 | 1.91 | | | |

PACKS    ON    TORA = 9001
NOSE BRKS  OFF    TODA = 9001
210 MPH TIRE    ASDA = 9001
ELEV = 11    GRAD = -.01%

----NOTES----

1. CLR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.04    +.03
   ICE ON    +.01    NONE

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON   ICE OFF/ON    NONE
   PACKS OFF  ICE OFF/ON    +.04

3. FLAP RETRACT HT(OCH)
   = 811 FTMSL

4. OBST: HT(FT AGL) DIST(NM)
   50    1.81

DATE: 12/09/92

### GROSS WEIGHT CORRECTIONS

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE 1 DEGREE HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    321 LBS/KT EFF HEAD W
       SUB FROM ZERO WIND   1322 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR —
  *WIND   *RUNWAY SHORTENING   *ANTI-SKID INOP
  *RUNWAY CONTAMINATION  *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR—
  *MEL PERFORMANCE DECREMENTS

### RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS

| | STANDING WATER SLUSH OR WET SNOW -IN- | REDUCE ZERO WIND W BY: -LBS- | REDUCE V1 SPEED BY: -LBS- |
|---|---|---|---|
| DRY SNOW -IN- | < 1/4 | 14000 | 31 |
| 3 1/2 TO 6 | 1/4 TO 1/2 | 28000 | 26 |
| ICE | | 14000 | 31 |
| ANTI-SKID INOP | | 6300 | 21 |

* = CHECK MAX STRUCTURAL WT

## LANDING DATA    PACKS ON

| LNDG FLAP | LENGTH | ANTI SKID | MAX WT ZERO WIND (DRY) | HW ADJ | CRIT TW | TW ADJ | MAX WT ZERO WIND (WET) | HW ADJ | CRIT TW | TW ADJ | AFT CRIT TEMP | SUB LB/F ABOVE CRIT TEMP | MAX OPER TEMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 8432 | OPER | *204200 | 290 | 0 | 1358 | *205800 | 210 | 0 | 3257 | | | |
| 30 | 8432 | INOP | *175700 | 970 | 0 | 3107 | *156800 | 950 | 0 | 3311 | 120 | | 120 |
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 120 | 0 | 120 |


PLAINTIFF'S EXHIBIT

B-727-200   JT8D-15   MIAMI INTL

KMIA   09L   FLAPS 15

| | | | | A/C | FCD | Nlt | GO | ENG ANTI-ICE A/C | | PACKS | ON | TORA | = 10502 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEMP | | ZERO | CLIMB | OFF | MAX | FOR | ARND | ZERO | CLIMB OFF | NOSE BRKS | OFF | TODA | = 10502 |
| F | C | WIND | LIMIT | (+) | EPR | T/O | EPR | WIND | LIMIT (+) | 210 MPH | TIRE | ASDA | = 10502 |
| | | | | | | | | | | ELEV = | 11 | GRAD | = .01% |
| -10 | -23 | 2000 R | 2050 | 0 R | 2.09 | 90 | 2.07 | 1975 | 2050 | 0 | | | |
| 0 | -18 | 2000 R | 2050 | 0 R | 2.09 | 91 | 2.07 | 1983 | 2050 | 0 | ----NOTES---- | | |
| 10 | -12 | 2000 R | 2050 | 0 R | 2.09 | 92 | 2.07 | 1983 | 2050 | 0 | | | |
| 20 | -7 | 2000 R | 2050 | 0 R | 2.09 | 93 | 2.07 | 1983 | 2050 | 0 | 1. CTR ENG EPR: MOD-A   NON-MOD | | |
| 30 | -1 | 2000 R | 2050 | 0 R | 2.09 | 94 | 2.07 | 1983 | 2050 | 0 | ICE OFF     +.03     +.01 | | |
| 32 | 0 | 2000 R | 2050 | 0 R | 2.09 | 94 | 2.07 | 1983 | 2050 | 0 | ICE ON      NONE     -.02 | | |
| 34 | 1 | 2000 R | 2050 | 0 R | 2.09 | 94 | 2.07 | 1983 | 2050 | 0 | | | |
| 36 | 2 | 2000 R | 2050 | 0 R | 2.09 | 95 | 2.07 | 1983 | 2050 | 0 | | | |
| 38 | 3 | 2000 R | 2050 | 0 R | 2.09 | 95 | 2.07 | 1983 | 2050 | 0 | 2. FCD ENG EPR: (MOD NOT APPL) | | |
| 40 | 4 | 2000 R | 2050 | 0 R | 2.09 | 95 | 2.07 | 1983 | 2050 | 0 | PACKS ON ICE OFF/ON   NONE | | |
| 42 | 6 | 2000 R | 2050 | 0 R | 2.09 | 95 | 2.07 | 1983 | 2050 | 0 | PACKS OFF ICE OFF/ON  +.04 | | |
| 44 | 7 | 2000 R | 2050 | 0 R | 2.09 | 95 | 2.07 | 1983 | 2050 | 0 | | | |
| 46 | 8 | 2000 R | 2050 | 0 R | 2.09 | 95 | 2.07 | 1983 | 2050 | 0 | | | |
| 48 | 9 | 2000 R | 2050 | 0 R | 2.09 | 96 | 2.07 | 1983 | 2050 | 0 | 3. FLAP RETRACT HT(OCH) | | |
| 50 | 10 | 2000 R | 2050 | 0 R | 2.09 | 96 | 2.07 | 1983 | 2050 | 0 | - 811 FTMSL | | |
| 52 | 11 | 2000 R | 2050 | 0 R | 2.09 | 96 | 2.07 | | | | | | |
| 54 | 12 | 2000 R | 2050 | 0 R | 2.09 | 96 | 2.07 | | | | 4. OBST: HT(FT AGL) DIST(NM) | | |
| 56 | 13 | 2000 R | 2050 | 0 R | 2.09 | 96 | 2.07 | | | | 8       1.87 | | |
| 58 | 14 | 2000 R | 2050 | 0 R | 2.09 | 97 | 2.07 | | | | | | |
| 60 | 16 | 2000 R | 2050 | 0 R | 2.09 | 97 | 2.07 | | | | | | |
| 62 | 17 | 2000 R | 2050 | 0 R | 2.09 | 97 | 2.07 | | | | DATE: 10/20/99 | | |
| 64 | 18 | 2000 R | 2050 | 0 R | 2.09 | 97 | 2.07 | | | | | | |
| 66 | 19 | 2000 R | 2050 | 0 R | 2.09 | 97 | 2.07 | | | GROSS WEIGHT CORRECTIONS | | | |
| 68 | 20 | 2000 R | 2050 | 0 R | 2.09 | 98 | 2.07 | | | | | | |
| 70 | 21 | 2000 R | 2050 | 0 R | 2.09 | 98 | 2.07 | | BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE | | | | |
| | | | | | | | | | 1 DEGREE F HOTTER TEMPERATURE | | | | |
| 72 | 22 | 2000 R | 2050 | 0 R | 2.09 | 98 | 2.07 | | | | | | |
| 74 | 23 | 2000 R | 2050 | 0 R | 2.09 | 98 | 2.07 | | WIND - ADD TO ZERO WIND     0 LBS/KT EFF HEAD W | | | | |
| 76 | 24 | 2000 R | 2050 | 0 R | 2.09 | 98 | 2.07 | | SUB FROM ZERO WIND  1198 LBS/KT EFF TAIL W | | | | |
| 78 | 26 | 2000 R | 2050 | 0 R | 2.09 | 98 | 2.07 | | | | | | |
| 80 | 27 | 2000 R | 2050 | 0 R | 2.09 | 99 | 2.07 | | ADJUST ZERO WIND COLUMN FOR -- | | | | |
| 82 | 28 | 2000 R | 2050 | 0 R | 2.09 | 99 | 2.07 | | *WIND  *RUNWAY SHORTENING   *ANTI-SKID INOP | | | | |
| 84 | 29 | 2000 R | 2050 | 0 R | 2.09 | 99 | 2.07 | | *RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT | | | | |
| 86 | 30 | 2000 R | 2050 | 0 R | 2.08 | 99 | 2.07 | | | | | | |
| 88 | 31 | 2000 R | 2050 | 0 R | 2.07 | 99 | 2.07 | | ADJUST CLIMB LIMIT FOR-- | | | | |
| 90 | 32 | 1997 R | 2038 | 3 R | 2.06 | 99 | 2.07 | | *MEL PERFORMANCE DECREMENTS | | | | |
| 92 | 33 | 1985 R | 2021 | 15 R | 2.05 | 98 | 2.06 | | | | | | |
| 94 | 34 | 1974 R | 2005 | 15 R | 2.04 | 98 | 2.05 | | RUNWAY CONTAMINATION AND ANTI - SKID INOP | | | | |
| 96 | 36 | 1950 R | 1974 | 15 R | 2.02 | 98 | 2.04 | | DECREMENTS | | | | |
| 98 | 37 | 1937 R | 1958 | 16 R | 2.01 | 98 | 2.03 | | | STANDING | REDUCE | REDUCE | |
| 100 | 38 | 1925 R | 1943 | 17 R | 2.01 | 98 | 2.02 | | | WATER | ZERO | V1 | |
| 102 | 39 | 1912 R | 1927 | 15 R | 2.00 | 97 | 2.01 | | DRY | SLUSH OR | WIND W | SPEED | |
| 104 | 40 | 1900 R | 1912 | 12 R | 1.99 | 97 | 2.00 | | SNOW | WET SNOW | BY: | BY: | |
| 106 | 41 | 1888 R | 1896 | 8 R | 1.98 | 97 | 1.99 | | -IN- | -IN- | -LBS- | -KNOTS- | |
| 108 | 42 | 1876 R | 1880 | 4 R | 1.97 | 97 | 1.98 | | | | | | |
| 110 | 43 | 1865 C | 1864 | 0 C | 1.96 | 97 | 1.96 | | | < 1/4 | 15500 | 29 | |
| 112 | 44 | 1853 C | 1849 | 0 C | 1.95 | 97 | 1.95 | | 3 1/2 TO 6 | 1/4 TO 1/2 | 29500 | 26 | |
| 114 | 46 | 1830 C | 1818 | 0 C | 1.93 | 96 | 1.94 | | ICE | | 15500 | 29 | |
| 116 | 47 | 1818 C | 1802 | 0 C | 1.92 | 96 | 1.93 | | ANTI-SKID INOP | | 6300 | 21 | |
| 118 | 48 | 1807 C | 1787 | 0 C | 1.92 | 96 | 1.92 | | | | | | |
| 120 | 49 | 1796 C | 1772 | 0 C | 1.91 | 96 | 1.91 | | | | | | |

* = CHECK MAX STRUCTURAL WT

## LANDING DATA

PACKS ON

| | | | --------- DRY --------- | | | | --------- WET --------- | | | | | | SUB LB/F | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LNDG | | ANTI | MAX WT ZERO | HW | CRIT | TW | MAX WT ZERO | HW | CRIT | TW | AFT CRIT | ABOVE CRIT | MAX OPER |
| FLAP | LENGTH | SKID | WIND | ADJ | TW | ADJ | WIND | ADJ | TW | ADJ | TEMP | TEMP | TEMP |
| 30 | 10502 | OPER | *210000 | 0 | 10 | 0 | *210000 | 0 | 10 | 0 | | | |
| 30 | 10502 | INOP | *210000 | 0 | 6 | 2926 | *194600 | 770 | -- 0 | 2948 | 143 | 0 | 120 |

AMERIJET INTERNATIONAL    MIAMI, FL

B-727-200   JT8D-15     MIAMI INTL

KMIA   12       FLAPS 15

| | | | A/C | POD | N1% GO | | ENG ANTI-ICE A/C | | |
|---|---|---|---|---|---|---|---|---|---|

PACKS ON   TORA = 9355
NOSE BRKS OFF   TODA = 9355
210 MPH TIRE   ASDA = 9355
ELEV = 11   GRAD = .00%

| TEMP F | C | ZERO WIND | CLIMB LIMIT | OFF (+) | MAX EPR | FOR T/O | ARND EPR | ZERO WIND | CLIMB LIMIT | OFF (+) |
|---|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2100 C | 2090 | 0 C | 2.10 | 90 | 2.07 | 2075 | 2065 | 0 |
| 0 | -18 | 2081 R | 2090 | 9 R | 2.10 | 91 | 2.07 | 2056 | 2065 | 9 |
| 10 | -12 | 2060 R | 2090 | 21 R | 2.10 | 92 | 2.07 | 2035 | 2065 | 21 |
| 20 | -7 | 2039 R | 2090 | 21 R | 2.10 | 93 | 2.07 | 2014 | 2065 | 21 |
| 30 | -1 | 2022 R | 2090 | 20 R | 2.10 | 94 | 2.07 | 1997 | 2065 | 20 |
| 32 | 0 | 2019 R | 2090 | 19 R | 2.10 | 94 | 2.07 | 1994 | 2065 | 19 |
| 34 | 1 | 2015 R | 2090 | 19 R | 2.10 | 94 | 2.07 | 1990 | 2065 | 19 |
| 36 | 2 | 2012 R | 2090 | 18 R | 2.10 | 95 | 2.07 | 1987 | 2065 | 18 |
| 38 | 3 | 2009 R | 2090 | 18 R | 2.10 | 95 | 2.07 | 1984 | 2065 | 18 |
| 40 | 4 | 2005 R | 2090 | 18 R | 2.10 | 95 | 2.07 | 1980 | 2065 | 18 |
| 42 | 6 | 2002 R | 2090 | 18 R | 2.10 | 95 | 2.07 | 1977 | 2065 | 18 |
| 44 | 7 | 1998 R | 2090 | 19 R | 2.10 | 95 | 2.07 | 1973 | 2065 | 19 |
| 46 | 8 | 1995 R | 2090 | 19 R | 2.10 | 95 | 2.07 | 1970 | 2065 | 19 |
| 48 | 9 | 1992 R | 2090 | 18 R | 2.10 | 96 | 2.07 | 1967 | 2065 | 18 |
| 50 | 10 | 1988 R | 2090 | 19 R | 2.10 | 96 | 2.07 | 1963 | 2065 | 19 |
| 52 | 11 | 1985 R | 2090 | 19 R | 2.10 | 96 | 2.07 | | | |
| 54 | 12 | 1982 R | 2090 | 19 R | 2.10 | 96 | 2.07 | | | |
| 56 | 13 | 1978 R | 2090 | 20 R | 2.10 | 96 | 2.07 | | | |
| 58 | 14 | 1975 R | 2090 | 20 R | 2.10 | 97 | 2.07 | | | |
| 60 | 16 | 1956 R | 2090 | 34 R | 2.10 | 97 | 2.07 | | | |
| 62 | 17 | 1954 R | 2090 | 33 R | 2.10 | 97 | 2.07 | | | |
| 64 | 18 | 1952 R | 2090 | 31 R | 2.10 | 97 | 2.07 | | | |
| 66 | 19 | 1950 R | 2090 | 30 R | 2.10 | 97 | 2.07 | | | |
| 68 | 20 | 1948 R | 2090 | 28 R | 2.10 | 98 | 2.07 | | | |
| 70 | 21 | 1946 R | 2090 | 27 R | 2.10 | 98 | 2.07 | | | |
| 72 | 22 | 1944 R | 2090 | 25 R | 2.10 | 98 | 2.07 | | | |
| 74 | 23 | 1942 R | 2090 | 24 R | 2.10 | 98 | 2.07 | | | |
| 76 | 24 | 1941 R | 2090 | 21 R | 2.10 | 98 | 2.07 | | | |
| 78 | 26 | 1939 R | 2090 | 19 R | 2.10 | 98 | 2.07 | | | |
| 80 | 27 | 1937 R | 2090 | 18 R | 2.10 | 99 | 2.07 | | | |
| 82 | 28 | 1935 R | 2090 | 17 R | 2.10 | 99 | 2.07 | | | |
| 84 | 29 | 1926 R | 2088 | 22 R | 2.10 | 99 | 2.07 | | | |
| 86 | 30 | 1914 R | 2072 | 21 R | 2.08 | 99 | 2.07 | | | |
| 88 | 31 | 1903 R | 2054 | 18 R | 2.07 | 99 | 2.07 | | | |
| 90 | 32 | 1891 R | 2037 | 17 R | 2.06 | 99 | 2.07 | | | |
| 92 | 33 | 1879 R | 2019 | 16 R | 2.05 | 98 | 2.06 | | | |
| 94 | 34 | 1867 R | 2001 | 15 R | 2.04 | 98 | 2.05 | | | |
| 96 | 36 | 1856 R | 1983 | 13 R | 2.03 | 98 | 2.04 | | | |
| 98 | 37 | 1844 R | 1965 | 12 R | 2.02 | 98 | 2.03 | | | |
| 100 | 38 | 1832 R | 1947 | 11 R | 2.01 | 98 | 2.02 | | | |
| 102 | 39 | 1820 R | 1930 | 11 R | 2.00 | 97 | 2.01 | | | |
| 104 | 40 | 1807 R | 1913 | 13 R | 1.99 | 97 | 2.00 | | | |
| 106 | 41 | 1795 R | 1896 | 14 R | 1.98 | 97 | 1.99 | | | |
| 108 | 42 | 1782 R | 1879 | 16 R | 1.97 | 97 | 1.98 | | | |
| 110 | 43 | 1770 R | 1862 | 16 R | 1.96 | 97 | 1.96 | | | |
| 112 | 44 | 1758 R | 1845 | 17 R | 1.95 | 97 | 1.95 | | | |
| 114 | 46 | 1746 R | 1828 | 18 R | 1.94 | 96 | 1.94 | | | |
| 116 | 47 | 1734 R | 1811 | 19 R | 1.93 | 96 | 1.93 | | | |
| 118 | 48 | 1721 R | 1794 | 21 R | 1.92 | 96 | 1.92 | | | |
| 120 | 49 | 1709 R | 1777 | 21 R | 1.90 | 96 | 1.91 | | | |

—NOTES—

1. CTR ENG EPR: MOD-A   NON-MOD
ICE OFF   +.04   +.03
ICE ON   +.01   NONE

2. POD ENG EPR: (MOD NOT APPL)
PACKS ON ICE OFF/ON   NONE
PACKS OFF ICE OFF/ON   +.04

3. FLAP RETRACT HT(OCH)
= 811 FTMSL

4. OBST: HT(FT AGL) DIST(NM)
200   4.00

DATE: 10/16/92

GROSS WEIGHT CORRECTIONS

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE 1 DEGREE HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND   325 LBS/KT EFF HEAD W
SUB FROM ZERO WIND   1336 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR —
*WIND   *RUNWAY SHORTENING   *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR—
*MEL PERFORMANCE DECREMENTS

RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS

| | STANDING WATER | REDUCE ZERO | REDUCE V1 |
|---|---|---|---|
| DRY SNOW -IN- | SLUSH OR WET SNOW -IN- | WIND W BY: -LBS- | SPEED BY: -LBS- |
| | < 1/4 | 14400 | 31 |
| 1/4 TO 1/2 | 3 1/2 TO 6 | 28300 | 26 |
| | ICE | 14400 | 31 |
| | ANTI-SKID INOP | 6300 | 21 |

* = CHECK MAX STRUCTURAL WT

**LANDING DATA**     PACKS ON

| LNDG FLAP | LENGTH | ANTI SKID | MAX WT ZERO WIND (DRY) | HW ADJ | CRIT TW | TW ADJ | MAX WT ZERO WIND (WET) | HW ADJ | CRIT TW | TW ADJ | APT CRIT TEMP | SUB LB/F ABOVE CRIT TEMP | MA OPE TEM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 9355 | OPER | *210000 | 0 | 2 | 1493 | *210000 | 0 | 4 | 1280 | | | |
| 30 | 9355 | INOP | *199500 | 530 | 0 | 2971 | *173400 | 960 | 0 | 3300 | 120 | 0 | 12 |
| 30 | 9290 | OPER | *210000 | 0 | 2 | 1334 | *210000 | 0 | 4 | 1276 | | | |
| 30 | 9290 | INOP | *197800 | 610 | 0 | 2961 | *172500 | 960 | 0 | 3171 | | | |

COMPUFLIGHT INC.

NasaRpt 8/19/99, 4:42 PM page 2
Incident date: 08-17-99

NASA, Aviation Safety Reporting System (ASRS report).
Report Date: 08-18-1999, Incident Date: 08-17-99
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs., Ratings: Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, with approximately 150 hours flight experience in the last ninety days.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors:    Thunderstorms in vicinity, rainshowers overhead, contaminated runway; conditions ripe for windshear.

## Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International, Inc. (AJT) Flight 827, Boeing 727, N397AJ.    Thunderstorms and rainshowers had passed through the area and were forecast to continue throughout the evening.  When I arrived, the field was under heavy rainshowers.  Anticipating a Max-weight performance-limited takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated interpretation regarding the *Navtech* runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff decision made June 08, 1999 out of MIA.  On that rainy morning, a Continental 727 had taxied into position and hold RW-12, then declined takeoff clearance... requesting full length 9L, instead.  The night before it had rained ten inches.  It was raining at the time.  While Tower had not provided a runway condition report, the runways were obviously wet. Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without prompting from the captain, I declined, reminding Tower that our flight required full-length 9L.  The captain chastised me for refusing RW-12 against his wishes (even though we had just finished discussing that the runway analysis did not support it, even on a dry day, even if we believed the weights reported by ramp personnel).    The captain insisted I radio-back Tower and accept RW-12.    I demurred.  After a brief but intense discussion, AJT 823 finally departed full-length 9L using nearly all available runway before finally breaking ground.  9L in MIA is 1,300' longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.  However, my refusal to accept RW-12 became the subject of a complaint by the captain which was investigated by Amerijet's acting chief pilot.  I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them.  The new (acting) chief pilot seemed intent on making a difference.  At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."



PLAINTIFF'S
EXHIBIT
BY  11/8/00

CONFIDENTIAL

000052

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), as is the case in all Amerijet Runway Analysis, there are no weight decrements for wet runways that do not specifically contain "Standing water".    Consequently, flight crews, the training department and dispatch personnel consider all runways "Dry" for performance planning purposes unless there exists a contamination report that contains the specific words, "Standing Water".    I have noted that some Boeing 727 performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot reduction to the Max-weight V1 speed for runways that are, "...well-soaked with water but do not have large areas of actual standing water". As of August 19, 1999, such questions had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 200' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they were June 08.  The dispatcher I queried reported to me that to his understanding Amerijet performance analysis do not contain weight-limiting decrements unless "Standing water" is reported.    I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use.   Hence, the landing numbers seem to imply a braking degradation, and perhaps an impediment to acceleration as well, resulting from wet runway surfaces... irrespective of whether or not the runway contains "Standing water". "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights.", I said.    The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' on the runway, it's dry."

As aircraft 397AJ was loaded for departure, I explained my question to the check airman, who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day.  In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safer solution and accept the "Standing Water ≤ 1/4" weight and V1 reduction for our flight. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain dismissed my concern, "We'll have to takeoff between water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.   He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst in the cross-groove channels worn by successive landing and departing aircraft.   No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a Max EPR, packs-off, takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect a packs-off takeoff.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch'. AJT 827 is cleared for takeoff, turn right heading one zero zero". As Tower began its transmission, the captain had advanced the throttles. The takeoff clearance was then issued without pause or delay. The captain had released the brakes before I could reply to the runway report and clearance. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. AJT 827 used all available runway. The captain rotated well inside the alternating red and white lights at the departure end of the runway and the main wheels broke ground at the last possible instant.   The aircraft crossed the airport boundary at less than 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation."



CONFIDENTIAL

"By knowing where I am, then drawing a straight line on my chart and navigating," I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits specified in Amerijet's Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked, incredulous. "Do you realize how incongruent that sounds coming from a check airman that just encouraged a flight crew to takeoff from a contaminated runway into possible windshear fifteen thousand pounds overweight? Even if I am wrong about navigating direct, ...and I don't think I am, one could get you violated, the other will get you killed. What is safe about that?" I shook my head.

AJT flight 827 exceeded aircraft performance limitations and violated FAA regulations in disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway in an aircraft that weighed fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the inevitable consequences eventually bestowed upon any air carrier which actively cultivates a culture of non-compliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on runways that are obviously contaminated, but cannot be described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning materials, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the contamination report.

My mistake August 17, was in letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the brother of its vice president, director of operations and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Had I done so before the aircraft taxied out of the ramp for take-off, I may have avoided the circumstances which placed my crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

NasaRpt: 8/19/99, 4:42 PM page 6
Incident date: 08-17-99

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...and to the more strident actions required to prevent takeoff once initiated. But that was not the controller's responsibility.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the captain and the check airman, prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the take-off from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Honestly, that did not occur to me until later. Would it have worked? I made a judgment call and elected not to intervene once the takeoff roll began.

Contributing factors included my excessive deference to management, not only with regard to the presence of the check airman, but pertaining to the recency of what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and on-going concern for regulatory compliance and flight safety at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way by denying them promotional and professional opportunities, abusing them in the simulator if need be...exploiting the PRIA to soil their careers while sending an unmistakably clear message to other flight crew who might consider showing similar unwelcome concern for flight safety and regulatory compliance.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,





**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP,
08-17-99.


Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

# CONFIDENTIAL

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com
000057



| | | |
|---|---|---|
| U.S. Department | Southern Region | P.O. Box 20836 |
| of Transportation | Office of the Regional Counsel | Atlanta, Georgia 30320 |

Federal Aviation
Administration

FEB 16 2006

(404) 305-5200
(404) 305-5223 FAX

CERTIFIED - RETURN RECEIPT REQUESTED

2000SO170009

Amerijet International, Inc.
David G. Bassett, President
498 S.W. 34th Street
Fort Lauderdale, FL 33315

## NOTICE OF PROPOSED CIVIL PENALTY

We have received a report of investigation, which indicates that:

1.    At all times material herein, Amerijet International, Inc., was and is the holder of
Air Carrier Operating Certificate No. PCSA059B.

2.    On or about August 17, 1999, Amerijet operated N397AJ, a Boeing 727, as
Amerijet Flight 827, under part 121 of the Federal Aviation Regulations, departing from Fort
Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida.

3.    At the time Flight 827 departed FLL, there was less than one quarter (¼) of an
inch of standing water on the departure runway.

4.    Chapter 4, Section 1A of the Airplane Operating Manual places limitations on
takeoff in water less than one quarter of an inch deep in accordance with the Airplane
Performance Manual.

5.    The Airplane Performance Manual requires a reduction in the maximum gross
takeoff weight by 17,000 pounds where the runway surface condition is that of less than one
quarter of an inch of standing water, slush, or wet snow.

6.    At the time Flight 827 departed FLL; no reduction in the maximum gross weight
of N397AJ was applied.

7.    By reason of the foregoing, at the time Flight 827 departed FLL the takeoff weight
exceeded the weight allowed under the prevailing conditions.



PLAINTIFF'S
EXHIBIT
BSW 11/8/00

000589

CONFIDENTIAL

8.    As a result, Amerijet violated the following sections of the Federal Aviation Regulations:

a.    Section 91.13(a) in that no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

b.    Section 91.605(b)(3) in that no person may operate a turbine engine-powered transport category airplane contrary to the Airplane Flight Manual, or take off that airplane unless the takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet).

Under 49 U.S.C. Sections 46301 (a)-(d), you are subject to a civil penalty not to exceed $11,000 for each violation of the regulations. By reason of the foregoing facts and circumstances, we propose to assess a civil penalty in the amount of $11,000.

Enclosed is information concerning your options in responding to this Notice. The options include participating in an informal conference with an FAA attorney and submission of information to the FAA for consideration. You must submit, in writing, your choice of the alternatives explained on the enclosed information form, on or before 30 days after you receive this Notice. If you fail to submit your choice within that time, you will have no further right to participate in the two informal procedures listed above.

EDDIE L. THOMAS
REGIONAL COUNSEL

BY: Juliana M. Winters
JULIANA M. WINTERS
Attorney
Office of the Regional Counsel

Enclosures:    Information Sheet
               Reply Form
               FAR 13.16 and Subpart G of Part 13

CONFIDENTIAL

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
ATLANTA, GEORGIA

INFORMATION REGARDING CIVIL PENALTIES
UNDER TITLE 49 U.S.C. SECTION 46301
(ATTACHMENT TO NOTICE OF PROPOSED CIVIL PENALTY)

Under 49 U.S.C. §46301, any person who violates pertinent provisions of 49
U.S.C. §§40101 et seq., or any rule, regulation, or order issued thereunder, is
subject to a civil penalty for each violation. The maximum assessment for each
violation is also prescribed by law, as specified in the Notice of Proposed
Civil Penalty to which this is attached. The Notice also states the amount of
the proposed civil penalty for the alleged violation(s).

This proceeding is governed by the Federal Aviation Regulations (FAR) set forth
in 14 C.F.R. §13.16 and 14 C.F.R. Part 13, Subpart G. Copies of these
regulations are attached. WITHIN THIRTY (30) DAYS AFTER YOUR RECEIPT OF THE
ENCLOSED NOTICE, you may elect to proceed in one or more of the following ways
by appropriately marking the corresponding box(es) on the attached election
sheet and returning it by mail or personal delivery to the address provided
below.

    1.    Submit the amount of the civil penalty specified in the Notice by
certified check or money order payable to the "Federal Aviation
Administration." Your submission constitutes your agreement that an Order
Assessing Civil Penalty in that amount may be issued without further notice,
and that you waive your right to a hearing in this matter.

    2.    Submit, in writing, information and evidence demonstrating that a
violation of the regulations was not committed or that, if it were, the facts
and circumstances do not warrant the proposed civil penalty. Information
provided will be considered in determining whether a civil penalty should be
imposed and the amount of any such civil penalty. This information may be
submitted in conjunction with a request for informal conference under
paragraph 5. Choosing this option will not affect your right to a hearing.

    3.    Submit, in writing, information and records indicating that you are
financially unable to pay the proposed civil penalty, or showing that payment
of the proposed penalty would prevent you from continuing in business. This
will not affect your right to a hearing.

    4.    Request that a civil penalty be assessed in a specific amount other
than that proposed in the Notice, or that no civil penalty be assessed. If you
choose this option, you should explain why a reduction or no civil penalty is
appropriate, and provide any supporting documentation. Information provided
will be considered in determining whether the amount you specified should be
assessed.

        If the FAA does not accept your offer, this will not affect your
right to a hearing. If the FAA accepts your offer, your request constitutes
your agreement that an Order Assessing Civil Penalty in that amount may be
issued without further notice, and that you waive your right to a hearing.

    5.    Request to discuss the matter informally with an FAA attorney
either telephonically or in person at any Regional Office of the FAA (see
attachment for addresses of Regional Offices), or at the Flight Standards

3/99 - nopcp.doc

000591
CONFIDENTIAL

District Office (FSDO) in Atlanta, Georgia. If you request a telephonic informal conference, an FAA attorney will call you at the telephone designation of your choice at any place within the United States. This will not affect your right to a hearing.

IMPORTANT - The informal conference is intended to provide you with an opportunity to present your reasons why the FAA should not proceed with the action as proposed. It also is intended to provide you with an opportunity to present any supporting documentation or information you wish the FAA to consider before the agency decides whether to proceed with the proposed action. NOTE: Ordinarily, air carrier informal conferences must be held in the region which issued the Notice.

6.    Request that the FAA assess a civil penalty without making findings of violations, and submit the reasons and any additional information in writing (with appropriate supporting documentation) to support your request. If the FAA does not accept your offer, your right to a hearing will not be affected. If the FAA accepts your offer, your request will constitute your agreement that a Compromise Order in that amount may be issued and that you waive your right to a hearing.

7.    Request to have a hearing in accordance with Section 13.16 of the Federal Aviation Regulations. Your request must be dated and signed. A Complaint will be filed and a formal evidentiary hearing of the matter will be held by an administrative law judge, under FAR Part 13, Subpart G. At the conclusion of the hearing all issues of fact and law will be decided and a decision rendered whether and in what amount a civil penalty will be assessed. An appeal from the judge's decision to the FAA decisionmaker is available and from there to the U.S. Court of Appeals.

Your request for a hearing must be made to the Hearing Docket, Federal Aviation Administration, 800 Independence Ave., SW, Room 924A, Washington, DC 20591, Attention: Hearing Docket Clerk. You must mail a copy to the FAA attorney handling this case at the address indicated below.

Please address all correspondence in this matter to the FAA attorney who signed the Notice at the following address:

[Attorney's Name]
Office of the Regional Counsel
Federal Aviation Administration
Southern Region
P. O. Box 20636
Atlanta, GA 30320

Your response may be delivered personally to the Office of the Regional Counsel for the Southern Region at 1701 Columbia Ave., College Park, Georgia, during normal business hours.

Telephone: (404) 305-5200 (Collect calls cannot be accepted).

--

000532
CONFIDENTIAL

If you are an individual:

### PRIVACY ACT NOTICE

This notice is provided in accordance with Section (e)(3) of the Privacy Act, 5 U.S.C. Section 552a(e)(3), and concerns the information requested in the letter or form to which this Notice is attached.

A.    Authority.    This information is solicited pursuant to the Federal Aviation Act of 1958, 49 U.S.C. §§40101, et seq., and regulations issued thereunder, codified in Part 13 of Title 14 of the Code of Federal Regulations. Submission of the telephone number is voluntary. The request for information is intended to provide you with an opportunity to participate in the investigation.

B.    Principal Purpose.    The requested information is intended to assist us in contacting you regarding this enforcement case.

C.    Routine Uses.    Records from this system of records may be disclosed in accordance with the routine uses as set forth in System of Records No. DOT/FAA 847, as published from time to time in the Federal Register.

D.    Effect of Failure to Respond.    If you do not provide the requested information, there may be a delay in contacting you regarding this enforcement case, and you may forfeit your right to a hearing on the merits of this case.

CONFIDENTIAL
000593

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
ATLANTA, GEORGIA

RETURN WITHIN 30 DAYS TO:

Office of the Regional Counsel                    DATE _____
Federal Aviation Administration
Southern Region
P. O. Box 20636
Atlanta, GA  30320

Telephone:   (404) 305-5200
Facsimile:   (404) 305-5223

Subject: Notice of Proposed Civil Penalty, Case No. _____

In reply to your Notice of Proposed Civil Penalty, I elect to proceed as
indicated by my check mark beside the numbered paragraph(s) below:

1.     [ ]  I hereby submit the amount of the proposed civil penalty with the
understanding that an Order Assessing Civil Penalty will be issued in that
amount without further notice, and that I waive my right to a hearing.

2.     [ ]  I hereby submit evidence and information, demonstrating that a
violation of the regulations did not occur as alleged or that the amount of the
penalty is not warranted by the circumstances.

3.     [ ]  I hereby submit information and records showing that I am
financially unable to pay the proposed civil penalty, or that payment of the
penalty would prevent me from continuing in business.

4.     [ ]  I hereby request that a civil penalty be assessed in the amount of
$_____ and I submit the reasons for the reduction of the proposed
amount. My request constitutes my agreement that if this offer is accepted by
the FAA, an Order Assessing Civil Penalty in the amount I submitted may be
issued without further notice and I waive my right to a hearing.

5.     a.     [ ]  I hereby request to discuss this matter in person at an
informal conference with an attorney from your office at the location checked
below.

               Check one:

               [ ]   Office of the Regional Counsel in Atlanta, Georgia
               [ ]   Flight Standards District Office in Atlanta, Georgia
               [ ]   Office of the Regional Counsel in _____
                     (See Attached List of Regional Offices.)

                                OR

        b.     [ ]  I hereby request a telephonic informal conference.  Please
call me at the number listed below to make arrangements for the conference.

               _____ Telephone number to call for conference

000504

CONFIDENTIAL

6.    [ ]    I hereby request that the FAA assess a civil penalty without making findings of violations, and submit my reasons.    My request constitutes my agreement that if this offer is accepted, a Compromise Order will be issued in that amount and I waive my right to a hearing.

7.    [ ]    I hereby request a hearing in accordance with Part 13, Subpart G of the Federal Aviation Regulations with the understanding that a Complaint will be filed.    I request that the hearing be held in _____.    I am sending this request both to the FAA attorney and to the Hearing Docket, Federal Aviation Administration, 800 Independence Ave., SW, Room 924A, Washington, DC 20591, Attention:  Hearing Docket Clerk.

Respondent:

Signature: _____

Name: _____

Address: _____

_____

_____

Telephone: _____

Attorney/representative:

Name: _____

Address: _____

_____

Telephone: _____

Interpol International

Zimmerman

Inw

000505
CONFIDENTIAL

## ADDRESSES OF THE REGIONAL OFFICES

ALASKA
Alaskan Region Headquarters
222 West 7th Avenue, #14
Anchorage, AK  99513

CALIFORNIA
Western-Pacific Region Headquarters
15000 Aviation Boulevard
Hawthorne, CA  90261

GEORGIA
Southern Region Headquarters
1701 Columbia Avenue
College Park, GA  30337

ILLINOIS
Great Lakes Region Headquarters
O'Hare Lake Office Center
2300 East Devon Avenue, Room 419
Des Plaines, IL  60018

MASSACHUSETTS
New England Region Headquarters
12 New England Executive Park
Burlington, MA  01803

MISSOURI
Central Region Headquarters
601 East 12th Street, Room 1558
Federal Building
Kansas City, MO  64106

NEW YORK
Eastern Region Headquarters
JFK International Airport
Fitzgerald Federal Building
Jamaica, NY  11430

OKLAHOMA
Mike Monroney Aeronautical Center
6500 South MacArthur
Oklahoma City, OK  73169

TEXAS
Southwest Region Headquarters
2601 Meacham Boulevard - 6E
Fort Worth, TX  76193-0007

WASHINGTON
Northwest Mountain Region Headquarters
1601 Lind Avenue, SW
Renton, WA  98055-4056

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

PATRICK SCOTT MAJOR,

CASE NO.: 00-6070-CIV-FERGUSON
Magistrate Judge Snow

Plaintiff,

v.

AMERIJET INTERNATIONAL, INC.,

Defendants.

_____/

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

Defendant, AMERIJET INTERNATIONAL, INC. (hereinafter "Amerijet"), by and

through undersigned counsel and pursuant to Rule 33, Federal Rules of Civil Procedure, hereby

serve the following responses to Plaintiff's Interrogatories.

Defendant objects to these interrogatories on the ground that these do not comply with

the parameters set forth in Local Rule 16.1 for the Southern District of Florida.

1.    **State the name of each person who prepared or participated in preparing the
responses to these interrogatories and state which interrogatories each such individual
prepared or participated in preparing.**

In response to Interrogatory No. 1, Defendant objects on the ground that this

interrogatory does not comply with the parameters set forth in Local Rule 16.1. Without waiving

the objection, Defendant states that the following persons participated in preparing the responses

to these Interrogatories:

1.    Derry Huff

2.    Pete Steele

3.    Tracey Dickinson



70240_1

ALLEN, NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

**2.    Do you contend that Major was not qualified to be a captain at Amerijet in February 1999? If yes, please state each and every qualification Major did not meet; identify each person with knowledge of Major's lack of qualifications and the substance of his knowledge; and identify all documents supporting this contention.**

In response to Interrogatory No. 2, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1. Without waiving the objection, Defendant states that the following persons have information regarding Plaintiff's lack of qualifications:

1.    Captain William Cline, see documents bate stamped 000266 to 000268.

2.    Captain Luis Michaels, see documents bate stamped 000258 to 000259

3.    Tracey Dickinson, see document bate stamped 000274.

4.    John Moktadier, see document bate stamped 000274.

5.    Dave Bassett; see document bate stamped 000070 and 000274.

6.    Chief Pilot Derry Huff, see documents bate stamped 000052 to 000066; 000131 to 000135; 000274; and 000309.

7.    Captain Pete Steele, see documents bate stamped 000071 to 000083; 000124 to 000127; 000274; and 000287

8.    Captain Ed Cook, see documents bate stamped 000052 to 000066; 000110 to 000111; 000128; and 000274.

9.    Captain Brian Steele, see documents bate stamped 000253 to 000255.

10.    Al Jorsey, Sr., see documents bate stamped 000052 to 000057.

11.    Barney Sonnem, see document bate stamped 000274. *—The Ridebarous valuation.*

**3.    Describe all the criteria for promotion of existing employees to the position of captain at Amerijet, together with the weight to be attached to each.**

In response to Interrogatory No. 3, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1, overly broad, vague, and unduly burdensome. Without waiving the objection, Defendant states that the criterion for promotion to Captain are the General Operation Manual, FAR Regulations for ATP Certifications, Up-grade Bid Sheets, flight hours, medical clearance, the interview process, performance, and the personal experiences of the interview panel. It is impossible to assign a weight because any one factor could negate promotion.

    **4.**    **Identify who made the decision to terminate Major and all the factors which went into it; and identify all documents which support the termination for the reasons stated.**

    In response to Interrogatory No. 4, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1. Without waiving the objection, Defendant refers Plaintiff to the documents referred to in its response to Interrogatory No. 2.

5.    Identify all existing employees who applied to be a captain between January 1, 1996 and September 1, 1999 and indicate those who were successful. Provide dates of birth and dates of hire for all candidates.

In response to Interrogatory No. 5, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1. Without waiving the objection, Defendant refers Plaintiff to documents bate stamped 000315 and 000316.

70240_1

**5**

ALLEN, NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

6.      Identify each person you know or reasonably believe to have knowledge of each of the following matters, and state the substance of the information you know or believe them to have:

a.      The decision to terminate Major.

b.      The decision not to promote Major to captain in February 1999.

c.      The decision not to promote Major to captain in response to his bid requests between April 1998 and February 1999.

d.      All efforts by Major to be promoted to captain between January 1, 1996 and April 1998, and any decisions not to promote him.

In response to Interrogatory No. 6, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1. Without waiving the objection, Defendant refers Plaintiff to the documents it referred to in its response to Interrogatory No. 2.

70240_1

7.    Do you contend that Amerijet terminated Major because it lacked confidence in him as an airman? If you answer is yes, identify each and every documentary and non-documentary ground which were bases for the decision.

In response to Interrogatory No. 7, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1, is duplicative and is unduly burdensome. Without waiving the objections, Defendant refers Plaintiff to the documents it referred to in its response to Interrogatory No. 2.

8.    Do you contend that Major acted inappropriately in any way in connection with the June 8, 1999 incident described in the Complaint? If your answer is yes, identify who makes this determination and its substance.

In response to Interrogatory No. 8, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1. Without waiving the objections, Defendant refers Plaintiff to the documents it referred to in its response to Interrogatory No. 2.

9.    Do you contend that Major acted inappropriately in any way in connection with the August 17, 1999 incident described in the Complaint? If your answer is yes, identify who makes this determination and its substance.

In response to Interrogatory No. 9, Defendant objects on the ground that this interrogatory does not comply with the parameters set forth in Local Rule 16.1. Without waiving the objection, Without waiving the objections, Defendant refers Plaintiff to the documents it referred to in its response to Interrogatory No. 2.

70240_1

10. State the factual basis for each and every affirmative defense you have raised, and identify each individual from whom you have taken a statement concerning the subject of Plaintiff's Complaint; providing the date of the statement; the form in which it was taken; and who took it.

In response to Interrogatory No. 10, Defendant objects on the ground that this

interrogatory does not comply with the parameters set forth in Local Rule 16.1, and that it seeks

information that is protected attorney/work product.

11.     Identify all documents which support or otherwise relate to your answer and affirmative defenses.

In response to Interrogatory No. 11, Defendant objects on the grounds that this interrogatory does not comply with the parameters set forth in Local Rule 16.1, and that it seeks information that is protected by attorney/work product.

### AFFIDAVIT

STATE OF FLORIDA          )
                          ) ss:
COUNTY OF BROWARD         )


I, _Derry S. Huff_, do hereby depose and state that the answers set forth in the foregoing interrogatories are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

SWORN AND SUBSCRIBED before me this _____ day of _____, 2000.

_____
NOTARY PUBLIC, State of Florida

My Commission expires:

> Phyllis M. McRAE
> MY COMMISSION # CC 837088
> EXPIRES: Jul 20, 2003
> 1-800-3-NOTARY   Fla. Notary Service & Bonding Co.

Personally known ✓ or produced identification____
Type of Identification_____

**13**

ALLEN, NORTON & BLUE, P.A.
PROFESSIONAL ASSOCIATION

NASA, Aviation Safety Reporting System (ASRS report).
Report Date: 08-18-1999, Incident Date: 08-17-99
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs., Ratings: Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, with approximately 150 hours flight experience in the last ninety days.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors:　　Thunderstorms in vicinity, rainshowers overhead, contaminated runway; conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International, Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed through the area and were forecast to continue throughout the evening. When I arrived, the field was under heavy rainshowers. Anticipating a Max-weight performance-limited takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated interpretation regarding the *Navtech* runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff decision made June 08, 1999 out of MIA. On that rainy morning, a Continental 727 had taxied into position and hold RW-12, then declined takeoff clearance... requesting full length 9L, instead. The night before it had rained ten inches. It was raining at the time. While Tower had not provided a runway condition report, the runways were obviously wet. Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without prompting from the captain, I declined, reminding Tower that our flight required full-length 9L. The captain chastised me for refusing RW-12 against his wishes (even though we had just finished discussing that the runway analysis did not support it, even on a dry day, even if we believed the weights reported by ramp personnel). The captain insisted I radio-back Tower and accept RW-12. I demurred. After a brief but intense discussion, AJT 823 finally departed full-length 9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300' longer than MIA RW-12; clearly, had we taken 12, there may have been an accident. However, my refusal to accept RW-12 became the subject of a complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."



PLAINTIFF'S
EXHIBIT
*BH* 11/8/00

CONFIDENTIAL

000052

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), as is the case in all Amerijet Runway Analysis, there are no weight decrements for wet runways that do not specifically contain "Standing water". Consequently, flight crews, the training department and dispatch personnel consider all runways "Dry" for performance planning purposes unless there exists a contamination report that contains the specific words, "Standing Water". I have noted that some Boeing 727 performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot reduction to the Max-weight V1 speed for runways that are, "...well-soaked with water but do not have large areas of actual standing water". As of August 17, 1999, such questions had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 200' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they were June 08. The dispatcher I queried reported to me that to his understanding Amerijet performance analysis do not contain weight-limiting decrements unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers seem to imply a braking degradation, and perhaps an impediment to acceleration as well, resulting from wet runway surfaces... irrespective of whether or not the runway contains "Standing water". "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights.", I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' on the runway, it's dry."

As aircraft 397AJ was loaded for departure, I explained my question to the check airman, who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safer solution and accept the "Standing Water ≤ 1/4" weight and V1 reduction for our flight. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain dismissed my concern, "We'll have to takeoff between water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers. He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.



Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst in the cross-groove channels worn by successive landing and departing aircraft.    No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a Max EPR, packs-off, takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect a packs-off takeoff.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch'.| AJT 827 is cleared for takeoff, turn right heading one zero zero". As Tower began its transmission, the captain had advanced the throttles. The takeoff clearance was then issued without pause or delay. The captain had released the brakes before I could reply to the runway report and clearance. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. AJT 827 used all available runway. The captain rotated well inside the alternating red and white lights at the departure end of the runway and the main wheels broke ground at the last possible instant.    The aircraft crossed the airport boundary at less than 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation."

CONFIDENTIAL

NasaRpt 8/19/99, 4:42 PM page 5
Incident date: 08-17-99

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits specified in Amerijet's Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked, incredulous. "Do you realize how incongruent that sounds coming from a check airman that just encouraged a flight crew to takeoff from a contaminated runway into possible windshear fifteen thousand pounds overweight? Even if I am wrong about navigating direct, ...and I don't think I am, one could get you violated, the other will get you killed. What is safe about that?" I shook my head.

AJT flight 827 exceeded aircraft performance limitations and violated FAA regulations in disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway in an aircraft that weighed fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the inevitable consequences eventually bestowed upon any air carrier which actively cultivates a culture of non-compliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on runways that are obviously contaminated, but cannot be described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning materials, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the contamination report.

My mistake August 17, was in letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the brother of its vice president, director of operations and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Had I done so before the aircraft taxied out of the ramp for take-off, I may have avoided the circumstances which placed my crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway.    The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff.    At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...and to the more strident actions required to prevent takeoff once initiated.    But that was not the controller's responsibility.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the captain and the check airman, prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the take-off from the right seat have presented a less dangerous scenario than what we encountered?  Who can say?  I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Honestly, that did not occur to me until later. Would it have worked?  I made a judgment call and elected not to intervene once the takeoff roll began.

Contributing factors included my excessive deference to management, not only with regard to the presence of the check airman, but pertaining to the recency of what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and on-going concern for regulatory compliance and flight safety at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way by denying them promotional and professional opportunities, abusing them in the simulator if need be...exploiting the PRIA to soil their careers while sending an unmistakably clear message to other flight crew who might consider showing similar unwelcome concern for flight safety and regulatory compliance.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17.  It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,                                    CONFIDENTIAL .



**Patrick Major**

Memo To: Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
          Pete Steele, Director of Operations and Interim Chief Pilot.
Date: 08-18-99
Subject: Contents of National Aeronautics and Space Administration Aviation Safety
          Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP,
          08-17-99.

Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

CONFIDENTIAL

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor178@aol.com

000057



Patrick Major

Memo To: Derry Huff
Date: 06-17-99
Subject: Note to file, AJT flight 823, June 08, 1999, addendum.

Greetings again, Derry. During our meeting Monday, June 14, 1999 regarding my flight with Captain Brian Steele Tuesday, June 08, 1999, you accepted my report concerning take-off runway selection out of MIA, then asked for an explanation pertaining to Brian's allegation that I refused to place the flap-handle to 40 degrees upon his command, and that I insisted he remove the flap-handle restricter bolt himself while maneuvering the aircraft on final approach for landing at St. Vincent. There is little to explain. The allegations are simply untrue. Here is what happened.

While on the ground in POS (the next leg was BGI, the following leg would be SVG), Brian and I discussed landing limits at St Vincent. In resolving how we had arrived at different maximum landing weights, Brian said he planned to use flaps 40. I reminded him that the FedEx hush kit STC does not provide for flight crew removal of the flap-handle restricter bolt; hence, with 397AJ, we were limited to a flaps thirty landing at SVG. Brian replied, "I don't give a shit about that. I plan on using flaps forty." (His choice of words).

By way of persisting, I described to Brian how the restricter bolt limitation materialized: Rand Brewer asked Director of Operations Pete Steele (Brian's brother) for a ruling regarding removing the bolt for flaps forty landings at short foreign airfields where stage-three noise abatement was not a factor. About six weeks later, Pete responded to Rand by stating that flaps 40 was not allowed on those aircraft that have a restricter bolt installed. Rand relayed this information to me by email. I reminded Brian that Pete later made an announcement to all flight officers at one of the recent meetings, "The FEDEX hush kit STC does not provide for flight crew removal of the flap-handle restricter bolt. Hence, there will be no more flaps 40 landings on aircraft with the FedEx STC. We hope to obtain flaps 40 approval for the Valsan conversion, but testing is still underway. Amerijet is providing Valsan....etc., etc." In my experience, Derry, no other captain uses flaps forty on aircraft that have a flap-handle restricter bolt installed.

Brian was undeterred. A short time later, he removed the flap-handle restricter bolt himself while the aircraft was still on the ground. Brian did not ask anyone else to perform the task or for their help. (Derry, during our meeting, Monday, I indicated this occurred in POS; it may have, but I can't be absolutely certain it wasn't BGI. In any event, the bolt was removed from the flap-handle path while the aircraft was parked and prior to departure for SVG). At first, Brian encountered difficulty removing the bolt. Larry Clifford moved to help, But Brian waved him off. Eventually, Brian removed the restricter bolt using just his fingers.

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com

CONFIDENTIAL        000058

NTF.BSteele.6/17/99, page 2

Upon arrival at SVG, flaps were extended normally. There was no delay or further discussion regarding Brian's choice of final flap setting; indeed, the bug card contained speeds for a flaps forty landing. As in the earlier discussion prior to takeoff out of MIA, Larry Clifford remained silent throughout, both on the ground and in the air. Brian did not ask for his input, nor did Larry offer it. On yesterday's flight 723, I asked Larry if he remembered anything out of the ordinary on approach into SVG. He replied, "No. What do you mean?"

"Do you recall me delaying placing the flap-handle to the forty degree position upon Brian's command?"

"Not that I remember."

"Did I miss the call, and Brian have to do it himself?"

"No. Everything seemed pretty ordinary to me. Why?"

"It came up in a discussion yesterday. I thought everything had gone pretty normally after we left MIA. I wondered if I had missed something."

"I remember you two discussing it on the ground. But after that, nothing out of the ordinary."

Just then, Chuck Bennett entered the cockpit. When Larry's and my conversation abruptly ceased, Chuck asked, "What? 'You two talking about me again?"

"No. We were just talking about Tuesday's flight into SVG."

"Is Brian using flaps forty again? Which airplane was it?"

"397".

Chuck sighed. "I don't know why he does that. He knows he's not supposed to remove that bolt."

Then I briefed Chuck on last Tuesday's runway selection controversy out of MIA, including the forty-five minute delay in getting weight and balance paperwork to the cockpit after the aircraft was loaded, ramp personnel's prolonged possession of the weight and balance computer, the rain on the field, wet runways, Brian's lack of rest prior to the flight, his repeated statements declaring his belief that the aircraft was considerably heavier than reported...prompting him to request V-speeds for a max. gross takeoff, up to and including my persistence in requesting full-length runway 9L for takeoff.

"How long did you have to wait for 9L?" Chuck asked.

"About a minute, maybe two."

CONFIDENTIAL

Chuck reasoned, "Under conditions like that, why would you take the shortest runway? Hell, be as safe as possible. Why risk it? I hardly ever use 12 out of MIA, not unless we're way under the limit. You never really know what the weights are, anything can happen. So, why take the chance?"

Afterwards, I said, "Larry. You know, the one thing I noted the other day, both out of MIA and pertaining to flaps 40 into SVG, was that you said nothing at all. It takes three people to fly this airplane. If you have something to say, speak up. Us guys up front can kill you. You are just going to get to the scene of the accident a little after us. If we are doing something you have an opinion about, speak up. I could have used your support the other day, particularly regarding runway 12."

"I didn't see there was any problem with it. According to the paperwork it would have been okay."

"But we suspected the paperwork wasn't right. Brian didn't believe it. Look how long they were cooking the numbers before returning with the paperwork and computer. Despite what the paperwork said, Brian asked for V-Speeds for a max. gross takeoff. He forgot all about that though when the tower offered one-two. And, you saw the takeoff, Larry. That's why I made that remark Thursday, when we were with Chuck. Thursday's was presumably a legitimate 195,000Lb takeoff. It was two degrees warmer, but there was more wind too. We actually rotated and broke ground sooner than on 823. Tuesday, the runways were wet. It had rained ten inches the night before. Hell, Continental taxied into position and hold, one-two, right in front of us. They took one look and said they needed 9L full length." Then I reminded Larry of the 15,000Lb wet runway performance penalty on 9L and 14,000Lb reduction 12...as well as the 31 knot V1 reduction on both. "Point of fact is, we should have used 9R. But there wasn't any point even suggesting that. Right now, I'm ashamed I didn't. 9L full length was way too close. What all this really does is beg the question concerning a wet runway 9L takeoff in FLL, especially going to POS or BGI; 9L in FLL is even shorter than MIA 12."

Chuck interjected, "That's why Dave is going to all -17 engines."

Derry, considering the 4,600' length of the runway at St. Vincent, flaps forty is more desirable than flaps 30. But the STC does not allow it. Nor was it required for 823's operation that day. If we had run off the runway, blown a tire, if the brakes had failed, or any number of unforeseen calamities occurred, the flaps forty choice would have undoubtedly produced a crew violation. Even so, that choice was unlikely to get us hurt. Hence, I acquiesced and participated in it. Indeed, on final approach to SVG, I noted aloud the aircraft's angular path to the runway (a five to eight degree offset) and asked Brian if that helped him avoid updrafts adjacent the rocky cliff North of short final and improved controllability of the aircraft. He said it did. The landing was uneventful. But then we rolled all the way to the departure end before slowing sufficiently to initiate a turn back to the ramp. Reverse thrust remained engaged until the aircraft was nearly stopped. I exclaimed "I have never been down here before."

Brian replied, "That is because I don't use brakes."    I thought to myself, "He insists on flaps forty but does not use brakes, how curious."

CONFIDENTIAL

Are you beginning to appreciate the irony here, Derry? Several times on Tuesday, June 08, flight 823, this pilot had to make qualitative assessments regarding the comparative risk of a succession of poor choices on the part of the captain, then determine how best and how firmly to respond in specific reference to the relative hazard presented by each. One scenario could have gotten us hurt. The other violated a management directive and the FAR's. The one with risk to life and property is where I put my foot down. The question is not how severely should Amerijet censure this pilot for the temerity to question Brian Steel's choices, but why should flight crew feel obligated to take risks or violate regulations? Is it Amerijet's intention to establish a culture of non-compliance? I have invested fourteen hours explaining actions which were empirically, ethically, practically, professionally, legally, and morally correct, all because I bruised a captain's ego? Thank me that he still has an ego left to bruise.

Derry, in Monday's meeting, you told me Brian alleged that I refused to move the flap-handle to forty degrees upon command, that I told him if he wanted flaps forty he would have to position the handle himself, and that I interfered with his efforts to remove the flap restricter bolt. Up to now, I have always found Brian to be honest. Undisciplined, foul-mouthed, non-compliant and irreverent, perhaps, but a skilled and knowledgeable pilot, honest to a fault. But, if you quoted Brian accurately the other day, then I am disappointed to report that his statements concerning the flaps forty landing in St. Vincent are a fabrication, void of any basis in fact. Perhaps Brian sought to shield himself from embarrassment for failing to obtain adequate rest prior to the flight, or for his ill-advised insistence on using a wet runway too short for the circumstances. There might be other reasons, none adequate, such as his reluctance to accept effective input from a required member of his crew, embarrassment over his apparent confusion regarding best-rate versus best-angle of climb speed references, or his doggedness in using a prohibited flaps setting for landing in SVG. Maybe due to his fatigued state that day, Brian confused my insistence that he call MIA tower himself to accept runway 12 with the memory of our later discussion concerning a flaps forty landing at St. Vincent. I do not know. At least that would make it an honest mistake.

You should note, Derry, I did not plan on bringing any of this to your attention. I should have and, arguably, that might concern you more than anything. Openness and willingness to help solve safety and regulatory issues at Amerijet has gained me nothing but grief in the past. I have paid dearly for not noting that sooner. The way I saw it, these were line matters, handled in the cockpit, and that is where they would have remained. Once Brian complained to you, though, I had no choice but to render full disclosure. Brian's complaint that his command authority entitles him to place others in jeopardy is absurd. His irreverence for regulations and the direction of management threatens the livelihood of everyone relying on Amerijet's continued success. I wish you luck in dealing with this effectively.

Sincerely,

Patrick Scott Major
The preceding statements are factually accurate to the best of my recollection.

CONFIDENTIAL

000061



Patrick Major

Memo To: Derry Huff
Date: 06-14-99
Subject: Note to file, AJT flight 823, June 08, 1999

Greetings, Derry.

During our telephone conversation earlier today you asked me to be prepared to discuss my flight last week with Brian Steele. Following is a my note to file (NTF) regarding events that day and following.

Tuesday, June 08, 1999
12:00 W/BSteele, MIA, POS, BGI, SVG, BGI, MIA.

I arrived at 8:00 a.m. Traffic and pouring rain increased drive time to 1:20 minutes. Captain Brian Steele and Second Officer Larry Clifford were already planeside. Freight was loaded, except bellies. No load plan, though. Brian said he had been up since 01:00L, left Ocala at 2:00 a.m. and drove straight through. Consequently, by time we departed for a sixteen hour duty day, nearly ten hours flight-time, Brian had already been up eight hours; by his own account, the last two hours of which required he negotiate a torrential downpour and a "...battlefield" (Brian's word choice) of wrecked automobiles. Brian explained he had asked for 51,000 Lbs of fuel. But we would call it 50/49.3 for takeoff, "Ghosting" 1,000Lbs. Said he was convinced loaders were cooking the numbers, so burn was likely to be higher than planned. Ramp personnel had removed the load computer from the cockpit and retained it for 45 minutes after the aircraft was fully loaded; accordingly, Brian asked me to produce V speeds for max. gross takeoff, full length, 9L. I did.     Load plan weight showed approximately 195,300Lbs. On taxi out, we discussed viability of 12; I had already noted the numbers and reported that the runway analysis did not support it, even if you believed the paperwork, and Brian had already said he didn't; I added that generally speaking, if you can't take 9L-L1, you can't take 12; aside from which the runways were obviously wet. RW 12 dry limit for 26C is 193.6. Even with packs off it would be close. Winds were 080 at 06, negligible help (except on 9L). By rights we probably should have used 9R due to the wet condition of the runway: wet runway less then <1/4" standing water, reduces RW 9L limit by 15,500Lbs, RW 12 by 14,000Lbs. But there was no point even suggesting that. Shortly after we discussed the RW 12 or 9L question, a Continental 727 taxied into position and hold on 12. Before tower could issue takeoff clearance, though, Continental called to say he needed 9L full length. As Continental taxied past us on way to takeoff 9L, I pointed out the change stating, "I wonder why Continental decided not to use 12."

Brian replied, "I don't know." Apparently, he saw no connection.

Then I said, "I'll bet they are going to offer it to us next."

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com

000062

CONFIDENTIAL

"Yep".

Just then, ATC instructed AJT 823 to taxi into position and hold 12. As I depressed the push to talk and replied over my headset, "Negative sir, Amerijet 823 needs full length 9L."   Brian was saying to me, simultaneously, "Okay, we'll take one two."

Tower replied, "Okay, hold position, I'll get you 9L momentarily."

Brian stated, "I'm in charge here.  I'll make the decisions, and I said we will takeoff on RW 12."

There was no interest in discussing it.   No consideration for CRM.  No regard for the apparent safety concern.  Apparently, Brian had forgotten telling me he believed the aircraft actually weighed much more than reported on the paperwork.  I responded, "Not with me on board you won't."  I wasn't angry, upset, or defensive, but 12 was not an option for this pilot that day.

"I said we'll take 12."

"Then you get on the radio, tell tower you have reconsidered the performance numbers and will take 12, after all."  Brian did nothing.  After a few moments silence, I said, "Brian, all I want to do today is get home safely."

"Me too, Pat.  Me too."  Brian sounded sincere.  But this was coming from a captain who held his crew and his responsibility in such contempt that he would be awake nearly 24 hours by time we got back to MIA...on who knows how little sleep prior rising nearly nine hours before.  Tower instructed us to take position and hold.  Then, "AJT 823 cleared for takeoff 9L, turn right heading 120."

9L, my takeoff, I advanced the throttles prior to brake release and asked for normal EPR as briefed.  Acceleration was apparently retarded by water on the runway surface and weight of he aircraft.  V1 was not achieved until well inside the alternating amber/white centerline lights (last 3,000 feet of runway), I rotated at normal rate, 3 degrees per second to 10 degrees pitch, main wheels left the runway well inside the red centerline lights (last 1,000').  .    We crossed the airport boundary approximately 100', 15 degrees pitch attitude, wings level.  Brian asked for the turn almost immediately.  Quiet climb profile.  Afterwards, normal climb was slow prompting ATC to ask us to give best rate through 10,000', I said to Brian I would use 250Kts for the climb as one or two engine climb speed, best reference for best rate, was 266.  Brian said best rate was flaps up maneuvering speed; I reminded him that Flaps up maneuvering speed is closer to a best angle and that ATC had asked for best rate.  Out of 10,000 feet I could only get to 319Kts while holding a  1,000' FPM climb.  The last 10,000 feet of climb to FL 290 we could not maintain a 500FPM climb at 270 knots.  Due to careful power management and trim, as well as direct routing, burn to POS was 38.8, 3,000Lbs over flight plan...not counting the 1,000Lbs of fuel we ghosted (4.0 total).  Burn to GTK was  3.8 above plan (again, not including the "Ghosted" 1,000 Lbs).

CONFIDENTIAL

000063

Upon arriving in POS we found four pallets only 1/2 of which were loaded with freight. Weights ranged from 1,800 to 2,500 Lbs. A stack of pipes had been laid across the empty portion of the pallets. Total pipe weight was 4,500Lbs. 1,800 to 2,500 Lbs one half of the pallet, 1125 Lbs on the other. Accordingly, those four pallets were out of the 10% of pallet-center CG limit by a considerable margin.

When Brian and I were alone in the cockpit on the ground in POS, I attempted to get closure on the earlier issue by saying, "Brian, you now I don't pull that shit." I had hoped to instigate a discussion. Instead Brian said, "We'll talk about it when we get back."

"Good, I would like a chance to talk about it." I said.

Brian responded. "Oh, we will. We definitely will. You can count on it."

Most of the rest of the day went normally. Cockpit communications standard, unrestrained.

Later, Jim Korby, JS from SVG, mentioned the tale regarding Ed Cook, Clay Lynn on SVG check-out, 15,000+/- over max. runway limit weight, 190AJ, some years ago. I was there as the flight as engineer and cleared up the rumor regarding branches in the nose gear as a result of the close call we had experienced taking off toward the mountains at night. I had performed the inspection myself after the nose gear failed to extend prior to landing in Barbados. Recycled, it had extended normally. Afterwards, Ed asked me to go check it out. When I came back upstairs I reported, "I think it will work fine now that I got the branches out of it." Then immediately added, "I'm just kidding. Everything looks normal." In actual fact, failure of the nose gear to extend on the first attempt was the result of a faulty switch behind the panel in the landing gear handle mechanism. We had almost died that night. I was trying to introduce some relief. Before opening the door in Barbados, we had sat there talking for 15-20 minutes. Each of us had privately advised Ed against the takeoff. But he had ignored us. We knew we were 3-5,000 Lbs over limit weight, at night into the mountains, but then each of us let Ed talk us into going. Later, we had the freight weighed in Barbados. It had been under-reported by more than 15,000 Lbs. Javier Carvahal summed up everyone's feelings when he said to Ed, "If I ever call you from down here asking you to buy me a ticket home, you'll understand why. I am never doing that again." Apparently, Brian had mentioned our earlier issue to Jim, prompting the discussion. Finally I added, "I don't mind dying. I just don't want to die doing something stupid."

RW 12 Tuesday, June 08, 1999...we might not have been so lucky. We would have at very least taken out the runway end lights. If so, the resulting investigation would have faulted the captain for accepting a contaminated runway less than the performance required length and the FO for excessive deference to authority; the FE for failure to speak up at all. Once the weights on the airway bills were totaled, Amerijet and the loaders would likely have been faulted as well. All this on a week when we knew a NASIP inspection was underway.

Upon return to MIA when I told Brian I would wait downstairs so we could talk, he said, "That's okay, Pat. That's okay."

CONFIDENTIAL

000064

Absent an accident, after the fact, events can be construed to meet whatever version most pleases those in authority.    Brian is a proud captain and brother of AJT Director of Operations Pete Steele.  The fact remains, Amerijet came dangerously close to losing an aircraft Tuesday morning.  It didn't because ultimately, Brian made the right choice.  Absent the resolve of 823's FO, though, a calamity could not have been avoided.  Did I hear, "Thank you, Pat.  Good job, Pat.  Thanks for sticking to your position."?  Will steps be taken to ensure flight crews are exercising appropriate judgment regarding rest, flight preparation and runway selection.  Or, is Amerijet going to censure this pilot for asserting his concern regarding the safety of flight?

**Wednesday, June 09, 1999.**  Contacted FSS asking for best source of runway airport conditions day prior.    Told them the decision making scenarios broadcast over the frequency, especially regarding a Continental 727 comprised an excellent basis for a performance/CRM lesson.  FSS suggested I contact Dade County Aviation Authority.

**Thursday, 06-10-99:**  MIA-POS, CB, LC:  ostensibly a reliable 195.5Lb takeoff, 28C (two degrees warmer than Tuesday), wind stronger, right down the runway: 9L full length.  Runways dry.  RW 12 was never a consideration, not discussed or offered by tower.  Chuck's leg.  Rotation point and main gear flight point slightly prior to what had been experienced Tuesday...main gear left ground at about the 1,000' mark.  What does this bode for similar operations out of FLL, (9L is even shorter than MIA RW 12)?

**Monday, 06-14-99:**  Spoke with Jim Murphy: Dade County Aviation Authority, airport conditions 12-13:00z Tuesday, June 08, 1999..  No record since airport closure May 19.  Authority does not assess condition of RW re water, etc., unless specifically requested by tower.  Due to shape of RW and grooving, little water actually pools or puddles, "But the runways were definitely wet and it was raining.  I remember, there had been nearly 10 inches of rain and flooding all over."

**06-14-99:**  Submitted FOIA request for tower and ground communication tapes between the hours of 12:15 and 13:30z June 08, 1999.  In particular, I am interested in documenting Continental's statement regarding their decision to change to the longer runway.

**Comments:** What would have happened had the Alaska Airlines FO told the tower they were going around at Juneau that ill-fated night, or, failing to get the appropriate response from that, pushed the throttles forward, leaving the Captain no choice but to go around?  What would have happened had the FO stood on the brakes as the Swissair 747 Captain initiated the takeoff roll without clearance at Tenerife?  What would have happened had the FO or FE shoved the throttles forward as the Kaletta DC-8 banked 45 degrees below 500' AGL in order to land on an unapproved RW in Guantanomo Bay; better yet, what would have happened had the Captain simply refused that flight...he had already been awake 24 hours when notified of the trip?  What would have happened in Croatia?  They each would probably have to explain their actions to the chief pilot.  But there would not have been accidents.

CONFIDENTIAL

Brian was tired; having just driven several hours to make the flight, he had already been awake the equivalent of a normal work day and under considerable stress. Several times Brian had stated his conviction that the aircraft was considerably heavier than reported. But then he wanted to accept a runway for takeoff that relied on the veracity of the reported weights; even if we believed the numbers, they were marginal at best... if the runway were dry and packs off for takeoff? It was wet. Another 727 captain taxied into position and hold, took one look and opted for the longer runway. What else should I have done?

I know you don't expect me to risk my life.

This FO made a difficult choice that day. As a result, there was no accident or incident to report, no loss of life, destruction of aircraft or property aboard, nor was there damage to runway end or approach lights which would have likely produced an embarrassing investigation. I did what pilots do, what Amerijet pays me to do. It would be nice to be appreciated for it, but that's not required. I know what I did was right.

Sincerely,

Patrick Scott Major

The preceding statement of fact are accurate to the best of my recollection.

CONFIDENTIAL

ACTION FORM

_Mayor    Patrick_          Dept. __4020__    Effective Date __8|31|99__
Last        First        M.

COMPLETE APPLICABLE AREAS IN THIS SECTION FOR NEW HIRES, REHIRES OR PERSONAL STATUS CHANGES

**EMPL. INFORMAL.**

Name _____ Social Security No. _____ DOB _____

Address _____ City _____ State _____ Zip _____

Phone No. (_____) _____    ☐ Male    ☐ Female

If married, Spouse name _____    Spouse DOB _____

COMPLETE APPLICABLE AREAS IN THIS SECTION FOR NEW HIRES AND REHIRED EMPLOYEES ONLY

**NEW HIRE REHIRE**

Job Title _____ Dept. _____ Hire Date _____

☐ Hourly   ☐ Salaried   Hourly rate or annual salary $_____   Date of first review _____   ☐ Full time   ☐ Part time

Emergency Contact _____    Phone No. (_____) _____

FOR HUMAN RESOURCES USE ONLY: W-4 info _____ Race _____ Marital Status _____ Salary Grade _____ Payroll direct deposit ☐ yes ☐ no

COMPLETE APPLICABLE AREAS IN THIS SECTION FOR SALARY, SALARY GRADE, DEPARTMENT, TITLE OR OTHER CHANGES

☐ Performance review/Increase   ☐ Adjustment   ☐ Promotion   ☐ Demotion   ☐ Transfer   ☐ Other

**CHANGES**

FROM:                                           TO:

Job Title _____ Salary Grade _____   Job Title _____ Salary Grade _____

Dept. _____ Rate of Pay _____   Dept. _____ Rate of Pay _____   Next review date _____

Other _____

COMPLETE THIS SECTION FOR ABSENCE OF ANY REASON

**ABSENCE**

☐ Vacation Cash Out, total days requested _____   ☐ Vacation, dates taken _____

☐ Sick time, dates taken _____   ☐ Personal time, dates taken _____

☐ Comp time, dates taken _____   ☐ Jury Duty, dates taken _____   ☐ Military duty, dates taken _____

☐ Bereavement pay, dates taken _____   Relative (relationship) _____

☐ Short term LOA, dates taken _____   ☐ Fam/Med LOA, dates taken _____

Reason/Other info _____

COMPLETE THIS SECTION FOR ALL EMPLOYEE TERMINATIONS    loss of confidence in his

**TERMINATION**

☐ Resignation   ☐ Retirement   ☐ Lay-off   ☒ Discharge   Reason for termination _abilities as an airman._

☐ Pay in lieu of notice, total days _____   ☐ Vacation, total days _____   ☐ Severance, total days _____

☐ Other reason _____ total days _____

Last day worked _8/17_   Eligible for re-hire? ☐ Yes ☒ No   Conditional _____   Reason, if no or conditional _____

Has employee received an Exit Interview? ☒ Yes ☐ No    If No, reason _____

Has employee returned company possessions? ☒ Yes ☐ No   If No, identify items _____    **000131**

APPROVALS

Division Supervisor _____   Date _9|7|99_   Human Resources/Payroll _____   Date _____

rev. 3/9

# PERSONNEL ACTION FORM

AUG 2 5 1999

Name __Major, Patrick__ PAYROLL    Dept. __4C2D__    Effective Date __8|23|99__
    Last    First    M.

COMPLETE APPLICABLE AREAS IN THIS SECTION FOR NEW HIRES, REHIRES OR PERSONAL STATUS CHANGES

**EMPLOYEE INFORMATION**

Name _____ Social Security No. _____ DOB _____

Address _____ City _____ State _____ Zip _____

Phone No. (_____) _____    ☐ Male    ☐ Female

If married, Spouse name _____ Spouse DOB _____

COMPLETE APPLICABLE AREAS IN THIS SECTION FOR NEW HIRES AND REHIRED EMPLOYEES ONLY

**NEW HIRE REHIRE**

Job Title _____ Dept _____ Hire Date _____

☐ Hourly    ☐ Salaried    Hourly rate or annual salary $_____    Date of first review _____    ☐ Full time    ☐ Part time

Emergency Contact _____ Phone No. (_____) _____

FOR HUMAN RESOURCES USE ONLY: W-4 info _____ Race _____ Marital Status _____ Salary Grade _____ Payroll direct deposit ☐ yes ☐ no

COMPLETE APPLICABLE AREAS IN THIS SECTION FOR SALARY, SALARY GRADE, DEPARTMENT, TITLE OR OTHER CHANGES

☐ Performance review/Increase    ☐ Adjustment    ☐ Promotion    ☐ Demotion    ☐ Transfer    ☐ Other

**CHANGES**

FROM:    TO:

Job Title _____ Salary Grade _____    Job Title _____ Salary Grade _____

Dept _____ Rate of Pay _____    Dept _____ Rate of Pay _____ Next review date _____

Other _____

COMPLETE THIS SECTION FOR ABSENCE OF ANY REASON

**ABSENCE**

☐ Vacation Cash Out, total days requested _____    ☐ Vacation, dates taken _____

☐ Sick time, dates taken _____    ☐ Personal time, dates taken _____

☐ Comp time, dates taken _____    ☐ Jury Duty, dates taken _____    ☐ Military duty, dates taken _____

☐ Bereavement pay, dates taken _____ Relative (relationship) _____

☐ Short term LOA, dates taken _____    ☐ Family/Med LOA, dates taken _____

✗ Reason/Other info __Remove from payroll effective 8|23|99 - Disciplinary Suspension until further notice.__

COMPLETE THIS SECTION FOR ALL EMPLOYEE TERMINATIONS

**TERMINATION**

☐ Resignation    ☐ Retirement    ☐ Lay-off    ☐ Discharge    Reason for termination _____

☐ Pay in lieu of notice, total days _____    ☐ Vacation, total days _____    ☐ Severance, total days _____

☐ Other reason _____ total days _____

Last day worked _____ Eligible for re-hire? ☐ Yes ☐ No    Conditional _____ Reason, if no or conditional _____

Has employee received an Exit Interview? ☐ Yes ☐ No    If No, reason _____

Has employee returned company possessions? ☐ Yes ☐ No    If No, identify items _____

000132

**APPROVALS**

Division Supervisor _____ Date __8-23-99__ Human Resources/Payroll _____ Date _____

Print SouthWare Mail

Amerijet International                Date-09/01/99   Ref# SWMAILTX
                                      Time-15:07:42   Page    1


<To:>        ULRICH         FLL - LISA ULRICH
<cc:>        MATTE          FLL - MIKE MATTE
<From.>      HUFF           FLL - DERRY HUFF
<Type:>      R              Regular
<Date:>      09/01/99       14:48:45
<Subject:>   Pat Major
<Purge Date:> 09/06/99
<FileName:>  MAIL/MSG21898.MAI
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
-Lisa, as you know Pat Major was fired as of Monday, Aug 30.  We have
decided that we will pay out Pats remaining vacation time in his next
paycheck as part of our seperation package.  Please let me know if
this is a problem.  Thanks for your help. Derry
t

Print SouthWare Mail

Amerijet International                Date-09/01/99   Ref# SWMAILTX
                                      Time-15:07:19   Page    1


<To:>        TERM NOTIFY     TERMINATION NOTICES  (List)
<From:>      HUFF            FLL - DERRY HUFF
<Type:>      R               Regular
<Date:>      09/01/99        14:43:33
<Subject:>   Patrick Major
<Purge Date:> 09/06/99
<FileName:>  MAIL/MSG21686.MAI
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
-Effective Monday, August 30, Patrick Majors employment with Amerijet
has been terminated. His employee number is 803. I have recieved his
company ID and Miami airport ID as well as all of his manuals.

Derry
D

000134

FROM THE DESK OF...
**Lisa Ulrich**
PAYROLL ADMINISTRATOR

Received payer
from Pat Major
9/13/99

00525 4815 — FI

248-2274

Lisa Ulrich

AMERIJET INTERNATIONAL, INC.
498 S.W. 34th Street
Fort Lauderdale, FL 33315
(954) 359-7670 ext. 784
FAX (954) 359-6851

TRANSMITTAL

DATE OF PRINTING :  7/08/98
PAGE :    1

Record ID: SO179812722

Comment Section

Primary Area: J    Key Word: 109    Opinion: I

Comment Text:

MR MAJOR APPEARED BEFORE ME TO TAKE AN ORAL EXAMINATION FOR A TYPE RATING ON
THE B-727.    HE WAS AN UPGRADE PILOT, HAVING SPENT A TOTAL OF SEVEN YEARS IN
THE POSITIONS OF FLIGHT ENGINEER AND FIRST OFFICER ON THE B-727. MR MAJOR HAD
BEEN RECOMMENDED BY PETE STEELE, THE D.O. OF AMERIJET. DURING THE NEXT
FIFTEEN MINUTES OR SO, MR MAJOR MISSED QUESTIONS ON LIMITATIONS, FLIGHT
CONTROLS, AND WIND SHEAR.  I ASKED HIM IF HE HAD RECEIVED ANY SIMULATOR
PERIODS UP TO NOW, AND HE STATED THAT HE HAD.  I THEN ASKED HIM IF THE
INSTRUCTION INCLUDED WIND SHEAR, AND HE CATEGORICALLY STATED THAT HE DID NOT
RECEIVE ANY WIND SHEAR TRAINING.
  BECAUSE OF HIS TOTAL LACK OF PREPARATION FOR THIS ORAL, AND BECAUSE I WAS
LED TO BELIEVE THAT HE DID NOT RECEIVE TRAINING DUE HIM (WIND SHEAR), I
TERMINATED THE ORAL.  MR MAJOR AND I THEN PROCEEEDED TO MR. STEELE'S OFFICE
WHERE WE DISCUSSED MR MAJOR'S PROBLEM FOR ABOUT 20 MINUTES.
MR STEELE SAID HE WOULD GIVE MR MAJOR MORE TRAINING AND SEE TO IT THAT HE
IS BETTER PREPARED THE NEXT TIME.  (I SHOULD POINT OUT THAT IT WAS MR STEELE
WHO SIGNED THE  APPLICATION  AS THE RECOMMENDING INSTRUCTOR, EVEN THOUGH MR
MAJOR STATED TO ME THAT HE WAS NOT GIVEN A PRE-ORAL IN REPLY TO MY INQUIRY)
IT IS MY FEELING THAT WHEN  A QUALIFIED INDIVIDUAL IN AN AIRLINE SIGNS AS
THE RECOMMENDING INSTRUCTOR, HE SHOULD ASCERTAIN THAT THE APPLICANT IS
THOROUGHLY PREPARED FOR THE TEST, ORAL, SIMULATOR, OR AIRCRAFT.   THE
RECOMMENDATION   SHOULD NEVER BE MADE IN A PERFUNCTORY MANNER IN THE ABSENCE
OF A  PROPER      EVALUATION AS  IT WAS IN THIS CASE.



INTERNATIONAL, INC.

August 30, 1999

Patrick Major
1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312

Dear Pat,

Due to Amerijets loss of confidence in you abilities to perform the duties of an airman, we are terminating your employment effective immediately. We wish you the best of luck in your future pursuits.

Sincerely,

Derry S. Huff
Chief Pilot
Amerijet International

## MAJOR v. AMERIJET
### File Number: 81975.002

Transcription of Termination Meeting - September 1, 1999

JW – John Washington
DH – Derry Huff
PM – Patrick Major

DH     Okay, this is Wednesday morning, 9:00 o'clock on September the 1st. This is Derry Huff, chief pilot, with Pat Major, first officer, and we are recording this conversation.

Basically, Pat, we have brought you in today to tell you that we are terminating your employment with us. As I basically referred to you the other day on the phone . . . Are you going to take that or not? No? I have a letter here basically stating that fact. This is for you. Okay. That is where we stand. You have several weeks vacation coming to you. We are going to pay that out to you in the next check. We'd also like to offer you a job placement service for a period of time. Probably for about a month to use as you see fit. We, however, will not work to place you in a position that is a flying position. So, if you would like to use that service to obtain a different kind of position, we will offer that service to you.

PM     I don't see why this doesn't apply to a flying position?

DH     Well, if you read the letter, we are terminating you due to the fact that we have lost confidence in your ability as an airman, and that . . .

PM     Specially as it relates to what?

DH     Specifically it relates to a combination of things. The fact of the matter is that we don't feel that you have developed to the point which you need to and we are saying at this point and for upgrades and we are at this point questioning your ability as a first officer, so we do not feel secure in referring you to another flying position.

PM     How do you explain, Derry, that Amerijet was comfortable enough with my flying abilities not only to pass me on my last motorized PC, but the check air runways was complementary with his comments to me, saying again, that yes he would recommend me for captain but he couldn't help me with my political problems and then, of course, I flew the line in good standing until I made a complaint that in the presence of the check air man that the runway contamination report was being ordered as ¼ inch and in the presence of a training flight engineer who had a trainee was (inaudible) that day (inaudible). I

PLAINTIFF'S EXHIBIT

complained that day we had taken off fifteen thousand pounds over the maximum allowable weight for that runway that day, and the only thing that has happened between my taking that flight and my falling from good graces and the incidents of my termination is that letter. That letter which I wrote to the National Aeronautics and Space Administration, Aviation Safety Reporting Service and then copied to you and to Pete with a request that that that be copied in its entirety to the safety officer. The only incident that I observed between employment in good standing and termination is this one complaint, specifically with regard to gross violation of aviation regulations, airmanship and common sense, and yet I am being terminated where I was the only one in the cockpit asking the others to please exceed to the demands of the moment and not take the aircraft out.

DH    Pat, this is not about the specifics of you questioning our operational procedures, however it does relate as to how you chose to question those items and your decision-making ability at that time.

PM    Now wait, that the letter. I wasn't going to until I got a chance to see how Amerijet was going to respond to this and the reason for that is . . .

DH    [Someone enters the room.] Hi, John. How's it going. John Washington.

PM    The reason for that is . . .

DH    Would you kindly make some photocopies for me? Thank you. Give this to Stacy when she comes in to make copies for me. Go ahead.

PM    Unless there is . . . I brought up this issue to (inaudible) when I left relating specifically with dispatch and with Jeff in dispatch and with other captains, that there is a concern that Amerijet is not providing by either (inaudible) by Boeing recommendations or by its own performance analysis and the take off planning for runway (inaudible) and takeoffs specifically in regards to maximum performance takeoffs there is runway contamination. The runway's grooved, it's dull, there is water present which creates drag, ¼ creates drag which needs to be displaced in order to get through it, which creates additional drag pushed up against the wings and fuselage that is why there is a 17,000 gallon breakdown (inaudible) wouldn't have standing water less than a quarter inch. That standing water, by the way, starts at one eighth and one would have to ask how much water would you have to have less than 1/8 of an inch. If you have observed wet and have less than 1/8 of an inch, would you consider the properties of water. And if it is raining and water is flowing off of the runway, all right it's not standing, but you still have considerable amounts of water which still represents a consider amount of drag. And then if the rubber has accumulated it in the cracks and grooves impeding the flow of water, such that you have standing water which is what we had the other

day, then where is the . . . Question: Where is the thoughtful consideration is the question? It's not being considered. What's being considered is that you have to get that plane airborne, and I brought that up to the check airman and I brought that up to the captain and just before we took off the tower issued a contamination report. Had they given us the time, had they said state your intentions, I am certain the results would have been different. Since they did not, a soon as they called out Amerijet 827, Captain Roseborough and off we go. Okay, now you may call it a question of my decision-making, there were seven other transport cargo aircrafts that were not taking off due to conditions which were being reported in the area at that precise moment. So if you really in your heart of hearts expect me to believe that this isn't punitive and retaliatory, I don't believe for a minute that you believe that.

DH   As I started with this, this is not about a specific incident, it is about continuing, . . . how should I phrase this? Amerijet has been looking for you to develop in a certain way: in the training that you've received, through you chance to upgrade through your extracurricular training that you are doing, working with (inaudible), we expected you to develop a certain decision-making skill. We don't see that that has happened.

PM   And how have you assessed that?

DH   We have assessed that through your various reports to us, we have assessed that through . . .

PM   Now let's look at that, Derry, your fine observation of the last report that you got from me prior to this is where the very same captain wanted to take off under very similar conditions on the shortest available runway out of Miami. A Continental 727-200 was taxing into position hold on that runway (inaudible) look at his runway analysis and realized it couldn't be done. We had a weight in balance which we had good reason to question the validity of – which said we weighed 195,000 pounds. The captain had admittedly ghosted a thousand pounds of fuel behind that, the maximum take off weight on a dry runway on 1-2 that day was 193,600 pounds. And so the report you got from me was a valid decision of a qualified professional airman saying "no, we are not going to take off on a runway when our weight exceeds the performance limitations of that runway under these conditions." It would have exceeded the performance limitations of that aircraft on that day if it were a dry day, and if we believed the weights. And, so, what we have is a PC in May, a category 2 PC with another company in June, that is a right seat training captain PC with another captain in June, which obviously had no problem with my judgment and decision making. We had a decision where the first officer in the airplane had to prevent a captain from doing something abominably stupid and then that very same captain comes back and does something even worse in front of a check airman, the most senior check airman this company

● Page 3

06070-WJZ Document 112 Entered on FLSD Docket 03/13/2001 Pa

has with a trainee on board, and it's my judgment that is being called to question? Is this starting to sound absurd?

Now let's go back to training, to training I wasn't provided. You said in your attempts to upgrade. I never failed an upgrade, I never failed an oral. My oral was discontinued when it became knowledge – when it became the knowledge of the examiner that I had not had an essential part of the training, a part of the training which was required before he could even be there, which was the pre-oral review. It hadn't been done. Ed Cook was on vacation. No one had done it. Pete had signed off a request for airman certification form that doesn't even apply to ATPs and that was how we started that check run, and after he looked into it, he said we are discontinuing this. We'll come back and do this when you have had all of the training and when there is a qualified check airman who's signed off that you have received all of the training. And it's my judgment being called into question? If this is starting to sound really stupid, it is. And sitting in a pretty office in a $75 million dollar company with bosses telling me what to do doesn't make it any less absurd. The fact that I am one person and you are part of a big company does not make it any less absurd. I wonder how Lieutenant Calley is going to like it now following his orders, its not a defense. And when somebody takes an air craft out of that airport when it is raining like it has been these last couple days, the only reason we survived that day was because of just some poor dumb luck. Imagine how that NTSB report would have looked. It would have looked something like that report that I gave you. If you reading it back, etc. etc. And at that point, now that you have that letter I will tell you as one person to another, now it becomes negligible homicide, it becomes criminal fraud.

DH   There is no question in my mind Pat, that that is what you believe and that's your perception of the event. That is part of the problem, it is part of the reason that we are taking the steps that we are taking is that we are not comfortable . . .

PM   Let's get on to the rest of the paper work because what I am hearing is – is a man who's sold out. You have lost your principles and your integrity and God bless you I hope you find a way to get them back. If you're sitting here telling me that you expect me to believe that there are rational, logical thinking people who are calling into question the judgment of a person who has complained because an airplane took off 15,000 pounds more than the maximum allowed of that particular runway that day in the conditions right for wind shear, if you expect me to accept that as a logical and rational conclusion forget it, it's not going to happen.

DH   Let's just say that everything that you said is correct Pat, it is very sad that you got onto that runway and took off, assuming – that's giving you the benefit of

● Page 4

the doubt, that everything that you said is correct, the very fact that you got to that point where you took the throttles up and you . . .

PM I didn't take off.

DH . . . that you ever left the gate in that airplane — Are you prepared to pay for it, for that weight imbalance?

PM I'm prepared to pay for it, for the weight imbalance? I had trouble . . .

DH There is no way that you should have been done . . .

PM (inaudible)

DH If you felt that you were right you should have done it that way.

PM I left myself an out. I left myself an out.

DH Did you exercise it?

PM And I, I made a . . . Yeah, I did make a . . . Let's go back to it, I talked to the check airman. We got a wet runway. We even had a tail wind, which at that point . . . Oh, forget the tail wind, three knots on the tail, Was what? 1,500 pounds a knot, (inaudible)

DH Assuming that you're correct . . .

PM The captain – the captain then, the two are one-upping each other to see who can be the most flagrant in their disregard for the questions I'm asking. We taxi out, as we taxi out there's seven aircraft waiting and I'm told to ask why is there a delay. There's no gate hold or anything. It's pilot discretion because of conditions at the airport and in the area. Well do you have a contamination report? Well, there have been no breaking reports but a contamination report is not yet available. If you want to go back, taxi back. At this point, I don't have anything but my own . . ., there's nothing that I can turn to, there is nothing valid and what's . . ., I've just got what I can see and I point out as we are taxiing out on the runway, look the rain has increased, there is standing water. Do you see it? You can see it as we taxi. Neither one of them care, we turn in position and hold. I fully expected, and this is where I made my mistake, I fully expected that if the contamination did not come, I did not have much of a leg to stand on because I had a check airman and one of Amerijet's most senior captains on board who were not concerned. Despite everything. I mean, Lt. Reese, who was it. The principal training captain at the company, everybody makes mistakes, but despite that I've got to sit there and recognize these two people, two very qualified people, who are both not concerned

● Page 5

despite the wind shear possibility, etc. But I'm hoping as this contamination report comes out, I'm thinking that he is going to say "state your intentions," at which time I will state, I will ask, that we taxi through the runway please and then he will give us, he will say cancel your take off clearance, turn right at the next exit, or what have you. He did not do that. He continued right on, no brake in the mike and by that time the airplane is already running. Now my choice is, at that present moment, do I intercede to abort the take off of an aircraft that is already under way, do I end that commitment, mutiny, or let the airplane go? We all know the choice I made and we can agonize over it forever, but that was the choice I had at that moment. So if I let the situation go to the point that I had all the information that I needed in order to say no this airplane should not go, and at that point it was already gone.

DH    Okay.

PM    Now if that's . . . like I said, that's the report, a copy you got. That can't go anywhere, not until I found out how Amerijet was going to respond to it. What I wanted out of it, I wanted a policy. I wanted a policy where Amerijet went back to NAFAC and NAFAC said that's right, all our performance numbers are based on optimum days, optimum braking, test pilots at the controls, and all those numbers come from dry runways. There are no performance tests done on wet runways that come into those performance analysis. All that extrapolation, mathematical extrapolation. And I want to see a policy that said when there is and Boeing suggests when there is a preponderance of water that will take a certain limit. Every airline does it, except us. When there is standing water we'll take the standing water. But Amerijet's policy has been that all runways are dry, unless there is standing water. That in itself is dangerous. The other day, we had a standing water contamination report that a senior captain, with Amerijet's most senior check captains, took off and I'm being fired because I find that to be reprehensible to me. My judgment is being called to question because I find that to be and decisions like that to be reprehensible behavior. Well, we just have to agree to disagree on that one Derry.

DH    Fair enough.

PM    These are . . ., do you need some manuals from me? Do you need all the jets back? My binders.

DH    Anything else you need?

PM    Discharge me please. And as that has been recorded in my presence I would expect a copy of that tape.

DH    You will certainly get a copy.

● Page 6

PM    Is there time for one of you to ask one of the people from personnel to come over so that I can review my file before I leave.

DH    Ah, I'll see if somebody is available.

[Phone call] I'm sure that Al's not in and as you know our human resources department has been spread a little bit thin lately. If you would like to make an appointment to come in to review that, I will make sure that somebody is available to see that with you. I'm sure if you would like to submit a request for copies of anything that these accommodations will be met.

PM    Okay. Training records? Training records of course

[Pause in talking. It appears that papers are being shuffled.]

DH    Sure.

PM    What specific comments are entered in regards to this termination?

DH    As to this point there are no specific comments entered.

PM    What will be?

DH    I can't tell you that at this point.

PM    Let the record reflect that there are absolutely no comment whatsoever on the proficiency check of 5/15/99. That there are, in fact, no comments in my training records as of this date since 5/14/99. That there are no comments on any PCs back as far as 1996. There are no comments in 1995 with the check ride with Joe Cline, which immediately followed his being called to task for having made such a difficult landing which was a report that I was asked to make. There is one engineering proficiency report, excuse me flight officer report, it is as a first officer of 1/15/98 and note that there are at least 12 in some file somewhere, with all of them there except for the one.

DH    Proficiency reports are not part of the training records.

PM    That one is. There seems to be no records of any kind with regard to any kind of training.

Derry, based on the records, the conclusions seemed to be based on something old. Be advised the file that I have and the correspondence that I had written to this company with regard to regulatory and weight balance and other concerns (inaudible) I am quite certain that none of those documents

exist in any file here.  The rather obvious implication is that someone has been trying to keep that information away from those who would be legitimately concerned, (inaudible). There is a protracted pattern here of retaliation for trying to see to safe operation of these aircrafts.  You know it and I know it.

DH    Is there any way I can get in touch with you the beginning of next week regarding the placement service . . .

PM    . . . and benefits?

DH    And you will receive your next paycheck and you should receive the balance of your vacation pay.

PM    When will I receive the information with regard to continuation of benefits?

DH    I can get back to you on that from HR.

PM    Thank you.  It's been a real pleasure.  I hope things work out good for you, I know you work at it.   You too John, good luck.

JW    Thanks for coming in Pat and good luck.

G:\LAW\81975\002\Memos\Transcription of meeting tape.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6070-Ferguson/Snow

PATRI E SCOTT MAJOR,                    )
                                        )   Civil No.
         Plaintiff,                     )   00-6070-...
                                        )
    vs                                  )
                                        )
AMERIJET INTERNATIONAL, INC.,           )
                                        )
         Defendants.                    )
_____      )

                500 East Broward Blvd
                Fort Lauderdale, Florida
                Monday, January 8, 2001
                10:00 a.m. - 12:05 p.m.

                    VOLUME 2

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

                DEPOSITION

                    OF

                DERRY S. HUFF

JOWNTOWN REPORTING     (954) 527-3778

---

1    Deposition of DERRY S. HUFF, a witness of
2  lawful age, taken by the Plaintiff for the purpose
3  of discovery and for use as evidence in the
4  above-entitled cause, wherein PATRICK SCOTT MAJOR is
5  the Plaintiff, and AMERIJET INTERNATIONAL, INC. is
6  the Defendant, pending In The United States District
7  Court For The Southern District of Florida, pursuant
8  to notice heretofore filed, before BEVERLY J. GRAMM,
9  Registered Professional Reporter and Notary Public
10 in and for the State of Florida at Large, at the law
11 offices of Heinrich, Gordon, Hargrove, Weihe &
12 James, P.A., 500 East Broward Boulevard, Suite 1000,
13 Fort Lauderdale, Florida, on the 8th day of January,
14 2001, commencing at 10:00 o'clock a.m.
15 --------------------------
16 THEREUPON,
17          DERRY S. HUFF
18 a witness named in the notice heretofore filed,
19 being of lawful age, and being previously duly sworn
20 in the above cause, testified on his oath as
21 follows:
22          DIRECT EXAMINATION
23 BY MS. SHEA:
24     Q. Mr. Huff, this is a continuation of your
25 deposition that we started on November 8th,

---

Page 152

                    INDEX

                                        Page

DIRECT EXAMINATION                       153
by MS. SHEA

                E X H I B I T S

                            MARKED FOR
                        IDENTIFICATION

Plaintiff' Exhibit 8          176
Plaintiff' Exhibit 9          170
Plaintiff' Exhibit 10         177
Plaintiff's Exhibit 11        179
Plaintiff's Exhibit 12        180
Plaintiff' Exhibit 1          181
Plaintiff's Exhibit 14        186
Plaintiff's Exhibit 15        187
Plaintiff's Exhibit 16        187
Plaintiff's Exhibit 17        187
Plaintiff's Exhibit 18        197
Plaintiff's Exhibit 19        197
Plaintiff's Exhibit 20        206
Plaintiff's Exhibit 21        208

(Exhibits retained by Attorney Shea.)

---

Page 154

1  1999 (sic); correct?
2      A. Yes, it is.
3      Q. You had to leave for a medical
4  appointment, I believe.
5      A. Yes.
6      Q. Are you all right today?
7      A. Yes.
8      Q. Eyesight okay?
9      A. It's getting there.
10     Q. Okay. You're not under any medication or
11 anything that would interfere with your ability to
12 testify today?
13     A. No, I'm not.
14     Q. Okay. And you are still under oath.
15     A. Yes.
16     Q. All right. We're taking your deposition
17 as the corporate representative of Amerijet; you're
18 aware of that?
19     A. Yes.
20     Q. All right. And are --
21        MS. SHEA: Off the record.
22        (Discussion held off the record.)
23 BY MS. SHEA:
24     Q. You were at your previous deposition, we
25 marked some documents as exhibits and you answered a

1 series of questions; correct?
2    A. Yes.
3    Q. All right. Let me first try to pick up
4 where we left off. All right. I have the original
5 exhibits from the last time. Let me hand you the
6 document that had just been marked, which was
7 Exhibit Number 7 to your deposition, which is the
8 transcript of your termination meeting with Mr.
9 major.
10    Have you had a chance to look at that at
11 all?
12    A. No.
13    Q. Okay.
14    MS. NORTON: I think I had asked you if
15 you had done that or if it had been done by a
16 certified court reporter.
17    MS. SHEA: No. As I said then, I don't
18 expect any authenticity stipulation or anything like
19 that. That was just for our use at this time.
20    MS. NORTON: Then I object.
21    MS. SHEA: Okay.
22 BY MS. SHEA:
23    Q. John Washington attended this meeting with
24 you?
25    A. Yes.

1    Q. All right. And he basically was there as
2 a witness as opposed to a participant; is that
3 correct?
4    A. That's correct.
5    Q. And the decision to terminate him had been
6 made, obviously, in advance of the meeting?
7    A. That's correct.
8    Q. So the meeting was not to discuss the
9 issues, it was to let him know that he no longer
10 worked for Amerijet; is that right?
11    A. That's correct.
12    Q. Did you at any time in that meeting tell
13 him anything about the line in the August report
14 that had concerned Amerijet and why that was the
15 deciding factor in terminating him?
16    A. I don't remember the specifics of our
17 conversation.
18    Q. Okay. Were you deliberately vague with
19 him in that meeting about the reasons?
20    MS. NORTON: Object to the form of the
21 question.
22    A. I don't recall being vague with him, no.
23 BY MS. SHEA:
24    Q. Okay. Was it your intention to be direct
25 and specific with him, or were you --

1    A. It was my intention to terminate him at
2 the meeting.
3    Q. Okay. On the first page of this
4 transcript which is numbered page 1, it states,
5 we're terminating you due to the fact that we've
6 lost confidence in your ability as an airman.
7    A. Where does that state that?
8    Q. Second entry by you, D.H..
9    A. Okay.
10    Q. And P.M., Pat Major. Specifically as it
11 relates to what? And you said specifically as it
12 relates to a combination of things. The fact of the
13 matter is that we don't feel you have developed to
14 the point which you need to, and we are saying at
15 this point, and for upgrades, we are at this point
16 questioning your ability as a first officer.
17    Do you recall making that -- a statement
18 to that effect?
19    A. Something to that effect, yes.
20    Q. Okay. Was that deliberately vague?
21    A. No.
22    Q. Okay. Did you tell him what it was that
23 prompted his firing?
24    A. Yes, I did.
25    Q. Where -- what did you tell him?

1    A. I told him that we'd lost the ability --
2 we had lost our confidence in his ability as an
3 airman.
4    Q. You didn't tell him anything more specific
5 than that?
6    A. I don't recall the specifics of our
7 conversation.
8    Q. But you had met with counsel beforehand
9 and you had decided that that was the reason why he
10 was being fired?
11    MS. NORTON: Object to the form of the
12 question. Any conversations between counsel, the
13 question, to the extent it was me, is fine. To the
14 extent that we discussed or did not discuss
15 something that is not, and I object to it.
16 Attorney/client privilege.
17    MS. SHEA: He testified about it last
18 time. He brought it up.
19    MS. NORTON: He testified he met with me.
20 Whatever that reflects.
21    MS. SHEA: All right.
22 BY MS. SHEA:
23    Q. So you had, before meeting with Pat Major,
24 you had decided to phrase his being fired as loss of
25 confidence in his ability as an airman?

1   A. That's correct.
2   Q. And you did not offer him further
3 specifics on that at the meeting?
4   A. I don't recall the specifics of the
5 conversation.
6   Q. Would you take a minute then and review
7 this transcript? I thought you might have since
8 you've had it for two months.
9   A. The second page, this transcript reflects
10 that I was told that I told him that we had a
11 concern about his decision-making ability. Page 3 I
12 refer to the fact, based on this transcript, that he
13 has not developed, his skill level has not developed
14 throughout his training.
15     Page 4 of this transcript reflects that I
16 am referring to his different perceptions of things
17 that happened, his continuing different perception
18 of things that happened. That's just about all I
19 see.
20   Q. All right. So basically, all that you
21 told him at the meeting was that you questioned his
22 decision-making ability, his development skill level
23 and his different perception of things that
24 happened.
25   A. Yes. Amongst a combination of other

Page 160

1 things I believe that are referred to in the first
2 page.
3   Q. Questioning his ability as a first
4 officer?
5   A. That's correct.
6   Q. On the comments, starting on page 4 and
7 going to page 5, did you -- were you faulting Pat
8 Major for not preventing the plane from taking off?
9   A. Let me read what my comment is here. And
10 your question is again?
11   Q. Well, you say if you're correct, Pat, it's
12 very sad that you got onto that runway and took off.
13 What were you implying there?
14   A. What I am implying is that if Pat truly
15 believed the position that he was taking, then he
16 should never have prepared the weight and balance
17 document that he did and he should have never
18 departed on that flight the way that he did. Which
19 again refers to his poor decision-making ability.
20   Q. Even though there was no reporting of
21 standing water at the time of push back?
22   A. The conditions did not change between the
23 time that he prepared the weight and balance and the
24 time that the plane departed.
25   Q. But Amerijet's policies would have the

1 runway be -- the weight and balance should be
2 prepared for dry conditions unless there is a
3 standing water report; correct?
4   A. The weight and balance is prepared based
5 on the field conditions.
6   Q Correct. Which under Amerijet's policies
7 are to be considered dry unless there's a standing
8 water report; is that correct?
9   A. That's not correct.
10   Q. Okay. What was not correct about that?
11   A. Whether a runway is considered dry or not
12 does not relate to a standing water report, as you
13 refer to it.
14   Q. Okay. Well, did you make an investigation
15 as to whether the conditions warranted a
16 modification to the weight and balance?
17   A. Yes, we did.
18   Q. At the time of push back?
19   A. Yes, we did.
20   Q. All right. And you concluded that the
21 conditions did not warrant any modification?
22   A That's correct.
23   Q. Therefore, he made the correct weight and
24 balance report?
25   A. That's correct.

Page 162

1   Q. Okay. So what you're saying on pages 4 to
2 5 is that the standing water report after push back,
3 before take off, should not have been taken into
4 consideration by Amerijet?
5   A. That's correct.
6   Q. And if you're wrong about that, then
7 you're wrong about your view of his perceptions?
8     MS. NORTON· Object to the form of the
9 question.
10   A. That's correct.
11 BY MS. SHEA·
12   Q Okay. You talked about his different
13 perception of things that happened, you specifically
14 meant what Amerijet's obligations were in light of
15 the standing water record; is that correct?
16   A. I'm sorry? Would you repeat that?
17   Q. When you talked about Pat's differing
18 perceptions of an event, you talked about, again,
19 his reaction to the standing water report and what
20 he thought Amerijet's reaction should be?
21   A. I'm referring to the fact that Pat had one
22 perception of things and that the captain and the
23 check airman on board and the company had a
24 different perception of it.
25   Q. Specifically whether you need to take the

| | |
|---|---|
| 1 degradations and the speed reduction in light of the | 1 BY MS. SHEA: |
| 2 standing water report as a matter of course? | 2 Q. So other than this page 6 of the |
| 3 A. That's correct. | 3 definition section in the runway analysis, what else |
| 4 Q. Okay. And you have the performance | 4 are you relying on? I geared my letter to your |
| 5 manuals with you today. Can you show me the | 5 testimony from last time. |
| 6 provision that you are relying on? | 6 A. Basically the procedure section, their |
| 7 A. The -- referring to the definition of | 7 AOM, which talks about a captain's responsibility -- |
| 8 runway contamination. | 8 Q. All right. |
| 9 Q. Which manual is -- | 9 A. -- as to ascertaining the weather |
| 10 A. This is the runway analysis. | 10 conditions. |
| 11 Q. Okay. | 11 Q. All right. Did you make a decision not to |
| 12 A. Which states the decrements are shown, | 12 produce that to me? Because -- |
| 13 which indicate zero wing weight, B-1 reductions | 13 A. No. |
| 14 required, with various depths of a dry snow, of | 14 Q. Okay. But why was it not produced? |
| 15 standing water/wet snow and ice. | 15 A. I didn't understand that you were asking |
| 16 Q. Okay. The last time you mentioned a | 16 for it. |
| 17 provision which -- in the definition section which | 17 MS. NORTON: We just went by your letter. |
| 18 gives captains an ability to disregard a standing | 18 That's what we produced specifically for today. It |
| 19 water report if they -- I'd like to just have that | 19 wasn't in there, so I didn't see it. |
| 20 page that you just mentioned, if we could get a copy | 20 MS. SHEA: I don't want to waste time on |
| 21 of that. | 21 this. I hope you're not being cute about this if I |
| 22 A. Page 6 of the definitions. | 22 didn't ask for it right. He testified to these |
| 23 Q. Okay. Is that the definition that you | 23 things last time. If he didn't properly define them |
| 24 were referring to, or are there other references? | 24 last time, then I can't be faulted because my |
| 25 A. Um, that is not what I was referring to. | 25 correspondence just tracked that. |

| | |
|---|---|
| 1 There would be other references available in the | 1 BY MS. SHEA: |
| 2 airplane operations manual. | 2 Q. I'd like to refer you to my request to |
| 3 Q. Okay. And is that what you have with you | 3 produce, of October 31st, 2000, second request to |
| 4 today also? | 4 produce, item number three was a complete copy of |
| 5 A. No. | 5 the airplane operating manual for the Boeing 727, to |
| 6 Q. Okay. Is there a reason why not? | 6 which he responded, defendant objects. It is unduly |
| 7 MS. NORTON: I don't remember you asking | 7 burdensome, overly broad and not reasonably |
| 8 for it. Did you? | 8 calculated to the lead the discovery of admissible |
| 9 THE WITNESS: Didn't we say that we gave | 9 evidence. |
| 10 you the sections of it that were pertaining to this. | 10 A week later, when I took Captain Huff's |
| 11 MS. SHEA: Well, I'm specifically -- I've | 11 deposition, I'm quite confident that he referred to |
| 12 written and I've done requests for the citations by | 12 that manual. It's a pending request. You're |
| 13 which a corporate representative is relying on for | 13 overdue. I feel like games are being played here, |
| 14 his -- | 14 and I would appreciate suspending the deposition and |
| 15 MS. NORTON: In your letter. And we | 15 having it produced so that I can complete this |
| 16 brought those. But I don't remember the airline -- | 16 interrogation today. |
| 17 the airplane operations manual being one of them. | 17 MS. NORTON: You didn't -- let's go off |
| 18 Were you very specific in what you cited? | 18 the record a minute. |
| 19 MS. SHEA: I can go back and look, but the | 19 (Discussion held off the record.) |
| 20 point is I'm taking his deposition, I'd like -- if | 20 MS. NORTON: I told -- you had him send |
| 21 there's manuals that you identified that you're | 21 the airplane operating manual, that portion of it. |
| 22 relying on to support what Brian Steele did on that | 22 MS. SHEA: I've requested it since |
| 23 runway that day, and not taking the degradations, I | 23 September 30th. |
| 24 just want to make sure I've thoroughly asked about | 24 MS. NORTON: And we objected. |
| 25 those. And I would like those produced. | 25 MS. SHEA: Now, if you -- |

1    MS NORTON: And we have a right to
2  object.
3        MS SHEA: And then he came to his
4  deposition a week later and he said, I'm
5  specifically relying on this portion. So that's
6  what I did a letter on. If you want to go through
7  the whole correspondence trail, I'm happy to do
8  that.
9        All I'm saying is while I take this
10 deposition, it's been two months since the last
11 session, two months ago today. My request to
12 produce are way old older than that. I would like
13 the provisions that he's relying on when he offered
14 testimony before.
15       MS. NORTON: You may not get them. We
16 don't have an obligation to you to produce what he's
17 going to testify to or what he's not. I am willing
18 to provide it. I did not, I objected validly on
19 producing a whole huge manual. And you didn't go
20 any further with it than that.
21       MS SHEA: Of course I did. That's why I
22 took the deposition. And I've corresponded with you
23 about it.
24       MS. NORTON: Fine. That's their way to
25 produce it. But merely putting the burden on us to

Page 168

1  show up with whatever he's going to testify to.
2        MS SHEA: It's overdue discovery, Susan.
3        MS. NORTON: Then move to compel on it.
4        MS. SHEA: As opposed to try to work it
5  out through two letters.
6        MS. NORTON: No. Fine. And I'll produce
7  what you had in the letter. And now you're upset
8  because I didn't anticipate something else.
9        MS. SHEA: You didn't produce what I had
10 in the letter.
11       MS. NORTON: I did, too. We produced the
12 performance manuals. They're all right there,
13 specific pages. Which, by the way, when you take
14 somebody's deposition -- I thought we were off the
15 record.
16       MS. SHEA: No, we're on the record. This
17 is a big waste of time and money.
18       MS. NORTON: I agree with you.
19       MS. SHEA: On the November 10th letter,
20 item 4, which you received by fax two days after
21 Derry Huff's deposition, you objected to our request
22 that you produce the entire airline operating
23 manual.
24       MS. NORTON: Right.
25       MS. SHEA. And the basis was that this

Page 169

1  request was overly broad. In light of Mr. Huff's
2  testimony, I believe we've clarified the portions of
3  those manuals to which we are entitled because they
4  are clearly in the scope of admissible evidence.
5        Those are referred to in the FAA Notice of
6  Civil Penalty Violation of Definition section
7  referred to by Derry Huff as providing the rationale
8  in the policies specifically relating to the
9  navigational clearance.
10       MS. NORTON: And we have brought over some
11 of those.
12       MS. SHEA: Some of those is the operative
13 word. Let's take a break. Let's be friendly, let's
14 take a break, talk to Derry, what does he need in
15 order to complete his testimony.
16       MS. NORTON: I'm not going to sit here and
17 have him decide what he needs to complete his
18 testimony. I'm not going to do that. I will have
19 him fax to you the operating manual, but we're not
20 going to anticipate -- how do I know what questions
21 you're going to ask? There's a way of proceeding on
22 this. And you're putting the burden on us to
23 produce everything we're going to talk about.
24       MS. SHEA: I want to mark copies of these
25 two letters as exhibits to the deposition.

Page 170

1        (Plaintiff's Exhibit 8, aircraft operating
2  manual, was marked for identification. )
3        (Plaintiff's Exhibit 9, runway analysis,
4  was marked for identification.)
5        MS. NORTON: Do you want him to fax over
6  that portion I agreed to have him fax over, or not?
7        MS. SHEA: Well, I'd like to bottom line
8  the whole situation here. So let me just --
9  BY MS. SHEA:
10 Q. Mr. Huff, there's an airplane operating
11 manual; correct? Airline or airplane. Airline?
12 A. Airplane.
13 Q. Airplane operating manual.
14 A. Aircraft, actually.
15 Q. Aircraft operating manual. Does the
16 runway analysis -- which you did bring a complete
17 manual today; correct?
18 A. Yes.
19 Q. But only page 6 of the definitions, in
20 your opinion, is pertinent to Captain Steele's
21 decision and assessment of the conditions on August
22 17th, 1999?
23 A. It's part of what he takes into
24 consideration.
25 Q. Right. But in terms of excerpts from this

| | |
|---|---|
| 1 | manual, that would be relied upon? |
| 2 | A. Yes. |
| 3 | MS. NORTON: I object to the form of the |
| 4 | question. |
| 5 | A. Other than the actual decrement itself, as |
| 6 | specified for that particular runway. |
| 7 | BY MS. SHEA: |
| 8 | Q. Which I marked I believe at the last |
| 9 | deposition. |
| 10 | A. I believe we have that, yes. |
| 11 | Q. Let's look at the B-727 performance |
| 12 | manual. As I understood your testimony last time, |
| 13 | you testified there was a definition section. |
| 14 | A. That really is referring to this, which is |
| 15 | a supplement to the performance manual. |
| 16 | Q. Okay. |
| 17 | MS. NORTON: This being? I'm sorry. |
| 18 | THE WITNESS: This being the Runway |
| 19 | Analysis Manual, which is a supplement to our |
| 20 | performance manual. |
| 21 | BY MS. SHEA: |
| 22 | Q. All right. So is there anything in the |
| 23 | B-727 performance manual which you were |
| 24 | incorporating into your testimony last time as |
| 25 | allowing a captain to choose not to take a tower |

| | |
|---|---|
| 1 | report of standing water into consideration? |
| 2 | MS. NORTON: Object to the form of the |
| 3 | question. I don't know if he remembers his |
| 4 | testimony to that extent. If you want to leave out |
| 5 | that portion of your testimony, I have no objection |
| 6 | to the question. Go ahead and answer it if you can. |
| 7 | BY MS. SHEA: |
| 8 | Q. So the weight and speed degradations would |
| 9 | be obligatory under the performance manual, would |
| 10 | they not? And you answered no, they would not. And |
| 11 | then I asked you what would be the basis, what |
| 12 | documents would support your testimony. |
| 13 | A. The documents would be the context of the |
| 14 | performance manual. I mean, it refers to |
| 15 | degradations, you know. It's part of the manual, |
| 16 | throughout the manual. |
| 17 | Q. Okay. Well, the manual, you're talking |
| 18 | about the Navtech runway analysis? |
| 19 | A. Both of these manuals. |
| 20 | Q. And the performance manual? |
| 21 | A. Correct. |
| 22 | Q. So you can't really isolate a specific |
| 23 | section, it's the context of the whole manual? |
| 24 | A. Correct. |
| 25 | MS. SHEA: Okay. Then I'd like to have |

| | |
|---|---|
| 1 | them all copied. |
| 2 | MS. NORTON: Fine. |
| 3 | BY MS. SHEA: |
| 4 | Q. Now, what about the aircraft operating |
| 5 | manual -- what, if anything, in the aircraft |
| 6 | operating manual, in context or in specific section, |
| 7 | would support the position that a captain does not |
| 8 | have to take the weight and speed degradations under |
| 9 | these circumstances? |
| 10 | A. I would immediately think of the operating |
| 11 | procedures section. |
| 12 | Q. Okay. And that would relate to the |
| 13 | captain's responsibilities to ascertain a weather |
| 14 | report? |
| 15 | A. Correct. |
| 16 | Q. Any other procedures that you're thinking |
| 17 | of offhand? |
| 18 | A. No. |
| 19 | MS. SHEA: All right. Well, why don't we |
| 20 | try to get this resolved so we don't get bogged down |
| 21 | in this. And I'll run those downstairs and get them |
| 22 | bulk copied, these two, right now. |
| 23 | MS. NORTON: You brought another manual, |
| 24 | didn't you? What else? |
| 25 | THE WITNESS: It's just the second half of |

| | |
|---|---|
| 1 | that. These are split in half alphabetically for |
| 2 | airports. The second half of it -- |
| 3 | MS. SHEA: Foreign airports. |
| 4 | THE WITNESS: As far as airports. |
| 5 | MS. SHEA: I mean different airports. |
| 6 | THE WITNESS: Yes. There's -- maybe all |
| 7 | you need out of this is the Fort Lauderdale section. |
| 8 | MS. SHEA: Just the Fort Lauderdale |
| 9 | definition. |
| 10 | THE WITNESS: I would think you would just |
| 11 | want the front section. |
| 12 | MS. SHEA: All right. We'll take a minute |
| 13 | and do that when we take a break. And I'll get that |
| 14 | copied and then we'll mark it as an exhibit after |
| 15 | that. |
| 16 | BY MS. SHEA: |
| 17 | Q. This performance manual looks to be a |
| 18 | document that's updated from time to time? |
| 19 | A. Correct. |
| 20 | Q. So this may or may not be completely |
| 21 | consistent with August 1999. There may have been |
| 22 | some updates? |
| 23 | A. It may or may not be, that's correct. |
| 24 | MS. SHEA: All right. Then we'll have |
| 25 | that copied then. All right. Why don't we. |

1    BY MS. SHEA:
2        Q. Looking at your testimony from last time,
3    you testified there's -- that there is covered in
4    the definition of the performance manual what is
5    defined as being standing water, what percent
6    average of the runway.
7        And then I asked, it's the definition
8    section of the performance manual that defines
9    standing water of one quarter inch, and in a way
10   that's consistent with allowing the captain to
11   decide whether there really is standing water.
12       Answer, the captain can ascertain the
13   condition of the runway.
14       Is there anything affirmatively in the
15   performance manual that makes a provision like that,
16   that talks about the length of the runway or how
17   much coverage of water there is?
18       A. I would have to go through the manual.
19   I'm not certain.
20       Q. You can't think of anything offhand?
21       A. Not off the top of my head, no.
22       Q. Okay. Well, again, I'm taking your
23   deposition as a corporate representative, and if
24   there's a basis that you're able to give for your
25   testimony, I just want to make sure that you've

1    refer me to, anything other than what's coming and
2    what we've already discussed?
3        A. Yeah. I believe what I'm having sent up
4    will cover that.
5        Q. All right. Well, let's defer on that and
6    come back to that then. All right. When you met
7    with Pat Major for the September 1st meeting, were
8    you being vague with him or not?
9        MS. NORTON: Object to the form of the
10   question.
11       A. I was not being vague with him, no.
12   BY MS. SHEA:
13       Q. Okay. While we're on documents here, you
14   referred in your earlier deposition to a report by
15   Al Jorsey that he did some kind of report on Pat
16   Major's performance. Do you recall that?
17       A. Yes.
18       MS. SHEA: Okay. Would you mark that,
19   please.
20       (Plaintiff's Exhibit 10, report, was
21   marked for identification.)
22   BY MS. SHEA:
23       Q. Let me show you what was marked as Exhibit
24   10. And I'll represent that was just produced to me
25   by your counsel. Is that the report that you're

1    stated that.
2        A. Okay.
3        Q. So the basis for your testimony that a
4    captain can make his own assessment of water and
5    follow that assessment, even if it's at variance
6    with the tower report, is the definition section of
7    the Runway Analysis Manual. Anything in the
8    performance manual.
9        A. No, nothing specifically.
10       Q. Okay. And then the aircraft operating
11   manual, just a procedure that says it's the
12   captain's responsibility to ascertain the weather?
13       A. That's correct.
14       MS. SHEA: Okay. All right. Let's go off
15   for a few minutes.
16       (Discussion held off the record.)
17   BY MS. SHEA:
18       Q. And does that procedure specifically
19   discuss runway conditions or just weather?
20       A. Just, generally speaking, weather. It may
21   include phraseology about the runway. I'm not
22   certain.
23       Q. All right. But in terms of Amerijet's
24   policy that allows the captain to independently
25   assess the condition of the runway, what would you

1    referring to?
2        A. No, it is not.
3        Q. Okay. Is there another written report
4    that Al Jorsey did concerning Pat Major?
5        A. I believe there was, yes.
6        Q. Okay. And you believe or was there?
7        A. Yes, there was.
8        Q. Okay. And did it predate the termination?
9        A. Yes, it did.
10       Q. Okay. And what happened to it after it
11   was done?
12       A. I don't know.
13       Q. How did it come about that it was done?
14   Did you request it?
15       A. No, I did not.
16       Q. You don't know what prompted Al Jorsey to
17   do a report?
18       A. I think what prompted him was that as a
19   check airman on board the flight, he felt that he
20   needed to report on what he had observed during the
21   flight.
22       Q. Was it a proficiency report or a narra --
23   a letter, a narrative report?
24       A. It was a letter.
25       Q. Okay. To whom?

| | Page 179 | | Page 181 |
|---|---|---|---|
| 1 | A. I believe it was addressed to me. | 1 | specifically for the definition 6 on page 6? |
| 2 | Q. All right. And you don't know what you | 2 | A. Correct. |
| 3 | did with it? | 3 | Q. And does that allow a captain to disagree |
| 4 | A. No. | 4 | with or override a tower report? |
| 5 | Q. Have you looked for it? | 5 | A. No. It's just a definition of runway |
| 6 | A. Yes. | 6 | contamination. |
| 7 | Q. So it's not available to us in the | 7 | Q. It doesn't give a captain any authority to |
| 8 | litigation? | 8 | not take the weight decrements or the speed |
| 9 | A. Not at this time it's not. | 9 | decrements? |
| 10 | Q. And you don't remember where you filed it | 10 | A. It's strictly a definition of runway |
| 11 | or what you did with it? | 11 | contamination. |
| 12 | A. I don't recall what I did with it. And we | 12 | MS. SHEA. Let's mark as Exhibit 13 some |
| 13 | went through a move between buildings, and I've been | 13 | excerpts of the performance manual. |
| 14 | unable to locate it at this point. | 14 | (Plaintiff's Exhibit 13, excerpts of |
| 15 | Q. All right. | 15 | performance manual, was marked for identification.) |
| 16 | A. But I have tried. | 16 | BY MS. SHEA: |
| 17 | MS. SHEA: Could you mark that as 11, | 17 | Q. All right. We ran off introduction flight |
| 18 | please. | 18 | planning and take off sections of the B-727 |
| 19 | (Plaintiff's Exhibit 11, report, was | 19 | performance manual. Do you recognize those as being |
| 20 | marked for identification.) | 20 | what Exhibit 13 is? |
| 21 | BY MS. SHEA | 21 | A. Yes. |
| 22 | Q. Okay. Let me show you what was marked as | 22 | Q. All right. And is there any provision in |
| 23 | Exhibit 11. | 23 | the performance manual which gives the captain the |
| 24 | A. All right. | 24 | abilities or authority to disagree with the tower |
| 25 | Q. Have you seen that before? | 25 | report and to override a tower report of standing |

| | Page 180 | | Page 182 |
|---|---|---|---|
| 1 | A. Yes. I believe that I have. | 1 | water? |
| 2 | Q. Okay. Did Brett Wise do any other written | 2 | A. There's no specific verbiage to that, no. |
| 3 | report of the August 17th, 1999 incident? | 3 | Q. It's not addressed in that at all, is it? |
| 4 | A. I don't recall specifically if he did or | 4 | A. No. |
| 5 | not. | 5 | Q. I asked you last time whether you recalled |
| 6 | MS. SHEA. Okay. All right. Let's go | 6 | what you said were the discrepancies between the |
| 7 | back and mark as the next exhibit I guess is it 12? | 7 | tower tapes and Pat Major's report, and you |
| 8 | MS. NORTON: Do you have copies of those? | 8 | weren't -- you didn't recall the specific |
| 9 | MS. SHEA: No. She made one. | 9 | discrepancies. Do you recall those today or not? |
| 10 | MS. NORTON: The performance manual, all | 10 | A. No. |
| 11 | right. | 11 | Q. You testified previously that you did not |
| 12 | MS. SHEA: This is the Runway Analysis | 12 | participate in any meetings with anyone at the FAA |
| 13 | Manual, the excerpts of the Runway Analysis Manual. | 13 | Before Pat Major was terminated, had you had any |
| 14 | We can get more made later. | 14 | occasion to meet with anyone at the FAA concerning |
| 15 | MS. NORTON: That's fine. I didn't know | 15 | the August incident since Pat Major was terminated? |
| 16 | what it was. | 16 | A. No. |
| 17 | (Plaintiff's Exhibit 12, definition | 17 | Q. You testified that the planes that turned |
| 18 | section of Runway Analysis Manual, was marked for | 18 | back from the runway at Fort Lauderdale on August |
| 19 | identification.) | 19 | 17, 1999 did not do so because of the weather in the |
| 20 | BY MS. SHEA: | 20 | immediate vicinity but because of weather in other |
| 21 | Q. Okay. And, Mr. Huff, let me show you what | 21 | areas. Do you recall that testimony? |
| 22 | was marked Exhibit 12, which is the definition | 22 | A. I recall testifying about the airplanes |
| 23 | section of the Runway Analysis Manual; correct? | 23 | that were holding for take off, yes. |
| 24 | A. Correct. | 24 | Q. How did you document that, if at all, in |
| 25 | Q. All right. And you've produced that | 25 | terms of documenting the reasons for Pat's |

Page 183

1  termination?
2      A. It had nothing to do with the termination
3  of Pat Major.
4      Q. Okay. All right. So why were you looking
5  at that issue?
6      A. We looked at that issue based upon the
7  fact that reviewing Pat's assertions and his report.
8      Q. Okay. Because he asserted that planes,
9  certain other planes were holding because of the
10 weather?
11     A. Because he asserted that the other
12 airplanes were holding because of -- yeah, the
13 weather, that's correct.
14     Q. And in your own investigation, what did
15 you determine to be incorrect about that?
16     A. We determined basically Pat's
17 interpretation that they were holding due to the
18 fact that the runway was wet versus the fact that
19 there was weather in their departure path.
20     Q. So you would agree that there was weather
21 in the immediate departure path, in the nature of
22 storms and wind and the like?
23     A. For those aircraft that were holding, yes.
24     Q. All right. And Captain Steele did not
25 give any written report of the incident to the

Page 184

1  company before Pat was terminated; correct?
2      A. I don't recall specifically.
3      Q. You don't recall?
4      A. That's correct.
5      Q. The only one you recall is Al Jorsey's,
6  and that's lost?
7      A. Correct.
8      Q. Okay. Did you or anyone at Amerijet
9  notify John Roseborough, the POI at the FAA of Pat
10 Major's report?
11     A. I don't recall.
12     Q. You would recall if you notified John
13 Roseborough, I presume.
14     A. I wouldn't presume that.
15     Q. Okay. You may have, you may not have, you
16 don't know?
17     A. I don't recall the specifics of the
18 situation.
19     Q. Was Amerijet required to notify the POI of
20 the report?
21     A. No.
22     Q. Did Pat Major ask you to notify the POI of
23 the report?
24     A. Not that I recall.
25     Q. Who was the safety officer for Amerijet at

Page 185

1  that time?
2      A. Dave Bassett.
3      Q. Did you notify him of the report?
4      A. I'm sure that he was notified. I
5  specifically did not notify him.
6      Q. Do you have any more information today
7  than you had last time concerning the FAA
8  investigation into this incident and any actions
9  resulting from it?
10     A. No.
11     Q. Have you tried to find out in the interim
12 two months since your last deposition what, if any,
13 penalties were assessed against Amerijet as a result
14 of the investigation?
15     A. No.
16     Q. Is there a reason why not?
17     A. No.
18     Q. You're still director of operations?
19     A. That's correct.
20     Q. Who did notify Dick Bassett of Pat Major's
21 report?
22     A. I don't know.
23     Q. It wasn't your job to do that?
24     A. That's correct.
25     MS. SHEA: Would you mark that, please, as

Page 186

1  the next exhibit.
2      (Plaintiff's Exhibit 14, proficiency
3  report, was marked for identification.)
4  BY MS. SHEA:
5      Q. Let me hand you what was marked as Exhibit
6  14. Can you tell me what that is?
7      MS NORTON: Do you have an extra copy of
8  that?
9      MS. SHEA: Actually, I do.
10     A. It is a proficiency report of -- a
11 proficiency report filled out by me on Pat Major.
12 BY MS. SHEA:
13     Q. And I believe you testified previously
14 that that proficiency report is done either at the
15 person who is reviewed's request or it can be
16 initiated by the captain; correct?
17     A. That is correct.
18     Q. All right. And you performed this
19 proficiency report on Pat Major in mid 1997?
20     A. Yes.
21     Q. Do you know of any others that you
22 performed on him?
23     A. No.
24     Q. And certainly, as a captain doing a
25 proficiency report you endeavor to be as candid and

Page 187

1  fair as possible in that report; is that fair to
2  say?
3      A. Yes.
4      MS. SHEA: Off the record.
5      (Discussion held off the record.)
6      MS. SHEA: Let's mark this as 15, please.
7      (Plaintiff's Exhibit 15, report, was
8  marked for identification.)
9      MS. SHEA: Why don't you mark these next
10 two, also.
11     (Plaintiff's Exhibit 16, report, was
12 marked for identification.)
13     (Plaintiff's Exhibit 17, report, was
14 marked for identification.)
15     MS. SHEA: All right. Let's mark this as
16 an exhibit.
17     (Plaintiff's Exhibit 18, AOM and GOM
18 excerpts, was marked for identification.)
19 BY MS. SHEA:
20     Q. Sir, let me he hand you what was marked as
21 Exhibit 18. Can you tell us what that is, please?
22     A. These are excerpts from the AOM and the
23 GOM.
24     Q. All right. And are there provisions in
25 the AOM portion that relate to your testimony that a

Page 188

1  captain can independently assess the condition of a
2  runway and form an opinion independently of a tower
3  report?
4      A. There is provisions in the GOM which
5  specify that. As far as the captain's
6  responsibility?
7      Q. First I was asking about the AOM, though.
8      A. Not specifically in the AOM.
9      Q. Nothing in the AOM. What do you have from
10 the AOM?
11     A. Um, I don't have anything specifically
12 from the AOM. but what I have here from the GOM is
13 going to be what I'll rely on.
14     Q. All right. But the part of the AOM that
15 they sent over that you're not relying on is what?
16     A. I don't have that part.
17     Q. Oh, all right.
18     A. So it's not contained here.
19     Q. All right. So what are you referring to
20 from the GOM?
21     A. What's covered here in the GOM will
22 basically, I believe, mirror that's in the AOM.
23     Q. Okay. And what specific --
24     A. You're asking for what I'm relying on my
25 statement here, and this is what I'll purport as --

Page 189

1      Q. Okay. All right. But what specifically?
2      A. Page 5, chapter 1.3, the duties and
3  responsibilities of the captain.
4      MS. NORTON: I'm sorry, what was that,
5  123?
6      THE WITNESS: Chapter 1.3, page 5.
7      MS. NORTON: 1.3, okay.
8  BY MS. SHEA.
9      Q. And is there specific language in that
10 that's like a little paragraph about the duties of a
11 captain, I think?
12     A. That's correct.
13     Q. Is there language in there that
14 specifically addresses this topic?
15     A. Yes.
16     Q. Which language are you relying on?
17     A. The -- he is responsible for compliance
18 with federal aviation regulations and company
19 policies and procedures. He shall ensure the
20 aircraft to which he is assigned is airworthy,
21 properly and adequately serviced and that the
22 loading is proper and secure, make himself familiar
23 with the route and reports that -- or which indicate
24 the flight can be made safely.
25     He is responsible to ensure that all

Page 190

1  checklists and company forms are completed as
2  required by the company and any station where the
3  company does not have a maintenance crew. That's
4  basically it.
5      Q. All right. So is there a company policy
6  or procedure then that authorizes him to not accept
7  a tower dispatch advisory of a contaminated runway?
8      A. Basically, what these -- what these four
9  pages, three pages will refer to is the captain's
10 responsibility to be aware of them and to take them
11 into consideration.
12     Q. But in no other language other than what
13 you've read?
14     A. There is other language, yes. Would you
15 like me to read them all?
16     Q. Well, I'm just -- I'm just trying to
17 bottom line with you. Is there an Amerijet policy
18 or procedure that says a captain can disregard a
19 tower report of a contaminated runway in his
20 discretion?
21     A. The report of -- that is issued by a tower
22 is an advisory, that's all it is. It's to be taken
23 into consideration by the captain.
24     Q. And where does it say that? Where does
25 that come in? Where is your opinion that that can

| | |
|---|---|
| 1  be disregarded by a captain? | 1  conditions affecting the flight? |
| 2      A. I would have to refer to the Airman's | 2  BY MS. SHEA: |
| 3  Information Manual more than likely, which is an | 3      Q. Right. |
| 4  FAA-produced document. | 4      A. Yes. |
| 5      Q. The Airman's Information Manual, all | 5      Q. Okay. And so when Amerijet, and I'm |
| 6  right. So can we agree there's no Amerijet policy | 6  asking you this, you're here as the corporate |
| 7  that authorizes a captain to disregard a | 7  representative of Amerijet with the most knowledge |
| 8  contamination report? | 8  concerning why Pat Major was terminated, you |
| 9      MS. NORTON: Object to the form of the | 9  concluded that Captain Steele's conduct was |
| 10  question. It's -- | 10  permissible because of the interpretation of |
| 11      A. The captain does not need to be authorized | 11  Amerijet's policies that you've given us here? |
| 12  to do that. That is part of -- that is not -- I | 12      MS. NORTON: Object to the form of the |
| 13  mean, that is not covered. The responsibilities of | 13  question. |
| 14  a captain is to ascertain the weather conditions, | 14      A. The -- we did ascertain that Captain |
| 15  that is his responsibility. He's the pilot in | 15  Steele's handling of the situation was appropriate, |
| 16  command. That is his -- he has the authority to | 16  that's correct. |
| 17  ascertain the weather conditions. | 17  BY MS. SHEA: |
| 18  BY MS. SHEA: | 18      Q. Based on the policies that we've reviewed |
| 19      Q. All right. I'd like an answer to my | 19  here today. |
| 20  question, though. Do we agree that there is no | 20      MS. NORTON: Object to the form of the |
| 21  Amerijet policy, written policy, that states that a | 21  question. |
| 22  captain can disregard a contamination report? | 22      A. Based on industry policies and procedures, |
| 23      A. There's no specific verbiage. | 23  practices. |
| 24      Q. Anywhere -- | 24  BY MS. SHEA: |
| 25      A. To that effect. | 25      Q. Okay. And that there were no FAA |

| Page 192 | Page 194 |
|---|---|
| 1      Q. Anywhere in any of these manuals? | 1  regulations implicated in what he did. |
| 2      A. That is correct.  ' | 2      MS. NORTON: Object to the form of the |
| 3      Q. Okay. So his authority to do that, in | 3  question. |
| 4  your opinion, comes from what? | 4      A. There was no violation of FAA regulations. |
| 5      A. The authority that we give him to | 5  BY MS. SHEA: |
| 6  ascertain the weather conditions for the flight. | 6      Q. Is there -- if there's standing water of |
| 7      Q. Which is what you just read from the | 7  more than a quarter inch, what happens? |
| 8  captain's duties? | 8      A. I'd have to refer to the runway analysis |
| 9      A. Which is covered in this document that I'm | 9  to tell you what that would be. |
| 10  producing. | 10      Q. Okay. Does it provide that planes don't |
| 11      Q. Okay. Exhibit 18? | 11  take off? |
| 12      A. Correct. | 12      A. It may. |
| 13      Q. And that analysis was the basis of | 13      Q. Is that a performance parameter that a |
| 14  Amerijet's conclusion that Captain Steele was active | 14  captain could disregard? |
| 15  permissibly or correctly on August 17th? | 15      A. If that's covered in the limitation |
| 16      A. Could you restate the question? | 16  section of the AOM, which I believe it is, then he |
| 17      Q. That analysis is why Amerijet concluded | 17  would be -- he would be bound by that limitation. |
| 18  that Captain Steele's conduct on -- | 18      Q. Okay. |
| 19      A. What analysis? | 19      A. For every set of circumstances there may |
| 20      Q. The -- what you talked about in terms of | 20  or may not be something that it states yes or no. |
| 21  your interpretation of Amerijet's policies. | 21      Q. But there's nothing about the |
| 22      MS. NORTON: Object to the form of the | 22  contamination report itself that is binding on a |
| 23  question. | 23  captain? |
| 24      A. Um, the fact that the captain is -- the | 24      MS. NORTON: Object to the form of the |
| 25  captain makes the discretion as to the weather | 25  question. |

1    A. It depends. I would say it would depend
2    upon the form of the report as to whether he would
3    find it binding or not.
4    BY MS. SHEA:
5    Q. Okay. And this particular report was not
6    binding on Captain Steele, the tower report of the
7    standing water?
8    A. That's correct.
9    Q. And that's because he said he visually
10   looked at the runway?
11   A. It's because he visually ascertained the
12   conditions of the runway and that the runway report
13   itself from the -- from runway one reported some
14   standing water.
15   Q. It seems to me I read if there's standing
16   water of more than a quarter inch nobody takes off.
17   A. I believe that is the case. For a 727.
18   Q. Correct. So could Captain Steele have
19   looked out the window if there was a report of a
20   quarter inch of water and said I disagree and taken
21   off, or would he have to hold?
22   A. He may have looked out. He may have
23   looked at the runway and said that that standing
24   water was in the last 25 percent of the runway and
25   no, that that did not apply to his -- as a

1    performance situation. He might have to refer to
2    the dispatcher on duty to discuss that type of a
3    situation.
4    Q. But arguably, he could take off?
5    A. Arguably, he could.
6    Q. That's pretty scary. Are there any
7    circumstances, in your opinion, under which a
8    captain is bound absolutely by an official report?
9        MS. NORTON: Object to the form of the
10   question.
11   BY MS. SHEA:
12   Q. Concerning contamination.
13   A There is if it's -- I would say that he
14   would be -- he would be bound by a specific report
15   that might cover the specifics that 100 percent of
16   the runway covered by greater than a quarter inch.
17   Something that specifically restricted him he would
18   certainly more than likely be bound by it.
19   Q. Okay. So there's really no black or white
20   in this situation?
21   A. That's correct.
22   Q. Okay. All right. I marked as an exhibit
23   a minute ago Exhibit 15. Do you recognize that?
24   A. Not specifically, no.
25   Q. Do you recall what is it? Can you

1    identify it?
2    A. It appears to be a report.
3        MS. SHEA: Actually, could you mark this
4    as an exhibit, too.
5        (Plaintiff's Exhibit 19, cover sheet, was
6    marked for identification.)
7    BY MS. SHEA:
8    Q. All right. I just want to give you also
9    Plaintiff's Exhibit 19, which I believe is the cover
10   sheet to that. It got separated from it. So if
11   that helps you identify it.
12   A. It does, yes.
13   Q. All right. Can you now identify Exhibit
14   15 and Exhibit 18?
15   A. It appears to be a proficiency report
16   generated by Captain Brian Steele regarding Flight
17   823 on 6/8 of '99.
18   Q. All right. And did you receive that
19   report from Captain Steele in June 1999?
20   A. I believe so, yes.
21   Q Do you know whether Pete Steele or Mark
22   Bassett received the report?
23   A. I don't recall specifically.
24   Q. Do you recall discussing that report with
25   either Pete Steele or Mark Bassett -- I'm sorry,

1    Mark Stewart.
2    A. No, not specifically.
3    Q There were no meetings concerning Pat
4    Major's abilities or performance?
5    A. I don't recall the specifics of any of
6    that.
7    Q. You don't recall any meetings like that?
8    A. I don't recall any meetings, that's
9    correct.
10   Q. Okay. No discussion of disciplining or
11   terminating Pat at that time?
12   A. I don't have any recollection of that, the
13   specifics surrounding that.
14   Q. What did you do when you received that
15   report?
16   A. What I do recall of this instance was
17   discussing this situation with Pat and -- both Pat
18   and Brian.
19   Q. Separately?
20   A. Correct.
21   Q. What was the first thing that you did
22   after you got the report from Captain Steele?
23   A. I believe that I talked to each of the
24   crew members on the flight.
25   Q. But you don't have a specific

1 recollection?
2 A. No.
3 Q. Any notes or records generated from that?
4 A. No.
5 Q. What was the next thing that you did?
6 A. I believe that's the way I left it after
7 discussing the situation with both of them. I made
8 each of them aware of each other's perceptions on
9 the situation. We reviewed how they should go about
10 resolving discrepancies, something to that effect.
11 Q. And what was the advice that you gave them
12 in terms of how to go about resolving discrepancies?
13 A. That they needed to communicate with each
14 other clearly and effectively at the gate when
15 they're preparing the -- when they were preparing
16 their paperwork about the concerns that they had,
17 especially when they're done at that time.
18 Q. Let me show you what was marked Exhibit 16
19 and 17. Can you take a look at those and tell me if
20 you've seen those and identify those?
21 A. They are reports from Pat regarding the
22 same flight, this one is. And this looks like one
23 as well.
24 Q. Did you ask for a written report from Pat?
25 A. More than likely. I don't recall

1 specifically.
2 Q. And did you receive those reports from
3 him?
4 A. I believe that I did, yes.
5 Q. Did you discuss those reports with anyone
6 else?
7 A. I don't recall that I discussed them with.
8 Q. You felt that the talks that you had with
9 each of the two of them was adequate remediation for
10 the complaint that Captain Steele had made?
11 A. Yes, I did.
12 Q. There was nothing in Pat Major's reports
13 then that concerned you regarding his skill
14 development, decision-making ability?
15 A. Yes, there were things. And we discussed
16 them at the time, I believe. This is -- it's my
17 recollection this was another instance in which Pat
18 had concerns at the gate that he did not address and
19 did not come to an understanding of the situation.
20 And that was one of my -- that is one of the things
21 that we discussed is about how he -- how his
22 conflict resolution skills needed to be dealt with.
23 Q. All right. You don't recall any
24 discussions with Pete Steele about Pat at that time?
25 A. Not specifically.

1 Q. Well, generally.
2 A. No.
3 Q. Did you make any investigation into the
4 weather on June 8th?
5 A. I don't recall specifically.
6 Q. Or did you listen to any tower tapes from
7 June 8th from that incident?
8 A. No, I did not.
9 Q. Did you -- take a look at Captain Steele's
10 report. Does he make any reference at all to
11 weather in his report? I'm talking about the
12 weather in Miami.
13 A. He doesn't appear to, no.
14 Q. Did you understand when you investigated
15 this issue that Pat Major's concern was that the
16 flight was overweight for the conditions due to
17 rain?
18 A. Yes, I did understand that.
19 Q. Okay. Did you question Captain Steele as
20 to why his report did not allude to any kind of
21 rainy weather that day?
22 A. I may have. I don't recall the specifics
23 of the conversation.
24 Q. Okay. And you did not make any analysis
25 yourself of weather, a weight degradation or a speed

1 degradation should have been taken that day?
2 A. I remember that it was an issue and that
3 we did look at it and that we did not find that that
4 was a factor.
5 Q. Okay. Based on what, do you recall?
6 A. Based on the fact that -- based on the
7 fact that it was the captain's determination of how
8 wet the runway was.
9 Q. So basically, there were a lot of
10 similarities between the scenario in June and the
11 scenario in August?
12 A. That's correct.
13 Q. Okay. In your experience at Amerijet, in
14 the many years that you've been there, have you ever
15 known of a plane to have more actual weight than
16 reported weight?
17 A. More actual weight than reported weight,
18 not specifically, no.
19 Q. I'm not really asking you specifically.
20 But, sir, isn't it a fact that all pilots at your
21 company have from time to time questioned weight
22 reports and admitted the possibility, if not
23 demonstrated that there's more weight on board than
24 is reported?
25 MS. NORTON: Object to the form of the

Page 203

1  question.
2      A. Um, there, on certain occasions there have
3  been captains that have asked to have freight
4  reweighed, yes.
5  BY MS. SHEA:
6      Q. Okay. Have you ever heard of the
7  expression ghosting fuel?
8      A. Only as it applied to as far as it was in
9  one of Pat's letters.
10     Q. Do you know what that would refer to?
11     A. I believe he's referring to somebody
12  hiding fuel on the aircraft.
13     Q. Under reporting the volume of fuel or the
14  weight of fuel?
15     A. Correct.
16     Q. Is that a practice or an instance that you
17  ever, ever heard of at Amerijet?
18     A. No.
19     Q. So you would deny that that's ever
20  happened?
21     A. I wouldn't deny that it's happened, but
22  I'm not aware of it happening.
23     Q. When you investigated the June 8th, 1999
24  incident, what, if any, findings did you make
25  concerning whether Captain Steele permissibly used

Page 204

1  flaps 40, as was part of the discussion after that
2  flight?
3      A. I believe that we discussed with Brian the
4  fact that he should not be using flaps 40.
5      Q. Was it not in fact an FAA violation for
6  him to use a flaps 40 setting on a 727 with a hush
7  kit?
8      A. It was not permitted, that's correct.
9      Q. So that was an FAA violation that Captain
10  Steele committed that was brought out in this
11  investigation?
12     A. It was a violation of the aircraft
13  limitations based on -- not based on anything
14  structural, but based on the noise limitations that
15  are in place within the United States that are not
16  in place in the airport that he was landing at.
17     Q. And what, if any, consequences were there
18  for Captain Steele of your finding that he had
19  committed this violation?
20     A. He was advised not to do it. That was
21  basically the end of it.
22     Q. And was that a matter that was discussed
23  with Pete Steele or Mark Stewart or anyone above
24  your level at Amerijet?
25     A. I believe I did discuss that with Pete

Page 205

1  Steele at the time.
2      Q. And agreed that a reprimand was sufficient
3  discipline for that?
4      A. We agreed that -- yes, that it was a
5  new -- it was a new scenario that the crews were
6  dealing with as far as having recently installed the
7  hush kits on the aircraft. And although it was not
8  a safety factor as far as doing the operation, it
9  was not -- we educated the crews as to the fact that
10  although it was not a safety issue, it's still part
11  of the STC of the airplane and that they had to
12  comply with it.
13     Q. All right. So Captain Steele had been
14  trained on this before that flight?
15     A. That's correct. What Captain Steele was
16  attempting to do by utilizing that flap setting was
17  to increase the safety margin on that landing. And
18  we understood why he was doing it. However, again,
19  we counseled him that that was not appropriate.
20     Q. Wasn't it Pete Steele who had advised all
21  the captains and all the pilots that use of that
22  setting was illegal a number of months before the
23  flight?
24     A. I'm not aware of that.
25         MS. SHEA: Can you mark that, please.

Page 206

1          (Plaintiff's Exhibit 20, memo, was marked
2  for identification.)
3          MS. SHEA  Do you want to take a look at
4  this?  I don't have an extra.
5  BY MS. SHEA:
6      Q. Let me show you what has been marked
7  Exhibit 20. Do you recognize that?
8      A. Yes.
9      Q. Okay. And what is that?
10     A. That is a memo from me to Juan Morales
11  summarizing the meeting that we had with Pat.
12     Q. And why did you prepare the memo?
13     A. As a record of my understanding of the
14  meeting.
15     Q. Was it agreed at that meeting that there
16  would not be anything reflected in Pat's personnel
17  file concerning the stalking charge?
18     A. I don't recall the specifics of the
19  meeting itself.
20     Q. Okay. Does that memo help to refresh your
21  recollection in that regard?
22     A. Yes, it does. Item number 4 says that
23  Juan offers to exclude the letter from Pat's
24  personnel file regarding there were no further
25  complaints. Pat agrees.

Page 207

1  Q. And we've never seen, and I guess you
2  don't have available the letter that's referred to;
3  is that correct?
4  A. That's correct.
5  Q. And there's no documentation of Tim
6  Green's complaint around today, that you're aware
7  of?
8  A. I'm not -- I don't know what's around
9  regarding his complaint. Obviously, this memo. And
10  I don't know what else other than that.
11  Q. You don't even -- at least when you met
12  with Tim you're not sure whether Tim had ever
13  complained in writing or just orally?
14  A. I don't recall specifically.
15  Q. So in this memorandum you tried to set
16  forth your understanding of what had happened at the
17  meeting?
18  A. Um-hum. Yes.
19  Q. Okay. And you didn't include anything in
20  your memorandum about Pat Major rambling
21  incoherently for an hour about unrelated topics, did
22  you, sir?
23  A. No.
24  Q. And there was not any discipline of Pat
25  Major as a result of this incident; isn't that

Page 208

1  correct?
2  A. I believe that's the way we left it, yes.
3  MS. SHEA: Okay. Let's mark this, please.
4  (Plaintiff's Exhibit 21, flier, was marked
5  for identification.)
6  MS. SHEA: Let me show you what was marked
7  Exhibit 21.
8  BY MS. SHEA:
9  Q. Let me hand you Exhibit 21 and see if
10  you've ever seen that before.
11  A. Have I ever seen it before?
12  Q. Yes.
13  A. No.
14  Q. You didn't get one of those in the mail.
15  Do you recall being aware in early 1999 that Tim
16  Green had been the recipient of a large verdict as
17  described in that flier?
18  A. No.
19  Q. You weren't aware of that?
20  A. In early 1991?
21  Q. '99.
22  A. No, I don't believe so.
23  Q. Do you remember what it was -- when he
24  complained about Pat Major, did he tell you that it
25  was about a lawsuit or about injuries or anything?

Page 209

1  A. It was about -- I believe yes, that it
2  was -- it was concerning the -- a lawsuit that he
3  had against Amerijet or a settlement that he had
4  against Amerijet and that Pat was disclosing --
5  disclosing the results of that to cockpit crew
6  members, something to that effect.
7  Q. All right. Had Tim Green sued Amerijet?
8  A. I don't know what the specifics of it
9  were.
10  Q. That was the gist of his complaint, that
11  Pat was discussing this matter with other crew
12  members?
13  A. And that Pat was repeatedly confronting
14  him about the issue when he had asked him to stop.
15  Q. Who prepares contamination reports at the
16  Fort Lauderdale Airport, who generates those?
17  A. The airport itself.
18  Q. The aviation authority?
19  A. Broward County Aviation Department.
20  Q. Okay. Isn't it a fact that there are
21  trained people who go out and review the runway in
22  order to make those reports?
23  A. I don't know the specifics of the training
24  involved.
25  Q. Okay. I asked you this two months ago, I

Page 210

1  assume the answer is the same, but has Amerijet
2  changed any of its policies as it relates to wet
3  runways or contamination reports since the incident
4  with Pat Major in August of '99?
5  MS. NORTON: Object to the form of the
6  question.
7  A. Not that I'm aware of.
8  BY MS. SHEA:
9  Q. What becomes of proficiency reports when
10  they're received at Amerijet?
11  A. They're kept on file.
12  Q. In what file?
13  A. The training department's file.
14  Q. Do they all go through you as the chief
15  pilot, or whoever the chief pilot is?
16  A. Not necessarily, no.
17  Q. Before you terminated Pat's employment,
18  did you review his training records?
19  A. I don't recall.
20  Q. So if I asked you the number or nature of
21  proficiency reports against him at the time that you
22  terminated him, what's your answer?
23  A. I don't recall.
24  MS. SHEA: Okay. As I understand it from
25  counsel, Mr. Huff is not the corporate

DOWNTOWN REPORTING                    Page 207 - Page 210

1  representative on the FAA investigation, the EEOC
2  charge or criteria for promotion to captain before
3  he became official chief pilot; is that correct?
4       MS. NORTON: Right. Before he became
5  acting chief pilot.
6       MS. SHEA: Yes. Okay.
7       MR. MAJOR: Do you know what the date of
8  that was?
9  BY MS. SHEA:
10      Q. When did you become acting chief pilot?
11      A. Early February of '99.
12      MS. SHEA: Okay. All right, sir, I think
13  we're concluded. Thank you.
14      MS. NORTON: I may have one or two
15  questions for you. Can you give me just a few
16  minutes?
17      MS. SHEA: You want a break?
18      MS. NORTON: Yes, just a few.
19      (Brief recess was taken.)
20      MS. NORTON: I don't have any questions.
21      (Deposition concluded at 12:05 p.m.)
22
23
24
25

Page 212

1            CERTIFICATE OF OATH
2
3  STATE OF FLORIDA          )
4  COUNTY OF BROWARD         )
5
6
7       I, the undersigned authority, certify that
8  DERRY S HUFF personally appeared before me and was
9  duly sworn.
10
11      WITNESS my hand and official seal the 11th
12  day of January, 2001.
13
14
15
16
17  BEVERLY J GRAMM, RPR
18  Notary Public - State of Florida
    My Commission Expires: 12/19/03
19
20
21         BEVERLY J. GRAMM
22         My Comm Exp 12/19/03
           No. CC 896700
23         [ ] Personally Known [ ] Other I.D.
24
25

1       REPORTER'S DEPOSITION CERTIFICATE
2
3  STATE OF FLORIDA          )
4  COUNTY OF BROWARD         )
5
6       I, BEVERLY J. GRAMM, Registered
7  Professional Reporter, certify that I was authorized
8  to and did stenographically report the deposition of
9  DERRY S. HUFF, that a review of the transcript was
10 not requested; and that the transcript is a true and
11 complete record of my stenographic notes.
12      I further certify that I am not a
13 relative, employee, attorney or counsel of any of
14 the parties, nor am I a relative or employee of any
15 of the parties' attorneys or counsel connected with
16 the action, nor am I financially interested in the
17 action.
18
19      DATED this 11th day of January, 2001.
20
21
22 BEVERLY J GRAMM, RPR
   Notary Public - State of Florida
23 My Commission Expires: 12/19/03
24
25

Page 214

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

'99 [4] 197:1 208:7
210:4 211:11
00 [2] 151:0 153:14
00-6070-Ferguson/Snow
[1] 151:0
05 [2] 151:0 211:21
1 [1] 157:4
1.3 [3] 189:2 189.6
189:7
10 [5] 151:0 152:10
153.14 177:20 177.24
100 [1] 196:15
1000 [1] 153:12
10th [1] 168:19
11 [4] 152:11 179:17
179:19 179.23
11th [2] 212:11 213:19
12 [6] 151:0 152:12
180.7 180:17 180:22
211.21
12/19/03 [2] 212:18
213:23
123 [1] 189.5
13 [4] 152:13 181:12
181:14 181:20
14 [3] 152:14 186:2
186:6
15 [5] 152:15 187:6
187:7 196:23 197:14
153 [1] 152:3
16 [3] 152:16 187:11
199.18
17 [4] 152:17 182.19
187:13 199:19
170 [2] 152:8 152.9
177 [1] 152:10
179 [1] 152:11
17th [3] 170:22 180:3
192:15
18 [5] 152:18 187:17
187.21 192:11 197:14
180 [1] 152.12
181 [1] 152:13
186 [1] 152:14
187 [4] 152:15 152:16
152:17 152:18
19 [3] 152:19 197.5
197.9
197 [1] 152.19
1991 [1] 208.20
1997 [1] 186:19
1999 [8] 154:1 170.22
174:21 180:3 182:19
197:19 203:23 208:15
1st [1] 177:7
2 [1] 151:0
20 [3] 152:20 206.1
206:7
2000 [1] 166:3
2001 [4] 151:0 153:14
212:12 213:19
206 [1] 152:20
208 [1] 152:21

21 [4] 2:2 208:4
208:7 208:9
25 [1] 195.24
3 [1] 159:11
30th [1] 166:23
31st [1] 166:3
4 [5] 159:15 160:6
162:1 168:20 206:22
40 [3] 204:1 204.4
204:6
5 [4] 160.7 162:2
189:2 189:6
500 [2] 151:0 153:12
522-3376 [1] 151:0
6 [5] 163:22 165:2
170:19 181:1 181:1
6/8 [1] 197:17
7 [1] 155·7
727 [3] 166·5 195:17
204:6
8 [3] 151:0 152:8
170:1
823 [1] 197:17
8th [5] 153.13 153:25
201:4 201:7 203:23
9 [2] 152:9 170.3
954 [1] 151:0
99-021746-11 [1]
151:0
a.m [2] 151:0 153.14
abilities [2] 181.24
198.4
ability [12] 154:11
157:6 157:16 158:1
158:2 158:25 159:11
159:22 160:3 160:19
163:18 200:14
able [1] 175.24
above [2] 153:20
204:23
above-entitled [1]
153.4
absolutely [1] 196:8
accept [1] 190:6
acting [2] 211:5
211:10
action [2] 213:16
213:17
actions [1] 185:8
active [1] 192:14
actual [3] 171:5
202:15 202:17
address [1] 200:18
addressed [2] 179:1
182:3
addresses [1] 189:14
adequate [1] 200.9
adequately [1] 189:21
admissible [2] 166:8
169:4
admitted [1] 202:22
advance [1] 156:6
advice [1] 199:11

advised [2] 204:20
205.20
advisory [2] 190:7
190.22
affecting [1] 193:1
affirmatively [1]
175:14
again [5] 160:10 160:19
162:18 175:22 205:18
against [4] 185.13
209:3 209.4 210.21
age [2] 153:2 153:19
ago [3] 167:11 196.23
209:25
agree [4] 168:18 183:20
191:6 191.20
agreed [4] 170:6
205:2 205.4 206:15
agrees [1] 206:25
ahead [1] 172:6
aircraft [11] 170:1
170:14 170.15 173:4
173:5 176:10 183.23
189:20 203:12 204:12
205·7
airline [1] 164:16
168:22 170:11 170.11
airman [5] 157:6
158:3 158:25 162:23
178:19
Airman's [2] 191:2
191:5
airplane [9] 164:2
164:17 166:5 166:21
170:10 170:11 170:12
170.13 205:11
airplanes [2] 182:22
183:12
airport [3] 204:16
209:16 209:17
airports [4] 174.2
174:3 174:4 174:5
airworthy [1] 189:20
Al [4] 177:15 178:4
178:16 184.5
ALLEN [1] 151:0
allow [1] 181:3
allowing [2] 171:25
175:10
allows [11] 176:24
allude [1] 201:20
alphabetically [1]
174:1
Amerijet [24] 151:0
153·5 154:17 156:10
156:14 162:4 184.8
184·19 184:25 185:13
190.17 191:6 191:21
192:17 193:5 193·7
202:13 203:17 204:24
209:3 209.4 209·7
210:1 210:10
Amerijet's [8] 160:25
161:6 162:14 162.20
176:23 192:14 192:21
193:11

Am. 1st [1] 159:25
analysis [16] 163:10
165:3 170.3 170:16
171:19 172:18 176:7
180:12 180:13 180:18
180.23 192:13 192:17
192.19 194:8 201:24
answer [5] 172:6
175:12 191:19 210.1
210:22
answered [2] 154:25
172:10
anticipate [2] 168.8
169:20
AOM [12] 165:7
187:17 187:22 187:25
188:7 188:8 188:9
188:10 188:12 188:14
188:22 194:16
appear [1] 201:13
APPEARANCES [1]
151:0
appeared [1] 212:8
Appearing [2] 151:0
151:0
applied [1] 203:8
apply [1] 195:25
appointment [1] 154:4
appreciate [1] 166:14
appropriate [2] 193:15
205:19
areas [1] 182:21
arguably [2] 196:4
196:5
ascertain [7] 173:13
175:12 176:12 191:14
191:17 192·6 193:14
ascertained [1] 195:11
ascertaining [1] 165:9
asserted [1] 183:8
183:11
assertions [1] 183·7
assess [2] 176:25
188:1
assessed [1] 185:13
assessment [3] 170:21
176:4 176.5
assigned [1] 189:20
assume [1] 210:1
attempting [1] 205:16
attended [1] 155:23
attorney [2] 152.24
213:13
Attorney/client [1]
158:16
attorneys [1] 213:15
August [9] 156:13
170:21 174:21 180:3
182:15 182:18 192:15
202:11 210.4
authenticity [1] 155:18
authority [7] 181:7
181:24 191:16 192:3
192:5 209:18 212:7
authorized [2] 191:11

authorizes [2] 190:6
191:7
available [3] 164:1
179.7 207:2
average [1] 175:6
aviation [3] 189:18
209:18 209:19
aware [9] 154:18
190:10 199.8 203:22
205:24 207·6 208:15
208:19 210.7
B [1] 152:5
B-1 [1] 163:13
B-727 [3] 171:11
171:23 181:18
balance [6] 160:16
160:23 161:1 161:4
161:16 161:24
based [11] 159:12
161:4 183:6 193:18
193:22 202:5 202·6
202:6 204:13 204.13
204:14
basis [5] 168.25 172:11
175:24 176:3 192:13
Bassett [4] 185:2
185:20 197:22 197:25
became [2] 211:3
211:4
become [1] 211:10
becomes [1] 210:9
beforehand [1] 158.8
behalf [2] 151:0
151:0
between [5] 158:12
160:22 179:13 182·6
202:10
BEVERLY [4] 153·8
212:17 213:6 213:22
big [1] 168:17
binding [1] 194:22
195·3 195:6
black [1] 196:19
BLUE [1] 151:0
Blvd [1] 151:0
board [3] 162:23
178:19 202:23
Boeing [1] 166:5
bogged [1] 173:20
bottom [2] 170:7
190:17
Boulevard [1] 153:12
bound [4] 194:17
196:8 196.14 196:18
break [4] 169:13 169:14
174:13 211:17
Brett [1] 180:2
Brian [4] 164:22
197:16 198:18 204:3
Brief [1] 211:19
bring [1] 170:16
broad [2] 166·7
169:1
brought [5] 158:18

164:16   169:10   173:23
204:10

**Broward** [5]        151:0
153:12   209:19   212:4
213:4

**buildings** [1]        179:13

**bulk** [1] 173.22

**burden** [2]        167:25
169:22

**burdensome** [1] 166:7

**calculated** [1]    166:8

**candid** [1]        186:25

**captain** [48]      162:22
166:10   170:20   171:25
173:7    175:10   175:12
176:4    176:24   181:3
181.7    181:23   183:24
186:16   186:24   188:1
189:3    189:11   190:18
190:23   191:1    191:7
191:11   191:14   191:22
192:14   192:18   192:24
192:25   193:9    193:14
194:14   194:23   195:6
195:18   196:8    197:16
197:19   198:22   200:10
201:9    201:19   203:25
204:9    204:18   205:13
205:15   211:2

**captain's** [7]        165:7
173:13   176:12   188:5
190:9    192:8    202:7

**captains** [3]        163:18
203:3    205:21

**case** [3]  151:0    151:0
195:17

**certain** [4]        175:19
176:22  183:9    203.2

**certainly** [2]        186:24
196:18

**CERTIFICATE** [2]
212:1   213:1

**certified** [1]        155:16

**certify** [3]        212:7
213:7   213:12

**chance** [1]        155:10

**change** [1]        160:22

**changed** [1]        210:2

**chapter** [2]        189:2
189:6

**charge** [2]        206:17
211:2

**check** [2]        162:23
178:19

**checklists** [1]        190:1

**chief** [5] 210:14  210:15
211:3    211:5    211:10

**choose** [1]        171.25

**circumstances** [3]
173:9    194:19   196:7

**citations** [1]        164:12

**cited** [1] 164:18

**Civil** [1] 169:6

**clarified** [1]        169:2

**clearance** [1]        169:9

**clearly** [2]        169:4

**cockpit** [1]        209.5

**combination** [2] 157:12
159:25

**coming** [1]        177.1

**command** [1]        191:16

**commencing** [1] 153:14

**comment** [1]        160:9

**comments** [1]        160:6

**Commission** [2] 212.18
213.23

**committed** [2]    204:10
204:19

**communicate** [1]
199:13

**company** [8]        162:23
184.1    189:18   190:1
190:2    190:3    190:5
202:21

**compel** [1]        168:3

**complained** [2] 207:13
208.24

**complaint** [4]        200:10
207:6    207:9    209:10

**complaints** [1]    206:25

**complete** [6]        166:4
166:15   169:15   169:17
170:16   213:11

**completed** [1]        190:1

**completely** [1]    174:20

**compliance** [1] 189:17

**comply** [1]        205:12

**concern** [2]        159:11
201:15

**concerned** [2]        156:14
200:13

**concerning** [9]    178:4
182:14   185:7   193:8
196:12   198.3    203:25
206:17   209.2

**concerns** [2]        199:16
200:18

**concluded** [5]    161:20
192:17   193:9   211:13
211:21

**conclusion** [1]    192.14

**condition** [3]    175:13
176:25   188:1

**conditions** [14]    160:22
161:2    161:5    161:15
161:21   165.10   170:21
176:19   191.14   191:17
192:6    193.1    195:12
201:16

**conduct** [2]        192:18
193:9

**confidence** [1]    157:6
158:2    158:25

**confident** [1]        166:11

**conflict** [1]        200:22

**confronting** [1] 209:13

**connected** [1]        213:15

**consequences** [1]
204:17

**consideration** [5]
162.4    170:24   172:1
190:11   190.23

**considered** [2]    161.7
161.11

**consistent** [2]    174.21
175:10

**contained** [1]        188:18

**contaminated** [2]
190.7    190.19

**contamination** [9]
163:8    181:6    181:11
191:8    191:22   194:22
196:12   209:15   210.3

**context** [3]        172:13
172:23   173.6

**continuation** [1]
153:24

**continuing** [1]    159.17

**conversation** [4]
156.17   158:7   159:5
201:23

**conversations** [1]
158:12

**copied** [4]        173:1
173:22   174:14   174:25

**copies** [2]        169:24
180:8

**copy** [3] 163:20    166:4
186:7

**corporate** [5]        154:17
164:13   175:23   193:6
210:25

**correct** [57]        154.1
155:1    156.3    156.4
156:7    156.11   159.1
160:5    160:11   161:3
161:6    161:8    161:9
161:10   161:22   161:23
161:25   162:5    162:10
162:15   163:3    170:11
170:17   172:21   172:24
173:15   174.19   174:23
176:13   180:23   180.24
181:2    183:13   184:1
184:4    184:7    185:19
185:24   186.16   186.17
189:12   192:2    192:12
193:16   195:8    195:18
196:21   198:9    198:20
202:12   203.15   204:8
205:15   207.3    207:4
208:1    211:3

**correctly** [1]        192:15

**corresponded** [1]
167:22

**correspondence** [2]
165:25   167:7

**counsel** [2]        158:8
158:12   177:25   210:25
213:13   213:15

**counseled** [1]    205:19

**County** [3]        209:19
212:4    213:4

**course** [2]        163:2
167:21

**court** [3] 151.0    153:7
155:16

**cov...** [1] 177.4    196:15
197.5    197:9

**coverage** [1]        175.17

**covered** [6]        175:3
188.21   191:13   192:9
194:15   196:16

**crew** [3] 190:3    198:24
209:5    209:11

**crews** [2]        205:5
205:9

**criteria** [1]        211:2

**cute** [1] 165.21

**D** [1]        152:1

**D.H** [1] 157:8

**date** [1] 211.7

**DATED** [1]        213:19

**Dave** [1] 185:2

**days** [1] 168:20

**dealing** [1]        205:6

**dealt** [1] 200:22

**decide** [2]        169:17
175:11

**decided** [2]        158.9
158:24

**deciding** [1]        156:15

**decision** [2]        156:5
165:11   170:21

**decision-making** [4]
159:11   159:22   160.19
200:14

**decrement** [1]    171:5

**decrements** [3]    163:12
181:8    181:9

**defendant** [4]        151:0
151:0    153:6    166:6

**defer** [1] 177:5

**define** [1]        165:23

**defined** [1]        175:5

**defines** [1]        175:8

**definition** [15]    163:7
163:17   163:23   165:3
169:6    171:13   174:9
175:4    175:7    176:6
180:17   180:22   181:1
181:5    181:10

**definitions** [2]    163:22
170:19

**degradation** [2] 201:25
202:1

**degradations** [5]
163:1    164:23   172:8
172:15   173:8

**deliberately** [2] 156.18
157:20

**demonstrated** [1]
202:23

**deny** [2] 203:19   203:21

**departed** [2]        160.18
160:24

**Department** [1] 209:19

**department's** [1]
210:13

**departure** [2]        183:19
183:21

**depend** [1]        195:1

**deposition** [22]    151:0
153:1    153:25   154:16
154.24   155:7    164:20
166.11   166.14   167:4
167:10   167:22   168:14
168:21   169:25   171:9
175:23   177:14   185:12
211:21   213:1    213:8

**depths** [1]        163:14

**Derry** [8]        151:0
153:1    153:17   168:21
169:7    169:14   212:8
213:9

**described** [1]        208:17

**determination** [1]
202:7

**determine** [1]        183.15

**determined** [1]        183:16

**developed** [3]        157:13
159:13   159:13

**development** [2]
159:22   200:14

**Dick** [1] 185.20

**different** [6]        159:16
159:17   159:23   162.12
162:24   174.5

**differing** [1]        162:17

**direct** [3]        152:3
153:22   156:24

**director** [1]        185:18

**disagree** [1]        181:3
181:24   195:20

**discipline** [2]    205:3
207:24

**disciplining** [1] 198:10

**disclosing** [2]    209.4
209:5

**discovery** [3]        153.3
166:8   168:2

**discrepancies** [4]
182:6    182:9    199.10
199:12

**discretion** [2]    190.20
192:25

**discuss** [6]        156:8
158:14   176:19   196:2
200:5    204:25

**discussed** [7]        158:14
177:2    200:7    200:15
200:21   204:3    204:22

**discussing** [4]    197:24
198:17   199:7    209:11

**discussion** [6]    154.22
166:19   176:16   187:5
198:10   204:1

**discussions** [1] 200:24

**dispatch** [1]        190:7

**dispatcher** [1]        152:1

**disregard** [5]        163:18
190.18   191:7    191:22
194:14

**disregarded** [1] 191.1

**District** [4]        151:0
151:0    153:6    153:7

**document** [6]        155:6

191.4    192.9
documentation [1]
207:5
documenting [1]
182:25
documents [4]    154:25
172:12   172:13    177:13
doesn't [2]    181.7
201:13
done [7]  155.15   155:15
164:12   178:11   178:13
186:14   199:17
down [1] 173:20
downstairs [1]   173.21
DOWNTOWN [1]
151:0
dry [4]    161:2    161:7
161:11   163:14
due [3]    157:5    183:17
201:16
duly [2]  153:19   212.9
during [1]    178:20
duties [3]    189:2
189:10  192.8
duty [1] 196:2
E [2]    152:1    152:5
early [3] 208:15   208.20
211:11
East [2]  151:0    153:12
educated [1]    205.9
EEOC [1]    211.1
effect [5]    157:18
157:19  191.25   199:10
209.6
effectively [1]   199:14
either [2]    186:14
197.25
employee [2]   213:13
213:14
employment [1] 210:17
end [1]  204:21
endeavor [1]    186:25
ensure [2]    189.19
189:25
entire [1]    168.22
entitled [1]    169:3
entry [1] 157:8
especially [1]   199.17
ESQUIRE [2]    151:0
151:0
event [1] 162:18
evidence [3]    153:3
166:9   169:4
EXAMINATION [2]
152.3   153:22
excerpts [6]    170:25
180:13  181:13   181:14
187:18  187:22
exclude [1]    206.23
exhibit [51]    152:8
152:9   152:10   152:11
152:12  152:13   152:14
152:15  152:16   152:17

152:21   155:7    170:1
170.3   174:14   177:20
177.23  179:19   179:23
180:7   180:17   180.22
181:12  181:14   181.20
186:1   186:2    186:5
187.7   187.11   187:13
187:16  187:17   187:21
192.11  196:22   196:23
197.4   197:5    197.9
197.13  197:14   199.18
206:1   206.7    208.4
208.7   208.9
exhibits [4]    152:24
154.25  155.5    169:25
expect [1]    155:18
experience [1]   202.13
Expires [2]    212.18
213:23
expression [1]   203:7
extent [3]    158:13
158.14  172.4
extra [2] 186.7   206:4
Eyesight [1]    154:8
FAA [10]
182:12  182:14   184:9
185:7   193:25   194:4
204:5   204.9    211:1
FAA-produced [1]
191:4
fact [15] 157:5   157.12
159.12  162:21   183.7
183.18  183:18   192.24
202.6   202:7    202:20
204:4   204:5    205:9
209.20
factor [3]    156:15
202.4   205:8
fair [2]  187:1   187.1
familiar [1]    189:22
far [5]   174:4   188:5
203.8   205.6    205:8
faulted [1]    165:24
faulting [1]    160:7
fax [4]   168:20   169:19
170.5   170.6
February [1]    211.11
federal [1]    189:18
felt [2]  178:19   200.8
few [3]   176.15   211:15
211:18
field [1] 161:5
file [5]  206:17   206.24
210:11  210:12   210:13
filed [3] 153.8   153:18
179:10
filled [1] 186.11
financially [1]   213:16
finding [1]    204:18
findings [1]    203:24
fine [5]  158:13   167:24
168.6   173:2    180:15
fired [2] 158:10   158:24
firing [1]    157:23
first [7] 155:3   157:3

171.14  160.1    160.5
188:7   198.21
flap [1]  205:16
flaps [3] 204:1    204:4
204.6
flier [2] 208.4   208:17
flight [14]    160:18
178.19  178:21   181:17
189.24  192:6    193.1
197:16  198.24   199:22
201:16  204:2    205.14
205:23
Florida [9]    151:0
151:0   153:7    153:10
153:13  212:3    212:18
213:3   213.22
follow [1]    176:5
follows [1]    153:21
Foreign [1]    174:3
form [17]    156:20
158:11  162:8    171:3
172.2   177.9    188:2
191.9   192:22   193:12
193.20  194:2    194:24
195.2   196.9    202:25
210.5
forms [1]    190:1
Fort [6]  151:0   153:13
174:7   174:8    182:18
209:16
forth [1] 207:16
four [1] 190.8
freight [1]    203:3
friendly [1]    169:13
front [2] 174.11
fuel [4]  203:7   203:12
203.13  203:14
games [1]    166.13
gate [2]  199:14   200:18
geared [1]    165.4
generally [2]    176:20
201.1
generated [2]    197.16
199:3
generates [1]    209:16
ghosting [1]    203:7
gist [1]  209:10
given [1] 193:11
GOM [6]    187:17
187:23  188.4    188:12
188:20  188.21
Gordon [2]    151:0
153:11
GRAMM [4]    153:8
212:17  213.6    213:22
greater [1]    196.16
Green [2]    208:16
209:7
Green's [1]    207:6
guess [2] 180.7   207:1
H [1]    152:5
half [3]  173.25   174:1
174:2
hand [5] 155.5   186:5
187.20  208.9    212:11

han    ng [1]    193:15
happening [1]    203:22
happy [1]    167:7
Hargrove [2]    151:0
153:11
head [1] 175:21
heard [2] 203.6    203:17
Heinrich [2]    151:0
153:11
held [4]  154:22   166.19
176.16  187:5
help [1] 206:20
helps [1] 197.1
heretofore [2]    153.8
153:18
hiding [1]    203:12
himself [1]    189.22
hold [1] 195:21
holding [5]    182:23
183.9   183:12   183:17
183:23
hope [1] 165:21
hour [1] 207.21
Huff [10]    151:0
153:1   153:17   153:24
169.7   170:10   180:21
210.25  212:8    213:9
Huff's [3]    166:10
168:21  169.1
huge [1] 167.19
hush [2] 204:6   205:7
ice [1]  163:15
identification [15]
152:7   170.2    170:4
177.21  179:20   180:19
181:15  186:3    187.8
187:12  187.14   187:18
197:6   206:2    208:5
identified [1]    164:21
identify [4]    197:1
197:11  197:13   199:20
illegal [1]    205:22
immediate [2]    182:20
183:21
immediately [1] 173:10
implicated [1]    194:1
implying [2]    160:13
160:14
INC [2]  151:0   153:5
inch [5] 175:9   194:7
195:16  195:20   196:16
incident [8]    180:3
182:15  183:25   185:8
201:7   203:24   207:25
210:3
include [2]    176:21
207:19
incoherently [1] 207:21
incorporating [1]
171:24
incorrect [1]    183.15
increase [1]    205:17
independently [3]
176.24  188:1    188.2

indicate [2]    163:13
189:23
industry [1]    193:22
information [3] 185:6
191.3   191.5
initiated [1]    186:16
injuries [1]    208:25
installed [1]    205:6
instance [3]    198:10
200.17  203:16
intention [2]    156:24
157:1
interested [1]    213:16
interfere [1]    154:11
interim [1]    185:11
INTERNATIONAL
[2]    151:0    153:5
interpretation [3]
183:17  192:21   193:10
interrogation [1]
166:16
introduction [1] 181:17
investigated [2] 201:14
203:23
investigation [7]
161:14  183:14   185:8
185:14  201:3    204:11
211:1
involved [1]    209:24
isolate [1]    172:22
issue [6] 183:5    183:6
201:15  202:2    205:10
209:14
issued [1]    190:21
issues [1]    156:9
item [3] 166:4    168:20
206:22
itself [5] 171:5    194:22
195:13  206:19   209:17
J [4]    153:8    212:17
213:6   213:22
James [1]    151:0
153:12
January [4]    151:0
153.13  212:12   213:19
job [1]  185:23
John [3] 155.23   184.9
184:12
Jorsey [3]    177:15
178:4   178:16
Jorsey's [1]    184.5
Juan [2] 206:10   206:23
June [5] 197:19   201:4
201:7   202:10   203:23
kept [1] 210:11
kind [2] 177:15   201:20
kit [1]  204:7
kits [1] 205:7
knowledge [1]    193:7
known [1]    202:15
L.T [1]  151:0
landing [2]    204:16
205:17
language [5]    189:9

**DERRY S. HUFF**                    **Condensed!t** ™

189:13   189:16   190:12
190:14

**large** [2] 153:10   208:16

**last** [15] 155:5   158:17
163:16   165:5   165:23
165:24   167:10   171:8
171:12   171:24   175:2
182:5   185:7   185:12
195:24

**Lauderdale** [6] 151:0
153:13   174:7   174:8
182:18   209:16

**law** [1] 153:10

**lawful** [2] 153.2
153:19

**lawsuit** [2] 208.25
209:2

**lead** [1] 166.8

**least** [1] 207:11

**leave** [2] 154:3   172:4

**left** [3] 155:4   199.6
208:2

**length** [1] 175:16

**letter** [11] 164:15
165:4   165:17   167:6
168:7   168:10   168:19
178:23   178:24   206:23
207:2

**letters** [3] 168:5
169:25   203:9

**level** [3] 159:13   159:22
204:24

**light** [3] 162.14   163:1
169:1

**likely** [3] 191.3
196:18   199:25

**limitation** [2] 194:15
194:17

**limitations** [2] 204:13
204:14

**line** [3] 156:13   170:7
190.17

**listen** [1] 201.6

**litigation** [1] 179:8

**loading** [1] 189:22

**locate** [1] 179:14

**longer** [1] 156:9

**look** [7] 155:10   164.19
171:11   199:19   201:9
202:3   206:3

**looked** [6] 179:5
183:6   195:10   195:19
195:22   195:23

**looking** [2] 175:2
183:4

**looks** [2] 174:17   199:22

**loss** [1] 158:24

**lost** [4] 157:6   158:1
158:2   184:6

**mail** [1] 208:14

**maintenance** [1] 190:3

**major** [20]   151:0
153:4   155:9   157:10
158.23   160:8   177:7
178:4   182:13   182:15
183:3   184:22   186:11

186:19   3.8   207:20
207:25   208:24   210:4
211:7

**Major's** [7]   177:16
182:7   184.10   185.20
198:4   200:12   201:15

**makes** [2]   175:15
192:25

**manual** [49]   163:9
164.2   164:17   166:5
166:12   166:21   167:19
168:23   169.19   170.2
170.11   170:13   170:15
170:17   171:1   171:12
171:15   171:19   171:20
171:23   172:9   172.14
172:15   172.16   172:17
172:20   172:23   173:5
173.6   173:23   174:17
175.4   175:8   175:15
175:18   176.7   176:8
176:11   180.10   180:13
180:13   180:18   180:23
181:13   181:15   181:19
181:23   191:3   191.5

**manuals** [6]   163.5
164:21   168:12   169:3
172:19   192:1

**margin** [1]   205:17

**mark** [17]   169 24
174:14   177:18   179.17
180:7   181:12   185:25
187:6   187:9   187:15
197:3   197:21   197.25
198:1   204:23   205.25
208:3

**marked** [27]   152:6
154:25   155:6   170.2
170:4   171:8   177:21
177:23   179.20   179:22
180:18   180:22   181:15
186.3   186:5   187:8
187:12   187:14   187:18
187:20   196:22   197.6
199:18   206.1   206:6
208.4   208:6

**matter** [4]
163:2   204 22   209:11

**may** [16] 167:15   174:20
174.20   174:21   174:23
174:23   176:20   184:15
184:15   194:12   194.19
194:20   195.22   195:22
201:22   211.14

**mean** [3] 172:14   174:5
191:13

**meant** [1]   162:14

**medical** [1]   154:3

**medication** [1]   154:10

**meet** [1] 182.14

**meeting** [16]   155.8
155:23   156.6   156:8
156:12   156:19   157:2
158:23   159:3   159:21
177:7   206:11   206:14
206:15   206.19   207.17

**meetings** [4]   182.12
198:3   198:7   198:8

**members** [3]   198.24
209:6   209:12

**memo** [5]   206.1
206:10   206.12   206:20
207:9

**memorandum** [2]
207:15   207:20

**mentioned** [2]   163:16
163:20

**merely** [1]   167.25

**met** [4]   158:8   158:19
177.6   207:11

**Miami** [1]   201:12

**mid** [1]   186:19

**might** [3]   159:7
196:1   196:15

**minute** [4]   159:6
166:18   174:12   196:23

**minutes** [2]   176:15
211:16

**mirror** [1]   188:22

**modification** [2]
161:16   161:21

**Monday** [1]   151:0

**money** [1]   168:17

**months** [6]   159:8
167:10   167:11   185:12
205:22   209:25

**Morales** [1]   206:10

**most** [1] 193:7

**move** [2] 168:3   179 13

**MS** [137] 152:3   153:23
154:21   154.23   155:14
155:17   155.20   155:21
155.22   156:20   156.23
158.11   158:17   158.19
158:21   158.22   162:8
162:11   164:7   164:11
164:15   164:19   165:1
165.17   165:20   166.1
166:17   166:20   166:22
166:24   166.25   167:1
167:3   167:15   167:21
167.24   168:2   168:3
168:4   168:6   168.9
168:11   168:16   168.18
168:19   168:24   168.25
169:10   169:12   169:16
169:24   170:5   170:7
170:9   171:3   171:7
171:17   171:21   172.2
172.7   172:25   173:2
173:3   173:19   173:23
174:3   174:5   174:8
174:12   174:16   174.24
175:1   176:14   176:17
177.9   177:12   177:18
177:22   179:17   179:21
180:6   180:8   180:9
180:10   180:12   180:15
180:20   181:12   181:16
185:25   186:4   186:7
186.9   186:12   187:4
187:6   187:9   187 15
187:19   189:4   189:7
189.8   191:9   191:18
192:22   193:2   193:12
193:17   193 20   193:24
194.2   194:5   194:24
195:4   196:9   196:11
197:3   197:7   202:25

203..   205:25   206:3
206:5   208:3   208:6
208:8   210:5   210:8
210:24   211:4   211:6
211:9   211:12   211:14
211:17   211:18   211.20

**N** [1]   152:1

**named** [1]   153:18

**narra** [1] 178.22

**narrative** [1]   178:23

**nature** [2]   183 21
210:20

**navigational** [1] 169:9

**Navtech** [1]   172:18

**necessarily** [1]   210:16

**need** [5] 157:14   162:25
169:14   174:7   191:11

**needed** [3]   178:20
199:13   200:22

**needs** [1]   169:17

**never** [3] 160.16   160:17
207:1

**new** [2]   205:5   205:5

**next** [4]   180:7   186:1
187:9   199:5

**nobody** [1]   195:16

**noise** [1] 204:14

**nor** [2]   213:14   213:16

**NORTON** [50]   151:0
151:0   155:14   155:20
156.20   158:11   158:19
162:8   164.7   164:15
165:17   166:17   166:20
166:24   167:1   167:15
167:24   168:3   168:6
168:11   168.18   168:24
169:10   169:16   170:5
171:3   171:17   172:2
173:2   173:23   177.9
180:8   180.10   180:15
186:7   189:4   189:7
191.9   192:22   193:12
193.20   194:2   194.24
196:9   202:25   210.5
211:4   211:14   211:18
211.20

**Notary** [3]   153:9
212:18   213:22

**notes** [2] 199:3   213:11

**nothing** [5]   176:9
183:2   188:9   194:21
200:12

**notice** [3]   153:8
153:18   169:5

**notified** [2]   184:12
185:4

**notify** [6]   184.9
184:19   184:22   185:3
185:5   185:20

**November** [2]   153.25
168:19

**now** [5] 166:25   168:7
173:4   173.22   197:13

**number** [5]   155:7
166:4   205:22   206.22
210.20

**numbered** [1]   157:4

203:25   206:3
**o'clock** [1]   153:14

**oath** [3]   153:20   154.14
212:1

**object** [18]   155:20
156:20   158:11   158:15
162:8   167:2   171:3
172:2   177:9   191:9
192:22   193:12   193.20
194:2   194:24   196:9
202:25   210:5

**objected** [3]   166.24
167:18   168.21

**objection** [1]   172:5

**objects** [1]   166:6

**obligation** [1]   167:16

**obligations** [1]   162:14

**obligatory** [1]   172:9

**observed** [1]   178.20

**obviously** [2]   156.6
207:9

**occasion** [1]   182:14

**occasions** [1]   203:2

**October** [1]   166:3

**off** [21]   154:21   154.22
155:4   160:8   160:12
162:3   166:17   166:19
168:14   175:21   176:14
176:16   181:17   181.18
182:23   187:4   187:5
194:11   195:16   195:21
196:4

**offer** [1] 159:2

**offered** [1]   167:13

**offers** [1]   206:23

**offhand** [2]   173:17
175:20

**officer** [3]   157 16
160:4   184:25

**offices** [1]   153:11

**official** [3]   196:8
211:3   212:11

**old** [1]   167:12

**older** [1] 167:12

**one** [13]   162:21   164:17
175:9   180:9   184:5
195:13   199:22   199:22
200:20   200:20   203:9
208:14   211:14

**onto** [1]   160:12

**operating** [12]   166:5
166:21   168:22   169:19
170:1   170:10   170:13
170:15   173:4   173:6
173:10   176:10

**operation** [1]   205:8

**operations** [3]   164:2
164:17   185:18

**operative** [1]   169.12

**opinion** [5]   170:20
188:2   190:25   192:4
196.7

**opposed** [2]   156 2
168:4

**orally** [1]   207:13

**order** [2] 169:15   209:22

original [1] 155:4

overdue [2] 166:13
168:2

overly [2] 166:7
169:1

override [2] 181:4
181:25

overweight [1] 201:16

own [2] 176:4 183:14

P.A [3] 151:0 151:0
153:12

p.m [3] 151:0 157:10
211:21

page [16] 152:2 157:3
157:4 159:9 159:11
159:15 160:2 160:6
160:7 163:20 163:22
165:2 170:19 181:1
189:2 189:6

pages [4] 162:1
168:13 190:9 190:9

paperwork [1] 199:16

paragraph [1] 189:10

parameter [1] 194:13

part [7] 170:23 172:15
188:14 188:16 191:12
204:1 205:10

participant [1] 156:2

participate [1] 182:12

particular [2] 171:6
195:5

parties [1] 213:14

parties' [1] 213:15

Pat [39] 157:10 158:23
160:7 160:11 160:14
162:7 177:7 177:15
178:4 182:7 182:13
182:15 183:3 184:1
184:9 184:22 185:20
186:11 186:19 193:8
198:3 198:11 198:17
198:17 199:21 199:24
200:12 200:17 200:24
201:15 206:11 206:25
207:20 207:24 208:24
209:4 209:11 209:13
210:4

Pat's [8] 162:17 182:25
183:7 183:16 203:9
206:16 206:23 210:17

path [2] 183:19 183:21

PATRICK [2] 151:0
153:4

penalties [1] 185:13

Penalty [1] 169:6

pending [2] 153:6
166:12

people [1] 209:21

percent [3] 175:5
195:24 196:15

perception [5] 159:17
159:23 162:13 162:22
162:24

perceptions [4] 159:16
162:7 162:18 199:8

perform... ce [23]

perform... [1]
163:4 168:12 171:11
171:15 171:20 171:23
172:9 172:14 172:20
174:17 175:4 175:8
175:15 176:8 177:16
180:10 181:13 181:15
181:19 181:23 194:13
196:1 198:4

performed [2] 186:18
186:22

permissible [1] 193:10

permissibly [2] 192:15
203:25

permitted [1] 204:8

person [1] 186:15

personally [1] 212:8

personnel [2] 206:16
206:24

pertaining [1] 164:10

pertinent [1] 170:20

Pete [6] 197:21 197:25
200:24 204:23 204:25
205:20

phrase [1] 158:24

phraseology [1] 176:21

pick [1] 155:3

pilot [6] 191:15 210:15
210:15 211:3 211:5
211:10

pilots [2] 202:20
205:21

place [2] 204:15 204:16

Plaintiff [4] 151:0
151:0 153:2 153:5

Plaintiff's [29] 152:8
152:9 152:10 152:11
152:12 152:13 152:14
152:15 152:16 152:17
152:18 152:19 152:20
152:21 170:1 170:3
177:20 179:19 180:17
181:14 186:2 186:7
187:11 187:13 187:17
197:5 197:9 206:1
208:4

plane [3] 160:8 160:24
202:15

planes [4] 182:17
183:8 183:9 194:10

planning [1] 181:18

played [1] 166:13

POI [3] 184:9 184:19
184:22

point [5] 157:14 157:15
157:15 164:20 170:19
191:21 191:21

policies [9] 160:25
161:6 169:8 189:19
192:21 193:11 193:18
193:22 210:2

policy [6] 176:24
190:5 190:17 191:6
191:21 191:21

poor [1] 160:19

portion [5] 166:21
167:5 170:6 172:5
187:25

portions [1] 160:15
173:7

position [2] 160:15
173:7

possibility [1] 202:22

possible [1] 187:1

POTTER [1] 151:0

practice [1] 203:16

practices [1] 193:23

predate [1] 178:8

prepare [1] 206:12

prepared [4] 160:19
160:23 161:2 161:4

prepares [1] 209:15

preparing [2] 199:15
199:15

presume [2] 184:13
184:14

pretty [1] 196:6

preventing [1] 160:8

previous [1] 154:24

previously [3] 153:19
182:11 186:13

privilege [1] 158:16

procedure [5] 165:6
176:11 176:18 190:6
190:18

procedures [4] 173:11
173:16 189:19 193:22

proceeding [1] 169:21

produce [10] 165:12
166:3 166:4 167:12
167:16 167:25 168:6
168:9 168:22 169:23

produced [7] 164:25
165:14 165:18 166:15
168:11 177:24 180:25

producing [2] 167:19
192:10

Professional [2] 153:9
213:7

proficiency [10] 178:22
186:2 186:10 186:11
186:14 186:19 186:25
197:15 210:9 210:21

promotion [1] 211:2

prompted [3] 157:23
178:16 178:18

proper [1] 189:22

properly [2] 165:23
189:21

provide [2] 167:18
194:10

providing [1] 169:7

provision [4] 163:6
163:17 175:15 181:22

provisions [3] 167:13
187:24 188:4

Public [3] 153:9
212:18 213:22

purport [1] 188:25

purpose [1] 153:2

pursuant [1] 153:7

push [3] 160:21 161:18
162:2

put [2] 169:2
169:22

quarter [5] 175:9
194:7 195:16 195:20
196:16

questioned [2] 159:21
202:21

questioning [2] 157:16
160:3

questions [4] 155:1
169:20 211:15 211:20

quite [1] 166:11

rain [1] 201:17

rainy [1] 201:21

rambling [1] 207:20

ran [1] 181:17

rationale [1] 169:7

reaction [1] 162:19
162:20

read [5] 160:9 190:13
190:15 192:7 195:15

really [5] 171:14
172:22 175:11 196:19
202:19

reason [3] 158:9
164:6 185:16

reasonably [1] 166:7

reasons [2] 156:19
182:25

recalled [1] 182:5

receive [2] 197:18
200:2

received [4] 168:20
197:22 198:14 210:10

recently [1] 205:6

recess [1] 211:19

recipient [1] 208:16

recognize [1] 181:19
196:23 206:7

recollection [4] 198:12
199:1 200:17 206:21

record [12] 154:21
154:22 162:15 166:18
166:19 168:15 168:16
176:16 187:4 187:5
206:13 213:11

records [2] 199:3
210:18

reduction [1] 163:1

reductions [1] 163:13

refer [9] 159:12 161:13
166:2 177:1 190:9
191:2 194:8 196:1

reference [1] 201:10

references [2] 163:24
164:1

referred [6] 160:1
166:11 169:5 169:7
177:14 207:2

referring [9] 159:14
162:21 163:7 163:24
163:25 171:14 178:1
188:19 203:11

refers [2] 160:19

reflected [1] 206:16

reflects [3] 158:20
159:9 159:15

refresh [1] 206:20

regard [1] 206:21

regarding [5] 197:16
199:21 200:13 206:24
207:9

Registered [2] 153:9
213:6

regulations [3] 189:18
194:1 194:4

relate [3] 161:12
173:12 187:25

relates [3] 157:11
157:12 210:2

relating [1] 169:8

relative [2] 213:13
213:14

relied [1] 171:1

rely [1] 188:13

relying [9] 163:6
164:13 164:22 165:4
167:5 167:13 188:15
188:24 189:16

remediation [1] 200:9

remember [6] 156:16
164:7 164:16 179:10
202:2 208:23

remembers [1] 172:3

repeat [1] 162:16

repeatedly [1] 209:13

report [69] 156:13
161:3 161:8 161:12
161:24 162:2 162:19
163:2 163:19 172:1
173:14 176:6 177:14
177:15 177:20 177:25
178:3 178:17 178:20
178:22 178:23 179:19
180:3 181:4 181:25
181:25 182:7 183:7
183:25 184:10 184:20
184:23 185:3 185:21
186:3 186:10 186:11
186:14 186:19 186:25
187:1 187:7 187:11
187:13 188:3 190:19
190:21 191:8 191:22
194:22 195:2 195:5
195:6 195:12 195:19
196:8 196:14 197:2
197:15 197:19 197:22
197:24 198:15 198:22
199:24 201:10 201:11
201:20 213:8

reported [4] 195:13
202:16 202:17 202:24

reporter [1] 153:9
155:16 213:7

REPORTER'S [1]
213:1

reporting [3] 151:0
160:20 203:13

reports [11] 189:23
199:21 200:2 200:25
200:12 202:22 209:15

209:22   210:3   210:9
210:21

**represent** [1]        177:24

**representative** [5]
154:17   164:13   175:23
193:7    211:1

**reprimand** [1]       205:2

**request** [8]           166:2
166:3   166:12   167:11
168:21  169:1   178:14
186:15

**requested** [2]       166:22
213:10

**requests** [1]         164:12

**required** [3]         163:14
184:19  190:2

**resolution** [1]       200:22

**resolved** [1]         173:20

**resolving** [2]       199:10
199:12

**responded** [1]       166:6

**responsibilities** [3]
173:13  189:3   191:13

**responsibility** [5]
165:7   176:12  188:6
190:10  191:15

**responsible** [2]     189:17
189:25

**restate** [1]          192:16

**restricted** [1]       196:17

**result** [2]           185:13
207:25

**resulting** [1]        185:9

**results** [1]          209:5

**retained** [1]         152:24

**review** [4]           159:6
209:21  210:18  213:9

**reviewed** [2]         193:18
199:9

**reviewed's** [1]      186:15

**reviewing** [1]        183:7

**reweighed** [1]       203:4

**right** [57] 154:6    154:16
154:20  155:3   155:4
156:1   156:10  158:21
159:20  161:20  165:8
165:11  165:22  167:1
168:12  168:24  170:25
171:22  173:19  173:22
174:12  174:24  174:25
176:14  176:23  177:5
177:6   179:2   179:15
179:24  180:6   180:11
180:25  181:17  181:22
183:4   183:24  186:18
187:15  187:24  188:14
188:17  188:19  189:1
190:5   191:6   191:19
193:3   196:22  197:8
197:13  197:18  200:23
205:13  209:7   211:4
211:12

**Roseborough** [2]
184:9   184:13

**route** [1]  189:23

**RPR** [2]  212:17  213:22

---

**run** [1]     3:21

**runway** [40]         160:12
161:1   161:11  163:8
163:10  164:23  165:3
170:3   170:16  171:6
171:18  172:18  175:6
175:13  175:16  176:7
176:19  176:21  176:25
180:12  180:13  180:18
180:23  181:5   181:10
182:18  183:18  188:2
190:7   190:19  194:8
195:10  195:12  195:12
195:13  195:23  195:24
196:16  202:8   209:21

**runways** [1]         210:3

**S** [6]      151:0    152:5
153:1   153:17  212:8
213:9

**sad** [1]    160:12

**safely** [1]          189.24

**safety** [4]          184:25
205:8   205:10  205:17

**says** [3] 176:11     190:18
206:22

**scary** [1] 196:6

**scenario** [3]        202:10
202:11  205:5

**scope** [1]           169:4

**SCOTT** [2]          151:0
153:4

**scal** [1]  212:11

**second** [5]          157:8
159:9   166:3   173:25
174:2

**section** [15]        163:17
165:3   165:6   169:6
171:13  172:23  173:6
173:11  174:7   174:11
175:8   176:6   180:18
180:23  194:16

**sections** [2]        164:10
181.18

**secure** [1]          189:22

**see** [3]    159:19   165:19
208:9

**send** [1] 166:20

**sent** [2] 177:3      188:15

**separated** [1]       197:10

**Separately** [1]      198:19

**September** [2]       166:23
177:7

**series** [1]          155:1

**serviced** [1]        189:21

**session** [1]         167:11

**set** [2]    194:19   207:15

**setting** [3]          204:6
205:16  205:22

**settlement** [1]      209.3

**shall** [1] 189:19

**Shea** [91] 151:0     152:3
152:24  153:23  154:21
154:23  155:17  155:21
155:22  156:23  158:17
158:21  158:22  162:11
164:11  164:19  165:1

---

165:20   166:1    166:22
166:25   167:3    167:21
168:2    168:4    168:9
168:16   168:19   168:25
169:12   169:24   170:7
170:9    171:7    171:21
172:7    172:25   173:3
173:19   174:3    174:5
174:8    174:12   174:16
174:24   175:1    176:14
176:17   177:12   177:18
177:22   179:17   179:21
180:6    180:9    180:12
180:20   181:12   181:16
185:25   186:4    186:9
186:12   187:4    187:6
187:9    187:15   187:19
189:8    191:18   193:2
193:17   193:24   194:5
195:4    196:11   197:3
197:7    203:5    205:25
206:3    206:5    208:3
208:6    208:8    210:8
210:24   211:6    211:9
211:12   211:17

**sheet** [2] 197:5     197:10

**show** [8] 163:5      168:1
177:23   179:22   180:21
199:18   206:6    208:6

**shown** [1]          163:12

**sic** [1]    154:1

**similarities** [1]    202:10

**sit** [1]    169:16

**situation** [10]      170:8
184:18   193:15   196:1
196:3    196:20   198:17
199:7    199:9    200:19

**skill** [3] 159:13    159:22
200:13

**skills** [1] 200.22

**snow** [2] 163:14    163:15

**sorry** [4] 162:16    171:17
189:4    197:25

**Southern** [2]        151:0
153:7

**speaking** [1]       176:20

**specific** [13]       156:25
158:4    164:18   168:13
172:22   173:6    182:2
182:8    188:23   189:9
191:23   196:14   198:25

**specifically** [28] 157:10
157:11   162:13   162:25
164:11   165:18   167:5
169:8    176:9    176:18
180:4    181:1    184:2
185:5    188:8    188:11
189:1    189:14   196:17
196:24   197:23   198:2
200.1    200:25   201:5
202:18   202:19   207:14

**specifics** [12]      156:16
158:6    159:3    159:4
184:17   196:15   198:5
198:13   201:22   206:18
209:8    209:23

**specified** [1]       171:6

**specify** [1]         188:5

**speed** [5]           163:1

---

172:0   173:8   181:8

**201.25**

**split** [1] 174:1

**stalking** [1]        206:17

**standing** [20]       160:21
161:3    161:7    161:12
162:2    162:15   162:19
163:2    163:15   163:18
172:1    175:5    175:9
175:11   181:25   194:6
195:7    195:14   195:15
195:23

**started** [1]         153:25

**starting** [1]        160:6

**state** [6] 153:10    157:7
212:3    212:18   213:3
213:22

**statement** [2]      157:17
188.25

**states** [7]          151:0
153:6    157:4    163:12
191:21   194:20   204:15

**station** [1]         190.2

**STC** [1] 205.11

**Steele** [21]         164:22
183:24   192:14   195:6
195.18   197:16   197:19
197:21   197.25   198:22
200:10   200.24   201:19
203:25   204:10   204:18
204:23   205:1   205:13
205.15   205:20

**Steele's** [5]        170:20
192:18   193:9   193:15
201:9

**stenographic** [1]
213:11

**stenographically** [1]
213:8

**Stewart** [2]        198:1
204:23

**still** [3] 154.14    185:18
205:10

**stipulation** [1]    155:18

**stop** [1] 209:14

**storms** [1]         183:22

**strictly** [1]        181:10

**structural** [1]     204:14

**sued** [1] 209 7

**sufficient** [1]     205.2

**Suite** [1] 153.12

**summarizing** [1]
206:11

**supplement** [2] 171:15
171:19

**support** [3]        164:22
172:12  173:7

**surrounding** [1] 198:13

**Susan** [2]          151:0
168:2

**suspending** [1]    166:14

**sworn** [2]          153:19
212:9

**T** [1]      152:5

**takes** [2] 170:23   195:16

---

**taking** [6]                  154:16
160:8   160:15   164:20
164:23   175:22

**talks** [2] 165:7    175:16
200:8

**tapes** [2] 182:7    201:6

**terminate** [2]      156:5
157:1

**terminated** [6]     182:13
182:15   184:1   193:8
210:17   210:22

**terminating** [3] 156:15
157:5    198.11

**termination** [4]    155:8
178:8    183:1   183:2

**terms** [5] 170:25    176:23
182:25   192:20   199:12

**testified** [9]       153:20
158:17   158:19   165:22
171:13   175:3   182:11
182:17   186:13

**testify** [3]         154:12
167:17   168:1

**testifying** [1]     182:22

**testimony** [15]     165:5
167:14   169:2   169:15
169:18   171:12   171:24
172:4    172:5   172:12
175:2    175:25   176:3
182:21   187:25

**Thank** [1]          211:13

**Therefore** [1]     161:23

**THEREUPON** [1]
153:16

**thinking** [1]       173:16

**thoroughly** [1]    164:24

**thought** [3]        159.7
162:20   168.14

**three** [2] 166:4    190:9

**through** [5]        167.6
168:5    175.18   179:13
210.14

**throughout** [2]    159:14
172:16

**Tim** [5]   207:5    207:12
207:12   208.15   209:7

**today** [12]                  154:6
154:12   163:5   164:4
165:18   166:16   167:11
170:17   182:9   185:6
193:19   207:6

**too** [2]    168.11   197.4

**took** [3] 160:12    166:10
167:22

**top** [1]    175:21

**topic** [1] 189:14

**topics** [1]         207:21

**tower** [12]         171:25
176:6    181:4   181:24
181:25   182:7   188:2
190:7    190.19   190.21
195:6    201:6

**tracked** [1]        165.25

**trail** [1] 167:7

**trained** [2]        205:14
209:21

**training** [4]    159:14
209:23    210:13

**transcript** [8]    155:8
157:4    159:7    159:9
159:12    159:15    213:9
213:10

**tried** [3]    179:16    185:11
207:15

**true** [1]    213:10

**truly** [1]    160:14

**try** [3]    155:3    168:4
173:20

**trying** [1]    190:16

**turned** [1]    182:17

**two** [12]    159:8    167:10
167:11    168:5    168:20
169:25    173:22    185:12
187:10    200:9    209:25
211:14

**type** [1]    196:2

**Um-hum** [1]    207:18

**unable** [1]    179:14

**under** [7]    154:10
154:14    161:6    172:9
173:8    196:7    203:13

**undersigned** [1]    212:7

**understand** [4]    165:15
201:14    201:18    210:24

**understood** [2]    171:12
205:18

**unduly** [1]    166:6

**United** [3]    151:0
153:6    204:15

**unless** [2]    161:2
161:7

**unrelated** [1]    207:21

**up** [4]    155:3    158:18
168:1    177:3

**updated** [1]    174:18

**updates** [1]    174:22

**upgrades** [1]    157:15

**upset** [1] 168:7

**used** [1] 203:25

**using** [1] 204:4

**utilizing** [1]    205:16

**vague** [5]    156:18
156:22    157:20    177:8
177:11

**VALERIE** [1]    151:0

**validly** [1]    167:18

**variance** [1]    176:5

**various** [1]    163:14

**verbiage** [2]    182:2
191:23

**verdict** [1]    208:16

**versus** [1]    183:18

**vicinity** [1]    182:20

**view** [1] 162:7

**violation** [6]    169:6
194:4    204:5    204:9
204:12    204:19

**visually** [2]    195:9
195:11

**volume** [2]    151:0

**vs** [1]    151:0

**warrant** [1]    161:21

**warranted** [1]    161:15

**Washington** [1] 155:23

**waste** [2]    165:20
168:17

**water** [22]    160:21
161:3    161:8    161:12
162:2    162:15    162:19
163:2    163:19    172:1
175:5    175:9    175:11
175:17    176:4    182:1
194:6    195:7    195:14
195:16    195:20    195:24

**water/wet** [1]    163:15

**weather** [20]    165:9
173:13    176:12    176:19
176:20    182:19    182:20
183:10    183:13    183:19
183:20    191:14    191:17
192:6    192:15    201:4
201:11    201:12    201:21
201:25

**week** [2] 166:10    167:4

**weight** [18]    160:16
160:23    161:1    161:4
161:16    161:23    163:13
172:8    173:8    181:8
201:25    202:15    202:16
202:17    202:17    202:21
202:23    203:14

**Weihe** [2]    151:0
153:11

**wet** [3]    183:18    202:8
210:2

**wherein** [1]    153:4

**white** [1] 196:19

**whole** [4]    167:7
167:19    170:8    172:23

**willing** [1]    167:17

**wind** [1] 183:22

**window** [1]    195:19

**wing** [1] 163:13

**Wise** [1] 180:2

**within** [1]    204:15

**witness** [11]    153:1
153:18    156:2    164:9
171:18    173:25    174:4
174:6    174:10    189:6
212:11

**word** [1] 169:13

**worked** [1]    156:10

**writing** [1]    207:13

**written** [6]    164:12
178:3    180:2    183:25
191:21    199:24

**wrong** [2]    162:6
162:7

**X** [2]    152:1    152:5

**years** [1] 202:14

**yourself** [1]    201:25

**zero** [1]    163:13

# HEINRICH
# GORDON
# HARGROVE
# WEIHE
# & JAMES
PROFESSIONAL ASSOCIATION
LAW OFFICES

Valerie Shea
Direct No (954) 519-1524

November 10, 2000

<u>Via Facsimile</u>

Susan Potter Norton, Esq.
Allen Norton & Blue
121 Majorca Avenue
Coral Gables, FL 333314

   Re: Major v. Amerijet
      Our File No. 81975.002

Dear Ms. Norton:

  Following up on the aborted deposition of Derry Huff, this letter will set forth a few things that I think we need to discuss and/or agree upon:

  1. We have not received any response to our three phone calls to your office requesting copies of the tower tapes. Please see that we receive these as soon as possible, and I would appreciate receiving the transcripts which Derry Huff referred to in his deposition.

  2. As you are aware, Derry Huff referred to a number of documents in his deposition which were not previously produced: the report by Al Jorsey and the notes made by Amerijet employees listening to the tower tapes, to name a couple. Please review with your client whether these materials are available.

  3. You are going to designate someone else as the corporate representative regarding the FAA/Amerijet involvement over the incident of August 17, 1999. Also, we need a deponent as to Items 6 and 7 of the 30(b)(6) deposition notice.

  4. You had objected to our request that you produce the entire airline operating manual and the entire airline performance manual. The basis for your objection was that this request was overly broad. In light of Mr. Huff's testimony, I believe we have clarified the portions of those manuals to which we are entitled, as they are clearly within the scope of



PLAINTIFF'S
EXHIBIT
7

500 East Broward Boulevard, Suite 1000, Fort Lauderdale, Florida 33394
Telephone (954) 527-2800 • Telecopier (954) 524-9481 • www.heinrichgordon.com

potentially admissible evidence. Those would be the sections referred to in the FAA notice of proposed civil penalty violation. the definition section referred to by Derry Huff as providing Amerijet's rationale for Capt. Steele's intent to disregard the tower weather report. and the policies specifically relating to the navigational clearance which Derry Huff contends Patrick Major acted outside of.

5.      As you know, after five hours together, about 3-1/2 to 4 of which were spent in deposition. you abruptly announced that you and your client were leaving as he had a previously scheduled medical appointment. At no time earlier in the day did you bring this to my attention. You have agreed to produce Derry Huff for the completion of his deposition before any other witnesses are deposed.

6. Regarding Patrick Major's deposition, as you are aware. this case has been pending for some ten months and at no time prior to late October 2000 did you serve a notice of taking his deposition or make any effort to do so. He is certainly willing to give a deposition. However, as I have explained to you repeatedly. he has just started a new job and has intensive training and scheduling commitments at this time. We are trying to work with his schedule as best as possible. As a party to the suit, he does have a right and interest in being present at depositions. I am enclosing the schedule to which he referred.

7. As matters now stand, Mr. Major is available for deposition on the following dates: 11/13, 11/14. 11/20. 11/21. 11/22, 11/29 or 11/30. I realize that you have schedule issues on these days. but please do not complain that we have not offered Mr. Major for deposition. Being that you only starting asking for dates a couple weeks ago. we are doing our best.

8.      That said, I have also suggested that if we cannot complete discovery before the pretrial conference set on December 11. 2000, that I would not be opposed to a motion for continuance. You may prefer to wait and see whether we can complete the further depositions the week of December 4, which was my original proposal.

9.      In light of the schedule issues for next week, I will not be able to produce Pat Major for partial deposition on the 16th and I will have to reset the depositions presently set for the 15th. As currently noticed. we have set for deposition on the 14th: Brian Steele at 10:00, John Washington at 11:00. and Tracey Dickenson at 1:00. It is also my understanding that your office agreed to times for Al Jorsey and William Cline, of 9:00 a.m. and 2:00 p.m. on the 14th, respectively. It is my understanding that all of these gentlemen are to be produced without the necessity of subpoena. If this is incorrect. please advise.

Given the length of time that it took to take Derry Huff's deposition, I am concerned that we will not be able to conclude those depositions on the 14th, especially because we have agreed that we will resume Derry Huff's deposition before we take anyone else. More realistically, I propose that we take Derry Huff's continued deposition starting at 9:00 a.m. on the 14th; depose

Brian Steele at 11:00 a.m.; and set the deposition of John Washington or one of the other available witnesses for the afternoon.

If you are agreeable to allowing Steve Santiago to attend any of the depositions of the Amerijet representatives, I would like to move whomever we do not get to on the 14th to the week of the 20th.

Unfortunately, we will not be able to take the depositions presently noticed for November 15 of Ed Cook. Juan Morales, Pete Steele and Dave Bassett. I do not know whether the availability of all these people had been confirmed anyway. I could move them to the week of Thanksgiving, too, if that were agreeable.

You will recall that I originally proposed that we extend the discovery deadline until December 8. If you are willing to reconsider on that subject; i.e., if you do not think your trial is going to go. then we should do that. Otherwise, we should probably do a joint motion for continuance at this point. However, so as not to lose the 14th, I enclose a notice of the continuation of Derry Huff's deposition for 9:00 a.m. and would ask that you have your office contact my secretary, Vicki, concerning the order for the rest of the day and for the completion of the rest of the witnesses.

As matters now stand, you have told us that you are not available at all from November 17 through 24. or the week of December 4. As you must realize, you've given us extraordinarily few days on which to try to schedule the outstanding depositions.

Let's please try to get this resolved. I would still like to accomplish as much as we can between now and the current deadline. Please let me hear how you would like to proceed.

Very truly yours.

VALERIE SHEA
For the Firm

VS:vjr
Enclosure
cc: Patrick Major
G:\LAW\81975\002\Letters\l-Norton006.doc

HEINRICH
GORDON
HARGROVE
WEIHE
& JAMES
PROFESSIONAL ASSOCIATION
LAW  OFFICES

Valerie Shea
Direct No (954) 519-1524

December 22, 2000

**VIA FACSIMILE**
Stephen Santiago, Esquire
Allen Norton & Blue
121 Majorca Avenue
Coral Gables. FL 333314

> Re:    Major v. Amerijet
>         Our File No. 81975.002

Dear Mr. Santiago:

After Derry Huff's deposition. I wrote Ms. Norton on November 10, 2000, to follow up on documents issues that came up during the deposition. I have had no response to that letter. This letter is again to follow up on open documents issues in hopes of avoiding discovery motions.

As a follow-up to my previous request for the Airplane Operating Manual and Airplane Performance Manual, the following are descriptions of the portions of the manuals that Derry Huff mentions in his deposition and, therefore, I am requesting copies of those portions at this time:

1.    Portion of Performance Manual that addresses the weight reduction to be made if the runway is contaminated to a certain degree. (Please see Page 40, Lines 21-24 of Derry Huff's deposition.)
2.    Portion of Performance Manual that addresses runway contamination and speed reduction. (Please see Page 41, Lines 1-4 of Derry Huff's deposition.)
3.    "Definitions" section of Performance Manual (Please see Page 54, Line 12, and Page 122, Lines 6-9 of Derry Huff's deposition.)
4.    Runway Analysis Manual (Please see Page 72, Line 15 of Derry Huff's deposition.)



PLAINTIFF'S
EXHIBIT
9
1/8/01

5.    Runway Analysis Procedure (Please Page 52. Line 22 of Derry Huff's deposition.)

6.    Provision of Manual (Performance and/or Operating) which addresses whether a pilot may accept a legal clearance which obligates the pilot to use a form of navigation such as GPS. (Please see Page 136, Line 10 through Page 141. Line 19 of Derry Huff's deposition.)

7.    Provision of Manual (Performance and/or Operating) that contains the operation specifications stating what clearance an Amerijet pilot may accept. (Please see Page 141, Line 12-24 of Derry Huff's deposition.)

In addition. Derry Huff refers to documentation which are responsive to my previous Requests for Production but not received. Therefore. I am requesting the following documents:

1.    The "written memo" stating the upgrade requirements in effect from 1996 through 1999, which is responsive to Plaintiff's First Request to Produce Number 3. (Please see Page 30, Line 18 through Page 31. Line 6 of Derry Huff's deposition.)

2.    Any and all written notes taken by Pete Steele. John Washington. and/or Derry Huff which were generated while listening to or as a result of listening to the tower tapes relating to the incident of August 17. 1999, involving flight 827. which are responsive to Plaintiff's First Request to Produce Number 16. (Please see Page 50, Line 22 through Page 51, Line 8 of Derry Huff's deposition.)

3.    Report written by Brian Steele to the FAA regarding the August 17. 1999, incident which is responsive to Plaintiff's First Request to Produce Number 16. (Please see Page 56, Lines 1-3 of Derry Huff's deposition.)

4.    Written reports generated by Al Jorsey, Brian Steele and Brett Wise regarding the August 17. 1999, flight which are responsive to Plaintiff's First Request to Produce Number 13 and 16. (Please see Page 60, Line 7-23, and Page 62, Line 21. of Derry Huff's deposition.)

5.    Letter, report or memorandum generated by Brian Steele regarding Patrick Major's performance and/or actions on the 6/8/99 flight which is responsive to Plaintiff's First Request for Production Number 15. (Please see Page 68. Lines 5-12 of Derry Huff's deposition.)

I would like to reiterate my request for documents pertaining to FAA investigation or action regarding the August 17, 1999, flight as it seems to me your production in this regard (being only the notice of proposed civil penalty violation) is incomplete.

In light of the upcoming depositions, I am requesting an amended response to Plaintiff's First Request for Production with respect to these documents, and Plaintiff's

January 5, 2001
Page 3

Second Request for Production with respect to the excerpts of the **manuals within one week of the date of this letter** or by **December 29, 2000**; otherwise, you leave me no choice but to file a motion to compel or a motion to preclude this evidence from trial.

Thank you for your anticipated cooperation in this matter.

Very truly yours,

VALERIE SHEA

VS/DDK:ddk
G:\LAW\81975\002\Letters\l-santiago014 - requesting excerpts of manuals.doc

CAPTAIN ALLEN JORSEY, SR.
6304 Zekan Lane
Springfield, VA 22150
(703) 971-7120

November 15,1999

John C. Roseborough
FAA Flight Standards District Office 17
1050 Lee Wagener Blvd., Suite 201
Ft Lauderdale, FL 33315

Reference: Letter of investigation, File Number 2000SO170012

Dear Mr. Roseborough:

On August 17,1999, Amerijet Flight #827 did depart Ft Lauderdale International Airport
but did not depart contrary to the Federal Aviation Regulations as to prevailing
conditions.

I arrived at the aircraft during a typical south Florida downpour to give the Captain Brian
Steele a line check. Weight reduction was discussed during the preflight and unknown to
me at the time, the F/O had requested a runway condition report. A normal start was
made and the Captain taxied west and then east on the taxi way with the weather radar on
to check the rain showers which were moving to the Northeast. Many passenger aircraft
elected to hold due to the weather to the North and Northeast. The F/O inquired and
received a runway report that he had requested earlier. As the rain had passed by; the
Captain elected to check the runway condition himself and back taxied the aircraft down
the runway to the West at which time he determined that the runway was only wet with
no standing water as the rain had stopped and this runway is grooved and has a crown.
From the observer seat I could see no standing water on the runway and no wipers were
needed as the rain had stopped. The runway was only wet requiring no penalty. The
Captain elected to take off based on his pilot observation during the back taxi and a
normal take off was made to the East.

As a side note are some facts, some not known to me at the time of this flight.
1. The Captain had given this F/O a poor performance rating some months earlier.
2. I had to instruct the F/O that he could not accept direct to Dorado because we were
   not yet authorized to use the GPS. He argued with me until I told him the discussion
   was over. The Captain called and got a heading, which we could accept.
3. This F/O has had poor performance grades on his proficiency check and was rejected
   for upgrade to Captain by FAA inspector B. Sonin. The company would not upgrade
   this F/O due to poor performance. Aeroservice also would not train him for upgrade
   to Captain.
4. This F/O has a pending suit against Amerijet



PLAINTIFF'S
EXHIBIT
<u>AC</u>
1/8/01

All these factors lead me to believe that this F/O is a former terminated disgruntled employee who wants to get back at the company, the Captain and the Check Captain for poor performance ratings.

I have given this Captain several line Checks, Proficiency Checks and know him to have many years and hours flying the B-727 and at no time were any FAR's or company regulations violated.

Sincerely,

Allen Jorsey, Sr.

November 18, 1999

Mr. Brett O. Wise
2280 Discovery Pointe Cr. West
Deerfield Beach, FL 33442

Mr. John Roseborough
Principal Operations Inspector
Federal Aviation Administration
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:    File Number 2000SO170011

In regards to your letter which I received about Amerijet Flight #827 on August 17, 1999, I remember that it had rained that day which is pretty much normal for Florida at that time of the year. Also, I recall that we back taxied down the runway to see for ourselves the actual condition of the runway. I was standing in the aircraft giving a new flight engineer IOE and I could see out of both windows. At no time during my observation was there standing water on the runway.we used for takeoff. It was a wet runway which does not impose any penalty.

The decision was made that a normal takeoff and climb was to be used and all flight crewmembers agreed. At no time did I hear the First Officer challenge the Captain's decision.

We have all had training in CRM and Captain Steele in my opinion is a high qualified pilot which would have no problem discussing the matter with a flight crew if any danger or concern was apparent.

Sincerely,

Brett O. Wise 

**PLAINTIFF'S EXHIBIT**
11
BSW 1/8/01





| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |
|---|---|---|

# RUNWAY ANALYSIS DESCRIPTION

(See Figure #1 Page 9)

① **HEADING**

The heading at the top of the page contains the following information:

**Operator Name**

**Airplane Model**

**Engine Model**

**Airport Location**

**Airport Name**

**ICAO Airport Identifier and Runway Number**    A suffix to the runway number may appear which has the following meaning:

C    Center runway when there are three parallel runways
L    Left runway when there are two or more parallel runways
R    Right runway when there are two or more parallel runways
P    Prior permission required to use runway
*    Special condition, such as additional or less runway due to construction

V₁ PLUS



PLAINTIFF'S EXHIBIT
12
8/01



| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |

## HEADING
(continued)

| | |
|---|---|
| M | Takeoff obstacle clearance based on mobile equipment in takeoff path |
| S | Takeoff obstacle clearance based on ship in the harbor/ channel |
| T | Special turn procedure for takeoff. |
| D | Runway length available day only |
| N | Runway length available night only |
| IX | Intersection takeoff from taxiway X |

**Flap Setting**     The pages are color coded as follows:

| | | | |
|---|---|---|---|
| Yellow | Flaps 5 | Blue | Flaps 25 |
| White | Flaps 15 | Pink | Special Procedures |
| Goldenrod | Flaps 20 | Green | Temporary pages |

②             **CONDITIONS BOX**

The following information is shown in the right side box below the heading:

**A/C Pack Configuration for Takeoff**

**Brake Configuration**

**Tire Speed Rating**

**Airport Elevation in Feet**

**Runway Length in Feet:** Takeoff roll available TORA, takeoff distance available, TODA, and accelerate-stop distance available, ASDA.

**Runway Gradient in Percent**     Average value is shown. Positive is uphill, negative is downhill.

2

V₁ PLUS

| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |
|---|---|---|

③            **TEMPERATURES AND GROSS WEIGHTS BOX**

TEMP column:
Gross weight limits are shown for temperatures from -23 C (-10 F) to the maximum operating temperature for the airport. Interpolation of weights for intermediate temperatures is acceptable, or the limits for the next higher temperature may be used. Takeoff at temperatures below -23 C (-10 F) is authorized (please see AFM for limits); the gross weight limits for -23 deg C (-10 F) should be observed.

ZERO WIND column:
Maximum takeoff weights in hundreds of pounds (anti-ice OFF) are shown for a no-wind condition considering runway length and gradient, tire speed limits, brake energy limits, and obstacles.

These weights are valid for the following conditions:

    A/C packs on—one or two packs operating.
    Anti-ice off.
    Nose brakes off.
    Autopack-Trip System Armed and Operative
    Engine Fail Light Operative

The weights in this column may exceed the climb limited weights which follow. This is necessary since these values are used as a base for various gross weight corrections.

LMT CON columns:
The condition which limits the gross weight in the ZERO WIND or CLIMB LIMIT column (anti-ice OFF) is indicated by a symbol as follows:

| | |
|---|---|
| R | Runway length |
| * | Obstacle clearance |
| T | Tire speed |
| B | Brake energy |
| C | Climb limit |

V₁ PLUS

3



| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |
|---|---|---|

CLIMB LIMIT column: Maximum takeoff weights in hundreds of pounds are shown considering the climb limits (usually the second segment climb gradient requirement).

A/C OFF (+) column: Weight increments in hundreds of pounds when operating with A/C packs off. Increment should be applied to weight column indicated by the limiting symbol.

POD MAX EPR column: Pod engine takeoff EPR setting at 0 to 60 knots for maximum power. Anti-ice is off. One or two A/C packs are on.

N1% for T/O column: The N1% setting for preliminary thrust at 0 to 60 knots for maximum power. Anti-ice is off. One or two A/C packs are on.

GO ARND EPR col: Maximum EPR at takeoff or MCT for go around procedures. Anti-ice is off. One or two A/C packs are on.

ENG ANTI-ICE
ZERO WIND column: The zero wind maximum weights are shown for temperatures from -23 deg C (-10 F) to the maximum temperature for use of engine anti-ice.

ENG ANTI-ICE
CLIMB LIMIT column: The climb limited weights for engine anti-ice operating are shown.

ENG ANTI-ICE-A/C
PACK OFF(+) column: Weight increment in hundreds of pounds when operating with A/C packs off and engine anti-ice on.

④                    NOTES

The notes section includes the correction to the POD MAX EPR column to obtain the center engine EPR. The correction to the pod EPR is also indicated for the packs off condition (Center Epr is still determined from original data in POD MAX EPR column). The flap retract height for engine out procedures is quoted in feet above mean sea level (FTMSL). The most frequent limiting obstacle is also shown in FTAGL.

The date given is the date of the last revision of the airport data.



4



| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |

⑤       **GROSS WEIGHT CORRECTIONS BOX**

**BARO PRESS:**     A barometric correction is provided to adjust the ZERO WIND and CLIMB LIMIT weights when the altimeter setting is less than 29.7 in. Hg.

**WIND:**     A correction for wind, which is used to correct the ZERO WIND limit weights (not the CLIMB LIMIT), is provided. This correction is given in lbs/knot of effective wind (component of the reported wind parallel to the runway).

**ADJUST ZERO WIND COLUMN:**     A reminder to adjust the ZERO WIND column for the following:

- WIND
- RUNWAY SHORTENING
- ANTI-SKID INOP
- RUNWAY CLUTTER
- MEL PERFORMANCE DECREMENTS

**ADJUST CLIMB LIMIT FOR**     A reminder to adjust the CLIMB LIMIT column for the following:

- MEL PERFORMANCE DECREMENTS

V₁ PLUS          5

| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |
|---|---|---|

**⑥ RUNWAY CONTAMINATION AND ANTI-SKID INOP DECREMENTS**

**RUNWAY CONTAMINATION:** Decrements are shown which indicate the zero wind weight and $V_1$ reductions required with various depths of dry snow, standing water, slush, wet snow, and ice.

Note: No decrement is required if the runway is contaminated with less than 3.5 in. of dry snow.

**ANTI-SKID INOP:** With anti-skid inoperative the ZERO WIND weight must be reduced by the amount shown. $V_1$ must also be reduced.

**$V_1$ REDUCTION:** The $V_1$ reduction is applied to the $V_1$ appropriate for the ZERO WIND limit weight, adjusted for wind. The resulting $V_1$ is compared to the $V_1$ shown for the actual weight, and the lower value is used.

6


$V_1$ PLUS

| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |
|---|---|---|

⑦                          **LANDING DATA BOX**

**PACKS:**                 A/C packs configuration for landing climb limits.

**LNDG FLAP column:**      Data is provided for the flap setting indicated.

**LENGTH column:**         The usable landing length in feet is the available runway beyond the threshold or displaced threshold. Where there is an ILS glideslope intercept at least 1000 feet less than the available runway beyond the threshold or displaced threshold, landing data is also provided based on a landing length beyond the glideslope intercept plus 1000 feet.

**ANTI-SKID column:**      Data is provided for anti-skid operative (OPER) and inoperative (INOP).

**DRY RUNWAY and WET RUNWAY**   Data is provided for dry and wet runway conditions.

**MAX WT ZERO WIND column:**   Maximum zero wind landing weight is shown. When the weight exceeds the Maximum Structural Landing Weight for Amerijet's fleet (164,000 lbs flaps 30, 142,500 lbs flaps 40), a star will indicate to check the Maximum Structural Wt with the final calculated performance limit and select the lesser of the two. When the runway length is not sufficient for landing at zero wind, NOT AUTHORIZED is shown.

**HW ADJ column:**         The weight in pounds that the MAX WT ZERO WIND may be increased for each knot of headwind component.

**CRIT TW column:**        The maximum tailwind component that permits landing at the MAX WT ZERO WIND. When the runway length is not sufficient for landing with 10 knots tailwind, N/A is shown, indicating that landing is not authorized with any amount of tailwind.



V₁ PLUS                                    7

| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |
|---|---|---|

<u>LANDING DATA BOX</u>
(continued)

TW ADJ column:  The weight in pounds that the MAX WT ZERO WIND must be decreased for each knot of tailwind component in excess of the CRIT TW. The maximum allowable tailwind is 10 kts.

APT CRIT
TEMP column:  The maximum temperature for landing based on climb requirements at a landing structural limit weight of 164,000 lbs. for flaps 30 and 142,500 lbs for flaps 40. A/C packs are on; anti-ice is off.

SUB LB/F ABOVE
CRIT TEMP column:  The weight in pounds that the limit weight must be reduced below the structural limit weight for each degree F above the APT CRIT TEMP.

MAX OPER
TEMP column:  The maximum operating temperature for landing.

V₁ PLUS



Figure #1

| Runway Analysis Description | Amerijet International | B727-200 JT8D-15 |
|---|---|---|

# AUTO PACK TRIP/ENGINE FAIL LIGHT CORRECTION TABLE

Subtract the following weight decrement from the appropriate zero wind or climb limit column for operation with the automatic bleed shut-off system inoperative and/or the engine failure warning light off (or not installed).

| A/C PACKS | ZERO WIND COLUMN | CLIMB LIMIT COLUMN |
|---|---|---|
| ON | 4000 | 2900 |
| OFF | 2000 | NONE |

$V_1$ PLUS

| Runway Analysis Description | Amerijet International | B727 - 200 JT8D - 15 |
|---|---|---|

## LAND AND HOLD SHORT OPERATIONS (LAHSO)

Many airports now use Land And Hold Short Operations (LAHSO) in order to use intersecting runways for simultaneous operations. The crew must adhere to the following procedure when determining wether to accept a LAHSO clearance.

1. Check the Airport elevation.

2. Select the table with the appropriate elevation range on page 12 of this manual. (There are tables for 5 different elevation ranges on this page)

3. Determine the Landing Distance Available (LDA)

4. Enter the appropriate table with the LDA and read across to the Maximum Landing Weight.

The landing distances in the table are listed in 500 ft. intervals from 11,000 ft down to 6,000 ft. Interpolation is permitted for LDAs between the values shown on the table. Or, the LDA may be rounded down to the Next lower value.

LAHSO operations are not authorised with a LDA less than 6,000 ft.

LAHSO operations are not authorised wit Anti-Skid INOP.

LAHSO operations are not authorised with a tailwind component.

LAHSO operations are not authorised on wet runways.

\* OBSERVE STRUCTURAL WEIGHT LIMITS



11

Stop.



| Runway Analysis Description | Amerijet International | B727 - 200 JT8D - 15 |
|---|---|---|

**MAXIMUM LANDING WEIGHT - FLAP 30**

**AIRPORT ELEVATION = UP TO 2000**

| LDA | MAX WEIGHT | LDA | MAX WEIGHT |
|---|---|---|---|
| 11000 | 210,000 | 8000 | 184,000 |
| 10500 | 209,000 | 7500 | 177,500 |
| 10000 | 205,000 | 7000 | 170,000 |
| 9500 | 200,500 | 6500 | 161,600 |
| 9000 | 195,500 | 6000 | 148,000 |
| 8500 | 190,000 | 5500 | N/A |

**AIRPORT ELEVATION = 2001 - 4000**

| LDA | MAX WEIGHT | LDA | MAX WEIGHT |
|---|---|---|---|
| 11000 | 210,000 | 8000 | 180,000 |
| 10500 | 205,000 | 7500 | 173,500 |
| 10000 | 201,000 | 7000 | 166,500 |
| 9500 | 196,000 | 6500 | 156,750 |
| 9000 | 191,000 | 6000 | 141,000 |
| 8500 | 186,000 | 5500 | N/A |

**AIRPORT ELEVATION = 4001 - 6000**

| LDA | MAX WEIGHT | LDA | MAX WEIGHT |
|---|---|---|---|
| 11000 | 205,000 | 8000 | 175,500 |
| 10500 | 201,000 | 7500 | 168,500 |
| 10000 | 196,000 | 7000 | 161,000 |
| 9500 | 191,500 | 6500 | 150,500 |
| 9000 | 186,500 | 6000 | 133,500 |
| 8500 | 181,000 | 5500 | N/A |

**AIRPORT ELEVATION = 6001 - 8000**

| LDA | MAX WEIGHT | LDA | MAX WEIGHT |
|---|---|---|---|
| 11000 | 201,000 | 8000 | 171,000 |
| 10500 | 196,000 | 7500 | 163,500 |
| 10000 | 192,000 | 7000 | 156,000 |
| 9500 | 187,000 | 6500 | 142,500 |
| 9000 | 182,600 | 6000 | 126,500 |
| 8500 | 177,000 | 5500 | N/A |

**AIRPORT ELEVATION = 8001 - 8300**

| LDA | MAX WEIGHT | LDA | MAX WEIGHT |
|---|---|---|---|
| 11000 | 199,000 | 8000 | 170,000 |
| 10500 | 195,000 | 7500 | 162,000 |
| 10000 | 191,000 | 7000 | 154,500 |
| 9500 | 186,000 | 6500 | 141,000 |
| 9000 | 181,000 | 6000 | 124,500 |
| 8500 | 175,000 | 5500 | N/A |

\* OBSERVE STRUCTURAL WEIGHT LIMITS

N / A = NOT AUTHORISED

12



INTRODUCTION
11:0.0

PLAINTIFF'S
EXHIBIT
13
1/8/01

## INTRODUCTION

The B-727 is certificated under the requirements of CAR4b, SR-422B, Amendment 25-15 and FAR Part 36. This manual contains performance information pertinent to certain of these certification requirements.

Flight planning data is presented for cruise schedules ranging from Long Range Cruise to Maximum Speed Cruise, including simplified Flight Planning Charts which cover the entire trip profile, and tabulations for accurate planning by sector.

When operation is in conformity with the Performance Charts and Airport Analyses as provided within the Boeing 727 Performance Manual, it will meet the manufacturer's performance criteria.

The Boeing 727 Series Performance Chapter provides for Sections which contain:

  -9 and -15 engine rating takeoff performance data.
  -9 and -15 engine rating cruise data.

  Landing performance data, and performance data not directly related to a thrust rating.

### NOSE BRAKES

The nose brakes have been deactivated on Company 727 series airplanes. On all charts that have a brake correction, make the nose wheel brake off correction.



FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSBOROUGH

PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999



PERFORMANCE MANUAL

INTRODUCTION

LIST OF EFFECTIVE PAGES

| CHAPTER | PAGE | DATE | PAGE | DATE | PAGE | DATE | PAGE | DATE |
|---|---|---|---|---|---|---|---|---|
| 11:0:0 | INTRO | 03/19/99 | INTRO 1 | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 |
| 11:1:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 | 6 | 03/19/99 | 7 | 03/19/99 |
|  | 8 | 03/19/99 | 9 | 03/19/99 | 10 | 03/19/99 | 11 | 03/19/99 |
|  | 12 | 03/19/99 |  |  |  |  |  |  |
| 11:2:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 | 6 | 03/19/99 | 7 | 03/19/99 |
|  | 8 | 03/19/99 | 8a | 03/19/99 | 9 | 03/19/99 | 10 | 03/19/99 |
|  | 11 | 03/19/99 | 12 | 03/19/99 | 13 | 03/19/99 | 14 | 03/19/99 |
|  | 15 | 03/19/99 |  |  |  |  |  |  |
| 11:3:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 | 6 | 03/19/99 |  |  |
| 11:4:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 | 6 | 03/19/99 | 7 | 03/19/99 |
|  | 8 | 03/19/99 | 9 | 03/19/99 | 10 | 03/19/99 | 11 | 03/19/99 |
| 11:5:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 |  |  |  |  |  |  |
| 11:6:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 |  |  |  |  |
| 11:7:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 |  |  |  |  |
| 11:8:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 | 6 | 03/19/99 | 7 | 03/19/99 |
|  | 8 | 03/19/99 | 9 | 03/19/99 | 10 | 03/19/99 | 11 | 03/19/99 |
| 11:9:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 | 6 | 03/19/99 |  |  |
|  | 4A | 03/19/99 |  |  |  |  |  |  |
|  | 4B | 03/19/99 |  |  |  |  |  |  |
| 11:10:0 | INDEX | 03/19/99 | 1 | 03/19/99 | 2 | 03/19/99 | 3 | 03/19/99 |
|  | 4 | 03/19/99 | 5 | 03/19/99 | 6 | 03/19/99 | 7 | 03/19/99 |



FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999



**FLIGHT PLANNING**

Flight Planning Table
Flight Planning LRC (Short Distance Trip)
Flight Planning LRC, M.79, M.80, M.82, M.84, 310 KIAS
Alternate and Reserve Fuel
International Alternate and Reserve
Wind Range Correction
Wind-Altitude Trade Tables

**TAKEOFF**

Takeoff Speeds and Climb Attitudes
Takeoff Thrust
Maximum Continuous Thrust for Bug Sheet
Go-Around Thrust
Reduced EPR Instructions
Instructions for Completion of Takeoff Data Card

**CLIMB**

Thrust Climb Data
Maximum Climb Thrust
Maximum Continuous Thrust

**CRUISE**

Altitude Capability
Buffet Margins
Maximum Cruise Thrust
Cruise Performance LRC, M.79, M.82
Flight Conduct

**FLIGHT CONDUCT**

Flight Conduct
Maximum Continuous Thrust

**LANDING**

Go-Around Thrust
Instruction for Completion of Landing Data Card
Maximum Landing Weight for Quick Turnaround

**EMERGENCIES/ABNORMALS**

Flight Conduct
Two-Engine Long Range Cruise
One-Engine Driftdown

FAA APPROVED, FT. LAUDERDALE FSD
JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999



Issued:    03/19/99
Revision:    6

## FLIGHT WITH GEAR DOWN

Gear Down Operations
Gear Down Flight Planning LRC
Gear Down Altitude Capability LRC
Gear Down Cruise Performance

## TWO-ENGINE FERRY PROCEDURES

Operating Limitations
Operating Procedures
Computation
TOGW Limited By Runway/Climb
Flight Planning
Subsequent Engine Failure

## CONVERSION TABLES

TAT at ISA
Temperature - Fahrenheit/Centigrade
Distance/Height - Meters/Feet
Weight - Kilos and Pounds
Common Conversion Factors
Climb Rate Table

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

### FLIGHT PLANNING

| Page | |
|------|---|
| 1  | -15 Flight Planning Table |
| 2  | -15 LRC Flight Planning (Short Distance Trip) |
| 3  | -15 LRC Flight Planning |
| 4  | -15 M .79 Flight Planning |
| 5  | -15 M .80 Flight Planning |
| 6  | -15 M .82 Flight Planning |
| 7  | -15 Alternate & Reserve Fuel |
| 8  | -15 International Alternate & Reserve Fuel |
| 9  | Wind Range Correction |
| 10 | Wind-Altitude Trade Tables |
| 11 | -9 Flight Planning Table |
| 12 | -9 Alternate & Reserve Fuel |

FAA APPROVED, FT LAUDERDALE FSDO
JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

**AMERIJET INTERNATIONAL**

## -15 FLIGHT PLANNING TABLE

Based on following speed schedule:

CLIMB:    250 KIAS to 10,000 ft; 300 KIAS to 29,000 ft.
          .78 Mach above 29,000 ft.

CRUISE:   250 KIAS below 10,000 ft; 300 KIAS between 10,000 ft.
          and 31,900 ft.; .82 Mach above 31,900 ft.

DESCENT:  .80 Mach to 34,000 ft; 280 KIAS between 34,000 ft.
          and 10,000 ft; 250 KIAS below 10,000 ft.

When the trip length line (corrected for wind) intersects
between the horizontal time-fuel lines, use the time and
fuel shown in the blocks for the flight altitude.

Example:  960 NM, 100 knot tailwind, altitude 37,000
          Time: 1:53, Fuel: 15.4

When the trip length line (corrected for wind) intersects
on a horizontal time-fuel line, interpolate.

Example: 1200 NM, 100 knot headwind, altitude 39,000
          Time: 3:29, Fuel: 29.1

FLIGHT PLANNING TABLE

FAA APPROVED FT. LAUDERDALE FSDO
DRAFT C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

FLIGHT TIME AND FUEL BURNOUT

NOTE – TABLE VALID ONLY FOR LANDING WEIGHT OF 120,000 LBS.   FOR EACH 10,000 LBS. DEVIATION ABOVE (BELOW) 120,000 LBS.,
ADD (SUBTRACT) FUEL BURNOUT CORRECTION SHOWN ABOVE FOR EACH HOUR OF FLIGHT TIME.



-15 LRC FLIGHT PLANNING (SHORT DISTANCE TRIP)

### -200-15 FLIGHT PLANNING: LRC
### (SHORT DISTANCE TRIP)
ISA CONDITIONS, ZERO WIND
250-310KIAS/M.78 CLIMB
M.80/280-250 KIAS DESCENT

| TRIP DIST (NM) | FL | TIME HR + MIN | TRIP FUEL (LBS) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | LANDING GROSS WEIGHT (1000 LBS) | | | | | | |
| | | | 110 | 120 | 130 | 140 | 150 | 160 | 170 |
| 100 | 120 | + 28 | 3980 | 4110 | 4250 | 4400 | 4550 | 4710 | 4880 |
| 200 | 270 | + 43 | 6000 | 6200 | 6410 | 6640 | 6880 | 7130 | 7380 |
| 300 | 330 | + 56 | 7410 | 7720 | 8060 | 8420 | 8800 | 9180 | 9580 |
| 400 | 330 | 1 + 10 | 9100 | 9430 | 9830 | 10290 | 10780 | 11320 | 11870 |
| 500 | 330 | 1 + 24 | 10810 | 11200 | 11680 | 12220 | 12830 | 13480 | 14150 |

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROXBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

AMERIJET INTERNATIONAL

-15 LRC FLIGHT PLANNING



FAA APPROVED, FT LAUDERDALE FSDX
JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
20 MAY 1999

AmeriJet
INTERNATIONAL

-15 M .79 FLIGHT PLANNING

BASED ON:
310/.78 CLIMB
.80/280/250 DESCENT







2 0 MAY 1999

-15 M. 80 FLIGHT PLANNING



FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

AmeriJet
INTERNATIONAL

-15 M .82 FLIGHT PLANNING



Page:      7
Issued:    03/19/99
Revision:  6

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

-15 ALTERNATE & RESERVE FUEL

## -200-15 FLIGHT PLANNING; LRC
## (FUEL TO ALTERNATE/RESERVE FUEL)

ISA CONDITIONS, ZERO WIND
250-310KIAS/M.78 CLIMB
M.80/280-250KIAS DESCENT

JT8D-15

| ALTER-NATE DIST. (NM) | FL | TIME (MIN) | ALTERNATE FUEL (LBS) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | ZERO FUEL WEIGHT (1000 LBS) | | | | | | |
| | | | 100 | 110 | 120 | 130 | 140 | 150 | 155 |
| 50 | 060 | + 19 | 2760 | 2850 | 2940 | 3030 | 3130 | 3240 | 3300 |
| 100 | 120 | + 28 | 3900 | 4040 | 4190 | 4340 | 4490 | 4650 | 4740 |
| 150 | 200 | + 36 | 5040 | 5140 | 5280 | 5460 | 5660 | 5890 | 6000 |
| 200 | 270 | + 43 | 5910 | 6100 | 6310 | 6550 | 6790 | 7050 | 7180 |
| 250 | 310 | + 50 | 6530 | 6780 | 7060 | 7380 | 7710 | 8060 | 8230 |
| 300 | 330 | + 56 | 7260 | 7560 | 7900 | 8260 | 8650 | 9060 | 9260 |
| 350 | 330 | 1 + 04 | 8110 | 8410 | 8760 | 9170 | 9620 | 10080 | 10340 |

45 MIN RESERVE FUEL
(@ CRUISE FL, LRC
SPEED & FUEL FLOW)

| | | | | | | |
|---|---|---|---|---|---|---|
| 4720 | 5030 | 5400 | 5820 | 6260 | 6750 | 6990 |

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

AMERIJET INTERNATIONAL

-15 INTERNATIONAL ALTERNATE & RESERVE FUEL

# INTERNATIONAL FLIGHT PLANNING

## -200-15 FLIGHT PLANNING; LRC

### FUEL TO ALTERNATE/RESERVE FUEL

**ISA CONDITIONS, ZERO WIND**
**250-310 KIAS/M.78 CLIMB**
**M.80/280-250 KIAS DESCENT**

JT8D-15

| DIST TO ALT | FL | TIME (MIN) | ALTERNATE FUEL (LBS) ZERO FUEL WEIGHT (1000 LBS) | | | | |
|---|---|---|---|---|---|---|---|
| | | | 110 | 120 | 130 | 140 | 150 |
| 50 | 060 | 19 | 2840 | 2920 | 3010 | 3110 | 3210 |
| 100 | 120 | 28 | 4030 | 4170 | 4310 | 4460 | 4620 |
| 150 | 200 | 36 | 5130 | 5260 | 5430 | 5630 | 5840 |
| 200 | 270 | 43 | 6070 | 6290 | 6500 | 6740 | 6990 |
| 250 | 310 | 50 | 6750 | 7040 | 7330 | 7650 | 7980 |
| 300 | 330 | 56 | 7540 | 7860 | 8210 | 8580 | 8970 |

| 30 MIN HOLD AT 1500 FT MIN DRAG HOLDING SPEED | 4000 | 4200 | 4300 | 4400 | 4600 |
|---|---|---|---|---|---|
| | 200 | 201 | 209 | 217 | 225 |

### 10% CONTINGENCY FUEL

30,000 FT

JT8D-15

| TRIP TIME HH:MM | FUEL (LBS) LANDING WEIGHT AT DESTINATION* 1000 LBS | | | | |
|---|---|---|---|---|---|
| | 120 | 130 | 140 | 150 | 160 |
| 1:00 | 720 | 790 | 860 | 910 | 930 |
| 1:30 | 1080 | 1165 | 1290 | 1365 | 1395 |
| 2:00 | 1440 | 1580 | 1720 | 1820 | 1860 |
| 2:30 | 1800 | 1975 | 2150 | 2275 | 2325 |
| 3:00 | 2160 | 2370 | 2580 | 2730 | 2790 |
| 3:30 | 2520 | 2765 | 3010 | 3185 | 3255 |
| 4:00 | 2880 | 3160 | 3440 | 3640 | 3720 |
| 4:30 | 3240 | 3555 | 3870 | 4095 | 4185 |
| 5:00 | 3600 | 3950 | 4300 | 4550 | 4650 |
| 5:30 | 3960 | 4345 | 4730 | 5005 | 5115 |
| 6:00 | 4320 | 4740 | 5160 | 5460 | 5580 |

*ZERO FUEL WEIGHT + ALTERNATE FUEL + HOLDING FUEL

FAA APPROVED, FT LAUDERDALE FSDO

*John C. Roseborough*

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

| | |
|---|---|
| Chapter: | 11:1:0 |
| Page: | 9 |
| Issued: | 03/19/99 |
| Revision: | 6 |

WIND RANGE CORRECTION

# WIND RANGE CORRECTION



**Example:**

| | | |
|---|---|---|
| Enter with average cruise TAS | = | 475 kt, |
| then up to headwind | = | 50 kt, |
| trace right to ground distance | = | 1800 ground nm, then down |
| to find the still air distance | = | 2125 nm. |

AMERIJET INTERNATIONAL

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

Page:     10
Issued:   03/19/99
Revision: 6

WIND-ALTITUDE TRADE TABLES

# WIND-ALTITUDE TRADE TABLES

## LONG RANGE CRUISE

| FLIGHT LEVEL | CRUISE WEIGHT (1000 POUNDS) | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 188 | 184 | 180 | 176 | 172 | 168 | 164 | 160 | 156 | 152 | 148 | 144 | 140 | 136 | 132 | 128 | 124 | 120 | 116 | 112 |
| | FACTORS | | | | | | | | | | | | | | | | | | | |
| 390 | | | | | | | | | | | | | 15 | 10 | 5 | 2 | 0 | 0 | 0 | 3 |
| 370 | | | | | | | | | | 12 | 7 | 4 | 1 | 0 | 0 | 1 | 1 | 7 | 13 | 19 |
| 350 | | | | | | 13 | 8 | 5 | 2 | 1 | 0 | 0 | 0 | 2 | 4 | 8 | 12 | 18 | 25 | 33 |
| 330 | | 12 | 8 | 5 | 2 | 1 | 0 | 0 | 0 | 1 | 3 | 6 | 9 | 13 | 18 | 24 | 31 | 40 | | |
| 310 | 2 | 1 | 0 | 0 | 0 | 1 | 2 | 5 | 7 | 11 | 14 | 19 | 24 | 29 | 34 | 41 | 50 | | | |
| 290 | 0 | 1 | 1 | 2 | 4 | 6 | 9 | 12 | 16 | 21 | 26 | 30 | 35 | 40 | 45 | 51 | 57 | | | |
| 270 | 6 | 9 | 12 | 15 | 19 | 23 | 28 | 32 | 37 | 41 | 46 | 51 | 57 | 62 | 68 | 73 | | | | |
| 250 | 19 | 23 | 27 | 31 | 35 | 39 | 44 | 48 | 53 | 58 | 63 | 68 | 73 | 78 | 83 | | | | | |
| 230 | 34 | 38 | 42 | 46 | 51 | 55 | 60 | 64 | 69 | 73 | 78 | | | | | | | | | |

## .79M - .82M CRUISE

| FLIGHT LEVEL | CRUISE WEIGHT (1000 POUNDS) | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 188 | 184 | 180 | 176 | 172 | 168 | 164 | 160 | 156 | 152 | 148 | 144 | 140 | 136 | 132 | 128 | 124 | 120 | 116 | 112 |
| | FACTORS | | | | | | | | | | | | | | | | | | | |
| 390 | | | | | | | | | | | | | 13 | 3 | 2 | 1 | 0 | 0 | 2 | 5 |
| 370 | | | | | | | | | | | 5 | 2 | 0 | 0 | 0 | 2 | 5 | 7 | 10 | 13 |
| 350 | | | | | | | 6 | 3 | 1 | 0 | 0 | 1 | 2 | 5 | 8 | 13 | 17 | 21 | 26 | 32 |
| 330 | | | 5 | 3 | 1 | 0 | 0 | 1 | 3 | 5 | 9 | 13 | 19 | 25 | 32 | 39 | 45 | 53 | | |
| 310 | 1 | 0 | 0 | 0 | 1 | 2 | 4 | 7 | 10 | 15 | 20 | 26 | 33 | 41 | 49 | 59 | 67 | 78 | | |
| 290 | 1 | 2 | 4 | 6 | 9 | 13 | 18 | 23 | 29 | 35 | 42 | 50 | 59 | 68 | 78 | 90 | | | | |
| 270 | 10 | 13 | 17 | 22 | 27 | 32 | 38 | 46 | 53 | 61 | 69 | 79 | 90 | 101 | 112 | 124 | | | | |
| 250 | 26 | 31 | 37 | 43 | 50 | 57 | 65 | 73 | 82 | 91 | 101 | 112 | 123 | 135 | 146 | | | | | |
| 230 | 49 | 56 | 63 | 70 | 78 | 87 | 96 | 105 | 114 | 124 | 135 | 146 | | | | | | | | |

These WIND-ALTITUDE TRADE tables present factors required to calculate the wind necessary to maintain the present range capability at another flight level. This is called the breakeven wind. A tailwind is + and a headwind is -. The breakeven wind at a new altitude is calculated by the following formula:

Present Wind - Present Factor + New Factor = Breakeven Wind

Examples: Compare FL 330 and FL 370 cruising at 80M at a gross weight of 144.0.

| | Present Wind at 330 | | Present Factor at 330 | | New Factor at 370 | | Breakeven Wind at 370 |
|---|---|---|---|---|---|---|---|
| Headwind | -50 | - | 9 | + | 2 | = | -57 |
| Tailwind | 50 | - | 9 | + | 2 | = | 43 |

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. YARBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

**AmeriJet INTERNATIONAL**

## -9 FLIGHT PLANNING TABLE

Based on following speed schedule:

CLIMB: 250 KIAS to 10,000 ft; 300 KIAS to 29,000 ft; .78 Mach above 29,000 ft.

CRUISE: 250 KIAS below 10,000 ft; 300 KIAS between 10,000 ft. and 31,900 ft.; .83 Mach above 31,900 ft.

DESCENT: .80 Mach to 34,000 ft; 280 KIAS between 34,000 ft. and 10,000 ft; 250 KIAS below 10,000 ft.

When the trip length line (corrected for wind) intersects between the horizontal time-fuel lines, use the time and fuel shown in the blocks for the flight altitude.

Example: 950 NM, 100 knot tailwind, altitude 37,000.
Time: 1:43, Fuel: 18.1

When the trip length line (corrected for wind) intersects on a horizontal time-fuel line, interpolate.

Example: 1200 NM, 100 knot headwind, altitude 39,000.
Time: 3:29, Fuel: 28.9

FLIGHT PLANNING TABLE



NOTE — TABLE VALID ONLY FOR LANDING WEIGHT OF 120,000 LBS. FOR EACH 10,000 LBS. DEVIATION ABOVE (BELOW) 120,000 LBS.,
ADD (SUBTRACT) FUEL BURNOUT CORRECTION SHOWN ABOVE FOR EACH HOUR OF FLIGHT TIME.

AMERIJET INTERNATIONAL

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

-9 ALTERNATE & RESERVE FUEL

**(FUEL TO ALTERNATE/RESERVE FUEL)**
**ISA CONDITIONS - - ZERO WIND**
**250/310/.78 CLIMB**
**.80/280/250 DESCENT**

| ALTERNATE DISTANCE (NM) | FL | TIME (MIN) | ALTERNATE FUEL (LB) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | ZERO FUEL WEIGHT (-1000LB) | | | | | |
| | | | 90 | 100 | 110 | 120 | 130 | 132 |
| 50 | 060 | + 16 | 1920 | 2000 | 2100 | 2520 | 2940 | 3040 |
| 100 | 120 | + 23 | 3010 | 3150 | 3300 | 3720 | 4170 | 4270 |
| 150 | 200 | + 30 | 4100 | 4300 | 4500 | 4920 | 5400 | 5500 |
| 200 | 270 | + 37 | 4990 | 5200 | 5400 | 5890 | 6400 | 6500 |
| 250 | 310 | + 44 | 5700 | 5950 | 6200 | 6710 | 7230 | 7350 |
| 300 | 330 | + 50 | 6500 | 6750 | 7000 | 7500 | 8020 | 8160 |
| 350 | 330 | + 57 | 7170 | 7420 | 7700 | 8530 | 8800 | 8920 |
| **45MIN RESERVE FUEL** (@ Cruise FL, LRC Speed and Fuel Flow) | | | 3980 | 4370 | 4750 | 5140 | 5520 | 5600 |

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

**TAKEOFF**

| Page | | |
|------|------|------|
| 1 | -15 | Takeoff Speeds and Climb Attitudes |
| 2 | -15 | Takeoff Thrust |
| 3 | -15 | Maximum Continuous Thrust for Bug Sheet |
| 4 | -15 | Maximum Climb Thrust for Bug Sheet |
| 5 | -15 | Go-Around Thrust |
| 6 | -200 | Critical Speeds |
| 7 | | Reduced EPR |
| 8 | | Reduced Takeoff Thrust Example |
| 8a | | Reduced Takeoff Thrust Example |
| 9 | | Instructions for Completion of Takeoff Data Ca |
| 10 | -9 | Takeoff Speeds and Climb Attitudes |
| 11 | -9 | Takeoff Thrust |
| 12 | -9 | Maximum Continuous Thrust for Bug Sheet |
| 13 | -9 | Maximum Climb Thrust for Bug Sheet |
| 14 | -9 | Go-Around Thrust |
| 15 | -9 | Go-Around Thrust Corrections |

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

**-15  TAKEOFF SPEEDS AND CLIMB ATTITUDES**

## -15 TAKEOFF SPEEDS

| PRESS ALT, FT × 1000 | OAT, °C | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7.1 to 8.3 | \-13 & colder | | | \-12 to 24 | | | 25 to 40 | | | | | |
| 5.1 to 7 | \-23 & colder | | | \-22 to 5 | | | 6 to 36 | | | 37 to 44 | | |
| 3.1 to 5 | 0 & colder | | | 1 to 32 | | | 33 to 45 | | | 46 to 49 | | |
| 1.1 to 3 | 28 & colder | | | 29 to 41 | | | 42 to 49 | | | | | |
| \-1 to 1 | 37 & colder | | | 38 to 49 | | | | | | | | |
| **TOGW LB × 1000** | V1 = Vr | V2 | Clb Att | V1 = Vr | V2 | Clb Att | V1 = Vr | V2 | Clb Att | V1 = Vr | V2 | Clb Att |
| **FLAPS 5** | | | | | | | | | | | | |
| 200 | 160 | 171 | 15 | 162 | 171 | 14 | | | | | | |
| 190 | 155 | 167 | 16 | 157 | 167 | 15 | 158 | 167 | 14 | | | |
| 180 | 150 | 163 | 17 | 152 | 163 | 15 | 154 | 163 | 14 | | | |
| 170 | 144 | 159 | 17 | 147 | 159 | 16 | 149 | 159 | 15 | 150 | 158 | 13 |
| 160 | 140 | 154 | 18 | 141 | 153 | 17 | 143 | 153 | 16 | 145 | 153 | 14 |
| 150 | 135 | 149 | 18 | 136 | 149 | 17 | 138 | 149 | 16 | 140 | 148 | 15 |
| 140 | 129 | 145 | 18 | 130 | 145 | 18 | 132 | 144 | 17 | 132 | 144 | 15 |
| 130 | 124 | 140 | 18 | 125 | 139 | 18 | 126 | 138 | 17 | 128 | 138 | 16 |
| 120 | 119 | 135 | 18 | 120 | 134 | 18 | 120 | 134 | 18 | 121 | 133 | 17 |
| **FLAPS 15** | | | | | | | | | | | | |
| 200 | 151 | 162 | 14 | 153 | 162 | 13 | | | | | | |
| 190 | 146 | 158 | 15 | 148 | 158 | 13 | 149 | 158 | 13 | | | |
| 180 | 141 | 154 | 15 | 143 | 154 | 14 | 145 | 154 | 13 | | | |
| 170 | 136 | 150 | 16 | 138 | 150 | 15 | 140 | 150 | 14 | 141 | 149 | 12 |
| 160 | 132 | 146 | 17 | 133 | 145 | 15 | 135 | 145 | 14 | 137 | 145 | 13 |
| 150 | 127 | 141 | 18 | 128 | 141 | 16 | 130 | 141 | 15 | 132 | 140 | 14 |
| 140 | 122 | 137 | 18 | 123 | 137 | 17 | 124 | 136 | 16 | 126 | 136 | 14 |
| 130 | 117 | 133 | 18 | 118 | 132 | 18 | 118 | 131 | 17 | 120 | 131 | 15 |
| 120 | 112 | 128 | 18 | 113 | 127 | 18 | 113 | 127 | 18 | 115 | 126 | 16 |
| **FLAPS 20** | | | | | | | | | | | | |
| 200 | 146 | 157 | 13 | 148 | 157 | 12 | | | | | | |
| 190 | 141 | 153 | 13 | 143 | 153 | 12 | 144 | 153 | 11 | | | |
| 180 | 136 | 150 | 14 | 138 | 150 | 13 | 140 | 149 | 12 | | | |
| 170 | 132 | 146 | 15 | 133 | 146 | 13 | 135 | 145 | 12 | 136 | 145 | 11 |
| 160 | 128 | 142 | 16 | 129 | 141 | 14 | 131 | 141 | 13 | 133 | 141 | 12 |
| 150 | 123 | 137 | 17 | 124 | 137 | 15 | 126 | 136 | 14 | 128 | 136 | 12 |
| 140 | 118 | 133 | 18 | 119 | 133 | 16 | 120 | 132 | 15 | 122 | 132 | 13 |
| 130 | 113 | 129 | 18 | 114 | 128 | 17 | 114 | 127 | 16 | 116 | 127 | 14 |
| 120 | 109 | 124 | 18 | 109 | 123 | 18 | 109 | 123 | 17 | 111 | 122 | 15 |
| **FLAPS 25** | | | | | | | | | | | | |
| 200 | 141 | 153 | 11 | 143 | 153 | 10 | | | | | | |
| 190 | 137 | 149 | 12 | 138 | 149 | 11 | 139 | 149 | 10 | | | |
| 180 | 132 | 145 | 13 | 134 | 145 | 11 | 136 | 145 | 10 | | | |
| 170 | 127 | 141 | 13 | 129 | 141 | 12 | 131 | 141 | 11 | 132 | 140 | 10 |
| 160 | 123 | 137 | 14 | 124 | 137 | 13 | 126 | 137 | 12 | 128 | 136 | 10 |
| 150 | 119 | 133 | 15 | 120 | 133 | 13 | 122 | 133 | 12 | 124 | 132 | 11 |
| 140 | 114 | 129 | 16 | 115 | 129 | 14 | 116 | 128 | 13 | 118 | 128 | 12 |
| 130 | 109 | 125 | 17 | 110 | 124 | 15 | 110 | 124 | 14 | 112 | 123 | 12 |
| 120 | 105 | 120 | 18 | 106 | 120 | 16 | 106 | 119 | 15 | 108 | 118 | 13 |

**CORRECTIONS**

Nose gear brakes inop - Reduce V1 by 1 knot.

**NOTES**

- Clb Att is the rotation target pitch attitude for a three-engine V2 + 10 climb.
- With an engine failed, V2 climb target attitudes are approximately 3 degrees lower. An 18° maximum has been imposed for passenger comfort; at very low weights, this results in a speed slightly faster than V2 + 10.



TEMP CONV

PRESSURE ALTITUDE FIELD ELEVATION CORR.

FAA APPROVED, FT LAUDERDALE FSW
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

**AmeriJet INTERNATIONAL**

## -15 TAKEOFF THRUST

### -15 TAKEOFF THRUST

Cells show EPR (top) / N1 (bottom).

| OAT °C (°F) | -1000 POD | -1000 CENTER | SEA LEVEL POD | SEA LEVEL CENTER | 500 POD | 500 CENTER | 1000 POD | 1000 CENTER | 1500 POD | 1500 CENTER | 2000 POD | 2000 CENTER | 3000 POD | 3000 CENTER | 3854 & Higher POD | 3854 & Higher CENTER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 (120) | 1.91 / 95.6 | 1.94 / 96.6 | | | | | | | | | | | | | EPR | N1 |
| 45 (113) | 1.94 / 98.3 | 1.97 / 97.3 | | | | | | | | | | | | | | |
| 40 (104) | 1.99 / 97.2 | 2.02 / 98.3 | | | | | | | | | | | | | | |
| 35 (95) | 2.03 / 98.0 | 2.06 / 99.2 | | | | | | | | | | | | | | |
| 30 (86) | 2.04 / 97.7 | 2.07 / 96.8 | 2.08 / 96.9 | 2.11 / 100.2 | | | | | | | | | | | | |
| 25 (77) | 2.04 / 96.9 | 2.07 / 98.0 | 2.09 / 98.6 | 2.13 / 99.9 | 2.11 / 99.2 | 2.14 / 100.4 | | | | | | | | | | |
| 22 (72) | 2.04 / 96.4 | 2.07 / 97.5 | 2.09 / 96.1 | 2.13 / 99.4 | 2.11 / 96.6 | 2.12 / 99.8 | 2.12 / 99.2 | 2.15 / 100.4 | | | | | | | | |
| 19 (66) | 2.04 / 95.9 | 2.07 / 97.0 | 2.09 / 96.9 | 2.13 / 98.1 | 2.11 / 98.1 | 2.14 / 98.5 | 2.12 / 99.7 | 2.15 / 96.8 | 2.13 / 100.1 | 2.16 / 99.2 | 2.13 / 100.5 | 2.16 | 2.16 / 100.5 | | | |
| 16 (61) | 2.04 / 95.5 | 2.07 / 96.5 | 2.09 / 97.1 | 2.13 / 96.4 | 2.11 / 97.6 | 2.14 / 96.8 | 2.12 / 98.0 | 2.15 / 90.3 | 2.13 / 98.3 | 2.16 / 99.6 | 2.14 / 96.7 | 2.17 / 100.0 | | | | |
| 13 (55) | 2.04 / 94.9 | 2.07 / 96.0 | 2.09 / 96.8 | 2.13 / 97.9 | 2.11 / 97.2 | 2.14 / 98.5 | 2.12 / 98.5 | 2.15 / 98.7 | 2.13 / 97.8 | 2.16 / 99.1 | 2.14 / 98.2 | 2.17 / 99.5 | | | | |
| 10 (50) | 2.04 / 94.5 | 2.07 / 95.5 | 2.09 / 96.1 | 2.13 / 97.4 | 2.12 / 97.1 | 2.15 / 98.5 | 2.13 / 98.5 | 2.16 / 98.6 | 2.14 / 96.8 | 2.17 / 97.8 | 2.17 / 99.0 | | | | | |
| 5 (41) | 2.04 / 93.7 | 2.07 / 94.8 | 2.09 / 95.3 | 2.13 / 96.8 | 2.12 / 96.2 | 2.15 / 97.5 | 2.16 / 97.2 | 2.18 / 96.5 | 2.17 / 97.8 | 2.20 / 99.0 | 2.20 / 97.8 | 2.20 / 99.0 | | | | |
| 0 (32) | 2.04 / 92.9 | 2.07 / 93.9 | 2.09 / 94.5 | 2.13 / 95.7 | 2.12 / 95.3 | 2.15 / 96.6 | 2.15 / 96.3 | 2.18 / 97.7 | 2.18 / 97.3 | 2.21 / 96.5 | 2.20 / 97.9 | 2.23 / 99.3 | | | | |
| -5 (23) | 2.04 / 92.0 | 2.07 / 91.1 | 2.09 / 93.6 | 2.13 / 94.8 | 2.12 / 94.5 | 2.15 / 95.8 | 2.15 / 95.4 | 2.18 / 96.8 | 2.18 / 96.4 | 2.21 / 97.6 | 2.21 / 97.3 | 2.24 / 98.8 | 2.23 / 96.0 | 2.26 / 99.5 | | |
| -10 (14) | 2.04 / 91.1 | 2.07 / 92.2 | 2.09 / 92.8 | 2.13 / 93.9 | 2.12 / 93.6 | 2.15 / 94.9 | 2.15 / 94.5 | 2.18 / 95.9 | 2.16 / 95.5 | 2.21 / 96.7 | 2.21 / 96.2 | 2.24 / 97.8 | 2.25 / 98.0 | 2.26 / 99.5 | | |
| -15 (5) | 2.04 / 90.3 | 2.07 / 91.4 | 2.09 / 91.9 | 2.13 / 93.0 | 2.12 / 93.6 | 2.15 / 94.0 | 2.15 / 94.6 | 2.18 / 95.0 | 2.18 / 95.8 | 2.21 / 95.3 | 2.21 / 96.9 | 2.24 / 97.5 | 2.26 / 99.0 | 2.30 / 97.9 | 2.27 / 96 | 2.: 99 |
| -20 (-4) | 2.04 / 89.4 | 2.07 / 90.5 | 2.09 / 91.0 | 2.13 / 92.1 | 2.12 / 91.9 | 2.15 / 93.1 | 2.15 / 92.7 | 2.18 / 94.1 | 2.18 / 93.7 | 2.21 / 94.9 | 2.21 / 94.5 | 2.24 / 96.0 | 2.26 / 96.5 | 2.30 / 97.7 | 2.29 | 2.: 9 |
| -25 (-13) | 2.04 / 88.5 | 2.07 / 89.6 | 2.09 / 90.1 | 2.13 / 91.2 | 2.12 / 90.9 | 2.15 / 92.1 | 2.15 / 91.8 | 2.18 / 93.2 | 2.18 / 92.6 | 2.21 / 94.0 | 2.21 / 93.6 | 2.24 / 95.1 | 2.26 / 95.6 | 2.30 / 97.0 | 2.30 / 97.2 | 2. 9 |
| -30 (-22) | 2.04 / 87.6 | 2.07 / 88.7 | 2.09 / 89.2 | 2.13 / 90.3 | 2.12 / 90.0 | 2.15 / 91.2 | 2.15 / 91.2 | 2.18 / 92.3 | 2.18 / 91.9 | 2.21 / 93.1 | 2.21 / 92.7 | 2.24 / 94.1 | 2.26 / 94.6 | 2.30 / 96.1 | 2.30 / 96.1 | 2. 9 |

*MAX TEMP.

### NOTES

Chart EPR and N1 settings on this page are based on:
- Pod engine—airconditioning bleeds on
- Center engine—airconditioning bleeds off (Center engine airconditioning on is not permitted at take-off thrust)
- Speed — 0 to 60 kt

### N1 CORRECTIONS

| Condition | Pod | Center |
|---|---|---|
| A/C bleed off | Use/center N1 | 0 |
| Engine anti-ice (condition A) | + 1.0 | + 0.4 |
| (condition B) | − 0.1 | − 0.7 |

### REDUCED-THRUST CALCULATIONS

- Reductions may not exceed .30 EPR; above 6400 ft PA may not exceed .12 EPR.

### EPR CORRECTIONS

| Condition | Pod | Center |
|---|---|---|
| A/C bleed off | Center EPR + .01 | 0 |
| Engine anti-ice (condition A) | 0 | − .03 |
| (condition B) | − .03 | − .06 |

### ANTI-ICE CONDITIONS

A — Below 3000 ft altitude or warmer than − 18° temperature

B — Above 3000 ft altitude and colder than − 18° temperature

### *HIGH ALTITUDE MAX TEMPERATURE LIMITATIONS

For altitudes above 3000 ft, observe the following temperature limitations

| ALT | 4000 | 5000 | 6000 | 7000 | 8000 | 8300 | 9000 | 10,0 |
|---|---|---|---|---|---|---|---|---|
| °C | 45 | 44 | 42 | 40 | 38 | 33 | 31 | 29 |

AMERIJET INTERNATIONAL

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

-15  MAXIMUM CONTINUOUS THRUST FOR BUG SHEET

## -15 MAX CONTINUOUS THRUST FOR BUG SHEET

| Airport OAT °C | AIRPORT PRESSURE ALTITUDE, FT | | | | | | | | | | | | | |
| | -1000 | | SEA LEVEL | | 499 | | 500 | | 1000 | | 2000 | | 3000 & Higher | |
| | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER |
| 49 | 1.75 | 1.78 | | | | | | | | | | | 1.74 | 1.78 |
| 45 | 1.79 | 1.82 | | | | | | | | | | | 1.78 | 1.82 |
| 40 | 1.84 | 1.87 | | | | | | | | | | | 1.83 | 1.87 |
| 35 | 1.84 | 1.87 | | | | | 1.90 | 1.93 | 1.89 | 1.93 | 1.89 | 1.93 | 1.89 | 1.93 |
| 30 | 1.84 | 1.87 | | | | | 1.95 | 1.98 | 1.95 | 1.98 | 1.94 | 1.98 | 1.94 | 1.98 |
| 25 | 1.84 | 1.87 | | | | | 2.00 | 2.03 | 1.99 | 2.03 | 1.99 | 2.03 | 1.99 | 2.03 |
| 22 | 1.85 | 1.89 | | | | | 2.02 | 2.06 | 2.02 | 2.06 | 2.02 | 2.06 | 2.01 | 2.06 |
| 19 | 1.88 | 1.91 | | | | | 2.05 | 2.07 | 2.05 | 2.07 | 2.05 | 2.07 | 2.04 | 2.07 |
| 16 | 1.91 | 1.94 | | | | | 2.08 | 2.11 | 2.08 | 2.11 | 2.07 | 2.11 | 2.07 | 2.11 |
| 13 | 1.93 | 1.97 | | | | | 2.10 | 2.13 | 2.10 | 2.13 | 2.10 | 2.13 | 2.09 | 2.13 |
| 10 | 1.97 | 2.00 | | | | | 2.13 | 2.16 | 2.13 | 2.16 | 2.12 | 2.16 | 2.12 | 2.16 |
| 5 | 2.02 | 2.06 | | | | | 2.15 | 2.18 | 2.16 | 2.19 | 2.16 | 2.19 | 2.15 | 2.19 |
| 0 | 2.07 | 2.10 | 2.08 | 2.11 | 2.08 | 2.11 | 2.15 | 2.18 | 2.18 | 2.22 | 2.19 | 2.23 | 2.18 | 2.2 |
| -5 | 2.07 | 2.10 | 2.13 | 2.16 | 2.13 | 2.16 | 2.15 | 2.18 | 2.18 | 2.22 | 2.23 | 2.26 | 2.22 | 2.2 |
| -10 | 2.07 | 2.10 | 2.13 | 2.16 | 2.15 | 2.18 | 2.15 | 2.18 | 2.18 | 2.22 | 2.24 | 2.28 | 2.25 | 2.2 |
| -15 | 2.07 | 2.10 | 2.13 | 2.16 | 2.15 | 2.18 | 2.15 | 2.18 | 2.18 | 2.22 | 2.24 | 2.28 | 2.28 | 2.3 |
| -20 & Colder | 2.07 | 2.10 | 2.13 | 2.16 | 2.15 | 2.18 | 2.15 | 2.18 | 2.18 | 2.22 | 2.24 | 2.28 | 2.29 | 2.3 |

| Airconditioning Bleed Corrections | | |
| --- | --- | --- |
| Condition | Pod | Center |
| A/C bleed on | Use pod EPR | NA |
| A/C bleed off | Use center EPR | Use center EPR |

| Anti-Ice Bleed Corrections | | | | |
| --- | --- | --- | --- | --- |
| Anti-Ice Mode | Rated below 1500 ft | | Rated above 1500 ft | |
| | Pod | Center | Pod | Center |
| Engine inlet | -.06 | -.12 | -.06 | -.12 |
| Engine & wing (2 eng bleed) | -.17 | NA | -.17 | NA |
| Engine & wing (1 eng bleed) | -.18 | NA | -.17 | NA |

NOTES

Chart EPR settings on this page are based o

• Pod engines — airconditioning bleeds on

• Center engine — airconditioning bleeds o

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROXBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

-15 MAXIMUM CLIMB THRUST FOR BUG SHEET

## -15 MAXIMUM CLIMB THRUST FOR BUG SHEET

| AIRPORT OAT °C | PRESSURE ALTITUDE, FT | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | −1000 | | SEA LEVEL | | 1000 | | 2000 | | 3000 & Higher | |
| | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER |
| 50 | 1.62 | 1.65 | | | | | | | 1.61 | 1.65 |
| 45 | 1.65 | 1.69 | | | | | | | 1.64 | 1.69 |
| 40 | 1.69 | 1.72 | | | | | | | 1.68 | 1.72 |
| 35 | 1.73 | 1.76 | | | | | | | 1.72 | 1.76 |
| 30 | 1.77 | 1.80 | | | | | | | 1.76 | 1.80 |
| 25 | 1.81 | 1.84 | | | | | | | 1.80 | 1.84 |
| 20 | 1.86 | 1.88 | | | | | | | 1.85 | 1.88 |
| 15 | 1.90 | 1.93 | | | | | | | 1.89i | 1.93 |
| 10 | 1.94 | 1.97 | | | | | | | 1.93 | 1.97 |
| 5 | 1.99 | 2.03 | 1.99 | 2.03 | 1.99 | 2.03 | 1.99 | 2.03 | 1.98 | 2.03 |
| 0 | 2.05 | 2.08 | 2.05 | 2.08 | 2.05 | 2.08 | 2.05 | 2.08 | 2.04 | 2.08 |
| − 5 | 2.07 | 2.10 | 2.10 | 2.14 | 2.10 | 2.14 | 2.10 | 2.14 | 2.09 | 2.14 |
| − 10 | 2.07 | 2.10 | 2.13 | 2.16 | 2.15 | 2.19 | 2.15 | 2.19 | 2.14 | 2.19 |
| − 15 | 2.07 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.19 | 2.22 | 2.18 | 2.22 |
| − 20 | 2.07 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.19 | 2.22 | 2.21 | 2.25 |
| − 25 | 2.07 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.25 | 2.28 | 2.24 | 2.28 |
| − 30 | 2.07 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.25 | 2.28 | 2.25 | 2.30 |
| − 35 | 2.07 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.25 | 2.28 | 2.27 | 2.31 |
| − 40 & Colder | 2.07 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.25 | 2.28 | 2.28 | 2.33 |

| NOTES |
|---|
| Chart EPR settings on this page are based on: |
| • Pod engines — airconditioning bleed on. |
| • Center engine — airconditioning bleed off. |
| Max climb thrust for bug sheet is an initial target EPR based on 1000 ft above airport and .30M. Reset to actual conditions as soon as possible. |

| CORRECTIONS | | |
|---|---|---|
| Condition | Pod | Center |
| Airconditioning bleed on | — | Use Pod EPR |
| Airconditioning bleed off | Use Center EPR | — |
| Engine anti-ice | − .08 | − .12 |
| Engine & wing anti-ice | − .17 | NA |

| CENTER ENGINE INLET CORRECTION |
|---|
| If a MOD A Center Engine Inlet is NOT Installed |
| Subtract　− 0.01 EPR |

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

-15  GO-AROUND THRUST

## -15 GO-AROUND THRUST

PRESSURE ALTITUDE, FT

Each cell below lists EPR / N1.

| Airport OAT °C (°F) | ~1000 POD | ~1000 CENTER | SEA LEVEL POD | SEA LEVEL CENTER | 500 POD | 500 CENTER | 1000 POD | 1000 CENTER | 1500 POD | 1500 CENTER | 2000 POD | 2000 CENTER | 3000 POD | 3000 CENTER | 3856 & Higher POD | 3856 & Higher CENTER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 (120) | 1.87 / 94.7 | 1.90 / 95.9 | — | — | — | — | — | — | — | — | — | — | — | — | EPR | N1 |
| 45 (113) | 1.91 / 95.5 | 1.95 / 96.7 | — | — | — | — | — | — | — | — | — | — | — | — | → | → |
| 40 (104) | 1.96 / 96.4 | 2.00 / 97.6 | — | — | — | — | — | — | — | — | — | — | — | — | → | → |
| 35 (95) | 2.01 / 97.2 | 2.04 / 98.4 | — | — | — | — | — | — | — | — | — | — | — | — | → | → |
| 30 (86) | 2.02 / 96.9 | 2.06 / 97.9 | 2.05 / 97.9 | 2.09 / 99.1 | — | — | — | — | — | — | — | — | — | — | → | → |
| 25 (77) | 2.02 / 98.1 | 2.06 / 97.1 | 2.07 / 97.4 | 2.10 / 98.6 | 2.08 / 98.1 | 2.11 / 99.1 | — | — | — | — | — | — | — | — | → | → |
| 22 (72) | 2.02 / 95.5 | 2.06 / 96.8 | 2.07 / 96.9 | 2.10 / 98.1 | 2.08 / 97.5 | 2.11 / 98.6 | 2.10 / 98.1 | 2.13 / 99.4 | — | — | — | — | — | — | → | → |
| 19 (66) | 2.02 / 95.0 | 2.06 / 96.2 | 2.07 / 96.4 | 2.10 / 97.6 | 2.08 / 97.0 | 2.11 / 98.1 | 2.10 / 97.5 | 2.13 / 98.7 | 2.11 / 98.1 | 2.14 / 99.2 | 2.12 / 98.3 | 2.16 / 99.7 | — | — | → | → |
| 16 (61) | 2.02 / 94.6 | 2.06 / 95.6 | 2.07 / 95.9 | 2.10 / 97.1 | 2.08 / 96.5 | 2.11 / 97.6 | 2.10 / 97.0 | 2.13 / 98.1 | 2.11 / 97.5 | 2.14 / 98.7 | 2.12 / 97.9 | 2.16 / 99.3 | — | — | → | → |
| 13 (55) | 2.02 / 94.0 | 2.06 / 95.1 | 2.07 / 95.4 | 2.10 / 96.6 | 2.08 / 96.1 | 2.11 / 97.3 | 2.10 / 96.4 | 2.13 / 97.8 | 2.11 / 97.0 | 2.14 / 97.4 | 2.12 / 98.1 | 2.16 / 98.8 | — | — | → | → |
| 10 (50) | 2.02 / 93.8 | 2.06 / 94.6 | 2.07 / 94.9 | 2.10 / 96.1 | 2.10 / 95.9 | 2.12 / 96.4 | 2.11 / 97.1 | 2.14 / 97.6 | 2.11 / 97.6 | 2.14 / 97.6 | 2.12 / 98.2 | 2.16 / 98.2 | — | — | → | → |
| 5 (41) | 2.02 / 92.6 | 2.06 / 93.9 | 2.07 / 94.0 | 2.10 / 95.2 | 2.10 / 95.1 | 2.12 / 96.3 | 2.12 / 96.1 | 2.16 / 97.4 | 2.15 / 96.8 | 2.18 / 98.1 | 2.15 / 96.8 | 2.18 / 98.1 | — | — | → | → |
| 0 (32) | 2.02 / 91.9 | 2.06 / 92.9 | 2.07 / 93.2 | 2.10 / 94.4 | 2.10 / 94.3 | 2.12 / 95.4 | 2.12 / 95.1 | 2.16 / 96.6 | 2.15 / 96.2 | 2.18 / 97.4 | 2.18 / 97.1 | 2.22 / 98.5 | — | — | → | → |
| -5 (23) | 2.02 / 91.0 | 2.06 / 90.1 | 2.07 / 92.4 | 2.10 / 93.5 | 2.10 / 93.5 | 2.12 / 94.6 | 2.12 / 94.2 | 2.16 / 95.8 | 2.15 / 95.3 | 2.18 / 96.6 | 2.18 / 96.1 | 2.22 / 97.7 | 2.22 / 97.3 | 2.25 / 98.6 | → | → |
| -10 (14) | 2.02 / 90.1 | 2.06 / 91.2 | 2.07 / 91.6 | 2.10 / 92.6 | 2.10 / 92.6 | 2.12 / 93.3 | 2.12 / 93.7 | 2.16 / 94.9 | 2.15 / 94.4 | 2.18 / 95.7 | 2.18 / 95.1 | 2.22 / 96.9 | 2.25 / 97.3 | 2.28 / 96.6 | → | → |
| -15 (-5) | 2.02 / 89.2 | 2.06 / 90.3 | 2.07 / 91.8 | 2.10 / 91.7 | 2.10 / 92.8 | 2.12 / 92.4 | 2.12 / 94.0 | 2.16 / 93.5 | 2.15 / 94.8 | 2.18 / 94.3 | 2.18 / 95.9 | 2.22 / 96.5 | 2.25 / 97.9 | 2.28 / 97.2 | 2.27 / 97.2 | 2.30 / 98.6 |
| -20 (-4) | 2.02 / 88.4 | 2.06 / 89.5 | 2.07 / 88.9 | 2.10 / 90.9 | 2.10 / 90.8 | 2.12 / 91.9 | 2.12 / 91.5 | 2.16 / 93.1 | 2.15 / 92.6 | 2.18 / 93.9 | 2.18 / 93.4 | 2.22 / 95.0 | 2.25 / 95.5 | 2.28 / 96.9 | 2.29 / 97.0 | 2.33 / 98.4 |
| -25 (-13) | 2.02 / 87.5 | 2.06 / 88.8 | 2.07 / 89.0 | 2.10 / 90.0 | 2.10 / 90.0 | 2.12 / 90.9 | 2.12 / 90.8 | 2.16 / 92.2 | 2.15 / 91.7 | 2.18 / 93.0 | 2.18 / 92.5 | 2.22 / 94.1 | 2.25 / 94.6 | 2.28 / 96.0 | 2.30 / 96.5 | 2.33 / 97.7 |
| -30 (-22) | 2.02 / 86.6 | 2.06 / 87.7 | 2.07 / 88.2 | 2.10 / 89.1 | 2.10 / 89.0 | 2.12 / 90.0 | 2.12 / 89.7 | 2.16 / ·91.3 | 2.15 / 90.7 | 2.18 / 92.1 | 2.18 / 91.8 | 2.22 / 93.1 | 2.25 / 93.7 | 2.28 / 95.1 | 2.30 / 95.4 | 2.33 / 96.9 |

### EPR/N1 CORRECTION

#### NOTES

Chart EPR and N1 settings on this page are based on:

- Pod engines — airconditioning bleeds on
- Center engine — airconditioning bleeds off
- OAT, or TAT minus 3°C (5°F).

Apply additional corrections as follows if applicable.

| Condition | Pod EPR | Pod N1 | Center EPR | Center N1 |
|---|---|---|---|---|
| A/C bleed off | Use Center EPR/N1 | | 0 | 0 |
| Engine anti-ice (condition A*) | 0 | +1.0 | -.03 | +0. |
| (condition B*) | -.03 | -0.1 | -.06 | -0. |
| Engine & wing anti-ice (2 eng bleed condition A*) | -.09 | -1.2 | NA | NA |
| (2 eng bleed condition B*) | -.12 | -2.3 | NA | NA |
| (1 eng bleed condition A*) | -.10 | -1.3 | NA | NA |
| (1 eng bleed condition B*) | -.13 | -2.4 | NA | NA |

*ANTI-ICE CONDITIONS

A — Below 3000 ft altitude or above -18°C temperature
B — Above 3000 ft altitude and below -18°C temperature

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

-200 CRITICAL SPEEDS

# -200

## -200 CRITICAL SPEEDS, KIAS

| GW 1000 LB | THRESHOLD IAS | | CLIMB SPD 1 OR 2 ENG | FLAP POSITION | 0° | 2° | 5° | 15° | 25° | 30° | 40° |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FLAPS 40° | FLAPS 30° | | MIN. MANEUVERING SPEED FOR GW UP TO 150,000 LB | 200 | 190 | 180 | 150 | 140 | VTH | VTH |
| 110 | 108 | 112 | 196 | | | | | | | | |
| 115 | 111 | 114 | 200 | | | | | | | | |
| 120 | 113 | 117 | 204 | | | | | | | | |
| 125 | 116 | 120 | 208 | FOR GW OVER 150,000 LB ADD 10 KT TO ABOVE SPEEDS | | | | | | | |
| 130 | 119 | 122 | 213 | | | | | | | | |
| 135 | 122 | 125 | 217 | FOR GW OVER 176,000 LB ADD 20 KT TO ABOVE SPEEDS | | | | | | | |
| 140 | 124 | 127 | 221 | | | | | | | | |
| 145 | 127 | 130 | 225 | FOR GW OVER 191,000 LB ADD 30 KT TO FLAPS 5, 15, AND 25 SPEEDS AN | | | | | | | |
| 150 | 129 | 132 | 229 | 35 KT TO FLAPS 0 AND 2 SPEEDS | | | | | | | |
| 155 | 132 | 137 | 233 | | | | | | | | |
| 160 | 134 | 138 | 237 | | | | | | | | |
| 165 | 137 | 141 | 241 | | | | | | | | |
| 170 | 140 | 143 | 244 | | | | | | | | |
| 175 | 142 | 145 | 248 | | | | | | | | |
| 180 | 145 | 148 | 252 | | | | | | | | |
| 185 | 147 | 150 | 255 | | | | | | | | |
| 190 | 150 | 153 | 259 | | | | | | | | |
| 195 | 153 | 155 | 262 | | | | | | | | |
| 200 | 155 | 158 | 266 | | | | | | | | |

### OPTIONAL LOW ALT MINIMUM MANEUVERING SPEEDS

| FLAPS | WEIGHT, LB × 1000 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 |
| 0° | 175 | 185 | 190 | 200 | 204 | 210 | 215 | 220 | 225 |
| 2° | 165 | 170 | 180 | 190 | 195 | 200 | 204 | 210 | 215 |
| 5° | 140 | 145 | 150 | 160 | 165 | 170 | 175 | 180 | 185 |
| 15° | 130 | 135 | 140 | 150 | 155 | 160 | 165 | 170 | 175 |
| 25° | 125 | 130 | 135 | 140 | 145 | 150 | 155 | 160 | 165 |

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

REDUCED EPR

Reduced takeoff thrust is the takeoff EPR computed using an assumed temperature.  As temperature is the HIGHEST TEMPERATURE on the Runway Analysis Chart that a take-off be made at the ACTUAL Gross take-off weight of the aircraft.  It will not be lower t maximum climb EPR.

Maximum takeoff thrust is the takeoff EPR computed using the airport temperature and pressure altitude.

Use reduced takeoff thrust whenever practicable to reduce turbine inlet temperature engine EGT during takeoff.

DO NOT USE reduced takeoff thrust for any of the following conditions:

    When takeoff runway has standing water, ice, slush, or snow;

    When headwind adjustment has been used to increase allowable takeoff weight;

    When takeoff is to be made with a tailwind;

    When main gear antiskid is inoperative;

    When anti-ice is on;

    When airport temperature is below +6°F (-14°C);

    When mixed engines are installed;

    When wind shear is reported or expected;

    When conducting a two engine ferry;

    When deicing fluid has been used.

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

### REDUCED TAKEOFF THRUST

To obtain the reduced thrust engine pressure ratio (EPR) setting, use the following example:

**STEP 1.** Read down the zero wind column until you find a gross weight that is less than the aircraft's actual takeoff gross weight.

**STEP 2.** Read the gross weight one line above the value found in step 1. This weight should be equal to or slightly greater than the aircraft's actual takeoff gross weight.

**STEP 3.** Read right to ensure that the climb limit weight corresponding to the zero wind limit found in step 2 is also greater than the aircraft's actual takeoff gross weight. If it is not, read up the climb limit column until you find a weight that is equal to or slightly greater than the aircraft's actual takeoff gross weight.

**STEP 4.** On the line on which both the zero wind & climb limit weights are equal to or greater than the aircraft's actual takeoff gross weight, read to the left to find the corresponding temperature in degrees Celsius & Farenheit. This is the highest outside air temperature (OAT) at which the aircraft can depart under the given conditions using reduced EPR; otherwise known as the assumed temperature.

**STEP 5.** On the same line, read right to the MAX T/O EPR column to find the reduced EPR setting. If this EPR setting is no more than .3 less than the maximum EPR setting found using the takeoff thrust tables in Chapter 11:2:0 then this reduced thrust value can be used. If this EPR setting is more than .3 less than the maximum EPR setting found using the takeoff thrust tables in Chapter 11:2:0 then the most that thrust may be reduced from maximum is .3.

### EXAMPLE

Ft. Lauderdale Runway 9 Left - 60°F
Actual Takeoff Gross Weight - 185,000 Pounds
Normal Takeoff Thrust from 11:2:0 PAGE 2 - 2.09, 2.13.

**STEP 1.** Initial Zero Wind weight limit - 184.6
**STEP 2.** Zero Wind weight limit one line above initial value - 185.8
**STEP 3.** Climb Limit weight - 203.7
**STEP 4.** Assumed Temperature for 185,000 pound takeoff - 90°F (32°C)
**STEP 5.** Reduced Thrust Required - 2.06

FAA APPROVED, FT/LAUDERDALE FSDO

JOHN C. ROSSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

### REDUCED TAKEOFF THRUST EXAMPLE

AMERIJET INTERNATIONAL    FORT LAUDERDALE, FL
B-727-200   JT8D-15       HOLLYWOOD INTL

KFLL    09L                    FLAPS   15

| TEMP F | C | ZERO WIND | CLIMB LIMIT | A/C OFF (+) | FOD MAX EPR | N1% FOR T/O | GD 2.07 EPR | ENG ANTI-ICE ZERO WIND | A/C CLIMB LIMIT | A/C OFF (+) |
|---|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2062 R | 2090 | 23 R 2.10 | 90 2.07 | 2037 | 2065 | 23 | | |
| 0 | -18 | 2043 R | 2090 | 21 R 2.10 | 91 2.07 | 2018 | 2065 | 21 | | |
| 10 | -12 | 2023 R | 2090 | 21 R 2.10 | 92 2.07 | 1998 | 2065 | 21 | | |
| 20 | -7 | 2002 R | 2090 | 21 R 2.10 | 93 2.07 | 1978 | 2065 | 21 | | |
| 30 | -1 | 1986 R | 2090 | 20 R 2.10 | 94 2.07 | 1961 | 2065 | 20 | | |
| 32 | 0 | 1982 R | 2090 | 20 R 2.10 | 94 2.07 | 1957 | 2065 | 20 | | |
| 34 | 1 | 1979 R | 2090 | 19 R 2.10 | 94 2.07 | 1954 | 2065 | 19 | | |
| 36 | 2 | 1976 R | 2090 | 19 R 2.10 | 95 2.07 | 1951 | 2065 | 19 | | |
| 38 | 3 | 1972 R | 2090 | 19 R 2.10 | 95 2.07 | 1947 | 2065 | 19 | | |
| 40 | 4 | 1969 R | 2090 | 18 R 2.10 | 95 2.07 | 1944 | 2065 | 18 | | |
| 43 | 6 | 1965 R | 2090 | 19 R 2.10 | 95 2.07 | 1340 | 2065 | 19 | | |
| 44 | 7 | 1962 R | 2090 | 19 R 2.10 | 95 2.07 | 1937 | 2065 | 19 | | |
| 46 | 8 | 1959 R | 2090 | 19 R 2.10 | 95 2.07 | 1934 | 2065 | 19 | | |
| 48 | 9 | 1956 R | 2090 | 19 R 2.10 | 96 2.07 | 1931 | 2065 | 19 | | |
| 50 | 10 | 1952 R | 2090 | 20 R 2.10 | 96 2.07 | 1927 | 2065 | 20 | | |
| 52 | 11 | 1949 R | 2090 | 20 R 2.10 | 96 2.07 | | | | | |
| 54 | 12 | 1946 R | 2090 | 19 R 2.10 | 96 2.07 | | | | | |
| 56 | 13 | 1942 R | 2090 | 20 R 2.10 | 96 2.07 | | | | | |
| 58 | 14 | 1939 R | 2090 | 20 R 2.10 | 97 2.07 | | | | | |
| 60 | 16 | 1922 R | 2090 | 33 R 2.10 | 97 2.07 | | | | | |
| 62 | 17 | 1320 R | 2090 | 31 R 2.10 | 97 2.07 | | | | | |
| 64 | 18 | 1918 R | 2090 | 30 R 2.10 | 97 2.07 | | | | | |
| 66 | 19 | 1916 R | 2090 | 28 R 2.10 | 97 2.07 | | | | | |
| 68 | 20 | 1914 R | 2090 | 27 R 2.10 | 98 2.07 | | | | | |
| 70 | 21 | 1912 R | 2090 | 25 R 2.10 | 98 2.07 | | | | | |
| 72 | 22 | 1910 R | 2090 | 24 R 2.10 | 98 2.07 | | | | | |
| 74 | 23 | 1909 R | 2090 | 21 R 2.10 | 98 2.07 | | | | | |
| 76 | 24 | 1907 R | 2090 | 20 R 2.10 | 98 2.07 | | | | | |
| 78 | 26 | 1905 R | 2090 | 18 R 2.10 | 98 2.07 | | | | | |
| 80 | 27 | 1904 R | 2090 | 16 R 2.10 | 99 2.07 | | | | | |
| 82 | 28 | 1901 R | 2090 | 16 R 2.10 | 99 2.07 | | | | | |
| 84 | 29 | 1892 R | 2088 | 23 R 2.10 | 99 2.07 | | | | | |
| 86 | 30 | 1881 R | 2071 | 20 R 2.08 | 99 2.07 | | | | | |
| 88 | 31 | 1869 R | 2054 | 19 R 2.07 | 99 2.07 | | | | | |
| 90 | 32 | 1858 R | 2037 | 17 R 2.06 | 99 2.07 | | | | | |
| 92 | 33 | 1846 R | 2019 | 16 R 2.05 | 98 2.06 | | | | | |
| 94 | 34 | 1835 R | 2001 | 14 R 2.04 | 98 2.05 | | | | | |
| 96 | 36 | 1823 R | 1983 | 13 R 2.03 | 98 2.04 | | | | | |
| 98 | 37 | 1812 R | 1965 | 12 R 2.02 | 98 2.03 | | | | | |
| 100 | 38 | 1800 R | 1947 | 11 R 2.01 | 98 2.02 | | | | | |
| 102 | 39 | 1788 R | 1930 | 12 R 2.00 | 97 2.01 | | | | | |
| 104 | 40 | 1776 R | 1913 | 13 R 1.99 | 97 2.00 | | | | | |
| 106 | 41 | 1763 R | 1896 | 15 R 1.98 | 97 1.99 | | | | | |
| 108 | 42 | 1751 R | 1879 | 16 R 1.97 | 97 1.98 | | | | | |
| 110 | 43 | 1739 R | 1862 | 17 R 1.96 | 97 1.96 | | | | | |
| 112 | 44 | 1727 R | 1845 | 18 R 1.95 | 97 1.95 | | | | | |
| 114 | 46 | 1715 R | 1828 | 19 R 1.94 | 96 1.94 | | | | | |
| 116 | 47 | 1704 R | 1811 | 19 R 1.93 | 96 1.93 | | | | | |
| 118 | 48 | 1692 R | 1794 | 20 R 1.92 | 96 1.92 | | | | | |
| 120 | 49 | 1680 R | 1777 | 21 R 1.90 | 96 1.91 | | | | | |

* = CHECK MAX STRUCTURAL WT

| | | | | PACKS | ON | TORA | = | 9001 |
|---|---|---|---|---|---|---|---|---|
| | | | | NOSE BRKS | OFF | TODA | = | 9001 |
| | | | | 210 MPH TIRE | | ASDA | = | 9001 |
| | | | | BLEV = | 11 | GRAD | = | -.01% |

----NOTES----

1. CTR ENG EPR:  HDD-HDD
   ICE OFF    +.04    +.03
   ICE ON     +.01    NONE

2. FOD ENG EPR: (HDD NOT APPL.)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON   +.04

3. FLAP RETRACT WT(OCH)
   = 811 FTMSL

4. OBST: HT(FT AGL) DIST(NM)
         50      1.81

DATE: 12/09/92

#### GROSS WEIGHT CORRECTIONS

BARO PRESS – FOR EACH .1 IN HG BELOW 29.70 USE 1 DEGREE HOTTER TEMPERATURE

WIND – ADD TO ZERO WIND    321 LBS/KT EFF HEAD W
       SUB FROM ZERO WIND  1322 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR —
   *WIND   *RUNWAY SHORTENING   *ANTI-SKID INOP
   *RUNWAY CONTAMINATION *REL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR—
   *REL PERFORMANCE DECREMENTS

RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS

| | | STANDING WATER | REDUCE V1 | REDUCE SPEED |
|---|---|---|---|---|
| | | ZERO | | |
| DRY | SLUSH OR WET SNOW | WIND W | BY: | BY: |
| SNOW | | | | |
| -DH- | -DH- | -LBS- | -LBS- | |
| | | < 1/4 | 14000 | 31 |
| 3 1/2 TO 6 | 1/4 TO 1/2 | | 28000 | 26 |
| | ICE | | 14000 | 31 |
| | ANTI-SKID INOP | | 6300 | 21 |

## LANDING DATA                    PACKS ON

| | | | — DRY — | | | | — WET — | | | | SUB LB/F | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MAX WT | | | | | MAX WT | | | | APT ABOVE | MAX |
| LNDG FLAP | ANTI LENGTH SKID | ZERO WIND | HW ADJ | CRIT TW | TW ADJ | ZERO WIND | HW ADJ | CRIT TW | TW ADJ | CRIT TEMP | OPER CRIT TEMP | OPER TEMP |
| 30 | 8432 OPER | *204200 | 290 | 0 | 1358 | *205400 | 210 | 0 | 3257 | | | |
| 30 | 6432 INOP | *175700 | 970 | 0 | 3107 | *156600 | 950 | 0 | 3311 | 120 | 0 | 120 |
| 30 | 8423 OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | | | |

COMPUFLIGHT INC.



FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

INSTRUCTIONS FOR COMPLETION OF TAKEOFF DATA CARD
(EXAMPLE DATA GIVEN IN BOLD PARENTHESIS)

1. FOUR LETTER ICAO STATION IDENTIFIER - FROM FLIGHT RELEASE (KFLL)
2. FLIGHT NUMBER - FROM FLIGHT RELEASE (845)
3. TAKEOFF WEIGHT - FROM WEIGHT & BALANCE LOAD PLAN (180,001 TO 185,000)
4. RUNWAY NUMBER - FROM ATIS (9L)
5. MAXIMUM TAKEOFF GROSS WEIGHT IN THOUSANDS OF POUNDS - FROM RUNWAY ANALYSIS (195.0)
6. ACTUAL TAKEOFF GROSS WEIGHT IN THOUSANDS OF POUNDS - FROM WEIGHT & BALANCE LOAD PLAN (185.0)
7. STABILIZER TRIM SETTING UNITS - FROM WEIGHT & BALANCE COMPUTER (5.8)
8. MAXIMUM EPR FOR POD & CENTER ENGINES - FROM PERFORMANCE MANUAL CHAPTER 11:3:0 FOR TYPE ENGINE INSTALLED (2.08   2.11)
9. NOMINAL N1% FOR POD & CENTER ENGINES - FROM PERFORMANCE MANUAL CHAPTER 11:3:0 FOR TYPE ENGINE INSTALLED (98.92   100.2)
10. REDUCED EPR FOR POD & CENTER ENGINES - FROM RUNWAY ANALYSIS (1.90   1.90)
11. INITIAL CLIMB EPR FOR POD & CENTER ENGINES - FROM PERFORMANCE MANUAL CHAPTER 11:3:0 FOR TYPE ENGINE INSTALLED (1.77   1.80)
12. GO-AROUND EPR FOR POD & CENTER ENGINES - FROM PERFORMANCE MANUAL CHAPTER 11:3:0 FOR TYPE ENGINE INSTALLED (2.07   2.10)
13. DUMP TIME REQUIRED (10)
14. ATIS PHONETIC ALPHABET LETTER IDENTIFIER & TIME OF OBSERVATION - (A   1555)
15. CLIMB SPEED PROFILES FOR GROSS WEIGHT - FROM AIRCRAFT OPERATING MANUAL - (250 | 310 | M.78)
16. TAKEOFF FLAP SETTING - CIRCLE APPLICABLE FLAP SETTING (15)
17. V1, Vr, V2, & CLIMB ATTITUDE - FROM PERFORMANCE MANUAL CHAPTER 11:3:0 FOR TYPE ENGINE INSTALLED (142, 143, 156, 15)
18. MANEUVERING SPEEDS FOR FLAP SETTING AT TAKEOFF GROSS WEIGHT (170, 180, 210, 220)
19. ONE (1) OR TWO (2) ENGINE INOPERATIVE CLIMB SPEED - FROM PERFORMANCE MANUAL CHAPTER 11:3:0 -200 CRITICAL SPEEDS CHART (255)

|  | B-727 TAKEOFF |  | STATION ____KFLL____ | 1. |
|  | DATA |  | FLT No. ____845____ | 2. |
| 3. | _____180,001 TO 185,000 LBS._____ |  |  |  |
| 4. | RWY_____9L_____ |  | CLB SPDS 250 | 310 | M.78 | 15. |
| 5. | MAX TOGW____195.0____ |  | FLAPS 5   15   20   25 | 16. |
| 6. | ACT TOGW____185.0____ |  | V₁ ____142____ |  |
| 7. | STAB TRIM ___5.8___ |  | Vᵣ ____143____ |  |
| 8. | MAX EPR 2.08 ___2.11__ |  | V₂ ____156____ | 17. |
| 9. | NOM N₁% 98.9 ___100.2 |  | CLIMB ATT ___15___  • |  |
| 10. | RED EPR_1.90_ ___1.90 |  | 15° MAN____170____ KIAS |  |
| 11. | CLB EPR_1.77_ ___1.80 |  | 5° MAN____180____ KIAS |  |
| 12. | G/A EPR_2.07_ _2.10 |  | 2° MAN____210____ KIAS | 18. |
| 13. | DUMP TIME___10___ MIN |  | 0° MAN____220____ KIAS |  |
| 14. | ATIS ___A__|__1555_z |  | 1 or 2 ENG |  |
|  |  |  | CLIMB ____255____ KIAS | 19. |

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
**2 0 MAY 1999**

Amerijet INTERNATIONAL

-9   TAKEOFF SPEEDS AND CLIMB ATTITUDES

## -9  TAKEOFF SPEEDS

| PRESS ALT, FT × 1000 | OAT, °C | | | |
|---|---|---|---|---|
| 9.1 to 10 | | -26 & colder | -25 to  0 | 1 to 30 |
| 7.1 to  9 | -38 & colder | -37 to -11 | -10 to 24 | 25 to 38 |
| 5.1 to  7 | -17 & colder | -16 to   4 | 5 to 35 | 36 to 42 |
| 3.1 to  5 | 0 & colder | 1 to  31 | 32 to 44 | |
| 1.1 to  3 | 29 & colder | 30 to  40 | 41 to 49 | |
| -1 to  1 | 38 & colder | 39 to  49 | | |

TEMP CONV
°C / °F

| | TOGW Lb × 1000 | V1 = Vr | V2 | Clb Att | V1 = Vr | V2 | Clb Att | V1 = Vr | V2 | Clb Att | V1 = Vr | V2 | Clb Att |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **F L A P S 5** | 190 | 156 | 168 | 14 | 158 | 168 | 13 | | | | | | |
| | 180 | 151 | 164 | 15 | 153 | 164 | 14 | | | | | | |
| | 170 | 146 | 160 | 15 | 148 | 159 | 14 | 150 | 158 | 13 | | | |
| | 160 | 141 | 156 | 16 | 142 | 155 | 15 | 144 | 154 | 14 | | | |
| | 150 | 135 | 151 | 17 | 137 | 151 | 16 | 139 | 150 | 14 | 139 | 149 | 13 |
| | 140 | 129 | 147 | 18 | 131 | 146 | 16 | 133 | 145 | 15 | 134 | 144 | 14 |
| | 130 | 123 | 142 | 18 | 125 | 141 | 17 | 127 | 141 | 16 | 129 | 140 | 15 |
| | 120 | 117 | 137 | 18 | 119 | 136 | 18 | 121 | 136 | 17 | 123 | 135 | 16 |
| | 110 | 110 | 132 | 18 | 112 | 131 | 18 | 114 | 131 | 18 | 116 | 130 | 17 |
| **F L A P S 15** | 190 | 148 | 158 | 12 | 149 | 157 | 11 | | | | | | |
| | 180 | 143 | 154 | 13 | 144 | 153 | 12 | | | | | | |
| | 170 | 138 | 151 | 14 | 139 | 149 | 13 | 140 | 149 | 12 | | | |
| | 160 | 133 | 147 | 15 | 134 | 146 | 14 | 135 | 145 | 13 | | | |
| | 150 | 128 | 143 | 16 | 129 | 142 | 14 | 131 | 141 | 13 | 132 | 139 | 13 |
| | 140 | 123 | 139 | 16 | 124 | 138 | 15 | 125 | 137 | 14 | 127 | 135 | 13 |
| | 130 | 117 | 135 | 17 | 119 | 134 | 16 | 120 | 132 | 15 | 122 | 131 | 14 |
| | 120 | 111 | 131 | 18 | 113 | 129 | 17 | 114 | 128 | 16 | 116 | 127 | 14 |
| | 110 | 105 | 126 | 18 | 107 | 125 | 18 | 108 | 124 | 17 | 110 | 122 | 15 |
| **F L A P S 25** | 180 | 134 | 146 | 11 | 135 | 145 | 10 | | | | | | |
| | 170 | 129 | 142 | 11 | 130 | 141 | 10 | | | | | | |
| | 160 | 124 | 139 | 12 | 126 | 138 | 11 | 127 | 137 | 10 | | | |
| | 150 | 120 | 135 | 13 | 121 | 134 | 12 | 122 | 133 | 10 | 124 | 134 | 9 |
| | 140 | 115 | 131 | 13 | 116 | 130 | 12 | 117 | 129 | 11 | 119 | 128 | 10 |
| | 130 | 109 | 127 | 14 | 111 | 126 | 13 | 112 | 125 | 12 | 114 | 124 | 11 |
| | 120 | 104 | 123 | 15 | 105 | 122 | 14 | 107 | 121 | 13 | 108 | 120 | 12 |
| | 110 | 98 | 119 | 16 | 99 | 118 | 15 | 101 | 117 | 14 | 103 | 115 | 12 |

### NOTES

Clb Att is the rotation target pitch attitude for a three-engine V2 + 10 climb. With an engine failed, V2 climb target attitudes are approximately 3 degrees lower. An 18° maximum has been imposed for passenger comfort; at very low weights, this results in a speed slightly faster than V2 + 10.

PRESSURE ALTITUDE
FIELD ELEVATION COR.
QNH PRESSURE / COR. FT



ANGLE BETWEEN WIND DIRECTION AND RUNWAY

RUNWAY COMPONENT, KT

CROSSWIND COMPONENT, KT

FAA APPROVED, FL LAUDERDALE FSDO

JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

**AMERIJET INTERNATIONAL**

## -9 TAKEOFF THRUST

### -9 TAKEOFF THRUST

| OAT °C (°F) | -1000 POD | CENTER | SEA LEVEL POD | CENTER | 1000 POD | CENTER | 2000 POD | CENTER | 3000 POD | CENTER | 4000 POD | CENTER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 (120) | 1.82 92.0 | 1.84 93.1 | | | | | | | MAX TEMPERATURE | | | |
| 45 (113) | 1.85 92.6 | 1.87 93.7 | | | | | | | | | | |
| 40 (104) | 1.90 93.4 | 1.92 94.7 | | | | | | | | | | |
| 35 (95) | 1.94 94.1 | 1.96 95.5 | | | | | | | | | | |
| 34 (93) | 1.95 94.3 | 1.97 95.7 | | | | | | | | | | |
| 30 (86) | 1.95 93.8 | 1.97 95.2 | 1.99 94.9 | 2.01 96.3 | | | | | | | | |
| 29 (84) | 1.95 93.6 | 1.97 95.1 | 2.00 95.0 | 2.02 96.5 | | | | | | | | |
| 25 (77) | 1.95 93.0 | 1.97 94.4 | 2.00 94.5 | 2.02 95.9 | | | | | | | | |
| 20 (68) | 1.95 92.2 | 1.97 93.6 | 2.00 93.7 | 2.02 95.1 | | | | | | | | |
| 15 (59) | 1.95 91.4 | 1.97 92.7 | 2.00 92.9 | 2.02 94.4 | | | | | | | | |
| 10 (50) | 1.95 90.6 | 1.97 91.9 | 2.00 92.1 | 2.02 93.5 | 2.03 93.3 | 2.05 94.8 | | | | | | |
| (0.3) | 1.95 91.6 | 1.97 91.7 | 2.00 93.2 | 2.02 93.4 | 2.05 94.7 | 2.07 | | | | | | |
| 5 (41) | 1.95 89.8 | 1.97 91.1 | 2.00 92.7 | 2.02 93.0 | 2.05 94.4 | 2.07 93.6 | 2.07 94.8 | 2.09 | | | | |
| 0 (32) | 1.95 89.0 | 1.97 90.2 | 2.00 91.9 | 2.02 92.2 | 2.05 93.6 | 2.07 93.8 | 2.10 95.0 | 2.12 | | | | |
| -1 (30) | 1.95 88.8 | 1.97 90.1 | 2.00 91.7 | 2.02 92.0 | 2.05 93.3 | 2.07 93.8 | 2.10 95.1 | 2.12 | | | | |
| -5 (23) | 1.95 88.2 | 1.97 89.4 | 2.00 91.0 | 2.02 91.4 | 2.05 92.7 | 2.07 93.1 | 2.10 94.4 | 2.12 94.0 | 2.13 95.2 | 2.15 | | |
| -10 (14) | 1.95 87.4 | 1.97 88.5 | 2.00 90.2 | 2.02 90.5 | 2.05 91.8 | 2.07 92.3 | 2.10 93.5 | 2.12 94.0 | 2.16 95.2 | 2.18 | | |
| -15 (5) | 1.95 86.5 | 1.97 87.7 | 2.00 89.3 | 2.02 89.7 | 2.05 90.9 | 2.07 91.3 | 2.10 92.6 | 2.12 93.0 | 2.16 94.3 | 2.18 94.0 | 2.18 95.3 | 2.20 |
| -20 (-4) | 1.95 85.7 | 1.97 86.9 | 2.00 87.0 | 2.02 88.4 | 2.05 88.9 | 2.07 90.1 | 2.10 90.4 | 2.12 91.7 | 2.16 92.1 | 2.18 93.4 | 2.21 94.0 | 2.23 95.3 |
| -25 (-13) | 1.95 84.8 | 1.97 86.0 | 2.00 86.2 | 2.02 87.5 | 2.05 88.0 | 2.07 89.2 | 2.10 89.5 | 2.12 90.8 | 2.16 91.2 | 2.18 92.5 | 2.21 93.0 | 2.23 94.4 |

| OAT °C (°F) | 4000 POD | CENTER | 5000 POD | CENTER | 5660 & ABO POD | CENTER |
|---|---|---|---|---|---|---|
| 49 (120) | | | MAX TEMPERATURE | | | |
| 45 (113) | 1.85 92.6 | 1.87 93.7 | | | | |
| 40 (104) | 1.90 93.4 | 1.92 94.7 | | | | |
| 35 (95) | 1.94 94.1 | 1.96 95.5 | | | | |
| 34 (93) | 1.95 94.3 | 1.97 95.7 | | | | |
| 30 (86) | 1.99 94.9 | 2.01 96.3 | | | | |
| 29 (84) | 2.00 95.0 | 2.02 96.5 | | | | |
| 25 (77) | 2.00 94.5 | 2.02 95.9 | | | | |
| 20 (68) | 2.00 93.7 | 2.02 95.1 | | | | |
| 15 (59) | 2.00 92.9 | 2.02 94.4 | | | | |
| 10 (50) | 2.03 93.3 | 2.05 94.6 | | | | |
| 8 (46) | 2.05 93.6 | 2.07 94.7 | | | | |
| 5 (41) | 2.07 93.6 | 2.09 94.8 | | | | |
| 0 (32) | 2.10 93.8 | 2.12 95.0 | | | | |
| -1 (30) | 2.10 93.8 | 2.12 95.1 | | | | |
| -5 (23) | 2.13 94.0 | 2.15 95.2 | | | | |
| -10 (14) | 2.16 94.0 | 2.18 95.2 | | | | |
| -15 (5) | 2.18 94.0 | 2.20 95.3 | | | | |
| -20 (-4) | 2.21 94.0 | 2.23 95.3 | | | | |
| -25 (-13) | 2.21 94.4 | 2.23 93.8 | 2.23 95.3 | 2.25 | | |
| -30 (-22) | 2.21 92.1 | 2.23 93.5 | 2.26 93.7 | 2.28 95.2 | | |
| -35 (-31) | 2.21 91.1 | 2.23 92.5 | 2.26 93.0 | 2.28 94.5 | 2.28 93.5 | |
| -40 (-40) | 2.21 90.1 | 2.23 91.5 | 2.26 92.0 | 2.28 93.5 | 2.30 93.2 | |
| -45 (-49) | 2.21 89.8 | 2.23 90.5 | 2.26 91.0 | 2.28 92.5 | 2.30 92.2 | |
| -50 (-58) | 2.21 88.1 | 2.23 89.5 | 2.26 90.0 | 2.28 91.5 | 2.30 91.2 | |

### N1 CORRECTIONS

**Airconditioning**
For pod engines airconditioning bleed off, use center N1.

**Anti-Ice**

| Engine anti-ice | Pod | Center |
|---|---|---|
| | + 1.0% | + 0.4% |

### REDUCED THRUST CALCULATIONS

- Reductions may not exceed .30 EPR; above 6400 ft PA may not exceed .12 EPR.

### EPR CORRECTIONS

**Airconditioning**
For pod engines airconditioning bleed off, use center EPR with the following corrections:

| | |
|---|---|
| 2.22 and lower | + 0.02 |
| 2.23 and higher | + 0.03 |

**Anti-Ice**

| Engine anti-ice | Pod | Center |
|---|---|---|
| | 0 | - 0.03 |

### NOTES

Chart EPR and N1 settings on this page are based on:
- Speed — 0 to 60 kt.
- Pod engine — airconditioning bleed on.
- Center engine — airconditioning bleed off. (Center engine airconditioning on is not permitted at takeoff thrust.)
- EPRs are limit EPR. N1s are nominal N1. N1s are not valid for reduced thrust.

### CENTER ENGINE INLET CORRECTION

If a MOD A Center Engine Inlet is installed:
Add   + 0.01 EPR



FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

-9  MAXIMUM CONTINUOUS THRUST FOR BUG SHEET

### -9 MAXIMUM CONTINUOUS THRUST FOR BUG SHEET

| OAT °C | PRESSURE ALTITUDE, FT | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | -1000 | | SEA LEVEL | | 499 | | 500 | | 1000 | | 2000 | | 3000 | |
| | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER | POD | CENTER |
| 45 | 1.65 | 1.69 | | | | | 1.67 | 1.70 | | | | | | |
| 40 | 1.68 | 1.71 | | | | | 1.72 | 1.74 | | | | | | |
| 35 | 1.71 | 1.74 | | | | | 1.76 | 1.79 | | | | | | |
| 30 | 1.74 | 1.77 | | | | | 1.82 | 1.85 | | | | | | |
| 25 | 1.76 | 1.80 | | | | | 1.87 | 1.91 | | | | | | |
| 20 | 1.79 | 1.83 | | | | | 1.92 | 1.95 | | | | | | |
| 15 | 1.82 | 1.86 | | | | | 1.97 | 2.00 | | | | | | |
| 10 | 1.86 | 1.89 | | | | | 2.01 | 2.04 | | | | | | |
| 5 | 1.90 | 1.93 | | | | | 2.04 | 2.07 | | | | | | |
| 4 | 1.91 | 1.94 | | | | | 2.05 | 2.08 | 2.05 | 2.08 | 2.05 | 2.08 | | |
| 0 | 1.94 | 1.97 | | | | | 2.05 | 2.08 | 2.08 | 2.10 | 2.08 | 2.10 | | |
| -2 | 1.97 | 1.99 | | | | | 2.05 | 2.08 | 2.08 | 2.10 | 2.09 | 2.11 | | |
| -5 | 1.97 | 1.99 | 2.00 | 2.03 | 2.00 | 2.03 | 2.05 | 2.08 | 2.08 | 2.10 | 2.10 | 2.13 | | |
| -8 | 1.97 | 1.99 | 2.03 | 2.06 | 2.03 | 2.06 | 2.05 | 2.08 | 2.08 | 2.10 | 2.12 | 2.15 | | |
| -10 | 1.97 | 1.99 | 2.03 | 2.06 | 2.05 | 2.08 | 2.05 | 2.08 | 2.08 | 2.10 | 2.13 | 2.16 | | |
| -15 | 1.97 | 1.99 | 2.03 | 2.06 | 2.05 | 2.08 | 2.05 | 2.08 | 2.08 | 2.10 | 2.13 | 2.16 | 2.16 | 2.19 |
| -20 | 1.97 | 1.99 | 2.03 | 2.06 | 2.05 | 2.08 | 2.05 | 2.08 | 2.08 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 |
| -25 & colder | 1.97 | 1.99 | 2.03 | 2.06 | 2.05 | 2.08 | 2.05 | 2.08 | 2.08 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 |

| OAT °C | PRESSURE ALTITUDE, FEET | | | | | |
|---|---|---|---|---|---|---|
| | 3000 | | 4000 | | 4660-10000 | |
| | POD | CENTER | POD | CENTER | POD | CENTER |
| 45 | 1.67 | 1.70 | | | | |
| 40 | 1.72 | 1.74 | | | | |
| 35 | 1.76 | 1.79 | | | | |
| 30 | 1.82 | 1.85 | | | | |
| 25 | 1.87 | 1.91 | | | | |
| 20 | 1.92 | 1.95 | | | | |
| 15 | 1.97 | 2.00 | | | | |
| 10 | 2.01 | 2.04 | | | | |
| 5 | 2.04 | 2.07 | | | | |
| 0 | 2.08 | 2.10 | | | | |
| -5 | 2.10 | 2.13 | | | | |
| -10 | 2.13 | 2.16 | | | | |
| -15 | 2.16 | 2.19 | 2.16 | 2.19 | | |
| -20 | 2.19 | 2.22 | 2.19 | 2.22 | | |
| -25 | 2.19 | 2.22 | 2.21 | 2.24 | | |
| -30 | 2.19 | 2.22 | 2.23 | 2.26 | 2.23 | 2.26 |
| -35 | 2.19 | 2.22 | 2.25 | 2.28 | 2.26 | 2.29 |
| -40 | 2.19 | 2.22 | 2.25 | 2.28 | 2.28 | 2.31 |
| -45 | 2.19 | 2.22 | 2.25 | 2.28 | 2.28 | 2.31 |
| -50 | 2.19 | 2.22 | 2.25 | 2.28 | 2.28 | 2.31 |

### CENTER ENGINE INLET CORRECTION

If a MOD A Center Engine Inlet is installed:

Add    + 0.01 EPR

### CORRECTIONS

**Airconditioning**

For pod engine airconditioning bleed off, use center EPR with the following corrections:

2.04 EPR and lower    + 0.01

2.05 EPR and higher    + 0.02

Center engine airconditioning bleed on is not permitted until flaps are up and all obstacles are cleared.

**Anti-Ice**

| Engine anti-ice | Pod -0.08 | Center -0.12 |
|---|---|---|
| Engine & wing anti-ice (pod engines only) | 2 Engine Supply -0.17 | 1 Engine Supply -0.17 |

### NOTES

Chart EPR settings on this page are based on:
- Pod engine — airconditioning bleed on.
- Center engine — airconditioning bleed off.

Max continuous thrust for bug sheet is in an initial target EPR based on 1000 ft above airport and .30M. Reset to actual conditions as soon as possible.

Max continuous thrust should only be used in the event of engine failure.



FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROXBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

## -9  MAXIMUM CLIMB THRUST FOR BUG SHEET

### -9 MAXIMUM CLIMB THRUST FOR BUG SHEET

| OAT °C | -1000 POD | -1000 CENTER | SEA LEVEL POD | SEA LEVEL CENTER | 1000 POD | 1000 CENTER | 2000 POD | 2000 CENTER | 3000 POD | 3000 CENTER | 4000 POD | 4000 CENTER | 4660~10,000 POD | 4660~10,000 CENTER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45 | 1.65 | 1.69 | | | | | | | | | | | | |
| 40 | 1.68 | 1.71 | | | | | | | | | | | | |
| 35 | 1.71 | 1.74 | | | | | | | | | | | | |
| 30 | 1.74 | 1.77 | | | | | | | | | | | | |
| 25 | 1.76 | 1.80 | | | | | | | | | | | | |
| 20 | 1.79 | 1.83 | | | | | | | | | | | | |
| 15 | 1.82 | 1.86 | | | | | | | | | | | | |
| 10 | 1.86 | 1.89 | | | | | | | | | | | | |
| 5 | 1.90 | 1.93 | | | | | | | | | | | | |
| 0 | 1.94 | 1.97 | 1.94 | 1.97 | 1.97 | | | | | | | | | |
| -2 | 1.97 | 1.99 | 1.97 | 1.99 | 1.99 | | | | | | | | | |
| -5 | 1.97 | 1.99 | 2.00 | 2.03 | 2.03 | | | | | | | | | |
| -8 | 1.97 | 1.99 | 2.03 | 2.06 | 2.03 | 2.06 | 2.06 | | | | | | | |
| -10 | 1.97 | 1.99 | 2.03 | 2.06 | 2.05 | 2.08 | 2.08 | | | | | | | |
| -13 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.10 | | | | | | | |
| -15 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.09 | 2.12 | | | | | | |
| -20 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.12 | 2.16 | | | | | | |
| -21 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | | | | | | |
| -25 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | 2.15 | 2.18 | | | | |
| -30 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | 2.18 | 2.21 | | | | |
| -32 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | | | | |
| -35 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.20 | 2.23 | 2.20 | 2.2 |
| -40 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.22 | 2.26 | 2.22 | 2.2 |
| -45 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.24 | 2.28 | 2.24 | 2.2 |
| -50 | 1.97 | 1.99 | 2.03 | 2.06 | 2.08 | 2.10 | 2.13 | 2.16 | 2.19 | 2.22 | 2.24 | 2.28 | 2.26 | 2.2 |

### NOTES

Chart EPR settings on this page are based on:
- Pod engines — airconditioning bleed on.
- Center engine — airconditioning bleed off.

Max climb thrust for bug sheet is an initial target EPR based on 1000 ft above airport and .30M. Reset to actual conditions as soon as possible.

#### CENTER ENGINE INLET CORRECTION

If a MOD A Center Engine Inlet is installed:

    Add    − 0.01 EPR

### CORRECTIONS

**Airconditioning**

Pod engine airconditioning bleed off, use center EPR with the following corrections:

| | |
|---|---|
| 2.04 EPR and lower | + 0.01 |
| 2.05 EPR and higher | + 0.02 |

Center engine airconditioning bleed on is not permitted until flaps are up and all obstacles are cleared.

**Anti-ice**

| | Pod | Center |
|---|---|---|
| Engine anti-ice | −0.06 | −0.10 |
| Engine & wing anti-ice (pod engines only) | 2 Engine Supply −0.09 | 1 Engine Sup −0.09 |

Chapter: 11:2:0
Page: 14
Issued: 03/19/99
Revision: 6

**AMERIJET INTERNATIONAL**

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
2 0 MAY 1999

## -9 GO-AROUND THRUST

Values shown in each cell as EPR / N1.

| TAT °C (°F) | −1000 POD | −1000 CENTER | SEA LEVEL POD | SEA LEVEL CENTER | 1000 POD | 1000 CENTER | 2000 POD | 2000 CENTER | 3000 POD | 3000 CENTER | 4000 POD | 4000 CENTER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 (122) | 1.80/92.6 | 1.83/93.5 | — | — | — | — | — | — | — | — | — | — |
| 45 (113) | 1.84/93.4 | 1.88/94.3 | — | — | — | — | — | — | — | — | — | — |
| 40 (104) | 1.89/94.2 | 1.92/95.1 | — | — | — | — | — | — | — | — | — | — |
| 37 (99) | 1.92/94.6 | 1.95/95.5 | — | — | — | — | — | — | — | — | — | — |
| 35 (95) | 1.92/94.2 | 1.95/95.1 | 1.94/95.0 | 1.97/95.9 | — | — | — | — | — | — | — | — |
| 32 (90) | 1.92/93.8 | 1.95/94.7 | 1.97/95.5 | 1.99/96.4 | — | — | — | — | — | — | — | — |
| 30 (86) | 1.92/93.5 | 1.95/94.4 | 1.97/95.2 | 1.99/96.1 | — | — | — | — | — | — | — | — |
| 25 (77) | 1.92/92.7 | 1.95/93.6 | 1.97/94.4 | 1.99/95.3 | — | — | — | — | — | — | — | — |
| 20 (68) | 1.92/91.8 | 1.95/92.7 | 1.97/93.6 | 1.99/94.5 | — | — | — | — | — | — | — | — |
| 18 (64) | 1.92/91.5 | 1.95/92.4 | 1.97/93.2 | 1.99/94.1 | — | — | — | — | — | — | — | — |
| 15 (59) | 1.92/91.0 | 1.95/91.9 | 1.97/92.7 | 1.99/93.6 | 1.99/93.5 | 2.02/94.4 | — | — | — | — | — | — |
| 10 (50) | 1.92/90.2 | 1.95/91.1 | 1.97/91.9 | 1.99/92.8 | 2.03/93.8 | 2.06/94.7 | — | — | — | — | — | — |
| 9 (48) | 1.92/90.0 | 1.95/90.9 | 1.97/91.7 | 1.99/92.6 | 2.03/93.6 | 2.06/94.5 | 2.03/93.9 | 2.06/94.8 | — | — | — | — |
| 5 (41) | 1.92/89.4 | 1.95/90.3 | 1.97/91.0 | 1.99/91.9 | 2.03/92.9 | 2.06/93.8 | 2.08/93.0 | 2.09/94.9 | — | — | — | — |
| 3 (37) | 1.92/89.1 | 1.95/90.0 | 1.97/90.7 | 1.99/91.6 | 2.03/92.6 | 2.06/93.5 | 2.08/94.1 | 2.10/95.0 | — | — | — | — |
| 0 (32) | 1.92/88.6 | 1.95/89.5 | 1.97/90.2 | 1.99/91.1 | 2.03/92.0 | 2.06/92.9 | 2.08/93.7 | 2.10/94.6 | 2.09/94.2 | 2.12/95.1 | — | — |
| −5 (23) | 1.92/87.7 | 1.95/88.6 | 1.97/89.4 | 1.99/90.3 | 2.03/91.2 | 2.06/92.1 | 2.08/92.8 | 2.10/93.7 | 2.12/94.3 | 2.15/95.2 | — | — |
| −7 (19) | 1.92/87.4 | 1.95/88.3 | 1.97/89.0 | 1.99/89.9 | 2.03/90.8 | 2.06/91.7 | 2.08/92.4 | 2.10/93.3 | 2.13/94.4 | 2.16/95.3 | — | — |
| −10 (14) | 1.92/86.9 | 1.95/87.8 | 1.97/88.5 | 1.99/89.4 | 2.03/90.3 | 2.06/91.2 | 2.08/91.9 | 2.10/92.8 | 2.13/93.8 | 2.16/94.7 | 2.15/94.4 | 2.18/95.3 |
| −15 (5) | 1.92/86.0 | 1.95/86.9 | 1.97/87.6 | 1.99/88.5 | 2.03/89.4 | 2.06/90.3 | 2.08/91.0 | 2.10/91.9 | 2.13/92.8 | 2.16/93.7 | 2.18/94.5 | 2.20/95.4 |
| −18 (0) | 1.92/85.6 | 1.95/86.5 | 1.97/87.1 | 1.99/88.0 | 2.03/88.9 | 2.06/89.8 | 2.08/90.4 | 2.10/91.3 | 2.13/92.3 | 2.16/93.2 | 2.19/94.5 | 2.22/95.4 |
| −20 (−4) | 1.92/85.2 | 1.95/86.1 | 1.97/86.8 | 1.99/87.7 | 2.03/88.5 | 2.06/89.4 | 2.08/90.1 | 2.10/91.0 | 2.13/91.9 | 2.16/92.8 | 2.19/93.9 | 2.22/94.8 |
| −25 (−13) | 1.92/84.3 | 1.95/85.2 | 1.97/85.9 | 1.99/86.8 | 2.03/87.6 | 2.06/88.5 | 2.08/89.2 | 2.10/90.1 | 2.13/91.0 | 2.16/91.9 | 2.19/93.0 | 2.22/93.9 |
| −30 (−22) | 1.92/83.5 | 1.95/84.4 | 1.97/85.0 | 1.99/85.9 | 2.03/86.7 | 2.06/87.6 | 2.08/88.3 | 2.10/89.2 | 2.13/90.0 | 2.16/90.9 | 2.19/92.0 | 2.22/92.9 |
| −35 (−31) | 1.92/82.6 | 1.95/83.5 | 1.97/84.1 | 1.99/85.0 | 2.03/85.8 | 2.06/86.7 | 2.08/87.4 | 2.10/88.3 | 2.13/89.1 | 2.16/90.0 | 2.19/91.1 | 2.22/92.0 |
| −40 (−40) | 1.92/81.8 | 1.95/82.7 | 1.97/83.2 | 1.99/84.1 | 2.03/84.9 | 2.06/85.8 | 2.08/86.4 | 2.10/87.3 | 2.13/88.2 | 2.16/89.1 | 2.19/90.1 | 2.22/91.0 |
| −45 (−49) | 1.92/80.9 | 1.95/81.8 | 1.97/82.4 | 1.99/83.3 | 2.03/84.0 | 2.06/84.9 | 2.08/85.5 | 2.10/86.4 | 2.13/87.2 | 2.16/88.1 | 2.19/89.1 | 2.22/90.0 |
| −50 (−58) | 1.92/80.0 | 1.95/80.9 | 1.97/81.4 | 1.99/82.3 | 2.03/83.1 | 2.06/84.0 | 2.08/84.6 | 2.10/85.5 | 2.13/86.3 | 2.16/87.2 | 2.19/88.1 | 2.22/89.0 |

SEE GO-AROUND THRUST CORRECTIONS ON PAGE 15

-06070-WJZ   Document 112   Entered on FLSD Docket 03/13/2001   Pa...

Chapter:   11:2  c
Page:      15
Issued:    03/19/99
Revision:  6

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1998

## -9 GO-AROUND THRUST CORRECTIONS

### -9 GO-AROUND THRUST

| TAT | PRESSURE ALTITUDE, FT | | | | | |
|-----|------|--------|------|--------|------|--------|
| °C | 4000 | | 5000 | | 5660 & ABOVE | |
| (°F) | POD | CENTER | POD | CENTER | POD | CENTER |
| 50 (122) | 1.80 92.6 | 1.83 93.5 | | | | |
| 45 (113) | 1.84 93.4 | 1.88 94.3 | | | | |
| 40 (104) | 1.89 94.2 | 1.92 95.1 | | | | |
| 37 (99) | 1.92 94.6 | 1.95 95.5 | | | | |
| 35 (95) | 1.94 95.0 | 1.97 95.9 | | | | |
| 32 (90) | 1.97 95.5 | 1.99 96.4 | | | | |
| 30 (86) | 1.97 95.2 | 1.99 96.1 | | | | |
| 25 (77) | 1.97 94.4 | 1.99 95.3 | | | | |
| 20 (68) | 1.97 93.6 | 1.99 94.5 | | | | |
| 18 (64) | 1.97 93.2 | 1.99 94.1 | | | | |
| 15 (59) | 1.99 93.5 | 2.02 94.4 | | | | |
| 10 (50) | 2.03 93.8 | 2.06 94.7 | | | | |
| 9 (48) | 2.03 93.9 | 2.06 94.8 | | | | |
| 5 (41) | 2.06 93.0 | 2.09 93.9 | | | | |
| 3 (37) | 2.08 94.1 | 2.10 95.0 | | | | |
| 0 (32) | 2.09 94.2 | 2.12 95.1 | | | | |
| -5 (23) | 2.12 94.3 | 2.15 95.2 | | | | |
| -7 (19) | 2.13 94.4 | 2.16 95.3 | | | | |
| -10 (14) | 2.15 94.4 | 2.18 95.3 | | | | |
| -15 (5) | 2.18 94.5 | 2.20 95.4 | | | | |
| -18 (0) | 2.19 94.5 | 2.22 95.4 | | | | |
| -20 (-4) | 2.19 94.8 | 2.22 94.3 | 2.20 95.4 | 2.23 | | |
| -25 (-13) | 2.19 93.9 | 2.22 94.4 | 2.22 95.3 | 2.26 | | |
| -30 (-22) | 2.19 92.9 | 2.22 93.9 | 2.25 94.8 | 2.28 94.3 | 2.25 | 2.28 95.2 |
| -35 (-31) | 2.19 91.1 | 2.22 92.0 | 2.25 93.0 | 2.28 93.9 | 2.27 94.0 | 2.30 94.9 |
| -40 (-40) | 2.19 90.1 | 2.22 91.0 | 2.25 92.0 | 2.28 92.9 | 2.28 93.3 | 2.31 94.2 |
| -45 (-49) | 2.19 89.1 | 2.22 90.0 | 2.25 91.0 | 2.28 91.9 | 2.28 92.4 | 2.31 93.3 |
| -50 (-58) | 2.19 88.1 | 2.22 89.0 | 2.25 90.1 | 2.28 91.0 | 2.28 91.4 | 2.31 92.3 |

EPR
N1

### N1 CORRECTIONS

**Airconditioning**

For pod engines airconditioning bleed off, use center N1.

**Anti-ice**

| Engine anti-ice | Pod | Center |
|-----|-----|-----|
| | +1.0% | +0.4% |
| Engine & wing anti-ice (Pod engine only) | 2 Engine Supply | 1 Engine Supply |
| | -0.9% | -1.0% |

### EPR CORRECTIONS

**Airconditioning**

For pod engines airconditioning bleed off, use center EPR with the following corrections:

2.04 EPR and lower   +0.01
2.05 EPR and higher  +0.02

**Anti-ice**

| Engine anti-ice | Pod | Center |
|-----|-----|-----|
| | 0 | -0.03 |
| Engine & wing anti-ice (Pod engines only) | 2 Engine Supply | 1 Engine Supply |
| | -0.09 | -0.09 |

### NOTES

Chart EPR and N1 settings on this page are based on:

- Pod engines — airconditioning bleed on.
- Center engine — airconditioning bleed off. (Center engine airconditioning on is not permitted at go-around thrust.)
- Use TAT, or OAT plus 3°C (5°F)

### PRESSURE ALTITUDE FIELD ELEVATION COR.

| QNH PRESSURE | | COR. |
|-----|-----|-----|
| MB | INCHES | FT |
| 1036-1034 | 30.63-30.53 | -600 |
| 1033-1030 | 30.52-30.42 | -500 |
| 1029-1026 | 30.41-30.31 | -400 |
| 1025-1023 | 30.30-30.20 | -300 |
| 1022-1019 | 30.19-30.09 | -200 |
| 1018-1015 | 30.08-29.98 | -100 |
| 1014-1012 | 29.97-29.87 | 0 |
| 1011-1008 | 29.86-29.76 | +100 |
| 1007-1004 | 29.75-29.65 | +200 |
| 1003-1001 | 29.64-29.54 | +300 |
| 1000- 998 | 29.53-29.44 | +400 |
| 997- 994 | 29.43-29.33 | +500 |
| 993- 990 | 29.32-29.23 | +600 |
| 989- 986 | 29.22-29.13 | +700 |
| 985- 983 | 29.12-29.03 | +800 |
| 982- 979 | 29.02-28.92 | +900 |

### CENTER ENGINE INLET CORRECTION

If a MOD A Center Engine Inlet is installed.

Add    +0.01 EPR

EXHIBIT
BY 1/8/01

FIRST OFFICER OR FLIGHT ENGINEER PROFICIENCY REPORT

| NAME | EMPLOYEE NUMBER | ☒ FIRST OFFICER ☐ FLIGHT ENGINEER | BASE | DATE |
|---|---|---|---|---|
| TRICK MAJOR | 803 | | MIA | 7/18/97 |

| AIRCRAFT TYPE | TRIP/DATE | | | APPROX. FLIGHT TIME HOURS |
|---|---|---|---|---|
| B-727 | 850 | 7/18/97 | | 6300 |

INSTRUCTIONS: Evaluate the officer's status based on the following scale:

① EXCELLENT　② ABOVE AVERAGE　③ AVERAGE　④ BELOW AVERAGE　⑤ UNSATISFACTORY

| | | | | | |
|---|---|---|---|---|---|
| [1] PUNCTUALITY | [1] COOPERATION | [1] KNOWLEDGE OF JOB | [1] KNOWLEDGE OF F A A AND COMPANY PROCEDURES |
| [1] PERSONAL APPEARANCE | [1] FLIGHT EQUIPMENT | [1] ABILITY TO PERFORM JOB | [2] USE OF CHECKLIST |
| [1] CONDUCT | [1] KNOWLEDGE OF AIRCRAFT AND SYSTEMS | [1] ABILITY TO ACCEPT INSTRUCTIONS | [1] CONCERN FOR CUSTOMER |
| [1] ATTITUDE | [1] KNOWLEDGE OF NORMAL AND EMERGENCY PROCEDURES | [1] RETENTION OF INSTRUCTIONS | [1] CREW COOPERATION |

| FIRST OFFICER | | | | FLIGHT ENGINEER | |
|---|---|---|---|---|---|
| [1] FLIGHT PLANNING | [1] HANDLING OF AIRPLANE | [ ] AIRCRAFT PREFLIGHT | [ ] MONITORING CORRECT CLIMB POWER |
| [1] FORMS WORK | [1] ALTITUDE AWARENESS | [ ] COCKPIT PREPARATION | [ ] USE AND KNOWLEDGE OF PERFORMANCE MANUAL |
| [1] COCKPIT PREPARATION | [1] ABILITY TO LAND AIRPLANE | [ ] LOG BOOK CHECK | [ ] USE OF TAKEOFF & LANDING DATA CARD |
| [1] RADIO EQUIPMENT CHECK | [1] COMPLIANCE WITH NORMAL OPERATING PROCEDURES | [ ] REPORT OF AIRCRAFT CONDITIONS TO CAPTAIN | [ ] ENROUTE OPERATIONS |
| [ ] USE OF COMMUNICATIONS RADIO | [1] INSTRUMENT FLYING AND A T C PROCEDURES | [ ] ENGINE START PROCEDURES | [ ] IN RANGE AND BEFORE LANDING DUTIES |
| [2] HANDLING OF A T C CLEARANCES | [1] NAVIGATION (MAINTAINING TRACK, ALTITUDE, ETC.) | [ ] MONITORING ELECTRICAL SYSTEM | [ ] SECURING |
| [1] DEPARTURE AND APPROACH PATTERN | [1] USE OF NAVIGATION RADIOS | [ ] INSTRUMENT MONITORING | [ ] LOG BOOK ENTRIES |
| [2] MONITORING OF INSTRUMENTS AND CONTROLS | [1] AREA NAVIGATION | [ ] HEATING AND COOLING | [ ] INTERMEDIATE STATION WALK AROUND & FUEL LOADING |
| [1] AIRSPEED CONTROL | [1] USE AND KNOWLEDGE OF PERFORMANCE MANUAL | [ ] PRESSURIZATION | [ ] HYDRAULICS |
| [1] COLLISION WATCH | [1] KNOWLEDGE OF ROUTES, FREQ. & AIRPORT INFORMATION | [ ] ABILITY TO TROUBLESHOOT MALFUNCTIONING SYSTEMS | [ ] POST FLIGHT INSPECTION |
| [1] RADIO WATCH AND POSITION REPORTS | | | |

REMARKS

PAT DEMONSTRATES A THOROUGH KNOWLEDGE OF AMERIJET POLICIES, PROCEDURES, AND MARKET REQUIREMENTS. HE IS VERY WILLING TO PROVIDE THE EXTRA EFFORT REQUIRED OF AMERIJET CREWMEMBERS TO ACCOMODATE OUR CUSTOMERS SPECIAL NEEDS. KNOWLEDGE OF AIRCRAFT SYSTEMS AND HIS COMMUNICATION SKILLS ARE VERY GOOD AS WELL AS AREA NAVIGATION SKILLS.

| OVERALL GRADE | WERE UNSATISFACTORY ITEMS DISCUSSED? ☒ YES ☐ NO | CHECK IF TWO-LANDING REQUIREMENT COMPLETED PER FAR 121.441(e). | ON FLIGHT NO. / DATE |
|---|---|---|---|

| CERTIFYING SIGNATURE | EMPLOYEE NO. | BASE | DATE |
|---|---|---|---|
| | 679 | MIA | 7/18/97 |

NOTE: USE REVERSE SIDE TO BETTER EXPLAIN AND UNUSUAL EVALUATIONS OR CHARACTERISTICS.

000262

**PEMARKS:**

PAT DEFINITELY SHOWS LEADERSHIP QUALITY IN THE
PERFORMANCE OF HIS DUTIES AS WELL AS GOOD JUDGEMENT
TOWARDS OPERATIONAL DECISIONS.

## INSTRUCTIONS TO CAPTAIN

This report is an aid to help the pilot for future upgrading. When properly filled out it may help to avert subsequent training problems. We encourage you as a Captain to exert you command responsibility in preparing your crew members to be professional airmen. Please feel free to discuss this report with the individual crew members. Return completed form to the Chief Pilot.

First Officer Proficiency Report
Pat Major
Flight 823
6-8-99

Flight 823 scheduled to depart at 1200z, myself and Larry Clifford; the Engineer arrived at 1100z. First Officer Major arrived at 1200z. We were delayed due to perishable freight and blocked out at 1305z. We weighed 195,000 lbs. in the blocks with 50,000 lbs. of fuel. During 20 minutes of waiting for takeoff clearance, the Engineer said we had 48,700 lbs. of fuel remaining. I told First Officer Major to check the runway analysis for runway 12. He did not open the book, but replied " it is the same for runway 9 left lima 1 intersection -191,000 lbs. takeoff limit". I again told him to open the runway analysis book and he disgustingly opened it to Miami runway 12. I showed him at the current temperature the runway limit was 194,000 lbs. with packs off and the wind at 8 knots - that we were well within limits to use runway 12. About 5 minutes later ATC requested us to use runway 12. I told First Officer Major to tell them O.K. Instead he replied to them "negative - we are too heavy, we must use runway 9 left full length". I told First Officer Major, "for the rest of the flight all decisions will come from the Captains seat. If he could not except that, I would taxi back and get another First Officer." His reply was "all I want to do is make it back alive!"

We arrived in Port of Spain 4 hours after block out from Miami. The agent brought us up the weight sheet and I told First Officer Major what positions to put them in. Instead of doing what he was told, he entered the information into his own personal laptop computer and I did the weight and balance myself. He then left the cockpit and proceeded to take pictures of the pallets as it was being off-loaded from the aircraft. He then started complaining to the agent about how the freight was palletized in Miami. I told him if he was that worried about how it was loaded; he should have showed up for work on time and complained about it then - not after the leg has already been flown. The leg from Port of Spain to St. Lucia was uneventful.

We left St. Lucia for St. Vincent where he complained I was not allowed to use flaps 40 for landing. I told him what I will use and when I will use it, and I will land the aircraft with or without his help. The leg from St. Vincent to San Juan was also uneventful.



PLAINTIFF'S
EXHIBIT
15
1/8/01

000254

We then left San Juan for Miami, at which time I allowed the First Officer to fly the leg. Then ATC requested us to descend from 31,000 ft. to 28,000 ft. and cross junior intersection at 16,000 ft. We were 150 miles from Miami when we started down. At 26,000 ft. I asked First Officer Major why he was still descending. He replied "we have to make the intersection at 16,000ft." I told him "you are 100 miles from junior, if you keep descending we will be 55 miles too early." He argued a little more, then realized he was not reading his DME correctly.

After flying this trip with First Officer Major, I feel he needs to pay more attention to his job according to the GOM and not concentrate all his efforts in finding fault in everyone else. First Officer Major has a hard time taking commands from his superiors and seems to enjoy being argumentative. Since he refuses to follow Captains orders he is a danger to himself and everyone around him. With 13 ½ years experience on the B-727 I feel very strongly that if First Officer Major were placed with a newly upgraded Captain, he might sway him to make poor decisions because of his persistence in arguing at every turn. That Captain might take his word that he is correct and ends up in a dangerous situation. He would be an accident waiting to happen. Maybe counciling may help him. My overall grade for him is  5 – unsatisfactory.

cc: Derry Huff
    Mark Stewart
    Pete Steele



Patrick Major

Memo To: Derry Huff
Date: 06-14-99
Subject: Note to file, AJT flight 823, June 08, 1999

Greetings, Derry.

During our telephone conversation earlier today you asked me to be prepared to discuss my flight last week with Brian Steele. Following is a my note to file (NTF) regarding events that day and following.

**Tuesday, June 08, 1999**
12:00 W/BSteele, MIA, POS, BGI, SVG, BGI, MIA.

I arrived at 8:00 a.m. Traffic and pouring rain increased drive time to 1:20 minutes. Captain Brian Steele and Second Officer Larry Clifford were already planeside. Freight was loaded, except bellies. No load plan, though. Brian said he had been up since 01:00L, left Ocala at 2:00 a.m. and drove straight through. Consequently, by time we departed for a sixteen hour duty day, nearly ten hours flight-time, Brian had already been up eight hours; by his own account, the last two hours of which required he negotiate a torrential downpour and a "...battlefield" (Brian's word choice) of wrecked automobiles. Brian explained he had asked for 51,000 Lbs of fuel. But we would call it 50/49.3 for takeoff, "Ghosting" 1,000Lbs. Said he was convinced loaders were cooking the numbers, so burn was likely to be higher than planned. Ramp personnel had removed the load computer from the cockpit and retained it for 45 minutes after the aircraft was fully loaded; accordingly, Brian asked me to produce V speeds for max. gross takeoff, full length, 9L. I did.         Load plan weight showed approximately 195,300Lbs. On taxi out, we discussed viability of 12; I had already noted the numbers and reported that the runway analysis did not support it, even if you believed the paperwork, and Brian had already said he didn't; I added that generally speaking, if you can't take 9L-L1, you can't take 12; aside from which the runways were obviously wet. RW 12 dry limit for 26C is 193.6. Even with packs off it would be close. Winds were 080 at 06, negligible help (except on 9L). By rights we probably should have used 9R due to the wet condition of the runway: wet runway less then <1/4" standing water, reduces RW 9L limit by 15,500Lbs, RW 12 by 14,000Lbs. But there was no point even suggesting that. Shortly after we discussed the RW 12 or 9L question, a Continental 727 taxied into position and hold on 12. Before tower could issue takeoff clearance, though, Continental called to say he needed 9L full length. As Continental taxied past us on way to takeoff 9L, I pointed out the change stating, "I wonder why Continental decided not to use 12."

Brian replied, "I don't know." Apparently, he saw no connection.

Then I said, "I'll bet they are going to offer it to us next."



PLAINTIFF'S EXHIBIT

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com

000062

CONFIDENTIAL

"Yep".

Just then, ATC instructed AJT 823 to taxi into position and hold 12. As I depressed the push to talk and replied over my headset, "Negative sir, Amerijet 823 needs full length 9L." Brian was saying to me, simultaneously, "Okay, we'll take one two."

Tower replied, "Okay, hold position, I'll get you 9L momentarily."

Brian stated, "I'm in charge here. I'll make the decisions, and I said we will takeoff on RW 12."

There was no interest in discussing it. No consideration for CRM. No regard for the apparent safety concern. Apparently, Brian had forgotten telling me he believed the aircraft actually weighed much more than reported on the paperwork. I responded, "Not with me on board you won't." I wasn't angry, upset, or defensive, but 12 was not an option for this pilot that day.

"I said we'll take 12."

"Then you get on the radio, tell tower you have reconsidered the performance numbers and will take 12, after all." Brian did nothing. After a few moments silence, I said, "Brian, all I want to do today is get home safely."

"Me too, Pat. Me too." Brian sounded sincere. But this was coming from a captain who held his crew and his responsibility in such contempt that he would be awake nearly 24 hours by time we got back to MIA...on who knows how little sleep prior rising nearly nine hours before. Tower instructed us to take position and hold. Then, "AJT 823 cleared for takeoff 9L, turn right heading 120."

9L, my takeoff, I advanced the throttles prior to brake release and asked for normal EPR as briefed. Acceleration was apparently retarded by water on the runway surface and weight of he aircraft. V1 was not achieved until well inside the alternating amber/white centerline lights (last 3,000 feet of runway), I rotated at normal rate, 3 degrees per second to 10 degrees pitch, main wheels left the runway well inside the red centerline lights (last 1,000'). . We crossed the airport boundary approximately 100', 15 degrees pitch attitude, wings level. Brian asked for the turn almost immediately. Quiet climb profile. Afterwards, normal climb was slow prompting ATC to ask us to give best rate through 10,000', I said to Brian I would use 250Kts for the climb as one or two engine climb speed, best reference for best rate, was 266. Brian said best rate was flaps up maneuvering speed; I reminded him that Flaps up maneuvering speed is closer to a best angle and that ATC had asked for best rate. Out of 10,000 feet I could only get to 319Kts while holding a 1,000' FPM climb. The last 10,000 feet of climb to FL 290 we could not maintain a 500FPM climb at 270 knots. Due to careful power management and trim, as well as direct routing, burn to POS was 38.8, 3,000Lbs over flight plan...not counting the 1,000Lbs of fuel we ghosted (4.0 total). Burn to GTK was 3.8 above plan (again, not including the "Ghosted" 1,000 Lbs).

CONFIDENTIAL

Upon arriving in POS we found four pallets only 1/2 of which were loaded with freight. Weights ranged from 1,800 to 2,500 Lbs. A stack of pipes had been laid across the empty portion of the pallets. Total pipe weight was 4,500Lbs. 1,800 to 2,500 Lbs one half of the pallet, 1125 Lbs on the other. Accordingly, those four pallets were out of the 10% of pallet-center CG limit by a considerable margin.

When Brian and I were alone in the cockpit on the ground in POS, I attempted to get closure on the earlier issue by saying, "Brian, you now I don't pull that shit." I had hoped to instigate a discussion. Instead Brian said, "We'll talk about it when we get back."

"Good, I would like a chance to talk about it" I said.

Brian responded. "Oh, we will. We definitely will. You can count on it."

Most of the rest of the day went normally. Cockpit communications standard, unrestrained.

Later, Jim Korby, JS from SVG, mentioned the tale regarding Ed Cook, Clay Lynn on SVG check-out, 15,000+/- over max. runway limit weight, 190AJ, some years ago. I was there as the flight as engineer and cleared up the rumor regarding branches in the nose gear as a result of the close call we had experienced taking off toward the mountains at night. I.had performed the inspection myself after the nose gear failed to extend prior to landing in Barbados. Recycled, it had extended normally. Afterwards, Ed asked me to go check it out. When I came back upstairs I reported, "I think it will work fine now that I got the branches out of it." Then immediately added, "I'm just kidding. Everything looks normal." In actual fact, failure of the nose gear to extend on the first attempt was the result of a faulty switch behind the panel in the landing gear handle mechanism. We had almost died that night. I was trying to introduce some relief. Before opening the door in Barbados, we had sat there talking for 15-20 minutes. Each of us had privately advised Ed against the takeoff. But he had ignored us. We knew we were 3-5,000 Lbs over limit weight, at night into the mountains, but then each of us let Ed talk us into going. Later, we had the freight weighed in Barbados. It had been under-reported by more than 15,000 Lbs. Javier Carvahal summed up everyone's feelings when he said to Ed, "If I ever call you from down here asking you to buy me a ticket home, you'll understand why. I am never doing that again." Apparently, Brian had mentioned our earlier issue to Jim, prompting the discussion. Finally I added, "I don't mind dying. I just don't want to die doing something stupid."

RW 12 Tuesday, June 08, 1999...we might not have been so lucky. We would have at very least taken out the runway end lights. If so, the resulting investigation would have faulted the captain for accepting a contaminated runway less than the performance required length and the FO for excessive deference to authority; the FE for failure to speak up at all. Once the weights on the airway bills were totaled, Amerijet and the loaders would likely have been faulted as well. All this on a week when we knew a NASIP inspection was underway.

Upon return to MIA when I told Brian I would wait downstairs so we could talk, he said, "That's okay, Pat. That's okay."

CONFIDENTIAL

000064

Absent an accident, after the fact, events can be construed to meet whatever version most pleases those in authority.    Brian is a proud captain and brother of AJT Director of Operations Pete Steele. The fact remains, Amerijet came dangerously close to losing an aircraft Tuesday morning. It didn't because ultimately, Brian made the right choice. Absent the resolve of 823's FO, though, a calamity could not have been avoided. Did I hear, "Thank you, Pat. Good job, Pat. Thanks for sticking to your position."? Will steps be taken to ensure flight crews are exercising appropriate judgment regarding rest, flight preparation and runway selection. Or, is Amerijet going to censure this pilot for asserting his concern regarding the safety of flight?

**Wednesday, June 09, 1999.** Contacted FSS asking for best source of runway airport conditions day prior.    Told them the decision making scenarios broadcast over the frequency, especially regarding a Continental 727 comprised an excellent basis for a performance/CRM lesson. FSS suggested I contact Dade County Aviation Authority.

**Thursday, 06-10-99:** MIA-POS, CB, LC: ostensibly a reliable 195.5Lb takeoff, 28C (two degrees warmer than Tuesday), wind stronger, right down the runway: 9L full length. Runways dry. RW 12 was never a consideration, not discussed or offered by tower. Chuck's leg. Rotation point and main gear flight point slightly prior to what had been experienced Tuesday...main gear left ground at about the 1,000' mark. What does this bode for similar operations out of FLL, (9L is even shorter than MIA RW 12)?

**Monday, 06-14-99:** Spoke with Jim Murphy: Dade County Aviation Authority, airport conditions 12-13:00z Tuesday, June 08, 1999.. No record since airport closure May 19. Authority does not assess condition of RW re water, etc., unless specifically requested by tower. Due to shape of RW and grooving, little water actually pools or puddles, "But the runways were definitely wet and it was raining. I remember, there had been nearly 10 inches of rain and flooding all over."

**06-14-99:** Submitted FOIA request for tower and ground communication tapes between the hours of 12:15 and 13:30z June 08, 1999. In particular, I am interested in documenting Continental's statement regarding their decision to change to the longer runway.

**Comments:** What would have happened had the Alaska Airlines FO told the tower they were going around at Juneau that ill-fated night, or, failing to get the appropriate response from that, pushed the throttles forward, leaving the Captain no choice but to go around? What would have happened had the FO stood on the brakes as the Swissair 747 Captain initiated the takeoff roll without clearance at Tenerife? What would have happened had the FO or FE shoved the throttles forward as the Kaletta DC-8 banked 45 degrees below 500' AGL in order to land on an unapproved RW in Guantanomo Bay; better yet, what would have happened had the Captain simply refused that flight...he had already been awake 24 hours when notified of the trip? What would have happened in Croatia? They each would probably have to explain their actions to the chief pilot. But there would not have been accidents.

# CONFIDENTIAL

Brian was tired; having just driven several hours to make the flight, he had already been awake the equivalent of a normal work day and under considerable stress. Several times Brian had stated his conviction that the aircraft was considerably heavier than reported. But then he wanted to accept a runway for takeoff that relied on the veracity of the reported weights; even if we believed the numbers, they were marginal at best... if the runway were dry and packs off for takeoff? It was wet. Another 727 captain taxied into position and hold, took one look and opted for the longer runway. What else should I have done?

I know you don't expect me to risk my life.

This FO made a difficult choice that day. As a result, there was no accident or incident to report, no loss of life, destruction of aircraft or property aboard, nor was there damage to runway end or approach lights which would have likely produced an embarrassing investigation. I did what pilots do, what Amerijet pays me to do. It would be nice to be appreciated for it, but that's not required. I know what I did was right.

Sincerely,

Patrick Scott Major

The preceding statement of fact are accurate to the best of my recollection.

CONFIDENTIAL

00006(



Patrick Major

**Memo To:** Derry Huff
**Date:** 06-17-99
**Subject:** Note to file, AJT flight 823, June 08, 1999, addendum.

Greetings again, Derry.  During our meeting Monday, June 14, 1999 regarding my flight with Captain Brian Steele Tuesday, June 08, 1999, you accepted my report concerning take-off runway selection out of MIA, then asked for an explanation pertaining to Brian's allegation that I refused to place the flap-handle to 40 degrees upon his command, and that I insisted he remove the flap-handle restricter bolt himself while maneuvering the aircraft on final approach for landing at St. Vincent. There is little to explain. The allegations are simply untrue. Here is what happened.

While on the ground in POS (the next leg was BGI, the following leg would be SVG), Brian and I discussed landing limits at St. Vincent. In resolving how we had arrived at different maximum landing weights, Brian said he planned to use flaps 40. I reminded him that the FedEx hush kit STC does not provide for flight crew removal of the flap-handle restricter bolt; hence, with 397AJ, we were limited to a flaps thirty landing at SVG. Brian replied, "I don't give a shit about that. I plan on using flaps forty." (His choice of words).

By way of persisting, I described to Brian how the restricter bolt limitation materialized: Rand Brewer asked Director of Operations Pete Steele (Brian's brother) for a ruling regarding removing the bolt for flaps forty landings at short foreign airfields where stage-three noise abatement was not a factor. About six weeks later, Pete responded to Rand by stating that flaps 40 was not allowed on those aircraft that have a restricter bolt installed. Rand relayed this information to me by email. I reminded Brian that Pete later made an announcement to all flight officers at one of the recent meetings, "The FEDEX hush kit STC does not provide for flight crew removal of the flap-handle restricter bolt. Hence, there will be no more flaps 40 landings on aircraft with the FedEx STC. We hope to obtain flaps 40 approval for the Valsan conversion, but testing is still underway. Amerijet is providing Valsan....etc., etc." In my experience, Derry, no other captain uses flaps forty on aircraft that have a flap-handle restricter bolt installed.

Brian was undeterred. A short time later, he removed the flap-handle restricter bolt himself while the aircraft was still on the ground. Brian did not ask anyone else to perform the task or for their help. (Derry, during our meeting, Monday, I indicated this occurred in POS; it may have, but I can't be absolutely certain it wasn't BGI. In any event, the bolt was removed from the flap-handle path while the aircraft was parked and prior to departure for SVG). At first, Brian encountered difficulty removing the bolt. Larry Clifford moved to help. But Brian waved him off. Eventually, Brian removed the restricter bolt using just his fingers.

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com



PLAINTIFF'S
EXHIBIT
17
BSM  11/2/01

CONFIDENTIAL

000058

pon arrival at SVG, flaps were extended normally. There was no delay or further discussion regarding Brian's choice of final flap setting; indeed, the bug card contained speeds for a flaps forty landing. As in the earlier discussion prior to takeoff out of MIA, Larry Clifford remained silent throughout, both on the ground and in the air. Brian did not ask for his input, nor did Larry offer it. On yesterday's flight 723, I asked Larry if he remembered anything out of the ordinary on approach into SVG. He replied, "No. What do you mean?"

"Do you recall me delaying placing the flap-handle to the forty degree position upon Brian's command?"

"Not that I remember."

"Did I miss the call, and Brian have to do it himself?"

"No. Everything seemed pretty ordinary to me. Why?"

"It came up in a discussion yesterday. I thought everything had gone pretty normally after we left MIA. I wondered if I had missed something."

"I remember you two discussing it on the ground. But after that, nothing out of the ordinary."

Just then, Chuck Bennett entered the cockpit. When Larry's and my conversation abruptly ceased, Chuck asked, "What? You two talking about me again?"

"No. We were just talking about Tuesday's flight into SVG."

"Is Brian using flaps forty again? Which airplane was it?"

"397".

Chuck sighed. "I don't know why he does that. He knows he's not supposed to remove that bolt."

Then I briefed Chuck on last Tuesday's runway selection controversy out of MIA, including the forty-five minute delay in getting weight and balance paperwork to the cockpit after the aircraft was loaded, ramp personnel's prolonged possession of the weight and balance computer, the rain on the field, wet runways, Brian's lack of rest prior to the flight, his repeated statements declaring his belief that the aircraft was considerably heavier than reported...prompting him to request V-speeds for a max. gross takeoff, up to and including my persistence in requesting full-length runway 9L for takeoff.

"How long did you have to wait for 9L?" Chuck asked.

"About a minute, maybe two."

CONFIDENTIAL

uck reasoned, "Under conditions like that, why would you take the shortest runway? Hell, ᴗ as safe as possible. Why risk it? I hardly ever use 12 out of MIA, not unless we're way under the limit. You never really know what the weights are, anything can happen. So, why take the chance?"

Afterwards, I said, "Larry. You know, the one thing I noted the other day, both out of MIA and pertaining to flaps 40 into SVG, was that you said nothing at all. It takes three people to fly this airplane. If you have something to say, speak up. Us guys up front can kill you. You are just going to get to the scene of the accident a little after us. If we are doing something you have an opinion about, speak up. I could have used your support the other day, particularly regarding runway 12."

"I didn't see there was any problem with it. According to the paperwork it would have been okay."

"But we suspected the paperwork wasn't right. Brian didn't believe it. Look how long they were cooking the numbers before returning with the paperwork and computer. Despite what the paperwork said, Brian asked for V-Speeds for a max. gross takeoff. He forgot all about that though when the tower offered one-two. And, you saw the takeoff, Larry. That's why I made that remark Thursday, when we were with Chuck. Thursday's was presumably a legitimate 195,000Lb takeoff. It was two degrees warmer, but there was more wind too. We actually rotated and broke ground sooner than on 823. Tuesday, the runways were wet. It had rained ten inches the night before. Hell, Continental taxied into position and hold, one-two, right in ont of us. They took one look and said they needed 9L full length." Then I reminded Larry of the 15,000Lb wet runway performance penalty on 9L and 14,000Lb reduction 12...as well as the 31 knot V1 reduction on both. "Point of fact is, we should have used 9R. But there wasn't any point even suggesting that. Right now, I'm ashamed I didn't. 9L full length was way too close. What all this really does is beg the question concerning a wet runway 9L takeoff in FLL, especially going to POS or BGI; 9L in FLL is even shorter than MIA 12."

Chuck interjected, "That's why Dave is going to all -17 engines."

Derry, considering the 4,600' length of the runway at St. Vincent, flaps forty is more desirable than flaps 30. But the STC does not allow it. Nor was it required for 823's operation that day. If we had run off the runway, blown a tire, if the brakes had failed, or any number of unforeseen calamities occurred, the flaps forty choice would have undoubtedly produced a crew violation. Even so, that choice was unlikely to get us hurt. Hence, I acquiesced and participated in it. Indeed, on final approach to SVG, I noted aloud the aircraft's angular path to the runway (a five to eight degree offset) and asked Brian if that helped him avoid updrafts adjacent the rocky cliff North of short final and improved controllability of the aircraft. He said it did. The landing was uneventful. But then we rolled all the way to the departure end before slowing sufficiently to initiate a turn back to the ramp. Reverse thrust remained engaged until the aircraft was nearly stopped. I exclaimed "I have never been down here before."

Brian replied, "That is because I don't use brakes." I thought to myself, "He insists on flaps forty but does not use brakes, how curious."



CONFIDENTIAL

Are you beginning to appreciate the irony here, Derry? Several times on Tuesday, June 08, flight 823, this pilot had to make qualitative assessments regarding the comparative risk of a succession of poor choices on the part of the captain, then determine how best and how firmly to respond in specific reference to the relative hazard presented by each. One scenario could have gotten us hurt. The other violated a management directive and the FAR's. The one with risk to life and property is where I put my foot down. The question is not how severely should Amerijet censure this pilot for the temerity to question Brian Steel's choices, but why should flight crew feel obligated to take risks or violate regulations? Is it Amerijet's intention to establish a culture of non-compliance? I have invested fourteen hours explaining actions which were empirically, ethically, practically, professionally, legally, and morally correct, all because I bruised a captain's ego? Thank me that he still has an ego left to bruise.

Derry, in Monday's meeting, you told me Brian alleged that I refused to move the flap-handle to forty degrees upon command, that I told him if he wanted flaps forty he would have to position the handle himself, and that I interfered with his efforts to remove the flap restricter bolt. Up to now, I have always found Brian to be honest: Undisciplined, foul-mouthed, non-compliant and irreverent, perhaps, but a skilled and knowledgeable pilot, honest to a fault. But, if you quoted Brian accurately the other day, then I am disappointed to report that his statements concerning the flaps forty landing in St. Vincent are a fabrication, void of any basis in fact. Perhaps Brian sought to shield himself from embarrassment for failing to obtain adequate rest prior to the flight, or for his ill-advised insistence on using a wet runway too short for the circumstances. There might be other reasons, none adequate, such as his reluctance to accept effective input from a required member of his crew, embarrassment over his apparent confusion regarding best-rate versus best-angle of climb speed references, or his doggedness in using a prohibited flaps setting for landing in SVG. Maybe due to his fatigued state that day, Brian confused my insistence that he call MIA tower himself to accept runway 12 with the memory of our later discussion concerning a flaps forty landing at St. Vincent. I do not know. At least that would make it an honest mistake.

You should note, Derry, I did not plan on bringing any of this to your attention. I should have and, arguably, that might concern you more than anything. Openness and willingness to help solve safety and regulatory issues at Amerijet has gained me nothing but grief in the past. I have paid dearly for not noting that sooner. The way I saw it, these were line matters, handled in the cockpit, and that is where they would have remained. Once Brian complained to you, though, I had no choice but to render full disclosure. Brian's complaint that his command authority entitles him to place others in jeopardy is absurd. His irreverence for regulations and the direction of management threatens the livelihood of everyone relying on Amerijet's continued success. I wish you luck in dealing with this effectively.

Sincerely,

Patrick Scott Major
The preceding statements are factually accurate to the best of my recollection.

CONFIDENTIAL

000061

Chapter:    4:1:1
Page:       30
Issued:     10/01/94
Revision:   28

**TAXI** (Continued)

**One and Two-Engine Taxi** (Continued)

### NORMAL CHECKLISTS

The PRETAXI CHECKLIST can be completed; however, the TAXI CHECKLIST
will have to be held at "ENGINEER'S TAXI CHECK".

### ELECTRICAL POWER

It is permissible to taxi without transferring electric power from
the APU.

### WING FLAPS

During single-engine taxi, the flaps should not be lowered until out
of congested areas and when taxiing straight ahead. This is because
of the effect that low hydraulic pressure may have on nose wheel
steering (caused by flaps and leading edge devices in transit).

### SUBSEQUENT ENGINE STARTING

There is no intention to create a rushed atmosphere.

IF ENGINES HAVE BEEN SHUT DOWN FOR LESS THAN TWO HOURS, the
remaining engine(s) should be started soon enough to permit APU cool
down and the completion of the Taxi and Takeoff Checklists; there is
no minimum time requirement from engine start until the application
of takeoff thrust.

IF ENGINES HAVE BEEN SHUT DOWN FOR TWO HOURS OR MORE, all engines
must be started at least five minutes before the application of
takeoff thrust.    This will minimize the chances of premature
compressor or turbine disk failure.

### Air Conditioning System

During taxi, the Flight Engineer should adjust the air conditioning system to
keep the cockpit as comfortable as possible.

### Fuel

Follow the fuel usage sequence for taxi.  During extended taxi or pre-takeoff
delays, it is especially important that taxi fuel be taken from the proper tank.



PLAINTIFF'S
EXHIBIT
18
BP4 1/8/01



Page:       5
Issued:     12/21/98
Revision:   37

## GENERAL OPERATIONS MANUAL

### DUTIES/RESPONSIBILITIES

#### CAPTAIN

The captain is responsible to the Chief Pilot. When on duty, the captain is in full command of the aircraft and crew. He shall have full authority and responsibility for the safe and efficient conduct of the flight. Such authority commences at the time the crew reports for duty, continues while enroute, at the intermediate points, and until the crewmembers have gone off duty for crew rest. While in command of the aircraft, the captain may be relieved of command only by the Vice President of Operations, the Chief Pilot or their designee. He is responsible for compliance with Federal Aviation Regulations and Company Policies and Procedures. He shall ensure that the aircraft to which he is assigned is airworthy, properly and adequately serviced and that the loading is proper and secure. He shall make himself familiar with the route and reports that or which indicate the flight can be made safely. He is responsible to insure that all checklists and company forms are completed as required by the company. At any station where the company does not maintain a maintenance base, the captain will act as company representative.

#### FIRST OFFICER

The first officer is administratively responsible to the Chief Pilot and functionally responsible to the captain of the flight. The first officer is second-in-command of the flight. While acting in this capacity, he shall comply with all regulations and directives pertaining to the conduct of the flight in a manner suitable to the captain. He is responsible for ensuring that all required manuals, enroute charts, terminal and approach charts are up to date with the latest revision and aboard the aircraft. The First Officer will observe the cargo loading operation. He shall confirm that the aircraft and the load plan are in agreement. He shall perform all functions as assigned by the captain.

#### SECOND OFFICER

The second officer is administratively responsible to the Chief Pilot and functionally responsible to the captain of the flight. Any action taken by the second officer while on duty will be at the captain's request, or with his know-ledge and approval. He is responsible for the mechanical pre-flight acceptance and servicing of the aircraft and the safe and efficient operation of the air-craft components and equipment over which he has control. He shall keep the captain informed of the mechanical condition of the aircraft and components. He is responsible for inspecting, supervising or assisting in the performance of any maintenance or servicing required by the aircraft at enroute stations where company maintenance personnel are not available.

#### ADDITIONAL RESPONSIBILITIES FOR ALL CREWMEMBERS

It is the responsibility of every crewmember to ensure that their manuals are current. Therefore, all manual revisions must be read, inserted, and fully understood before a crewmember may take their next flight.

JAN 8 '01 11:09                                              PAGE.002

-06070-WJZ   Document 112   Entered on FLSD Docket 03/13/2001   Pa

Chapter:   1.500
Page:      3
Issued:    07/01/90
Revision:  18

## GENERAL OPERATIONS MANUAL

### GENERAL POLICIES

#### COMMAND RESPONSIBILITY

The Captain is in command of the aircraft and crew, and is responsible for the
safety of the aircraft, the crew and the goods carried. His command responsi-
bility begins when the crewmembers report for duty and continues while enroute,
at intermediate departure points and until the crewmembers have gone off duty to
receive a rest period, or until relieved by a designated representative of the
Company. On arrival at an airport other than a Company operating base, the
Captain shall retain control and responsibility for all matters pertaining to
aircraft servicing, ground handling and maintenance, unless a Company designated
technical representative is present to assume responsibility for such matters.

#### COMMAND AUTHORITY

The Captain has command authority over all crewmembers, from the time those
crewmembers report for duty until those crewmembers go off duty to receive a rest
period. The Captain can be relieved of his command authority only by the Vice
President of Operations or his designee.

#### SEQUENCE OF COMMAND

Should the Captain become disabled while in command of a Company aircraft, the
next crewmember in sequence shall assume command.

The sequence of command is:

> Captain
> Reserve Captain
> First Officer
> Second Officer

#### EMERGENCY AUTHORITY

In emergency situations which require immediate decisions and action, the Captain
may follow any course of action which he considers necessary under the circum-
stances and in the interest of safety.

In such instances, to the extent required, the captain may deviate from pre-
scribed operational procedures, methods, weather minimums and the FAR.

When emergency authority is exercised, the appropriate communications facility
shall be kept fully informed regarding the progress of the flight.

When emergency authority has been exercised, the captain shall, upon completion
of the flight, submit a written report to the Vice President of Operations
detailing the circumstances pertaining to the emergency and the course of action
taken. The report must be submitted within five working days. The Vice Presi-
dent of Operations will submit a report to the FAA within 10 days.



Chapter:   1.900
Page:      1
Issued:    06/17/96
Revision:  31

### GENERAL OPERATIONS MANUAL

#### FLIGHT CONTROL, FLIGHT RELEASES, FLIGHT PLANNING

#### OPERATIONAL CONTROL GENERAL

Operational control is the exercise of authority over the initiation, continuation, diversion or termination of a flight.

#### OPERATIONAL CONTROL RESPONSIBILITY

The Director of Operations is responsible for the exercise of Operational Control. He/she may delegate the function of Operational Control to those persons or organizations listed under Operational Control Authority, but he/she may not delegate the responsibility.

#### OPERATIONAL CONTROL AUTHORITY

Those persons/facilities authorized to exercise operational control over company flights are:

Facilities:        Amerijet International Flight Operations-FLL

Personnel:         Flight Followers records are maintained at Amerijet's FLL
                   facility in the Vice President of Operations office.

#### OPERATIONAL CONTROL POLICIES

Joint Responsibility

The Pilot-in-Command and the person exercising control over the flight are jointly responsible for the initiation, continuation, diversion and termination of a flight in compliance with the Federal Aviation Regulations and the Operations Specifications.

Pre-flight Planning

The Pilot-in-Command is responsible for the pre-flight planning and the operation of the flight in compliance with the Federal Aviation Regulations the Operations Specifications of this manual. He/she will have the authority to delay, divert, discontinue, or cancel a flight when, in his/her opinion conditions do not appear suitable for the safe continuation of the flight.

The Pilot-in-Command and the person exercising the operational control must reach an agreement on all provisions of the release prior to execution of the release. If agreement cannot be reached, the Director of Operations will be contacted for resolution.

Deviation From Flight Release and Emergency Authority

Once the flight or series of flights has begun, the Pilot-in Command has the final authority and may override flight Control. If this is done, the Pilot-in-Command must submit, within 24 hours, a report to the Director of Operations outlining the circumstances and reasons for his/her decision.

Received  10-50-01  02:43pm  From-305 442 1578  -To-  -01-  Page 04

**.RS. .FFICER OR FLIGHT ENGINEER PRO..CIENCY REPORT**

American INTERNATIONAL

| NAME | | EMPLOYEE NUMBER | | ☒ FIRST OFFICER ☐ FLIGHT ENGINEER | BASE | DATE |
|---|---|---|---|---|---|---|
| PAT | MAJOR | | | | MIA | 6-8-99 |

| AIRCRAFT TYPE | TRIP/DATE | | ATTACK FLIGHT TIME HOURS |
|---|---|---|---|
| B-727 | 6-8-99  FLT 823  MIA-POS-SLU-SVD-SJU-MIA | | 9.8 |

INSTRUCTIONS: Evaluate the officer's status based on the following scale:

| ① EXCELLENT | ② ABOVE AVERAGE | ③ AVERAGE | ④ BELOW AVERAGE | ⑤ UNSATISFACTORY |
|---|---|---|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | PUNCTUALITY | 1 | COOPERATION | 3 | KNOWLEDGE OF JOB | 3 | KNOWLEDGE OF F A A AND COMPANY PROCEDURES |
| 3 | PERSONAL APPEARANCE | 3 | FLIGHT EQUIPMENT | 4 | ABILITY TO PERFORM JOB | 3 | USE OF CHECKLIST |
| 1 | CONDUCT | 3 | KNOWLEDGE OF AIRCRAFT AND SYSTEMS | 5 | ABILITY TO ACCEPT INSTRUCTIONS | 3 | CONCERN FOR CUSTOMER |
| 4 | ATTITUDE | 3 | KNOWLEDGE OF NORMAL AND EMERGENCY PROCEDURES | 5 | RETENTION OF INSTRUCTIONS | 5 | CREW COOPERATION |

| FIRST OFFICER | | | | FLIGHT ENGINEER | | | |
|---|---|---|---|---|---|---|---|
| 3 | FLIGHT PLANNING | 3 | HANDLING OF AIRPLANE | ☐ | AIRCRAFT PREFLIGHT | ☐ | MONITORING CORRECT CLIMB POWER |
| 3 | FORMS WORK | 3 | ALTITUDE AWARENESS | ☐ | COCKPIT PREPARATION | ☐ | USE AND KNOWLEDGE OF PERFORMANCE MANUAL |
| 3 | COCKPIT PREPARATION | 4 | ABILITY TO LAND AIRPLANE | ☐ | LOG BOOK CHECK | ☐ | USE OF TAKEOFF & LANDING DA CARD |
| 3 | RADIO EQUIPMENT CHECK | 3 | COMPLIANCE WITH NORMAL OPERATING PROCEDURES | ☐ | REPORT OF AIRCRAFT CONDITIONS TO CAPTAIN | ☐ | ENROUTE OPERATIONS |
| 3 | USE OF COMMUNICATIONS RADIO | 3 | INSTRUMENT FLYING AND A T C PROCEDURES | ☐ | ENGINE START PROCEDURES | ☐ | IN RANGE AND BEFORE LANDING DUTIES |
| 3 | HANDLING OF A T C CLEARANCES | 3 | NAVIGATION (MAINTAINING TRACK, ALTITUDE, ETC.) | ☐ | MONITORING ELECTRICAL SYSTEM | ☐ | SECURING |
| 3 | DEPARTURE AND APPROACH PATTERN | 3 | USE OF NAVIGATION RADIOS | ☐ | INSTRUMENT MONITORING | ☐ | LOG BOOK ENTRIES |
| 3 | MONITORING OF INSTRUMENTS AND CONTROLS | 3 | AREA NAVIGATION | ☐ | HEATING AND COOLING | ☐ | INTERMEDIATE STATION WALK AROUND & FUEL LOADING |
| 3 | AIRSPEED CONTROL | 4 | USE AND KNOWLEDGE OF PERFORMANCE MANUAL | ☐ | PRESSURIZATION | ☐ | HYDRAULICS |
| 3 | COLLISION WATCH | 3 | KNOWLEDGE OF ROUTES, FREQ. & AIRPORT INFORMATION | ☐ | ABILITY TO TROUBLESHOOT MALFUNCTIONING SYSTEMS | ☐ | POST FLIGHT INSPECTION |
| 3 | RADIO WATCH AND POSITION REPORTS | | | | | | |

**REMARKS**

SEE Attached

| OVERALL GRADE | WERE UNSATISFACTORY ITEMS DISCUSSED? | ☐ YES  ☒ NO | CHECK IF TWO-LANDING REQUIREMENT COMPLETED PER PAR 121.441(e). | ON FLIGHT NO. / DATE |
|---|---|---|---|---|

| CHECK AIRMAN SIGNATURE | | EMPLOYEE NO. | BASE | DATE |
|---|---|---|---|---|
| | | 2025 | MIA | 6-8-99 |

NOTE: USE REVERSE SIDE TO BETTER EXPLAIN AND UNUSUAL EVALUATIONS OR CHARACTERISTICS.

000253

01/05/01  FRI 15:45 FAX 305 442 1578  ALLEN NORTON&BLUE,PA  ☐004

Memorandum

To:   Juan Morales
From: Derry Huff
Date: 04/26/99
Re:   Pat Major

---

**Review of meeting with Pat Major on Friday, April 23, 1999.**

1. Met with Pat and Juan to review a letter prepared by Juan regarding the allegations of stalking. The letter stated the facts of the situation and expressed our concern about the issue.

2. After presenting the letter to Pat, Juan listened to Pat's insistence that this was retaliation against him.

3. Juan and I both emphasize the fact that this was a complaint brought forward by Tim Green and was verified by other crewmembers.

4. Juan asks for Pat's assurance that his activities will cease concerning Tim Green. Pat agrees to cease actions. Juan then offers to exclude the letter from Pat's personnel file providing there are no further complaints. Pat agrees.

5. Pat was asked to return to work. He had removed himself from the schedule because he felt unable to perform his duties as a flight officer. He states that he will think about it over the weekend and call me on Monday, April 26, 1999.



PLAINTIFF'S EXHIBIT 20



CONFIDENTIAL

1

TIMOTHY J. GREEN and SHARI L. GREEN vs. BUTCH GRETCHEN

COUNTY/DOCKET #/JUDGE: Broward / 97-015597 03 / Patti Englander-Henning

PLAINTIFF(S) ATTORNEY(S): Alexander Penalta, Boca Raton (Lead Trial Attorney; Adjunct Associate Professor, Embry-Riddle Aeronautical University); Arthur Wolff, Ft. Lauderdale

DEFENDANT(S) ATTORNEY(S): n/a

AGE/SEX/OCCUPATION OF PLAINTIFF: 29 / M / Commercial Airline Transport Pilot

CAUSE OF INJURY: *Airplane Accident/Pilot Negligence.* On May 16, 1996, Plaintiff was a rear passenger in a Beech 55 Baron twin-engine light aircraft that departed Ft. Lauderdale enroute to Dothan, Alabama. Plaintiff alleged that Defendant negligently induced oscillation on final approach to the Dothan Airport, causing multiple impacts onto Runway 14 upon landing and resulting in a collapsed nose gear with substantial propeller damage. Plaintiff claimed that Defendant, an experienced 747 airline transport pilot, knowingly assumed pilot-in-command of a single-yoke propeller light aircraft for which he was not type-rated and for which the Defendant knowingly operated in violation of the rules of the Federal Aviation Administration (FAA).

NATURE OF INJURY: Herniated disc at L4-L5 and central herniated disc at L3-L4 with secondary nerve impingement requiring future surgery. Plaintiff's neurosurgeon opined that Plaintiff will be occupationally disabled within five to ten years.

EXPERT WITNESSES:
PLAINTIFF'S:    Douglas F. Martin, M.D., Neurosurgery/Microsurgery, Boca Raton (depo)
Bernard Pettingill, Ph.D., Economist, Palm Beach Gardens

VERDICT: *$3,950,000 for Plaintiffs on October 20, 1998 ($3,700,000 for Timothy; $250,000 for Shari - loss of consortium).*

EDITOR'S NOTE: The verdict form did not provide for itemization of damages.

•   •   •



PLAINTIFF'S
EXHIBIT
2 /
1/8/01



*Alexander Penalta, Legal Attorney*
Washburn University, School of Law, Juris Doctor (1991)
University of Florida, B.A., A.A. (1987)
Boca Raton High School (1983)

U.S. Naval Reserve, JAG Corps, Ltng., Desert Storm (1990-1992)
Florida Department of Labor, Administrative Hearing Officer (1993-94)
Kansas Legislature, House of Representatives, Legislative Aide (1990)
U.F. Academic Scuba Diving Program, Assistant Director (1987-88)
Embry-Riddle Aeronautical University, Adjunct Associate Professor

1200 North Federal Highway, Suite 200
Boca Raton, Florida 33432
Telephone: (561) 362-7833
Facsimile: (561) 362-8796
E-Mail: law@penalta.com
Web Site: www.penalta.com

ADMITTED IN FLORIDA AND WASHINGTON, D.C.  MR. PENALTA IS AVAILABLE STATE-WIDE, NATIONALLY,
AND INTERNATIONALLY AS AN INVITED SPEAKER AND TRIAL CONSULTANT.  HABLAMOS ESPANOL

**In The Matter Of:**

*Major    v.*
*Amerijet*

---

*David Bassett*
*Vol. 1, February 19, 2001*

---

*Friedman, Lombardi & Olson*
*19 West Flagler St.*
*Miami, FL  33130*
*(305) 371-6677*

*Original File db021901, 71 Pages*
*Min-U-Script® File ID: 3837953377*

**Word Index included with this Min-U-Script®**

[1]          UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
[2]
[3]
             CASE NO. 00-6070 FERGUSON/SNOW
[4]          L.T. CASE NO. 99-021746-11
[5]
[6] PATRICK SCOTT MAJOR,
[7]     Plaintiff,
[8] vs.
[9] AMERIJET INTERNATIONAL, INC.,
[10]    Defendant.
[11]
[12]
[13]
[14]          One E. Broward Blvd.,
              Ft. Lauderdale, Florida,
[15]          Monday, 10:40 a.m.,
              February 19, 2001.
[16]
[17]
[18]
[19]
[20]
             DEPOSITION
[21]
               of
[22]
             DAVID BASSETT
[23]
             taken on behalf of the Plaintiff
[24] pursuant to a Notice of Taking Deposition
[25]

.

[1] APPEARANCES
[2]
       HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A., by,
[3]       VALERIE SHEA, ESQ., of counsel,
          Attorneys for Plaintiff.
[4]
          ALLEN, NORTON & BLUE, P.A., by,
[5]       SUSAN POTTER NORTON, ESQ., and
          STEPHEN P. SANTIAGO, ESQ., of counsel,
[6]       Attorneys for Defendant.
[7]
       ALSO PRESENT: Patrick Major.
[8]       Derry Huff, Corporate Representative for
             Amerijet International.
[9]
[10]
[11]
[12]
                      INDEX
[13]
       WITNESS  DIRECT  CROSS  REDIRECT  RECROSS
[14]
       DAVID BASSETT
[15] (By Ms. Shea)          3
[16]
[17]
[18]              EXHIBITS
[19] PLAINTIFF'S EXHIBITS     FOR IDENTIFICATION
[20]     No. 51              Pg. 64
        No. 52              Pg. 67
[21]     No. 53              Pg. 68
[22]
[23]
[24]
[25]

Page 3

[1]          **Thereupon:**
[2]          **DAVID BASSETT**
[3] was called as a witness and, having been duly sworn, was
[4] examined and testified as follows:
[5]          **DIRECT EXAMINATION**
[6]          **BY MS. SHEA:**
[7]    **Q:** Sir, would you tell us your full name and where you
[8] live, please?
[9]    **A:** My name is David Bassett. My address is 5421 Lightner
[10] Drive, Coral Springs, Florida.
[11]   **Q:** What do you do?
[12]   **A:** I am the President of Amerijet International.
[13]   **Q:** Do you hold any other positions other than the office
[14] of President?
[15]   **A:** I am also the Secretary and Treasurer.
[16]   **Q:** Do you own any stock? Are you the stockholder?
[17]   **A:** Yes.
[18]   **Q:** Are you Chief Executive Officer?
[19]   **A:** Yes.
[20]   **Q:** Are you the founder of Amerijet?
[21]   **A:** Yes, I am.
[22]   **Q:** When did you found the company?
[23]   **A:** In 1974.
[24]   **Q:** What is the business of Amerijet currently?
[25]   **A:** Amerijet is in the cargo business.

Page 4

[1]    **Q:** What is the current number of full-time employees
[2] employed by Amerijet?
[3]    **A:** Approximately 450.
[4]    **Q:** What was that number in about the fall of 1999?
[5]    **A:** If I recall, approximately 750.
[6]    **Q:** Sir, what is the highest level of your formal
[7] education?
[8]    **A:** I have an Associate's degree in, I don't know what it
[9] is anymore, but that is it.
[10]   **Q:** Where did you grow up?
[11]   **A:** I grew up in Africa and South America.
[12]   **Q:** What did you do for your adult work life prior to
[13] starting Amerijet in 1974?
[14]   **A:** Well, I went to school. Then when I got out of school
[15] I spent four years in the Air Force. After leaving the Air
[16] Force I worked for a year for a flight school, a fixed base
[17] operation here in South Florida.
[18]   **Q:** Are you a pilot?
[19]   **A:** Yes, I am.
[20]   **Q:** When did you become a pilot?
[21]   **A:** Actually started in – actually became interested in
[22] aviation when I was nine years old. I got a private pilot's
[23] license when I was 17. So I have been flying all my life.
[24]   **Q:** What is your date of birth?
[25]   **A:** July 23, 1948.

Page 5

[1]    **Q:** How many total hours of flight time do you have?
[2]    **A:** Approximately 17,000.
[3]    **Q:** Do you do any commercial flying currently?
[4]    **A:** No.
[5]    **Q:** How long has it been since you did any commercial
[6] flying yourself?
[7]    **A:** Probably five or six years.
[8]    **Q:** Your function is mostly administrative of the company?
[9]    **A:** That is correct.
[10]   **Q:** You are aware of my client, Mr. Major, who used to
[11] work for Amerijet?
[12]   **A:** Yes.
[13]   **Q:** When did you first become acquainted with Mr. Major,
[14] if you recall?
[15]   **A:** I don't really have a specific time. I know it was in
[16] the early 90s.
[17]   **Q:** You were not involved in his hiring?
[18]   **A:** No. Not that I recall.
[19]   **Q:** Have you flown with Mr. Major himself at the controls?
[20]   **A:** I have flown with Mr. Major a long time ago. Early
[21] 90s.
[22]   **Q:** Not since then?
[23]   **A:** No.
[24]   **Q:** Was that in the 727, if you remember, or something
[25] else?

Page 6

[1]    **A:** I don't recall if I flew with Pat in a 727. I flew
[2] with Pat in a Citation.
[3]    **Q:** Do you recall one incident, one such flight or were
[4] there a number of them?
[5]    **A:** There were a number of flights. At that point he was
[6] my copilot.
[7]    **Q:** But none since the early 90s and the Citation that you
[8] recall?
[9]    **A:** Not that I can remember.
[10]   **Q:** Did there come a time in early 1999 when you made a
[11] decision that Pat Major would not be promoted to Captain at
[12] Amerijet?
[13]   **A:** Yes.
[14]   **Q:** What prompted you to become involved in that decision,
[15] to ultimately make that decision, if you did that?
[16]   **MRS. NORTON:** Object.
[17]   **A:** Well, I did make that decision. What was your
[18] question again?
[19]   **Q:** What prompted you to become involved in Pat's
[20] promotional process so as to make that decision?
[21]   **MRS. NORTON:** Object to the form of the question.
[22] Answer if you can.
[23]   **A:** I became involved after he had completed some training
[24] to become a Captain.
[25]   **Q:** Do you routinely become involved in promotional

Page 7

[1] decisions where there were some special circumstances related to
[2] Pat Major?
[3]    A: Normally I don't become involved.
[4]    Q: How did you happen to become involved this time?
[5]    A: My Director of Operations and the people from the
[6] Training Department got me involved.
[7]    Q: That would be Pete Steele from Operations?
[8]    A: Yes.
[9]    Q: From Training, would that be Tracy Dickinson?
[10]   A: Yes.
[11]   Q: What did they bring to you or ask of you or present to
[12] you?
[13]   A: Well, they basically came to me and said that Pat was
[14] very interested in becoming a Captain. That they had trained
[15] him and they were unsatisfied with his performance and yet Pat
[16] continued to press to be made into a Captain. So they came to
[17] me to get my opinion.
[18]   Q: What did you do?
[19]   A: Well, I investigated the situation. Asked both
[20] Mr. Steele and Tracy Dickinson exactly what had been done and
[21] what the circumstances were. I did a full investigation.
[22]   Q: What did Mr. Dickinson contribute to that
[23] investigation?
[24]   A: As I recall, he was the training instructor. He
[25] basically said that he did not feel that Mr. Major was prepared

Page 8

[1] or qualified to be in that position.
[2]    Q: Did you investigate any of those representations by
[3] Mr Dickinson or did you just accept those?
[4]    A: Primarily I have to take the representations of the
[5] Training Department. I mean it is, other than personally going
[6] out there and flying with him, why I pretty much have to take
[7] the recommendations of the Training Department.
[8]    Q: Did you review any of Mr Major's training records
[9] yourself?
[10]   A: No.
[11]   Q: Did you review his personnel file at all?
[12]   A: No.
[13]   Q: So you relied on Mr. Dickinson's impressions as he
[14] related them to you?
[15]   A: I relied on Mr. Dickinson, Mr. Steele and other
[16] people.
[17]   Q: Basically you relied on his impressions of Pat's
[18] training as he related it to you?
[19]   A: Mr. Dickinson's alone?
[20]   Q: No, not alone.
[21]   A: Yes, I listened to what Tracy had to say.
[22]   Q: Do you recall whether Tracy gave you any specifics of
[23] any particular training exercises or instructions?
[24]   A: I really was not looking for specifics. I have a
[25] Training Department. They are very well regulated by the FAA.

Page 9

[1] Their requirements are very straightforward and I leave it up to
[2] them.
[3]    Q: Anything else that we haven't discussed in terms of
[4] what the Training Department contributed to your decision?
[5]    A: Well, I am not sure I can answer that question.
[6]    MRS. NORTON: Object to the form.
[7]    A: You would have to be specific
[8]    Q: Other than what you have said, to summarize what
[9] Mr. Dickinson told you, that he did not feel that Pat Major's
[10] performance was sufficient, anything else that you recall
[11] Mr. Dickinson specifically contributing to this investigation?
[12]   A: Not that I recall.
[13]   Q: Let me ask you the same questions for Pete Steele.
[14] Was it Pete Steele who brought the issue of Pat's promotion to
[15] you?
[16]   A: Yes.
[17]   Q: What was it that he brought to you that led you –
[18] what did he contribute to your decision that Pat would not be
[19] promoted to a Captain at Amerijet?
[20]   A: Well, Pete told me that Pat had been trained by the
[21] Training Department. That he had received the normal training
[22] that any upgrade Captain was supposed to have. That there was
[23] questions about whether or not he was going to be able to
[24] upgrade. That he personally had recommended Pat for the
[25] check-ride. That Pat had not completed his oral exam. The oral

Page 10

[1] exam that he was given by the FAA was terminated or ended, was
[2] not completed. It was the impression, or the words that I got
[3] was, that he failed the exam.
[4]    You know, as a matter of fact, Mr. Steele informed me
[5] that he had gotten himself in trouble somewhat with the FAA
[6] because he actually recommended Pat for the exam.
[7]    Q: When you say "the words", were those Pete Steele's
[8] words about Pat having failed the FAA oral?
[9]    A: Yes.
[10]   Q: Do you know how long before Pete discussed Pat's
[11] situation with you that that had occurred?
[12]   A: I don't remember.
[13]   Q: Did Pete elaborate at all why he got in trouble with
[14] the FAA?
[15]   A: Yes. As a flight instructor, you are the examiner,
[16] you are required to recommend for check-ride and he had
[17] recommended Pat.
[18]   Q: Did you ask Pete any questions with respect to his
[19] personal basis for having recommended Pat?
[20]   MRS. NORTON: Object to the form of the question.
[21]   A: Ask your question again.
[22]   Q: Sure. Did you ask Pete or did Pete inform you on what
[23] basis he had recommended Pat?
[24]   A: Well, nobody else in the Training Department would, so
[25] he decided to do it himself. That was what he told me.

Page 11

[1] **Q:** Pete related that to you?

[2] **A:** Yes.

[3] **Q:** Did you ask Pete in any detail about the training of

[4] Pat? Had this preceded the oral examination?

[5] **A:** No, not specifically, other than to assure that he had

[6] received the training, the normal upgrade training.

[7] **Q:** How did you do that?

[8] **A:** I just asked him.

[9] **Q:** You did not again review the summary of training or

[10] anything?

[11] **A:** No. It has been a long time since I was specifically

[12] involved in the Training Department so I did not get into any

[13] detail questions as to what he was and was not asked.

[14] **Q:** You relied on the fact that he had gotten the

[15] complete, proper training?

[16] **A:** That is correct.

[17] **Q:** Anything else that you recall Pete Steele advising you

[18] that informed your decision that Pat would not be promoted?

[19] **A:** I am not sure I know how to answer the question. Ask

[20] it a different way.

[21] **Q:** Did either Pete Steele or Tracy Dickinson inform you

[22] that Pat Major had obtained a type rating?

[23] **A:** Yes. I found out about that later.

[24] **Q:** Did you find out about that before you made the

[25] decision that Pat would not be promoted to Captain?

Page 12

[1] **A:** Yes

[2] **Q:** When you say later, what period of time did this

[3] investigation take place?

[4] **A:** Well, if I remember correctly, Pat first received his

[5] training, his upgrade training. Then he was recommended by

[6] Mr. Steele to do a check-ride with the FAA. Subsequent to that

[7] he failed that check-ride. Then he went out and obtained

[8] additional training from some other source and ultimately

[9] received a type rating at that point. I mean this happened over

[10] a period of time. I mean this took a series of weeks, maybe

[11] even a month more or two.

[12] **Q:** But you and Pete began your discussion immediately

[13] after the FAA oral situation?

[14] **A:** It was an ongoing thing. You know, it was on a

[15] need-to-know type of basis.

[16] **Q:** Well, I am just wondering, if the basis for your

[17] decision not to promote Pat was the FAA oral, why was that

[18] decision not made and communicated to him before he went and

[19] obtained additional training?

[20] **A:** I don't think I said that. I did not make the

[21] decision on whether or not he passed the oral as to why he

[22] didn't become a Captain. I made that decision based on the

[23] ultimate information that I got from both the Training

[24] Department and Mr. Steele.

[25] **Q:** Were you advised by Pete that he had failed the FAA

Page 13

[1] oral at or about the time that that occurred?

[2] **A:** Yes.

[3] **Q:** Did he ask you for any decision regarding Pat's

[4] promotion at that time?

[5] **MRS. NORTON:** Object to the form.

[6] **A:** You cannot promote somebody that didn't pass the oral.

[7] **Q:** Did you make a decision at that time that Pat was not

[8] promotable as a result of the problem with the oral?

[9] **A:** No.

[10] **Q:** Is there a reason why not?

[11] **A:** Well, I did not know what he was going to do next.

[12] **Q:** Did you still consider him a viable upgrade candidate

[13] in light of the FAA situation?

[14] **A:** Up until the time I made the decision not to upgrade

[15] him, I did not make any decisions. I listened and advised the

[16] Training Department and Mr. Steele and everybody in the company

[17] to do whatever was appropriate and necessary for Pat to be

[18] upgraded

[19] **Q:** So he was still a bona fide upgrade candidate right up

[20] until the time that you made the decision some time later?

[21] **A:** Yes.

[22] **Q:** Did you know in advance that he was going to, at his

[23] own expense, obtain a type rating outside the company?

[24] **A:** No

[25] **Q:** When he obtained the type rating, why was he not at

Page 14

[1] that point advanced in the upgrade process of Amerijet?

[2] **A:** Well, a type rating doesn't do anything for you. All

[3] the type rating says, on a given day at a given time that you

[4] have passed a FAA check-ride. To have a type rating in the

[5] airplane, that does not make you an air carrier pilot. That is

[6] all that does. It just says now you have a type rating.

[7] **Q:** I just want to make sure what informed your decision.

[8] What was the basis for your decision after you were aware that

[9] he had had the problem with the FAA oral, but that then had

[10] satisfied the same requirement?

[11] **A:** How do you satisfy the same requirement?

[12] **Q:** I am sorry, I thought on a type rating there is a

[13] provision for the FAA oral. Is that not part of that process?

[14] **A:** That is for a type rating. That is a type rating

[15] requirement, but it is not a Captain requirement for an air

[16] carrier. They are two different things.

[17] **Q:** Were you surprised to learn that Pat Major had

[18] obtained a type rating outside?

[19] **A:** No.

[20] **Q:** Did it have any influence on your decision one way or

[21] the other?

[22] **A:** No.

[23] **Q:** We have talked about the input that you received from

[24] Tracy Dickinson. I am just trying to determine, what additional

[25] input did you get from Pete Steele or Tracy Dickinson that made

Page 15

[1] you make the decision that you made?

[2] **A:** Let me see if I can elaborate a little for you. There

[3] is a large misconception and I sense that this misconception has

[4] been involved in this case for a long time. It is a

[5] misconception that if you have a type rating that that

[6] automatically makes you a Captain. That is a huge

[7] misconception.

[8] Just because you have a type rating on an airplane

[9] does not authorize you for an air carrier Captain. You have to

[10] pass the training program and you have to pass the check-rides

[11] that are given for that position by the air carrier that is

[12] giving you that position.

[13] So Pat could have a type rating in the airplane, could

[14] have a type rating in the airplane before he busted the oral

[15] from the Training Department. He could have had one then. The

[16] fact of the matter is, you still have to pass an FAA check-ride

[17] to be a Captain.

[18] **Q:** So the criteria that you are talking about are

[19] Amerijet's own requirements?

[20] **A:** Yes. As approved by the FAA.

[21] **Q:** Those are all in your training manual?

[22] **A:** Yes.

[23] **Q:** If we agree that a type rating is merely an indication

[24] that in a particular series of testing requirements there was

[25] satisfactory performance, once Pat had documented that, what, if

Page 16

[1] anything, happened after that to cause you to make the decision

[2] that he was not a viable Captain candidate at Amerijet?

[3] **MRS. NORTON:** Object to the form of the question.

[4] **A:** I am lost on that question. You will have to start it

[5] again. I don't know what you are asking me.

[6] **Q:** Well, he had the problem with the FAA oral, which you

[7] did not flush him out of the upgrade program because of that.

[8] Correct?

[9] **A:** That is correct.

[10] **Q:** You knew about it at the time?

[11] **A:** Uh-huh.

[12] **Q:** You could have decided that that was a disqualifying

[13] event. Correct?

[14] **A:** Yes.

[15] **Q:** He was still in the upgrade program?

[16] **A:** Yes.

[17] **Q:** Then he went and got a type rating elsewhere and I

[18] hear what you are saying, that that is not conclusive of

[19] anything. Correct?

[20] **A:** Yes.

[21] **Q:** Then you decided not to upgrade him, to wash him out

[22] of the upgrade process. I just wanted to know what caused that

[23] decision to be made.

[24] **A:** Again, the decision was made based on the

[25] recommendation of the Training Department and the Operations

Page 17

[1] Department.

[2] Mr. Major went out and got a type rating from

[3] someplace else. You can get a type rating from anybody, that

[4] does not really mean anything. You still have to pass the

[5] training program and actually go into and go through the whole

[6] process of becoming a Captain or any other position, for that

[7] matter, for an air carrier.

[8] **Q:** So in Mr. Major's case, did he go through that process

[9] subsequent to getting this type rating?

[10] **A:** I don't even know if I know – I am not sure I

[11] understand your question.

[12] **Q:** Did he fail something in the training process at

[13] Amerijet?

[14] **A:** Yes, he did. He failed the upgrade training.

[15] **Q:** What training did he fail?

[16] **A:** According to the Training Department, he failed the

[17] oral.

[18] **Q:** But he failed, according to your Training Department,

[19] he failed the oral, but you did not rule him out. So I just

[20] want to understand. Did he fail some training subsequent to

[21] that?

[22] **A:** No. As I recall, Pat, at that time, felt that if he

[23] went out and got a type rating, that that would somehow change

[24] the situation in the Training Department. That now that he had

[25] the type rating, that would then enable him to become a Captain

Page 18

[1] and that is not just what has to happen. He has to complete the

[2] training program, he has to go through the training program in

[3] order to do that.

[4] **Q:** Basically you made your decision based on the failure

[5] of the FAA oral exam and you are being told that he had failed

[6] internal training at Amerijet?

[7] **A:** I made my decision based on the recommendation of the

[8] Training Department and the Operations Department. The Training

[9] Department and the Operations Department told me that they were

[10] not satisfied with Mr. Major and his training and his ability to

[11] be a Captain at Amerijet. Even though he had subsequently

[12] received a type rating, they were not satisfied that he was

[13] capable of doing that.

[14] **Q:** But if I ask you, did he have any Amerijet training

[15] after the FAA oral, do you know the answer to that question?

[16] **A:** I don't know the answer to that question.

[17] **Q:** If I asked you, should he have had additional Amerijet

[18] training after the FAA oral before such a determination was

[19] made?

[20] **A:** No. I don't think he necessarily should or should

[21] not. You asked me did I make up my mind and I told you I did

[22] not make up my mind. Shouldn't or should he have received the

[23] training? I don't know whether he should or should not have.

[24] **Q:** You don't know whether he got any or did not get

[25] anymore training at Amerijet?



Page 19

[1] **A:** Actually, I don't recall whether he did or did not.

[2] **Q:** The only thing you do know, he got a type rating from

[3] outside, but you explained how you considered that?

[4] **A:** Yes.

[5] **Q:** You don't recall any other specifics of any training

[6] for which Pat made representations or undertook at Amerijet?

[7] **A:** I don't really recall.

[8] **Q:** Did you describe your investigation in full that you

[9] did –

[10] **MRS. NORTON:** Object to the form of the question.

[11] **Q:** – before making this decision that Pat would not be

[12] promoted to Captain at Amerijet?

[13] **MRS. NORTON:** Object to the form of the question.

[14] **A:** I am listening. Do I answer?

[15] **MRS. NORTON:** Yes, if you can.

[16] **A:** I think I have described it for you. I mean I went to

[17] the Training Department. I went to Mr. Steele. I mean it is

[18] very important for me to assure that every person, every pilot

[19] at Amerijet be given the opportunity to upgrade. I mean it is

[20] important that that happen and I was concerned that Pat had

[21] received the necessary training for that to happen.

[22] **Q:** When you say Training Department, again, you are

[23] specifically referring to Tracy Dickinson?

[24] **A:** It is a whole department. They have several

[25] instructors over there. Tracy Dickinson was not the only

Page 20

[1] instructor at that time.

[2] **Q:** He was Director at that time, right?

[3] **A:** As I recall.

[4] **Q:** You primarily rely on him to inform you as to the

[5] Training Department's evaluations?

[6] **A:** Yes, and his boss, which is Mr. Steele.

[7] **Q:** Well, you said it was very important to you to assure

[8] that all pilots have an opportunity to upgrade at Amerijet.

[9] Isn't it a fact, sir, that in February 1997 you made a decision

[10] that Pat would not be offered an opportunity to upgrade from

[11] First Officer to Captain?

[12] **A:** Well, I believe earlier in his career I made a

[13] decision that he was not going to be upgraded in the near

[14] future. If my memory serves me right.

[15] **Q:** So you did not, at that time, decide or communicate to

[16] him that he had no upgrade prospects at Amerijet?

[17] **MRS. NORTON:** Object to the form of the question.

[18] **A:** I don't remember that.

[19] **Q:** Can you delineate the distinction between Amerijet's

[20] requirements for a Captain of a Boeing 727 and the requirements

[21] for a type certification on the Boeing 727?

[22] **A:** Can I delineate the description? One is conducted

[23] simply by passing an oral or check-ride given by the FAA The

[24] other is a proper completion of an FAA approved training program

[25] by the air carrier.

Page 21

[1] **Q:** In terms of the elements of the training program, can

[2] you delineate the differences between Amerijet's requirements

[3] and the requirements that Pat Major satisfied outside of

[4] Amerijet?

[5] **MRS. NORTON:** Object to the form of the question

[6] **A:** Can I delineate the difference between an FAA

[7] check-ride and Amerijet's training program? Is that what you

[8] are asking me?

[9] **Q:** If that is your testimony, that all the type

[10] certification is an FAA check-ride. Is that your testimony,

[11] that there are no other components to the training?

[12] **A:** That is correct.

[13] **Q:** So Amerijet's program includes an FAA check-ride, but

[14] it includes other elements?

[15] **A:** Absolutely.

[16] **Q:** Are you able to recite those or no?

[17] **A:** Not specifically, but all the elements relate to

[18] operating the airplane under 121, as opposed to strictly a 91

[19] operator or commercial-type or even non-commercial-type

[20] operation.

[21] **Q:** Did you interview or meet with Pat Major prior to

[22] making your decision that he would not be promoted to Captain in

[23] early 1999?

[24] **MRS. NORTON:** Object to the form of the question.

[25] **A:** I don't remember.

Page 22

[1] **Q:** Other than the Training Department, Director of

[2] Operations, did you interview or meet with any other individuals

[3] who informed your decision not to promote Pat to Captain?

[4] **A:** I seem to recall that I may have and I am not sure I

[5] really recall, but I will just say this, I may have spoken with

[6] some of the other Captains, some of the other people that he flew with.

[7] **Q:** But you are very vague on that?

[8] **A:** Yes, because I don't remember at what point that I did

[9] that. I can't remember if it was before or after.

[10] **Q:** Did you document your investigation in any way?

[11] **A:** No.

[12] **Q:** Did you form a personal opinion regarding Pat Major's

[13] upgrade qualifications or situation as opposed to relying on the

[14] information that you obtained from others?

[15] **MRS. NORTON:** Object to the form of the question.

[16] **A:** Did I form a personal –

[17] **Q:** Let me see if I can ask that better.

[18] **A:** Okay

[19] **Q:** You testified you made your decision based on input

[20] from some of your managers. Correct?

[21] **A:** That is correct.

[22] **Q:** Discounting that, did you, out of your own experience

[23] or knowledge of Pat Major, form any opinions that contributed to

[24] your decision or did you make your decision based on what you

[25] were advised by your senior managers?

Page 23

[1] **A:** I formed some opinions that were very old. I formed
[2] some opinions about Pat's ability from a flying prospective many
[3] years earlier when he was flying with me as my copilot.
[4] However, I did my best to discount those because it had been
[5] years and years since I had physically flown with him so it was
[6] really not fair to include those very heavily at least, but they
[7] are certainly my opinions. My opinions are what they are.
[8] **Q:** Those were a number of years old so you did not?
[9] **A:** I did my best to discount them, yes.
[10] **Q:** Other than your own recollections of having flown with
[11] Pat a number of years before, did you have any personal basis
[12] for your decision?
[13] **MRS. NORTON:** Object to the form of the question.
[14] **A:** Other than my opinion did I have anything else?
[15] **Q:** Right. Other than those recollections of having flown
[16] with Pat and the information that you got from your senior
[17] managers, was there any impressions or experience that you had
[18] with Pat Major that informed your decision?
[19] **A:** No.
[20] **Q:** Is there a reason you didn't review his personnel file
[21] or training records yourself?
[22] **A:** I didn't feel I needed to. That is what I pay people
[23] to do.
[24] **Q:** Do you recall how your decision was communicated to
[25] Pat Major in early 1999?

Page 24

[1] **A:** I seem to recall that I wrote Pat a letter and that I
[2] brought Pat into my office and asked him to sit down and then I
[3] gave him that letter.
[4] **Q:** Was it your intent in that letter, in that meeting, to
[5] once and for all advise Pat Major that he was not at that point
[6] and would never be in the future a Captain candidate at
[7] Amerijet?
[8] **A:** As I recall, yes.
[9] **Q:** How long before that letter and that meeting had you
[10] and Pete Steele and Tracy Dickinson gotten together on this
[11] issue and led to your decision?
[12] **MRS. NORTON:** Object to the form of the question.
[13] **A:** As I recall, we had several meetings prior to that
[14] probably within a couple days of my writing that letter.
[15] **Q:** Was Pete Steele angry at Pat Major? Did he express
[16] being angry at him?
[17] **A:** I don't remember.
[18] **Q:** Was he advocating the decision that you made?
[19] **A:** Was Pete Steele advocating that decision?
[20] **Q:** Yes. Was he advocating that once and for all and told
[21] you that he would not be a Captain?
[22] **MRS. NORTON:** Object to the form of the question.
[23] **A:** No, not that I recall.
[24] **Q:** How about Tracy Dickinson, was he advocating that
[25] decision?

Page 25

[1] **A:** No. I don't recall him advocating that decision.
[2] **Q:** Were they recommending it?
[3] **A:** No, I don't think they were even recommending it.
[4] That decision was mine.
[5] **Q:** I am trying to understand how the issue came up and
[6] the tone of it. You did not initiate the discussion, I take it.
[7] Pete brought the issue to you?
[8] **A:** Yes.
[9] **Q:** Was it a dollar and sense issue? Was it a
[10] training/money issue?
[11] **A:** No.
[12] **Q:** It was the failed FAA oral?
[13] **A:** If you just ask me a question, I would be glad to
[14] answer it.
[15] **MRS. NORTON:** Objection.
[16] **A:** You know, ask me. What would you like to know and I
[17] will be glad to answer it.
[18] **Q:** When this issue surfaced, it was instigated by Pete
[19] Steele. Is that correct?
[20] **MRS. NORTON:** Object to the form of the question.
[21] **A:** When this issue surfaced, Mr. Steele brought me the
[22] issue of whether or not we were going to upgrade Pat Major and I
[23] think I have already answered that already.
[24] **Q:** So when Mr. Steele asked or raised the question of,
[25] are we going to make Pat Major a Captain, is it your testimony

Page 26

[1] that he did not recommend against it?
[2] **MRS. NORTON:** Object to the form of the question.
[3] **A:** That he did not recommend against making him a
[4] Captain?
[5] **Q:** Right.
[6] **A:** That isn't my testimony.
[7] **Q:** Did he recommend against it?
[8] **A:** Yes, he did.
[9] **Q:** As to Tracy Dickinson?
[10] **A:** Yes, he did.
[11] **Q:** Who was your Chief Pilot then?
[12] **A:** I think it was Ed Cook.
[13] **Q:** What caused Ed Cook to leave Amerijet?
[14] **A:** As I recall, he resigned.
[15] **Q:** Right. But he resigned as a result of discussions or
[16] requests by you. Is that correct?
[17] **MRS. NORTON:** Object to the form of the question?
[18] **A:** He resigned because of what?
[19] **Q:** Because of management changes that you wished to make.
[20] Is that correct?
[21] **A:** That is correct.
[22] **Q:** So you requested his resignation?
[23] **A:** I think I did, yes.
[24] **Q:** What was behind that? What were the changes that you
[25] wished to make that prompted you to ask for his resignation?

Page 27

[1] A: I don't remember right now what that was. We were in

[2] the process of changing our Flight Department and I just wanted

[3] a different group of people in that job.

[4] Q: Did you have a candidate in line for that job at the

[5] time you asked Ed Cook to resign?

[6] A: Did I have a candidate? I don't think so. I don't

[7] remember.

[8] Q: So your testimony is that you asked Ed Cook to resign

[9] because you wanted a different group of people. Correct?

[10] A: That is correct.

[11] Q: But you did not have anyone in mind for that job?

[12] A: I don't remember if I had somebody or not.

[13] Q: Do you remember whether Derry Huff was a candidate in

[14] your mind at that time?

[15] MRS. NORTON: Object to the form of the question.

[16] A: I don't remember.

[17] Q: How did Derry Huff become the Chief Pilot at Amerijet?

[18] A: My guess is we were looking for a Chief Pilot and he

[19] applied for that position.

[20] Q: Did you recruit him for that position?

[21] A: I don't remember that.

[22] Q: Did you intend, when Ed Cook left, that there would be

[23] a vacancy as Chief Pilot for some period of time?

[24] MRS. NORTON: Object to the form of the question.

[25] A: No.

Page 28

[1] Q: What was your intentions of how that position would be

[2] filled when Ed Cook left?

[3] A: Again, I just was looking for a management change so I

[4] don't remember what other than that. I mean those are my

[5] intentions. It was time for a management change.

[6] Q: Did you consider Derry Huff to be a more qualified

[7] Chief Pilot than Ed Cook?

[8] A: I don't remember at what point Derry got into the

[9] equation.

[10] Q: Do you consider Derry Huff to be a more qualified

[11] Chief Pilot than Ed Cook at or about the time of transition?

[12] MRS. NORTON: Object to the form of the question.

[13] Asked and answered.

[14] A: More qualified? No, I don't think he was more

[15] qualified than Ed Cook. At that time, certainly not.

[16] Q: Can you identify why you would consider Derry Huff to

[17] be more desirable as Chief Pilot for Amerijet than Ed Cook?

[18] A: I think Derry Huff had better communication skills,

[19] more interpersonal skills with people, more human resource

[20] capabilities, things like that.

[21] Q: Did you discuss Pat Major's promotion with Derry Huff

[22] at or about the time that you decided to end his upgrade

[23] opportunity in 1999?

[24] A: I don't remember whether Derry Huff was the Chief

[25] Pilot when that letter was put together.

Page 29

[1] Q: Same question for Ed Cook. Do you have recollection

[2] of discussing the issue with Ed Cook?

[3] A: Again, I don't remember when Ed Cook left, so I can't

[4] put those pieces together for you.

[5] Q: When did Pete Steele leave Amerijet?

[6] A: Last April.

[7] Q: April of 2000?

[8] A: I believe so.

[9] Q: Did you request his resignation?

[10] A: No, he came to me on his own.

[11] Q: What reason did he give you for leaving Amerijet?

[12] A: He told me that he felt that he had reached a point

[13] where our, or Amerijet had reached a point where he could no

[14] longer effectively do his job as I wanted him to do it.

[15] Q: Did you accept his resignation or did you seek to

[16] accommodate?

[17] A: No, I accepted his resignation.

[18] Q: What was it that he felt that he was unable to

[19] effectively do?

[20] A: Well, I was asking him to become more involved from

[21] both, not just with the FAA and with the pilots, but from an

[22] operational aspect, from a financial aspect, from an accounting

[23] aspect and cost control aspect and all of those things that he

[24] did not feel qualified to do.

[25] Q: Do you consider Derry Huff to be qualified to fulfill

Page 30

[1] those various functions?

[2] A: He is learning.

[3] Q: The answer is not yet?

[4] A: Not yet.

[5] Q: You testified that you do have a recollection of

[6] having made a decision several years previously that Pat was not

[7] going to be an upgrade candidate in the foreseeable future. I

[8] would just like to ask you a little more detail about that. How

[9] did it come to be that that issue was in front of you back in

[10] that period of time?

[11] A: Well, from time to time – Pat was an old employee.

[12] Pat had been with me a long time. He initially came in as a

[13] brand new, fairly new airman with very little experience and was

[14] trained to be a Flight Engineer and ultimately was upgraded to

[15] being a First Officer and then in the natural progression it

[16] would be for that person to continue on to being a Captain.

[17] Q: Were you aware from Pat that he was very interested in

[18] promoting to Captain?

[19] A: Oh, yes. Pat made it clear to everybody that he

[20] wanted to be a Captain

[21] Q: What prompted you to decide several years before the

[22] ultimate decision that you made to affirmatively discourage him

[23] from seeking to be a Captain at Amerijet?

[24] MRS. NORTON: Object to the form of the question.

[25] THE WITNESS: Can I answer the question?

Page 31

[1] **MRS. NORTON:** Yes.

[2] **A:** The same process. I mean I asked the Training

[3] Department, is he ready to go and the Training Department said

[4] no.

[5] **Q:** Do you recall who was the head of the Training

[6] Department at that time?

[7] **A:** Don't remember.

[8] **Q:** Was Pat, as a pilot, someone who communicated with you

[9] more often than the normal person over what he perceived to be

[10] management issues within the company?

[11] **MRS. NORTON:** Object to the question. How can he

[12] answer what Mr. Major perceives?

[13] **Q:** Do you need me to rephrase that?

[14] **A:** I am just the witness. Ask me the question.

[15] **Q:** Did you hear from Pat more than you heard from other

[16] pilots concerning, what I will call administrative management

[17] and human resources, personnel, non-aviation issues, concerning

[18] Amerijet?

[19] **A:** Not particularly, that I recall.

[20] **Q:** You wouldn't say he had a high profile or was

[21] outspoken?

[22] **A:** No, I don't think so. Not anymore than anybody else.

[23] **Q:** Was he more vocal or more outspoken than anyone else

[24] with respect to union issues at Amerijet?

[25] **A:** No. As I recall about union issues, Pat was always on

Page 32

[1] the company side. He was always trying to work with the company

[2] in the terms of union issues. I appreciated that a great deal

[3] about Pat.

[4] **Q:** Was Pat outspoken on human resource issues?

[5] **A:** Pat had a human resource background so he had more of

[6] an inclination in terms of human resources than many of the

[7] other pilots, but I don't really recall him being outspoken

[8] about human resource issues. He talked about them.

[9] **Q:** Do you recall Pat recommending that Amerijet have a

[10] dedicated human resource function back at the time it did not?

[11] **A:** Yes, I do.

[12] **Q:** Was Pat, as a pilot, more outspoken than peers with

[13] respect to aviation issues effecting Amerijet?

[14] **MRS. NORTON:** Object to the form of the question.

[15] **A:** I don't recall that, no.

[16] **Q:** Were there ever on any occasions where you had any

[17] personal ill-will toward Pat Major during his time at Amerijet?

[18] **A:** Ill-will? I think I have already testified that I

[19] appreciated Pat for Pat's contribution to what he was doing for

[20] the company.

[21] **Q:** That was an unqualified appreciation?

[22] **A:** Sure.

[23] **Q:** You did not consider him out of line?

[24] **A:** Absolutely not.

[25] **Q:** Too critical of the company?

Page 33

[1] **A:** As I have said many, many times, everybody has one

[2] boss and I have 700 of them, so there is always somebody telling

[3] me how they think it ought to be done.

[4] **Q:** Back in 1997 the Training Department basically

[5] informed you that they did not consider Pat Major ready to go?

[6] **A:** Yes.

[7] **Q:** Was Pete Steele also part of that discussion?

[8] **A:** Certainly.

[9] **Q:** Anyone else that you recall other than the Training

[10] Department that were not sure other than the then Director, Pete

[11] Steele?

[12] **A:** Well, my guess is that at that point, 1997, the Chief

[13] Pilot was Ed Cook. So the Training Department, the Chief Pilot,

[14] Mr. Steele and, you know, everybody that had to do with flight

[15] operations.

[16] **Q:** Again, would you have personally researched his

[17] training records or his personnel file in being confronted with

[18] that decision to make?

[19] **MRS. NORTON:** Object to the form of the question.

[20] **A:** No. I basically took the words of my Training

[21] Department when they said they put him through a class and that

[22] he went through that class.

[23] **Q:** What was it that you intended to convey to Pat Major

[24] back on that occasion as it related to his future promotional

[25] prospects at Amerijet?

Page 34

[1] **A:** Well, I wanted to convey then that he had been –

[2] through Pat's career at Amerijet, Pat had continually requested

[3] that he be upgraded, felt that he was being overlooked or what

[4] have you. You know, the impression that I had at that time was

[5] that he felt like he was not getting his due, you know, his due

[6] course. So I wanted to make sure that he knew that I had in

[7] fact reviewed what was going on and that the recommendations

[8] from the Training Department and the Flight Department were what

[9] they were and that I was making that decision and it was

[10] something I was not going to change in the very near future.

[11] **Q:** What happened between that decision and the time in

[12] which he was permitted to enter the upgrade process to change

[13] your mind?

[14] **A:** It was 1997 to 1999. I mean, a couple of years. It

[15] is time to learn, time to grow.

[16] **Q:** Did you have occasion, when he did seek to upgrade

[17] later, to meet with your management team and specifically

[18] discuss Pat Major and his progression?

[19] **A:** Pat continued to request an upgrade and I continued

[20] to, as I always did with everybody, to tell my management team

[21] that they needed to – our interest was to promote from within,

[22] to take care of our people and get everybody equal opportunity.

[23] **Q:** If I asked you to enumerate the factors that changed

[24] between when he received the first message from you and when he

[25] entered the upgrade program, after that, are you able to tell me

Page 35

[1] those factors or would you refer me to other folks on your
[2] management team?
[3]    **MRS. NORTON:** Object to the form of the question.
[4]    **A:** I am not sure what you are asking. Ask it a different
[5] way.
[6]    **Q:** What happened between your message to him that was
[7] clear in 1997, we don't consider you a strong prospect, if ever,
[8] certainly not any time soon for Captain. Correct?
[9]    **A:** Yes.
[10]    **Q:** To the time that he was permitted to enter the upgrade
[11] process. What happened in between?
[12]    **A:** I think I have answered that. I think two years is a
[13] long time. I mean it is time to look at it again.
[14]    **Q:** Well, that was my next question. That is what I was
[15] trying to ask. Did you sit down and look at it again before you
[16] approved of him being offered an upgrade?
[17]    **A:** Not that I specifically recall.
[18]    **Q:** Did you discuss it with anybody?
[19]    **A:** I specifically discussed it with the Training
[20] Department and the Flight Department that Mr. Major and everyone
[21] else, but certainly Mr. Major, be given the opportunity again if
[22] they felt that they could accomplish the job. I did not want
[23] Pat or anybody else at Amerijet to feel like they were not being
[24] treated properly.
[25]    **Q:** Did you offer Pat an exit package back in 1997?

Page 36

[1]    **A:** As I recall, there was an exit package. I just don't
[2] remember the details about it.
[3]    **Q:** Is that something that has been offered to anyone else
[4] in Amerijet?
[5]    **MRS. NORTON:** Object to the form of the question.
[6]    **A:** Specifically, I don't know. I don't remember.
[7]    **Q:** You are not aware of any that you can think of sitting
[8] here today?
[9]    **A:** I can't think of any right now.
[10]    **Q:** What prompted you to make that offer of an exit
[11] package to Pat Major?
[12]    **A:** Well, I knew Pat was very disappointed in the fact
[13] that he was not going to be a Captain any time soon and I wanted
[14] to make him understand that he could leave and/or he could stay,
[15] but you know, my choice was my decision, that he was not going
[16] to be upgraded.
[17]    **Q:** That related to your understanding of his lack of
[18] success in the upgrade training immediately leading up to that?
[19]    **A:** If my memory serves me correct, because of his
[20] disappointment of not being able to upgrade and not having an
[21] opportunity to have that reviewed in the near future, well, here
[22] is an opportunity to just leave if you want to.
[23]    **Q:** But again, my question was: That decision was made at
[24] that time because of the upgrade training that he had failed or
[25] what prompted that decision to be made?

Page 37

[1]    **MRS. NORTON:** Object to the form.
[2]    **A:** I just answered that part
[3]    **Q:** His disappointment?
[4]    **A:** I felt bad for him. You know, I felt we tried to but
[5] that it did not happen, so here was an opportunity to leave.
[6]    **Q:** Let me make sure I want to pin this down. When you
[7] say we tried to but it did not happen, do you have a
[8] recollection?
[9]    **A:** Meaning "we". I speak as a company.
[10]    **Q:** Right.
[11]    **A:** The Training Department, the Flight Department and so
[12] forth.
[13]    **Q:** That he had failed measurable performance assessments?
[14]    **A:** As I recall, yes.
[15]    **Q:** Obviously you did not consider him unsafe as an
[16] Amerijet pilot.
[17]    **MRS. NORTON:** Object to the form of the question.
[18]    **A:** Not at that time, not in the position he was flying.
[19] If I thought he was unsafe, I would have fired him.
[20]    **Q:** Does Amerijet have any assessment methods, any
[21] criteria, anything you can point me to by which it evaluates the
[22] viability of people as upgrade candidates?
[23]    **A:** The pilots?
[24]    **Q:** Right.
[25]    **A:** I can't give you specific answers. I am certain that

Page 38

[1] our manuals someplace, at least, layout broad guidelines as to
[2] the viability of candidates.
[3]    **Q:** Could you contrast Pat Major with other Captain
[4] candidates and describe for me the differences in qualifications
[5] or criteria?
[6]    **A:** I am not familiar
[7]    **Q:** Are you the final authority on who makes Captain and
[8] who doesn't make Captain in general?
[9]    **A:** Well, yes and no. I mean most of the time I am not.
[10] The only time I become that final authority is if either I voice
[11] a concern or there is a concern in terms of the ultimate safety
[12] of the operation.
[13]    **Q:** When you made the decision concerning Pat Major in
[14] 1999, you haven't mentioned any safety issues. What, if any,
[15] concerns did you have with regard to safety?
[16]    **A:** The Training Department told me that he was again not
[17] qualified and, not necessarily qualified, but not able and
[18] capable of filling that position.
[19]    **Q:** But if I understood your earlier testimony that
[20] related to failures of formal training within the training
[21] manual of Amerijet, were they safety related or not?
[22]    **MRS. NORTON:** Object to the form of the question.
[23] That is not what his testimony reflected.
[24]    **A:** I will repeat it one more time. The Training
[25] Department told me that in their opinion Pat Major was not

Page 39

[1] qualified and was not able to be a Captain. That is what they
[2] told me.
[3] When I did my review and I asked my questions, short
[4] of getting in the airplane and going to fly with him, which I
[5] haven't done in years and years, I basically take the
[6] information that comes from that department and I evaluate that
[7] and look at it, look at its history and then make a
[8] determination.
[9] **Q:** Let me ask it this way. Obviously you continued in
[10] your belief that Pat was a safety capable First Officer or you
[11] could have discharged him?
[12] **A:** That is correct. At that point in time I felt that he
[13] was a capable First Officer. He was not a capable Captain.
[14] **Q:** Why did you offer Pat in his exit package in 1997 an
[15] age discrimination release?
[16] **A:** Any time you offer a package to anybody, an exit
[17] package, there is a standard program that is put together, our
[18] attorneys put together, that encompasses all kinds of things.
[19] We just gave him a standard package.
[20] **Q:** So you had legal advice and counsel at that point?
[21] **A:** I always have legal advice and counsel when it comes
[22] to employee issues.
[23] **Q:** Did you specifically seek any advice of counsel
[24] regarding your decision to inform Pat in 1999 that he would not
[25] be promoted to Captain?

Page 40

[1] **A:** No, I did not seek any legal advice on that one, no.
[2] **Q:** Was Pat's age a factor in your personal
[3] decision-making process?
[4] **A:** Absolutely not.
[5] **Q:** Have you ever made statements to Pat to the effect of,
[6] if you don't like it here, just go somewhere else?
[7] **A:** I don't remember.
[8] **Q:** Have you made statements of that nature in pilot
[9] meetings or to pilots in general that work for you?
[10] **A:** Oh, I have made statements many times to people, you
[11] have to like your job and if you are not happy at the job here
[12] at Amerijet, then it is probably best for both of us that you
[13] not be here.
[14] **Q:** Did you have any involvement in the decision to
[15] terminate Pat Major's employment?
[16] **A:** Yes, I did.
[17] **Q:** How was that presented to you? What happened?
[18] **MRS. NORTON:** Object to the form. Can we take a break
[19] or do you want him to answer that?
[20] **MS. SHEA:** Answer the question, then we can take a
[21] break.
[22] **MRS. NORTON:** Okay.
[23] **A:** The decision to terminate Pat was when I realized and
[24] became aware of the situation on the runway that ultimately
[25] resulted in what I refer to as the NASA report. The report

Page 41

[1] where Pat was concerned, apparently, prior to take-off about the
[2] safety of the aircraft and ultimately the aircraft took off.
[3] There was an ultimate question as to whether or not the aircraft
[4] was actually safe to take-off at that time.
[5] My decision to terminate Pat at that point was that he
[6] had now violated or now reached a point where he was no longer
[7] safe as a First Officer.
[8] **Q:** Let me follow-up on that quickly. How did you become
[9] aware of the situation on the runway that day?
[10] **A:** I think that information was brought to me by
[11] Mr. Steele and it may even have been brought to me by Pat. I
[12] don't remember for sure exactly how I got it.
[13] **Q:** Did you reach a conclusion that Pat Major had violated
[14] a Federal Aviation Regulation?
[15] **A:** No. I made a decision that Pat Major had violated a
[16] position where he was no longer able to make the right judgment
[17] call at the time that the airplane was ready to depart.
[18] **Q:** In what respect?
[19] **A:** He didn't stop the flight.
[20] **Q:** So you would agree that the flight was overweight?
[21] **A:** No, I wouldn't agree to that at all. I am simply
[22] saying that any time an airman, any type of pilot, regardless of
[23] their position in the airplane, is uncomfortable, particularly
[24] before it takes off, with its legality or its viability, it is
[25] required of them to do something about it.

Page 42

[1] **Q:** So you made the decision to fire Pat Major because he
[2] allowed the flight to take off, he did not personally retard the
[3] flight from taking off?
[4] **A:** No. I mean, basically it was a decision. He is a
[5] crew member. The airplane cannot leave without a full
[6] compliment of a crew. Certainly every pilot has to determine
[7] before they get on an airplane and actually take-off whether
[8] they are going to fly on it and he ultimately was on that
[9] airplane when it took off over grave concerns of his own by what
[10] was reflected in his report.
[11] **Q:** What determination did you make as to whether his
[12] grave concerns were well-founded or unfounded?
[13] **A:** It doesn't matter whether they were well-founded or
[14] unfounded.
[15] **Q:** So you consciously did not make any determination on
[16] the merits of the situation whether Pat was right or wrong in
[17] being concerned?
[18] **A:** That is not the point. The point is that Pat was
[19] concerned, at least he appeared to be concerned by what he wrote
[20] in that letter or that report and continued to act as a crew
[21] member and continued to allow the flight to go.
[22] **Q:** Is there an Amerijet policy or procedure to which you
[23] can point me that advises a pilot who is a crew member that he
[24] has this duty?
[25] **A:** There are.

Page 43

[1] **Q:** What is the one you are referring to?

[2] **A:** It is fundamental that if you are not satisfied with a

[3] pre-flight airplane that you don't take off.

[4] **Q:** It doesn't mean you keep your job if you get off?

[5] **A:** Absolutely. You do keep your job if you get off.

[6] **Q:** You do?

[7] **A:** Absolutely.

[8] **Q:** Founded or unfounded?

[9] **A:** Founded or unfounded, that's correct.

[10] **Q:** Is there an Amerijet policy or procedure that states

[11] that?

[12] **A:** I don't know if it is stated, but that is certainly

[13] mine. I mean I am a pilot and any time any pilot of mine feels

[14] like the flight is unsafe, unsafe enough to where they are

[15] willing to stand up for their belief and get off the airplane,

[16] that is a good thing. It may be unfounded, it may be

[17] aggravated, but it is the right thing to do.

[18] **MRS. NORTON:** Can we take a break here?

[19] **MS. SHEA:** Sure.

[20] [Recess Taken.]

[21] **Q:** (By Ms. Shea:) Did you receive a copy of the document

[22] that you have referred to as the NASA report before you made the

[23] decision to terminate Pat's employment?

[24] **A:** Yes.

[25] **Q:** Do you know how long before you made that decision?

Page 44

[1] **A:** No.

[2] **Q:** Were you involved in the decision to suspend Pat as

[3] opposed to terminate him?

[4] **A:** I don't remember the details.

[5] **Q:** Did you attend any meetings at which discipline of Pat

[6] was discussed?

[7] **MRS. NORTON:** Other than what he has testified about?

[8] What time frame?

[9] **MS. SHEA:** This is all in August 1999.

[10] **MRS. NORTON:** Okay.

[11] **A:** Did I attend any meetings? I believe I had a meeting

[12] with Mr. Steele

[13] **Q:** Did he make a recommendation concerning whether Pat

[14] should be terminated?

[15] **A:** No, not that I recall. That was my decision.

[16] **Q:** Did Mr. Steele recommend against terminating him?

[17] **A:** No, I don't think so.

[18] **Q:** You were the designated Safety Officer at Amerijet at

[19] that time?

[20] **A:** Still am.

[21] **Q:** Did you forward Pat Major's report yourself to any

[22] regulator or administrative agencies?

[23] **A:** No.

[24] **Q:** Did you make any report of this incident at all, the

[25] incident at which he had made the report?

Page 45

[1] **A:** No.

[2] **Q:** Why not?

[3] **A:** Again, didn't feel like I needed to.

[4] **Q:** Did you conclude that there had not been an FAA

[5] violation, is that why?

[6] **A:** I concluded that the flight departed safely and that I

[7] didn't really see any evidence of an FAA violation.

[8] **Q:** Had you seen evidence of an FAA violation, you would

[9] agree that that would be your duty as Safety Officer to report

[10] it. Is that correct?

[11] **A:** That is correct.

[12] **Q:** Did you listen to the tower tapes?

[13] **A:** No, I did not.

[14] **Q:** Were you aware that there was reports of standing

[15] water prior to take-off?

[16] **MRS. NORTON:** Object to the form of the question.

[17] **A:** I was aware of it at some point, I just don't remember

[18] when.

[19] **Q:** Do you know at what point in its departure the plane

[20] was when the standing water report came out?

[21] **MRS. NORTON:** Object to the form of the question.

[22] **A:** What was that question again?

[23] **Q:** Do you know whether taxi was underway when that report

[24] came out?

[25] **A:** I don't know. I would have to go back and review that

Page 46

[1] whole file.

[2] **Q:** You haven't done that for the deposition today?

[3] **A:** No.

[4] **Q:** Are you aware that Pat Major had, in June of 1999,

[5] encountered circumstances similar to those that existed in

[6] August and discussed with Chief Pilot Derry Huff his concerns

[7] regarding avoiding take-offs on contaminated runways?

[8] **MRS. NORTON:** Object to the form of the question. Is

[9] your question similar circumstances or discussed with Derry Huff

[10] the various aspects?

[11] **Q:** Did you understand my question?

[12] **A:** Ask it again. I am confused, so let me make sure I

[13] understand your question.

[14] **Q:** On August 17, 1999 you were aware it was raining.

[15] Correct?

[16] **MRS. NORTON:** Object to the form of the question.

[17] **A:** That is the report, as I recall.

[18] **Q:** It had been raining that day. Correct?

[19] **A:** Again, that is the report. I don't have a

[20] recollection whether it was raining or not on August 17th.

[21] **Q:** But you understood that to be a circumstance?

[22] **A:** That is what is in the report.

[23] **Q:** A maximum weight take-off is projected?

[24] **MRS. NORTON:** Object to the form of the question.

[25] **A:** It was.

Page 47

[1] **Q:** You don't know or you don't recall?

[2] **A:** You are telling me. You said a maximum weight is

[3] projected. I am asking, was it?

[4] **Q:** You have no recollection of that yourself?

[5] **A:** I am waiting for your question.

[6] **Q:** Was there a maximum weight take-off projected for the

[7] subject flight on August 17, 1999?

[8] **A:** I believe there was.

[9] **Q:** Were the runways dry or contaminated?

[10] **A:** I was not there.

[11] **Q:** When the plane departed the ramp, were the runways dry

[12] or contaminated, if you know?

[13] **A:** I was not there.

[14] **Q:** You don't know?

[15] **A:** I was not there.

[16] **Q:** And you have no information about that to this day

[17] from any source. Is that your testimony?

[18] **A:** Other than what is on the reports that have come out

[19] since then, both the tower reports, the tapes and Pat's report

[20] and so forth, I have no firsthand information of what is on

[21] that.

[22] **Q:** Would you agree Amerijet's practice at that time was

[23] to consider runways in a dry condition in the absence of an

[24] official tower report of standing water?

[25] **A:** I am not aware of that.

Page 48

[1] **Q:** You don't know one way or the other?

[2] **A:** No, not at this point.

[3] **Q:** Do you know whether Pat had encountered conditions on

[4] a flight in June similar to the conditions on this particular

[5] flight in August and had a discussion about that with Derry

[6] Huff?

[7] **A:** I am aware that Pat had a discussion with Derry Huff

[8] about an incident earlier in that year, what it was about, I

[9] don't remember or I don't recall.

[10] **Q:** But you are aware that Pat was reprimanded for having

[11] questioned the Captain's performance planning directives on that

[12] day?

[13] **MRS. NORTON:** Object to the form of the question.

[14] **A:** I was not aware he was reprimanded.

[15] **Q:** What did Derry Huff tell you about that incident?

[16] **A:** That he had a discussion with Pat concerning the

[17] incident.

[18] **Q:** What kind of discussion did he have with Pat?

[19] **MRS. NORTON:** Object to the form of the question.

[20] **A:** Again, I don't know.

[21] **Q:** Other than remembering that Derry mentioned to you

[22] that he had a discussion with Pat about a similar incident, can

[23] you tell me anything about the substance of that discussion?

[24] **A:** No, I can't.

[25] **Q:** What exactly do you do as Safety Officer of Amerijet?

Page 49

[1] What does that mean?

[2] **A:** Well, that means that I am supposed to be aware of

[3] whatever is any kind of safety issue that may come as part of

[4] the operation of the airline.

[5] For example, if there has been an incident on the

[6] airport with a pilot where someone has had a problem, they have

[7] the right to come directly to me rather than go through somebody

[8] else to resolve the issue.

[9] **Q:** What else other than accepting complaints or incident

[10] reports?

[11] **A:** Making decisions as to whether or not something is

[12] safe or not. Making a determination as to the ultimate safety

[13] of the airline.

[14] **Q:** You are unable to testify as to what Amerijet's

[15] practice was in 1999 as it relates to taking weight and speed

[16] decrements on wet runways?

[17] **A:** Amerijet's practice is what is outlined in our

[18] operating manuals and what is outlined by FARs. Certainly by

[19] going back to those things, yes, I can figure that out, but I

[20] can't sit here today and tell you that.

[21] **Q:** Do you know whether those practices have changed at

[22] all since August of 1999?

[23] **A:** No.

[24] **Q:** No, they have not?

[25] **A:** Not to my knowledge, they haven't.

Page 50

[1] **Q:** Are your pilots authorized to disregard official

[2] runway contamination reports?

[3] **MRS. NORTON:** Object to the form of the question.

[4] **A:** No.

[5] **Q:** If given your conclusion in August of 1999 that if Pat

[6] had a concern about the flight, it did not matter whether it was

[7] unfounded or well-founded, he should have gotten off the flight

[8] and had he done so there would be no repercussions to him, why

[9] did you not simply do a memorandum to him advising him of that

[10] fact? What, in your opinion, warranted termination?

[11] **A:** Well, because he allowed this flight to actually

[12] continue to the point where he had got to the place where a

[13] severe hazard had occurred or what could have occurred I mean

[14] in his NASA report he mentions that ultimately. The ones that

[15] particular stick out in my brain, the most was ultimately I was

[16] out of options and all I could really do is throw myself on the

[17] throttles to stop the airplane.

[18] I mean to me, as a pilot, there is really two very,

[19] very serious times or dangerous places in an airplane. Probably

[20] the most dangerous is a fire. An airborne fire is an incredibly

[21] dangerous place to me. Probably, to me, the second most

[22] dangerous place is to be on the take-off roll and abort the

[23] take-off.

[24] Any airman that basically considers himself in a

[25] position that he has no other option other than to throw himself

Page 51

[1] on the throttles on the take-off roll is incredible. There is
[2] no cockpit resource management going on. There is a severe lack
[3] of judgment. There is a severe lack of pre-flight planning.
[4] There is no crew coordination going on. It is just the wrong
[5] place to be.
[6]     Any crew member that is involved in and feels that way
[7] at that point and has allowed it to go that far, particularly a
[8] crew member that has been with Amerijet as long as Pat has been
[9] with Amerijet, is just unacceptable.
[10]    Q: Well, obviously Pat Major did nothing to forcibly
[11] prevent the take-off of that flight. He did not get fired for
[12] doing some rash maneuver in the cockpit in terms of flying.
[13]    A: He got fired for not taking care of the problem before
[14] or making sure the problem was cared for to his level of concern
[15] and comfortable before the airplane ever had the engine started.
[16]    Q: To answer my question, you are well aware at the time
[17] you decided to fire him that he did not do anything in the
[18] cockpit to disrupt the flight?
[19]    A: Thank God.
[20]    MRS. NORTON: Object to the form.
[21]    Q: He deferred and that is what you are supposed to do
[22] once you are underway?
[23]    MRS. NORTON: Object to the form.
[24]    A: No. I am sorry, that is not what you are supposed to
[25] do.

Page 52

[1]    Q: You are supposed to —
[2]    A: You are supposed to do something before you are
[3] underway.
[4]    Q: Once you are underway then the pilot in command is in
[5] charge?
[6]    A: The pilot in command is in charge as long as the
[7] airplane is operating, yes.
[8]    Q: I just want to make sure I understand. He got fired
[9] because he should have gotten off at the ramp regardless of
[10] whether his concern was well-founded or not?
[11]    A: No, no. If he had as much as a concern as he
[12] obviously had, it was his duty and his obligation by FARs to
[13] stop at least for him not to participate in that flight.
[14]    Q: And he was fired for his poor judgment. Tell me in
[15] your own words.
[16]    A: He didn't have the courage, did not have the correct
[17] judgment. He felt very strongly about a situation as it related
[18] to safety and failed to follow through.
[19]    Q: Now, you don't know anything more about the prior
[20] incident than what you testified to a few minutes ago that you
[21] discussed it with Derry?
[22]    A: I don't recall.
[23]    Q: Don't recall any specifics about that?
[24]    A: Don't know.
[25]    Q: Don't know if he was reprimanded or not?

Page 53

[1]    A: Don't know. Certainly he was not fired.
[2]    Q: Don't know whether Brian Steele complained about him
[3] or not?
[4]    A: Don't remember.
[5]    Q: What other employees at Amerijet had made a NASA
[6] report and brought it to your attention?
[7]    A: Can't remember any specifics.
[8]    Q: Can't think of any?
[9]    A: Can't think of any.
[10]    Q: Can you tell me any other employees who have ever
[11] gotten off an airplane under this duty that you testified about
[12] to not participate in the flight that have escaped any
[13] discipline or reprimand?
[14]    A: Well, me for one.
[15]    Q: Tell me.
[16]    A: I have done it.
[17]    Q: Tell me your experience.
[18]    A: I was flying with my ex-partner actually in a Learjet
[19] and I was serving as the copilot and we actually came to the
[20] runway with take-off clearance with snow on the wicks and I
[21] refused to be part of the crew. It was his leg, I was not the
[22] Captain and I got off the airplane. I basically said I am not
[23] accepting the take-off clearance.
[24]    I am aware of one other incident that Mr. Huff told me
[25] about in which he actually did the same thing.

Page 54

[1]    Q: Do you know whether he related that experience to Pat
[2] Major?
[3]    A: I don't know whether he did or not.
[4]    Q: Sir, are you aware that Mr. Huff has testified that he
[5] reprimanded Pat Major for having declined the take-off clearance
[6] on a flight with Brian Steele in June of 1999 under very similar
[7] circumstances?
[8]    A: I am not aware of that.
[9]    MRS. NORTON: Object to the form.
[10]    Q: You were not aware of that when you decided to fire
[11] him as well?
[12]    MRS. NORTON: Object to the form. Counsel's questions
[13] are not testimony and facts.
[14]    A: No, I wasn't.
[15]    Q: Did you ever read Brian Steele's report of his earlier
[16] flight with Pat Major complaining about Pat?
[17]    A: No.
[18]    Q: Are you aware that that report contains a clear
[19] confessed violation of an FAR?
[20]    A: I did not read it.
[21]    MRS. NORTON: Object to the form.
[22]    A: How could I be aware?
[23]    Q: You could be aware. You are aware of Pat's training
[24] records and you never looked at those.
[25]    MRS. NORTON: Just answer the question Counsel would

Page 55

[1] be what I characterize as argumentative. Just answer the
[2] question.

[3]    **A:** Certainly.

[4]    **Q:** My question was: You are not aware then?

[5]    **A:** Of what?

[6]    **Q:** Of clear FAR violations in Captain Steele's own report
[7] of the June 1999 flight?

[8]    **MRS. NORTON:** Object to the form of the question.
[9] Counsel's questions are not fact or testimony.

[10]    **Q:** You are not aware of that. Correct?

[11]    **A:** I am not aware of the report at all.

[12]    **Q:** Somebody that read that report ought to give it to you
[13] as Safety Officer if there is a violation report in there.
[14] Correct?

[15]    **MRS. NORTON:** Object to the form. Ms. Shea, you are
[16] argumentative

[17]    **MS. SHEA:** I am asking for information.

[18]    **MRS. NORTON:** You are being very argumentative.

[19]    **A:** I don't know what your question is. If you ask it, I
[20] will be glad to answer.

[21]    **Q:** You, as the Safety Officer, should be the receiving
[22] party for reports of violations occurring within your company.
[23] Correct?

[24]    **A:** If there was a violation?

[25]    **Q:** It should be brought to your attention?

Page 56

[1]    **A:** If there was one?

[2]    **Q:** Yes. If there was one, yes

[3]    **A:** I think I answered that if there was a violation, yes,
[4] I should be reported of a violation.

[5]    **Q:** Did you assess whether Pat Major's report of August
[6] 1999 reflected a FAR violation?

[7]    **A:** Did I assess there was a violation?

[8]    **Q:** Did you assess the report or try to determine whether
[9] there was a violation?

[10]    **A:** Well, certainly.

[11]    **Q:** Did you conclude that there had been no violation?

[12]    **A:** To this date my conclusion is that there still isn't a
[13] violation.

[14]    **Q:** What is the basis for that?

[15]    **A:** Because I have taken off of the runway of Fort
[16] Lauderdale probably in excess of 4,000 times and the runway just
[17] doesn't have standing water on it.

[18]    **Q:** I asked you a few minutes ago if a pilot can disregard
[19] an official report of standing water and you said no.

[20]    **A:** As I recall, that report that we got from the tower
[21] doesn't indicate that there is standing water on the runway. It
[22] indicates there is a certain amount of water on the run six feet
[23] or so on either side of the center line, as I recall.

[24]    **Q:** So back in August of 1999 when you assessed this, you
[25] concluded that there was no violation of an FAR because the

Page 57

[1] tower report did not contain the technical terms?

[2]    **A:** I just, at that point and still to this day, I am not
[3] convinced there was an FAR violation. That is all I can tell
[4] you. That is my opinion.

[5]    **Q:** And the basis for that, you just don't think that
[6] runway has standing water on it regardless of what official
[7] report comes out?

[8]    **MRS. NORTON:** Object to the form of the question

[9]    **A:** No, no. My opinion of it is that the report is
[10] extraordinarily vague. Number one, that comes from a ground
[11] vehicle. The report also indicates that there is some water and
[12] most of it is on either side of the center line.

[13]    I know from personal experience having used that
[14] runway as much time as I have that I can almost see what it
[15] looks like.

[16]    **Q:** So back in August of 1999, did you not report this
[17] possible violation because of the assessment that you have just
[18] given me now?

[19]    **MRS. NORTON:** Object to the form of the question.

[20]    **A:** I did not report this possibility violation because at
[21] that point, then and to this point today, I do not consider that
[22] a violation.

[23]    **Q:** I am just saying, back in August of 1999, was it for
[24] the reason that you have given me today, that you don't consider
[25] the tower report to be a qualifying event?

Page 58

[1]    **MRS. NORTON:** Object to the form of the question.

[2]    **A:** Ma'am, you are putting words in my mouth and I don't
[3] appreciate it. I think I have answered your question.

[4]    **Q:** Let me try asking it again. You testified that you
[5] did not make a report to the FAA or any other agency because you
[6] did not consider there to be a violation?

[7]    **A:** That is correct.

[8]    **Q:** The question to you is, back in August of 1999 before
[9] the FAA did its own investigation, what was your rationale, your
[10] reasoning in not reporting it to the FAA yourself as Safety
[11] Officer?

[12]    **MRS. NORTON:** Asked and answered.

[13]    **A:** Asked and answered.

[14]    **Q:** I get to ask it again.

[15]    **MRS. NORTON:** I don't know, it is about 50 times.

[16]    **A:** Because I said that I did not consider it a violation
[17] based on the information that I had.

[18]    **Q:** Would that specifically relate to your personal
[19] familiarity with the runway and your belief that it does not
[20] accumulate water?

[21]    **A:** It is based on over 35 years of experience in
[22] aviation, including all the information I got on that report as
[23] Safety Officer. That is my job. I am supposed to use my
[24] experience, my knowledge and all those reports to come up with a
[25] conclusion. My conclusion was that an FAR had not been

Page 59

[1] violated.

[2] **Q:** I just want to make sure I fully explore the basis for

[3] that conclusion.

[4] **A:** Okay.

[5] **Q:** Any factors that you have not mentioned, that was part

[6] of your process in August of 1999?

[7] **MRS. NORTON:** Object to the form of the question.

[8] **A:** No.

[9] **Q:** What is the status of the proposed civil penalty

[10] against Amerijet as a result of the August 17th incident? Has

[11] that been paid?

[12] **MRS. NORTON:** Object to the form of the question.

[13] **A:** To my knowledge, I haven't. I am not even aware where

[14] it is. I think it is still in Washington. I am not sure of the

[15] status of that.

[16] **Q:** Do you know if anyone at Amerijet knows more than you

[17] do about that?

[18] **A:** Maybe our Washington lawyer may know more about it.

[19] **Q:** You have not been designated as the person most

[20] knowledgeable on that subject, so I just want to make sure I

[21] am making my statement on the record right now. You will not be

[22] presenting anymore evidence?

[23] **MRS. NORTON:** It depends. It is pending.

[24] **MS. SHEA:** You are not testifying.

[25] **MRS. NORTON:** You looked at me for an answer as to

Page 60

[1] whether we will present anybody more qualified or anybody with

[2] additional information.

[3] **MS. SHEA:** I am saying on the record right now, you

[4] will not be presenting at trial another corporate

[5] representative.

[6] **MRS. NORTON:** At this point in time it is still there.

[7] I mean there is nothing to say at this point.

[8] **Q:** (By Ms. Shea:) Are you the person in Amerijet

[9] primarily responsible for responding to and dealing with the FAA

[10] on that matter?

[11] **A:** Well, I get all the letters since I am the General

[12] Manager and I am the Safety Officer. Then I put all that

[13] information over in the hands of the Flight Department,

[14] specifically Mr. Huff. When Mr. Steele was there, in his hands.

[15] They in turn work through our legal counsel to get back to the

[16] FAA and deal with those issues.

[17] **Q:** So you would defer to Mr. Huff as being the person

[18] most knowledgeable at Amerijet on what is going on with that

[19] investigation?

[20] **A:** In this specific case, probably not even Mr. Huff.

[21] Probably our attorney.

[22] **Q:** Who is that?

[23] **A:** John Richardson.

[24] **Q:** You do not know whether that matter has been resolved,

[25] is pending or what the status of it is from your personal

Page 61

[1] knowledge?

[2] **A:** I just heard right here in our discussions that it is

[3] still pending. I have no civil penalty that I am aware of.

[4] **Q:** You don't know, other than your counsel just

[5] interjecting, you could not answer that question? Is that what

[6] you are saying?

[7] **A:** Not today.

[8] **Q:** Were you aware that Pat Major filed an EEOC report

[9] alleging age discrimination in February of 1999?

[10] **A:** No, I don't think so.

[11] **Q:** Have you ever, to this day, been informed that that

[12] occurred?

[13] **A:** Yes.

[14] **Q:** When did you learn of it?

[15] **A:** In preparation for this trial.

[16] **Q:** But at or about the time that it occurred, it did not

[17] come to you and you were not made aware of it?

[18] **A:** Not that I recall.

[19] **Q:** Do you have any policy or procedure at Amerijet that

[20] you would want to know if someone who worked for you had filed a

[21] complaint alleging employment discrimination?

[22] **A:** As I have already testified, I have over 700 people

[23] and I have employees filing all kinds of things all the time.

[24] It is HR's function. That's why I employ an HR Department, to

[25] take care of these issues. It is only when it gets to an

Page 62

[1] elevated legal status where I have to be involved in it either

[2] financially or through testimony or whatever that I know

[3] anything about it.

[4] **Q:** So this would go to and be handled by your HR

[5] Department?

[6] **A:** That is correct.

[7] **Q:** That has changed a lot. Who was there in February of

[8] 1999?

[9] **A:** February 1999, I think Juan Morales was there.

[10] **Q:** During, let's see, the 1990s at Amerijet, did you make

[11] any personal efforts to standardize criteria for upgrading to

[12] Captain positions at Amerijet?

[13] **A:** From time to time I think that subject was discussed

[14] with – I have some recollection of having that discussion with

[15] the Flight and Training Department.

[16] **Q:** Were there objective criteria or standards for

[17] selecting upgrade candidates at Amerijet in the last five years

[18] say?

[19] **A:** I believe so.

[20] **Q:** Do you know what those were?

[21] **A:** Not specifically.

[22] **Q:** When you say you believe, what do you base that on?

[23] **A:** Well, I have a Flight Department who functions and

[24] they upgrade people. I mean it is in the normal course of

[25] business.

Page 63

[1] **Q:** Is seniority such a criteria?

[2] **A:** Seniority is part of it.

[3] **Q:** What else is there other than seniority? Which are

[4] the stated?

[5] **A:** Qualifications, experience, judgment, skill.

[6] **Q:** Those are all part of the announced upgrade criteria

[7] at Amerijet?

[8] **A:** They are certainly all part of it, yes.

[9] **Q:** You don't know whether they are presented as such to

[10] candidates?

[11] **A:** I believe they are.

[12] **Q:** Do you believe there is a written policy or document of

[13] some form that would inform candidates of all of these factors?

[14] **A:** Well, I couldn't tell you specifically where it is

[15] written, but there are certainly broad guidelines.

[16] **Q:** Those are the products of the Flight Department?

[17] **A:** Uh-huh.

[18] **Q:** You have to answer out loud.

[19] **A:** Yes.

[20] **Q:** When you say qualifications, and let me just start

[21] with qualifications, what does that refer to?

[22] **A:** Experience.

[23] **Q:** Hours?

[24] **A:** Hours, ratings, types of flying, areas of flying.

[25] **Q:** Let me show you a document that was previously marked

Page 64

[1] as Exhibit No. 37. It is a memo from Ed Cook regarding

[2] promotion awards. There are a few names listed under Captains.

[3] Are you sufficiently familiar with the credentials of those

[4] individuals to compare them or contrast them to Pat Major?

[5] **A:** No, I am not.

[6] **Q:** Sir, let me hand you what I will mark as Plaintiff's

[7] Exhibit No. 51.

[8] [Thereupon, the document referred to was marked as

[9] Plaintiff's Exhibit No. 51, for Identification ]

[10] **Q:** Do you recognize that?

[11] **A:** Sure. I wrote it

[12] **Q:** That was one of my questions. Did you author this or

[13] was it prepared for you?

[14] **A:** No, I wrote it.

[15] **Q:** Looking at that today, does that refresh your

[16] recollection as to any investigation that you did or analysis

[17] that you did that you did not testify to earlier when I asked

[18] you about this decision?

[19] **MRS. NORTON:** Object to the form of the question.

[20] **A:** No.

[21] **Q:** Have you testified fully as to all the legitimate

[22] business reasons why you felt that you were not willing to

[23] promote Pat Major?

[24] **MRS. NORTON:** Object to the form of the question.

[25] **A:** Business reasons?

Page 65

[1] **Q:** Let me rephrase that. Have you testified fully as to

[2] all the reasons underlying your decision not to promote Pat

[3] Major?

[4] **MRS. NORTON:** Object to the form of the question.

[5] **THE WITNESS:** Do I answer this?

[6] **MRS. NORTON:** I don't know how you can

[7] **Q:** Have you given me all your reasons?

[8] **MRS. NORTON:** Object to the form of the question.

[9] **A:** I think I have. I mean basically the reasons that I

[10] have for not promoting him is that I felt that without the

[11] recommendation of the people that trained him that it is just a

[12] safety risk that I am just not ready to do.

[13] Ultimately when the decision of the Flight Department

[14] and the Training Department is disputed by an employee and they

[15] ultimately come to me to mediate it, I have to look at what I

[16] can look at and then make that determination. That is what I

[17] did.

[18] **Q:** Well, was there a dispute between Pat Major and the

[19] Departments at that point?

[20] **A:** Well, certainly once Pat wanted to be promoted and he

[21] was not, so Pat was continuing to desire to be promoted.

[22] **Q:** Right, and he had not been dissuaded in that effort

[23] until your decision, as I understand it. Do you know to the

[24] contrary?

[25] **A:** No.

Page 66

[1] **Q:** He was still —

[2] **A:** Attempting to upgrade.

[3] **Q:** Right, and he was still being told that he was an

[4] upgrade candidate until your letter. Are you aware of that?

[5] **MRS. NORTON:** Object to the form of the question.

[6] **A:** I am confused, so help me out.

[7] **Q:** Well, did not Pete Steele and Tracy Dickinson act

[8] toward Pat Major as though he was a Captain candidate until your

[9] decision was made?

[10] **A:** They continued to work with Pat to make him a Captain

[11] until ultimately I made the decision based on the information I

[12] got from them that it wasn't going to work. It was not going to

[13] happen.

[14] **Q:** Did you tell the Chief Pilot, whoever it was at that

[15] point, of this decision?

[16] **A:** Yes.

[17] **Q:** So you wouldn't contend for the Chief Pilot to

[18] continue to lead Pat on in any way about this?

[19] **MRS. NORTON:** Object to the form of the question.

[20] **Q:** Your message would have been clear?

[21] **A:** This is the message I sent. This is the one that is

[22] clear. What the Chief Pilot did or did not do was up to the

[23] Chief Pilot. But this message is under my signature directly to

[24] Pat and to everybody involved from this point forward that that

[25] is what is going on.

---

Page 67

[1]    **Q:** You would have told Derry or Ed, as the case may be,
[2] under no uncertain terms?
[3]    **A:** They would have understood this letter.
[4]    **Q:** That is out?
[5]    **A:** That is correct.
[6]    **Q:** Let me show you what I will mark as Plaintiff's
[7] Exhibit No. 52. If you can look at that, please.
[8]    [Thereupon, the document referred to was marked as
[9] Plaintiff's Exhibit No. 52, for Identification.]
[10]    **Q:** Did you receive that transmittal from Pat Major?
[11]    **A:** I don't remember.
[12]    **Q:** Do you know whether you received the NASA report
[13] before Pat sent it to you or when Pat sent it to you?
[14]    **A:** I don't remember.
[15]    **Q:** Did you consult legal counsel with the termination of
[16] Pat Major?
[17]    **A:** You have asked me that already and I have answered it.
[18]    **Q:** Yes?
[19]    **A:** I have answered it already. The answer is, no, I made
[20] my own decision.
[21]    **Q:** Did you make a decision that Pat Major would not be
[22] recommended for a flying position elsewhere?
[23]    **A:** I don't remember that.
[24]    **Q:** Did you make any personal investigation into the facts
[25] and circumstances of Pat's FAA oral exam?

Page 69

[1] there?
[2]    **A:** Yes.
[3]    **Q:** With date of birth, date of hire, date of upgrade?
[4]    **A:** Right.
[5]    **Q:** Can you compare his experience and credentials to that
[6] of Patrick Majors?
[7]    **A:** Don't know David Mitchell.
[8]    **Q:** By way of explaining the promotion decision that was
[9] made with respect to him?
[10]    **A:** I don't know David Mitchell. I do know Derry Huff I
[11] do not know John Washington. I do know Tracy Dickinson. You
[12] know, so there are people on here that I know, certainly.
[13]    **Q:** Basically you might have anecdotal information about
[14] their credentials as opposed to being able to say this is the
[15] reason for this person's promotion and this is the reason?
[16]    **A:** No specifics as to one versus the other.
[17]    **Q:** Did you instruct Derry Huff that he should not extend
[18] out-placement services to Pat Major, which would include flying
[19] positions elsewhere?
[20]    **A:** I don't know I think just as a matter of practice
[21] when someone is terminated that those services are not offered.
[22]    **MS. SHEA:** Excuse me a minute.
[23]    I don't have any other questions for you, Mr. Bassett.
[24]    Thank you for your time.
[25]    **THE WITNESS:** Thank you.

---

Page 68

[1]    **A:** Which one?
[2]    **Q:** The one for which Pete Steele sponsored him?
[3]    **A:** All I know, the investigation I had, that he was with
[4] the examining officer for approximately 20 minutes and the
[5] examining person discontinued the oral.
[6]    **Q:** You didn't review any paperwork on that yourself?
[7]    **A:** I didn't ask him any of the questions asked, no.
[8]    **Q:** Did you review any documentation of that?
[9]    **A:** No.
[10]    [Thereupon, the following document was marked as
[11] Plaintiff's Exhibit No. 53, for Identification.]
[12]    **Q:** Sir, let me hand you Exhibit No. 53, which I will
[13] represent was produced to us in this case.
[14]    My question, again, would be, are you sufficiently
[15] familiar with the credentials of the various airmen to compare
[16] or contrast them with Pat Major or not?
[17]    **A:** In what respect? I mean there are names here that I
[18] have known for a long time.
[19]    **Q:** Right. To discuss the respective seniority
[20] qualifications and experience that informed the decisions to
[21] promote those individuals
[22]    **MRS. NORTON:** Object to the form of the question.
[23]    **A:** I am not trying to be difficult Ask your question
[24] again. What are you trying to find out?
[25]    **Q:** For example, David Mitchell. Do you see his name

Page 70

[1]    **MRS. NORTON:** Wait just a second.
[2]    We don't have any questions. We will waive.
[3]    [Thereupon, reading and signing was waived and the
[4] taking of deposition was concluded at 12:35 p.m.]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 71

[1]     STATE OF FLORIDA)
        COUNTY OF BROWARD)

[2]

[3]
        I, JEANNIE L. IMRISEK, a Notary Public in and for the

[4] State of Florida at Large, do hereby certify that, pursuant to a
        Notice of Taking Deposition in the above-entitled cause, DAVID

[5] BASSETT, was by me first duly cautioned and sworn to testify the
        whole truth, and upon being carefully examined testified as is

[6] hereinabove shown, and the testimony of said witness was reduced
        to typewriting under my personal supervision and that the said

[7] deposition constitutes a true record of the testimony given by
        the witness.

[8]

[9] I further certify that the said deposition was taken
        at the time and place specified hereinabove and that I am

[10] neither of counsel nor solicitor to either of the parties in
        said suit nor interested in the event of the cause.

[11]

[12] WITNESS my hand and official seal in the City of Ft.
        Lauderdale, County of Broward, State of Florida, this 26th day

[13]        of February, 2001.

[14]

[15]

                        JEANNIE L. IMRISEK

[16]                    Comm. No. CC 611297
                        Exp. April 19, 2001

[17]                    Bonded by Pichard Ins

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

## 1

**121** 21:18
**12:35** 70:4
**17** 4:23; 46:14; 47:7
**17,000** 5:2
**17th** 46:20; 59:10
**1948** 4:25
**1974** 3:23; 4:13
**1990s** 62:10
**1997** 20:9; 33:4, 12;
34:14; 35:7, 25; 39:14
**1999** 4:4, 6:10; 21:23;
23:25; 28:23; 34:14;
38:14; 39:24; 44:9; 46:4,
14; 47:7; 49:15, 22; 50:5,
54:6; 55:7; 56:6, 24; 57:16,
23; 58:8, 59:6, 61:9; 62:8,
9

## 2

**20** 68:4
**2000** 29:7
**23** 4:25

## 3

**35** 58:21
**37** 64:1

## 4

**4,000** 56:16
**450** 4:3

## 5

**50** 58:15
**51** 64:7, 9
**52** 67:7, 9
**53** 68:11, 12
**5421** 3:9

## 7

**700** 33:2; 61:22
**727** 5:24; 6:1; 20:20, 21
**750** 4:5

## 9

**90s** 5:16, 21; 6:7
**91** 21:18

## A

**ability** 18:10; 23:2

**able** 9:23; 21:16; 34:25;
36:20; 38:17; 39:1; 41:16;
69:14
**abort** 50:22
**absence** 47:23
**Absolutely** 21:15; 32:24;
40:4; 43:5, 7
**accept** 8:3; 29:15
**accepted** 29:17
**accepting** 49:9; 53:23
**accommodate** 29:16
**accomplish** 35:22
**According** 17:16, 18
**accounting** 29:22
**accumulate** 58:20
**acquainted** 5:13
**act** 42:20; 66:7
**Actually** 4:21, 21; 10:6;
17:5; 19:1; 41:4; 42:7;
50:11; 53:18, 19, 25
**additional** 12:8, 19;
14:24; 18:17; 60:2
**address** 3:9
**administrative** 5:8;
31:16; 44:22
**adult** 4:12
**advance** 13:22
**advanced** 14:1
**advice** 39:20, 21, 23; 40:1
**advise** 24:5
**advised** 12:25; 13:15;
22:25
**advises** 42:23
**advising** 11:17; 50:9
**advocating** 24:18, 19,
20, 24; 25:1
**affirmatively** 30:22
**Africa** 4:11
**again** 6:18; 10:21; 11:9;
16:5, 24; 19:22; 28:3; 29:3;
33:16; 35:13, 15, 21;
36:23; 38:16; 45:3, 22;
46:12, 19; 48:20; 58:4, 14;
68:14, 24
**against** 26:1, 3, 7; 44:16;
59:10
**age** 39:15; 40:2; 61:9
**agencies** 44:22
**agency** 58:5
**aggravated** 43:17
**ago** 5:20; 52:20; 56:18
**agree** 13:23; 41:20, 21;
45:9; 47:22
**Air** 4:15, 15; 14:5, 15;
15:9, 11; 17:7; 20:25
**airborne** 50:20
**aircraft** 41:2, 2, 3
**airline** 49:4, 13
**airman** 30:13; 41:22;
50:24
**airmen** 68:15
**airplane** 14:5; 15:8, 13,
14; 21:18; 39:4; 41:17, 23;

42:5, 7, 9; 43:3, 15; 50:17,
19; 51:15; 52:7; 53:11, 22
**airport** 49:6
**alleging** 61:9, 21
**allow** 42:21
**allowed** 42:2; 50:11; 51:7
**almost** 57:14
**alone** 8:19, 20
**already** 25:23, 23; 32:18;
61:22; 67:17, 19
**always** 31:25; 32:1; 33:2;
34:20; 39:21
**America** 4:11
**Amerijet** 3:12, 20, 24, 25;
4:2, 13; 5:11; 6:12; 9:19;
14:1; 16:2; 17:13; 18:6, 11,
14, 17, 25; 19:6, 12, 19,
20:8, 16; 21:4; 24:7; 26:13;
27:17; 28:17; 29:5, 11, 13;
30:23; 31:18, 24; 32:9, 13,
17; 33:25, 34:2; 35:23;
36:4; 37:16, 20; 38:21;
40:12; 42:22; 43:10;
44:18; 48:25; 51:8, 9; 53:5;
59:10, 16; 60:8, 18; 61:19;
62:10, 12, 17; 63:7
**Amerijet's** 15:19; 20:19,
21:2, 7, 13; 47:22; 49:14,
17
**amount** 56:22
**analysis** 64:16
**and/or** 36:14
**anecdotal** 69:13
**angry** 24:15, 16
**announced** 63:6
**answered** 25:23; 28:13;
35:12; 37:2; 56:3; 58:3, 12,
13; 67:17, 19
**anybody** 17:3; 31:22;
35:18, 23; 39:16; 60:1, 1
**anymore** 4:9; 18:25.
31:22; 59:22
**anyone** 27:11; 31:23;
33:9; 36:3; 59:16
**apparently** 41:1
**appeared** 42:19
**applied** 27:19
**appreciate** 58:3
**appreciated** 32:2, 19
**appreciation** 32:21
**appropriate** 13:17
**approved** 15:20; 20:24;
35:16
**Approximately** 4:3, 5;
5:2; 68:4
**April** 29:6, 7
**areas** 63:24
**argumentative** 55:1, 16,
18
**aspect** 29:22, 22, 23, 23
**aspects** 46:10
**assess** 56:5, 7, 8
**assessed** 56:24
**assessment** 37:20,

57:17
**assessments** 37:13
**Associate's** 4:8
**assure** 11:5; 19:18; 20:7
**Attempting** 66:2
**attend** 44:5, 11
**attention** 53:6; 55:25
**attorney** 60:21
**attorneys** 39:18
**August** 44:9; 46:6, 14,
20; 47:7; 48:5; 49:22; 50:5;
56:5, 24; 57:16, 23; 58:8;
59:6, 10
**author** 64:12
**authority** 38:7, 10
**authorize** 15:9
**authorized** 50:1
**automatically** 15:6
**aviation** 4:22; 32:13;
41:14; 58:22
**avoiding** 46:7
**awards** 64:2
**aware** 5:10; 14:8; 30:17;
36:7; 40:24; 41:9; 45:14,
17; 46:4, 14; 47:25; 48:7,
10, 14; 49:2; 51:16; 53:24;
54:4, 8, 10, 18, 22, 23, 23;
55:4, 10, 11, 59:13; 61:3,
8, 17; 66:4

## B

**back** 30:9; 32:10; 33:4,
24; 35:25; 45:25; 49:19;
56:24; 57:16, 23; 58:8;
60:15
**background** 32:5
**bad** 37:4
**base** 4:16; 62:22
**based** 12:22; 16:24; 18:4,
7; 22:19, 24; 58:17, 21;
66:11
**basically** 7:13, 25, 8:17;
18:4; 33:4, 20; 39:5; 42:4,
50:24; 53:22; 65:9; 69:13
**basis** 10:19, 23; 12:15,
16, 14:8; 23:11; 56:14;
57:5; 59:2
**BASSETT** 3:2, 9; 69:23
**became** 4:21; 6:23; 40:24
**become** 4:20, 5:13; 6:14,
19, 24, 25; 7:3, 4; 12:22;
17:25; 27:17; 29:20;
38:10; 41:8
**becoming** 7:14; 17:6
**began** 12:12
**behind** 26:24
**belief** 39:10; 43:15; 58:19
**believe** 20:12; 29:8;
44:11; 47:8; 62:19, 22;
63:11, 12
**best** 23:4, 9; 40:12
**better** 22:17; 28:18
**birth** 4:24; 69:3

**Boeing** 20:20, 21
**bona** 13:19
**boss** 20:6; 33:2
**both** 7:19; 12:23; 29:21;
40:12; 47:19
**brain** 50:6
**brand** 30:13
**break** 40:18, 21; 43:18
**Brian** 53:2; 54:6, 15
**bring** 7:11
**broad** 38:1; 63:15
**brought** 9:14, 17, 24:2;
25:7, 21; 41:10, 11, 53:6;
55:25
**business** 3:24, 25; 62:25;
64:22, 25
**busted** 15:14

## C

**call** 31:16; 41:17
**called** 3:3
**came** 7:13, 16; 25:5;
29:10; 30:12; 45:20, 24;
53:19
**can** 6:9, 22; 9:5; 15:2;
17:3; 19:15; 20:19, 22;
21:1, 6; 22:17; 28:16;
30:25; 31:11; 36:7; 37:21;
40:18, 20; 42:23; 43:18;
48:22; 49:19; 53:10;
56:18; 57:3, 14; 65:6, 16;
67:7; 69:5
**candidate** 13:12, 19;
16:2; 24:6; 27:4, 6, 13;
30:7; 66:4, 8
**candidates** 37:22; 38:2,
4; 62:17; 63:10, 13
**capabilities** 28:20
**capable** 18:13; 38:18;
39:10, 13, 13
**Captain** 6:11, 24; 7:14,
16; 9:19, 22; 11:25; 12:22;
14:15; 15:6, 9, 17; 16:2;
17:6, 25; 18:11; 19:12;
20:11, 20; 21:22; 22:3,
24:6, 21; 25:25; 26:4;
30:16, 18, 20, 23; 35:8;
36:13; 38:3, 7, 8; 39:1, 13,
25; 53:22; 55:6; 62:12;
66:8, 10
**Captain's** 48:11
**Captains** 22:6, 64:2
**care** 34:22; 51:13, 61:25
**cared** 51:14
**career** 20:12; 34:2
**cargo** 3:25
**carrier** 14:5, 16; 15:9, 11;
17:7; 20:25
**case** 15:4; 17:8; 60:20,
67:1; 68:13
**cause** 16:1
**caused** 16:2; 26:13
**center** 56:23; 57:12

**certain** 37:25; 56:22
**certainly** 23:7; 28:15;
33:8; 35:8, 21; 42:6; 43.12;
49:18; 53:1; 55:3; 56:10;
63:8, 15, 65:20; 69:12
**certification** 20:21;
21:10
**change** 17:23; 28:3, 5;
34:10, 12
**changed** 34:23; 49:21;
62:7
**changes** 26:19, 24
**changing** 27:2
**characterize** 55:1
**charge** 52:5, 6
**check-ride** 9:25; 10:16;
12:6, 7; 14:4, 15:16; 20:23;
21:7, 10, 13
**check-rides** 15:10
**Chief** 3:18; 26:11; 27:17,
18, 23, 28:7, 11, 17, 24;
33:12, 13; 46:6, 66:14, 17,
22, 23
**choice** 36:15
**circumstance** 46:21
**circumstances** 7:1, 21;
46:5, 9; 54:7; 67:25
**Citation** 6:2, 7
**civil** 59:9; 61:3
**class** 33:21, 22
**clear** 30:19; 35:7; 54:18;
55:6; 66:20, 22
**clearance** 53:20, 23,
54:5
**client** 5:10
**cockpit** 51:2, 12, 18
**comfortable** 51:15
**command** 52:4, 6
**commercial** 5:3, 5
**commercial-type** 21:19
**communicate** 20:15
**communicated** 12:18;
23:24; 31:8
**communication** 28:18
**company** 3:22; 5:8;
13:16, 23; 31:10; 32:1, 1,
20, 25; 37:9; 55:22
**compare** 64:4; 68:15;
69:5
**complained** 53:2
**complaining** 54:16
**complaint** 61:21
**complaints** 49:9
**complete** 11:15; 18:1
**completed** 6:23; 9:25;
10:2
**completion** 20:24
**compliment** 42.6
**components** 21:11
**concern** 38:1, 11; 50:6;
51:14; 52:10, 11
**concerned** 19:20; 41:1;
42:17, 19, 19
**concerning** 31:16, 17;

38:13; 44:13; 48:16
**concerns** 38:15; 42:9,
12; 46:6
**conclude** 45:4; 56:11
**concluded** 45:6; 56:25;
70:4
**conclusion** 41:13; 50:5;
56.12; 58:25, 25, 59:3
**conclusive** 16:18
**condition** 47:23
**conditions** 48:3, 4
**conducted** 20:22
**confessed** 54:19
**confronted** 33:17
**confused** 46:12; 66:6
**consciously** 42:15
**consider** 13:12, 28:6, 10,
16; 29:25; 32:23; 33:5;
35:7; 37:15; 47:23; 57:21,
24; 58:6, 16
**considered** 19:3
**considers** 50:24
**consult** 67:15
**contain** 57:1
**contains** 54:18
**contaminated** 46:7;
47:9, 12
**contamination** 50:2
**contend** 66:17
**continually** 34:2
**continue** 30:16; 50:12;
66.18
**continued** 7:16; 34.19,
19; 39:9; 42:20, 21; 66:10
**continuing** 65:21
**contrary** 65:24
**contrast** 38:3; 64:4;
68:16
**contribute** 7:22, 9:18
**contributed** 9:4; 22:23
**contributing** 9:11
**contribution** 32:19
**control** 29:23
**controls** 5:19
**convey** 33:23; 34:1
**convinced** 57:3
**Cook** 26:12, 13; 27:5, 8,
22; 28:2, 7, 11, 15, 17;
29:1, 2, 3; 33:13; 64:1
**coordination** 51:4
**copilot** 6:6; 23:3; 53:19
**copy** 43.21
**Coral** 3:10
**corporate** 60:4
**correctly** 12:4
**cost** 29:13
**couldn't** 63:14
**counsel** 39:20, 21, 23;
54:25; 60:15; 61:4; 67:15
**Counsel's** 54:12; 55:9
**couple** 24:14; 34:14
**courage** 52:16

**course** 34:6, 62:24
**credentials** 64:3; 68:15;
69:5, 14
**crew** 42:5, 6, 20, 23; 51:4,
6, 8; 53:21
**criteria** 15:18; 37:21;
38:5; 62:11, 16; 63:1, 6
**critical** 32:25
**current** 4:1
**currently** 3.24, 5:3

# D

**dangerous** 50:19, 20, 21,
22
**date** 4:24; 56:12; 69:3, 3,
3
**DAVID** 3:2, 9; 68:25; 69:7,
10
**day** 14:3; 41:9, 46:18;
47:16; 48:12; 57:2; 61:11
**days** 24:14
**deal** 32:2; 60:16
**dealing** 60:9
**decide** 20:15; 30:21
**decided** 10:25; 16:12, 21;
28:22, 51:17; 54:10
**decision** 6:11, 14, 15, 17,
20; 9:4, 18; 11:18, 25;
12:17, 18, 21, 22; 13:3, 7,
14, 20; 14:7, 8, 20; 15:1;
16:1, 23, 24; 18:4, 7;
19:11; 20:9, 13; 21:22;
22:3, 19, 24, 24, 23:12, 18,
24; 24:11, 18, 19, 25; 25:1,
4; 30:6, 22; 33:18; 34:9,
11; 36:15, 23, 25; 38:13;
39:24; 40:14, 23; 41:5, 15;
42:1, 4; 43:23, 25; 44:2,
15; 64:18; 65:2, 13, 23;
66:9, 11, 15; 67:20, 21;
69:8
**decision-making** 40:3
**decisions** 7:1; 13:15;
49:11; 68:20
**declined** 54:5
**decrements** 49:16
**dedicated** 32:10
**defer** 60:17
**deferred** 51:21
**degree** 4:8
**delineate** 20:19, 22; 21:2,
6
**depart** 41:17
**departed** 45:6; 47:11
**Department** 7:6; 8:5, 7,
25; 9:4, 21; 10:24; 11:12;
12:24; 13:16; 15:15;
16:25; 17:1, 16, 18, 24;
18:8, 8, 9, 9; 19:17, 22, 24;
22:1; 27:2; 31:3, 3, 6; 33:4,
10, 13, 21; 34:8, 8; 35:20,
20; 37:11, 11; 38:16, 25;
39:6; 60:13; 61:24; 62:5,
15, 23; 63:16; 65:13, 14

**Department's** 20:5
**Departments** 65:19
**departure** 45:19
**depends** 59:23
**deposition** 46:2; 70.4
**Derry** 27:13, 17; 28:6, 8,
10, 16, 18, 21, 24; 29:25;
46:6, 9; 48:5, 7, 15, 21,
52:21; 67:1; 69:10, 17
**describe** 19:8; 38:4
**described** 19:16
**description** 20.22
**designated** 44:18; 59:19
**desirable** 28:17
**desire** 65:21
**detail** 11.3, 13; 30:8
**details** 36:2; 44.4
**determination** 18:18;
39:8; 42:11, 15; 49:12;
65:16
**determine** 14:24; 42:6;
56:8
**Dickinson** 7.9, 20, 22;
8:3, 15; 9:9, 11; 11:21;
14:24, 25; 19:23, 25,
24:10, 24; 26:9; 66:7;
69:11
**Dickinson's** 8:13, 19
**difference** 21:6
**differences** 21:2; 38:4
**different** 11:20; 14:16;
27:3, 9; 35:4
**difficult** 68:23
**DIRECT** 3:5
**directives** 48:11
**directly** 49:7; 66:23
**Director** 7:5; 20:2; 22:1;
33:10
**disappointed** 36:12
**disappointment** 36:20;
37:3
**discharged** 39:11
**discipline** 44:5; 53:13
**discontinued** 68:5
**discount** 23:4, 9
**Discounting** 22:22
**discourage** 30:22
**discrimination** 39:15;
61:9, 21
**discuss** 28:21; 34:18;
35:18; 68:19
**discussed** 9:3; 10:10;
35:19; 44:6; 46:6, 9; 52:21;
62:13
**discussing** 29:2
**discussion** 12:12; 25:6;
33:7; 48:5, 7, 16, 18, 22,
23; 62:14
**discussions** 26:15; 61:2
**dispute** 65:18
**disputed** 65:14
**disqualifying** 16:12
**disregard** 50:1; 56:18

**disrupt** 51:18
**dissuaded** 65:22
**distinction** 20:19
**document** 22:10; 43:21;
63:12, 25; 64:8; 67:8;
68:10
**documentation** 68:8
**documented** 15:25
**dollar** 25:9
**done** 7:20; 33:3; 39:5;
46:2; 50:8, 53:16
**down** 24:2; 35:15; 37:6
**Drive** 3:10
**dry** 47:9, 11, 23
**due** 34:5, 5
**duly** 3:3
**during** 32:17; 62:10
**duty** 42:24; 45:9; 52:12;
53:11

# E

**earlier** 20:12; 23:3; 38:19;
48:8; 54:15; 64.17
**early** 5:16, 20; 6:7, 10,
21:23, 23:25
**Ed** 26:12, 13; 27:5, 8, 22;
28:2, 7, 11, 15, 17; 29:1, 2,
3; 33:13; 64:1; 67:1
**education** 4:7
**EEOC** 61:8
**effect** 40:5
**effecting** 32:13
**effectively** 29:14, 19
**effort** 65:22
**efforts** 62:11
**either** 11:21; 38:10,
56:23; 57:12; 62:1
**elaborate** 10:13; 15:2
**elements** 21:1, 14, 17
**elevated** 62:1
**else** 5:25; 9:3, 10; 10:24;
11:17; 17:3; 23:14; 31:22,
23; 33:9; 35:21, 23; 36:3;
40:6; 49:8, 9; 63:3
**elsewhere** 16:17; 67:22;
69:19
**employ** 61:24
**employed** 4:2
**employee** 30:11; 39:22;
65:14
**employees** 4:1, 53.5, 10;
61:23
**employment** 40:15;
43:23; 61,21
**enable** 17:25
**encompasses** 39:18
**encountered** 46.5, 48.3
**end** 28:22
**ended** 10:1
**engine** 51:15
**Engineer** 30:13
**enough** 43:14

enter 34:12; 35:10
entered 34:25
enumerate 34:23
equal 34:22
equation 28:9
escaped 53:12
evaluate 39:6
evaluates 37:21
evaluations 20:5
even 12:11; 17:10; 18:11; 21:19, 25:3; 41:11; 59:13; 60.20
event 16:13; 57:25
every 19:18, 18; 42:6
everybody 13:16; 30:19; 33:1, 14; 34:20, 22; 66:24
everyone 35:20
evidence 45:7, 8; 59:22
ex-partner 53:18
exactly 7:20; 41:12; 48:25
exam 9:25; 10:1, 3, 6; 18:5; 67:25
EXAMINATION 3:5; 11:4
examined 3:4
examiner 10:15
examining 68:4, 5
example 49:5; 68:25
excess 56:16
Excuse 69:22
Executive 3:18
exercises 8:23
Exhibit 64:1, 7, 9; 67:7, 9; 68:11, 12
existed 46:5
exit 35:25; 36:1, 10; 39:14, 16
expense 13.23
experience 22.22; 23:17; 30:13; 53.17; 54:1; 57:13; 58:21, 24; 63:5, 22; 68:20; 69:5
explained 19:3
explaining 69:8
explore 59:2
express 24:15
extend 69:17
extraordinarily 57:10

## F

FAA 8:25; 10:1, 5, 8, 14; 12:6, 13, 17, 25; 13:13; 14:4, 9, 13; 15:16, 20; 16:6; 18:5, 15, 18; 20:23, 24; 21:6, 10, 13; 25:12; 29:21; 45:4, 7, 8; 58:5, 9, 10; 60:9, 16; 67:25
fact 10:4; 11:14; 15:16; 20:9; 34:7; 36:12; 50:10; 55:9
factor 40:2
factors 34:23; 35:1; 59:5;

63:13
facts 54:13; 67:24
fail 17:12, 15, 20
failed 10:3, 8; 12:7, 25; 17:14, 16, 18, 19; 18:5; 25:12; 36:24; 37:13; 52:18
failure 18:4
failures 38:20
fair 23:6
fairly 30:13
fall 4:4
familiar 38.6; 64:3; 68:15
familiarity 58:19
far 51:7; 54:19; 55:6; 56:6, 25; 57:3; 58:25
FARs 49:18; 52:12
February 20:9; 61:9; 62:7, 9
Federal 41:14
feel 7:25; 9:9; 23:22; 29:24; 35:23; 45:3
feels 43:13; 51:6
feet 56:22
felt 17:22; 29:12, 18; 34:3, 5; 35:22; 37:4, 4; 39:12; 52:17; 64:22; 65:10
few 52:20; 56:18; 64:2
fide 13:19
figure 49:19
file 8:11; 23:20; 33:17; 46:1
filed 61:8, 20
filing 61:23
filled 28:2
filling 38:18
final 38:7, 10
financial 29:22
financially 62:2
find 11:24; 68:24
fire 42:1; 50:20, 20; 51:17; 54:10
fired 37:19; 51:11, 13; 52:8, 14; 53:1
first 5:13; 12:4; 20:11; 30:15; 34:24; 39:10, 13; 41:7
firsthand 47:20
five 5:7; 62:17
fixed 4:16
flew 6:1, 1; 22:6
flight 4:16; 5:1; 6:3; 10:15; 27:2; 30:14; 33:14; 34:8; 35:20; 37:11; 41:19, 20; 42:2, 3, 21; 43:14; 45:6; 47:7; 48:4, 5; 50:6, 7, 11; 51:11, 18; 52:13; 53:12; 54:6, 16; 55:7; 60:13; 62:15, 23; 63:16; 65:13
flights 6:5
Florida 3:10; 4:17
flown 5:19, 20; 23:5, 10, 15
flush 16:7

fly 39:4; 42:8
flying 4:23; 5:3, 6; 8:6; 23:2, 3; 37:18; 51:12; 53:18; 63:24, 24; 67:22; 69:18
folks 35:1
follow 52:18
follow-up 41:8
following 68:10
follows 3:4
Force 4:15, 16
forcibly 51:10
foreseeable 30:7
form 6:21; 9:6; 10:20; 13:5; 16:3; 19:10, 13; 20:17; 21:5, 24; 22:12, 15, 16, 23; 23:13; 24:12, 22; 25:20; 26:2, 17; 27:15, 24; 28:12; 30:24; 32:14; 33:19; 35:3; 36:5; 37:1, 17; 38:22; 40:18; 45:16, 21; 46:8, 16, 24; 48:13, 19; 50:3; 51:20, 23; 54:9, 12, 21; 55:8, 15; 57:8, 19; 58:1; 59:7, 12; 63:13; 64:19, 24; 65:4, 8; 66:5, 19; 68:22
formal 4:6; 38:20
formed 23:1, 1
Fort 56:15
forth 37:12; 47:20
forward 44:21; 66:24
found 3:22; 11:23
Founded 43:8, 9
founder 3:20
four 4:15
frame 44:8
front 30:9
fulfill 29:25
full 3:7; 7:21; 19:8; 42:5
full-time 4:1
fully 59:2; 64:21; 65:1
function 5:8; 32:10; 61:24
functions 30:1; 62:23
fundamental 43:2
future 20:14; 24:6; 30:7; 33:24; 34:10; 36:21

## G

gave 8:22; 24:3; 39:19
general 38:8; 40:9; 60:11
gets 61:25
given 10:1; 14:3, 3; 15:11; 19:19; 20:23; 35:21; 50:5, 57:18, 24; 65:7
giving 15:12
glad 25:13, 17; 55:20
God 51:19
good 3:16
grave 42:9, 12

great 32:2
grew 4:11
ground 57:10
group 27:3, 9
grow 4:10; 34:15
guess 27:18; 33:12
guidelines 38:1; 63:15

## H

hand 64:6; 68:12
handled 62:4
hands 60:13, 14
happen 7:4; 18:1; 19:20, 21; 37:5, 7; 66:13
happened 12:9; 16:1; 34:11; 35:6, 11; 40:17
happy 40:11
haven't 9:3; 38:14; 39:5; 46:2, 49:25; 59:13
hazard 50:13
head 31:5
hear 16:18; 31:15
heard 31:15; 61.2
heavily 23:6
help 66:6
high 31:20
highest 4:6
himself 5:19; 10:5, 25, 50:24, 25
hire 69:3
hiring 5:17
history 39:7
hold 3.13
hours 5:1; 63:23, 24
HR 61:24; 62:4
HR's 61:24
Huff 27:13, 17; 28:6, 10, 16, 18, 21, 24; 29:25; 46:6, 9; 48:6, 7, 15; 53:24; 54:4; 60:14, 17, 20; 69:10, 17
huge 15:6
human 28:19; 31:17; 32:4, 5, 6, 8, 10

## I

Identification 64:9; 67:9, 68:11
identify 28:16
ill-will 32:17, 18
immediately 12:12; 36:18
important 19:18, 20; 20:7
impression 10:2; 34:4
impressions 8:13, 17; 23:17
incident 6:3; 44.24, 25; 48:8, 15, 17, 22; 49:5, 9; 52:20; 53:24; 59:10
inclination 32:6
include 23:6; 69:18

includes 21.13, 14
including 58:22
incredible 51:1
incredibly 50:20
indicate 56:21
indicates 56:22; 57:11
indication 15:23
individuals 22:2, 64:4; 68:21
influence 14:20
inform 10:22, 11:21; 20:4; 39:24, 63:13
information 12:23; 22:14; 23:16; 39:6; 41:10; 47:16, 20; 55:17; 58:17, 22; 60:2, 13; 66:11; 69:13
informed 10:4; 11:18; 14:7; 22:3; 23:18; 33:5; 61:11; 68:20
initially 30:12
initiate 25:6
input 14:23, 25; 22:19
instigated 25:18
instruct 69:17
instructions 8:23
instructor 7:24; 10:15; 20:1
instructors 19:25
intend 27:22
intended 33:23
intent 24:4
intentions 28:1, 5
interest 34:21
interested 4:21; 7:14: 30:17
interjecting 61:5
internal 18:6
International 3.12
interpersonal 28:19
interview 21:21; 22:2
into 7:16; 11:12; 17:5; 24:2; 28:8; 67:24
investigate 8:2
investigated 7:19
investigation 7:21, 23; 9:11; 12:3; 19:8; 22:10; 58:9; 60:19; 64:16; 67:24; 68:3
involved 5:17; 6:14, 19, 23, 25; 7:3, 4, 6, 11-12; 15:4; 29:20; 44:2; 51:6; 62:1; 66:24
involvement 40:14
issue 9:14; 24:11; 25:5, 7, 9, 10, 18, 21, 22; 29:2, 30:9; 49:3, 8
issues 31:10; 17, 24, 25; 32:2, 4, 8, 13; 38:14; 39:22; 60:16; 61:25

## J

job 27:3, 4, 11; 29:14;

35:22; 40:11, 11; 43:4, 5;
58:23
John 60:23; 69:11
Juan 62:9
judgment 41:16; 51:3;
52:14, 17; 63:5
July 4:25
June 46:4; 48:4; 54:6;
55:7

## K

keep 43:4, 5
kind 48:18; 49:3
kinds 39:18; 61:23
knew 16:10; 34:6; 36:12
knowledge 22:23, 49:25;
58:24; 59:13; 61:1
knowledgeable 59:20;
60:18
known 68:18
knows 59:16

## L

lack 36:17; 51:2, 3
large 15:3
Last 29:6; 62:17
later 11:23; 12:2; 13:20;
34:17
Lauderdale 56:16
lawyer 59:18
layout 38:1
lead 66:18
leading 36:18
Learjet 53:18
learn 14:17; 34:15; 61:14
learning 30:2
least 23:6; 38:1; 42:19;
52:13
leave 9:17; 26:13; 29:5;
36:14, 22; 37:5; 42:5
leaving 4:15; 29:11
led 9:17; 24:11
left 27:22; 28:2; 29:3
leg 53:21
legal 39:20, 21; 40:1;
60:15; 62:1; 67:15
legality 41:24
legitimate 64:21
letter 24:1, 3, 4, 9, 14;
28:25; 42:20; 66:4; 67:3
letters 60:11
level 4:6; 51:14
license 4:23
life 4:12, 23
light 13:13
Lightner 3:9
line 27:4; 32:23; 56:23;
57:12
listed 64:2

listen 45:12
listened 8:21; 13:15
listening 19:14
little 15:2; 30:8, 13
live 3:8
long 5:5, 20; 10:10;
11:11; 15:4; 24:9; 30:12;
35:13; 43:25; 51:8; 52:6;
68:18
longer 29:14; 41:6, 16
look 35:13, 15; 39:7, 7,
65:15, 16; 67:7
looked 54:24; 59:25
looking 8:24; 27:18, 28:3,
64:15
looks 57:15
lost 16:4
lot 62:7
loud 63:18

## M

Ma'am 58:2
Major 5:10, 13, 19, 20,
6:11; 7:2, 25, 11:22; 14:17;
17:2; 18:10; 21:3, 21;
22:23; 23:18, 25; 24:5, 15;
25:22, 25; 31:12; 32:17;
33:5, 23; 34:18; 35:20, 21;
36:11; 38:3, 13, 25; 41:13,
15; 42:1; 46:4; 51:10; 54:2,
5, 16; 61:8; 64:4, 23; 65:3,
18; 66:8; 67:10, 16, 21,
68:16, 69:18
Major's 8:8; 9:9; 17:8.
22:12; 28:21; 40:15;
44:21, 56:5
Majors 69:6
makes 15:6; 38:7
making 19:11; 21:22,
26:3; 34:9; 49:11, 12;
51:14; 59:21
management 26:19;
28:3, 5; 31:10, 16; 34:17,
20; 35:2; 51:2
Manager 60:12
managers 22:20, 25,
23:17
maneuver 51:12
manual 15:21; 38:21
manuals 38:1; 49:18
many 5:1; 23:2; 32:6;
33:1, 1; 40:10
mark 64:6; 67:6
marked 63:25; 64:8;
67:8; 68:10
matter 10:4; 15:16; 17:7;
42:13; 50:6; 60:10, 24.
69:20
maximum 46:23; 47:2, 6
may 22:4, 5; 41:11; 43:16,
16; 49:3; 59:18; 67:1
maybe 12:10; 59:18
mean 8:5; 12:9, 10; 17:4;

19:16, 17, 19; 28:4; 31:2;
34:14; 35:13; 38:9; 42:4;
43:4, 13; 49:1; 50:13, 18;
60:7; 62:24; 65:9; 68:17
Meaning 37:9
means 49:2
measurable 37:13
mediate 65:15
meet 21:21; 22:2; 34:17
meeting 24:4. 9, 44:11
meetings 24:13; 40:9;
44:5, 11
member 42:5, 21, 23;
51:6, 8
memo 64:1
memorandum 50:9
memory 20:14, 36:19
mentioned 38:14; 48:21;
59:5
mentions 50:14
merely 15:23
merits 42:16
message 34:24; 35:6;
66:20, 21, 23
methods 37:20
might 69:13
mind 18:21, 22; 27:11,
14; 34:13
mine 25:4; 43:13, 13
minute 69:22
minutes 52:20; 56:18;
68:4
misconception 15:3, 3,
5, 7
Mitchell 68:25; 69:7, 10
month 12:11
Morales 62:9
more 12:11; 28:6, 10, 14,
14, 17, 19, 19; 29:20; 30:8;
31:9, 15, 23, 23; 32:5, 12;
38:24; 52:19; 59:16, 18;
60:1
most 38:9; 50:15, 20, 21;
57:12; 59:19; 60:18
mostly 5:8
mouth 58:2
MRS 16:6, 21; 9:6; 10:20;
13:5; 16:3; 19:10, 13, 15;
20:17, 21:5, 24; 22:15;
23:13; 24:12, 22; 25:15,
20, 26:2, 17; 27:15, 24;
28:12; 30:24; 31:1, 11;
32:14; 33:19; 35:3; 36:5;
37:1, 17; 38:22; 40:18, 22;
43:18; 44:7, 10; 45:16, 21;
46:8, 16, 24; 48:13, 19;
50:3; 51:20, 23; 54:9, 12,
21, 25; 55:8, 15, 18; 57:8,
19, 58:1, 12, 15; 59:7, 12,
23, 25; 60:6; 64:19, 24;
65:4, 6, 8; 66:5, 19; 68:22;
70:1
much 8:6; 52:11; 57:14
myself 10:6

## N

name 3:7, 9; 68:25
names 64:2; 68:17
NASA 40:25; 43:22,
50:14; 53:5; 67:12
natural 30:15
nature 40:8
near 20:13; 34:10; 36:21
necessarily 18:20; 38:17
necessary 13:17; 19:21
need 31:13
need-to-know 12:15
needed 23:22, 34:21,
45:3
new 30:13, 13
next 13:11; 35:14
nine 4:22
nobody 10:24
non-aviation 31:17
non-commercial-type
21:19
none 6:7
normal 9:21; 11:6; 31:9;
62:24
Normally 7:3
NORTON 6:16, 21; 9:6;
10:20; 13:5; 16:3; 19:10,
13, 15; 20:17; 21:5, 24;
22:15; 23:13; 24:12, 22;
25:15, 20; 26:2, 17; 27:15.
24; 28:12; 30:24, 31:1, 11;
32:14, 33:19; 35:3; 36:5.
37:1, 17; 38:22; 40:18, 22,
43:18; 44:7, 10; 45:16, 21;
46:8, 16, 24; 48:13, 19;
50:3; 51:20, 23; 54:9, 12,
21, 25; 55:8, 15, 18; 57:8,
19, 58:1, 12, 15; 59:7, 12,
23, 25; 60:6; 64:19, 24;
65:4, 6, 8; 66:5, 19; 68:22;
70:1
nothing 51:10; 60:7
number 4:1, 4; 6:4, 5;
23:8, 11; 57:10

## O

Object 6:16, 21; 9:6,
10:20; 13:5; 16:3: 19:10,
13; 20:17; 21:5, 24; 22:15;
23:13; 24:12, 22; 25:20;
26:2, 17; 27:15, 24; 28:12;
30:24; 31:11; 32:14;
33:19; 35:3; 36:5; 37:1, 17;
38:22; 40:18; 45:16, 21;
46:8, 16, 24; 48:13, 19;
50:3; 51:20, 23; 54:9, 12,
21; 55:8, 18; 57:8, 19;
58:1; 59:7, 12; 64:19, 24;
65:4, 8; 66:5, 19; 68:22
Objection 25:15
objective 62:16
obligation 52:12

obtain 13:23
obtained 11:22; 12:7, 19;
13:25; 14:18; 22:14
Obviously 37:15; 39:9;
51:10; 52:12
occasion 33:24; 34:16
occasions 32:16
occurred 10:11; 13:1;
50:13, 13; 61:12, 16
occurring 55:22
off 41:2, 24; 42:2, 3, 9;
43:3, 4, 5, 15, 50:7, 52:9;
53:11, 22; 56:15
offer 35:25, 36:10; 39:14,
16
offered 20:10; 35:16;
36:3; 69:21
office 3:13; 24:2
Officer 3:18; 20:11;
30:15; 39:10, 13; 41:7;
44:18; 45:9; 48:25, 55:13,
21; 58:11, 23; 60: 12; 68:4
official 47:24; 50:1;
56:19; 57:6
often 31:9
old 4:22; 23:1, 8, 30:11
once 15:25, 24:5, 20,
51:22; 52:4; 65:20
one 6:3, 3; 14:20; 15:15;
20:22; 33:1; 38:24; 40:1;
43:1, 48:1; 53:14, 24; 56:1,
2; 57:10; 64:12; 66:21;
68:1, 2; 69:16
ones 50:1
ongoing 12:14
only 19:2, 25, 38:10,
61:25
operating 21:18; 49:18;
52:7
operation 4:17; 21:20;
38:12; 49:4
operational 29:22
Operations 7:5, 7; 16:25,
18:8, 9; 22:2; 33:15
operator 21:19
opinion 7:17; 22:12;
23:14; 38:25; 50:10; 57:4,
9
opinions 22:23; 23:1, 2,
7, 7
opportunity 19:19; 20:8,
10, 28:23; 34:22; 35:21;
36:21, 22; 37:5
opposed 21:18; 22:13;
44:3; 69:14
option 50:25
options 50:16
oral 9:25, 25; 10:8; 11:4;
12:13, 17, 21; 13:1, 6, 8;
14:9, 13; 15:14; 16:6;
17:17, 19; 18:5, 15, 18,
20:23; 25:12; 67:25; 68:5
order 18:3
others 22:14
ought 33:3; 55:12

**out** 4:14; 8:6; 11:23, 24; 12:7; 16:7, 21; 17:2, 19, 23; 22:22; 32:23; 45:20, 24; 47:18; 49:19; 50:15, 16; 57:7; 63:18; 66:6; 67:4; 68:24
**out-placement** 69:18
**outlined** 49:17, 18
**outside** 13:23; 14:18, 19:3; 21:3
**outspoken** 31:21, 23; 32:4, 7, 12
**over** 12:9; 19:25; 31:9; 42:9; 58:21; 60:13; 61:22
**overlooked** 34:3
**overweight** 41:20
**own** 3:16; 13:23; 15:19; 22:22; 23:10; 29:10; 42:9; 52:15; 55:6; 58:9; 67:20

**P**

**p.m** 70:4
**package** 35:25; 36:1, 11; 39:14, 16, 17, 19
**paid** 59:11
**paperwork** 68:6
**part** 11:4; 33:7; 37:2; 49:3; 53:21; 59:5; 63:2, 6, 8
**participate** 52:13; 53:12
**particular** 8:23; 15:24; 48:4; 50:15
**particularly** 31:19; 41:23; 51:7
**party** 55:22
**pass** 13:6; 15:10, 10, 16; 17:4
**passed** 12:21; 14:4
**passing** 20:23
**Pat** 6:1, 2, 11; 7:2, 13, 15; 9:9, 18, 20, 24, 25; 10:6, 8, 17, 19, 23; 11:4; 18, 22, 25; 12:4; 17; 13:7, 17; 14:17; 15:13, 25; 17:22; 19:6, 11, 20; 20:10; 21:3, 21; 22:3, 12, 23; 23:11, 16, 18, 25; 24:1, 2, 5, 15; 25:22, 25; 28:21; 30:6, 11, 12, 17, 19; 31:8, 15, 25; 32:3, 4, 5, 9, 12, 17, 19; 33:5, 23; 34:2, 18, 19; 35:23, 25; 36:11, 12; 38:3, 13, 25; 39:10, 14, 24; 40:5, 15, 23; 41:1, 5, 11, 13, 15; 42:1, 16, 18; 44:2, 5, 13, 21; 46:4; 48:3, 7, 10, 16, 18, 22; 50:5; 51:8, 10, 54:1, 5, 16, 16; 56:5; 61:8; 64:4, 23; 65:2, 18, 20, 21; 66:8, 10, 18, 24; 67:10, 13, 13, 16, 21; 68:16; 69:18
**Pat's** 6:19; 8:17; 9:14; 10:10; 13:3; 23:2; 32:19; 34:2; 40:2; 43:23; 47:19; 54:23; 67:25

**Patrick** 69:6
**pay** 23:22
**peers** 32:12
**penalty** 59:9; 61:3
**pending** 59:23; 60:25; 61:3
**people** 7:5; 8:16; 22:6; 23:22; 27:3, 9; 28:19; 34:22; 37:22; 40:10; 61:22; 62:24; 65:11; 69:12
**perceived** 31:9
**perceives** 31:12
**performance** 7:15; 9:10; 15:25; 37:13; 48:11
**period** 12:2, 10; 27:23; 30:10
**permitted** 34:12; 35:10
**person** 19:18; 30:16; 31:9; 59:19; 60:8, 17; 68:5
**person's** 69:15
**personal** 10:19; 22:12, 16; 23:11; 32:17; 40:2; 57:13; 58:18; 60:25; 62:11; 67:24
**personally** 8:5; 9:24; 33:16; 42:2
**personnel** 8:11; 23:20; 31:17; 33:17
**Pete** 7:7; 9:13, 14, 20, 10:7, 10, 13, 18, 22, 22; 11:1, 3, 17, 21; 12:12, 25; 14:25; 24:10, 15, 19; 25:7, 18, 29:5; 33:7, 10; 66:7; 68:2
**physically** 23:5
**pieces** 29:4
**pilot** 4:18, 20; 14:5; 19:18; 26:11; 27:17, 18, 23; 28:7, 11, 17, 25; 31:8; 32:12; 33:13, 13; 37:16; 40:8; 41:22; 42:6, 23; 43:13, 13; 46:6; 49:6; 50:18; 52:4, 6; 56:18; 66:14, 17, 22, 23
**pilot's** 4:22
**pilots** 20:8; 29:21; 31:16, 32:7; 37:23; 40:9; 50:1
**pin** 37:6
**place** 12:3; 50:12, 21, 22; 51:5
**places** 50:19
**Plaintiff's** 64:6, 9; 67:6. 9; 68:11
**plane** 45:19; 47:11
**planning** 48:11; 51:3
**please** 3:8; 67:7
**point** 6:5; 12:9; 14:1; 22:8; 24:5; 28:8; 29:12, 13; 33:12; 37:21; 39:12, 20, 41:5, 6; 42:18, 18, 23; 45:17, 19; 48:2; 50:12; 51:7; 57:2, 21, 21; 60:6, 7; 65:19; 66:15, 24
**policy** 42:22; 43:10; 61:19; 63:12
**poor** 52:14

**position** 8:1; 15:11, 12; 17:6; 27:19, 20; 28:1; 37:18; 38:18; 41:16, 23; 50:25; 67:22
**positions** 3:13; 62:12; 69:19
**possibility** 57:20
**possible** 57:17
**practice** 47:22; 49:15, 17; 69:20
**practices** 49:21
**pre-flight** 43:3; 51:3
**preceded** 11:4
**preparation** 61:15
**prepared** 7:25; 64:13
**present** 7:11; 60:1
**presented** 40:17; 63:9
**presenting** 59:22; 60:4
**President** 3:12, 14
**press** 7:16
**pretty** 8:6
**prevent** 51:11
**previously** 30:6; 63:25
**Primarily** 8:4; 20:4; 60:9
**prior** 4:12; 21:21; 24:13; 41:1; 45:15; 52:19
**private** 4:22
**Probably** 5:7; 24:14; 40:12; 50:19, 21; 56:16; 60:20, 21
**problem** 13:8; 14:9; 16:6; 49:6; 51:13, 14
**procedure** 42:22; 43:10; 61:19
**process** 6:20; 14:1, 13; 16:22, 17:6, 8, 12; 27:2, 31:2; 34:12; 35:11; 40:3; 59:6
**produced** 68:13
**products** 63:16
**profile** 31:20
**program** 15:10; 16:7, 15; 17:5; 18:2, 2, 20:24; 21:1, 7, 13; 34:25; 39:17
**progression** 30:15, 34:18
**projected** 46:23; 47:3, 6
**promotable** 13:8
**promote** 12:17; 13:6; 22:3; 34:21; 64:23; 65:2; 68:21
**promoted** 6:11; 9:19, 11:18, 25; 19:12; 21:22; 39:25; 65:20, 21
**promoting** 30:18; 65:10
**promotion** 9:14; 13:4; 28:21; 64:2; 69:8, 15
**promotional** 6:20, 25; 33:24
**prompted** 6:14, 19; 26:25; 30:21; 36:10, 25
**proper** 11:15; 20:24
**properly** 35:24
**proposed** 59:9

**prospect** 35:7
**prospective** 23:2
**prospects** 20:16; 33:25
**provision** 14:13
**put** 28:25; 29:4; 33:21; 39:17, 18; 60:12
**putting** 58:2

**Q**

**qualifications** 22:13; 38:4; 63:5, 20, 21; 68:20
**qualified** 8:1; 28:6, 10, 14, 15; 29:24, 25; 38:17, 17; 39:1; 60:1
**qualifying** 57:25
**questioned** 48:11
**quickly** 41:8

**R**

**raining** 46:14, 18, 20
**raised** 25:24
**ramp** 47:11; 52:9
**rash** 51:12
**rather** 49:7
**rating** 11:22; 12:9; 13:23, 25; 14:2, 3, 4, 6, 12, 14, 14, 18; 15:5, 8, 13, 14, 23; 16:17; 17:2, 3, 9, 23, 25; 18:12; 19:2
**ratings** 63:24
**rationale** 58:9
**reach** 41:13
**reached** 29:12, 13; 41:6
**read** 54:15, 20; 55:12
**reading** 70:3
**ready** 31:3; 33:5; 41:17; 65:12
**realized** 40:23
**really** 5:15; 8:24; 17:4, 19:7; 22:5; 23:6; 32:7; 45:7; 50:16, 18
**reason** 13:10; 23:20; 29:11; 57:24; 69:15, 15
**reasoning** 58:10
**reasons** 64:22, 25; 65:2, 7, 9
**recall** 4:5; 5:14, 18, 6:1, 3, 8; 7:24; 8:22; 9:10, 12; 11:17; 17:22; 19:1, 5, 7; 20:3; 22:4, 5; 23:24; 24:1, 8, 13, 23; 25:12; 31:5, 19, 25; 32:7, 9, 15; 33:9; 35:17; 36:1, 37:14; 44:15; 46:17; 47:1; 48:9; 52:22, 23; 56:20, 23; 61:18
**receive** 43:21; 67:10
**received** 9:21; 11:6; 12:14, 9; 14:23; 18:12, 22; 19:21; 34:24; 67:12
**receiving** 55:21
**Recess** 43:20

**recite** 21:16
**recognize** 64:10
**recollection** 29:1; 30:5; 37:8; 46:20; 47:4; 62:14; 64:16
**recollections** 23:10, 15
**recommend** 10:16; 26:1, 3, 7; 44:16
**recommendation** 16:25, 18:7; 44:13; 65:11
**recommendations** 8:7; 34:7
**recommended** 9:24; 10:6, 17, 19, 23, 12:5; 67:22
**recommending** 25:2, 3; 32:9
**record** 59:21; 60:3
**records** 8:8, 23:21; 33:17; 54:24
**recruit** 27:20
**refer** 35:1; 40:25; 63:21
**referred** 43:22; 64:8; 67:8
**referring** 19:23; 43:1
**reflected** 38:23; 42:10; 56:6
**refresh** 64:15
**refused** 53:21
**regard** 38:15
**regarding** 13:3; 22:12, 39:24; 46:7; 64:1
**regardless** 41:22; 52:9. 57:6
**regulated** 8:25
**Regulation** 11:14
**regulator** 44:22
**relate** 21:17; 58:18
**related** 7:1; 8:14, 18; 11:1; 33:24; 36:17; 38:20, 21; 52:17; 54:1
**relates** 49:15
**release** 39:15
**relied** 8:13, 15, 17; 11:14
**rely** 20:4
**relying** 22:13
**remember** 5:24; 6:9; 10:12; 12:4; 20:18; 21:25; 22:8, 9; 24:17; 27:1, 7, 12, 13, 16, 21; 28:4, 8, 24, 29:3; 31:7; 36:2, 6; 40:7; 41:12; 44:4; 45:17; 48:9, 53:4, 7; 67:11, 14, 23
**remembering** 48:21
**repeat** 38:24
**repercussions** 50:8
**rephrase** 31:13; 65:1
**report** 40:25, 25, 42:10, 20; 43:22; 44:21, 24, 25; 45:9, 20, 23; 46:17, 19, 22; 47:19, 24; 50:14; 53:6, 54:15, 18; 55:6, 11, 12, 13; 56:5, 8, 19, 20; 57:1, 7, 9, 11, 16, 20, 25; 58:5, 22; 61:8; 67:12
**reported** 56:4

reporting 58:10
reports 45:14; 47:18, 19; 49:10; 50:2; 55:22; 58:24
represent 68:13
representations 8:2, 4, 19:6
representative 60:5
reprimand 53:13
reprimanded 48:10, 14; 52:25; 54:5
request 29:9; 34:19
requested 26:22; 34:2
requests 26:16
required 10:16; 41:25
requirement 14:10, 11, 15, 15
requirements 9:1; 15:19, 24; 20:20, 20; 21:2, 3
researched 33:16
resign 27:5, 8
resignation 26:22, 25; 29:9, 15, 17
resigned 26:14, 15, 18
resolve 49:8
resolved 60:24
resource 28:19; 32:4, 5, 8, 10; 51:2
resources 31:17; 32:6
respect 10:18; 31:24; 32:13; 41:18, 68:17; 69:9
respective 68:19
responding 60:9
responsible 60:9
result 13:8; 26:15; 59:10
resulted 40:25
retard 42:1
review 8:8, 11; 11:9; 23:20; 39:3; 45:25; 68:6, 8
reviewed 34:7; 36:21
Richardson 60:23
right 13:19; 20:2, 14; 23:15; 26:5, 15; 27:1, 36:9; 37:10, 24; 41:16; 42:16; 43:17; 49:7; 59:21; 60:3; 61:2; 65:22; 66:3; 68:19; 69:4
risk 65:12
roll 50:22; 51:1
routinely 6:25
rule 17:19
run 56:22
runway 40:24; 41:9; 50:2; 53:20; 56:15, 16, 21; 57:6, 14; 58:19
runways 46:7; 47:9, 11, 23; 49:16

**S**

safe 41:4, 7; 49:12
safely 45:6
safety 38:11, 14, 15, 21; 39:10; 41:2; 44:18; 45:9;

48:25; 49:3, 12; 52:18; 55:13, 21; 58:10, 23; 60:12; 65:12
same 9:13; 14:10, 11; 29:1; 31:2; 53:25
satisfactory 15:25
satisfied 14:10; 18:10, 12; 21:3; 43:2
satisfy 14:11
saying 16:18; 41:22, 57:23; 60:3; 61:6
school 4:14, 14, 16
second 50:21; 70:1
Secretary 3:15
seek 29:15; 34:16; 39:23; 40:1
seeking 30:23
seem 22:4; 24:1
selecting 62:17
senior 22:25, 23:16
seniority 63:1, 2, 3; 68:19
sense 15:3; 25:9
sent 66:21; 67:13, 13
series 12:10; 15:24
serious 50:19
serves 20:14; 36:19
services 69:18, 21
serving 53:19
several 19:24, 24:13, 30:6, 21
severe 50:13; 51:2, 3
SHEA 3:6; 40:20, 43:19, 21; 44:9; 55:15, 17, 59:24, 60:3, 8;69:22
short 39:3
Shouldn't 18:22
show 63:25; 67:6
side 32:1; 56:23; 57:12
signature 66:23
signing 70:3
similar 46:5, 9; 48:4, 22; 54:6
simply 20:23; 41:21; 50:9
sit 24:2; 35:15; 49:20
sitting 36:7
situation 7:19; 10:11; 12:13; 13:13; 17:24; 22:13; 40:24; 41:9; 42:16, 52:17
six 5:7; 56:22
skill 63:5
skills 28:18, 19
snow 53:20
somebody 13:6; 27:12, 33:2; 49:7; 55:12
somehow 17:23
someone 31:8; 49:6; 61:20; 69:21
someplace 17:3; 38:1
something 5:24; 17:12; 34:10; 36:3; 41:25; 49:11; 52:2
somewhat 10:5

somewhere 40:6
soon 35:8; 36:13
sorry 14:12; 51:24
source 12:8; 47:17
South 4:11, 17
speak 37:9
special 7:1
specific 5:15; 9:7, 37:25; 60:20
specifically 9:11; 11:5, 11; 19:23; 21:17; 34:17; 35:17, 19; 36:6; 39:23; 58:18; 60:14; 62:21; 63:14
specifics 8:22, 24; 19:5; 52:23; 53:7; 69:16
speed 49:15
spent 4:15
spoken 22:5
sponsored 68:2
Springs 3:10
stand 43:15
standard 39:17, 19
standardize 62:11
standards 62:16
standing 45:14, 20; 47:24; 56:17, 19, 21; 57:6
start 16:4; 63:20
started 4:21, 51:15
starting 4:13
stated 43:12; 63:4
statement 59:21
statements 40:5, 8, 10
states 43:10
status 59:9, 15; 60:25; 62:1
stay 36:14
Steele 7:7, 20; 8:15; 9:13, 14; 10:4; 11:17, 21; 12:6, 24; 13:16; 14:25; 19:17; 20:6; 24:10, 15, 19; 25:19, 21, 24; 29:5; 33:7, 11, 14; 41:11; 44:12, 16; 53:2, 54:6; 60:14; 66:7; 68:2
Steele's 10:7; 54:15, 55:6
stick 50:15
still 13:12, 19; 15:16; 16:15; 17:4, 44:20, 56:12; 57:2; 59:14; 60:6; 61:3, 66:1, 3
stock 3:16
stockholder 3:16
stop 41:19; 50:17, 52:13
straightforward 9:1
strictly 21:18
strong 35:7
strongly 52:17
subject 47:7; 59:20; 62:13
Subsequent 12:6; 17:9, 20
subsequently 18:11
substance 48:23
success 36:18

sufficient 9:10
sufficiently 64:3; 68:14
summarize 9:8
summary 11:9
supposed 9:22; 49:2, 51:21, 24; 52:1, 2; 58:23
sure 9:5; 10:22; 11:19; 14:7; 17:10; 22:4; 32:22; 33:10; 34:6; 35:4; 37:6; 41:12, 43:19; 46:12; 51:14; 52:8; 59:2, 14, 20; 64:11
surfaced 25:18, 21
surprised 14:17
suspend 44:2
sworn 3:3

**T**

take-off 41:1, 4; 42:7; 45:15; 46:23; 47:6; 50:22, 23; 51:1, 11; 53:20, 23; 54:5
take-offs 46:7
talked 14:23; 32:8
talking 15:18
tapes 45:12; 47:19
taxi 45:23
team 34:17, 20; 35:2
technical 57:1
telling 33:2, 47:2
terminate 40:15, 23, 41:5; 43:23; 44:3
terminated 10:1; 44:14; 69:21
terminating 44:16
termination 50:10; 67:15
terms 9:3; 21:1; 32:2, 6; 38:11; 51:12; 57:1; 67:2
testified 3:4; 22:19; 30:5; 32:18; 44:7; 52:20; 53:11; 54:4; 58:4; 61:22; 64:21; 65:1
testify 49:14; 64:17
testifying 59:24
testimony 21:9, 10; 25:25; 26:6; 27:8; 38:19, 23; 47:17; 54:13; 55:9; 62:2
testing 15:24
Thereupon 3:1; 64:8; 67:8; 68:10; 70:3
though 18:11; 66:8
thought 14:12, 37:19
throttles 50:17, 51:1
throw 50:16, 25
times 33:1; 40:10; 50:19; 56:16; 58:15
today 36:8; 46:2; 49:20; 57:21, 24; 61:7; 64:15
together 24:10; 28:25; 29:4; 39:17, 18
told 9:9, 20; 10:25; 18:5, 9, 21; 24:20; 29:12; 38:16,

25; 39:2; 53:24; 66:3; 67:1
tone 25:6
took 12:10, 33:20; 41:2; 42:9
total 5:1
toward 32:17; 66:8
tower 45:12; 47:19, 24; 56:20; 57:1, 25
Tracy 7:9, 20; 8:21, 22; 11:21; 14:24, 25; 19:23, 25, 24:10, 24, 26:9; 66:7; 69:11
trained 7:14; 9:20; 30:14; 65:11
training 6:23, 7:6, 9, 24; 8:5, 7, 8, 18, 23, 25; 9:4, 21, 21; 10:24, 11:3, 6, 6, 9, 12, 15; 12:5, 5, 8, 19, 23; 13:16; 15:10, 15, 21; 16:25; 17:5, 12, 14, 15, 16, 18, 20, 24; 18:2, 2, 6, 8, 8, 10, 14, 18, 23, 23; 19:5, 17, 21, 22; 20:5, 24; 21:1, 7, 11; 22:1; 23:21; 31:2, 3, 5; 33:4, 9, 13, 17, 20; 34:8; 35:19; 36:18, 24; 37:11; 38:16, 20, 20, 24; 54:23; 62:15; 65:14
training/money 25:10
transition 28:11
transmittal 67:10
Treasurer 3:15
treated 35:24
trial 60:4; 61:15
tried 37:4, 7
trouble 10:5, 13
try 56:8; 58:4
trying 14:24; 25:5; 32:1; 35:15; 68:23, 24
turn 60:15
two 12:11; 14:16; 35:12; 50:18
type 11:22; 12:9, 15; 13:23, 25; 14:2, 3, 4, 6, 12, 14, 14, 18; 15:5, 8, 13, 14, 23; 16:17; 17:2, 3, 9, 23, 25; 18:12; 19:2; 20:21; 21:9; 41:22
types 63:24

**U**

ultimate 12:23; 30:22; 38:11; 41:3; 49:12
ultimately 6:15; 12:8; 30:14; 40:24; 41:2; 42:8; 50:14, 15; 65:13, 15; 66:11
unable 29:18; 49:14
unacceptable 51:9
uncertain 67:2
uncomfortable 41:23
under 21:18; 53:11; 54:6; 64:2; 66:23; 67:2
underlying 65:2
understood 38:19;

46:21; 67:3

**undertook** 19:6

*underway* 45:23; 51:22;
52:3, 4

**unfounded** 42:12, 14;
43:8, 9, 16; 50:7

**union** 31:24, 25; 32:2

**unqualified** 32:21

**unsafe** 37:15, 19; 43:14,
14

**unsatisfied** 7:15

**up** 4:10, 11; 9:1; 13:14,
19; 18:21, 22; 25:5; 36:18;
43:15; 58:24; 66:22

**upgrade** 9:22, 24, 11:6;
12:5; 13:12, 14, 19; 14:1;
16:7, 15, 21, 22; 17:14;
19:19; 20:8, 10, 16; 22:13;
25:22; 28:22; 30:7; 34:12,
16, 19, 25; 35:10, 16,
36:18, 20, 24; 37:22;
62:17, 24; 63:6; 66:2, 4;
69:3

**upgraded** 13:18; 20:13;
30:14; 34:3; 36:16

**upgrading** 62:11

**use** 58:23

**used** 5:10; 57:13

## V

**vacancy** 27:23
**vague** 22:7; 57:10
**various** 30:1, 46:10;
68:15
**vehicle** 57:11
*versus* 69:16
**viability** 37:22; 38:2;
41:24
**viable** 13:12; 16:2
**violated** 41:6, 13, 15,
59:1
**violation** 45:5, 7, 8;
54:19; 55:13, 24; 56:3, 4,
6, 7, 9, 11, 13, 25; 57:3, 17,
20, 22; 58:6, 16
**violations** 55:6, 22
**vocal** 31:23
**voice** 38:10

## W

**Wait** 70:1
**waiting** 47:5
**waive** 70:2
**waived** 70:3
**warranted** 50:10
**wash** 16:21
**Washington** 59:14, 18;
69:11
**water** 45:15, 20; 47:24,
56:17, 19, 21, 22; 57:6, 11;
58:20

**way** 11:20; 14:20, 22:10;
35:5; 39:9; 48:1; 51:6;
66:18; 69:8

**weeks** 12:10

**weight** 46:23; 47:2, 6;
49:15

**well-founded** 42:12, 13;
50:7; 52:10

**wet** 49:16

**whole** 17:5; 19:24; 46:1

**wicks** 53:20

**will** 16:4; 22:5; 25:17;
31:16; 38:24; 55:20;
59:21; 60:1, 4, 64:6; 67:6,
68:12; 70:2

**willing** 43:15; 64:22

**wished** 26:19, 25

**within** 24:14; 31:10;
34:21; 38:20; 55:22

**without** 42:5; 65:10

**witness** 3:3; 30:25;
31:14; 65:5; 69:25

**wondering** 12:16

**words** 10:2, 7, 8; 33:20;
52:15; 58:2

**work** 4:12; 5:11; 32:1;
40:9; 60:15; 66:10, 12

**worked** 4:16; 61:20

**writing** 24:14

**written** 63:12, 15

**wrong** 42:16; 51:4

**wrote** 24:1; 42:19; 64:11,
14

## Y

**year** 4:16; 48:8
**years** 4:15, 22; 5:7; 23:3,
5, 5, 8, 11, 30:6, 21, 34:14;
35:12; 39:5, 5; 58:21;
62:17

**Lawyer's Notes**



February 5, 1999

Mr. Pat Major
1722 W. Las Olas Blvd.
Ft. Lauderdale, FL 33312

Dear Pat:

I would like to begin by saying that I value you very highly as an employee and recognize the contribution that you have made to the company during your tenure with Amerijet.

I know that it has long been your desire to become a Captain at Amerijet. I have had numerous and lengthy discussions with the training department and flight department personnel, and it is abundantly clear that they do not feel you are capable of filling this position safely. I have full trust and confidence in the judgement of my senior staff members and will uphold their recommendation.

I take my responsibility to all of my employees, to the insurance company, and to myself very seriously, and cannot in good conscience allow you to become a Captain here at Amerijet. Based upon what I've learned, and what I know, the decision is made and my position will not change. I would like to make it abundantly clear that the safety of the aircraft and crew is my first responsibility, and you as a Captain are a risk I am not willing to take.

Pat, I know you have worked hard and I would like you to continue working for Amerijet in your current capacity. Ultimately, you will have to decide whether this is what you want, and I will support whatever decision you choose to make.

Sincerely,

David G. Bassett
Chairman & CEO



000070

CARGO *IS* OUR BUSINESS



**Patrick Major**

## FAX

The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.

**FAX To:** David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
**Date:** 08-25-99
**Subject:** NASA ASRS Report

Greetings Dave,

Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence that would actually occur.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, please accept my apologies.

Warmest Regards,

Pat



PLAINTIFF'S
EXHIBIT
3.19.01 JL

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com

| NAME | D/O/B | D/O/H | D/O/J |
|------|-------|-------|-------|
| David Mitchell | 10/22/59 | 02/03/95 | 05/01/96 |
| David Bruns | 02/09/66 | 04/08/94 | 10/16/96 |
| Derry Huff | 11/26/66 | 12/14/89 | 10/16/96 |
| John Hogan | 01/23/67 | 11/27/89 | 12/15/96 |
| John Washington | 10/07/70 | 04/27/92 | 12/15/96 |
| Paul Andresen | 11/19/55 | 03/25/87 | 06/12/97 |
| Jeff Novak | 12/01/63 | 02/24/89 | 09/23/97 |
| James Battillo | 01/09/64 | 01/29/90 | 09/23/97 |
| Raymond Meunier | 04/08/68 | 05/06/95 | 11/17/97 |
| Tracey Dickinson | 04/21/64 | 04/08/95 | 11/19/97 |
| Michael Pelly | 08/28/64 | 12/06/89 | 12/05/97 |
| Patrick Major | 10/02/63 | 05/20/91 | N/A |
| Timothy Green | 06/01/67 | 02/18/92 | 10/06/98 |
| Douglas Benson | 06/11/58 | 05/04/95 | 11/09/98 |
| Patrick McManus | 02/19/66 | 06/02/92 | 11/11/98 |
| James Kirk | 12/30/67 | 08/03/92 | N/A |
| John Moktadier | 04/21/64 | 04/08/95 | 05/17/99 |
| Ronald Rooks | 08/25/69 | 07/22/94 | 08/27/99 |
| Edward Hoffman | 08/07/66 | 03/18/91 | 09/09/99 |
| Kennith Matthews | 07/31/65 | 08/10/92 | 11/09/99 |
| Ronald Jakubek | 06/23/70 | 11/06/95 | 01/20/00 |
| Michael Bachrach | 11/23/55 | 04/29/95 | 01/20/00 |
| Jeffrey Michlowitz | 03/09/62 | 03/18/91 | N/A |
| Charles Church | 08/18/68 | 07/01/96 | N/A |
| James Basham | 09/07/69 | 09/23/96 | 01/20/00 |
| Robert Reed | 02/23/68 | 11/17/95 | N/A |
| Jacques Raissiguer | 05/29/63 | 07/01/96 | N/A |



PLAINTIFF'S
EXHIBIT
53
2-19-01 JI

CONFIDENTIAL     000315

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                    )   L.T. Case No.
                                        )   99-021734-11
            Plaintiff,                  )
                                        )
vs.                                     )
                                        )
AMERIJET INTERNATIONAL, INC.,           )
                                        )
            Defendant.                  )
----------------------------------------)

                    500 East Broward Blvd.
                    Fort Lauderdale, Florida
                    Monday, January 8, 2001
                    3:05 p.m. - 4:04 p.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

        -----------------------------

                    DEPOSITION

                        OF

                JOHN W. WASHINGTON

        ------------------------------

    DOWNTOWN REPORTING    (954) 522-3376

---

I N D E X

                                            Page

DIRECT EXAMINATION                            2
BY MS. SHEA

CROSS-EXAMINATION                            35
BY MS. NORTON

REDIRECT EXAMINATION                         48
OF MS. SHEA

            E X H I B I T S

    (No exhibits marked for identification.)

    DOWNTOWN REPORTING    (954) 522-3376

---

Page 3

1
2       Deposition of JOHN W. WASHINGTON, a
3   witness of lawful age, taken by the Plaintiff for
4   the purpose of discovery and for use as evidence in
5   the above-entitled cause, wherein PATRICK SCOTT
6   MAJOR is the Plaintiff, and AMERIJET INTERNATIONAL,
7   INC. is the Defendant, pending In The United States
8   District Court For The Southern District of Florida,
9   pursuant to notice heretofore filed, before BEVERLY
10  J. GRAMM, Registered Professional Reporter and
11  Notary Public in and for the State of Florida at
12  Large, at the law offices of Heinrich, Gordon,
13  Hargrove, Weihe & James, P.A., 500 East Broward
14  Boulevard, Suite 1000, Fort Lauderdale, Florida, on
15  the 8th day of January, 2001, commencing at 3:05
16  o'clock p.m.
17      --------------------------
18  THEREUPON,
19          JOHN W. WASHINGTON
20  a witness named in the notice heretofore filed,
21  being of lawful age, and being duly sworn in the
22  above cause, testified on his oath as follows:
23          DIRECT EXAMINATION
24  BY MS. SHEA:
25      Q. Okay. Sir, can you tell us your whole

Page 4

1   name and where you live, please?
2       A. John Wendell Washington, 415 N.W. 95th
3   Terrace, Coral Springs, Florida, 33071.
4       Q. All right. And where do you work?
5       A. Amerijet International.
6       Q. As?
7       A. Director of training.
8       Q. How long have you been director of
9   training?
10      A. Since July of 1999.
11      Q. You replaced Traccy Dickinson?
12      A. That's correct.
13      Q. Do you still fly?
14      A. Yes, ma'am.
15      Q. Okay. And what's your flying schedule, a
16  reduced schedule?
17      A. It's just enough to keep current and
18  whenever I get the itch to go fly. But not too
19  much.
20      Q. All right. And what do you do as director
21  of training?
22      A. Director of training, I'm responsible for
23  ground instructor, scheduling training and also
24  administrating check rights to captains and first
25  officers.

Page 5

1   Q. Do you oversee proficiency reports?
2   A. Um, I file them. I use them for training
3   purposes. But they do come to me, yes.
4   Q. You usually get copies of all of them?
5   A. Yes, ma'am.
6   Q. Does Amerijet have a practice that
7   people -- that a captain who fills out a proficiency
8   report should review it with the person that he's
9   doing the reporting?
10  A. They have the option. It's either they
11  can review it or they can keep it within the
12  company. But it doesn't have to be discussed with
13  the pilot.
14  Q. Okay. And do you do anything with those
15  other than file them when they receive them?
16  A. We file them and then we review those
17  prior to the pilot coming in for training. And if
18  there's any areas that he needs help in, then we
19  kind of tailor it to that area. Depending on
20  what -- if there is some. They're mostly positive
21  reports. So it's rare that we have to use one for
22  remedial training or just additional training.
23  Q. Okay. And what's your date of birth?
24  A October 7th, 1970.
25  Q. When did you start working at Amerijet?

Page 6

1   A. Part time 1985, full time June 20th, 1988.
2   Q. What did you start working -- what was
3   your position in 1985?
4   A. 1985 was just basically go-fer, anything
5   and everything. Washing airplanes. More custodial
6   than anything.
7   Q. Did you become a pilot at some point?
8   A. Yeah. I became a pilot in 1990. And then
9   started commercially for Amerijet in 1992.
10  Q. When you started commercially for Amerijet
11  in 1992, were you a flight engineer?
12  A. I was a first officer on a Falcon 20.
13  Q. All right. And did you receive any
14  promotions after that?
15  A. Yes. I received a promotion in 1993 to
16  co-pilot in the 727 and then October of '96 to
17  captain in a 727.
18  Q. Okay. How many total hours flying do you
19  have now?
20  A. Right now 5,700 hours, estimated. It's
21  about 5,600 and some change.
22  Q. And do you recall -- this is a memory
23  question, but about the time you were promoted to
24  captain, what were your hours?
25  A. My hours as captain, that would -- I'd

Page 7

1   have to go back and look at my logbooks. I don't
2   recall.
3   Q. When does your seniority start for purpose
4   of being considered for promotion?
5   A. For flight crew I was, seniority was '92.
6   When I went on line. I don't know if it was -- it
7   had to be my check-out date because my date of hire
8   was '88. So my seniority status for flight crew,
9   for bidding and seniority, didn't start until '92.
10  Q. Are there any special qualifications that
11  you have that you would attribute your being
12  promoted to captain so early in your career?
13  A. I just -- I was based in Miami for two
14  years and I found that that was not really the
15  proper place to get the experience that I needed, I
16  thought, so I changed my base to New Orleans, which
17  allowed me to acquire severe weather flying and also
18  winter flying experience that I would not get in
19  Miami.
20      I also flew with a check airman, Captain
21  Greg Kroll, a week a month. That was part of that.
22  And he kind of gave me a lot of good instruction.
23  And it was beneficial to fly with him. So that's
24  why.
25  Q He was on your crew?

Page 8

1   A. Yes. I flew two weeks a month, and out of
2   the one week I flew with Greg Kroll.
3   Q. And when were you based in New Orleans?
4   A. That would be April of 1995.
5   Q. Through till you were promoted to captain?
6   A. That's correct.
7   Q. And then you came back to Fort Lauderdale?
8   A. I came back to Miami.
9   Q. Miami, okay. Did you have -- strike the
10  question. You know who Pat Major is; correct?
11  A. Yes, I do.
12  Q. And you've worked at Amerijet for a time?
13  A. For quite some time, yes.
14  Q. Did you, as director of training, give or
15  furnish any training to Pat Major?
16  A. I believe I can -- it was tough because I
17  remember going in sometimes on my off time and
18  volunteering, you know, my instruction capabilities.
19  And I don't remember if there was a sign-in sheet
20  that I was on. Sometimes I come in in the middle of
21  a class and maybe do a section or of just asking
22  questions or answering questions. And there may
23  have been a time that I taught a class. I think I
24  recall doing one. Maybe two.
25  Q. Do you recall time frame or subject?

1    A. No. I think it was -- I think it was one
2  of the times that he was in the upgrade with Raymond
3  Yure and Tim Green. I think I remember those two in
4  the same time frame of the class. I don't recall.
5  It could have been recurrent ground school, I'm not
6  sure.
7      Q. That would have been director of training?
8      A. That's correct. But I still hold the
9  status ground instructor.
10     Q. All right. Have you flown with Pat as
11 flight crew together?
12     A. Yes, ma'am.
13     Q. Other than the training that you did and
14 flying with him as flight crew, have you had any
15 other relationship with Pat Major at Amerijet?
16     A. Um, no. I flew -- he flew as flight
17 engineer, as a co-pilot at that time. He was flight
18 engineer. I don't recall how many times. But other
19 than that, I think I rented an airplane at his
20 flight school several times. Other than that,
21 nothing. Nothing other than that.
22     Q. Did you have a role in the decision to
23 terminate Pat's employment?
24     A. No, ma'am.
25     Q. Okay. Did you have a role in

1  investigating the circumstances after take off of a
2  flight from Fort Lauderdale that Pat was crew on
3  in --
4      A. Yes. Yes, ma'am.
5      Q. -- in August 1999?
6      A. Yes, ma'am.
7      Q. Okay. What was your role in that?
8      A. I was asked by Pete Steele and Derry Huff
9  to coordinate a visit to the Fort Lauderdale tower
10 to review a tower tape that was on the date of that
11 flight, I believe 8/27, out of Fort Lauderdale. And
12 to a company them just to take notes or jot down
13 anything that may have been on the tape that raised
14 any questions.
15     Q. Okay. And who did you go with to that
16 visit to --
17     A. I think his name -- the person that
18 accompanied us, I think it was Mr. Boyd. At the
19 Fort Lauderdale tower.
20     Q. Okay. And then did Pete, Derry and you
21 three all go --
22     A. Yes, ma'am.
23     Q. -- and listen to this tape?
24     A. It wasn't really a physical tape, it was
25 digital. It was on a computer. They don't transfer

1  to tape until later on.
2      Q. All right. What did you understand to be
3  the purpose for your listening to the tape when you
4  set this meeting up and went?
5      A. I was given a NASA report that Pat had
6  faxed to I believe Derry or Pete Steele, and they
7  just wanted me to accompany them and to see if there
8  was any discrepancy between the report and what the
9  tape said.
10     Q. Okay. So before you went to listen to the
11 tape, you understood you were going to see if the
12 tape was consistent with --
13     A. That's correct.
14     Q. -- the NASA report?
15     A. That's correct.
16     Q. Was there any discussion about the
17 potential FAA violation that Pat had outlined in the
18 report?
19     A. No. I don't recall that, no.
20     Q. Did you read the NASA report before you
21 went and listened to the tower tape?
22     A. I believe I did.
23     Q. Did you give any opinion, as director of
24 training, as to whether what was reported by Pat
25 Major, if correct, would have been an FAA violation?

1      A. If correct, would have been an FAA
2  violation, not at that time, no.
3      Q. So you went to the tower authority to
4  listen to the tapes to see if there were
5  discrepancies.
6      A. That's correct.
7      Q. And you took notes?
8      A. Um, yes, ma'am.
9      Q. Do you have those notes?
10     A. No, ma'am.
11     Q. Did you keep them at the time?
12     A. I think I had them at the time. It was
13 probably on a Post It or something, just -- or a pad
14 of paper. I don't recall that I made any formal,
15 typed notes at the time. It's just something I jot
16 down on a piece of paper.
17     Q. Did you make a memo or a report to anyone?
18     A. No, ma'am.
19     Q. Did you give an opinion to anyone?
20     A. Um, an opinion. I believe I made
21 statements at the time that we were listening to it
22 based on what the NASA report said, that there was
23 discrepancies at the time.
24     Q. Do you recall what those were?
25     A. Um, the thing that was highlighted was the

Page 13

1  fact that I believe Pat asked for a runway
2  contamination check at the time of taxi out, which
3  is -- would not be the proper time to do that.
4  Normally it's done when you're at the blocks with
5  the airplane parked, not normally when it blocks
6  out. It's something, information you want to know
7  before you leave rather than taxiing out. So that
8  was something that I remember that stuck out.
9      Q. Okay. So that didn't have to do with a
10  discrepancy, that had to do with something that you
11  felt his request was --
12      A. Right. That was like opinions or just
13  something that stuck out in my head. This was the
14  first time I heard it, so I was giving my opinion at
15  the time of what I thought was out of place or out
16  of the norm.
17      Q. Any other comments that you recall giving
18  as you listened to the tapes?
19      A. Um, there was a couple, I believe, that
20  was, um, inconsistent with the NASA report that I
21  read that there was, during taxi out, when they
22  transferred him over from ground control to tower,
23  they asked Pat.
24      I recall Pat asking for them to pass along
25  the report to tower, since they're two different

Page 14

1  frequencies. And when they came back over to tower
2  frequency, they said that they were -- they would
3  pass out the report along when it came available.
4      And then they asked if they were -- can
5  they accept a departure, and then Pat responded with
6  a yes, or affirmative, I can't recall which one it
7  was, without hearing the report. I found that a
8  little odd.
9      Q. Okay. Was the report in fact issued
10  before take off?
11      A. The report was issued before take off.
12  They asked the first time, would you be able to
13  accept the departure. And the response back from
14  Pat was, yes. And then they told him I believe to
15  go down in position and hold on the runway.
16      And then the report came back and said --
17  the tower came back and gave the report of the
18  runway conditions. And let's see. Came back with
19  the runway conditions and then said -- then that was
20  it.
21      And they came back and said in the same
22  breath that runway condition report, he read back
23  the runway condition report and then said the flight
24  number and then says, ready for take off, without
25  that delay, which in the NASA report said that there

Page 15

1  was no pause or delay from the report of the
2  contamination to the take-off clearance. Which
3  there was a pause in that. So that was another
4  discrepancy that I noted.
5      Q. Did you draw any conclusions or anything?
6      A. No. I mean, what I just responded was
7  there was no conversation in the cockpit between
8  crew members on the runway condition report. If
9  there was a conversation, there would have been a
10  break in the transmission. By which it was just one
11  sentence, there was no break in that, so that led me
12  to believe there was no conversation.
13      Usually there's a gap or a standby and you
14  don't know what's going on in the cockpit, but there
15  would be at least a ten or 20 second delay, which
16  there was not.
17      Q. In the absence of a tower report of
18  contamination, standing water contamination, was it
19  Amerijet's policy at that time to consider the
20  conditions as dry for purposes of the performance
21  limitations?
22      A. I believe I -- I believe that at the time
23  the -- it's the discretion of the pilot in command
24  to determine that.
25      Q. Is that a written policy?

Page 16

1      A. I don't recall. I don't know if it is or
2  not. We have -- it may be in the manuals. I would
3  have to look.
4      Q. What about today, has that policy changed
5  at all?
6      A. No.
7      Q. With a tower report of contamination
8  consisting of standing water of less than one
9  quarter inch, is the captain bound to adhere to the
10  performance parameters that are set forth in the
11  runway analysis?
12      A. It all depends. There's more parameters
13  that have to be considered. The percentage of
14  runway that is covered and also the -- if it's less
15  than an eighth of an inch of standing water, it's
16  not considered contaminated. And that's from the
17  runway analysis company, Navtech.
18      Q. Did you make any assessment of the -- of
19  those circumstances at the Fort Lauderdale Airport
20  for that flight and make any conclusions as to
21  whether Captain Steele properly exercised his
22  discretion?
23      A. At the time, no.
24      Q. Was Pat Major already suspended from the
25  flight schedule?

1  A. I don't know. I wasn't informed of that,
2  no.
3  Q. Was the decision to make Pat Major -- I'm
4  sorry, to terminate Pat Major made during that visit
5  to the aviation authority?
6  A. No.
7  Q. Were you asked to do anything further in
8  the investigation or the review?
9  A. That was it.
10  Q. Did there come a time when you found out
11  that Pat was going to be terminated?
12  A. There was one point in time that I was
13  aware of, that I don't know the time frame. It may
14  have been the day that I showed up that they said
15  that I needed to sit in on his termination, but
16  other than that, I was not aware of it.
17  Q. So at some point you were told that you
18  were going to sit in on his termination?
19  A. Yes.
20  Q. Was this something that you had ever done
21  before?
22  A. No, ma'am.
23  Q. And you weren't going to deliver the news?
24  A. I was the one in the hallway that they
25  basically needed someone to sit in, a manager,

1  management status.
2  Q. Who asked you, Derry?
3  A. Derry Huff, that's correct.
4  Q. He just caught you that morning?
5  A. Yeah, it was that morning. And I guess I
6  was the only manager in sight, so I was elected to
7  sit in on it.
8  Q. So you weren't consulted about the merit
9  of the termination decision?
10  A. No, ma'am.
11  Q. So did Pat, when he was told the decision,
12  attempt to put forth his case or make any statements
13  about what had happened?
14  A. I don't recall the whole thing. I know
15  that Pat -- knowing Pat for a while, he does talk a
16  lot, so I'm sure that somewhere in there that there
17  was a plea of his case. I just don't recall the
18  verbal transfer at that time.
19  Q. Okay. Did you -- you don't recall
20  anything about what he said or how persuasive it was
21  or your reaction to it?
22  A. No, I don't. I mean, I remember that he
23  argued something, but it was -- it's been a while,
24  so I don't really remember what it was.
25  Q. Did you make any statements to him?

1  A. I did not speak a word.
2  Q. Were you asked by anyone to document your
3  impressions, your comments about the take off
4  circumstances of that flight?
5  A. No, ma'am.
6  Q. Have you ever done that to this day?
7  A. No, ma'am.
8  Q. In the investigation, before Pat was
9  terminated, do you know whether anyone obtained
10  Brian Steele's recollections or perspective on what
11  happened on that flight?
12  A. I was -- if there was, I was not a part of
13  that.
14  Q. If when a contamination report came out
15  the captain had already advanced the throttles and
16  the take off roll had started, would you expect the
17  first officer to try to delay the take off?
18  A. If he feels that it's threatening the
19  safety of the flight, yes, I would. I would
20  expect -- there's different ways that you can do it,
21  but I would expect an intervention of some sort. If
22  he's -- if that person, he or she, is concerned
23  about the safety of the flight.
24  Q. And what would be a permissible sort of
25  intervention, assuming there's a well-founded

1  concern about the safety?
2  A. Probably being the co-pilot, working the
3  radio transmissions with ATC. I would have probably
4  broadcast on the radio that we were 17,000 pounds
5  overweight and we could not leave, and that would
6  basically stop it right there.
7  Q. Why did you just say 17,000 pounds
8  overweight, is that some information that you have
9  relating to this flight?
10  A. There were some numbers that I saw about
11  the less core decrements in Fort Lauderdale. Plus
12  training, ground school and all that we use that as
13  far as training purposes.
14  Q. So you've used the FAA investigation
15  materials of this incident in training?
16  A. No. We just use it as contaminated
17  runway. We do that every training session, as far
18  as ground school. And snow, it could be ice,
19  whatever. We use 17,000 pounds and 27 knots, so
20  it's just a generic as far as for training purposes.
21  Q. And you train people if there's a report
22  of contamination of standing water less than a
23  quarter inch, you take those decrements?
24  A. There's more to it. It has to be between
25  an eighth of an inch and a quarter of an inch of

1  standing water to cause dynamic hydroplaning. If
2  it's less than an eighth, according to Navtech, it's
3  considered a wet runway and the contamination
4  decrement does not apply. And there's also a
5  percentage of more than 25 percent of the runway has
6  to be covered for that decrement to be implemented.
7  Q. Okay. Did you make any findings or any
8  determination as to whether the runway, at the time
9  of the take off of the flight Pat Major was on, was
10 contaminated between an eighth of an inch and a
11 quarter of an inch?
12 A. That information was not provided as far
13 as the transcripts that I heard from the tower tape.
14 Q. Likewise, the percentage of the runway
15 that was contaminated, did you make a finding?
16 A. That was not also included in that.
17 Q. Under what circumstances can an Amerijet
18 captain disregard a contamination report?
19 A. Under what circumstances disregard a
20 contamination report, I can't think of any.
21 Q. After you met with Pat, during the meeting
22 in which he was terminated, what, if anything, was
23 the next thing you heard from any source about this
24 flight?
25 A. That was it.

1  Q. And you report to John Roseborough, the
2  FAA, POI concerning the flight?
3  A. I know that there was some documentation
4  transferred, but I wasn't privileged to that, those
5  documents. That didn't go through my department.
6  Q. Well, wouldn't you, as the director of
7  training, be informed if there's an FAA
8  investigation of a flight episode?
9  A. Not necessarily. Depending. It all
10 depends. There's -- but I wasn't aware of it, no.
11 It depends on the circumstances. But not all of
12 them.
13 Q. Are you aware that the FAA issued a notice
14 of proposed civil penalty violation to Amerijet
15 concerning this incident?
16 A. I was aware of that afterwards, but not
17 when it initially was posed, no.
18 Q. When did you become aware of it?
19 A. I believe when this -- when the lawsuit
20 started with the Pat Major case.
21 Q. Well, if the lawsuit started in '99 and
22 the notice came out in 2000, you'd be incorrect
23 about that?
24 MS. NORTON: Object to the form of the
25 question.

1  A. I don't know.
2  MS. NORTON: Mr. Major wasn't discharged
3  until September of '99.
4  MS. SHEA: All right. It's a 2000 number.
5  MS. NORTON: It's -- the number of the
6  case is 00-6070.
7  BY MS. SHEA:
8  Q. Mr. Washington, let me show you what was
9  marked Plaintiff's Exhibit 24.
10 A. Sure.
11 Q. Which is dated February 16th, 2000.
12 A. That's correct.
13 Q. Have you seen that document before?
14 A. Yes, I have.
15 Q. Okay. That's the notice of proposed civil
16 penalty to Amerijet?
17 A. That's correct.
18 Q. And when did you first see that?
19 A. I do not recall.
20 Q. Within the last six months?
21 A. Yes, it could be.
22 Q. Do you know when Pat Major filed his case?
23 A. No, ma'am.
24 Q. But you were only shown that as a result
25 of the lawsuit, or in connection with the lawsuit?

1  A. I think it was just documents transferred,
2  yeah. It's possible. yes.
3  Q. Okay. Well, did you review the notice and
4  the analysis of the FAA as it relates to the
5  take-off conditions for that flight?
6  A. No, I have not.
7  Q. Are you aware that the FAA determined that
8  the flight was overweight upon take off and violated
9  FAR's?
10 MS. NORTON: Object to the form of the
11 question.
12 BY MS. SHEA:
13 Q. That's a yes or no question. Do you see
14 here, it says the flight departed, at the time the
15 flight departed Fort Lauderdale, the flight exceeded
16 the weight allowed and the conditions, and as a
17 result Amerijet violated the regs. Did you read
18 this notice when you saw it?
19 A. Yes, ma'am. It's a notice be posted.
20 It's not an actual violation, it's pending.
21 Q. Okay.
22 A. So I see it as not a violation until
23 proven that it is.
24 Q. Are you involved in the response to that
25 at all?

Page 25

1    A. No.
2    Q. What is Amerijet's responsibilities to it?
3    A. I don't know what the response is to that.
4    That is director of operations, the director of
5    training.
6    Q. That would be Derry Huff that you would
7    expect would know that?
8    A. That's correct.
9    Q. Wouldn't it be important for the director
10   of training to know of something like this notice of
11   proposed violation, when it's occurring, since you
12   may have to modify the training?
13   A. Um, we had modified the training prior to
14   that. After the flight of 8/27, there was some, I
15   guess some areas that needed to be covered with
16   regards to runway contamination. So those were, I
17   guess, magnified from what we would spend a little
18   bit more time on it in the course than normal.
19   Q. Do you now instruct captains that
20   contamination reports are binding?
21   A. Yes, ma'am.
22   Q. Okay. Are you here today as the
23   representative of Amerijet with the most knowledge
24   of the FAA investigation and any associated
25   penalties of the August 17th, 1999 incident as it

Page 26

1    relates to Amerijet or any of the pilots
2    individually?
3           MS. NORTON: As to the status of it, yes.
4    Not because he wasn't involved with the earlier
5    part.
6    BY MS. SHEA:
7    Q. Well, do you have knowledge of the FAA
8    investigation and any associated penalties of that
9    incident?
10   A. No, ma'am.
11   Q. As it relates to Amerijet or any other
12   pilots individually.
13   A. No, ma'am.
14          MS. NORTON: Well, because there aren't
15   any. He can't be aware of any penalties because
16   there aren't any penalties. He's aware of the
17   status, but it's pending. That's all there is.
18   There's nothing to be aware of if it's pending. Do
19   you follow me?
20          MS. SHEA: No. I'm going to exhaust this
21   witness's recollection and take it up with the Court
22   because I'm through playing games with this.
23   BY MS. SHEA:
24   Q. All right. Sir, you did not -- this
25   document was addressed to Dave Bassett, it was not

Page 27

1    addressed to you?
2    A. That's correct.
3    Q. Okay. You came to have a copy of it much
4    later because of the lawsuit, and you were going to
5    be a witness; correct?
6    A. That's correct.
7    Q. What did Dave Bassett do when he got this?
8    A. I have no idea.
9    Q. You don't know any response that was made?
10   A. No, ma'am.
11   Q. Do you know whether there's been any final
12   determination?
13   A. No, ma'am.
14   Q. You don't know one way or the other?
15   A. That's correct.
16   Q. Same question for Brian Steele, what's the
17   status of the FAA investigation for Brian Steele?
18   A. I am not involved in that case.
19   Q. You never saw any paperwork on that?
20   A. No, ma'am.
21   Q. Same question for Al Jorsey.
22   A. He was -- that I was aware of, because
23   he's a check airman for Amerijet and he was taken
24   off check airman status because of the
25   investigation. When that was finalized and found

Page 28

1    that he had not broken any federal regulations, he
2    was put back on. So I was aware of that because it
3    came through my department for that.
4    Q. Your department has the paperwork on that,
5    that told him --
6    A. We all did the pilot records, so we had a
7    letter that was sent from John Roseborough to Derry
8    Huff regarding that the check airman status be
9    revoked until this case was against Al Jorsey, Sr.,
10   or the penalty or the violation, pending violation
11   was cleared.
12          And they found that he was over the age of
13   60 and he was not part of the crew and that he was
14   cleared of any penalty of violations. And he came
15   back on status as check airman, which runs through
16   my department, so I was aware of that.
17   Q. So you've seen a copy of John
18   Roseborough's letter to him closing the
19   investigation?
20   A. Yes, ma'am.
21          MS. SHEA: Again, this is long overdue
22   discovery.
23          MS. NORTON. You've gotten it. We sent it
24   to you.
25          MS. SHEA: No.

Page 29

1   MS. NORTON: Yes, you have. I sent it to
2   you twice myself. You have the stuff I sent you on
3   Friday.
4       MS. SHEA: Yes.
5       MS. NORTON: It was in there.
6       MS. SHEA: Of course it was not in there.
7   I wouldn't be asking about it today.
8       MS. NORTON: I sent that to you.
9       MS. SHEA: John Roseborough.
10      MS. NORTON: To Jorsey Sr., yes.
11      MS. SHEA: Okay. Fine. So you sent that
12  to me, so we'll check on that.
13      MS. SHEA: Yes.
14      MS. SHEA: And the letter from Roseborough
15  to Huff saying that he was suspended as a check
16  airman, is it your position that you sent that to me
17  too?
18      MS. NORTON: That one, I don't think I've
19  seen it.
20      THE WITNESS: To Huff. Huff is not a
21  check airman.
22  BY MS. SHEA:
23      Q. The letter that you mentioned that John
24  Roseborough wrote to Derry Huff saying that Al
25  Jorsey cannot be a check airman while the

Page 30

1   investigation was under way?
2       A. That's correct. I did not see that one
3   because of the fact of him as a check airman.
4       MS. SHEA: That's not one I've seen.
5       MS. NORTON: I can't answer that I haven't
6   personally seen it. I'll check on that.
7   BY MS. SHEA:
8       Q. All right. You have not seen any FAA
9   letter to Brian Steele closing the investigation as
10  to him?
11      A. That's correct.
12      Q. Okay. What about Brett Wise, have you
13  seen any correspondence on that?
14      A. No, ma'am.
15      Q. Or Pat Major?
16      A. No, ma'am.
17      Q. Have you described everything you did in
18  connection with the pretermination investigation
19  into the flight of August 1999?
20      A. Yes, ma'am.
21      Q. Okay. You were not involved in the
22  decision to suspend Pat Major?
23      A. No, ma'am.
24      Q. Have you ever met with anyone at the FAA
25  about this incident?

Page 31

1       A. No, ma'am.
2       Q. Do you today take issue with whether the
3   flight took off overweight, in violation of the FAA
4   regulations that are cited in that letter?
5       A. No, ma'am.
6       Q. Do you concede that the flight took off
7   under conditions that violated the FAA regulations?
8       MS. NORTON: Object to the form of the
9   question.
10  BY MS. SHEA:
11      Q. You're being produced as the person most
12  knowledgeable of the investigation and the
13  penalties. You've reviewed that material.
14      A. That's correct.
15      Q. What's your position on whether FAA
16  violations were committed that day?
17      A. I don't understand the question. As far
18  as have I given any response to that letter?
19      Q. No. I'm just asking you as director of
20  training for Amerijet.
21      A. That's correct.
22      Q. Did that flight or did that flight not
23  take off under conditions that violated the FAA
24  regs?
25      A. I have not reviewed it to the extent as

Page 32

1   far as to look at it, no, I have not.
2       Q. I'm asking you right now. It's not that
3   complex.
4       A. Right. I mean, I haven't looked at the
5   date as far as to determine if it was overweight,
6   no. I've seen the letter, but I have not done any
7   research on it.
8       Q. Assuming the facts the FAA set forth are
9   correct, do you dispute that take off under those
10  conditions violated the FAA regs?
11      MS. NORTON: Object to the form of the
12  question.
13      A. I would have to research it as far as the
14  conditions at the time and the reportings and the
15  weights and the wind and everything. But I have not
16  done that.
17  BY MS. SHEA:
18      Q. Do you know whether Amerijet even
19  responded to the letter of intent from the FAA?
20      A. I have no idea.
21      Q. You don't -- you can't explain why they
22  didn't, if they didn't?
23      A. That's correct, I don't know.
24      MS. SHEA: I want to make clear with your
25  counsel, you're being produced today as the

1 representative of Amerijet International, Inc., with
2 the most knowledge of the investigation and any
3 associated penalties of the August 17, 1999
4 incident.
5     MS. NORTON: As I said, as of the status
6 right now. I told you at the beginning, he doesn't
7 have the previous knowledge what happened. But
8 right now.
9     MS. SHEA: Okay. Right now --
10     MS. NORTON: Right now is where it is.
11 BY MS. SHEA:
12     Q. Does Amerijet dispute that it violated FAA
13 regulations in the manner that that flight took off
14 on that date?
15     A. I don't know if they dispute it or not.
16     Q. Well, you don't know, you have no idea
17 what the company position is on this?
18     A. That's correct.
19     Q. Even though you're director of training?
20     A. That's correct.
21     Q. And who would know? Would you expect
22 Derry Huff to know?
23     A. Director of operations.
24     Q. That would be Derry Huff?
25     A. That's correct.

1     Q. If he doesn't know, you can't name anybody
2 else that would know what Amerijet's position is?
3     A. Dave Bassett. That would be the only one
4 I can think of.
5     Q. Dave's never discussed this with you?
6     A. No, ma'am.
7     Q. And you're not prepared to tell us that
8 you would conclude that if that flight took off
9 under the circumstances described in that letter,
10 that it violated the FAA regs?
11     A. No, I could not at this time.
12     Q. Even though that's what the FAA letter
13 says?
14     A. That's what the FAA letter says. I don't
15 know if it has or not without doing the research to
16 determine that.
17     Q. So you don't have any facts to dispute
18 what the FAA found?
19     A. That's correct.
20     Q. You're just not prepared to concede that
21 they're right and Amerijet's wrong?
22     A. That's correct.
23     Q. Can you tell us what Class 1 navigation
24 is?
25     A. Class 1 navigation is navigation that is

1 conducted within the standard service volumes of the
2 federal airway system, without going one hour
3 outside, one hour after the signal loss of a nav
4 aid, without reaching another nav aid within one
5 hour prior.
6     Q. And is that what Amerijet flights are
7 conducted under?
8     A. Yes, ma'am.
9     Q. And do the rules of Class 1 navigation
10 govern at Amerijet? Is that part of what you train
11 and teach on?
12     A. Yes, ma'am, Class 1.
13     MS. SHEA: All right. That's all I have.
14     MS. NORTON: I have a couple questions.
15     CROSS-EXAMINATION
16 BY MS. NORTON:
17     Q. Mr. Washington, who is responsible for
18 determining the balance and weight of the plane,
19 what position?
20     A. Um, I'm sorry. Say that one more time.
21     Q. What position on the flight crew is
22 responsible for determining the weights and balances
23 on the plane?
24     A. The center of gravity, the information is
25 provided by the load master that's on the ground,

1 the ramp supervisor. And then that's relayed to the
2 co-pilot, which does the weight and balance data for
3 the aircraft, enters it into a weight and balance
4 computer.
5     Q. And do you know who the co-pilot was on
6 the flight in question in August?
7     A. Patrick Major.
8     Q. And it's Mr. Major's responsibility to
9 determine what the balance of the total weight of
10 the plane should be?
11     A. He determines what it is. What it should
12 be is determined through the runway analysis data.
13 And that is written on the load plan under a
14 performance area, and he provides that. He does the
15 calculations, enters those numbers. And then
16 whatever the computer displays, he writes down the
17 load plan of those weights and then presents that to
18 the captain for his signature.
19     Q. Is it his responsibility only to present a
20 load plan that he believes is correct and complies
21 with FAA?
22     A. That's correct.
23     Q. And if in fact he is presented with the
24 plan, then he has the captain sign off on it?
25     A. That's correct.

1 Q. So it's initially his responsibility to
2 make sure the plane is not overloaded?
3 A. Yes, ma'am. That's correct. Yes, ma'am.
4 Q. Now, if in fact this flight, the
5 conditions changed or there were reasons for the
6 first officer, the co-pilot, to believe
7 circumstances have changed, did Mr. Major, other
8 than being the initial person to make the decision
9 anyway, have opportunities to raise this issue with
10 the pilot?
11 A. Yes, ma'am.
12 Q. Okay. And what would have been the first
13 opportunity?
14 A. Um, on the ramp, with the airplane parked
15 at the ramp, on the ground.
16 Q. And how could that have been done?
17 A. That could have been done with discussion
18 with the captain, of the conditions at the airport.
19 The condition should have been determined prior to
20 block out. Before wheel movement.
21 Q. And what conditions are those?
22 A. If there was a condition of the runway, it
23 would have been posted on the ATIS, the hourly
24 weather broadcast. It's on a frequency on the
25 airport. And if there was any runway conditions

Page 38

1 that would affect the safety of the flight, they
2 would be issued on that recording.
3 Q. At what point in time would the tower or
4 ground start recording from the cockpit
5 conversations?
6 A. Um, that would -- when it started from
7 taxi out? It's when the initial call from the
8 co-pilot or the flight crew on the radio to request
9 taxi. There's also a clearance delivery that's made
10 prior to that, asking for a clearance to your
11 destination.
12 Q. Now, would the -- any conversation as to
13 the contamination of the runway have been done after
14 that point, when the conversations were recorded in
15 the FAA tapes?
16 A. They wouldn't have been recorded if it was
17 a conversation in the cockpit. It would only record
18 transmissions that are made from the airplane to the
19 tower.
20 Q. Okay. Now, in Mr. Major's reports he
21 indicates basically that he had raised this issue
22 numerous times and the pilot refused to accede to
23 his request that the plane was overloaded.
24 A. Right.
25 Q. Okay. What steps could he have done to

1 have prevented that?
2 MS. SHEA: I just object to the form of
3 the question. Lack of predicate on what the report
4 said.
5 BY MS. NORTON:
6 Q. What steps would you have expected a first
7 officer co-pilot to have taken if in fact he
8 believed that?
9 MS. SHEA: Same objection.
10 MS. NORTON: Go ahead.
11 A. Those -- that would be a -- the conditions
12 of the airport should have been determined prior to
13 block out. That should have been done on the ramp,
14 before it was -- so it could be determined on the
15 load plan for that flight.
16 BY MS. NORTON:
17 Q. And then what else?
18 A. If that was determined that those
19 decrements need to be utilized, then that should be
20 put on the load plan and presented to the captain at
21 that time.
22 Q. So a modified or an amended?
23 A. Modified, yes. As far as it should have
24 been done at that time, or redone. If the
25 conditions change, it should have been redone at the

Page 40

1 time.
2 Q. And then once they're ready for taxi,
3 before they push off, if the co-pilot believed that
4 the conditions were unsafe, does the co-pilot have
5 various options?
6 A. Prior to push back?
7 Q. Yes.
8 A. Yes, ma'am.
9 Q. And what are they?
10 A. He could get off the airplane, the stairs
11 are still there. If he has a dispute about the
12 runway contamination, if he found out from the
13 airport that it was actually contaminated, then he
14 has an opportune time to get up and get off the
15 airplane at that time and not take the flight.
16 Q. Now, in your recollection of reviewing it,
17 and I realize you have not looked at his reports and
18 compared it with the FAA, it's not in front of you,
19 but do you recall finding conduct or conversations
20 that would have been inconsistent with someone who,
21 based upon their report, said that they were
22 considering throwing themselves on the throttles?
23 In other words, did the conduct that you
24 recall hearing, the conversation you heard in the
25 FAA tapes, was that consistent with a co-pilot, the

1  circumstances that a co-pilot would consider
2  throwing himself on the throttles of the plane?
3          MS. SHEA: Objection. Argumentative.
4  Lack of predicate.
5  BY MS. NORTON:
6          Q. Do you understand my question?
7          A. Yes. There was a discrepancy of what I
8  heard on the tower recording versus what I saw in
9  the NASA report.
10         Q. Okay. And what were those discrepancies?
11         A. Just the discrepancies of the NASA report
12 stating that there was no way of turning back, or no
13 way of getting -- there's no way, you're basically
14 now along for the ride.
15         Whereas it showed concern in the NASA
16 report, yet on the tower tape it seemed like, you
17 know, are you ready to take a departure, or can you
18 accept a departure. There was no conversation of
19 us, no pause of conversation in -- according to the
20 NASA report, it seemed like there was conversation
21 in the cockpit about this during the taxi out.
22         Whereas the tower tapes indicated to me
23 that there was no -- there was no pause or delay,
24 there's just a yes, or an affirmative, and that was
25 it.

1          Q. Would you have expected a pause?
2          A. Yes.
3          Q. If there had been conversation in the
4  cockpit?
5          A. Yes, ma'am. Um-hum.
6          Q. And why would you have expected the pause
7  in the tape?
8          A. If the crew member had a legit concern as
9  far as the safety of the flight. I would expect
10 them, if it's a co-pilot working the radios, to say
11 stand by or give me a minute. And that would be a
12 time where the co-pilot would talk with the captain
13 and say, due to the present conditions, do you feel
14 like we should take a departure, can we accept a
15 departure.
16         And that would take at least five seconds.
17 And there was no pause or delay in that
18 transmission. It was just a yes without any
19 conversation.
20         Q. And no hesitancy?
21         A. That's correct.
22         Q. Any other discrepancies you found on the
23 tape? As to what you could expect to find that in
24 fact the co-pilot was faced with the situation that
25 Mr. Major has outlined in his NASA --

1          A. Yeah, there was a report where they gave
2  the runway contamination report and they ended the
3  transmission. The co-pilot, Mr. Major, came back
4  and said on the tape, or on the transmission to the
5  tower, that he repeated the contamination report and
6  then said the flight number and says, ready for take
7  off.
8          I would expect, you know, contamination
9  report with a delay and then a conversation in the
10 cockpit which would, to me, would take about ten or
11 20 seconds, depending, and then a response back
12 saying yes, we can, or no, we can't. Depending on
13 that.
14         But there was none. There was a read back
15 and a clearance, affirmative to go, ready for take
16 off, which I would expect a delay if there was a
17 conversation or if there was a concern for safety.
18         Q. And if -- let's just assume for purposes
19 of my question that the pilot is still not listening
20 and the co-pilot has a true concern over the weight,
21 maybe conditions changed, whatever, are there any
22 other avenues at that point in time when you're on
23 the runway that the co-pilot could have taken?
24         A. Yes, ma'am.
25         Q. And what are they?

1          A. He could --
2          MS. SHEA: I'm going to object to the
3  hypothetical. It assumes facts not in evidence.
4  Unless you're putting him on as an expert.
5  BY MS. NORTON:
6          Q. Go ahead.
7          A. That would be transmitting to the tower
8  the concerns of either their actual conditions at
9  the time or just his concerns at the time. If it
10 was just that crew member's concern. If it wasn't
11 the pilot command's concern of safety and it was the
12 co-pilot's, there is either, you know, saying no to
13 the captain, that the captain says we're going
14 anyway, then there's a way of getting out, by
15 responding to the ATC that you're not ready for
16 departure. And they would cancel your take-off
17 clearance.
18         Q. Could you say that we're overloaded?
19         A. Yes. You could say that, sure.
20         Q. Now, were these the type of things that
21 you would have expected to find in the FAA tape if
22 in fact Mr. Major had the concern that he wants us
23 to believe he had in his August write ups?
24         MS. SHEA: Object to the form.
25         MS. NORTON: What's your objection?

1   MS. SHEA: He has not testified that he
2   has a recall of those write ups. They've not been
3   marked in evidence. He's not testifying to the
4   contents of them. You're asking him a series of
5   leading questions, to assume that the contents are
6   as you say they are, and now you're going into
7   hypothetical, speculative questions. That's my
8   objection.
9       MS. NORTON: I'm just asking what he
10  recalls.
11      MS. SHEA: It didn't seem like that.
12  That's a fact.
13  BY MS. NORTON:
14  Q. When you went to the FAA tower, would you
15  have anticipated hearing the pauses and some of the
16  other conversations that you outlined?
17  A. Yes, ma'am.
18  Q. Did you find that the FAA tape was
19  inconsistent with the reports that Mr. Major had
20  made in August?
21  A. Yes, ma'am. Yes.
22  Q. Was this discussed amongst you, the three
23  of you?
24  A. Yes, ma'am, it was.
25  Q. And do you remember conversations between

1   you, Huff, just as to these inconsistencies?
2   A. Yes, there was.
3   Q. Did you reach the conclusion that there --
4   based upon your review of the FAA tapes and based
5   upon -- do you remember seeing the weight and
6   balance sheet?
7   A. No, ma'am.
8   Q. Okay. Based upon your review of the FAA
9   tapes, was there anything in there to suggest -- or
10  to suggest Mr. Major's version as set forth in his
11  August NASA report?
12  A. Other than transmits, transmissions on the
13  tower tape, you're just saying the report in
14  general?
15  Q. No. The FAA transmission.
16      MS. SHEA: Object. Compound question. It
17  doesn't make sense, either.
18      MS. NORTON: I agree with that. Let me
19  withdraw that one.
20      MS. SHEA: Object to form.
21  BY MS. NORTON:
22  Q. Do you remember any discussion on the
23  lights?
24  A. The one that was in the NASA report?
25  Q. Yes.

1   A. Yes. There was a statement made by Mr.
2   Major on the facts of the take off roll, that it
3   rotated well within the alternating red and white
4   lights of the runway. Red and white lights on a
5   runway consist of center line lighting. And there's
6   no center line lighting installed at Fort
7   Lauderdale-Hollywood International Airport, so that
8   would mean that that is a false statement.
9   Q. Okay. Is it -- did you reach the
10  conclusion as to -- you yourself, did you reach the
11  conclusion or do you remember a conclusion being
12  discussed as to the underlying accuracy of Mr.
13  Major's August report? Do you understand my
14  question?
15  A. No.
16  Q. Okay. As you sit there now, do you have
17  any reason to doubt the accuracy of Mr. Major's
18  report?
19  A. Yes.
20  Q. And what is that based on?
21  A. Based on just the tower transmissions and
22  the lighting statement. Just -- it shows that
23  there's inaccuracies, which would give me the idea
24  that it's not accurate.
25      MS. NORTON: Okay. Thank you.

1   REDIRECT EXAMINATION
2   BY MS. SHEA:
3   Q. In those two particulars; is that correct?
4   A. Excuse me?
5   Q. In those two particulars, the sequence
6   with the tower and the lights?
7   A. The sequence with the tower. And as far
8   as the NASA report of how it was worded, as far as I
9   don't remember exactly. I don't remember exactly
10  how it was worded, but there was inconsistencies
11  between what was written and what was said.
12  Q. And the tower conversation?
13  A. Right, the tower conversations between the
14  tower and the flight deck. And the statement of
15  alternating red and white lights there, that's
16  something that's not installed at the airport.
17  Q. Nothing that you're prepared to testify to
18  today out of the NASA report?
19  A. Nothing as far as the ones that stick in
20  my memory.
21  Q. And you didn't, obviously, interview Pat
22  Major before the termination.
23  A. That's correct.
24  Q. Or Al Jorsey or Brett Wise.
25  A. No, ma'am.

Page 49

1    Q. All right. So did you conduct any
2    investigation to determine whether Pat Major had
3    raised any concerns at the ramp?
4    A. No, ma'am.
5    Q. So you don't know one way or the other
6    whether he did?
7    A. That's correct. Except for the NASA
8    report that indicated that he had discussed it with
9    Al Jorsey, Sr. and Captain Steele. That was it.
10   Q. And isn't it a fact that the captain is
11   the one who initially proposes specifications to go
12   into the rebalance report?
13   A. The information that is inputted into
14   that, no, that's provided by the load personnel,
15   which is then entered into our weight and balance
16   computer. He does sign it, but he is not the one
17   that calculates the information.
18   Q. Had Pat Major refused the take-off
19   clearance on that flight and insisted on another one
20   or otherwise intervened --
21   A. Yes, ma'am.
22   Q. -- what, if any, discipline could he have
23   anticipated from Amerijet?
24   A. I would expect none.
25   Q. Based on what?

Page 51

1    captain to review. And if they're out of limits, he
2    would say so, or not sign -- or sign the load plan.
3    Q. If the captain doesn't approve of the
4    underlying assumptions leading to production of the
5    weight and balance report, is it his prerogative to
6    refuse to sign it?
7    A. That's correct.
8    Q. What happens then?
9    A. If he refuses to sign it, it should be --
10   there should be a reason for it. If -- it should
11   never be presented to a captain, that should refuse
12   to sign it. It should be presented under limits
13   and within CG. If there's no discrepancies with
14   that load plan, there should be no reason for him
15   not to sign it.
16   Q. Okay. But if the captain does refuse to
17   sign it, isn't it true that the first officer has to
18   repeat production of a report until he comes up with
19   one to prove it?
20   A. I don't know why that person would put a
21   report or hand a report without it being within
22   limits.
23       MS. SHEA: Okay. That's all I have.
24   Thank you.
25       MS. NORTON: Nothing else. I will get to

Page 50

1    A. Based on the conditions at the time, if
2    there was -- if there was I mean proper reasoning
3    for it. If it was determined that it wasn't, I
4    would expect none. If he had the right reason to.
5    Or any other co-pilot.
6    Q. But if you disagreed with the reason, then
7    there could have been serious implications?
8    A. That's correct. That's correct.
9    Q. He could have been considered
10   insubordinate?
11   A. That's true, yes.
12   Q. The conditions that are assumed in
13   producing weight and balance materials, are those
14   specified by the captain?
15   A. I'm sorry, can you repeat that question,
16   please?
17   Q. The conditions that are assumed in
18   producing performance materials, are those specified
19   by the captain?
20   A. Are you saying that the weights or -- I
21   don't understand the question.
22   Q. What -- all right. What the acceptable
23   weight and speed will be, are those conditions
24   provided by the captain?
25   A. Those are provided by the co-pilot to the

Page 52

1    you by Wednesday noon on the attorney issue that
2    really revolves around a lot of this.
3        MS. SHEA: It seems to me that you have to
4    produce Dave Bassett on the FAA investigation. So
5    let me know whether you're willing to do that.
6    Because if not, I'm going to have to file some sort
7    of motion on this, because I've gone as far as I can
8    do. I'm not going to get cooperation on that.
9        MS. NORTON: I understand. On the FAA I
10   do agree. Okay?
11       MS. SHEA: All right. Thanks. Why don't
12   I retain the exhibits, unless you think you need
13   them.
14       THE COURT REPORTER: Attorney Shea, would
15   you like these transcribed?
16       MS. SHEA: Yes.
17       THE COURT REPORTER: Attorney Norton,
18   would you like copies of the transcripts?
19       MS. NORTON: Yes.
20       THE COURT REPORTER: And would you like
21   condensed and ASCII?
22       MS. NORTON: Yes.
23       (Deposition concluded at 4:04 p.m.)
24
25

Page 53

```
 1              CERTIFICATE OF OATH
 2
 3    STATE OF FLORIDA        )
 4    COUNTY OF BROWARD       )
 5
 6
 7           I, the undersigned authority, certify that
 8    JOHN W. WASHINGTON personally appeared before me and
 9    was duly sworn.
10
11           WITNESS my hand and official seal the 11th
12    day of January, 2001.
13
14
15
16                  [signature: Beverly J. Gramm]
17          BEVERLY J. GRAMM, RPR
            Notary Public - State of Florida
18          My Commission Expires:  12/19/03
19
20                  [seal: BEVERLY J. GRAMM
21                   NOTARY PUBLIC
                     My Comm Exp. 12/19/03
22                   No. CC 895700
23                   [ ] Personally Known [ ] Other I.D.]
24
25
```

Page 54

```
 1              REPORTER'S DEPOSITION CERTIFICATE
 2
 3    STATE OF FLORIDA        )
 4    COUNTY OF BROWARD       )
 5
 6           I, BEVERLY J. GRAMM, Registered
 7    Professional Reporter, certify that I was authorized
 8    to and did stenographically report the deposition of
 9    JOHN W. WASHINGTON, that a review of the transcript
10    was not requested; and that the transcript is a true
11    and complete record of my stenographic notes.
12           I further certify that I am not a
13    relative, employee, attorney or counsel of any of
14    the parties, nor am I a relative or employee of any
15    of the parties' attorneys or counsel connected with
16    the action, nor am I financially interested in the
17    action.
18
19           DATED this 11th day of January, 2001.
20                  [signature: Beverly J. Gramm]
21
22          BEVERLY J. GRAMM, RPR
            Notary Public - State of Florida
23          My Commission Expires:  12/19/03
24
25
```

Page 55

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

'88 [1]    7:8
'92 [2]    7:5    7:9
'96 [1]    6:16
'99 [2]    22:21    23:3
00-6070 [1]    23:6
00-6070-Ferguson/Snow
  [1]    1:0
04 [2]    1:0    52:23
05 [2]    1:0    3:15
1 [4]    34:23    34:25
  35:9    35:12
1000 [1] 3:14
11th [2] 53:11    54:19
12/19/03 [2]    53:18
  54:23
16th [1]  23:11
17 [1]    33:3
17,000 [3]    20:4
  20:7    20:19
17th [1] 25:25
1970 [1] 5:24
1985 [3] 6:1    6:3
  6:4
1988 [1] 6:1
1990 [1] 6:8
1992 [2] 6:9    6:11
1993 [1] 6:15
1995 [1] 8:4
1999 [5] 4:10    10:5
  25:25    30:19    33:3
20 [3]    6:12    15:15
  43:11
2000 [3] 22:22    23:4
  23:11
2001 [4] 1:0    3:15
  53:12    54:19
20th [1]  6:1
24 [1]    23:9
25 [1]    21:5
27 [1]    20:19
3 [3]    1:0    2:0
  3:15
3307 [1]    4:3
35 [1]    2:0
4 [2]    1:0    52:23
415 [1]    4:2
48 [1]    2:0
5,600 [1]    6:21
5,700 [1]    6:20
500 [1]    3:13
522-3376 [2]    1:0
  2:0
60 [1]    28:13
727 [2]    6:16    6:17
7th [1]    5.24
8 [1]    1:0
8/27 [2]    10:11    25:14
8th [1]    3:15
954 [2]    1:0    2:0
95th [1]    4:2
99-021746-11 [1]
  1:0

able [1]    12
above [1]    3:22
above-entitled [1]
  3:5
absence [1]    15:17
accede [1]    38:22
accept [1]    14:5
  14:13    41:18    42:14
acceptable [1]    50:22
accompanied [1]
  10:18
accompany [1]    11:7
according [2]    21:2
  41:19
accuracy [2]    47:12
  47:17
accurate [1]    47:24
acquire [1]    7:17
action [2]    54:16
  54:17
actual [2]    14:20
  44:8
additional [1]    5:22
addressed [2]    26:25
  27:1
adhere [1]    16:9
administrating [1]
  4:24
advanced [1]    19:15
affect [1]    38:1
afterwards [1]    22:16
Again [1]    28:21
against [1]    28:9
age [3]    3:3    3:21
  28:12
agree [2] 46:18    52:10
ahead [2]    39:10
  44.6
aid [2]    35:4    35:4
aircraft [1]    36:3
airman [9]    7:20
  27:23    27:24    28:8
  28:15    29:16    29:21
  29:25    30:3
airplane [6]    9:19
  13:5    37:14    38:18
  40:10    40:15
airplanes [1]    6:5
airport [1]    16:19
  37:18    37:25    39:12
  40:13    47:7    48:16
airway [1]    35:2
AJ [5]    27:21    28:9
  29:24    48:24    49:9
ALLEN [1]    1:0
allowed [2]    7:17
  24:16
along [3] 13:24    14:3
  41:14
alternating [2]    47:3
  48:15
amended [1]    39.22
Amerijet [24]    1:0
  3:6    4:5    5:6

5:25    6:9    6:10
8:12    9:15    21:17
22:14    23:16    24:17
25:23    26:1    26:11
27:23    31:20    32:18
33:1    33:12    35:6
35:10    49:23
Amerijet's [4]    15:19
  25:2    34:2    34:21
amongst [1]    45:22
analysis [4]    16:11
  16:17    24:4    36:12
answer [1]    30:5
answering [1]    8:22
anticipated [2]    45:15
  49:23
anyway [2]    37:9
  44:14
APPEARANCES [1]
  1:0
appeared [1]    53:8
Appearing [2]    1:0
  1:0
apply [1]    21:4
approve [1]    51:3
April [3] 8:4
area [2]    5:19    36:14
areas [2] 5:18    25:15
argued [1]    18:23
Argumentative [1]
  41:3
ASCII [1]    52:21
assessment [1]    16:18
associated [3]    25:24
  26:8    33:3
assume [2]    43:18
  45:5
assumed [2]    50:12
  50:17
assumes [1]    44:3
assuming [2]    19:25
  32:8
assumptions [1] 51:4
ATC [2]    20:3    44:15
ATIS [1] 37:23
attempt [1]    18:12
attorney [4]    52:1
  52:14    52:17    54:13
attorneys [1]    54:13
attribute [1]    7:11
August [9]    1:0
  25:25    30:19    33:3
  36:6    44:23    45:20
  46:11    47:13
authority [3]    12:3
  17:5    53:7
authorized [1]    54:7
available [1]    14:3
avenues [1]    43:22
aviation [1]    17:5
aware [13]    17:13
  17:16    22:10    22:13
  22:16    22:18    24:7
  26:15    26:16    26:18

27:.    28:2    28:16
B [1]    2:0
balance [8]    35:18
  36:2    36:3    36:9
  46:6    49:15    50:13
  51:5
balances [1]    35:22
base [1] 7:16
based [1]    7:13
  8:3    12:22    40:21
  46:4    46:4    46:8
  47:20    47:21    49:25
  50:1
Bassett [4]    26:25
  27:7    34:3    52:4
became [1]    6:8
become [2]    6:7
  22:18
beginning [1]    33:6
behalf [2]    1:0
  1:0
believes [1]    36:20
beneficial [1]    7:23
between [2]    11:8
  15:7    20:24    21:10
  45:25    48:11    48:13
BEVERLY [4]    3:9
  53:17    54:6    54:22
bidding [1]    7:9
binding [1]    35:20
birth [1] 5:23
bit [1]    25:18
block [2]    37:20
  39:13
blocks [2]    13:4
  13:5
BLUE [1]    1:0
Blvd [1] 1:0
Boulevard [1]    3:14
bound [1]    16:9
Boyd [1] 10:18
break [2] 15:10    15:11
breath [1]    14:22
Brett [2] 30:12    48:24
Brian [4]    19:10
  27:16    27:17    30:9
broadcast [2]    20:4
  37:24
broken [1]    28:1
Broward [4]    1:0
  3:13    53:4    54.4
calculates [1]    49:17
calculations [1] 36:15
cancel [1]    44:16
cannot [1]    29:25
capabilities [1]    8:18
captain [27]    5:7
  6:17    6:24    6:25
  7:12    7:20    8:5
  16:9    16:21    19:15
  21:18    36:18    36:24
  37:18    39:20    42:12
  44:13    44:13    49:9
  49:10    50:14    50:19

50:24    51:1    51:3
51:11    51:16
captains [2]    4:24
  25:19
career [1]    7:12
case [9]    1:0    1:0
  18:12    18:17    22:20
  23:6    23:22    27:18
  28:9
caught [1]    18:4
center [1]    35:24
  47:5    47:6
CERTIFICATE [2]
  53:1    54:1
certify [3]    53:7
  54:7    54:12
CG [1]    51:13
change [2]    6:21
  39:25
changed [5]    7:16
  16:4    37:5    37:7
  43:21
check [13]    4:24
  7:20    13:2    27:23
  27:24    28:8    28:15
  29:12    29:15    29:21
  29:25    30:3    30:6
check-out [1]    7:7
circumstances [9]
  10:1    16:19    19:4
  21:7    21:19    22:11
  34:9    37:7    41:1
cited [1] 31:4
civil [2] 22:14    23:15
class [7] 8:21    8:23
  9:4    34:23    34:25
  35:9    35:12
clear [1] 32:24
clearance [6]    15:2
  38:9    38:10    43:15
  44:17    49:19
cleared [2]    28:11
  28:14
closing [2]    28:18
  30:9
co-pilot [20]    6:16
  9:17    20:2    36:2
  36:5    37:6    38:8
  39:7    40:3    40:4
  40:25    41:1    42:10
  42:12    42:24    43:3
  43:20    43:23    50:5
  50:25
co-pilot's [1]    44:12
cockpit [7]    15:7
  15:14    38:4    38:17
  41:21    42:4    43:10
coming [1]    5:17
command [1]    15:23
command's [1]  44:11
commencing [1] 3:5
comments [2]    13:17
  19:3
commercially [2]
  6:9    6:10
Commission [2] 53:18

**committed** [1]        31:16

**company** [4]        5:12
10:12    16:17    33:17

**compared** [1]        40:18

**complete** [1]        54:11

**complex** [1]        32:3

**complies** [1]        36:20

**Compound** [4]        46:16

**computer** [4]        10:25
36:4    36:16    49:16

**concede** [2]        31:6
34:20

**concern** [8]        20:1
41:15    42:8    43:17
43:20    44:10    44:11
44:22

**concerned** [1]        19:22

**concerning** [2]        22:2
22:15

**concerns** [3]        44:8
44:9    49:3

**conclude** [1]        34:8

**concluded** [1]        52:23

**conclusion** [4]        46:3
47:10    47:11    47:11

**conclusions** [2]        15:5
16:20

**condensed** [1]        52:21

**condition** [5]        2:12
14:23    15:8    37:19
37:22

**conditions** [23]        14:18
14:19    15:20    24:5
24:16    31:7    31:23
32:10    32:14    37:5
37:18    37:21    37:25
39:11    39:25    40:4
42:13    43:21    44:8
50:1    50:12    50:17
50:23

**conduct** [3]        40:19
40:23    49:1

**conducted** [2]        35:1
35:7

**connected** [1]        54:15

**connection** [2]        23:25
30:18

**consider** [2]        15:19
41:1

**considered** [5]        7:4
16:13    16:16    21:3
50:9

**considering** [1]        40:22

**consist** [1]        47:5

**consistent** [2]        11:12
40:25

**consisting** [1]        16:8

**consulted** [1]        18:8

**contaminated** [5]
16:16    20:16    21:10
21:15    40:13

**contamination** [17]
13:2    15:2    15:18
15:18    16:7    19:14
20:22    21:3    21:18

**contents** [2]        45:4
45:5

**control** [1]        13:22

**conversation** [14]
15:7    15:9    15:12
38:12    38:17    40:24
41:18    41:19    41:20
42:3    42:19    43:9
43:17    48:12

**conversations** [6]
38:5    38:14    40:19
45:16    45:25    48:13

**cooperation** [1]        52:8

**coordinate** [1]        10:9

**copies** [2]        5:4
52:18

**copy** [2]        27:3    28:17

**Coral** [1]        4:3

**core** [1]        20:11

**correct** [39]        4:12
8:6    8:10    9:8
11:13    11:15    11:25
12:1    12:6    18:3
23:12    23:17    25:8
27:2    27:5    27:6
27:15    30:2    30:11
31:14    31:21    32:9
32:23    33:18    33:20
33:25    34:19    34:22
36:20    36:22    36:25
37:3    42:21    48:3
48:23    49:7    50:8
50:8    51:7

**correspondence** [1]
30:13

**counsel** [2]        32:25
54:13    54:15

**COUNTY** [2]        53:4
54:4

**couple** [2]        13:19
35:14

**course** [2]        25:18
29:6

**Court** [6]        1:0
3:8    26:21    52:14
52:17    52:20

**covered** [3]        16:14
21:6    25:15

**crew** [12]        7:5    7:8
7:25    9:11    9:14
10:2    15:8    18:13
35:21    38:8    42:8
44:10

**CROSS-EXAMINATION**
[2]    2:0    35:15

**current** [1]        4:17

**custodial** [1]        6:5

**D** [1]        2:0

**data** [2]        36:2    36:12

**date** [6]        5:23    7:7
7:7    10:10    32:5
33:14

**dated** [2]    23:11    54:19

**Dave** [4]    26:25    27:7

**Dave's** [1]        34:5

**decision** [6]        9:22
17:3    18:9    18:11
30:22    37:8

**deck** [1]    48:14

**decrement** [2]        21:4
21:6

**decrements** [3]        20:11
20:23    39:19

**Defendant** [3]        1:0
1:0    3:7

**delay** [8]    14:25    15:1
15:15    19:17    41:23
42:17    43:9    43:16

**deliver** [1]        17:23

**delivery** [1]        38:9

**departed** [2]        24:14
24:15

**department** [4]        22:5
28:3    28:4    28:16

**departure** [7]        14:5
14:13    41:17    41:18
42:14    42:15    44:16

**depending** [4]        5:19
22:9    43:11    43:12

**deposition** [5]        1:0
3:2    52:23    54:1
54:8

**Derry** [10]        10:8
10:20    11:6    18:2
18:3    25:6    28:7
29:24    33:22    33:24

**described** [2]        30:17
34:9

**destination** [1]    38:11

**determination** [2]
21:8    27:12

**determine** [5]        15:24
32:5    34:16    36:9
49:2

**determined** [7]        24:7
36:12    37:19    39:12
39:14    39:18    50:3

**determines** [1]        36:11

**determining** [2]    35:18
35:22

**Dickinson** [1]        4:11

**different** [2]        13:25
19:20

**digital** [1]        10:25

**DIRECT** [1]
3:23

**director** [14]        4:7
4:8    4:20    4:22
8:14    9:7    11:23
22:6    25:4    25:4
25:9    31:19    33:19
33:23

**disagreed** [1]        50:6

**discharged** [1]        23:2

**discipline** [1]        49:22

**discovery** [2]        3:4
28:22

**discrepancies** [6]
12:5    12:23    41:10

**discrepancy** [4]    11:8
13:10    15:4    41:7

**discretion** [2]    15:23
16:22

**discussed** [5]        5:12
34:5    45:22    47:12
49:8

**discussion** [3]        11:16
37:17    46:22

**displays** [1]        36:16

**dispute** [5]        32:9
33:12    33:15    34:17
40:11

**disregard** [2]        21:18
21:19

**District** [4]        1:0
1:0    3:8    3:8

**document** [3]        19:2
23:13    26:25

**documentation** [1]
22:3

**documents** [2]        22:5
24:1

**doesn't** [5]        5:12
33:6    34:1    46:17
51:3

**done** [11]    13:4    17:20
19:6    32:6    32:16
37:16    37:17    38:13
38:25    39:13    39:24

**doubt** [1]        47:17

**down** [4]    10:12    12:16
14:15    36:16

**DOWNTOWN** [2]
1:0    2:0

**draw** [1]    15:5

**dry** [1]    15:20

**due** [1]    42:13

**duly** [2]    3:21    53:9

**during** [4]        13:21
17:4    17:21    41:21

**dynamic** [1]        21:1

**E** [2]    2:0    2:0

**early** [1]    7:12

**East** [2]    1:0    3:13

**eighth** [1]        16:15
20:25    21:2    21:10

**either** [4]        5:10
44:8    44:12    46:17

**elected** [1]        18:6

**employee** [2]    54:13
54:14

**employment** [1]    9:23

**ended** [1]        43:2

**engineer** [3]        6:11
9:17    9:18

**entered** [1]    49:15

**enters** [2]        36:3
36:15

**episode** [1]        22:8

**ESQUIRE** [2]    1:0
1:0

**estimated** [1]        6:20

**evidence** [3]        3:4
44:3    45:3

**exactly** [2]        48:9
48:9

**EXAMINATION** [4]
2:0    2:0    3:23
48:1

**exceeded** [1]    24:15

**Except** [1]        49:7

**Excuse** [1]        48:4

**exercised** [1]    16:21

**exhaust** [1]    26:20

**Exhibit** [1]    23:9

**exhibits** [2]        2:0
52:12

**expect** [11]        19:16
19:20    19:21    25:7
33:21    42:9    42:23
43:8    43:16    49:24
50:4

**expected** [4]        39:6
42:1    42:6    44:21

**experience** [2]        7:15
7:18

**expert** [1]        44:4

**Expires** [2]        53:18
54:23

**explain** [1]        32:21

**extent** [1]        31:25

**FAA** [38]        11:17
11:25    12:1    20:14
22:2    22:7    22:13
24:4    24:7    25:24
26:7    27:17    30:8
31:15    31:23    32:8
32:10    32:19    33:12
34:10    34:12    34:14
34:18    36:21    38:15
40:18    40:25    44:21
45:14    45:18    46:4
46:8    46:15    52:4
52:9

**faced** [1]    42:24

**fact** [10]    13:1    14:9
30:3    36:23    37:4
39:7    42:24    44:22
45:12    49:10

**facts** [4]    32:8    34:17
44:3    47:2

**Falcon** [1]        6:12

**false** [1]    47:8

**far** [14]    20:13    20:17
20:20    21:12    31:17
32:1    32:5    32:13
39:23    42:9    48:7
48:8    48:19    52:7

**FAR's** [1]        24:9

**faxed** [1]        11:6

**February** [1]    23:11

**federal** [2]        28:1
35:2

**feels** [1]    19:18

**felt** [1]    13:11

**file** [4]    5:2    5:15
5:16    52:6

**filed** [3] 3:9   3:20
23:22
**fills** [1]  5:7
**final** [1] 27:11
**finalized** [1]        27:25
**financially** [1] 54:16
**finding** [2]        21:15
40:19
**findings** [1]        21:7
**Fine** [1] 29:11
**first** [10] 4:24   6:12
13:14   14:12   19:17
23:18   37:6   37:12
39:6   51:17
**five** [1]  42:16
**flew** [5]  7:20   8:1
8:2   9:16   9:16
**flight** [46]        6:11
7:5   7:8   9:11
9:14   9:16   9:17
9:20   10:2   10:11
14:23   16:20   16:25
19:4   19:11   19:19
19:23   20:9   21:9
21:24   22:2   22:8
24:5   24:8   24:14
24:15   24:15   25:14
30:19   31:3   31:6
31:22   31:22   33:13
34:8   35:21   36:6
37:4   38:1   38:8
39:15   40:15   42:9
43:6   48:14   49:19
**flights** [1]        35:6
**Florida** [10]        1:0
1:0   3:8   3:11
3:14   4:3   5:3
53:18   54:3   54:22
**flown** [1]        9:10
**fly** [1]   4:13   4:18
7:23
**flying** [5]        4:15
6:18   7:17   7:18
9:14
**follow** [1]        26:19
**follows** [1]        3:22
**form** [7] 22:24   24:10
31:8   32:11   39:2
44:24   46:20
**formal** [1]        12:14
**Fort** [11] 1:0   3:14
8:7   10:2   10:9
10:11   10:19   16:19
20:11   24:15   47:6
**forth** [4] 16:10   18:12
32:8   46:10
**found** [8]        7:14
14:7   17:10   20:5
28:12   34:18   40:12
42:22
**frame** [3]        8:25
9:4   17:13
**frequencies** [1]  14:1
**frequency** [2]        14:2
37:24
**Friday** [1]        29:3
**front** [1] 40:18

**full** [1]
**furnish** [1]        8:15
**games** [1]        26:22
**gap** [1]   15:13
**general** [1]        46.14
**generic** [1]        20:20
**given** [2] 11:5   31:18
**giving** [2]        13:14
13:17
**go-fer** [1]        6:4
**gone** [1]  52:7
**good** [1] 7:22
**Gordon** [2]        1:0
3:12
**govern** [1]        35:10
**GRAMM** [4]        3:10
53:17   54:6   54:22
**gravity** [1]        35:24
**Green** [1]        9:3
**Greg** [2] 7:21   8:2
**ground** [9]        4:23
9:5   9:9   13:22
20:12   20:18   35:25
37:15   38:4
**guess** [3] 18:5   25:15
25:17
**H** [1]   2:0
**hallway** [1]        17:24
**hand** [2] 51:21   53:11
**Hargrove** [2]        1:0
3:13
**head** [1] 13:13
**heard** [5] 13:14   21:13
21:23   40:24   41:8
**hearing** [3]        14:7
40:24   45:15
**Heinrich** [1]        1:0
3:12
**help** [1] 5:18
**heretofore** [2]        3:9
3:20
**hesitancy** [1]        42:20
**highlighted** [1]  12:25
**himself** [1]        41:2
**hire** [1]  7:7
**hold** [2] 9:8   14:15
35:5
**hourly** [1]        37:23
**hours** [4] 6:18   6:20
6:24   6:25
**Huff** [11]        10:8
18:3   25:6   28:8
29:15   29:20   29:20
29:24   33:22   33:24
46:1
**hydroplaning** [1]
21:1
**hypothetical** [2] 44:3
45:7
**ice** [1]   20:18
**idea** [4] 27:8   32:20
33:16   47:23

**identification** [1]
2:0
**implemented** [1]
21:6
**implications** [1] 50:7
**important** [1]        25:9
**impressions** [1] 19:3
**inaccuracies** [1] 47:23
**Inc** [3]   1:0   3:7
33:1
**inch** [7] 16:9   16:15
20:23   20:25   20:25
21:10   21:11
**incident** [6]        20:15
22:15   25:25   26:9
30:25   33:4
**included** [1]        21:16
**inconsistencies** [2]
46:1   48:10
**inconsistent** [3] 13:20
40:20   45:19
**incorrect** [1]        22:22
**indicated** [2]        41:22
49:8
**indicates** [1]        38:21
**individually** [2] 26:2
26:12
**information** [6] 13:6
20:8   21:12   35:24
49:13   49:17
**informed** [2]        17:1
22:7
**initial** [2]        37:8
38:7
**inputted** [1]        49:13
**insisted** [1]        49:19
**installed** [2]        47:6
48:16
**instruct** [1]        25:19
**instruction** [2]  7:22
8.18
**instructor** [2]        4:23
9:9
**insubordinate** [1]
50:10
**intent** [1]        32:19
**interested** [1]        54:16
**International** [5]
1:0   3:6   4:5
33:1   47:7
**intervened** [1]  49:20
**intervention** [2] 19:21
19:25
**interview** [1]        48:21
**investigating** [1]
10:1
**investigation** [16]
17:8   19:8   20:14
22:8   25:24   26:8
27:17   27:25   28:19
30:1   30:9   30:18
31:12   33:2   49:2
52:4
**involved** [4]        24:24
26:4   27:18   30:21

**issue** [...] 31:2   37:9
38:21   52:1
**issued** [4]        14:9
14:11   22:13   38:2
**itch** [1]   4:18
**J** [4]   3:10   53:17
54:6   54:22
**James** [2]        1:0
3:13
**January** [4]        1:0
3:15   53:12   54:19
**John** [11] 1:0   3:2
3:19   4:2   22:1
28:7   28:17   29:9
29:23   53:8   54:9
**Jorsey** [2]        27:21
28:9   29:10   29:25
48:24   49:9
**jot** [2]   10:12   12:15
**July** [1]  4:10
**June** [1] 6:1
**keep** [3] 4:17   5:11
12:11
**kind** [2] 5:19   7:22
**knots** [1] 20:19
**knowing** [1]        18:15
**knowledge** [4]  25:23
26:7   33:2   33:7
**knowledgeable** [1]
31:12
**Kroll** [2] 7:21   8:2
**L.T** [1]   1:0
**Lack** [2] 39:3   41:4
**Large** [1]        3:12
**last** [2]  13:20
**Lauderdale** [10] 1:0
3:14   8:7   10:2
10:9   10:11   10:19
16:19   20:11   24:15
**Lauderdale-Hollywood**
[1]   47:7
**law** [1]   3:12
**lawful** [2]        3:3
3:21
**lawsuit** [5]        22:19
22:21   23:25   23:25
27:4
**leading** [2]        45:5
51:4
**least** [2] 15:15   42:16
**leave** [2] 13:7   20.5
**led** [1]   15:11
**legit** [1] 42:8
**less** [5]  16:8   16:14
20:11   20:22   21:2
21:2
**letter** [12]        28:7
28:18   29:14   29:23
30:9   31:4   31:18
32:6   32:19   34.9
34:12   34:14
**lighting** [1]        47:5
47:6   47:22
**lights** [5]        46:23
47:4   47:4   48:6
48:15

**Likewise** [1]        21:14
**limitations** [1]  15:21
**limits** [3]        51:1
51:12   51:22
**line** [3]  7:6   47:5
47:6
**listen** [3]        10:23
11:10   12:4
**listened** [2]        11:21
13:18
**listening** [3]        11:3
12:21   43:19
**live** [1]  4:1
**load** [9] 35:25   36:13
36:17   36:20   39:15
39:20   49:14   51:2
51:14
**logbooks** [1]        7:1
**look** [3] 7:1   16:3
32:1
**looked** [2]        32:4
40:17
**loss** [1]  35:3
**ma'am** [45]        4:14
5:5   9:12   9:24
10:4   10:6   10:22
12:8   12:10   12:18
17:22   18:10   19:5
19:7   23:23   24:19
25:21   26:10   26:13
27:10   27:13   27:20
28:20   30:14   30:16
30:20   30:23   31:1
31:5   34:6   35:8
35:12   37:3   37:3
37:11   40:8   42:5
43:24   45:17   45:21
45:24   46:7   48:25
49:4   49:21
**magnified** [1]        25:17
**Major** [25]        1:0
3:6   8:10   8:15
9:15   11:25   16:24
17:3   17:4   21:9
22:20   23:2   23:22
30:15   30:22   36:7
37:7   42:25   43:3
44:22   45:19   47:2
48:22   49:2   49:18
**Major's** [5]        36:8
38:20   46:10   47:13
47:17
**management** [1] 18:1
**manager** [2]        17:25
18:6
**manner** [1]        33:13
**manuals** [1]        16:2
**marked** [3]        2:0
23:9   45:3
**master** [1]        35:25
**material** [1]        31:13
**materials** [1]        20:15
50:13   50:18
**may** [5] 8:22   10:13
16:2   17:13   25:12
**mean** [2] 15:6   18:22
32:4   47:8   50:2

meeting [2] 1:4
21:21
member [1] 42:8
member's [1] 44:10
members [1] 15:8
memo [1] 12:17
memory [1] 6:22
48:20
mentioned [1] 29:23
merit [1] 18:8
met [2] 21:21 30:24
Miami [4] 7:13
7:19 8:8 8:9
middle [1] 8:20
minute [1] 4:2
modified [3] 25:13
39:22 39:23
modify [1] 25:12
Monday [1] 1:0
month [2] 7:21
8:1
months [1] 23:20
morning [2] 18:4
18:5
most [3] 25:23 31:11
33:2
mostly [1] 5:20
motion [1] 5:7
movement [1] 37:20
MS [75] 2:0 2:0
2:0 3:24 22:24
23:2 23:4 23:5
23:7 24:10 24:12
26:3 26:6 26:14
26:20 26:23 28:21
28:23 28:25 29:1
29:4 29:5 29:6
29:8 29:9 29:14
29:11 29:13 29:14
29:18 29:22 30:4
30:5 30:7 31:8
31:10 32:11 32:17
32:24 33:5 33:9
33:10 33:11 35:13
35:14 35:16 39:2
39:5 39:9 39:10
39:16 41:3 41:5
44:2 44:5 44:24
44:25 45:1 45:9
45:11 45:13 46:16
46:18 46:20 46:21
47:25 48:2 51:23
51:25 52:3 52:9
52:11 52:16 52:19
52:22
N [1] 2:0
N.W [1] 4:2
name [3] 4:1 10:17
34:1
named [1] 3:20
NASA [16] 11:5
11:14 11:20 12:22
13:20 14:25 14:9
41:11 41:15 41:20
42:25 46:11 46:24
48:8 48:18 49:7
nav [2] 35:3 35:4

navigat.. r [4] 34:23
34:25 34:25 35:9
Navtech [2] 16:17
21.2
necessarily [1] 22:9
need [2] 37:9 52:12
needed [4] 7:15
17:15 17:25 25:15
needs [1] 5:18
never [3] 27:19 34:5
51:11
New [2] 7:16 8:3
news [1] 17:23
next [1] 21:23
none [3] 43:14 49:24
50:4
noon [1] 52:1
nor [2] 54:14 54:16
norm [1] 13:16
normal [1] 25:18
normally [2] 13:4
13:5
Norton [39] 1:0
1:0 2:0 22:24
23:2 23:5 24:10
26:3 26:14 28:23
29:1 29:5 29:18
29:10 29:13 29:18
30:5 31:8 32:11
33:5 33:10 35:14
35:16 39:5 39:10
39:16 41:5 44:5
44:25 45:9 45:13
46:18 46:21 47:25
51:25 52:9 52:17
52:19 52:22
Notary [3] 3:11
53:18 54:22
noted [1] 15:4
notes [5] 10:12 12:7
12:9 12:15 54:11
nothing [6] 9:21
9:21 26:18 48:17
48:19 51:25
notice [9] 3:9
3:20 22:13 22:22
23:15 24:3 24:18
24:19 25:10
now [16] 6:19 6:20
25:19 32:2 33:6
33:8 33:9 33:10
37:4 38:12 38:20
40:16 41:14 44:20
45:6 47:16
number [4] 14:24
23:4 23:5 43:6
numbers [2] 20:10
36:15
numerous [1] 38:22
o'clock [1] 3:16
oath [2] 3:22 53:1
object [9] 22:24
24:10 31:8 32:11
39:2 44:2 44:24
46:16 46:20
objection [4] 39:9
41:3 44:25 45:8

obtained [1] 19:9
obviously [1] 48:21
occurring [1] 25:11
October [2] 5:24
6:16
odd [1] 14:8
off [24] 8:17 10:1
14:10 14:11 14:24
19:3 19:16 19:17
21:9 24:8 27:24
31:3 31:6 31:23
32:9 33:13 34:8
36:24 40:3 40:10
40:14 43:7 43:16
47:2
officer [5] 6:12
19:17 37:6 39:7
51:17
officers [1] 4:25
offices [1] 3:12
official [1] 53:11
once [1] 40:2
one [25] 5:21 8:2
8:24 9:1 14:6
15:10 16:8 17:12
17:24 27:14 29:18
30:2 30:4 34:3
35:2 35:3 35:4
35:20 46:19 46:24
49:5 49:11 49:16
49:19 51:19
ones [1] 48:19
operations [2] 25:4
33:23
opinion [4] 11:23
12:19 12:20 13:14
opinions [1] 13:12
opportune [1] 40:14
opportunities [1]
37:9
opportunity [1] 37:13
option [1] 5:10
options [1] 40:5
Orleans [2] 7:16
8:3
otherwise [1] 49:20
outlined [3] 11:17
42:25 45:16
outside [1] 35:3
overdue [1] 28:21
overloaded [3] 37:2
38:23 44:18
oversee [1] 5:1
overweight [5] 20:5
20:8 24:8 31:3
32:5
P.A [3] 1:0 1:0
3:13
p.m [4] 1:0 1:0
3:16 52:23
pad [1] 12:13
Page [1] 2:0
paper [2] 12:14 12:16
paperwork [2] 27:19
28:4

para...ters [2] 16:10
16:12
parked [2] 13:5
37:14
part [6] 6:1 7:21
19:12 26:5 28:13
35:10
particulars [2] 48:3
48:5
parties [1] 54:14
parties' [1] 54:15
pass [2] 13:24 14:3
Pat [30] 8:10 8:15
9:10 9:15 10:2
11:5 11:17 11:24
13:1 13:23 13:24
14:5 14:14 16:24
17:3 17:4 17:11
18:11 18:15 18:15
19:8 21:9 21:21
22:20 23:22 30:15
30:22 48:21 49:2
49:18
Pat's [1] 9:23
Patrick [3] 1:0
3:5 36:7
pause [7] 15:1
15:3 41:19 41:23
42:1 42:6 42:17
pauses [1] 45:15
penalties [6] 25:25
26:8 26:15 26:16
31:13 33:3
penalty [4] 22:14
23:16 28:10 28:14
pending [5] 3:7
24:20 26:17 26:18
28:10
people [2] 5:7
20:21
percent [1] 21:5
percentage [3] 16:13
21:5 21:14
performance [4] 15:20
16:10 36:14 50:18
permissible [1] 19:24
person [6] 5:8
10:17 19:22 31:11
37:8 51:20
personally [2] 30:6
53:8
personnel [1] 49:14
perspective [1] 19:10
persuasive [1] 18:20
Pete [3] 10:8 10:20
11:6
physical [1] 10:24
piece [1] 12:16
pilot [10] 5:13 5:17
6:7 6:8 15:23
28:6 37:10 38:22
43:19 44:11
pilots [2] 26:1
26:12
place [2] 7:15 13:15
Plaintiff [4] 1:0

1:0 3:3 3:6
Plaintiff's [1] 23:9
plan [8] 36:13 36:17
36:20 36:24 39:15
39:20 51:2 51:14
plane [6] 35:18 35:23
36:10 37:2 38:23
41:2
playing [1] 26:22
plea [1] 18:17
Plus [1] 20:11
POI [1] 22:2
point [6] 6:7 17:12
17:17 38:3 38:14
43:22
policy [3] 15:19
15:25 16:4
posed [1] 22:17
position [8] 6:3
14:15 29:16 31:15
33:17 34:2 35:19
35:21
positive [1] 5:20
possible [1] 24:2
Post [1] 12:13
posted [2] 24:19
37:23
potential [1] 11:17
POTTER [1] 1:0
pounds [3] 20:4
20:7 20:19
practice [1] 5:6
predicate [2] 39:3
41:4
prepared [1] 34:7
34:20 48:17
prerogative [1] 51:5
present [2] 36:19
42:13
presented [4] 36:23
39:20 51:11 51:12
presents [1] 36:17
pretermination [1]
30:18
prevented [1] 39:1
previous [1] 33:7
privileged [1] 22:4
produce [1] 52:4
produced [2] 31:11
32:25
producing [2] 50:13
50:18
production [2] 51:4
51:18
Professional [2] 3:10
54:7
proficiency [2] 5:1
5:7
promoted [3] 6:23
7:12 8:5
promotion [2] 6:15
7:4
promotions [1] 6:14
proper [3] 7:15

13:3    50:2

**properly** [1]          16:21
**proposed** [3]          22:14
  23:15    25:11
**proposes** [1]          49:11
**prove** [1]             51:19
**proven** [1]            24:23
**provided** [5]          21:12
  35:25    49:14    50:24
  50:25
**provides** [1]          36:14
**Public** [3]            3:11
  53:18    54:22
**purpose** [3]           3:4
  7:3     11:3
**purposes** [5]          5:3
  15:20    20:13    20:20
  43:18
**pursuant** [1]          3:9
**push** [2]  40:3        40:6
**put** [4]  18:12        38:2
  39:20    51:20
**putting** [1]           44:4
**qualifications** [1]
  7:10
**quarter** [4]           16:9
  20:23    20:25    21:11
**questions** [6]         8:22
  8:22     10:14    35:14
  45:5     45:7
**quite** [1] 8:13
**radio** [3] 20:3        20.4
  38:8
**radios** [1]            42:10
**raise** [1] 37:9
**raised** [3]            10:13
  38:21    49:3
**ramp** [5] 36:1         37:14
  37:15    39:13    49:3
**rare** [1]  5:21
**rather** [1]            13:7
**Raymond** [1]           9:2
**reach** [3] 46:3        47:9
  47:10
**reaching** [1]          35:4
**reaction** [1]          18:21
**read** [5]  11:20       13:21
  14:22    24:17    43:14
**ready** [6] 14:24       40:2
  41:17    43:6     43:15
  44:15
**realize** [1]           40:17
**really** [4]            7:14
  10:24    18:24    52:2
**reason** [5]            47:17
  50:4     50:6     51:10
  51:14
**reasoning** [1]         50:2
**reasons** [1]           37:5
**rebalance** [1]         41:2
**recalls** [1]           45:10
**receive** [2]           5:15
  6:13
**received** [1]          6:15

**recolle...on** [2] 26:21
  40:16
**recollections** [1]
  19:10
**record** [2]            38:17
  54:11
**recorded** [2]          38:14
  38:16
**recording** [3]         38:2
  38:4     41:8
**records** [1]           28:6
**recurrent** [1]         9:5
**red** [3]    47:3       47:4
  48:15
**REDIRECT** [2] 2:0
  48:1
**redone** [2]            39:24
  39:25
**reduced** [1]           4:16
**refuse** [3]            51:6
  51:11    51:16
**refused** [2]           38:22
  49:18
**refuses** [1]           51:9
**regarding** [1]         28:8
**regards** [1]           25:16
**Registered** [2]        3:10
  54:6
**regs** [4] 24:17        31:24
  32:10    34:10
**regulations** [4]       28:1
  31:4     31:7     33:13
**relates** [1]           24.4
  26:1     26:11
**relating** [1]          20:9
**relationship** [1] 9:15
**relative** [2]          54:13
  54:14
**relayed** [1]           36:1
**remedial** [1]          5:22
**remember** [12]         8:17
  8:19     9:3      13:8
  18:22    18:24    45:25
  46:5     46:22    47:11
  48:9     48:9
**rented** [1]            9:19
**repeat** [2]            50:15
  51:18
**repeated** [1]          43:5
**replaced** [1]          4:11
**report** [52]           5:8
  11:5     11:8     11:14
  11:18    11:20    12:17
  12:22    13:20    13:25
  14:3     14:7     14:9
  14:11    14:16    14:17
  14:22    14:23    14:25
  15:1     15:8     15:17
  16:7     19:14    20:21
  21:18    21:20    22:1
  39:3     40:21    41:9
  41:11    41:16    41:20
  43:1     43:2     43:5
  43:9     46:11    46:13
  46:24    47:13    47:18
  48:8     48:18    49:8

**recolle...** [2] 26:21
  49:12    51:5     51:18
  51:21    51:21    54:8
**reported** [1]          11:24
**Reporter** [5]          3:10
  52:14    52:17    52:20
  54:7
**REPORTER'S** [1]
  54:1
**reporting** [3]         1:0
  2:0      5:9
**reportings** [1]        32:14
**reports** [6]           5:1
  5:21     25:20    38:20
  40:17    45:19
**representative** [2]
  25:23    33:1
**request** [3]           13:11
  38:8     38:23
**requested** [1]         54:10
**research** [3]          32:7
  32:13    34:15
**responded** [3]         14:5
  15:6     32:19
**responding** [1]        44:15
**response** [6]          14:13
  24:24    25:3     27:9
  31:18    43:11
**responsibilities** [1]
  25:2
**responsibility** [3]
  36:8     36:19    37:1
**responsible** [3]       4:22
  35:17    35:22
**result** [2]            23:24
  24:17
**retain** [1]            52:12
**review** [10]           5:8
  5:11     5:16     10:10
  17:8     24:3     46:4
  46:8     51:1     54:9
**reviewed** [2]          31:13
  31:25
**reviewing** [1]         40:16
**revoked** [1]           28:9
**revolves** [1]          52:2
**ride** [1]  41:14
**right** [25] 4:4        4:20
  6:13     6:20     9:10
  11:2     13:12    20:6
  23:4     26:24    30:8
  32:2     32:4     33:6
  33:8     33:9     33:10
  34:21    35:13    38:24
  48:13    49:1     50:4
  50:22    52:11
**rights** [1]            4:24
**role** [3]  9:22        9:25
  10:7
**roll** [2]   19:16     47:2
**Roseborough** [5]
  22:1     28:7     29:9
  29:14    29:24
**Roseborough's** [1]
  28:18
**rotated** [1]           47:3
**RPR** [2] 53:17         54:22

**rule...** [1] 35:9
**runs** [1] 28:15
**runway** [25]           13:1
  14:15    14:18    14:19
  14:22    14:23    15.8
  16:11    16:14    16:17
  20:17    21:3     21:5
  21:8     21:14    25:16
  36:12    37:22    37:25
  38:13    40:12    43:2
  43:23    47:4     47:5
**S** [1]     2:0
**safety** [7]            19:19
  19:23    20:1     38:1
  42:9     43:17    44:11
**saw** [4]   20:10      24:18
  27:19    41:8
**says** [6]  14:24      24:14
  34:13    34:14    43:6
  44:13
**schedule** [3]          4:15
  4:16     16:25
**scheduling** [1]        4:23
**school** [4]            9:5
  9:20     20:12    20:18
**SCOTT** [2]             1:0
  3:5
**seal** [1]  53:11
**second** [1]            15:15
**seconds** [2]           42:16
  43:11
**section** [1]           8:21
**see** [8]    11:7      11:11
  12:4     14:18    23:18
  24:13    24:22    30:2
**seeing** [1]            46:5
**seem** [1] 45:11
**seniority** [4]         7:3
  7:5      7:8      7:9
**sense** [1] 46:17
**sent** [7]  28:7       28:23
  29:1     29:2     29:8
  29:11    29:16
**sentence** [1]          15:11
**September** [1]         23:3
**sequence** [2]          48.5
  48:7
**series** [1]            45:4
**serious** [1]           50:7
**service** [1]           35:1
**session** [1]           20:17
**set** [4]    11:4      16.10
  32:8     46:10
**several** [1]           9:20
**severe** [1]            7:17
**Shea** [41] 1:0         2:0
  2:0      3:24     23:7
  23.7     24:12    26:6
  26:20    26:23    28:21
  28:25    29:4     29:6
  29:9     29:11    29:14
  29:22    30:4     30:7
  31:10    32:17    32:24
  33:9     33:11    35:13
  39:2     39:9     41:3
  44:2     44:24    45:1

**properly - statements**
  45:11    46:16    46:20
  48:2     51:23    52:3
  52:11    52:14    52:16
**sheet** [2] 8:19        46:6
**show** [1] 23:8
**showed** [2]            17:14
  41:15
**shown** [1]             23:24
**shows** [1]             47:22
**sight** [1] 18:6
**sign** [9]  36:24      49:16
  51:2     51:2     51:6
  51:9     51:12    51:15
  51:17
**sign-in** [1]           8:19
**signal** [1]            35:3
**signature** [1]         36:18
**sit** [5]    17:15     17:18
  17:25    18:7     47:16
**situation** [1]         42:24
**six** [1]   23:20
**snow** [1] 20:18
**someone** [2]           17:25
  40:20
**sometimes** [2]         8:17
  8:20
**somewhere** [1]         18:16
**sorry** [3] 17:4       35:20
  50:15
**sort** [3]   19:21     19:24
  52:6
**source** [1]            21:23
**Southern** [2]          1:0
  3:8
**speak** [1]             19:1
**special** [1]           7:10
**specifications** [1]
  49:11
**specified** [2]         50:14
  50:18
**speculative** [1]       45:7
**speed** [1]             50:23
**spend** [1]             25:17
**Springs** [1]           4:3
**Sr** [2]    28:9       29:10
  49:9
**stairs** [1] 40:10
**stand** [1] 42:11
**standard** [1]          35:1
**standby** [1]           15:13
**standing** [5]          15:18
  16:8     16:15    20:22
  21:1
**start** [5]  5:25      6:2
  7:3      7:9      38:4
**started** [6]           6:9
  6:10     19:16    22:20
  22:21    38:6
**State** [5] 3:11        53:3
  53:18    54:3     54:22
**statement** [4]         47:1
  47:8     47:22    48:14
**statements** [1]        12:21
  18:12    18:25

**States** [2]   1:0
3:7

**stating** [1]   41:12

**status** [10]   7:8
9:9     18:1     26:3
26:17   27:17   27:24
28:8    28:15   33:5

**Steele** [7]   10:8
11:6    16:21   27:16
27:17   30:9    49:9

**Steele's** [1]   19:10

**stenographic** [1]
54:11

**stenographically** [1]
54:8

**steps** [2] 38:25   39:6

**stick** [1] 48:19

**still** [4]   4:13     9:8
40:11   49:16

**stop** [1]   20:6

**strike** [1]   8:9

**stuck** [2] 13:8   13:13

**stuff** [1] 29:2

**subject** [1]   8.25

**suggest** [2]   46:9
46:10

**Suite** [1] 3:14

**supervisor** [1]   36:1

**SUSAN** [3]   1:0

**suspend** [1]   30:22

**suspended** [2]   16:24
29:15

**sworn** [2]   3:21
53:9

**system** [1]   35:2

**T** [1]   2:0

**tailor** [1] 5:19

**take-off** [4]   15:2
24:5    44:16   49:18

**tape** [18] 10:10   10:13
10:23   10:24   11:1
11:3    11:9    11:11
11:12   11:21   21:13
41:16   42:7    42:23
43:4    44:21   45:18
46:13

**tapes** [7] 12:4   13:18
38:15   40:25   41:22
46:4    46:9

**taught** [1]   8:23

**taxi** [6]   13:2   13:21
38:7    38:9    40:2
41:21

**taxiing** [1]   13:7

**teach** [1] 35:11

**ten** [2]   15:15   43:10
17:4

**terminate** [2]   9.23
17:4

**terminated** [3]   17:11
19:9    21:22

**termination** [4]   17:15
17:18   18:9    48:22

**Terrace** [1]   4:3

**testified** [2]   3:22
45:1

**testify** [1]   48:17

**testifying** [1]   45:3

**Thank** [2]   47:25
51:24

**Thanks** [1]   52:11

**themselves** [1]   40:22

**THEREUPON** [1]
3:18

**They've** [1]   45:2

**thought** [2]   7:16
13:15

**threatening** [1]   19:18

**three** [2] 10:21   45:22

**throttles** [3]   19:15
40:22   41:2

**through** [6]   8:5
22:5    26:22   28:3
28:15   36:12

**throwing** [2]   40:22
41:2

**Tim** [1]   9:3

**times** [4] 9:2     9:18
9:20    38:22

**today** [6]   16:4
25:22   29:7    31:2
32:25   48:18

**together** [1]   9:11

**too** [2]   4:18   29:17

**took** [5]   12:7   31:3
31:6    33:13   34:8

**total** [2]   6:18   36:9

**tough** [1]   8:16

**tower** [27]   10:9
10:10   10:19   11:21
12:3    13:22   13:25
14:1    14:17   15:17
16:7    21:13   38:3
38:19   41:8    41:16
41:22   43:5    44:7
45:14   46:13   47:21
48:6    48:7    48:12
48:13   48:14

**Tracey** [1]   4:11

**train** [2] 20:21   35.10

**training** [26]   4:7
4:9     4:21    4:22
4:23    5:2     5:17
5:22    5:22    8:14
8:15    9:7     9:13
11:24   20:12   20:13
20:15   20:17   20:20
22:7    25:5    25:10
25:12   25:13   31:20
33:19

**transcribed** [1] 52:15

**transcript** [2]   54:9
54:10

**transcripts** [2]   21:13
52:18

**transfer** [2]   10:25
18:18

**transferred** [3]   13:22
22:4    24:1

**transmission** [5]
15:10   42:18   43:3
43:4    46:15

**transmissions** [4]
20:3    38:18   46:12
47:21

**transmits** [1]   46:12

**transmitting** [1] 44:7

**true** [4]   43:20   50:11
51:17   54:10

**try** [1]   19:17

**turning** [1]   41:12

**twice** [1] 29:2

**two** [7]   7:13     8:1
8:24    9:3     13:25
48:3    48:5

**type** [1]   44:20

**typed** [1]   12.15

**Um-hum** [1]   42:5

**under** [10]   21:17
21:19   30:1    31:7
31:23   32:9    34:9
35:7    36:13   51:12

**underlying** [2]   47:12
51:4

**undersigned** [1] 53:7

**understand** [6]   11:2
31:17   41:6    47:13
50:21   52:9

**understood** [1]   11:11

**United** [2]   1:0
3:7

**unless** [1]   44.4
52:12

**unsafe** [1]   40.4

**up** [5]   11:4   17.14
26:21   40:14   51:18

**upgrade** [1]   9:2

**ups** [2]   44:23   45:2

**used** [1]   20:14

**usually** [2]   5:4
15:13

**utilized** [1]   39:19

**VALERIE** [1]   1:0

**various** [1]   40.5

**verbal** [1]   18:18

**version** [1]   46:10

**versus** [1]   41:8

**violated** [7]   24:8
24:17   31:7    31:23
32:10   33:12   34:10

**violation** [10]   11:17
11:25   12:2    22:14
24:20   24:22   25:11
28:10   28:10   31:3

**violations** [2]   28:14
31:16

**visit** [3]   10:9   10:16
17:4

**volumes** [1]   35:1

**volunteering** [1] 8:18

**vs** [1]   1:0

**W** [5]   1:0   3:2
3:19    53:8    54:9

**wants** [1]   44:22

**Washing** [1]   6:5

**Washington** [8]   1:0

**States - Yure**

3:2     3:19    4:2
23:8    35:17   53:8
54:9

**water** [5] 15:18   16:8
16:15   20:22   21:1

**ways** [1] 19:20

**weather** [2]   7:17
37:24

**Wednesday** [1]   52:1

**week** [2] 7:21   8:2

**weeks** [1]   8:1

**weight** [11]   24:16
35:18   36:2    36:3
36:9    43:20   46:5
49:15   50:13   50:23
51:5

**weights** [4]   32:15
35:22   36:17   50:20

**Weihe** [2]   1:0
3:13

**well-founded** [1]
19:25

**Wendell** [1]   4:2

**wet** [1]   21:3

**wheel** [1]   37:20

**Whereas** [2]   41:15
41:22

**wherein** [1]   3:5

**white** [3] 47:3   47:4
48:15

**whole** [2]   3:25
18:14

**willing** [1]   52:5

**wind** [1] 32:15

**winter** [1]   7:18

**Wise** [2] 30:12   48:24

**withdraw** [1]   46:19

**within** [7]   5:11
23:20   35:1    35:4
47:3    51:13   51:21

**without** [7]   14:7
14.24   34:15   35:2
35:4    42:18   51:21

**witness** [5]   3:3
3:20    27:5    29:20
53:11

**witness's** [1]   26:21

**word** [1] 19:1

**worded** [2]   48:8
48:10

**words** [1]   40:23

**worked** [1]   8:12

**write** [2] 44:23   45:2

**writes** [1]   36:16

**written** [3]   15:25
36:13   48:11

**wrong** [1]   34:21

**wrote** [1]   29:24

**X** [2]   2:0   2:0

**years** [1] 7:14

**yet** [1]   41:16

**yourself** [1]   47.10

**Yure** [1] 9:3

| | | | |
|---|---|---|---|

[1] UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

[2]

CASE NO: 00-6070-Ferguson/Snow
L.T. Case No. 99-021746-11

[3]

[4] PATRICK SCOTT MAJOR,

[5]    Plaintiff,

[6] vs.

[7] AMERIJET INTERNATIONAL, INC.,

COPY

[8]    Defendant.
_____/

[9]

[10]          500 East Broward Boulevard
          Fort Lauderdale, Florida
[11]          Wednesday, January 24, 2001
          9:40 a.m. - 11:45 a.m.
[12]
APPEARANCES:
[13]
    HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
[14]    500 East Broward Boulevard, Suite 1000
    Fort Lauderdale, Florida 33394
[15]    By: VALERIE SHEA, ESQ.
    Appearing on behalf of the Plaintiff.
[16]    (954)527-2800

[17]    ALLEN, NORTON & BLUE, P.A.
    121 Majorca Avenue, Suite 300
[18]    Miami, Florida 33134
    By: SUSAN POTTER NORTON, ESQ.
[19]    Appearing on behalf of the Defendant.
    (305)445-7801
[20]

[21] ALSO PRESENT: Patrick Scott Major
          Lily Jules, Representative of Amerijet
[22]

[23]
          DEPOSITION
[24]          OF
          AL JORSEY
[25]    (Appearing Telephonically)

---

[1] I N D E X

[2] WITNESS: AI JORSEY                    PAGE

[3] DIRECT EXAMINATION                      5
   BY MS. SHEA
[4]
   CROSS-EXAMINATION                       70
[5] BY MS. NORTON

[6] REDIRECT EXAMINATION                    77
   BY MS. SHEA
[7]
   RECROSS-EXAMINATION                      79
[8] BY MS. NORTON

[9] FURTHER DIRECT EXAMINATION                  80
   BY MS. SHEA
[10]
   FURTHER CROSS-EXAMINATION                  81
[11] BY MS. NORTON

[12] FURTHER REDIRECT EXAMINATION               84
   BY MS. SHEA
[13]
   FURTHER RECROSS-EXAMINATION                 85
[14] BY MS. NORTON

[15] FURTHER REDIRECT EXAMINATION               85
   BY MS. SHEA
[16]
   FURTHER RECROSS-EXAMINATION                 87
[17] BY MS. NORTON

[18]              EXHIBITS
[19]    (Retained by Ms. Shea and Not Attached)

[20] PLAINTIFF'S

[21] NUMBER 25 - Letter dated 11/15 from Al Jorsey    58
          to John Roseburough
[22]

[23]

[24]

[25]

---

Page 3

[1]          Deposition of AL JORSEY, a witness of

[2] lawful age, taken by the Defendant for purpose

[3] of discovery and for use as evidence in the

[4] above-entitled cause, wherein PATRICK SCOTT MAJOR

[5] is the Plaintiff and AMERIJET INTERNATIONAL, INC.,

[6] is the Defendant, pending in the Circuit Court of the

[7] 17th Judicial Circuit in and for Broward County,

[8] pursuant to notice heretofore filed, before

[9] AMBER G. CHEEK, Court Reporter and Notary Public in

[10] and for the State of Florida at Large, at the offices

[11] of Heinrich, Gordon, Hargrove, Weihe & James, P.A.,

[12] 500 East Broward Boulevard, Fort Lauderdale, Broward

[13] County, Florida on Wednesday, the 24th day of January

[14] 2001 commencing at 9:40 o'clock a.m.

[15] THEREUPON:

[16]    (The following proceedings were had):

[17]    MS. SHEA: Good morning, Mr. Jorsey.

[18]    THE WITNESS: Yes.

[19]    MS. SHEA: This is Valerie Shea. I'm Pat

[20] Major's attorney.

[21]    THE WITNESS: Yes.

[22]    MS. SHEA: How are you?

[23]    THE WITNESS: Good.

[24]    MS. SHEA: I'm here with Susan Norton, Lily

[25] Jules from Amerijet, Pat Major, and the court

---

Page 4

[1] reporter, and with your permission we're about to

[2] go on the record. And since we're are speaking

[3] with you by telephone today, the court reporter

[4] has asked that the record reflect that Ms. Norton

[5] and I agree for you to be sworn in.

[6]    THE WITNESS: Okay. Let me put you on hold

[7] for just a second. I think your secretary is

[8] calling me.

[9]    MS. SHEA: Okay.

[10]    (Whereupon, there was a discussion off the

[11] record.)

[12]    THE WITNESS: All right. I'm back. They

[13] were trying to fax me some stuff or e-mail it to

[14] me, and I can't get on the Internet for some

[15] reason. There is a problem with the network and

[16] so they were going to fax me some papers, but I

[17] don't have a fax machine so that's not going to

[18] work either.

[19]    MS. SHEA: Okay.

[20]    THE WITNESS: So then we'll go without it.

[21]    MS. SHEA: Well, then with Ms. Norton's and

[22] my agreement, I'll just ask the court reporter

[23] here, Amber Cheek, to administer the oath to you

[24] and we will proceed with your deposition.

[25]    THE WITNESS: Okay.

[1]   Thereupon:

[2]          AL JORSEY

[3]   a witness named in the notice heretofore filed,

[4]   being of lawful age and being first duly sworn in

[5]   the above cause, testified on his oath as follows:

[6]          DIRECT EXAMINATION

[7]   BY MS. SHEA:

[8]   Q.   Sir, can you tell us your full name.

[9]   A.   Allen Jorsey.

[10]  Q.   What's your date of birth, sir?

[11]  A.   March 15, 1937.

[12]  Q.   And where do you live?

[13]  A.   6304 Zekan Lane, Springfield, Virginia.

[14]  22150.

[15]  Q.   Are you employed?

[16]  A.   Not full-time.

[17]  Q.   What's your occupation?

[18]  A.   I am an airline pilot.

[19]  Q.   Are you an employee of any company at this

[20]  time?

[21]  A.   I'm a part-time employee with several

[22]  companies and do contract work.

[23]  Q.   All right. Let's see. We are taking your

[24]  deposition in January 2001. Is Amerijet one of the

[25]  companies that you may have a part-time relationship

---

[1]   with?

[2]   A.   Yes.

[3]   Q.   And what is that relationship?

[4]   A.   I am a check captain and instructor, line

[5]   pilot - not a line pilot - a test pilot and ferry

[6]   pilot and two-engine ferry captain.

[7]   Q.   And do you maintain a regular schedule with

[8]   Amerijet?

[9]   A.   No.

[10]  Q.   How is it that you work for them? Is it

[11]  intermittent or on-call or occasional?

[12]  A.   Intermittent on-call as needed.

[13]  Q.   Just by way of example, in the last three

[14]  months how much work have you done for Amerijet?

[15]  A.   I've had - I did a two-engine ferry flight

[16]  in December and I did several line checks in December.

[17]  I haven't done any work this month yet for them.

[18]  Q.   Now, has that basically been consistent with

[19]  how you have done work for Amerijet over the last

[20]  several years, or has there been a time in which you

[21]  devoted more of your time there?

[22]  A.   I was a full-time employee for Amerijet at

[23]  one time.

[24]  Q.   What period was that?

[25]  A.   I started with them in March '97 - I believe

---

[1]   March of '97 - and I worked for them full-time for

[2]   some point, I can't remember what, and then I was laid

[3]   off. And then I came - they brought me back as - I

[4]   came back only as part-time some time after a couple

[5]   three months.

[6]   Q.   Do you remember --

[7]   A.   But I was never off the records as a checker

[8]   with Amerijet.

[9]   Q.   Okay. Do you remember approximately when

[10]  you were laid off? Was that in 2000 or earlier?

[11]  A.   No, it was earlier than 2000. I don't

[12]  really remember.

[13]  Q.   Now, if you came to work for Amerijet in

[14]  March 1997, that was about the time that you turned

[15]  60; is that correct?

[16]  A.   Yes.

[17]  Q.   What happens when you're an airline pilot

[18]  when you turn 60?

[19]  A.   We drop dead. Well, in the F.A.A.s mind we

[20]  can't fly airplanes anymore as line pilots for

[21]  revenue. I can't fly cargo, I can't fly passengers.

[22]  Q.   All right. Prior to March 1997 had you been

[23]  so occupied?

[24]  A.   Yes, I worked for several companies. I was

[25]  with Eastern Airlines for 25 years and when they shut

---

[1]   down I went to three or four other companies and as

[2]   they shut down, or whatever, I moved on.

[3]   Q.   I see. All right.

[4]        So since you came to work at Amerijet you

[5]   were ineligible to be a line pilot?

[6]   A.   Yes.

[7]   Q.   And you've done these other functions

[8]   instead.

[9]   A.   Right.

[10]  Q.   Do you work for any other companies that are

[11]  located in Florida? Do you work for any Florida

[12]  based?

[13]  A.   Yes. I work for Planet Airlines; I work for

[14]  - I've worked for Laker; I worked for Falcon through

[15]  Aero Service; I work for Pan Am Flight Training

[16]  Academy; I work for Aero Service; I do ferry flying

[17]  for Gem Aviation, several companies.

[18]  Q.   All right.

[19]  A.   Whoever will hire me.

[20]  Q.   How often are you in South Florida?

[21]  A.   About every week or every other week.

[22]  Q.   We tried to arrange for your deposition to

[23]  be taken down here. Did you have an objection to

[24]  that?

[25]  A.   No, I just - I'm not down there. I happen

[ 1]    to be taking some time off and I'm just not in
[ 2]    Florida. I'm in Florida, but I'm not in Miami.
[ 3]        Q. You're in Florida now, right?
[ 4]        A. Well, yeah, I'm in Daytona Beach. I have a
[ 5]    home in Daytona Beach.
[ 6]        Q. But you were not able to make yourself
[ 7]    available in South Florida for deposition?
[ 8]        MS. NORTON: Well, he didn't know if you
[ 9]    would pay for his trip down here.
[10]        THE WITNESS: No, I have no reason to be
[11]    down there. I'm not working this week. I'm off.
[12]    I'm on holiday.
[13]        MS. SHEA: All right.
[14]    BY MS. SHEA:
[15]        Q. So are you saying it was just because it was
[16]    set for this week, and any other week you would have
[17]    been agreeable to appearing live here?
[18]        A. Well, I wouldn't have known when that would
[19]    be. I don't know when I'm coming back. I have no
[20]    contract - I have no job right now. That may change
[21]    as we speak.
[22]        Q. Now --
[23]        A. I go to work when I get called.
[24]        Q. All right. You're appearing voluntarily for
[25]    your deposition over the phone at Amerijet's request;

[ 1]    is that correct?
[ 2]        THE WITNESS: Well, I don't know who
[ 3]    requested it.
[ 4]        MS. NORTON: Well, you noticed him for depo.
[ 5]    I mean, I think you're asking him a legal
[ 6]    question.
[ 7]        MS. SHEA: Why are you interrupting?
[ 8]        MS. NORTON: Because I think you're asking
[ 9]    him a legal question. You're the one that wanted
[10]    the depo. He's not our witness to be deposed.
[11]    You're deposing him.
[12]        MS. SHEA: I understand that. I'm just
[13]    asking him - I mean, I asked him whether he had
[14]    made arrangements with you.
[15]        MS. NORTON: Okay. Fine. I mean, he's not
[16]    voluntarily here. He's here because you asked
[17]    him to be here.
[18]        MS. SHEA: Well, that's what I was trying to
[19]    ask him.
[20]        THE WITNESS: Well, if you want to ask me,
[21]    go ahead and ask me.
[22]        MS. SHEA: All right.
[23]        THE WITNESS: Did you ask me to come to
[24]    Miami? No. The answer is no.
[25]    BY MS. SHEA:

Page 11

[ 1]        Q. We'll, I've not spoken to you before.
[ 2]        A. No.
[ 3]        Q. Okay.
[ 4]        A. Okay.
[ 5]        Q. Now, did Amerijet's counsel discuss with you
[ 6]    appearing for your deposition today?
[ 7]        A. Yes, by telephone.
[ 8]        Q. And you agreed to appear after you spoke
[ 9]    with them about this?
[10]        A. Yeah. I told them that they could call me
[11]    at 9:30 this morning and I would do it on the
[12]    telephone.
[13]        Q. Okay. Are you currently working for
[14]    American Jet? Do you have a relationship with them?
[15]        A. Yes. I am a part-time employee with
[16]    Amerijet.
[17]        Q. But you have no regular hours?
[18]        A. No regular hours.
[19]        Q. They may just call?
[20]        A. That's right.
[21]        Q. We are speaking today you have nothing
[22]    pending with Amerijet, is that your testimony?
[23]        A. Not formally, no. I have certain people
[24]    that I have line checks to do and those I have a list
[25]    of, and when I can schedule them into my schedule and

Page 12

[ 1]    into when they're flying, I will show up and fly with
[ 2]    them and give them line checks. I don't freely
[ 3]    announce when I'm going to do it, and I make my own
[ 4]    schedule in that respect. If Amerijet needs me to fly
[ 5]    an airplane, like in the last couple few weeks ago, a
[ 6]    two-engine ferry from Seattle to Fort Lauderdale, they
[ 7]    call me and I proceed to wherever the airline is and
[ 8]    do the job.
[ 9]        Q. Who do you work with at Amerijet as it
[10]    relates to setting line checks?
[11]        A. Usually the Director of Training maintains
[12]    the records and the required line checks that are due
[13]    are published at every - I have a list and they're due
[14]    on a certain month; and I can give them the line check
[15]    a month ahead or during or a month after, which is
[16]    called the grace month.
[17]        Q. Who is Director of Training these days?
[18]        A. I have no idea.
[19]        Q. Who is it that you would currently be
[20]    working with to discuss line checks, for example, or
[21]    other training-related duties?
[22]        A. Well, I know who needs a line check and I
[23]    will call and schedule and they will tell me when that
[24]    pilot is flying, and if it suits my fancy, I will
[25]    proceed to the airplane and then call a crew schedule

[ 1]   and say, Put me on the manifest. I am giving this

[ 2]   person a check line.

[ 3]       Q.   But you don't have a contract with a person,

[ 4]   though, at Amerijet as the Director of Training?

[ 5]       A.   No. I didn't really before. I am one of

[ 6]   two or three people that can give a line check at

[ 7]   Amerijet and they have to be done and they are - I

[ 8]   just do it on my own.

[ 9]       Q.   Who are the other two or three people that

[10]   are also --

[11]       A.   Clay Lane is a check captain, Tracy

[12]   Dickinson is a check captain, I believe John Macineer

[13]   is a check captain, Allen Jorsey, Jr. is a check

[14]   captain, and that's about it that I can think of.

[15]       Q.   But you all get the same list?

[16]       A.   Yeah. They don't usually do line checks.

[17]   They usually leave them for me.

[18]       Q.   Oh, all right. What is a line check?

[19]       A.   It's an observation and it's required by the

[20]   F.A.A. You have to have one. You have to observe in

[21]   their month, either their due month or the month ahead

[22]   or their grace month, a line operation where they take

[23]   off and land.

[24]       Q.   To what members of the crew does that apply?

[25]       A.   It applies to the captain by regulation, but

[ 1]   the line check also includes the whole crew for crew

[ 2]   coordination. And I only write a report usually on

[ 3]   the captain, but I can write a report on any member of

[ 4]   the crew.

[ 5]       Q.   Is that the form that follows a line check

[ 6]   and is called a Proficiency/Qualification Check?

[ 7]       A.   Yeah. We have one that -- Let me get it and

[ 8]   I'll read off what it says. The one that we used for

[ 9]   the captain is a form that says on the top of it --

[10]   Let me see. I've got one here for you.

[11]           MS. NORTON:  Do you have a copy of that?

[12]           THE WITNESS:  It says, "Line Check Flight

[13]   Report Captain." And on it, it has the captain's

[14]   name, the first officer's name, the flight

[15]   engineer's name, employee number, base; and then

[16]   it gives the flight that you observed, the

[17]   aircraft number, the stops, and then there is a

[18]   place for evaluating them on pre-flight, taxying,

[19]   takeoff, line and route, et cetera.

[20]   BY MS. SHEA:

[21]       Q.   All right.

[22]       A.   And then on the back it has some more. And

[23]   when it gets all done it has a General Critique and an

[24]   Overall Evaluation. And then it says, "Below average,

[25]   unsatisfactory. I discussed it with them: Yes, no,

Page 15

[ 1]   none. Comments Noted, Pilot's initials, signature

[ 2]   flight officer" - that's me - and my employee number

[ 3]   and my base and my date.

[ 4]       Q.   All right. So that's what you would fill

[ 5]   out on the captain, and of course it would also

[ 6]   implicate the crew's behavior?

[ 7]       A.   Right.

[ 8]       Q.   Is there a time requirement within which

[ 9]   that must be completed?  Do you have to do it at the

[10]   same time as the flight?

[11]       A.   Yeah, I do it as we're going along.

[12]       Q.   Okay.

[13]       A.   Or I take notes and then I transpose them

[14]   onto this form and then I have the captain sign it or

[15]   initial it and I show it to him.

[16]       Q.   I see.

[17]           I have two forms, Captain Jorsey, that are

[18]   on Amerijet letterhead or it's Amerijet's document.

[19]       A.   Um-hmm.

[20]       Q.   "Airman Proficiency/Qualification Check,"

[21]   one that you completed on Pat Major in May '98 and one

[22]   that you completed on Pat Major in May 1999. Can you

[23]   just explain to me what that form refers to and what

[24]   the nature of that check is if you are familiar with

[25]   that.

Page 16

[ 1]       A.   What was the date in '99?

[ 2]       Q.   One was 5/6/98 and one was 5/14/99 and it's

[ 3]   a two-collum checklist.

[ 4]       A.   A two-column checklist.

[ 5]       Q.   Right. That has spots for -- It looks like

[ 6]   a one-page sheet. I don't have a back side any way.

[ 7]   It says, "Satisfactory or unsatisfactory on flight

[ 8]   maneuver."

[ 9]       A.   Oh, that's a simulator.

[10]       Q.   Okay.

[11]       A.   That's a flight proficiency check.

[12]       Q.   Is that an F.A.A. required check?

[13]       A.   Yes.

[14]       Q.   And is that something that has to be done on

[15]   an annual basis?

[16]       A.   Yes.

[17]       Q.   And that has to done on an --

[18]       A.   For the co-pilot it's done on an annual

[19]   basis, and on the captain it's done on a six-month

[20]   basis.

[21]       Q.   Those were two of the documents I was going

[22]   to send you. I take it you do at lot of these.

[23]           Do you have any personal recollection of the

[24]   checks that you did on Pat Major in May of '98 and May

[25]   of '99?

[1]     A. I have only one that I can basically recall,

[2]     and I don't know what the date was. I believe it

[3]     probably was the later one that you have, but I'm not

[4]     sure because I don't keep a record of them myself. I

[5]     mean, the company has a report of it. I didn't - you

[6]     know, I don't have one to refer to.

[7]     Q. Were you furnished anything by Amerijet to

[8]     review in order to refresh your recollection about

[9]     this case?

[10]    A. No, no. I have nothing on that, on those

[11]    forms at all.

[12]    Q. All right.

[13]    A. I just looked at my book and I do have a

[14]    record that I, in fact, was in the simulator on that

[15]    date.

[16]    Q. Okay.

[17]    A. The '99 one. I don't know about the other

[18]    one. I don't have my book that far back.

[19]    Q. I see. But you have something there that

[20]    shows that you did the check with Pat in the simulator

[21]    on May 14th of '99?

[22]    A. Right.

[23]    Q. I have the same one for the year before.

[24]    A. Okay.

[25]    Q. That's just basically just the standard

Page 19

[1]     Q. Okay. After you did the simulator check on

[2]     Pat in connection with his upgrade, did you recommend

[3]     him for upgrade?

[4]     A. No, I did not.

[5]     Q. Did you articulate anything one way or the

[6]     other, or you just said that the report is

[7]     satisfactory?

[8]     A. No, I met with the Director of Operations

[9]     who had directed me to evaluate first officers as I

[10]    give them proficiency checks as they came due for

[11]    check rides and/or seniority to be promoted. And what

[12]    I would normally do is I would put them in the

[13]    captain's seat and see what their judgment and their

[14]    abilities were and then recommend or not recommend

[15]    them being further trained and upgraded to captain.

[16]    Q. But you wouldn't do that in writing?

[17]    A. No. Sometimes I did, but most of the time

[18]    it was a meeting with the Director of Operations. We

[19]    would critique what happened on the check ride or the

[20]    proficiency check and that was it.

[21]    Q. Neither of the forms that I have indicate

[22]    that Pat in the simulator was put in the left seat,

[23]    was checked as a pilot. Do you have actually personal

[24]    recollection about that one way or the other?

[25]    A. Yes, I put him in the left seat, and he was

[1]     Amerijet --

[2]     A. Yes. It's got little "S"s on it.

[3]     Q. Correct.

[4]     A. We grade them as satisfactory or not

[5]     applicable and the overall results I approve or I

[6]     don't approve and then I sign it.

[7]     Q. So the one that you have in front of you,

[8]     you signed that you approved in 1999, correct?

[9]     A. I don't have it in front of me. I just

[10]    happen to know that from my log book that I was in the

[11]    simulator on that day.

[12]    Q. Okay.

[13]    A. And Pat Major was one of the people getting

[14]    a check. In fact, I believe he was being evaluated

[15]    for upgrade to captain.

[16]    Q. All right. Well, the forms that I have

[17]    reflect satisfactory performance. Is that consistent

[18]    with your recollections?

[19]    A. Yes, he passed his check as first officer at

[20]    that time.

[21]    Q. Now, do you recall completing any

[22]    proficiency reports on Pat Major? That's a different

[23]    form.

[24]    A. Well, that is the proficiency report, right?

[25]    The one in the simulator is the proficiency report.

Page 20

[1]     flying I believe initially as support as a captain but

[2]     occupying the captain's seat.

[3]     Q. You don't recall what year that was?

[4]     A. No. I believe it was in '99.

[5]     Q. Okay.

[6]     A. It might have been in 2000, but I don't

[7]     think so. I think it was in '99.

[8]     Q. Well, I do have another form that just says,

[9]     "First Officer or Flight Engineer Proficiency Report,"

[10]    which is a different format than the airman

[11]    proficiency slash --

[12]    A. Did I sign that?

[13]    Q. Yeah, I do have another one that you signed.

[14]        MS. NORTON: May I see that please?

[15]    BY MS. SHEA:

[16]    Q. But you don't have personal recollection of

[17]    that one?

[18]    A. What date is on it?

[19]    Q. 1/15/98.

[20]    A. Oh, that's way back.

[21]        Who was the captain on it?

[22]    Q. Your counsel is looking at it.

[23]        MS. NORTON: Are these the same copies?

[24]        MS. SHEA: Yes.

[25]        MS. NORTON: It doesn't say.

Page 21

[ 1]    THE WITNESS: Pat Major's name, only his

[ 2]    name is on it?

[ 3]    MS. SHEA: Correct.

[ 4]    BY MS. SHEA:

[ 5]    Q.  That's all right.  If you don't have

[ 6]    recollection of it --

[ 7]    A.  I have no recollection of it.  You know,

[ 8]    obviously, if I signed it -- But I just don't

[ 9]    remember.

[10]    Q.  The logbook entry that you're looking at

[11]    that you put Pat in the simulator, does that have a

[12]    date on it?  Is that the May of '99?

[13]    A.  Yes.

[14]    Q.  May 14, '99?

[15]    A.  Let me look at my book here.  I have May

[16]    14th of '99, and maybe -- Yeah, May 14th of '99 I do

[17]    have down.

[18]    Q.  All right.  So that's the date that you're

[19]    referring to that you believe you had him as captain?

[20]    A.  Yeah, I believe he was being evaluated then

[21]    for upgrade.

[22]    Q.  And who else did you have in the simulator

[23]    that same day if your logbook indicates?

[24]    A.  Joel Latori.

[25]    Q.  So it would have been after this simulator

Page 22

[ 1]    proficiency check of May 14, '99 that you discussed

[ 2]    Pat's upgrade desires with Pete Steel?

[ 3]    A.  Yes.

[ 4]    Q.  All right.  Thanks.

[ 5]    Other than doing the several annual checks

[ 6]    on Pat that we have, what, if any, direct contact did

[ 7]    you have with Pat Major during his employment at

[ 8]    Amerijet?

[ 9]    A.  Well, I've met him, been in recurrent

[10]    training sessions with him or sat in on them or

[11]    stopped in with him.  He's, you know, on the ramp.

[12]    I've had chances to meet him and then discuss them at

[13]    different meetings.  We had a check airmen's meeting

[14]    prior to the May check - that same year we had a check

[15]    airmen's meeting where he was I think being considered

[16]    for upgrade.

[17]    Q.  Who was at that meeting?

[18]    A.  The check airmen.

[19]    Q.  Is that Clay Landview and at that time Bill

[20]    Cline?

[21]    A.  Yes, Bill Cline.  I believe that's the other

[22]    name I had forgot to include that gets check rides.

[23]    Bill Cline was at that meeting.

[24]    Q.  And at that meeting he received a go-ahead

[25]    for upgrade consideration I take it since you then had

Page 23

[ 1]    the simulator check?

[ 2]    A.  I don't think we gave - I don't think they

[ 3]    gave him the go-ahead there.  I do know that he was

[ 4]    not recommended at that time by more than one, but

[ 5]    that was the Director of Operation's decision to

[ 6]    evaluate him.

[ 7]    Q.  When you say "not recommended by more than

[ 8]    one," was there any writing or voting?

[ 9]    A.  No, we just discussed it.

[10]    Q.  Now, did you have an opinion that you

[11]    expressed at that meeting?

[12]    A.  Yes.

[13]    Q.  And what was that?

[14]    A.  That he not be upgraded.

[15]    Q.  Based on what?

[16]    A.  His performance.  I just didn't think he had

[17]    what it takes to be a captain.

[18]    Q.  Can you elaborate on that at all.

[19]    A.  Judgment, decision making.

[20]    Q.  And what was that -- This meeting was before

[21]    the May 1999 simulator check, correct?

[22]    A.  Yeah.  I had been on check rides with him

[23]    before and had him in the simulator, had him in the

[24]    class.

[25]    Q.  So you had him in classes.  How did he do on

Page 24

[ 1]    the class work?

[ 2]    A.  Are you familiar with the term a

[ 3]    "Philadelphia lawyer?"

[ 4]    Q.  Yes.

[ 5]    A.  Okay.  He's a Philadelphia lawyer in my

[ 6]    opinion.  He wants to talk a lot, but doesn't fly very

[ 7]    well in my opinion.  And I think his judgment was

[ 8]    lacking at that point, and up until I evaluated him I

[ 9]    still considered him.  And on the line check that I

[10]    gave Brian Steel I felt the same way.

[11]    Q.  Well, before we get to the line check he

[12]    gave Brian Steel, is it fair to say that he did well

[13]    on the class work?

[14]    A.  I don't know.  I didn't teach the class.  I

[15]    just sat in on it, so I don't know what he did.  I

[16]    know on occasion when I first came with the company I

[17]    was being trained with Amerijet's procedures myself

[18]    and had occasion to observe him in a class room

[19]    situation, and I just thought that there was a lot of

[20]    questions being asked that he should have known the

[21]    answers to.  I don't mind a man asking the questions,

[22]    but I got the impression that he was maybe sharp

[23]    shooting the instructor.  I didn't know any of these

[24]    people at the time really.

[25]    Q.  Did you evaluate Pat as having good

[ 1]  knowledge of aircraft and procedures?

[ 2]      A.  Well, yeah.  I have nothing against his -

[ 3]  that I would say that he knew.  I think several

[ 4]  occasions he was completely wrong and was very

[ 5]  argumentative about his opinion.

[ 6]      Q.  Well, sir, I'm reading from your proficiency

[ 7]  check of 1/15/99 where you state, "Has good knowledge

[ 8]  of aircraft and procedures."

[ 9]          Do you recall writing that statement about

[10]  Pat Major?

[11]      A.  I don't recall, but if I wrote it I'm sure

[12]  at that time he did.

[13]      Q.  Well that's the form I have.

[14]      A.  On that particular point.  But, you know --

[15]      Q.  Well, that's the only written record from

[16]  you.

[17]      A.  Right.

[18]          MS. NORTON:  I object to that question.

[19]  That's not so.  There is a sentence prior to

[20]  that.  That's not the only written record.

[21]          MS. SHEA:  That's an excerpt from the only

[22]  written record.

[23]          MS. NORTON:  Fine.

[24]  BY MS. SHEA:

[25]      Q.  I'll read you your whole comment --

---

Page 27

[ 1]  instructor.  By that I take it you mean kind of

[ 2]  holding the instructor to too much detail or to task?

[ 3]          MS. NORTON:  Object to the form of the

[ 4]  question.

[ 5]          Go ahead, Mr. Jorsey.  I was just objecting

[ 6]  to the form of her question.

[ 7]  BY MS. SHEA:

[ 8]      Q.  What does sharp shooing the instructor mean?

[ 9]      A.  Well, sometimes asking a question you

[10]  already know the answer to and to be argumentative.

[11]  You know, these things are pretty cut and dry usually,

[12]  and I just felt that it goes -- You know, he went out

[13]  of his way and a lot of the instructors had made

[14]  comments to this that I've spoken with that, you know,

[15]  most of the time he sat back with his computer going a

[16]  mile a minute, which the instructor allowed that.  I

[17]  personally wouldn't allow that, but --

[18]      Q.  So you've talked to other instructors since

[19]  then about Pat?

[20]      A.  Well, he was discussed at every meeting that

[21]  we ever had amongst the check airmen, and as a check

[22]  captain you get calls.  You know, I have input referred to me all the

[23]  so-and-so.  And I have input referred to me all the

[24]  time from all sources, not only in formal meetings but

[25]  just get-togethers.

---

[ 1]      A.  Okay.

[ 2]      Q.  -- on the one proficiency report that you

[ 3]  did on him, not the checklist.  You wrote, "Pat needs

[ 4]  to keep his mind on only flying when in an Amerijet

[ 5]  aircraft.  Seems to lose track of what is required to

[ 6]  do.  Has good knowledge of aircraft and procedures.

[ 7]  Accepts help from the captain and makes adjustments."

[ 8]          Was that an accurate comment at the time

[ 9]  that you wrote it?

[10]      A.  That's an accurate comment.

[11]      Q.  Okay.

[12]      A.  And with emphasis on the first part, which

[13]  you can -- You know, he may know the knowledge, but he

[14]  had to accept a lot of help from the captain.

[15]      Q.  All right.

[16]      A.  And that's why that last comment is in

[17]  there.  The first comment, if you read it over to me

[18]  again, I'll pick it apart one by one.

[19]      Q.  Well, I'm happy to do that, but I don't want

[20]  to belabor it either.

[21]      A.  Well, that's the crux of my decision that I

[22]  didn't think he should be upgraded, and that was way

[23]  back in 1998.

[24]      Q.  Right.  So you were in classes with him and

[25]  you said you felt he was sharp shooting the

---

Page 28

[ 1]      Q.  Did you ever tell Pat that you recommended

[ 2]  him to be a captain or to be upgraded?

[ 3]      A.  No, I never told him I recommended him.

[ 4]      Q.  Did --

[ 5]      A.  I told him he should try.  You know, I think

[ 6]  everybody should try.  That's what we are here to be.

[ 7]      Q.  Did you ever tell Pat directly you were

[ 8]  concerned or the fact that you were recommending

[ 9]  against him?

[10]      A.  He was -- I thought I made it quite clear on

[11]  the comments I made that he had to - he was going to

[12]  have to improve to make the grade.

[13]      Q.  What comments were those?

[14]      A.  Well, in the statement - I believe it was

[15]  this one - "When he was being evaluated for upgrade,

[16]  he was talking on his telephone and in the captain's

[17]  seat and he was supposed be flying a flight."

[18]      Q.  Well, my question is, did you ever tell Pat

[19]  Major that you personally were not recommending him

[20]  for any of the reasons that you are talking about

[21]  today?

[22]      A.  I wanted to throw him out of the simulator

[23]  that day, and only because we needed to finish the

[24]  period I let him stay.  I wanted to throw him out

[25]  right there.

[1]   Q.   Okay. Let me ask my question again.

[2]   Did you ever tell Pat Major yourself that

[3]   you were not recommending him for upgrade based on any

[4]   of these issues or these concerns that you've

[5]   expressed today?

[6]   A.   Yes.

[7]   Q.   When was that?

[8]   A.   In that same period right there.

[9]   Q.   All right. What did you say to him at that

[10]   time?

[11]   A.   I told him, I said, "You want to be a

[12]   captain and you're on the telephone. You're not ready

[13]   to captain in so many words.

[14]   Q.   Anything other than that? Any other

[15]   occasion on which you ever discussed with Pat your --

[16]   A.   No, I don't think I ever had, you know, a

[17]   real conversation with him about upgrading --

[18]   Q.   Okay.

[19]   A.   -- other than that.

[20]   Q.   Well, my specific question was whether you

[21]   ever told Pat your personal evaluation on the fact

[22]   that you'd not supported him with management. But to

[23]   broaden it a little bit based on your response that

[24]   you never otherwise discussed Pat's upgrade with him,

[25]   did you ever have occasion to telephone him at home to

Page 31

[1]   to upgrade, correct?

[2]   A.   That's correct.

[3]   Q.   All right. And whose decision was that, if

[4]   you know?

[5]   A.   I imagine Pete Steel.

[6]   Q.   And then you had the simulator check, you

[7]   did the written report, the one-page written report

[8]   that we have. You didn't make any other written

[9]   report or memorandum or anything concerning Pat Major,

[10]   is that correct?

[11]   A.   I don't -- I wrote memos to Pete Steel, and

[12]   Pat Major in probably one of those or more memos was

[13]   mentioned. Those memos were addressed with the title

[14]   of "To whom it should concern," and they were just my

[15]   comments and compiled notes of the trip, the PC check,

[16]   or whatever.

[17]   Q.   Okay. That would be after the August 17th

[18]   flight?

[19]   A.   I have no idea. There is some before that,

[20]   that he was mentioned. I'm quite sure, but I don't

[21]   have copies of them. They were cranked out and given

[22]   to Pete as Director of Operations and he probably put

[23]   them in the circular file after that. I don't know.

[24]   They were just comments, not only on him but on

[25]   several people. Just about on every trip I ever went

[1]   discuss with him his upgrade?

[2]   MS. NORTON: Object to the form of the

[3]   question.

[4]   THE WITNESS: I don't remember. I don't

[5]   recall.

[6]   BY MS. SHEA:

[7]   Q.   Do you recall whether you ever told Pat that

[8]   his political problems were going to keep him from

[9]   getting upgraded and that he should get his rating and

[10]   go elsewhere?

[11]   A.   I believe I probably told him that.

[12]   Q.   But you didn't tell him that you were not

[13]   supporting him?

[14]   A.   No, I probably just made a general comment

[15]   that --

[16]   Q.   Did you ever tell him --

[17]   MS. NORTON: Excuse me. Would you please

[18]   let the witness finish his sentence.

[19]   BY MS. SHEA:

[20]   Q.   Did you ever tell him that Pete Steel would

[21]   not let you make captain?

[22]   A.   Probably did.

[23]   Q.   And you testified that there was a meeting

[24]   before Pat's simulator check at which you were opposed

[25]   to his upgrade bid and yet he was put in the process

Page 32

[1]   on either as test flight or two-engine ferry flight

[2]   there was an After Action Report done.

[3]   Q.   That you just voluntarily did?

[4]   A.   Yes.

[5]   Q.   But you don't know where any of those are?

[6]   A.   No, no.

[7]   Q.   Okay.

[8]   A.   I have copies of a few of them on my

[9]   computer when I got computer literate enough to save

[10]   them, but I checked them and I have none that refer to

[11]   Pat Major.

[12]   Q.   You were asked to look for these?

[13]   A.   No.

[14]   Q.   You looked for them?

[15]   A.   I looked for them myself.

[16]   Q.   Okay. You talked about observing Pat in

[17]   classes. We have the one First Officer Proficiency

[18]   report that you did in early '98, and we have the two

[19]   simulator check reports from May of '98 and May of

[20]   '99.

[21]   Prior to the flight of August 1999, the

[22]   Brian Steel flight were you were doing the check on

[23]   him, did you have any other occasions to directly

[24]   observe Pat's performance in the cockpit?

[25]   A.   Yes, I had been on, I'm quite sure, checks

[ 1]   before that. I know of one situation - I don't know

[ 2]   if I went on the trip - but we had a problem with a

[ 3]   flight, and I spoke to him on the ramp about it along

[ 4]   with the chief pilot at the time and of course reports

[ 5]   from other captains who —

[ 6]       Q.   Well, before we get to that, my question was

[ 7]   on direct observations.

[ 8]       A.   Yeah, that was direct observations. And I

[ 9]   don't remember what the problem was, but I remember

[10]   that I was very direct in what I had to say to him but

[11]   I don't remember what it was about.

[12]       Q.   All right. You don't remember who the

[13]   captain was?

[14]       A.   I believe it was Captain Lewis Michaels.

[15]       Q.   And it was some problem on the ramp?

[16]       A.   Well, I discussed it on the ramp with him,

[17]   but it might have been the loading or it might have

[18]   been a complaint of his. I know at the time a lot of

[19]   people, Captain Michaels for one didn't let him fly

[20]   and it might have been over that. But I don't really

[21]   remember.

[22]       Q.   So have you exhausted your recollection in

[23]   terms of direct observations of Pat in the cockpit

[24]   before the flight of August 1999 with Brian Steel?

[25]       A.   I've been in the cockpit with him before

[ 1]   either giving somebody a line check or just jump-seat

[ 2]   riding or -- I've been in the airplane with him two or

[ 3]   three times other than formal line checks I'm quite

[ 4]   sure.

[ 5]       Q.   Nothing else jumps out?

[ 6]       A.   Not that I can remember.

[ 7]       Q.   Let's talk about the flight of August 17th

[ 8]   1999. Do you recall that flight?

[ 9]       A.   Yes, that was with Brian Steel.

[10]       Q.   Right.

[11]       A.   Yes.

[12]       Q.   How did you come to be on that flight?

[13]       A.   Brian Steel was doing a line check.

[14]       Q.   And I gather from your earlier testimony

[15]   that you do not advise the captain in advance of the

[16]   crew, you just show up for that flight. Is that

[17]   right?

[18]       A.   I try to do it that way.

[19]       Q.   Okay.

[20]       A.   It doesn't also work.

[21]       Q.   Do you recall on that date what happened

[22]   from the time that you arrived until pushback?

[23]       A.   Yes.

[24]       Q.   What do you recall about that?

[25]       A.   I arrived to give a line check to the crew

Page 35

[ 1]   and it was raining, heavy rain, and we proceeded to

[ 2]   get to the airplane and we sat there while it poured

[ 3]   rain for a while and then we taxied out and we

[ 4]   departed for wherever we were going. I think it was

[ 5]   Barbados or some place.

[ 6]       Q.   When you said you recalled the flight very

[ 7]   well, was there anything else that you specifically

[ 8]   recall about the beginning pre-takeoff part of the

[ 9]   flight?

[10]       A.   Well, we had to taxi position the airplane

[11]   so we could look at the weather. We taxied down the

[12]   runway so we could look at the runway because there

[13]   was a question of the amount of water on the runway,

[14]   and Pat Major had called for a report, we turned

[15]   around and observed the runway, reversed our course,

[16]   took another look at the weather, and off we went.

[17]       Q.   What, if any, conversation did you have

[18]   concerning the weather back at the gate before

[19]   pushback?

[20]       A.   Well, just that there was, you know, a lot

[21]   of thunderstorms around. It was a heavy rain and it

[22]   was pouring. Typical South Florida weather.

[23]       Q.   Okay. What, if any, concerns did Pat Major

[24]   voice concerning the potential need to take into

[25]   account contamination on the runway and setting weight

Page 36

[ 1]   and speed calculations for the flight?

[ 2]       A.   Well, he was concerned that we had to take a

[ 3]   penalty because of standing water on the runway and he

[ 4]   brought that up. It was discussed and at the time we

[ 5]   got ready to go there was no standing water, so it

[ 6]   didn't become a factor.

[ 7]       Q.   At the time of pushback or takeback?

[ 8]       A.   Well, pushback, you know, it was still

[ 9]   raining. But, again, you can say you need to take a

[10]   weight reduction two days from now because it's going

[11]   to be raining, but at the time that you actually do

[12]   it, it doesn't matter. There is no penalty.

[13]       Q.   So what material are the conditions at the

[14]   time of takeoff?

[15]       A.   Well, yeah, the condition at the time of

[16]   takeoff is what determines whether you need to take a

[17]   penalty or not.

[18]       Q.   All right. What, if any, policy does

[19]   Amerijet have with respect to considering runways dry

[20]   unless there isn't an official contamination report?

[21]   Is there a policy on that?

[22]           MS. NORTON: Object to the form of the

[23]   question.

[24]           THE WITNESS: As I understand it they have

[25]   in their Weight and Balance books that if it's

[ 1]    less than a quarter of an inch of standing water

[ 2]    then it's a dry runway.

[ 3]  BY MS. SHEA:

[ 4]    Q.   All right.

[ 5]    A.   Or it's just a wet runway.  It's --

[ 6]    Q.   But unless there is a standing water report,

[ 7]  that's the equivalent of a dry runway in terms of not

[ 8]  taking a penalty.

[ 9]    A.   Well, it's standing water a quarter or less

[10]  - or a quarter inch or more.  And it has to be

[11]  standing water.

[12]    Q.   But, again, in the absence of a report of

[13]  standing water of one quarter or greater, then

[14]  there is no penalty, there is no weight or speed

[15]  reduction?

[16]    A.   Right.  And it depends.  The captain can

[17]  make the report.  He can report himself as to what the

[18]  conditions are.

[19]    Q.   All right.

[20]    A.   You're not obligated to - whatever.  Some

[21]  guy drives down the runway in his car, and when you

[22]  get out there and look at it and you determine that

[23]  it's okay to go, then you can go.

[24]    Q.   If the captain determines that there is

[25]  standing water, even if there has not been a report of

---

[ 1]    it at Amerijet, have you seen captains then take a

[ 2]  weight and speed reduction voluntarily?

[ 3]      MS. NORTON:  Object to the form of the

[ 4]    question.

[ 5]  BY MS. SHEA:

[ 6]    Q.   Are you familiar with that?

[ 7]    A.   I've never seen it myself, but that doesn't

[ 8]  mean it doesn't happen.  I just -- You know, I've

[ 9]  taken penalties myself for standing water on the

[10]  runway.

[11]    Q.   Even in the absence of a report?

[12]    A.   Well, sure.  I reported it.

[13]    Q.   And that would be a prudent thing to do

[14]  obviously.

[15]    A.   That's why I'm still here.

[16]    Q.   Right.  Because it is a safety issue,

[17]  correct?

[18]    A.   Well, the whole - everything you do is a

[19]  safety issue.

[20]    Q.   All right.

[21]    A.   Not just this one particular thing.

[22]    Q.   Is the report from the tower of standing

[23]  water of a quarter inch or more binding on the

[24]  captain?

[25]    A.   No, no.  That's a report at the time, and

---

Page 39

[ 1]    the captain has the final authority to look at the

[ 2]  situation and put everything together and decide

[ 3]  whether he's going to go.

[ 4]    Q.   And I'm sorry, I'm not sure I agree with

[ 5]  your statement about the standing water greater than a

[ 6]  quarter inch, so I just want to ask you the same

[ 7]  question.

[ 8]      If there is a report by the tower of

[ 9]  standing water of less than one quarter inch, does

[10]  that have any binding authority on the captain?

[11]    A.   Less than a quarter of an inch?

[12]    Q.   Correct.

[13]    A.   No.

[14]    Q.   No penalty for that regardless?

[15]    A.   Not that I know of.  Again, you have to read

[16]  it very carefully as to what it actually says, and

[17]  there's different opinions of what is standing water.

[18]  There's percentages.  You know, you have to go into

[19]  fine detail of what it is.  But, again, it becomes a

[20]  question of the captain to decide that there is no

[21]  water, no standing water, and he can proceed.  That's

[22]  why we make them captains.  That's why we have

[23]  judgment.  That's why we have this rank.

[24]    Q.   Does Amerijet have criteria for a

[25]  contaminated runway?

---

Page 40

[ 1]    A.   Yes.

[ 2]    Q.   But it's your testimony that those are not

[ 3]  binding, those are only guidelines?

[ 4]    A.   I didn't testify to that.

[ 5]    Q.   Okay.

[ 6]    A.   They are binding.

[ 7]    Q.   Oh, all right.

[ 8]      Well, what are those criteria?

[ 9]    A.   Well, there is a bunch of them; you know,

[10]  snow on the runway, slush.  But if the ATUS comes out

[11]  and says that there is six inches or more of snow on

[12]  the runway, that is a report that somebody has made,

[13]  and you can go out and look and say, There's not six

[14]  inches out there and then they change the ATUS and you

[15]  can go.

[16]    Q.   What's the ATUS?

[17]    A.   Automatic Terminal something -- It's the

[18]  message you get at the tower as to what the weather

[19]  is.

[20]    Q.   But you said the ATUS would then change if

[21]  the conditions changed.

[22]    A.   Yeah, that's the formal report that is

[23]  issued as to the weather at the airport.

[24]    Q.   Was there a formal ATUS report of

[25]  contaminated runway conditions at Fort Lauderdale

[ 1]    prior to takeoff of this flight?

[ 2]        A.   No, not that I know of.

[ 3]        Q.   Had there been one, would you agree that the

[ 4]    penalty would have to be taken?

[ 5]            MS. NORTON:  Object to the form of the

[ 6]        question.

[ 7]            THE WITNESS:  No, I don't agree to that.

[ 8]            MS. SHEA:  Asked and answered.

[ 9]    BY MS. SHEA:

[10]        Q.   And why is that?

[11]        A.   Well, because that's a Runway Condition

[12]    Report, and the Runway Condition Report is something

[13]    that is a judgment call.  Again, they send a guy out

[14]    there that drives down the runway in his car, and he

[15]    determines in his opinion that there's water on the

[16]    runway or snow on the runway or whatever.

[17]        Q.   So in your opinion are there any

[18]    circumstances under which an ATUS report is binding,

[19]    or does the captain always have the discretionary

[20]    authority to use his own judgment?

[21]            MS. NORTON:  Object to the form of the

[22]        question.

[23]            THE WITNESS:  Well, if the ATUS reports said

[24]        that there were six inches of snow on the runway,

[25]        and if I was the captain and I looked out there

---

[ 1]    and saw that there was no snow on the runway, I

[ 2]    would call him up and say, Change your report.

[ 3]    It's wrong.  I hereby am doing a Pilot Report.

[ 4]    The weather is such-and-such.  Your ATUS is

[ 5]    wrong.

[ 6]            MS. SHEA:  All right.  I'd like the court

[ 7]        reporter to read my question back, because I

[ 8]        don't think you answered it.  I'm not faulting

[ 9]        you for that, but I would like an answer when she

[10]        is finished.

[11]            (Whereupon, the court reporter read back the

[12]        last question).

[13]            MS. NORTON:  Asked and answered and object

[14]        to the form of the question.

[15]    BY MS. SHEA:

[16]        Q.   So my question is, sir, is an ATUS report

[17]    binding pending a superseding report or not?

[18]            MS. NORTON:  Asked and answered.

[19]            THE WITNESS:  It's a report.  It's not

[20]        binding on anything.  It's just a report.

[21]    BY MS. SHEA:

[22]        Q.   So there is no relationship between

[23]    Amerijet's runway analysis and it's provisions for

[24]    taking a penalty for a tower contamination report?

[25]        A.   The ATUS can say that the weather is 200

---

Page 43

[ 1]    and-a-half, 200 feet ceiling, but the airline may have

[ 2]    a regulation that says you cannot go below 250 feet.

[ 3]        Q.   Okay.

[ 4]        A.   Or the approach may be only 250 feet.  Well,

[ 5]    then that takes over the present.  Or certain airlines

[ 6]    can go below 200 feet.

[ 7]        Q.   Did you have a headset on when you were on

[ 8]    this particular flight before the takeoff?

[ 9]        A.   Pardon?

[10]        Q.   Where you wearing a headset that would allow

[11]    you to overhear --

[12]        A.   Yes.

[13]        Q.   -- the ground tower communications?

[14]        A.   Yes, yes.

[15]        Q.   Okay.  Was there a tower report of standing

[16]    water immediately before this aircraft took off?

[17]        A.   Yes.  Pat Major was requesting that the

[18]    ground tell the tower to relay the report to the tower

[19]    so that they could get it on that frequency.

[20]        Q.   Was that an ATUS report as you've been

[21]    describing it?

[22]        A.   That's not an ATUS report, that's a Runway

[23]    Condition Report, and that was taken earlier and was

[24]    also taken before we taxied down the runway.

[25]        Q.   So it's your testimony then that at no time

---

Page 44

[ 1]    while you were between pushback and takeoff was there

[ 2]    what you called an ATUS report --

[ 3]        A.   Not, that I heard.

[ 4]        Q.   -- of standing water?

[ 5]        A.   Not that I heard.

[ 6]        Q.   And you did hear a report of standing water

[ 7]    from the tower?

[ 8]        A.   Yes.  I don't remember the exact words of

[ 9]    it, but I believe it was some standing water less than

[10]    a quarter of an inch either side of the center line or

[11]    something to that effect.

[12]        Q.   But it's your testimony that that did not

[13]    require a weight or speed reduction on that flight?

[14]            THE WITNESS:  No.

[15]            MS. NORTON:  I'm sorry.  Is that no, it's

[16]        not your answer, or no, it is?

[17]            THE WITNESS:  No, it didn't require a speed

[18]        reduction or a weight reduction.

[19]    BY MS. SHEA:

[20]        Q.   Do you recall having any discussion with Pat

[21]    back at the ramp concerning whether a weight or speed

[22]    reduction should be taken?

[23]        A.   Yeah.  He had mentioned that if we had

[24]    standing water greater than whatever amount that we

[25]    would have to take some "X" number of pound reduction

Page 45

[ 1]  and that he was concerned about.

[ 2]     Q.  Do you fault him for having that concern?

[ 3]     A.  No, I have no problem with his concern.

[ 4]     Q.  All right. And did you make any response to

[ 5]  his concerns that were expressed back at the gate? Do

[ 6]  you recall anything that you said in response to that?

[ 7]     MS. NORTON: Object to the form of the

[ 8]  question to the ramp.

[ 9]  BY MS. SHEA:

[10]     Q.  The ramp.

[11]     A.  On the ramp?

[12]     Q.  Yes.

[13]     A.  Well, you know, I think on the ramp I

[14]  believe my comment was, Well, we'll see what happens.

[15]  We haven't left yet. We're not -- We are just getting

[16]  on the airplane. I believe he mentioned this to me

[17]  before we were on the airplane.

[18]     Q.  So you were not - you didn't disparage his

[19]  concerns or say anything negative to him, is that fair

[20]  to say?

[21]     A.  No, not that I remember.

[22]     Q.  What about in the cockpit prior to

[23]  push-back, do you recall any statements that Pat Major

[24]  made or that you made concerning the possibility of

[25]  water, standing water?

Page 46

[ 1]     MS. NO...ON: Object to the form of the

[ 2]  question.

[ 3]     THE WITNESS: No, I wasn't hooked up on the

[ 4]  radio all the time initially, because I was doing

[ 5]  paperwork or something. But also he did the

[ 6]  weight and balance and made no reduction at that

[ 7]  time.

[ 8]  BY MS. SHEA:

[ 9]     Q.  Do you recall any statements that Brian

[10]  Steel made in the plane prior to push-back to Pat

[11]  Major responding to Pat's concerns about the standing

[12]  water possibility?

[13]     A.  I don't recall any comment that he made, if

[14]  there was any.

[15]     Q.  Did you make a comment to Pat to the effect

[16]  that the runway was going to be treated as dry in the

[17]  absence of a report and that if he didn't like it he

[18]  could quit?

[19]     A.  I don't remember that statement, but that

[20]  would be my thought, yes. You know, if you don't --

[21]  If you have a concern, then do something about it.

[22]     Q.  Do you recall whether your precise comment

[23]  to him was, Then go work somewhere else or leave?

[24]     A.  That may very well have been. I don't

[25]  remember those exact words.

Page 47

[ 1]     Q.  Okay.

[ 2]     A.  It may very well be. It sounds like

[ 3]  something I might say.

[ 4]     Q.  Okay. Now, you objected to a navigation

[ 5]  decision that Pat made on this flight; is that

[ 6]  correct?

[ 7]     A.  That's correct.

[ 8]     Q.  Can you summarize that for me?

[ 9]     A.  The aircraft is equipped with a D.P.S.

[10]  Navigation System, and as we departed Miami or Fort

[11]  Lauderdale, the tower cleared us Direct to a place

[12]  called Derotto which is down in Puerto Rico, and Pat

[13]  said, "Roger, go on direct." And I can't remember, I

[14]  believe Brian Steel asked for a heading direct, and I

[15]  made the comment to Pat that he could not accept

[16]  Direct to Derotto because at that time we did not have

[17]  authorization to use the G.P.S. as a primary

[18]  navigation system. And he proceeded to argue with me

[19]  over it and brought out all kinds of books and charts

[20]  that he could draw lines and fly a straight line, and

[21]  I finally said, Don't argue with me, at that point.

[22]  Just take my word for it. You have to get an

[23]  indication from the controller of a heading to get you

[24]  started and then you can do anything you want. You

[25]  can use any navigation system you want to get there,

Page 48

[ 1]  but he knows that you were on the initial heading

[ 2]  going direct. And I had to be very firm with him, and

[ 3]  he was going to discuss this all the way to wherever

[ 4]  we were going. He didn't agree with me and that's his

[ 5]  opinion.

[ 6]     Q.  Okay. This was Class 1 navigation that you

[ 7]  were operating under, correct?

[ 8]     A.  That's affirmed.

[ 9]     Q.  And just so I understand, what about the

[10]  particular clearance was inconsistent with that or

[11]  outside of that as you saw it?

[12]     MS. NORTON: Object to the form of the

[13]  question.

[14]     Go ahead.

[15]     THE WITNESS: I don't understand that.

[16]  BY MS. SHEA:

[17]     Q.  What did you rely on in advising him that he

[18]  was not authorized to accept that clearance? Was it

[19]  an Amerijet policy or an F.A.R.?

[20]     A.  F.A.R.

[21]     Q.  It's not something that Amerijet has a

[22]  policy on?

[23]     A.  Well, Amerijet is bound by the --

[24]     Q.  Okay.

[25]     A.  -- F.A.R. at this point because they don't

[1] have authorization to use it. And this was confirmed
[2] and backed up the next day by the Amerijet principal
[3] Operation Inspector, John Roseburough.
[4]    Q. Okay.
[5]    A. Because before I called Pat I called
[6] Roseburough and asked him specifically. I gave him
[7] the situation. I gave him the thing.
[8]    Have you done anything to change the
[9] Amerijet procedures that allows Amerijet airplanes to
[10] use the G.P.S. to go direct?
[11]    And he said, No, that we could not accept
[12] direct without an initial heading to get it started.
[13]    Q. All right. So, anyway, you and Pat had this
[14] exchange in the cockpit and I gather he did defer
[15] after some argument to your instructions, correct?
[16]    MS. NORTON: Object to the form of the
[17] question.
[18]    THE WITNESS: I told him I wasn't going to
[19] discuss it with him.
[20] BY MS. SHEA:
[21]    Q. So he went your way, right?
[22]    MS. NORTON: Object to the form of the
[23] question. That's not what he said.
[24]    You can answer the question, Mr Jorsey. I
[25] just object to preserve it.

[1]    THE WITNESS: Ask me the question again.
[2] BY MS. SHEA:
[3]    Q. He did it the way you told him to do it,
[4] correct?
[5]    A. Well, he didn't do it. Brian Steel did it.
[6]    Q. All right. Anything else eventful on that
[7] flight?
[8]    A. Well, the whole flight in my opinion was
[9] not -- It was confrontational.
[10]    Q. Okay.
[11]    A. And if I had anything to write up on Brian
[12] Steel, I would have reprimanded him for not silencing
[13] the co-pilot for overruling and trying to overrule his
[14] authority. I would have thrown Pat Major off the
[15] airplane if he had been my co-pilot before we ever
[16] started. Unacceptable.
[17]    Q. What do you mean before you ever started?
[18]    A. Before I ever took the airplane off the
[19] ground.
[20]    Q. Well, what happened before the --
[21]    A. Well, he was in business for himself. The
[22] captain is in charge of the airplane, not the
[23] co-pilot. To captain makes the decisions, and Pat
[24] Major was making decisions without inquiring of the
[25] captain.

Page 51

[1]    Q. Well, at what point do you think he should
[2] have been thrown off the plane?
[3]    A. Probably I would have thrown him off before
[4] we ever left the block.
[5]    Q. Because he asked about the contaminated
[6] runway?
[7]    A. No, he can ask, but he -- You know, if he
[8] was so adamant about having this runway condition, why
[9] didn't he do something about it? Why didn't he demand
[10] or get off the airplane or put it in the Weight and
[11] Balance and then hand it to the captain to sign it?
[12] But he went along with it.
[13]    Q. So why should he have gotten thrown off the
[14] plane if he went along? That's what I'm a little
[15] confused about. I mean, you just said --
[16]    A. His authority.
[17]    Q. -- the captain should have just thrown him
[18] right off the plane before he left the gate, and I
[19] want to know exactly what he did that should have
[20] gotten him booted off.
[21]    A. Insubordination.
[22]    Q. Okay. And that consisted of raising the
[23] concerns about the --
[24]    A. No, that's not what I said.
[25]    Q. Okay.

Page 52

[1]    A. He was insubordinate in that he was not
[2] taking the captain's direction on what to do. He's
[3] not in charge of the flight. He doesn't sign for the
[4] airplane. The captain signs for the airplane.
[5]    Q. But you just said if he had a concern he
[6] should have been more demanding or put something in
[7] the Weight and Balance Report. I thought he did do
[8] what the captain told him to do at the gate before
[9] pushback.
[10]    A. No, the captain didn't tell him what to do
[11] about the weight and balance. Pat did it on his own.
[12]    Q. All right.
[13]    A. But again he accepted -- He answered for the
[14] captain before he ever checked with the captain on
[15] many occasions on that flight, on the Direct to
[16] Derotto.
[17]    Q. Well --
[18]    A. "Roger, we're going direct." Before we ever
[19] took off, "Roger, clear for takeoff." You know, "Taxi
[20] out." You know, it's not, Are you ready to taxi,
[21] Captain? Are you ready for takeoff, Captain? He
[22] didn't even give him a chance to answer. Just
[23] answered for him. I don't operate that way. I don't
[24] run my cockpit that way.
[25]    Q. All right. Here's my question, Captain

[ 1] Jorsey: Tell me exactly what behavior Pat Major did

[ 2] before he left - before pushback that you're relying

[ 3] on to support the testimony you just gave that Captain

[ 4] Steel should have in your opinion thrown Pat Major off

[ 5] the plane. I just want to make sure exactly what Pat

[ 6] did before pushback that you think he should have been

[ 7] thrown off the plane for.

[ 8]    A.  Well, maybe not before pushback. Probably I

[ 9] would have let all of it go until we started taxying,

[10] and then I probably would have turned the airplane

[11] around and brought him back and said, Look, you're not

[12] acceptable here. I'll get another co-pilot.

[13]    Q.  Because of Pat's persistence about the water

[14] situation?

[15]    A.  No, no. Just in the way he handled the

[16] communications and the way it was confrontational.

[17] You know, I thought Brian Steel was very tolerant of

[18] the atmosphere in the cockpit. I wouldn't have

[19] allowed that atmosphere myself.

[20]    Q.  What, if anything, did you do following this

[21] flight as it relates to Pat Major?

[22]    A.  I called John Roseburough requesting a

[23] clarification on the regulation and the Amerijet

[24] authorization reference to Direct Derotto.

[25]    Q.  And he confirmed your analysis of that?

Page 55

[ 1]    A.  None.

[ 2]    Q.  Did there a come a time that you learned

[ 3] that Pat had filed an F.A.A. - filed a report with

[ 4] NASA and with Amerijet concerning an alleged F.A.A.

[ 5] violation?

[ 6]    A.  I became aware of it one evening when I was

[ 7] passing through the office coming in off a trip. Pete

[ 8] Steel, Dave Bassett, and somebody else - maybe two

[ 9] other people - were in the room and they saw me and

[10] summoned me to come in, and that was the first I knew

[11] that there was a report.

[12]    Q.  Do you know whether that was before or after

[13] Pat was terminated?

[14]    A.  That was before.

[15]    Q.  Were you asked to or did you prepare any

[16] memorandum or written account of your version of the

[17] events at that time?

[18]    A.  No, not that I recall.

[19]    Q.  At this meeting then were you asked for your

[20] recollections of what had happened?

[21]    A.  Yes.

[22]    Q.  And I take it you shared those.

[23]    A.  Yes.

[24]    Q.  Did you read the report in detail at that

[25] time?

[ 1]    A.  Exactly.

[ 2]    Q.  What, if anything else, did you do?

[ 3]    A.  Nothing.

[ 4]    Q.  Did you undertake to do a memo as you

[ 5] suggested a short while ago?

[ 6]    A.  I didn't do a memo that I remember or that I

[ 7] have a record of. I was working - I was putting

[ 8] things in my computer at that period of time, and I

[ 9] have nothing in there that says I ever -- But I did

[10] speak with the Director of Operations reference the

[11] Direct Derotto situation.

[12]    Q.  And you initiated that call or was that a

[13] phone call to him?

[14]    A.  No, I stopped in and saw him.

[15]    Q.  Okay.  Was that Pete Steel?

[16]    A.  Yes.

[17]    Q.  What, if any, conversations did you have

[18] with Pete Steel regarding Pat's standing water

[19] concerns?

[20]    A.  I had none at that point.

[21]    Q.  What, if any, role did you play in the

[22] decision to suspend Pat from flying?

[23]    A.  None.

[24]    Q.  What, if any, role did you have in the

[25] decision to terminate Pat's employment?

Page 56

[ 1]    A.  No. I didn't have it.

[ 2]    Q.  Oh, you weren't furnished then?

[ 3]    A.  I never saw it.

[ 4]    Q.  Okay.  Now, when you're on the aircraft as a

[ 5] check airman, you are a representative of the F.A.A.

[ 6] in some capacity; is that correct?

[ 7]    A.  Right.

[ 8]    Q.  So --

[ 9]    A.  I am an F.A.A. approved check captain for

[10] Amerijet.

[11]    Q.  So does that give you an obligation to

[12] disclose in the report any F.A.A. violations that come

[13] to your attention during the course of a flight?

[14]    A.  That's true.

[15]    Q.  After this time that you were summoned in to

[16] give your version of what had happened on this flight,

[17] what was the next thing that you learned or found out

[18] about as it related to Pat's complaint?

[19]    A.  I got a letter from John Roseburough.

[20]    Q.  And what did you do after you received that

[21] letter?

[22]    A.  I called John Roseburough and I called --

[23] Actually, I guess the company called me and said that

[24] I was being removed as a check airman as of some date

[25] whichever was like November 10th it's dated, but that

[ 1]   may not be the exact date.

[ 2]   Q.   And what else did you do?  Did you respond

[ 3]   to the letter?

[ 4]       A.   Yes.

[ 5]   Q.   The Roseburough letter to you asked for a

[ 6]   response?

[ 7]       A.   Let's see.  Yeah.  Let's see.

[ 8]       It says here, "We wish to offer you an

[ 9]   opportunity to discuss this personally and submit a

[10]   written statement in your behalf.  Should you choose

[11]   to, either this should be accomplished within ten days

[12]   following receipt of this letter.  Your statement

[13]   should contain all pertinent facts and mitigating

[14]   circumstances of the very incident."  Which I did.

[15]   Okay.  And so I wrote a letter on - let's see -

[16]   November 15th.

[17]   Q.   Do you have a copy of that with you?

[18]       A.   Yes.

[19]   Q.   Yes?

[20]       A.   Yes.

[21]   Q.   That was one of the documents I was going to

[22]   try to fax to you, so I'm happy that you have that.

[23]       A.   Yep.

[24]   Q.   Let me go ahead have that marked as Exhibit

[25]   25.

Page 59

[ 1]   Lauderdale to describe for me the path of the aircraft

[ 2]   between the pushback and takeoff?

[ 3]       A.   Yes.

[ 4]   Q.   Could you describe that for me please.

[ 5]       A.   Well, we taxied out and we taxied east first

[ 6]   so that we could look at the runway - or look at the

[ 7]   weather on the weather radar, which we pointed to the

[ 8]   east and looked at the thunderstorms.  And as we

[ 9]   turned they were east and northeast predominantly, and

[10]   then we turned at some point.  I don't remember the

[11]   exact taxiway, but there was quite a few aircrafts

[12]   lined up waiting for takeoff on the taxiway.  We went

[13]   all the way down quite a ways and then got to another

[14]   taxiway, and then when we were clear to go, we had -

[15]   we taxied back down and that's when we observed the

[16]   runway and taxied and turned around and took off back

[17]   to the east.

[18]   Q.   You're not able to name runways or taxiways,

[19]   is that fair?

[20]       A.   I'm not what?

[21]   Q.   You're not able to name the specific runways

[22]   or the taxiways?

[23]       A.   Well, no, I don't know the --

[24]   Q.   Okay.

[25]       A.   Not off the chart.  I don't know what the

[ 1]   Sir, what I have is on letterhead that just

[ 2]   states, "Captain Allen Jorsey, Sr., November 15th,"

[ 3]   and there is a second page that is pretty short.

[ 4]       A.   Right.

[ 5]   Q.   It's two short paragraphs and one full page.

[ 6]       A.   Yes.

[ 7]       MS. SHEA:  All right.  Let me just have a

[ 8]   copy of it become an exhibit to your deposition

[ 9]   and that will be 25.

[10]       (Whereupon, the above-referenced document

[11]   was marked as Plaintiff's Exhibit Number 25 for

[12]   Identification).

[13]       MS. NORTON:  May I see that?

[14]       MS. SHEA:  Sure.

[15]       MS. NORTON:  Thank you.

[16]   BY MS. SHEA:

[17]   Q.   Sir, is it true that you did this letter on

[18]   your own as opposed to hiring an attorney to do it?

[19]       A.   No, I wrote it.

[20]   Q.   When you state in the second paragraph about

[21]   the taxi situation --

[22]       A.   Um-hmm.

[23]   Q.   -- why did -- Strike the question.

[24]       Can you describe for me in terms of -- Are

[25]   you familiar enough with the runways at Fort

Page 60

[ 1]   taxiway is called.  It's the parallel taxiway that

[ 2]   runs east and west.  And we taxied east initially and

[ 3]   then got on the runway and taxied west on the runway,

[ 4]   that would be 27, and then we turned around and we

[ 5]   took off on Runway 9.

[ 6]   Q.   When you say that he back taxied --

[ 7]       A.   Right, that's taxying west.

[ 8]   Q.   Okay.  That's taxying on the actual runway

[ 9]   from --

[10]       A.   On the runway.

[11]   Q.   -- from which you were going to take off.

[12]   Not the taxiway?

[13]       A.   On the runway that we took off on.

[14]   Q.   Okay.  If the runway, the entire length of

[15]   the runway is a hundred percent of the runway, are you

[16]   able to say what percentage of that runway you back

[17]   taxied?  Would it be like 20 percent, 80 percent, or

[18]   some other percent?  Can you approximate that?

[19]       A.   I would just guess - again, I don't have a

[20]   chart to look at - but I would just guess that's

[21]   somewhere less than 50 percent.

[22]   Q.   And that would be the 50 percent between

[23]   where you start the takeoff run?

[24]       A.   Right.

[25]   Q.   Not the other end?

[ 1]    A.   Not the other end.

[ 2]    Q.   Not the east end.  All right.

[ 3]        After the paragraph in which you set forth

[ 4]    your recollections of what happened that day, you have

[ 5]    a paragraph as a side note.

[ 6]    A.   Right.

[ 7]    Q.   "And some facts not known to me at the time

[ 8]    of this flight."

[ 9]    A.   Right.

[10]    Q.   What was the course of those comments or

[11]    that information?  Let's take Number 1.

[12]    A.   Well, the poor performance rating some

[13]    months earlier came from the Proficiency - or the

[14]    report that Brian Steel had written up on I believe it

[15]    was back in June or some time where he gave them very

[16]    poor ratings.

[17]    Q.   When did you learn about that incident or

[18]    that report?

[19]    A.   When I got the letter and I started

[20]    researching it.  You know, I had heard about it and I

[21]    went and got the report out of the file and read it.

[22]    Q.   So you actually read Brian Steel's June

[23]    report some time after Pat was fired when you were

[24]    aware of the F.A.A. complaint, the F.A.A. letter of

[25]    intent.

---

[ 1]    A.   Yeah.  I read that somewhere between

[ 2]    whenever I got the letter from the Feds and

[ 3]    November 15th when I wrote this letter.

[ 4]    Q.   Okay.

[ 5]    A.   I knew that there was -- You know, I didn't

[ 6]    study it or anything, I just read it.

[ 7]    Q.   All right.  Did you make any investigation

[ 8]    into Pat's response to that letter or the upshot of

[ 9]    it?

[10]    A.   No, no.

[11]    Q.   Skipping to Number 3, "The flight officer

[12]    had poor performance grades on his proficiency check."

[13]        What did that refer to?

[14]    A.   That was in reference to the proficiency

[15]    check that I gave him where I was evaluating him for

[16]    upgrade to captain.

[17]    Q.   All right.  The only thing that I have just

[18]    has Satisfactory checked.

[19]    A.   Again, I said that I had given him an

[20]    evaluation in the left seat of the airplane and that

[21]    report was given to Pete Steel and that was the poor

[22]    performance that I was referring to that he was not

[23]    ready to be a captain.

[24]    Q.   But that was not on a proficiency check as

[25]    such, that was some memo?

---

Page 63

[ 1]    A.   No, that was during his proficiency check.

[ 2]    He was in the simulator for a proficiency check if I

[ 3]    remember right, and this was back when our --

[ 4]    Q.   Right.

[ 5]    A.   And he was rejected for upgrade.  And they

[ 6]    went ahead and tried to upgrade him anyway.

[ 7]    Q.   Right.  But before we get to that, I mean, I

[ 8]    only have the written proficiency reports that say,

[ 9]    Satisfactory, that you filled out.  So I just want to

[10]    make sure I understand.

[11]    A.   Okay.  This is not a proficiency check

[12]    report, this was the actual proficiency check that I

[13]    gave him.  And during the performance on that

[14]    proficiency check as an upgrade to captain, I probably

[15]    worded it wrong, but it's not the report for

[16]    performance grades or not, it's during the proficiency

[17]    check that I gave him poor grades for upgrade to

[18]    captain.

[19]    Q.   Okay.

[20]    A.   I did not recommend him for captain at that

[21]    point.

[22]    Q.   So you never filled out a proficiency check

[23]    form in which you gave him a poor grade.  You're just

[24]    saying that on the side you told Pete that you did not

[25]    approve of his performance.

---

Page 64

[ 1]    A.   Yeah.  He performed satisfactory as a

[ 2]    co-pilot on that proficiency check and the records

[ 3]    show that.  Whatever proficiency check you have or

[ 4]    that I signed, it shows that he was given a

[ 5]    satisfactory check as a first officer.

[ 6]    Q.   Right.  But to your knowledge there is no

[ 7]    documentation - there are no documents that support

[ 8]    the statement here that he got poor performance grades

[ 9]    on a proficiency check.  You intended to refer to what

[10]    you told Pete.

[11]    A.   Right.

[12]    Q.   Okay.

[13]    A.   Right.  I don't know.  He might have.  I

[14]    didn't give him all of his proficiency checks.

[15]    Q.   He never failed one with you?

[16]    A.   Not with me.

[17]    Q.   When you say here that he was rejected for

[18]    upgrade to captain by F.A.A. Inspector Barney Sonan,

[19]    what do you know about that?  What was the basis of

[20]    that statement?

[21]    A.   One from Barney Sonan that he was in the

[22]    oral portion of the check less than ten minutes, and

[23]    then Barney Sonan sent a nastygram or a letter to Pete

[24]    Steel - which I don't know the exact words of it, but

[25]    I read it - basically saying, Don't send us anybody

[ 1]    until they're ready. He was not prepared.

[ 2]        Q.    When did you have the opportunity to talk to

[ 3]    Barney Sonan and read that documentation?

[ 4]        A.    Right after he was -- Not right after. Soon

[ 5]    after he was in there for upgrade.

[ 6]        Q.    And when you saw he was rejected, was he

[ 7]    failed by Barney Sonan?

[ 8]        A.    Unfortunately for the F.A.A.s part, Barney

[ 9]    Sonan did Pat Major a favor and did not give him a

[10]    pink slip. He did write a letter to Pete Steel and

[11]    basically said that he questioned the instruction that

[12]    was given to him and that he should never have been

[13]    recommended for a check ride or an upgrade, upgrade

[14]    oral.

[15]        Q.    So you would agree that he was not failed or

[16]    pink slipped by the F.A.A.?

[17]        A.    He did not get a -- On the record there is

[18]    no pink slip. But he didn't pass either. I should

[19]    put that in.

[20]        Q.    I understand. I'm just questioning where --

[21]        A.    All right. Well, I know how lawyers are.

[22]    They --

[23]        Q.    Well, you said he was rejected. He was not

[24]    rejected. His test was discontinued. Isn't that the

[25]    case?

---

[ 1]        A.    Well, in terms of how it was told to me by

[ 2]    the inspector, Barney Sonan, he said, I threw him out

[ 3]    of the oral. Read into it whatever you want.

[ 4]        Q.    Okay. "The first officer has a pending suit

[ 5]    against Amerijet."

[ 6]            What do you know about that? What did you

[ 7]    know about that in November of 1999?

[ 8]        A.    In November of 1999 I did not know he had a

[ 9]    suit against Amerijet.

[10]        Q.    All right.

[11]        A.    I didn't know this until like much later.

[12]        Q.    On page 2 you say, "All these factors lead

[13]    me to believe that this F.O. is a former terminated

[14]    disgruntled employee who wants to get back at the

[15]    company, the captain, and the check captain for poor

[16]    performance ratings."

[17]        A.    Um-hmm.

[18]        Q.    You've never given him a poor performance

[19]    rating as I understand it.

[20]        A.    No, I did not give him a poor performance

[21]    rating.

[22]        Q.    Have you reviewed Pat's training records at

[23]    Amerijet?

[24]        A.    Yes, part of it. Not all of it.

[25]        Q.    What are the poor performance ratings that

---

Page 67

[ 1]    you're referring to?

[ 2]        A.    Mine. Again, they're not written. But,

[ 3]    like I say, every check ride, every proficiency check,

[ 4]    after the fact I would usually debrief the Director of

[ 5]    Operations as to what happened, what could be

[ 6]    improved, what could be done. And his poor

[ 7]    performance in my opinion was relayed to Pete Steel at

[ 8]    these debriefings.

[ 9]        Q.    Are you aware of a single piece of paper in

[10]    Pat Major's file that shows he was not a pilot in good

[11]    standing at Amerijet when he was fired?

[12]        A.    I have no knowledge of any of that.

[13]        Q.    Based on your familiarity with his training

[14]    reports, he was a pilot in good standing at Amerijet

[15]    when he was terminated?

[16]            MS. NORTON: Object to the form of the

[17]    question.

[18]            THE WITNESS: I have no knowledge of that.

[19]    BY MS. SHEA:

[20]        Q.    What came first; his F.A.A. complaint that

[21]    you were responding to or his firing?

[22]            MS. NORTON: Object to the form of the

[23]    question. It's a matter of chronology.

[24]            THE WITNESS: Yeah. What do you mean what

[25]    came first?

---

Page 68

[ 1]    BY MS. SHEA:

[ 2]        Q.    Do you understand?

[ 3]        A.    No, I don't.

[ 4]        Q.    Okay. Sorry. Let me try to ask that

[ 5]    better.

[ 6]            Well, you characterize him as a disgruntled

[ 7]    employee. Sir, isn't it a fact that he made the NASA

[ 8]    report and the report to Amerijet that went to the

[ 9]    F.A.A. while he was still working at Amerijet?

[10]        A.    I didn't know that.

[11]        Q.    Okay.

[12]        A.    I have no information as to when his reports

[13]    were written or sent.

[14]        Q.    Okay.

[15]        A.    He sent lots of correspondence to people

[16]    that I know have no knowledge or date of.

[17]        Q.    All right. So if I understand your comment

[18]    correctly in the letter, you thought this F.A.A. issue

[19]    should be taken with a grain of salt because he was

[20]    just a disgruntled, fired employee; is that right?

[21]            MS. NORTON: Object to the form of the

[22]    question.

[23]            THE WITNESS: Yes. You know, that's one of

[24]    the factors that led me to believe that he was

[25]    out to get captain Brian Steel in my opinion.

[ 1]    That's just my opinion, but that's what I relayed

[ 2]    to the F.A.A.

[ 3]    BY MS. SHEA:

[ 4]    Q.   And you don't have any facts to support

[ 5]    that. That's just your opinion.

[ 6]        MS. NORTON: Object to the form of the

[ 7]    question. It's argumentative. He was there.

[ 8]        THE WITNESS: No, that's my opinion I guess

[ 9]    that I put on paper in subsequent reports to

[10]    Roseburough when I met with him that this is

[11]    ridiculous.

[12]    BY MS. SHEA:

[13]    Q.   Do you know what the outcome of John

[14]    Roseburough's investigation was as it related to

[15]    Captain Steel?

[16]    A.   I don't know. I believe based on the others

[17]    that it's been thrown out. It's dismissed like mine.

[18]    Q.   And in your opinion it was ridiculous to

[19]    begin with?

[20]    A.   Right.

[21]    Q.   Okay.

[22]    A.   A waste of government time.

[23]    Q.   And in your case you received a letter from

[24]    John Roseburough saying that no violation had been

[25]    found; is that correct?

[ 1]    A.   That's right.

[ 2]    Q.   Were your check airman privileges restored?

[ 3]    A.   Yes.

[ 4]    Q.   How long were you without them?

[ 5]    A.   I'm not sure. I tried to go back and look.

[ 6]    It's longer than what the letter is dated. I don't

[ 7]    know. I don't have an exact date, but it was a couple

[ 8]    three months I believe.

[ 9]    Q.   Cost you some income?

[10]    A.   Pardon?

[11]    Q.   Cost you some income?

[12]    A.   You bet ya. Lots of money.

[13]    Q.   Not happy about that I guess.

[14]    A.   I'm never happy about losing money.

[15]    Q.   Did you just lose your check airman's

[16]    privileges with Amerijet, or did you --

[17]    A.   No, just Amerijet.

[18]        MS. SHEA: All right, sir. That's all the

[19]    questions I have for you.

[20]        MS. NORTON: I have a few, Mr. Jorsey.

[21]        THE WITNESS: Sure.

[22]            CROSS-EXAMINATION

[23]    BY MS. NORTON:

[24]    Q.   What's your definition of a "Philadelphia

[25]    lawyer?"

Page 71

[ 1]    A.   One that knows all the answers before they

[ 2]    ask it.

[ 3]    Q.   Is it one that will debate with you?

[ 4]    A.   And they will debate you and argue with you

[ 5]    and go over and over the same thing over and over

[ 6]    again.

[ 7]    Q.   Okay. You indicated that Mr. Major had - or

[ 8]    that you may have mentioned to him, or something, that

[ 9]    he might have had political problems.

[10]        Do you remember using --

[11]    A.   Oh, yes.

[12]    Q.   That word?

[13]    A.   Right.

[14]    Q.   Did that refer at all to his age?

[15]    A.   No, no, no. Age has nothing to do with it.

[16]    Q.   Mr. Major was terminated August of '99, and

[17]    he submitted a letter to NASA some time in August of

[18]    '99?

[19]    A.   Um-hmm.

[20]    Q.   At the time you made the political issue did

[21]    it have anything to do with the supposed report to

[22]    NASA?

[23]    A.   Oh, no, no. That was well before that

[24]    period. The political problem comment came back in

[25]    the time of his upgrade. I mean, it was a well-known

Page 72

[ 1]    fact that, you know, people didn't recommend him for

[ 2]    upgrade and that --

[ 3]    Q.   That Mr. Bassett had no confidence in him?

[ 4]        MS. SHEA: Object to the form of the

[ 5]    question.

[ 6]        THE WITNESS: That's affirmed.

[ 7]    BY MS. NORTON:

[ 8]    Q.   That's affirmed?

[ 9]    A.   This is true.

[10]    Q.   Okay. Does it make a difference where the

[11]    water is standing if you're getting ready to take off

[12]    on the runway?

[13]    A.   Yeah. If the water is outside the wheel

[14]    path of the airplane, it doesn't matter. That

[15]    particular runway is a crown-grooved runway. It

[16]    didn't really matter as long as the standing water is

[17]    not -- I mean, you can have standing water on the last

[18]    five feet of the runway and it's not going to make any

[19]    difference.

[20]    Q.   So the mere fact that there is some standing

[21]    water does not tell you much, does it?

[22]    A.   Doesn't tell me anything.

[23]    Q.   Were you and/or Captain Steel able to see

[24]    the runway?

[25]    A.   Oh, certainly. We taxied right down it.

[ 1]    Q.   Do you have any recollection whether or not

[ 2]   there was standing water --

[ 3]    A.   No, standing water at all.

[ 4]    Q.   -- in the relevant portions of it?

[ 5]    A.   Yeah. None at all. And we didn't even use

[ 6]   wipers at takeoff. The storm had passed. The rain

[ 7]   had moved on.

[ 8]    Q.   Do you have any concerns -- Well, let me

[ 9]   rephrase that.

[10]        As you sit here now do you remember whether

[11]   or not Mr. Major was arguing back and forth with

[12]   Captain Steel on the Weight and Balance Report while

[13]   he was in the cockpit, or did Mr. Major accept the

[14]   Weight and Balance Report and not discuss it again?

[15]    A.   No, the Weight and Balance Report was done,

[16]   submitted, signed and returned.

[17]    Q.   So you have no recollection at all of this

[18]   being a point of discussion back and forth once it was

[19]   signed by - excuse me - once it was submitted by

[20]   Mr. Major and given to the captain?

[21]    A.   No, no.

[22]    Q.   Okay. If Mr. Steel had not followed

[23]   procedures and/or had taken off or attempted to take

[24]   off over weight, would you have an obligation as an

[25]   F.A.A. check airman to report that?

Page 75

[ 1]        Again, if I had any fault with Brian Steel,

[ 2]   I would have faulted him for not being more assertive

[ 3]   in having Pat Major do what Brain Steel wanted him to

[ 4]   do or told him to do. He didn't give him a chance

[ 5]   to -- You know, there is one thing about cockpit

[ 6]   resource management in this business, but somebody has

[ 7]   to be in charge, and you can't have people in business

[ 8]   for themselves as I say, as I call it. It's like the

[ 9]   engineer who puts something in the logbook before he

[10]   checks with the captain. That's why the captain is

[11]   the captain. That's why he makes the big bucks. He

[12]   has the experience. Now, he certainly takes input

[13]   from the others, but you can't let the co-pilot or the

[14]   engineer or anybody else fly your flight.

[15]    Q.   Did Mr. Major accept clearance in takeoff

[16]   without checking with the Captain?

[17]    A.   Yes. He said, "Roger, clear for takeoff,"

[18]   and off we went.

[19]    Q.   Is that consistent or inconsistent with his

[20]   profess of concern now of being over weight?

[21]        MS. SHEA: Object to the form.

[22]        THE WITNESS: It's inconsistent. If he was

[23]   concerned about it, you know -- I was a co-pilot

[24]   for a very long time, and in the airline that I

[25]   started with it took many years -- I flew with

[ 1]    A.   Oh, yes, definitely. I would have reported

[ 2]   it and I would not have gone. I would have stopped

[ 3]   the flight. If I felt that he was in violation or

[ 4]   that it was dangerous, I would have stopped the flight

[ 5]   before it ever took off.

[ 6]    Q.   And you also had the ability to see the

[ 7]   runway and to watch his actions at the time?

[ 8]    A.   Certainly. That's why I was checking him.

[ 9]    Q.   You made some comment about Mr. Major about

[10]   having -- Let me find it. Give me one second, sir.

[11]   "He was in business for himself."

[12]    A.   Right.

[13]    Q.   The comment was made that you would have

[14]   thrown him off the plane after I guess you backed off

[15]   at some point.

[16]    A.   Right.

[17]    Q.   And you said, He was in business for

[18]   himself. He did not allow the Captain to make

[19]   decision or he didn't discuss with the Captain

[20]   beforehand.

[21]        What did you mean by "He was in business for

[22]   himself?"

[23]    A.   Well, he was taking everything on and

[24]   running the flight as if he was the captain. He's not

[25]   the captain.

Page 76

[ 1]   the old grumpy captains at Eastern Airlines who

[ 2]   basically said, Sit on your hands and don't say

[ 3]   anything or do anything until you call me

[ 4]   captain. But I have taken an airplane away from

[ 5]   a captain because he was going to kill me. And

[ 6]   if Pat Major thought that the thing was dangerous

[ 7]   or he had a problem, he should have gotten off,

[ 8]   and taken the airplane away from him before we

[ 9]   ever left.

[10]        MS. NORTON: Counsel objected to the form of

[11]   my question. Was it the word "profess,"

[12]   Counselor, or what was your objection?

[13]        MS. SHEA: I can't remember. The answer was

[14]   too long.

[15]        MS. NORTON: All right. Let me rephrase my

[16]   question.

[17]   BY MS. NORTON:

[18]    Q.   I'm going to ask you basically the same

[19]   question, Mr. Jorsey.

[20]        You indicated that Mr. Major accepted

[21]   takeoff clearance and took off without discussing it

[22]   with the captain. Is that action consistent or

[23]   inconsistent with what he has stated to be his concern

[24]   for an over-weight plane?

[25]    A.   Well, it's inconsistent.

[1]    Q.   Thank you.

[2]    A.   If I understand the question right, yeah.

[3]    It's not -- If he was so concerned, he wouldn't have

[4]    accepted the clearance to takeoff.

[5]    Q.   At that point could he have told the tower

[6]    he was over weight?

[7]    A.   Well, that would have certainly gotten my

[8]    attention if I had been the captain, and I'm sure it

[9]    would have gotten Brian Steel's, because now it's

[10]   broadcast all over the world that the airplane is over

[11]   weight.

[12]       MS. NORTON:  Thank you.  No other questions.

[13]           REDIRECT EXAMINATION

[14]   BY MS. SHEA:

[15]   Q.   Sir, I gather from the nature of your

[16]   testimony you're not saying that Pat should have

[17]   intervened and not accepted the clearance if he had a

[18]   concern.

[19]   A.   Well, if he had a concern he should not have

[20]   accepted the clearance.

[21]   Q.   Even though he's --

[22]   A.   He should have asked the captain.  But, you

[23]   know, he said, "Roger, clear."

[24]   Q.   All right.  He's under the control of the

[25]   pilot in command and he should do what the pilot in

---

[1]    command wants him to do, correct?

[2]    A.   Well, to a point.

[3]    Q.   Okay.

[4]    A.   You know, you're not going - you don't let

[5]    the pilot come in and kill you.  If you think your

[6]    life is in danger or it's unsafe, or whatever, you

[7]    don't let that happen.  If you want to express your

[8]    concern, express it.  But otherwise don't write a

[9]    nasty letter later and try to change the facts to suit

[10]   the report.

[11]   Q.   But you would not consider it insubordinate

[12]   if Pat had said no to that clearance?

[13]   A.   No.  If he felt that he had a genuine

[14]   concern about the safety of the flight and in his mind

[15]   felt that was something that he would be against, I

[16]   would not - as a co-pilot he should not have accepted

[17]   the clearance, he should not have accepted taxiing

[18]   out, and he should not have accepted taking off.

[19]   Q.   And you would not think that a pilot with a

[20]   well-founded concern in that regard should be

[21]   disciplined in any way for making such a decision?

[22]   A.   Well, if he wanted to walk off the airplane,

[23]   I wouldn't discipline him for walking off the

[24]   airplane, no.

[25]   Q.   Well --

---

Page 79

[1]    A.   I didn't get disciplined for taking the

[2]    airplane away from a captain.

[3]    Q.   As a co-pilot?

[4]    A.   Right.

[5]    Q.   All right.

[6]    A.   I didn't get disciplined.

[7]    Q.   So that's a reasonable thing to do if your

[8]    concern is well founded?

[9]    A.   Right.  The guy was going to kill me.

[10]       MS. SHEA:  All right.  That's all the

[11]   questions I have.

[12]       MS. NORTON:  I have one more question, Mr.

[13]   Jorsey.

[14]       THE WITNESS:  Okay.

[15]       MS. NORTON:  I think the record is clear.

[16]           RECROSS-EXAMINATION

[17]   BY MS. NORTON:

[18]   Q.   Did at any time Mr. Major turn to you and

[19]   say, You know, I've had - I've completed this weight

[20]   and balances and it's finished, but I'm very concerned

[21]   now that I see it that we should not be going off with

[22]   this much weight?

[23]   A.   He never said anything like that to me.

[24]       MS. NORTON:  All right.  Thank you, Mr.

[25]   Jorsey.

---

Page 80

[1]           FURTHER REDIRECT EXAMINATION

[2]    BY MS. SHEA:

[3]    Q.   Sir, it's your testimony that you do not

[4]    think that Pat Major would have been subjected to any

[5]    discipline had he quote/unquote taken control of the

[6]    aircraft?

[7]    A.   Oh, I don't know if anybody else would have

[8]    disciplined him, but I wouldn't have.  But that's --

[9]    If you're so concerned about something and you make a

[10]   decision to do something, I would respect the

[11]   decision.  But what other people might do, what the

[12]   company might do, that's a different story.

[13]   Q.   Well, that's what we're interested in here

[14]   because that's who he worked for.

[15]       Do you have an opinion about what Amerijet's

[16]   response would have been had he elected to take

[17]   control of the aircraft?

[18]       MS. NORTON:  Object to the form of the

[19]   question.

[20]       THE WITNESS:  I don't know what Amerijet

[21]   thinks half the time.

[22]   BY MS. SHEA:

[23]   Q.   All right.  I'm having a hard time

[24]   reconciling the testimony with your earlier testimony

[25]   that you really faulted Brian Steel for allowing Pat

[ 1]    the latitude that Pat took in the cockpit.

[ 2]    A.    Yes.

[ 3]    Q.    Can you explain that to me, how you think

[ 4]    Brian Steel should have been much more demanding of

[ 5]    deference by Pat and not permitting him to make any

[ 6]    independent decisions or exercise any independent

[ 7]    judgment while at the same time defending Pat's right

[ 8]    to take control.

[ 9]    A.    The co-pilot cannot make the decisions for

[10]    the captain or the judgments for the captain.  He can

[11]    have input, but the captain is the final authority.  A

[12]    captain in a God.  He makes the decisions.  He is the

[13]    one that is ultimately responsible for the crew and

[14]    the safety of the flight and the airplane.  That's why

[15]    we have captains, co-pilots, and flight engineers.

[16]        MS. SHEA:  All right.

[17]        MS. NORTON:  I have one more question, Mr.

[18]    Jorsey.

[19]        FURTHER RECROSS-EXAMINATION

[20]    BY MS. NORTON:

[21]    Q.    Do you see a difference between a situation

[22]    where a co-pilot sits quietly and never raises an

[23]    issue where it can be addressed and then takes control

[24]    of a plane, as opposed to a co-pilot who sits there

[25]    and discusses with the pilot, I disagree with this,

[ 1]    and takes all avenues to protect it and is ignored?

[ 2]    A.    Oh, it's the same case but in reverse.  I

[ 3]    would fault - there I would fault the co-pilot.  If

[ 4]    you're going to sit there all day long and accept

[ 5]    everything and then jump up at the last minute and

[ 6]    say, I don't like it, it's inconsistent with your

[ 7]    actions prior.

[ 8]    Q.    When you received the F.A.A. report or -

[ 9]    excuse me - complaint and found that Mr. Major was

[10]    complaining that the plane was over weight --

[11]        MS. SHEA:  Objection as to lack of

[12]    predicate.

[13]        MS. NORTON:  He already said he received it.

[14]    BY MS. NORTON:

[15]    Q.    Do you remember getting a warning letter or

[16]    a letter from the F.A.A. questioning --

[17]        MS. SHEA:  Objection.  I mean, where is the

[18]    predicate?  Where is that part of the record?  I

[19]    mean, I'm just going to object to you

[20]    characterizing this document that's not in

[21]    evidence.

[22]        MS. NORTON:  All right.

[23]        THE WITNESS:  Are you talking about the

[24]    letter that --

[25]        MS. NORTON:  Well, let me rephrase the

Page 83

[ 1]    question.

[ 2]    BY MS. NORTON:

[ 3]    Q.    It will obviously become clear, or let's

[ 4]    just assume that the point of my question is clear

[ 5]    now, that Mr. Major's complaint in part is that, one,

[ 6]    the runway conditions were such that he believes that

[ 7]    the flight was over weight.  You understand that now,

[ 8]    right?

[ 9]    A.    Right.

[10]    Q.    That now that's what he is contending?

[11]    A.    Right.

[12]    Q.    All right.  Is that position he is now

[13]    taking consistent or inconsistent with your

[14]    observations of his conduct in the cockpit on the day

[15]    in question?

[16]        MS. SHEA:  Object to the form.

[17]        MS. NORTON:  You can answer it.

[18]        THE WITNESS:  Okay.  It's not consistent

[19]    with what he did in the cockpit.

[20]        MS. NORTON:  What's your objection to the

[21]    form?

[22]        MS. SHEA:  I object to the term "consistent

[23]    or inconsistent."

[24]        MS. NORTON:  Okay.

[25]    BY MS. NORTON:

Page 84

[ 1]    Q.    Did the actions that Mr. Major said and what

[ 2]    Mr. Major did that you observed and you heard in that

[ 3]    cockpit, does that to you underscore actions of a

[ 4]    co-pilot that has voiced the concerns that Mr. Major

[ 5]    has now in terms of the takeoff?

[ 6]        MS. SHEA:  Object to the form.

[ 7]        THE WITNESS:  Not consistent.

[ 8]        MS. NORTON:  Thank you.

[ 9]        MS. SHEA:  Sorry, Mr. Jorsey, but I have a

[10]    couple more question.

[11]        THE WITNESS:  All right.

[12]        FURTHER REDIRECT EXAMINATION

[13]    BY MS. SHEA:

[14]    Q.    Number one, you do recall Pat trying to get

[15]    a report on runway conditions, correct?

[16]    A.    Right.

[17]    Q.    And you do recall his raising concerns about

[18]    the weather back at the gate, correct?

[19]    A.    Right.

[20]    Q.    And, in fact, you even discussed it with him

[21]    on the ramp.

[22]    A.    Right.

[23]    Q.    To the point where you may have said, If

[24]    you're really that worried then just go work some

[25]    place else.

[ 1]    A.   Yeah. The report at that point is

[ 2]  immaterial.

[ 3]    Q.   All right. But Pat on the ramp, at the

[ 4]  gate, and during the taxiway, all three times, had

[ 5]  expressed and voiced concerns about the weather and

[ 6]  the possible runway contamination, correct? Yes or

[ 7]  no?

[ 8]    A.   Yes.

[ 9]        MS. SHEA:  Okay. That's all my questions.

[10]  Thank you.

[11]        FURTHER RECROSS-EXAMINATION

[12]  BY MS. NORTON:

[13]    Q.   At those times were the runway conditions

[14]  material?

[15]    A.   No.

[16]        MS. NORTON:  Thank you.

[17]        FURTHER REDIRECT EXAMINATION

[18]  BY MS. SHEA:

[19]    Q.   And when you say that they were not

[20]  material, that means because of the passage of time

[21]  the weather conditions could have been changed and

[22]  improved?

[23]    A.   And they did.

[24]    Q.   Right. And the report that you received

[25]  from the tower of standing water was how long before

[ 1]  takeoff of the aircraft?

[ 2]    A.   Well, the report was given just prior to

[ 3]  takeoff.

[ 4]    Q.   Okay.

[ 5]    A.   But the report was taken quite a bit

[ 6]  earlier.

[ 7]    Q.   And what is the time specified on that

[ 8]  report?

[ 9]    A.   What do you mean the time?  I don't know

[10]  what time, but I would say that it was -- On ground

[11]  control we could hear them sending out the guy that

[12]  was going to do the report.

[13]    Q.   While you were back-taxiing?

[14]    A.   No, no. I think while we were sitting. He

[15]  wasn't on the runway while we were taxiing. He did

[16]  that before we ever left the ramp, but we didn't get

[17]  the report until later.

[18]    Q.   All right. But the report was immediately

[19]  before takeoff.

[20]    A.   To go back to your original question, you

[21]  threw in two things there. You asked something about

[22]  the condition of the runway, but prior to that in the

[23]  same statement you said the weather conditions. We

[24]  are not talking -- We've been talking about the runway

[25]  conditions, but the weather conditions I believe also

Page 87

[ 1]  was a big concern of Pat's.

[ 2]        MS. SHEA:  All right. Thank you. No

[ 3]  further questions.

[ 4]        MS. NORTON:  I have one, Mr. Jorsey.

[ 5]        FURTHER RECROSS-EXAMINATION

[ 6]  BY MS. NORTON:

[ 7]    Q.   Did you ever form the opinion -- Are there

[ 8]  pilots that are afraid to fly in bad weather to your

[ 9]  knowledge?

[10]        MS. SHEA:  Beyond the scope of direct and

[11]  relevancy.

[12]        MS. NORTON:  Okay. I withdraw it.

[13]  Nevermind, Mr. Jorsey. Thank you very much.

[14]        MS. SHEA:  We're finished.

[15]        THE WITNESS:  Okay.

[16]        MS. SHEA:  Sir, you have a right to read

[17]  this deposition transcript when it's typed for

[18]  purposes of correcting any errors in the court

[19]  reporting, which will probably not be a bad idea

[20]  since we are remote here, or you can waive that

[21]  right which many people do as well.

[22]        MS. NORTON:  I just recommend you waive it.

[23]        THE WITNESS:  Okay. I waive it.

[24]        MS. SHEA:  All right. Thank you, sir.

[25]        MS. NORTON:  Thank you.

Page 88

[ 1]        THE WITNESS:  All right. Bye.

[ 2]        (Whereupon, the deposition was concluded at

[ 3]  11:45 and the Reading and Signing thereof are

[ 4]  waived).

[ 5]

[ 6]

[ 7]

[ 8]

[ 9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

CERTIFICATE OF OA.

[1]
[2]
[3] STATE OF FLORIDA )
[4] COUNTY OF BROWARD )
[5]
[6]         I, the undersigned authority, certify that
[7] AL JORSEY personally appeared before me and was duly
[8] sworn.
[9]
[10]         WITNESS my hand and official seal this 30th
[11] day of January 2001.
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]         _____
                Amber G. Cheek, Court Reporter
                Notary Public - State of Florida
[22]            My Commission Expires: 9-17-02
[23]
[24]
[25]

REPOR .'S DEPOSITION CERTIFICATE

[1]
[2] STATE OF FLORIDA )
[3] COUNTY OF BROWARD )
[4]
[5]         I, Amber G. Cheek, Court Reporter, certify
[6] that I was authorized to and did stenographically
[7] report the deposition of AL JORSEY, that a review of
[8] the transcript was requested; and that the transcript
[9] is a true and complete record of my stenographic
[10] notes.
[11]
[12]         I further certify that I am not a relative,
[13] employee, attorney or counsel of any of the parties,
[14] nor am I a relative or employee of any of the parties'
[15] attorneys or counsel connected with the action, nor am
[16] I financially interested in the action.
[17]
[18]         DATED this 30th day of January 2001.
[19]
[20]
[21]         _____
                Amber G. Cheek, Court Reporter
                Notary Public - State of Florida
[22]            My Commission Expires: 9-17-02
[23]
[24]
[25]

**&**  1/13, 1/17, 3/11

**,**

'97  6/25, 7/1
'98  15/21, 16/24, 32/18, 32/19
'99  16/1, 16/25, 17/17, 17/21, 20/4, 20/7, 21/12, 21/14, 21/16, 22/1, 32/20, 71/16, 71/18

**0**

00-6070-Ferguson/Snow  1/2

**1**

1  48/6, 61/11
1/15/98  20/19
1/15/99  25/7
1000  1/14
10th  56/25
11/15  2/21
11:45  1/11, 88/3
121  1/17
14  21/14, 22/1
14th  17/21, 21/16
15  5/11
15th  57/16, 58/2, 62/3
17th  3/7, 31/17, 34/7
1937  5/11
1997  7/14, 7/22
1998  26/23
1999  15/21, 18/8, 23/21, 32/21, 33/24, 34/8, 66/7, 66/8

**2**

2  66/12
20  60/17
200  42/25, 43/1, 43/6
2000  7/10, 7/11, 20/6
2001  1/11, 3/14, 5/24, 89/11
22150  5/14
24  1/11
24th  3/13
25  2/21, 7/25, 57/25, 58/9, 58/11
250  43/2, 43/4
27  60/4

**3**

3  62/11
300  1/17
305  1/19
30th  89/10
33134  1/18
33394  1/14

**4**

445-7801  1/19

**5**

5  2/3
5/14/99  16/2
5/6/98
50  60/21, 60/22
500  1/10, 1/14, 3/12
527-2800  1/16
58  2/21

**6**

60  7/15, 7/18
6304  5/13

**7**

70  2/4
77  2/6
79  2/7

**8**

80  2/9, 60/17
81  2/10
84  2/12
85  2/13, 2/15

**9**

9  60/5
9-17-02  89/21
954  1/16
99-052746-11  1/3
9:30  11/11
9:40  1/11, 3/14

**A**

a.m  1/11, 3/14
abilities  19/14
ability  74/6
above-entitled  3/4
above-referenced  58/10
absence  37/12, 38/11, 46/17
Academy  8/16
accept  26/14, 47/15, 48/18, 49/11, 73/13, 75/15, 82/4
acceptable  53/12
accepted  52/13, 76/20, 77/4, 77/17, 77/20, 78/16, 78/17, 78/18
Accepts  26/7
accomplished  57/11
account  35/25, 55/16
accurate  26/8, 26/10
Action  32/2, 76/22, 90/15, 90/16
actions  74/7, 82/7, 84/1, 84/3
adamant  51/8
addressed  31/13, 81/23
adjustments  26/7
administer  4/23
advance  34/15
advise
advising  48/17
Aero  8/15, 8/16
affirmed  48/8, 72/6, 72/8
afraid  87/8
age  3/2, 5/4, 71/14, 71/15
agree  4/5, 39/4, 41/3, 41/7, 48/4, 65/15
agreeable  9/17
agreed  11/8
agreement  4/22
aircraft  14/17, 25/1, 25/8, 26/5, 26/6, 43/16, 47/9, 56/4, 59/1, 80/6, 80/17, 86/1
aircrafts  59/11
airline  5/18, 7/17, 12/7, 43/1, 75/24
Airlines  7/25, 8/13, 43/5, 76/1
Airman  15/20, 20/10, 56/5, 56/24, 70/2, 73/25
airman's  70/15
airmen  22/18, 27/21
airmen's  22/13, 22/15
airplane  12/5, 12/25, 34/2, 35/2, 35/10, 45/16, 45/17, 50/15, 50/18, 50/22, 51/10, 52/4, 53/10, 62/20, 72/14, 76/4, 76/8, 77/10, 78/22, 78/24, 79/2, 81/14
airplanes  7/20, 49/9
airport  40/23
AL  1/24, 2/2, 2/21, 3/1, 5/2, 89/7, 90/7
alleged  55/4
ALLEN  1/17, 5/9, 13/13, 58/2
allow  27/17, 43/10, 74/18
allowed  27/16, 53/19
allowing  80/25
allows  49/9
AMBER  3/9, 4/23, 89/20, 90/5
American  11/14
AMERIJET  1/7, 1/21, 3/5, 3/25, 5/24, 6/8, 6/14, 6/19, 6/22, 7/8, 7/13, 8/4, 11/16, 11/22, 12/4, 12/9, 13/4, 13/7, 15/18, 17/7, 18/1, 22/8, 26/4, 36/19, 38/1, 39/24, 48/19, 48/21, 48/23, 49/2, 49/9, 53/23, 55/4, 56/10, 66/5, 66/9, 66/23, 67/11, 67/14, 68/8, 68/9, 70/16, 70/17, 80/20
Amerijet's  9/25, 11/5, 15/18, 24/17, 42/23, 80/15
amount  35/13, 44/24
analysis  42/23, 53/25
and-a-half  43/1
announce  12/3
annual  16/15, 16/18, 22/5
answer  7/3, 7/4, 7/13, 8/4, 19/10, 24/16, 61/13, 67/20, 67/25, 71/24
answered  41/8, 42/8, 42/13, 42/18, 52/13, 52/23
answers  24/21, 71/1
APPEARANCES  1/12
applicable  18/5
applies  13/25
apply  13/24
approach  43/4
approve  18/5, 18/6, 63/25

approximate  60/18
argue  47/18, 47/21, 71/4
arguing  73/11
argument  49/15
argumentative  25/5, 27/10, 69/7
arrange  8/22
arrangements  10/14
arrived  34/22, 34/25
articulate  19/5
assertive  75/2
atmosphere  53/18, 53/19
Attached  2/19
attempted  73/23
attention  56/13, 77/8
attorney  3/20, 58/18, 90/13
attorneys  90/15
ATUS  40/10, 40/14, 40/16, 40/20, 40/24, 41/18, 41/23, 42/4, 42/16, 42/25, 43/20, 43/22, 44/2
August  31/17, 32/21, 33/24, 34/7, 71/16, 71/17
authority  39/1, 39/10, 41/20, 50/14, 51/16, 81/11, 89/6
authorization  47/17, 49/1, 53/24
authorized  48/18, 90/6
Automatic  40/17
available  9/7
Avenue  1/17
avenues  82/1
average  14/24
Aviation  8/17

**B**

back-taxying  86/13
backed  49/2, 74/14
bad  87/8, 87/19
Balance  36/25, 46/6, 51/11, 52/7, 52/11, 73/12, 73/14, 73/15
balances  79/20
Barbados  35/5
Barney  64/18, 64/21, 64/23, 65/3, 65/7, 65/8, 66/2
base  14/15, 15/3
based  8/12, 23/15, 29/3, 29/23, 67/13, 69/16
basis  16/15, 16/19, 16/20, 64/19
Bassett  55/8
Beach  9/4, 9/5
behavior  15/6, 53/1
belabor  26/20
bet  70/12
bid  30/25
big  75/11, 87/1
Bill  22/19, 22/21, 22/23
binding  38/23, 39/10, 40/3, 40/6, 41/18, 42/17, 42/20
birth  5/10
bit  29/23, 86/5
block  51/4
BLUE  1/17
book  17/13, 17/18, 18/10, 21/15
books  36/25, 47/19
booted  51/20
Boulevard  1/10, 1/14, 3/12
bound  48/23
Brain  75/3
Brian  24/10, 24/12, 32/22, 33/24, 34/13, 46/9, 47/14, 50/5, 50/11, 53/17, 61/14, 61/22, 68/25, 75/1, 77/9, 80/25, 81/4
broadcast  77/10
broaden  29/23
brought  7/3, 36/4, 47/19, 53/11
Broward  1/10, 1/14, 3/7, 3/12, 89/4, 90/3
bucks  75/11
bunch  40/9
business  50/21, 74/11, 74/17, 74/21, 75/6, 75/7
Bye  88/1

**C**

calculations  36/1
call  11/10, 11/19, 12/7, 12/23, 12/25, 41/13, 42/2, 54/12, 54/13, 75/8, 76/3
calls  27/22
came  7/3, 7/4, 7/13, 8/4, 19/10, 24/16, 61/13, 67/20, 67/25, 71/24
capacity  56/6
captain  6/4, 6/6, 13/11, 13/12, 13/13, 13/14, 13/25, 14/3, 14/9, 14/13, 15/5, 15/14, 15/17, 16/19, 18/15, 19/15, 20/1, 20/21, 21/19, 23/17, 26/7, 26/14, 27/22, 28/2, 29/12, 29/13, 30/21, 33/13, 33/14, 33/19, 34/15, 37/16, 37/24, 38/24, 39/1, 39/10, 39/20, 41/19, 41/25, 50/22, 50/23, 50/25, 51/11, 51/17, 52/4, 52/8, 52/10, 52/14, 52/21, 52/25, 53/3,

66/15, 68/25, 69/15, 72/23, 73/12, 73/20, 74/11
74/19, 74/24, 74/25, 75/10, 75/11, 75/16, 76/4, 76/5,
76/22, 77/8, 77/22, 79/2, 81/10, 81/11, 81/12
captain's 14/13, 19/13, 20/2, 28/16, 52/2
captains 33/5, 38/1, 39/22, 76/1, 81/15
car 37/21, 41/14
carefully 39/16
cargo 7/21
CASE 1/2, 1/3, 17/9, 65/25, 69/23, 82/2
ceiling 43/1
center 44/10
CERTIFICATE 89/1, 90/1
certify 89/6, 90/5, 90/12
chance 52/22, 75/4
chances 22/12
change 9/20, 40/14, 40/20, 42/2, 49/8, 78/9
changed 40/21, 85/21
characterize 68/6
characterizing 82/20
charge 50/22, 52/3, 75/7
chart 59/25, 60/20
charts 47/19
check 6/4, 12/14, 12/22, 13/2, 13/6, 13/11, 13/12,
13/13, 13/18, 14/1, 14/5, 14/6, 14/12, 15/20, 15/24,
16/11, 16/12, 17/20, 18/14, 18/19, 19/1, 19/11,
19/19, 19/20, 22/1, 22/13, 22/14, 22/18, 22/22, 23/1,
23/21, 23/22, 24/9, 24/11, 25/7, 27/21, 30/24, 31/6,
31/15, 32/19, 32/22, 34/1, 34/13, 34/25, 56/5, 56/9,
56/24, 62/12, 62/15, 62/24, 63/1, 63/2, 63/11, 63/12,
63/14, 63/17, 63/22, 64/2, 64/3, 64/5, 64/9, 64/22,
65/13, 66/15, 67/3, 70/2, 70/15, 73/25
checked 19/23, 32/10, 52/14, 62/18
checker 7/7
checking 74/8, 75/16
checklist 16/3, 16/4, 26/3
checks 6/16, 11/24, 12/2, 12/10, 12/12, 12/20,
13/16, 16/24, 19/10, 22/5, 32/25, 34/3, 64/14, 75/10
CHEEK 3/9, 4/23, 89/20, 90/5
chief 33/4
choose 57/10
chronology 67/23
Circuit 3/6, 3/7
circular 31/23
circumstances 41/18, 57/14
clarification 53/23
class 23/24, 24/1, 24/13, 24/14, 24/18, 48/6
classes 23/25, 26/24, 32/17
Clay 13/11, 22/19
clear 28/10, 52/19, 59/14, 75/17, 77/23, 79/15,
83/3, 83/4
clearance 48/10, 48/18, 75/15, 76/21, 77/4, 77/17,
77/20, 78/12, 78/17
cleared 47/11
Cline 22/20, 22/21, 22/23
co-pilot 16/18, 50/13, 50/15, 50/23, 53/12, 64/2,
75/13, 75/23, 78/16, 79/3, 81/9, 81/22, 81/24, 82/3,
84/4
co-pilots 81/15
cockpit 32/24, 33/23, 33/25, 45/22, 49/14, 52/24,
53/18, 73/13, 75/5, 81/1, 83/14, 83/19, 84/3
command 77/25, 78/1
commencing 3/14
comment 25/25, 26/8, 26/10, 26/16, 26/17, 30/14,
45/14, 46/13, 46/15, 46/22, 47/15, 68/17, 71/24,
74/9, 74/13
Comments 15/1, 27/14, 28/11, 31/13, 31/15,
31/24, 61/10
Commission 89/21
communications 43/13, 53/16
companies 5/22, 5/25, 7/24, 8/1, 8/10, 8/17
company 5/19, 17/5, 24/16, 56/23, 66/15, 80/12
compiled 31/15
complaining 82/10
complaint 33/18, 56/18, 61/24, 67/20, 82/9, 83/5
complete 90/9
completed 15/9, 15/21, 15/22, 79/19
completing 18/21
computer 27/15, 32/9, 54/8
concern 31/14, 45/2, 45/3, 46/21, 52/5, 75/20,
76/23, 77/18, 77/19, 78/8, 78/14, 78/20, 79/8, 87/1
concerned 28/8, 36/2, 45/1, 75/23, 77/3, 79/20,
80/9
concerns 29/4, 35/23, 45/5, 45/19, 46/11, 51/23,
54/19, 73/8, 84/4, 84/17, 85/5
concluded 88/2
condition 36/15, 41/11, 41/12, 42/23, 51/8, 86/22
conditions 36/13, 37/18, 40/21, 40/25, 83/6,
84/15, 85/13, 85/21, 86/23, 86/25
conduct 83/14
confidence 72/3
confirmed 49/1, 53/25
confrontational 50/9, 53/16

confused 51/19
connected 90/15
connection 19/2
consideration 22/25
consistent 6/18, 18/17, 75/19, 76/22, 83/13,
83/18, 83/22, 84/7
contact 22/6
contain 57/13
contaminated 39/25, 40/25, 51/5
contamination 35/25, 36/20, 42/24, 85/6
contending 83/10
contract 5/22, 9/20, 13/3
control 77/24, 80/5, 80/17, 81/8, 81/23, 86/11
controller 47/23
conversation 29/17, 35/17
conversations 54/17
coordination 14/2
copies 20/25, 31/21, 32/8
copy 14/11, 57/17, 58/8
correct 7/15, 10/1, 18/3, 18/8, 21/3, 23/21, 31/1,
31/2, 31/10, 38/17, 39/12, 47/6, 47/7, 48/7, 49/15,
50/4, 56/6, 69/25, 78/1, 84/15, 84/18, 85/6
correcting 87/18
correctly 68/18
correspondence 68/15
Cost 70/9, 70/11
counsel 11/5, 20/22, 76/10, 90/13, 90/15
Counselor 76/1
County 3/7, 3/13, 89/4, 90/3
couple 7/4, 12/5, 70/7, 84/10
course 15/5, 33/4, 35/15, 56/13, 61/10
COURT 1/1, 3/6, 3/9, 3/25, 4/3, 4/22, 42/6,
42/11, 87/18, 89/20, 90/5
cranked 31/21
crew 12/25, 13/24, 14/1, 14/4, 34/16, 34/25, 81/13
crew's 15/6
criteria 39/24, 40/8
Critique 14/23, 19/19
CROSS-EXAMINATION 2/4, 2/10, 70/22
crown-grooved 72/15
crux 26/21
currently 11/13, 12/19
cut 27/11

**Column 3 (D):**

# D

D.P.S 47/9
danger 78/6
dangerous 74/4, 76/6
date 5/10, 15/3, 16/1, 17/2, 17/15, 20/18, 21/12,
21/18, 34/21, 56/24, 57/1, 68/16, 70/7
dated 2/21, 56/25, 70/6
Dave 55/8
day 3/13, 18/11, 21/23, 28/23, 49/2, 61/4, 82/4,
83/14, 89/11
days 18/10, 57/11
Daytona 9/4, 9/5
dead 7/19
debate 71/3, 71/4
debrief 67/4
debriefings 67/8
December 6/16
decide 39/2, 39/20
decision 23/5, 23/19, 26/21, 31/3, 47/5, 54/22,
54/25, 74/19, 78/21, 80/10, 80/11
decisions 50/23, 50/24, 81/6, 81/9, 81/12
Defendant 1/8, 1/19, 3/2, 3/6
defending 81/7
defer 49/14
deference 81/5
definition 70/24
demand 51/9
demanding 52/6, 81/4
departed 35/4, 47/10
depends 37/16
depo 10/4, 10/10
deposed
deposing 10/11
DEPOSITION 1/23, 3/1, 4/24, 5/24, 8/22, 9/7,
9/25, 11/6, 58/8, 87/17, 88/2, 90/1, 90/7
Derotto 42/23, 54/10, 54/12, 53/24, 54/11
describe 58/24, 59/1, 59/4
describing 43/21
desires 22/2
detail 27/2, 39/19, 55/24
determine 37/22
determines 36/16, 37/24, 41/15
devoted 6/21
Dickinson 13/12
difference 72/10, 72/19, 81/21
DIRECT 2/3, 2/9, 5/6, 22/6, 33/7, 33/8, 33/10,
33/23, 47/11, 47/13, 47/14, 47/16, 48/2, 49/10,
49/12, 52/15, 52/18, 53/24, 54/11, 57/10

direction 52/2
Director 12/11, 12/17, 13/4, 19/8, 19/18, 23/5,
31/22, 54/10, 67/4
disagree 81/25
discipline 78/23, 80/5
disciplined 78/23, 79/1, 79/6, 80/8
disclose 56/12
discontinued 65/24
discovery 3/3
discretionary 41/19
discuss 11/5, 12/20, 12/22, 30/1, 48/3, 49/19,
57/9, 73/14, 74/19
discussed 14/25, 22/1, 23/9, 27/20, 29/15, 29/24,
33/16, 36/4, 84/20
discusses 81/25
discussing 76/21
discussion 4/10, 44/20, 73/18
disgruntled 66/14, 68/6, 68/20
dismissed 69/17
disparage 45/18
DISTRICT 1/1
document 15/18, 58/10, 82/20
documentation 64/7, 65/3
documents 16/21, 57/21, 64/7
doesn't 20/25, 24/6, 34/20, 36/12, 38/7, 38/8,
52/3, 72/14, 72/22
draw 47/20
drives 37/21, 41/14
drop 7/19
dry 27/11, 36/19, 37/2, 37/7, 46/16
during 12/15, 22/7, 56/13, 63/1, 63/13, 63/16, 85/4
duties 12/21

# E

e-mail 4/13
East 1/10, 1/14, 3/12, 59/5, 59/8, 59/9, 59/17,
60/2, 61/2
Eastern 7/25, 76/1
effect 44/11, 46/15
elaborate 23/18
elected 80/16
emphasis 26/12
employed 5/15
employee 5/19, 5/21, 6/22, 11/15, 14/15, 15/2,
66/14, 68/7, 68/20, 90/13, 90/14
employment 22/7, 54/25
end 60/25, 61/1, 61/2
Engineer 20/9, 75/9, 75/14
engineer's 14/15
engineers 81/15
entry 21/10
equipped 47/9
equivalent 37/7
errors 87/18
evaluate 19/9, 23/6, 24/25
evaluated 18/14, 21/20, 24/8, 28/15
evaluating 14/18, 62/15
Evaluation 14/24, 29/21, 62/20
evening 55/6
eventful 50/6
events 55/17
evidence 3/3, 82/21
EXAMINATION 2/3, 2/6, 2/9, 2/12, 2/15, 5/6,
77/13, 80/1, 84/12, 85/17
excerpt 25/21
exchange 69/14
Excuse 30/17, 73/19, 82/9
exercise 81/6
exhausted 33/22
Exhibit 57/24, 58/8, 58/11
EXHIBITS 2/18
experience 75/12
Expires 89/21
express 78/7, 78/8
expressed 23/11, 29/5, 45/5, 85/5

# F

F.A.A 13/20, 16/12, 55/3, 55/4, 56/5, 56/9, 56/12,
61/24, 64/18, 65/16, 67/20, 68/9, 68/18, 69/2, 73/25,
82/8, 82/16
F.A.A.s 7/19, 65/8
F.A.R 48/19, 48/20, 48/25
F.O 66/13
fact 17/14, 18/14, 28/8, 29/21, 67/4, 68/7, 72/1,
72/20, 84/20
factor 36/6
factors 66/12, 68/24
facts 57/13, 61/7, 69/4, 78/9
failed 64/15, 65/7, 65/15

Falcon 8/14
familiarity 67/13
fancy 12/24
fault 45/2, 75/1, 82/3
faulted 75/2, 80/25
faulting 42/8
favor 65/9
fax 4/13, 4/16, 4/17, 57/22
Feds 62/2
feet 43/1, 43/2, 43/4, 43/6, 72/18
ferry 6/5, 6/6, 6/15, 8/16, 12/6, 32/1
file 31/23, 61/21, 67/10
filed 3/8, 5/3, 55/3
fill 15/4
filled 63/9, 63/22
financially 90/16
find 74/10
Fine 10/15, 25/23, 39/19
finish 28/23, 30/18
finished 42/10, 79/20, 87/14
fired 61/23, 67/11, 68/20
firing 67/21
firm 48/2
five 72/18
flew 27/22, 75/25
flight 6/15, 8/15, 14/12, 14/14, 14/16, 15/2, 15/10, 16/7, 16/11, 20/9, 28/17, 31/18, 32/1, 32/21, 32/22, 33/3, 33/24, 34/7, 34/8, 34/12, 34/16, 35/6, 35/9, 36/1, 41/1, 43/8, 44/13, 47/5, 50/7, 50/8, 52/3, 52/15, 53/13, 56/16, 61/8, 62/11, 74/3, 74/4, 74/24, 75/14, 78/14, 81/14, 81/15, 83/7
FLORIDA 1/1, 1/10, 1/14, 1/18, 3/10, 3/11, 8/20, 9/2, 9/3, 9/7, 35/22, 89/3, 89/21, 90/2
fly 7/20, 7/21, 12/1, 12/4, 24/6, 33/19, 47/20, 75/14, 87/8
flying 8/16, 12/1, 12/24, 20/1, 26/4, 28/17, 54/22
followed 73/22
follows 5/5, 14/5
forgot 22/22
form 14/5, 14/9, 15/14, 15/23, 18/23, 20/8, 25/13, 27/3, 27/6, 30/2, 36/22, 38/3, 41/5, 41/21, 42/14, 45/7, 46/1, 48/12, 49/16, 49/22, 63/23, 67/16, 67/22, 68/21, 69/6, 72/4, 75/21, 76/10, 80/18, 83/16, 83/21, 84/6, 87/7
formal 27/24, 34/3, 40/22, 40/24
formally 11/23
format 20/10
forms 15/17, 17/11, 18/16, 19/21
Fort 1/10, 1/14, 3/12, 12/6, 40/25, 47/10, 58/25
found 56/17, 69/25, 82/9
founded 79/8
four 8/1
frequency 43/19
front 18/7, 18/9
full-time 5/16, 6/22, 7/1
functions 8/7
furnished 17/7, 56/2

G

G.P.S 47/17, 49/10
gate 35/18, 45/5, 51/18, 52/8, 84/18, 85/4
gather 34/14, 49/14, 77/15
Gem 8/17
genuine 78/13
get-togethers 27/25
go-ahead 22/24, 23/3
God 81/12
GORDON 1/13, 3/11
government 69/22
grace 12/16, 13/22
grade 18/4, 28/12, 63/23
grades 62/12, 63/16, 63/17, 64/8
grain 68/19
greater 37/13, 39/5, 44/24
ground 43/13, 43/18, 50/19, 86/10
grumpy 76/1
guess 56/23, 60/19, 60/20, 69/8, 70/13, 74/14
guidelines 40/5
guy 37/21, 41/13, 79/9, 86/11

H

half 80/21
hand 51/11, 89/10
handled 53/15
hands 76/2
happy 26/19, 57/22, 70/13, 70/14
hard 80/23
HARGROVE 1/13, 3/11
heading 47/14, 47/23, 48/1, 49/12
heavy 35/1, 35/21
HEINRICH 1/13, 3/11
help 26/7, 26/14
hire 8/19
hiring 58/18
hold 4/6
holding 27/2
holiday 9/12
home 9/5, 29/25
hooked 46/3
hours 11/17, 11/18
hundred 60/15

I

idea 12/18, 31/19, 87/19
Identification 58/12
ignored 82/1
imagine 31/5
immaterial 85/2
implicate 5/11
impression 24/22
improve 28/12
improved 67/6, 85/22
inch 37/1, 37/10, 37/13, 38/23, 39/6, 39/9, 39/11, 44/10
inches 40/11, 40/14, 41/24
incident 57/14, 61/17
income 70/9, 70/11
inconsistent 48/10, 75/19, 75/22, 76/23, 76/25, 82/6, 83/13, 83/23
independent 81/6
indicate 19/21
indicated 71/7, 76/20
indicates 21/23
indication 47/23
ineligible 8/5
information 61/11, 68/12
initial 15/15, 48/1, 49/12
initials 15/1
initiated 54/12
input 27/23, 75/12, 81/11
inquiring 52/8
Inspector 49/3, 64/18, 66/2
instruction 65/11
instructions 49/15
instructor 6/4, 24/23, 27/1, 27/2, 27/8, 27/16
instructors 27/13, 27/18
insubordinate 52/1, 78/11
Insubordination 51/21
intent 61/25
intermittent 6/11, 6/12
INTERNATIONAL 1/7, 3/5
Internet 4/14
interrupting 10/7
intervened 77/17
investigation 62/7, 69/14
issue 38/16, 38/19, 68/18, 71/20, 81/23
issued 40/3
issues 29/4

J

JAMES 1/13, 3/11
January 1/11, 3/13, 5/24, 89/11
Jet 11/14
job 9/20, 12/8
Joel 21/12
John 2/21, 13/12, 49/3, 53/22, 56/19, 56/22, 69/13, 69/24
JORSEY 1/24, 2/2, 2/21, 3/1, 5/2, 5/9, 13/13, 15/17, 49/24, 53/1, 58/2, 79/13, 79/25, 81/18, 89/7, 90/7
judgment 19/13, 23/19, 24/7, 39/23, 41/13, 41/20, 81/7
judgments 81/10
Judicial 3/7
Jules 1/21, 3/25
jump 82/5
jump-seat 34/1
jumps 34/5
June 61/15, 61/22

K

kill 76/5, 78/5, 79/9
knowledge 25/1, 25/7, 26/6, 26/13, 64/6, 67/12, 67/18, 68/16, 87/9
known 9/18, 24/20, 61/7
knows 48/1, 71/1

L

L.T 1/3
lack 82/11
lacking 24/8
laid 7/2, 7/10
Laker 8/14
land 13/23
Landview 22/19
Lane 5/13, 13/11
Large 3/10
later 17/3, 66/11, 78/9, 86/17
latitude 81/1
Latori 21/24
Lauderdale 1/10, 1/14, 3/12, 12/6, 40/25, 47/11, 59/1
lawful 3/2, 5/4
lawyer 24/3, 24/5, 70/25
lawyers 65/21
lead 66/12
learn 61/17
learned 55/2, 56/17
leave 13/17, 46/23
led 68/24
left 19/22, 19/25, 45/15, 51/4, 51/18, 53/2, 62/20, 76/9, 86/16
legal 10/5, 10/9
length 60/1
Letter 2/21, 56/19, 56/21, 57/3, 57/5, 57/12, 57/15, 58/17, 61/19, 61/24, 62/2, 62/3, 62/8, 64/23, 65/10, 68/18, 69/23, 70/6, 71/17, 78/9, 82/15, 82/16, 82/24
letterhead 15/18, 58/1
Lewis 33/14
life 78/6
Lily 1/21, 3/24
line 6/4, 6/5, 6/16, 7/20, 8/5, 11/24, 12/2, 12/10, 12/12, 12/14, 12/20, 12/22, 13/2, 13/6, 13/16, 13/18, 13/22, 14/1, 14/5, 14/12, 14/19, 24/9, 24/11, 34/1, 34/3, 34/13, 34/25, 44/10, 47/20
lined 59/12
lines 47/20
list 11/24, 12/13, 13/15
literate 32/9
little 18/2, 29/23, 51/14
live 5/12, 9/17
loading 33/17
located 8/11
log 18/10
logbook 21/10, 21/23, 75/9
lose 26/5, 70/15
losing 70/14

M

machine 4/17
Macineer 13/12
maintain 6/7
maintains 12/11
MAJOR 1/4, 1/21, 3/4, 3/25, 15/21, 15/22, 16/24, 18/13, 18/22, 22/7, 25/10, 28/19, 29/2, 31/9, 31/12, 32/11, 35/14, 35/23, 43/17, 45/23, 46/11, 50/14, 50/24, 53/1, 53/4, 53/21, 65/9, 75/3, 76/6, 80/4
Major's 3/20, 21/1, 67/10
Majorca 1/17
man 24/21
management 29/22, 75/6
maneuver 16/8
manifest 13/1
March 5/11, 6/25, 7/1, 7/14, 7/22
marked 57/24, 58/11
material 36/13, 85/14, 85/20
matter 36/12, 67/23, 72/14, 72/16
meet 22/12
meeting 19/18, 22/13, 22/15, 22/17, 22/23, 22/24, 23/11, 23/20, 27/20, 30/23, 55/19
meetings 22/13, 27/24
member 14/3
members 13/24
memo 54/4, 54/6, 62/25
memorandum 31/9, 55/16
memos 31/11, 31/12, 31/13
mentioned 31/20, 44/23, 45/16, 71/8
message 40/18
met 19/8, 22/9, 69/10
Miami 1/18, 9/2, 10/24, 47/10
Michaels 33/14, 33/19
mile 27/16
mind 7/19, 24/21, 26/4, 78/14
minute 27/16, 82/5
minutes 64/22
mitigating 57/13

month 6/17, 12/14, 12/15, 12/16, 13/21, 13/2.
months 6/14, 7/5, 61/13, 70/8
morning 3/17, 11/11
moved 8/2, 73/7
Mr. Bassett 17/3
Mr. Jorsey 3/17, 27/5, 70/20, 76/19, 84/9, 87/4, 87/13
Mr. Major 71/7, 71/16, 73/11, 73/13, 73/20, 74/9, 75/15, 76/20, 79/18, 82/9, 84/1, 84/2, 84/4
Mr. Major's 83/5
Mr. Steel 73/22
MS. NORTON 2/5, 2/8, 2/11, 2/14, 2/17, 4/4, 9/8, 10/4, 10/8, 10/15, 14/11, 20/14, 20/23, 20/25, 25/18, 25/23, 27/3, 30/2, 30/17, 36/22, 38/3, 41/5, 41/21, 42/13, 42/18, 44/15, 45/7, 46/1, 48/12, 49/16, 49/22, 58/13, 58/15, 67/16, 67/22, 68/21, 69/6, 70/20, 70/23, 72/7, 76/10, 76/15, 76/17, 77/12, 79/12, 79/15, 79/17, 79/24, 80/18, 81/17, 81/20, 82/13, 82/14, 82/22, 82/25, 83/2, 83/17, 83/20, 83/24, 83/25, 84/8, 85/12, 85/16, 87/4, 87/6, 87/12, 87/22, 87/25
Ms. Norton's 4/21
MS. SHEA 2/3, 2/6, 2/9, 2/12, 2/15, 2/19, 3/17, 3/19, 3/22, 3/24, 4/9, 4/19, 4/21, 5/7, 9/13, 9/14, 10/7, 10/12, 10/18, 10/22, 10/25, 14/20, 20/15, 20/24, 21/3, 21/14, 25/21, 25/24, 27/7, 30/6, 30/19, 37/3, 38/5, 41/8, 41/9, 42/6, 42/15, 42/21, 44/19, 45/9, 46/8, 48/16, 49/20, 50/2, 58/7, 58/14, 58/16, 67/19, 68/1, 69/3, 69/12, 70/18, 72/4, 75/21, 76/13, 77/14, 79/10, 80/2, 80/22, 81/16, 82/11, 82/17, 83/16, 83/22, 84/6, 84/9, 84/13, 85/18, 87/2, 87/10, 87/14, 87/16, 87/24

### N

name 5/8, 14/14, 14/15, 21/1, 21/2, 22/22, 59/18, 59/21
named 5/3
NASA 55/4, 68/7, 71/17, 71/22
nasty 78/9
nastygram 64/23
nature 75/14, 77/15
navigation 47/4, 47/10, 47/18, 47/25, 48/6
need 35/24, 36/9, 36/16
needed 6/12, 28/23
needs 12/4, 12/22, 26/3
negative 45/19
network 4/15
Nevermind 87/13
normally 19/12
northeast 59/9
NORTON 1/17, 1/18, 3/24
Notary 3/9, 89/21
note 61/5
notes 15/13, 31/15, 90/10
notice 3/8, 5/3
November 56/25, 57/16, 58/2, 62/3, 66/7, 66/8
NUMBER 2/21, 14/15, 14/17, 15/2, 44/25, 58/11, 61/11, 62/11, 84/14

### O

oath 4/23, 5/5, 89/1
object 25/18, 27/3, 30/2, 36/22, 38/3, 41/5, 41/21, 42/13, 45/7, 46/1, 48/12, 49/16, 49/22, 49/25, 67/16, 67/22, 68/21, 69/6, 72/4, 75/21, 80/18, 82/19, 83/16, 83/22, 84/6
objected 47/4, 76/10
objecting 27/5
objection 8/23, 76/12, 82/11, 82/17, 83/20
obligated 37/20
obligation 56/11, 73/24
observation 13/19
observations 33/7, 33/8, 33/23, 83/14
observe 13/20, 24/18, 32/24
observed 14/16, 35/15, 59/15, 84/2
observing 32/16
occasion 24/16, 24/18, 29/15, 29/25
occasional 6/11
occasions 25/4, 32/23, 52/15
occupation 5/17
occupied 7/23
occupying 20/2
offer 57/8
office 55/7
officer 15/2, 18/19, 20/9, 32/17, 62/11, 64/5, 66/4
officer's 14/14
officers 19/9
offices 3/10
official 36/20, 89/10
old 76/1

one-page 16/6, 31/7
operate 52/23
operating 48/7
operation 13/22, 49/3
Operation's 23/5
Operations 19/8, 19/18, 31/22, 54/10, 67/5
opinion 23/10, 24/6, 24/7, 25/5, 41/15, 41/17, 48/5, 50/8, 53/4, 67/7, 68/25, 69/1, 69/5, 69/8, 69/18, 80/15, 87/7
opinions 57/9
opportunity 57/9, 65/2
opposed 30/24, 58/18, 81/24
oral 64/22, 65/14, 66/3
order 17/8
original 63/2
outcome 69/13
over-weight 76/24
overhear 43/11
overrule 50/13
overruling

### P

P.A 1/13, 1/17, 3/11
Pan 8/15
paper 67/9, 69/9
papers 4/16
paperwork 46/5
paragraph 58/20, 61/3, 61/5
paragraphs 58/5
parallel 60/1
Pardon 43/9, 70/10
part 26/12, 35/8, 65/8, 66/24, 82/18, 83/5
part-time 5/21, 5/25, 7/4, 11/15
parties 90/13
parties' 90/14
pass 65/18
passage 85/20
passed 18/19, 73/6
passengers 7/21
passing 55/7
Pat 3/19, 3/25, 15/21, 15/22, 16/24, 17/20, 18/13, 18/22, 19/12, 19/22, 21/1, 21/11, 22/6, 22/7, 24/25, 25/10, 26/3, 27/19, 28/1, 28/7, 28/18, 29/2, 29/15, 29/21, 30/7, 31/9, 31/12, 32/11, 32/16, 33/23, 35/14, 35/23, 43/17, 44/20, 45/23, 46/10, 46/15, 47/5, 47/12, 47/15, 49/5, 49/13, 50/14, 50/23, 52/11, 53/1, 53/4, 53/5, 53/21, 54/22, 55/3, 55/13, 61/23, 65/9, 67/10, 75/3, 76/6, 77/16, 78/12, 80/4, 80/25, 81/1, 81/5, 84/14, 85/3
Pat's 22/2, 29/24, 30/24, 32/24, 46/11, 53/13, 54/18, 54/25, 56/18, 62/8, 66/22, 81/7, 87/1
path 59/1, 72/14
PATRICK 1/4, 1/21, 3/4
pay 9/9
PC 31/15
penalties 38/9
penalty 36/3, 36/12, 36/17, 37/8, 37/14, 39/14, 41/4, 42/24
pending 3/6, 11/22, 42/17, 66/4
percentage 60/16
percentages 39/18
performance 18/17, 23/16, 32/24, 61/12, 62/12, 62/22, 63/13, 63/16, 63/25, 64/8, 66/16, 66/18, 66/20, 66/25, 67/7
performed 64/1
period 6/24, 28/24, 29/8, 54/8, 71/24
permission 4/1
permitting 81/5
persistence 53/13
personal 16/23, 19/23, 20/16, 29/21
personally 27/17, 28/19, 57/9, 89/7
Pete 22/2, 30/20, 31/5, 31/11, 31/22, 54/15, 54/18, 55/7, 62/21, 63/24, 64/10, 64/23, 65/10, 67/7
Philadelphia 24/3, 24/5, 70/24
phone 9/25, 54/13
pick 26/18
piece 67/9
pilot 5/18, 6/5, 6/6, 7/17, 8/5, 12/24, 19/23, 33/4, 42/3, 67/10, 67/14, 77/25, 78/5, 78/19, 81/25
Pilot's 15/1
pilots 7/20, 67/8, 65/18
pink 65/10, 65/16, 65/18
place 14/18, 35/5, 47/11, 84/25
Plaintiff 1/5, 1/15, 3/5
PLAINTIFF'S 2/20, 58/11
plane 46/10, 51/2, 51/14, 51/18, 53/5, 53/7, 74/14, 76/24, 81/24, 82/10
Planet 8/13
play 54/21
point 7/2, 24/8, 25/14, 47/21, 48/25, 51/1, 54/20, 59/10, 63/21, 73/18, 74/15, 77/5, 78/2, 83/4, 84/23,

pointed 59/7
policy 36/18, 36/21, 48/19, 48/22
political 30/8, 71/9, 71/20, 71/24
poor 61/12, 61/16, 62/12, 62/21, 63/17, 63/23, 64/8, 66/15, 66/18, 66/20, 66/25, 67/6
portion 64/22
portions 73/4
position 35/10, 83/12
possibility 45/24, 46/12
possible 85/6
potential 35/24
POTTER 1/18
pound 44/25
poured 35/2
pouring 35/22
pre-flight 14/18
pre-takeoff 35/8
predicate 82/12, 82/18
predominantly 59/9
prepare 65/1
prepared 65/1
preserve 49/25
pretty 27/11, 58/3
primary 47/17
problem 4/15, 33/2, 33/9, 33/15, 45/3, 71/24, 76/7
problems 30/8, 71/9
procedures 24/17, 25/1, 25/8, 26/6, 49/9, 73/23
proceed 4/24, 12/7, 12/25, 39/21
proceeded 35/1, 47/18
proceedings 3/16
process 30/25
profess 75/20, 76/11
proficiency 16/11, 18/22, 18/24, 18/25, 19/10, 19/20, 20/9, 20/11, 22/1, 25/6, 26/2, 32/17, 61/13, 62/12, 62/14, 62/24, 63/1, 63/2, 63/8, 63/11, 63/12, 63/14, 63/16, 63/22, 64/2, 64/3, 64/9, 64/14, 67/3
Proficiency/Qualification 14/6, 15/20
promoted 19/11
protect 82/1
provisions 42/23
prudent 83/13
Public 3/9, 89/21
published 12/13
Puerto 47/12
purpose 3/2
purposes 87/18
push-back 45/23, 46/10
pushback 34/22, 35/19, 36/7, 36/8, 44/1, 52/9, 53/2, 53/6, 53/8, 59/2
put 4/6, 13/1, 19/12, 19/22, 19/25, 21/11, 30/25, 31/22, 39/2, 51/10, 52/6, 65/19, 69/9
puts 75/9
putting 54/7

### Q

quarter 37/1, 37/9, 37/10, 37/13, 38/23, 39/6, 39/9, 39/11, 44/10
question 10/6, 10/9, 25/18, 27/4, 27/6, 27/9, 28/18, 29/1, 29/20, 30/3, 33/6, 35/13, 36/23, 38/4, 39/7, 39/20, 41/6, 41/22, 42/7, 42/12, 42/14, 42/16, 45/8, 46/2, 48/13, 49/17, 49/23, 49/24, 50/1, 52/25, 58/23, 67/17, 67/23, 68/22, 69/7, 72/5, 76/11, 76/16, 76/19, 77/2, 79/12, 80/19, 81/17, 83/1, 83/4, 83/15, 84/10, 86/20
questioning 65/11
questioning 65/20, 82/16
questions 24/20, 24/21, 70/19, 77/12, 79/11, 85/9, 87/3
quietly 81/22
quit 46/18
quote/unquote 80/5

### R

radar 59/7
radio 46/4
rain 35/1, 35/3, 35/21, 73/6
raining 35/1, 36/9, 36/11
raises 81/22
raising 51/22, 84/17
ramp 22/11, 33/3, 33/15, 33/16, 44/21, 45/8, 45/10, 45/11, 45/14, 45/23, 46/10, 85/3, 86/16
rank 39/23
rating 30/9, 61/12, 66/19, 66/21
ratings 61/16, 66/16, 66/25
read 14/8, 25/25, 26/17, 39/15, 42/7, 42/11, 55/24, 61/21, 61/22, 62/1, 62/6, 64/25, 65/3, 66/3, 87/16
reading 25/6, 88/3

reasonable 79/7
reasons 28/20
recall 17/1, 18/21, 20/3, 25/9, 25/11, 30/5, 30/7, 34/8, 34/21, 34/24, 35/8, 44/20, 45/6, 45/23, 46/9, 46/13, 46/22, 55/18, 84/14, 84/17
recalled 35/6
receipt 57/12
received 32/24, 56/20, 69/23, 82/8, 82/13, 85/24
recollection 16/23, 17/8, 19/24, 20/16, 21/6, 21/7, 33/22, 73/1, 73/17
recollections 18/18, 55/20, 61/4
recommend 19/2, 19/14, 63/20, 72/1, 87/22
recommended 23/4, 23/7, 28/1, 28/3, 65/13
recommending 28/8, 28/19, 29/3
reconciling 80/24
record 4/2, 4/4, 4/11, 17/4, 17/14, 25/15, 25/20, 35/22, 54/7, 65/17, 79/15, 82/18, 90/9
records 7/7, 12/12, 64/2, 66/22
RECROSS-EXAMINATION 2/7, 2/13, 2/16, 79/16, 81/19, 85/11, 87/5
REDIRECT 2/6, 2/12, 2/15, 77/13, 80/1, 84/12, 85/17
reduction 36/10, 37/15, 38/2, 44/13, 44/18, 44/22, 44/25, 46/6
reference 53/24, 54/10, 62/14
reflect 4/4, 18/17
refresh 17/8
regular 6/7, 11/17, 11/18
regulation 13/25, 43/2, 53/23
rejected 63/5, 64/17, 65/6, 65/23, 65/24
related 56/18, 69/14
relates 12/10, 53/21
relationship 5/25, 6/3, 11/14, 42/22
relative 90/12, 90/14
relay 43/18
relayed 67/7, 69/1
relevancy 87/11
rely 48/17
relying 53/2
remember 7/2, 7/6, 7/9, 7/12, 21/9, 30/4, 33/9, 33/11, 33/12, 33/21, 34/6, 44/8, 45/21, 46/19, 46/25, 47/13, 54/6, 59/10, 63/3, 71/10, 73/10, 76/13, 82/15
remote 87/20
removed 56/24
rephrase 73/9, 76/15, 82/25
report 14/2, 14/3, 14/13, 17/5, 18/24, 18/25, 19/6, 20/9, 26/2, 31/7, 31/9, 32/2, 32/18, 35/14, 36/20, 37/6, 37/12, 37/17, 37/25, 38/11, 38/22, 38/25, 39/8, 40/12, 40/22, 40/24, 41/12, 41/18, 42/2, 42/3, 42/16, 42/17, 42/19, 42/20, 42/24, 43/15, 43/18, 43/20, 43/22, 43/23, 44/2, 44/6, 46/17, 52/7, 55/3, 55/11, 55/24, 56/12, 61/14, 61/18, 61/21, 61/23, 62/21, 63/12, 63/15, 68/8, 71/21, 73/12, 73/14, 73/15, 73/25, 78/10, 82/8, 84/15, 85/1, 85/24, 86/2, 86/5, 86/8, 86/12, 86/17, 86/18, 90/7
reported 38/12, 74/1
Reporter 3/9, 4/1, 4/3, 4/22, 42/7, 42/11, 89/20, 90/5
REPORTER'S 90/1
reporting 87/19
reports 18/22, 32/19, 33/4, 41/23, 63/8, 67/14, 68/12, 69/9
Representative 1/21, 56/5
reprimanded 50/12
request 9/25
requested 10/3, 90/8
requesting 43/17, 53/22
require 44/13, 44/17
required 12/12, 13/19, 16/12, 26/5
requirement 15/8
researching 61/20
resource 75/6
respect 12/4, 36/19, 80/10
respond 57/2
responding 46/11, 67/21
response 29/23, 45/4, 45/6, 57/6, 62/8, 80/16
responsible 81/13
restored 70/2
results 18/5
Retained 2/19
returned 73/16
revenue 7/21
reverse 82/2
reversed 35/15
review 17/8, 90/7
reviewed 66/22
Rico 47/12
ride 19/19, 65/13, 67/3
rides 19/11, 22/22, 23/22
riding 34/2
Roger 47/13, 52/18, 52/19, 75/17, 77/23
role 54/21, 54/24

Roseburough 2/21, 49/3, 49/6, 53/22, 56/19, 56/22, 57/5, 69/10, 69/24
Roseburough's 69/14
route 14/19
run 52/24, 60/23
running 74/24
runs 60/2
runway 35/12, 35/13, 35/15, 35/25, 36/3, 37/2, 37/5, 37/7, 37/21, 38/10, 39/25, 40/10, 40/12, 40/25, 41/11, 41/12, 41/14, 41/16, 41/24, 42/1, 42/23, 43/22, 43/24, 46/16, 51/6, 51/8, 59/6, 59/16, 60/3, 60/5, 60/8, 60/10, 60/13, 60/14, 60/15, 60/16, 72/12, 72/15, 72/18, 72/24, 74/7, 83/6, 84/15, 85/6, 85/13, 86/15, 86/22, 86/24
runways 36/19, 58/25, 59/18, 59/21

**S**

safety 38/16, 38/19, 78/14, 81/14
salt 68/19
sat 22/10, 24/15, 27/15, 35/2
Satisfactory 16/7, 18/4, 18/17, 19/7, 62/18, 63/9, 64/1, 64/5
save 32/9
saw 42/1, 48/11, 54/14, 55/9, 56/3, 65/6
schedule 6/7, 11/25, 12/4, 12/23, 12/25
scope 87/10
SCOTT 1/4, 1/21, 3/4
seal 89/10
seat 19/13, 19/22, 19/25, 20/2, 28/17, 62/20
Seattle 12/6
second 4/7, 58/3, 58/20, 74/10
secretary 4/7
send 16/22, 41/13, 64/25
sending 86/11
seniority 19/11
sent 64/23, 68/13, 68/15
sentence 25/19, 30/18
Service 8/15, 8/16
sessions 22/10
set 9/16, 61/3
setting 12/10, 35/25
shared 55/22
sharp 24/22, 26/25, 27/8
SHEA 1/15, 3/19
sheet 16/6
shooing 27/8
shooting 24/23, 26/25
short 54/5, 58/3, 58/5
show 12/1, 15/15, 34/16, 64/3
shows 17/20, 64/4, 67/10
shut 7/25, 8/2
side 16/6, 44/10, 61/5, 63/24
sign 15/14, 18/6, 20/12, 51/11, 52/3
signature 15/1
signed 18/8, 20/13, 21/8, 64/4, 73/16, 73/19
Signing 88/3
signs 52/4
silencing 50/12
simulator 16/9, 17/14, 17/20, 18/11, 18/25, 19/1, 19/22, 21/11, 21/22, 21/25, 23/1, 23/21, 23/23, 28/22, 30/24, 31/6, 32/19, 63/2
single 67/9
sit 73/10, 76/2, 82/4
sits 81/22, 81/24
sitting 86/14
situation 24/19, 33/1, 39/2, 49/7, 53/14, 54/11, 58/21, 81/21
six 40/11, 40/13, 41/24
six-month 16/19
Skipping 62/11
slash 20/11
slip 65/10, 65/18
slipped 65/16
slush 40/10
snow 40/11, 41/16, 41/24, 42/1
Sonan 64/18, 64/21, 64/23, 65/3, 65/7, 65/9, 66/2
sounds 47/2
sources 27/24
South 8/20, 9/7, 35/22
SOUTHERN 1/1
specified 86/7
speed 36/1, 37/14, 38/2, 44/13, 44/17, 44/21
spots 16/5
Springfield 5/13
standard 17/25
standing 36/3, 36/5, 37/1, 37/6, 37/9, 37/11, 37/13, 37/25, 38/9, 38/22, 39/5, 39/9, 39/17, 39/21, 43/15, 44/4, 44/6, 44/9, 44/24, 45/25, 46/11, 54/18, 67/11, 67/14, 72/11, 72/16, 72/17, 72/20, 73/2, 73/3, 85/25
start 60/23

61/19, 75/25
State 3/10, 25/7, 58/20, 89/3, 89/21, 90/2
statement 25/9, 28/14, 39/5, 46/19, 57/10, 57/12, 64/8, 64/20, 86/23
statements 45/23, 46/9
STATES 1/1, 58/2
stay 28/24
Steel 22/2, 24/10, 24/12, 30/20, 31/5, 31/11, 32/22, 33/24, 34/9, 34/13, 46/10, 47/14, 50/5, 50/12, 53/4, 53/17, 54/15, 54/18, 55/8, 61/14, 62/21, 64/24, 65/10, 67/7, 68/25, 69/15, 72/23, 73/12, 75/1, 75/3, 80/25, 81/4
Steel's 61/22, 77/9
stenographic 90/9
stenographically 90/6
stopped 22/11, 54/14, 74/2, 74/4
stops 14/17
storm 73/6
story 80/12
straight 47/20
Strike 58/23
study 62/6
stuff 4/13
subjected 80/4
submit 57/9
submitted 71/17, 73/16, 73/19
such-and-such 42/4
suit 66/4, 66/9, 78/9
Suite 1/14, 1/17
suits 12/24
summarize 47/8
summoned 55/10, 56/15
superseding 42/17
support 20/1, 53/3, 64/7, 69/4
supported 29/22
supporting 30/13
SUSAN 1/18, 3/24
suspend 54/22
sworn 4/5, 5/4, 89/8
System 47/10, 47/18, 47/25

**T**

takeback 36/7
takeoff 14/19, 36/14, 36/16, 41/1, 43/8, 44/1, 52/19, 52/21, 59/2, 59/12, 60/23, 73/6, 75/15, 75/17, 76/21, 77/4, 84/5, 86/1, 86/3, 86/19
talk 24/6, 34/7, 65/2
talked 27/18, 32/16
talking 28/16, 28/20, 82/23, 86/24
task 27/2
taxi 35/10, 52/19, 52/20, 58/21
taxied 35/3, 35/11, 43/24, 59/5, 59/15, 59/16, 60/2, 60/3, 60/6, 60/17, 72/25
taxiway 59/11, 59/12, 59/14, 60/1, 60/12, 85/4
taxiways 59/18, 59/22
taxying 14/18, 53/9, 60/7, 60/8, 78/17, 86/15
teach 24/14
telephone 4/3, 11/7, 11/12, 28/16, 29/12, 29/25
Telephonically 1/25
ten 57/11, 64/22
term 24/2, 83/22
Terminal 40/17
terminate 54/25
terminated 55/13, 66/13, 67/15, 71/16
terms 33/23, 37/7, 58/24, 66/1, 84/5
test 6/5, 32/1, 65/24
testified 5/5, 30/23
testify 40/4
testimony 11/22, 34/14, 40/2, 43/25, 44/12, 53/3, 77/16, 80/3, 80/24
Thank 58/15, 77/1, 77/12, 79/24, 84/8, 85/10, 85/16, 87/2, 87/13, 87/24, 87/25
Thanks 22/4
THEREUPON 3/15, 5/1
three 6/13, 7/5, 8/1, 13/6, 13/9, 34/3, 70/8, 85/4
threw 66/2, 86/21
throw 28/22, 28/24
thrown 50/14, 51/2, 51/3, 51/13, 51/17, 53/4, 53/7, 69/17, 74/14
thunderstorms 35/21, 59/8
time 5/20, 6/20, 6/21, 6/23, 7/4, 7/14, 9/1, 15/8, 15/10, 18/20, 19/17, 22/19, 23/4, 24/24, 25/12, 26/8, 27/15, 27/24, 29/10, 33/4, 33/18, 34/22, 36/4, 36/7, 36/11, 36/14, 36/15, 38/25, 43/25, 46/4, 46/7, 47/16, 54/8, 55/2, 55/17, 55/25, 56/15, 61/7, 61/15, 61/23, 69/22, 71/17, 71/20, 71/25, 74/7, 75/24, 79/18, 80/21, 80/23, 81/7, 85/20, 86/7, 86/9, 86/10
times 34/3, 85/4, 85/13
title 31/13
tolerant 53/17
top 14/9

towns 38/22, 39/8, 40/2, 42/24, 42/15, 43/
43/18, 44/7, 47/11, 77/5, 85/25
track  26/5
Tracy  13/11
trained  19/15, 24/17
Training  8/15, 12/11, 12/17, 13/4, 22/10, 66/22,
67/13
training-related  12/21
transcript  87/17, 90/8
transpose  15/13
treated  46/16
trip  9/9, 31/15, 31/25, 33/2, 55/7
true  56/14, 58/17, 72/9, 90/9
turn  7/18, 79/18
turned  7/14, 35/14, 53/10, 59/9, 59/10, 59/16, 60/4
two  13/6, 13/9, 15/17, 16/21, 32/18, 34/2, 36/10,
55/8, 58/5, 86/21
two-collum  16/3
two-column  16/4
two-engine  6/6, 6/15, 12/6, 32/1
typed  87/17

### U

Um-hmm  15/19, 58/22, 66/17, 71/19
Unacceptable  50/16
underscore  84/3
undersigned  89/6
UNITED  1/1
unsafe  78/6
unsatisfactory  14/25, 16/7
upgrade  18/15, 19/2, 19/3, 21/21, 22/2, 22/16,
22/25, 28/15, 29/3, 29/24, 30/1, 30/25, 31/1, 62/16,
63/5, 63/6, 63/14, 63/17, 64/18, 65/5, 65/13, 71/25,
72/2
upgraded  19/15, 23/14, 26/22, 28/2, 30/9
upgrading  29/17
upshot  62/8

### V

VALERIE  1/15, 3/19
version  55/16, 56/16
violation  55/5, 69/24, 74/3
violations  56/12
Virginia  5/13
voice  35/24
voiced  84/4, 85/5
voluntarily  9/24, 10/16, 32/3, 38/2
voting  23/8

### W

waiting  59/12
waive  87/20, 87/22, 87/23
waived  88/4
walk  78/22
walking  78/23
warning  82/15
waste  69/22
watch  74/7
water  35/13, 36/3, 36/5, 37/1, 37/6, 37/9, 37/11,
37/13, 37/25, 38/9, 38/23, 39/5, 39/9, 39/17, 39/21,
41/15, 43/16, 44/4, 44/6, 44/9, 44/24, 45/25, 46/12,
53/13, 54/18, 72/11, 72/13, 72/16, 72/17, 72/21,
73/2, 73/3, 85/25
wearing  43/10
weather  35/1, 35/16, 35/18, 35/22, 40/18, 40/23,
42/4, 42/25, 59/7, 84/18, 85/5, 85/21, 86/23, 86/25,
87/8
Wednesday  1/11, 3/13
week  8/21, 9/11, 9/16
weeks  12/5
weight  35/25, 36/10, 36/25, 37/14, 38/2, 44/13,
44/18, 44/21, 46/6, 51/10, 52/7, 52/11, 73/12, 73/14,
73/15, 73/24, 75/20, 77/6, 77/11, 79/19, 79/22,
82/10, 83/7
WEIHE  1/13, 3/11
well-founded  78/20
west  60/2, 60/3, 60/7
wet  37/5
wheel  72/13
wherever  12/7, 35/4, 48/3
wipers  73/6
wish  57/8
withdraw  87/12
WITNESS  2/2, 3/1, 3/18, 3/21, 3/23, 4/6, 4/12,
4/20, 4/25, 5/3, 9/10, 10/2, 10/10, 10/20, 10/23,
14/12, 21/1, 30/4, 30/18, 36/24, 41/7, 41/23, 42/19,
44/14, 44/17, 46/3, 48/15, 49/18, 50/1, 67/18, 67/24,
68/23, 69/8, 70/21, 72/6, 75/22, 79/14, 80/20, 82/23,
83/18, 84/7, 84/11, 87/15, 87/23, 88/1, 89/10

worded  63/15
words  29/13, 44/8, 46/25, 64/24
work  4/18, 5/22, 6/10, 6/14, 6/17, 6/19, 7/13, 8/4,
8/10, 8/11, 8/13, 8/15, 8/16, 9/23, 12/9, 24/1, 24/13,
34/20, 46/23, 84/24
worked  7/1, 7/24, 8/14, 80/14
working  9/11, 11/13, 12/20, 54/7, 68/9
world  77/10
worried  84/24
write  14/2, 14/3, 50/11, 65/10, 78/8
writing  19/16, 23/8, 25/9
written  25/15, 25/20, 25/22, 31/7, 31/8, 55/16,
57/10, 61/14, 63/8, 67/2, 68/13
wrong  25/4, 42/3, 42/5, 63/15
wrote  25/11, 26/3, 26/9, 31/11, 57/15, 58/19, 62/3

### X

X  2/1, 44/25

### Y

year  17/23, 20/3, 22/14
years  6/20, 7/25, 75/25

### Z

Zekan  5/13

CAPTAIN ALLEN JORSEY, SR.
6304 Zekan Lane
Springfield, VA 22150
(703) 971-7120

November 15, 1999

John C. Roseborough
FAA Flight Standards District Office 17
1050 Lee Wagener Blvd., Suite 201
Ft Lauderdale, FL 33315

Reference: Letter of investigation, File Number 2000SO170012

Dear Mr. Roseborough:

On August 17, 1999, Amerijet Flight #827 did depart Ft Lauderdale International Airport
but did not depart contrary to the Federal Aviation Regulations as to prevailing
conditions.

I arrived at the aircraft during a typical south Florida downpour to give the Captain Brian
Steele a line check. Weight reduction was discussed during the preflight and unknown to
me at the time, the F/O had requested a runway condition report. A normal start was
made and the Captain taxied west and then east on the taxi way with the weather radar on
to check the rain showers which were moving to the Northeast. Many passenger aircraft
elected to hold due to the weather to the North and Northeast. The F/O inquired and
received a runway report that he had requested earlier. As the rain had passed by; the
Captain elected to check the runway condition himself and back taxied the aircraft down
the runway to the West at which time he determined that the runway was only wet with
no standing water as the rain had stopped and this runway is grooved and has a crown.
From the observer seat I could see no standing water on the runway and no wipers were
needed as the rain had stopped. The runway was only wet requiring no penalty. The
Captain elected to take off based on his pilot observation during the back taxi and a
normal take off was made to the East.

As a side note are some facts, some not known to me at the time of this flight.
1. The Captain had given this F/O a poor performance rating some months earlier.
2. I had to instruct the F/O that he could not accept direct to Dorado because we were
   not yet authorized to use the GPS. He argued with me until I told him the discussion
   was over. The Captain called and got a heading, which we could accept.
3. This F/O has had poor performance grades on his proficiency check and was rejected
   for upgrade to Captain by FAA inspector B. Sonin. The company would not upgrade
   this F/O due to poor performance. Aeroservice also would not train him for upgrade
   to Captain.
4. This F/O has a pending suit against Amerijet



PLAINTIFF'S
EXHIBIT
10
1/8/01

PLAINTIFF'S
EXHIBIT

All these factors lead me to believe that this F/O is a former terminated disgruntled employee who wants to get back at the company, the Captain and the Check Captain for poor performance ratings.

I have given this Captain several line Checks, Proficiency Checks and know him to have many years and hours flying the B-727 and at no time were any FAR's or company regulations violated.

Sincerely,

Allen Jorsey, Sr.