UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PATRICK SCOTT MAJOR.                    :            CASE NO. 00-6070-Ferguson
                                                     Magistrate Judge Lurana S. Snow
        Plaintiff,                      :            L.T. Case No. 99-021746-11

vs.                                     :

AMERIJET INTERNATIONAL, INC.,           :

        Defendant.                      :
_____/

## PLAINTIFF'S STATEMENT OF MATERIAL DISPUTED FACTS

        Plaintiff. Patrick Scott Major. contends that the following evidence creates material fact
issues for trial.[1]

### MAJOR'S PROMOTIONAL EFFORTS

        1.      Major's date of birth is October 2. 1953.  He turned forty on October 2. 1993.
(P.E. 53)

        2.      Major began as a flight engineer with Amerijet in March 1991.  (Major D. 97)  In
1994. he was promoted to first officer, flying in the "right seat."  (Major D. 124)  Thereafter he
became interested in being promoted to captain.

        3.      As a cargo carrier subject to Part 121 of the Federal Airline Regulations (FARs),
Amerijet provides annual recurrent training to pilots and completes an annual proficiency check.
Apart from these requirements. Amerijet has no institutional means of evaluating its pilots.
(Huff D. 27)

        4.      In 1996, there were no written criteria for promotion (or if there were, they were
not preserved).  There was no formal process for upgrade.  (Dickinson D. 18)

        5.      Major sought promotion to captain throughout 1996.  In February 1997. he met
with then-chief pilot Ed Cook and Human Resources Director Wayne Penny.  In an
undocumented discussion. the two informed Major that he was not deemed a candidate for
captain at Amerijet and he was offered an Exit Package.  (Major D. 144; P.E. 28)  It included a

---

[1] "P.E." shall refer to designated documents marked at depositions by plaintiff. "___ D.___" shall refer to
depositions filed with the Clerk of Court.  "_____ Aff." shall refer to the affidavits of Patrick Major and Jose
Pagan filed contemporaneously with plaintiff's response.



CASE NO. 00-6070-Ferguson

release from any potential claim for age discrimination. (Id. at 147) Major declined the package and remained employed at Amerijet as a first officer.

6.    In June 1997, Amerijet introduced a new report, called a Proficiency Report, for pilots to use to evaluate crewmembers. Candidates for upgrade to captain were required to have these reports made. Between July 1997 and February 1998, Major gathered seven proficiency reports.[2] All but one evaluated Major as excellent. (Major Aff. Exh. B) Derry Huff, who became Amerijet's chief pilot, stated "Pat demonstrates thorough knowledge, leadership, good judgment." (P.E. 14) Major's annual proficiency checks were satisfactory. (Major Aff. Exh. A)

7.    By Spring 1998, Amerijet's pilots were being pressured to join a union: a move opposed by Amerijet. It made an effort to standardize its promotional criteria. Recognizing that seniority is a traditional union issue, Amerijet adopted seniority, along with "qualifications," as the two criteria in a formal job opportunity bulletin that came out in April 1998. (Cook D. 37; P.E. 29)

8.    In Spring 1998, there were 31 pilots on Amerijet's roster of first officers. (A.J. 164)

9.    Despite his having been discouraged, in 1998 Major applied to be captain. (Major D. 154) He was given an upgrade opportunity.[3] (P.E. 31) Consistent with Amerijet's demands, Major signed a promissory note for $14,000 to pay Amerijet for training. (P.E. 32)

10.    Major did not receive the normal training: specifically, a review prior to being set for a two-hour FAA oral examination. (Major D. 218-219)

11.    He did not receive training that the other members in his class did. (Major D. 219)

12.    He was scheduled for his FAA oral without proper approvals from Amerijet. (Major D. 168)

13.    As a result, Major's performance on the FAA oral was not satisfactory to the examiner. Rather than "pink slip" or fail Major, he stopped the exam after a few minutes. (Id.)

---

[2] In Major's training records (where it did not belong), which Amerijet produced in February 2001, there appears one further negative report purportedly completed by Al Jorsey in 1998.

The FAA Principal Operations Inspector, John Roseborough, wrote a letter to Amerijet critiquing its training program. (P.E. 46)

14.    Amerijet did **not** eliminate Major from the upgrade process. According to Dickinson, the company was 100% behind Major. (Dickinson D. 47) However, it stymied Major's efforts to get the necessary training. Months passed, others were promoted, while Major was not scheduled for the further training he needed. (Dickinson D. 85-86)

15.    Finally, with Amerijet's knowledge and representation that it would lead to promotion (Morales D. 32), Major went to an outside school which trains pilots. At a personal cost of $10,000, he underwent all the training which is FAA-required and passed with excellent reviews. (Major Aff. Exh. D)

16.    He presented these training records to Amerijet in December 1998. (Dickinson D. 88)

17.    Amerijet's managers continued to hedge, telling him he had to fulfill further requirements. (Dickinson D. 85-86) These so-called requirements are not FAA and are not in Amerijet's Training Manual. (Dickinson D. 95) They were never even articulated. They appear to be a moving target created for a class of one: Major.

18.    Between Major's upgrade bid in 1996 and his September 1, 1999, termination, the following promotions occurred:

| Name | Year of Birth | Date of Upgrade |
|------|--------------|-----------------|
| Tim Green | 1967 | 10/06/98 |
| John Washington | 1970 | 12/15/96 |
| Patrick McManus | 1969 | 11/11/98 |
| David Bruns | 1966 | 10/16/96 |
| David Mitchell | 1959 | 05/01/96 |
| Tracey Dickinson | 1964 | 11/19/97 |
| Douglas Benson | 1956 | 11/09/98 |
| Raymond Meunier | 1968 | 11/17/97 |
| John Moktadier | 1964 | 05/17/99 |
| Ron Rooks | 1969 | 08/27/99 |

[3] Contrary to defendant's statement that he was promoted after complaining of perceived age discrimination, Major was only offered an opportunity, not a promotion.

3

(P.E. 53) With the exception of Doug Benson, all first officers promoted over Major were outside the protected class on the date of their promotion.

19.    All of these candidates were junior to Major on the seniority list. Id.

20.    According to Amerijet's roster of captains dated April 7, 1999, 19 of 30 captains had less seniority than Major. (A.J. 167)

21.    Finally, on February 5, 1999, Dave Bassett wrote Pat Major that "I have had numerous and lengthy discussions with the training department and flight department personnel, and it is abundantly clear that they do not feel you are capable of filling this position safely . . .. Based upon what I've learned, and what I know, the decision is made and my position will not change." (P.E. 51) Bassett stated in deposition that he relied on Tracey Dickinson, Training Director, and Pete Steele, Director of Operations. (Bassett D. 20) Pete Steele's deposition has not been taken and is the subject of Plaintiff's Motion for an Order Compelling Peter Steele's Deposition or Precluding His Direct or Indirect Testimony at Trial. Tracy Dickinson denied in deposition that he ever consulted with Bassett concerning Major. (Dickinson D. 86)[4]

22.    Bassett did not review Major's training records and had no relevant firsthand knowledge of Major's abilities. (Bassett D. 23) The only alleged failure on Major's part was the discontinued FAA oral. However, Bassett conceded he was aware of this when it happened and this did not knock Major out of the process. (Bassett D. 10, 13) All that happened was Major's achievement of the necessary credentials at an unbiased, outside academy.

23.    Major filed his EEOC charge in February 1999. (Major Aff. Exh. C)

24.    After Major's termination, he found a job at Miami Air, which fully qualified him and gave him the rank of captain. (Major D. 9) However, he was not able to practice his profession for over one year.

25.    Major suffered severe financial penalties as a result of being denied promotion to captain at Amerijet.[5]

---

[4] Dickinson also never heard that Major was told he would never make captain. (Dickinson D. 75)

[5] These have been quantified by plaintiff's expert, Jim Gilbert, whose report was produced to defendant on March 9, 2001, and again on March 20, 2001.

4

26.     Amerijet would have had to pay Major more than its outside hires, and more than the junior first officers promoted. (Major D. 265-266)

## MAJOR'S TREATMENT AFTER EEOC CHARGE

27.     By early 1999, Amerijet had had a parting of ways with its longtime, highly qualified Chief Pilot Ed Cook. Derry Huff, a 27-year old who lacked the **most** basic requirements to be a Chief Pilot, had been hand picked by Bassett for this job, and was holding himself out as the Chief Pilot to the line pilots. (Bassett D. 28)

28.     Major, continuing to believe he deserved a captain slot at Amerijet, responded to postings that came out in Spring 1999. Huff's response was evasive and deceitful. He told Major he "would be afforded the same opportunities as all the other crewmembers." (Huff D. 20) Privately, he meant that Major would have **no** further opportunities. (Id.)

29.     Major sensed a distinct change in the climate and atmosphere at Amerijet, as though he was being goaded or encouraged to quit. Al Jorsey, affecting a buddy-buddy demeanor, even made this suggestion to Major. (Major D. 210)

30.     Major's sense of walking-on-eggshells was heightened when, in April 1999, he was called in to see Derry Huff and Human Resources Director Juan Morales and accused of having "stalked" another pilot, Tim Green. (Morales D. 45-49) The actual conduct alleged in no way measured up to the inflammatory label of stalking. Id. (Major D. 255) This unfounded accusation, however, petrified Major as any such entry in his file could have career-ending effects. (Major D. 257) Amerijet retained counsel. It refrained from making any entry in his file.

## THE JUNE INCIDENT

31.     Major's next problem, and the first of the two flights at issue in the complaint, occurred on June 8, 1999. Amerijet at that time was flying out of Miami. Major was flying with Captain Brian Steele, brother of Director of Operations Pete Steele.

32.     The Federal Aviation Regulations **closely** regulate Part 121 air carriers, both directly and by adoption of manufacturer's manuals and other materials.

33.     Under the FARs, when there is standing water of ¼" or less on a runway, an airline must significantly reduce the otherwise permissible weight of the aircraft **and** reduce V-1

5

(takeoff decision) speed. Formulas prescribing the required reductions are done by a company called Navtech, which analyzes each runway. The Navtech analyses are incorporated into the Boeing Aircraft Performance Manual, which in turn is incorporated into the FARs. (Major D. 189)

34.    This is clearly a safety issue. (Major D. 193)

35.    Amerijet's policy (or practice, as it was unwritten) was to treat any runway as **dry** unless there was an official report of standing water from the air traffic control tower. (Major D. 189-190; Dickinson D. 116-117) This allowed Amerijet to carry the maximum payload.

36.    On June 8, at the Miami airport, it was raining hard. There was no tower report of standing water. The plane was at the maximum weight permitted under dry conditions. As first officer, Major conducted radio communications with the tower. (P.E. 16)

37.    After taxiing out, the tower offered Major's flight the shortest runway at Miami. Feeling it would be unsafe, Major declined that clearance and requested a longer runway. Captain Steele became angry at Major and insisted he accept the clearance. Major refused and there were some tense moments before the tower cleared the flight for the longer runway requested by Major. (P.E. 16)

38.    Major did not take any action as a result of this flight. However, Captain Steele wrote an extremely negative proficiency report (P.E. 15, 19) characterizing Major as insubordinate. Major filed two comprehensive memoranda, not only explaining and defending his conduct, but addressing the deficiencies in Amerijet's policy. (P.E. 16, 17)

39.    Huff decided Major **was** insubordinate and had a "formal counseling" session with Major in which he reprimanded him. (Huff D. 134-35) Huff **denies** telling Major that he did the right thing and that he would have done the same thing himself. (Huff D. 115)

## AUGUST 17, 1999, INCIDENT

40.    Major confronted much the same circumstances on August 17, 1999, when he was again assigned to fly with Brian Steele and it was again a very rainy day. (Major D. 187-188) This time, the flight was to leave Fort Lauderdale.

41.    Before pushback, Major raised his concern about the wet conditions and proposed taking the weight reduction applicable to standing water. (Major D. 202) Naturally, the plane

6

was loaded to maximum capacity for dry conditions. His concerns were rejected by Captain Steele and Al Jorsey, who was along for a check ride. (Major D. 196) Because there was no **official** report of standing water, the flight was arguably legal.

42.    Amerijet contends that Major should have gotten off the plane if he had concerns and showed "lack of courage" in doing so. (Bassett D. 52) However, Major was smarting from his June 1999 reprimand and knew it would cost him his job. (Major D. 253) Indeed, Al Jorsey expressed the blunt opinion that Major was insubordinate for broaching the issue and should have been **thrown** off the plane! (Jorsey D. 50) His response to Major's concerns was that they were treating the runway as dry and if he didn't like it, he could quit. (Jorsey D.46)

43.    Major acquiesced, prepared paperwork for dry conditions, and the plane taxied out. Major asked the tower whether there was a standing water report. The response continued to be negative until **just** before takeoff. (Major D. 252-253) Then, there **was** a standing water report. Nonetheless, Major accepted the takeoff clearance and the flight took off at the maximum **dry** weight of 193,000 pounds. (Major D. 253)

## MAJOR'S REPORT AND FIRING

44.    The following day, Major prepared a lengthy and detailed report, in the format of a NASA report. NASA is the vehicle for a pilot who has **himself** engaged in an FAR violation – as Major concedes he did – to report a violation and receive "safe harbor" so long as there was no criminality. (Pagan Aff.)

45.    Major gave his report to Derry Huff and Pete Steele. (Huff D. 44)

46.    He said that he submitted it to NASA, but in fact he held back. (Major Aff.)

47.    The next day, Major was summarily suspended. (Huff D. 45)

48.    According to Huff, he and Steele investigated the incident. No documentation exists of this investigation and Huff is vague as to what was done. (Huff D. 47-51, 60-63)

49.    The decision to fire Major was Dave Bassett's. (Bassett D. 44)[6]

50.    Amerijet hired counsel and wrote Major a carefully-worded termination letter, purportedly from Huff, claiming "loss of confidence in you [sic] abilities as an airman." (Huff D. 65, 158-159)

---

[6] Huff attributes it to Pete Steele. (Huff D. 63)

51.    For the eight-and-a-half years before Major's NASA report, Major was a pilot in good standing. **Nothing** changed except for his report.

## DISCLOSURE, FAA PROCEEDINGS

52.    Major disclosed his report not only to NASA, but to John Roseborough, the local FAA official. (Roseborough D. 9)

53.    The FAA investigated the incident and concluded that the flight **was** illegal. (Roseborough D. 38-39; P.E. 39) Once the tower report came out, Amerijet was required to reduce the flight's weight by 17,000 pounds. Id.

54.    Plaintiff's expert, Jose Pagan (a retired FAA official), independently concludes that the flight was illegal. (Pagan Aff.) It is not even debatable. However, Amerijet's witnesses refuse to concede this; still insisting that Major's report was frivolous. According to Al Jorsey, it was "ridiculous," "a waste of government time," and made by a "disgruntled ex-employee." (Jorsey D. 68-69) Corporate representative Derry Huff is now Director of Operations, a job which includes serving as the FAA liaison. He testified he had no idea what happened with the FAA. As far as he is concerned, the take off was correctly analyzed as a dry departure. (Huff D. 53) The dry departure analysis was staunchly defended by Captain Steel and President Dave Bassett. (Bassett D. 56)

55.    Captain Steele was not disciplined by Amerijet. (Steele D.42) Amerijet did not disclose its violation to the FAA. Amerijet did not change its policy. (Huff D. 107-08) Huff, who was produced as Amerijet's corporate representative and is now its Director of Operations, is completely in the dark as to the FAA investigation. (Huff D. 108)

## AMERIJET'S PRETEXTUAL REASON FOR FIRING MAJOR

56.    Questioned about what caused him to lose confidence in Major, Huff points to two sentences in Major's single-spaced, six-page typewritten report:

> Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes, or otherwise interfere with the captain's choice to take off.
>
> Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say.

8

CASE NO. 00-6070-Ferguson

(Huff D. 114, P.E. 3) Amerijet extracts these two isolated sentences and contends they support its decision to terminate a pilot who **did** defer to the captain, but who also objected to, and disclosed, the blatantly illegal flight.[7] Bassett, who takes credit for the firing, likewise based his decision on these references in the NASA report. (Bassett D. 50)[8] Bassett, who also faults Major in "lacking in courage" for not refusing to fly, had no idea that his Chief Pilot reprimanded Major for a previous, similar incident. (Bassett D. 54)

I hereby certify that a true and correct copy of the foregoing was furnished via U.S. Mail to: **Susan Potter Norton, Esquire** and **Stephen P. Santiago, Esquire**, Attorney for Defendant, Allen, Norton & Blue, P.A., 121 Majorca, Suite 300, Coral Gables, FL 33134, this 23rd day of March, 2001.

> HEINRICH GORDON HARGROVE
> WEIHE & JAMES, P.A.
> Attorneys for Plaintiff
> 500 East Broward Boulevard, Suite 1000
> Fort Lauderdale, Florida 33394
> Telephone:    954-527-2800
> Facsimile:    954-524-9481
>
> By: _____
>           VALERIE SHEA
>           Florida Bar No. 436800

---

[7] Amerijet also refers to several alleged discrepancies between Major's reported conversation with the tower, which he did from recollection, and the actual tower tapes. (Huff D. 38)

[8] Major testified that, at the critical moment in the cockpit, the thought of interfering with the flight did not even occur to him. (Major D. 253)