UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED by _____ D.C.

⋯⋰ 2 3 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA. FT. LAUD.

PATRICK SCOTT MAJOR,                  :        CASE NO. 00-6070-Ferguson

                                                        Magistrate Judge Lurana S. Snow
          Plaintiff,                           :        L.T. Case No. 99-021746-11

vs.                                                :

AMERIJET INTERNATIONAL, INC.,      :

          Defendant.                          :
_____/

### PLAINTIFF'S NOTICE OF FILING EXHIBITS AND DEPOSITION EXCERPT PAGES REFERRED TO IN PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S STATEMENT OF MATERIAL DISPUTED FACTS

Plaintiff, Patrick Scott Major, by and through its undersigned counsel, hereby gives notice of filing the following exhibits and deposition excerpt pages referred to in Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Statement of Material Disputed Facts:

1.      Deposition of Patrick Major taken February 15, 2001, Volume 1, Pages 9, 11, 97, 124, 144, 147,154, 168, 187-190, 193, 196, 202, 210, and 218-220.

2.      Deposition of Patrick Major taken February 19, 2001, Volume II, Pages 242, 252-257, and 265-266.

3.      Deposition of Derry S. Huff taken November 8, 2000, Volume I, Pages 20, 27, 44-45, 47-51, 53, 60-63, 65, 107-108, 114-115, 130, 134-135, and Exhibit 3.

4.      Deposition of Derry S. Huff taken January 8, 2001, Volume II, Pages 158-159, and Exhibits 14, 15, 16, 17, and 19.



5.    Deposition of Tracey Dickinson taken February 13, 2001, Pages 18, 47, 75, 85-86, 88, 95, and 116-117.

6.    Deposition of Ed Cook taken January 24, 2001, Page 37, and Exhibits 28, 29, 31, and 32.

7.    Deposition of Juan Morales taken February 7, 2001, Pages 32, 34, 41, and 45-49.

8.    Deposition of David Bassett taken February 19, 2001, Pages 10, 13, 20, 23, 28, 44, 50, 52, 54, 56, and Plaintiff's Exhibits 51 and 53.

9.    Deposition of Al Jorsey taken January 24, 2001, Pages 46, 50, and 68-69.

10.    Deposition of John C. Roseborough taken February 13, 2001, Pages 9, 11-21, 38-39, and Exhibits 39, 40, 41, and 46.

11.    Deposition of Brian Steele, taken January 8, 2001, Page 42.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished via U.S. Mail to: **Susan Potter Norton, Esquire** and **Stephen P. Santiago, Esquire**, Attorney for Defendant, Allen, Norton & Blue, P.A., 121 Majorca, Suite 300, Coral Gables, FL 33134, this 23rd day of _March_____, 2001.

HEINRICH GORDON HARGROVE
WEIHE & JAMES, P.A.
Attorneys for Plaintiff
500 East Broward Boulevard, Suite 1000
Fort Lauderdale, Florida 33394
Telephone:    954-527-2800
Facsimile:    954-524-9481

By: _VALERIE SHEA_
        VALERIE SHEA
        Florida Bar No. 436800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6070-CIV-FERGUSON

PATRICK SCOTT MAJOR,

       Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,

       Defendant.



_____/

One East Broward Blvd.
Fort Lauderdale, Florida
Friday, 9:45 a.m.
February 15, 2001

VIDEOTAPED DEPOSITION

OF

PATRICK MAJOR

taken on behalf of the Defendant
pursuant to a Notice of Taking Deposition
- - -

FRIEDMAN, LOMBARDI & OLSON

```
 1           Q     Are there annual pay increases on a routine

 2    basis?

 3           A     I wouldn't know.

 4           Q     You never asked?

 5           A     Correct.

 6           Q     And are you paid by the week or by the month?

 7           A     Twice monthly.

 8           Q     Hourly or salaried?

 9           A     Salaried.

10           Q     And how many hours approximately do you work?

11           A     It varies.

12           Q     4, 10, 20, a hundred?

13           A     I serve as a captain on the 727 in addition to

14    my instructor duties, so it varies.

15           Q     Do you have any average?

16           A     No, ma'am.

17           Q     Do you keep a schedule?

18           A     There is a schedule provided to me.  I do my

19    best to keep up with it.

20           Q     And are there a number of days you're scheduled

21    to work?

22           A     That varies.

23           Q     As you sit there now, you have no perception of

24    an average number of hours that you work per week?

25           A     No, ma'am.  There really isn't an average.
```



FRIEDMAN, LOMBARDI & OLSON

1    instructor -- let me rephrase my question.

2            The percentage of your job duties is more

3    heavily weighed on the ground instructing than it is

4    flying?

5        A    In the simulator, CPT and ground instruction,

6    as opposed to flying at the moment.

7        Q    And you said that has been the case since you

8    were qualified?

9        A    Yes, ma'am.

10       Q    And when were you qualified?

11       A    December 19th.

12       Q    Can you give us the number of hours that you

13   have logged as the PIC on the 727 since December 19th?

14       A    I have not flown a 727 since December 19th.

15       Q    What have you flown since December 19th as

16   captain?

17       A    I have done some flight instruction on Cessna

18   402s and --

19       Q    I'm sorry, Mr. Major. I misunderstood then

20   your responses. I understood that you were employed by

21   Miami Air International in two job functions.

22       A    That's correct.

23       Q    Primarily as instructor, but also as a captain?

24       A    Yes, ma'am.

25       Q    And what planes then have you captained since

FRIEDMAN, LOMBARDI & OLSON

1   spiritually oriented -- what I would consider to be

2   insightful types of documents that I might use if I were

3   at church giving the meditation that day or giving the

4   talk.  I would write that talk or that meditation.

5          Other than that, it would be a newsletter in

6   conjunction with my activities either at work or at

7   church or what have you.

8       Q    Again, I'm excluding work.

9       A    That's about it.

10      Q    You joined Amerijet in I think March of '91?

11      A    That's correct.

12      Q    And you went through the flight engineer

13   training program?

14      A    That's correct.

15      Q    What did that consist of, to the best of your

16   memory?

17      A    It consisted of orientation to the systems of

18   the Boeing 727, the duties and responsibilities of flight

19   engineers.  I'm sure there was a basic indoctrination,

20   which is a term specifically described in the Federal

21   Aviation Regulations, required of all air carriers.

22      Q    Do you have a copy of the FARs?

23      A    Yes.

24      Q    Would you receive a copy when you went to

25   Amerijet, or is that just something you have?

```
 1   told or have been -- insofar as like we're talking about

 2   such things, I have a vague idea or at least a rumored

 3   idea, rumored notion of what a person's qualifications

 4   and background are.

 5        Q    So you would have no knowledge of his

 6   qualifications?

 7        A    Right.

 8        Q    Thank you.  It was shortly after you first

 9   raised this idea of age discrimination that you in fact

10   were successfully upgraded to first officer, were you

11   not?

12             MS. SHEA:  Object to the form of the

13        question.  I don't see that age discrimination

14        is raised in this document, unless you do.

15             MS. NORTON:  He's already suggested it

16        could be there.

17             MS. SHEA:  We'll let the testimony speak

18        for itself on that.

19             MS. NORTON:  Fine.

20        Q    After your letter of October of '94 you became

21   first officer, correct?

22        A    Yes, ma'am.

23        Q    It was in November, I believe, you filled out a

24   contract.  Do you remember that?

25        A    Sounds right.
```



FRIEDMAN, LOMBARDI & OLSON

1   to make those choices.

2        Q    Mr. Major, the law does not require that

3   seniority, does it?

4        A    I'm not talking from a legal standpoint.

5        Q    Well, that's what I asked you.

6             MS. SHEA:  Objection, you asked from an HR

7        standpoint.

8        A    I'm simply speaking from an issue of fairness

9   and equity.  The law doesn't often go there.

10            MS. NORTON:  Would you read me back my

11       question?  I got sidetracked.

12            (The question referred to was read back by the

13       reporter as above recorded.)

14       Q    Well, let me rephrase that.

15            Let me direct your attention to something else

16  real quickly.  How were you advised that the decision had

17  been made you were not promotable in 1997?

18       A    I came into a meeting with Ed Cook and Wayne

19  Penny, where I had been -- I was expecting, to discuss

20  promotional opportunities and was told, as you described

21  a moment ago, and offered the exit package.

22            MS. NORTON:  Let's have this marked

23       Plaintiff's Exhibit 7.

24            MS. SHEA:  It's not Plaintiff's.  I don't

25       know what we're doing, but it's not

FRIEDMAN, LOMBARDI & OLSON

1    "Wayne Penny re: release."  That's follow up.  That means
2    follow up Wayne Penny with reference to a release.
3        Q    Okay.
4        A    He had provided to me a pile of legal
5    documentation, asking me to waive all rights to any kind
6    of age discrimination claim, etc., in order for me to
7    be -- to accept or to be offered, you could say, granted
8    the exit package that you referred to earlier.
9        Q    Well, do you have any knowledge that the
10   company routinely would offer an exit package at this
11   level?
12       A    I do not.
13       Q    So they were offering you something that you
14   would not normally receive, to your knowledge, if you
15   chose to leave the company and accept it?
16       A    I don't have any idea.
17       Q    One way or the other?
18       A    I don't know.
19       Q    Okay.  But you had the option of staying?
20       A    Yes.
21       Q    This was just a way if you wanted to leave?
22       A    If I wanted to leave and take the exit package,
23   all I had to do was agree that I would never bring any
24   kind of a claim with respect to their behavior toward me
25   in applying for promotions.

FRIEDMAN, LOMBARDI & OLSON

```
 1        A    I believe it was written, yes.
 2        Q    Now, it was subsequent to your complaints in
 3   that letter of age discrimination that in fact, you were
 4   awarded the bid to upgrade to captain, were you not?
 5        A    Subsequent to this?
 6        Q    Yes.
 7        A    Yes.
 8        Q    And in fact, in May of '98 I believe you
 9   submitted a bid for the position of captain?
10        A    Right.  That's two years later.
11        Q    How do you figure May of '98 is two years after
12   February of '97?
13        A    This is February, '97 -- okay, I was thinking
14   '96, December 18th, '96.  Right, I had gone on -- okay.
15   In May of '98, that would be correct.
16        Q    What positions between February of '97 and May
17   of '98, if any, did you submit a bid for?  Let me
18   rephrase that.
19             Did you submit the bid for captain upgrade
20   prior to May of '98?
21        A    Yes, ma'am.
22        Q    Okay, when?
23        A    Continuously.  I had a discussion with -- if
24   memory serves, with -- in fact, Ed came out to visit
25   Dolphin Holiday and indicated that he was aware that I
```

FRIEDMAN, LOMBARDI & OLSON

1        Q    Do you remember him telling you you have to

2    know all this because you're the pilot?

3        A    No, ma'am.

4        Q    Nothing like that?

5        A    No, ma'am.

6        Q    Do you remember telling him you didn't receive

7    any training in wind shear?

8        A    No, ma'am.

9        Q    Do you remember him discontinuing it after 10

10   minutes?

11       A    Yes, ma'am.

12       Q    Do you remember him telling you he's going to

13   do you a favor and not pink slip you?

14       A    No, ma'am.

15       Q    What do you remember him telling you about

16   that?

17       A    I remember him finding that the required form

18   out of the Amerijet files had not been completed.   Pete

19   Steele had signed only the airman's -- the request for

20   additional airman certification, which he had handed me

21   back.   The form that was to have been signed, which

22   signified the instructor's certification of the

23   completion of the training program and his recommendation

24   for oral, for the FAA oral exam, had not been signed.

25       Q    Are you indicating that the reason -- let me

FRIEDMAN, LOMBARDI & OLSON

```
 1            Q      And in your case the training didn't take
 2   place, did it?  That's why you believed that the failure
 3   to sign off was the major problem?
 4            A      I wouldn't agree with that, ma'am.
 5            Q      Let me direct you to the incident in August,
 6   1999.
 7            A      You're directing me to what, ma'am?
 8            Q      August, 1999.
 9            A      To what in August of 1999?
10            Q      Well, let me ask you.  Do you remember flying
11   with Brian Steele in August of 1999?
12            A      Yes.
13            Q      Do you remember flying with him what, the 17th
14   or 18th of August?
15            A      Yes, I do.
16            Q      Tell me what you recall about that.
17            A      What part of that would you like me to
18   describe?
19            Q      Tell me about the beginning of the flight.
20   What time did you get there?
21            A      I don't remember what time.  I showed up before
22   anyone else.
23            Q      Did you show up in time to do the weights and
24   balances?
25            A      I showed up well before that.  We were on call.
```

FRIEDMAN, LOMBARDI & OLSON

 1   The flight was already eight or nine hours delayed.

 2        Q    All right.  So you showed up and you filled out

 3   the weight and balance form?

 4        A    No, ma'am.  First thing I did was went into the

 5   operations shack and called operations, which at the time

 6   was the protocol, to certify that I had arrived and to

 7   discuss the weather.

 8        Q    Okay.  You said you arrived long before anybody

 9   else and before that was even started doing the weights

10   and balances.  Why would you worry about the weather that

11   far in advance?

12        A    The weather was unusually awful.  The airport

13   was surrounded by level three and level five

14   thunderstorms and it's just rare.  Usually you have them

15   in one direction or another.  They went around the whole

16   field and the airport had been and was continuing to be

17   deluged with what can only be described as a torrential

18   downpour.

19             I was concerned because the aircraft had been

20   only recently certified for using those particular

21   runways at the weights that we would be using them and

22   with the flap setting we would be using --

23        Q    Wait.  How do you know what runway you would be

24   using at that point in time?

25        A    There's two runways and they're the same

FRIEDMAN, LOMBARDI & OLSON

```
 1   length.  In fact, they're the exact same piece of
 2   pavement.
 3        Q    And you said the airline had just been recently
 4   certified for using them?
 5        A    At the weights they were using, yes.
 6        Q    And who had done the certification?
 7        A    A company called Nav-Tech Performance
 8   Engineering.
 9        Q    Did you have any difficulty with the fact it
10   had just been certified by Nav-Tech?
11        A    I had reservations.
12        Q    Were those certifications not approved by the
13   FAA?
14        A    I don't know.  I know they were given to us.
15        Q    By whom?
16        A    By the operations department.
17        Q    Well, are you saying that you don't know
18   whether or not Nav-Tech certifications were approved by
19   the FAA or not or you just don't know if those particular
20   ones were?
21        A    I don't have any personal frame of reference
22   with regard to it either way.
23        Q    Okay.  So what was the basis for your
24   reservation?
25        A    The basis for my reservation was that
```



FRIEDMAN, LOMBARDI & OLSON

1    Amerijet's performance planning policy had been and
2    continued to be that unless a tower report came out
3    describing a runway as wet, then for Amerijet's
4    performance planning purposes, it was dry.

5              This had become an issue on a prior flight,
6    where in fact a longer runway was used or was
7    contemplated being used and we -- well, it just -- that
8    policy had been a matter of discussion between myself and
9    others at Amerijet for some time.

10   Q    But that policy had been improved up to that
11   point in time by the FAA, had it not?

12   A    I don't even know if the FAA was even aware
13   that policy existed.

14   Q    Well, it was part of what, the GOM?

15   A    No, ma'am, it wouldn't be part of any.  It was
16   a standard operational procedure which is derived from
17   the runway analysis and the other documents that were
18   approved by the FAA.  The documents provided --

19   Q    I'm sorry, you said it's part of the runway
20   analysis that had been approved by the FAA?

21   A    No, I didn't say that.

22   Q    What did you say?

23   A    I said it's derived from.  I said it's a
24   standard operational procedure derived from.

25   Q    Then let me ask my question to you this way.

FRIEDMAN, LOMBARDI & OLSON

```
 1   Sr. had arrived and we entered the discussion -- I told
 2   him that I again felt I was being placed in a very
 3   difficult position; that I knew, as he recognized, that
 4   contaminated runways represent a very serious hazard to
 5   aviation.   In fact, there are seven times as many
 6   accidents as a result of aborted takeoffs on wet runways
 7   than there are from dry and that Amerijet, despite my
 8   activism to promote a different policy, still maintained
 9   that if the tower didn't say there was water on the
10   runway and in a specific amount referred to or referenced
11   in its performance engineering documents, then as far as
12   it was concerned, the runway was dry.

13          I believe that was a policy that represented a
14   threat to aviation, a hazard to people on the ground and
15   to me in particular.

16      Q    But you've discussed that with the chief pilot
17   and with the director of operations and none of them
18   shared your concern?

19      A    I wouldn't go that far, no, ma'am.  I discussed
20   it with each of them.  Each of them had indicated that
21   they shared my concern and promised to look into it and
22   revise the policy as appropriate.

23      Q    Now, you indicated that the tower has to
24   indicate the weather?  Doesn't the weather exist
25   regardless of what the tower says one way or the other?
```

FRIEDMAN, LOMBARDI & OLSON

1   several discussions with respect to a prior incident with

2   this same captain, who seemed cavalier with regard to all

3   manner of regulations and safety issues.

4         Q    And who is that?

5         A    Brian Steele.

6         Q    And what did Al Jorsey Sr. say?

7         A    He said, "Well, Pat, if you don't like it, you

8   should just quit."

9         Q    What did you say?

10        A    I said, "That doesn't solve the problem."

11        Q    So then what happened?  What next took place in

12  terms of you I guess preparing for pushback and takeoff?

13        A    As I recall, at some point and I'm not sure if

14  it was next, but there was a discussion with regard to a

15  tail wind.  There's an excellent example.

16             I go outside, I don't feel any wind.  Probably

17  nobody would.  But the tower says the winds are 270 at

18  three knots.  The regulations require that I go to those

19  same performance planning documents and take what amounts

20  to a very significant penalty for the fact there's wind

21  on our tail as opposed to on our nose.

22             When I brought that up, both Al Jorsey and

23  Brian Steele chided me for it and said something like --

24  I don't recall exactly what they said.  I just recall

25  they chided me for being -- for bringing it up.

FRIEDMAN, LOMBARDI & OLSON

1     Q    What did you say to Brian Steele directly?

2     A    I said I believe we should take -- we should

3  wait until the runway is dry, because taking the

4  performance decrement that the conditions required would

5  have put us overweight for takeoff.

6     Q   What did he say?

7     A    I think his characteristic response to

8  something like that would have been something about --

9     Q    No, Mr. Major, you're speculating now.

10    A    What did he say, I don't know. But basically,

11  he declined.

12    Q    He declined. But you don't remember what he

13  said? You remember you didn't get the action you wanted,

14  but you don't remember what he said; is that correct?

15    A    It was something like "no", with an expletive

16  proceeding it.

17    Q    Now, how come you were flying with Brian

18  Steele? Hadn't you had an incident with him in June

19  where you didn't believe he was a safe pilot?

20    A    Yes, ma'am, and I had been assured by Derry

21  Huff that he had had a session with Brian Steele.  I

22  think the term Derry used was, "We don't appreciate

23  cowboys around here any more and you need to go by

24  prudent, conservative pilot airmanship."

25         I had actually approached Derry to determine

FRIEDMAN, LOMBARDI & OLSON

```
 1   go immediately into IOE?

 2         A    Yes.

 3         Q    And were you told that could not happen?

 4         A    No.

 5         Q    At any time?

 6         A    No.   In fact, we met and we were discussing an

 7   IOE schedule.

 8         Q    And then did you have any conversations with

 9   Pete or did you have any correspondence to Pete where you

10   accused him of being deceptive, duplicitous?

11         A    I did, yes.

12         Q    And what prompted that?

13         A    There had been a phone call to me during my

14   training at Pan Am from Amerijet's most senior check

15   airman.

16         Q    And who is that?

17         A    Al Jorsey.

18         Q    Al Jorsey Sr?

19         A    That is correct.  Al Jorsey had represented to

20   me that he was very supportive of my efforts to make

21   captain and had been for some time; that he had in fact

22   recommended me for captain as early as a year prior.

23              We had met several times during the course of

24   my training.  At this phone call, though, which was

25   initiated by him, he said, "Pat, I'm just calling to tell
```



FRIEDMAN, LOMBARDI & OLSON

1   about for contending it's because of your age, other than

2   the fact that you are in a protected age group?

3        A    There were 11 or 12 junior flight officers less

4   qualified than myself who were not only upgraded to the

5   position of captain, but each of them were given a

6   thorough and exhaustive pre-oral review.

7        Q    Were you present?

8        A    No, ma'am.

9        Q    Did you give the review?

10       A    No, ma'am.

11       Q    So how do you know it was thorough and

12   exhaustive?

13       A    By talking to the individuals.  I did sit on a

14   portion of one or two of them.

15       Q    And who were they?

16       A    Or I would be in the office and walked by the

17   training room while it's obvious that was what was going

18   on.  They're all the people that I think have been named

19   in the complaint.

20       Q    Is there any other basis, contending that you

21   were not promoted because of your age?

22       A    Well, let's see.  It's either 11 or 12 people

23   who were all under the age of 40 who had been provided

24   the complete training --

25       Q    The one thing you're contending you were not

FRIEDMAN, LOMBARDI & OLSON

 1 | provided, the pre-oral exam or the pre-oral inquiry, is

 2 | there any other aspects of training you weren't given

 3 | that they were?

 4 | A    No provision had even been made to give me a

 5 | pre-oral review.

 6 | Q    I understand your position on the pre-oral

 7 | review.  Is there any other aspect of the training that

 8 | you believe you did not get and they did?

 9 | A    Only the completion of the training.  I didn't

10 | get all of the captain training from Amerijet.

11 | Q    Well, because of the pre-oral -- because you

12 | were disqualified or discontinued by the FAA?

13 | A    That's another interesting point.  Amerijet's

14 | policies as stated were that a failure would produce

15 | retraining and another opportunity to take the oral.  I

16 | had not failed and so here's a policy on the one hand and

17 | here's their behavior toward me on the other.  The two

18 | did not correspond.

19 | Q    Anything else?

20 | A    Not that I can think of at this point.

21 | Q    Did anybody say, "Pat Major, you're too old for

22 | captain?"

23 | A    I'm trying to recall.  I don't know that those

24 | exact words were used.

25 | Q    Mr. Major, they were hiring in captains older

FRIEDMAN, LOMBARDI & OLSON

1 | than you, weren't they?

2 |     A   Yes, ma'am, but they were not providing

3 | training to captains of my age.

4 |     Q   In order to go on line they had to receive

5 | training on Amerijet's procedures, they had to go to

6 | ground school, they had to go through an IOE.  They had

7 | training?

8 |     A   They were entitled to -- as being current and

9 | qualified, coming from somewhere else already having been

10 | a captain, they were allowed to get them in at a much

11 | reduced expense and time requirement.

12 |     Q   Anything else that you rely upon for your

13 | contention that it was age discrimination that you

14 | haven't already told me?  I'm not asking you to repeat

15 | what you've already said.

16 |     A   I can't think of anything at this point.

17 |         MS. SHEA:  Are we about to wrap up?

18 |         MS. NORTON:  No.

19 |         MS. SHEA:  Well, we need to, because he

20 |     has to pick up his daughter.  It's been six

21 |     hours plus, plus, plus.

22 |         MS. NORTON:  No, we don't have six hours

23 |     yet.

24 |         THE WITNESS:  Ma'am, if it's 4:45 and we

25 |     started at 9:30, I don't know how we couldn't

FRIEDMAN, LOMBARDI & OLSON

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-6070-CIV-FERGUSON
Magistrate Judge Snow

PATRICK SCOTT MAJOR,

     Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,

     Defendant.

_____/



One E. Broward Blvd.,
Ft. Lauderdale, Florida,
Monday, 9:04 a.m.,
February 19, 2001.

C O N T I N U E D

V I D E O T A P E D

D E P O S I T I O N

of

PATRICK SCOTT MAJOR

taken on behalf of the Defendant
pursuant to a Notice of Taking Deposition



FRIEDMAN, LOMBARDI & OLSON

wind shear.

Q.    What did he say?

A.    My best recollection of most of Captain Jorsey's and
Captain Brian's responses to me with respect to most of these
concerns was outright ridicule.

Q.    First, let me ask you exactly what Captain Jorsey said
that you have now characterized as outright ridicule.

A.    One of Captain Jorsey's comments and, forgive me, I
don't recall if they are included here, was that if I didn't
like the Amerijet's interpretations of its policies, I should
quit and go to work somewhere else.

Q.    Let me ask you that.  What policy were you talking
about there?

A.    The policy that -- it's actually a practice -- that
Amerijet dispatch had just confirmed to me moments before I
walked out to the airplane, unless there is a tower report, an
official tower report containing the specific wording "standing
water", then as far as Amerijet's performance planning
procedures are concerned, the runway is dry.

Q.    And you took exception to that practice?

A.    I had been for several months --

Q.    Mr. Major, did you take exception to it or not?  Yes
or no?

A.    -- engaged in an effort to promote a change to that
policy.

FRIEDMAN, LOMBARDI & OLSON

252

1  saying, listen to me, I'm serious about this or words to that
2  effect?

3      A.    That is precisely what I did when he entered the
4  cockpit.

5      Q.    What did you verbatim say to him?

6      A.    Ma'am, I'm not gonna be able to recall verbatim what I
7  said to him over a year and-a-half ago.

8      Q.    Have you already told me then what you've said to him?

9      A.    I have summarized it to the extent of saying -- the
10  only thing I can add is that I made it very clear that I was
11  concerned.  I called to his attention all of the research that I
12  had recently done and could remember on the point.  I had
13  recalled to him specifically the conversation with dispatch.  I
14  recalled to him the conversation I had with Derry Huff assuring
15  me that he had had a private conference with Brian Steele and
16  that water was to be taken into consideration as a consequence
17  of the June 8th incident.

18     Q.    Did you call Derry Huff?

19     A.    No, ma'am, I did not.

20     Q.    Did you tell them you wanted off the plane?

21     A.    No, ma'am, I did not.

22     Q.    Did you mention to them that you were gonna get off
23  the plane if they didn't pay attention to you?

24     A.    No, ma'am, I did not.

25     Q.    You accepted takeoff from the tower when the tower

FRIEDMAN, LOMBARDI & OLSON

1    made the weather report.  Do you recall that?

2        A.    I recall that the airplane was already throttles up,

3    brakes released and accelerating for takeoff when the tower

4    issued that report or issued that clearance, excuse me.

5        Q.    You say ready for takeoff.  Why did you not tell the

6    tower you were overweight, we cannot take takeoff, we're

7    overweight?

8        A.    It frankly didn't occur to me.

9        Q.    Okay.

10           MRS. NORTON:  Let's go off the record just a minute.

11    I'm about finished.

12           THE VIDEOGRAPHER:  At this time we're going off video

13    record, it is 9:52 a.m.

14              [Recess Taken.]

15           THE VIDEOGRAPHER:  At this time we are returning to

16    video record, it is 9:55 a.m.

17        Q.    (By Mrs. Norton:)  Mr. Major, why did you just not get

18    off the plane?

19        A.    It would have cost me my job.

20        Q.    Don't you remember Derry Huff telling you just in June

21    that he had gotten off the plane?

22        A.    Yes, ma'am, I do.

23        Q.    Did you think of that as an alternative, just to get

24    off the ramp and leave?

25        A.    I did.

FRIEDMAN, LOMBARDI & OLSON

254

1     Q.    But you didn't do it?

2     A.    No, ma'am.

3     Q.    You have indicated that you were subject to

4  harassment, workplace harassment and you referenced the stalking

5  with Tim Greene, all right, and the fact that you had filed an

6  EEOC charge on age discrimination.  Other than what we've talked

7  about, are there any other incidents that come to your mind?

8     A.    I referenced the allegation of stalking.

9     Q.    Okay.

10    A.    Are there any other incidents ---

11    Q.    That you were harassed by the company.

12    A.    Ma'am, I was denied promotion for several years while

13 an assortment of flight officers, junior and less qualified,

14 were promoted in my place.

15    Q.    Can you tell me anyone that you considered junior and

16 less qualified?

17    A.    I think I enumerated as many as I could remember in

18 prior testimony.

19    Q.    Do you remember any as you sit there now?

20    A.    I remember several as I sit here now.

21    Q.    Would you give me their names?

22    A.    Ray Maneure.  I believe it's spelled M-a-n-e-u-r-e.

23 Tim Greene.  David Mitchell.  Pat McManis.  John Washington,

24 Junior.  Several others whose names escape me at the moment.

25    Q.    In regarding Tim Greene, do you have any knowledge of

FRIEDMAN, LOMBARDI & OLSON

1    any evidence that Mr. Greene did not come to the company?  In
2    other words -- do you understand my question?

3        A.    No. --

4        Q.    Did you hear Mr. Morales' testimony, you were in the
5    room, when Mr. Morales indicated that Tim Greene had come to, he
6    and Juan Morales and Derry Huff complaining about your actions.
7    Do you have any evidence that that's not true?

8        A.    I know that -- I know that the company took -- I know
9    that there was absolutely no basis upon what the company was
10   told as it had been related to me by both Derry Huff and by Juan
11   Morales.  And then they pulled down and read the statute with
12   respect to stalking and there was no comparison between what Tim
13   Greene had complained about and the term itself.

14       Q.    And to your knowledge, what did Tim Greene complain
15   about?

16       A.    He had complained that I had been describing what had
17   been forwarded to me as a matter of public record by an attorney
18   of his in a Christmas card, which was a brag sheet essentially,
19   on how he had won for Tim Greene a multi-million-dollar, and his
20   wife, a multi-million-dollar lawsuit as a consequence of an
21   illegal charter that Amerijet had engaged in to move a flight
22   crew from Ft. Lauderdale to Dothan, Alabama.

23       Q.    And the letter from the attorney said it was an
24   illegal charter?

25       A.    No, ma'am.

FRIEDMAN, LOMBARDI    & OLSON

1    Q.    And where did you pick up the term illegal charter?

2    A.    I think that would accurately describe the events.

3    Q.    Who -- well, that remains to be seen. But where did

4    you learn the term? Where did you hear that it was an illegal

5    charter? From whom?

6    A.    I was reasonably familiar with the facts as they

7    pertain to the incident.

8    Q.    So that is your understanding or your perception of

9    it, no one told you that?

10    A.    That's my professional opinion, yes, ma'am.

11    Q.    And Mr. Greene won an award and you were describing

12    this to people or telling them about it?

13    A.    I used it as an example to dissuade flight crew

14    members from forming or from joining a union. I wanted to

15    impress upon them that there were several alternatives available

16    to them short of bringing in an outside third-party which could

17    produce and perhaps even better and more quickly produce the

18    results they sought than by --

19    Q.    Mr. Major.

20    A.    -- bringing in the Teamsters Union.

21    Q.    Let me ask it this way then. Other than Mr. Morales

22    and Mr. Huff talking with you about this and indicating that,

23    you know, if it ceased and deceased they would remove anything

24    from your file, were you subject to any other penalty?

25    A.    Ma'am, a charge of stalking in a pilot's personnel

FRIEDMAN, LOMBARDI & OLSON

1   file, when you're a threat that one personnel proffered that
2   day, could have been a career-ending event.

3        Q.   It was not in your personnel file, though, was in
4   Mr. Major?

5        A.   He indicated it would go there if I continued to act
6   in a manner, which is completely consistent with my right with
7   respect to promoting safety in the workplace.

8        Q.   Okay, talking about how Mr. Greene got a
9   multi-million-dollar award.

10       Is there any other actions on the part of Amerijet
11  that you contend created a unpleasant work environment or
12  hostile environment for you?

13       A.   There were several, ma'am, but I don't carry them
14  around as excess baggage.  I'm sure there's -- I've made note of
15  most of them and you've been given copies of most of my
16  correspondence and my notes and my files.

17       Q.   What would you do to refresh your memory?

18       A.   I would go back through some of my notes.

19       Q.   There's nothing that stands out now?

20       A.   Nothing that comes to mind at the moment.

21       Q.   Well, you knew you were gonna finish your deposition
22  today, right?

23       A.   Yes, ma'am.

24       Q.   We sat on Thursday for a while, then you had the
25  weekend.  So you knew you were gonna be asked additional

FRIEDMAN, LOMBARDI & OLSON

1    a named party called Harris vs. Major?

2        A.    Yes, ma'am.

3        Q.    You didn't mention that in the questioning on direct

4    about lawsuits in which you had been involved.  Is there a

5    reason why not?

6        A.    That wasn't a lawsuit.

7        Q.    Would you just briefly describe the nature of that

8    action?

9        A.    My at the time -- my wife's at the time, what could

10   best be described as guru, had begun to engage in a personal

11   relationship with my, as I say, my then wife.  My then wife had

12   either had begun to file for or had filed for divorce.  The

13   spiritual counselor that she had engaged in this affair with

14   became -- went to the courthouse and wrote up a document that

15   requested a restraining order be placed against me for reasons

16   that I don't understand and which ultimately was dismissed.

17       Q.    That action was dismissed?

18       A.    Yes, ma'am.  On its merits.

19       Q.    When you were asked the other day regarding factors or

20   considerations which caused you to believe that your promotion

21   was substantially motivated by age discrimination, were there

22   any salary or wage issues that you considered sparing on that?

23       A.    Oh, yes, ma'am.

24       Q.    Could you just elaborate on that, please?

25       A.    When Amerijet hired outside the company for captains,

FRIEDMAN, LOMBARDI & OLSON

266

1  which it did largely for those captains as of record who were
2  over 40 years old, it was able to hire those captains at $70.00
3  per hour for the pay planning and use of time as well as train
4  them as current and qualified, would save them considerable time
5  and expense in putting them on the line and having them
6  contribute to the overall profit of the organization.

7          Additionally, by promoting junior, that is to say
8  flight officers with less seniority than me, in some cases as
9  many as five or six years or seven years less, the company was
10 able to save substantial amounts of money, in some cases as much
11 as $10,000 per individual per year with respect to their direct
12 compensation once they became captains.  They would have had to
13 pay me more as a consequence of my tenure with the company.

14         MRS. SHEA:  That's all my questions on cross.

15         MRS. NORTON:  No questions.

16         [Thereupon, the taking of deposition was concluded at

17         10:18 a.m.]

18

19

20         _____
                   PATRICK MAJOR
21

22 Sworn to and subscribed
   before this _____
23 day of _____, 2001.

24 _____
   Notary Public
25 State of Florida at Large.


FRIEDMAN, LOMBARDI & OLSON

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF FLORIDA

              CASE NO.  00-6070-Ferguson/Snow


PATRICK SCOTT MAJOR,               )   L.T. CASE NO.
                                   )   99-021746-11
              Plaintiff,           )
                                   )
vs.                                )
                                   )   COPY
AMERIJET INTERNATIONAL, INC.,      )
                                   )
              Defendant.           )
- - - - - - - - - - - - - - - - - -)

                        337 East Las Olas Boulevard
                        Fort Lauderdale, Florida
                        November 8, 2000
                        10:30 o'clock a.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
          - and -
     DANIEL BRESSLER, ESQUIRE
Appearing on behalf of the Defendant


                        -------------------------------

                        DEPOSITION

                        OF

                        DERRY S. HUFF

                        -------------------------------
```

1          A.    What I told Pat was that he would be

2    treated, he would be afforded the same opportunities

3    that all the other crew members were afforded.

4    BY MS. SHEA:

5          Q.    Okay.  And that was after you had

6    discussed Pat's particular situation with Pete

7    Steele?

8          A.    That was before I talked to Pete Steele.

9    And basically, my conversation with Pete Steele was

10   that Pat had been afforded that opportunity already.

11         Q.    So how, if at all, did that change what

12   you had told Pat Major?

13         A.    It didn't change anything.

14         Q.    Okay.  It did not mean he was eliminated

15   in 1999?

16         A.    What it meant was that what I told Pat was

17   that he would be afforded the opportunities that

18   everybody else was afforded and that when I talked

19   to the director of operations, he informed me that

20   Pat had already been afforded those opportunities,

21   since that was prior to my coming in to the office.

22   I didn't have any knowledge of that.  Other than the

23   fact that he had been in the system.

24         Q.    Okay.  So did you relay to Pat Major that

25   he would in fact not be given any further

```
 1   BY MS. SHEA:
 2        Q.   Okay.  Outside of the promotion process
 3   and the bid process, are pilots at Amerijet
 4   evaluated or assessed for their skills on any
 5   regular basis?
 6        A.   Outside of the promotional process?
 7        Q.   Right.
 8        A.   Yes, they are.
 9        Q.   Okay.  What does that consist of?
10        A.   They come in, every crew member comes in
11   once a year for training.  Additional recurrent
12   training it's called, at the -- during which they
13   receive a simulator check.  And at any time during
14   their -- during the year flying a line, a captain
15   can perform a performance evaluation on a crew
16   member.
17        Q.   Is that performance evaluation by a
18   captain called a proficiency report?
19        A.   Yes, it is.
20        Q.   And are those done in any kind of routine
21   basis or is it just discretionary?
22        A.   Discretionary.
23        Q.   And as I understand it, those can be done
24   either at the captain's behest or at the request of
25   the subordinate crew member; is that correct?
```

```
 1              MS. NORTON:  Object to the form of the
 2     question.
 3         A.   Pat called me.  Either beeped me or called
 4     me, to tell me about it.
 5     BY MS. SHEA:
 6         Q.   All right.  And what did he say and what
 7     did you say?  If you recall.
 8         A.   He told me that he had a flight that he
 9     was very concerned about and that he had written a
10     NASA report concerning the incident.
11         Q.   Okay.  And what, if any, response did you
12     make to him?
13         A.   I told him that was fine and that if he
14     would forward that in to me, that I would
15     investigate the situation.
16         Q.   Did he tell you at that time whether he
17     had actually filed it with NASA?
18         A.   I believe that at the time he told me he
19     had sent it to NASA, yes, I believe so.
20         Q.   Okay.  How did you get the report?
21         A.   He faxed it in to us.
22         Q.   And what did you do with it once you
23     received it?
24         A.   I didn't actually receive it.  I was not
25     in the office that week.
```

```
 1          Q.   Where were you, on vacation or just off

 2     the schedule?

 3          A.   I was out of town.

 4          Q.   Okay.  All right.  So you spoke to him

 5     after the flight.  Was that while you were out of

 6     town or was that before you departed?

 7          A.   That was while I was out of town.

 8          Q.   Okay.  And then you just said fax it to me

 9     at the office?

10          A.   Yes.

11          Q.   Do you know if any action was taken on it

12     before you returned?

13          A.   Yes.

14          Q.   Okay.  What do you know about that?

15          A.   Pat was suspended from the schedule.

16          Q.   Were you part of any telephone conferences

17     or other conferences about that?

18          A.   No.

19          Q.   Did you do any investigation or any review

20     of this report between the date that Pat called you

21     and his being suspended from the schedule?

22          A.   Yes.

23          Q.   Okay.  What did you do?

24          A.   Well, I'm sorry.  Between the time that he

25     called me.
```

```
 1        A.    We investigated the letter.

 2        Q.    Okay.  What, if any, investigation had

 3  already been done?

 4        A.    I don't know.

 5        Q.    Okay.  When you say we investigated the

 6  letter, is that you and Pete Steele?

 7        A.    Yes, we were all involved in it.  And John

 8  Washington.

 9        Q.    Anyone else?

10        A.    Not that I recall.

11        Q.    Mark Stewart?

12        A.    I don't believe so, no.

13        Q.    Dave Bassett?

14        A.    Not to my recollection.

15        Q.    And forgive me if I've asked you this

16  already, but do you know what, if anything, had been

17  done by the others that caused them to suspend Pat

18  Major while you were still out?

19        A.    Other than reading the letter, that's all

20  I know.

21        Q.    All right.  So when you say we

22  investigated it once you got back, what did that

23  consist of?

24        A.    It consisted of listening to the tower

25  tapes.
```

1          Q.    Okay.  Had those already been obtained?

2          A.    They were not actually obtained at the

3     time.  We requested production of them, I believe.

4     But we did actually listen to them in the tower.

5          Q.    All right.  So you, Derry Huff, got the

6     tower tapes?

7          A.    We requested the tower tapes.

8          Q.    Okay.  In other words, they weren't

9     available when you returned from va -- or from being

10    out of town?

11         A.    They were available for us to listen to,

12    but we were not given a hard copy of the tapes.

13         Q.    When did you listen to them?

14         A.    Sometime early in that week.

15         Q.    Okay.  So you actually went over to the

16    aviation authority and listened to them?

17         A.    Yes.

18         Q.    Who was part of that?

19         A.    I believe it was Pete Steele, John

20    Washington and myself.

21         Q.    Okay.  And are you able to testify as to

22    the discrepancy between what was in Pat's complaint

23    and what you heard when you went to the aviation

24    authority?

25                MS. NORTON:  Object to the form of the

 1 | question. Go ahead and answer.

 2 |              MS. SHEA: I'll rephrase it.

 3 | BY MS. SHEA:

 4 |      Q.   Was there anything about your listening to

 5 | the tower tapes that you found significant?

 6 |      A.   Yes.  The content -- just flat out that

 7 | the content of the letter was not the same as the

 8 | content of the audiotapes.

 9 |      Q.   Okay.  Do you recall any material way in

10 | which it differed?

11 |      A.   There was significant discrepancies

12 | between the sequence of events, the reported

13 | material.

14 |      Q.   Okay.  Was there a -- an advisory or a

15 | bulletin, whatever you would call it, from the tower

16 | of standing water of less than one quarter inch

17 | before the Amerijet plane was given take off

18 | permission?

19 |              MS. NORTON: Object to the form of the

20 | question.  What time frame?  Immediately before,

21 | days before, hours before?

22 |              MS. SHEA: Well, on the tape that you

23 | listened to.

24 |              MS. NORTON: Okay.

25 |      A.   As far as I can recall, there was a report

1    given immediately prior to the takeoff clearance.

2    BY MS. SHEA:

3        Q.    Okay.    Was that consistent with Pat

4    Major's complaint?

5        A.    No, it was not.    I don't believe so.

6        Q.    Okay.    Do you recall what Pat's complaint,

7    the sequence that Pat's complaint had that was at

8    odds with the tower tapes?

9        A.    No, not specifically.

10       Q.    Okay.    Any other items in the sequence

11   that you heard on the tower tapes that you found

12   inconsistent with Pat's report?

13       A.    As I said, there were several

14   inconsistencies.    I don't know the specifics of them

15   at this time.

16       Q.    Okay.    You can't --

17       A.    I don't recall the specifics of them.

18       Q.    Did you document those at all?

19       A.    We have a transcript of it.

20       Q.    You got that after the fact?

21       A.    After the -- yes.

22       Q.    As you three sat and listened to it, did

23   you take any notes or create any documents of what

24   you were hearing and how you felt it was at variance

25   with Pat's complaint?

```
 1         A.   Yes, we did.

 2         Q.   What became of those notes?

 3         A.   At what time are you talking about these

 4    notes being done?

 5         Q.   Contemporaneously with going over to the

 6    aviation authority and listening to them.

 7         A.   Yes, we did take notes.  I have no idea

 8    what became of those notes.

 9         Q.   Did you prepare any kind of file

10    memorandum or any kind of document to summarize the

11    variances or the inconsistencies?

12         A.   I did not, no.

13         Q.   Do you know whether John did or Pete

14    Steele did?

15         A.   I do not know.

16         Q.   Okay.  Have you seen any document at

17    Amerijet, whether in Pat's file or otherwise, that

18    sets forth what you consider, what Amerijet

19    considers to be the inconsistencies between the

20    tower tapes and Pat's complaint?

21              MS. NORTON:  That was used at the time.

22              MS. SHEA:  Well, used at the time or --

23              MS. NORTON:  Not in preparation for this

24    litigation.

25              MS. SHEA:  No.
```

1    performance degradation there would have been due to

2    the circumstances on the runway.

3         Q.   Okay. And again, it was you, John and

4    Pete collectively?

5         A.   Correct.

6         Q.   And what, if any, conclusions did you

7    make?

8         A.   We concluded that there was no error.

9         Q.   And why was that?

10         MS. NORTON: Object to the form of the

11    question. Why was there no error?

12    BY MS. SHEA:

13         Q.   What was the basis for that conclusion

14    that there was no error?

15         A.   Because departure that they did fell

16    within the parameters of the performance solution

17    that they had created.

18         Q.   All right. In forming that conclusion,

19    was it your assumption that it was a dry departure

20    analysis?

21         A.   That's correct.

22         Q.   Okay. So the parameters were appropriate

23    for dry runway conditions?

24         A.   That's correct.

25         Q.   Okay. And why did you analyze this as a

1    terminated?

2         A.    That's correct.

3         Q.    All right.  So that he was, Brian Steele,

4    Al Jorsey.  Do you recall who the flight engineer

5    was?

6         A.    I believe it was Brett Wise.

7         Q.    And they -- what was the contribution of

8    Al Jorsey to the investigation?

9         A.    Other than an oral report, he submitted a

10   written performance report.

11        Q.    Okay.  And did that address the degree of

12   water or lack of water on the runway?

13        A.    I don't recall specifically what it

14   addressed.

15        Q.    What was the contribution of Brett Wise to

16   the investigation?

17        A.    Other than his accounting of what

18   happened, I don't recall any specific.

19        Q.    Did he do a written report?

20        A.    I don't recall if he did or not.

21        Q.    Okay.  And was Al Jorsey's report part of

22   what was relied upon in making the decision to

23   terminate Mr. Major?

24        A.    That was part of that decision, yes.

25        Q.    But you don't recall the contents of it as

DOWNTOWN REPORTING    (954) 522-3376

```
 1      it relates to the specific issue of whether the
 2      aircraft was being operated within correct
 3      parameters?
 4           A.    Generally speaking, that the aircraft did
 5      operate within the normal safety margin and that he
 6      found Pat, Pat's performance to be poor.
 7           Q.    Do you recall in what objective way he
 8      found Pat's performance to be poor?
 9           A.    His observing as a check airman.
10           Q.    So beyond that, do you recall any
11      specifics, like raised his voice or disregarded, or
12      do you recall anything in specific that Al Jorsey
13      was critical of?
14           A.    He specifically, I recall that he was
15      critical of Pat's acceptance of a clearance from
16      Miami center, that we were not authorized to accept.
17           Q.    Miami, I thought you were at Fort
18      Lauderdale that day, that flight.
19           A.    Miami center covers from Jacksonville to
20      almost San Juan.
21           Q.    Okay.  All right.  Al Jorsey was critical
22      of Pat's acceptance of a clearance from them?
23           A.    Correct.
24           Q.    Okay.  Why, do you know?
25           A.    It was in violation of our company
```

1    procedures.

2         Q.   How so?

3         A.   We're not authorized to perform what the

4    clearance was and he accepted the clearance.

5         Q.   Okay.  Can you be any more specific about

6    that?

7         A.   Pat accepted a clearance to go direct to

8    an intersection that he wasn't capable of navigating

9    to.

10        Q.   Okay.  So this is after the takeoff?

11        A.   That's correct.

12        Q.   Okay.  What, if any, criticisms did check

13   airman Jorsey have -- make of Pat relative to the

14   takeoff conditions?

15        A.   I don't recall any specific.

16        Q.   And what, if any, observations did Al

17   Jorsey make in his report concerning the degree of

18   contamination of the runway?

19        A.   I don't recall any specific comments to

20   it.

21        Q.   Okay.  All right.  And you don't recall

22   Brian Steele doing any written report before Pat

23   Major was let go?

24        A.   I don't recall if there was one made or

25   not.

```
 1            Q.   All right.  What else, if anything,

 2   transpired before Pat Major was terminated?

 3            A.   Prior to his termination, after the

 4   decision was made?

 5            Q.   Well, after this investigation that you've

 6   described was under way, was there any further

 7   investigation, or have you described it in full?

 8            A.   That's pretty much the whole thing.

 9            Q.   Did you have any meetings with the FAA?

10            A.   No, we did not.

11            Q.   All right.

12            A.   That I was involved in, we did not.

13            Q.   Okay.  And a decision was made to

14   terminate Pat.  Was that made in a meeting?

15            A.   That was made -- I don't recall exactly

16   when it was made.  It was made by the director of

17   operations.

18            Q.   Well, did you give him advice and consent

19   on it, so to speak?  Did you give him an opinion?

20            A.   I agreed with his decision.

21            Q.   If the weight reduction had been taken on

22   the flight in question in accordance with the runway

23   analysis, would that have involved a substantial

24   delay of the flight?

25                 MS. NORTON:  Object to the form of the
```

```
 1          Q.   Was the flight in question the one about

 2    which Pat Major complained at full capacity for

 3    cargo and fuel?

 4          A.   I have no idea.

 5          Q.   All right.  Did Pete Steele ask you to

 6    prepare the letter to Pat and give you the wording

 7    for that letter?

 8               MS. NORTON:  Object to the form of the

 9    question.

10          A.   We did discuss the wording of the letter,

11    yes.

12    BY MS. SHEA:

13          Q.   Okay.  Was that you, Pete and John or just

14    you and Pete?

15          A.   That was I believe Pete, myself.  And I

16    believe at that time we had engaged legal counsel at

17    that point.

18          Q.   Okay.  Now, was Pat's -- Pat Major's

19    complaint that we're calling the NASA complaint, the

20    first time that he had taken up with you

21    specifically concerns relating to runway

22    contamination?

23               MS. NORTON:  Object to the form of the

24    question.  You're calling it the NASA report.

25               MS. SHEA:  Okay.
```

```
 1    letter absolving the senior -- the check airman on
 2    board the aircraft, after reviewing the facts, found
 3    that there was no violations and issued a letter
 4    stating so.
 5         Q.   That would be to Al Jorsey?
 6         A.   That's correct.
 7         Q.   Do you know what, if any, correspondence
 8    was issued from the FAA involving Brian Steele?
 9         A.   As far as I know, there's been none.
10         Q.   Is there an investigation open regarding
11    Brian Steele?
12         A.   There is.   The original letter of
13    investigation is still open.
14         Q.   And do you know what, if any, penalty was
15    assessed against the company?
16         A.   No.
17         Q.   Did Amerijet take any actions to review or
18    revisit any of its policies about runway
19    contamination following the incident with Pat Major?
20         A.   We did review our policies.
21         Q.   Okay.   Any revisions or changes of
22    policies?
23         A.   Not that I'm aware of.
24         Q.   Well, you would be aware if there was
25    revision of policies; correct?
```

```
 1          A.    Of a policy, yes.

 2          Q.    Okay.  So there's no new policy at

 3    Amerijet on runway contamination or runway analysis

 4    as it relates to contaminated runways?

 5          A.    No.

 6          Q.    You've been produced as the person at

 7    Amerijet with the most knowledge of the FAA

 8    investigation and any associated penalties

 9    concerning this incident.

10          But as I understand you, you don't know

11    what, if any, penalties were assessed against

12    Amerijet?

13          A.    That's correct.

14          MS. SHEA:  Miss Norton, do you have anyone

15    else that you might produce that would be able to

16    testify on that subject?

17          MS. NORTON:  Yes.

18          MS. SHEA:  Okay.

19    BY MS. SHEA:

20          Q.    All right.  So as far as you know, Mr.

21    Huff, Mr. Jorsey was cleared, Brian Steele, there's

22    still an open investigation on, and you don't know

23    what happened as it pertains to the air certificate

24    holder itself; is that correct?

25          A.    That's correct.  As far as I know, it's an
```

DOWNTOWN REPORTING    (954) 522-3376

```
 1    gave us as a copy of the letter that he sent in.

 2         Q.   Okay.  And can you point me to the

 3    language in here that you've referenced in your

 4    deposition testimony concerning throwing himself on

 5    the throttle?

 6         A.   Two references.  The first on page 3 that

 7    reads, despite the circumstances, I did not forcibly

 8    retire the throttles, stand on the brakes or

 9    otherwise interfere with the captain's choice to

10    takeoff.  And where he says on the page --

11         Q.   You can refer to the number on the bottom

12    if you want.

13         A.   On number 56, when he says, would forcibly

14    aborting the takeoff from the right seat have

15    presented a less dangerous scenario than what we

16    encountered?  Who can say?

17         Q.   So that's two excerpts out of six single

18    space, typed pages are what made you conclude that

19    you couldn't be?

20         A.   In the culminating point, yes.

21         Q.   And we know that he did not in fact make

22    any more effort to retard the throttles?

23         A.   Yes, we do know that.

24         Q.   And if I understand your testimony

25    correctly, had he gotten off the plane before it
```

 1    pushed back, would there have been any potential

 2    discipline?

 3         A.    He would have undoubtedly been sent in for

 4    retraining so that he would understand how to

 5    perform a performance problem on aircraft.   But

 6    other than that, no.   It's the type of behavior we

 7    would support rather than condemn.

 8         Q.    Well, did you tell him back in June 1999,

 9    that not only did you do the right thing, but I

10    would have done the same thing myself?

11         A.    I don't -- I do not believe that I told

12    him that, no.

13         Q.    Okay.   But based on the answer that you

14    just gave me, is that consistent with something that

15    you would have told him, was that walking off the

16    airplane would be acceptable?

17               MS. NORTON:   Object to the form of the

18    question.   I mean, there's no predicate to what the

19    issue was.

20         A.    Could you state the question again.

21    BY MS. SHEA:

22         Q.    Would his walking off the airplane on June

23    8, 1999 have been acceptable?

24         A.    Absolutely, it would have been acceptable

25    if they had concerns about the flight.

DOWNTOWN REPORTING    (954) 522-3376

1    to do with whether or not Pat Major was qualified to

2    be a captain at Amerijet?

3         A.   No.

4         Q.   Okay.  Document 274, is that a document

5    that you've seen before?

6         A.   No, it is not.

7         Q.   So you didn't place any reliance on that

8    document in any of your assessment of Pat Major?

9         A.   No, I did not.

10        Q.   And 309 is just the termination letter

11   that you authored; is that correct?

12        A.   That is correct.

13        Q.   Okay.  So if there's any documents that

14   reflect Pat Major is not qualified to be a captain

15   in Amerijet, you have not seen them?

16        A.   I don't know.  I'm not aware of any.

17        Q.   Okay.  Let me ask you, can you please take

18   a look at question four in that set.  Identify who

19   made the decision to terminate Major and all the

20   factors which went into it and identify all

21   documents which support the termination.

22             We've talked about that at some length.

23   Other than the documents that you've identified

24   today and the factors that you've identified today,

25   are you aware of any -- any other ingredients in the

```
 1          A.   As far as I know.
 2          Q.   Question eight, do you contend that Major
 3     acted in inappropriately in any way in connection
 4     with the June 8th, 1999 incident which was the
 5     flight with Captain Steele.  The answer to that was
 6     pretty vague.  I just want to make sure I'm clear on
 7     that.  Did Amerijet fault Pat Major?
 8          A.   Yes.
 9          Q.   And consider that he acted
10     inappropriately?
11          A.   Yes.
12          Q.   And who made -- you're the person that's
13     making that determination?
14          A.   Yes.
15          Q.   Okay.  And the basis, the essence of it is
16     what?
17          A.   That he didn't -- he basically was
18     insubordinate to the captain.
19          Q.   And how was he insubordinate?
20          A.   He did not follow the captain's
21     instructions as to runway choice.  Basically, that's
22     it.
23          Q.   All right.  But that episode did not
24     result in any kind of informal or formal reprimand
25     or discipline?
```

```
 1              MS. NORTON:  Object to the form.

 2         A.   It resulted in a formal counseling session

 3    with him.

 4    BY MS. SHEA:

 5         Q.   What do you mean when you say formal

 6    counseling?  There's no record of it.

 7         A.   We discussed the circumstances and how he

 8    should have, could have better handled the

 9    situation, how he should have handled the situation.

10         Q.   Is human resources typically involved when

11    there is "formal counseling of an employee"?

12         A.   No.

13         Q.   Okay.  Is there any documentation that's

14    typically associated with that?

15         A.   No.

16         Q.   What makes it formal counseling as opposed

17    to informal counseling if there's no human resources

18    involvement and no documentation?

19         A.   Because it was an actual conversation

20    between the two of us rather than I told somebody to

21    tell him.

22         Q.   But it was no more formal than that?

23         A.   Correct.

24         Q.   And in terms of question nine, do you

25    contend that Major acted inappropriately in any way
```

NasaRpt: 8/19/99, 4:42 PM page 2
Incident date:  08-17-99

NASA, Aviation Safety Reporting System (ASRS report).
Report Date: 08-18-1999, Incident Date: 08-17-99
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs., Ratings: Boeing 727 Type, CFI, CFII,
    MEI, A&P, FEJ, with approximately 150 hours flight experience in the last ninety days.
Flight Phase: Takeoff, Airspace:  Class C.
Weather Factors:    Thunderstorms  in  vicinity,  rainshowers  overhead,  contaminated
    runway; conditions ripe for windshear.

## Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ.    Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening.  When I arrived,
the field was under heavy rainshowers.  Anticipating a Max-weight performance-limited
takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the *Navtech* runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff decision made
June 08, 1999 out of MIA.  On that rainy morning, a Continental 727 had taxied into
position and hold RW-12, then declined takeoff clearance... requesting full length 9L,
instead.  The night before it had rained ten inches.  It was raining at the time.  While
Tower had not provided a runway condition report, the runways were obviously wet.
Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way.
Without prompting from the captain, I declined, reminding Tower that our flight required
full-length 9L.  The captain chastised me for refusing RW-12 against his wishes (even
though we had just finished discussing that the runway analysis did not support it, even
on a dry day, even if we believed the weights reported by ramp personnel).    The captain
insisted I radio-back Tower and accept RW-12.    I demurred.    After a brief but intense
discussion, AJT 823 finally departed full-length 9L using nearly all available runway before
finally breaking ground.   9L in MIA is 1,300' longer than MIA RW-12;  clearly, had we
taken 12, there may have been an accident.  However, my refusal to accept RW-12 became
the subject of a complaint by the captain which was investigated by Amerijet's acting chief
pilot.  I was exonerated for my actions that day, but it was a profoundly uncomfortable
experience...especially in light of a pending age discrimination charge against the employer
(it has promoted nine junior, younger, less-qualified first officers to captain ahead of me),
management's acts of retaliation for the charge, and the company's protracted pattern of
punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory
compliance (duty times, hazmat and weight & balance), and the equitable treatment of
pilot employees...myself among them.  The new (acting) chief pilot seemed intent on
making a difference.  At the conclusion of his investigation, he stated, "Not only did you
do the right thing, but I would have done the same thing myself.  I have, in fact, walked off
an aircraft when a captain refused to get it deiced."



PLAINTIFF'S EXHIBIT
BLA 11/8/00
CONFIDENTIAL

000052

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), as is the case in all Amerijet Runway Analysis, there are no weight decrements for wet runways that do not specifically contain "Standing water".  Consequently, flight crews, the training department and dispatch personnel consider all runways "Dry" for performance planning purposes unless there exists a contamination report that contains the specific words, "Standing Water".    I have noted that some Boeing 727 performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot reduction to the Max-weight V1 speed for runways that are, "...well-soaked with water but do not have large areas of actual standing water".   As of August 17, 1999, such questions had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08.  9L in FLL is 200' shorter than 12 in MIA: 1,501' shorter than MIA 9L.  The conditions were significantly worse August 17, than they were June 08.  The dispatcher I queried reported to me that to his understanding Amerijet performance analysis do not contain weight-limiting decrements unless "Standing water" is reported.   I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use.  Hence, the landing numbers seem to imply a braking degradation, and perhaps an impediment to acceleration as well, resulting from wet runway surfaces... irrespective of whether or not the runway contains "Standing water".  "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights.", I said.    The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' on the runway, it's dry."

As aircraft 397AJ was loaded for departure, I explained my question to the check airman, who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day.  In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safer solution and accept the "Standing Water ≤ 1/4" weight and V1 reduction for our flight.   That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts.  The reported weight of our aircraft that day was 192,298 Lbs.  The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain dismissed my concern,  "We'll have to takeoff between water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.   He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.



000053

NasaRpt: 8/19/99, 4:42 PM page 4
Incident date: 08-17-99

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst in the cross-groove channels worn by successive landing and departing aircraft.   No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a Max EPR, packs-off, takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect a packs-off takeoff.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch'. AJT 827 is cleared for takeoff, turn right heading one zero zero". As Tower began its transmission, the captain had advanced the throttles. The takeoff clearance was then issued without pause or delay. The captain had released the brakes before I could reply to the runway report and clearance. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. AJT 827 used all available runway. The captain rotated well inside the alternating red and white lights at the departure end of the runway and the main wheels broke ground at the last possible instant.   The aircraft crossed the airport boundary at less than 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation."



NasaRpt: 8/19/99, 4:42 PM page 5
Incident date: 08-17-99

"By knowing where I am, then drawing a straight line on my chart and navigating," I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits specified in Amerijet's Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked, incredulous. "Do you realize how incongruent that sounds coming from a check airman that just encouraged a flight crew to takeoff from a contaminated runway into possible windshear fifteen thousand pounds overweight? Even if I am wrong about navigating direct, ...and I don't think I am, one could get you violated, the other will get you killed. What is safe about that?" I shook my head.

AJT flight 827 exceeded aircraft performance limitations and violated FAA regulations in disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway in an aircraft that weighed fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the inevitable consequences eventually bestowed upon any air carrier which actively cultivates a culture of non-compliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on runways that are obviously contaminated, but cannot be described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning materials, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the contamination report.

My mistake August 17, was in letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the brother of its vice president, director of operations and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Had I done so before the aircraft taxied out of the ramp for take-off, I may have avoided the circumstances which placed my crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.



NasaRpt: 8/19/99, 4:42 PM page 6
Incident date: 08-17-99

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway.  The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff.  At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...and to the more strident actions required to prevent takeoff once initiated.  But that was not the controller's responsibility.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the captain and the check airman, prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17.  I should not have allowed the aircraft to depart.  Would forcibly aborting the take-off from the right seat have presented a less dangerous scenario than what we encountered?  Who can say?  I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Honestly, that did not occur to me until later.  Would it have worked?  I made a judgment call and elected not to intervene once the takeoff roll began.

Contributing factors included my excessive deference to management, not only with regard to the presence of the check airman, but pertaining to the recency of what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and on-going concern for regulatory compliance and flight safety at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff.  I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training.  I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO).  The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way by denying them promotional and professional opportunities, abusing them in the simulator if need be...exploiting the PRIA to soil their careers while sending an unmistakably clear message to other flight crew who might consider showing similar unwelcome concern for flight safety and regulatory compliance.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17.  It did not get done.  That is the reason for this report.  I hope it will do someone, somewhere, some good.

Respectfully submitted,                          CONFIDENTIAL



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
　　　　 Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
　　　　 Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP,
　　　　 08-17-99.


Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.


# CONFIDENTIAL

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor1178@aol.com

000057

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA

                  CASE NO.  00-6070-Ferguson/Snow

PATRICK. SCOTT MAJOR,                 )   L.T. Case No.
                                      )   99-021746-11
               Plaintiff,             )
                                      )
vs.                                   )
                                      )
AMERIJET INTERNATIONAL, INC.,         )   COPY
                                      )
               Defendant.             )
- - - - - - - - - - - - - - - - - - -)

                          500 East Broward Blvd.
                          Fort Lauderdale, Florida
                          Monday, January 8, 2001
                          10:00 a.m. - 12:05 p.m.

                          VOLUME 2

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

                          -------------------------------

                          DEPOSITION

                          OF

                          DERRY S. HUFF

                          -------------------------------
```

1       A.    I told him that we'd lost the ability --
2    we had lost our confidence in his ability as an
3    airman.
4        Q.    You didn't tell him anything more specific
5    than that?
6        A.    I don't recall the specifics of our
7    conversation.
8        Q.    But you had met with counsel beforehand
9    and you had decided that that was the reason why he
10   was being fired?
11            MS. NORTON:    Object to the form of the
12   question.    Any conversations between counsel, the
13   question, to the extent it was me, is fine.    To the
14   extent that we discussed or did not discuss
15   something is not, and I object to it.
16   Attorney/client privilege.
17            MS. SHEA:    He testified about it last
18   time.    He brought it up.
19            MS. NORTON:    He testified he met with me.
20   Whatever that reflects.
21            MS. SHEA:    All right.
22   BY MS. SHEA:
23       Q.    So you had, before meeting with Pat Major,
24   you had decided to phrase his being fired as loss of
25   confidence in his ability as an airman?

1    A.    That's correct.

2        Q.    And you did not offer him further
3    specifics on that at the meeting?

4        A.    I don't recall the specifics of the
5    conversation.

6        Q.    Would you take a minute then and review
7    this transcript?  I thought you might have since
8    you've had it for two months.

9        A.    The second page, this transcript reflects
10    that I was told that I told him that we had a
11    concern about his decision-making ability.  Page 3 I
12    refer to the fact, based on this transcript, that he
13    has not developed, his skill level has not developed
14    throughout his training.

15            Page 4 of this transcript reflects that I
16    am referring to his different perceptions of things
17    that happened, his continuing different perception
18    of things that happened.  That's just about all I
19    see.

20        Q.    All right.  So basically, all that you
21    told him at the meeting was that you questioned his
22    decision-making ability, his development skill level
23    and his different perception of things that
24    happened.

25        A.    Yes.  Amongst a combination of other

PLAINTIFF'S
EXHIBIT

**FIRST OFFICER OR FLIGHT ENGINEER PROFICIENCY REPORT**

| NAME MACK MAJOR | EMPLOYEE NUMBER 803 | ☒ FIRST OFFICER ☐ FLIGHT ENGINEER | BASE MIA | DATE 7/18/97 |
|---|---|---|---|---|

| AIRCRAFT TYPE B-727 | TRIP/DATE 850  7/18/97 | | | APPROX. FLIGHT TIME HOURS 6300 |
|---|---|---|---|---|

INSTRUCTIONS Evaluate the officer's status based on the following scale.

| ① EXCELLENT | ② ABOVE AVERAGE | ③ AVERAGE | ④ BELOW AVERAGE | ⑤ UNSATISFACTORY |
|---|---|---|---|---|
| [1] PUNCTUALITY | [1] COOPERATION | | [1] KNOWLEDGE OF JOB | [1] KNOWLEDGE OF F A A AND COMPANY PROCEDURES |
| [1] PERSONAL APPEARANCE | [1] FLIGHT EQUIPMENT | | [1] ABILITY TO PERFORM JOB | [2] USE OF CHECKLIST |
| [1] CONDUCT | [1] KNOWLEDGE OF AIRCRAFT AND SYSTEMS | | [1] ABILITY TO ACCEPT INSTRUCTIONS | [1] CONCERN FOR CUSTOMER |
| [1] ATTITUDE | [1] KNOWLEDGE OF NORMAL AND EMERGENCY PROCEDURES | | [1] RETENTION OF INSTRUCTIONS | [1] CREW COOPERATION |

| FIRST OFFICER | | FLIGHT ENGINEER | |
|---|---|---|---|
| [1] FLIGHT PLANNING | [1] HANDLING OF AIRPLANE | [ ] AIRCRAFT PREFLIGHT | [ ] MONITORING CORRECT CLIMB POWER |
| [1] FORMS WORK | [1] ALTITUDE AWARENESS | [ ] COCKPIT PREPARATION | [ ] USE AND KNOWLEDGE OF PERFORMANCE MANUAL |
| [1] COCKPIT PREPARATION | [1] ABILITY TO LAND AIRPLANE | [ ] LOG BOOK CHECK | [ ] USE OF TAKEOFF & LANDING DATA CARD |
| [1] RADIO EQUIPMENT CHECK | [1] COMPLIANCE WITH NORMAL OPERATING PROCEDURES | [ ] REPORT OF AIRCRAFT CONDITIONS TO CAPTAIN | [ ] ENROUTE OPERATIONS |
| [ ] USE OF COMMUNICATIONS RADIO | [1] INSTRUMENT FLYING AND A T C PROCEDURES | [ ] ENGINE START PROCEDURES | [ ] IN RANGE AND BEFORE LANDING DUTIES |
| [2] HANDLING OF A T C CLEARANCES | [1] NAVIGATION (MAINTAINING TRACK, ALTITUDE, ETC.) | [ ] MONITORING ELECTRICAL SYSTEM | [ ] SECURING |
| [1] DEPARTURE AND APPROACH PATTERN | [1] USE OF NAVIGATION RADIOS | [ ] INSTRUMENT MONITORING | [ ] LOG BOOK ENTRIES |
| [2] MONITORING OF INSTRUMENTS AND CONTROLS | [1] AREA NAVIGATION | [ ] HEATING AND COOLING | [ ] INTERMEDIATE STATION WALK AROUND & FUEL LOADING |
| [1] AIRSPEED CONTROL | [1] USE AND KNOWLEDGE OF PERFORMANCE MANUAL | [ ] PRESSURIZATION | [ ] HYDRAULICS |
| [1] COLLISION WATCH | [1] KNOWLEDGE OF ROUTES, FREQ. & AIRPORT INFORMATION | [ ] ABILITY TO TROUBLESHOOT MALFUNCTIONING SYSTEMS | [ ] POST FLIGHT INSPECTION |
| [1] RADIO WATCH AND POSITION REPORTS | | | |

**REMARKS**

PAT DEMONSTRATES A THOROUGH KNOWLEDGE OF AMERIJET
POLICIES, PROCEDURES, AND MARKET REQUIREMENTS. HE IS VERY
WILLING TO PROVIDE THE EXTRA EFFORT REQUIRED OF AMERIJET
CREWMEMBERS TO ACCOMODATE OUR CUSTOMERS SPECIAL NEEDS.
KNOWLEDGE OF AIRCRAFT SYSTEMS AND HIS COMMUNICATION SKILLS
ARE VERY GOOD AS WELL AS AREA NAVIGATION SKILLS

| OVERALL GRADE | WERE UNSATISFACTORY ITEMS DISCUSSED? ☒ YES ☐ NO | CHECK IF TWO-LANDING REQUIREMENT COMPLETED PER FAR 121.441(e). | ON FLIGHT NO. / DATE |
|---|---|---|---|

| CERTIFYING SIGNATURE | EMPLOYEE NO 679 | BASE MIA | DATE 7/18/97 |
|---|---|---|---|

NOTE: USE REVERSE SIDE TO BETTER EXPLAIN AND UNUSUAL EVALUATIONS OR CHARACTERISTICS.

000262

REMARKS:

PLT DEFINITELY SHOWS LEADERSHIP QUALITY IN THE
PERFORMANCE OF HIS DUTIES AS WELL AS GOOD JUDGEMENT
TOWARDS OPERATIONAL DECISIONS.

## INSTRUCTIONS TO CAPTAIN

This report is an aid to help the pilot for future upgrading. When properly filled out it may help to
avert subsequent training problems. We encourage you as a Captain to exert you command
responsibility in preparing your crew members to be professional airmen. Please feel free to
discuss this report with the individual crew members. Return completed form to the Chief Pilot.

First Officer Proficiency Report
Pat Major
Flight 823
6-8-99

Flight 823 scheduled to depart at 1200z, myself and Larry Clifford;
the Engineer arrived at 1100z. First Officer Major arrived at 1200z. We were
delayed due to perishable freight and blocked out at 1305z. We weighed
195,000 lbs. in the blocks with 50,000 lbs. of fuel. During 20 minutes of
waiting for takeoff clearance, the Engineer said we had 48,700 lbs. of fuel
remaining. I told First Officer Major to check the runway analysis for
runway 12. He did not open the book, but replied " it is the same for runway
9 left lima 1 intersection -191,000 lbs. takeoff limit". I again told him to
open the runway analysis book and he disgustingly opened it to Miami
runway 12. I showed him at the current temperature the runway limit was
194,000 lbs. with packs off and the wind at 8 knots - that we were well
within limits to use runway 12. About 5 minutes later ATC requested us to
use runway 12. I told First Officer Major to tell them O.K. Instead he
replied to them "negative - we are too heavy, we must use runway 9 left full
length". I told First Officer Major, "for the rest of the flight all decisions
will come from the Captains seat. If he could not except that, I would taxi
back and get another First Officer." His reply was "all I want to do is make it
back alive!"

We arrived in Port of Spain 4 hours after block out from Miami. The
agent brought us up the weight sheet and I told First Officer Major what
positions to put them in. Instead of doing what he was told, he entered the
information into his own personal laptop computer and I did the weight and
balance myself. He then left the cockpit and proceeded to take pictures of
the pallets as it was being off-loaded from the aircraft. He then started
complaining to the agent about how the freight was palletized in Miami. I
told him if he was that worried about how it was loaded; he should have
showed up for work on time and complained about it then - not after the leg
has already been flown. The leg from Port of Spain to St. Lucia was
uneventful.

We left St. Lucia for St. Vincent where he complained I was not
allowed to use flaps 40 for landing. I told him what I will use and when I
will use it, and I will land the aircraft with or without his help. The leg from
St. Vincent to San Juan was also uneventful.



PLAINTIFF'S
EXHIBIT
15

000254

We then left San Juan for Miami, at which time I allowed the First Officer to fly the leg. Then ATC requested us to descend from 31,000 ft. to 28,000 ft. and cross junior intersection at 16,000 ft. We were 150 miles from Miami when we started down. At 26,000 ft. I asked First Officer Major why he was still descending. He replied "we have to make the intersection at 16,000ft." I told him "you are 100 miles from junior, if you keep descending we will be 55 miles too early." He argued a little more, then realized he was not reading his DME correctly.

After flying this trip with First Officer Major, I feel he needs to pay more attention to his job according to the GOM and not concentrate all his efforts in finding fault in everyone else. First Officer Major has a hard time taking commands from his superiors and seems to enjoy being argumentative. Since he refuses to follow Captains orders he is a danger to himself and everyone around him. With 13 ½ years experience on the B-727 I feel very strongly that if First Officer Major were placed with a newly upgraded Captain, he might sway him to make poor decisions because of his persistence in arguing at every turn. That Captain might take his word that he is correct and ends up in a dangerous situation. He would be an accident waiting to happen. Maybe counciling may help him. My overall grade for him is  5 – unsatisfactory.

cc: Derry Huff
    Mark Stewart
    Pete Steele

000255



Patrick Major

**Memo To:** Derry Huff
**Date:** 06-14-99
**Subject:** Note to file, AJT flight 823, June 08, 1999

Greetings, Derry.

During our telephone conversation earlier today you asked me to be prepared to discuss my flight last week with Brian Steele. Following is a my note to file (NTF) regarding events that day and following.

**Tuesday, June 08, 1999**
12:00 W/BSteele, MIA, POS, BGI, SVG, BGI, MIA.

I arrived at 8:00 a.m. Traffic and pouring rain increased drive time to 1:20 minutes. Captain Brian Steele and Second Officer Larry Clifford were already planeside. Freight was loaded, except bellies. No load plan, though. Brian said he had been up since 01:00L, left Ocala at 2:00 a.m. and drove straight through. Consequently, by time we departed for a sixteen hour duty day, nearly ten hours flight-time, Brian had already been up eight hours; by his own account, the last two hours of which required he negotiate a torrential downpour and a "...battlefield" (Brian's word choice) of wrecked automobiles. Brian explained he had asked for 51,000 Lbs of fuel. But we would call it 50/49.3 for takeoff, "Ghosting" 1,000Lbs. Said he was convinced loaders were cooking the numbers, so burn was likely to be higher than planned. Ramp personnel had removed the load computer from the cockpit and retained it for 45 minutes after the aircraft was fully loaded; accordingly, Brian asked me to produce V speeds for max. gross takeoff, full length, 9L. I did.    Load plan weight showed approximately 195,300Lbs. On taxi out, we discussed viability of 12; I had already noted the numbers and reported that the runway analysis did not support it, even if you believed the paperwork, and Brian had already said he didn't; I added that generally speaking, if you can't take 9L-L1, you can't take 12; aside from which the runways were obviously wet. RW 12 dry limit for 26C is 193.6. Even with packs off it would be close. Winds were 080 at 06, negligible help (except on 9L). By rights we probably should have used 9R due to the wet condition of the runway: wet runway less then <1/4" standing water, reduces RW 9L limit by 15,500Lbs, RW 12 by 14,000Lbs. But there was no point even suggesting that. Shortly after we discussed the RW 12 or 9L question, a Continental 727 taxied into position and hold on 12. Before tower could issue takeoff clearance, though, Continental called to say he needed 9L full length. As Continental taxied past us on way to takeoff 9L, I pointed out the change stating, "I wonder why Continental decided not to use 12."

Brian replied, "I don't know." Apparently, he saw no connection.

Then I said, "I'll bet they are going to offer it to us next."



PLAINTIFF'S
EXHIBIT

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com

000062

CONFIDENTIAL

"Yep".

Just then, ATC instructed AJT 823 to taxi into position and hold 12. As I depressed the push to talk and replied over my headset, "Negative sir, Amerijet 823 needs full length 9L." Brian was saying to me, simultaneously, "Okay, we'll take one two."

Tower replied, "Okay, hold position, I'll get you 9L momentarily."

Brian stated, "I'm in charge here. I'll make the decisions, and I said we will takeoff on RW 12."

There was no interest in discussing it. No consideration for CRM. No regard for the apparent safety concern. Apparently, Brian had forgotten telling me he believed the aircraft actually weighed much more than reported on the paperwork. I responded, "Not with me on board you won't." I wasn't angry, upset, or defensive, but 12 was not an option for this pilot that day.

"I said we'll take 12."

"Then you get on the radio, tell tower you have reconsidered the performance numbers and will take 12, after all." Brian did nothing. After a few moments silence, I said, "Brian, all I want to do today is get home safely."

"Me too, Pat. Me too." Brian sounded sincere. But this was coming from a captain who held his crew and his responsibility in such contempt that he would be awake nearly 24 hours by time we got back to MIA...on who knows how little sleep prior rising nearly nine hours before. Tower instructed us to take position and hold. Then, "AJT 823 cleared for takeoff 9L, turn right heading 120."

9L, my takeoff, I advanced the throttles prior to brake release and asked for normal EPR as briefed. Acceleration was apparently retarded by water on the runway surface and weight of he aircraft. V1 was not achieved until well inside the alternating amber/white centerline lights (last 3,000 feet of runway), I rotated at normal rate, 3 degrees per second to 10 degrees pitch, main wheels left the runway well inside the red centerline lights (last 1,000').  .    We crossed the airport boundary approximately 100', 15 degrees pitch attitude, wings level. Brian asked for the turn almost immediately. Quiet climb profile. Afterwards, normal climb was slow prompting ATC to ask us to give best rate through 10,000', I said to Brian I would use 250Kts for the climb as one or two engine climb speed, best reference for best rate, was 266. Brian said best rate was flaps up maneuvering speed; I reminded him that Flaps up maneuvering speed is closer to a best angle and that ATC had asked for best rate. Out of 10,000 feet I could only get to 319Kts while holding a 1,000' FPM climb. The last 10,000 feet of climb to FL 290 we could not maintain a 500FPM climb at 270 knots. Due to careful power management and trim, as well as direct routing, burn to POS was 38.8, 3,000Lbs over flight plan...not counting the 1,000Lbs of fuel we ghosted (4.0 total). Burn to GTK was 3.8 above plan (again, not including the "Ghosted" 1,000 Lbs).

CONFIDENTIAL

Upon arriving in POS we found four pallets only 1/2 of which were loaded with freight. Weights ranged from 1,800 to 2,500 Lbs. A stack of pipes had been laid across the empty portion of the pallets. Total pipe weight was 4,500Lbs. 1,800 to 2,500 Lbs one half of the pallet, 1125 Lbs on the other. Accordingly, those four pallets were out of the 10% of pallet-center CG limit by a considerable margin.

When Brian and I were alone in the cockpit on the ground in POS, I attempted to get closure on the earlier issue by saying, "Brian, you now I don't pull that shit." I had hoped to instigate a discussion. Instead Brian said, "We'll talk about it when we get back."

"Good, I would like a chance to talk about it." I said.

Brian responded. "Oh, we will. We definitely will. You can count on it."

Most of the rest of the day went normally. Cockpit communications standard, unrestrained.

Later, Jim Korby, JS from SVG, mentioned the tale regarding Ed Cook, Clay Lynn on SVG check-out, 15,000+/- over max. runway limit weight, 190AJ, some years ago. I was there as the flight as engineer and cleared up the rumor regarding branches in the nose gear as a result of the close call we had experienced taking off toward the mountains at night. I had performed the inspection myself after the nose gear failed to extend prior to landing in Barbados. Recycled, it had extended normally. Afterwards, Ed asked me to go check it out. When I came back upstairs I reported, "I think it will work fine now that I got the branches out of it." Then immediately added, "I'm just kidding. Everything looks normal." In actual fact, failure of the nose gear to extend on the first attempt was the result of a faulty switch behind the panel in the landing gear handle mechanism. We had almost died that night. I was trying to introduce some relief. Before opening the door in Barbados, we had sat there talking for 15-20 minutes. Each of us had privately advised Ed against the takeoff. But he had ignored us. We knew we were 3-5,000 Lbs over limit weight, at night into the mountains, but then each of us let Ed talk us into going. Later, we had the freight weighed in Barbados. It had been under-reported by more than 15,000 Lbs. Javier Carvahal summed up everyone's feelings when he said to Ed, "If I ever call you from down here asking you to buy me a ticket home, you'll understand why. I am never doing that again." Apparently, Brian had mentioned our earlier issue to Jim, prompting the discussion. Finally I added, "I don't mind dying. I just don't want to die doing something stupid."

RW 12 Tuesday, June 08, 1999...we might not have been so lucky. We would have at very least taken out the runway end lights. If so, the resulting investigation would have faulted the captain for accepting a contaminated runway less than the performance required length and the FO for excessive deference to authority; the FE for failure to speak up at all. Once the weights on the airway bills were totaled, Amerijet and the loaders would likely have been faulted as well. All this on a week when we knew a NASIP inspection was underway.

Upon return to MIA when I told Brian I would wait downstairs so we could talk, he said, "That's okay, Pat. That's okay."

# CONFIDENTIAL

Absent an accident, after the fact, events can be construed to meet whatever version most pleases those in authority.    Brian is a proud captain and brother of AJT Director of Operations Pete Steele. The fact remains, Amerijet came dangerously close to losing an aircraft Tuesday morning. It didn't because ultimately, Brian made the right choice. Absent the resolve of 823's FO, though, a calamity could not have been avoided. Did I hear, "Thank you, Pat. Good job, Pat. Thanks for sticking to your position."? Will steps be taken to ensure that flight crews are exercising appropriate judgment regarding rest, flight preparation and runway selection. Or, is Amerijet going to censure this pilot for asserting his concern regarding the safety of flight?

**Wednesday, June 09, 1999.** Contacted FSS asking for best source of runway airport conditions day prior.    Told them the decision making scenarios broadcast over the frequency, especially regarding a Continental 727 comprised an excellent basis for a performance/CRM lesson. FSS suggested I contact Dade County Aviation Authority.

**Thursday, 06-10-99:** MIA-POS, CB, LC: ostensibly a reliable 195.5Lb takeoff, 28C (two degrees warmer than Tuesday), wind stronger, right down the runway: 9L full length. Runways dry. RW 12 was never a consideration, not discussed or offered by tower. Chuck's leg. Rotation point and main gear flight point slightly prior to what had been experienced Tuesday...main gear left ground at about the 1,000' mark. What does this bode for similar operations out of FLL, (9L is even shorter than MIA RW 12)?

**Monday, 06-14-99:** Spoke with Jim Murphy: Dade County Aviation Authority, airport conditions 12-13:00z Tuesday, June 08, 1999.. No record since airport closure May 19. Authority does not assess condition of RW re water, etc., unless specifically requested by tower. Due to shape of RW and grooving, little water actually pools or puddles, "But the runways were definitely wet and it was raining. I remember, there had been nearly 10 inches of rain and flooding all over."

**06-14-99:** Submitted FOIA request for tower and ground communication tapes between the hours of 12:15 and 13:30z June 08, 1999. In particular, I am interested in documenting Continental's statement regarding their decision to change to the longer runway.

**Comments:** What would have happened had the Alaska Airlines FO told the tower they were going around at Juneau that ill-fated night, or, failing to get the appropriate response from that, pushed the throttles forward, leaving the Captain no choice but to go around? What would have happened had the FO stood on the brakes as the Swissair 747 Captain initiated the takeoff roll without clearance at Tenerife? What would have happened had the FO or FE shoved the throttles forward as the Kaletta DC-8 banked 45 degrees below 500' AGL in order to land on an unapproved RW in Guantanomo Bay; better yet, what would have happened had the Captain simply refused that flight...he had already been awake 24 hours when notified of the trip? What would have happened in Croatia? They each would probably have to explain their actions to the chief pilot. But there would not have been accidents.

**CONFIDENTIAL**

000065

Brian was tired; having just driven several hours to make the flight, he had already been awake the equivalent of a normal work day and under considerable stress. Several times Brian had stated his conviction that the aircraft was considerably heavier than reported. But then he wanted to accept a runway for takeoff that relied on the veracity of the reported weights; even if we believed the numbers, they were marginal at best... if the runway were dry and packs off for takeoff? It was wet. Another 727 captain taxied into position and hold, took one look and opted for the longer runway. What else should I have done?

I know you don't expect me to risk my life.

This FO made a difficult choice that day. As a result, there was no accident or incident to report, no loss of life, destruction of aircraft or property aboard, nor was there damage to runway end or approach lights which would have likely produced an embarrassing investigation. I did what pilots do, what Amerijet pays me to do. It would be nice to be appreciated for it, but that's not required. I know what I did was right.

Sincerely,

Patrick Scott Major

The preceding statement of fact are accurate to the best of my recollection.

CONFIDENTIAL



Patrick Major

**Memo To:** Derry Huff
**Date:** 06-17-99
**Subject:** Note to file, AJT flight 823, June 08, 1999, addendum.

Greetings again, Derry.  During our meeting Monday, June 14, 1999 regarding my flight with Captain Brian Steele Tuesday, June 08, 1999, you accepted my report concerning take-off runway selection out of MIA, then asked for an explanation pertaining to Brian's allegation that I refused to place the flap-handle to 40 degrees upon his command, and that I insisted he remove the flap-handle restricter bolt himself while maneuvering the aircraft on final approach for landing at St. Vincent.  There is little to explain.  The allegations are simply untrue.  Here is what happened.

While on the ground in POS (the next leg was BGI, the following leg would be SVG), Brian and I discussed landing limits at St. Vincent.  In resolving how we had arrived at different maximum landing weights, Brian said he planned to use flaps 40.  I reminded him that the FedEx hush kit STC does not provide for flight crew removal of the flap-handle restricter bolt; hence, with 397AJ, we were limited to a flaps thirty landing at SVG.  Brian replied, "I don't give a shit about that.  I plan on using flaps forty."  (His choice of words).

By way of persisting, I described to Brian how the restricter bolt limitation materialized: Rand Brewer asked Director of Operations Pete Steele (Brian's brother) for a ruling regarding removing the bolt for flaps forty landings at short foreign airfields where stage-three noise abatement was not a factor.  About six weeks later, Pete responded to Rand by stating that flaps 40 was not allowed on those aircraft that have a restricter bolt installed.  Rand relayed this information to me by email.  I reminded Brian that Pete later made an announcement to all flight officers at one of the recent meetings, "The FEDEX hush kit STC does not provide for flight crew removal of the flap-handle restricter bolt.  Hence, there will be no more flaps 40 landings on aircraft with the FedEx hush STC.  We hope to obtain flaps 40 approval for the Valsan conversion, but testing is still underway.  Amerijet is providing Valsan....etc., etc."  In my experience, Derry, no other captain uses flaps forty on aircraft that have a flap-handle restricter bolt installed.

Brian was undeterred.  A short time later, he removed the flap-handle restricter bolt himself while the aircraft was still on the ground.  Brian did not ask anyone else to perform the task or for their help.  (Derry, during our meeting, Monday, I indicated this occurred in POS; it may have, but I can't be absolutely certain it wasn't BGI.  In any event, the bolt was removed from the flap-handle path while the aircraft was parked and prior to departure for SVG).  At first, Brian encountered difficulty removing the bolt.  Larry Clifford moved to help.  But Brian waved him off.  Eventually, Brian removed the restricter bolt using just his fingers.

1722 West Las Olas Blvd., Ft. Lauderdale, FL 33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor4178@aol.com

PLAINTIFF'S
EXHIBIT
17
PM  11/8/01

CONFIDENTIAL        000058

Upon arrival at SVG, flaps were extended normally. There was no delay or further discussion regarding Brian's choice of final flap setting; indeed, the bug card contained speeds for a flaps forty landing. As in the earlier discussion prior to takeoff out of MIA, Larry Clifford remained silent throughout, both on the ground and in the air. Brian did not ask for his input, nor did Larry offer it. On yesterday's flight 723, I asked Larry if he remembered anything out of the ordinary on approach into SVG. He replied, "No. What do you mean?"

"Do you recall me delaying placing the flap-handle to the forty degree position upon Brian's command?"

"Not that I remember."

"Did I miss the call, and Brian have to do it himself?"

"No. Everything seemed pretty ordinary to me. Why?"

"It came up in a discussion yesterday. I thought everything had gone pretty normally after we left MIA. I wondered if I had missed something."

"I remember you two discussing it on the ground. But after that, nothing out of the ordinary."

Just then, Chuck Bennett entered the cockpit. When Larry's and my conversation abruptly ceased, Chuck asked, "What? You two talking about me again?"

"No. We were just talking about Tuesday's flight into SVG."

"Is Brian using flaps forty again? Which airplane was it?"

"397".

Chuck sighed. "I don't know why he does that. He knows he's not supposed to remove that bolt."

Then I briefed Chuck on last Tuesday's runway selection controversy out of MIA, including the forty-five minute delay in getting weight and balance paperwork to the cockpit after the aircraft was loaded, ramp personnel's prolonged possession of the weight and balance computer, the rain on the field, wet runways, Brian's lack of rest prior to the flight, his repeated statements declaring his belief that the aircraft was considerably heavier than reported...prompting him to request V-speeds for a max. gross takeoff, up to and including my persistence in requesting full-length runway 9L for takeoff.

"How long did you have to wait for 9L?" Chuck asked.

"About a minute, maybe two."



Chuck reasoned, "Under conditions like that, why would you take the shortest runway? Hell, be as safe as possible. Why risk it? I hardly ever use 12 out of MIA, not unless we're way under the limit. You never really know what the weights are, anything can happen. So, why take the chance?"

Afterwards, I said, "Larry. You know, the one thing I noted the other day, both out of MIA and pertaining to flaps 40 into SVG, was that you said nothing at all. It takes three people to fly this airplane. If you have something to say, speak up. Us guys up front can kill you. You are just going to get to the scene of the accident a little after us. If we are doing something you have an opinion about, speak up. I could have used your support the other day, particularly regarding runway 12."

"I didn't see there was any problem with it. According to the paperwork it would have been okay."

"But we suspected the paperwork wasn't right. Brian didn't believe it. Look how long they were cooking the numbers before returning with the paperwork and computer. Despite what the paperwork said, Brian asked for V-Speeds for a max. gross takeoff. He forgot all about that though when the tower offered one-two. And, you saw the takeoff, Larry. That's why I made that remark Thursday, when we were with Chuck. Thursday's was presumably a legitimate 195,000Lb takeoff. It was two degrees warmer, but there was more wind too. We actually rotated and broke ground sooner than on 823. Tuesday, the runways were wet. It had rained ten inches the night before. Hell, Continental taxied into position and hold, one-two, right in front of us. They took one look and said they needed 9L full length." Then I reminded Larry of the 15,000Lb wet runway performance penalty on 9L and 14,000Lb reduction 12...as well as the 31 knot V1 reduction on both. "Point of fact is, we should have used 9R. But there wasn't any point even suggesting that. Right now, I'm ashamed I didn't. 9L full length was way too close. What all this really does is beg the question concerning a wet runway 9L takeoff in FLL, especially going to POS or BGI; 9L in FLL is even shorter than MIA 12."

Chuck interjected, "That's why Dave is going to all -17 engines."

Derry, considering the 4,600' length of the runway at St. Vincent, flaps forty is more desirable than flaps 30. But the STC does not allow it. Nor was it required for 823's operation that day. If we had run off the runway, blown a tire, if the brakes had failed, or any number of unforeseen calamities occurred, the flaps forty choice would have undoubtedly produced a crew violation. Even so, that choice was unlikely to get us hurt. Hence, I acquiesced and participated in it. Indeed, on final approach to SVG, I noted aloud the aircraft's angular path to the runway (a five to eight degree offset) and asked Brian if that helped him avoid updrafts adjacent the rocky cliff North of short final and improved controllability of the aircraft. He said it did. The landing was uneventful. But then we rolled all the way to the departure end before slowing sufficiently to initiate a turn back to the ramp. Reverse thrust remained engaged until the aircraft was nearly stopped. I exclaimed "I have never been down here before."

Brian replied, "That is because I don't use brakes."    I thought to myself, "He insists on flaps forty but does not use brakes, how curious."

CONFIDENTIAL

Are you beginning to appreciate the irony here, Derry? Several times on Tuesday, June 08, flight 823, this pilot had to make qualitative assessments regarding the comparative risk of a succession of poor choices on the part of the captain, then determine how best and how firmly to respond in specific reference to the relative hazard presented by each. One scenario could have gotten us hurt. The other violated a management directive and the FAR's. The one with risk to life and property is where I put my foot down. The question is not how severely should Amerijet censure this pilot for the temerity to question Brian Steel's choices, but why should flight crew feel obligated to take risks or violate regulations? Is it Amerijet's intention to establish a culture of non-compliance? I have invested fourteen hours explaining actions which were empirically, ethically, practically, professionally, legally, and morally correct, all because I bruised a captain's ego? Thank me that he still has an ego left to bruise.

Derry, in Monday's meeting, you told me Brian alleged that I refused to move the flap-handle to forty degrees upon command, that I told him if he wanted flaps forty he would have to position the handle himself, and that I interfered with his efforts to remove the flap restricter bolt. Up to now, I have always found Brian to be honest: Undisciplined, foul-mouthed, non-compliant and irreverent, perhaps, but a skilled and knowledgeable pilot, honest to a fault. But, if you quoted Brian accurately the other day, then I am disappointed to report that his statements concerning the flaps forty landing in St. Vincent are a fabrication, void of any basis in fact. Perhaps Brian sought to shield himself from embarrassment for failing to obtain adequate rest prior to the flight, or for his ill-advised insistence on using a wet runway too short for the circumstances. There might be other reasons, none adequate, such as his reluctance to accept effective input from a required member of his crew, embarrassment over his apparent confusion regarding best-rate versus best-angle of climb speed references, or his doggedness in using a prohibited flaps setting for landing in SVG. Maybe due to his fatigued state that day, Brian confused my insistence that he call MIA tower himself to accept runway 12 with the memory of our later discussion concerning a flaps forty landing at St. Vincent. I do not know. At least that would make it an honest mistake.

You should note, Derry, I did not plan on bringing any of this to your attention. I should have and, arguably, that might concern you more than anything. Openness and willingness to help solve safety and regulatory issues at Amerijet has gained me nothing but grief in the past. I have paid dearly for not noting that sooner. The way I saw it, these were line matters, handled in the cockpit, and that is where they would have remained. Once Brian complained to you, though, I had no choice but to render full disclosure. Brian's complaint that his command authority entitles him to place others in jeopardy is absurd. His irreverence for regulations and the direction of management threatens the livelihood of everyone relying on Amerijet's continued success. I wish you luck in dealing with this effectively.

Sincerely,

Patrick Scott Major
The preceding statements are factually accurate to the best of my recollection.

CONFIDENTIAL

000061

PLAINTIFF'S EXHIBIT
1/8/01

Page 04     -To-     From-305 442 1578     02:43pm     01-05-10     Received

# IRST OFFICER OR FLIGHT ENGINEER PRU...CIENCY REPORT

| NAME | PAT MAJOR | EMPLOYEE NUMBER | ☒ FIRST OFFICER ☐ FLIGHT ENGINEER | BASE MIA | DATE 6-8-99 |
|---|---|---|---|---|---|

| AIRCRAFT TYPE B-727 | TRIP/DATE FLT 823  6-8-99 | MIA-POS-SLU-SVD-SJU-MIA | APPROX. FLIGHT TIME HOURS 9.8 |
|---|---|---|---|

INSTRUCTIONS: Evaluate the officer's status based on the following scale:

① EXCELLENT    ② ABOVE AVERAGE    ③ AVERAGE    ④ BELOW AVERAGE    ⑤ UNSATISFACTORY

| | | | |
|---|---|---|---|
| 5 PUNCTUALITY | 5 COOPERATION | 3 KNOWLEDGE OF JOB | 3 KNOWLEDGE OF F A A AND COMPANY PROCEDURES |
| 3 PERSONAL APPEARANCE | 3 FLIGHT EQUIPMENT | 4 ABILITY TO PERFORM JOB | 3 USE OF CHECKLIST |
| 5 CONDUCT | 3 KNOWLEDGE OF AIRCRAFT AND SYSTEMS | 5 ABILITY TO ACCEPT INSTRUCTIONS | 3 CONCERN FOR CUSTOMER |
| 4 ATTITUDE | 3 KNOWLEDGE OF NORMAL AND EMERGENCY PROCEDURES | 5 RETENTION OF INSTRUCTIONS | 5 CREW COOPERATION |

## FIRST OFFICER

| | |
|---|---|
| 3 FLIGHT PLANNING | 3 HANDLING OF AIRPLANE |
| 3 FORMS WORK | 3 ALTITUDE AWARENESS |
| 3 COCKPIT PREPARATION | 4 ABILITY TO LAND AIRPLANE |
| 3 RADIO EQUIPMENT CHECK | 3 COMPLIANCE WITH NORMAL OPERATING PROCEDURES |
| 3 USE OF COMMUNICATIONS RADIO | 3 INSTRUMENT FLYING AND A T C PROCEDURES |
| 3 HANDLING OF A T C CLEARANCES | 3 NAVIGATION (MAINTAINING TRACK, ALTITUDE, ETC.) |
| 3 DEPARTURE AND APPROACH PATTERN | 3 USE OF NAVIGATION RADIOS |
| 3 MONITORING OF INSTRUMENTS AND CONTROLS | 3 AREA NAVIGATION |
| 3 AIRSPEED CONTROL | 4 USE AND KNOWLEDGE OF PERFORMANCE MANUAL |
| 3 COLLISION WATCH | 3 KNOWLEDGE OF ROUTES, FREQ. & AIRPORT INFORMATION |
| 3 RADIO WATCH AND POSITION REPORTS | |

## FLIGHT ENGINEER

| | |
|---|---|
| ☐ AIRCRAFT PREFLIGHT | ☐ MONITORING CORRECT CLIMB POWER |
| ☐ COCKPIT PREPARATION | ☐ USE AND KNOWLEDGE OF PERFORMANCE MANUAL |
| ☐ LOG BOOK CHECK | ☐ USE OF TAKEOFF & LANDING DATA CARD |
| ☐ REPORT OF AIRCRAFT CONDITIONS TO CAPTAIN | ☐ ENROUTE OPERATIONS |
| ☐ ENGINE START PROCEDURES | ☐ IN RANGE AND BEFORE LANDING DUTIES |
| ☐ MONITORING ELECTRICAL SYSTEM | ☐ SECURING |
| ☐ INSTRUMENT MONITORING | ☐ LOG BOOK ENTRIES |
| ☐ HEATING AND COOLING | ☐ INTERMEDIATE STATION WALK-AROUND & FUEL LOADING |
| ☐ PRESSURIZATION | ☐ HYDRAULICS |
| ☐ ABILITY TO TROUBLESHOOT MALFUNCTIONING SYSTEMS | ☐ POST FLIGHT INSPECTION |

## REMARKS

SEE ATTached

| OVERALL GRADE 5 | WERE UNSATISFACTORY ITEMS DISCUSSED? ☐ YES ☒ NO | ☐ CHECK IF TWO-LANDING REQUIREMENT COMPLETED PER FAR 121.441(a). | ON FLIGHT NO. / DATE |
|---|---|---|---|
| CLASSIFIC SIGNATURE | | COMPLETED NO. 2025   BASE MIA | DATE 6-8-99 |

NOTE: USE REVERSE SIDE TO BETTER EXPLAIN AND UNUSUAL EVALUATIONS OR CHARACTERISTICS.

000253

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                )  L.T. CASE NO.
                                    )  99-021746-11
            Plaintiff,              )
                                    )
vs.                                 )
                                    )
AMERIJET INTERNATIONAL, INC.,       )  COPY
                                    )
            Defendant.              )
- - - - - - - - - - - - - - - - - -)

                        500 East Broward Blvd.
                        Fort Lauderdale, Florida
                        Tuesday, February 13, 2001
                        1:25 p.m. - 4:25 p.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

------------------------------

DEPOSITION

OF

TRACEY DICKENSON

------------------------------

DOWNTOWN REPORTING    (954) 522-3376

1  petition the chief pilot.

2        Q.    I'm sorry?

3        A.    Petition the chief pilot.  Just went in

4  and told the chief pilot I want to do that.

5        Q.    Okay.  It's pretty informal.

6        A.    Yeah.  Very informal at that point.  It

7  became more formal as time went on.

8        Q.    Okay.  Can you describe that?  Did you

9  spearhead that or were you responsible for that?

10       A.    No.

11       Q.    What caused it to become more formal?

12       A.    I guess there was more people involved to

13 be upgraded and there were just more people wanted

14 to upgrade, so they got human resources involved, to

15 help out.

16       Q.    Okay.  Is there a person that you're

17 thinking of in terms of human resources that became

18 involved in that effort?

19       A.    I -- I don't know who it was.

20       Q.    Okay.  Did you have any role in trying to

21 standardize criteria or qualifications for upgrade?

22       A.    No.

23       Q.    Back when you first started as director of

24 training, was seniority a factor or consideration

25 for upgrade?

1          A.    Yes.

2               MS. NORTON:   Object to the form of the

3     question.

4     BY MS. SHEA:

5          Q.    And when you say a second failure, you are

6     aware that Pat did not fail the FAA oral exam;

7     correct?

8          A.    Yes, it was discontinued.

9          Q.    Okay.   Which is not a failure.

10         A.    I've never had them discontinued.   Other

11    than Pat Major's.

12         Q.    And the reason it was discontinued was so

13    that it would not be judged as a pass or fail;

14    correct?

15         A.    Which was done at the discretion of the

16    FAA inspector.

17         Q.    Right.   But you would agree that he did

18    not fail the oral.

19         A.    He did not complete it.

20         Q.    Would agree that he did not --

21         A.    Which the FAA, from the letters I saw from

22    Mr. Roseborough, deemed that he considered it a

23    failure even though it was not an official failure.

24         Q.    Well, you operate by records and results;

25    correct?   I mean, if the FAA decides to discontinue

1  notice.

2  BY MS. SHEA:

3      Q.  All right, sir.  You started to say later

4  you found out some what?

5      A.  Well, later I found out that there was a

6  letter written by Mr. Major in regards, in regards

7  to our meeting that day.  And I don't -- I don't

8  know why, what made Pete decide not to continue with

9  it at that time.

10      It wasn't really stopped, it just -- we

11  weren't proceeding with it at that time.  I mean, he

12  wasn't just thrown out the window and said we're not

13  going to continue ever, it was just kind of stopped

14  at that time.

15      Q.  How do you know that?  How do you know he

16  wasn't told for all time you're out?

17      A.  That's what I understood.  That's what I

18  understood, he was not out at that time.  I guess

19  there was issues he had to work out with the

20  management.

21      MS. NORTON:  Tracey, if you know, tell

22  him.  If you don't know, don't guess or speculate.

23      A.  I really don't.  I don't know why he

24  didn't.  I can't answer for him what his reasons

25  were.

```
 1        Q.   So you don't remember that meeting and Pat
 2   was not scheduled for anymore upgrade training by
 3   your department as a result of this correspondence?
 4        A.   Not as a result of this correspondence.
 5   We just had not convened to discuss how we were
 6   going to proceed.
 7        Q.   All right.
 8        A.   That was the stipulation that was in that
 9   meeting way back when in July, when was it, in
10   reference -- July 24th.
11        Q.   All right.  Well, July 24th he was going
12   to fly the line for 30 days, then by your testimony
13   there was going to be a meeting and he was going to
14   be scheduled for more upgrade training; right?
15        A.   No, I did not say that.  I said that we
16   were going to reconvene and we were all going to
17   discuss how to proceed.
18        Q.   Well, what does that mean?  Other than
19   scheduling more training.
20        A.   Well, exactly.  When we were going to do
21   it, how we were going to do it.  But there was no
22   date until we met, when we were going to start
23   training.
24        Q.   Well, you never met, though.
25        A.   Well, we did.
```

1          Q.    Were you part of any meeting with Pat

2    Major at all between when he wrote this letter in

3    August and when he brought you his type rating in

4    December, in December 1998?

5          A.    I can't be for sure.  If it was, if it

6    was, it was not a formal meeting.  I cannot recall.

7          Q.    All right.  And you didn't give him

8    anymore training between this August correspondence

9    and when he brought you the type rating later in the

10   year?

11         A.    That's correct.

12         Q.    Okay.  Did you ever give an opinion --

13   strike the question.  You've never discussed Pat

14   Major with Dave Bassett at all; is that correct?

15         A.    That's correct.

16         Q.    So have you ever given him an opinion that

17   Pat could not safely fill the position of captain at

18   Amerijet?

19         A.    I barely know Dave Bassett.  I only know

20   him in passing.  I don't have any professional or

21   personal relations with Dave Bassett.  It goes

22   through my boss, at the time, which was Pete Steele.

23         Q.    All right.  Did you ever give Pete Steele

24   an opinion that Pat Major could not or should not be

25   made a captain at Amerijet?

```
 1        involve Pete Steele in any way, such as saying Pete
 2        Steele will not let Pat be a captain?
 3             A.    I don't recall.
 4             Q.    Okay.
 5             A.    An opinion being made.
 6             Q.    Did there come a time in late 1998 when
 7        Pat Major did give you records from a Part
 8        142-approved training center that he had
 9        accomplished a 727-type certification?
10             A.    Yes.
11             Q.    What did you do -- did he also give you a
12        temporary airman's certificate?
13             A.    Yes.
14             Q.    And what did you do with those documents?
15             A.    I would suspect they were put into his
16        training record.  I don't know.  I'm sure I gave
17        them to Pete Steele and he filed them.
18             Q.    Okay.  You gave them to Pete and expected
19        that he would file them in training records?
20             A.    I'm sure, yeah.
21             Q.    That's where they should go; right?
22             A.    Right.
23             Q.    Okay.
24             A.    Although it didn't really make much
25        difference to Amerijet.  It wasn't Amerijet's
```

1    rating.

2    BY MS. SHEA:

3        Q.    But my question is where in the training

4    manual -- does the training manual address that at

5    all?

6        A.    No, it does not.  It does not address a

7    142 school.  It addresses -- it's just as if you

8    came in and you already had it.  You already had the

9    type rating previous to upgrading, it doesn't

10    matter.  You still have to go through the ground

11    school curriculum, the simulator curriculums and

12    checks.

13        Q.    Okay.

14        A.    And that's how it was taken, interpreted

15    to be.

16        Q.    All right.  That was an interpretation

17    that you gave it or that you, in connection with Ed

18    Cook --

19        A.    That's what I gave it.

20        Q.    Okay.  And again, in terms of saying okay,

21    now what are the steps, there really -- is this in

22    one place here or no?  In the training manual.

23        A.    Um, they're in the training manual.

24    3.307, that's chapter 3.307, which would be page 1,

25    there's a curriculum for upgrade training.  That's

```
 1            A.   Did we train, yes.

 2            Q.   Right.  Do you teach all of those

 3    yourself?

 4            A.   Yes.

 5            Q.   During the time of Pat Major's employment,

 6    what would you teach first officers concerning

 7    Amerijet's policies for wet runways?

 8            A.   The performance restrictions that would

 9    apply to a wet runway or to a contaminated runway.

10            Q.   Would your teaching include that unless

11    there was a tower report of standing water, that

12    runways would be considered dry for purposes of

13    performance planning?

14            A.   No.  If it's got standing water, they're

15    not dry.

16            Q.   Okay.  Was there a policy or procedure

17    that you taught concerning performance planning in

18    the absence of a contamination report?

19                 MS. NORTON:  Object to the form of the

20    question.  You can answer it if you can.

21                 MS. SHEA:  I can rephrase that if that was

22    vague.

23            A.   Okay.

24    BY MS. SHEA:

25            Q.   Is there a policy at Amerijet that
```

```
 1     required a performance penalty for a wet runway if
 2     there was no contamination report?
 3          A.    No, there's no penalty for a wet runway.
 4                MS. SHEA:  All right, sir.  That's all the
 5     questions I have for you.  Thank you.
 6                THE WITNESS:  Good.
 7                MS. SHEA:  Maybe not good.  She may have a
 8     few.
 9                MS. NORTON:  I guess I don't have any.
10     There's nothing.  Thank you, Tracey.  We'll waive.
11                THE COURT REPORTER:  Attorney Shea, would
12     you like this transcribed?
13                MS. SHEA:  Yes.
14                THE COURT REPORTER:  Would you like a
15     copy?
16                MS. NORTON:  Whatever she gets I want.
17                (Deposition concluded at 4:25 p.m.)
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:  00-6070-Ferguson/Snow
L.T. Case No. 99-021746-11

PATRICK SCOTT MAJOR,

       Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,

       Defendant.

_____/

COPY

                500 East Broward Boulevard
                Fort Lauderdale, Florida
                Wednesday, January 24, 2001
                1:15 p.m. - 3:00 p.m.

APPEARANCES:

    HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
    500 East Broward Boulevard, Suite 1000
    Fort Lauderdale, Florida 33394
    By:  VALERIE SHEA, ESQ.
    Appearing on behalf of the Plaintiff.
    (954)527-2800

    ALLEN, NORTON & BLUE, P.A.
    121 Majorca Avenue, Suite 300
    Miami, Florida 33134
    By:  SUSAN POTTER NORTON, ESQ.
    Appearing on behalf of the Defendant.
    (305)445-7801

ALSO PRESENT:  Patrick Scott Major
               Lily Jules, Representative of Amerijet

                DEPOSITION
                   OF
                ED COOK

```
 1    little bit.  I think the total time for captain stayed

 2    pretty constant.

 3         Q.   Okay.  Under "Upgrade Program

 4    Description" -- Do you see that?

 5         A.   Upgrade Program Description, right.

 6         Q.   "In the interest of fairness upgrade

 7    selections will be based on seniority and

 8    qualifications."

 9         A.   Uh-huh.

10         Q.   Can you explain what that means.

11         A.   Well, obviously, I didn't pay much attention

12    to that.  That's a new one for me.

13              "Based on seniority and qualifications."

14              Well, let's see.  May of '98, I think that's

15    about the time the Union thing was happening, and one

16    of the Union issues was seniority, so I'm sure that we

17    were in the process of changing to starting thinking

18    like a more Union airline obviously.

19         Q.   To stave of becoming a Union airline.

20         A.   I think "seniority" here is new a word, just

21    like the "part 25 time" is a new word.

22         Q.   So if I understand you correctly, you were

23    hoping the company would not become Union, correct?

24              THE WITNESS:  Excuse me?

25              MS. NORTON:  Well --
```

DOWNTOWN REPORTING (954)522-3376



## MEMORANDUM

TO:        Patrick Major

FROM:      Wayne Penny

DATE:      February 20, 1997

RE:        **VOLUNTARY EXIT INCENTIVE AGREEMENT PROPOSAL**

---

As a follow-up to our discussion of last week, I have enclosed for your review a proposed Voluntary Exit Incentive Agreement. As we discussed, you are under no obligation to accept this and, if you decide not to accept it, you can continue to be employed as a Flight Officer with Amerijet. You will have twenty-one (21) days from today to accept or reject this Agreement. However, you may accept this Agreement earlier if you so desire. Once you sign the Agreement, you retain the right to revoke it within seven (7) days. If you decide to accept this Agreement, your employment will end eight (8) days thereafter.

This Agreement is only being offered to you. No one else in the Company is being offered this package at this time. As a result, prior to providing you with this Agreement, by signing below, you agree that you will keep our discussions regarding this Agreement and the contents of this Agreement confidential. You agree that, whether you accept this Agreement or not, you will not discuss it with anyone, except your attorney and/or accountant, at any time in the future. If you fail to abide by this confidentiality requirement, you agree that your employment will be terminated immediately. If there are any other individuals that you would like to discuss this Agreement with, please let me know in writing so that the Company may determine whether or not to authorize you to do so in advance of your requested disclosure.

If you have any questions, please do not hesitate to discuss them with me.

I, PATRICK MAJOR, have read this memorandum, and I am in agreement with all of its provisions, and I agree to abide by the confidentiality provision set forth above.

---

PATRICK MAJOR                    DATE


PLAINTIFF'S
EXHIBIT

## VOLUNTARY EXIT INCENTIVE AGREEMENT AND GENERAL RELEASE

WHEREAS, PATRICK MAJOR ("MR. MAJOR"), 1722 W. Las Olas Blvd. Ft. Lauderdale, FL 33312, has been a Flight Officer of AMERIJET INTERNATIONAL, INC. ("AMERIJET"), a Florida corporation, since 1991; and

WHEREAS, AMERIJET and MR. MAJOR have agreed that his employment will end on or before March 21, 1997; and

WHEREAS, MR. MAJOR voluntarily resigns from his employment on or before March 13, 1997.

AS A RESULT, IT IS AGREED THAT:

I.    In exchange for the promises made by AMERIJET contained in this Settlement Agreement and General Release (hereafter referred to as the "Agreement"), MR. MAJOR agrees:

    A.    To generally release, satisfy and forever discharge AMERIJET, its parent corporation, owners, its affiliates, officers, directors, employees, agents and attorneys (collectively "AMERIJET") of and from all actions, claims and demands, including but not limited to actions under **Title VII of the Civil Rights Acts of 1964, 43 U.S.C.§2000(e) et seq., as amended; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. Section 621 et seq. (The "ADEA") the Federal Americans with Disabilities Act, 42 U.S.C. Section 12101 et seq.; the Florida Human Rights Act of 1977 and the Florida Civil Rights Act of 1992, as amended; Chapter 760, Florida Statutes; the Equal Pay Act of 1963, 29 U.S.C. Section 206(d); the Family and Medical Leave Act, as amended, 29 U.S.C. Section 2601, et seq.; COBRA, as amended, 29 U.S.C. Section 1161, et seq.;** and any other federal, state or local statute, or ordinance relating to or dealing with employment discrimination; and any claim for breach of an employment contract or tort damages and/or personal injury as a result of employment with AMERIJET which MR. MAJOR ever had, may have had, or has against AMERIJET. No right or claims arising under ADEA after the date this Agreement is signed are waived.

    B.    Not to seek employment with AMERIJET in the future.

II.    In exchange for the promises of MR. MAJOR contained in this Agreement, and after seven (7) days have expired from the date this Agreement is signed by the parties, AMERIJET agrees to pay MR. MAJOR as additional gross wages, $5,130.00 gross total, less all required payroll deductions i.e., federal withholding, $943.92, Social Security and Medicare $392.45 and 401-K contribution $410.40, for a net amount of $3,383.23 in a lump sum payment. The parties agree that AMERIJET will also pay MR. MAJOR an additional amount for all earned and available vacation/personal days, less all required payroll deductions, in accordance with Company Policy.

_____
Initials

1

I have read the foregoing Agreement and General Release, and I accept and agree to the provisions therein.

_____  
DATE

_____  
PATRICK MAJOR

AMERIJET INTERNATIONAL, INC.  
a Florida corporation

_____  
DATE

By:_____

NAME:_____

ITS:_____

3

STATE OF FLORIDA:
      : ss.
COUNTY OF DATE:

The foregoing instrument was acknowledged before me this _____ day of _____ 1997, by
PATRICK MAJOR (who is personally known to me) (or who has produced _____
as identification).

 

                                      Notary Public, State of Florida at Large

(SEAL)

                                      Print Name of Notary

My Commission Expires:

_____

STATE OF FLORIDA:
      : ss.
COUNTY OF DATE:

The foregoing instrument was acknowledged before me this _____ day of _____ 1997, by
_____, as _____ of
AMERIJET INTERNATIONAL, INC. (who is personally known to me) (or who has produced
_____ as identification).

                                      Notary Public, State of Florida at Large

(SEAL)

                                      Print Name of Notary

My Commission Expires:

veip

4

III.   Because of the voluntary undertaking of this Agreement on the part of the parties hereto, it is agreed by MR. MAJOR that the terms of this Agreement, the content of the discussions pertaining thereto between the parties and AMERIJET related information shall be considered and treated as confidential. Neither MR. MAJOR, nor his present or future representatives, spouse, attorneys, or agents shall issue any publicity release or otherwise publicize or give out in any manner to anyone , except his attorney and/or accountant, the terms of this Agreement, the content of the discussions pertaining thereto, the settlement of this matter, or any proprietary information he has obtained from any source while employed by AMERIJET about AMERIJET, its operations, customers or business activities. If a court of competent jurisdiction adjudges that MR. MAJOR has breached this provision, all obligations of AMERIJET to make payments shall cease, and MR. MAJOR agrees to immediately return the amount received under Paragraph II, above. All other terms of this Agreement shall remain in full force and effect.

IV.   This Agreement constitutes the complete understanding between AMERIJET and MR. MAJOR. No other promise or agreements shall be binding unless signed by the parties to this Agreement. AMERIJET shall not be obligated to take any action or be obligated to MR. MAJOR except as specifically set forth in Paragraph II, above.

V.    MR. MAJOR has read this Agreement prior to signing it, and he understands that he has the right to consult with an attorney prior to signing this Agreement. **MR. MAJOR shall have twenty one (21) days to sign this Agreement and shall have seven (7) days after signing this Agreement to revoke the terms of this Agreement.** Each party agrees to bear its own attorney's fees and costs and not seek any attorney's fees or costs from the other party.

VI.   It is understood that this Agreement does not constitute an admission by AMERIJET of any violation of any law, ordinance or statute, claim for relief or cause of action.

VII   The parties agree that the law of the State of Florida (venue-Dade County) shall govern the interpretation and enforcement of this Agreement should a dispute arise.

VIII.  The parties agree that this Agreement may be used as evidence only in a subsequent proceeding in which one of the parties alleges a breach of this Agreement. It is understood and agreed that this Agreement shall not be used, introduced or enforced in any way in any administrative proceeding (except the Agreement may be used by AMERIJET if MR. MAJOR seeks unemployment compensation), any lawsuit, or in any claim, or cause of action against AMERIJET, its successors or assigns or any related corporate body or officers, agents, attorneys or employees of AMERIJET other than as set forth in this subsection.

IX.   If one or more provisions or terms of this Agreement shall be ruled unenforceable, AMERIJET may elect to enforce the remainder of this Agreement or cancel it and receive from MR. MAJOR, his successors and or assigns, or otherwise, any consideration paid.

Initials

2



PLAINTIFF'S
EXHIBIT 29
98


## JOB OPPORTUNITY BULLETIN

| Position | Number | Position | Number |
|----------|--------|----------|--------|
| Captain | 3 | First Officer | 6 |

### UPGRADE PROGRAM DESCRIPTION

In the interest of fairness, upgrades selections will be based on seniority and qualifications.

### MINIMUM QUALIFICATIONS

**All Pilot Positions:** Commercial, Multi-engine and Instrument Ratings.
**Captains Only:** ATP or ATP written.

|  | **FIRST OFFICER** | **CAPTAIN** |
|--|-------------------|-------------|
| Total Time | 2,000 hours | 5,000 hours |
| Part 25 Time($\geq$ 12,500 lbs.) | N/A | 2,000 hours |
| Pilot-in-Command | 500 hours | 1,500 hours |
| Medical Certificate | 2nd Class | 1st Class |

A domicile and position bid will be published as company requirements dictate. All qualified flight crewmembers may bid for any open position. Qualified candidates will be selected in order of seniority. Before being selected for upgrade, all qualified candidates must pass a pre-upgrade written examination. This examination will be inclusive to the crewmember's current position.

Training will commence after payment of $2,500 and completion of the upgrade contract. The $2,500 deposit along with all other funds collected pursuant to the training agreement will be held in an interest bearing joint account until such time as the agreement is fulfilled. At that time, all moneys will be returned to the flight crewmember.

Upgrade may be bypassed by any flight crewmember without penalty. Elimination from upgrade training will result in placement back in the previous flight crewmember's position. Base assignment will be subject to availability. The candidate must then wait one year before re-entering the upgrade program.

Flight crewmembers who fail their initial ground school, checkride, FAA line check, or company line check will be given more training and another check ride or line check as required. A second failure will result in placement back in the previous flight crewmember's position subject to the base assignment and wait-time requirements described above.

Additional opportunities will not be given past the second attempt at upgrade and your position will have to be assessed by the Chief Pilot and the Director of Operations regarding your future with Amerijet. It may even result in termination.

**137**

Enclosed is a bid form for the upgrade positions that are available at this time.



May 20, 1998

Mr. Patrick S. Major
1722 West Las Olas Boulevard
Ft. Lauderdale, FL  33312

Dear Mr. Major:

Congratulations - you have been awarded the bid to upgrade to Captain.

The Training Department will be contacting you in the next few weeks to verify your upgrade training dates.    For upgrade training you will need to report to Amerijet International's Fort Lauderdale office at 578 SW 34th Street, Fort Lauderdale, FL  33315.

You will be required to sign a  contract during the first few days  of training and submit the required contract deposit of $2,500.00.  Additionally, your spouse will also be required to sign the contract. If you have any questions, please do not hesitate to contact Terri Sargent at (954) 359-7670 ext. 744.

Thank you for your attention to this matter.

Sincerely,

Ed Cook
Chief Pilot

EC/tls



000128

498 S.W. 34TH STREET, FORT LAUDERDALE, FL 33315   (954) 359-0077   FAX: (954) 359-7871

## EMPLOYMENT AND FLIGHT TRAINING AGREEMENT

EMPLOYMENT AND FLIGHT TRAINING AGREEMENT (the "Agreement") made this ___1___ day of ___June___, 19 98 between AMERIJET INTERNATIONAL, INC., a Florida corporation, with its principal office located at 498 S.W. 34th Street, Fort Lauderdale, Florida 33315 (the "Corporation") and ___Patrick S. Major___ (The "Employee"), residing at ___1722 West Las Olas Boulevard, Ft. Lauderdale, FL 33312___ ("Employee's" residence).

In consideration of the mutual covenants contained herein, the Corporation and Employee agree as follows:

1.     **DUTIES:**     The corporation shall employ Employee as a pilot-in-command (PIC), first officer (SIC), Flight Engineer (F/E), or other flight crew member in connection with the operation of various Corporation aircraft. Employee shall operate the Corporation's aircraft in such crew member position designated by the Corporation at times and along such routes for such purposes as the Corporation shall designate, subject to the direction and general supervision of the Corporation. Employee shall further render unrelated duties as the Corporation may assign him/her from time to time. Employee shall comply with all governmental regulations in connection with the operation of Corporation's aircraft.

2.     **COMPENSATION:**     The Corporation shall pay Employee compensation in accordance with the Salary Administration Program (SAP).

3.     **INSURANCE BENEFITS:**     During the term of this Agreement, the Corporation shall provide Employee and his/her dependents with such group insurances as the Corporation elects to furnish, in its sole discretion, to other employees performing same or similar duties for the Corporation.

4.     **INITIAL TERM:**     The initial term of the Employee's employment shall be for three (3) years commencing the ___1___ day of ___Aug___, 19 98 (the "Initial Term"), but subject to the following:

> (a)     The Corporation shall have the right to terminate this Agreement, with or without cause, upon five (5) days written notice to Employee.

> (b)     In the event of Employee's death during the term of this Agreement, this Agreement shall automatically terminate, and the Corporation shall pay Employee's estate such compensation due Employee computed up to the date of termination.

> (c)     The corporation may immediately discharge Employee and terminate this Agreement for cause. As used in this paragraph, "cause" shall mean any or all of the following:



PLAINTIFF'S EXHIBIT 32

**CONFIDENTIAL**

001214

(i)     commission of a fraud or felony or other criminal activity
        disclosed during the term of this Agreement;

(ii)    a misrepresentation made by Employee to the Corporation relating
        to his/her qualifications or employment history;

(iii)   a breach of any of the Employee's obligations under this
        Agreement; or

(iv)    a violation by the Employee of "Company Policy" that is
        established or maybe established from time to time by the
        Corporation (see Employee Hand Book).

5.    **EXTENSION OF AGREEMENT:**    Upon the expiration of the Initial Term or
the Additional Term as defined below, the terms of this agreement shall automatically continue,
subject to the termination provisions set forth in the previous article, until such time as the
Corporation gives Employee five (5) days written notice of termination, with or without cause, or
Employee gives Corporation thirty (30) days written notice of termination, with or without cause.

6.    **EXTENT OF SERVICE:**    The Employee shall devote his/her entire time,
attention and energies to the Corporation's business and shall not, during the term of this
Agreement be engaged in any other business activity, whether or not such business activity is a
pursuit for gain, or profit or other pecuniary advantage.

7.    **FLIGHT TRAINING :**

(a)    Prior to or during the term of this Agreement, Corporation shall furnish
       Employee with the necessary ground and flight training to perform his/her
       duties under this Agreement in a ___B-727___ aircraft. The Corporation
       shall pay Employee compensation at a rate of $ 30.00 ___ per ___day___
       during the ground school portion of the flight training. The Corporation
       and Employee hereby stipulate that the value of such training shall be
       $14,000.00 ___ for a pilot-in-command (PIC), $ ~~for a
       first officer (SIC), and $ ~~ ~~for a flight engineer (F/E)~~ (the
       "Flight Training Expense").

(b)    If in the sole determination of the Corporation, the progress of the
       Employee during training is unsatisfactory then the Corporation shall have
       the right to terminate this Agreement and the parties shall thereupon be
       bound by any previous Employment Agreement in effect at the
       commencement of the Agreement.

2



000215

(c)     In the event the Corporation terminates this Agreement pursuant to subsection (b) above then the Corporation shall have the right to apply the proceeds in the Security Deposit Account (as that term is defined in Section 9 of this Agreement) towards reimbursing the Corporation for the following expenses incurred by the Corporation during training: wages, simulator time, per diem expenses, and any other out-of-pocket expenses incurred. Any proceeds remaining in the Security Deposit Account after satisfaction of such expenses shall be disbursed to Employee.

8.      **REIMBURSEMENT OF FLIGHT TRAINING EXPENSE:**      Employee shall not have any obligation to reimburse the Corporation for furnishing the Flight Training Expense if Employee remains employed under this Agreement for the full length of the Initial Term. If, however, this Agreement is terminated by the Corporation (with cause) or by the Employee (for any reason) prior to the completion of the entire Initial Term, then Employee shall reimburse the Corporation for the full amount of the Flight Training Expense ( the "Training Expense Liability") without any proration or credit for partial completion of the Initial Term.

9.      **SECURITY DEPOSIT ACCOUNT AND PROMISSORY NOTE:**

(a)     The Corporation agrees to establish a security deposit account in the name of Employee (the "Security Deposit Account") with the Corporation reserving exclusive signature authority. Employee shall tender to the Corporation the initial sum of $2,500.00_____ . Thereafter, the Corporation shall withhold the sum of $92.30_____ from Employee's earnings for each pay period up to **$ 7,000.00,** for deposit into the Security Deposit Account. Until the Employee's satisfactory completion of the Initial Term, the Corporation shall hold the proceeds contained in the Security Deposit Account as security for Employee's Training Expense Liability and for all other liabilities of the Employee to the Corporation created pursuant to this Agreement and the employment relationship ( the "Other Liabilities"). Upon the Employee's satisfactory completion of the entire Initial Term, the Corporation the Corporation shall refund all accumulated proceeds held in the Security Deposit Account to Employee, plus any accrued interest.

(b)     Concurrent with the execution of the Agreement, Employee and spouse (if applicable) shall execute a Promissory Note in favor the Corporation in the principal amount equal to the Flight Training Expense. ( A copy of said Promissory Note is attached hereto). The Corporation shall hold such note, and not negotiate same, during the employment relationship. Upon completion of the entire Initial Term, the Corporation shall mark the Promissory Note "cancelled" and return same to Employee.

10.     **ADDITIONAL TRAINING/EXTENSION OF INITIAL TERM:**     If prior to the expiration of the Initial Term, the Employee requests and the Corporation agrees to provide additional training, the following terms shall apply:

3       CONFIDENTIAL

000216

(a) The Corporation shall inform the Employee of the value of the additional training as of that date (the "Additional Flight Training Expense").

(b) The Employee shall be indebted to the Corporation for the value of the additional training ( the "Employee's Additional Training Expense Liability").

(c) The Initial Term shall be extended for an additional three (3) years effective the _____ day of _____ , 19 _____ (such additional three (3) year period being referred to hereafter a the "Extended Term"). I acknowledge and am in aggreement with the "Extended Term" above _____ , _____
             ("Employee's" Signature)         Date

(d) Employee shall not have any obligation to reimburse the Corporation for furnishing the Additional Flight Training Expense if Employee remains employed under this Agreement for the full length of the Additional Term. If, however, this Agreement is terminated by the Corporation (with cause) or by the Employee (for any reason) prior to the completion of the entire Additional Term, then the Employee shall reimburse the Corporation for the full amount of the Employee's Additional Training Expense Liability without any proration or credit for partial completion of the Additional Term.

(e) Until satisfactory completion of the Additional Term, the Corporation shall continue to retain all amounts contained in the Security Deposit Account as security for the Employee's Additional Training Expense Liability. Upon Employee's satisfactory completion of the entire Additional Term, the Corporation shall refund all accumulated proceeds held in the Security Deposit Account plus accrued interest to Employee.

(f) Notwithstanding anything contained herein to the contrary, the Corporation shall continue to hold the Promissory Note until the Employee's completion of the Additional Term at which time the Corporation shall mark the Promissory Note "canceled" and return same to the Employee.

11. **TEMPORARY BREAK IN SERVICE:** The Corporation and the Employee recognize that there may be periods in which business may require a reduction in the workforce and during which the Corporation will have the sole right to lay off the Employee. If, during the Initial Term or the Additional Term, the Employee is laid-off for a period of up to 90 consecutive calendar days and is then recalled to work, this Agreement shall not be considered to have been terminated. As a result, although there may be a break in service, this Agreement will remain in full force and continue in effect as of the date the Employee return to work after such lay-off, provided, however, that the Initial Term or the Additional Term shall be extended for the number days that the Employee was laid off. If, however, the Employee is laid-off in excess of 90 consecutive calendar days, this agreement shall automatically terminate and the Corporation shall reimburse the Employee all proceeds contained in the Security Deposit Account.

4

000217

CONFIDENTIAL

12.    **REMEDIES:**    Notwithstanding anything contained herein to the contrary, in the event Employee become liable to the Corporation for the Training Expense Liability, Additional Training Expense Liability, or Other Liabilities ( the "Liabilities"), then the Corporation shall immediately have, and may elect from, any or all of the following remedies to satisfy, the Liabilities:

      (a)    apply the total proceed contained in the Security Deposit Account towards the partial satisfaction of the Liabilities;

      (b)    apply any of the Employee's earned, but unpaid, wages, bonuses or other outstanding compensation towards partial satisfaction of the Liabilities;

      (c)    apply any other sums of whatever nature owed by the Corporation to Employee towards partial satisfaction of Liabilities;

      (d)    notify any credit rating service or agency that Employee has failed to satisfy Liabilities;

      (e)    bring an action against Employee and spouse (if applicable) for enforcement and collection of the Promissory Note in accordance with the terms and conditions contained in the Promissory Note; and/or

      (f)    seek any and all relief available under the law. The Corporation in its sole discretion shall have the option of electing any one or more of the above described remedies. If the Corporation's exercise of any one or more of the above remedies fails to completely satisfy the Liabilities, then the Corporation shall have the right to immediately bring an action for collection of the unsatisfied balance of the Liabilities.

Employee hereby stipulates to waive any defenses assertable in an action brought by the Corporation and instead shall assert the relief afforded by such defenses (e.g. a set-off), and any other available claims against the Corporation, by counterclaim or a separate action. In the event, Employee files such a counterclaim, Employee hereby stipulates to the severance of such counterclaim from the Corporation's action. In the event Employee brings a separate action Employee hereby waives any right to seek consolidation of such action with Corporation's action. In no event shall Employee assert the pendency of such counterclaim or separate action as a basis for denying or staying the entry of a judgement on the Corporation's claim or from execution thereon.

13.    **RESTRICTIVE COVENANTS:**

      (a)    **Definitions.**  For the purpose of this section, the following definitions shall apply:

5

000218

(i)    "Business Activities."    Any and all commercial activities engaged in or commenced by the Corporation during term of this Agreement. "Business Activities" shall included, but not be limited to, the following services: passenger or freight aircraft charter flights; scheduled or non-scheduled air freight flights and air courier delivery flights.

(ii)    "Confidential Information."    All written and oral confidential proprietary information of the Corporation, whether or not discovered or developed by Employee, and third parties (such as but not limited to, suppliers, customers and consultants) who may impart information in confidence to the Corporation, known by Employee as a result of his/her employment with the Corporation. "Confidential Information" shall further include, but not be limited to all financial information relating to the Corporation and customer lists, known by Employee as a result of his/her employment by the Corporation.

(iii)    "Territories."    The geographic areas serviced by the Corporation.

(b)    **Non-Competitive Agreement**.    From the date of this Agreement and for 90 days following the voluntary termination or termination for cause of the Employee, Employee shall not:

(i)    engage in, or be affiliated directly or indirectly (as principal, agent, employee consultant, investor, guarantor, lender or otherwise) with any person or entity engaged in, about to be engaged in or contemplating entry into a business similar to, or in competition with, the Corporation's business activities within the Territory;

(ii)    entice, induce or encourage an employee of the Corporation or Amerijet to engage in any activity, which, if engaged in by the Employee, would violate any provision of this Section.

(c)    **Non-Disclosure**.    Except as required by Employee's duties the Corporation, Employee shall never (during or after any period of employment) directly or indirectly use, publish, disseminate or otherwise disclose any Confidential Information without the express prior written consent of the Corporation.

6

CONFIDENTIAL    000219

(d) **Disclosure of Non-Competition Agreement**. The Corporation retains the unconditional right to publish, disseminate, or otherwise disclose the terms and conditions of this Agreement, and the names of any and all parties to this Agreement, to any person or entity without notice to the Employee. Such disclosure may be affected at any time before, during and or after the Employee 's term of employment with the Corporation without the express or implied consent of the Employee.

(e) **Special Services**. The Employee acknowledges that his/her services under this Agreement are of special, unique, unusual, extraordinary and intellectual character, and that a breach by the Employee of this Agreement will cause the Corporation irreparable injury and damage. In the event of such breach, the Corporation shall be entitled to injunctive relief against the Employee, in addition to all other rights the Corporation may have at law or in equity.

14. **NOTICES:** All notices hereunder shall be in writing. Notices shall be sent by personal delivery to the other party, by personal delivery to a person at the other party's address, or by U.S. Mail. All notices sent by U.S. Mail shall be deemed to have been given when mailed in any United States Post Office enclosed in a registered, postpaid envelope addressed to the address of the respective parties stated above, or to such other addresses as such party may have fixed by notice; provided, however, that any notice of change of address shall be effective only upon receipt.

15. **WAIVER:** Failure to insist upon strict compliance with any of the terms, covenants, or conditions, hereof shall not be deemed a waiver of such term, covenant, or condition, nor shall any waiver or relinquishment of such right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

16. **SEVERABILITY:** The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceablity of any other provisions in this Agreement.

17. **MODIFICATION:** This Agreement cannot be changed, modified or discharged orally, but only if consented to in writing by both parties.

18. **GOVERNING LAW:** This Agreement is entered to in the State of Florida and, in the event of any controversy or litigation, shall be construed in accordance with the laws of the State of Florida. All legal actions arising from this Agreement shall be brought before a state court of competent jurisdiction in Broward County or Dade County, Florida. Both parties hereby consent to such jurisdiction and venue. Employee further agrees and stipulates to appear for deposition in Broward County or Dade County, Florida (at the election of the Corporation ) irrespective of whether Employee seeks affirmative relief in legal action. The Corporation shall be entitled to its costs and reasonable attorneys' fees if it is the prevailing party in any action arising between Corporation and Employee (including but not limited to any action arising from this Agreement).

7

CONFidential.

000220

19. **WAIVER OF CERTAIN RIGHTS:**

    (a) **WAIVER OF JURY TRAIL:** EMPLOYEE AND CORPORATION HEREBY KNOWNINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRAIL BY JURY IN RESPECT TO ANY ACTION, PROCEEDING, LITIGATION, OR COUNTERCLAIM BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, AND ANY OTHER AGREEMENT EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR CORPORATION'S EXECUTION OF THIS AGREEMENT.

    (b) **WAIVER OF ATTORNEYS' FEES:** EMPLOYEE HEREBY KNOWNINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY STATUTORY OR OTHER RIGHT TO RECOVER ATTORNEYS' FEES, INCLUDING ANY AND ALL RIGHTS UNDER § 57.105(2) FLORIDA STATUTES, IN RESPECT TO ANY ACTION, PROCEEDING, LITIGATION, OR COUNTERCLAIM BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, AND ANY OTHER AGREEMENT EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR CORPORATION'S EXECUTION OF THIS AGREEMENT.

20. **OPPORTUNITY FOR REVIEW:** Employee hereby represents and acknowledges that Employee has had an opportunity to throughly review the contents of the Agreement, the Promissory Note and other documents contemplated thereby, and Employee further acknowledges and represents that Employee has had an opportunity to seek advice of an attorney pertaining to the legal obligations created by this Agreement and the Promissory Note. The Employee hereby represents and acknowledges that the Corporation has not exerted, or attempted to exert improper or unlawful pressure or has in any way attempted to induce, through threats or otherwise, the execution of this Agreement and Promissory Note. Employee also acknowledges that Employee has conducted such investigation of the facts, circumstances and other matters involving any provision contained in this Agreement, the Promissory Note, and any agreements contemplated thereby, as Employee deems necessary, and that Employee has not and is not relying upon, using, or in any way basing Employee's understanding or interpretation of any provision contained in, or Employee's consent to, such agreements on any facts, matter, statements, circumstances or representations made by Corporation other than those representations, facts and matters set forth in this Agreement and Promissory Note.

8

CONFIDENTIAL    000221

21.    **ASSIGNMENT:**    This Agreement shall inure to the benefit of, and shall be binding upon, the Corporation, its successors or assigns. Employee may not assign his/her rights and/or interests under this Agreement without the Corporation's prior written consent.

22.    **ENTIRE AGREEMENT:**    This instrument contains entire agreement of the parties and may not be changed except by an instrument signed by the party against whom the enforcement of any waiver, change, extension, modification or discharge is sought.

EXECUTED by the parties on the day and year first above written.

AMERIJET INTERNATIONAL, INC.

By:_____
David G. Bassett, President

ATTEST:

_____
Secretary

_____
Patrick S. Major
(Employee)

_____

_____

empflagr.wpd

9

000222

## PROMISSORY NOTE

After date, for value received, the undersigned and (spouse, if applicable) residing at 1722 Las Olas Blvd., Ft. Lauderdale, FL 33312_ (the "Maker"), promise to pay to the order of Amerijet International, Inc., 498 SW 34 St. Fort Lauderdale, FL 33315 (the "Holder"), the principal sum of $14,000.00_____, payable upon demand by Holder. This Promissory Note shall bear no interest during the period prior to demand but shall bear interest at the rate of eighteen percent (18%) per annum after such demand is made. The principal sum shall be payable at 498 SW 34 St. Ft. Lauderdale, FL 33315, or at such other place as Holder may specify in writing. Maker waives presentment for payment, protest, notice of non-payment, dishonor, offset and other legal defenses. Without limiting the generality of the foregoing, Maker specifically waives any offset or defenses arising from Maker's Employment and Education/Training Agreement with holder. Maker agrees to pay a reasonable attorney's fee, including reasonable appellate fees, if any, if this Promissory Note is placed in the hands of an attorney for collection after default.

All actions arising from this Promissory Note shall be brought before a court of competent jurisdiction in Broward County or Dade County, Florida. Maker further agrees to appear for deposition in Broward County or Dade County, Florida (at the election of the Holder ) irrespective of whether Maker seeks affirmative relief in any legal action. Maker acknowledges that such forums bear a reasonable relationship to this Promissory Note.

Maker here by stipulates to waive any defenses assertable in an action brought by the Holder and instead shall assert the relief afforded by such defenses (e.g. a set-off), and any other available claims against the Holder, by counter claim or a separate action. In the event Maker files such a counterclaim, Maker hereby stipulates to the severance of such counterclaim from the Holder's action. In the event Maker brings a separate action Maker hereby waives any right to seek consolidation of such action with the Holder's action. In no event shall Maker assert the pendency of such counterclaim or separate action as a basis for denying or staying the entry of a judgment on the Holder's claim or from execution thereon.

Maker and Holder, by accepting this note, hereby knowingly, voluntarily, and intentionally waive the right either may have to a trial by jury or a right to Attorney's fees in respect to any action, proceeding, litigation or counterclaim based hereon, or arising out of, under or in connection with this note, and any other agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party. This provision is a material inducement for Holder's consideration pursuant to this note.

Done this __1__ day of __June_____, 19 98__, in the County of__Broward_____, in the State of __Florida_____

Employee/Maker:_____
                      Patrick S. Major

Employee's Spouse/Maker:_____
                              Beth Major

10   CONFIDENTIAL   000223

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                        CASE NO. 00-6070-Ferguson/Snow
 3                      L.T. Case No. 99-021746-11

 4

 5

 6    PATRICK SCOTT MAJOR,

 7          Plaintiff,

 8          vs.

 9    AMERIJET INTERNATIONAL, INC.,

10          Defendants.
      _____/
11

12                    500 East Broward Boulevard
13                    Suite 1000
                      Fort Lauderdale, Florida
14                    Wednesday, February 7, 2001
                      9:37 a.m. -  10:55 a.m.
15

16

17
      APPEARANCES:
18
      HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
19    BY:  VALERIE SHEA, ESQ.
      Attorney for the Plaintiff
20
      ALLEN, NORTON & BLUE, P.A.
21    BY:  SUSAN POTTER NORTON, ESQ.
      Attorney for the Defendant
22

23

24                         DEPOSITION
                              OF
25                       JUAN D. MORALES
```

DOWNTOWN REPORTING   (954) 522-3376

1    put forward, I don't remember exactly what it was,

2    but, um, he got his money back to go to a

3    different school and he was going for, um, that

4    certification, that certificate.  And he was to

5    return after completion and, um, presumably for

6    anther opportunity.

7        Q.    Okay.  All right.  Did he complete the

8    training at the other school?

9        A.    I don't have personal knowledge of

10   that.

11       Q.    Do you know whether he brought back

12   that evidence or not?

13       A.    He brought back a certificate.

14       Q.    Okay.  So, to your knowledge, he did

15   complete the requirements at the other school?

16       A.    To my knowledge, he had gone to one

17   school and was asked to leave that school,

18   according to -- I don't remember who told me this,

19   um -- and then he went to a different school and

20   got a certificate at the second school.

21       Q.    All right.  So you don't even remember

22   who said anything to you about one school?

23       A.    No, I really don't.  Not specifically.

24       Q.    Okay.  So you don't have any personal

25   knowledge about that?

```
 1    Pete Steele or Dave Bassett as a human resources
 2    professional in terms of how candidates should be
 3    evaluated?
 4                MS. NORTON:    Object to the form of
 5          the question.
 6          A.    Fairly.
 7          Q.    Objectively?
 8          A.    Objectively, fairly.
 9          Q.    Did you inquire of Dave or Pete Steele
10    at or about the time that they had this meeting
11    with Pat, that you attended, as to what impartial
12    or objective criteria they had to support their
13    decision?
14          A.    It was their judgment as pilots, as
15    people who were responsible for the company's FAA,
16    um, Pete as the D.O., and Dave as the, I think,
17    officially, he was a Safety Officer for the
18    company, that they could not in good conscious
19    ever recommend Patrick to be a Captain.  And the
20    reason they said -- Dave said is that he just did
21    not have confidence in Pat's judgment and that,
22    um, one day if he, he feared that Pat would take
23    an airplane down into a neighborhood and kill a
24    lot of people.  That was the gist of the
25    conversation, that I recall.
```

1  about your records?

2      A.      I remember asking someone on my staff

3  to look at everyone who had been upgraded in the

4  time period that was referenced, and the

5  information that they brought back was that, um,

6  he was one of the youngest ones.  Actually, there

7  were a lot of people that were -- I shouldn't say --

8  I will say that there are a lot of people that

9  were older than Pat that, um --

10     Q.      Who were upgraded in that period of

11  time?

12     A.      Yes.

13     Q.      -- which was a couple of years?

14     A.      I don't remember.  I don't have the

15  complaint in front of me.

16     Q.      That's what you considered to be the

17  pertinent information to look at?

18     A.      That I can recall, yeah.

19     Q.      But you don't know whether you made a

20  formal response to the EEOC or just got that

21  information?

22     A.      I don't recall making a formal

23  response.

24     Q.      Did you prepare EEO reports from

25  AmeriJet?

```
 1    relationship with Pat, so whenever I'd see him,
 2    I'd stop and talk to him.
 3              There was one other meeting where
 4    someone had complained about him stalking, that's
 5    the only last thing that sticks out, I guess.
 6         Q.    Okay.  Who was that?
 7         A.    Another pilot.
 8         Q.    What do you recall about that?
 9         A.    I recall that, um, his name was Tim --
10    Tim Green, and he had complained -- I'm not sure
11    if I was the first one that he complained to, but
12    he certainly complained to me that Patrick was
13    stalking him.
14         Q.    That was his word?
15         A.    That was his word.
16         Q.    What did he describe as the behavior?
17         A.    He described the behavior that Patrick
18    had, in front of other crew members, been, um,
19    spreading information about him, about some kind
20    of a Workers' Comp issue that he had, or lawsuit,
21    and that, um, he persistently kept pursuing him.
22         Q.    Meaning, Pat pursued Tim?
23         A.    Yes.  And talked about him with other
24    crew members, and in front of other crew members,
25    and uttered information about him.  I guess that's
```

1   the gist of what I recall.

2        Q.    When you say pursued him, there was no

3   suggestion that Pat was driving his car passed his

4   home at night or --

5        A.    He used the word "stalking", and I

6   remember specifically saying, "Stalking?" And he

7   said, "Yes. Stalking." I said, "Are you sure you

8   mean stalking?" And he said, "Yes, that's exactly

9   what I mean."

10       Q.    Okay.

11       A.    So I said, "Okay." So I had to deal

12  with it with Derry Huff and Pat.

13       Q.    You've described the behavior, I just

14  want to make sure that I understand when you say

15  that Tim said Pat pursued him, do you mean pursued

16  him to engage him in conversation about his

17  lawsuit, or was there anything --

18       A.    I don't remember.

19       Q.    -- that you found sinister about the

20  behavior when you asked him to --

21       A.    That I found sinister?

22       Q.    Yes.

23       A.    It was not my perception that was at

24  issue here, it was the complainant's, who

25  perceived that wherever he went at work, that Pat

DOWNTOWN REPORTING  (954) 522-3376

```
 1   was stalking him during the course of work.
 2        Q.    Okay.  Nothing outside of work?
 3        A.    No.  Which I would not have anything
 4   to do with something outside of work.  In fact, I
 5   told him if it was, call the Sheriff.
 6        Q.    All right.
 7        A.    I mean, it's not my -- that's not my
 8   role.  My role was inside the workplace.
 9        Q.    Okay.  So all this behavior that Tim
10   characterized in a very inflammatory way took
11   place at work?
12        A.    Yes.
13        Q.    Did you ask Tim to document this at
14   all, or did he give you anything written about
15   this?
16        A.    I don't recall if he did or didn't.
17        Q.    Okay.  Who involved Derry Huff?
18        A.    I think Derry already knew about it.
19   By then Derry was the, um, I believe, he was Chief
20   Pilot.
21        Q.    Okay.  You did not involve Derry
22   yourself?
23        A.    I don't recall how that really
24   happened.
25        Q.    Okay.
```

```
 1        A.      Either way, it was his boss and I
 2    would have --
 3        Q.      Okay.  So what did you do when you
 4    said you had to address it?  How did you address
 5    it?
 6        A.      We had a meeting with Pat, I remember
 7    that I had, um, composed a letter to his file.
 8    Pat denied having stalked him, but he did admit
 9    that there had been some conversation about his
10    Worker's Compensation suit, whatever it was, I
11    don't really remember the specifics.  He was very
12    concerned that this would go in his file and, um,
13    I told him that if his behavior ceased and
14    desisted, and he left Tim alone, that I would not
15    place that letter into his file.  And it appeared
16    that that's what happened, so I did not place the
17    letter into his file.
18        Q.      Okay.  Did you follow up and verify
19    that with Tim Green after the meeting?
20        A.      Yeah, I did.
21        Q.      And what he was supposed to cease and
22    desist was discussing Tim Green's lawsuit?
23        A.      Yes, as I remember.
24        Q.      Or approaching Tim Green concerning
25    the lawsuit?
```

```
 1        A.    Leaving Tim Green alone.
 2        Q.    Okay.  Anything else that you recall
 3   about that incident that was basically resolved?
 4        A.    Yes, that was basically resolved.
 5        Q.    Any other significant contact that you
 6   recall with Pat before you transitioned out of
 7   Human Resources?
 8        A.    No.
 9        Q.    Any contact with Pat after you
10   transitioned out of Human Resources?
11        A.    I don't specifically recall any,
12   really.
13        Q.    Was seniority a criterion, a factor
14   for promotion or upgrade to Captain at AmeriJet
15   during the time that you were Director of Human
16   Resources?
17        A.    It was a factor, but not the
18   controlling factor, as I recall.
19        Q.    Okay.  What was the controlling
20   factor?
21        A.    Ability.
22        Q.    Ability as demonstrated by --
23        A.    By their testing and the, um, FAA
24   compliance.
25        Q.    Okay.  Do you recall back at the time
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6070 FERGUSON/SNOW
L.T. CASE NO. 99-021746-11

1

2

3

4

5

6      PATRICK SCOTT MAJOR,

7              Plaintiff,

8      vs.

9      AMERIJET INTERNATIONAL, INC.,

10             Defendant.
       _____/



11

12

13

14                                          One E. Broward Blvd.,
                                            Ft. Lauderdale, Florida,
15                                          Monday, 10:40 a.m.,
                                            February 19, 2001.
16

17

18

19                                                   ✦

20

                          D E P O S I T I O N
21
                                  of
22
                             DAVID BASSETT
23
                    taken on behalf of the Plaintiff
24              pursuant to a Notice of Taking Deposition

25


                  FRIEDMAN, LOMBARDI  & OLSON

exam that he was given by the FAA was terminated or ended, was not completed. It was the impression, or the words that I got was, that he-failed the exam.

You know, as a matter of fact, Mr. Steele informed me that he had gotten himself in trouble somewhat with the FAA because he actually recommended Pat for the exam.

Q.   When you say "the words", were those Pete Steele's words about Pat having failed the FAA oral?

A.   Yes.

Q.   Do you know how long before Pete discussed Pat's situation with you that that had occurred?

A.   I don't remember.

Q.   Did Pete elaborate at all why he got in trouble with the FAA?

A.   Yes.  As a flight instructor, you are the examiner, you are required to recommend for check-ride and he had recommended Pat.

Q.   Did you ask Pete any questions with respect to his personal basis for having recommended Pat?

MRS. NORTON:  Object to the form of the question.

A.   Ask your question again.

Q.   Sure.  Did you ask Pete or did Pete inform you on what basis he had recommended Pat?

A.   Well, nobody else in the Training Department would, so he decided to do it himself.  That was what he told me.

FRIEDMAN, LOMBARDI & OLSON

1    oral at or about the time that that occurred?

2         A.    Yes.

3         Q.    Did he ask you for any decision regarding Pat's

4    promotion at that time?

5              MRS. NORTON:    Object to the form.

6         A.    You cannot promote somebody that didn't pass the oral.

7         Q.    Did you make a decision at that time that Pat was not

8    promotable as a result of the problem with the oral?

9         A.    No.

10         Q.    Is there a reason why not?

11         A.    Well, I did not know what he was going to do next.

12         Q.    Did you still consider him a viable upgrade candidate

13    in light of the FAA situation?

14         A.    Up until the time I made the decision not to upgrade

15    him, I did not make any decisions.  I listened and advised the

16    Training Department and Mr. Steele and everybody in the company

17    to do whatever was appropriate and necessary for Pat to be

18    upgraded.

19         Q.    So he was still a bona fide upgrade candidate right up

20    until the time that you made the decision some time later?

21         A.    Yes.

22         Q.    Did you know in advance that he was going to, at his

23    own expense, obtain a type rating outside the company?

24         A.    No.

25         Q.    When he obtained the type rating, why was he not at

FRIEDMAN, LOMBARDI & OLSON

1    instructor at that time.

2        Q.    He was Director at that time, right?

3        A.    As I recall.

4        Q.    You primarily rely on him to inform you as to the

5    Training Department's evaluations?

6        A.    Yes, and his boss, which is Mr. Steele.

7        Q.    Well, you said it was very important to you to assure

8    that all pilots have an opportunity to upgrade at Amerijet.

9    Isn't it a fact, sir, that in February 1997 you made a decision

10   that Pat would not be offered an opportunity to upgrade from

11   First Officer to Captain?

12       A.    Well, I believe earlier in his career I made a

13   decision that he was not going to be upgraded in the near

14   future.  If my memory serves me right.

15       Q.    So you did not, at that time, decide or communicate to

16   him that he had no upgrade prospects at Amerijet?

17             MRS. NORTON:  Object to the form of the question.

18       A.    I don't remember that.

19       Q.    Can you delineate the distinction between Amerijet's

20   requirements for a Captain of a Boeing 727 and the requirements

21   for a type certification on the Boeing 727?

22       A.    Can I delineate the description?  One is conducted

23   simply by passing an oral or check-ride given by the FAA.  The

24   other is a proper completion of an FAA approved training program

25   by the air carrier.

FRIEDMAN, LOMBARDI & OLSON

1    A.    I formed some opinions that were very old.  I formed
2    some opinions about Pat's ability from a flying prospective many
3    years earlier when he was flying with me as my copilot.
4    However, I did my best to discount those because it had been
5    years and years since I had physically flown with him so it was
6    really not fair to include those very heavily at least, but they
7    are certainly my opinions.  My opinions are what they are.

8         Q.    Those were a number of years old so you did not?

9         A.    I did my best to discount them, yes.

10        Q.    Other than your own recollections of having flown with
11   Pat a number of years before, did you have any personal basis
12   for your decision?

13             MRS. NORTON:  Object to the form of the question.

14        A.    Other than my opinion did I have anything else?

15        Q.    Right.  Other than those recollections of having flown
16   with Pat and the information that you got from your senior
17   managers, was there any impressions or experience that you had
18   with Pat Major that informed your decision?

19        A.    No.

20        Q.    Is there a reason you didn't review his personnel file
21   or training records yourself?

22        A.    I didn't feel I needed to.  That is what I pay people
23   to do.

24        Q.    Do you recall how your decision was communicated to
25   Pat Major in early 1999?

FRIEDMAN, LOMBARDI & OLSON

1    Q.    What was your intentions of how that position would be
2    filled when Ed Cook left?

3    A.    Again, I just was looking for a management change so I
4    don't remember what other than that.  I mean those are my
5    intentions.  It was time for a management change.

6    Q.    Did you consider Derry Huff to be a more qualified
7    Chief Pilot than Ed Cook?

8    A.    I don't remember at what point Derry got into the
9    equation.

10    Q.    Do you consider Derry Huff to be a more qualified
11    Chief Pilot than Ed Cook at or about the time of transition?

12    MRS. NORTON:    Object to the form of the question.
13    Asked and answered.

14    A.    More qualified?  No, I don't think he was more
15    qualified than Ed Cook.  At that time, certainly not.

16    Q.    Can you identify why you would consider Derry Huff to
17    be more desirable as Chief Pilot for Amerijet than Ed Cook?

18    A.    I think Derry Huff had better communication skills,
19    more interpersonal skills with people, more human resource
20    capabilities, things like that.

21    Q.    Did you discuss Pat Major's promotion with Derry Huff
22    at or about the time that you decided to end his upgrade
23    opportunity in 1999?

24    A.    I don't remember whether Derry Huff was the Chief
25    Pilot when that letter was put together.

1    A.   No.

2    Q.   Were you involved in the decision to suspend Pat as

3  opposed to terminate him?

4    A.   I don't remember the details.

5    Q.   Did you attend any meetings at which discipline of Pat

6  was discussed?

7       MRS. NORTON:  Other than what he has testified about?

8  What time frame?

9       MS. SHEA:  This is all in August 1999.

10      MRS. NORTON:  Okay.

11   A.   Did I attend any meetings?  I believe I had a meeting

12  with Mr. Steele.

13   Q.   Did he make a recommendation concerning whether Pat

14  should be terminated?

15   A.   No, not that I recall.  That was my decision.

16   Q.   Did Mr. Steele recommend against terminating him?

17   A.   No, I don't think so.

18   Q.   You were the designated Safety Officer at Amerijet at

19  that time?

20   A.   Still am.

21   Q.   Did you forward Pat Major's report yourself to any

22  regulator or administrative agencies?

23   A.   No.

24   Q.   Did you make any report of this incident at all, the

25  incident at which he had made the report?

FRIEDMAN, LOMBARDI & OLSON

Q.   Are your pilots authorized to disregard official
runway contamination reports?

MRS. NORTON:   Object to the form of the question.

A.   No.

Q.   If given your conclusion in August of 1999 that if Pat
had a concern about the flight, it did not matter whether it was
unfounded or well-founded, he should have gotten off the flight
and had he done so there would be no repercussions to him, why
did you not simply do a memorandum to him advising him of that
fact?  What, in your opinion, warranted termination?

A.   Well, because he allowed this flight to actually
continue to the point where he had got to the place where a
severe hazard had occurred or what could have occurred.  I mean
in his NASA report he mentions that ultimately.  The ones that
particular stick out in my brain, the most was ultimately I was
out of options and all I could really do is throw myself on the
throttles to stop the airplane.

I mean to me, as a pilot, there is really two very,
very serious times or dangerous places in an airplane.  Probably
the most dangerous is a fire.  An airborne fire is an incredibly
dangerous place to me.  Probably, to me, the second most
dangerous place is to be on the take-off roll and abort the
take-off.

Any airman that basically considers himself in a
position that he has no other option other than to throw himself

FRIEDMAN, LOMBARDI & OLSON

52

1    Q.    You are supposed to ---

2    A.    You are supposed to do something before you are
3    underway.

4    Q.    Once you are underway then the pilot in command is in
5    charge?

6    A.    The pilot in command is in charge as long as the
7    airplane is operating, yes.

8    Q.    I just want to make sure I understand.  He got fired
9    because he should have gotten off at the ramp regardless of
10   whether his concern was well-founded or not?

11   A.    No, no.  If he had as much as a concern as he
12   obviously had, it was his duty and his obligation by FARs to
13   stop at least for him not to participate in that flight.

14   Q.    And he was fired for his poor judgment.  Tell me in
15   your own words.

16   A.    He didn't have the courage, did not have the correct
17   judgment.  He felt very strongly about a situation as it related
18   to safety and failed to follow through.

19   Q.    Now, you don't know anything more about the prior
20   incident than what you testified to a few minutes ago that you
21   discussed it with Derry?

22   A.    I don't recall.

23   Q.    Don't recall any specifics about that?

24   A.    Don't know.

25   Q.    Don't know if he was reprimanded or not?

FRIEDMAN, LOMBARDI & OLSON

1    Q.    Do you know whether he related that experience to Pat
2    Major?

3    A.    I don't know whether he did or not.

4    Q.    Sir, are you aware that Mr. Huff has testified that he
5    reprimanded Pat Major for having declined the take-off clearance
6    on a flight with Brian Steele in June of 1999 under very similar
7    circumstances?

8    A.    I am not aware of that.

         MRS. NORTON:    Object to the form.

10    Q.    You were not aware of that when you decided to fire
11    him as well?

12         MRS. NORTON:    Object to the form.  Counsel's questions
13    are not testimony and facts.

14    A.    No, I wasn't.

15    Q.    Did you ever read Brian Steele's report of his earlier
16    flight with Pat Major complaining about Pat?

17    A.    No.

18    Q.    Are you aware that that report contains a clear
19    confessed violation of an FAR?

20    A.    I did not read it.

21         MRS. NORTON:    Object to the form.

22    A.    How could I be aware?

23    Q.    You could be aware.  You are aware of Pat's training
24    records and you never looked at those.

25         MRS. NORTON:    Just answer the question.  Counsel would

FRIEDMAN, LOMBARDI & OLSON

1        A.    If there was one?

2        Q.    Yes.    If there was one, yes.

3        A.    I think I answered that if there was a violation, yes,

4    I should be reported of a violation.

5        Q.    Did you assess whether Pat Major's report of August

6    1999 reflected a FAR violation?

7        A.    Did I assess there was a violation?

8        Q.    Did you assess the report or try to determine whether

9    there was a violation?

10        A.    Well, certainly.

11        Q.    Did you conclude that there had been no violation?

12        A.    To this date my conclusion is that there still isn't a

13    violation.

14        Q.    What is the basis for that?

15        A.    Because I have taken off of the runway of Fort

16    Lauderdale probably in excess of 4,000 times and the runway just

17    doesn't have standing water on it.

18        Q.    I asked you a few minutes ago if a pilot can disregard

19    an official report of standing water and you said no.

20        A.    As I recall, that report that we got from the tower

21    doesn't indicate that there is standing water on the runway.    It

22    indicates there is a certain amount of water on the run six feet

23    or so on either side of the center line, as I recall.

24        Q.    So back in August of 1999 when you assessed this, you

25    concluded that there was no violation of an FAR because the

FRIEDMAN, LOMBARDI  & OLSON

**AMERIJET**
INTERNATIONAL, INC.

February 5, 1999

Mr. Pat Major
1722 W. Las Olas Blvd.
Ft. Lauderdale, FL 33312

Dear Pat:

I would like to begin by saying that I value you very highly as an employee and recognize the
contribution that you have made to the company during your tenure with Amerijet.

I know that it has long been your desire to become a Captain at Amerijet. I have had numerous and
lengthy discussions with the training department and flight department personnel, and it is
abundantly clear that they do not feel you are capable of filling this position safely. I have full trust
and confidence in the judgement of my senior staff members and will uphold their recommendation.

I take my responsibility to all of my employees, to the insurance company, and to myself very
seriously, and cannot in good conscience allow you to become a Captain here at Amerijet. Based
upon what I've learned, and what I know, the decision is made and my position will not change. I
would like to make it abundantly clear that the safety of the aircraft and crew is my first
responsibility, and you as a Captain are a risk I am not willing to take.

Pat, I know you have worked hard and I would like you to continue working for Amerijet in your
current capacity. Ultimately, you will have to decide whether this is what you want, and I will
support whatever decision you choose to make.

Sincerely,

David G. Bassett
Chairman & CEO



PLAINTIFF'S
EXHIBIT
21
2-19-01  JI

000070

498 S.W. 34TH STREET, FORT LAUDERDALE, FL 33315 • (954) 359-0077 • FAX (954) 359-7866 • http://www.amerijet.com

CARGO *IS* OUR BUSINESS

| NAME | D/O/B | D/O/H | D/O/U |
|------|-------|-------|-------|
| David Mitchell | 10/22/59 | 02/03/95 | 05/01/96 |
| David Bruns | 02/09/66 | 04/08/94 | 10/16/96 |
| Derry Huff | 11/26/66 | 12/14/89 | 10/16/96 |
| John Hogan | 01/23/87 | 11/27/89 | 12/15/96 |
| John Washington | 10/07/70 | 04/27/92 | 12/15/96 |
| Paul Andresen | 11/19/55 | 03/25/87 | 06/12/97 |
| Jeff Novak | 12/01/63 | 02/24/89 | 09/23/97 |
| James Battillo | 01/09/64 | 01/29/90 | 09/23/97 |
| Raymond Meunier | 04/08/68 | 05/06/95 | 11/17/97 |
| Tracey Dickinson | 04/21/64 | 04/08/95 | 11/19/97 |
| Michael Pelly | 08/28/64 | 12/06/89 | 12/05/97 |
| Patrick Major | 10/02/63 | 05/20/91 | N/A |
| Timothy Green | 06/01/67 | 02/18/92 | 10/06/98 |
| Douglas Benson | 06/11/56 | 05/04/95 | 11/09/98 |
| Patrick McManus | 02/19/69 | 06/08/92 | 11/11/98 |
| James Kirk | 12/30/67 | 08/03/92 | N/A |
| John Moktadler | 04/21/64 | 04/08/95 | 06/17/99 |
| Ronald Rooks | 08/26/69 | 07/22/94 | 08/27/99 |
| Edward Hoffman | 08/07/66 | 03/18/91 | 09/09/99 |
| Kennith Matthews | 07/31/65 | 08/10/92 | 11/09/99 |
| Ronald Jakubek | 06/23/70 | 11/06/95 | 01/20/00 |
| Michael Bachrach | 11/23/55 | 04/29/95 | 01/20/00 |
| Jeffrey Michlowitz | 03/09/62 | 03/18/91 | N/A |
| Charles Church | 06/18/68 | 07/01/96 | N/A |
| James Basham | 09/07/69 | 09/23/96 | 01/20/00 |
| Robert Reed | 02/23/68 | 11/17/95 | N/A |
| Jacques Raissigluer | 05/29/63 | 07/01/96 | N/A |


PLAINTIFF'S
EXHIBIT
53
2-19-01 JI

CONFIDENTIAL    000315

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:   00-6070-Ferguson/Snow
L.T. Case No. 99-021746-11

PATRICK SCOTT MAJOR,

      Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,



      Defendant.

_____/

                         500 East Broward Boulevard
                         Fort Lauderdale, Florida
                         Wednesday, January 24, 2001
                         9:40 a.m. - 11:45 a.m.

APPEARANCES:

    HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
    500 East Broward Boulevard, Suite 1000
    Fort Lauderdale, Florida 33394
    By:   VALERIE SHEA, ESQ.
    Appearing on behalf of the Plaintiff.
    (954)527-2800

    ALLEN, NORTON & BLUE, P.A.
    121 Majorca Avenue, Suite 300
    Miami, Florida 33134
    By:   SUSAN POTTER NORTON, ESQ.
    Appearing on behalf of the Defendant.
    (305)445-7801

ALSO PRESENT:   Patrick Scott Major
                 Lily Jules, Representative of Amerijet

                     DEPOSITION
                        OF
                    AL JORSEY
            (Appearing Telephonically)

```
 1              MS. NORTON:  Object to the form of the
 2         question.
 3              THE WITNESS:  No, I wasn't hooked up on the
 4         radio all the time initially, because I was doing
 5         paperwork or something.  But also he did the
 6         weight and balance and made no reduction at that
 7         time.
 8    BY MS. SHEA:
 9         Q.   Do you recall any statements that Brian
10    Steel made in the plane prior to push-back to Pat
11    Major responding to Pat's concerns about the standing
12    water possibility?
13         A.   I don't recall any comment that he made, if
14    there was any.
15         Q.   Did you make a comment to Pat to the effect
16    that the runway was going to be treated as dry in the
17    absence of a report and that if he didn't like it he
18    could quit?
19         A.   I don't remember that statement, but that
20    would be my thought, yes.  You know, if you don't --
21    If you have a concern, then do something about it.
22         Q.   Do you recall whether your precise comment
23    to him was, Then go work somewhere else or leave?
24         A.   That may very well have been.  I don't
25    remember those exact words.
```

```
 1              THE WITNESS:  Ask me the question again.
 2   BY MS. SHEA:
 3         Q.   He did it the way you told him to do it,
 4   correct?
 5         A.   Well, he didn't do it.  Brian Steel did it.
 6         Q.   All right.  Anything else eventful on that
 7   flight?
 8         A.   Well, the whole flight in my opinion was
 9   not -- It was confrontational.
10         Q.   Okay.
11         A.   And if I had anything to write up on Brian
12   Steel, I would have reprimanded him for not silencing
13   the co-pilot for overruling and trying to overrule his
14   authority.  I would have thrown Pat Major off the
15   airplane if he had been my co-pilot before we ever
16   started.  Unacceptable.
17         Q.   What do you mean before you ever started?
18         A.   Before I ever took the airplane off the
19   ground.
20         Q.   Well, what happened before the --
21         A.   Well, he was in business for himself.  The
22   captain is in charge of the airplane, not the
23   co-pilot.  To captain makes the decisions, and Pat
24   Major was making decisions without inquiring of the
25   captain.
```

BY MS. SHEA:

```
 1   BY MS. SHEA:
 2        Q.   Do you understand?
 3        A.   No, I don't.
 4        Q.   Okay.  Sorry.  Let me try to ask that
 5   better.
 6             Well, you characterize him as a disgruntled
 7   employee.  Sir, isn't it a fact that he made the NASA
 8   report and the report to Amerijet that went to the
 9   F.A.A. while he was still working at Amerijet?
10        A.   I didn't know that.
11        Q.   Okay.
12        A.   I have no information as to when his reports
13   were written or sent.
14        Q.   Okay.
15        A.   He sent lots of correspondence to people
16   that I know have no knowledge or date of.
17        Q.   All right.  So if I understand your comment
18   correctly in the letter, you thought this F.A.A. issue
19   should be taken with a grain of salt because he was
20   just a disgruntled, fired employee; is that right?
21             MS. NORTON:  Object to the form of the
22        question.
23             THE WITNESS:  Yes.  You know, that's one of
24        the factors that led me to believe that he was
25        out to get captain Brian Steel in my opinion.
```

```
 1              That's just my opinion, but that's what I relayed
 2         to the F.A.A.
 3    BY MS. SHEA:
 4         Q.   And you don't have any facts to support
 5    that.  That's just your opinion.
 6              MS. NORTON:  Object to the form of the
 7         question.  It's argumentative.  He was there.
 8              THE WITNESS:  No, that's my opinion I guess
 9         that I put on paper in subsequent reports to
10         Roseburough when I met with him that this is
11         ridiculous.
12    BY MS. SHEA:
13         Q.   Do you know what the outcome of John
14    Roseburough's investigation was as it related to
15    Captain Steel?
16         A.   I don't know.  I believe based on the others
17    that it's been thrown out.  It's dismissed like mine.
18         Q.   And in your opinion it was ridiculous to
19    begin with?
20         A.   Right.
21         Q.   Okay.
22         A.   A waste of government time.
23         Q.   And in your case you received a letter from
24    John Roseburough saying that no violation had been
25    found; is that correct?
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                    )   L.T. CASE NO.
                                        )   99-021746-11
                Plaintiff,              )
                                        )
vs.                                     )
                                        )   COPY
AMERIJET INTERNATIONAL, INC.,           )
                                        )
                Defendant.              )
- - - - - - - - - - - - - - - - - - -)

                        1050 Lee Wagener Blvd.
                        Fort Lauderdale, Florida
                        Tuesday, February 13, 2001
                        9:10 a.m. - 11:15 a.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant

------------------------------

DEPOSITION

OF

JOHN C. ROSEBOROUGH

------------------------------

DOWNTOWN REPORTING      (954) 522-3376

1    him, with the understanding that what was said would

2    stay in this room, would not go out.  I asked him at

3    the time to put in writing what his concerns were

4    and to send them to me and upon receipt I would

5    conduct an investigation.

6    BY MS. SHEA:

7         Q.    All right.  Did there come a time after

8    that meeting when you received a written report from

9    Mr. Major?

10        A.    There did.  It was about October the 4th,

11   I believe.

12        Q.    Of 1999?

13        A.    Yes, ma'am.

14        Q.    All right.  And did you thereafter conduct

15   an investigation?

16        A.    No, ma'am, I did not.  The report came in

17   perhaps on the Friday before that Monday.  The

18   Saturday night before that Monday my mother passed

19   away, so that Monday, which I had walk-in duty, to

20   accommodate all people that come in the office on

21   all phone calls, I noticed that a report in a brown

22   envelope had come from Mr. Major.  I did not examine

23   the contents.

24              I spent the day resolving walk-ins and

25   making reservations for my family to travel to San

```
 1    resolved and prepared for adjudication by our

 2    regional counsel's office in Atlanta.

 3        Q.   All right.  So you did prepare a written

 4    investigation?

 5        A.   I did an investigation, I prepared an

 6    enforcement investigative report, with items

 7    approved to substantiate the findings within that

 8    investigation.

 9        Q.   All right.  And are you -- were you the

10    author of the enforcement investigation report?

11        A.   Yes.

12        Q.   Do I detect anything from the tone of your

13    testimony that you felt Mr. Major was out of line or

14    that you resented having this report --

15             MS. NORTON:  I object to the form of the

16    question.

17    BY MS. SHEA:

18        Q.   -- made to you?

19             MS. NORTON:  And I detect exactly the

20    opposite, a very precise delivery.  I object to any

21    characterization by counsel.

22             THE WITNESS:  Ask your question again,

23    Miss Shea.

24    BY MS. SHEA:

25        Q.   Do you have any resentment towards Mr.
```

1    Major for having made the report?

2         A.   Not for making the report, but for

3    bringing this action.  Because what was discussed in

4    this room was to stay in this room, and this man did

5    not honor his word in that regard.

6         Q.   Oh, great.  Let's hear about that.  What

7    transpired in this room that you feel was breached

8    by his making a report?

9              MS. NORTON:  Object to the form of the

10   question.

11        A.   Not by him making a report.  I told him

12   that I would go forward with nothing, I would not

13   implicate him in any way except by his written

14   request and I would use only those items of

15   information that he provided me in writing.  I

16   requested that he take nothing out of this room

17   himself, which he has done.

18   BY MS. SHEA:

19        Q.   What did he allege -- what did he

20   allegedly take out of this room?

21        A.   If he had taken nothing, we would not be

22   having this deposition.

23        Q.   Then what did he take out of this room?

24   What's your sworn testimony under oath that my

25   client removed from a conference room in the FAA

1    office in Fort Lauderdale Airport?

2            A.    The discussion itself.

3            Q.    Okay.  No documents?

4            A.    No.

5            Q.    All right.  What did you tell him in that

6    room that he allegedly took out of this room, what

7    statements?

8            A.    I really don't remember the dialogue of

9    the conversation that occurred, except that it

10   pertained to his perception of an overweight takeoff

11   by Amerijet.

12           Q.    Well, he had a perception of an overweight

13   takeoff that he discussed with you.  This was your

14   first notification or knowledge of this incident;

15   correct?

16           A.    As I recall, it was.

17           Q.    Amerijet had not made any report to you

18   concerning the same flight?

19           A.    Not that I can recall.

20           Q.    Okay.  So when Mr. Major expressed his

21   perception concerning a possible overweight takeoff,

22   what was your response to him?

23           A.    Put it in writing and send it to me.

24           Q.    All right.  Now, what is it -- and he did

25   that.

DOWNTOWN REPORTING    (954) 522-3376

```
 1            A.    That's what was received on about October
 2      the 4th, that I didn't have a chance to look at
 3      until the latter part of the month when it had
 4      already been turned over to the Office of Secretary.
 5            Q.    So the Secretary of Transportation.  So
 6      what is it that you claim he took out of this
 7      office?
 8            A.    I requested -- he requested that I grant
 9      him an off the record conversation, and I said
10      that's fine.  I said that's fine, I have done this
11      before, with the understanding that what is said in
12      this room stays in this room.  And that being said,
13      the issues involved with that meeting are being
14      discussed today.  That was not supposed to occur.
15            Q.    Well, if you grant an off-the-record
16      meeting, that would be out of protecting him, not
17      you; right?
18            A.    It was both ways.  He was to not go
19      forward with anything that I may have said, I was
20      not to go forward with anything that he said.
21            Q.    So you feel as though there's a chain of
22      command issue here that he --
23                  MS. NORTON:  Object to the form of the
24      question.
25            A.    He should have gotten my permission before
```

06070-WJZ    Document 134    Entered on FLSD Docket 03/26/2001    Pa

```
 1    he contacted you in regard to the meeting that we
 2    had.
 3    BY MS. SHEA:
 4         Q.   So before he sought legal advice he should
 5    have gotten permission from you?
 6         A.   In regard to the meeting that we had, yes.
 7         Q.   Well, what basis do you have for stating
 8    that the meeting that he had with you is in any way
 9    a factor in this lawsuit?
10         A.   I'm not saying that it is.
11         Q.   You don't have any information --
12         A.   I'm saying that the very fact that we had
13    a meeting that has been raised in this deposition is
14    that he did not honor his word to me.
15         Q.   You felt that you extracted a commitment
16    from him that he would address a report only --
17         A.   It was not extracted, it was given.
18         Q.   That he would not discuss this matter with
19    anyone other than you?
20         A.   That's correct.
21         Q.   But you were not going to do anything
22    about it until you got a written report; correct?
23         A.   And I didn't.
24         Q.   And he certainly didn't -- you're not
25    accusing my client of waiting until your mother's
```

1    unfortunate passing to slip this report in, are you?

2        A.    No.    What I stated is the report arrived

3    at a very unfortunate time, and before I could get

4    to it, it appears to me that he grew impatient and

5    wanted immediate action, so he forwarded it to the

6    Secretary of Transportation, the Office of the

7    Attorney -- or the Office of the Inspector General.

8        Q.    And that makes you angry?

9            MS. NORTON:    Object to the form of the

10   question.

11       A.    Not -- it doesn't make me angry.

12   BY MS. SHEA:

13       Q.    You seem as though you're angry.

14           MS. NORTON:    Object to the form of the

15   question.    I don't detect any anger.

16       A.    I'm angry --

17           MS. NORTON:    Let the record reflect,

18   you're characterizing stuff, Counsel.    And I can put

19   an opposite characterization down.

20   BY MS. SHEA:

21       Q.    Sir, you started to say I'm angry.    Please

22   tell me why you are angry.

23       A.    I am not happy that Mr. Major brought up a

24   meeting that was not supposed to have been divulged.

25       Q.    How did -- what are you talking about that

1    he brought up this meeting?

2        A.    What are you deposing me for, this
3    meeting?

4        Q.    I'll represent to you, I've never heard of
5    this meeting ever before today. So tell me what's
6    the basis for your statement that Pat Major divulged
7    to anyone a meeting that you claim was to be
8    confidential, what's the basis of that statement?

9        A.    What are the issues of the deposition?

10        Q.    I'm not answering any more of your
11    questions, you're here to answer mine. But you've
12    given sworn testimony under oath that this lawsuit
13    violated a meeting that was confidential between you
14    and Pat Major. I want you to tell me the factual
15    basis for that statement, because I don't know what
16    you're talking about.

17            MS. NORTON:  Miss Shea, Mr. Roseborough is
18    not here represented by counsel and I don't think
19    it's appropriate for you to sit here and poke your
20    finger at him. There's a way of asking questions
21    and there's a was not to. And I object on the
22    record.

23            MS. SHEA:  I'm offended.

24            MS. NORTON:  Well, I'm offended by your
25    using your finger and pointing it at him repeatedly

1   like that. So for mutually -- if we're mutually

2   offended, why don't you rephrase the question.

3   BY MS. SHEA:

4        Q.   I don't mean to intimidate you, but I do

5   need to ask you for the basis of your sworn

6   testimony that you just offered, that you had a

7   meeting with Pat Major that was supposed to be

8   confidential and that he's breached that

9   confidentiality.

10       A.   It is my perception that this deposition

11  is a result of that meeting that occurred that was

12  to remain off the record. If that is not true, then

13  I have a misperception.

14       Q.   Okay. You'll concede that?

15            MR. MAJOR: I accept your apology.

16       A.   Yes, ma'am, I will concede that.

17  BY MS. SHEA:

18       Q.   You don't have any file materials, any

19  documents that you've seen --

20       A.   No, ma'am. All this is, is my subpoena

21  and a note that I am not to waive for my review

22  rights.

23       Q.   That's fine. But this will go better if

24  you let me finish my question before you start to

25  answer it.

1              A.    Certainly.

2              Q.    Have you had a file in these matters?

3     Obviously, in this whole investigation.

4              A.    There is a file that resides in Atlanta

5     and we have an office file, that's correct.

6              Q.    All right.  And there's nothing in that

7     file that you've reviewed that involves any

8     disclosure of this meeting by Mr. Major?

9              A.    I haven't reviewed that file since I had

10    completed it and sent it to Atlanta.

11             Q.    But there's nothing as we sit here today

12    that you're thinking of that you consider a

13    violation of the confidentiality that you agreed to?

14             A.    No, ma'am.

15             Q.    All right.  And even though this report

16    that originally came to you ended up having a

17    duplicate copy forwarded to someone else, you would

18    have investigated it anyway; right?

19             A.    That's correct.

20             Q.    Okay.  So regardless of whether the

21    Department of Transportation ever got involved, you

22    as the principal operations inspector for Amerijet,

23    having gotten a written report alleging the

24    violation Mr. Major alleged, would have done exactly

25    what you did?

1          A.    Would have done the same investigation.

2               MS. NORTON:  Object the form of the

3     question.

4          A.    The same investigation in the same, exact

5     manner.

6     BY MS. SHEA:

7          Q.    So other than your perception that Mr.

8     Major breached the privacy of a meeting that you

9     wanted --

10         A.    No.  He asked for the meeting, not me.

11         Q.    Right.  But you're upset about the privacy

12    of the meeting.

13              MS. NORTON:  Object to the

14    characterization.  Object to the form of the

15    question.  Excuse me.

16         A.    I'm disappointed and I'm somewhat taken

17    aback by it.

18    BY MS. SHEA:

19         Q.    If it happened.  If there was a breach of

20    that meeting.

21         A.    That's correct.

22         Q.    All right.  And you as a government

23    official are upset that that meeting was not private

24    why?  If in fact that was the case.

25         A.    Because it was an off-the-record meeting.

```
 1          Q.    Well, why would a government official
 2    who's charged with the safety and operational
 3    compliance of the airline want an off-the-record
 4    meeting?
 5          A.    I did not.  This gentleman did.
 6          Q.    All right.  So if it was for his
 7    protection that it was off the record, why would you
 8    be upset if it was discussed later?  Assuming that
 9    it was.
10          A.    I think I've already responded to that.
11                MS. NORTON:  Object.  Asked and answered.
12    BY MS. SHEA:
13          Q.    All right.  So we've established you don't
14    know whether it was ever discussed by Mr. Major
15    again.  Have you ever seen anything written by Pat
16    Major, attributed to Pat Major, credited to Pat
17    Major, which discusses this meeting?
18          A.    Not that I can recall.
19          Q.    All right.  So this enforcement
20    investigation report is a form of report that you're
21    familiar with doing, that you've done other ones
22    before?
23          A.    I've done hundreds of them.
24          Q.    I'm sorry, hundreds?
25          A.    Yes, ma'am.
```

```
 1           Q.   All right.  It actually has your approval
 2    on it some months prior to the incident; is that
 3    right?
 4           A.   That's correct.  20 May 1999.
 5           Q.   All right.  And what is IOP number 8?
 6           A.   This is from the weight and balance
 7    manual, which is also approved.  And it lists the
 8    aircraft by N number, or registration number, and
 9    the maximum takeoff weight of the aircraft.
10           Q.   And why was that pertinent to your
11    investigation?
12           A.   Because that establishes a baseline from
13    which any degradations would have to be applied.
14           Q.   All right.  Would you turn back to page 2,
15    section B, summary of the facts.
16           A.   Okay.
17           Q.   And read aloud the third paragraph of that
18    section, please.
19           A.   The aircraft was taking off at a weight
20    17,000 pounds greater than allowed and indicated V-1
21    air speed 28 knots faster than allowed for
22    conditions, thus degrading the performance
23    capability.
24           Q.   All right, sir.  By virtue of being
25    operated in that manner, did the flight violate
```

 1    federal aviation regulations in the air?

 2         A.    Yes, ma'am, by that statement it did.

 3         Q.    You indicated in section D that you did

 4    not receive a response from Dave Bassett at Amerijet

 5    to the potential violation?  Do you see that?

 6         A.    I see that.  These in the last sentence.

 7         Q.    All right.  You indicate Mr. Bassett was

 8    sent two letters of investigation, LOI.  What is a

 9    letter of investigation?

10         A.    It's -- there should be one in here, as a

11    matter of fact.  It's a letter that describes the

12    event.  Let's see.  It's IOP 14.  13 and 14.  13 was

13    an LOI sent registered mail, certified return

14    receipt, and 14 is the same letter sent by regular

15    mail.

16              And it apprises the recipient of the date,

17    the time, the location, the aircraft and the

18    activity, where it departed, where it was going.

19    And it gives that individual all of the peripheral

20    data in connection with the activity.  It advises

21    that the matter is under investigation and it offers

22    the -- the person an opportunity to submit a written

23    statement in their behalf or to speak with us in the

24    same manner.

25         Q.    All right.  And this is part of your

RIS: FO 2150-1

| ENFORCEMENT INVESTIGATIVE REPORT | Report Number    Related Number |
| (Read Order 2150.3 for instructions) | 2000SO170009 |

ALLEGED VIOLATOR IDENTIFICATION

1. Name AMERIJET INTERNATIONAL INC
   DBA Name
   Designator PCSA          | 2. Address (Include zip code)  Send CO
                            | PERETZ, STEPHEN I ESQ ASV
                            | KLUGER PERETZ AND KAPLAN  pcs
                            | 1970 MIAMI CENTER            See related
                            | MIAMI                FL 33131   Steele

| Telephone Number ( )   -   | 3. Date of Birth  / /  | 4. Sex |

| 5. FAA Cert. # | 6. FAA Certificate Type |
| PCSA059B      | SCHED AIR CARRIER 121 &/O |

7. Aviation Employer

AIRCRAFT, ENGINE, PROPELLER, COMPONENT OR APPLIANCE INVOLVED

| 8. Make BOEING | 9. Model 727 | 10. Ident. Number 397AJ |
|                |              | ACFT SN |

| 11. Owner Name    AMERIJET INTERNATIONAL INC |
|                   | 12. Address (Include zip code) |
|                   | 498 S W 34TH ST |
|                   | FORT LAUDERDALE       FL 33315 |

ALLEGED VIOLATION

| 13. Date Occurred | 14. Time | 15. Date Known to FAA | 16. Region of Discov |
| 1999/08/17        | 19:40    | 1999/10/18            | SO |

| 17. Location FT LAUDERDALE-HOLLYW  FT LAUDERDALE  FL  Sec Cat 1 |
| FT LAUDERDALE |
| Airport ID FLL |


PLAINTIFF'S EXHIBIT 39

2

EIR 00SO170009

## SECTION B - SUMMARY OF FACTS

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ on Tuesday, August 17, 1999, during the hours of
2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time), B-727,
N397AJ operated as Amerijet flight 827, a Supplemental Air Carrier operating
under FAR Part 121, departed the Fort Lauderdale-Hollywood International Airport
Runway 9 Left with Standing Water Less than one quarter (1/4) of an inch on the
runway. (IOP 1, page 3; IOP 3, pp. 5 -10; IOP 4 - 5.)

The flight was operated without adjusting the maximum takeoff weight to that
required by the Airplane Performance Manual, contrary to the Airplane Operating
Manual. The aircraft weight and V1 degredations required for this flight, as the
aircraft was configured, for runways with standing water of less than one quarter
inch were 17,000 pounds and 28 knots. (IOP 3, pp. 5 - 10; IOP 6 - 12.)

The aircraft was taken off at a weight 17,000 pounds greater than allowed and at
an indicated V1 airspeed 28 knots faster than allowed for conditions thus
degrading the performance capability. (IOP 6 and 12.)

By virtue of the above, the flight was further operated▓▓▓▓▓▓▓▓▓▓▓▓▓
"in a careless or reckless manner so as to endanger the life or property of
another".

3

EIR 00SO170009

SECTION C - ITEMS OF PROOF

| IOP | #PAGES | DESCRIPTION |
|-----|--------|-------------|
| 1 | 3 | VIS PERSONNEL LIST AND OPERATOR INFORMATION |
| 2 | 4 | COPIES OF PERTINENT FAR PARTS 1, 121 AND 91 |
| 3 | 10 | LETTER OF COMPLAINT FROM PATRICK S. MAJOR |
| 4 | 2 | REQUEST FOR ATC TAPE FROM FLL ATCT AND TAPE |
| 5 | 2 | TYPED TRANSCRIPT OF ATCT TAPE |
| 6 | 3 | PAGES - AOM, NAVTECH, PERFORMANCE MANUAL |
| 7 | 4 | PERFORMANCE MANUAL PAGES |
| 8 | 2 | PAGES FROM WEIGHT AND BALANCE MANUAL |
| 9 | 1 | AIRCRAFT LOG BOOK MAINTENANCE LOG PAGE |
| 10 | 1 | AMERIJET FLIGHT RELEASE |
| 11 | 1 | WEATHER SHEET |
| 12 | 1 | B-727-200C LOAD PLAN/WEIGHT AND BALANCE |
| 13 | 2 | CERTIFIED LOI SENT TO PRESIDENT DAVID G. BASSETT |
| 14 | 2 | LOI SENT TO DAVID G. BASSETT VIA REGULAR MAIL |
| 15 | 5 | AMERIJET VIOLATION HISTORY |

```
+----------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report      Air Operator Directory Information |
| Air Operator: PCSA      AMERIJET INTERNATIONAL INC                    |
|                                                                        |
| Title:    Main Maint Location    MML    AMERIJET INTERNATIONAL INCORPORA |
| Name:                                   498 SW 34TH STREET            |
| VIS Title:                                                            |
| Phone:    -    -    Ext    FTS    -     FORT LAUDERDALE    FL 33315   |
+----------------------------------------------------------------------+
| Title:                           DOS    AMERIJET INTERNATIONAL INCORPORA |
| Name:    BASSETT, DAVID G.             498 S.W. 34TH STREET           |
| VIS Title: PRESIDENT/GENERAL MANAGER/DIRE                              |
| Phone: 954-359-7670 Ext    FTS    -     FORT LAUDERDALE    FL 33315   |
+----------------------------------------------------------------------+
| Title:    General Manager        MGR                                  |
| Name:    BASSETT, DAVID G.                                            |
| VIS Title: PRESIDENT/GENERAL MANAGER                                  |
| Phone: 954-359-0077 Ext    FTS    -                                   |
+----------------------------------------------------------------------+
```

1 OF 3

**I.O.P.# 1**

```
+----------------------------------------------------------+------------------------------------------+
| Title:                               DOS                  | AMERIJET INTERNATIONAL INCORPORA         |
| Name:     BASSETT, DAVID G.                               | 498 SW 34TH STREET                       |
| VIS Title: GENERAL MANAGER/SAFETY OFFICER                 |                                          |
| Phone: 954-359-0077 Ext       FTS    -                    | FORT LAUDERDALE      FL 33315            |
+----------------------------------------------------------+------------------------------------------+
| Title:     Director of Oper      DOP                                                                 |
| Name:      STEELE, PETER A.                                                                          |
| VIS Title: VICE PRESIDENT OF OPERATIONS                                                              |
| Phone: 954-359-0077 Ext 777  FTS    -                                                                |
+------------------------------------------------------------------------------------------------------+
| Title:     Dir of Maintenance    DMT                                                                 |
| Name:      VENUTO, JOSEPH                                                                            |
| VIS Title: DIRECTOR OF MAINTENANCE                                                                   |
| Phone: 954-359-0077 Ext      FTS    -                                                                |
+------------------------------------------------------------------------------------------------------+
| Title:     Dir of Maintenance    DMT                                                                 |
| Name:      SCHUMACHER, IRVING F.                                                                     |
| VIS Title: VICE PRESIDENT OF MAINTENANCE                                                             |
| Phone: 954-359-0077 Ext      FTS    -                                                                |
+------------------------------------------------------------------------------------------------------+
```

2 OF 3

I.O.P. # 1

```
ISIS Air Operator (VIS) Report Air Operator Aircraft Inventory Info
Air Operator: PCSA      AMERIJET INTERNATIONAL INC
                        Max.  Max.  Flt.   129  |------- FAR 135 -------|
                        Pass. Pass. Att.   Mnt.                      Com-
AIC            Qty  FAR Demo. Appr. Number Pgm. Class Turb. VFR Day muter
===            ===  === ===== ===== ====== === ===== ==== === === =====
B-727-200      10`  121
```

3 OF 3

I.O.P. # 1

"Medical certificate" means acceptable evidence of physical fitness on a form prescribed by the Administrator.

"Military operations area" (MOA) means an airspace that is established outside Class A airspace to separate or segregate certain nonhazardous military activities from IFR Traffic and to identify for VFR traffic where these activities are conducted.

"Minimum descent altitude" means the lowest altitude, expressed in feet above mean sea level, to which descent is authorized on final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure, where no electronic glide slope is provided.

"Minor alteration" means an alteration other than a major alteration.

"Minor repair" means a repair other than a major repair.

"Navigable airspace" means airspace at and above the minimum flight altitudes prescribed by or under this chapter, including airspace needed for safe takeoff and landing.

"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time.

"Nonprecision approach procedure" means a standard instrument approach procedure in which no electronic glide slope is provided.

"Operate," with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in §91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).

"Operational control," with respect to a flight, means the exercise of authority over initiating, conducting, or terminating a flight.

"Overseas air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct of furtherance of a business or vocation, in commerce between a place in any State of the United States, or the District of Columbia, and any place in a territory or possession of the United States; or between a place in a territory or possession of the United States, and a place in any other territory or possession of the United States.

"Overseas air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce —
(1) Between a place in a State or the District of Columbia and a place in a possession of the United States; or
(2) Between a place in a possession of the United States and a place in another possession of the United States;

whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Over-the-top" means above the layer of clouds or other obscuring phenomena forming the ceiling.

"Parachute" means a device used or intended to be used to retard the fall of a body or object through the air.

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

"Pilotage" means navigation by visual reference to landmarks.

"Pilot in command" means the person who:
(1) Has final authority and responsibility for the operation and safety of the flight;
(2) Has been designated as pilot in command before or during the flight; and
(3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight.

"Pitch setting" means the propeller blade setting as determined by the blade angle measured in a manner, and at a radius, specified by the instruction manual for the propeller.

"Positive control" means control of all air traffic, within designated airspace, by air traffic control.

"Powered-lift" means a heavier-than-air aircraft capable of vertical takeoff, vertical landing, and low speed flight that depends principally on engine-driven lift devices or engine thrust for lift during these flight regimes and on nonrotating airfoil(s) for lift during horizontal flight.

"Precision approach procedure" means a standard instrument approach procedure in which an electronic glide slope is provided, such as ILS and PAR.

1 OF 4

I.O.P. # 2

Ⓐ *Amend #47 eff 8-4-97*

© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED.

## SUBPART T — FLIGHT OPERATIONS

### 121.531 APPLICABILITY

This subpart prescribes requirements for flight operations applicable to all certificate holders, except where otherwise specified.

### 121.533 RESPONSIBILITY FOR OPERATIONAL CONTROL: DOMESTIC OPERATIONS

(a) Each certificate holder conducting domestic operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
(1) Monitoring the progress of each flight;
(2) Issuing necessary information for the safety of the flight; and
(3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

### 121.535 RESPONSIBILITY FOR OPERATIONAL CONTROL: FLAG OPERATIONS

(a) Each certificate holder conducting flag operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
(1) Monitoring the progress of each flight;
(2) Issuing necessary instructions and information for the safety of the flight; and
(3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(f) No pilot may operate an aircraft in a careless or reckless manner so as to endanger life or property.

### 121.537 RESPONSIBILITY FOR OPERATIONAL CONTROL: SUPPLEMENTAL OPERATIONS

(a) Each certificate holder conducting supplemental operations —
(1) Is responsible for operational control; and
(2) Shall list each person authorized by it to exercise operational control in its operator's manual.

(b) The pilot in command and the director of operations are jointly responsible for the initiation, continuation, diversion, and termination of a flight in compliance with this chapter and the operations specifications. The director of operations may delegate the functions for the initiation, continuation, diversion, and termination of a flight but he may not delegate the responsibility for those functions.

(c) The director of operations is responsible for canceling, diverting, or delaying a flight if in his opinion or the opinion of the pilot in command the flight cannot operate or continue to operate safely as planned or released. The director of operations is responsible for assuring that each flight is monitored with respect to at least the following:
(1) Departure of the flight from the place of origin and arrival at the place of destination, including intermediate stops and any diversions therefrom.
(2) Maintenance and mechanical delays encountered at places of origin and destination and intermediate stops.
(3) Any known conditions that may adversely affect the safety of flight.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and aircraft. The pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(e) Each pilot in command of an aircraft is responsible for the preflight planning and the operation of the flight in compliance with this chapter and the operations specifications.

**I.O.P. # 2**

**2 OF 4**

© JEPPESEN SANDERSON, INC., 1996. ALL RIGHTS RESERVED.

## SUBPART G — ADDITIONAL EQUIPMENT AND OPERATING REQUIREMENTS
### FOR LARGE AND TRANSPORT CATEGORY AIRCRAFT

**91.601    APPLICABILITY**

This subpart applies to operation of large and transport category U.S.-registered civil aircraft.

**91.603    AURAL SPEED WARNING DEVICE**

No person may operate a transport category airplane in air commerce unless that airplane is equipped with an aural speed warning device that complies with §25.1303 (c)(1).

**91.605    TRANSPORT CATEGORY CIVIL AIRPLANE WEIGHT LIMITATIONS**

(a) No person may take off any transport category airplane (other than a turbine-engine-powered airplane certificated after September 30, 1958) unless —
  (1) The takeoff weight does not exceed the authorized maximum takeoff weight for the elevation of the airport of takeoff;
  (2) The elevation of the airport of takeoff is within the altitude range for which maximum takeoff weights have been determined;
  (3) Normal consumption of fuel and oil in flight to the airport of intended landing will leave a weight on arrival not in excess of the authorized maximum landing weight for the elevation of that airport; and
  (4) The elevations of the airport of intended landing and of all specified alternate airports are within the altitude range for which maximum landing weights have been determined.
(b) No person may operate a turbine-engine-powered transport category airplane certificated after September 30, 1958, contrary to the Airplane Flight Manual, or take off that airplane unless —
  (1) The takeoff weight does not exceed the takeoff weight specified in the Airplane Flight Manual for the elevation of the airport and for the ambient temperature existing at the time of takeoff;
  (2) Normal consumption of fuel and oil in flight to the airport of intended landing and to the alternate airports will leave a weight on arrival not in excess of the landing weight specified in the Airplane Flight Manual for the elevation of each of the airports involved and for the ambient temperatures expected at the time of landing;
  (3) The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet). Wet runway distances associated with grooved or porous friction course runways, if provided in the Airplane Flight Manual, may be used only for runways that are grooved or treated with a porous friction course (PFC) overlay, and that the operator determines are designed, constructed, and maintained in a manner acceptable to the Administrator.
  (4) Where the takeoff distance includes a clearway, the clearway distance is not greater than one-half of —
    (i) The takeoff run, in the case of airplanes certificated after September 30, 1958, and before August 30, 1959; or
    (ii) The runway length, in the case of airplanes certificated after August 29, 1959.
(c) No person may take off a turbine-engine-powered transport category airplane certificated after August 29, 1959, unless, in addition to the requirements of paragraph (b) of this section —
  (1) The accelerate-stop distance is no greater than the length of the runway plus the length of the stopway (if present); and
  (2) The takeoff distance is no greater than the length of the runway plus the length of the clearway (if present); and
  (3) The takeoff run is no greater than the length of the runway.

**I.O.P. # 2**

**3 OF 4**

© JEPPESEN SANDERSON, INC., 1990, 1998. ALL RIGHTS RESERVED.

(d) Any person taking off or landing a helicopter certificated under *part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting height-speed envelope established for that helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

## 91.11  PROHIBITION AGAINST INTERFERENCE WITH CREWMEMBERS

No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

## 91.13  CARELESS OR RECKLESS OPERATION

(a) *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

(b) *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

## 91.15  DROPPING OBJECTS

No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property. However, this section does not prohibit the dropping of any object if reasonable precautions are taken to avoid injury or damage to persons or property.

## 91.17  ALCOHOL OR DRUGS

(a) No person may act or attempt to act as a crewmember of a civil aircraft —
   (1) Within 8 hours after the consumption of any alcoholic beverage;
   (2) While under the influence of alcohol;
   (3) While using any drug that affects the person's faculties in any way contrary to safety; or
   (4) While having .04 percent by weight or more alcohol in the blood.

(b) Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.

(c) A crewmember shall do the following:
   (1) On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when —
      (i) The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
      (ii) The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.
   (2) Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates percentage by weight of alcohol in the blood.

4 OF 4

I.O.P. # 2

*(Not published herein — Ed.)

© JEPPESEN SANDERSON, INC., 1990. ALL RIGHTS RESERVED.



Hand Delivered

John E. Tarborough
Principal Reachel Impacts
FAA, 5300-13
1050 Lee Wagener Blvd Suite 204
Ft. Lauderdale, FL 33315

RECEIVED BY
OCT 4 1992
FEDERAL AVIATION ADMINISTRATION
FSDO
FT. LAUDERDALE

1 OF 10

Patrick & Beth Major

I.O.P. # 3



**Patrick Major**

John C. Roseborough
Principal Operations Inspector
Federal Aviation Administration
Flight Standards district Office - 17
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315
Voice: (954) 356-7523, Extension 154
Fax    (954) 356-7531

10-01-99

Dear John,

Following is the text of three memo's and letters regarding Amerijet Flight 827, 08-17-99, which you and I discussed, Thursday, September 16th.

I reported the incident to the director of operations and chief pilot as required by Amerijet's GOM, recommending the safety officer be notified as well, then sent a report to NASA's ASRS (Aviation Safety Reporting System). Amerijet's GOM further requires that its POI be notified: Thirty days after the incident, you told me it had yet to be reported by anyone other than me.

John, the termination of my employment is a classic whistle blower scenario; the only event between my being an employee in good standing and being fired because Amerijet had, "...lost confidence in my abilities as an airman..." is the complaint regarding a takeoff 15,000Lbs over the maximum performance limit for conditions at the field. That is the subject of a complaint to the DOT Inspector's General's Office. But, I am most concerned that if Amerijet does not immediately change its policies regarding takeoff from wet runways, someone is going to get hurt. The question is, will the FAA take action before that happens, or wait until newspaper headlines, carnage, catastrophe and public outrage leave it no other choice.

If I can be of further assistance, do not hesitate to contact me. The cellular phone is the best way to reach me.

Warmest Regards,

Patrick Major

Z OF 10



**I.O.P. #3**



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP, 08-17-99.

Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

Warmest Regards,

Pat

3 OF 10



**I.O.P. #3**



**Patrick Major**

**FAX**
The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.


**FAX To:** David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
**Date:** 08-25-99
**Subject:** NASA ASRS Report


Greetings Dave,

Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence you would ever see it if I did not submit it to you directly.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, accept my apologies.

Warmest Regards,

Pat


$4$ OF $10$



**I.O.P. #$3$**



Cpy for. Qlu Roxborough,    **Patrick Major**
Poi, FAA, FSDO-17

### NASA, Aviation Safety Reporting System
### (ASRS report)

Report Date: 08-18-1999, Incident Date: 08-17-99    ←——
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs.,
Ratings: Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, FAR Part 142 Certified Pilot and Flight
Engineer Instructor/Boeing 727.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors: Thunderstorms in vicinity, rainshowers overhead, contaminated runway,
conditions ripe for windshear.


### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening. When I arrived, the
field was under heavy rainshowers. Anticipating a max-weight performance-limited takeoff
on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the Navtech runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff controversy
which took place June 08, 1999, out of MIA. On that rainy morning, a Continental 727 had
taxied into position and hold RW-12, then declined takeoff clearance... requesting full length
9L, instead. The night before it had rained ten inches. It was raining at the time. While
Tower had not provided a runway condition report, the runways were obviously wet. Amerijet
flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without
prompting from the captain, I declined, reminding Tower that our flight required full-length 9L.
The captain chastised me for refusing RW-12 against his wishes (even though we had just
finished discussing that the runway analysis did not support it, even on a dry day, even if we
believed the weights reported by ramp personnel). The captain insisted I radio-back Tower
and accept RW-12. I demurred. After a brief discussion, AJT 823 finally departed full-length
9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300'
longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.



5 OF 10

**I.O.P. #3**

However, my refusal to accept RW-12 became the subject of a disciplinary complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation against me for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. 9L FLL is 355 feet shorter than 12 in MIA. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), regardless how wet a runway, Amerijet flight crews are taught by the training department and warned by dispatch personnel to consider all runways "Dry" for performance planning purposes unless there exists a contamination report containing the specific words, "Standing Water." Though there are frequent storms in the area, rarely are contamination reports conducted at South Florida Airports. Most airlines encourage their crews to simply accept the "Standing Water less than 1/4"" penalty...reasoning that the penalty applies to depths as shallow as 1/8"... and is clearly the safest option. Some Boeing performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot max-weight V1 speed reduction for runways that are, "...well-soaked with water but do not have large areas of actual standing water." But absent a contamination report specifically including the term "Standing Water", Amerijet considers all runways dry. Considering drag induced as aircraft tires displace water on the runway surface, additional drag produced by water spraying against the fuselage and wings, as well as reduced braking implications, that policy could be a recipe for disaster. As of August 17, 1999, these concerns had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 355' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they had been June 08. Even so, the dispatcher I queried reported to me that to his understanding Amerijet performance policies do not observe weight penalties unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers imply a braking degradation and an impediment to acceleration when runway surfaces are wet ... irrespective of whether or not the runway contains "Standing water." "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights," I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' actually reported on the runway, it's dry."

6 OF 10

**I.O.P. # 3**

As aircraft 397AJ was loaded for departure, I explained my question to the check airman who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safest solution and accept the "Standing Water ≤ 1/4" weight and V1 penalty. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain jokingly dismissed my concern, "We'll have to takeoff between the water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.    He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available."    The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower".    Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us ... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway surface.    The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst adjacent the channels of accumulated rubber left by successive landing and departing aircraft.    No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a packs-off takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect it.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch. AJT 827 is cleared for takeoff, turn right heading one zero zero." As Tower began its transmission, the captain advanced the throttles and released the brakes. Probably because the aircraft was already rolling, tower issued the takeoff clearance without pause or delay. Before I could even begin to reply to the report and clearance, the aircraft was accelerating down the runway.    Previously, I thought I would have a chance to prevent

the takeoff when the controller inevitably asked, "AJT 827, state your intentions." He did not. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. Perhaps, I should have. I feared an aborted takeoff on a wet runway with the captain and I fighting over the controls could have been just as dangerous. If all three engines operated normally, if no windshear was encountered, perhaps the takeoff would be safer than a mutiny-abort on a wet runway in driving rain. AJT 827 used all available runway. The captain rotated well inside the $\leftarrow$ alternating red and white lights at an indicated airspeed five knots below V1. The main wheels broke ground at the last possible instant and the aircraft crossed the airport boundary at approximately 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts. I called-out the fluctuations then held my breath, praying for altitude.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation." (referring to the GPS installed in the aircraft, but not approved in the ops specs).

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits of Class II navigation described in the Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked. "Do you realize how incongruent that sounds coming from a check airman who just goaded a flight crew into taking off from a contaminated runway into possible windshear fifteen thousand pounds over the maximum performance limit? Even if I am wrong about navigating direct, ...and I don't think I am, one could get us violated, the other will get us killed. What is safe about that?"

AJT flight 827 exceeded aircraft limitations and violated FAA regulations in flagrant disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway weighing fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the consequences inevitably bestowed upon any air carrier which actively cultivates a culture of noncompliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on

8 OF 10    **I.O.P. #** 3

runways that are obviously contaminated, but have not been officially described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning policies, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the official report.

Among my many mistakes August 17, was letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Although it should not have been necessary, due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the 'sacred cow' brother of its vice president, director of operations, and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Admittedly, that was the captain's job, but had I insisted on such a plan before the aircraft taxied out of the ramp for takeoff, I may have avoided the circumstances which placed me and the rest of the crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff once such a report was issued. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...as well as the strident actions required to prevent takeoff once initiated. But with the aircraft already rolling, Tower probably figured he had his answer.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the check airman and captain prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Would that have worked? Honestly, that did not occur to me until later. I made a judgment call and elected not to intervene once the takeoff roll began. Not a day passes that I don't relive the possible consequences of my choice.

Contributing factors included my deference to authority in the cockpit, not only with regard to the presence of a check airman who I held in high regard, and that particular captain (most other captains would not have been out there to start with), but pertaining to the recency of

what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and ongoing concern for flight safety and regulatory compliance at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way, impervious to the legitimacy of their concerns, by denying them promotional and professional opportunities, abusing them in the simulator if need be, terminating their employment and exploiting the PRIA (Pilot Records Improvement Act, 1996) to soil their careers... while sending an unmistakably clear message to other flight crew lest they, too, consider showing unwelcome interest in flight safety.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

COPY for John Roseborough
POI, FAA, FSDO - 17

10-01-95

10 OF 10

I.O.P. # 3




**Memorandum**

U.S. Department
· of Transportation
**Federal Aviation**
**Administration**

Ft. Lauderdale International ATC Tower
4150 S.W. 12 Terrace
Ft. Lauderdale, Fl. 33315

Subject **INFORMATION:** Tape Request

Date: October 25, 1999

From: Manager

Reply To
Attn. of: FLL-2

Ft. Lauderdale Int'l ATC Tower

To: Manager, Ft Lauderdale FSDO-17

Per telephone request of October 22, 1999, the following tape recording is enclosed.

Ft. Lauderdale ATC Tower
August 17, 1999 UTC
Ground Control 2340 UTC-0000 UTC
Local Control North 2340 UTC – 0000 UTC

Please advise if we can be of any further assistance.

Ronald S. Boyd

1 OF 2
**I.O.P. # 4**



4

FORT LAUDERDALE INTERNATIONAL AIR TRAFFIC CONTROL TOWER
CERTIFIED RE-RECORDING OF AMERIJET (PCSA) FLIGHT 827 OCCURRING
AUGUST 17, 1999 DURING THE TIME PERIOD FROM 2340 UTC - 0000 UTC
(1940 - 2000 LOCAL DAYLIGHT SAVINGS TIME).

THE RE-RECORDING WAS PREPARED BY MICHAEL T. JONES, SUPPORT
SPECIALIST AT THE FORT LAUDERDALE-HOLLYWOOD AIR TRAFFIC
CONTROL TOWER.

THE COUNTER NUMBERS BELOW REPRESENT EITHER AMERIJET OR
FORT LAUDERDALE ATC VOICE COMMUNICATIONS AS PERTAIN TO AMJ
FLIGHT 827. MOST OTHER VOICE COMMUNICATIONS HAVE NOT BEEN
IDENTIFIED WITH COUNTER NUMBERS. DUE TO THE EXTRANEOUS NOISE
EMITTED IN THE SIDETONE OF THE RE-RECORDING, A CLEARER VOICE
TRANSMISSION/RENDITION CAN BE HEARD WHEN PLAYED ON A STEREO
RECORDER/PLAYER WITH THE VOLUME ON ONE SIDE TURNED LOWER.

| COUNTER (APPROX.) | DIALOGUE | BY |
|---|---|---|
| 129 | DELAY AHEAD? | AMJ |
| 138 | RWY CONDITION WET, NO REPORTS | ATC |
| 146 | WE'RE GONNA NEED A STANDING WATER REPORT | ATC |
| 168 | AMJ 827 REQUESTS TAXI | AMJ |
| 171 | AMJ 827 HOLD SHORT OF TAXIWAY BRAVO, STAND BY | ATC |
| 183 | RAMP 1 CALLS FLL ATCT | |
| 194 | AMJ 827 CALLS ASKING FOR THE CURRENT WINDS | AMJ |
| 198 | AMJ 827, WILL YOU BE ABLE TO DEPART | ATC |
| 203 | AMJ 827, TAXI TO RUNWAY 9 LEFT | ATC |
| 239 | RAMP ONE CALLS | |
| 241 | PROCEED | ATC |
| 243 | AJT IS ASKED IF THEY CAN ACCEPT DEPARTURE | ATC |
| 276 | RAMP ONE CALLS | |

279    RAMP ONE ADVISES LESS THAN ¼ INCH, GOOD DRAINAGE,
SLIGHT STANDING WATER ABOUT 6 FEET ON EITHER SIDE OF
CENTERLINE

| 349 | CONVECTIVE SIGMET 51E AVAILABLE | ATC |

I.O.P. # 5
1 OF 2

5

433   LOCAL CONTROL, NORTH POSITION COMMUNICATIONS
BEGIN

464   DELTA 312 HEAVY (LOCKHEED L-1011, TRISTAR)
466   DELTA 312, CLEARED FOR TAKEOFF                    ATC

512   US AIR 2335 CALLS TO INQUIRE ABOUT WHAT WEATHER ATC
SHOWS WITHIN 15 MILES OF FLL. ATC ADVISES THAT MAIN BODY
OF STORM WILL BE AVOIDED WITH A 110 DEGREE HEADING AFTER
TAKEOFF (20 DEGREES RIGHT OF TAKEOFF HEADING)

584   AMJ827 CALLS                                     AMJ
585   AMJ 827, ARE YOU READY FOR DEPARTURE             ATC

586   YES SIR, 827, YOU'LL PASS ON THAT RUNWAY REPORT
WHEN YOU GET IT, RIGHT?                               AMJ

587   YES, HE'S OUT THERE INSPECTING IT RIGHT NOW      ATC

589   AMJ 827, GO OUT B2 AND BACK TAXI INTO POSITION AND
HOLD                                                  ATC

607   AMJ 827, HE REPORTS THERE'S SOME STANDING WATER
LESS THAN A QUARTER ON AN INCH                        ATC

609   SOME STANDING WATER LESS THAN A QUARTER OF AN
INCH, AMJ 827 READY FOR TAKEOFF                       AMJ

610   AMJ 827 RUNWAY 9 LEFT CLEARED FOR TAKEOFF, TURN
RIGHT HEADING 110                                     ATC

611   RIGHT HEADING 110, CLEARED FOR TAKEOFF, AMJ 827,
THANK YOU MUCH.                                       AMJ

832   CHANGE YOUR CODE TO 1153                         ATC
833   1123, 827                                        AMJ

      THANK YOU, CONTACT MIAMI DEPARTURE               ATC



I.O.P. # 5
2 OF 2

ADVERSE WEATHER TAKEOFF AND CLIMB - Reference 4:1:55

Takeoff Limitations

Takeoff should not be attempted if the following limitations are exceeded:

- Dry snow more than 6 inches deep.

- Slush or wet snow more than 1/2 inch deep.

- Water more than 1/4 inch deep.

When values less than the aforementioned limits exist, check Performance Manual
for appropriate reductions to maximum takeoff gross weight.

   CAUTION:  DURING TAKEOFF, SNOW AND SLUSH PICKED UP BETWEEN THE NOSE-
             WHEEL TIRES MAY BE THROWN BACK AND PACKED INTO THE RAM AIR
             INLET, CAUSING BOTH AIR CONDITIONING PACKS TO TRIP OFF.  TO
             REDUCE THE POSSIBILITY OF THIS OCCURRING, THE RAM AIR DOORS
             MAY BE POSITIONED TO THE FULL CLOSED POSITIONS JUST PRIOR TO
             TAKEOFF.

Airplane Control

Exercise extreme caution in crosswinds.  Normally, it is recommended that a
runway more into the wind be requested when crosswind components over 15 kts are
reported on known slippery runways.

   CAUTION:  ENSURE THAT PARKING BRAKE IS RELEASED BEFORE STARTING
             TAKEOFF ROLL ON ICE OR SNOW COVERED RUNWAYS.

Setting Takeoff Thrust

Align the airplane with the runway before increasing thrust.  If engine anti-ice
is being used for takeoff, ensure that engine thrust is increased to the highest
practicable setting (80% N1 recommended) for 10 to 15 seconds before setting
takeoff thrust.  Observe stable engine operation before brake release.

Engine inlet ice can affect EPR indications.  When takeoff thrust is set in
icing conditions, crosscheck all engine instruments.  Ensure that the indica-
tions are reasonable and that no engine limits are exceeded.  Specifically,
compare the N1 readings with the anticipated value and be prepared to reject the
takeoff if a discrepancy exists between the EPR and N1 readings.

If the airplane starts to slide on ice or snow, release the brakes and begin the
takeoff roll, but ensure that the instrument crosscheck is accomplished,
including the comparison of the EPR and N1 readings.  Apply firm nosedown
elevator pressure to aid nose wheel steering effectiveness.  Don't allow the lag
in nose wheel steering effectiveness to cause over-controlling on slippery
surfaces.

**I.O.P. # 6**



NAVTECH

The Runway Analysis provides data for takeoff and landing performance in adverse weather conditions for the B727-200 powered by JT8D-15/17 engines. Data are presented for operations on wet, standing water and snow covered runways in accordance with the guidelines and recommendations of FAA.

**WET RUNWAY** – A runway is considered wet when it is well soaked but without significant areas of standing water (depth less than 1/8 inch or 3mm of standing water). A runway is considered to be well soaked when there is sufficient moisture on the runway surface to cause it to appear reflective.

**RUNWAY CONTAMINATED BY STANDING WATER, SLUSH OR SNOW** – A runway is considered contaminated when at least 25% of the runway within the required length and width being used is covered by slush, standing water or snow greater than 3mm of equivalent water depth.

> • *Additional consideration: If the contaminates are lying on that portion of the runway where the high speed part of the takeoff roll will occur, it MAY BE appropriate to consider the runway contaminated.*

Daniel Liu

Aircraft Performance Engineer
Navtech Systems Support Inc.

**I.O.P. # 6**

**Navtech Systems Support Inc.**
175 Columbia Street West, Suite 102     Waterloo, Ontario, Canada, N2L 5Z5     Phone (519) 747-1170     Fax (519) 747-1827

SITA - YYZNSCR   AFTN - CYYZXNSX   ARINC - YKFNSCR

2 OF 3

**AMERIJET INTERNATIONAL**     **FORT LAUDERDALE, FL**

**B-727-200    JT8D-15**     **HOLLYWOOD INTL**

**KFLL     09L**     **FLAPS   20**

| TEMP F | C | ZERO WIND | CLIMB LIMIT | A/C OFF (+) | POD MAX EPR | N1% GO FOR T/O ARND EPR | | ENG ANTI-ICE ZERO WIND | CLIMB LIMIT | A/C OFF (+) |
|---|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2000 C | 1980 | 0 C | 2.09 | 90 | 2.07 | 1975 | 1957 | 0 |
| 0 | -18 | 2000 C | 1980 | 0 C | 2.09 | 91 | 2.07 | 1983 | 1957 | 0 |
| 10 | -12 | 2000 C | 1980 | 0 C | 2.09 | 92 | 2.07 | 1983 | 1957 | 0 |
| 20 | -7 | 2000 C | 1980 | 0 C | 2.09 | 93 | 2.07 | 1983 | 1957 | 0 |
| 30 | -1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 32 | 0 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 34 | 1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 36 | 2 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 38 | 3 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 40 | 4 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 42 | 6 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 44 | 7 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 46 | 8 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 48 | 9 | 1999 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1982 | 1957 | 0 |
| 50 | 10 | 1996 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1979 | 1957 | 0 |
| 52 | 11 | 1993 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 54 | 12 | 1990 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 56 | 13 | 1987 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 58 | 14 | 1984 C | 1980 | 0 C | 2.09 | 97 | 2.07 | | | |
| 60 | 16 | 1979 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 62 | 17 | 1975 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 64 | 18 | 1971 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 66 | 19 | 1967 R | 1969 | 2 R | 2.09 | 97 | 2.07 | | | |
| 68 | 20 | 1963 R | 1969 | 6 R | 2.09 | 98 | 2.07 | | | |
| 70 | 21 | 1961 R | 1969 | 8 R | 2.09 | 98 | 2.07 | | | |
| 72 | 22 | 1960 R | 1969 | 9 R | 2.09 | 98 | 2.07 | | | |
| 74 | 23 | 1958 R | 1969 | 11 R | 2.09 | 98 | 2.07 | | | |
| 76 | 24 | 1956 R | 1969 | 13 R | 2.09 | 98 | 2.07 | | | |
| 78 | 26 | 1952 R | 1969 | 14 R | 2.09 | 98 | 2.07 | | | |
| 80 | 27 | 1949 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 82 | 28 | 1946 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 84 | 29 | 1942 R | 1970 | 15 R | 2.09 | 99 | 2.07 | | | |
| 86 | 30 | 1928 R | 1951 | 15 R | 2.08 | 99 | 2.07 | | | |
| 88 | 31 | 1917 R | 1936 | 14 R | 2.07 | 99 | 2.07 | | | |
| 90 | 32 | 1906 R | 1921 | 13 R | 2.06 | 99 | 2.07 | | | |
| 92 | 33 | 1895 R | 1906 | 11 R | 2.05 | 98 | 2.06 | | | |
| 94 | 34 | 1884 R | 1891 | 7 R | 2.04 | 98 | 2.05 | | | |
| 96 | 36 | 1861 R | 1861 | 0 R | 2.02 | 98 | 2.04 | | | |
| 98 | 37 | 1849 C | 1847 | 0 C | 2.01 | 98 | 2.03 | | | |
| 100 | 38 | 1837 C | 1832 | 0 C | 2.02 | 98 | 2.02 | | | |
| 102 | 39 | 1826 C | 1818 | 0 C | 2.00 | 97 | 2.01 | | | |
| 104 | 40 | 1814 C | 1803 | 0 C | 1.99 | 97 | 2.00 | | | |
| 106 | 41 | 1803 C | 1789 | 0 C | 1.98 | 97 | 1.99 | | | |
| 108 | 42 | 1792 C | 1774 | 0 C | 1.97 | 97 | 1.98 | | | |
| 110 | 43 | 1781 C | 1759 | 0 C | 1.96 | 97 | 1.96 | | | |
| 112 | 44 | 1770 C | 1744 | 0 C | 1.95 | 97 | 1.95 | | | |
| 114 | 46 | 1748 C | 1715 | 0 C | 1.93 | 96 | 1.94 | | | |
| 116 | 47 | 1736 C | 1701 | 0 C | 1.92 | 96 | 1.93 | | | |
| 118 | 48 | 1724 C | 1687 | 0 C | 1.92 | 96 | 1.92 | | | |
| 120 | 49 | 1712 C | 1672 | 0 C | 1.91 | 96 | 1.91 | | | |

| | | |
|---|---|---|
| PACKS | ON | TORA = 9000 |
| NOSE BRKS | OFF | TODA = 9000 |
| 210 MPH TIRE | | ASDA = 9000 |
| ELEV = | 11 | GRAD = -.01% |

----NOTES----

1. CTR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.03    +.01
   ICE ON    NONE    -.02

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON    +.04

3. FLAP RETRACT HT (OCH)
   = 811 FTMSL

4. OBST: HT(FT AGL)    DIST(NM)
   50    1.81

DATE: 12/09/92

**GROSS WEIGHT CORRECTIONS**

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
1 DEGREE F HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    0 LBS/KT EFF HEAD W
SUB FROM ZERO WIND    1301 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
*WIND    *RUNWAY SHORTENING    *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
*MEL PERFORMANCE DECREMENTS

**RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS**

| | STANDING WATER SLUSH OR WET SNOW -IN- | REDUCE ZERO WIND W BY: -LBS- | REDUCE V1 SPEED BY: -KNOTS- |
|---|---|---|---|
| DRY SNOW | < 1/4 | 17000 | 28 |
| | 3 1/2 TO 6   1/4 TO 1/2 | 30000 | 25 |
| | ICE | 17000 | 28 |
| | ANTI-SKID INOP | 8500 | 18 |

* = CHECK MAX STRUCTURAL WT

## LANDING DATA

PACKS ON

| LNDG FLAP | LENGTH | ANTI SKID | DRY MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | WET MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | APT CRIT TEMP | SUB LB/F ABOVE CRIT TEMP | MAX OPER TEMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 143 | 0 | 120 |

3 OF 3     **I.O.P. # 6**

NAVTECH SYSTEMS

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

## REDUCED EPR

Reduced takeoff thrust is the takeoff EPR computed using an assumed temperature.  Assumed temperature is the HIGHEST TEMPERATURE on the Runway Analysis Chart that a take-off could be made at the ACTUAL Gross take-off weight of the aircraft.  It will not be lower than maximum climb EPR.

Maximum takeoff thrust is the takeoff EPR computed using the airport temperature and pressure altitude.

Use reduced takeoff thrust whenever practicable to reduce turbine inlet temperature and engine EGT during takeoff.

DO NOT USE reduced takeoff thrust for any of the following conditions:

When takeoff runway has standing water, ice, slush, or snow;

When headwind adjustment has been used to increase allowable takeoff weight;

When takeoff is to be made with a tailwind;

When main gear antiskid is inoperative;

When anti-ice is on;

When airport temperature is below +6°F (-14°C);

When mixed engines are installed;

When wind shear is reported or expected;

When conducting a two engine ferry;

When deicing fluid has been used.



FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

| | |
|---|---|
| Chapter: | 11:2:0 |
| Page: | 8a |
| Issued: | 03/19/99 |
| Revision: | 6 |

REDUCED TAKEOFF THRUST EXAMPLE

**AMERIJET INTERNATIONAL     FORT LAUDERDALE, FL**

**B-727-200   JT8D-15      HOLLYWOOD INTL**

**KFLL     09L          FLAPS  15**

| PACKS | ON | TORA = | 9001 |
|---|---|---|---|
| NOSE BRKS | OFF | TODA = | 9001 |
| 210 MPH TIRE | | ASDA = | 9001 |
| ELEV = | 11 | GRAD = | -.01% |

NOTES

1. CTR ENG EPR: MOD-A   NON-MOD
   ICE OFF      +.04      +.03
   ICE ON       +.01      NONE

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON  ICE OFF/ON   NONE
   PACKS OFF ICE OFF/ON   +.04

3. FLAP RETRACT HT(OCH)
      = 811 FTMSL

4. OBST: HT(FT AGL) DIST(NM)
         50        1.81

DATE: 12/09/92

**GROSS WEIGHT CORRECTIONS**

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
1 DEGREE HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    321 LBS/KT EFF HEAD W
       SUB FROM ZERO WIND  1322 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
   *WIND   *RUNWAY SHORTENING   *ANTI-SKID INOP
*RUNWAY CONTAMINATION *REL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
   *REL PERFORMANCE DECREMENTS

RUNWAY CONTAMINATION AND ANTI - SKID INOP
DECREMENTS

| | | STANDING | REDUCE | REDUCE |
|---|---|---|---|---|
| | | WATER | ZERO | V1 |
| | DRY | SLUSH OR | WIND W | SPEED |
| | SNOW | WET SNOW | BY: | BY: |
| | -IN- | -IN- | -LBS- | -LBS- |
| | | < 1/4 | 14000 | 31 |
| 3 1/2 TO 6 | 1/4 TO 1/2 | | 28000 | 26 |
| | ICE | | 14000 | 31 |
| | ANTI-SKID INOP | | 6300 | 21 |

| TEMP | | ZERO | CLIMB | A/C POD OFF MAX | N1% GO FOR ARND | ENG ANTI-ICE A/C ZERO CLIMB OFF | |
|---|---|---|---|---|---|---|---|
| F | C | WIND | LIMIT | (+) EPR | T/O EPR | WIND LIMIT | (+) |
| -10 | -23 | 2062 R 2090 | 23 R 2.10 | 90 2.07 | 2037 2065 | 23 |
| 0 | -18 | 2043 R 2090 | 21 R 2.10 | 91 2.07 | 2018 2065 | 21 |
| 10 | -12 | 2023 R 2090 | 21 R 2.10 | 92 2.07 | 1998 2065 | 21 |
| 20 | -7 | 2003 R 2090 | 21 R 2.10 | 93 2.07 | 1978 2065 | 21 |
| 30 | -1 | 1986 R 2090 | 20 R 2.10 | 94 2.07 | 1961 2065 | 20 |
| 32 | 0 | 1982 R 2090 | 20 R 2.10 | 94 2.07 | 1957 2065 | 20 |
| 34 | 1 | 1979 R 2090 | 19 R 2.10 | 94 2.07 | 1954 2065 | 19 |
| 36 | 2 | 1976 R 2090 | 19 R 2.10 | 95 2.07 | 1951 2065 | 19 |
| 38 | 3 | 1972 R 2090 | 19 R 2.10 | 95 2.07 | 1947 2065 | 19 |
| 40 | 4 | 1949 R 2090 | 18 R 2.10 | 95 2.07 | 1944 2065 | 18 |
| 42 | 6 | 1945 R 2090 | 19 R 2.10 | 95 2.07 | 1940 2065 | 19 |
| 44 | 7 | 1962 R 2090 | 19 R 2.10 | 95 2.07 | 1937 2065 | 19 |
| 46 | 8 | 1959 R 2090 | 19 R 2.10 | 95 2.07 | 1934 2065 | 19 |
| 48 | 9 | 1956 R 2090 | 19 R 2.10 | 96 2.07 | 1931 2065 | 19 |
| 50 | 10 | 1952 R 2090 | 20 R 2.10 | 96 2.07 | 1927 2065 | 20 |
| 52 | 11 | 1949 R 2090 | 20 R 2.10 | 96 2.07 | | |
| 54 | 12 | 1946 R 2090 | 19 R 2.10 | 96 2.07 | | |
| 56 | 13 | 1942 R 2090 | 20 R 2.10 | 96 2.07 | | |
| 58 | 14 | 1939 R 2090 | 20 R 2.10 | 97 2.07 | | |
| 60 | 16 | 1932 R 2090 | 33 R 2.10 | 97 2.07 | | |
| 62 | 17 | 1920 R 2090 | 31 R 2.10 | 97 2.07 | | |
| 64 | 18 | 1918 R 2090 | 30 R 2.10 | 97 2.07 | | |
| 66 | 19 | 1916 R 2090 | 28 R 2.10 | 97 2.07 | | |
| 68 | 20 | 1914 R 2090 | 27 R 2.10 | 98 2.07 | | |
| 70 | 21 | 1912 R 2090 | 25 R 2.10 | 98 2.07 | | |
| 72 | 22 | 1910 R 2090 | 24 R 2.10 | 98 2.07 | | |
| 74 | 23 | 1909 R 2090 | 21 R 2.10 | 98 2.07 | | |
| 76 | 24 | 1907 R 2090 | 20 R 2.10 | 98 2.07 | | |
| 78 | 26 | 1905 R 2090 | 18 R 2.10 | 98 2.07 | | |
| 80 | 27 | 1904 R 2090 | 16 R 2.10 | 99 2.07 | | |
| 82 | 28 | 1901 R 2090 | 16 R 2.10 | 99 2.07 | | |
| 84 | 29 | 1892 R 2088 | 22 R 2.10 | 99 2.07 | | |
| 86 | 30 | 1881 R 2071 | 20 R 2.08 | 99 2.07 | | |
| 88 | 31 | 1869 R 2054 | 19 R 2.07 | 99 2.07 | | |
| 90 | 32 | 1856 R 2037 | 17 R 2.06 | 99 2.07 | | |
| 92 | 33 | 1846 R 2019 | 16 R 2.05 | 98 2.06 | | |
| 94 | 34 | 1835 R 2001 | 14 R 2.04 | 98 2.05 | | |
| 96 | 36 | 1823 R 1983 | 13 R 2.03 | 98 2.04 | | |
| 98 | 37 | 1812 R 1965 | 12 R 2.02 | 98 2.03 | | |
| 100 | 38 | 1800 R 1947 | 11 R 2.01 | 98 2.02 | | |
| 102 | 39 | 1788 R 1930 | 12 R 2.00 | 97 2.01 | | |
| 104 | 40 | 1776 R 1913 | 13 R 1.99 | 97 2.00 | | |
| 106 | 41 | 1763 R 1896 | 15 R 1.98 | 97 1.99 | | |
| 108 | 42 | 1751 R 1879 | 16 R 1.97 | 97 1.98 | | |
| 110 | 43 | 1739 R 1862 | 17 R 1.96 | 97 1.96 | | |
| 112 | 44 | 1727 R 1845 | 18 R 1.95 | 97 1.95 | | |
| 114 | 46 | 1715 R 1828 | 19 R 1.94 | 96 1.94 | | |
| 116 | 47 | 1704 R 1811 | 19 R 1.93 | 96 1.93 | | |
| 118 | 48 | 1692 R 1794 | 20 R 1.92 | 96 1.92 | | |
| 120 | 49 | 1680 R 1777 | 21 R 1.90 | 96 1.91 | | |

* = CHECK MAX STRUCTURAL WT

**LANDING DATA**                                      PACKS ON

| | | | DRY | | | | WET | | | | | SUB LB/F | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LNDG FLAP | LENGTH | ANTI SKID | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | APT CRIT TEMP | ABOVE CRIT TEMP | MAX OPER TEMP |
| 30 | 8432 | OPER | *204200 | 290 | 0 | 1358 | *205400 | 210 | 0 | 3257 | | | |
| 30 | 8432 | INOP | *175700 | 970 | 0 | 3107 | *156400 | 950 | 0 | 3311 | 120 | 0 | 120 |
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | | | |

COMPUFLIGHT INC.

2 OF 4

I.O.P. #__7__

## REDUCED EPR INSTRUCTIONS

Reduced takeoff thrust is the takeoff EPR computed using an assumed temperature. Assumed temperature is the HIGHEST TEMPERATURE on the Runway Analysis Chart that a take-off could be made at the ACTUAL Gross take-off weight of the aircraft. It will not be lower than maximum climb EPR.

Maximum takeoff thrust is the takeoff EPR computed using the airport temperature and pressure altitude.

Use reduced takeoff thrust whenever practicable to reduce turbine inlet temperature and engine EGT during takeoff.

DO NOT USE reduced takeoff thrust for any of the following conditions:

When takeoff runway has standing water, ice, slush, or snow;

When headwind adjustment has been used to increase allowable takeoff weight;

When takeoff is to be made with a tailwind;

When main gear antiskid is inoperative;

When anti-ice is on;

When airport temperature is below +6°F (-14°C);

When mixed engines are installed;

When wind shear is reported or expected;

When conducting a two engine ferry;

When deicing fluid has been used.

3 OF 4

I.O.P. # 1

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

0 8 APR 1999

AMERIJET
INTERNATIONAL

REDUCED EPR INSTRUCTIONS

AMERIJET INT'L                      FT. LAUDERDALE, FLA.

B-727-100 JT8D-7                    -HOLLYWOOD INTL

DATE 02/15/90              KFLL 13              FLAPS 15

| TD&P °F °C | ZERO WIND | CLIMB LIMIT | A/C OFF (+) | MAX T/O EPR | N1† · GO FOR T/O | ENG ANTI-ICE A/C ZERO WIND | CLIMB LIMIT OFF (+) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | B-727-100 PW-JT8D-7 PACKS ON | KFLL 13 LENGTH = 6928 ELEV = 11 GRAD = .03 | |
| -10 -23 | 1633 R | 1802 | 8 R 1.96 | 87 | | | | | |
| 0 -17 | 1618 R | 1802 | 8 R 1.96 | 88 | | | Front Section | | |
| 10 -12 | 1605 R | 1802 | 8 R 1.96 | 88 | | | B727 - 100/7 | | |
| 20 -6 | 1592 R | 1802 | 8 R 1.96 | 89 | | | Revision: 2 | | |
| 30 -1 | 1575 R | 1802 | 8 R 1.96 | 90 | | | 4/19/90 | | |
| 32 0 | 1572 R | 1802 | 8 R 1.96 | 91 | | | | | |
| 34 1 | 1569 R | 1802 | 8 R 1.96 | 91 | | | TO OBTAIN REDUCED THRUST EPR SETTING | | |
| 36 2 | 1566 R | 1802 | 8 R 1.96 | 91 | | | USE EXAMPLE AND FIND NORMAL EPR: | | |
| 38 3 | 1562 R | 1802 | 8 R 1.96 | 91 | | | | | |
| 40 4 | 1559 R | 1802 | 8 R 1.96 | 91 | | | STEP: | | |
| 42 5 | 1557 R | 1802 | 8 R 1.96 | 91 | | | 1. Then enter chart at actual | | |
| 44 6 | 1555 R | 1802 | 8 R 1.96 | 92 | | | aircraft take-off weight. | | |
| 46 7 | 1553 R | 1802 | 8 R 1.96 | 92 | | | Note the temperature and | | |
| 48 8 | 1551 R | 1802 | 8 R 1.96 | 92 | | | EPR. | | |
| 50 10 | 1549 R | 1802 | 8 R 1.96 | 92 | | | STEP | | |
| 52 11 | 1547 R | 1802 | 8 R 1.96 | 92 | | | 2. Compare against the EPR from | | |
| 54 12 | 1545 R | 1801 | 8 R 1.96 | 92 | | | the maximum climb thrust for | | |
| | | | | 93 | | | bug sheet chart 11:3:6 use | | |
| NORMAL | TAKEOFF | | THRUST | 93 | | | actual field temperature. | | |
| 60 15 | 1531 R | 1795 | 8 R 1.96 | 93 | | | | | |
| 62 16 | 1529 R | 1795 | 10 R 1.96 | 93 | | | STEP | | |
| 64 17 | 1526 R | 1795 | 10 R 1.96 | 94 | | | 3. Use the highest EPR for re- | | |
| 66 18 | 1524 R | 1795 | 10 R 1.96 | 94 | | | duced thrust. Thrust reduc- | | |
| 68 20 | 1521 R | 1795 | 10 R 1.96 | 94 | 1 | | tion may not exceed 25% of | | |
| 70 21 | 1518 R | 1795 | 10 R 1.96 | 94 | 1 | | the normal take-off thrust. | | |
| 72 22 | 1516 R | 1795 | 10 R 1.96 | 94 | 1 | | (This is equivalent to a | | |
| 74 23 | 1513 R | 1795 | 10 R 1.96 | 94 | 1 | | 0.30 EPR reduction) | | |
| 76 24 | 1511 R | 1795 | 10 R 1.96 | 94 | 1 | | | | |
| 78 25 | 1508 R | 1795 | 10 R 1.96 | 95 | 1 | | STEP | | |
| 80 26 | 1505 R | 1795 | 10 R 1.96 | 95 | 1 | | 4. Use temperature in step 1 to | | |
| 82 27 | 1503 R | 1795 | 10 R 1.96 | 95 | 1 | | determine V-speeds. 11:3:1 | | |
| 84 28 | 1500 R | 1794 | 10 R 1.95 | 95 | 1.93 | | DECREMENTS | | |
| 86 30 | 1489 R | 1779 | 10 R 1.95 | 95 | 1.93 | | | | |
| 88 31 | 1478 R | 1762 | 10 R 1.93 | 95 | 1.93 | | STANDING | REDUCE | REDUCE |
| 90 32 | 1467 R | 1747 | 10 R 1.92 | 95 | 1.93 | | WATER. | ZERO | V1 |
| 92 33 | 1458 R | 1732 | 10 R 1.92 | 94 | 1.92 | | DRY SLUSH OR | WIND W | SPEED |
| 94 34 | 1448 R | 1716 | 10 R 1.91 | 94 | 1.91 | | SNOW WET SNOW | BY: | BY: |
| 96 35 | 1439 R | 1702 | 10 R 1.90 | 94 | 1.90 | | -IN- -IN- | -LBS- | -KTS- |
| 98 36 | 1429 R | 1688 | 9 R 1.89 | 94 | 1.89 | | < 1/4 | 18800 | 25 |
| 100 37 | 1419 R | 1674 | 9 R 1.88 | 94 | 1.88 | | 1 1/2 TO 6 1/4 TO 1/2 | 24800 | 22 |
| 102 | REDUCED | EPR | R 1.87 | 93 | 1.87 | | ICE | 18800 | 31 |
| 104 40 | 1399 R | 1644 | 10 R 1.46 | 93 | 1.86 | | ANTI-SKID INOP | 6000 | 14 |
| 106 41 | 1389 R | 1639 | 10 R 1.85 | 93 | 1.85 | | | | |
| 108 42 | 1379 R | 1614 | 10 R 1.84 | 93 | 1.84 | | | | |
| 110 43 | 1369 R | 1599 | 10 R 1.83 | 93 | 1.82 | | V1 FOR HIGH GROSS WTS. - S.L. < 40°F | | |
| 112 44 | 1360 R | 1583 | 10 R 1.82 | 93 | 1.81 | | | | |
| 114 45 | 1350 R | 1568 | 10 R 1.81 | 92 | 1.80 | | WT 1700 1740 1780 1820 1860 1900 | | |
| 116 46 | 1341 R | 1551 | 10 R 1.80 | 92 | 1.79 | | V1 136 138 140 142 144 146 | | |
| 118 47 | 1332 R | 1534 | 10 R 1.79 | 92 | 1.78 | | | | |
| 120 | | | | | | | EXAMPLE | | |

FT. LAUDERDALE RWY 13 - 60°F
ACTUAL GROSS T/O WT - 140,000
NORMAL TAKE-OFF THRUST = 1.96 EPR
STEP 1. = 140,000 LBS = 102°F AND 1.87 EPR
STEP 2. = MAX CLIMB THRUST (@ 15°C) (60°F)
         FOR BUG SHEET = 1.83
STEP 3. = 1.87 EPR IS THE REDUCED EPR
NOTE: THIS IS LESS THAN 0.30 REDUCTION FROM
      NORMAL TAKE-OFF THRUST 1.96 EPR.
STEP 4 = V SPEEDS @ 102°F = 123KT V1 138 KT V2

| SUB | |
|---|---|
| L&F | |
| ABOVE | MAX |
| CUT | OPEN |
| TD&P | TD&P |
| 0 | 120 |

4 OF 4

I.O.P. # 7

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
A 8 APR 1990

## WEIGHT AND BALANCE MANUAL

### WEIGHT AND BALANCE

#### FLEET WEIGHT LIMITATIONS

| FLEET WEIGHT LIMITATIONS | | N994AJ → N397AJ ← N395AJ N495AJ N797AJ | |
|---|---|---|---|
| Maximum Taxi Weight - (AFM) | | 197,700 | 197,700 | 197,700 |
| Maximum Taxi Weight is a structural limit for taxiing | | | | |
| MAXIMUM TAKE-OFF WEIGHT | | 197,000 | 197,000 | 197,000 |
| This is the maximum allowable gross weight at brake release, just prior to takeoff roll | | | | |
| MAXIMUM IN-FLIGHT WEIGHT (AFM) | FLAPS UP | **NOTE | 196,000 | **NOTE |
| | FLAPS 30 | **NOTE | 164,000 | **NOTE |
| | FLAPS 40 | **NOTE | 142,500 | **NOTE |
| MAXIMUM LANDING WEIGHT - (AFM) | FLAPS 30 | 164,000 | 164,000 | *164,000 |
| | FLAPS 40 | 142,500 | 142,500 | (*EMERGENCY USE ONLY) |
| MAXIMUM ZERO FUEL WEIGHT - | | 155,000 | 155,000 | 155,00 |

**NOTE: N994J maximum in-flight weight - 196,000.

**NOTE: N395AJ maximum in-flight weight - 196,000.

**NOTE: N495AJ maximum in-flight weight - 196,000.

*NOTE: QW Landing Data

2 OF 2

### AMERIJET FLEET LIMITATIONS

Maximum Operating Airspeed of Vmo equals 350 knots indicated airspeed (KIAS), or code "B" [350 knots equivalent airspeed (KIAS)].

I.O.P. # 8

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
1 6 SEP 1999

INTERNATIONAL

WEIGHT AND BALANCE MANUAL

General Information

| Aircraft No. | B.O.W Weight | Moment |
|---|---|---|
| \| N794AJ | 93,316 | 88178325 |
| \| N994AJ | 94,139 | 88105202 |
| \| N395AJ | 93,883 | 88124473 |
| N495AJ | 92,711 | 87181149 |
| N895AJ | 93,005 | 88056640 |
| N196AJ | 92,819 | 87773553 |
| \| N296AJ | 93,379 | 87734708 |
| ⟶ N397AJ ——— | 93,308 —— | 88534151 ⟵ |
| \| N797AJ | 92,868 | 88022669 |
| N598AJ | 92,772 | 87088635 |

1 OF 2

I.O.P. # 8

FAA APPROVED, FT LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
1 6 SEP 1999

AIRCRAFT LOG BOOK — AIRCRAFT MAINTENANCE LOG — FORM M1

A/C TYPE B727 AIRCRAFT # 3917 FLIGHT CODE 4

I.O.P. #9

52010

OPERATING & ALL DEADHEAD CREW MEMBERS:
- Steele B
- Major P
- Ramsingh O
- Wise B
- Massey Sr. A

EMPLOYEE NO.
- 2025
- 803
- 1851
- 72097

DISCREPANCIES (PLEASE PRINT)
- Transit check due
- Transit check due

CORRECTIVE ACTION
- Transit check complete

AMERIJET FLIGHT RELEASE

DATA STORED IN COMPUTER

ARTCC MIAMI (ZMA) MAIN 305-716-1588    DATA 305-716-1648

00/17/99 (1 DATE)    TIME 2055Z    TRIP/DATE 827/17    AIRCRAFT 797AJ    8727/8    ETD 2300

*NON FT LAUDERDALE    TO PORT OF SPAIN

FILED ROUTE:    ZBV ASS5 DOP-N G449 POS

PLANNED ROUTE ZBV ZGR ZLS-N INDEE GTK ASS5 DOP-N G449 POS

TOTAL DISTANCE 1459.9    DIRECT DISTANCE 1413.9    3.7    ALTERNATE    SHNG (155 NI / 277 DEG)

PLANNED BURN    37.2    3:50

ALTERNATE    6.3    0:30    MACH .77    PREPARED BY: KII TIMBRI

LOS EXTRA FUEL 3.5    0:20    INDICATED AIRSPEED 300    CAPTAIN: BRIAN STEELE

RESERVE    4.1    0:30    TRUE AIRSPEED 470    FIRST OFFICER: PAT MAJOR

HOLDING FUEL 0.0    0:00    FLIGHT LEVEL 290    SECOND OFFICER: BRETT WISE

TAXI FUEL    0.5    ZERO FUEL WEIGHT 141.8    CREW/ACM/SALT A.JORSEY

REQUIRED FUEL 51.6    4:40    TAKE OFF WEIGHT 192.9    U.KAMGIN631

SOF    13.9    LANDING FUEL 13.9

EXTRA FUEL    0.0    0:00    LANDING WEIGHT 155.7

BLOCK FUEL    51.6    4:40    TOTAL BURN 36.1 (INCLUDES TAXI)

FOR EACH 10.0 OVER PLANNED TAKE OFF WEIGHT BURN WILL BE 1.5 OVER PLANNED BURN

PLANNED CARGO 49.1    MAX CARGO 50.2

CRUISE CAY -30 (ISA + 12)

DM) NUMBER    DATE    MEL REF

8942    07/18/1988    24-72    PROCS DEFFERED PER MOD UNDER PRPFLT OPPM

8968    07/24/1996    24-1    A 2 DMS DIFFERENTIAL INDESS

MGI 194.2  MGL IS BASED ON STRUCTURAL LIMITS ONLY NO AIRPORT DATA ON FILE FOR FT LAUDERDALE

WINDS: (24/76)REMOT 40/6  (20/69)HARDY 120/5  (14/63)PELMA 70/10

| FROM/TO | | | FREQ | LEG | MTG | TIME REM | GS | TIME | TOT TIME | BURN | TOT BURN | FUEL REM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KFLL | 118  D  119 | ZBV | 116.7 | 31 | 1409 | | 320 | | | | 18KGLF> FUEL 51.1 |
| ZBV | 116 | *FIR* | *KZMA* | 17 | 1391 | | 620 | | | | |
| *FIR* | | TOC | | 69 | 1322 | 2:55 | 320 | 0126 | 0126 | 6.3 | 6.3 | 44.8 |
| TOC | D  112 | ZGR | 112.7 | 22 | 1301 | 2:52 | 471 | 0103 | 0129 | 0.5 | 6.8 | 44.5 |
| ZGR | 126  D  126 | ZLS-N | 526.0 | 148 | 1153 | 2:33 | 472 | 0119 | 0147 | 3.7 | 10.5 | 40.6 |
| ZLS-N | 119  D  119 | INDEE | | 55 | 1098 | 2:26 | 469 | 0107 | 0154 | 1.4 | 11.9 | 39.3 |
| INDEE | 119  D  120 | GTK | 114.2 | 207 | 891 | 1:59 | 467 | 0127 | 0321 | 5.1 | 16.9 | 34.6 |
| GTK | 132  A  133 | COCBU | | 32 | 858 | 1:55 | 466 | 0104 | 0325 | 0.8 | 17.7 | 33.9 |
| COCBU | 133  A  133 | BROD1 | | 69 | 790 | 1:47 | 465 | 0109 | 0334 | 1.7 | 19.4 | 31.8 |
| BROD1 | 134  A  134 | HARDY | *FJJQ* | 55 | 735 | 1:39 | 465 | 0107 | 1141 | 1.3 | 20.7 | 30.4 |
| HARDY | 134  A  135 | IDAHO | | 80 | 654 | 1:29 | 465 | 0110 | 1151 | 1.9 | 22.6 | 28.5 |
| IDAHO | 135  D  135 | DOP-N | 391.0 | 84 | 570 | 1:18 | 465 | 0111 | 2102 | 2.0 | 24.6 | 26.5 |
| DOP-N | 159  A  160 | VANNA | | 11 | 559 | 1:17 | 465 | 0101 | 2104 | 0.3 | 24.9 | 26.3 |
| VANNA | 160  A  160 | GESSO | | 58 | 501 | 1:09 | 465 | 0107 | 2111 | 1.4 | 26.3 | 24.9 |
| GESSO | 160  A  160 | HENLI | | 40 | 461 | 1:04 | 465 | 0105 | 2116 | 1.0 | 27.2 | 23.9 |
| HENLI | 161  A  161 | AMMER | | 49 | 412 | 0:58 | 466 | 0106 | 2123 | 1.2 | 28.4 | 22.8 |
| AMMER | 157  A  158 | ANNDA | | 85 | 327 | 9:47 | 465 | 0111 | 2134 | 2.0 | 30.4 | 20.8 |
| ANNDA | 160 | *FIR* | *TTPO* | 4 | 323 | 0:46 | 466 | | 2134 | 0.1 | 30.4 | 20.7 |
| *FIR* | A  160 | PELMA | | 61 | 262 | 0:38 | 467 | 0108 | 8142 | 1.4 | 31.8 | 19.3 |
| PELMA | 162  A  163 | PERRY | | 64 | 198 | 0:30 | 467 | 0108 | 2150 | 1.0 | 33.4 | 17.8 |
| PERRY | 164  A  164 | PERBA | | 97 | 101 | 0:18 | 468 | 0112 | 3103 | 2.2 | 35.5 | 15.6 |
| PERBA | 163 | TTD | | 14 | 87 | 0:16 | 470 | 0102 | 3104 | 0.1 | 35.8 | 15.3 |
| TTD | A  162 | POS | 116.9 | 79 | 8 | | 326 | | DESCENT | | | |
| POS | 019  D  019 | TTPP | | 8 | -0 | | 326 | | 3103 | | 36.1 | 13.5 |

KFLL N26:04.3 / W80:09.1    ZBV N25:42.2 / W79:17.7    ZGR N25:01.7 / W77:27.0    ZLSN N23:34.8 / W75:15.8

INDEE N23:08.3 / W74:21.4    GTK N21:26.4 / W71:08.1    COCBU N21:08.9 / W70:29.3    BROD1 N20:31.4 / W69:37.4

HARDY N20:00.4 / W48:49.0    IDAHO N19:15.6 / W67:38.4    DOPN N18:28.1 / W66:84.7    VANNA N18:15.0 / W66:18.8

GESSO N17:29.6 / W65:46.7    HENLI N16:52.1 / W65:24.5    AMMER N16:12.0 / W64:50.0    ANNDA N13:04.1 / W64:08.1

PELMA N14:08.0 / W63:33.0    PERRY N13:13.0 / W63:00.0    PERBA N11:48.3 / W62:11.4    POS N10:27.8 / W61:23.6

TTPP N10:35.6 / W61:20.9    SHNG N10:54.9 / W63:57.9

ACTUAL BLOCK FUEL OUT _____    ACTUAL BLOCK FUEL IN _____    TOTAL BURN _____

*1 PRICES ARE AMERIJET CONTRACT FUEL 520    15.7    36.3

Fuel cost at KFLL $0.60 Fuel cost at TTPP $0.68  Tanker fuel as needed for operational reasons = No difference in cost.

RELEASED BY _____    TIME OF RELEASE 21:52

I CERTIFY THAT I HAVE COMPLETED ON AIRPORT AND ROUTE PREFLIGHT AS REQUIRED BY FAR 121.613

CAPTAIN _____

FIR BOUNDARIES:  KZMA 0:13   TJZS 1:44   TTZP 2:34

KFLL/TTPP

O.P.# 10

```
 . . .A02 SLP159 CB DSNT H...5 T03060233 56022=
 KFLL 172053Z 03009KT 10S...FEW035CB SCT050 SCT150 ...50 30/23 
     A3000 RMK A02 SLP159 CB VC E T03200228 58015=...
 TTPP 172000Z 07006KT 9...FEW012CB SCT280 32/24 Q1011 NOSIG=
 TTPP 172000Z 07007KT    FEW012CB SCT280 32/24 Q1011 NOSIG=
 TTPP 172000Z 07007KT    FEW012CB SCT280 32/24 Q1011 NOSIG=
 TTPP 172000Z 07007KT    FEW012CB SCT280 32/24 Q1011 NOSIG=
 TTPP 1719002 08006KT 9999 FEW010CB BKN280 31/25 Q1012 NOSIG=
 TTPP 1718002 12005KT 9999 FEW010CB SCT020 BKN280 31/25
     Q1013 TEMPO SHRA=
 TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
 TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
 TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
 TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
 TGPY 1719002 11011KT 9999 FEW021 30/26 Q1012=
 TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
 TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
 TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
 TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
 TFFF 1719002 08012KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
 TFFF 1718002 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
 TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
 TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
 TFFR 1719002 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
 TFFR 1719002 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
 TFFR 1719002 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
 TFFR 1718002 12010KT 100V170 9999 VCSH FEW016CB SCT020
     32/24 Q1014 NOSIG
     CB (S/WNW)=
 TFFR 1718002 12010KT 090V170 9999 VCSH FEW016CB SCT020
     32/24 Q1014 NOSIG
     CB (WNW)=
 SVMG NO CURRENT REPORT.
 SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
 SVMG 1719002 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

 -----------
 FORECASTS
 -----------

 MIA
 KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
     BECMG 2122 09005KT NSW SCT025 BKN250
     FM0100 VRB04KT P6SM SCT025 SCT250
     BECMG 0406 VCSH
     FM1500 09010KT P6SM FEW030 SCT250=
 FLL
 KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
     BECMG 2122 NSW SCT025 BKN250
     FM0100 VRB04KT P6SM SCT025 SCT250
     BECMG 0406 VCSH
     FM1500 09010KT P6SM FEW030 SCT250=
 TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
     3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
 TTPP 171000Z 171212 08010G20KT 9999 SCT020 TEMPO
     BKN300  PROB30 TEMPO 5000 SHRA FEW010CB BKN015
     PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
     BECMG 2223 08005KT=
 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
     TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
     TEMPO 0010 00000KT
     BECMG 1012 11012KT=
 TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
     TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
     TEMPO 0010 00000KT
     BECMG 1012 11012KT=
 TGPY 171600Z 171818 NIL=
 TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
     SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
     1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 SCT050=
```



# B-727-200C LOAD PLAN
## 12-POSITION WEIGHT & BALANCE

AMERIJET INTERNATIONAL

DATE: 12th Aug '99
FLIGHT NO: 227
ACN#: A342
FROM: FLL TO: POS
ALT ARPT(s): SVMC

Max. Cumulative Load 34,100 lbs.

Max. Cumulative Load 34,951 lbs.

| 1 PAS | 2 PAS | 3 | 4 PAS | 5 PAS | 6 PAS | 7 P/P | 8 PAS | 9 PAS | 10 PAS | 11 PAS | 1235 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULD: P504DK | ULD: 1477JR | ULD: | ULD: 1494JR | ULD: P504JR | ULD: 1477JR | ULD: 2211R | ULD: 1340DK | ULD: P245JR | ULD: P241JR | ULD: P241JR | ULD: P44JR |
| DEST: EDE | DEST: EDE | DEST: | DEST: EDE | DEST: EDF | DEST: POS | DEST: POS | DEST: POS | DEST: EDE | DEST: EDE | DEST: POS | DEST: PTP |
| WT: 3140 | WT: 3360 | WT: | WT: 3260 | WT: 3640 | WT: 5400 | WT: 3160 | WT: 7730 | WT: 3640 | WT: 4160 | WT: 3410 | WT: 3070 |
| 3800# MAX | 4800# MAX | 4720# MAX | 4880# MAX | 4320# MAX | 5840# MAX | 8000# MAX | 8000# MAX | 5840# MAX | 4240# MAX | 5280# MAX | 3000# MAX |

FORWARD HOLD (6000# max.)

AFT HOLD (8000# max.)

| | TOTAL WT 1420 | | | | | TOTAL WT |
|---|---|---|---|---|---|---|
| 1A | 1B | 1C | 1D | | 2A | 2B | 2C |
| DEST: COMAT | DEST: | DEST: POS | DEST: POS | | DEST: | DEST: | DEST: |
| WT: 60 | WT: | WT: 515 | WT: 515 | | WT: 1490 | WT: | WT: 1020 |
| 2+1A 5440# | 3+1B 8000# | 4+1C 5200# | 5+1D 8000# | | 9+2A 8000# | 10+2B 4240# | 11+2C 8000# | 12+2D 8000# |

51.3

B.O.W. 93,508
CARGO TOTAL 47,290
ZFW 144,998
ZFW MAC 21.6
TAKEOFF WT 192,298
TAKEOFF CG
STAB TRIM
FUEL BURN 82,326
LANDING WT 164,072

COMAT
ITEM(s) E-5 201    D5
WEIGHT 1x20.

### STRUCTURAL LIMITS
MAX TAXI WEIGHT
ZERO FUEL WEIGHT
MAX LDG WEIGHT

RUNWAY 27
WIND 7/12 TEMP 29°C
FLAP SETTING

CAPTAIN'S SIGNATURE
Sign in accordance with FAR 121.693, 121.697, 121.133, 121.135

CAPTAIN
FO
SO
AGM

AIRCRAFT COPY - WHITE    •    STATION COPY - YELLOW

Form #0-200A
DATE: 04/23/99

*11/10/99*
*SUPERVISOR*

November 10, 1999

**CERTIFIED-RETURN RECEIPT**

Mr. David G. Bassett, President
Amerijet International Incorporated
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Mr. Bassett:

## LETTER OF INVESTIGATION

File Number: 2000SO170009

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

1 OF 2

Enclosure: PRIVACY ACT NOTICE

**I.O.P. # 13**

2

File: 8030.1

WP: H:\AMERIJET\LOIBAS01.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

Thank you for using Return Receipt Service.

**SENDER:**
☐ Complete items 1 and/or 2 for additional services.
☐ Complete items 3, 4a, and 4b.
☐ Print your name and address on the reverse of this form so that we can return this card to you.
☐ Attach this form to the front of the mailpiece, or on the back if space does not permit.
☐ Write "Return Receipt Requested" on the mailpiece below the article number.
☐ The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee)
1 ☐ Addressee's Address
2 ☐ Restricted Delivery

3. Article Addressed to:

MR. DAVID G. BASSETT, PRESIDENT
AMERIJET INTERNATIONAL INCORP.
498 S.W. 34th STREET
FORT LAUDERDALE, FLORIDA 33315

4a. Article Number
P 372 062 005

4b. Service Type
☐ Registered         ☒ Certified
☐ Express Mail       ☐ Insured
☒ Return Receipt for Merchandise   ☐ COD

7. Date of Delivery

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature (Addressee or Agent)

PS Form 3811, December 1994          102595-99 B-0223    Domestic Return Receipt

Is your RETURN ADDRESS completed on the reverse side?

---

P 372 062 005
**Receipt for**
**Certified Mail**
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

UNITED STATES
POSTAL SERVICE

| Sent to | |
| --- | --- |
| DAVID BASSETT | |
| Street and No. | |
| 498 S.W. 34th ST. | |
| P.O., State and ZIP Code | |
| FT. LAUDERDALE FL 33315 | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form 3800, June 1991

SENT 11/10/99

I.O.P. # 13

2 OF 2



*11/10/99*
*SUPERVISOR*

November 10, 1999

Mr. David G. Bassett, President
Amerijet International Incorporated
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Mr. Bassett:

### LETTER OF INVESTIGATION

File Number: 2000SO170009

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

**I.O.P. # 14**

**1 OF 2**

2

File: 8030.1

WP: H:\AMERIJET\LOIBAS01.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

I.O.P. # 14

2 OF 2

Enforcement Information
Enforcement 184 Summary Report of Violator States

------------------------------------------------------------------------

Code: PCSA    Violator Name: AMERIJET INTERNATIONAL INC

| No. of open Violations | No. of closed Violations | No. of reopen Violations | No. of pending Violations | Total |
|========================|==========================|==========================|===========================|=======|
| 3 | 40 | 0 | 0 | 43 |

------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
              LVL2  LVL1        MMENU       PRINT       RETRN        LOGOF
PRESS 'ENTER' KEY TO PROCEED


1 OF 5

I.O.P. # 15

06070 W3Z    Document 134    Enforcement Information LSD Docket 03/26/2001    Pa
Enforcement records meeting criteria r: PCSA    thru: 14
Jump to: VIOL. DATE                    Sort column: 1 A Crit.: _              of: 43

```
  . Viol.Date  Status  Rgn      Case #      Related Case #   FAR's Violated (1)
  ----------  ------  ---   ------------    --------------   ------------------
_ 1984-06-30  CLOSED   SO   1995SO170035                     121.401
_ 1984-10-17  CLOSED   SO   1986SO620045                     91.29A
_ 1984-10-17  CLOSED   SO   1986SO620046                     91.29A
_ 1985-08-27  CLOSED   SO   1986SO620047                     39.3
_ 1985-10-30  CLOSED   SO   1995SO170034                     121.434
_ 1985-11-22  CLOSED   SO   1986SO620049                     91.29A
_ 1985-12-09  CLOSED   SO   1986SO620044                     91.29A
_ 1986-02-24  CLOSED   SO   1986SO620017                     91.29A
_ 1986-04-01  CLOSED   SO   1986SO620043                     135.419G
_ 1986-04-01  CLOSED   SO   1986SO620050                     121.371A
_ 1986-04-01  CLOSED   SO   1986SO620042                     43.11A7
_ 1987-02-04  CLOSED   SO   1987SO620015                     91.29A
_ 1987-04-13  CLOSED   SO   1987SO620059                     135.65
_ 1988-01-01  CLOSED   SO   1988SO170033                     43.13A
```

```
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1      MMENU       PRINT       RETRN        LOGOF
Mark with 'X' to select; and F2 to execute.
```

2 OF 5

I.O.P. # 15

```
                        Enforcement records meeting criteria  : R: FCSA   thru: 28
Jump to: VIOL. DATE     _____   Sort column: 1 A Crit.: _        of: 43
-------------------------------------------------------------------------------
 . Viol.Date   Status   Rgn    Case #      Related Case #   FAR's Violated (1)
   ----------  ------   ---   -----------  --------------   ------------------
_  1988-01-25  CLOSED   SO    1988SO170032                      43.13
_  1988-03-24  CLOSED   SO    1988SO170048                      121.627C
_  1988-07-16  CLOSED   SO    1988SO620149                      121.380
_  1988-07-18  CLOSED   SO    1988SO620148                      121.133B
_  1988-07-19  CLOSED   SO    1988SO620146                      121.427B2
_  1988-07-19  CLOSED   SO    1988SO620147                      121.133B
_  1988-08-08  CLOSED   SO    1988SO620161                      43.13
_  1988-08-20  CLOSED   SO    1988SO620164                      43.13A
_  1988-08-22  CLOSED   SO    1988SO170047                      43.13A
_  1988-08-28  CLOSED   SO    1988SO620162                      43.13
_  1988-09-01  CLOSED   SO    1988SO170046                      121.361
_  1988-09-02  CLOSED   SO    1988SO620163                      43.13A
_  1988-09-22  CLOSED   SO    1988SO620181                      39.3
_  1989-09-28  CLOSED   WP    1989WP090194                      121.123
-------------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1        MMENU        PRINT       RETRN        LOGOF
Mark with 'X' to select; and F2 to execute.
```

3 OF 5

I.O.P. # 15

```
to: VIOL. DATE    _____    Sort column: 1 A Crit.: _        of: 43
-------------------------------------------------------------------------------
Viol.Date   Status  Rgn     Case #      Related Case #   FAR's Violated (1)
----------  ------  ---   ------------  --------------   ------------------
1998-01-08  CLOSED  SO    1998SO740239                   175.20A
_
_
_
_
_
_
_
_
_
_
_
_
-------------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1       MMENU        PRINT        RETRN       LOGOF
Mark with 'X' to select; and F2 to execute.
```

5 OF 5

I.O.P. #15

4

00SO170009

*SECTION D - FACTS AND ANALYSIS*

**FACTS**

On Monday, October 4, 1999, the investigating Inspector found on his desk a letter **(IOP 3)** from the First Officer (Patrick Major EIR # 00SO170013) of the subject flight detailing the events which led to the investigation herein. This correspondence had followed a conference between the complainant and the investigating Inspector some weeks before in which the Inspector had requested the account to be put in writing. Due to a death in the family that occurred two days prior (Saturday, October 2nd), and walk in duty on October 4th, the letter could not be given due consideration. During the Inspectors resulting absence for the funeral of his mother and use or lose annual leave, the correspondent directed his concerns to the Department of Transportation's Inspector General, hence the investigation now in progress.

On Tuesday, August 17, 1999, between the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time) Amerijet B-727, N397AJ (a FAR 121 Supplemental Air Carrier, **IOP 1, page 3),** operating as Amerijet (AMJ) Flight # 827 departed Runway 9L (9 Left) at Fort Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida **(IOP 3, 4, 5, and 9)** when there was less than one quarter (1/4) of an inch of standing water on the departure runway as reported by the FLL FAA Air Traffic Control Tower (ATCT) following a runway contamination/condition check accomplished by the FLL Airport Authority identified on the ATCT tape recording **(IOP 4)** as "Ramp One". The airport runway contamination/condition report in detail represented that there was "less than ¼ inch, good drainage, slight standing water about six (6) feet on either side of centerline". This report was subsequently provided to the Flightcrew of AMJ 827 by the FLL ATCT as "some standing water less than a quarter of an inch" prior to a takeoff clearance being given to the flight, and was acknowledged by the pilot **(ATCT Tape counter number 607, IOP 4).**

Amerijet AOM in Chapter 4, Section 1A, Subject 55 [4:1:55**(IOP 6, page 1)**] directs that for takeoff limitations other than as listed on this page, the user **"check Performance Manual for appropriate reductions to maximum takeoff gross weight" (IOP 6, page 3).** Even though the NAVTECH page **(IOP 6, page 2)** provides additional information as to wet runways and standing water of less than one eighth (1/8) inch, the information as contained on the Amerijet International B-

5

727-200, JT8D-15 Performance Chart for Fort Lauderdale runway 9L with Flaps 20 **(IOP 6, page 3)** is applicable. This chart requires a weight reduction of 17,000 pounds and a V1 airspeed reduction of 28 knots from the data as expressed on the B-727-200c Load Plan **(IOP 12)** rendering the figures of weight reduction from 192,298 to 175,298 pounds. The aircraft thus departed 17,000 pounds above its maximum gross takeoff weight as corrected for contaminated runway conditions, and therefore **contrary to** ████████████████████████ **(IOP 2, pages 3 and 4).**

FAR Part 1 **(IOP 2, page 1)** clearly defines the terms **"Operate", "Operational Control"** and **"Person"**, as follows. The terms state in pertinent part, "Operate" means use, cause to use or authorize to use aircraft; "Operational Control" means the exercise of authority over initiating, conducting or terminating a flight"; "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them".

**IOP 1, pp. 1 and 2,** identify Mr. David G. Basset as the President/General Manager/Safety Officer representing Amerijet and, therefore, a person accommodating the terms expressed above in concert with the company. As stipulated in ████████████ **"Each certificate holder conducting supplemental operations - (1) is responsible for operational control."** The company through Mr. Bassett exercises Operational Control, hence, the flight as identified above was "operated" by Amerijet International Incorporated **contrary** ████████████████████████

Amerijet International Incorporated has a violation history covering the years from 1984 through 1998 with forty (40) closed and three (3) open violations **(IOP 15).**

Mr. Bassett was sent two (2) Letters of Investigation (LOI), one via certified mail and one via regular mail and to date has failed to respond to either **(IOP 13 and 14).**

RIS: FO 2150-1



```
|------------------------------------------------------------------------|
|  ENFORCEMENT INVESTIGATIVE REPORT    |  Report Number    Related Number |
|  (Read Order 2150.3 for instructions) |  2000SO170011    2000SO170009   |
|------------------------------------------------------------------------|
|                   ALLEGED VIOLATOR IDENTIFICATION                       |
|------------------------------------------------------------------------|
|  1. Name STEELE, BRIAN A                                                |
|     DBA Name                                                            |
|     Designator          | 2. Address (Include zip code)                |
|                         |                                              |
|                         |                                              |
|                         |                                              |
|                         |   ████████████████        ████████          |
|------------------------------------------------------------------------|
| Telephone Number (   )   -    | 3.████████████████████ | 4. Sex  M     |
|------------------------------------------------------------------------|
| 5. FAA Cert. # | 6. FAA Certificate Type                               |
|    265456264   | AIRLINE TRANSPORT PILOT                                |
|------------------------------------------------------------------------|
| 7. Aviation Employer    AMERIJET INTERNATIONAL INC                      |
|------------------------------------------------------------------------|
|    AIRCRAFT, ENGINE, PROPELLER, COMPONENT OR APPLIANCE INVOLVED         |
|------------------------------------------------------------------------|
| 8. Make  BOEING  | 9. Model  727        | 10. Ident. Number  397AJ      |
|                  |                      |     ACFT SN                   |
|------------------------------------------------------------------------|
| 11. Owner Name     AMERIJET INTERNATIONAL INC                          |
|                  | 12. Address (Include zip code)                      |
|                  |                                                     |
|                  |                                                     |
|                  |                                                     |
|                  |                                                     |
|------------------------------------------------------------------------|
|                        ALLEGED VIOLATION                               |
|------------------------------------------------------------------------|
| 13. Date Occurred | 14. Time | 15. Date Known to FAA | 16. Region of Discov |
|     1999/08/17    |  19:40   |     1999/10/08        |       SO          |
|------------------------------------------------------------------------|
| 17. Location  FT LAUDERDALE-HOLLYW  FT LAUDERDALE   FL      Sec Cat 1  |
|               FT LAUDERDALE                                             |
|               Airport ID  FLL                                          |
```

PLAINTIFF'S
EXHIBIT
40

2

EIR 00SO170011

## SECTION B - SUMMARY OF FACTS

███████████████████████ on Tuesday, August 17, 1999, during the hours of
2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time), Captain
Brian A. Steele was in command of B-727, N397AJ **(IOP 9, 10 and 12)**. This
aircraft was operated as Amerijet flight 827, a Supplemental Air Carrier operating
under FAR Part 121, which departed the Fort Lauderdale-Hollywood International
Airport Runway 9 Left with Standing Water Less than one quarter (1/4) of an inch
on the runway. **(IOP 1, page 3; IOP 3, pp. 5 -10; IOP 4 - 5.)**

Captain Steele was operating subject to the responsibility as conveyed under███████
█████████████(IOP 2, page 3)** during flight time (defined in FAR 1, IOP 2,
page 1).

The flight was operated without adjusting the maximum takeoff weight to that
required by the Airplane Performance Manual, contrary to the Airplane Operating
Manual. The aircraft weight and V1 degredations required for this flight, as the
aircraft was configured, for runways with standing water of less than one quarter
inch were 17,000 pounds and 28 knots. **(IOP 3, pp. 5 - 10; IOP 6 - 12.)**

The aircraft was taken off at a weight 17,000 pounds greater than allowed and at
an indicated V1 airspeed 28 knots faster than allowed for conditions thus
degrading the performance capability. **(IOP 6 and 12.)**

By virtue of the above, Captain Brian A. Steele further operated **contrary to**████
████████ **"No pilot may operate an aircraft in a careless or reckless
manner, so as to endanger life or property" and also contrary to FAR**
████████ "No person may operate an aircraft in a careless or reckless
manner so as to endanger the life or property of another".

3

EIR 00SO170011

SECTION C - ITEMS OF PROOF

| IOP | #PAGES | DESCRIPTION |
|-----|--------|-------------|
| 1 | 3 | VIS OPERATOR INFORMATION |
| 2 | 6 | COPIES OF PERTINENT FAR PARTS 1, 121 A■ND 91 |
| 3 | 10 | LETTER OF COMPLAINT FROM PATRICK S. ▶▲AJOR |
| 4 | 2 | REQUEST FOR ATC TAPE FROM FLL ATCT A_ND TAPE |
| 5 | 2 | TYPED TRANSCRIPT OF ATCT TAPE |
| 6 | 3 | PAGES - AOM, NAVTECH, PERFORMANCE M_ANUAL |
| 7 | 4 | ISIS AIRMAN INFORMATION/VIOLATION HISTORY |
| 8 | 2 | PAGES FROM WEIGHT AND BALANCE MANU■AL |
| 9 | 1 | AIRCRAFT LOG BOOK MAINTENANCE LOG P_AGE |
| 10 | 1 | AMERIJET FLIGHT RELEASE |
| 11 | 1 | WEATHER SHEET |
| 12 | 1 | B-727-200C LOAD PLAN/WEIGHT AND BALAN■CE |
| 13 | 2 | LOI SENT VIA CERTIFIED MAIL |
| 14 | 2 | LOI SENT VIA REGULAR MAIL |
| 15 | 2 | RESPONSE TO LOI |

```
+------------------------------------------------------------------------+
| 'ISIS Air Operator (VIS) Report  Air Operator Vital Information         |
+------------------------------------------------------------------------+
| Air Operator:  PCSA     AMERIJET INTERNATIONAL INC                      |
|                                                                         |
| Air Operator Vital Info--- Validation Date: 1999 08 25                  |
| Primary DBA                                                             |
|                                                                         |
| Other DBA                                                               |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
| Address:  AMERIJET INTERNATIONAL INC  City:   FT LAUDERDALE             |
|           498 SW 34TH STREET          State:  FL                        |
|                                       Zip:    33315                     |
| Phone:    954-359-0077  Ext. 11                                         |
+------------------------------------------------------------------------+
```

```
+------------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report  Air Operator Regulatory Information     |
+------------------------------------------------------------------------+
| Air Operator:  PCSA     AMERIJET INTERNATIONAL INC       CHDO:  SO17    |
|                                                                         |
| Exemp. Auth:                   Other Deviat. Auth: N                    |
| FAR Regulation: 121            Crew Training:      CONTRACT OUT MOD/AMT  |
| National Use:                  Examining Auth:                          |
| HAZMAT: N     Applicable Airports:                                      |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
|                                                                         |
+------------------------------------------------------------------------+
```

I.O.P. # 1

1/2

```
+------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report  FAA Region/District Office Information |
+------------------------------------------------------------------+
| Air Operator:  PCSA      AMERIJET INTERNATIONAL INC        CHDO:  SO17 |
|                                                                  |
| Regions of Operation:                                            |
|                                                    OPS DO:  SO17 |
|                                                    MTC DO:  SO17 |
|                                                    AVI DO:  SO17 |
|                                                                  |
|                                                                  |
|                                                                  |
|                                                                  |
|                                                                  |
|                                                                  |
|                                                                  |
+------------------------------------------------------------------+


+------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report  Air Operator Certificate Information |
+------------------------------------------------------------------+
| Air Operator:  PCSA      AMERIJET INTERNATIONAL INC              |
|                                                                  |
| Air Operator Cert Info----- Cert#:  PCSA059B                     |
|                                                                  |
| Cert Type:  AIR CARRIER           Cert Status:  ACTIVE           |
| Issued:     1975 11 28 Prev Cert#: AT70515                       |
| Stat Dt:    1990 01 25    Exp Dt:                                |
|                                                                  |
| Certificated Kinds Of Operations--------------                   |
|                                                                  |
| Certified---121:     SUPPLEMENTAL C.O.     125:                  |
|             135-Fix:                       135-Roto:             |
|             137:                                                 |
+------------------------------------------------------------------+
```

I.O.P. # 1
2/2

"Flap extended speed" means the highest speed permissible with wing flaps in a prescribed extended position.

"Flash resistant" means not susceptible to burning violently when ignited.

"Flight crewmember" means a pilot, flight engineer, or flight navigator assigned to duty in an aircraft during flight time.

"Flight level" means a level of constant atmospheric pressure related to a reference datum of 29.92 inches of mercury. Each is stated in three digits that represent hundreds of feet. For example, flight level 250 represents a barometric altimeter indication of 25,000 feet; flight level 255, an indication of 25,500 feet.

"Flight plan" means specified information, relating to the intended flight of an aircraft, that is filed orally or in writing with air traffic control.

"Flight time" means:
(1) Pilot time that commences when an aircraft moves under its own power for the purpose of flight and ends when the aircraft comes to rest after landing; or
(2) For a glider without self-launch capability, pilot time that commences when the glider is towed for the purpose of flight and ends when the glider comes to rest after landing.

"Flight visibility" means the average forward horizontal distance, from the cockpit of an aircraft in flight, at which prominent unlighted objects may be seen and identified by day and prominent lighted objects may be seen and identified by night.

"Foreign air carrier" means any person other than a citizen of the United States, who undertakes directly, by lease or other arrangement, to engage in air transportation.

"Foreign air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct or furtherance of a business or vocation, in commerce between a place in the United States and any place outside thereof; whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Foreign air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce between a place in the United States and any place outside of the United States, whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Forward wing" means a forward lifting surface of a canard configuration or tandem-wing configuration airplane. The surface may be a fixed, movable, or variable geometry surface, with or without control surfaces.

"Glider" means a heavier-than-air aircraft that is supported in flight by the dynamic reaction of the air against its lifting surfaces and whose free flight does not depend principally on an engine.

"Go-around power or thrust setting" means the maximum allowable in-flight power or thrust setting identified in the performance data.

"Ground visibility" means prevailing horizontal visibility near the earth's surface as reported by the United States National Weather Service or an accredited observer.

"Gyrodyne" means a rotorcraft whose rotors are normally engine-driven for takeoff, hovering, and landing, and for forward flight through part of its speed range, and whose means of propulsion, consisting usually of conventional propellers, is independent of the rotor system.

"Gyroplane" means a rotorcraft whose rotors are not engine-driven except for initial starting, but are made to rotate by action of the air when the rotorcraft is moving; and whose means of propulsion, consisting usually of conventional propellers, is independent of the rotor system.

"Helicopter" means a rotorcraft that, for its horizontal motion, depends principally on its engine-driven rotors.

"Heliport" means an area of land, water, or structure used or intended to be used for the landing and takeoff of helicopters.

"Idle thrust" means the jet thrust obtained with the engine power control lever set at the stop for the least thrust position at which it can be placed.

"IFR conditions" means weather conditions below the minimum for flight under visual flight rules.

"IFR over-the-top," with respect to the operation of aircraft, means the operation of an aircraft over-the-top on an IFR flight plan when cleared by air traffic control to maintain "VFR conditions" or "VFR conditions on top."

"Indicated airspeed" means the speed of an aircraft as shown on its pitot static airspeed indicator calibrated to reflect standard atmosphere adiabatic compressible flow at sea level uncorrected for airspeed system errors.

I.O.P. # 2     1/6



Amend #47 eff 8-4-97

© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED.

"Medical certificate" means acceptable evidence of physical fitness on a form prescribed by the Administrator.

"Military operations area" (MOA) means an airspace that is established outside Class A airspace to separate or segregate certain nonhazardous military activities from IFR Traffic and to identify for VFR traffic where these activities are conducted.

"Minimum descent altitude" means the lowest altitude, expressed in feet above mean sea level, to which descent is authorized on final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure, where no electronic glide slope is provided.

"Minor alteration" means an alteration other than a major alteration.

"Minor repair" means a repair other than a major repair.

"Navigable airspace" means airspace at and above the minimum flight altitudes prescribed by or under this chapter, including airspace needed for safe takeoff and landing.

"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time.

"Nonprecision approach procedure" means a standard instrument approach procedure in which no electronic glide slope is provided.

"Operate," with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in §91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).

"Operational control," with respect to a flight, means the exercise of authority over initiating, conducting, or terminating a flight.

"Overseas air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct of furtherance of a business or vocation, in commerce between a place in any State of the United States, or the District of Columbia, and any place in a territory or possession of the United States; or between a place in a territory or possession of the United States, and a place in any other territory or possession of the United States.

"Overseas air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce —
(1) Between a place in a State or the District of Columbia and a place in a possession of the United States; or
(2) Between a place in a possession of the United States and a place in another possession of the United States;

whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Over-the-top" means above the layer of clouds or other obscuring phenomena forming the ceiling.

"Parachute" means a device used or intended to be used to retard the fall of a body or object through the air.

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

"Pilotage" means navigation by visual reference to landmarks.

"Pilot in command" means the person who:
(1) Has final authority and responsibility for the operation and safety of the flight;
(2) Has been designated as pilot in command before or during the flight; and
(3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight.

"Pitch setting" means the propeller blade setting as determined by the blade angle measured in a manner, and at a radius, specified by the instruction manual for the propeller.

"Positive control" means control of all air traffic, within designated airspace, by air traffic control.

"Powered-lift" means a heavier-than-air aircraft capable of vertical takeoff, vertical landing, and low speed flight that depends principally on engine-driven lift devices or engine thrust for lift during these flight regimes and on nonrotating airfoil(s) for lift during horizontal flight.

"Precision approach procedure" means a standard instrument approach procedure in which an electronic glide slope is provided, such as ILS and PAR.

**I.O.P. # 2**   2/6

© JEPPESEN SANDERSON, INC., 1996. 1997. ALL RIGHTS RESERVED

## SUBPART T — FLIGHT OPERATIONS

### 121.531 APPLICABILITY

This subpart prescribes requirements for flight operations applicable to all certificate holders, except where otherwise specified.

### 121.533 RESPONSIBILITY FOR OPERATIONAL CONTROL: DOMESTIC OPERATIONS

(a) Each certificate holder conducting domestic operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
  (1) Monitoring the progress of each flight;
  (2) Issuing necessary information for the safety of the flight; and
  (3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

### 121.535 RESPONSIBILITY FOR OPERATIONAL CONTROL: FLAG OPERATIONS

(a) Each certificate holder conducting flag operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
  (1) Monitoring the progress of each flight;
  (2) Issuing necessary instructions and information for the safety of the flight; and
  (3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(f) No pilot may operate an aircraft in a careless or reckless manner so as to endanger life or property.

### 121.537 RESPONSIBILITY FOR OPERATIONAL CONTROL: SUPPLEMENTAL OPERATIONS

(a) Each certificate holder conducting supplemental operations —
  (1) Is responsible for operational control; and
  (2) Shall list each person authorized by it to exercise operational control in its operator's manual.

(b) The pilot in command and the director of operations are jointly responsible for the initiation, continuation, diversion, and termination of a flight in compliance with this chapter and the operations specifications. The director of operations may delegate the functions for the initiation, continuation, diversion, and termination of a flight but he may not delegate the responsibility for those functions.

(c) The director of operations is responsible for canceling, diverting, or delaying a flight if in his opinion or the opinion of the pilot in command the flight cannot operate or continue to operate safely as planned or released. The director of operations is responsible for assuring that each flight is monitored with respect to at least the following:
  (1) Departure of the flight from the place of origin and arrival at the place of destination, including intermediate stops and any diversions therefrom.
  (2) Maintenance and mechanical delays encountered at places of origin and destination and intermediate stops.
  (3) Any known conditions that may adversely affect the safety of flight.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and aircraft. The pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(e) Each pilot in command of an aircraft is responsible for the preflight planning and the operation of the flight in compliance with this chapter and the operations specifications.

I.O.P. # 2    3/6

**A** *Amend #253 eff 2-26-96*

© JEPPESEN SANDERSON, INC., 1996. ALL RIGHTS RESERVED.

✓(f) No pilot may operate an aircraft in a careless or reckless manner, so as to endanger life or property.

## 121.538 AIRPLANE SECURITY

Certificate holders conducting operations under this part shall comply with the applicable security requirements in Part 108 of this chapter.

## 121.539 OPERATIONS NOTICES

Each certificate holder shall notify its appropriate operations personnel of each change in equipment and operating procedures, including each known change in the use of navigation aids, airports, air traffic control procedures and regulations, local airport traffic control rules, and known hazards to flight, including icing and other potentially hazardous meteorological conditions and irregularities in ground and navigation facilities.

## 121.541 OPERATIONS SCHEDULES: DOMESTIC AND FLAG AIR CARRIERS

**A** In establishing flight operations schedules, each certificate holder conducting domestic or flag operations shall allow enough time for the proper servicing of aircraft at intermediate stops, and shall consider the prevailing winds enroute and the cruising speed of the type of aircraft used. This cruising speed may not be more than that resulting from the specified cruising output of the engines.

## 121.542 FLIGHT CREWMEMBER DUTIES

(a) No certificate holder shall require, nor may any flight crewmember perform, any duties during a critical phase of flight except those duties required for the safe operation of the aircraft. Duties such as company required calls made for such nonsafety related purposes as ordering galley supplies and confirming passenger connections, announcements made to passengers promoting the air carrier or pointing out sights of interest, and filling out company payroll and related records are not required for the safe operation of the aircraft.

(b) No flight crewmember may engage in, nor may any pilot in command permit, any activity during a critical phase of flight which could distract any flight crewmember from the performance of his or her duties or which could interfere in any way with the proper conduct of those duties. Activities such as eating meals, engaging in nonessential conversations within the cockpit and nonessential communications between the cabin and cockpit crews, and reading publications not related to the proper conduct of the flight are not required for the safe operation of the aircraft.

(c) For the purposes of this section, critical phases of flight includes all ground operations involving taxi, takeoff and landing, and all other flight operations conducted below 10,000 feet, except cruise flight.

*(handwritten: STERILE COCKPIT)*

**NOTE** — Taxi is defined as "movement of an airplane under its own power on the surface of an airport."

## 121.543 FLIGHT CREWMEMBERS AT CONTROLS

(a) Except as provided in paragraph (b) of this section, each required flight crewmember on flight deck duty must remain at the assigned duty station with seat belt fastened while the aircraft is taking off or landing, and while it is enroute.

(b) A required flight crewmember may leave the assigned duty station —
(1) If the crewmember's absence is necessary for the performance of duties in connection with the operation of the aircraft;
(2) If the crewmember's absence is in connection with physiological needs; or
(3) If the crewmember is taking a rest period, and relief is provided —
  (i) In the case of the assigned pilot in command during the enroute cruise portion of the flight, by a pilot who holds an airline transport pilot certificate and an appropriate type rating, is currently qualified as pilot in command or second in command, and is qualified as pilot in command of that aircraft during the enroute cruise portion of the flight. A second in command qualified to act as a pilot in command enroute need not have completed the following pilot in command requirements: The 6-month recurrent flight training required by §121.433(c)(1)(iii); the operating experience required by §121.434; the takeoffs and landings required by §121.439; the line check required by §121.440; and the 6-month proficiency check or simulator training required by §121.441(a)(1); and
  (ii) In the case of the assigned second in command, by a pilot qualified to act as second in command of that aircraft during enroute operations. However, the relief pilot need not meet the recent experience requirements of §121.439(b).

## 121.545 MANIPULATION OF CONTROLS

No pilot in command may allow any person to manipulate the controls of an aircraft during flight nor may any person manipulate the controls during flight unless that person is —
(a) A qualified pilot of the certificate holder operating that aircraft.

*(handwritten: I.O.P. # 2  4/6)*

## SUBPART G — ADDITIONAL EQUIPMENT AND OPERATING REQUIREMENTS FOR LARGE AND TRANSPORT CATEGORY AIRCRAFT

### 91.601   APPLICABILITY

This subpart applies to operation of large and transport category U.S.-registered civil aircraft.

### 91.603   AURAL SPEED WARNING DEVICE

No person may operate a transport category airplane in air commerce unless that airplane is equipped with an aural speed warning device that complies with §25.1303 (c)(1).

### 91.605   TRANSPORT CATEGORY CIVIL AIRPLANE WEIGHT LIMITATIONS

(a)   No person may take off any transport category airplane (other than a turbine-engine-powered airplane certificated after September 30, 1958) unless —
   (1)   The takeoff weight does not exceed the authorized maximum takeoff weight for the elevation of the airport of takeoff;
   (2)   The elevation of the airport of takeoff is within the altitude range for which maximum takeoff weights have been determined;
   (3)   Normal consumption of fuel and oil in flight to the airport of intended landing will leave a weight on arrival not in excess of the authorized maximum landing weight for the elevation of that airport; and
   (4)   The elevations of the airport of intended landing and of all specified alternate airports are within the altitude range for which maximum landing weights have been determined.

(b)   No person may operate a turbine-engine-powered transport category airplane certificated after September 30, 1958, contrary to the Airplane Flight Manual, or take off that airplane unless —
   (1)   The takeoff weight does not exceed the takeoff weight specified in the Airplane Flight Manual for the elevation of the airport and for the ambient temperature existing at the time of takeoff;
   (2)   Normal consumption of fuel and oil in flight to the airport of intended landing and to the alternate airports will leave a weight on arrival not in excess of the landing weight specified in the Airplane Flight Manual for the elevation of each of the airports involved and for the ambient temperatures expected at the time of landing;
   (3)   The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet). Wet runway distances associated with grooved or porous friction course runways, if provided in the Airplane Flight Manual, may be used only for runways that are grooved or treated with a porous friction course (PFC) overlay, and that the operator determines are designed, constructed, and maintained in a manner acceptable to the Administrator.
   (4)   Where the takeoff distance includes a clearway, the clearway distance is not greater than one-half of —
     (i)   The takeoff run, in the case of airplanes certificated after September 30, 1958, and before August 30, 1959; or
     (ii)   The runway length, in the case of airplanes certificated after August 29, 1959.

(c)   No person may take off a turbine-engine-powered transport category airplane certificated after August 29, 1959, unless, in addition to the requirements of paragraph (b) of this section —
   (1)   The accelerate-stop distance is no greater than the length of the runway plus the length of the stopway (if present); and
   (2)   The takeoff distance is no greater than the length of the runway plus the length of the clearway (if present); and
   (3)   The takeoff run is no greater than the length of the runway.

**I.O.P. # 2    5/6**

© JEPPESEN SANDERSON, INC., 1990, 1998. ALL RIGHTS RESERVED.

(d)  Any person taking off or landing a helicopter certificated under *part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting height-speed envelope established for that helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

## 91.11  PROHIBITION AGAINST INTERFERENCE WITH CREWMEMBERS

No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

## 91.13  CARELESS OR RECKLESS OPERATION



(a)  *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.
(b)  *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

## 91.15  DROPPING OBJECTS

No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property. However, this section does not prohibit the dropping of any object if reasonable precautions are taken to avoid injury or damage to persons or property.

## 91.17  ALCOHOL OR DRUGS

(a)  No person may act or attempt to act as a crewmember of a civil aircraft —
    (1)  Within 8 hours after the consumption of any alcoholic beverage;
    (2)  While under the influence of alcohol;
    (3)  While using any drug that affects the person's faculties in any way contrary to safety; or
    (4)  While having .04 percent by weight or more alcohol in the blood.
(b)  Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.
(c)  A crewmember shall do the following:
    (1)  On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when —
        (i)   The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
        (ii)  The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.
    (2)  Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates percentage by weight of alcohol in the blood.

# I.O.P. # 2

6/6

*(Not published herein — Ed.)

© JEPPESEN SANDERSON, INC., 1990. ALL RIGHTS RESERVED.

Hand Delivered

John C. Roseborough
Principal Operations Inspector
FAA, FSDO-12
1050 Lee Wagener Blvd Suite 201
Ft Lauderdale, FL 33315

Hand-Delivered

RECEIVED BY

OCT - 4 1999

FEDERAL AVIATION ADMINISTRATION
FSDO
FT. LAUDERDALE



Patrick & Beth Major

I.O.P. # 3
1/10



**Patrick Major**

John C. Roseborough
Principal Operations Inspector
Federal Aviation Administration
Flight Standards district Office - 17
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315
Voice: (954) 356-7523, Extension 154
Fax    (954) 356-7531

10-01-99

Dear John,

Following is the text of three memo's-and letters regarding Amerijet Flight 827, 08-17-99, which you and I discussed, Thursday, September 16th.

I reported the incident to the director of operations and chief pilot as required by Amerijet's GOM, recommending the safety officer be notified as well, then sent a report to NASA's ASRS (Aviation Safety Reporting System). Amerijet's GOM further requires that its POI be notified: Thirty days after the incident, you told me it had yet to be reported by anyone other than me.

John, the termination of my employment is a classic whistle blower scenario; the only event between my being an employee in good standing and being fired because Amerijet had, "...lost confidence in my abilities as an airman..." is the complaint regarding a takeoff 15,000Lbs over the maximum performance limit for conditions at the field. That is the subject of a complaint to the DOT Inspector's General's Office. But, I am most concerned that if Amerijet does not immediately change its policies regarding takeoff from wet runways, someone is going to get hurt. The question is, will the FAA take action before that happens, or wait until newspaper headlines, carnage, catastrophe and public outrage leave it no other choice.

If I can be of further assistance, do not hesitate to contact me. The cellular phone is the best way to reach me.

Warmest Regards,

Patrick Major

**I.O.P. # 3**

2/10



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP, 08-17-99.

Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

Warmest Regards,

Pat

I.O.P. # 3
3/10





**Patrick Major**

FAX
The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.

**FAX To:** David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
**Date:** 08-25-99
**Subject:** NASA ASRS Report

Greetings Dave,

*Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off* performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence you would ever see it if I did not submit it to you directly.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, *accept my apologies.*

Warmest Regards,

Pat

**I.O.P. #** 3
4 / 10



Copy for John Rashborough,
POI, FAA, FSDO-17        **Patrick Major**

### NASA, Aviation Safety Reporting System
### (ASRS report)

**Report Date:** 08-18-1999, Incident Date: 08-17-99
**Time:** 23:40z, Location: KFLL,
**Type of Operation:** FAR Part 121, Supplemental Air Carrier-Cargo Only.
**Type of Aircraft:** B-727/200, Advanced, w/Pemco Cargo Door Modification
**Engines:** JT8D-15 (3).
**Reported by:** First Officer, Flight Experience: 7,700hrs.,
**Ratings:** Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, FAR Part 142 Certified Pilot and Flight Engineer Instructor/Boeing 727.
**Flight Phase:** Takeoff, Airspace: Class C.
**Weather Factors:** Thunderstorms in vicinity, rainshowers overhead, contaminated runway; conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International, Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed through the area and were forecast to continue throughout the evening. When I arrived, the field was under heavy rainshowers. Anticipating a max-weight performance-limited takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated interpretation regarding the Navtech runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff controversy which took place June 08, 1999, out of MIA. On that rainy morning, a Continental 727 had taxied into position and hold RW-12, then declined takeoff clearance... requesting full length 9L, instead. The night before it had rained ten inches. It was raining at the time. While Tower had not provided a runway condition report, the runways were obviously wet. Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without prompting from the captain, I declined, reminding Tower that our flight required full-length 9L. The captain chastised me for refusing RW-12 against his wishes (even though we had just finished discussing that the runway analysis did not support it, even on a dry day, even if we believed the weights reported by ramp personnel). The captain insisted I radio-back Tower and accept RW-12. I demurred. After a brief discussion, AJT 823 finally departed full-length 9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300' longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.



I.0.P. # 3

However, my refusal to accept RW-12 became the subject of a disciplinary complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation against me for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. 9L FLL is 355 feet shorter than 12 in MIA While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), regardless how wet a runway, Amerijet flight crews are taught by the training department and warned by dispatch personnel to consider all runways "Dry" for performance planning purposes unless there exists a contamination report containing the specific words, "Standing Water."  Though there are frequent storms in the area, rarely are contamination reports conducted at South Florida Airports.  Most airlines encourage their crews to simply accept the "Standing Water less than 1/4"" penalty...reasoning that the penalty applies to depths as shallow as 1/8"... and is clearly the safest option.  Some Boeing performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot max-weight V1 speed reduction for runways that are, "...well-soaked with water but do not have large areas of actual standing water."  But absent a contamination report specifically including the term "Standing Water", Amerijet considers all runways dry.  Considering drag induced as aircraft tires displace water on the runway surface, additional drag produced by water spraying against the fuselage and wings, as well as reduced braking implications, that policy could be a recipe for disaster.  As of August 17, 1999, these concerns had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08.  9L in FLL is 355' shorter than 12 in MIA: 1,501' shorter than MIA 9L.  The conditions were significantly worse August 17, than they had been June 08.  Even so, the dispatcher I queried reported to me that to his understanding Amerijet performance policies do not observe weight penalties unless "Standing water" is reported.  I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use.  Hence, the landing numbers imply a braking degradation and an impediment to acceleration when runway surfaces are wet ... irrespective of whether or not the runway contains "Standing water."  "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights," I said.  The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' actually reported on the runway, it's dry."

**I.O.P. #3**

**6/10**

L.FAA.JRoseborough, 10/1/99, page 6

As aircraft 397AJ was loaded for departure, I explained my question to the check airman who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safest solution and accept the "Standing Water ≤ 1/4" weight and V1 penalty.   That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts.  The reported weight of our aircraft that day was 192,298 Lbs.  The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late.   Both the check airman and the captain jokingly dismissed my concern, "We'll have to takeoff between the water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.    He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity.  I asked if a runway report was available.  "No braking action reports have been made.  A runway inspection report is not yet available."    The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower".   Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us ... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway surface.    The ground controller then called "Ramp One" to request a runway inspection.  Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower.  Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L.  As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst adjacent the channels of accumulated rubber left by successive landing and departing aircraft.   No contamination report had been relayed, as yet; it looked like we were going without it.  So, I asked the captain if he would use a packs-off takeoff, "...For the grandmothers, wives and kids?"  The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect it.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows:  'Wet, Standing Water, less than 1/4 inch.  AJT 827 is cleared for takeoff, turn right heading one zero zero."  As Tower began its transmission, the captain advanced the throttles and released the brakes. Probably because the aircraft was already rolling, tower issued the takeoff clearance without pause or delay.  Before I could even begin to reply to the report and clearance, the aircraft was accelerating down the runway.   Previously, I thought I would have a chance to prevent

I.O.P. # 3

7/10

the takeoff when the controller inevitably asked, "AJT 827, state your intentions." He did not.
Suddenly, I was isolated and out of options.    Neither the flight engineer, flight engineer
trainee, check-airman, or captain shared my concern regarding the weather, runway
contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or
otherwise interfere with the captain's choice to takeoff. Perhaps, I should have. I feared an
aborted takeoff on a wet runway with the captain and I fighting over the controls could have
been just as dangerous.    If all three engines operated normally, if no windshear was
encountered, perhaps the takeoff would be safer than a mutiny-abort on a wet runway in
driving rain.  AJT 827 used all available runway.    The captain rotated well inside the
alternating red and white lights at an indicated airspeed five knots below V1.    The main
wheels broke ground at the last possible instant and the aircraft crossed the airport
boundary at approximately 100' struggling to attain V2, then V2 plus ten Kts, with the
airspeed fluctuating +/- 3-5 Kts.  I called-out the fluctuations then held my breath, praying for
altitude.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a
direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of
nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This
airline is not approved for GPS navigation." (referring to the GPS installed in the aircraft, but
not approved in the ops specs).

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied.
"I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as
long as I can navigate within the limits of Class II navigation described in the Ops Specs. I
can confirm progress along my route by checking crossing radials and DME. I just need to
be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked.  "Do you realize how incongruent that sounds coming from a
check airman who just goaded a flight crew into taking off from a contaminated runway into
possible windshear fifteen thousand pounds over the maximum performance limit? Even if I
am wrong about navigating direct, ...and I don't think I am, one could get us violated, the
other will get us killed. What is safe about that?"

AJT flight 827 exceeded aircraft limitations and violated FAA regulations in flagrant disregard
for the most basic of air safety principles and CRM (cockpit resource management). It took
off from a contaminated runway weighing fifteen thousand pounds more than the maximum
specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the consequences inevitably bestowed upon any air carrier
which actively cultivates a culture of noncompliance will soon come to roost at Amerijet, and
for the devastation and loss of life such a tragedy would entail, but for the missing
information in Amerijet's runway analysis pertaining to performance degradations on



**I.O.P. # 3**

8/10

runways that are obviously contaminated, but have not been officially described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning policies, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the official report.

Among my many mistakes August 17, was letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Although it should not have been necessary, due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the 'sacred cow' brother of its vice president, director of operations, and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Admittedly, that was the captain's job, but had I insisted on such a plan before the aircraft taxied out of the ramp for takeoff, I may have avoided the circumstances which placed me and the rest of the crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff once such a report was issued. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...as well as the strident actions required to prevent takeoff once initiated. But with the aircraft already rolling, Tower probably figured he had his answer.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the check airman and captain prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Would that have worked? Honestly, that did not occur to me until later. I made a judgment call and elected not to intervene once the takeoff roll began. Not a day passes that I don't relive the possible consequences of my choice.

Contributing factors included my deference to authority in the cockpit, not only with regard to the presence of a check airman who I held in high regard, and that particular captain (most other captains would not have been out there to start with), but pertaining to the recency of



I.O.P. # 3
a /10

what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and ongoing concern for flight safety and regulatory compliance at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way, impervious to the legitimacy of their concerns, by denying them promotional and professional opportunities, abusing them in the simulator if need be, terminating their employment and exploiting the PRIA (Pilot Records Improvement Act, 1996) to soil their careers... while sending an unmistakably clear message to other flight crew lest they, too, consider showing unwelcome interest in flight safety.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

Copy for John Roseborough
POI, FAA, FSDO - 17

10-01-95

I.O.P. # 3
10/10

# Memorandum



**U.S. Department
of Transportation
Federal Aviation
Administration**

Ft. Lauderdale International ATC Tower
4150 S.W. 12 Terrace
Ft. Lauderdale, Fl. 33315

---

Subject **INFORMATION:** Tape Request

Date: October 25, 1999

From: Manager

Reply To
Attn. of: FLL-2

Ft. Lauderdale Int'l ATC Tower

To:
Manager, Ft Lauderdale FSDO-17

Per telephone request of October 22, 1999, the following tape recording is enclosed.

Ft. Lauderdale ATC Tower
August 17, 1999 UTC
Ground Control 2340 UTC-0000 UTC
Local Control North 2340 UTC – 0000 UTC

Please advise if we can be of any further assistance.

Ronald S. Boyd

I.O.P. # 4
1/2

COPY OF FLL ATCT
TAPE AJT 827
8/17/99
ORIGINAL WITH
2........... 9
14.10 ......... LOCAL
...... ..... UTC

i.O.P. # 1

4

FORT LAUDERDALE INTERNATIONAL AIR TRAFFIC CONTROL TOWER
CERTIFIED RE-RECORDING OF AMERIJET (PCSA) FLIGHT 827 OCCURRING
AUGUST 17, 1999 DURING THE TIME PERIOD FROM 2340 UTC - 0000 UTC
(1940 - 2000 LOCAL DAYLIGHT SAVINGS TIME).

THE RE-RECORDING WAS PREPARED BY MICHAEL T. JONES, SUPPORT
SPECIALIST AT THE FORT LAUDERDALE-HOLLYWOOD AIR TRAFFIC
CONTROL TOWER.

THE COUNTER NUMBERS BELOW REPRESENT EITHER AMERIJET OR
FORT LAUDERDALE ATC VOICE COMMUNICATIONS AS PERTAIN TO AMJ
FLIGHT 827. MOST OTHER VOICE COMMUNICATIONS HAVE NOT BEEN
IDENTIFIED WITH COUNTER NUMBERS. DUE TO THE EXTRANEOUS NOISE
EMITTED IN THE SIDETONE OF THE RE-RECORDING, A CLEARER VOICE
TRANSMISSION/RENDITION CAN BE HEARD WHEN PLAYED ON A STEREO
RECORDER/PLAYER WITH THE VOLUME ON ONE SIDE TURNED LOWER.

| COUNTER (APPROX.) | DIALOGUE | BY |
|---|---|---|
| 129 | DELAY AHEAD? | AMJ |
| 138 | RWY CONDITION WET, NO REPORTS | ATC |
| 146 | WE'RE GONNA NEED A STANDING WATER REPORT | ATC |
| 168 | AMJ 827 REQUESTS TAXI | AMJ |
| 171 | AMJ 827 HOLD SHORT OF TAXIWAY BRAVO, STAND BY | ATC |
| 183 | RAMP 1 CALLS FLL ATCT | |
| 194 | AMJ 827 CALLS ASKING FOR THE CURRENT WINDS | AMJ |
| 198 | AMJ 827, WILL YOU BE ABLE TO DEPART | ATC |
| 203 | AMJ 827, TAXI TO RUNWAY 9 LEFT | ATC |
| 239 | RAMP ONE CALLS | |
| 241 | PROCEED | ATC |
| 243 | AJT IS ASKED IF THEY CAN ACCEPT DEPARTURE | ATC |
| 276 | RAMP ONE CALLS | |

279   RAMP ONE ADVISES LESS THAN ¼ INCH, GOOD DRAINAGE,
SLIGHT STANDING WATER ABOUT 6 FEET ON EITHER SIDE OF
CENTERLINE

349   CONVECTIVE SIGMET 51E AVAILABLE                    ATC

**I.O.P. # 5**

1/2

5

**433** LOCAL CONTROL, NORTH POSITION COMMUNICATIONS BEGIN

**464** DELTA 312 HEAVY (LOCKHEED L-1011, TRISTAR)
**466** DELTA 312, CLEARED FOR TAKEOFF                    ATC

**512** US AIR 2335 CALLS TO INQUIRE ABOUT WHAT WEATHER ATC SHOWS WITHIN 15 MILES OF FLL. ATC ADVISES THAT MAIN BODY OF STORM WILL BE AVOIDED WITH A 110 DEGREE HEADING AFTER TAKEOFF (20 DEGREES RIGHT OF TAKEOFF HEADING)

**584** AMJ827 CALLS                                     AMJ
**585** AMJ 827, ARE YOU READY FOR DEPARTURE             ATC

**586** YES SIR, 827, YOU'LL PASS ON THAT RUNWAY REPORT WHEN YOU GET IT, RIGHT?                              AMJ

**587** YES, HE'S OUT THERE INSPECTING IT RIGHT NOW     ATC

**589** AMJ 827, GO OUT B2 AND BACK TAXI INTO POSITION AND HOLD                                                ATC

**607** AMJ 827, HE REPORTS THERE'S SOME STANDING WATER LESS THAN A QUARTER ON AN INCH                        ATC

**609** SOME STANDING WATER LESS THAN A QUARTER OF AN INCH, AMJ 827 READY FOR TAKEOFF                         AMJ

**610** AMJ 827 RUNWAY 9 LEFT CLEARED FOR TAKEOFF, TURN RIGHT HEADING 110                                     ATC

**611** RIGHT HEADING 110, CLEARED FOR TAKEOFF, AMJ 827, THANK YOU MUCH.                                      AMJ

**832** CHANGE YOUR CODE TO 1153                         ATC
**833** 1123, 827                                        AMJ

THANK YOU, CONTACT MIAMI DEPARTURE                  ATC

I.O.P. # 5
2/2



ADVERSE WEATHER TAKEOFF AND CLIMB - Reference 4:1:55

## Takeoff Limitations

Takeoff should not be attempted if the following limitations are exceeded:

- Dry snow more than 6 inches deep.

- Slush or wet snow more than 1/2 inch deep.

- Water more than 1/4 inch deep.

When values less than the aforementioned limits exist, check Performance Manual for appropriate reductions to maximum takeoff gross weight.

> CAUTION: DURING TAKEOFF, SNOW AND SLUSH PICKED UP BETWEEN THE NOSE-
> WHEEL TIRES MAY BE THROWN BACK AND PACKED INTO THE RAM AIR
> INLET, CAUSING BOTH AIR CONDITIONING PACKS TO TRIP OFF.  TO
> REDUCE THE POSSIBILITY OF THIS OCCURRING, THE RAM AIR DOORS
> MAY BE POSITIONED TO THE FULL CLOSED POSITIONS JUST PRIOR TO
> TAKEOFF.

## Airplane Control

Exercise extreme caution in crosswinds.  Normally, it is recommended that a runway more into the wind be requested when crosswind components over 15 kts are reported on known slippery runways.

> CAUTION: ENSURE THAT PARKING BRAKE IS RELEASED BEFORE STARTING
> TAKEOFF ROLL ON ICE OR SNOW COVERED RUNWAYS.

## Setting Takeoff Thrust

Align the airplane with the runway before increasing thrust. If engine anti-ice is being used for takeoff, ensure that engine thrust is increased to the highest practicable setting (80% N1 recommended) for 10 to 15 seconds before setting takeoff thrust. Observe stable engine operation before brake release.

Engine inlet ice can affect EPR indications.  When takeoff thrust is set in icing conditions, crosscheck all engine instruments.  Ensure that the indica-tions are reasonable and that no engine limits are exceeded.  Specifically, compare the N1 readings with the anticipated value and be prepared to reject the takeoff if a discrepancy exists between the EPR and N1 readings.

If the airplane starts to slide on ice or snow, release the brakes and begin the takeoff roll, but ensure that the instrument crosscheck is accomplished, including the comparison of the EPR and N1 readings.  Apply firm nosedown elevator pressure to aid nose wheel steering effectiveness. Don't allow the lag in nose wheel steering effectiveness to cause over-controlling on slippery surfaces.

I.O.P. # 6



NAVTECH

The Runway Analysis provides data for takeoff and landing performance in adverse weather conditions for the B727-200 powered by JT8D-15/17 engines. Data are presented for operations on wet, standing water and snow covered runways in accordance with the guidelines and recommendations of FAA.

**WET RUNWAY** – A runway is considered wet when it is well soaked but without significant areas of standing water (depth less than 1/8 inch or 3mm of standing water). A runway is considered to be well soaked when there is sufficient moisture on the runway surface to cause it to appear reflective.

**RUNWAY CONTAMINATED BY STANDING WATER, SLUSH OR SNOW** – A runway is considered contaminated when at least 25% of the runway within the required length and width being used is covered by slush, standing water or snow greater than 3mm of equivalent water depth.

> • *Additional consideration: If the contaminates are lying on that portion of the runway where the high speed part of the takeoff roll will occur, it MAY BE appropriate to consider the runway contaminated.*

Daniel Liu

Aircraft Performance Engineer
Navtech Systems Support Inc.

**I.O.P. # 6**

2/3

Navtech Systems Support Inc.
175 Columbia Street West, Suite 102      Waterloo, Ontario, Canada, N2L 5Z5      Phone (519) 747-1170      Fax (519) 747-1827

SITA - YYZNSCR   AFTN - CYYZXNSX   ARINC - YKFNSCR

**AMERIJET INTERNATIONAL**      **FORT LAUDERDALE, FL**

**B-727-200   JT8D-15**      **HOLLYWOOD INTL**

**KFLL    09L**      **FLAPS   20**

| | | | | A/C | POD | N1% | GO | ENG ANTI-ICE A/C | | | PACKS | ON | TORA | = | 9000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEMP | | ZERO | CLIMB | OFF | MAX | FOR | ARND | ZERO | CLIMB | OFF | NOSE BRKS | OFF | TODA | = | 9000 |
| F | C | WIND | LIMIT | (+) | EPR | T/O | EPR | WIND | LIMIT | (+) | 210 MPH | TIRE | ASDA | = | 9000 |
| | | | | | | | | | | | ELEV = | 11 | GRAD | = | -.01% |

| -10 | -23 | 2000 C | 1980 | 0 C | 2.09 | 90 | 2.07 | 1975 | 1957 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | -18 | 2000 C | 1980 | 0 C | 2.09 | 91 | 2.07 | 1983 | 1957 | 0 |
| 10 | -12 | 2000 C | 1980 | 0 C | 2.09 | 92 | 2.07 | 1983 | 1957 | 0 |
| 20 | -7 | 2000 C | 1980 | 0 C | 2.09 | 93 | 2.07 | 1983 | 1957 | 0 |
| 30 | -1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 32 | 0 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 34 | 1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 36 | 2 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 38 | 3 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 40 | 4 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 42 | 6 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 44 | 7 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 46 | 8 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | ·0 |
| 48 | 9 | 1999 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1982 | 1957 | 0 |
| 50 | 10 | 1996 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1979 | 1957 | 0 |
| 52 | 11 | 1993 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 54 | 12 | 1990 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 56 | 13 | 1987 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 58 | 14 | 1984 C | 1980 | 0 C | 2.09 | 97 | 2.07 | | | |
| 60 | 16 | 1979 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 62 | 17 | 1975 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 64 | 18 | 1971 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 66 | 19 | 1967 R | 1969 | 2 R | 2.09 | 97 | 2.07 | | | |
| 68 | 20 | 1963 R | 1969 | 6 R | 2.09 | 98 | 2.07 | | | |
| 70 | 21 | 1961 R | 1969 | 8 R | 2.09 | 98 | 2.07 | | | |
| 72 | 22 | 1960 R | 1969 | 9 R | 2.09 | 98 | 2.07 | | | |
| 74 | 23 | 1958 R | 1969 | 11 R | 2.09 | 98 | 2.07 | | | |
| 76 | 24 | 1956 R | 1969 | 13 R | 2.09 | 98 | 2.07 | | | |
| 78 | 26 | 1952 R | 1969 | 14 R | 2.09 | 98 | 2.07 | | | |
| 80 | 27 | 1949 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 82 | 28 | 1946 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 84 | 29 | 1942 R | 1970 | 15 R | 2.09 | 99 | 2.07 | | | |
| 86 | 30 | 1928 R | 1951 | 15 R | 2.08 | 99 | 2.07 | | | |
| 88 | 31 | 1917 R | 1936 | 14 R | 2.07 | 99 | 2.07 | | | |
| 90 | 32 | 1906 R | 1921 | 13 R | 2.06 | 99 | 2.07 | | | |
| 92 | 33 | 1895 R | 1906 | 11 R | 2.05 | 98 | 2.06 | | | |
| 94 | 34 | 1884 R | 1691 | 7 R | 2.04 | 98 | 2.05 | | | |
| 96 | 36 | 1861 R | 1861 | 0 R | 2.02 | 98 | 2.04 | | | |
| 98 | 37 | 1849 C | 1847 | 0 C | 2.01 | 98 | 2.03 | | | |
| 100 | 38 | 1837 C | 1832 | 0 C | 2.01 | 98 | 2.02 | | | |
| 102 | 39 | 1826 C | 1818 | 0 C | 2.00 | 97 | 2.01 | | | |
| 104 | 40 | 1814 C | 1803 | 0 C | 1.99 | 97 | 2.00 | | | |
| 106 | 41 | 1803 C | 1789 | 0 C | 1.98 | 97 | 1.99 | | | |
| 108 | 42 | 1792 C | 1774 | 0 C | 1.97 | 97 | 1.98 | | | |
| 110 | 43 | 1781 C | 1759 | 0 C | 1.96 | 97 | 1.96 | | | |
| 112 | 44 | 1770 C | 1744 | 0 C | 1.95 | 97 | 1.95 | | | |
| 114 | 46 | 1748 C | 1715 | 0 C | 1.93 | 96 | 1.94 | | | |
| 116 | 47 | 1736 C | 1701 | 0 C | 1.92 | 96 | 1.93 | | | |
| 118 | 48 | 1724 C | 1687 | 0 C | 1.92 | 96 | 1.92 | | | |
| 120 | 49 | 1712 C | 1672 | 0 C | 1.91 | 96 | 1.91 | | | |

----NOTES----

1. CTR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.03    +.01
   ICE ON    NONE    -.02

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON    +.04

3. FLAP RETRACT HT (OCH)
   = 811 FTMSL

4. OBST: HT (FT AGL)  DIST (NM)
   50    1.81

DATE: 12/09/92

**GROSS WEIGHT CORRECTIONS**

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
1 DEGREE F HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    0 LBS/KT EFF HEAD W
SUB FROM ZERO WIND  1301 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
*WIND   *RUNWAY SHORTENING   *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
*MEL PERFORMANCE DECREMENTS

**RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS**

| | STANDING | REDUCE | REDUCE |
|---|---|---|---|
| | WATER | ZERO | V1 |
| DRY | SLUSH OR | WIND W | SPEED |
| SNOW | WET SNOW | BY: | BY: |
| -IN- | -IN- | -LBS- | -KNOTS- |
| | < 1/4 | 17000 | 28 ← |
| 3 1/2 TO 6 | 1/4 TO 1/2 | 30000 | 25 |
| ICE | | 17000 | 28 |
| ANTI-SKID INOP | | 8500 | 18 |

\* = CHECK MAX STRUCTURAL WT

**LANDING DATA**      PACKS ON

| | | | ---------- DRY ---------- | | | | ---------- WET ---------- | | | | SUB LB/F | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MAX WT | | | | MAX WT | | | | APT | ABOVE | MAX |
| LNDG | | ANTI | ZERO | HW | CRIT | TW | ZERO | HW | CRIT | TW | CRIT | CRIT | OPER |
| FLAP | LENGTH | SKID | WIND | ADJ | TW | ADJ | WIND | ADJ | TW | ADJ | TEMP | TEMP | TEMP |
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 143 | 0 | 120 |

3/3      **I.O.P. # 6**

NAVTECH SYSTEMS

```
+(WCAISM1)-----------------------------------------------------------+
| ISIS Airman Report              CAIS Information - Basic Information |
| Cert Pfx:    Cert No: 265456264  Cert Sfx:    [REDACTED]            |
+--------------------------------------------------------------------+
| Name:  STEELE, BRIAN A                            Name-Sfx:         |
|                                                                    |
| [REDACTED]                                                         |
|                                                                    |
| Status:              Info:     Name/Address Source:  Airm          |
| Date of Address Update: 1999 05 15   Citizenship:  USA             |
| Street: [REDACTED]                        County:  083             |
| City: [REDACTED]          State: [REDACTED] Zip: [REDACTED]         |
| Country:                                                           |
+--------------------------------------------------------------------+
```
   THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.


```
+(WCAISM3)-----------------------------------------------------------+
| ISIS Airman Report                CAIS Information - Medical        |
| Cert Pfx:    Cert No: 265456264  Cert Sfx:            Information   |
+--------------------------------------------------------------------+
| Medical Information for: STEELE, BRIAN A                            |
|  Class:              First                                          |
|  Certificate Desc.:  CLEAR                                          |
|                                                                    |
|  Medical Date: 1999 05 18   Medical ID#: 99097461   Pathology:     |
|                                                                    |
|  Restriction:                                                      |
|                                                                    |
+--------------------------------------------------------------------+
```
   THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.


1/4

I.O.P. # 2

```
+(WCAISM2)-------------------------------------------------------------------+
¦ ISIS Airman Report                     CAIS Information - Certificate      ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:              Information         ¦
+----------------------------------------------------------------------------+
¦  Pilot Information for:        STEELE          BRIAN A                      ¦
¦  Cert-Level:  AIRLINE TRANSPORT PILOT                                       ¦
¦  Rating/Level:                                                             ¦
¦   AIRPLANE MULTIENGINE LAND/AIRLINE TRANSPORT PILOT                        ¦
¦   AIRPLANE SINGLE ENGINE LAND/PRIVATE PILOT                               ¦
¦                                                                            ¦
¦                                                                            ¦
¦  Type Rating/Level:                                                        ¦
¦  B-727/AIRLINE TRANSPORT PILOT                                             ¦
¦                                                                            ¦
¦                                                                            ¦
¦                                                                            ¦
¦                                                                            ¦
¦  Date of Issue: 1995 04 20   Update Date:  1995 10 12                      ¦
¦           Seal: Blue         Cert Status:  Active                          ¦
+----------------------------------------------------------------------------+
```

```
+(WCAISM2)-------------------------------------------------------------------+
¦ ISIS Airman Report                     CAIS Information - Certificate      ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:              Information         ¦
+----------------------------------------------------------------------------+
¦  Acft Mechanic Info           STEELE          BRIAN A                       ¦
¦  Cert-Level:  MECHANIC                                                      ¦
¦  Rating/Level:                                                             ¦
¦   AIRFRAME/MECHANIC                                                        ¦
¦   POWERPLANT/MECHANIC                                                      ¦
¦                                                                            ¦
¦                                                                            ¦
¦  Type Rating/Level:                                                        ¦
¦                                                                            ¦
¦                                                                            ¦
¦                                                                            ¦
¦                                                                            ¦
¦  Date of Issue: 1985 01 07   Update Date:  1995 10 12                      ¦
¦           Seal: Black        Cert Status:  Active                          ¦
+----------------------------------------------------------------------------+
```

2/4
I.0.P. # 2

```
+-(WCAISM2)----------------------------------------------------------------+
¦ ISIS Airman Report                    CAIS Information - Certificate      ¦
¦ Cert Pfx:    Cert No: 265456264  Cert Sfx:              Information       ¦
+--------------------------------------------------------------------------+
¦  Flt Engineer Info              STEELE          BRIAN A                   ¦
¦  Cert-Level:  FLIGHT ENGINEER                                             ¦
¦  Rating/Level:                                                            ¦
¦   TURBOJET POWERED/FE                                                     ¦
¦                                                                           ¦
¦                                                                           ¦
¦                                                                           ¦
¦  Type Rating/Level:                                                       ¦
¦                                                                           ¦
¦                                                                           ¦
¦                                                                           ¦
¦                                                                           ¦
¦                                                                           ¦
¦  Date of Issue: 1986 07 16   Update Date:  1995 10 12                     ¦
¦           Seal: Black        Cert Status:  Active                         ¦
+--------------------------------------------------------------------------+
```


            ISIS ACCIDENT/INCIDENT (AID) REPORT


            NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 265456264
            ISIS ACCIDENT/INCIDENT (AID) REPORT


            NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 265456264
            ISIS ACCIDENT/INCIDENT (AID) REPORT


            NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 265456264


                                        3/4
                                    I.O.P. # 2

ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00265456264
ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00265456264
ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00265456264

4/4
I.O.P. # 7

AMERIJET
INTERNATIONAL

Chapter:    Introduction
Page:       Preface
Issued:     09/01/99
Revision:   65

WEIGHT AND BALANCE MANUAL

General Information

| Aircraft No. | B.O.W Weight | Moment |
|---|---|---|
| N794AJ | 93,316 | 88178325 |
| N994AJ | 94,139 | 88105202 |
| N395AJ | 93,883 | 88124473 |
| N495AJ | 92,711 | 87181149 |
| N895AJ | 93,005 | 88056640 |
| N196AJ | 92,819 | 87773553 |
| N296AJ | 93,379 | 87734708 |
| N397AJ | 93,308 | 88534151 |
| N797AJ | 92,868 | 88022669 |
| N598AJ | 92,772 | 87088635 |

**I.O.P. # 8**

1/2

FAA APPROVED, FT LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

1 6 SEP 1999

## WEIGHT AND BALANCE MANUAL

### WEIGHT AND BALANCE

### FLEET WEIGHT LIMITATIONS

| FLEET WEIGHT LIMITATIONS | N994AJ → N397AJ ← N395AJ<br>N495AJ    N797AJ | | |
|---|---|---|---|

| | N994AJ<br>N495AJ | N397AJ<br>N797AJ | N395AJ |
|---|---|---|---|
| Maximum Taxi Weight -<br>(AFM) | 197,700 | 197,700 | 197,700 |
| *Maximum Taxi Weight is a structural limit for taxiing* | | | |
| **MAXIMUM TAKE-OFF WEIGHT** | 197,000 | 197,000 | 197,000 |
| This is the maximum allowable gross weight at brake release, just prior to takeoff roll | | | |
| **MAXIMUM IN-FLIGHT WEIGHT**<br>(AFM) | | | |
| FLAPS UP | **NOTE | 196,000 | **NOTE |
| FLAPS 30 | **NOTE | 164,000 | **NOTE |
| FLAPS 40 | **NOTE | 142,500 | **NOTE |
| **MAXIMUM LANDING WEIGHT -**<br>(AFM) | | | |
| FLAPS 30 | 164,000 | 164,000 | *164,000 |
| FLAPS 40 | 142,500 | 142,500 | (*EMERGENCY USE ONLY) |
| **MAXIMUM ZERO FUEL WEIGHT -** | 155,000 | 155,000 | 155,00 |

**NOTE: N994J maximum in-flight weight - 196,000.

**NOTE: N395AJ maximum in-flight weight - 196,000.

**NOTE: N495AJ maximum in-flight weight - 196,000.

*NOTE: QW Landing Data

**I.O.P. # 8**
**2/2**

AMERIJET FLEET LIMITATIONS

Maximum Operating Airspeed of Vmo equals 350 knots indicated airspeed (KIAS), or code "B" [350 knots equivalent airspeed (KIAS)].

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
1 6 SEP 1999



AIRCRAFT LOG BOOK    AIRCRAFT MAINTENANCE LOG    FORM M1

A/C TYPE B727    AIRCRAFT # 3970    FLIGHT CODE

I.O.P. # 9

52010

| EMPLOYEE NO. | INT | OPERATING & ALL DEADHEAD CREW MEMBERS |
|---|---|---|
| 2025 | B | Steele |
| 803 | P | Major |
| 6740 | O | Ramsingh |
| 7857 | B | Wise |
| 42093 | A | Norris, Sr. |

DISCREPANCIES (PLEASE PRINT)
In transit check due
In transit check complete

06070-WJZ Document 134 Entered on FLSD Docket 03/26/2001 Pa

AMERIJET FLIGHT RELEASE

ARTCC MIAMI (DMA) MRIN 305-716-1500   DATA 305-716-1640

08/17/99 (Z DATE)   TIME 2055Z   TRIP/DATE 827/17   AIRCRAFT N9/2J   B727/A   ETD 2000

*HON FT LAUDERDALE   TO PORT OF SPAIN

FILED ROUTE:   ZBV R555 DOP-N G449 POS

PLANNED ROUTE ZBV ZGA ZL5-N INDEE GTK R555 DOP-N G449 POS

TOTAL DISTANCE 1459.9   DIRECT DISTANCE 1413.9   3.7   ALTERNATE   SOMB (1155 N) / 277 DEG)

PLANNED WARN 37.2   3:20

ALTERNATE 5.3   0:30   NECH 77

10% EXTRA FUEL 3.5   0:20   INDICATED AIRSPEED 300

RESERVE 4.1   0:30   TRUE AIRSPEED 470

HOLDING FUEL 0.0   0:00   FLIGHT LEVEL 290

TRIP FUEL 0.5   ZERO FUEL WEIGHT 141.8

REQUIRED FUEL 51.6   4:40   TAKE OFF WEIGHT 132.5

RDF 13.5   LANDING FUEL 13.9

EXTRA FUEL 0.0   0:00   LANDING WEIGHT 155.7

BLOCK FUEL 51.6   4:40   TOTAL BURN 38.1 (INCLUDES TAXI)

FOR EACH 10.0 OVER PLANNED TAKE OFF WEIGHT BURN WILL BE 1.5 OVER PLANNED BURN

PLANNED CARGO 49.1   MAX CARGO 50.2

CRUISE CNT -35 (ISA + 12)

PREPARED BY: K11 TIMPRI
CAPTAIN: BRIAN STEELE
FIRST OFFICER: PAT MAJOR
SECOND OFFICER: BRETT WISE
DISPATCHER: A. JORSEY
U. KOMSINO31

DM1 MEMBER   DATE   MEL REF
8342   07/18/1998   24-72   DOCS DETAINED PER MOD UNDER ABOUT 0AM
8465   07/24/1998   24-1   A 2 DAY DIFFERENTIAL PRESS

PG. 194.2 AEL IS BASED ON STRUCTURAL LIMITS ONLY NO AIRPORT DATA ON FILE FOR FT LAUDERDALE
WINDS: (24/76)DENOT 40/5   (20/65)HARDY 120/5   (14/63)PELMA 70/10

| | FROM/TO | | FREQ | LEB | MTG | TIME REM | GS | TIME | TOT TIME | BURN | TOT BURN | FUEL REM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KFLL | 118 D 119 | ZBV | 116.7 | 31 | 1409 | | 320 | | | | TAKEOFF FUEL | 51.1 |
| ZBV | 116 | | *FIR* | 95/0MM | 17 | 1391 | | 60 | | | | | |
| *FIR* | | TDC | | 69 | 1322 | 2:55 | 320 | 0:26 | 0:26 | 6.3 | 6.3 | 44.8 |
| TDC | D 112 | ZGA | 112.7 | 82 | 1301 | 2:52 | 471 | 0:03 | 0:29 | 0.2 | 6.8 | 44.3 |
| ZGA | 126 D 126 | ZL5-N | 526.0 | 148 | 1153 | 2:33 | 472 | 0:19 | 0:47 | 3.7 | 10.5 | 41.6 |
| ZL5-N | 119 D 119 | INDEE | | 55 | 1098 | 2:26 | 469 | 0:07 | 0:54 | 1.4 | 11.9 | 39.6 |
| INDEE | 119 D 120 | GTK | 114.2 | 207 | 891 | 1:59 | 467 | 0:27 | 1:21 | 5.1 | 16.9 | 34.6 |
| GTK | 132 A 133 | COCOU | | 32 | 859 | 1:55 | 464 | 0:04 | 1:25 | 0.8 | 17.7 | 33.8 |
| COCOU | 133 A 133 | 69001 | | 69 | 790 | 1:47 | 465 | 0:09 | 1:34 | 1.7 | 19.4 | 31.6 |
| GROOI | 134 A 134 | HARDY | *FJJ54 | 55 | 735 | 1:39 | 465 | 0:07 | 1:41 | 1.3 | 20.7 | 30.4 |
| HARDY | 134 A 135 | IDAHO | | 80 | 654 | 1:29 | 465 | 0:10 | 1:51 | 1.9 | 22.6 | 28.5 |
| IDAHO | 135 D 135 | DOP-N | 391.0 | 84 | 570 | 1:18 | 465 | 0:11 | 2:02 | 2.0 | 24.6 | 26.5 |
| DOP-N | 159 A 160 | WAPRA | | 11 | 559 | 1:17 | 465 | 0:01 | 2:04 | 0.3 | 24.9 | 26.3 |
| WAPRA | 160 A 160 | GESSO | | 58 | 501 | 1:09 | 465 | 0:07 | 2:11 | 1.4 | 26.3 | 24.9 |
| GESSO | 160 A 160 | HENLI | | 40 | 461 | 1:04 | 465 | 0:05 | 2:16 | 1.0 | 27.2 | 23.9 |
| HENLI | 161 A 161 | ANNER | | 49 | 412 | 0:58 | 466 | 0:06 | 2:23 | 1.4 | 28.4 | 22.8 |
| ANNER | 157 A 158 | ANDOR | | 85 | 327 | 0:47 | 465 | 0:11 | 2:34 | 2.0 | 30.4 | 20.8 |
| ANDOR | 160 | | *FIR* | *FJJ54 | 4 | 323 | 0:46 | 466 | | 2:34 | 0.1 | 30.4 | 20.7 |
| *FIR* | A 160 | PELMA | | 61 | 262 | 0:38 | 467 | 0:08 | 2:42 | 1.4 | 31.8 | 19.3 |
| PELMA | 162 A 163 | PERRY | | 64 | 198 | 0:30 | 467 | 0:08 | 3:00 | 1.0 | 32.6 | 17.8 |
| PERRY | 164 A 164 | PERSA | | 97 | 101 | 0:18 | 468 | 0:12 | 3:03 | 2.2 | 35.5 | 15.6 |
| PERSA | 163 | TDD | | 14 | 87 | 0:16 | 470 | 0:02 | 3:04 | 0.1 | 35.9 | 15.3 |
| TDD | A 162 | POS | 116.9 | 73 | 8 | | 324 | | DESCENT | 1.4 | | |
| POS | 019 D 019 | TTPP | | 8 | -0 | | 324 | | 3:20 | | 36.2 | 13.5 |

KFLL N26:04.3 / W80:09.1   ZBV N25:42.2 / W79:17.7   ZGA N25:01.7 / W77:27.0   ZL5N N23:34.8 / W75:13.6
INDEE N23:08.3 / W74:23.4   GTK N21:26.4 / W71:08.1   COCOU N21:08.9 / W70:39.3   GROOI N20:31.6 / W69:37.9
HARDY N20:00.4 / W68:49.0   IDAHO N19:11.6 / W67:38.4   DOPN N18:28.1 / W66:24.7   WAPRA N18:15.0 / W66:18.6
GESSO N17:29.6 / W65:46.7   HENLI N16:53.1 / W65:24.5   ANNER N16:13.0 / W64:58.0   ANDOR N13:04.1 / W64:08.1
PELMA N14:08.0 / W63:33.0   PERRY N13:13.0 / W63:00.0   PERSA N11:48.3 / W62:11.4   POS N10:27.8 / W61:23.6
TTPP N10:33.6 / W61:20.4   SOMB N10:54.9 / W63:57.9

ACTUAL BLOCK FUEL OUT _____ ACTUAL BLOCK FUEL IN _____   TOTAL BURN _____

15.7   36.3

FL PRICES ARE AMERIJET CONTRACT FUEL 52.0

Fuel cost at KFLL $0.60 Fuel cost at TTPP $0.68   Tanker fuel as needed for operational reasons = No difference in cost.

RELEASED BY _____   TIME OF RELEASE 21:52

I CERTIFY THAT I HAVE COMPLETED ON AIRPORT AND ROUTE PREFLIGHT AS REQUIRED BY FAR 121.443

CAPTAIN _____

FIR BOUNDARIES: KZMA 0:13   TJTS 1:41   TTZP 2:34

KFLL/TTPP

O.P.# 10

```
. . . A02 SLP159 CB DSNT H   05 T03060233 56022=,
KFLL 172053Z 03009KT 109 FEW035CB SCT050 SCT150 SC 50 30/23,
     A3000 RMK A02 SLP159 CB VC E T03000228 50015=
TTPP 172000Z 07007KT 9    FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT     FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT     FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 1719002 08006KT 9999 FEW010CB BKN280 31/25 Q1012 NOSIG=
TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
     Q1013 TEMPO SHRA=
TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172000Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
TFFF 171900Z 08012KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/24 Q1014 NOSIG=
TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
     Q1014 NOSIG
     CB (S)=
TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
     32/24 Q1014 NOSIG
     CB (S/WNW)=
TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
     32/24 Q1014 NOSIG
     CB (WNW)=
SVMG NO CURRENT REPORT.
SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

-----------
FORECASTS
-----------

MIA
KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
     BECMG 2122 09005KT NSW SCT025 BKN250
     FM0100 VRB04KT P6SM SCT025 SCT250
     BECMG 0406 VCSH
     FM1500 09010KT P6SM FEW030 SCT250=
FLL
KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
     BECMG 2122 NSW SCT025 BKN250
     FM0100 VRB04KT P6SM SCT025 SCT250
     BECMG 0406 VCSH
     FM1500 09010KT P6SM FEW030 SCT250=
TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
     3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
TTPP 171000Z 171212 08010G20KT 9999 SCT020    BKN300   PROB30 TEMPO 5000 SHRA FEW010CB BKN015
     PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
     BECMG 2223 08005KT=
TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
     TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
     TEMPO 0010 00000KT
     BECMG 1012 11012KT=
180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
     TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
     TEMPO 0010 00000KT
     BECMG 1012 11012KT=
TGPY 171600Z 171818 NIL=
TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
     SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
     1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 CT050=
```

I.O.P. # 11

-06070-WJZ    Document 134    Entered on FLSD Docket 03/20/2001    Pa

DATE: 17th Aug 99
FLIGHT NO: 897
ACN#: N337
FROM: FLL TO: PJS
ALT ARPT(s): SVMC

**AmeriJet INTERNATIONAL**

# B-727-200C LOAD PLAN
## 12-POSITION WEIGHT & BALANCE

------ Max. Cumulative Load 34,100 lbs. ------

------ Max. Cumulative Load 34,951 lbs. ------

| 1 PAT | 2 PAT | 3 | 4 PAT | 5 PAT | 6 PAT | 7 T.P. | 8 PAT | 9 PAT | 10 PAT | 11 PAT | 12 PAT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULD: 25043N | ULD: 14721N | ULD: | ULD: 14941N | ULD: 25041N | ULD: 14321N | ULD: 12721N | ULD: 13402N | ULD: 02243N | ULD: 02361N | ULD: 24HJN | ULD: 24HJN |
| DEST: EDE | DEST: EDE | DEST: | DEST: EDE | DEST: EDF | DEST: PJS | DEST: PJS | DEST: PJS | DEST: PJS | DEST: EDE | DEST: PJS | DEST: PJS |
| WT: 3180 | WT: 3360 | WT: | WT: 3040 | WT: 3640 | WT: 5400 | WT: 3160 | WT: 7730 | WT: 3640 | WT: 4160 | WT: 3410 | WT: 3070 |
| 3800# MAX | 4880# MAX | | 4980# MAX | 4320# MAX | 5840# MAX | 8000# MAX | 8000# MAX | 5840# MAX | 4240# MAX | 5280# MAX | (8000# MAX) |
| | | | | | | | | | | | 30000# MAX |

**FORWARD HOLD**                                                    **AFT HOLD**

| TOTAL WT: 47200# MAX | | | | TOTAL WT: 42400# MAX | |
|---|---|---|---|---|---|
| 1A | 1B | 1C (6000# max) | 1D | 2A | 2B | 2C |
| DEST: MIAMI | DEST: | DEST: PJS | DEST: PJS | DEST: | DEST: | DEST: MIA |
| WT: 602 | WT: | WT: 515 | WT: 515 | WT: 1480 | WT: | WT: 1000 |
| 2-1A 5440# | 3-1B 8000# | 3-1B 8000# | 4-1C 5200# | 4-1C 5200# | 5-1D 8000# | 9-2A 8000# | 10-2B 4240# | 11-2C 8000# | 12-2D 8000# |

B.O.W. _93,708_
CARGO TOTAL _51,290_
ZFW _144,998_
ZFW %MAC _51.3_ _21.6_
TAKEOFF WT _(11) 192,298_
TAKEOFF CG _715_
STAB TRIM
FUEL BURN _47,200_
LANDING WT _157,002_

MAXIMUM ALLOWABLE TAKEOFF WEIGHT

(PERFORMANCE
(STRUCTURAL LIMITS)

RUNWAY _9_
WIND _TEMP 28_
FLAP SETTING

| MAX TAXI WEIGHT | 13.2 |
| ZERO FUEL WEIGHT | 117.0 |
| MAX LDG WEIGHT 302 | 414.0 |

**CAPTAIN'S SIGNATURE**
Sign in accordance with
FAR 121.693, 121.697, 121.113, 121.145

CAPTAIN
F/O
S/O
1)
2)
3)

ARM
1)
2)
3)

COMAT
TEM@S
WEIGHT

P #

AIRCRAFT COPY - WHITE        STATION COPY - YELLOW

Form/#0-200A
DATE:04/23/99

*gmc*
*11/10/99*
*SUPERVISOR*

November 10, 1999

## CERTIFIED-RETURN RECEIPT

Captain Brian A. Steele

Dear Captain Steele:

### LETTER OF INVESTIGATION

File Number: 2000SO170011

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Captain (pilot in command) on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1/2
**I.O.P. #** 13

**2**

File: 8030.1

WP: H:\AMERIJET\LOISTL02A.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

---

Z 593 221 205

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| Sent to | |
|---|---|
| BRIAN STEELE | |
| Street & Number | |
| Post Office, State, ███ | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form 3800, April 1995

SENT 11/10/99

---

**SENDER:**
□ Complete items 1 and/or 2 for additional services.
  Complete items 3, 4a, and 4b.
□ Print your name and address on the reverse of this form so that we can return this card to you.
□ Attach this form to the front of the mailpiece, or on the back if space does not permit.
□ Write *"Return Receipt Requested"* on the mailpiece below the article number.
□ The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. □ Addressee's Address
2. □ Restricted Delivery

3. Article Addressed to:

███TAIN BRIAN A. STEELE

| 4a. Article Number |
|---|
| Z 593 221 205 |

4b. Service Type
□ Registered         ☒ Certified
□ Express Mail       □ Insured
☒ Return Receipt for Merchandise  □ COD

7. Date of Delivery
11/15/95

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature (Addressee or Agent)

PS Form 3811, December 1994

102595-99-B-0223    Domestic Return Receipt

*Thank you for using Return Receipt Service.*

2/2

*GJR*
*11/10/99*
*SUPERVISOR*

November 10, 1999

Captain Brian A. Steele

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dear Captain Steele:

### LETTER OF INVESTIGATION

File Number: 2000SO170011

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Captain (pilot in command) on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

**I.O.P. # 14    1/2**

2

File: 8030.1

WP: H:\AMERIJET\LOISTL01A.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

I.O.P. # 14    2/2

November 20, 1999

Captain Brian A. Steele

Mr. John Roseborough
Principal Operations Inspector
Federal Aviation Administration
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315



Rcd 11/23/99 @0800 pm

Re:    File Number 2000SO170011

Dear Inspector Roseborough,

On August 17, 1999, I was the Captain on Amerijet Flight #827 along with the rest of the crew, First Officer Patrick Major and Flight Engineer Brett Wise. Captain Allen Jorsey, Sr. (Senior Check Airman) was jumpseating to perform an annual PIC Line Check. I reported for duty at the aircraft at bout 2230Z for a 2330Z departure. At about 2315Z, a rain shower passed over the airport. While it was raining, Captain Jorsey and I stood in the crew entryway of the aircraft and discussed some of the operational limitations and other Line Check procedures.

As we prepared for departure the rain had stopped and I requested the ground crew to push us back on the Amerijet ramp facing east so I could turn on the weather radar and see if there were any storms in our departure path. There were storms to the north and the one that passed over us to the south; however, to the east our departure path was clear of any weather. Before starting engines, I told First Officer Major to contact ground control to see if there were any delays for our departure. Because I noticed three to four aircraft waiting for departure on runway 9 Left. First Officer Major also requested the runway condition. The Tower replied there are no delays, the condition of the runway was wet and informed us that aircraft are holding at the end of 9 Left for pilots discretion with reference to weather. After normal engine start we requested taxi, taxi instructions were taxi out and hold short of Bravo and contact the Tower for back taxi instructions. We then contacted the Tower and were instructed to taxi to Bravo 2 and back taxi on to the runway in position for takeoff. When we were told to back taxi on to the runway, First Officer Major acknowledged the clearance and also asked for the runway condition report but it was not available at that time. I instructed him we had the runway conditions from ground control and it was reported wet. During the back taxi on the runway, I observed no standing water on the runway. Therefore requiring no reduction to weight or V1.

**I.O.P. # 15**    1/2

We were cleared for takeoff and used normal takeoff thrust and normal climb thrust as per
Amerijet's procedures. We departed Fort Lauderdale at 2347Z. The performance, runway
analysis and weight and balance I used for the departure were within all the limitations specified
in the Amerijet procedures.

Sincerely,

Brian A. Steele

**I.O.P. # 15   2/2**



4

00SO170011

## SECTION D - FACTS AND ANALYSIS

### FACTS

On Monday, October 4, 1999, the investigating Inspector found on his desk a letter (IOP 3) from the First Officer (Patrick Major EIR # 00SO170013) of the subject flight detailing the events which led to the investigation herein. This correspondence had followed a conference between the complainant and the investigating Inspector some weeks before in which the Inspector had requested the account to be put in writing. Due to a death in the family that occurred two days prior (Saturday, October 2nd), and walk in duty on October 4th, the letter could not be given due consideration. During the Inspectors resulting absence for the funeral of his mother and use or lose annual leave, the correspondent directed his concerns to the Department of Transportation's Inspector General, hence the investigation now in progress.

On Tuesday, August 17, 1999, between the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time) Amerijet B-727, N397AJ (a FAR 121 Supplemental Air Carrier, IOP 1, pp. 1 and 2), operating as Amerijet (AMJ) Flight # 827 departed Runway 9L (9 Left) at Fort Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida (IOP 3, 4, 5, 9, and 10) when there was less than one quarter (1/4) of an inch of standing water on the departure runway as reported by the FLL FAA Air Traffic Control Tower (ATCT) following a runway contamination/condition check accomplished by the FLL Airport Authority identified on the ATCT tape recording (IOP 4) as "Ramp One". The airport runway contamination/condition report in detail represented that there was "less than ¼ inch, good drainage, slight standing water about six (6) feet on either side of centerline". This report was subsequently provided to the Flightcrew of AMJ 827 by the FLL ATCT as "some standing water less than a quarter of an inch" prior to a takeoff clearance being given to the flight, and was acknowledged by the pilot (ATCT Tape counter number 607, IOP 4).

Amerijet AOM in Chapter 4, Section 1A, Subject 55 [4:1:55(IOP 6, page 1)] directs that for takeoff limitations other than as listed on this page, the user "check Performance Manual for appropriate reductions to maximum takeoff gross weight" (IOP 6, page 3). Even though the NAVTECH page (IOP 6, page 2) provides additional information as to wet runways and standing water of less than one eighth (1/8) inch, the information as contained on the Amerijet International B-

727-200, JT8D-15 Performance Chart for Fort Lauderdale runway 9L with Flaps 20 (IOP 6, page 3) is applicable. This chart requires a weight reduction of 17,000 pounds and a V1 airspeed reduction of 28 knots from the data as expressed on the B-727-200c Load Plan (IOP 12) rendering the figures of weight reduction from 192,298 to 175,298 pounds. The aircraft thus departed 17,000 pounds above its maximum gross takeoff weight as corrected for contaminated runway conditions, and therefore contrary to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
(IOP 2, pp. 4 - 6 and IOP 3 - 6, 7 - 12).

FAR Part 1 (IOP 2, page 1) clearly defines the terms "Operate", "Operational Control" and "Person", as follows. The terms state in pertinent part, "Operate" means use, cause to use or authorize to use aircraft; "Operational Control" means the exercise of authority over initiating, conducting or terminating a flight; "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

IOP 9, 10 AND 12, identify Captain Brian A. Steele as the Pilot in Command of the subject flight. As stipulated in FAR 121.537(b)(d) and (e), the pilot in command is responsible for the safety aspects of flight including the safety of other crewmembers. His abdication of those duly appointed responsibilities places him in violation of specific FAR, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

As a Captain for Amerijet he becomes a person accommodating the terms expressed in FAR Part 1 as exercising operational control in concert with the company. As stipulated in FAR 121.537(a), "Each certificate holder conducting supplemental operations - (1) Is responsible for operational control." The company through Captain Brian A. Steele exercises Operational Control, hence, the flight as identified above was "operated" by Captain Steele under the authority and responsibility of ▓▓▓▓▓▓▓▓▓ and, therefore contrary to ▓▓▓▓▓▓▓ contrary to ▓▓▓▓▓▓▓ and contrary to ▓▓▓▓ ▓▓▓▓(IOP 1 - 12).

Captain Brian A. Steele does not have a violation history (IOP 7).

Captain Steele was sent two (2) Letters of Investigation (LOI), one via certified mail and one via regular mail (IOP 13 and 14).

IOP 15 is Captain Steele's response to the LOI containing information which presents his perspective that the runway was not covered with standing water of ¼

6

inch or less. The FLL ATCT re-recording **(IOP 4 and 5)**, however, contradicts his statement for the period in question.

| ENFORCEMENT INVESTIGATIVE REPORT | Report Number 2000SO170014 | Related Number |
|---|---|---|

ALLEGED VIOLATOR IDENTIFICATION

WISE, BRETT OGDEN
DBA Name
Designator                          2. Address (Include zip code)

‚M

| 5. FAA Cert. # 344567857 | 6. FAA Certificate Type FLIGHT ENGINEER | |
|---|---|---|

AMERIJET

AIRCRAFT, ENGINE, PROPELLER, COMPONENT OR APPLIANCE INVOLVED

| BOEING | 727 | 397AJ |
|---|---|---|
| | ACFT SN | |

AMERIJET
12. Address (Include zip code)

ALLEGED VIOLATION

| 13. Date Occurred 1999/08/17 | 14. Time 19:40 | 15. Date Known to FAA 1999/10/18 | 16. Region of Discov SO |
|---|---|---|---|

FT LAUDERDALE-HOLLYW   FT LAUDERDALE   FL          1
FT LAUDERDALE
FLL


PLAINTIFF'S
EXHIBIT
41
2/13/01

2

EIR 00SO170014

## SECTION B - SUMMARY OF FACTS

████████████████ on Tuesday, August 17, 1999, during the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time), B-727, N397AJ operated as Amerijet flight 827, a Supplemental Air Carrier operating under FAR Part 121, departed the Fort Lauderdale-Hollywood International Airport Runway 9 Left with *Standing Water Less than one quarter (1/4) of an inch on the runway.* (IOP 1, pp. 1 and 2; IOP 3, pp. 5 -10; IOP 4 - 5.)

The flight was operated without adjusting the maximum takeoff weight to that required by the Airplane Performance Manual, contrary to the Airplane Operating Manual. The aircraft weight and V1 degredations required for this flight, as the aircraft was configured, for runways with standing water of less than one quarter inch were 17,000 pounds and 28 knots. (IOP 3, pp. 5 - 10; IOP 6 - 12.)

The aircraft was taken off at a weight 17,000 pounds greater than allowed and at an indicated V1 airspeed 28 knots faster than allowed for conditions thus degrading the performance capability. (IOP 6 and 12.)

By virtue of the above, the flight was further operated ████████████████ "in a careless or reckless manner so as to endanger the life or property of another".

3

EIR 00SO170014

SECTION C - ITEMS OF PROOF

| IOP | #PAGES | DESCRIPTION |
|-----|--------|-------------|
| 1 | 2 | VIS OPERATOR INFORMATION |
| 2 | 3 | COPIES OF PERTINENT FAR PARTS 1, 121 AND 91 |
| 3 | 10 | LETTER OF COMPLAINT FROM PATRICK S. MAJOR |
| 4 | 2 | REQUEST FOR ATC TAPE FROM FLL ATCT AND TAPE |
| 5 | 2 | TYPED TRANSCRIPT OF ATCT TAPE |
| 6 | 3 | PAGES - AOM, NAVTECH, PERFORMANCE MANUAL |
| 7 | 3 | ISIS AIRMAN INFORMATION/VIOLATION HISTORY |
| 8 | 2 | PAGES FROM WEIGHT AND BALANCE MANUAL |
| 9 | 1 | AIRCRAFT LOG BOOK MAINTENANCE LOG PAGE |
| 10 | 1 | AMERIJET FLIGHT RELEASE |
| 11 | 1 | WEATHER SHEET |
| 12 | 1 | B-727-200C LOAD PLAN/WEIGHT AND BALANCE |
| 13 | 3 | FLIGHT ENGINEERS LOCAL ADDRESS |
| 14 | 2 | LOI SENT VIA CERTIFIED MAIL - RETURNED UNCLAIMED |
| 15 | 2 | LOI SENT VIA REGULAR MAIL |
| 16 | 1 | RESPONSE TO LOI |

```
+----------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report  Air Operator Vital Information        |
+----------------------------------------------------------------------+
| Air Operator:  PCSA      AMERIJET INTERNATIONAL INC                   |
|                                                                      |
| Air Operator Vital Info--- Validation Date: 1999 08 25               |
| Primary DBA                                                           |
|                                                                      |
| Other DBA                                                            |
|                                                                      |
|                                                                      |
|                                                                      |
| Address:  AMERIJET INTERNATIONAL INC  City:    FT LAUDERDALE          |
|           498 SW 34TH STREET          State:   FL                     |
|                                       Zip:     33315                  |
| Phone:    954-359-0077  Ext. 11                                       |
+----------------------------------------------------------------------+
```

```
+----------------------------------------------------------------------+
| ISIS Air Operator (VIS) Report  Air Operator Regulatory Information   |
+----------------------------------------------------------------------+
| Air Operator:  PCSA      AMERIJET INTERNATIONAL INC      CHDO:  SO17  |
|                                                                      |
| Exemp. Auth:                    Other Deviat. Auth: N                 |
| FAR Regulation: 121             Crew Training:      CONTRACT OUT MOD/AMT |
| National Use:                   Examining Auth:                       |
| HAZMAT: N     Applicable Airports:                                    |
|                                                                      |
|                                                                      |
|                                                                      |
|                                                                      |
|                                                                      |
|                                                                      |
+----------------------------------------------------------------------+
```

1/2        I.O.P. # 1

"Medical certificate" means acceptable evidence of physical fitness on a form prescribed by the Administrator.

"Military operations area" (MOA) means an airspace that is established outside Class A airspace to separate or segregate certain nonhazardous military activities from IFR Traffic and to identify for VFR traffic where these activities are conducted.

"Minimum descent altitude" means the lowest altitude, expressed in feet above mean sea level, to which descent is authorized in final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure, where no electronic glide slope is provided.

"Minor alteration" means an alteration other than a major alteration.

"Minor repair" means a repair other than a major repair.

"Navigable airspace" means airspace at and above the minimum flight altitudes prescribed by or under this chapter, including airspace needed for safe takeoff and landing.

"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time.

"Nonprecision approach procedure" means a standard instrument approach procedure in which no electronic glide slope is provided.

"Operate," with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in §91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).

"Operational control," with respect to a flight, means the exercise of authority over initiating, conducting, or terminating a flight.

"Overseas air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct of furtherance of a business or vocation, in commerce between a place in any State of the United States, or the District of Columbia, and any place in a territory or possession of the United States; or between a place in a territory or possession of the United States, and a place in any other territory or possession of the United States.

"Overseas air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce —
  (1) Between a place in a State or the District of Columbia and a place in a possession of the United States; or
  (2) Between a place in a possession of the United States and a place in another possession of the United States;
whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Over-the-top" means above the layer of clouds or other obscuring phenomena forming the ceiling.

"Parachute" means a device used or intended to be used to retard the fall of a body or object through the air.

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

"Pilotage" means navigation by visual reference to landmarks.

"Pilot in command" means the person who:
  (1) Has final authority and responsibility for the operation and safety of the flight;
  (2) Has been designated as pilot in command before or during the flight; and
  (3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight.

"Pitch setting" means the propeller blade setting as determined by the blade angle measured in a manner, and at a radius, specified by the instruction manual for the propeller.

"Positive control" means control of all air traffic, within designated airspace, by air traffic control.

"Powered-lift" means a heavier-than-air aircraft capable of vertical takeoff, vertical landing, and low speed flight that depends principally on engine-driven lift devices or engine thrust for lift during these flight regimes and on nonrotating airfoil(s) for lift during horizontal flight.

"Precision approach procedure" means a standard instrument approach procedure in which an electronic glide slope is provided, such as ILS and PAR.

1/3

I.O.P. # 2

© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED.

## SUBPART G — ADDITIONAL EQUIPMENT AND OPERATING REQUIREMENTS FOR LARGE AND TRANSPORT CATEGORY AIRCRAFT

**91.601    APPLICABILITY**

This subpart applies to operation of large and transport category U.S.-registered civil aircraft.

**91.603    AURAL SPEED WARNING DEVICE**

No person may operate a transport category airplane in air commerce unless that airplane is equipped with an aural speed warning device that complies with §25.1303 (c)(1).

**91.605    TRANSPORT CATEGORY CIVIL AIRPLANE WEIGHT LIMITATIONS**

(a) No person may take off any transport category airplane (other than a turbine-engine-powered airplane certificated after September 30, 1958) unless —
   (1) The takeoff weight does not exceed the authorized maximum takeoff weight for the elevation of the airport of takeoff;
   (2) The elevation of the airport of takeoff is within the altitude range for which maximum takeoff weights have been determined;
   (3) Normal consumption of fuel and oil in flight to the airport of intended landing will leave a weight on arrival not in excess of the authorized maximum landing weight for the elevation of that airport; and
   (4) The elevations of the airport of intended landing and of all specified alternate airports are within the altitude range for which maximum landing weights have been determined.

(b) No person may operate a turbine-engine-powered transport category airplane certificated after September 30, 1958, contrary to the Airplane Flight Manual, or take off that airplane unless —
   (1) The takeoff weight does not exceed the takeoff weight specified in the Airplane Flight Manual for the elevation of the airport and for the ambient temperature existing at the time of takeoff;
   (2) Normal consumption of fuel and oil in flight to the airport of intended landing and to the alternate airports will leave a weight on arrival not in excess of the landing weight specified in the Airplane Flight Manual for the elevation of each of the airports involved and for the ambient temperatures expected at the time of landing;
   (3) The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet). Wet runway distances associated with grooved or porous friction course runways, if provided in the Airplane Flight Manual, may be used only for runways that are grooved or treated with a porous friction course (PFC) overlay, and that the operator determines are designed, constructed, and maintained in a manner acceptable to the Administrator.
   (4) Where the takeoff distance includes a clearway, the clearway distance is not greater than one-half of —
      (i) The takeoff run, in the case of airplanes certificated after September 30, 1958, and before August 30, 1959; or
      (ii) The runway length, in the case of airplanes certificated after August 29, 1959.

(c) No person may take off a turbine-engine-powered transport category airplane certificated after August 29, 1959, unless, in addition to the requirements of paragraph (b) of this section —
   (1) The accelerate-stop distance is no greater than the length of the runway plus the length of the stopway (if present); and
   (2) The takeoff distance is no greater than the length of the runway plus the length of the clearway (if present); and
   (3) The takeoff run is no greater than the length of the runway.

2/3          I.O.P. # 2

© JEPPESEN SANDERSON, INC., 1990, 1998. ALL RIGHTS RESERVED.

(d) Any person taking off or landing a helicopter certificated under *part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting height-speed envelope established for that helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

**91.11  PROHIBITION AGAINST INTERFERENCE WITH CREWMEMBERS**

No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

**91.13  CARELESS OR RECKLESS OPERATION**

(a) *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

(b) *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

**91.15  DROPPING OBJECTS**

No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property. However, this section does not prohibit the dropping of any object if reasonable precautions are taken to avoid injury or damage to persons or property.

**91.17  ALCOHOL OR DRUGS**

(a) No person may act or attempt to act as a crewmember of a civil aircraft —
  (1) Within 8 hours after the consumption of any alcoholic beverage;
  (2) While under the influence of alcohol;
  (3) While using any drug that affects the person's faculties in any way contrary to safety; or
  (4) While having .04 percent by weight or more alcohol in the blood.

(b) Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.

(c) A crewmember shall do the following:
  (1) On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when —
    (i) The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
    (ii) The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.
  (2) Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates percentage by weight of alcohol in the blood.

3/3

I.O.P. #2

© JEPPESEN SANDERSON, INC., 1990. ALL RIGHTS RESERVED.

Hand Delivered

John C. McDonough
Principal Operations Inspector
FAA FSDO
1050 Lee Wagoner Blvd Suite 201
Ft Lauderdale FL 33315

Handed - Delivered

RECEIVED BY
OCT - 1 1999
FEDERAL AVIATION ADMINISTRATION
FSDO
FT. LAUDERDALE

Patrick & Beth Major

I.O.P. # 3
1/10



**Patrick Major**

John C. Roseborough
Principal Operations Inspector
Federal Aviation Administration
Flight Standards district Office - 17
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315
Voice: (954) 356-7523, Extension 154
Fax    (954) 356-7531

10-01-99

Dear John,

Following is the text of three memo's and letters regarding Amerijet Flight 827, 08-17-99, which you and I discussed, Thursday, September 16th.

I reported the incident to the director of operations and chief pilot as required by Amerijet's GOM, recommending the safety officer be notified as well, then sent a report to NASA's ASRS (Aviation Safety Reporting System). Amerijet's GOM further requires that its POI be notified: Thirty days after the incident, you told me it had yet to be reported by anyone other than me.

John, the termination of my employment is a classic whistle blower scenario; the only event between my being an employee in good standing and being fired because Amerijet had, "...lost confidence in my abilities as an airman..." is the complaint regarding a takeoff 15,000Lbs over the maximum performance limit for conditions at the field. That is the subject of a complaint to the DOT Inspector's General's Office. But, I am most concerned that if Amerijet does not immediately change its policies regarding takeoff from wet runways, someone is going to get hurt. The question is, will the FAA take action before that happens, or wait until newspaper headlines, carnage, catastrophe and public outrage leave it no other choice.

If I can be of further assistance, do not hesitate to contact me. The cellular phone is the best way to reach me.

Warmest Regards,

Patrick Major

**I.O.P. #** 3

2/10



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP, 08-17-99.

Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

Warmest Regards,

Pat

I.O.P. # 3
3/10





**Patrick Major**

**FAX**
The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.


**FAX To:** David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
**Date:** 08-25-99
**Subject:** NASA ASRS Report


Greetings Dave,

Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence you would ever see it if I did not submit it to you directly.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, accept my apologies.

Warmest Regards,

Pat


**I.O.P. # 3**
**4/10**





Copy for John Racborough,
POI, FAA, FSD0-17

**Patrick Major**

**NASA, Aviation Safety Reporting System
(ASRS report)**

Report Date: 08-18-1999, Incident Date: 08-17-99 ⟵——
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs.,
Ratings: Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, FAR Part 142 Certified Pilot and Flight
Engineer Instructor/Boeing 727.
Flight Phase: Takeoff, Airspace: Class C.
Weather Factors: Thunderstorms in vicinity, rainshowers overhead, contaminated runway;
conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening. When I arrived, the
field was under heavy rainshowers. Anticipating a max-weight performance-limited takeoff
on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the Navtech runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff controversy
which took place June 08, 1999, out of MIA. On that rainy morning, a Continental 727 had
taxied into position and hold RW-12, then declined takeoff clearance... requesting full length
9L, instead. The night before it had rained ten inches. It was raining at the time. While
Tower had not provided a runway condition report, the runways were obviously wet. Amerijet
flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without
prompting from the captain, I declined, reminding Tower that our flight required full-length 9L.
The captain chastised me for refusing RW-12 against his wishes (even though we had just
finished discussing that the runway analysis did not support it, even on a dry day, even if we
believed the weights reported by ramp personnel). The captain insisted I radio-back Tower
and accept RW-12. I demurred. After a brief discussion, AJT 823 finally departed full-length
9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300'
longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.



**I.O.P. # 3**

However, my refusal to accept RW-12 became the subject of a disciplinary complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation against me for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. 9L FLL is 355 feet shorter than 12 in MIA. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), regardless how wet a runway, Amerijet flight crews are taught by the training department and warned by dispatch personnel to consider all runways "Dry" for performance planning purposes unless there exists a contamination report containing the specific words, "Standing Water." Though there are frequent storms in the area, rarely are contamination reports conducted at South Florida Airports. Most airlines encourage their crews to simply accept the "Standing Water less than 1/4"" penalty...reasoning that the penalty applies to depths as shallow as 1/8"... and is clearly the safest option. Some Boeing performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot max-weight V1 speed reduction for runways that are, "...well-soaked with water but do not have large areas of actual standing water." But absent a contamination report specifically including the term "Standing Water", Amerijet considers all runways dry. Considering drag induced as aircraft tires displace water on the runway surface, additional drag produced by water spraying against the fuselage and wings, as well as reduced braking implications, that policy could be a recipe for disaster. As of August 17, 1999, these concerns had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 355' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they had been June 08. Even so, the dispatcher I queried reported to me that to his understanding Amerijet performance policies do not observe weight penalties unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers imply a braking degradation and an impediment to acceleration when runway surfaces are wet ... irrespective of whether or not the runway contains "Standing water." "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights," I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' actually reported on the runway, it's dry."

I.O.P. #3

6/10

As aircraft 397AJ was loaded for departure, I explained my question to the check airman who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safest solution and accept the "Standing Water ≤ 1/4" weight and V1 penalty. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain jokingly dismissed my concern, "We'll have to takeoff between the water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers. He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us ... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway surface. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst adjacent the channels of accumulated rubber left by successive landing and departing aircraft. No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a packs-off takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect it.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch. AJT 827 is cleared for takeoff, turn right heading one zero zero." As Tower began its transmission, the captain advanced the throttles and released the brakes. Probably because the aircraft was already rolling, tower issued the takeoff clearance without pause or delay. Before I could even begin to reply to the report and clearance, the aircraft was accelerating down the runway. Previously, I thought I would have a chance to prevent

I.O.P. # 3

7/10

the takeoff when the controller inevitably asked, "AJT 827, state your intentions." He did not. Suddenly, I was isolated and out of options.    Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. Perhaps, I should have. I feared an aborted takeoff on a wet runway with the captain and I fighting over the controls could have been just as dangerous.    If all three engines operated normally, if no windshear was encountered, perhaps the takeoff would be safer than a mutiny-abort on a wet runway in driving rain. AJT 827 used all available runway.    The captain rotated well inside the alternating red and white lights at an indicated airspeed five knots below V1.    The main wheels broke ground at the last possible instant and the aircraft crossed the airport boundary at approximately 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts. I called-out the fluctuations then held my breath, praying for altitude.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation." (referring to the GPS installed in the aircraft, but not approved in the ops specs).

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits of Class II navigation described in the Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked. "Do you realize how incongruent that sounds coming from a check airman who just goaded a flight crew into taking off from a contaminated runway into possible windshear fifteen thousand pounds over the maximum performance limit? Even if I am wrong about navigating direct, ...and I don't think I am, one could get us violated, the other will get us killed. What is safe about that?"

AJT flight 827 exceeded aircraft limitations and violated FAA regulations in flagrant disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway weighing fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the consequences inevitably bestowed upon any air carrier which actively cultivates a culture of noncompliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on

**I.O.P. #3**

runways that are obviously contaminated, but have not been officially described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning policies, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the official report.

Among my many mistakes August 17, was letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Although it should not have been necessary, due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the 'sacred cow' brother of its vice president, director of operations, and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Admittedly, that was the captain's job, but had I insisted on such a plan before the aircraft taxied out of the ramp for takeoff, I may have avoided the circumstances which placed me and the rest of the crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff once such a report was issued. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...as well as the strident actions required to prevent takeoff once initiated. But with the aircraft already rolling, Tower probably figured he had his answer.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the check airman and captain prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Would that have worked? Honestly, that did not occur to me until later. I made a judgment call and elected not to intervene once the takeoff roll began. Not a day passes that I don't relive the possible consequences of my choice.

Contributing factors included my deference to authority in the cockpit, not only with regard to the presence of a check airman who I held in high regard, and that particular captain (most other captains would not have been out there to start with), but pertaining to the recency of



I.O.P. #3

what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and ongoing concern for flight safety and regulatory compliance at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way, impervious to the legitimacy of their concerns, by denying them promotional and professional opportunities, abusing them in the simulator if need be, terminating their employment and exploiting the PRIA (Pilot Records Improvement Act, 1996) to soil their careers... while sending an unmistakably clear message to other flight crew lest they, too, consider showing unwelcome interest in flight safety.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

COPY for John Roseborough
POI, FAA, FSDO - 17

10-01-99

I.O.P. # 3
10/10

# **Memorandum**



**U.S. Department
of Transportation
Federal Aviation
Administration**

Ft. Lauderdale International ATC Tower
4150 S.W. 12 Terrace
Ft. Lauderdale, Fl. 33315

Subject **INFORMATION:** Tape Request

Date: October 25, 1999

From: Manager

Reply To
Attn. of: FLL-2

Ft. Lauderdale Int'l ATC Tower

To: Manager, Ft Lauderdale FSDO-17

Per telephone request of October 22, 1999, the following tape recording is enclosed.

Ft. Lauderdale ATC Tower
August 17, 1999 UTC
Ground Control 2340 UTC-0000 UTC
Local Control North 2340 UTC – 0000 UTC

Please advise if we can be of any further assistance.

Ronald S. Boyd

**I.O.P. # 4**

1/2

4

FORT LAUDERDALE' INTERNATIONAL AIR TRAFFIC CONTROL TOWER
CERTIFIED RE-RECORDING OF AMERIJET (PCSA) FLIGHT 827 OCCURRING
AUGUST 17, 1999 DURING THE TIME PERIOD FROM 2340 UTC - 0000 UTC
(1940 - 2000 LOCAL DAYLIGHT SAVINGS TIME).

THE RE-RECORDING WAS PREPARED BY MICHAEL T. JONES, SUPPORT
SPECIALIST AT THE FORT LAUDERDALE-HOLLYWOOD AIR TRAFFIC
CONTROL TOWER.

THE COUNTER NUMBERS BELOW REPRESENT EITHER AMERIJET OR
FORT LAUDERDALE ATC VOICE COMMUNICATIONS AS PERTAIN TO AMJ
FLIGHT 827. MOST OTHER VOICE COMMUNICATIONS HAVE NOT BEEN
IDENTIFIED WITH COUNTER NUMBERS. DUE TO THE EXTRANEOUS NOISE
EMITTED IN THE SIDETONE OF THE RE-RECORDING, A CLEARER VOICE
TRANSMISSION/RENDITION CAN BE HEARD WHEN PLAYED ON A STEREO
RECORDER/PLAYER WITH THE VOLUME ON ONE SIDE TURNED LOWER.

| COUNTER (APPROX.) | DIALOGUE | BY |
|---|---|---|
| 129 | DELAY AHEAD? | AMJ |
| 138 | RWY CONDITION WET, NO REPORTS | ATC |
| 146 | WE'RE GONNA NEED A STANDING WATER REPORT | ATC |
| 168 | AMJ 827 REQUESTS TAXI | AMJ |
| 171 | AMJ 827 HOLD SHORT OF TAXIWAY BRAVO, STAND BY | ATC |
| 183 | RAMP 1 CALLS FLL ATCT | |
| 194 | AMJ 827 CALLS ASKING FOR THE CURRENT WINDS | AMJ |
| 198 | AMJ 827, WILL YOU BE ABLE TO DEPART | ATC |
| 203 | AMJ 827, TAXI TO RUNWAY 9 LEFT | ATC |
| 239 | RAMP ONE CALLS | |
| 241 | PROCEED | ATC |
| 243 | AJT IS ASKED IF THEY CAN ACCEPT DEPARTURE | ATC |
| 276 | RAMP ONE CALLS | |

279  RAMP ONE ADVISES LESS THAN ¼ INCH, GOOD DRAINAGE,
SLIGHT STANDING WATER ABOUT 6 FEET ON EITHER SIDE OF
CENTERLINE

| 349 | CONVECTIVE SIGMET 51E AVAILABLE | ATC |

I.O.P. # 5

1/2

5

433  LOCAL CONTROL, NORTH POSITION COMMUNICATIONS
BEGIN

464  DELTA 312 HEAVY (LOCKHEED L-1011, TRISTAR)
466  DELTA 312, CLEARED FOR TAKEOFF                    ATC

512  US AIR 2335 CALLS TO INQUIRE ABOUT WHAT WEATHER ATC
SHOWS WITHIN 15 MILES OF FLL. ATC ADVISES THAT MAIN BODY
OF STORM WILL BE AVOIDED WITH A 110 DEGREE HEADING AFTER
TAKEOFF (20 DEGREES RIGHT OF TAKEOFF HEADING)

584  AMJ827 CALLS                                      AMJ
585  AMJ 827, ARE YOU READY FOR DEPARTURE              ATC

586  YES SIR, 827, YOU'LL PASS ON THAT RUNWAY REPORT
WHEN YOU GET IT, RIGHT?                                AMJ

587  YES, HE'S OUT THERE INSPECTING IT RIGHT NOW       ATC

589  AMJ 827, GO OUT B2 AND BACK TAXI INTO POSITION AND
HOLD                                                   ATC

607  AMJ 827, HE REPORTS THERE'S SOME STANDING WATER
LESS THAN A QUARTER ON AN INCH                         ATC

609  SOME STANDING WATER LESS THAN A QUARTER OF AN
INCH, AMJ 827 READY FOR TAKEOFF                        AMJ

610  AMJ 827 RUNWAY 9 LEFT CLEARED FOR TAKEOFF, TURN
RIGHT HEADING 110                                      ATC

611  RIGHT HEADING 110, CLEARED FOR TAKEOFF, AMJ 827,
THANK YOU MUCH.                                        AMJ

832  CHANGE YOUR CODE TO 1153                          ATC
833  1123, 827                                         AMJ

THANK YOU, CONTACT MIAMI DEPARTURE                     ATC

I.O.P. # 5
2/2

ADVERSE WEATHER TAKEOFF AND CLIMB - Reference 4:1:55

Takeoff Limitations

Takeoff should not be attempted if the following limitations are exceeded:

- Dry snow more than 6 inches deep.

- Slush or wet snow more than 1/2 inch deep.

- Water more than 1/4 inch deep.

When values less than the aforementioned limits exist, check Performance Manual for appropriate reductions to maximum takeoff gross weight.

> CAUTION: DURING TAKEOFF, SNOW AND SLUSH PICKED UP BETWEEN THE NOSE-
> WHEEL TIRES MAY BE THROWN BACK AND PACKED INTO THE RAM AIR
> INLET, CAUSING BOTH AIR CONDITIONING PACKS TO TRIP OFF. TO
> REDUCE THE POSSIBILITY OF THIS OCCURRING, THE RAM AIR DOORS
> MAY BE POSITIONED TO THE FULL CLOSED POSITIONS JUST PRIOR TO
> TAKEOFF.

Airplane Control

Exercise extreme caution in crosswinds.    Normally, it is recommended that a runway more into the wind be requested when crosswind components over 15 kts are reported on known slippery runways.

> CAUTION: ENSURE THAT PARKING BRAKE IS RELEASED BEFORE STARTING
> TAKEOFF ROLL ON ICE OR SNOW COVERED RUNWAYS.

Setting Takeoff Thrust

Align the airplane with the runway before increasing thrust. If engine anti-ice is being used for takeoff, ensure that engine thrust is increased to the highest practicable setting (80% N1 recommended) for 10 to 15 seconds before setting takeoff thrust. Observe stable engine operation before brake release.

Engine inlet ice can affect EPR indications.    When takeoff thrust is set in icing conditions, crosscheck all engine instruments.    Ensure that the indications are reasonable and that no engine limits are exceeded.    Specifically, compare the N1 readings with the anticipated value and be prepared to reject the takeoff if a discrepancy exists between the EPR and N1 readings.

If the airplane starts to slide on ice or snow, release the brakes and begin the takeoff roll, but ensure that the instrument crosscheck is accomplished, including the comparison of the EPR and N1 readings.    Apply firm nosedown elevator pressure to aid nose wheel steering effectiveness. Don't allow the lag in nose wheel steering effectiveness to cause over-controlling on slippery surfaces.

**I.O.P. # 6**
**1/3**


NAVTECH

The Runway Analysis provides data for takeoff and landing performance in adverse weather conditions for the B727-200 powered by JT8D-15/17 engines. Data are presented for operations on wet, standing water and snow covered runways in accordance with the guidelines and recommendations of FAA.

WET RUNWAY – A runway is considered wet when it is well soaked but without significant areas of standing water (depth less than 1/8 inch or 3mm of standing water). A runway is considered to be well soaked when there is sufficient moisture on the runway surface to cause it to appear reflective.

RUNWAY CONTAMINATED BY STANDING WATER, SLUSH OR SNOW – A runway is considered contaminated when at least 25% of the runway within the required length and width being used is covered by slush, standing water or snow greater than 3mm of equivalent water depth.

- *Additional consideration: If the contaminates are lying on that portion of the runway where the high speed part of the takeoff roll will occur, it MAY BE appropriate to consider the runway contaminated.*

Daniel Liu

Aircraft Performance Engineer
Navtech Systems Support Inc.

**I.O.P. # 6**
**2/3**

Navtech Systems Support Inc.
175 Columbia Street West, Suite 102    Waterloo, Ontario, Canada, N2L 5Z5    Phone (519) 747-1170    Fax (519) 747-1827

SITA - YYZNSCR   AFTN - CYYZXNSX   ARINC - YKFNSCR

# AMERIJET INTERNATIONAL      FORT LAUDERDALE, FL
## B-727-200   JT8D-15        HOLLYWOOD INTL

KFLL   09L                          **FLAPS   20**

| TEMP F | C | ZERO WIND | CLIMB LIMIT | A/C POD OFF (+) | N1% MAX EPR | GO FOR ARND T/O EPR | ENG ANTI-ICE ZERO WIND | A/C CLIMB LIMIT | OFF (+) |
|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2000 C | 1980 | 0 C | 2.09 | 90 2.07 | 1975 | 1957 | 0 |
| 0 | -18 | 2000 C | 1980 | 0 C | 2.09 | 91 2.07 | 1983 | 1957 | 0 |
| 10 | -12 | 2000 C | 1980 | 0 C | 2.09 | 92 2.07 | 1983 | 1957 | 0 |
| 20 | -7 | 2000 C | 1980 | 0 C | 2.09 | 93 2.07 | 1983 | 1957 | 0 |
| 30 | -1 | 2000 C | 1980 | 0 C | 2.09 | 94 2.07 | 1983 | 1957 | 0 |
| 32 | 0 | 2000 C | 1980 | 0 C | 2.09 | 94 2.07 | 1983 | 1957 | 0 |
| 34 | 1 | 2000 C | 1980 | 0 C | 2.09 | 94 2.07 | 1983 | 1957 | 0 |
| 36 | 2 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 38 | 3 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 40 | 4 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 42 | 6 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 44 | 7 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 46 | 8 | 2000 C | 1980 | 0 C | 2.09 | 95 2.07 | 1983 | 1957 | 0 |
| 48 | 9 | 1999 C | 1980 | 0 C | 2.09 | 96 2.07 | 1982 | 1957 | 0 |
| 50 | 10 | 1996 C | 1980 | 0 C | 2.09 | 96 2.07 | 1979 | 1957 | 0 |
| 52 | 11 | 1993 C | 1980 | 0 C | 2.09 | 96 2.07 | | | |
| 54 | 12 | 1990 C | 1980 | 0 C | 2.09 | 96 2.07 | | | |
| 56 | 13 | 1987 C | 1980 | 0 C | 2.09 | 96 2.07 | | | |
| 58 | 14 | 1984 C | 1980 | 0 C | 2.09 | 97 2.07 | | | |
| 60 | 16 | 1979 C | 1969 | 0 C | 2.09 | 97 2.07 | | | |
| 62 | 17 | 1975 C | 1969 | 0 C | 2.09 | 97 2.07 | | | |
| 64 | 18 | 1971 C | 1969 | 0 C | 2.09 | 97 2.07 | | | |
| 66 | 19 | 1967 C | 1969 | 2 R | 2.09 | 97 2.07 | | | |
| 68 | 20 | 1963 R | 1969 | 6 R | 2.09 | 98 2.07 | | | |
| 70 | 21 | 1961 R | 1969 | 8 R | 2.09 | 98 2.07 | | | |
| 72 | 22 | 1960 R | 1969 | 9 R | 2.09 | 98 2.07 | | | |
| 74 | 23 | 1958 R | 1969 | 11 R | 2.09 | 98 2.07 | | | |
| 76 | 24 | 1956 R | 1969 | 13 R | 2.09 | 98 2.07 | | | |
| 78 | 26 | 1952 R | 1969 | 14 R | 2.09 | 98 2.07 | | | |
| 80 | 27 | 1949 R | 1969 | 14 R | 2.09 | 99 2.07 | | | |
| 82 | 28 | 1946 R | 1969 | 14 R | 2.09 | 99 2.07 | | | |
| 84 | 29 | 1942 R | 1970 | 15 R | 2.09 | 99 2.07 | | | |
| 86 | 30 | 1928 R | 1951 | 15 R | 2.08 | 99 2.07 | | | |
| 88 | 31 | 1917 R | 1936 | 14 R | 2.07 | 99 2.07 | | | |
| 90 | 32 | 1906 R | 1921 | 13 R | 2.06 | 99 2.07 | | | |
| 92 | 33 | 1895 R | 1906 | 11 R | 2.05 | 98 2.06 | | | |
| 94 | 34 | 1884 R | 1891 | 7 R | 2.04 | 98 2.05 | | | |
| 96 | 36 | 1861 R | 1861 | 0 R | 2.02 | 98 2.04 | | | |
| 98 | 37 | 1849 C | 1847 | 0 C | 2.01 | 98 2.03 | | | |
| 100 | 38 | 1837 C | 1832 | 0 C | 2.01 | 98 2.02 | | | |
| 102 | 39 | 1826 C | 1818 | 0 C | 2.00 | 97 2.01 | | | |
| 104 | 40 | 1814 C | 1803 | 0 C | 1.99 | 97 2.00 | | | |
| 106 | 41 | 1803 C | 1789 | 0 C | 1.98 | 97 1.99 | | | |
| 108 | 42 | 1792 C | 1774 | 0 C | 1.97 | 97 1.98 | | | |
| 110 | 43 | 1781 C | 1759 | 0 C | 1.96 | 97 1.96 | | | |
| 112 | 44 | 1770 C | 1744 | 0 C | 1.95 | 97 1.95 | | | |
| 114 | 46 | 1748 C | 1715 | 0 C | 1.93 | 96 1.94 | | | |
| 116 | 47 | 1736 C | 1701 | 0 C | 1.92 | 96 1.93 | | | |
| 118 | 48 | 1724 C | 1687 | 0 C | 1.92 | 96 1.92 | | | |
| 120 | 49 | 1712 C | 1672 | 0 C | 1.91 | 96 1.91 | | | |

PACKS ON  NOSE BRKS OFF  210 MPH TIRE  ELEV = 11
TORA = 9000  TODA = 9000  ASDA = 9000  GRAD = -.01%

----NOTES----

1. CTR ENG EPR: MOD-A / NON-MOD
   ICE OFF  +.03 / +.01
   ICE ON   NONE / -.02

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON  NONE
   PACKS OFF ICE OFF/ON  +.04

3. FLAP RETRACT HT(OGH) = 811 FTMSL

4. OBST: HT(FT AGL) DIST(NM)  50  1.81

DATE: 12/09/92

**GROSS WEIGHT CORRECTIONS**

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE 1 DEGREE F HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND  0 LBS/KT EFF HEAD W
       SUB FROM ZERO WIND  1301 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
  *WIND  *RUNWAY SHORTENING  *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
  *MEL PERFORMANCE DECREMENTS

**RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS**

| | | STANDING WATER DRY SNOW -IN- | SLUSH OR WET SNOW -IN- | REDUCE ZERO WIND BY: -LBS- | REDUCE V1 SPEED BY: -KNOTS- |
|---|---|---|---|---|---|
| | | < 1/4 | | 17000 | 28 |
| | 3 1/2 TO 6 | 1/4 TO 1/2 | | 30000 | 25 |
| | | ICE | | 17000 | 28 |
| | | ANTI-SKID INOP | | 8500 | 18 |

* = CHECK MAX STRUCTURAL WT

**LANDING DATA**                PACKS ON

| LNDG FLAP | LENGTH | ANTI SKID | DRY MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | WET MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | APT CRIT TEMP | SUB LB/F ABOVE CRIT TEMP | MAX OPER TEMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 143 | 0 | 120 |

3/3

**I.O.P.# 6**

NAVTECH SYSTEMS

```
+ (WCAISM1) ------------------------------------------------------------+
| ISIS Airman Report              CAIS Information - Basic Information   |
| Cert Pfx:    Cert No: 344567857  Cert Sfx:                            |
+-----------------------------------------------------------------------+
| Name:  WISE, BRETT OGDEN                              Name-Sfx:        |
|                                                                       |
|                                                                       |
| Status:           Info:      Name/Address Source:  Airm              |
| Date of Address Update: 1993 05 04   Citizenship:  USA               |
| Street:                              County:  059                    |
| City:                   State:    Zip:                               |
| Country:                                                              |
| TOT CIVIL HOURS: 04600                                                |
+-----------------------------------------------------------------------+
   THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.


+ (WCAISM3) ------------------------------------------------------------+
| ISIS Airman Report                    CAIS Information - Medical       |
| Cert Pfx:    Cert No: 344567857  Cert Sfx:              Information    |
+-----------------------------------------------------------------------+
| Medical Information for: WISE, BRETT OGDEN                            |
|  Class:            First                                              |
|  Certificate Desc.:  CLEAR                                            |
|                                                                       |
|  Medical Date:  1999 03 11  Medical ID#:  99046910    Pathology:      |
|  Restriction:                                                         |
|                                                                       |
+-----------------------------------------------------------------------+
   THIS INFORMATION IS PROTECTED BY THE PRIVACY ACT. FOR OFFICIAL USE ONLY.
```

1/3        I.O.P. # 7

```
+(WCAISM2)---------------------------------------------------------------+
¦ ISIS Airman Report                          CAIS Information - Certificate ¦
¦ Cert Pfx:      Cert No: 344567857  Cert Sfx:              Information   ¦
+------------------------------------------------------------------------+
¦ Pilot Information for:        WISE              BRETT OGDEN             ¦
¦ Cert-Level:  COMMERCIAL PILOT                                          ¦
¦ Rating/Level:                                                          ¦
¦  AIRPLANE SINGLE ENGINE LAND/COMMERCIAL PILOT                          ¦
¦  AIRPLANE MULTIENGINE LAND/COMMERCIAL PILOT                            ¦
¦  INSTRUMENT AIRPLANE/COMMERCIAL PILOT                                  ¦
¦                                                                        ¦
¦ Type Rating/Level:                                                     ¦
¦                                                                        ¦
¦                                                                        ¦
¦                                                                        ¦
¦                                                                        ¦
¦ Date of Issue: 1998 09 28   Update Date:  1998 09 28                   ¦
¦          Seal: Blue         Cert Status:  Active                       ¦
+------------------------------------------------------------------------+
```

```
+(WCAISM2)---------------------------------------------------------------+
¦ ISIS Airman Report                          CAIS Information - Certificate ¦
¦ Cert Pfx:      Cert No: 344567857  Cert Sfx:              Information   ¦
+------------------------------------------------------------------------+
¦ Flt Engineer Info            WISE              BRETT OGDEN             ¦
¦ Cert-Level:  FLIGHT ENGINEER                                           ¦
¦ Rating/Level:                                                          ¦
¦  TURBOJET POWERED/FE                                                   ¦
¦                                                                        ¦
¦                                                                        ¦
¦ Type Rating/Level:                                                     ¦
¦                                                                        ¦
¦                                                                        ¦
¦                                                                        ¦
¦ Date of Issue: 1998 09 28   Update Date:  1998 09 28                   ¦
¦          Seal: Black        Cert Status:  Active                       ¦
+------------------------------------------------------------------------+
```

2/3            I.O.P. # 2

ISIS ACCIDENT/INCIDENT (AID) REPORT


NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 344567857
ISIS ACCIDENT/INCIDENT (AID) REPORT


NO ACCIDENT/INCIDENT RECORDS FOUND FOR CERTIFICATE: 344567857


ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00344567857
ISIS ENFORCEMENT (EIS) REPORT


NO ENFORCEMENT RECORDS FOUND USING CERTIFICATE 00344567857


ISIS INSPECTION REPORT


NO INSPECTION RECORDS FOUND USING CERTIFICATE: 344567857
ISIS INSPECTION REPORT


NO INSPECTION RECORDS FOUND USING CERTIFICATE: 344567857


I.O.P. # 2

3/3

**AmeriJet**
INTERNATIONAL

Chapter:   Introduction
Page:      Preface
Issued:    09/01/99
Revision:  65

WEIGHT AND BALANCE MANUAL

General Information

| Aircraft No. | B.O.W Weight | Moment |
|---|---|---|
| N794AJ | 93,316 | 88178325 |
| N994AJ | 94,139 | 88105202 |
| N395AJ | 93,883 | 88124473 |
| N495AJ | 92,711 | 87181149 |
| N895AJ | 93,005 | 88056640 |
| N196AJ | 92,819 | 87773553 |
| N296AJ | 93,379 | 87734708 |
| N397AJ | 93,308 | 88534151 |
| N797AJ | 92,868 | 88022669 |
| N598AJ | 92,772 | 87088635 |

**I.O.P. #** 8
1/2

FAA APPROVED, FT LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
1 6 SEP 1999

```
              .A02 SLP159 CB DSNT H   P5 T03060233 50022=
KFLL 172053Z 03009KT 10S  FEW035CB 6CT050 SCT150 SC   00 30/23
    A3000 RMK A02 SLP159 CB VC E T03000228 58015=
TTPP 172000Z 07007KT   FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT   FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT   FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 171900Z 08006KT 9999 FEW010CB BKN280 31/25 Q1012 NOSIG=
TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
    Q1013 TEMPO SHRA=
TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
TFFF 171900Z 08012KT 9999 FEW033 BKN300 31/22 Q1014 NOSIG=
TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
    32/24 Q1014 NOSIG
    CB (S/WNW)=
TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
    32/24 Q1014 NOSIG
    CB (WNW)=
SVMG NO CURRENT REPORT.
SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

------------
FORECASTS
------------


MIA
KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
    BECMG 2122 09005KT NSW SCT025 BKN250
    FM0100 VRB04KT P6SM SCT025 SCT250
    BECMG 0406 VCSH
    FM1500 09010KT P6SM FEW030 SCT250=
FLL
KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
    BECMG 2122 NSW SCT025 BKN250
    FM0100 VRB04KT P6SM SCT025 SCT250
    BECMG 0406 VCSH
    FM1500 09010KT P6SM FEW030 SCT250=
TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
    3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
TTPP 171000Z 171212 08010G20KT 9999 SCT020   BKN300  PROB30 TEMPO 5000 SHRA FEW010CB BKN015
    PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
    BECMG 2223 08005KT=
TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
    TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
    TEMPO 0010 00000KT
    BECMG 1012 11012KT=
TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
    TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
    TEMPO 0010 00000KT
    BECMG 1012 11012KT=
TGPY 171600Z 171818 NIL=
TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
    SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
    1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 ST050=
```


I.O.P. # //



**B-727-200C LOAD PLAN**
**12-POSITION WEIGHT & BALANCE**

DATE: ____
FLIGHT NO. 827
ACN# N339
FROM: FLL TO PVS
ALT ARPT(s) SVNG

—— Max. Cumulative Load 34,100 lbs. ——
—— Max. Cumulative Load 34,951 lbs. ——

| 1 pas | 2 pas | 3 | 4 pas | 5 pas | 6 pas | 7 pp | 8 pas | 9 pas | 10 pas | 11 pas | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULD: | ULD:1472.1F | ULD: | ULD:1494.1F | ULD:2504.1F | ULD:1467.1F | ULD:1227.1F | ULD:1340.2F | ULD:0341.1F | ULD:0341.1F | ULD:0341.1F | ULD:207.1F |
| DEST: FDE | DEST: FDF | DEST: | DEST: FDF | DEST: FDF | DEST: PVS | DEST: PVS | DEST: PVS | DEST: FDF | DEST: FDE | DEST: PVS | DEST: PVS |
| WT: 3190 | WT: 3360 | WT: | WT: 3060 | WT: 3640 | WT: 5460 | WT: 3160 | WT: 7730 | WT: 3640 | WT: 3410 | WT: 3410 | WT: 2070 |
| 3800# MAX | 4880# MAX | 4720# MAX | 4880# MAX | 4330# MAX | 5840# MAX | 8000# MAX | 8000# MAX | 5840# MAX | 4240# MAX | 5280# MAX | 3000# MAX |

FORWARD HOLD (6000# max.)    AFT HOLD (6000# max.)

| TOTAL WT. 1250 | | | | | TOTAL WT. 1430 | | |
|---|---|---|---|---|---|---|---|
| 1A DEST: | 1B DEST: | 1C DEST: PVS | 1D DEST: PVS | | 2A DEST: | 2B DEST: | 2C DEST: |
| WT: 60 | WT: | WT: 575 | WT: 575 | | WT: 1430 | WT: | WT: 1030 |
| 2+1A 5440# | 3+1B 8000# | 4+1C 5200# | 5+1D 8000# | | 9+2A 4000# | 10+2B 4240# | 11+2C 8000# |

12+2D 8000#

B.O.W.            93,708
CARGO TOTAL      47,290
ZFW             144,998    21.6
ZFW MAC   51.3

| | WT | MAC |
|---|---|---|
| TAKEOFF | 192,200 | 21.7 |
| TAKEOFF CG | | |
| STAB TRIM | | |
| FUEL BURN | 32,200 | |
| LANDING | 160,682 | |

MAXIMUM ALLOWABLE TAKEOFF WEIGHT (PERFORMANCE)
RUNWAY
WIND: ___ TEMP: 24
FLAP SETTING

**STRUCTURAL LIMITS**
MAX TAXI WEIGHT    192.2
ZERO FUEL WEIGHT   150.0
MAX LDG WEIGHT     160

CAPTAIN'S SIGNATURE
Sign in accordance with
FAR 121.693, 121.697, 121.443, 121.665

COMAT
ITEM(S)
WEIGHT   lbs

P.#

CAPTAIN
F/O
A/M

AIRCRAFT COPY - WHITE    STATION COPY - YELLOW

Form #0-200A
DATE: 04/23/99

AIRCRAFT LOG BOOK   AIRCRAFT MAINTENANCE LOG   FORM M1   A/C TYPE B727   AIRCRAFT # 391   FLIGHT CODE 4

| POS | EMPLOYEE | INT | OPERATING & ALL DEADHEAD CREW MEMBERS |
|---|---|---|---|
| 1 | 202.5 | B | Stebe |
| 2 | 603 | P | Major |
| 3 | — | O | Ramsingh |
| 4 | 7851 | B | Wise |
| 5,6 | 72093 | A | Dorsey Sr |

| NO. | DISCREPANCIES (PLEASE PRINT) | NO. | CORRECTIVE ACTION | SER. NO. OFF | SER. NO. ON | STN | MECHANIC |
|---|---|---|---|---|---|---|---|
| 3 1/2 | in. frost check ok | 1 | 1e "#frost check complete | | | FLL | Willi-Anyan |

52010

:-06070-WJZ  Document 134  Filed on FLSD Docket 03/26/2001  Pa

AMERIJET FLIGHT RELEASE

ARTCC MIAMI (ZMA) MAIN 305-716-1588    DATA 305-716-1648

00/17/99 (Z DATE)    TIME 2055Z    TRIP/DATE 827/17    AIRCRAFT 757FJ    8/27/8    ETD 2300

#NON FT LAUDERDALE    TO PORT OF SPAIN
FILED ROUTE:    ZBV A555 DOP-N G449 POS
PLANNED ROUTE ZBV ZQA ZLS-N INDEE BTK A555 DOP-N G449 POS
TOTAL DISTANCE  1499.9  DIRECT DISTANCE  1413.9    3.7    ALTERNATE    SOME (155 AL */ 277 DEG)

PLANNED BURN   37.2    3:20
ALTERNATE      6.3     0:30              MCH ,77
10% EXTRA FUEL  3.5    0:20       INDICATED AIRSPEED 300      PREPARED BY:  KIT TIWARI
RESERVE        4.1     0:30         TRUE AIRSPEED 470         CAPTAIN:  BRIAN STEELE
HOLDING FUEL   0.0     0:00        FLIGHT LEVEL 290          FIRST OFFICER:  PAT MAJOR
1ROT FUEL      0.5               ZERO FUEL WEIGHT 141.8      SECOND OFFICER:  BASIT WISE
REQUIRED FUEL  51.6    4:40        TAKE OFF WEIGHT 192.9                A. JORGET
EOF            16.9              LANDING FUEL  13.9                 D. MANGINATI
EXTRA FUEL     0.0     0:00        LANDING WEIGHT 155.7
BLOCK FUEL     51.6    4:40        TOTAL BURN  38.1 (INCLUDES TAXI)
FOR EACH 10.0 OVER PLANNED TAKE OFF WEIGHT BURN WILL BE 1.5 OVER PLANNED BURN
PLANNED CARGO  49.1  MAX CARGO 50.2
CRUISE CAT -30 (ISA + 12)

DRI MEMBER    DATE    MEL REF
8942    07/18/1998    24-22    POCS DEFERRED PER MOD UNDER ABOUT OAM
8968    07/24/1996    24-1    8 2 DME DIFFERENTIAL INDEE

MGA 194.2   MGL IS BASED ON STRUCTURAL LIMITS ONLY NO AIRPORT DATA ON FILE FOR FT LAUDERDALE
WINDS:  (24/76)BENDT 40/%  (20/69)HARDY 120/5  (14/63)PELAA 70/10

| FROM/TO | | FREQ | LEB | MTG | TIME REM | GS | TIME | TOT TIME | BURN | TOT BURN | FUEL REM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KFLL | 118  0  119  ZBV | 116.7 | 51 | 1409 | | 320 | | | | | TAKE+ FUEL 51.1 |
| ZBV  114 | *FIR* | 6K/DN* | 1/ | 1391 | | 60 | | | | | |
| *FIR* | | TOC | 69 | 1322 | 2:55 | 320 | 0126 | 0:29 | 6.3 | 6.3 | 44.8 |
| TOC | 0  112  ZQA | 112.7 | 22 | 1301 | 2:52 | 471 | 0103 | 0:29 | 0.5 | 6.8 | 44.3 |
| ZQA  126  0  126  ZLS-N | 526.0 | 148 | 1153 | 2:33 | 472 | 0119 | 0:47 | 3.7 | 10.5 | 40.6 |
| ZLS-N  119  0  119  INDEE | | 55 | 1098 | 2:26 | 469 | 0107 | 0:54 | 1.4 | 11.7 | 39.3 |
| INDEE  119  0  120  BTK | 114.2 | 207 | 891 | 1:59 | 467 | 0127 | 1:11 | 5.1 | 16.9 | 35.5 |
| BTK  122  0  133  COCBU | | 22 | 858 | 1:55 | 464 | 0104 | 1:25 | 0.8 | 17.7 | 34.4 |
| COCBU  133  0  133  GRBD1 | | 69 | 790 | 1:47 | 465 | 0109 | 1:34 | 1.7 | 19.4 | 31.8 |
| GRBD1  134  0  134  HARDY | *FIR* | 55 | 735 | 1:39 | 465 | 0107 | 1:41 | 1.3 | 20.7 | 30.4 |
| HARDY  134  0  134  IDAHO | | 80 | 654 | 1:29 | 465 | 0110 | 1:51 | 1.9 | 22.6 | 28.5 |
| IDAHO  135  0  135  DOP-N | 391.0 | 64 | 570 | 1:18 | 465 | 0111 | 2:02 | 1.9 | 24.6 | 26.5 |
| DOP-N  159  0  160  VANNA | | 11 | 559 | 1:17 | 465 | 0101 | 2:04 | 0.3 | 24.9 | 26.3 |
| VANNA  160  0  160  GESSO | | 58 | 501 | 1:09 | 465 | 0107 | 2:11 | 1.4 | 26.3 | 24.9 |
| GESSO  160  0  160  HENLI | | 40 | 461 | 1:04 | 465 | 0105 | 2:16 | 1.9 | 27.8 | 22.9 |
| HENLI  161  0  161  ANNER | | 49 | 412 | 0:58 | 466 | 0106 | 2:23 | 1.2 | 28.4 | 22.8 |
| ANNER  157  0  158  ANNDA | | 85 | 327 | 0:47 | 465 | 0111 | 2:34 | 2.0 | 30.4 | 20.8 |
| ANNDA  160 | *FIR* | *TIPS* | 4 | 323 | 0:46 | 464 | | 2:34 | 0.1 | 30.4 | 20.7 |
| *FIR*  0  160  PELAR | | 61 | 262 | 0:38 | 467 | 0108 | 2:42 | 1.4 | 31.8 | 19.3 |
| PELAR  162  0  163  PERRY | | 64 | 190 | 0:30 | 467 | 0404 | -2:50 | 1.8 | 32.6 | 17.8 |
| PERRY  164  0  164  PERSA | | 97 | 101 | 0:18 | 468 | 0112 | 3:03 | 2.2 | 35.5 | 15.6 |
| PERSA  163 | | TOD | 14 | 87 | 0:16 | 470 | 0108 | 3:04 | 0.5 | 35.8 | 15.3 |
| TOD  0  162  POS | 116.5 | 79 | 0 | | 324 | | DESCENT | 1.4 | | |
| POS  019  0  019  TTPP | | 0 | -0 | | 324 | | 3:20 | | 37.2 | 13.5 |

KFLL  W24:04.3 / W80:09.1    ZBV  W25:42.2 / W79:17.7    ZQA  W25:01.7 / W77:27.0    ZLS-N  W23:34.8 / W75:15.8
INDEE  W23:08.3 / W74:23.4    BTK  W21:26.4 / W71:08.1    COCBU  W21:08.9 / W70:39.3    GRBD1  W20:31.1 / W69:37.*
HARDY  W20:00.4 / W68:49.0    IDAHO  W19:15.6 / W67:38.4    DOPN  W18:28.1 / W66:24.7    VANNA  W18:19.0 / W66:18.8
GESSO  N17:29.6 / W65:46.7    HENLI  N16:55.1 / W65:24.5    ANNER  N16:13.0 / W64:58.0    ANNDA  N13:05.1 / W64:08.1
PELAR  N14:08.0 / W63:33.0    PERRY  N13:11.0 / W63:00.0    PERSA  N11:48.3 / W62:11.4    POS  N10:27.8 / W61:23.6
TTPP  N10:35.6 / W61:20.9    SOME  N10:34.9 / W63:57.9
ACTUAL BLOCK FUEL OUT          ACTUAL BLOCK FUEL IN          TOTAL BURN
                                                15.7                36.5
(4) PRICES ARE AMERIJET CONTRACT FUEL 520
Fuel cost at KFLL $0.60 Fuel cost at TTPP $0.68  Tanker fuel as needed for operational reasons = No difference in cost.

RELEASED BY                          TIME OF RELEASE
I CERTIFY THAT I HAVE COMPLETED ALL AIRPORT AND ROUTE PREFLIGHT AS REQUIRED BY FAR 121.443

CAPTAIN

FIR BOUNDARIES:  KZMA 0:13  TJZS 1:41  TTZP 2:34

KFLL/TTPP

D.P.# 10

```
. . AO2 SLP159 CB DSNT H   D5 T03060233 56022=
KFLL 172053Z 03009KT 10S FEW035CB SCT050 SCT150 SC   0 30/23,
    A3000 RMK AO2 SLP159 CB VC E T03000228 58015
TTPP 172002 24406KT 9   R  d  oran Lazer lo ket-03/26/2001    Pa
TTPP 172000Z 07007KT    FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT    FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT    FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 171900Z 08006KT 9999 FEW010CB BKN280 31/25 Q1012 NOSIG=
TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
    Q1013 TEMPO SHRA=
TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
TFFF 171900Z 08012KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
    Q1014 NOSIG
    CB (S)=
TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
    32/24 Q1014 NOSIG
    CB (S/WNW)=
TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
    32/24 Q1014 NOSIG
    CB (WNW)=
SVMG NO CURRENT REPORT.
SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

-----------
FORECASTS
-----------

MIA
KMIA 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
    BECMG 2122 09005KT NSW SCT025 BKN250
    FM0100 VRB04KT P6SM SCT025 SCT250
    BECMG 0406 VCSH
    FM1500 09010KT P6SM FEW030 SCT250=
FLL
KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
    BECMG 2122 NSW SCT025 BKN250
    FM0100 VRB04KT P6SM SCT025 SCT250
    BECMG 0406 VCSH
    FM1500 09010KT P6SM FEW030 SCT250=
TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
    3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
TTPP 171000Z 171212 08010G20KT 9999 SCT020    PROB30 TEMPO 5000 SHRA FEW010CB BKN015
    BKN300 PROB30 TEMPO 5000 SHRA FEW010CB BKN015
    PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
    BECMG 2223 08005KT=
TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
    TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
    TEMPO 0010 00000KT
    BECMG 1012 11012KT=
TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
    TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
    TEMPO 0010 00000KT
    BECMG 1012 11012KT=
TGPY 171600Z 171818 NIL=
TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
    SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
    1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 SCT050=
```



I.O.P. #11



# B-727-200C LOAD PLAN
## 12-POSITION WEIGHT & BALANCE

DATE 17th Aug 99
FLIGHT NO. 827
ACN# N317
FROM ELL TO PIS
ALT ARPT(s) SVHG

--- Max. Cumulative Load 34,100 lbs. ---
--- Max. Cumulative Load 34,951 lbs. ---

| 1 pax | 2 pax | 3 | 4 pax | 5 pax | 6 pax | 7 pp | 8 pax | 9 pax | 10 pax | 11 pax | 12 pax |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULD: C5043H | ULD: 1417 1H | ULD: | ULD: 1494 1H | ULD: C504 1H | ULD: 1347 1H | ULD: 1211 1H | ULD: 1340 1H | ULD: A224 1H | ULD: A236 1H | ULD: A24h 1H | ULD: A24h 1H |
| DEST: EDE | DEST: EDF | DEST: | DEST: EDE | DEST: EDF | DEST: PIS | DEST: PIS | DEST: PIE | DEST: EDE | DEST: EDE | DEST: PIE | DEST: PIP |
| WT: 3190 | WT: 3360 | WT: | WT: 3060 | WT: 3640 | WT: 5400 | WT: 3160 | WT: 7730 | WT: 3440 | WT: 4160 | WT: 3410 | WT: 2070 |
| 3800# MAX | 4880# MAX | 4720# MAX | 4800# MAX | 4320# MAX | 5840# MAX | 8000# MAX | 8000# MAX | 5840# MAX | 4240# MAX | 5280# MAX | 3000# MAX (8000# max.) |

FORWARD HOLD

| TOTAL WT | 1/3C | (6000# max.) |
|---|---|---|
| 1A | 1B | 1C | 1D |
| DEST: Ague | DEST: | DEST: PIS | DEST: PIS |
| WT: 60 | WT: | WT: 515 | WT: 575 |
| 2-1A 5440# | 3-1B 8000# | 4+1C 5200# | 5+1C 8000# |

AFT HOLD

| TOTAL WT | |
|---|---|
| 2A | 2B | 2C | 2D |
| DEST: | DEST: | DEST: | DEST: PIP |
| WT: 1490 | WT: | WT: 1020 | WT: 9070 |
| 9-2A 8000# | 10-2B 4240# | 11-2C 8000# | 12-2D 8000# |

51.3

B.O.W. 93,308
CARGO TOTAL 41,290
ZFW 144,598
ZFW MAC 51.3

TAKEOFF WT 192,288
TAKEOFF CG 76.5
STAB TRIM 7.8
FUEL BURN 53,320
LANDING WT 136,018

MAXIMUM ALLOWABLE TAKEOFF WEIGHT (PERFORMANCE)

STRUCTURAL LIMIT(S)
MAX TAXI WEIGHT 212
ZERO FUEL WEIGHT 110.0
MAX LDG WEIGHT 142.0

RUNWAY 79L
WIND 270 TEMP 20
FLAP SETTING 20

(STRUCTURAL LIMITS)

CAPTAIN'S SIGNATURE
Sign in accordance with
FAR 121.693, 121.697, 121.135, 121.415

COMAT
ITEM(s)
WEIGHT

P-#

CAPTAIN
FO
1
2

ACM

Form #: 0-200A
DATE: 04/23/99

AIRCRAFT COPY - WHITE    •    STATION COPY - YELLOW



November 10, 1999

Mr. John Roseborough
Federal Aviation Administration
Flight Standards District Office
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:    B. Wise Information

Dear Mr. Roseborough:

The following is the requested information pertaining to Flight Engineer Brett Wise:

Brett O. Wise                              Certificate #:  344567857

If you have any questions or require additional information, please contact me. Thanking you
in advance for your assistance.

Sincerely,

Peter A. Steele
Vice President of Operations
Amerijet International, Inc.

1/3                              I.O.P. # 13

498 S.W. 34TH STREET, FORT LAUDERDALE, FL 33315 • (954) 359-0077 • FAX: (954) 359-7896 • http://www.amerijet.com

CARGO *IS* OUR BUSINESS



## FACSIMILE TRANSMITTAL SHEET

DATE: November 10, 1999

COMPANY: FAA

ATTN OF: John Roseborough

FAX NO: (954) 356-7531



**COMMENTS:**

_____

_____

_____

_____

_____

FROM: Terri Sargent

NUMBER OF PAGES INCLUDING COVER SHEET: 2

2/3

**AMERIJET INTERNATIONAL**
**498 SW 34TH STREET**
**FORT LAUDERDALE, FL 33315**
**PHONE:(954)359-7766**
**FAX: (954) 359-6954**   **I.O.P. # 13**



November 10, 1999

Mr. John Roseborough
Federal Aviation Administration
Flight Standards District Office
1050 Lee Wagener Boulevard
. Suite 201
Fort Lauderdale, FL 33315

Re:    B. Wise Information

Dear Mr. Roseborough:

The following is the requested information pertaining to Flight Engineer Brett Wise:

Brett O. Wise                                    Certificate #: 344567857

If you have any questions or require additional information, please contact me. Thanking you
in advance for your assistance.

Sincerely,

Peter A. Steele
Vice President of Operations
Amerijet International, Inc.

$3/3$ .                                              **I.O.P. # 13**

*11/10/99*
*JMR*
*SUPERVISOR*

November 10, 1999

**CERTIFIED-RETURN RECEIPT**

· Mr. Brett O. Wise

Dear Mr. Wise:

### LETTER OF INVESTIGATION

File Number: 2000SO170014

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Flight Engineer on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1/2

**I.O.P. # H**

File 8030 1

WP H AMERLIE ILOIWF.02.Dou

SO FSDO 17 J ROSFBOROUGH.JCR 9

Z 593 221 208

Receipt for Certified Mail

BRETT WISE

PS Form 3800, April 1995

Return Receipt
Whom X Date Deliv.
Return Receipt
Date, X Addr.

TOTAL Postage & Fee | $

Postmark or Date

SENT 11/10/99

CERTIFIED

Z 593 221 208

MAIL

Federal Aviation Administration
Flight Standards District Office
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315

Official Business
Penalty for Private Use, $300

I.O.P. # 14
2/2

DCR #4 FT LAUDERDALE, FL 333.11-10-99 20:47

Mr. BRETT O. WISE

RETURNED
TO
SENDER

REASON
FORWARDED
Unclaimed
Attempted-Not Known
Insufficient Address
No such Number
No such Street
No such Office in this state
Do not remail to this address

1st Notice
2nd Notice

42

*11/10/99*
*SUPERVISOR*

November 10, 1999

Mr. Brett O. Wise

Dear Mr. Wise:

### LETTER OF INVESTIGATION

File Number: 2000SO170014

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Flight Engineer on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1/2

**I.O.P. # 15**

**2**

File: 8030.1

WP: H:\AMERIJET\LOIWIS01.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

2/2

I.O.P. # 15

*Red 11/23/99*
*@ 0800 ym*

November 18, 1999

Mr. Brett O. Wise

Mr. John Roseborough
Principal Operations Inspector
Federal Aviation Administration
1050 Lee Wagener Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:    File Number 2000SO170011

In regards to your letter which I received about Amerijet Flight #827 on August 17, 1999, I
remember that it had rained that day which is pretty much normal for Florida at that time of the
year. Also, I recall that we back taxied down the runway to see for ourselves the actual condition
of the runway. I was standing in the aircraft giving a new flight engineer IOE and I could see out
of both windows. At no time during my observation was there standing water on the runway we
used for takeoff. It was a wet runway which does not impose any penalty.

The decision was made that a normal takeoff and climb was to be used and all flight
crewmembers agreed. At no time did I hear the First Officer challenge the Captain's decision.

We have all had training in CRM and Captain Steele in my opinion is a high qualified pilot
which would have no problem discussing the matter with a flight crew if any danger or concern
was apparent.

Sincerely,

Brett O. Wise

**I.O.P. # 16**

4

00SO170014

## SECTION D - FACTS AND ANALYSIS

### FACTS

On Monday, October 4, 1999, the investigating Inspector found on his desk a letter **(IOP 3)** from the First Officer (Patrick Major EIR # 00SO170013) of the subject flight detailing the events which led to the investigation herein. This correspondence had followed a conference between the complainant and the investigating Inspector some weeks before in which the Inspector had requested the account to be put in writing. Due to a death in the family that occurred two days prior (Saturday, October 2nd), and walk in duty on October 4th, the letter could not be given due consideration. During the Inspectors resulting absence for the funeral of his mother and use or lose annual leave, the correspondent directed his concerns to the Department of Transportation's Inspector General, hence the investigation now in progress.

On Tuesday, August 17, 1999, between the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time) Amerijet B-727, N397AJ (a FAR 121 Supplemental Air Carrier, **IOP 1, pp. 1 and 2)**, operating as Amerijet (AMJ) Flight # 827 departed Runway 9L (9 Left) at Fort Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida **(IOP 3, 4, 5, 9 and 12)** when there was less than one quarter (1/4) of an inch of standing water on the departure runway as reported by the FLL FAA Air Traffic Control Tower (ATCT) following a runway contamination/condition check accomplished by the FLL Airport Authority identified on the ATCT tape recording **(IOP 4)** as "Ramp One". The airport runway contamination/condition report in detail represented that there was "less than ¼ inch, good drainage, slight standing water about six (6) feet on either side of centerline". This report was subsequently provided to the Flightcrew of AMJ 827 by the FLL ATCT as "some standing water less than a quarter of an inch" prior to a takeoff clearance being given to the flight, and was acknowledged by the pilot **(ATCT Tape counter number 607, IOP 4)**.

Amerijet AOM in Chapter 4, Section 1A, Subject 55 [4:1:55(IOP 6, page 1)] directs that for takeoff limitations other than as listed on this page, the user **"check Performance Manual for appropriate reductions to maximum takeoff gross weight" (IOP 6, page 3)**. Even though the NAVTECH page **(IOP 6, page 2)** provides additional information as to wet runways and standing water of less than one eighth (1/8) inch, the information as contained on the Amerijet International B-

727-200, JT8D-15 Performance Chart for Fort Lauderdale runway 9L with Flaps 20 (IOP 6, page 3) is applicable. This chart requires a weight reduction of 17,000 pounds and a V1 airspeed reduction of 28 knots from the data as expressed on the B-727-200c Load Plan (IOP 12) rendering the figures of weight reduction from 192,298 to 175,298 pounds. The aircraft thus departed 17,000 pounds above its maximum gross takeoff weight as corrected for contaminated runway conditions, and therefore ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓(IOP 2, pages 3 and 4).

FAR Part 1 (IOP 2, page 1) clearly defines the terms "Operate", "Operational Control" and "Person", as follows. The terms state in pertinent part, "Operate" means use, cause to use or authorize to use aircraft; "Operational Control" means the exercise of authority over initiating, conducting or terminating a flight; "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

IOP 9 and 12, identify Mr. Brett Ogden Wise as the Flight Engineer, a flightcrew member required by aircraft certification and operational requirements and accommodating the terms expressed above in concert with the company, as a person. As stipulated in FAR 91.605(b)(3), "No person may operate a turbine powered airplane certificated after September 30, 1958, contrary to the Flight Manual, or take off that airplane unless - (3) The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff...........from wet runways" (IOP 2, page 3).

Flight Engineer Wise, in performing his duties as a required flightcrew member, was a person who "operated an aircraft in a careless or reckless manner so as to endanger the life or property of another", contrary to ▓▓▓▓▓▓▓OP 1 - 12).

Mr. Wise does not have a violation history (IOP 7, page 3).

Mr. Wise was sent two (2) Letters of Investigation (LOI), one via certified mail which was returned unclaimed, and one via regular mail, to which he respond. His response is identified as IOP 16, but fails to offer any additional information, instead tending to contradict the facts as established by the preponderance of other IOP submitted and included herein.

# Draft

July 8, 1998

Captain N. Edward Cook
Chief Pilot
Amerijet International, Inc.
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Captain Cook:

### Captain Upgrade/Training Quality

Recently, we have noticed what appears to be a trend toward mediocrity (at best) in Amerijet's pilot training/checking/upgrade program. An oral exam recently conducted by an Inspector from this office detected a very lackadaisical attitude and great lack of preparation on the part of the applicant. The specifics to this particular account pertain to Mr. Patrick Scott Major, certificate number 265069531. Mr. Major appeared to lack any decorum normally associated with, and expected from, a professional pilot in his approach to embracing the testing environment. The lack of knowledge demonstrated by this applicant during the oral portion of his evaluation/test was so poor that the activity was terminated during the first ten (10) minutes.

The incident as described above is not an isolated instance, and while not necessarily the norm, is indicative of a departure from excellence that should be the goal within any FAR 121 operational environment. It is with that in mind that this office now requires notification in writing within five (5) business days following the second failure of any portion of the testing phase, either certification or proficiency of any airman at Amerijet, and prior to scheduling any further testing. Any third attempt must be observed by an FAA Inspector provided from this office who will evaluate the applicant's entitlement to hold a pilot certificate as provided for under the reexamination authority of the FAA. Further, Check Airmen and/or Instructors who knowingly recommend applicants who perform in a manner substandard to the norm, and contrary to Amerijet's Training Program will be considered for termination from that activity.

Please ensure this information receives due dissemination within Amerijet, among the Check Airman and Instructor contingent, and provide copies of any bulletins generated in that accord.

Sincerely,

John C. Roseborough
Principal Operations
Inspector



PLAINTIFF'S
EXHIBIT
46

000275

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                    )   L.T. Case No.
                                        )   99-021746-11
              Plaintiff,                )
                                        )
vs.                                     )
                                        )   COPY
AMERIJET INTERNATIONAL, INC.,           )
                                        )
              Defendant.                )
- - - - - - - - - - - - - - - - - - -)


                        500 East Broward Blvd.
                        Fort Lauderdale, Florida
                        Monday, January 8, 2001
                        1:30 p.m. - 2:25 p.m.


APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY:  VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY:  SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant



- - - - - - - - - - - - - - - - - - - - - - - - - - -

                      DEPOSITION

                          OF

                    BRIAN A. STEELE

- - - - - - - - - - - - - - - - - - - - - - - - - - -

```
 1   to something.  I don't know if there's a privilege
 2   there or not.
 3   BY MS. SHEA:
 4        Q.   Okay.  So, Captain Steele, to the best of
 5   your knowledge, it's unresolved?
 6        A.   To the best of my knowledge.
 7        Q.   Okay.  But to date, there has not been any
 8   sanction against you, such as suspension or fine or
 9   anything?
10        A.   No.  No.
11        Q.   No hearings, nothing?
12        A.   No.
13        Q.   Okay.  Do you know what, if any, actions
14   are pending against Amerijet as a result of this
15   incident?
16        A.   I don't know.
17        Q.   Internal to Amerijet, forgetting the FAA
18   and any discipline, were there any warning or other
19   repercussions to you of this August 1999 flight?
20        A.   No.
21             MS. SHEA:  Can you mark this, please.
22             (Plaintiff's Exhibit 24, letter, was
23   marked for identification.)
24   BY MS. SHEA:
25        Q.   Captain Steele, please take a look at what
```