UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 00-6070-Ferguson/Snow
L.T. Case No. 99-021746-11

PATRICK SCOTT MAJOR,

Plaintiff,

vs.

AMERIJET INTERNATIONAL, INC.,

Defendant.
_____________________________/

ORIGINAL

500 East Broward Boulevard
Fort Lauderdale, Florida
Wednesday, January 24, 2001
1:15 p.m. - 3:00 p.m.

APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
500 East Broward Boulevard, Suite 1000
Fort Lauderdale, Florida 33394
By: VALERIE SHEA, ESQ.
Appearing on behalf of the Plaintiff.
(954)527-2800

FILED by DKTG ______ D.C.
MAR 23 2001
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

ALLEN, NORTON & BLUE, P.A.
121 Majorca Avenue, Suite 300
Miami, Florida 33134
By: SUSAN POTTER NORTON, ESQ.
Appearing on behalf of the Defendant.
(305)445-7801

ALSO PRESENT: Patrick Scott Major
Lily Jules, Representative of Amerijet

DEPOSITION
OF
ED COOK



137

# I N D E X


| WITNESS: ED COOK | PAGE |
|---|---|
| DIRECT EXAMINATION BY MS. SHEA | 3 |


## EXHIBITS

(Retained by Ms. Shea and Not Attached)

PLAINTIFF'S


| Exhibit | Description | Page |
|---|---|---|
| NUMBER 26 | Annual Pilot Meeting, Chief Pilot Topics for Ed Cook | 10 |
| NUMBER 27 | Letter to Pat Major | 24 |
| NUMBER 28 | Letter to Pat Major | 24 |
| NUMBER 29 | Letter referencing May '98 upgrade policies | 35 |
| NUMBER 30 | Document dated April 30, 1998 | 40 |
| NUMBER 31 | Passing certificate of pre-upgrade written examination | 41 |
| NUMBER 32 | Contract Agreement | 45 |
| NUMBER 33 | Letter related to upgrade effort | 64 |
| NUMBER 34 | Pilot Simulator Flight Time Training document for Captain Patrick Scott Major | 73 |
| NUMBER 35 | Pilot Instructor Training Form | 74 |
| NUMBER 36 | Document on training periods | 74 |

Deposition of ED COOK, a witness of lawful age, taken by the Defendant for purpose of discovery and for use as evidence in the above-entitled cause, wherein PATRICK SCOTT MAJOR is the Plaintiff and AMERIJET INTERNATIONAL, INC., is the Defendant, pending in the Circuit Court of the 17th Judicial Circuit in and for Broward County, pursuant to notice heretofore filed, before AMBER G. CHEEK, Court Reporter and Notary Public in and for the State of Florida at Large, at the offices of Heinrich, Gordon, Hargrove, Weihe & James, P.A., 500 East Broward Boulevard, Fort Lauderdale, Broward County, Florida on Wednesday, the 24th day of January 2001 commencing at 1:15 o'clock p.m.

Thereupon:

**ED COOK**

a witness named in the notice heretofore filed, being of lawful age and being first duly sworn in the above cause, testified on his oath as follows:

DIRECT EXAMINATION

BY MS. SHEA:

Q. Sir, can you tell us your full name please.

A. Norman Edward Cook.

Q. Where do you live?

A. In Davie.

Want the address?

Q. Please.

A. 373 West Garden Cove Circle.

Q. And do you work?

A. Yes.

Q. Who do you work for?

A. Aero Service Aviation Center.

Q. What is that?

A. It's a lot of things. I work in the training center which is a place where they train airline and corporate crew numbers.

Q. And how long have you worked there?

A. Over two years.

Q. Did you go there immediately after Amerijet?

A. No, not immediately. I bounced around and I tried to take it easy and that just didn't work out for me. I just didn't like taking it easy, so I found something to do.

Q. When did you leave Amerijet?

A. I think it was around October, the last part of October of '98.

Q. All right. You were employed there for a long time?

A. About nine years.

Q. So '89?

A. Yes, '89.

Q. What is your background? Are you a pilot also?

A. Um-hmm.

Q. You have to answer yes for her.

A. Yes. I'm sorry.

Q. Can you just give me a real quick overview of your experience before you came to Amerijet.

A. Before I came to Amerijet I was the Chief Pilot for West States Airlines, before that I was the Chief Pilot for D.H.L. Airways, and before that I was the line pilot and Chief Pilot for International Aero Service Company which has several clients like Japan Airlines, et cetera. I was with Japan Airlines.

Q. What's your date of birth?

A. 2/11/42.

Q. So you still fly as a line pilot yourself?

A. Yes, I can.

Q. Do you do any of that?

A. Not very often, no.

Q. And what position did you take when you first joined Amerijet?

A. Chief Pilot.

Q. And that remained constant until you left?

A. That's correct.

Q. Did you leave voluntarily or involuntarily?

A. It was a mutual agreement. I wanted to do something else and he wanted the Chief Pilot to be something else, so I left.

Q. That would be Dave Bassett?

A. Yes.

Q. When you say that he wanted the Chief Pilot to be something else, what was your sense at the time about what he was looking for that was different than what you offered?

A. He didn't really say what was different. He and I had a conversation and I said that I felt that under the current circumstances that the posture of the Chief Pilot's office should change and we didn't talk about what the change should be; and we later talked about what I wanted to do and I didn't want to be Chief Pilot anymore, I want to become the Director of Training. But I was over-qualified for that position, so we made an arrangement to where it was possible for me to go do what I wanted to do, which I did with Aero Service at the salary that I wanted.

Q. As Chief Pilot at Amerijet who did you report to?

A. Pete Steel.

Q. Director of Operations.

A. Vice President of Operations.

Q. Vice President of Operations.

A. Um-hmm.

Q. All right. Who reported to you?

A. Well, at what time? When?

Q. Well, categorically. Not by individual. Like do the pilots report to you as such?

A. Yeah. My question was at what time meaning what time in history, because the history I was there who reported to me varied.

Q. I see.

A. But generally during the whole time the pilots reported to me, yes.

Q. What about training? Was that under your umbrella or was that lateral to you?

A. It was more or less lateral to me in that I was more responsible for the quality assurance or the quality of the training product. Another name for Chief Pilot would be Director of Flight Standards. Some airlines use that term. The legal term that the F.A.A. requires is Chief Pilot.

Q. Did you fly as Chief Pilot or were you all administrative?

A. I flew also.

Q. As a captain?

A. Yes.

Q. Did you supervise the check airmen in their capacity as a check airman?

A. Um-hmm.

Q. You have to answer out loud.

A. I'm sorry. I forgot. You can't hear my head rattle, can you?

Q. Were you in charge of compliance for line checks and proficiency checks and that kind of thing?

A. Yes.

Q. What were the numbers of pilots that you had at Amerijet over your tenure. Did it increase with the years?

A. It went up and down depending on the business, and I really don't remember the numbers. It was less than a hundred some times and more than a hundred other times.

Q. Okay. But it could fluctuate just around a hundred?

A. I can't remember really. I don't know.

MS. SHEA: Let's go off the record.

(Whereupon, a short break was taken.)

BY MS. SHEA:

Q. Did you personally hire all the flight crew?

A. I participated in the hiring.

Q. Okay.

A. That would be more accurate.

Q. Did you hire Pat Major?

A. I don't remember. I probably did, but I don't remember.

Q. All right. When you were Chief Pilot at Amerijet in, let's say, pre-1996 were there upgrade policies in effect for members of the flight crew that were seeking promotion to either be first officer or captain?

A. Where there policies in effect?

Q. Right.

A. Yeah.

Q. Say until 1996.

A. Yeah, there were. I don't remember what they were, but there were, yes. I'm sorry.

Q. Some of this may seem like a memory quiz, but I'm not trying to do that.

A. I understand.

Q. But I don't want to go back further than I need to.

A. And I promise that I will tell you everything I know just as accurately as I can.

Q. All right. That is fair enough. I may mark a few documents that may help you remember or may be

of some help to us. Let me hand you what we will mark as Exhibit Number 26 to the deposition.

A. All right.

(Whereupon, the above-referenced document was marked as Plaintiff's Exhibit Number 26 for Identification).

BY MS. SHEA:

Q. Do you see "Ed Cook" on this or "Chief Pilot Topics for Ed Cook?"

A. Um-hmm.

Q. Again, not to quiz you on your memory, I just thought I'd show you this document if it helps your recollection any.

Was there an annual pilot meeting?

A. I think they tried to do an annual pilot meeting most of the time, yes.

Q. And you would typically be one of the speakers or participants?

A. And I would typically have an agenda, right.

Q. All right. The one I've shown you is for mid-year 1996 and you talk about upgrade and hiring policies. Was there going to be new policies in effect at that time, or would that be just the type of thing that you would discuss at this meeting, if you recall?

A. Well, we discussed it every year at the meeting, and sometimes there were changes to the policy and additions or deletions or modifications because we had learned some things.

Q. Was there an upgrade policy in writing at Amerijet as of the time that you left in October of 1998?

A. I believe there was, yes.

Q. Where would that be found and who would I ask for that?

A. Well, I'm not sure. At the time that I was there, you would ask me for it and I would have it. I'm not sure who has it now. I would suspect that whoever runs H.R. now knows.

Q. Would it be part of one of the multiple volumes and manuals that the company has?

A. Possibly.

Q. You don't know for sure?

A. I don't know anymore. I wouldn't know today where you'd find it. It's not something I discuss with them anymore, so --

Q. Right. But as of the time you were there, it's not part of the G.O.M.?

A. No.

Q. It's not part of the A.O.M.?

A. No, the A.O.M. is the Airplane Operating Manual.

Q. Right.

A. And the G.O.M., I don't remember it ever being in the G.O.M. I don't remember it being in there.

Q. You don't remember it being bound in a volume or part of a larger document?

A. I remember it being bound in a very small volume, yes.

Q. Okay.

A. I remember. And it changed and had revisions over the years that I was there.

Q. Was there an employee handbook --

A. Yes.

Q. -- for example, that have all the personnel policies?

A. There was.

Q. Is that what it would have been in?

A. At one time it was separate to that volume and later became or tried to make it part of that volume. At least I stuck mine in there. I don't know officially if that was the way it was supposed to be done or not.

Q. You don't still have yours, do you?

A. No, I don't think so.

Q. "Topics: Upgrade and hiring policies, two checks rides, blank checks, and upgrade evaluations."

Does that trigger any recollections on your part in terms of anything that was going on in 1999 as it would relate to those subjects?

A. Well, how a check ride was conducted, we discussed that. Pilots throughout the industry have a fear of check rides. So I would just remind them basically what a check ride was, what we were supposed to do, remind them what the law required at a meeting this, what is required in the line check, what vehicle we're using the line check to do.

And you're probably more interested in what comments I had on upgrade evaluations more than the other stuff, because that other stuff is --

Q. Again, I don't know if that helps you remember anything specific to that time period.

A. I don't remember anything about this particular meeting.

Q. Okay.

A. But upgrade evaluations was something that we had at Amerijet. We would evaluate a candidate for the next position. When Pat was a second officer --

Well, in fact, let me just say this: People

were being evaluated from the time that they came in the front door through every promotion that they had. So you would be evaluated as a new hire. I don't remember how Pat was evaluated. But when I left we were doing a written test as well as a simulator evaluation for people coming in for new hires. Then when people were going to be promoted, there would again be a simulator evaluation and some other type of testing, oral testing or written testing or something like that, for a promotion.

Q. Well, how does one get promoted at Amerijet as a member of the flight crew to either be a first officer or a captain? I gather that they wait for a posting of some kind, an opportunity --

MS. NORTON: Prior to December of '98?

MS. SHEA: Well, all these questions are for during the time that you were there.

MS. NORTON: Okay.

THE WITNESS: Yeah. Well, it varied during the time that I was there.

BY MS. SHEA:

Q. Okay.

A. When I first came to work there, we would be told - managers would be told that we were supposed to have so many first officers, captains, and second

officers, and we would go through the process that we had. Later we tried to more formalize it, and I don't think we were always so successful. I know we tried to make it so that everybody could see what was going to happen --

Q. Right.

A. -- so that they could ask to be promoted. And the reason that came about is because we wanted to promote one fellow at one time, and he said, I really don't want to be promoted because I don't want to move. A promotion means moving and I don't want to move.

Q. Right.

A. So for that and other reasons we decided to give everybody the opportunity to ask to be promoted. And that happened two ways: My most favorite way - and it wasn't always that way - but my most favorite way was that everybody who wanted to be promoted would submit a bid for promotion letting their managers know that they wanted to upgrade. And if they met the requirements -- We posted the requirements and it varied throughout the years. If you were a second officer and you wanted to be a first officer, there was certain requirement that were posted. The employee group was made aware of it, and then if you

met those qualifications then you could apply for the position, and then when the position became open you could continue the application process.

Q. Okay. And you say that was your favorite way because that allowed candidates to identify themselves and come forward and --

A. Yes. And say, I want to do this. Yeah, I like that way.

Q. And you say meet with their managers.

Who other than you as the Chief Pilot would be involved once a bid invitation, if you will, is put out in evaluating candidates that are interested?

A. The Director of Training, the Vice President of Operations, select the check airmen.

Q. All right. And those are people that would confer on the front end in terms of who are we going to allow to go through the training and go through the process of being upgraded?

MS. NORTON: Object to the form of the question.

THE WITNESS: I'm not sure I even understand the question.

MS. NORTON: That's quite fine.

BY MS. SHEA:

Q. Well, I take it you as Chief Pilot wouldn't

identify the positions available. That would come from Operations, correct?

A. Yeah. They would say, We need this many. They would say, We're going to have this many airplanes in your schedule.

Q. Right.

A. And I was usually in on that meeting.

Q. Right.

A. Our schedule would require this many crews to operate them, so then we would break that down and say, Okay, we need this many captains, this many first officers and this many second officers.

Q. Right.

A. And then the process would go from there.

Q. And then you put out a posting or an opportunity bulletin, whatever it may be called --

A. Right.

Q. -- that would say what the then criteria was because you said that it might change over the year.

A. Yes.

Q. And then a bunch of people would submit expressions of interest or bids.

A. Usually they had already submitted that interest.

Q. Right.

A. They had already said, I want to do the next promotion when it becomes available.

Q. And then I thought I understood your testimony that training operations and selected check airmen and yourself would review the candidates?

A. Yes, we would review the candidates. But it was an ongoing process. We would say, Okay, these are the people who are applying. Let's make sure that they meet the requirements that the company now has. There were insurance requirements and there were various reasons why you had to have this many hours, this much experience and so forth. And we would make sure that everybody fell into the right category and then we would attempt to see who we could train in the time period that he we had to train.

Q. Okay.

A. What I mean by that is that Amerijet was not a training organization, it was an airline that carried cargo. So my budget was typically - I've forgotten now what the dollar value was - but I was allowed so many periods, so much training to occur, to upgrade a person.

Q. I see.

A. Then we would decide based on the testing that we did, the interviews, as objectively as

possible, we would decide who we thought we could promote in the training time that we had. If we have this much time for ground school, this many simulator periods, this much airplane time, can this person do that? That's a very short version as to how we decided as objectively as we could.

Q. Did you have to have any direct F.A.A. involvement in terms of your selection of who you thought you could present as candidates?

A. No, there would be no need for F.A.A. involvement. The F.A.A. has rules that say what each candidate has to have and they're very clear and everybody understood what those rules were I thought.

Q. I guess that's one of my questions.

Are there F.A.R.s involved that would dictate requirements to you for basic qualifications and then training for promotion --

A. Yes.

Q. -- and then to satisfy the requirements?

A. Yes.

Q. So was that part of your job to be familiar with those?

A. Oh, yes.

Q. So as I understand your testimony, you said that over time you became more formal in terms of

announcing opportunities to everyone to solicit interest as opposed to --

A. Well, as we had the help as - we developed a Human Resources department they took some of these tasks and they were very good at that. Or at least they tried to be good at it. I don't know how good they were, but --

Q. Was seniority a criteria for promotion or a consideration for promotion at Amerijet?

A. Was seniority criteria for considerations for a promotion?

Q. I guess criteria is not the right word.

But was seniority was one of the bases in which you assessed interested candidates for promotion?

A. For the most part, no, it wasn't. For the most part our management didn't like seniority as a promotion criteria and it was not something that they liked. If we had two individuals that were equally qualified and could perform equally, then we were allowed to select the most senior for the position.

Q. Okay.

A. But normally the selections were made on who was the most qualified, who we viewed to be the most qualified for the promotion or to be hired.

Q. Okay.

A. Every promotion was like being re-hired, only not really.

Q. Right. Okay.

A. But it was similar in mentality.

Q. There was no policy of seniority, of deferring to senior interested crew members?

MS. NORTON: Object to the form.

Other than what he said?

THE WITNESS: I'm not sure I understand what you're asking me. But I don't know of any policy other than the one I just gave you about if two people were equally qualified that we would defer to the most senior. We were allowed to defer to the most senior one.

MS. SHEA: Okay.

BY MS. SHEA:

Q. Would the individual job opportunity bulletins or the upgrade announcements set out what the criteria were for a particular position; like what the minimum qualifications were and that sort of thing?

A. Not necessarily. They might. If the qualifications had changed or something had changed about it, they might tell you this is the

qualification. Or sometimes I think after we began to have more H.R. influence, the H.R. people would say, You know, you should remind these people what the qualifications are. And so we would.

Q. Okay.

A. But not necessarily. We wouldn't necessarily have the criteria for upgrade.

Q. Well, if I were at Amerijet in the mid-1990s and I wanted to know what Amerijet's policies were, like how would I know whether I would complete what they looked at as a candidate, is there any handbook or written policy or procedure that I could refer to that would tell me how I could assess myself as a candidate?

MS. NORTON: Object to the form of the question.

THE WITNESS: I think there was. I think there was something at one time. Initially in the earlier 90s there wasn't really much of anything written. It was an understanding and then that led to a memorandum of understanding which led to some other documents, but I don't remember what they were called.

BY MS. SHEA:

Q. I realize you've been gone from the company,

but as we sit here today there is nothing you could really refer me to, to tell me what Amerijet was looking for?

A. No, I wouldn't know what the name of it was.

Q. Okay.

A. I just remember there were things that were written at different times and I was one of the authors.

Q. Okay.

A. But I don't remember what they were called know --

Q. Okay.

A. -- and how they were distributed to people. I can only tell you what I think I remember about it.

Q. Did you administer or oversee Pat's promotion to a first officer at Amerijet?

A. Most probably, yes. I don't remember. There wasn't anything particularly remarkable about that event.

Q. Okay.

A. I don't even remember for sure if he accomplished it on the first time. Some guys did and some guys didn't. But I seem to recall at that particular time that he would have been promoted that he would probably have taken a check ride or some kind

of a testing process. I don't remember particularly about it.

Q. Do you remember a time when Pat first expressed interest in being a captain? Is that a conversation that you and he had, or do you have any recollection of his --

A. Well, I have recollections of a lot of conversations with Pat, because we did social things together. I would have to think that we had official conversations and then we had social conversations. I think Pat had expressed an interest in being a captain from the first day he walked in the door. I don't know that I could sort out any particular time that he -- I mean, I always knew that he and everybody else wanted to be a captain.

Q. Okay. Lots of guys want to be a captain?

A. I don't think anyone came to work there that didn't want to be a captain.

Q. Okay.

MS. SHEA: Let's mark this as Number 27 and Number 28.

(Whereupon, the above-referenced documents were marked as Plaintiff's Exhibit Number 27 and Plaintiff's Exhibit Number 28 for Identification.)

MS. SHEA: Off the record.

(Whereupon, there was a discussion off the record).

MS. SHEA: Back on.

BY MS. SHEA:

Q. Sir, these are the next two documents. Let me just hand you Number 27 and 28. Would you take a minute and take a look at those.

A. All right.

Q. Do you have a recollection of being involved in meetings with Pat Major in early 1997 regarding his interest in upgrading and speaking with him about that at that time?

A. Now, the question is, do I have any recollection of meeting with Pat Major in 1997 about this time here, February of '97 --

Q. Right.

A. -- regarding his upgrade or any promotion?

Q. Right.

A. Not specifically, but I don't doubt that we did.

Q. Okay.

A. Okay.

Q. So that's a better question I should ask you without documents. Then let me ask you on Exhibit 28.

A. Okay.

Q. Is that a document that you saw at about the time that it was created?

A. I believe so. Let me just finish reading it.

Q. Okay. I'm not sure I ever really actually saw this document, although I knew of its existence. Okay.

A. I don't remember actually reading it. I remember this first part here and I remember parts of this, but I don't think I ever knew the dollar figures that were involved.

Q. All right.

A. I don't think I ever knew.

Q. I don't think you're shown as a carbon copy on the letter that's Exhibit 27.

A. This is to Pat from -- No, I'm not shown as a carbon copy.

What do you want me to do with this?

Q. Well, I showed it to you because it's a reference with meeting with Wayne Penny and Ed Cook in February of 1997.

A. Yes.

Q. Does that refresh you recollection as to meeting with Pat Major and Wayne Penny at or about

that time to discuss his promotional prosects at Amerijet?

A. Well, let's see here. When he refers to a letter that Pat wrote to him?

Q. Um-hmm.

A. I don't think I ever did get to read this letter before now.

Q. Okay.

A. But I did know about this letter, and I was told that it was being sent to him.

Q. Okay. Well, I'd like to basically know what you do recall about early 1997.

A. When this happened?

Q. Right.

What prompted there to be this meeting with Pat? Were you carrying a massage, or what was the nature of the meeting?

MS. NORTON: Object to the form of the question.

THE WITNESS: Okay. Let's see. I don't remember exactly what led up to this other than I presume that Pat was wanting to be considered for a promotion to captain. That's probably accurate. And it had been decided that he was not ready for that position yet. Those are my

words, "Not yet ready for that position."

BY MS. SHEA:

Q. Right.

A. Then there was some concern about if he would ever be ready, at what timetable it would take to get him ready. That sort of dialogue was happening. And somewhere along in there Mr. Bassett decided that he didn't run a training school and he didn't feel that Pat was going to be ready in a timely fashion and he wanted to offer him a separation. I think if I remember right Wayne might have suggested the separation. I can't remember that for sure how that went.

Q. It wasn't your suggestion?

A. No, I don't remember suggesting that, no.

Q. All right. Pat was a first officer in good standing with the company, correct?

A. As far as I remember, yes.

Q. Okay.

A. Yeah, he had -- Did you want to define that term, "good standing."

Q. Well, he wasn't under any disciplinary action, he didn't have any pending disciplinary issues or --

A. Right.

Q. -- anything that would preclude him from being considered as a candidate?

A. Discipline was not a factor at this time.

Q. Or any unsatisfactory proficiency checks or anything like that?

A. I can't remember that. He might have some. I don't know.

Q. You don't recall?

A. I don't recall. Because sometimes a person has an unsatisfactory proficiency check. It happens.

Q. Right. Which itself may not disqualify them.

A. Not as long as they were able to get a satisfactory one later on.

Q. All right.

A. Obviously, if he had had an unsatisfactory, then he was not satisfactory.

Q. Right.

A. But he came to work on time and he did what he was supposed to, and I don't remember anything in a disciplinary nature that way.

Q. The group that discussed Pat's promotion at this time would have been you, Dave Bassett, and Wayne Penny, because of the H.R. implications I suppose?

A. It wasn't one discussion. It was more than

one. And some of the folks involved would have been check airmen, training department people, Pete Steel, Dave Bassett, Wayne Penny at different times. There was more than one discussion. I remember a discussion between Dave Basset, myself and Wayne Penny. I don't remember exactly what we talked about. I remember another discussion between Pete steel, Wayne Penny and myself and another discussion between Pete Steel, Wayne Bassett and myself about this.

Q. Okay.

A. So it wasn't something that was taken lightly. It wasn't something that was just blown off. He either is or he isn't. There were reasons for why he was determined not to be ready for upgrade, and there were reasons for the concerns as to why he might take a while to do it.

Q. Okay.

A. It might take a while to establish it and nobody could put down how much time is it going to take. When is he going to be ready? In 1999? In 2002? When is that going to happen?

Q. It seemed that the offer of the severance package and the letter were pretty definitive. I mean, they weren't just saying, We don't really this as being your time. They seem definitive in saying

that you are not going to be upgraded at this company.

A. Is that what you interpret this to say?

Q. Well --

A. I don't know. Maybe it does say that. I just don't understand that.

Q. Okay. Your understanding of the message at that time was simply going to be to Pat that we don't consider you to be ready?

A. My understanding was that because we - meaning the people on my level - were unable to predict when Pat was going to be ready.

Q. Right.

A. Maybe he was never going to be ready. Maybe we couldn't get him ready. Maybe he couldn't get ready.

Q. Okay.

A. Let me think. I think, as I said earlier, that Mr. Bassett didn't run a flying school and he wanted people who could progress at the timetable that I think he might have had in his head. I don't know.

Q. Okay.

A. And if he's not going to be ready, then maybe he should go do something else. If he is not going to be ready in a given time, then maybe he should go do something else.

Q. Right. But you didn't suggest when you met with Pat that his job as a first officer was in jeopardy, correct? You said he was welcome to stay on as a first officer.

A. I might have said that. I don't remember.

Q. Okay.

A. I'm sure I reflected whatever it was decided to say. Whatever I was - whatever the group had decided and whatever Mr. Bassett decided to do, I'm sure I said what I was supposed to say. I just don't remember what it was.

Q. That's a fair answer.

So if I were to ask you any more about what it was, you've kind of exhausting your recollection about that?

A. Well, other than the fact that I can remember the issues that were in question as to why he wasn't being upgraded. I remember those clearly. He was perceived as not taking criticism well and that's a very important issue. He is perceived as not always having the best judgment and making the best judgment decisions, particularly in a crisis. And probably the one that sticks out the most is that he was perceived as a -- How would you say it? He had poor situational awareness. And these are all three qualities that are

real important for a captain and particularly for a captain candidate. The ability to take constructive criticism is an important thing for a captain candidate or any upgrading candidate to have. But the first two items are a real important thing for a captain to have. Situational awareness is extremely important.

Q. Does that relate to him in the cockpit?

A. Primarily.

Q. Was there a crisis situation in which Pat's judgment was put to the test that --

A. I don't really remember any particular situation that I was involved in. I remember comments from crew members and I remember comments from -- And I don't remember specific comments. I just remember how I came to feel the way I felt because of what people told me; the people that mattered to my organization, meaning the check airmen, the training department, other captains, and so forth.

Q. Okay. So you do recall meeting with him and carrying a message to him that was phrased in terms that he was not perceived as being ready for promotion?

A. Right. And not in the foreseeable future.

Q. But his position as first officer was not in

jeopardy at this time?

A. Yeah, I don't remember his first officer position being in jeopardy at this time.

Q. So he continued on in that position.

A. Yeah, that sounds reasonable.

Q. Were there things that Pat had done as a company employee that you felt showed extraordinary interest or contribution or him demonstrating to be an asset to the company?

A. Were there things that he did?

I think Pat always had an interest in the company. He always had extraordinary interest in the company. The biggest thing I remember is him being pretty helpful during the Union crisis, if I could use that phrase. He had a lot of H.R. experience, and I seem to recall he was helpful in that way. He was helpful to me anyway.

Q. Do you remember him serving on various committees and trying to work on benefits and all that kind of thing?

A. Sure. He was always willing to help, particularly in using his expertise as a former H.R. person.

Q. Did he ever give you any constructive ideas in terms of policies or making improvements?

A. Constructive ideas and constructive criticisms.

Q. Which are all good things?

A. Some of his ideas we tried and some we didn't.

Q. Okay.

A. Some, you know, like you would with any expert.

MS. SHEA: Let me show you what I'll mark as Exhibit 29.

(Whereupon, the above-referenced document was marked as Plaintiff's Exhibit Number 29 for Identification).

BY MS. SHEA:

Q. Calling on your memory again, can you recognize Exhibit 29?

A. This is about May of '98.

Q. Right.

A. Okay. Do we know who wrote this?

Q. No. I was hoping you could tell me. I was hoping you were the writer.

A. Well, probably I'm one of the authors, yes. probably that's true. It all looks very familiar to me. Although if this document is, in fact, May of '98, I'm sure that H.R. had an influence on how that

was written. If you can find an earlier document, '94 -- Before H.R. really came into our organization, I wrote - whoever's department it was - wrote what you had to write.

Q. I don't think I've seen any earlier ones. But you wouldn't be able to help me out on that one?

A. When I left my office, I just took my personal things and turned the rest into H.R. But, yes, I'm sure that I had something to do with the authoring of this. And I don't know who -- May of '98, I think Juan Morales might have been running H.R. by then.

Q. So for earlier time periods the upgrade opportunities may have been in a less formal structure of memorandum?

A. Yeah, that's possible, but it would be pretty close to this format. There are some things that are added in here, like the part 25 times, 12,500 pounds, N.A. for a first, 2,000 for captains; that's a change from something that we had written some years before.

Q. Okay.

A. And pilot command times and medical certificates and total times and so forth. I think the total times for a first officer has fluctuated a

little bit. I think the total time for captain stayed pretty constant.

Q. Okay. Under "Upgrade Program Description" -- Do you see that?

A. Upgrade Program Description, right.

Q. "In the interest of fairness upgrade selections will be based on seniority and qualifications."

A. Uh-huh.

Q. Can you explain what that means.

A. Well, obviously, I didn't pay much attention to that. That's a new one for me.

"Based on seniority and qualifications."

Well, let's see. May of '98, I think that's about the time the Union thing was happening, and one of the Union issues was seniority, so I'm sure that we were in the process of changing to starting thinking like a more Union airline obviously.

Q. To stave of becoming a Union airline.

A. I think "seniority" here is new a word, just like the "part 25 time" is a new word.

Q. So if I understand you correctly, you were hoping the company would not become Union, correct?

THE WITNESS: Excuse me?

MS. NORTON: Well --

MS. SHEA: Let me rephrase that.

MS. NORTON: Okay.

BY MS. SHEA:

Q. Was the management of Amerijet in favor of the Union coming in to represent the pilots?

A. The management of Amerijet was not in favor of the Union.

Q. But because of the Union interest in the company, it made you start thinking about seniority and other things that are traditional Union issues?

A. Well, that's an over-simplification.

Q. Okay.

A. Mr. Bassett was very interested in staying non-Union because he wanted to be able to communicate with his people, talk to his people, and he felt if there was a Union on the property he wouldn't be able to do that.

Q. Okay.

A. For some time this seniority issue had been an issue. The pilot group that wanted seniority -- And I can remember conversations with him when I first went to work for him where that was mentioned and he said he didn't believe in seniority.

And I said, Well, the pilots tend to like seniority and it's something that they're taught is

the way it's done.

Well, we don't want to do it here at Amerijet.

Okay. Fine.

However, at this point I think he was -- And possibly the seniority might have been one of the issues and possibly Pat might have had an input to this. So he might be able to say more about it than I could, because he was involved in the Union fight so to speak more so than I was actually. I was busy doing check rides and seeing to it that we didn't bend any sheet metal and not really doing H.R. things. I think that possibly the management of Amerijet was beginning to listen a little bit, Maybe we ought to consider what these people like and do some of these things. Maybe we're getting so big and that sort of thing was happening to where -- This is the first --

Q. And then down below there is another sentence here, "Qualified candidates will be selected in order of seniority." So you also think that would be like a new emphasis on seniority as a consideration?

A. I think that would be a new emphasis. But then again the "qualified candidates." He's still holding out for what he considered to be a qualified

candidate. At that time I think we had a lot of fellows that didn't meet requirements. Some of these times here in the paragraph above were Union - not Union, excuse me - were insurance problems, and how he came up with some of these times I didn't always have knowledge of that.

Q. Do you remember whether Pat Major responded to this job opportunity bulletin?

A. No, I don't remember specifically if Pat did.

Q. Okay.

A. I would have been surprised if he didn't.

Q. Let me show you what we will mark as Number 30 and see if that refreshes your recollection.

A. So this is April 30, 1998. Obviously he did and obviously I acknowledged that he did, but I'm not surprised.

(Whereupon, the above-referenced document was marked as Plaintiff's Exhibit Number 30 for Identification).

BY MS. SHEA:

Q. All right, back to this upgrade description.

It says, "Before being selected for upgrade all qualified candidates must pass a pre-upgrade written examination."

Do you know whether Pat took and passed that examination?

A. No, I don't know that for sure. I can only assume that he did, but I don't know that he did.

Q. Let me show you what I'll mark as Exhibit 31 and see if that refreshes your recollection about that.

A. Must have been passed then, because here is the award. This is the document that you need.

Q. All right.

A. This is your ticket in.

(Whereupon, the above-referenced document was marked as Plaintiff's Exhibit Number 31 for Identification).

BY MS. SHEA:

Q. Now, as of this point when he gets the letter, "Congratulations you've been awarded a bid for upgrade to captain," have there again been informal meetings with the management group that's interested in the subject - Pete Steel, the Director of Training concerning --

A. You mean about how we selected these people?

Q. Well, yeah, concerning who is in the pool and who is going to get the congratulatory letters.

A. Well, I think, yes, there was meetings to

that effect. But now it was a little more - there were more formalized guidelines as to how to select people instead of the -- I mean, it was more like a checklist. Did he do this? Did he do this? Did he do this? Okay, he didn't.

Q. All right.

A. If he didn't do that, he's not hired. Is he senior enough? All of those things.

Q. All right. Are you able to tell me anything about any of these discussions as it relates to Pat's being awarded a bid for upgrade to captain?

A. No, I don't remember. I don't remember anything remarkable about Pat's bid.

Q. Did the group reconvene and say, Okay, well, we think now he's got adequate situational awareness, he's taking criticism better in his judgments in a crisis? How did we get from February '97 to Congratulations, you're in the bid?

A. You just jogged something in my memory.

Q. Okay.

A. We decided over a long period of time in several meetings - we decided that the training program should be able or should be designed and could show whether a person has those qualities. If they make it through the training program, then obviously

they have these qualities. If they don't, then they don't. If they don't make it through the program, then they don't have the qualities. Okay. So that theory stands alone, and now we've just got to try to form arguments to either support that theory or take it down. And I think at this point based on what was happening with the Union, based on other issues that weren't even related to the Union or related to Pat, it was decided that maybe we'll test the training program and see if it does hold water, see if our theory holds water.

Q. So the group didn't really evaluate Pat any differently. You just decided to give him like a sink or a swim.

MS. NORTON: Object to the form of the question.

THE WITNESS: Sink or swim --

MS. SHEA: Well --

THE WITNESS: I don't think that was used.

MS. SHEA: Okay. Let's withdrawal that one.

MS. NORTON: Fly or crash.

MS. SHEA: We don't like that analogy. I'll let your answer stand then. Let me try to rephrase it.

BY MS. SHEA:

Q. Back to the upgrade opportunity.

It says, "Training will commence after payment of $2,500." So the person that's going to test your theory gets to deposit $2,500 to Amerijet; is that right?

A. Well, that has been the way that it has been done there for a long time.

Q. All right.

A. As I said earlier, David Bassett didn't run a training school. He had a contract and what this $2,500 is in reference to is the contract.

As you see it says, "Contract deposit." So what you would do if you were a candidate is you would give the company $2,500 cash as a down payment and they would put it in an escrow account -- This is my understanding of what happened. I did not handle the money. It's not my thing. They would take $2,500 - the money person would take $2,500, put that in escrow accounts, and $2,500 would then draw interest. And then additionally they would take so much a payday - and I don't remember what that was. At one time it was $91 a payday, but I don't know if that's even true. I don't know that I ever read a contract myself. I don't remember reading one. And that would happen for I think two years, if I remember, or a

period of time. I think the contract's time changed over the years. Sometimes it was two years, sometimes it was three years, sometimes it was one year.

At the end of this period, whatever period it was determined that it took for a commercial pilot to pay back his training costs, which at one time it was two years, if you upgraded or came to work there - if you came to work there it was the same thing as if you upgraded. People coming to work there paid $2,500, it was put in an escrow account, so much a payday was taken out until the end of the contract agreement, at which time if you were still employed at Amerijet, if you didn't leave voluntarily, then you got all the money and interest back. If you left to go work for United Airlines or American Airlines, then they kept the money. So that's what this was referring to.

MS. SHEA: Let's make this Exhibit 32.

(Whereupon, the above-referenced document was marked as Plaintiff's Exhibit Number 32 for Identification).

BY MS. SHEA:

Q. Let me show you Plaintiff's 32. Is that the contract agreement that was in effect at that time?

A. I wouldn't have any idea. I never did

contracts.

Q. Okay.

A. I don't remember ever having anything to do with contracts at all.

Q. It then goes on to say, "Upgrades may be bypassed by a flight crew member without penalty." In other words, if they were the next senior person --

A. Is that what it says?

Q. -- and they're not interested, that's all right.

A. Okay.

Q. "Elimination of Upgrade Training: Elimination from upgrade training will result in placement back in the previous flight crew member's position."

What does that mean?

A. Well, if you were a first officer upgrading to captain and you failed to pass, were eliminated from the program because of your inability to pass, then you would be put back where you came from.

Q. So if you fail some testing process, right?

A. Right.

Q. Then you get to stay where you were and you have to wait one year before re-applying to upgrade?

A. That's a typical industry thing to happen,

yes.

Q. Then it goes on to says, "Flight crew members who fail their initial ground school check ride, F.A.A. line check, or company line check will be given more training and another check ride or line check as required. A second failure will result back - will result in placement in the previous flight crew member's position based upon the state requirements and wait time requirements as described above."

A. Um-hmm.

Q. I didn't really understand how those two paragraphs worked together.

A. Which one? The one that starts with "Upgrade," and the one that starts with "Flight?" You don't understand how they work together?

Q. Well, the first paragraph seems to say that if you fail, you have to wait a year, et cetera, or you're out. The second paragraph indicates that you get two chances.

A. The first paragraph talks about once it's decided that you're finished.

Q. Oh.

A. Once you have failed whatever the required tests were for you to fail and now you're not going to make it, you're going back to your previous position.

That's what the first paragraph says.

The second paragraph talks a little bit about what can happen to you, how many chances to fail do you get.

Q. Okay.

A. And specifically the most difficult ones and the checks that we didn't really have control over were the F.A.A.'s proficiency check and line check. If an F.A.A. inspector -- And I just recently had a client that we had rated in the airplane and an F.A.A. inspector failed him on the line check.

Q. Okay.

A. These are things that the training department and the Chief Pilot's office wouldn't have control over.

Q. So you don't necessarily get a second failure?

A. Well, if it's something -- Do you mean does the F.A.A. not allow you not to have a second failure?

Q. Well, I mean, what are you telling these people that want to apply in terms of what failures you can have?

A. "Flight crew members who fail their initial ground school, check ride, F.A.A. line check, or company line check will be given more training and

another line check as required."

Q. Right. But a second failure will result in placement back?

A. Yes.

Q. It looks to me like they get two bytes. Is that right?

A. That's probably true, yes.

Q. Okay.

A. You could say that, yes.

Q. Okay.

A. You get two shots at it.

Q. Okay.

A. Now, there is preparation for the second time.

Q. Okay.

A. I mean, you just don't automatically get thrown back to the dogs to be gnawed on again, you get some preparation.

Q. And you've had people have to have that extra help?

A. Sure.

Q. Let's see. So you left, I'm sorry, in November or did you say September?

A. I think October of '98.

Q. All right. So assuming that this cycle was

more formal than the other cycles, are you able to say whether, for example, if people fail, they would have gotten some written documentation in terms of, You're out of the program and your wait time is now twelve months from today?

A. They should have, yeah. They should have.

Q. Okay. Now, I'm Pat Major and I paid my $2,500 and I've gotten the congratulatory letter, is there a set curriculum for the training that will be administered in the upgrade process, or is it going to vary from candidate to candidate?

A. The answer to that question that is both sides are true.

Q. Okay.

A. There is a set curriculum that's required by the regulatory agency and every candidate does need a certain amount of individualized training.

Q. And that's the part that will vary, the individualized.

A. Um-hmm?

Q. All right.

A. And you would be allowed certain latitudes.

Q. And whose job is it to decide what individualized training that person needs and when they've had sufficient training?

A. It's normally the training department that decides. The training department administers training and then they do a preliminary evaluation, and through their evaluation process they decide if the person is ready for a check, whatever that next check may be, whether it be a oral or a written test or whatever.

Q. Right. So someone from training should be pretty familiar with the candidate's level of knowledge and be ready to get them on to the next step.

A. Um-hmm.

Q. You have to answer out loud.

A. Yes.

I'm sorry. She's so quiet, I forget she's here.

Q. Can you explain what the F.A.A. oral examination is.

A. For a captain?

Q. Yes.

A. It's primarily a description of the airman and how it works and how it's operated.

Q. And would that be after all of the internal training is received in Amerijet?

A. Um-hmm.

Q. Would that be one of the last steps?

A. I don't know that it's fair to say it's one of the last steps. We're at the end of that phase of training, so it would be the last step of that phase of training.

Q. So what's the part of the training that precedes that F.A.A. oral?

A. It would be the ground school. And I don't remember what they did at Amerijet at that time, but there was a certain number of hours of ground school where they tested that the student was supposed to accomplish.

Q. A written test?

A. Yes.

Q. And then is there a simulator component of that training as well?

A. Not for the oral.

Q. So it's basically just ground school and class.

A. Right. Remember, it's an oral test and you're only supposed to describe how the airplane works and how you operate it.

Q. Is that then Phase One of the qualification process? Does that all precede the simulator and F.A.A.?

A. It may precede, but not necessarily.

Q. They can be going on at the same time?

A. They can be going on at the same time. The oral can be happening some time after the simulator has started, after the simulator phase of training has started.

Q. And then what does the simulator training consist of?

A. Whatever their training - Amerijet's training manual said it was. It was so many periods and each period was so many hours long.

Q. Is that something that has to be certified by the F.A.A.?

A. Yes, it's an approved document.

Q. Okay. And then what is the balance of the training? It says here, F.A.A. or a company line check, the check rides.

A. Right. Well, at the completion of the simulator training the applicant then presents or is presented to the F.A.A. -- Actually from the F.A.A.s viewpoint he presents himself, but from the company's viewpoint he is presented to the F.A.A. for a simulator check. He has his form in his hand that shows that he's passed the oral. He has to pass the oral before he can pass the simulator check.

Now, I don't remember in Pat's case whether

we were doing Appendix H Training or not.

THE REPORTER: I'm sorry?

THE WITNESS: Appendix H Training.

Maybe I shouldn't have gone there.

MS. SHEA: We like a little jargon to wake us all up.

Off the record.

THE WITNESS: Appendix H Training is simulator training. No airplane training is involved.

BY MS. SHEA:

Q. So simulator training and then some kind of F.A.A. simulator approval.

A. Right. The F.A.A. comes in and administers the simulator. And that's what I do now is I administer F.A.A. tests for the captains and flight engineers.

Q. So when you say the F.A.A. comes in, it could be an Amerijet employee that is just designated by the F.A.A.

A. At that time Amerijet had no employees. Right now I don't know. I don't think they do now either.

Q. All right.

A. There is a way that I can administer now an

Amerijet test, but at that time there was no non-F.A.A. people who could do an F.A.A. test. That's only been in the last year.

Q. Now, the F.A.A. simulator test I guess then is some real cockpit testing. Is that what follows?

A. Well, the simulator is cockpit.

Q. Right.

A. That's all it is.

Q. Well, I mean a line check or something.

A. Then comes initial operating experience. Now it's no longer called Initial Operating Experience, it's called Operating Experience only. I don't remember what it was called in '98. I don't remember when the change was made. During the operating experience, usually the last leg of the operating experience, the F.A.A. observes the candidate and that's their last shot at him before he goes to be a captain.

Q. Now, did you have any personal involvement in Pat Major's training or preparation to be upgraded after he was accepted or approved in May and deposited the money? Were you involved in the subsequent training?

A. I don't remember anything about that at all. I mean, if I was involved, he wasn't doing anything

real great or rad bad.

Q. Okay. Nothing exceptional?

A. Nothing remarkable.

Q. Do you remember what happened as it relates to Pat's participation in the upgrade process then in the summer of 1998?

A. Well, the only thing I remember is it seems like Pat had something he had to do, and he had done the proper things to be allowed the time off to do whatever it was he had to do. I don't remember what it was he had to do. There was a couple of times that Pat had arranged to do something. I think he had to be gone for a while and I really don't remember why. At any rate, he then came back and did his training. I was on vacation, and when I came back from vacation I found that he had failed his oral with F.A.A. inspector Barney Sonan, FSDO 17.

Q. What is FSDO?

A. Flight Standards District Office.

Q. 17?

A. Which is the Fort Lauderdale Flight Standards District Office. And Barney Sonan was the inspector. I remember that. And I don't know why I remember that in particular.

Q. And when you say that Pat had something he

needed to do, are you faulting him --

A. No.

Q. -- for not getting training?

A. No. I just remember that about that time. I'm just trying - actually just remembering out loud.

Q. Okay.

A. We entered the training program, there was something he had to do, there was some complication, we made arrangements I'm sure to his and the company's satisfaction to where he could do what he had to do and get trained.

I just remembered something odd about it. Normally when someone goes, he goes right in, click, click, click, and comes right out. And I think the last time he upgraded, if you remember when he upgraded to first officer, I don't remember anything remarkable about it. So it probably was that he was given the award, paid his $2,500, and click, click, right through and back out again. But this time there was something unusual that he had to do and there was something done, and I wasn't involved directly with doing it because it would be the training department that did that. Tracy Dickinson I think was the Director of Training.

Q. So he still should have gotten the training

before he went before the F.A.A.?

A. Sure. Oh, yes.

Q. And if he didn't, you don't know why he didn't?

A. I don't know that he didn't get the training. I would assume that he did because he took the oral.

Q. Okay.

A. I certainly don't mean to imply that he didn't get the training or that he was uncooperative. This is just my way of remembering how it happened.

Q. Now, in terms of failing the oral, is it your recollection that he got a pink slip by the F.A.A.?

A. You know, now that you say that, I don't think he did get a pink slip. Now that you mentioned that, no, I don't think Barney issued him a pink slip. He stopped the oral. That's what happened. That's right. He stopped the oral.

Q. Which is different than a failure which is the same as a pink slip; is that right?

A. Technically it is different than a failure. It depends on who is looking at it.

Q. Okay. Well, a pink slip is a pink slip, right?

A. If I were Ms. Garby - that's the administrator - I would say he didn't fail. If I were Amerijet I would say he failed, because the inspector stopped the oral and the comment that he made was, This guy is not ready or something like that.

And let me say something about why Mr. Sonan would have done it that way. Mr. Sonan is a long-time airline pilot, a retired Delta fellow, and the failure or pink slip can have adverse effects to a man's career, to an airman's career. So I think he probably thought he was doing everybody a favor. It also would have caused the FSDO 17 people, our principal operations inspector -- I don't remember who it was at that time. It might have been Mr. John Roseburough. He probably would have said, Why did this man - Why was he put up for an oral and why did he fail? That's my opinion in knowing Barney and knowing how sometimes these things are done. I think Barney felt that either Pat wasn't ready or he choked up, but for some reason the oral wasn't going well, so he stopped it.

Q. Right.

A. I do remember that's what happened; the oral was stopped.

Q. Right.

A. That's correct.

Q. So you wouldn't testify under oath that he failed the F.A.A. oral because you now recall that it was discontinued?

A. I would say he wasn't issued a pink slip.

Q. Right.

A. As to whether he failed or not, that's a matter of opinion that we discussed.

Q. Well, what was Amerijet's reaction to that? Did you regard it as a failure and tell him, Okay, you get another byte? Or did you regard it as not being a failure and indicate that he needs work, additional training, for it to go forward again? How did Amerijet react to this?

A. I think - and I don't remember for sure - they viewed it as a failure, because obviously Mr. Sonan didn't sign the 8400 or didn't sign Pat's application. So he didn't complete the oral. And the F.A.A.'s posture was that they weren't going to redo him or do an oral on him until somebody said he was ready.

Q. So it's your recollection that Amerijet at that point said, Well, we tried our theory. You weren't trained, you failed, you're out of the upgrade?

MS. NORTON: Object to the form.

Go ahead.

THE WITNESS: No, I don't think so. I don't think they said that, no. I don't remember that being said. I remember this is a problem and this could really be serious from the F.A.A.'s viewpoint and it could be serious from an H.R. viewpoint. I mean, here we've got a guy dangling here. We've got to do something. So something has to be done to get him ready for the oral.

BY MS. SHEA:

Q. So as you recall the commitment was made to get him prepared for the oral as opposed to eliminating him from the upgrade program?

A. No. Let's see. What happened there?

There were steps that were going to be taken to prepare him for the oral, for another oral, and the difficulty was that somebody was going to have to attest to his readiness and there was some concern as to how the P.O.I. was going to respond if he failed again. So there was a lot of fear and nobody wanted to touch this, because if he failed, it would be serious problems for that individual with the F.A.A. And whoever put him up -- He couldn't fail, in other words.

Q. Okay.

A. He had to pass. More than the normal amount of pressure.

Q. But just in terms of, again, the company's consideration of Pat's status, he was still an active officer candidate in the upgrade program, not eliminated from the upgrade program?

MS. NORTON: Object to the form of the question.

Go ahead.

THE WITNESS: At the time that I returned and was told that he was no longer going to the simulator because there had been a problem with the oral, there was no mention to me about him being removed from the upgrade program at that time.

BY MS. SHEA:

Q. Okay.

A. It didn't happen until later.

Q. All right. Had other captain candidates from Amerijet been pink slipped by the F.A.A. ever in your knowledge?

A. Yes. Other candidates had problems like this. It doesn't happen very often, but it does happen. Because we try not to - in the industry we try not to present an applicant for a test unless he's

ready. For example, as an examiner my failure rate is under ten percent because of that. I fail less than ten percent of the people I examine because people are very conscientious about, Don't put a guy up unless you're sure he's going to pass because it reflects badly upon you.

Q. But you've had captain candidates at Amerijet not get pink slipped?

A. And it's important to understand that other captain candidates were handled just like that. They didn't get a pink slip, their oral was stopped, or the check ride was stopped.

Q. Okay.

A. From Amerijet's perspective it's still a failure. It doesn't matter whether he gets a pink slip or not, he's not getting the rating. The check ride was not complete.

Q. But they're not eliminated from the upgrade?

A. Not necessarily, no.

Q. Okay.

A. Not necessarily, no. That's right. Your point is true. Based on what we've said so far, he's not eliminated from the program. That's right.

Q. Okay. And you talked about putting a guy up. Somebody from Amerijet has to basically sponsor

Pat for the oral; is that correct?

MS. NORTON: Object to the form of the question.

THE WITNESS: Somebody has to say he's ready, yes.

BY MS. SHEA:

Q. Do you know who that was in Pat's case?

A. No idea. You'd have to look at the training records.

Q. When you talk about nobody wants to touch it after the fact, somebody had to certify it the first time, right?

A. Sure, somebody has to say he's ready. And you'd have to see his training records.

Q. Okay.

A. And see his application for airman's certificate to see who it was that signed it. I don't know who it was. I don't remember. I don't know that I ever looked to see. It was a training department issue and I was going to help them resolve it.

MS. SHEA: Let's mark this as Exhibit 33.

(Whereupon, the above-referenced document was marked as Plaintiff's Exhibit Number 33 for Identification).

BY MS. SHEA:

Q. Let me hand you what we've marked as Exhibit 33. Do you recognize that letter?

A. I think I remember something about that, yes.

Q. Does that refresh your recollection again as to what the plan was as it related to Pat?

A. Well, I don't know that it was particularly anything remarkable other than apparently we decided, or somebody decided, that he was to return to the line for a period of time - for thirty days it looks like - and then we would have another meeting and then we would determine how to best prepare for his oral exam by the F.A.A.

Q. But he was still in the upgrade process at that point?

A. Yeah, I would say so.

Q. Okay. Do you remember what happened between the date of that correspondence and when you left the company, if anything, as it relates to Pat's upgrade effort?

A. I remember some things, but I don't remember if I remember - I don't know if I remember the times and I don't know if I have them in the right order.

Q. What is it that you have in mind?

A. I remember a meeting that we had with Pat -

we meaning Tracy Dickinson, myself, and I'm not sure who else was there. And I think Tracy Dickinson was there. I don't recall - which he was asked some questions and the idea was to see where we would have to go with Pat to get him ready. What didn't he know about the airplane. The questions varied from some systems questions to some performance questions in just a general way that a guy -- Some of the questions were looked at as a guy that had been on the airplane for that many years should know the answer to because he had lived with it for that many years, and some of them were things that he probably should have been taught in the upgrade system.

And it was, Well, was he taught? Does he remember that stuff? Where do we have to go here? I remember that meeting with him.

Q. That was you and Tracy and Pat?

A. I don't really remember for sure who was there. I think Tracy was there. I think possibly John Washington was there. I don't really remember who was there.

Q. And what was the outcome of this meeting if you recall?

A. Well, there was a lot of issues that we were going to have to work on to get him ready. And I

don't remember particularly what they were, but it was just a lot of issues to work on. What we attempted to do was find the things that he needed to be strengthened on.

Q. Was that written down anywhere?

MS. NORTON: Object to the form of the question.

BY MS. SHEA:

Q. Are you aware of any documentation of that meeting that would say - you know, between the group that met with him regarding Pat in order to get him through the program that we need to emphasis such-and-such?

A. Yeah, there was something written about this meeting. As to where it would be, I don't know. And it would have identified the areas that the training department -- It would be from my office from the training department identifying the areas that he needs to work on.

Q. Okay. And did Pat continue with any training while you were still with the company?

A. I don't remember. I seem to recall that there was another meeting subsequent to that in Pete Steel's office, and I really don't remember what came of that meeting. And then I left shortly after that.

I became busy doing something else and shortly after that I left.

Q. All right. He was not eliminated from upgrade training during your time at the company, correct?

A. I don't remember ever sending him a letter saying that he was eliminated. I may have. I don't know. But I don't remember specifically sending him a letter saying that he was eliminated. I don't remember seeing one. I may have. I don't know.

Q. Basically what you recall is that he was going to remedial training, if you will, for extra help?

A. Yes. And then there was some time tables. It was not as simple as that, but I don't remember the details of it. I really don't.

Q. So was the initial ground school a pass-or-fail situation?

A. You mean -- He should have passed the initial ground school, yeah.

Q. Right. To get to the oral.

A. Sure.

Q. Okay. So basically at the time that you left he would have passed the ground school and the F.A.A. oral was discontinued without an actual pink

slip?

A. Um-hmm.

Q. Yes?

A. Yes.

Q. And certain more focused training was going to be underway?

A. Yes.

Q. All right. Did Dave Bassett, Pete Steel, or anyone tell you before you left that he was not going to make Captain at Amerijet or that he was not wanted as a captain or was regarded as being eliminated from the system?

MS. NORTON: Object to the form of the question.

THE WITNESS: Let me make sure of the question.

Did Dave Bassett or Pete Steel --

MS. SHEA: Let me rephrase the question.

THE WITNESS: Okay.

BY MS. SHEA:

Q. To your knowledge Pat Major was an officer - a captain candidate as of the time that you left the company.

A. As best I can remember, yes.

Q. Okay.

MS. SHEA: Ms. Norton, is Mr. Cook being produced as Amerijet's person most knowledgeable in terms of the criteria for Captain?

MS. NORTON: No.

MS. SHEA: Okay. We have not confirmed that, so that's why I ask you.

MS. NORTON: I think you asked me about hiring. You didn't ask me about the most --

MS. SHEA: Hiring or promotion.

MS. NORTON: Okay. Well, he would have knowledge of the hiring.

MS. SHEA: All right.

MS. NORTON: But I don't --

BY MS. SHEA:

Q. Between conclusion of ground school and the discontinued oral examination, would there have been a pre-oral review by someone at Amerijet in order to allow them to certify that he was prepared to take that examination?

A. I think the most logical way to proceed - and I don't remember specifically what was decided, but I don't think it would have been decided any other way - would be to first find out what he didn't know, which is what we did in my office. Okay.

Q. Okay.

A. We had an interview with him where we talked about the specifics about the airplane and how it's operated, and based on that interview we would then proceed with what is it that he needs to know to get through the oral and the training department would be directed then to strengthen those areas. Obviously, he passed the ground school, but for some reason he wasn't strong enough in the areas that Mr. Sonan was probing. Mr. Sonan decided he wasn't prepared.

I wasn't there. You know what could have happened in there? He could have just got nervous.

Q. Okay. Well, let's not speculate about it.

I guess my question is just really in terms of Amerijet's procedures. Would you expect there would be a pre-oral review by the person that was going to sign them off to take the oral or by somebody under his command?

A. Before you took the first oral?

Q. Yes.

A. Sure. I would think whoever signed his document would have given him a pre-oral review. I certainly would not sign somebody's recommendation without at least testing them to my satisfaction.

Q. Had any decision been made by the time you left as to who was going to be like the person that

would shepherd Pat for the next oral that would sign him off?

A. I don't remember.

Q. You indicated some people did not want to do that, but do you recall anyone either being assigned to do that?

A. No, I don't recall anybody being assigned to do it. Tracy Dickinson called and I remember Pete Steel making the statement that if nobody would do it, he would do it himself.

Q. Okay.

A. And I don't think there was going to be a problem if somebody would have done it, but my only point in bringing that up was that it was a pretty nervous time because the P.O.I. had made it clear that we don't make these kind of mistakes. When we put somebody up for a check line they are supposed to pass.

Q. Not just Pat, but anybody.

A. Anybody. He wasn't focused on Pat. I don't recall John Roseburough - and I'm pretty sure it was John Roseburough - I don't think he ever mentioned Pat. It was just whenever this happens. This is not good when somebody doesn't complete the check ride, doesn't pass the check ride.

Interestingly enough, if you talk to the F.A.A., from my perspective they look at it as not passing, even though they didn't pink him, because he didn't complete it.

Q. Do you know how long it went? How long is it supposed to go? How long is the whole thing, the oral?

A. It usually takes me about two to three hours to do an oral for the first time type reading. I would say probably a minimum of two hours with Barney Sonan.

Q. Do you know how far Pat got with this before it was discontinued?

A. I only know what I was told. I don't know for sure. I never talked to Barney about it. I didn't talk to Pat about it. Or if I did talk to Pat about it, I don't remember Pat saying how long he was in the room. I don't know for sure.

Q. You heard some figure though?

A. Yes.

Q. A very short time, right?

A. Yes.

Q. A few minutes?

A. I heard 15.

Q. Okay.

MS. SHEA: Let's take a break for a minute.

(Whereupon, a short break was taken).

MS. SHEA: Let's mark this as Exhibit Number 34.

(Whereupon, the above-referenced document was marked as Plaintiff's Exhibit Number 34 for Identification).

BY MS. SHEA:

Q. I am going to ask you to take a look at Exhibit 34 and tell me if you recognize that.

A. Okay. This is a Pilot Simulator Flight Time Training for a Captain Patrick Scott Major, and apparently he got his first period on 6/11/98 and then subsequent periods on 6/18 and 6/23/98.

Q. Can you tell the results of the training from that?

A. No, not from this. This is only documenting the time that he was trained.

MS. SHEA: Let's mark these as the next exhibits.

(Whereupon, the above-referenced documents were marked as Plaintiff's Exhibit Number 35 and Plaintiff's Exhibit Number 36 for Identification).

BY MS. SHEA:

Q. Let me show you Exhibit 36 and see if you recognize that.

A. So based on this, this tells us how the training went. He received mostly satisfactories with some unsatisfactories.

Q. Do you know if that relates to Exhibit 34?

A. No, the whole thing has been disassembled from his training folder.

Q. Okay.

A. And, unfortunately, this is a situation that the person who designed the training folder didn't foresee. But we can assume --

Q. All right.

A. -- that this is three periods (indicating) and this is three periods (indicating) and this is probably -- This does look my handwriting here and this is the way that I like to fill one out. And I trained Bill Cline to do this, and I'm assuming that these are followed.

Q. Had Pat --

MS. NORTON: If you know, tell her that you know that they followed. If you don't know that they followed, just tell her that you are assuming.

THE WITNESS: I understand.

MS. NORTON: Don't assume it.

THE WITNESS: I don't know for sure that they followed.

MS. SHEA: Okay.

BY MS. SHEA:

Q. Had Pat completed the simulator portion of the training for the upgrade in June or July 1998?

A. Not based on these documents. He had not completed it.

Q. What was missing?

A. Well, several periods.

Q. There is more periods required?

A. Sure. As you can see I think there is seven.

Q. Oh, all right.

A. Okay. Yeah, he didn't - this doesn't show that he's completed it. Now, one could complete before seven. Don't let me lead you down the primrose path there.

Q. Okay.

A. One could complete before seven, but I don't see anything on here - anything in these documents that I have in my hands that says that he's completed anything.

Q. Okay.

A. For example, at the bottom where it says, "Date training completed," there is nothing there.

Q. So it may have been picked and pulled from his training records, but with what you've got here it does not appear to you that he concluded that part of the training?

A. Right, based on what I have in my hand, training was not completed.

Q. Please take a look at Exhibit 35. Can you tell me what that is?

A. Okay. That is a Pilot Instructor Recommendation Form, and it shows that on 6/23/98 somebody said that he could take the oral. And then I made the statement that, "The oral discontinued by F.A.A. inspector due to applicant's lack of knowledge," and I signed it.

Q. Oh, that's your writing?

A. That is my writing and that is my signature.

Q. How did you come to fill out that part of the document?

A. Based on what I was told.

Q. Do you recognize the signature above yours, the person that signed them off?

A. No, I sure don't.

Q. It's not yours?

A. No, it's not mine.

Q. Okay.

A. No, because when he went for the oral, I wasn't around. I wasn't there.

Q. Right.

A. I mean, if I would have been one of the persons asked to do it by the training department, I would have given him a little test, and if he would have passed my test I would have signed it.

Q. Okay.

A. I don't know who that is for sure and it would be a guess if I said anybody's name.

Q. So you're familiar with this form?

A. The form, yes.

Q. This is Amerijet's way or making sure that someone who signs someone off can vouch for their preparedness?

A. Right. That's one of the vehicles used. There is another form that's also used.

Q. Okay.

A. And that would have been the F.A.A. form.

Q. Oh, all right.

A. Because the F.A.A. inspector, Inspector Sonan, wouldn't have cared about that except for, Is your paperwork in order. He would have been more

interested in the application for airman's certificate.

Q. All right.

A. That's the one he would have very much wanted to see and that should have this same signature on it.

Q. Now, that was not part of the training records?

A. It usually isn't. It goes to the F.A.A.

Q. Okay.

A. Although in this case I don't think the F.A.A. would have it. I don't know what became of it. Maybe he took it with him. Barney Sonan, I mean. But I don't know.

Q. I see.

A. I don't know what became of his application.

Q. And Barney Sonan, he comes right out to Amerijet's office to do the test; is that right?

A. If those arrangements are made, he can, yes. Sometimes it's done -- Wherever you make the arrangements to do the test, that's where it is.

Q. Okay. Was it the training department's responsibility back in '98 to set up these types of appointments and the use of the facilities?

A. Yes. In fact, I don't even know where this

test took place that wasn't completed.

Q. Okay.

(Whereupon, there was a discussion off the record.)

BY MS. SHEA:

Q. Would an airman's request for certification still apply under Appendix H for someone who already has an A.T.P.?

A. Ask the question again.

Q. Would an airman's for certification still apply under Appendix H for someone who already has an A.T.P.?

A. By the policy of FSDO 17 at that time, yes.

Q. Okay.

A. Only by the policy, by the policy of the Flight Standards District Office.

Q. Not Amerijet?

A. Not Amerijet or not even the F.A.A.

MS. SHEA: All right. That's all I have. Thank you.

THE WITNESS: Are we finished?

MS. SHEA: We are finished unless Ms. Norton has any questions for you.

MS. NORTON: Let me see.

I don't think so. I don't have any

questions.

MS. SHEA: Then we are finished. Thank you very much.

You have the right as the deponent to review the deposition transcript when it's transcribed to make sure she has taken everything down accurately, or alternatively you can waive that right.

MS. NORTON: I recommend that you waive.

THE WITNESS: That's fine.

MS. SHEA: Thank you so much.

And I will retain the exhibits.

(Whereupon, the deposition was concluded at 3:00 p.m. and the Reading and Signing thereof are waived).

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, the undersigned authority, certify that ED COOK personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 30th day of January 2001.

AMBER G. CHEEK
My Comm Exp. 9/17/2002
No. CC 776131
[ ] Personally Known [ ] Other I.D.

Amber G. Cheek, Court Reporter
Notary Public - State of Florida
My Commission Expires: 9-17-02

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA )

COUNTY OF BROWARD )

I, Amber G. Cheek, Court Reporter, certify that I was authorized to and did stenographically report the deposition of ED COOK, that a revies of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 30th day of January 2001.

Amber G. Cheek, Court Reporter
Notary Public - State of Florida
My Commission Expires: 9-17-02

STATE OF FLORIDA NOTARY PUBLIC
AMBER G. CHEEK
My Comm Exp. 9/17/2002
No. CC 776131
[ ] Personally Known [ ] Other I.D.






Due to the tremendous amount questions that have arose, I have selected a few of questions from the agenda sheets that you have sent in. Thank you for your response.

**AGENDA FOR PILOT MEETING**
**June 23, 1996**

**Topics addressed to Mr. David Bassett, President.**

1) Where do you see the future of Amerijet in the next 10 years?

Burlington, expansion, bigger aircraft, different markets, etc...

2) In the event of a catastrophic circumstance in your life, what would the effect on Amerijet as a company be?

**Topics addressed to Peter A Steele, Vice President of Operations.**

1) Explanation of new vacation, sick and personal time policy which was recently implemented.

2) Salary Cap and compensation for duty time.

3) Hazmat control on Amerijet aircraft.

4) Burlington crews/hotel/schedule/per diem.

5) Captain's fund envelopes.

6) Miami crew office and scheduling.

7) Jepp's.

8) Aircraft/Irv item's.

**Topics for Ed Cook, Chief Pilot.**

1) Upgrade and hiring policies.

2) Checkrides, line checks and upgrade evaluations.

3) Aircraft Log Books.

**Topics for Jay Klucar, Miami Station Manager.**

1) Communications between Miami Traffic, Dispatch and the Out Stations.

2) Responsibility for crew van pick upon arrival of aircraft in Miami.

**Topics for Wayne Penny, Director of Human Resources.**

1) Affordable Insurance for family members.

2) Long term disability.

103

3) Life insurance increase.

4) Travel benefits - i.e. Carnival, other carrier, etc....

As time permits - we will have questions and answers and will limit each to 2 minutes per question.







February 21, 1997

Mr. Patrick Scott Major
1722 West Las Olas Blvd.
Ft. Lauderdale, FL 33312

Dear Pat:

After your meeting with Wayne Penny and Ed Cook on February 11, 1997, you submitted to me your letter dated December 18, 1996. I have read your letter thoroughly, and I appreciate the time and effort you expended in composing it. It is clear that you put a great deal of thought into it, and you articulated your perspective very candidly. I appreciate your concerns. At Amerijet it has been, and will continue to be, our desire to balance the needs of our employees with the needs of the company. Although this is a difficult balance to achieve, we continue to make every effort to effectively meet the needs of everyone involved.

Although I cannot address every item you raise, I do want to reply to a few comments you have made with which I take issue. It would appear as though at times I have been credited with saying things that I really didn't say. This is particularly true based upon the quotes in your letter which you have attributed to me. Furthermore, I believe the management philosophy at Amerijet you have described has been misconstrued.

Because of the nature of our business, the public and our customers expect us to run a "tight ship". As a result, I have always demanded the most from all Amerijet's employees. However, as you know, I also listen to employees' concerns and work with our supervisors and employees to address these concerns. I cannot always do what employees want or desire, but I listen and then make the judgment call based upon what is best for the individual, other employees and the Company.

In my opinion, many of the items you raise are perceptions of one or just a few employees, and not the reality of this Company. Perceptions often arise through rumor, innuendo, hearsay or unsubstantiated "facts". As you know, we have approximately 70 flight officers. I can almost bet you that on various issues we could find many different ideas and opinions among the group without there being any strong consensus. So, although you raise many issues, I find it hard to believe that you are speaking for all others. However, I know that if someone perceives a problem, to that person and potentially to others, the problem may be "real".

I am disappointed that you find so many negative aspects about management and the "corporate culture" at Amerijet. I have always made reasonable efforts to accommodate you and your requests. We also appreciate your contribution as one of Amerijet's Flight Officers and for taking the time to bring your concerns to my attention. However, at the end of your letter, you write that you believe me to be "hurt", "angered" and "threatened" by your concerns. Again, this is only perception, for I am none of these.

I appreciate you or anyone at Amerijet taking advantage of our open door policy to raise their concerns. I will make sure that the issues are reviewed by the Company. I cannot promise that I, or the Company, will always do what others want because this may not be in the best interest of the Company. However, I can assure you that we will always listen, take seriously employees' concerns, and always attempt to address the concerns raised within the context of running a business in a competitive market.

As always, thank you for your input.

Sincerely,

David G. Bassett
President

AMERIJET

## MEMORANDUM

TO: Patrick Major

FROM: Wayne Penny

DATE: February 20, 1997

RE: **VOLUNTARY EXIT INCENTIVE AGREEMENT PROPOSAL**

---

As a follow-up to our discussion of last week, I have enclosed for your review a proposed Voluntary Exit Incentive Agreement. As we discussed, you are under no obligation to accept this and, if you decide not to accept it, you can continue to be employed as a Flight Officer with Amerijet. You will have twenty-one (21) days from today to accept or reject this Agreement. However, you may accept this Agreement earlier if you so desire. Once you sign the Agreement, you retain the right to revoke it within seven (7) days. If you decide to accept this Agreement, your employment will end eight (8) days thereafter.

This Agreement is only being offered to you. No one else in the Company is being offered this package at this time. As a result, prior to providing you with this Agreement, by signing below, you agree that you will keep our discussions regarding this Agreement and the contents of this Agreement confidential. You agree that, whether you accept this Agreement or not, you will not discuss it with anyone, except your attorney and/or accountant, at any time in the future. If you fail to abide by this confidentiality requirement, you agree that your employment will be terminated immediately. If there are any other individuals that you would like to discuss this Agreement with, please let me know in writing so that the Company may determine whether or not to authorize you to do so in advance of your requested disclosure.

If you have any questions, please do not hesitate to discuss them with me.

I, PATRICK MAJOR, have read this memorandum, and I am in agreement with all of its provisions, and I agree to abide by the confidentiality provision set forth above.

PATRICK MAJOR DATE



VOLUNTARY EXIT INCENTIVE AGREEMENT AND GENERAL RELEASE

WHEREAS, PATRICK MAJOR ("MR. MAJOR"), 1722 W. Las Olas Blvd. Ft. Lauderdale, FL 33312, has been a Flight Officer of AMERIJET INTERNATIONAL, INC. ("AMERIJET"), a Florida corporation, since 1991; and

WHEREAS, AMERIJET and MR. MAJOR have agreed that his employment will end on or before March 21, 1997; and

WHEREAS, MR. MAJOR voluntarily resigns from his employment on or before March 13, 1997.

AS A RESULT, IT IS AGREED THAT:

I. In exchange for the promises made by AMERIJET contained in this Settlement Agreement and General Release (hereafter referred to as the "Agreement"), MR. MAJOR agrees:

A. To generally release, satisfy and forever discharge AMERIJET, its parent corporation, owners, its affiliates, officers, directors, employees, agents and attorneys (collectively "AMERIJET") of and from all actions, claims and demands, including but not limited to actions under **Title VII of the Civil Rights Acts of 1964, 43 U.S.C.§2000(e) et seq., as amended; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. Section 621 et seq. (The "ADEA") the Federal Americans with Disabilities Act, 42 U.S.C. Section 12101 et seq.; the Florida Human Rights Act of 1977 and the Florida Civil Rights Act of 1992, as amended; Chapter 760, Florida Statutes; the Equal Pay Act of 1963, 29 U.S.C. Section 206(d); the Family and Medical Leave Act, as amended, 29 U.S.C. Section 2601, et seq.; COBRA, as amended, 29 U.S.C. Section 1161, et seq.;** and any other federal, state or local statute, or ordinance relating to or dealing with employment discrimination; and any claim for breach of an employment contract or tort damages and/or personal injury as a result of employment with AMERIJET which MR. MAJOR ever had, may have had, or has against AMERIJET. No right or claims arising under ADEA after the date this Agreement is signed are waived.

B. Not to seek employment with AMERIJET in the future.

II. In exchange for the promises of MR. MAJOR contained in this Agreement, and after seven (7) days have expired from the date this Agreement is signed by the parties, AMERIJET agrees to pay MR. MAJOR as additional gross wages, $5,130.00 gross total, less all required payroll deductions i.e., federal withholding, $943.92, Social Security and Medicare $392.45 and 401-K contribution $410.40, for a net amount of $3,383.23 in a lump sum payment. The parties agree that AMERIJET will also pay MR. MAJOR an additional amount for all earned and available vacation/personal days, less all required payroll deductions, in accordance with Company Policy.

______
Initials

I have read the foregoing Agreement and General Release, and I accept and agree to the provisions therein.

________________________________
DATE

________________________________
PATRICK MAJOR

AMERIJET INTERNATIONAL, INC.
a Florida corporation

________________________________
DATE

By:________________________________

NAME:______________________________

ITS:________________________________

STATE OF FLORIDA:

: ss.

COUNTY OF DATE:

The foregoing instrument was acknowledged before me this _____day of ___________ 1997, by PATRICK MAJOR (who is personally known to me) (or who has produced _______________ as identification).

_______________________________

Notary Public, State of Florida at Large

(SEAL)

_______________________________

Print Name of Notary

My Commission Expires:

_______________________________

STATE OF FLORIDA:

: ss.

COUNTY OF DATE:

The foregoing instrument was acknowledged before me this _____day of ___________ 1997, by _______________________________, as ________________________________________ of AMERIJET INTERNATIONAL, INC. (who is personally known to me) (or who has produced _______________ as identification).

_______________________________

Notary Public, State of Florida at Large

(SEAL)

_______________________________

Print Name of Notary

My Commission Expires:

veip

III. Because of the voluntary undertaking of this Agreement on the part of the parties hereto, it is agreed by MR. MAJOR that the terms of this Agreement, the content of the discussions pertaining thereto between the parties and AMERIJET related information shall be considered and treated as confidential. Neither MR. MAJOR, nor his present or future representatives, spouse, attorneys, or agents shall issue any publicity release or otherwise publicize or give out in any manner to anyone, except his attorney and/or accountant, the terms of this Agreement, the content of the discussions pertaining thereto, the settlement of this matter, or any proprietary information he has obtained from any source while employed by AMERIJET about AMERIJET, its operations, customers or business activities. If a court of competent jurisdiction adjudges that MR. MAJOR has breached this provision, all obligations of AMERIJET to make payments shall cease, and MR. MAJOR agrees to immediately return the amount received under Paragraph II, above. All other terms of this Agreement shall remain in full force and effect.

IV. This Agreement constitutes the complete understanding between AMERIJET and MR. MAJOR. No other promise or agreements shall be binding unless signed by the parties to this Agreement. AMERIJET shall not be obligated to take any action or be obligated to MR. MAJOR except as specifically set forth in Paragraph II, above.

V. MR. MAJOR has read this Agreement prior to signing it, and he understands that he has the right to consult with an attorney prior to signing this Agreement. **MR. MAJOR shall have twenty one (21) days to sign this Agreement and shall have seven (7) days after signing this Agreement to revoke the terms of this Agreement.** Each party agrees to bear its own attorney's fees and costs and not seek any attorney's fees or costs from the other party.

VI. It is understood that this Agreement does not constitute an admission by AMERIJET of any violation of any law, ordinance or statute, claim for relief or cause of action.

VII The parties agree that the law of the State of Florida (venue-Dade County) shall govern the interpretation and enforcement of this Agreement should a dispute arise.

VIII. The parties agree that this Agreement may be used as evidence only in a subsequent proceeding in which one of the parties alleges a breach of this Agreement. It is understood and agreed that this Agreement shall not be used, introduced or enforced in any way in any administrative proceeding (except the Agreement may be used by AMERIJET if MR. MAJOR seeks unemployment compensation), any lawsuit, or in any claim, or cause of action against AMERIJET, its successors or assigns or any related corporate body or officers, agents, attorneys or employees of AMERIJET other than as set forth in this subsection.

IX. If one or more provisions or terms of this Agreement shall be ruled unenforceable, AMERIJET may elect to enforce the remainder of this Agreement or cancel it and receive from MR. MAJOR, his successors and or assigns, or otherwise, any consideration paid.

______ Initials

-06070-WJZ Document 137 Entered on FLSD Docket 03/26/2001 Pa






May 98

**JOB OPPORTUNITY BULLETIN**

| Position | Number | Position | Number |
|---|---|---|---|
| Captain | 3 | First Officer | 6 |

**UPGRADE PROGRAM DESCRIPTION**

In the interest of fairness, upgrades selections will be based on seniority and qualifications.

**MINIMUM QUALIFICATIONS**

**All Pilot Positions:** Commercial, Multi-engine and Instrument Ratings.
**Captains Only:** ATP or ATP written.

| | FIRST OFFICER | CAPTAIN |
|---|---|---|
| Total Time | 2,000 hours | 5,000 hours |
| Part 25 Time(≥ 12,500 lbs.) | N/A | 2,000 hours |
| Pilot-in-Command | 500 hours | 1,500 hours |
| Medical Certificate | 2nd Class | 1st Class |

A domicile and position bid will be published as company requirements dictate. All qualified flight crewmembers may bid for any open position. Qualified candidates will be selected in order of seniority. Before being selected for upgrade, all qualified candidates must pass a pre-upgrade written examination. This examination will be inclusive to the crewmember's current position.

Training will commence after payment of $2,500 and completion of the upgrade contract. The $2,500 deposit along with all other funds collected pursuant to the training agreement will be held in an interest bearing joint account until such time as the agreement is fulfilled. At that time, all moneys will be returned to the flight crewmember.

Upgrade may be bypassed by any flight crewmember without penalty. Elimination from upgrade training will result in placement back in the previous flight crewmember's position. Base assignment will be subject to availability. The candidate must then wait one year before re-entering the upgrade program.

Flight crewmembers who fail their initial ground school, checkride, FAA line check, or company line check will be given more training and another check ride or line check as required. A second failure will result in placement back in the previous flight crewmember's position subject to the base assignment and wait-time requirements described above.

Additional opportunities will not be given past the second attempt at upgrade and your position will have to be assessed by the Chief Pilot and the Director of Operations regarding your future with Amerijet. It may even result in termination.

137

Enclosed is a bid form for the upgrade positions that are available at this time.



# MEMORANDUM

**TO:** PATRICK MAJOR

**FR:** ED COOK

**DATE:** APRIL 30, 1998

**RE:** UPGRADE BID

---

Please consider this as confirmation of the receipt of your Upgrade Bid sheet by my office.

Thank you for your prompt response.






May 20, 1998

Mr. Patrick S. Major
1722 West Las Olas Boulevard
Ft. Lauderdale, FL 33312

Dear Mr. Major:

Congratulations - you have been awarded the bid to upgrade to Captain.

The Training Department will be contacting you in the next few weeks to verify your upgrade training dates. For upgrade training you will need to report to Amerijet International's Fort Lauderdale office at 578 SW 34th Street, Fort Lauderdale, FL 33315.

You will be required to sign a contract during the first few days of training and submit the required contract deposit of $2,500.00. Additionally, your spouse will also be required to sign the contract. If you have any questions, please do not hesitate to contact Terri Sargent at (954) 359-7670 ext. 744.

Thank you for your attention to this matter.

Sincerely,

Ed Cook
Chief Pilot

EC/tls




000128

EMPLOYMENT AND FLIGHT TRAINING AGREEMENT

EMPLOYMENT AND FLIGHT TRAINING AGREEMENT (the "Agreement") made this 1 day of June, 1998 between AMERIJET INTERNATIONAL, INC., a Florida corporation, with its principal office located at 498 S.W. 34th Street, Fort Lauderdale, Florida 33315 (the "Corporation") and Patrick S. Major (The "Employee"), residing at 1722 West Las Olas Boulevard, Ft. Lauderdale, FL 33312 ("Employee's" residence).

In consideration of the mutual covenants contained herein, the Corporation and Employee agree as follows:

1. **DUTIES:** The corporation shall employ Employee as a pilot-in-command (PIC), first officer (SIC), Flight Engineer (F/E), or other flight crew member in connection with the operation of various Corporation aircraft. Employee shall operate the Corporation's aircraft in such crew member position designated by the Corporation at times and along such routes for such purposes as the Corporation shall designate, subject to the direction and general supervision of the Corporation. Employee shall further render unrelated duties as the Corporation may assign him/her from time to time. Employee shall comply with all governmental regulations in connection with the operation of Corporation's aircraft.

2. **COMPENSATION:** The Corporation shall pay Employee compensation in accordance with the Salary Administration Program (SAP).

3. **INSURANCE BENEFITS:** During the term of this Agreement, the Corporation shall provide Employee and his/her dependents with such group insurances as the Corporation elects to furnish, in its sole discretion, to other employees performing same or similar duties for the Corporation.

4. **INITIAL TERM:** The initial term of the Employee's employment shall be for three (3) years commencing the 1 day of Aug, 1998 (the "Initial Term"), but subject to the following:

(a) The Corporation shall have the right to terminate this Agreement, with or without cause, upon five (5) days written notice to Employee.

(b) In the event of Employee's death during the term of this Agreement, this Agreement shall automatically terminate, and the Corporation shall pay Employee's estate such compensation due Employee computed up to the date of termination.

(c) The corporation may immediately discharge Employee and terminate this Agreement for cause. As used in this paragraph, "cause" shall mean any or all of the following:




CONFIDENTIAL

(i) commission of a fraud or felony or other criminal activity disclosed during the term of this Agreement;

(ii) a misrepresentation made by Employee to the Corporation relating to his/her qualifications or employment history;

(iii) a breach of any of the Employee's obligations under this Agreement; or

(iv) a violation by the Employee of "Company Policy" that is established or maybe established from time to time by the Corporation (see Employee Hand Book).

5. **EXTENSION OF AGREEMENT:** Upon the expiration of the Initial Term or the Additional Term as defined below, the terms of this agreement shall automatically continue, subject to the termination provisions set forth in the previous article, until such time as the Corporation gives Employee five (5) days written notice of termination, with or without cause, or Employee gives Corporation thirty (30) days written notice of termination, with or without cause.

6. **EXTENT OF SERVICE:** The Employee shall devote his/her entire time, attention and energies to the Corporation's business and shall not, during the term of this Agreement be engaged in any other business activity, whether or not such business activity is a pursuit for gain, or profit or other pecuniary advantage.

7. **FLIGHT TRAINING** :

(a) Prior to or during the term of this Agreement, Corporation shall furnish Employee with the necessary ground and flight training to perform his/her duties under this Agreement in a B-727 aircraft. The Corporation shall pay Employee compensation at a rate of $ 30.00 per day during the ground school portion of the flight training. The Corporation and Employee hereby stipulate that the value of such training shall be $14,000.00 for a pilot-in-command (PIC), ~~$______ for a first officer (SIC); and $______ for a flight engineer (F/E)~~ (the "Flight Training Expense").

(b) If in the sole determination of the Corporation, the progress of the Employee during training is unsatisfactory then the Corporation shall have the right to terminate this Agreement and the parties shall thereupon be bound by any previous Employment Agreement in effect at the commencement of the Agreement.



CONFIDENTIAL

(c) In the event the Corporation terminates this Agreement pursuant to subsection (b) above then the Corporation shall have the right to apply the proceeds in the Security Deposit Account (as that term is defined in Section 9 of this Agreement) towards reimbursing the Corporation for the following expenses incurred by the Corporation during training: wages, simulator time, per diem expenses, and any other out-of-pocket expenses incurred. Any proceeds remaining in the Security Deposit Account after satisfaction of such expenses shall be disbursed to Employee.

8. **REIMBURSEMENT OF FLIGHT TRAINING EXPENSE**: Employee shall not have any obligation to reimburse the Corporation for furnishing the Flight Training Expense if Employee remains employed under this Agreement for the full length of the Initial Term. If, however, this Agreement is terminated by the Corporation (with cause) or by the Employee (for any reason) prior to the completion of the entire Initial Term, then Employee shall reimburse the Corporation for the full amount of the Flight Training Expense ( the "Training Expense Liability") without any proration or credit for partial completion of the Initial Term.

9. **SECURITY DEPOSIT ACCOUNT AND PROMISSORY NOTE**:

(a) The Corporation agrees to establish a security deposit account in the name of Employee (the "Security Deposit Account") with the Corporation reserving exclusive signature authority. Employee shall tender to the Corporation the initial sum of $2,500.00 . Thereafter, the Corporation shall withhold the sum of $92.30 from Employee's earnings for each pay period up to $ 7,000.00, for deposit into the Security Deposit Account. Until the Employee's satisfactory completion of the Initial Term, the Corporation shall hold the proceeds contained in the Security Deposit Account as security for Employee's Training Expense Liability and for all other liabilities of the Employee to the Corporation created pursuant to this Agreement and the employment relationship ( the "Other Liabilities"). Upon the Employee's satisfactory completion of the entire Initial Term, the Corporation the Corporation shall refund all accumulated proceeds held in the Security Deposit Account to Employee, plus any accrued interest.

(b) Concurrent with the execution of the Agreement, Employee and spouse (if applicable) shall execute a Promissory Note in favor the Corporation in the principal amount equal to the Flight Training Expense. ( A copy of said Promissory Note is attached hereto). The Corporation shall hold such note, and not negotiate same, during the employment relationship. Upon completion of the entire Initial Term, the Corporation shall mark the Promissory Note "cancelled" and return same to Employee.

10. **ADDITIONAL TRAINING/EXTENSION OF INITIAL TERM**: If prior to the expiration of the Initial Term, the Employee requests and the Corporation agrees to provide additional training, the following terms shall apply:



CONFIDENTIAL

(a) The Corporation shall inform the Employee of the value of the additional training as of that date (the "Additional Flight Training Expense").

(b) The Employee shall be indebted to the Corporation for the value of the additional training ( the "Employee's Additional Training Expense Liability").

(c) The Initial Term shall be extended for an additional three (3) years effective the ________ day of __________, 19 ______ (such additional three (3) year period being referred to hereafter a the "Extended Term"). I acknowledge and am in aggreement with the "Extended Term" above ______________________________, ____________

("Employee's" Signature) Date

(d) Employee shall not have any obligation to reimburse the Corporation for furnishing the Additional Flight Training Expense if Employee remains employed under this Agreement for the full length of the Additional Term. If, however, this Agreement is terminated by the Corporation (with cause) or by the Employee (for any reason) prior to the completion of the entire Additional Term, then the Employee shall reimburse the Corporation for the full amount of the Employee's Additional Training Expense Liability without any proration or credit for partial completion of the Additional Term.

(e) Until satisfactory completion of the Additional Term, the Corporation shall continue to retain all amounts contained in the Security Deposit Account as security for the Employee's Additional Training Expense Liability. Upon Employee's satisfactory completion of the entire Additional Term, the Corporation shall refund all accumulated proceeds held in the Security Deposit Account plus accrued interest to Employee.

(f) Notwithstanding anything contained herein to the contrary, the Corporation shall continue to hold the Promissory Note until the Employee's completion of the Additional Term at which time the Corporation shall mark the Promissory Note "canceled" and return same to the Employee.

11. **TEMPORARY BREAK IN SERVICE:** The Corporation and the Employee recognize that there may be periods in which business may require a reduction in the workforce and during which the Corporation will have the sole right to lay off the Employee. If, during the Initial Term or the Additional Term, the Employee is laid-off for a period of up to 90 consecutive calendar days and is then recalled to work, this Agreement shall not be considered to have been terminated. As a result, although there may be a break in service, this Agreement will remain in full force and continue in effect as of the date the Employee return to work after such lay-off, provided, however, that the Initial Term or the Additional Term shall be extended for the number days that the Employee was laid off. If, however, the Employee is laid-off in excess of 90 consecutive calendar days, this agreement shall automatically terminate and the Corporation shall reimburse the Employee all proceeds contained in the Security Deposit Account.





CONFIDENTIAL

12. **REMEDIES:** Notwithstanding anything contained herein to the contrary, in the event Employee become liable to the Corporation for the Training Expense Liability, Additional Training Expense Liability, or Other Liabilities ( the "Liabilities"), then the Corporation shall immediately have, and may elect from, any or all of the following remedies to satisfy, the Liabilities:

(a) apply the total proceed contained in the Security Deposit Account towards the partial satisfaction of the Liabilities;

(b) apply any of the Employee's earned, but unpaid, wages, bonuses or other outstanding compensation towards partial satisfaction of the Liabilities;

(c) apply any other sums of whatever nature owed by the Corporation to Employee towards partial satisfaction of Liabilities;

(d) notify any credit rating service or agency that Employee has failed to satisfy Liabilities;

(e) bring an action against Employee and spouse (if applicable) for enforcement and collection of the Promissory Note in accordance with the terms and conditions contained in the Promissory Note; and/or

(f) seek any and all relief available under the law. The Corporation in its sole discretion shall have the option of electing any one or more of the above described remedies. If the Corporation's exercise of any one or more of the above remedies fails to completely satisfy the Liabilities, then the Corporation shall have the right to immediately bring an action for collection of the unsatisfied balance of the Liabilities.

Employee hereby stipulates to waive any defenses assertable in an action brought by the Corporation and instead shall assert the relief afforded by such defenses (e.g. a set-off), and any other available claims against the Corporation, by counterclaim or a separate action. In the event, Employee files such a counterclaim, Employee hereby stipulates to the severance of such counterclaim from the Corporation's action. In the event Employee brings a separate action Employee hereby waives any right to seek consolidation of such action with Corporation's action. In no event shall Employee assert the pendency of such counterclaim or separate action as a basis for denying or staying the entry of a judgement on the Corporation's claim or from execution thereon.

13. **RESTRICTIVE COVENANTS:**

(a) **Definitions.** For the purpose of this section, the following definitions shall apply:



CONFIDENTIAL

000218

(i) "Business Activities." Any and all commercial activities engaged in or commenced by the Corporation during term of this Agreement. "Business Activities" shall included, but not be limited to, the following services: passenger or freight aircraft charter flights; scheduled or non-scheduled air freight flights and air courier delivery flights.

(ii) "Confidential Information." All written and oral confidential proprietary information of the Corporation, whether or not discovered or developed by Employee, and third parties (such as but not limited to, suppliers, customers and consultants) who may impart information in confidence to the Corporation, known by Employee as a result of his/her employment with the Corporation. "Confidential Information" shall further include, but not be limited to all financial information relating to the Corporation and customer lists, known by Employee as a result of his/her employment by the Corporation.

(iii) "Territories." The geographic areas serviced by the Corporation.

(b) **Non-Competitive Agreement**. From the date of this Agreement and for 90 days following the voluntary termination or termination for cause of the Employee, Employee shall not:

(i) engage in, or be affiliated directly or indirectly (as principal, agent, employee consultant, investor, guarantor, lender or otherwise) with any person or entity engaged in, about to be engaged in or contemplating entry into a business similar to, or in competition with, the Corporation's business activities within the Territory;

(ii) entice, induce or encourage an employee of the Corporation or Amerijet to engage in any activity, which, if engaged in by the Employee, would violate any provision of this Section.

(c) **Non-Disclosure**. Except as required by Employee's duties the Corporation, Employee shall never (during or after any period of employment) directly or indirectly use, publish, disseminate or otherwise disclose any Confidential Information without the express prior written consent of the Corporation.



CONFIDENTIAL

(d) **Disclosure of Non-Competition Agreement**. The Corporation retains the unconditional right to publish, disseminate, or otherwise disclose the terms and conditions of this Agreement, and the names of any and all parties to this Agreement, to any person or entity without notice to the Employee. Such disclosure may be affected at any time before, during and or after the Employee 's term of employment with the Corporation without the express or implied consent of the Employee.

(e) **Special Services**. The Employee acknowledges that his/her services under this Agreement are of special, unique, unusual, extraordinary and intellectual character, and that a breach by the Employee of this Agreement will cause the Corporation irreparable injury and damage. In the event of such breach, the Corporation shall be entitled to injunctive relief against the Employee, in addition to all other rights the Corporation may have at law or in equity.

14. **NOTICES:** All notices hereunder shall be in writing. Notices shall be sent by personal delivery to the other party, by personal delivery to a person at the other party's address, or by U.S. Mail. All notices sent by U.S. Mail shall be deemed to have been given when mailed in any United States Post Office enclosed in a registered, postpaid envelope addressed to the address of the respective parties stated above, or to such other addresses as such party may have fixed by notice; provided, however, that any notice of change of address shall be effective only upon receipt.

15. **WAIVER:** Failure to insist upon strict compliance with any of the terms, covenants, or conditions, hereof shall not be deemed a waiver of such term, covenant, or condition, nor shall any waiver or relinquishment of such right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

16. **SEVERABILITY:** The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceablity of any other provisions in this Agreement.

17. **MODIFICATION:** This Agreement cannot be changed, modified or discharged orally, but only if consented to in writing by both parties.

18. **GOVERNING LAW:** This Agreement is entered to in the State of Florida and, in the event of any controversy or litigation, shall be construed in accordance with the laws of the State of Florida. All legal actions arising from this Agreement shall be brought before a state court of competent jurisdiction in Broward County or Dade County, Florida. Both parties hereby consent to such jurisdiction and venue. Employee further agrees and stipulates to appear for deposition in Broward County or Dade County, Florida (at the election of the Corporation ) irrespective of whether Employee seeks affirmative relief in legal action. The Corporation shall be entitled to its costs and reasonable attorneys' fees if it is the prevailing party in any action arising between Corporation and Employee (including but not limited to any action arising from this Agreement).



CONFIDENTIAL

19. **WAIVER OF CERTAIN RIGHTS:**

(a). **WAIVER OF JURY TRAIL:** EMPLOYEE AND CORPORATION HEREBY KNOWNINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRAIL BY JURY IN RESPECT TO ANY ACTION, PROCEEDING, LITIGATION, OR COUNTERCLAIM BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, AND ANY OTHER AGREEMENT EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR CORPORATION'S EXECUTION OF THIS AGREEMENT.

(b) **WAIVER OF ATTORNEYS' FEES:** EMPLOYEE HEREBY KNOWNINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY STATUTORY OR OTHER RIGHT TO RECOVER ATTORNEYS' FEES, INCLUDING ANY AND ALL RIGHTS UNDER § 57.105(2) FLORIDA STATUTES, IN RESPECT TO ANY ACTION, PROCEEDING, LITIGATION, OR COUNTERCLAIM BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, AND ANY OTHER AGREEMENT EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR CORPORATION'S EXECUTION OF THIS AGREEMENT.

20. **OPPORTUNITY FOR REVIEW:** Employee hereby represents and acknowledges that Employee has had an opportunity to throughly review the contents of the Agreement, the Promissory Note and other documents contemplated thereby, and Employee further acknowledges and represents that Employee has had an opportunity to seek advice of an attorney pertaining to the legal obligations created by this Agreement and the Promissory Note. The Employee hereby represents and acknowledges that the Corporation has not exerted, or attempted to exert improper or unlawful pressure or has in any way attempted to induce, through threats or otherwise, the execution of this Agreement and Promissory Note. Employee also acknowledges that Employee has conducted such investigation of the facts, circumstances and other matters involving any provision contained in this Agreement, the Promissory Note, and any agreements contemplated thereby, as Employee deems necessary, and that Employee has not and is not relying upon, using, or in any way basing Employee's understanding or interpretation of any provision contained in, or Employee's consent to, such agreements on any facts, matter, statements, circumstances or representations made by Corporation other than those representations, facts and matters set forth in this Agreement and Promissory Note.



CONFIDENTIAL 000221

21. **ASSIGNMENT:** This Agreement shall inure to the benefit of, and shall be binding upon, the Corporation, its successors or assigns. Employee may not assign his/her rights and/or interests under this Agreement without the Corporation's prior written consent.

22. **ENTIRE AGREEMENT:** This instrument contains entire agreement of the parties and may not be changed except by an instrument signed by the party against whom the enforcement of any waiver, change, extension, modification or discharge is sought.

EXECUTED by the parties on the day and year first above written.

AMERIJET INTERNATIONAL, INC.

By:______________________________
David G. Bassett, President

ATTEST:

______________________________
Secretary

______________________________
Patrick S. Major
(Employee)

______________________________

______________________________

empftagr.wpd



000222

**PROMISSORY NOTE**

After date, for value received, the undersigned and (spouse, if applicable) residing at 1722 Las Olas Blvd., Ft. Lauderdale, FL 33312 (the "Maker"), promise to pay to the order of Amerijet International, Inc., 498 SW 34 St. Fort Lauderdale, FL 33315 (the "Holder"), the principal sum of $14,000.00, payable upon demand by Holder. This Promissory Note shall bear no interest during the period prior to demand but shall bear interest at the rate of eighteen percent (18%) per annum after such demand is made. The principal sum shall be payable at 498 SW 34 St. Ft. Lauderdale, FL 33315, or at such other place as Holder may specify in writing. Maker waives presentment for payment, protest, notice of non-payment, dishonor, offset and other legal defenses. Without limiting the generality of the foregoing, Maker specifically waives any offset or defenses arising from Maker's Employment and Education/Training Agreement with holder. Maker agrees to pay a reasonable attorney's fee, including reasonable appellate fees, if any, if this Promissory Note is placed in the hands of an attorney for collection after default.

All actions arising from this Promissory Note shall be brought before a court of competent jurisdiction in Broward County or Dade County, Florida. Maker further agrees to appear for deposition in Broward County or Dade County, Florida (at the election of the Holder ) irrespective of whether Maker seeks affirmative relief in any legal action. Maker acknowledges that such forums bear a reasonable relationship to this Promissory Note.

Maker here by stipulates to waive any defenses assertable in an action brought by the Holder and instead shall assert the relief afforded by such defenses (e.g. a set-off), and any other available claims against the Holder, by counter claim or a separate action. In the event Maker files such a counterclaim, Maker hereby stipulates to the severance of such counterclaim from the Holder's action. In the event Maker brings a separate action Maker hereby waives any right to seek consolidation of such action with the Holder's action. In no event shall Maker assert the pendency of such counterclaim or separate action as a basis for denying or staying the entry of a judgment on the Holder's claim or from execution thereon.

Maker and Holder, by accepting this note, hereby knowingly, voluntarily, and intentionally waive the right either may have to a trial by jury or a right to Attorney's fees in respect to any action, proceeding, litigation or counterclaim based hereon, or arising out of, under or in connection with this note, and any other agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party. This provision is a material inducement for Holder's consideration pursuant to this note.

Done this 1 day of June, 19 98, in the County of Broward, in the State of Florida

Employee/Maker: ______________________
Patrick S. Major

Employee's Spouse/Maker: ______________________
Beth Major



CONFIDENTIAL 000223




August 20, 1998

Mr. Patrick S. Major
1722 West Las Olas Boulevard
Ft. Lauderdale, FL 33312

Dear Pat:

This letter is in reference to your fax dated Tuesday, August 18, 1998, regarding the scheduling of your type rating oral exam. After your last oral with the FAA and your pre-oral with the Training Department, you and I had a meeting to discuss how we would proceed. As I remember from our last meeting, you and I decided that you would return to the flight line for thirty days and then we would have a second meeting. This second meeting would be to determine how best to prepare you for your oral type rating exam with the FAA.

The time has now come for you to contact Tracey Dickinson to arrange the second meeting.

Sincerely,

Peter A. Steele
Vice President of Operations

cc: E. Cook
T. Dickinson
J. Morales




000125

AMERIJET

PILOT SIMULATOR/FLIGHT TIME TRAINING

NAME Patrick Scott Myer

BASE

CLOCK NO.

☒ CAPTAIN
☐ FIRST OFFICER

☒ INITIAL
☐ TRANSITION
☐ UPGRADE
☐ REQUAL.

| | | | SIMULATOR | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | PILOT TIME | | OBSERVE TIME | | BRF.-DEBRF. TIME | | INSTRUCTOR |
| TYPE | PER. | DATE | DAILY | TOTAL | DAILY | TOTAL | DAILY | TOTAL | |
| B-727 | 1 | 6/11/98 | 2+00 | 2+00 | 2+00 | 2+00 | 1+00 | 1+00 | [signature] |
| B-727 | 2 | 6/18/98 | 2:00 | 4:00 | 2:00 | 4:00 | 1:30 | 2:30 | [signature] |
| B-727 | 3 | 6/23/98 | 2:00 | 6:00 | 2:00 | 6:00 | 1:00 | 3:30 | [signature] |
| | 4 | | | | | | | | |
| | 5 | | | | | | | | |
| | 6 | | | | | | | | |
| | 7 | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| A/C NMBR | AIRCRAFT | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | | |
| | 2 | | | | | | | | |
| | 3 | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

DATE TRAINING COMPLETED ____________

TOTAL TIME: SIMULATOR ____________
AIRCRAFT ____________

PLAINTIFF'S EXHIBIT 34

FORM OT_104B (04/90)

000288

AMERIJET INTERNATIONAL

PILOT INSTRUCTOR RECOMMENDATION

CAPTAIN
FIRST OFFICER Patrick Scott Mayo

Has completed the required training for the Aircraft Oral Examination.
I recommend him/her for this oral.

Instructor: [signature] Date: 6-23-98

Completed - ORAL DISCONTINUED BY FAA INSPECTOR DUE TO APPLICANTS LACK OF KNOWLEDGE [signature]

Checked by Date

Has completed the required training for the Simulator Proficiency Check.
I recommend him for this check.

Instructor Date

Completed - Checked by FAA/Check Pilot Date

Has completed ____________ hours of training in the aircraft.
I recommend him for the Aircraft Type Rating or Aircraft Proficiency Check.

Instructor Date

Completed - Checked by FAA/Check Pilot Date

OT-103A (04/90)

PLAINTIFF'S EXHIBIT 35

000287




## SIMULATOR/AIRCRAFT TRAINING




CAPTAIN
FIRST OFFICER Patrick Scott Major

Grading Legend: S = Satisfactory
U = Unsatisfactory
I = Incomplete

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cockpit Lighting...................... | S | S | S | | | | | | | |
| Use of Checklists..................... | S | S | S | | | | | | | |
| Crew Coordination/Briefing............ | S | S | S | | | | | | | |
| Radio Set-up and Use.................. | S | S | S | | | | | | | |
| Start & Taxi Procedures............... | S | S | S | | | | | | | |
| Engine Start Problems................. | – | S | S | | | | | | | |
| Anti-Icing/De-Icing Set-up............ | – | – | U | | | | | | | |
| Takeoff Normal........................ | S | S | S | | | | | | | |
| ( ) Flap Takeoff...................... | – | (5) S | (15) S | | | | | | | |
| Rejected Takeoff...................... | – | – | S | | | | | | | |
| Takeoff Engine Failure after $V_1$........ | – | – | S | | | | | | | |
| Instrument Takeoff.................... | – | S | S | | | | | | | |
| Takeoff Eng. Out-Instrument........... | – | – | S | | | | | | | |
| Noise Abatement Takeoff............... | S | S | S | | | | | | | |
| Area Departure........................ | S | S | S | | | | | | | |
| Climb to Altitude..................... | S | S | S | | | | | | | |
| Standard Instrument Departure......... | S | S | S | | | | | | | |
| Adherence to Heading/Track/Radials..... | S | S | S | | | | | | | |
| Altitude and Airspeed Control......... | S | S | S | | | | | | | |
| Turns With/Without Spoilers........... | S | – | S | | | | | | | |
| Steep Turns........................... | S | – | S | | | | | | | |
| Approach to Stalls - Clean............ | S | – | S | | | | | | | |
| Takeoff/Turning... | S | – | S | | | | | | | |
| Landing........... | S | – | – | | | | | | | |
| High Sink Rate Recovery............... | S | – | – | | | | | | | |
| High Altitude Approach to Stall........ | – | S | – | | | | | | | |
| Dutch Roll............................ | – | S | – | | | | | | | |
| Rapid Decompression................... | – | – | – | | | | | | | |
| Emergency Descent..................... | – | – | – | | | | | | | |
| Max Endurance/Range Cruise............ | – | S | – | | | | | | | |
| Mach Buffet........................... | – | S | – | | | | | | | |
| Dutch Roll Recovery................... | – | S | – | | | | | | | |

AMERIJET INTERNATIONAL

SIMULATOR/AIRCRAFT TRAINING - (Continued)

CAPTAIN
FIRST OFFICER Patrick Scott Meyer

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Standard Area Arrival.................. | S | S | S | | | | | | | |
| Holding................................ | - | S | S | | | | | | | |
| Fuel Dumping........................... | - | - | S | | | | | | | |
| ILS Approach & Landing................. | S | S | S | | | | | | | |
| Back Course Approach................... | - | - | - | | | | | | | |
| VOR Approach........................... | - | - | S | | | | | | | |
| ADF Approach........................... | - | S | - | | | | | | | |
| ASR Approach........................... | - | - | - | | | | | | | |
| Localizer Approach..................... | - | - | S | | | | | | | |
| Normal Landing......................... | S | S | S | | | | | | | |
| Rejected Landing....................... | - | S | S | | | | | | | |
| Normal ILS Approach & Landing.......... | S | S | S | | | | | | | |
| 3 Engine ILS Approach & Missed Approach | S | S | S | | | | | | | |
| Normal Flight Director ILS Approach.... | S | - | S | | | | | | | |
| Two Engine Landing..................... | - | - | S | | | | | | | |
| Two Engine Approach & Landing.......... | - | - | S | | | | | | | |
| Two Engine Approach & Go Around........ | - | - | S | | | | | | | |
| Non-Precision Approach & Landing....... | - | S | S | | | | | | | |
| Non-Prevision Approach Followed by | - | - | - | - | - | - | - | - | - | - |
| a Complete Missed Approach.......... | - | S | S | | | | | | | |
| No Flap Approach....................... | - | - | - | | | | | | | |
| No Flap Approach & Landing............. | - | - | - | | | | | | | |
| Jammed Stabilizer Landing & Go Around.. | - | - | - | | | | | | | |
| ( ) Flap Go-Around & Landing........... | - | - | - | | | | | | | |
| Manual Reversion, Go-Around or Landing. | - | - | S | | | | | | | |
| Use of Reverse Thrust & Brakes......... | S | S | S | | | | | | | |
| Shutdown & Parking Procedures.......... | S | S | S | | | | | | | |

Emergency Procedures

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Engine Fire or Failure................. | - | S | S | | | | | | | |
| Engine Shutdown Inflight............... | - | S | S | | | | | | | |
| Engine Inflight Re-Start............... | - | S | - | | | | | | | |
| No Engine Response to Thrust Levers.... | - | - | - | | | | | | | |
| Electrical Smoke & Fire................ | - | - | - | | | | | | | |
| Smoke Evacuation....................... | - | - | - | | | | | | | |
| Loss of All Generators................. | - | S | S | | | | | | | |
| Runaway Stabilizer..................... | - | - | S | | | | | | | |

OT-103C (04/90)
PAGE 2

AMERIJET INTERNATIONAL

SIMULATOR/AIRCRAFT TRAINING - (Continued)

CAPTAIN
FIRST OFFICER Patrick Scott Myer

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Hydraulic Failures..................... | – | – | S | | | | | | | |
| Rudder Boost........................... | – | – | S | | | | | | | |
| Flight Controls........................ | – | S | S | | | | | | | |
| Alternate Flap Operation............... | – | – | – | | | | | | | |
| Manual Gear Extension.................. | – | – | S | | | | | | | |
| Use of Emergency Brakes................ | – | – | S | | | | | | | |
| Emergency Evacuation................... | – | – | S | | | | | | | |
| Normal Operations/Limitations/Performance | S | S | S | | | | | | | |
| System Checks & Procedures............. | S | S | S | | | | | | | |
| Electrical............................. | S | S | S | | | | | | | |
| Hydraulic.............................. | S | S | S | | | | | | | |
| Air Conditioning....................... | S | S | S | | | | | | | |
| Pressurization......................... | S | S | S | | | | | | | |
| Pneumatics............................. | S | S | S | | | | | | | |
| Fuel & Oil............................. | S | S | S | | | | | | | |
| Flight Instruments & Nav. Equipment.... | S | S | S | | | | | | | |
| Auto Pilot............................. | S | S | – | | | | | | | |
| Radar.................................. | – | – | – | | | | | | | |
| Wind Shear............................. | – | – | – | | | | | | | |
| Flight Engineer Panel Training......... | N/A | N/A | – | | | | | | | |

FORM OT-103C (04/90)
PAGE 3



# MEMO

**To:** ALL CREWMEMBERS
**From:** ED COOK
**Subject:** PROMOTION BID AWARDS
**Date:** August 5, 1998

THE FOLLOWING CREWMEMBERS HAVE BEEN AWARDED UPGRADE BIDS.

**CAPTAINS**
T. GREEN
J. KIRK
P. MCMANUS
D. BENSON

**FIRST OFFICERS**
N. DAILY
D. CHASTANET
M. BLASTIC
A. HORN
P. PEREA

CONGRATULATIONS TO THOSE CREWMEMBERS WHO WERE UPGRADED. THERE IS A NEW ( OPEN BID ) FOR CAPTAINS AND FIRST OFFICERS NOW ACTIVE. IF YOU ARE INTERESTED IN A PROMOTION YOU MUST BID. IF YOU HAVE ANY QUESTIONS PLEASE CALL ME.

THANK YOU IN ADVANCE.

cc: P. STEELE
J. MORALES
CREW SCHEDULING
FLIGHT OPERATIONS



