1
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

2

           CASE NO. 00-6070-Ferguson/Snow
3
           L.T. Case No. 99-021746-11

4

5

6   PATRICK SCOTT MAJOR,                    **ORIGINAL**

7　　　　Plaintiff,

8　　　　vs.                                FILED by _____ D.C.
                                         DKTG
9   AMERIJET INTERNATIONAL, INC.,
                                         MAR 2 3 2001
10　　　　Defendants.
　　_____/   CLARENCE MADDOX
11                                          CLERK U.S. DIST. CT.
                                           S.D. OF FLA. FT. LAUD.
12

           500 East Broward Boulevard
13　　　　　　　　　　Suite 1000
           Fort Lauderdale, Florida
14　　　　　　　　　　Wednesday, February 7, 2001
           9:37 a.m. - 10:55 a.m.

15

16

17

APPEARANCES:
18

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
19   BY:  VALERIE SHEA, ESQ.
Attorney for the Plaintiff

20

ALLEN, NORTON & BLUE, P.A.
21   BY:  SUSAN POTTER NORTON, ESQ.
Attorney for the Defendant

22

23

24　　　　　　　　　　DEPOSITION
               OF
25　　　　　　　　JUAN D. MORALES

| | |
|---|---|
| 1 | <u>I N D E X</u> |
| 2 | <u>WITNESS:</u>  JUAN MORALES |
| 3 | DIRECT EXAMINATION |
| | BY MS. SHEA |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| | <u>EXHIBITS</u> |
| 8 | |
| | PLAINTIFF'S EXHIBIT 37 |
| 9 | (Memo from Ed Cook) |
| 10 | PLAINTIFF'S EXHIBIT 2 |
| | (Letter dated 11/6/98) |
| 11 | |
| 12 | (Exhibits retained by Ms. Shea) |

PAGE

3

55

56

```
 1              Deposition of JUAN D. MORALES, a
 2    witness of lawful age, taken by the Plaintiff for
 3    the purpose of discovery and for use as evidence
 4    in the above-entitled cause, wherein PATRICK SCOTT
 5    MAJOR is the Plaintiff and AMERIJET INTERNATIONAL,
 6    INC. are the Defendants, pending in the United
 7    States District Court in and for the Southern
 8    District of Florida, pursuant to notice heretofore
 9    filed, before JUDITH M. CAPUTO, Shorthand Reporter
10    and Notary Public in and for the State of Florida
11    at Large, at the offices of Heinrich, Gordon,
12    Hargrove, Weihe & James, 500 East Broward
13    Boulevard, Suite 1000, Fort Lauderdale, Broward
14    County, Florida on Wednesday, the 7th day of
15    February, 2001, commencing at 9:37 o'clock a.m.
16              -  -  -  -  -  -  -
17    Thereupon:
18              JUAN MORALES, a witness named in the
19    notice heretofore filed, being of lawful age and
20    being first duly sworn in the above cause,
21    testified on his oath as follows:
22              DIRECT EXAMINATION
23    BY MS. SHEA:
24         Q.    Good morning.  Would you tell us your
25    full name and where you live, please?
```

DOWNTOWN REPORTING   (954) 522-3376

```
 1        A.      Juan D. Morales.  1420 South Ocean
 2   Boulevard, Pompano Beach.
 3        Q.      Sir, are you employed?
 4        A.      Yes.
 5        Q.      Who do you work for?
 6        A.      DHL.
 7        Q.      DHL, the cargo carrier?
 8        A.      Yes.
 9        Q.      And what do you do for DHL?
10        A.      I am the Vice-President of Human
11   Resources for International Americas.
12        Q.      Where is your office?
13        A.      It's in Fort Lauderdale.
14        Q.      Okay.  And how long have you been with
15   them?
16        A.      14 months.
17        Q.      Okay.  Which would be, November of --
18        A.      December.
19        Q.      December of 1999?
20        A.      '99, yes.
21        Q.      Were you employed previous to that?
22        A.      Yes.
23        Q.      Where did you work before that?
24        A.      I worked at AmeriJet.
25        Q.      All right.  What were your dates of
```

```
 1   employment at AmeriJet?
 2        A.    I don't remember the exact dates.
 3        Q.    Okay.  Approximately?
 4        A.    June of '97?
 5              MR. MAJOR:  '98.
 6              MS. SHEA:   No, no.  Don't help.
 7              THE WITNESS:  Is Patrick the one
 8        taking the depo over here?
 9        A.    Through, um, September, October --
10   I'm sorry.  October of '99.
11        Q.    All right.  And what caused you to
12   leave AmeriJet?
13        A.    I resigned.
14        Q.    Okay.  And why did you resign?
15        A.    Because I didn't want to work there
16   anymore.
17        Q.    Okay.  Any specific reasons?
18        A.    I needed to go back into human
19   resources.
20        Q.    Okay.  What were you doing in
21   AmeriJet?
22        A.    The last position I held there was the
23   Senior Vice-President of Cargo Operations.
24        Q.    And what was the first position you
25   held there?
```

```
 1        A.      Director of Human Resources.
 2        Q.      All right.  What happened in the two
 3  plus years that you were at AmeriJet that caused
 4  you to transition from the Director of Human
 5  Resources to Senior VP of Cargo Operations?
 6        A.      I accepted a promotion.
 7        Q.      When did you get that promotion?
 8        A.      I don't remember the exact date, but I
 9  think it was March of -- or rather May of '99?
10        Q.      After this promotion, what if any
11  human resource responsibilities did you have?
12        A.      That of general management.
13        Q.      Okay.  No direct responsibilities?
14        A.      That's correct.
15        Q.      Okay.  Who replaced you as Director of
16  Human Resources?
17        A.      Rick Alberti.
18        Q.      Did you hire Mr. Alberti?
19        A.      Yes, I did.
20        Q.      So he came in new to the position, he
21  was not promoted?
22        A.      No, he had been there.
23        Q.      What had he been doing before?
24        A.      He was Director of Human Resources, I
25  was Senior Director of Human Resources.
```

```
 1        Q.    So he got promoted when you got
 2   promoted?
 3        A.    Correct.
 4        Q.    Can you give me a little overview of
 5   your educational background?
 6        A.    Yes.  I went to Michigan State
 7   University, Michigan Tech University, um, '77.
 8        Q.    Did you graduate?
 9        A.    Yes.
10        Q.    Degree in what?
11        A.    Liberal Arts.
12        Q.    Okay.  When was that?
13        A.    '76.
14        Q.    Okay.  And can you give me a little
15   overview of your work history subsequent to that?
16        A.    Well, I worked for various social
17   programs in the City of Detroit during the '70's,
18   um, all employment and training related.
19        Q.    Ceda-Beta that sort of --
20        A.    Yeah, that kind of thing.  And
21   eventually went to work for United Parcels
22   Service.
23        Q.    Here in Florida or --
24        A.    No, in Michigan.
25        Q.    All right.  And when did you work into
```

```
 1   the human resources field as such?

 2        A.    Um, I was -- their management program

 3   is that you go into driving before you go into

 4   management.  I was a driver for almost three

 5   years, then I was promoted into the human

 6   resources function and, um, that was in around

 7   1984.

 8        Q.    Okay.  And how long did you stay with

 9   UPS?

10        A.    17 years.

11        Q.    Okay.  Was that your last employment

12   prior to AmeriJet?

13        A.    No.

14        Q.    Who else did you work for?

15        A.    I worked for Title Owens of America.

16   I was Vice-President of Human Resources there.

17        Q.    Where were they based?

18        A.    Atlanta.

19        Q.    When did you locate, relocate to

20   Florida?

21        A.    In 1989.

22        Q.    Okay.  So you were in Florida with UPS

23   as well as your subsequent job?

24        A.    Yes.

25        Q.    Are you a Michigan native?
```

```
 1          A.      Yes.
 2          Q.      What if any certifications or
 3    credentials do you currently have in human
 4    resources?
 5          A.      I have an S.P.H.R.
 6          Q.      S.P.H.R.?
 7          A.      Um-hum.
 8          Q.      That's a Florida certification?
 9          A.      No.  It's Society for Human Resources
10    Management Certification.
11          Q.      Does that involve testing?
12          A.      Um-hum.
13          Q.      You have to answer "yes" for the court
14    reporter --
15          A.      Yes.
16          Q.      -- she can't take down an inaudible
17    response.
18          A.      Yes.
19          Q.      When you came to work in June, 1997 at
20    AmeriJet as Director of Human Resources, who did
21    you replace?
22          A.      Wayne Penny.
23          Q.      Okay.  Did he leave the company when
24    you came in, or prior to your coming in?
25          A.      Prior to my coming into the company.
```

```
 1        Q.    And could you describe the Human
 2   Resources Department at AmeriJet that you
 3   directed?   What was the scope of its operations
 4   and responsibilities?
 5        A.    It's responsible for human resources
 6   activity for the company.
 7        Q.    Okay.   Could you tell me what human
 8   resources activity consists of as it related to
 9   your obligations?
10        A.    Um, that would be employment and
11   recruitment training which would be non-aviation
12   training.
13        Q.    Okay.
14        A.    Um, employee relations, payroll and
15   administration.   I guess that about covers it.
16        Q.    Were you involved in hiring aviation
17   professionals?
18        A.    Not directly.
19        Q.    Who was directly involved in that?
20        A.    I had a representative of human
21   resources that worked with the Flight Operations
22   Department.
23        Q.    Who was that?
24        A.    Donna Green was there when I got there
25   and was replaced by -- who replaced Donna?
```

```
 1              I don't remember.  Sarah.  I don't
 2    remember Sarah's last name, actually.
 3         Q.    As I understand it, the chief pilot
 4    would also have a role --
 5         A.    Yes.
 6         Q.    -- in hiring?
 7         A.    Yes.  The chief pilot was really the
 8    point of contact.
 9         Q.    And then you mentioned that your
10    department did not administer the training to
11    aviation professionals?
12         A.    That's correct.
13         Q.    And who did that?
14         A.    Um, that would be Pete Steele was
15    responsible for that whole area.  And I believe
16    the training person was Tracy Dickinson.
17         Q.    All right.  Who maintained pilot files
18    and records?
19         A.    The Flight Department and Human
20    Resources, I guess.
21         Q.    Okay.
22         A.    Combined.
23         Q.    Okay.  Did the Flight Department have
24    responsibility for a certain set of records and
25    you for another, or how did that work?
```

```
 1          A.     Yes.  According to the FAA, there's
 2    fairly strict regulations as to what goes into a
 3    pilot's file.
 4          Q.     You mean the one the Flight Department
 5    maintains?
 6          A.     Yes.
 7          Q.     So you maintain the garden variety
 8    personnel file?
 9          A.     Correct.
10          Q.     As Director of HR AmeriJet, was it
11    your job to know what the FAA required in terms of
12    maintenance of pilot records?
13          A.     Would you rephrase the question?
14          Q.     Do you know what the FAA requirements
15    were with respect to the records that had to be
16    maintained on --
17          A.     I was not an expert on them, no, I
18    couldn't say I was an expert in that.
19          Q.     Who would you refer me to, during your
20    time at AmeriJet, who would have the most
21    knowledge of that?
22          A.     It would have been Pete Steele.
23          Q.     Okay.
24          A.     I guess that was on-the-job training
25    for me since I wasn't an aviation person.
```

```
 1        Q.    Right.  This is your first aviation
 2   job; is that correct?
 3        A.    Correct.
 4        Q.    What if any administrative changes did
 5   you make, or standards did you introduce in terms
 6   of maintaining personnel files of AmeriJet; do you
 7   recall anything specifically?
 8             MS. NORTON:   Object to the form of
 9        the question.  Answer if you can.
10        A.    Could you repeat the question?
11        Q.    Well, when you came in in June of
12   1997, did you implement any new standards or
13   requirements as it related to the contents or
14   maintenance of personnel files at AmeriJet?
15             MS. NORTON:   Object to the form of
16        the question.  Go ahead.
17        A.    I would say that I organized it in a
18   different way than it had been, yes.
19        Q.    Okay.  Specifically, as it relates to
20   the aviation professionals, do you recall how you
21   reorganized the file --
22        A.    I did not --
23        Q.    -- maintenance?
24        A.    -- maintain the aviation portion of
25   the files.  So the portions that I would have
```

 1    changed or restructured would have been pretty
 2    much straight employment file.
 3         Q.    Okay.
 4         A.    The employment records and how they
 5    were maintained.
 6         Q.    With regard to the aviation
 7    professionals from the HR side of the house, if
 8    you will, did you implement anything like annual
 9    evaluations or performance appraisals, anything
10    like that?
11         A.    They pretty much had their performance
12    standards already setup.  I did implement them in
13    other parts of the business.
14         Q.    Okay.  But not so much for pilots?
15         A.    No.
16         Q.    Okay.  Did the FAA have any specific
17    requirements as it related to crew member
18    personnel files as distinct from their flight
19    records or training records that you had to adhere
20    to?
21         A.    Would you restate the question?
22         Q.    Sure.  Did, in the personnel files
23    themselves, did you have to adhere to any FAA
24    guidelines in terms of record maintenance?
25              MS. NORTON:  Object to the form of

```
 1        the question.
 2        A.      Not in the personnel files that I
 3   kept, not FAA, no.
 4        Q.      Okay.  Who decided what materials or
 5   items would go into someone's personnel file?
 6        A.      Which personnel file?
 7        Q.      That of an aviation professional?
 8        A.      The Flight Department had control over
 9   the aviation personnel files that were
10   nonemployment related.
11        Q.      Okay.
12        A.      So that would be under the, um, Pete
13   Steele when I was there, I guess.  I'm not sure
14   exactly.
15        Q.      So Pete could still control, for
16   example, whether a customer accommodation, or
17   unfavorable internal memo, or something like that
18   would go into an individual's personnel file?
19             MS. NORTON:   Object to the form of
20        the question.
21        A.      Um, into which personnel file, I guess
22   that's my question.
23        Q.      The human resources one.
24        A.      He could, yes.
25        Q.      Okay.  And could human resources also
```

```
 1   make decisions about that?
 2        A.    Yes.
 3        Q.    When you came to AmeriJet in June,
 4   1997, were there policies or procedures with
 5   respect to promotion or upgrade of crew members
 6   seeking to become a Captain from a First Officer
 7   position?
 8        A.    They were already in existence, yes.
 9        Q.    In what form were they in existence?
10        A.    I'm not exactly certain as to every
11   step of the process.  I know that there was a
12   process.
13        Q.    Was there a Human Resources Manual, or
14   Personnel Handbook, or other document that you can
15   refer me to generically that would contain those
16   requirements?
17        A.    No.  That was kept by the Flight
18   Department.
19        Q.    So you're not aware of any
20   documentation generated by, or maintained by Human
21   Resources that would set out criteria for upgrades
22   or steps for upgrade?
23        A.    I'm sure we had it somewhere in the
24   department, but I'm not specifically aware of
25   where it was, or what it was called or -- there
```

```
 1    was something in there that, according to bids and
 2    things like that.
 3         Q.    Right.  My question is, did that come
 4    out of your department or --
 5         A.    No --
 6         Q.    -- did it come out of Flight?
 7         A.    -- no, it did not -- it came out of
 8    Flight.
 9         Q.    All right.  Would it be fair just
10    for ease of reference, to call what the flight
11    operations maintained as training records versus --
12         A.    Yes.
13         Q.    -- personnel records?
14         A.    Yes, correct.  That would be fair to
15    say.
16         Q.    So as Director of HR, did you
17    undertake to revamp, rewrite or otherwise concern
18    yourself with upgrade requirements or policies?
19         A.    No.
20               MS. NORTON:    Object to the form of
21          the question.
22         Q.    That was nothing that you ever took on
23    as an initiative when you were there?
24               MS. NORTON:    Object to the form of
25          the question.
```

```
 1        A.    No.
 2        Q.    What if any involvement did your
 3   department have in the upgrade process by which
 4   Captain positions were identified, and candidates
 5   were selected, and upgrades were undertaken?
 6        A.    Would you restate the question?
 7        Q.    Okay.  Did you, in your professional
 8   capacity at AmeriJet, have any role in selecting,
 9   training or upgrading individuals to Captain --
10        A.    Not --
11        Q.    -- while you were there?
12        A.    No.  Not upgrades, no.
13        Q.    You had some involvement in external
14   hires?
15        A.    Yes.
16        Q.    Okay.  But as far as administration,
17   the upgrade program, did you have any official
18   responsibilities?
19              MS. NORTON:   Object to the form of
20         the question.
21        A.    Only those responsibilities which a
22   Director of Human Resources would have at a
23   company, as a generalist, not specific to the
24   Flight Department or any other department.
25        Q.    Okay.  So those might involve, um,
```

```
 1   benefits or just --
 2        A.      (Witness nods.)
 3        Q.      -- again, what I call garden variety
 4   aspects of somebody being promoted --
 5        A.      Correct.
 6        Q.      -- as opposed to anything
 7   discretionary?
 8        A.      Correct.
 9        Q.      Did your office promulgate the job
10   opportunity bulletins or upgrade bid materials?
11        A.      We, um, monitored them, made sure that
12   they were in compliance, and it was a person in my
13   department that would normally have been a Donna
14   Green kind of duty.
15        Q.      When you say "in compliance", what
16   would they be?
17        A.      In compliance of whatever the
18   standards Flight Department had already setup,
19   made sure things were communicated, bids, we did
20   keep records of the results, but we didn't
21   administer it.
22        Q.      So you might do things like make sure
23   the bid notices were properly circulated and that
24   responses were stored somehow?
25        A.      Yes.  Someone in my office would do
```

1    that, correct.

2        Q.    But in terms of the content of those,

3    you did not contribute?

4        A.    No.

5        Q.    Did you maintain a seniority list of

6    pilot crew members at AmeriJet?

7        A.    Well, it would be a length of service

8    list, I guess.  I don't know if it's a seniority

9    list, but yes.

10       Q.    Your office would generate those?

11       A.    We would get the information from the

12   Flight Department, again, then hold it.

13       Q.    So you really wouldn't -- that wasn't

14   part of your Human Resource's function to maintain

15   a seniority roster or length of service?

16       A.    Yeah.  To maintain the roster, but we

17   didn't generate it.

18       Q.    So are you the person who, during the

19   time that you worked for AmeriJet, was most

20   familiar with the criteria and procedures for

21   upgrade to Captain?

22       A.    No.

23       Q.    Okay.

24       A.    Absolutely not.

25       Q.    Okay.  While you were Director of

```
 1    Human Resources, were you part of the process by
 2    which the company would decide how many Captain
 3    openings it had?
 4         A.    No.
 5         Q.    So are you able to tell me what all
 6    the criteria were for promotion to Captain, for
 7    someone seeking to be promoted to Captain?
 8         A.    The answer is still, no.
 9         Q.    Did you participate in interviews, or
10    in any other way directly involved yourself in the
11    upgrade --
12         A.    No.
13         Q.    -- process?
14               Did there come a time when you were
15    Director of Human Resources at AmeriJet, that you
16    became aware that Pat Major was in the upgrade
17    process, had been awarded an upgrade bid?
18         A.    At some point, yes.
19         Q.    I realize you've left the company --
20         A.    The dates are -- in thinking back to
21    my original statement, I think that was '98,
22    actually.  Yeah.  Yeah.  He's probably right, when
23    I started.
24         Q.    So you think you may have started in '98?
25         A.    Yes.  In '98.
```

```
 1        Q.    All right.  Do you recall, recognizing
 2   that you've been away from that position and even
 3   from the company for sometime, whether Pat Major
 4   was a Captain candidate at the time that you
 5   started with the company?
 6        A.    I don't remember if he was when I
 7   started with the company or not.
 8        Q.    Okay.
 9        A.    Just sometime shortly after joining I
10   became aware he was in the process.
11        Q.    Okay.  And what do you recall about
12   that?  How did you become aware of -- who brought
13   that to your attention and for what purpose?
14        A.    Gee's, I don't remember who,
15   honestly.
16        Q.    What if any participation did you have
17   in the upgrade process as it related to Pat Major?
18        A.    It was brought to my attention that he
19   had not, um, passed an oral exam -- or it was
20   discontinued by the FAA.
21        Q.    All right.  And what was it that you,
22   as the Director of Human Resources, were expected
23   to do, or why were you told that it was being
24   brought to your attention?
25        A.    It was brought to my attention because
```

```
 1    none of the Flight Department, or the owner of the
 2    company ever heard of that happening before with
 3    any candidate.
 4          Q.    This is what was related to you?
 5          A.    Yes.
 6          Q.    But you don't remember by who?
 7          A.    Not specifically.  Could either have
 8    been Mr. Bassett, or could have been Pete Steele,
 9    I don't really remember who it was, specifically.
10    We met as a management group often.
11          Q.    Okay.  So you think this first was
12    brought to your attention in a management group
13    context?
14          A.    Possibly.
15          Q.    Okay.
16          A.    General knowledge, I guess, I don't
17    know.
18          Q.    You indicate that you were new to
19    aviation?
20          A.    Yes.  So I was kind of learning all
21    of -- going through all of this for the first time
22    myself.
23          Q.    Right.
24          A.    Through upgrade processes and --
25          Q.    So you weren't -- is it fair to say
```

1   you really weren't evaluating the impact of this,

2   you were just -- it was brought to your attention

3   and you were asked to become involved?

4       A.    Yes.

5             MS. NORTON:   Object to the form of

6       the question.

7       A.    I don't remember if I was asked to

8   become involved, but I do remember that it was

9   just brought to my attention.

10      Q.    Okay.  Fair enough.  What if any

11  involvement did you have after that as it relates

12  to Pat Major's upgrade effort?

13      A.    Eventually, and again, I don't

14  remember the specifics because of the time period,

15  but eventually, um, I became aware, and I'm not

16  sure how, if it was through Pat or through, um,

17  Pete or Dave or -- that Pat was dissatisfied with

18  the process.

19      Q.    Okay.  And you don't remember who

20  approached you about that?

21      A.    Not at first, no, no.

22      Q.    Okay.  So what if anything did you do

23  at that point when you were -- when it was brought

24  to your attention that Pat was dissatisfied with

25  the process?

```
 1          A.      I asked specifically what had
 2     happened, um, during his oral examination.  It was
 3     related to me and, again, everyone seemed to be
 4     pretty puzzled as to how that all happened and why
 5     it happened, um, there was then some documentation
 6     that, um, came from the FAA later, kind of, as I
 7     recall, um, reprimanding AmeriJet for sending
 8     unqualified candidates before it for oral
 9     examination, as I recall.
10          Q.      Again, in your capacity as Director of
11     Human Resources, was there anything that you were
12     asked to do as a result of either Pat's individual
13     situation or this correspondence from AmeriJet
14     from --
15          A.      No.
16          Q.      -- from the FAA?
17          A.      Not specifically.  There was an
18     extreme sensitivity at AmeriJet with the FAA
19     because of a brief shutdown that they had before I
20     came to the company, so they were very aware of
21     any, um, discrepancies between the FAA and their
22     Flight Department.
23          Q.      The people that you were meeting with
24     amongst whom was discussed would basically be Dave
25     Bassett and Pete Steele?
```

```
 1              A.      As I recall, yeah.

 2              Q.      Ed Cook?

 3              A.      Possibly Ed Cook.  I mean, it was all

 4      kind of a management group there.

 5              Q.      Was there a sense of blame of Pat for

 6      triggering a sensitive situation with the FAA?

 7              A.      Not that I recall.

 8              Q.      What was the sense of the group as it

 9      related as to what should be done about Pat's

10      situation?

11              MS. NORTON:    Object to the form of

12          the question.

13              A.      What was the question again?  I'm

14      sorry.

15              Q.      Well, what if anything do you recall

16      about statements made by members of the management

17      group as to what should be done in light of the

18      discontinuation of Pat's oral exam?

19              A.      I just remember that they were all

20      kind of stunned that had occurred.  Honestly, I

21      don't remember, um, at that point that anyone had

22      any specific recommendation.

23              Q.      Okay.  Did you have any

24      recommendations?

25              A.      That's what happened, no.  I probably
```

1    asked if it was a training issue, what kind of an

2    issue it was, um, and they just, um, indicated

3    that he had failed on the most basic of questions.

4         Q.    Okay.  So they denied that there was

5    any training breakdown?

6         A.    There was no accusation of training

7    breakdown.  They just said that he had gone

8    through the training, and had not given a very

9    basic answer to a very basic question in a way

10   that, um, the examiner was comfortable with.

11        Q.    Okay.  What if any inquiry or

12   investigation did you make into whether Pat's

13   training had been properly administered?

14        A.    Mainly, after Pat brought it to my

15   attention and, again, all those events kind of

16   blend in.  AmeriJet had its share of, um, other

17   employee relations, challenges.

18        Q.    Okay.  How many employees did AmeriJet

19   have back then?

20        A.    Now you're asking me hard questions,

21   um, I think around seven hundred.

22        Q.    Okay.  How many people worked in your

23   department?

24        A.    Eight, nine.

25        Q.    Okay.  Other than the discussions that

1    you've testified to, at which you were not asked

2    to do anything, did there come any time when you

3    were asked to become involved in Pat's process,

4    anymore directly in Pat's upgrade process?

5              MS. NORTON:   Object to the form of

6         the question.

7         A.    It may have been at Pat's request.

8         Q.    You don't recall?

9         A.    Not specifically.   I deal with

10   hundreds of employees.

11        Q.    That's fine.   I'm not here to have you

12   make it up.

13        A.    Not specifically, but I had dialogue

14   with Pat in the past.   I mean, I found him to be,

15   um, very helpful to me when I first came to the

16   company in terms of, um, getting to know, um, what

17   was happening in the company.   Because when I

18   joined the company, there was a unionization

19   attempt going on now that fairly accomplished

20   that, not aviation, but Pat was very helpful

21   during that process.   So it wasn't like when I saw

22   him I didn't speak to him, I mean, we spoke.

23        Q.    Okay.   When you say Pat was helpful

24   during the unionization process, what did he do

25   that you considered helpful?

DOWNTOWN REPORTING   (954) 522-3376

```
 1          A.      Um, well, I found him to be a pretty
 2   positive influence.
 3          Q.      In terms of defeating the Union?
 4          A.      Yes.  In terms of calming down the
 5   others.
 6          Q.      Okay.  Pretty close vote that time,
 7   right?
 8          A.      Pretty close vote.
 9          Q.      So Pat's upgrade issues don't really
10   stand out in your mind as we sit here today?
11                  MS. NORTON:  Object to the form of
12          the question.
13          A.      He had upgrade issues, I mean --
14          Q.      Okay.
15          A.      -- and I think you were asking me how
16   I became aware of them.
17          Q.      Right.  ·
18          A.      And I -- it all kind of blends in
19   together, to be honest, and I did have
20   conversations with him about it, and I sat in on
21   conversations, which I don't really recall
22   specifically between he and Pete Steele.
23          Q.      In what capacity did you sit in on
24   those conversations?
25          A.      In my capacity as Director of Human
```

DOWNTOWN REPORTING   (954) 522-3376

```
 1    Resources, that's the only reason I was there, it
 2    wasn't for fun.
 3         Q.    Do you get called in when someone is
 4    going to be potentially discharged or
 5    disciplined?  Why would you, as a Director of
 6    Human Resources, sit in on a meeting between a
 7    pilot and Pete Steele?
 8              MS. NORTON:   Object to the form of
 9         the question.
10              You can answer it if you understand.
11         A.    I would like you to restate the
12    question.
13         Q.    Okay.  Well, you mentioned that you
14    would have attended such meetings as Director of
15    Human Resources, why?  Under what circumstances
16    would a Director of Human Resources be asked to
17    attend a meeting between a pilot and Pete Steele?
18         A.    At the request of another department
19    head.
20         Q.    Because they perceive there to be
21    Human Resource issues involved?
22         A.    Probably, yeah.  Usually, that's how
23    it works.
24         Q.    Okay.  You testified that you don't
25    have a very specific recollection of such
```

```
 1    meetings, do you recall, in general, the substance
 2    of any meetings that you had that you attended in
 3    that capacity?
 4         A.    At which time?
 5               MS. NORTON:   Object to the form of
 6          the question.
 7         Q.    Concerning Pat's upgrade process?
 8         A.    Concerning Pat.  Concerning Pat,
 9    yeah.  He had some concerns about his training,
10    and, um, there was some issues that he had raised
11    to Pete that, um, he felt uncomfortable with the
12    training, the specifics of it, I don't recall.
13    Um, he wanted another opportunity to take the
14    test, I guess.
15         Q.    Okay.
16         A.    As I recall.
17         Q.    And do you recall what the outcome of
18    any of those meetings were?
19               MS. NORTON:   Object to the form of
20          the question.
21         A.    Yeah.  The one I do recall is that the
22    outcome was that he was going to go into another
23    school, a different school, because he didn't have
24    confidence in the training that he had received at
25    AmeriJet.  There was an issue of money that was
```

```
 1   put forward, I don't remember exactly what it was,
 2   but, um, he got his money back to go to a
 3   different school and he was going for, um, that
 4   certification, that certificate.  And he was to
 5   return after completion and, um, presumably for
 6   anther opportunity.
 7        Q.    Okay.  All right.  Did he complete the
 8   training at the other school?
 9        A.    I don't have personal knowledge of
10   that.
11        Q.    Do you know whether he brought back
12   that evidence or not?
13        A.    He brought back a certificate.
14        Q.    Okay.  So, to your knowledge, he did
15   complete the requirements at the other school?
16        A.    To my knowledge, he had gone to one
17   school and was asked to leave that school,
18   according to -- I don't remember who told me this,
19   um -- and then he went to a different school and
20   got a certificate at the second school.
21        Q.    All right.  So you don't even remember
22   who said anything to you about one school?
23        A.    No, I really don't.  Not specifically.
24        Q.    Okay.  So you don't have any personal
25   knowledge about that?
```

```
 1        A.    No.
 2        Q.    Okay.
 3        A.    Not either one, really.
 4        Q.    Other than he did bring the
 5   certification in?
 6        A.    Yeah.
 7        Q.    What happened after that?
 8        A.    After that, to my recollection, um,
 9   there was still a large level of discomfort with,
10   um, by Dave Bassett and Pete Steele and, um,
11   granting Pat the promotion to Captain because they
12   were, um, convinced that he didn't have the
13   ability to be a Captain.
14        Q.    Did you participate in meetings with
15   those two in which this issue was discussed?
16        A.    Yes.  One meeting in particular, I
17   remember when David, um, Bassett told Patrick
18   that -- maybe not in those words, but he just told
19   him he did not have the confidence in him to ever
20   be a pilot and -- I should say a Captain.
21        Q.    Okay.  What if any contributions did
22   you make at that meeting?
23        A.    I don't remember making much
24   contributions.  I was just present.
25        Q.    What if any opinions did you give to
```

```
 1 │ Pete Steele or Dave Bassett as a human resources
 2 │ professional in terms of how candidates should be
 3 │ evaluated?
 4 │            MS. NORTON:    Object to the form of
 5 │       the question.
 6 │       A.    Fairly.
 7 │       Q.    Objectively?
 8 │       A.    Objectively, fairly.
 9 │       Q.    Did you inquire of Dave or Pete Steele
10 │ at or about the time that they had this meeting
11 │ with Pat, that you attended, as to what impartial
12 │ or objective criteria they had to support their
13 │ decision?
14 │       A.    It was their judgment as pilots, as
15 │ people who were responsible for the company's FAA,
16 │ um, Pete as the D.O., and Dave as the, I think,
17 │ officially, he was a Safety Officer for the
18 │ company, that they could not in good conscious
19 │ ever recommend Patrick to be a Captain.  And the
20 │ reason they said -- Dave said is that he just did
21 │ not have confidence in Pat's judgment and that,
22 │ um, one day if he, he feared that Pat would take
23 │ an airplane down into a neighborhood and kill a
24 │ lot of people.  That was the gist of the
25 │ conversation, that I recall.
```

```
 1        Q.     Right.  So at which point, you being
 2   from Human Resources, would say, "Well, is there
 3   any objective support for this opinion?"  And what
 4   was the response?
 5        A.     It was their professional opinion.
 6        Q.     So the answer is?
 7        A.     It was their professional opinion,
 8   that's the answer.
 9        Q.     Unsubstantiated by --
10        A.     Substantiated by their years of
11   experience.
12        Q.     Okay.
13        A.     And their positions in the company.
14        Q.     Okay.  Why did they permit Pat to
15   spend his own money to go through the training and
16   get the certification from outside if they didn't
17   have this confidence in him to begin with?
18               MS. NORTON:    Object to the form of
19        the question.
20        A.     I don't know what motivated them, if
21   that's what you mean.
22        Q.     Yeah.  That's what I mean.  You did
23   have some meetings before Pat went off-site to get
24   trained?
25        A.     Um-hum.
```

```
 1          Q.     What if any conversations did you have
 2     with Dave or Pete Steele about that?
 3          A.     Well, there was an awareness that he
 4     had been asked to leave the school, that they felt
 5     was considerable.  And when he received the
 6     certificate from the school, which in their mind
 7     was known to issue certificates in exchange for
 8     money, and not be a very good quality school, they
 9     felt that, um, they couldn't live with that.
10          Q.     Well, my question is, if the basic
11     issue was that they didn't have confidence in his
12     judgement, they didn't feel right about him, why
13     go through this whole exercise of sending him
14     off-site to go get trained somewhere else?
15          A.     You'd have to ask them that question.
16          Q.     Okay.
17          A.     It was my perception that they wanted
18     to be fair with him, to give him every
19     opportunity.
20          Q.     Right.  But then when he passed the
21     other training and brought the certificate back,
22     he was foreclosed for the same reasons that --
23          A.     Well, it was because --
24          Q.     Gut feeling?
25          A.     He had been asked to leave the
```

1    training course that they felt was qualified and

2    the best of the two, or the best school that he

3    could have gone to.

4        Q.    And what school was that?

5        A.    I don't remember the name of it.

6        Q.    I'm sure you, as Director of Human

7    Resources said, "Well, have we documented that?

8    That he was asked to leave"?

9        A.    Well, you can't be sure of what I

10    would do, could you?

11            I'm sorry.  I didn't get your

12    question.

13        Q.    Well, if this was the reason, the

14    objective reason was that he had been asked to

15    leave a school, did you as Human Resources

16    Director say, "well, gosh, let's make sure we've

17    documented that, if that's the case"?

18            MS. NORTON:   Object to the form of

19        the question.

20        A.    I did not do that.

21        Q.    Is there a reason for that?

22        A.    Not that I recall.

23        Q.    And you don't know if it's true or

24    not?

25        A.    No, I do not.

```
 1          Q.      After Pat Major's oral with the FAA
 2   was discontinued, why did Dave and Pete not at
 3   that point say, "You are not eligible for
 4   upgrade"?
 5               MS. NORTON:   Asked and answered.
 6         Object to the form of the question.
 7         A.     I don't know.
 8         Q.      But the meetings that you have
 9   attended, despite the distress about what had
10   happened, he was still regarded as a Captain
11   candidate at that time, correct?
12         A.     I don't understand the question.
13         Q.      Well, after the FAA examination issue,
14   and AmeriJet got the letter that was somewhat
15   critical of the people that they put up, etcetera,
16   Dave and Pete could have at that point said,
17   "You know, Pat, you had your chance, you blew it
18   with the FAA.   This proves our underlying concerns
19   about you, you're out of the upgrade pipeline";
20   that didn't happen; do you know why?
21         A.     I don't.
22         Q.      Did you offer any opinions back in
23   that time frame that he needed to be given a fair
24   shot?
25         A.     Yes.
```

```
 1            Q.    Okay.  Do you know what school he
 2     obtained a certification from?
 3            A.    I want to say PanAm.
 4            Q.    And are you able to offer an opinion,
 5     or are you prepared to offer an opinion?
 6            A.    No.
 7            Q.    That it's a substandard school?
 8            A.    I cannot do that.
 9            Q.    You don't know one way or the other?
10            A.    No.
11            Q.    But Dave and Pete expressed to you
12     their belief that it was?
13            A.    Yes.
14            Q.    Did you make any representations or
15     statements to Pat during this process that his
16     upgrade efforts would be fairly and objectively
17     evaluated --
18            A.    I don't remember, really.
19            Q.    -- or that he had been given fair or
20     equal consideration?
21            A.    It would be something that I would
22     probably tell a person in that situation, but I
23     don't remember specifically.
24            Q.    Did there come a time when you became
25     aware that Pat had filed an EEOC charge?
```

```
1        A.      There was a time when I became aware
2    of that, I --
3        Q.      When was that?
4        A.      -- don't ask me when.  I don't
5    remember.
6        Q.      Okay.  How did you become aware of
7    that?
8        A.      Probably because -- it probably came
9    in the mail, I would think.
10       Q.      Do those usually come to you at that
11   time?
12       A.      Yeah, eventually they would.
13       Q.      Okay.  What if any response did you
14   make to the EEOC?
15       A.      You know, I don't really recall.  I
16   know that there had been, um -- they had sent back
17   some information on mediation, and by the time
18   that it all came about, I was gone, I think.
19       Q.      Okay.
20       A.      I did check into his, um, his claim,
21   which was age, as I recall now, I don't have the
22   complaint in front of me, and in reviewing the
23   records, I found that there was absolutely no
24   basis for it.
25       Q.      Okay.  What do you recall about that,
```

```
 1   about your records?

 2        A.    I remember asking someone on my staff

 3   to look at everyone who had been upgraded in the

 4   time period that was referenced, and the

 5   information that they brought back was that, um,

 6   he was one of the youngest ones.  Actually, there

 7   were a lot of people that were -- I shouldn't say --

 8   I will say that there are a lot of people that

 9   were older than Pat that, um --

10        Q.    Who were upgraded in that period of

11   time?

12        A.    Yes.

13        Q.    -- which was a couple of years?

14        A.    I don't remember.  I don't have the

15   complaint in front of me.

16        Q.    That's what you considered to be the

17   pertinent information to look at?

18        A.    That I can recall, yeah.

19        Q.    But you don't know whether you made a

20   formal response to the EEOC or just got that

21   information?

22        A.    I don't recall making a formal

23   response.

24        Q.    Did you prepare EEO reports from

25   AmeriJet?
```

```
 1         A.      I didn't, not personally.
 2         Q.      Okay.   They came out of your
 3    department?
 4         A.      Yes.
 5         Q.      During your tenure at AmeriJet, were
 6    there any female members of the flight crews?
 7         A.      Not that I can recall.
 8         Q.      Okay.
 9         A.      I wish some had applied.
10         Q.      Okay.   Any African Americans?
11         A.      I don't recall.   Again, it was always
12    something that we attempted to do, recruit members
13    of protected groups, but they needed to apply.
14    And I don't recall very many applicants.   I
15    believe there was one African American crew member
16    but --
17         Q.      How large was the flight crew
18    population, if you recall, back then?
19         A.      A hundred, I think.
20         Q.      Did you ever inquire of Pat,
21    concerning the question of whether he left the
22    training school or the circumstances of that?
23         A.      I don't recall him doing that, no.
24         Q.      Is there a reason why not?
25         A.      I don't recall, really.
```

1          Q.     Did you make any effort to determine

2     the respective accreditations of the schools or

3     any further information about them?

4          A.     No.

5          Q.     You never even tried to document

6     whether that happened?  As I understand it, you

7     relied on what Pete and Dave told you they heard?

8          A.     The owner of the company, yes.

9          Q.     Okay.  The meeting that you sat in

10    with, um, Pat and Dave, in which Dave advised him

11    that he would not promote him to Captain, was

12    anyone else present at that meeting?

13         A.     Just Pete, as I recall, I don't really

14    recall anyone else.

15         Q.     Did you, when you were Director of

16    Human Resources, have any policies concerning

17    tape-recording or documenting sensitive meetings

18    of that nature?

19         A.     It's illegal to tape-record people in

20    the State of Florida, I would never do that.

21         Q.     Not if they consent, right?

22         A.     That's right.  They --

23         Q.     You didn't have any policy about

24    tape-recording -- I'm not suggesting it was

25    non-consensually.

```
 1          A.     No, I had no tape-recording policy
 2     other than --
 3          Q.     You didn't tape anything?
 4          A.     No.
 5          Q.     You did not personally evaluate
 6     whether Pat was qualified or unqualified to be a
 7     Captain at AmeriJet?
 8          A.     No.
 9          Q.     That's not --
10          A.     I'm not qualified to do that.
11          Q.     Okay.  You transitioned out of Human
12     Resources in May of 1999?
13          A.     More or less, yeah.  I think -- I
14     don't remember the exact -- might have been April.
15          Q.     All right.  What if any involvement
16     did you have in Pat's termination or the
17     circumstances surrounding that?
18          A.     None.
19          Q.     Okay.  Was there any discussion back
20     in February of letting Pat go?
21          A.     No.
22          Q.     Okay.  After the February meeting
23     before you transitioned out of Human Resources,
24     what if any contact do you recall with Pat?
25          A.     It was always a fairly cordial
```

```
 1    relationship with Pat, so whenever I'd see him,
 2    I'd stop and talk to him.
 3              There was one other meeting where
 4    someone had complained about him stalking, that's
 5    the only last thing that sticks out, I guess.
 6         Q.   Okay.  Who was that?
 7         A.   Another pilot.
 8         Q.   What do you recall about that?
 9         A.   I recall that, um, his name was Tim --
10    Tim Green, and he had complained -- I'm not sure
11    if I was the first one that he complained to, but
12    he certainly complained to me that Patrick was
13    stalking him.
14         Q.   That was his word?
15         A.   That was his word.
16         Q.   What did he describe as the behavior?
17         A.   He described the behavior that Patrick
18    had, in front of other crew members, been, um,
19    spreading information about him, about some kind
20    of a Workers' Comp issue that he had, or lawsuit,
21    and that, um, he persistently kept pursuing him.
22         Q.   Meaning, Pat pursued Tim?
23         A.   Yes.  And talked about him with other
24    crew members, and in front of other crew members,
25    and uttered information about him.  I guess that's
```

1   the gist of what I recall.

2        Q.    When you say pursued him, there was no

3   suggestion that Pat was driving his car passed his

4   home at night or --

5        A.    He used the word "stalking", and I

6   remember specifically saying, "Stalking?"  And he

7   said, "Yes.  Stalking."  I said, "Are you sure you

8   mean stalking?"  And he said, "Yes, that's exactly

9   what I mean."

10        Q.    Okay.

11        A.    So I said, "Okay."  So I had to deal

12   with it with Derry Huff and Pat.

13        Q.    You've described the behavior, I just

14   want to make sure that I understand when you say

15   that Tim said Pat pursued him, do you mean pursued

16   him to engage him in conversation about his

17   lawsuit, or was there anything --

18        A.    I don't remember.

19        Q.    -- that you found sinister about the

20   behavior when you asked him to --

21        A.    That I found sinister?

22        Q.    Yes.

23        A.    It was not my perception that was at

24   issue here, it was the complainant's, who

25   perceived that wherever he went at work, that Pat

```
 1   was stalking him during the course of work.
 2       Q.    Okay.  Nothing outside of work?
 3       A.    No.  Which I would not have anything
 4   to do with something outside of work.  In fact, I
 5   told him if it was, call the Sheriff.
 6       Q.    All right.
 7       A.    I mean, it's not my -- that's not my
 8   role.  My role was inside the workplace.
 9       Q.    Okay.  So all this behavior that Tim
10   characterized in a very inflammatory way took
11   place at work?
12       A.    Yes.
13       Q.    Did you ask Tim to document this at
14   all, or did he give you anything written about
15   this?
16       A.    I don't recall if he did or didn't.
17       Q.    Okay.  Who involved Derry Huff?
18       A.    I think Derry already knew about it.
19   By then Derry was the, um, I believe, he was Chief
20   Pilot.
21       Q.    Okay.  You did not involve Derry
22   yourself?
23       A.    I don't recall how that really
24   happened.
25       Q.    Okay.
```

```
 1        A.     Either way, it was his boss and I
 2   would have --
 3        Q.     Okay.  So what did you do when you
 4   said you had to address it?  How did you address
 5   it?
 6        A.     We had a meeting with Pat, I remember
 7   that I had, um, composed a letter to his file.
 8   Pat denied having stalked him, but he did admit
 9   that there had been some conversation about his
10   Worker's Compensation suit, whatever it was, I
11   don't really remember the specifics.  He was very
12   concerned that this would go in his file and, um,
13   I told him that if his behavior ceased and
14   desisted, and he left Tim alone, that I would not
15   place that letter into his file.  And it appeared
16   that that's what happened, so I did not place the
17   letter into his file.
18        Q.     Okay.  Did you follow up and verify
19   that with Tim Green after the meeting?
20        A.     Yeah, I did.
21        Q.     And what he was supposed to cease and
22   desist was discussing Tim Green's lawsuit?
23        A.     Yes, as I remember.
24        Q.     Or approaching Tim Green concerning
25   the lawsuit?
```

```
 1        A.      Leaving Tim Green alone.
 2        Q.      Okay.  Anything else that you recall
 3   about that incident that was basically resolved?
 4        A.      Yes, that was basically resolved.
 5        Q.      Any other significant contact that you
 6   recall with Pat before you transitioned out of
 7   Human Resources?
 8        A.      No.
 9        Q.      Any contact with Pat after you
10   transitioned out of Human Resources?
11        A.      I don't specifically recall any,
12   really.
13        Q.      Was seniority a criterion, a factor
14   for promotion or upgrade to Captain at AmeriJet
15   during the time that you were Director of Human
16   Resources?
17        A.      It was a factor, but not the
18   controlling factor, as I recall.
19        Q.      Okay.  What was the controlling
20   factor?
21        A.      Ability.
22        Q.      Ability as demonstrated by --
23        A.      By their testing and the, um, FAA
24   compliance.
25        Q.      Okay.  Do you recall back at the time
```

DOWNTOWN REPORTING    (954) 522-3376

1   of the unionization, whether seniority was an

2   issue the pilots wanted?

3           A.      They had so many issues, it was --

4           Q.      Okay.  Do you recall --

5           A.      I'm sure.  Everything, everything you

6   can think of, if you've ever dealt with a bunch of

7   pilots --

8                   THE WITNESS:  Sorry, Pat.

9           A.      -- everything was an issue.  And, um,

10  I mean it was from -- it was a laundry list of

11  issues.

12          Q.      Okay.  All right.  Again, I'm not

13  trying to question memory that you may not have,

14  but do you recall, did AmeriJet agree to make

15  seniority more of a qualifying criteria as a

16  result of, at or about the time of the union

17  efforts, to help stayed that off?

18          A.      I don't recall qualifying as being one

19  of the commitments that AmeriJet made.  It was

20  more to scheduling, as I recall, because the

21  scheduling, or lack of scheduling, however you

22  want to look at it, was one of the major issues.

23  And also in terms of, um, of pay, in changing the

24  pay structure.

25          Q.      I take it the pilots wanted more

1    beneficial schedule arrangements?

2         A.    Yes.

3         Q.    I mean, more money, too?

4         A.    And more money, too, that's right.

5         Q.    Unions are usually seniority driven,

6    right?

7         A.    Yes.

8         Q.    Okay.  So if there was testimony that

9    that was also an issue on the table that would --

10        A.    It wouldn't -- yeah.  That was one of

11   the issues that was on the table, that was one of

12   the --

13        Q.    So you're not the person to ask about

14   what's required to be in training records or how

15   those are maintained; is that correct?

16        A.    No, not specifically, no.

17        Q.    Did you ever undertake to look back

18   through Pat's file to see what positive or

19   negative information existed on him?

20        A.    His file was thick, as I recall.  Pat

21   did seem to write a lot of letters at his time at

22   AmeriJet.  They were long, rambling, um, that's

23   what stands out about Pat's file to me is, um,

24   just a series of long rambling letters.

25        Q.    Okay.  At or about the time that there

```
 1  |  was the meeting with Dave Bassett at which he said
 2  |  to Pat, "you're not going to be made a Captain
 3  |  here", which was sometime after the FAA and the
 4  |  subsequent training, did you as Director, ever go
 5  |  back through the file to attempt to determine what
 6  |  if any document there was relative to Pat's
 7  |  qualifications, or lack of qualifications to be a
 8  |  pilot, or is that not something you did?
 9  |       A.     I certainly would have looked through
10  |  it, but not being an expert on really on what I
11  |  was looking at, I mean, he appeared to be
12  |  qualified, to be in the right seat up to that
13  |  time, and that's really what I could tell.  From
14  |  that point on, it was really the judgment of the
15  |  Flight Training Department and the Flight
16  |  Department, and the owner of the company, that he
17  |  was not qualified to be a Captain.
18  |       Q.     Were you aware that Dave had made a
19  |  similar judgment in 1997 before you were with the
20  |  company?
21  |            MS. NORTON:   Object to the form of
22  |       the question.
23  |       A.     I don't know what you're referring to.
24  |       Q.     Or a similar determination had been
25  |  made?
```

```
 1                    MS. NORTON:  As to what?

 2          A.    I'm not following you.

 3                    MS. NORTON:  Object to the form of

 4          the question.

 5          Q.    Okay.  Let me restate it.  Were you

 6     aware in 1998, that prior to the 1998 upgrade

 7     season, Pat Major had been told that he was not

 8     considered eligible as a Captain candidate by the

 9     company?

10          A.    I don't recall that, no.

11          Q.    Okay.  So my next question was going

12     to be then, do you know what would have changed

13     between '97 and '98 that caused him to be allowed

14     to go into the upgrade process?

15          A.    No.

16          Q.    You don't recall that background being

17     discussed?

18          A.    No, not discussed, no.

19          Q.    Before I mark this, let me just ask

20     you, if I were to show you seniority lists like

21     this, that are undated, I mean, are you able to

22     date these?

23          A.    No.

24          Q.    I didn't think so.

25          A.    I can barely see it from where you're
```

```
 1   holding it, first of all.
 2        Q.    Take a look.  I'd love to ask you
 3   about it, I don't mean to be self-defeating, I
 4   just think I know the answer to that one.
 5        A.    Yeah, you do.  I have no idea.  Looks
 6   like something they would have produced, but who,
 7   when --
 8        Q.    Right.  And you personally weren't the
 9   author of those lists?
10        A.    This may have been the listing -- you
11   know, because the date of birth is on here, this
12   may have been what I asked someone to put together
13   after his complaint was received.
14        Q.    Okay.  You just don't recognize that
15   document?
16        A.    Yeah, well --
17        Q.    Let me show you a document that was
18   previously --
19        A.    I don't think normally a date of birth
20   would be showing up on a listing.
21        Q.    On the seniority list?
22        A.    On the seniority list.  You'd have the
23   date of hire, but not the date of birth.  I think
24   this may have been a document I requested after
25   receiving his complaint.
```

1          Q.    It's not -- that format doesn't look

2     like one you would have normally had to maintain

3     for any other purpose?

4          A.    No.  I could not even imagine putting

5     somebody's date of birth on a general listing.

6          Q.    Let me show you a document that was

7     marked as Deposition Exhibit 29.

8          A.    Okay.

9          Q.    Did your department generate that

10    document?

11         A.    No.  Might have generated the document

12    where it says, "job opportunity bulletin".

13         Q.    Right.

14         A.    But the content is strictly a, um, a

15    department kind of -- input.

16         Q.    All right.

17              MS. SHEA:  We're marking documents

18         consecutively.  Can you mark this 37?

19              (Memo from Ed Cook, received and

20         marked Plaintiff's Exhibit 37.)

21         Q.    Sir, let me show you what's marked 37.

22              MS. NORTON:  Do you have another copy

23         of that?

24         Q.    I thought I already marked it, but I

25    guess not.

```
 1                    MS. NORTON:   Do you have another copy?

 2                    MS. SHEA:  No.

 3          A.    Okay.

 4          Q.    You're indicated as a carbon copy on

 5    that document; do you recognize that?

 6          A.    I was indicated on a lot of carbon

 7    copies.

 8          Q.    Other than being a recipient of that

 9    document, did you have any input in making that

10    determination of who would be --

11          A.    No.

12          Q.    -- awarded upgrade bids?

13          A.    No.  It was from Ed Cook, as you can

14    see on the memo.  Basically, we would -- I think

15    we'd have to binder these things in my

16    department.  And the person I had assigned the

17    flight would probably have, um, put both of these

18    things into a binder from flight.

19                    MS. SHEA:  Can you mark this 38,

20         please?

21                    (Letter dated November 6, 1998,

22         received and marked Plaintiff's Exhibit 38.)

23                    MS. NORTON:   Do you have a copy of

24         this one?

25                    MS. SHEA:  No.
```

1          Q.      Please take a look at what I've marked

2    as Exhibit 38.  Can you identify that?

3          A.      It looks like a letter from Pete

4    Steele to Pat.

5          Q.      Okay.  Copying you?

6          A.      Copying me.

7          Q.      Okay.  Does that refresh your

8    recollection as to the meeting in which Pat's

9    funds were returned to him to go seek training

10   elsewhere?

11         A.      Yes.

12         Q.      Okay.  Did you make the decision

13   regarding denial of Pat's request for differential

14   back pay, or did Pete Steele make that decision?

15         A.      I researched it and found it to be

16   without base.

17         Q.      What did that research consist of?

18         A.      I don't recall, because I didn't do it

19   myself.  Someone put together the, his claim, um,

20   of wanting back pay, as I recall, he wanted to be

21   paid as a Captain for that time and I may be --

22   my recollection may not be good, I just remember

23   that we did not find it to have any merit.

24         Q.      Okay.  Are you talking about legal

25   research, or research into Pat's file, or do you

```
 1   not recall?
 2        A.    Legal research?  What do you mean by
 3   legal research?
 4        Q.    I guess it wasn't legal research when
 5   you say when you're researching --
 6        A.    Records.  We probably looked back at
 7   what his claim was and found it not to have merit.
 8        Q.    But you don't recall the basis?
 9        A.    Not specifically, really.
10        Q.    Okay.  Does this document, Exhibit 38,
11   refresh your recollection in any other respects
12   with regard to what you and Pete Steele discussed
13   with Pat in the fall of 1998?
14        A.    No.
15        Q.    Okay.  The letters, the correspondence
16   of Pat that you referred to that were in his
17   personnel file --
18        A.    Yes.
19        Q.    -- and you reviewed that at or about
20   the time of Dave and Pete's meeting with Pat that
21   you attended concerning Dave's telling Pat he
22   would not be made a Captain?
23             MS. NORTON:  Object to the form of
24        the question.  Go ahead.
25        A.    I saw a lot of letters in his file,
```

```
 1    and to tell you I read every one of them is
 2    absolutely -- would be absolutely untrue.  They
 3    were very long --
 4         Q.    Okay.
 5         A.    -- and detailed.
 6         Q.    But my question really is this, was a
 7    file of the official personnel, a review of the
 8    official personnel file that you did, and in that
 9    time frame, that's what I'm trying to figure out.
10         A.    Sometime in that time frame, yeah, I'm
11    sure I looked at his file.
12         Q.    And you didn't go look at his training
13    records?
14         A.    No -- well, I may have looked at them,
15    but again, knowing what I was looking at and
16    looking at them is two different things, I would
17    have conceded to the experts.
18         Q.    But the correspondence that you're
19    talking about was in his personnel file?
20         A.    As I recall.
21         Q.    Okay.  That's where everything should
22    be, right?  It's one or the other place?
23         A.    Right.  I wouldn't know where else I
24    would go to get correspondence from.
25         Q.    You didn't maintain a supervisor's
```

```
 1   file or anything like that?
 2        A.    No.
 3        Q.    Or are aware of any other files being
 4   maintained?
 5        A.    No, I don't.
 6        Q.    Just a sec.
 7              (Whereupon a brief recess was taken.)
 8              MS. SHEA:  We're finished.
 9              Mr. Morales, thank you very much.
10              MS. NORTON:   I don't have any
11        questions.  And do you want to just waive?
12              THE WITNESS:  No -- yeah, I'll waive.
13        I have no interest in this.
14              MS. SHEA:  Transcribe this.
15              MS. NORTON:  Copy, please.  Ascii and
16        minu.
17              (Whereupon the deposition was concluded.)
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OATH

 2

 3

 4    STATE OF FLORIDA    )

 5    COUNTY OF BROWARD    )

 6

 7

 8

 9              I, the undersigned authority, certify

10    ·that JUAN MORALES, personally appeared before me

11    and was duly sworn.

12

13

14              WITNESS my hand and official seal this

15    16th day of February, 2001.

16

17

18

19

20

21                        _____
                          Judith M. Caputo
22                        Notary Public - State of Florida
                          My Commission Expires:  12-27-03
23

24

25
```

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3   STATE OF FLORIDA    )

 4   COUNTY OF BROWARD    )

 5

 6           I, Judith M. Caputo, Shorthand

 7   Reporter, certify that I was authorized to and

 8   did stenographically report the deposition of

 9   JUAN MORALES, that a review of the transcript was

10   not requested; and that the transcript is a true

11   and complete record of my stenographic notes.

12

13           I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of

16   any of the parties' attorneys or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19

20           DATED this 16th day of February, 2001.

21

22

23           _____

24           Judith M. Caputo
             Notary Public - State of Florida
25           My Commission Expires:  12-27-03
```

DOWNTOWN REPORTING    (954) 522-3376



# MEMO

**To:** ALL CREWMEMBERS
**From:** ED COOK
**Subject:** PROMOTION BID AWARDS
**Date:** August 5, 1998

THE FOLLOWING CREWMEMBERS HAVE BEEN AWARDED UPGRADE BIDS.

| **CAPTAINS** | **FIRST OFFICERS** |
| --- | --- |
| T. GREEN | N. DAILY |
| J. KIRK | D. CHASTANET |
| P. MCMANUS | M. BLASTIC |
| D. BENSON | A. HORN |
|  | P. PEREA |

CONGRATULATIONS TO THOSE CREWMEMBERS WHO WERE UPGRADED. THERE IS A NEW ( OPEN BID ) FOR CAPTAINS AND FIRST OFFICERS NOW ACTIVE. IF YOU ARE INTERESTED IN A PROMOTION YOU MUST BID. IF YOU HAVE ANY QUESTIONS PLEASE CALL ME.

THANK YOU IN ADVANCE.

cc:    P. STEELE
       J. MORALES
       CREW SCHEDULING
       FLIGHT OPERATIONS

**144**


PLAINTIFF'S
EXHIBIT
NO. 37



November 6, 1998

Mr. Patrick S. Major
1722 West Las Olas Blvd
Ft. Lauderdale, FL   33312

Dear Pat,

In reference to your letter dated September 11, 1998 and our subsequent meeting on October 22, 1998 at which Juan Morales was present, there were two outstanding issues remaining.

The first issue was your $2,500.00 deposit check for your upgrade contract. In that regard, you have received your $2,500.00 deposit check. The second issue was your request for backpay. Regarding your allegation of being victimized relating to your delay gaining a promotion, I find no evidence of this occurring. Therefore, your request for differential backpay for the last two (2) years has been declined.

Good luck with all your future endeavors here at Amerijet.

Sincerely,

Peter A. Steele
Vice President of Operations
Amerijet International, Inc.

cc:    J. Morales



000081

CARGO IS OUR BUSINESS