IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.   00-6070-Ferguson/Snow

PATRICK SCOTT MAJOR,                )    L.T. Case No.
                                    )    99-021746-11
              Plaintiff,            )
                                    )
vs.                                 )       **ORIGINAL**
                                    )
AMERIJET INTERNATIONAL, INC.,       )   FILED by _____ D.C.
                                    )   DKTG
              Defendant.            )      MAR 2 3 2001
- - - - - - - - - - - - - - - - - -)
                                        CLARENCE MADDOX
                                        CLERK U.S. DIST. CT.
                                        S.D. OF FLA. FT. LAUD.

                    500 East Broward Blvd.
                    Fort Lauderdale, Florida
                    Monday, January 8, 2001
                    1:30 p.m. - 2:25 p.m.


APPEARANCES:

HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.
BY: VALERIE SHEA, ESQUIRE
Appearing on behalf of the Plaintiff

ALLEN, NORTON & BLUE, P.A.
BY: SUSAN POTTER NORTON, ESQUIRE
Appearing on behalf of the Defendant


                    ------------------------------

                            DEPOSITION

                               OF

                        BRIAN A. STEELE

                    ------------------------------

1                          I N D E X

2                                                    Page

3       DIRECT EXAMINATION                              3
        BY MS. SHEA

4

5                        E X H I B I T S

6
                                         MARKED FOR
7                                        IDENTIFICATION

8       Plaintiff's Exhibit 22                33

9       Plaintiff's Exhibit 23                33

10      Plaintiff's Exhibit 24                42

11

12

13

14

15

16

17

18

19

20

21

22

23

24          (Exhibits retained by Attorney Shea.)

25

                DOWNTOWN REPORTING      (954) 522-3376

```
 1              Deposition of BRIAN A. STEEL, a witness of
 2   lawful age, taken by the Plaintiff for the purpose
 3   of discovery and for use as evidence in the
 4   above-entitled cause, wherein PATRICK SCOTT MAJOR is
 5   the Plaintiff, and AMERIJET INTERNATIONAL, INC. is
 6   the Defendant, pending In The United States District
 7   Court For The Southern District of Florida, pursuant
 8   to notice heretofore filed, before BEVERLY J. GRAMM,
 9   Registered Professional Reporter and Notary Public
10   in and for the State of Florida at Large, at the law
11   offices of Heinrich, Gordon, Hargrove, Weihe &
12   James, P.A., 500 East Broward Boulevard, Suite 1000,
13   Fort Lauderdale, Florida, on the 8th day of January,
14   2001, commencing at 1:30 o'clock p.m.
15              ---------------------------
16   THEREUPON,
17                    BRIAN A. STEELE
18   a witness named in the notice heretofore filed,
19   being of lawful age, and being duly sworn in the
20   above cause, testified on his oath as follows:
21                  DIRECT EXAMINATION
22   BY MS. SHEA:
23       Q.   Sir, would you tell us your full name and
24   where you live, please?
25       A.   My full name is Brian Alexander Steele, I
```

```
 1    live at 15302 85th Way North, Palm Beach Gardens,
 2    Florida.
 3         Q.   All right, sir.  And what is your date of
 4    birth?
 5         A.   9/30/58.
 6         Q.   Where are you employed?
 7         A.   Amerijet.
 8         Q.   And how long have you worked for Amerijet?
 9         A.   It will be 15 years April.  So 14 years
10    and change.
11         Q.   Fifteen years in April of 2001.  So since
12    1986?
13         A.   That's correct.  That's correct.
14         Q.   And what did you first do when you came to
15    Amerijet 15 years ago?
16         A.   I was a flight engineer.
17         Q.   Okay.  Had you worked as a flight engineer
18    elsewhere?
19         A.   No.
20         Q.   This was your first job in the cockpit?
21         A.   Yes.
22         Q.   And how long did you remain a flight
23    engineer?
24         A.   I couldn't answer for sure.  Five years.
25    It's a guess.
```

```
 1            Q.    What kind of work had you done prior to
 2      1986?
 3            A.    I was in the Air Force.
 4            Q.    All right.  And after five years you
 5      became a first officer?  Approximately.
 6            A.    That's correct.
 7            Q.    All right.  Do you remember approximately
 8      when that was?
 9            A.    No.
10            Q.    And what is your rank now?
11            A.    Captain.
12            Q.    How long have you been a captain?
13            A.    Since '95.
14            Q.    All right.  And you sought out a promotion
15      to become a captain in 1995?
16            A.    Yes.
17            Q.    Okay.  And how many total hours of flying
18      do you have now?
19            A.    A little over 12,000.
20            Q.    Do you remember how many hours you had of
21      flight when you were promoted to captain?
22            A.    No.
23            Q.    Can you approximate that or not?
24            A.    I'll approximate, but --
25            Q.    Okay.
```

```
 1        A.    You can't hold me to it.  Um --
 2              MS. NORTON:  Don't guess.  If you have an
 3   estimate, reasonable, tell her.
 4        A.    An estimate would be 8,000.
 5   BY MS. SHEA:
 6        Q.    About?
 7        A.    Estimate.
 8        Q.    Okay.  And some of that, or a large
 9   percentage of that would be as a flight engineer as
10   opposed to a first officer?
11        A.    No.  No.
12        Q.    Half and half or --
13        A.    Three-quarters flying, a quarter engineer.
14        Q.    Okay.  Do you have any relatives who
15   currently work at Amerijet?
16        A.    Yes.
17        Q.    Who?
18        A.    My brother-in-law, Jeff Miklovits.
19        Q.    What does he do?
20        A.    He's first officer.
21        Q.    How long has he been with the airline?
22        A.    Don't know.  I'll guess.
23              MS. NORTON:  Don't guess.
24        A.    I don't know.
25   BY MS. SHEA:
```

```
 1        Q.    Is he a new employee or has he been there?
 2        A.    No.  No.  He's been there.
 3        Q.    Any other relatives currently work for
 4   Amerijet?
 5        A.    No.
 6        Q.    What about previously?
 7        A.    My brother Pete.
 8        Q.    Okay.  And what was Pete's position at
 9   Amerijet?
10        A.    Director of operations.
11        Q.    All right.  And when did he leave?
12        A.    Less than a year ago.
13        Q.    Why did he leave?
14        A.    Don't know.
15        Q.    Are you in contact with your brother?
16        A.    Yes.
17        Q.    But you never discussed with him --
18        A.    No.
19        Q.    You have to let me finish the question
20   before you answer.
21        A.    Okay.
22        Q.    Even if you know what I'm going to ask,
23   because she can't --
24              MS. NORTON:  She might change it on you at
25   the end.
```

```
 1    BY MS. SHEA:

 2         Q.   He never discussed circumstances with you?

 3         A.   No.

 4         Q.   Did he leave voluntarily or involuntarily?

 5         A.   Don't know.

 6         Q.   Where is he working now?

 7         A.   Last I heard, United.

 8         Q.   Is he in this area?

 9         A.   Don't know.

10         Q.   You don't know if he's in the area?

11         A.   Working?

12         Q.   Yes.  Living.

13         A.   Living, yes.

14         Q.   Okay.  You're not on the outs or anything?

15         A.   No.

16         Q.   Okay.  And how long had he worked for

17    Amerijet?

18         A.   He told me 23 years.

19         Q.   Was he involved in hiring you at Amerijet?

20         A.   Yes.

21         Q.   Was he director of operations or was that

22    a promotion?

23         A.   I don't know.

24         Q.   Okay.  Was he director of operations in

25    1986 when you came?
```

```
 1          A.    I don't know.

 2          Q.    You don't recall?

 3          A.    Don't recall, no.  I want to say chief

 4   pilot, but I don't recall.

 5               MS. SHEA:  Now, Miss Norton, I understand

 6   he's not here as a corporate rep or anything.

 7               MS. NORTON:  That's correct.

 8               MS. SHEA:  Okay.

 9   BY MS. SHEA:

10          Q.    Do you know my client, Pat Major?

11          A.    Yes.

12          Q.    How do you know him?

13          A.    From work.

14          Q.    Not outside of work at all?

15          A.    No.

16          Q.    Okay.  You've flown with him before?

17          A.    At work?

18          Q.    Yes.

19          A.    Yes.

20          Q.    Okay.  How often had you flown with Mr.

21   Major while he was working at Amerijet?

22          A.    I couldn't give a definite answer.  Don't

23   know.

24          Q.    Did you ever fly with Mr. Major when you

25   were a first officer or was it always --
```

```
 1          A.   Yes.

 2          Q.   Okay.  So you've flown with him both when

 3   you were first officer and since you were made a

 4   captain; is that correct?

 5          A.   Correct.

 6          Q.   Have you had any special jobs at Amerijet,

 7   such as training officer or acting chief pilot, or

 8   anything other than being a line captain?

 9          A.   We went through all my jobs.

10          Q.   Right.

11          A.   I was a flight engineer, a first officer

12   and a captain, period.

13          Q.   So the answer is no, you have not had any

14   other positions for any length of time?

15          A.   As in?

16          Q.   As in training director or acting chief

17   pilot, or anything of that nature.

18          A.   No.

19               MS. SHEA:  Okay.  Off the record.

20               (Discussion held off the record.)

21   BY MS. SHEA:

22          Q.   All right, sir.  Off the record we've

23   decided between counsel to use the previously marked

24   exhibits to the first deposition of Mr. Huff and

25   just go in order, so I'll refer to plaintiff's
```

```
 1   deposition exhibits and we'll use those throughout.
 2         Let me show you what was marked as
 3   Plaintiff's Exhibit 15 and Plaintiff's Exhibit 19.
 4   Would you please take a look at those and tell me if
 5   you can identify them?
 6         A.   And your question was?
 7         Q.   Can you -- do you recognize those
 8   documents?
 9         A.   Yes.
10         Q.   Okay.  And do they go together?
11         A.   Yes.
12         Q.   All right.  And what is the one that's
13   called Exhibit 19, what is this?
14         A.   It's a flight crew member proficiency
15   report.
16         Q.   All right.  And you prepared this?
17         A.   That's correct.
18         Q.   Okay.  Why did you prepare it?
19         A.   No reason.
20         Q.   All right.  What about Exhibit 15?
21         A.   That goes with this.
22         Q.   All right.
23         A.   It's all one.
24         Q.   Okay.  Why did you do -- why did you write
25   the letter that's Exhibit 15?
```

```
 1        A.    I filled that out because of the way I
 2   felt the flight went.
 3        Q.    All right.  What did you do with the
 4   letter after you wrote it?
 5        A.    I sent it to -- I think I wrote it on
 6   there.  Yes, I sent it to Derry Huff, Mark Stewart
 7   and Pete Steele.
 8        Q.    All right.  What, if any, follow up was
 9   there between you and your brother concerning this
10   letter?
11        A.    None.
12        Q.    You never discussed it with him?
13        A.    No.
14        Q.    You didn't hear anything from him about it
15   one way or the other?
16        A.    Not that I remember.
17        Q.    What is Amerijet's policy on doing
18   proficiency reports?
19        A.    I don't know.  There isn't one.
20        Q.    Okay.  Is there a policy that they should
21   be reviewed with the subject of the proficiency
22   report at any time?
23              In other words, if you fill one out, are
24   you supposed to review it with the person that
25   you're evaluating?
```

```
 1          A.    It's up to the individual at the time.

 2          Q.    Okay.  Did you review this report with Pat

 3   Major?

 4          A.    No.

 5          Q.    Why not?

 6          A.    I didn't want to.

 7          Q.    Okay.  Why not?

 8          A.    I didn't want to.  That's my answer.

 9          Q.    Okay.  When you gave it to Mark Stewart,

10   did you give -- did you get any feedback from him or

11   have any follow up with him?

12          A.    No.

13          Q.    You never heard from him about it?

14          A.    No.

15          Q.    Were you expecting a response?

16          A.    No.

17          Q.    Why not?

18          A.    It's strictly used as a training aid.

19          Q.    Was that your intention in completing this

20   report?

21          A.    That's correct.

22          Q.    As a training aid?

23          A.    That's correct.

24          Q.    But you didn't feel any responsibility as

25   the captain to discuss it with your crew yourself?
```

```
 1        A.    No.
 2        Q.    Okay.  After you gave this report to Derry
 3   Huff, what, if any, follow up was there from him?
 4        A.    None to me.
 5        Q.    Did you have a meeting with him at all
 6   about this?
 7        A.    I remember we briefly spoke about it, but
 8   I don't recall any particulars.
 9        Q.    Did you ask for the meeting or did he ask
10   for the meeting?
11        A.    I think I was passing by.  I think I was
12   just passing through the offices.
13        Q.    So did you stop and speak to him about it
14   or did he call you?
15        A.    I think I just stopped in to say hello.
16        Q.    All right.  And what was said about the
17   report?
18        A.    I don't recall.  I don't remember.
19        Q.    Okay.  Did you try when you did this
20   report to give a full and accurate statement of the
21   circumstances of the flight?
22        A.    Certainly.
23        Q.    What were the weather conditions in Miami
24   on June 8th, when the flight was departing?
25        A.    I don't recall.
```

1          Q.    Is there anything in that report

2     concerning the weather conditions in Miami?

3          A.    Not in mine, no.

4          Q.    Is there a reason why not?

5          A.    It's not a weather report, it's a

6     proficiency report.

7          Q.    Was weather a factor at all in the

8     situation in Miami concerning the take off?

9          A.    No.

10         Q.    Well, when Pat Major raised the weight of

11    the aircraft, did that have any relationship to a

12    weather condition or not?

13              MS. NORTON:   Object to the form of the

14    question.

15         A.    I don't know what that -- what do you mean

16    raise the weight of the aircraft?  I don't know what

17    that means.

18    BY MS. SHEA:

19         Q.    Well, I gather from the first paragraph of

20    your report there was some discussion about whether

21    you could use runway 12.

22         A.    The discussion of using runway 12 came up

23    prior to getting out, or we were waiting in line.

24         Q.    Okay.

25         A.    And I asked him to check the analysis for

```
 1   runway 12.
 2         Q.   Right.  And what was his response?
 3         A.   His response was we were too heavy for it.
 4         Q.   All right.  Which you disagreed with?
 5         A.   That's correct.
 6         Q.   Okay.  When he responded -- well, strike
 7   the question.  Was there any inclement weather that
 8   day at all?
 9         A.   I don't recall.
10         Q.   Okay.  Well, is it your testimony that it
11   was dry or wet, or you don't know?
12         A.   I don't know.  I don't remember.  It was a
13   year ago.
14         Q.   Would it be significant to you to know
15   whether it was wet or dry, in terms of the runway
16   analysis?
17         A.   Say that again.
18         Q.   Would it be significant for you to know
19   whether it was wet or dry in terms of making a
20   runway analysis?
21              MS. NORTON:  Object to the form of the
22   question.
23         A.   You need to be more specific on what
24   you're -- I don't --
25   BY MS. SHEA:
```

DOWNTOWN REPORTING    (954) 522-3376

```
 1          Q.   Okay.  Well, the runway analysis, Pat

 2     Major said you needed to use runway 12, or you were

 3     too heavy for 12; correct?

 4          A.   That was his complaint.

 5          Q.   Okay.  And that you needed to use 9 left?

 6          A.   That's correct.

 7          Q.   Because it was longer.

 8          A.   That's correct.

 9          Q.   Okay.  And my question is was the runway

10     wet or dry?

11          A.   I don't remember.

12          Q.   Okay.

13          A.   I don't know.

14          Q.   So you're not able to say whether his

15     concern was based on a wet -- the runway being wet

16     or not, you don't recall?

17          A.   I don't recall.

18          Q.   Okay.  Now, in this document, the bottom

19     of page 1, he -- you say he complained, I was not

20     allowed to use flaps 40 for landing?

21          A.   That's correct.

22          Q.   I told him what I will use and when I will

23     use it?

24          A.   That's correct.

25          Q.   Isn't it fact, sir, that the use of flaps
```

 1    40 violated federal aviation regulations because

 2    that aircraft was equipped with a hush kit?

 3         A.    Not with the information I was given at

 4    the time.

 5         Q.    Okay.  What information were you relying

 6    on?

 7         A.    What we were trained to do.

 8         Q.    Do you recall, in January 1999, your

 9    brother announcing to all the pilots that you could

10    not use flaps 40 on a plane equipped with a hush

11    kit?

12         A.    I don't recall.

13         Q.    So it's your testimony that Amerijet did

14    not train you against using flaps 40 on a plane with

15    a hush kit?

16              MS. NORTON:  Object to the form of the

17    question.

18         A.    No.

19    BY MS. SHEA:

20         Q.    What training were you relying on in

21    stating that you could use the flaps 40?

22         A.    What we used previous to any changes, what

23    we were initially trained to do.

24         Q.    All right.  And it's your testimony that

25    you were not given any different training before

```
 1   this incident in June of 1999?

 2        A.   Not that I can recall.

 3        Q.   All right.  So after this incident, as a

 4   result of this report, did you get any training?

 5        A.   It was mentioned, yes.  At the next

 6   recurrent class.

 7        Q.   All right.  That in fact this was an

 8   illegal flap position?

 9             MS. NORTON:  Object to the form of the

10   question.

11        A.   Not illegal, no.  But --

12   BY MS. SHEA:

13        Q.   Well, was it or was it not an FAA

14   violation to do what you did in June 1999?

15        A.   It's not an FAA violation, no.

16        Q.   It's still not an FAA violation?

17        A.   No.

18        Q.   Okay.  And that's -- it's permissible?

19        A.   Now that I have documentation as to what's

20   being done, this is the new parameters about doing

21   it.  Before the airplanes were converted and before

22   anything was done, we had a certain procedure.

23        Q.   Right.

24        A.   Now that the airplanes are converted, the

25   documentation is in, this is what we do.
```

```
 1          Q.    Well, I just want to make sure we're clear

 2     on this.  Was it an FAA violation in June 1999 to

 3     exceed the limitations of the aircraft?

 4          A.    I didn't exceed any limitations.

 5          Q.    Was it an FAA violation in June of 1999 to

 6     land with flaps 40 on a 727 equipped with a hush

 7     kit?  Whether you knew about it or not, was it a

 8     violation or not at that time?

 9          A.    Well, if I didn't know, how would I know?

10          Q.    No one's told you since then?

11          A.    Since then?

12          Q.    Since then did they tell you what you did

13     was wrong?

14          A.    Not wrong, no.  This is the new procedure.

15          Q.    When did the new procedure go into effect?

16     Was it after June 8th?

17          A.    It must have been.

18          Q.    Okay.  Because if it's not, nobody ever

19     told you any differently?

20                MS. NORTON:  Object to the form of the

21     question.  Prior to June, he said.

22          A.    Prior to this flight, no.

23     BY MS. SHEA:

24          Q.    Right.  Well, after this flight, based on

25     your report, did Derry Huff, Pete Steele or anybody
```

1  else tell you that what you had done was wrong?

2      A.   Not what I had done was wrong, no.

3      Q.   Did Derry Huff, Pete Steele or anyone else

4  tell you that use of flaps 40 on that particular

5  aircraft with a hush kit was -- exceeded the

6  performance parameters for that aircraft?

7      A.   Not at that time, that I can recall.

8      Q.   So you were never corrected in any way

9  about what you did on this flight, what you reported

10 yourself?

11     A.   I told them what I had done.

12     Q.   Right.  And they didn't tell you, by the

13 way, Captain Steele, that was a violation?

14     A.   No.

15     Q.   Pat is right, you were wrong?

16     A.   No.  No.

17     Q.   So to this day, do you maintain that what

18 you did was permissible and lawful?

19     A.   Yes.

20     Q.   Where were you trained to remove and

21 replace the bolt restricting -- the bolt restrictor

22 that restricted movement beyond flaps 30, what part

23 of your training was that?

24     A.   There is no training.

25     Q.   You just did that on your own, yes?

```
 1        A.   Yes.

 2        Q.   And that was a permissible thing for a

 3   captain to do, is to remove a bolt that restricts

 4   movement of the flaps?

 5        A.   I don't know if it's permissible to

 6   everyone or what they decide they do.  I just land

 7   the plane the way I'm trained to operate the plane.

 8        Q.   Right.  But you had to actually move the

 9   bolt restrictor in order to do that; correct?  You

10   had to move a restrictor device to do that?

11        A.   There's a bolt screwed into the side, yes.

12        Q.   Which you unscrewed?

13        A.   Yes.

14        Q.   Okay.  And you were not reprimanded in any

15   way for doing that?

16        A.   Not at that time, no.

17        Q.   Well, at any time.

18        A.   I was told afterwards that with the new

19   documentation on the airplanes, we're only going to

20   use flaps 30.

21        Q.   Okay.

22        A.   But it was after this.

23        Q.   It had nothing to do with this report?

24        A.   Not that I know of, no.

25        Q.   It wasn't as a result of your report?
```

DOWNTOWN REPORTING    (954) 522-3376

```
 1          A.    No.  Not that I know of.

 2          Q.    And obviously, nothing went into your file

 3   about that?

 4          A.    I -- not that I know of.

 5          Q.    Okay.  Nobody made any FAA report about

 6   that?

 7          A.    Not that I know of.

 8          Q.    Okay.  To your knowledge, Pat Major never

 9   complained about you on that flight, you complained

10   about him on that flight; correct?

11          A.    To the best of my knowledge.

12          Q.    Okay.  And you don't know whether it was

13   raining, dry or in between on the day of that

14   flight, you don't remember?

15          A.    I don't remember, no.

16          Q.    Okay.  Have you ever used the expression

17   ghosting fuel or ghosting weight?

18          A.    No.  I don't know what that means.

19          Q.    Have you ever heard that expression?

20          A.    No.

21          Q.    Have you ever said to a crew member, we're

22   ghosting a thousand pounds of fuel, or anything to

23   that effect?

24          A.    No.

25          Q.    Have you ever made any comment to any crew
```

```
 1   member suggesting that fuel or cargo weight on an
 2   aircraft was not fully reported?
 3        A.   No.
 4        Q.   Have you ever had an experience in all
 5   your years with Amerijet in which you suspected that
 6   fuel or weight were not fully reported?
 7        A.   That it was checked prior to leaving.
 8        Q.   So the answer was yes, but then you would
 9   ask for a check?
10        A.   You asked if I suspected?
11        Q.   Right.
12        A.   Well, if I suspect then they would check
13   it.
14        Q.   Okay.  So you have suspected that and had
15   it checked some times?
16        A.   No.  I didn't say I did.  I said if I had
17   suspected I would have had it checked to make sure
18   we were within limitations.
19        Q.   Okay.  But you never had that suspicion?
20        A.   Not that I recall.
21        Q.   Okay.  Tell me what you recall about your
22   flight with Pat on August 17th, 1999.  Do you recall
23   that flight?
24        A.   What do you want to know?
25        Q.   Do you recall the flight?
```

```
 1          A.    Yes.
 2          Q.    Okay.   What time of day was the flight
 3    scheduled to leave?
 4          A.    I believe it was early afternoon.
 5          Q.    Okay.   Did it depart the gate on time?
 6    Did it push back on time?
 7          A.    No idea.
 8          Q.    Who was the crew that day?
 9          A.    Myself, Pat, Brett Wise, Al Jorsey, Sr.
10    was giving me a captain evaluation.   And there was
11    an extra crew member in there, I don't recall his
12    name.
13          Q.    Had you flown at all with Pat Major since
14    the June 8th flight?
15          A.    Yes.
16          Q.    No problems on those flights?
17          A.    Not that I recall.
18          Q.    Okay.   So you never discussed the June 8th
19    flight with Pat after that flight?
20          A.    Not that I recall.
21          Q.    Okay.   And other than a passing comment
22    with Derry Huff, no one ever discussed your report
23    with you?
24          A.    To the best of my knowledge, that's true.
25          Q.    Okay.   And do you remember anything Derry
```

26

```
 1    said to you when you just mentioned it in passing?
 2         A.   No.
 3         Q.   But you know for sure that you were not
 4    criticized in any way for your actions?
 5         A.   Not that I recall.
 6         Q.   Well, you'd recall if you were, wouldn't
 7    you?
 8         A.   I would think so.
 9         Q.   Okay.  And you don't recall anything like
10    that?
11         A.   No.
12         Q.   So you didn't follow up to inquire if Pat
13    had had any more training or how your concerns had
14    been addressed?
15         A.   No.
16         Q.   You just flew with him whenever he was on
17    your crew list?
18         A.   Whenever scheduling put him on.
19         Q.   Okay.  What do you recall about the
20    weather conditions at the time of push back of your
21    flight on August 17th?
22         A.   There was -- it had just stopped raining.
23         Q.   Okay.
24         A.   Or it had stopped raining.
25         Q.   Were there still storms in the area?
```

1       A.    Yes.   To the north and south.

2       Q.    All right.   When you were taxiing out

3   after push back, what, if any, discussion do you

4   recall between you and Pat concerning the conditions

5   of the runways?

6       A.    I don't recall any about the condition of

7   the runways.   The only thing I wanted to do was be

8   pushed back so we could point the radar in the

9   direction of the departure, so I could look at the

10  weather.

11      Q.    Okay.   And that's what you were able to

12  do?

13      A.    That's correct.

14      Q.    And that's the basis of your testimony

15  that the storms were north and south?

16      A.    That's how I proved it.

17      Q.    None east and none west?

18      A.    I wouldn't know about the west, that's in

19  my rearview mirror.

20      Q.    But it was clear to the east?

21      A.    That's correct.

22      Q.    What else do you recall about taxiing out?

23      A.    Taxied out.

24      Q.    Do you recall any conversation with Pat

25  Major?

28

```
 1        A.    No.
 2        Q.    Do you recall whether there was a Runway
 3   Analysis Report available when you were taxiing out?
 4        A.    To the best of my knowledge, there was
 5   nothing on the ATIS.
 6        Q.    What's the ATIS?
 7        A.    Airman's information, about the airport
 8   and the weather, the airport condition, winds at the
 9   airport.  If there was any type of, any elements
10   that crew members need to be concerned with will be
11   on the ATIS.
12        Q.    Okay.  So there were no reports at the
13   time that you pushed back or were taxiing out?
14        A.    No.  No.
15        Q.    Do you remember whether the runways at the
16   airport were wet or dry?
17        A.    It had just stopped raining, they were
18   wet.
19        Q.    Okay.  Is it a policy at Amerijet to
20   consider runways dry unless there is an official
21   ATIS report of standing water?
22        A.    That's correct.
23        Q.    Does that continue to be the policy to
24   this day?
25        A.    Yes.
```

```
 1          Q.   Do you recall any discussion with Pat
 2    Major regarding wet runway and the performance
 3    limitations before push back that day?
 4          A.   No.
 5          Q.   Do you recall telling Pat Major to
 6    disregard the tail wind that was initially reported
 7    on the runway that was going to be your intended
 8    take-off runway?
 9          A.   No.
10          Q.   Did you have that discussion or do you
11    just not recall?  Do you deny that discussion?
12          A.   I deny that, yeah.  There were no tail
13    winds.
14          Q.   Okay.  Did you have occasion before your
15    taxi out and the actual take off to discuss with Pat
16    Major the runway choice or the runway conditions?
17          A.   Tower was using 9 left.
18          Q.   Okay.  So what happened, you taxied out
19    directly into the line for a 9 left?
20          A.   We taxied out, there were airplanes
21    waiting to depart.  They were departing north and
22    maybe to the south.  I'm not sure which way they
23    were departing to.  I don't know their destinations.
24    We were going to depart due east.
25          Q.   Okay.
```

1          A.    And the ground control -- I'm not sure if

2    it was ground, it might have been -- no, I'm pretty

3    sure it was ground control, had us taxi out so we

4    could back taxi down the runway.

5          Q.    Okay.   What does that mean?   Does that

6    mean go all the way down the runway?

7          A.    Well, we went to an intersection that we

8    could get out onto the runway.

9          Q.    Okay.

10         A.    And then back taxi down and then turn

11   around so you can take off to the east.

12         Q.    Okay.   And if the full length of the

13   runway is a hundred percent, at what point was the

14   intersection?   If you use zero at the point of take

15   off.

16         A.    I don't know.

17         Q.    Okay.

18         A.    I don't know which intersection we went in

19   at.   I could show you on a map or a chart, but to

20   the best that I could remember.   I don't remember

21   the actual intersection we went to.

22         Q.    So it could have been what, 20 -- that you

23   back taxied 20 percent of the runway or 40 percent

24   or some other percent, you just don't recall?

25         A.    No.

31

```
 1        Q.   So at that point your plan was to treat
 2   the take off as having a dry runway; correct?
 3        A.   That's what the performance numbers and
 4   everything were calculated at.
 5        Q.   Okay.  Did anything happen between then
 6   and when you actually took off that would affect
 7   that analysis?
 8        A.   No.
 9        Q.   Was there a tower report of standing water
10   before take off?
11        A.   Not to my knowledge.
12        Q.   Do you have a headset on when you're in
13   the cockpit?
14        A.   Earpiece.  Just one side.
15        Q.   Can you hear the tower, the air traffic
16   control?
17        A.   Yeah, that's a good idea.
18        Q.   Right.  Okay.  Just checking.
19        A.   Okay.
20        Q.   Do you remember Pat Major raising with you
21   in the cockpit at any point prior to take off any
22   objection to the performance parameters that you
23   were observing or the runway conditions?
24        A.   No.
25        Q.   Did you ever learn thereafter that he had
```

```
 1   complained to Amerijet concerning that flight and
 2   the take-off circumstances?
 3        A.   I learned afterwards, yes.
 4        Q.   Okay.  It didn't -- how did you learn
 5   about that?
 6        A.   I don't recall.
 7        Q.   Okay.  So you didn't make a complaint
 8   about him on that flight because nothing happened?
 9        A.   No.  No.
10        Q.   Okay.  Did you learn about his complaint
11   while he was still working there, or was he already
12   terminated?
13        A.   I think he was already terminated.
14        Q.   So you don't think you even knew that he
15   made a complaint before he was terminated?
16        A.   That's correct.
17        Q.   Did Derry Huff or your brother or anyone
18   interview you about the flight?
19        A.   No.
20        Q.   And you didn't make any written report of
21   that flight?
22        A.   No.
23        Q.   You weren't asked to do that?
24        A.   No.
25        Q.   Did you have any role in the decision to
```

33

```
 1    terminate Pat?
 2         A.   No.
 3         Q.   Okay.  And you don't remember how you
 4    learned that he had been terminated?
 5         A.   Someone told me.
 6         Q.   Okay.
 7         A.   Who, I don't know.
 8         Q.   But not in an official capacity --
 9         A.   No.
10         Q.   -- was it?
11         A.   No.  No.
12              MS. SHEA:  Okay.  Would you mark that as
13    the next exhibit?
14              (Plaintiff's Exhibit 22, FAA letter dated
15    11/10/99, was marked for identification.
16              MS. SHEA:  Would you mark that one also.
17              (Plaintiff's Exhibit 23, letter to John
18    Roseborough, was marked for identification.)
19    BY MS. SHEA:
20         Q.   Okay.  Sir, let me show you what's marked
21    as Exhibit 22, Plaintiff's Deposition Exhibit 22.
22    Can you identify that?
23         A.   Yes.  It's the letter I received in the
24    mail.
25         Q.   From the FAA; correct?
```

34

```
 1          A.    Yes.

 2          Q.    All right.  Was -- what was the date of

 3    that letter?

 4          A.    November 10th.

 5          Q.    All right.  So that he was almost three

 6    months --

 7          A.    1999.

 8          Q.    That was almost three months after the

 9    flight.  Had you known prior to that letter that Pat

10    Major had made a complaint about the take off on

11    that flight?

12          A.    No.  Not that I recall, no.

13          Q.    So this letter was the first news that you

14    had of that?

15          A.    That's correct.

16          Q.    All right.  And what did you do when you

17    received that letter?  What did you do to react to

18    it?

19          A.    I took it to an attorney.

20          Q.    Was that Amerijet's attorney or outside?

21          A.    That's just my -- that's what I did.  I

22    took it to an attorney.

23          Q.    A personal attorney?

24          A.    An attorney.

25          Q.    Well, I'm just wondering if the company --
```

```
 1            A.    Does it make a difference?  I took it to

 2    an attorney.

 3            Q.    Okay.  Let me ask you my question again.

 4    Did Amerijet provide you with an attorney for this?

 5            A.    I won't say either way.

 6            Q.    I think that you can answer that question.

 7            A.    I don't want to.

 8            MS. SHEA:  Well, then I would ask

 9    Amerijet's counsel to instruct him on that subject.

10    I'm not going to ask about the substance of any

11    communications, I'm asking whether the company

12    furnished him with counsel or he retained counsel on

13    an individual, personal basis.  It has to do with

14    the document responses and a number of other things.

15            MS. NORTON:  Let me just step outside for

16    a minute with him.  Okay?

17            MS. SHEA:  Okay.  Let the record reflect

18    they're having a conference, counsel and the

19    deponent.  I'm not going to ask about confidential

20    communications.

21                 (Discussion held off the record.)

22            MS. SHEA:  Can you read the last question

23    back?

24                 (The referred-to portion of the record was

25    read back.)
```

DOWNTOWN REPORTING     (954) 522-3376

1          A.    Yes.

2     BY MS. SHEA:

3          Q.    All right.  And let me show you what was

4     marked Exhibit 23.  Can you identify that?

5          A.    Yes, I recall this.

6          Q.    All right.  Is this -- what is it?

7          A.    It's the letter I wrote in response to

8     this.

9          Q.    This being John Roseborough's letter of

10    intent?

11         A.    That's correct.

12         Q.    Did you -- have you made any other written

13    statements concerning the flight or the events of

14    the flight of August 17th?

15         A.    I don't believe so.

16         Q.    Okay.  So looking at paragraph two on the

17    first page, in which you recount what happened on

18    this flight, there's a sentence here, I instructed

19    him, that being Pat, that we had the runway

20    conditions from ground control and it was reported

21    wet?

22         A.    That's correct.

23         Q.    Okay.  When did you get that report?

24         A.    That's what ground control gave us when he

25    asked for the -- for I'm not sure what he called it,

```
 1    either a runway condition report or a ground report.
 2    Or however he worded it, I'm not sure.
 3         Q.   Okay.  But wet is not the same thing as
 4    standing water of less than a quarter inch; is that
 5    correct?
 6         A.   No.  Wet is wet.
 7         Q.   Right.  So you did not get a report of
 8    standing water less than a quarter inch before take
 9    off?
10         A.   No.  No.
11         Q.   Okay.  Now, in the absence of a report
12    like that, it was appropriate to treat the
13    conditions as dry for analysis?
14         A.   According to our paperwork, that's
15    correct.
16         Q.   Okay.  All right.  What, if anything,
17    happened after you did this letter that -- that
18    Exhibit 23 to John Roseborough.
19              MS. NORTON:  Object to the form of the
20    question.
21    BY MS. SHEA:
22         Q.   Did you get any response?
23         A.   Not that I know of.  You mean from
24    Amerijet or from --
25         Q.   No.  You wrote John Roseborough the
```

```
 1   letter; correct?  At the FAA.

 2       A.    That's correct.

 3       Q.    What happened next?  If you know.  As it

 4   relates to you.

 5       A.    I received another letter from Atlanta, I

 6   believe.

 7       Q.    All right.

 8       A.    That's where it came from.

 9       Q.    And what did that letter say?

10       A.    That was the -- that they investigated it

11   and we were -- I had my options whether to -- how I

12   wanted to handle it.

13       Q.    Okay.  Was that a notice of proposed civil

14   penalty violation, is that what that's called?

15       A.    I'm not quite sure what they call it.  I

16   think it's a certificate action.

17       Q.    Okay.  And did you give a copy of that to

18   Amerijet?

19       A.    Yes.

20       Q.    Okay.  And it gave you some options in

21   terms of further handling of the complaint?

22       A.    That's correct.

23       Q.    All right.  And do you remember what the

24   options were?  Was it pay a fine or --

25       A.    I don't recall.  I'd have to see it again.
```

```
 1          Q.   Okay.  And what happened as a result of
 2     that?
 3          A.   It was given to the attorney.
 4          Q.   All right.
 5          A.   And he's handling it.  That's all I know.
 6          Q.   It's still open?
 7          A.   As -- to the best of my knowledge.
 8          Q.   All right.  So you don't have any
 9     paperwork on that at all?
10          A.   No.
11          Q.   In your personal possession.
12          A.   No.
13          Q.   But you did give it to Amerijet?
14          A.   That's correct.
15               MS. SHEA:  Let me ask your counsel.  I've
16     asked and asked and asked for this information.
17               MS. NORTON:  I've given you everything
18     I've gotten from Mr. Steele.  I faxed it to you on
19     Friday again.  Did you get my fax?
20               MS. SHEA:  Right.  Which is where I got
21     his letter to John Roseborough.
22               MS. NORTON:  Okay.
23               MS. SHEA:  But my discovery request
24     clearly call for the whole file, the follow up to
25     that.
```

```
 1              MS. NORTON:  I've given you everything
 2    else I've gotten.  I don't know how else to answer
 3    it.
 4              MS. SHEA:  Where is this letter from
 5    Atlanta that gave him his options?
 6              THE WITNESS:  I gave it to the attorney.
 7              MS. NORTON:  I've never seen it.  I don't
 8    know.
 9              MS. SHEA:  Do you know who the attorney
10    is?
11              MS. NORTON:  Yes.
12              MS. SHEA:  You need to get it from the
13    attorney.
14              MS. NORTON:  No, I don't.  It's his
15    personal stuff.  When he gave me something, I
16    produced it to you because it came in our
17    possession.  Okay?
18              MS. SHEA:  But you hired the attorney for
19    him.
20              MS. NORTON:  I don't care.  His counsel,
21    though.  I don't have an obligation to go to his
22    attorney.  That was not our records.
23              MS. SHEA:  I can't believe that you're
24    going to argue that you the carrier do not have
25    constructive possession of the FAA file on your
```

1   captain when you've retained a counsel for him.  I

2   mean, what kind of position is that?  You're the

3   certificate holder.

4              MS. NORTON:  Well, I know that.  But he

5   still is the one that has the records and the

6   documents.

7              MS. SHEA:  Not when he's just testified he

8   gave it all to Amerijet, he doesn't have any of it.

9              THE WITNESS:  I gave it to the attorney.

10             MS. NORTON:  I don't have it is what I'm

11  telling you.

12             MS. SHEA:  Well, you need to get it.  Are

13  you telling me you've asked the attorney for it and

14  they will not provide it?

15             MS. NORTON:  No.  I'm telling you I

16  thought I've given you everything we have.  I will

17  double check.

18             MS. SHEA:  I mean, if you're telling me

19  you're going to make a good faith request for it,

20  then I will not file a motion to compel tomorrow.

21  But if you're throwing down the gauntlet and telling

22  me to compel, then I won't wait in good faith

23  anymore.

24             MS. NORTON:  I will talk to the attorney

25  and let you know tomorrow.  I'm not going to agree

DOWNTOWN REPORTING     (954) 522-3376

42

```
 1    to something.  I don't know if there's a privilege
 2    there or not.
 3    BY MS. SHEA:
 4        Q.   Okay.  So, Captain Steele, to the best of
 5    your knowledge, it's unresolved?
 6        A.   To the best of my knowledge.
 7        Q.   Okay.  But to date, there has not been any
 8    sanction against you, such as suspension or fine or
 9    anything?
10        A.   No.  No.
11        Q.   No hearings, nothing?
12        A.   No.
13        Q.   Okay.  Do you know what, if any, actions
14    are pending against Amerijet as a result of this
15    incident?
16        A.   I don't know.
17        Q.   Internal to Amerijet, forgetting the FAA
18    and any discipline, were there any warning or other
19    repercussions to you of this August 1999 flight?
20        A.   No.
21            MS. SHEA:  Can you mark this, please.
22            (Plaintiff's Exhibit 24, letter, was
23    marked for identification.)
24    BY MS. SHEA:
25        Q.   Captain Steele, please take a look at what
```

43

```
 1      was marked Plaintiff's Exhibit 24.
 2           A.   Okay.
 3           Q.   Does that resemble in form the next
 4      correspondence that you received from the FAA after
 5      your letter to John Roseborough?
 6           A.   No.
 7           Q.   All right.
 8           A.   No.
 9           Q.   Okay.  Did the correspondence come from
10      the same person, Julianna Winters, in Atlanta, that
11      you received?
12           A.   I believe so.
13           Q.   Did it cite these sections of part 91?
14           A.   I don't know.
15           Q.   You don't recall?
16           A.   No.
17           Q.   You never got any further correspondence
18      from John Roseborough?
19           A.   Just phone conversations.
20           Q.   He never wrote you a letter saying that no
21      action was being taken?
22           A.   Not yet, no.
23                MS. SHEA:  Okay.  Excuse us one second.
24                MS. NORTON:  Sure.
25                (Discussion held off the record.)
```

```
 1   BY MS. SHEA:
 2       Q.  I just want to ask you, I think I know the
 3   answer to this one, but in your earpiece, can you
 4   hear what the first officer is saying to air traffic
 5   control, just as you can hear what air traffic
 6   control is saying to you?
 7       A.  Yes.
 8       Q.  Okay.  So it would be your habit while
 9   flying to listen to both sides of the
10   communications?
11       A.  Oh, yes.
12           MS. SHEA:  All right.  That's all the
13   questions I have.  Thank you.
14           MS. NORTON:  Okay.
15           MS. SHEA:  You're excused.
16           (Deposition concluded at 2:25 p.m.)
17
18
19
20
21
22
23
24
25
```

```
 1                        CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA        )

 4    COUNTY OF BROWARD       )

 5

 6

 7            I, the undersigned authority, certify that

 8    BRIAN A. STEELE personally appeared before me and

 9    was duly sworn.

10

11            WITNESS my hand and official seal the 11th

12    day of January, 2001.

13

14

15

16

17    _____
      BEVERLY J. GRAMM, RPR
18    Notary Public - State of Florida
      My Commission Expires:  12/19/03
19

20                  BEVERLY J. GRAMM
                    My Comm Exp. 12/19/03
21                     No. CC 896700
                   [ ] Personally Known  [ ] Other I.D.
22

23

24

25
```

DOWNTOWN REPORTING     (954) 522-3376

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3     STATE OF FLORIDA          )

 4     COUNTY OF BROWARD         )

 5

 6              I, BEVERLY J. GRAMM, Registered

 7     Professional Reporter, certify that I was authorized

 8     to and did stenographically report the deposition of

 9     BRIAN A. STEELE, that a review of the transcript was

10     not requested; and that the transcript is a true and

11     complete record of my stenographic notes.

12              I further certify that I am not a

13     relative, employee, attorney or counsel of any of

14     the parties, nor am I a relative or employee of any

15     of the parties' attorneys or counsel connected with

16     the action, nor am I financially interested in the

17     action.

18

19              DATED this 11th day of January, 2001.

20

21

22              BEVERLY J. GRAMM, RPR
                Notary Public - State of Florida
23              My Commission Expires:   12/19/03
```

BEVERLY J. GRAMM
My Comm Exp 12/19/03
No. CC 896700
[ ] Personally Known [ ] Other I.D.

```
24

25
```

DOWNTOWN REPORTING        (954) 522-3376

FAA FLIGHT STANDARDS DISTRICT OFFICE 17
FT. LAUDERDALE JET CENTER
1000 LEE WAGENER BLVD., SUITE 201
FT. LAUDERDALE, FL 33315
(954) 356-7980 X184

November 10, 1999

Captain Brian A. Steele
100 Uno Lago Drive, # 20
Juno Beach, Florida 33408

Dear Captain Steele:

### LETTER OF INVESTIGATION

File Number: 200080170011

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 16,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that you were the Captain (pilot in command) on this flight and that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely.

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

PLAINTIFF'S
EXHIBIT
23
1/8/01

Received    01-05-01    02:43pm    From-305 442 1578    -To-    -01    08 aℓ⁵ᵈ

November 20, 1999

Captain Brian A. Steele
100 Uno Lago Drive, # 201
Juno Beach, FL 33408

Mr. John Roseborough
Principal Operations Inspector
Federal Aviation Administration
1050 Lee Wagner Boulevard
Suite 201
Fort Lauderdale, FL 33315

Re:    File Number 2000SO170011

Dear Inspector Roseborough,

On August 17, 1999, I was the Captain on Amerijet Flight #827 along with the rest of the crew,
First Officer Patrick Major and Flight Engineer Brett Wise. Captain Allen Jorsey, Sr. (Senior
Check Airman) was jumpseating to perform an annual PIC Line Check. I reported for duty at
the aircraft at bout 2230Z for a 2330Z departure. At about 2315Z, a rain shower passed over the
airport. While it was raining, Captain Jorsey and I stood in the crew entryway of the aircraft and
discussed some of the operational limitations and other Line Check procedures.

As we prepared for departure the rain had stopped and I requested the ground crew to push us
back on the Amerijet ramp facing east so I could turn on the weather radar and see if there were
any storms in our departure path. There were storms to the north and the one that passed over us
to the south; however, to the east our departure path was clear of any weather. Before starting
engines. I told First Officer Major to contact ground control to see if there were any delays for
our departure. Because I noticed three to four aircraft waiting for departure on runway 9 Left,
First Officer Major also requested the runway condition. The Tower replied there are no delays,
the condition of the runway was wet and informed us that aircraft are holding at the end of 9 Left
for pilots discretion with reference to weather. After normal engine start we requested taxi, taxi
instructions were taxi out and hold short of Bravo and contact the Tower for back taxi
instructions. We then contacted the Tower and were instructed to taxi to Bravo 2 and back taxi
on to the runway in position for takeoff. When we were told to back taxi on to the runway, First
Officer Major acknowledged the clearance and also asked for the runway condition report but it
was not available at that time. I instructed him we had the runway conditions from ground
control and it was reported wet. During the back taxi on the runway, I observed no standing
water on the runway. Therefore requiring no reduction to weight or V1.



PLAINTIFF'S
EXHIBIT
23
1/8/01

We were cleared for takeoff and used normal takeoff thrust and normal climb thrust as per Amerijet's procedures. We departed Fort Lauderdale at 2347Z. The performance, runway analysis and weight and balance I used for the departure were within all the limitations specified in the Amerijet procedures.

Sincerely,

Brian A. Steele



U.S. Department
of Transportation

Southern Region
Office of the Regional Counsel

P.O. Box 20636
Atlanta, Georgia 30320

**Federal Aviation
Administration**

(404) 305-5200
(404) 305-5223 FAX

FEB 1 6 2000

CERTIFIED - RETURN RECEIPT REQUESTED

2000SO170009

Amerijet International, Inc.
David G. Bassett, President
498 S.W. 34th Street
Fort Lauderdale, FL 33315

## NOTICE OF PROPOSED CIVIL PENALTY

We have received a report of investigation, which indicates that:

1.     At all times material herein, Amerijet International, Inc., was and is the holder of
Air Carrier Operating Certificate No. PCSA059B.

2.     On or about August 17, 1999, Amerijet operated N397AJ, a Boeing 727, as
Amerijet Flight 827, under part 121 of the Federal Aviation Regulations, departing from Fort
Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida.

3.     At the time Flight 827 departed FLL, there was less than one quarter (¼) of an
inch of standing water on the departure runway.

4.     Chapter 4, Section 1A of the Airplane Operating Manual places limitations on
takeoff in water less than one quarter of an inch deep in accordance with the Airplane
Performance Manual.

5.     The Airplane Performance Manual requires a reduction in the maximum gross
takeoff weight by 17,000 pounds where the runway surface condition is that of less than one
quarter of an inch of standing water, slush, or wet snow.

6.     At the time Flight 827 departed FLL, no reduction in the maximum gross weight
of N397AJ was applied.

·7.     By reason of the foregoing, at the time Flight 827 departed FLL the takeoff weight
exceeded the weight allowed under the prevailing conditions.



000589
CONFIDENTIAL

8.    As a result, Amerijet violated the following sections of the Federal Aviation Regulations:

a.    Section 91.13(a) in that no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

b.    Section 91.605(b)(3) in that no person may operate a turbine engine-powered transport category airplane contrary to the Airplane Flight Manual, or take off that airplane unless the takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet).

Under 49 U.S.C. Sections 46301 (a)-(d), you are subject to a civil penalty not to exceed $11,000 for each violation of the regulations. By reason of the foregoing facts and circumstances, we propose to assess a civil penalty in the amount of $11,000.

Enclosed is information concerning your options in responding to this Notice. The options include participating in an informal conference with an FAA attorney and submission of information to the FAA for consideration. You must submit, in writing, your choice of the alternatives explained on the enclosed information form, on or before 30 days after you receive this Notice. If you fail to submit your choice within that time, you will have no further right to participate in the two informal procedures listed above.

EDDIE L. THOMAS
REGIONAL COUNSEL

BY: Juliana M. Winters
JULIANA M. WINTERS
Attorney
Office of the Regional Counsel

Enclosures:    Information Sheet
Reply Form
FAR 13.16 and Subpart G of Part 13

000590
CONFIDENTIAL

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
ATLANTA, GEORGIA

INFORMATION REGARDING CIVIL PENALTIES
UNDER TITLE 49 U.S.C. SECTION 46301
(ATTACHMENT TO NOTICE OF PROPOSED CIVIL PENALTY)

Under 49 U.S.C. §46301, any person who violates pertinent provisions of 49 U.S.C. §§40101 et seg., or any rule, regulation, or order issued thereunder, is subject to a civil penalty for each violation. The maximum assessment for each violation is also prescribed by law, as specified in the Notice of Proposed Civil Penalty to which this is attached. The Notice also states the amount of the proposed civil penalty for the alleged violation(s).

This proceeding is governed by the Federal Aviation Regulations (FAR) set forth in 14 C.F.R. §13.16 and 14 C.F.R. Part 13, Subpart G. Copies of these regulations are attached. WITHIN THIRTY (30) DAYS AFTER YOUR RECEIPT OF THE ENCLOSED NOTICE, you may elect to proceed in one or more of the following ways by appropriately marking the corresponding box(es) on the attached election sheet and returning it by mail or personal delivery to the address provided below.

        1.    Submit the amount of the civil penalty specified in the Notice by certified check or money order payable to the "Federal Aviation Administration." Your submission constitutes your agreement that an Order Assessing Civil Penalty in that amount may be issued without further notice, and that you waive your right to a hearing in this matter.

        2.    Submit, in writing, information and evidence demonstrating that a violation of the regulations was not committed or that, if it were, the facts and circumstances do not warrant the proposed civil penalty. Information provided will be considered in determining whether a civil penalty should be imposed and the amount of any such civil penalty. This information may be submitted in conjunction with a request for informal conference under paragraph 5. Choosing this option will not affect your right to a hearing.

        3.    Submit, in writing, information and records indicating that you are financially unable to pay the proposed civil penalty, or showing that payment of the proposed penalty would prevent you from continuing in business. This will not affect your right to a hearing.

        4.    Request that a civil penalty be assessed in a specific amount other than that proposed in the Notice, or that no civil penalty be assessed. If you choose this option, you should explain why a reduction or no civil penalty is appropriate, and provide any supporting documentation. Information provided will be considered in determining whether the amount you specified should be assessed.

        If the FAA does not accept your offer, this will not affect your right to a hearing. If the FAA accepts your offer, your request constitutes your agreement that an Order Assessing Civil Penalty in that amount may be issued without further notice, and that you waive your right to a hearing.

        5.    Request to discuss the matter informally with an FAA attorney either telephonically or in person at any Regional Office of the FAA (see attachment for addresses of Regional Offices), or at the Flight Standards

5/99 - nopcp.doc

000591
CONFIDENTIAL

informal conference, an FAA attorney will call you at the telephone designation of your choice at any place within the United States. This will not affect your right to a hearing.

IMPORTANT - The informal conference is intended to provide you with an opportunity to present your reasons why the FAA should not proceed with the action as proposed. It also is intended to provide you with an opportunity to present any supporting documentation or information you wish the FAA to consider before the agency decides whether to proceed with the proposed action. NOTE: Ordinarily, air carrier informal conferences must be held in the region which issued the Notice.

6. Request that the FAA assess a civil penalty without making findings of violations, and submit the reasons and any additional information in writing (with appropriate supporting documentation) to support your request. If the FAA does not accept your offer, your right to a hearing will not be affected. If the FAA accepts your offer, your request will constitute your agreement that a Compromise Order in that amount may be issued and that you waive your right to a hearing.

7. Request to have a hearing in accordance with Section 13.16 of the Federal Aviation Regulations. Your request must be dated and signed. A Complaint will be filed and a formal evidentiary hearing of the matter will be held by an administrative law judge, under FAR Part 13, Subpart G. At the conclusion of the hearing all issues of fact and law will be decided and a decision rendered whether and in what amount a civil penalty will be assessed. An appeal from the judge's decision to the FAA decisionmaker is available and from there to the U.S. Court of Appeals.

Your request for a hearing must be made to the Hearing Docket, Federal Aviation Administration, 800 Independence Ave., SW, Room 924A, Washington, DC 20591, Attention: Hearing Docket Clerk. You must mail a copy to the FAA attorney handling this case at the address indicated below.

Please address all correspondence in this matter to the FAA attorney who signed the Notice at the following address:

[Attorney's Name]
Office of the Regional Counsel
Federal Aviation Administration
Southern Region
P. O. Box 20636
Atlanta, GA 30320

Your response may be delivered personally to the Office of the Regional Counsel for the Southern Region at 1701 Columbia Ave., College Park, Georgia, during normal business hours.

Telephone: (404) 305-5200 (Collect calls cannot be accepted).

--

000532
CONFIDENTIAL

If you are an individual:

## PRIVACY ACT NOTICE

This notice is provided in accordance with Section (e)(3) of the Privacy Act. 5 U.S.C. Section 552a(e)(3), and concerns the information requested in the letter or form to which this Notice is attached.

A.    Authority.    This information is solicited pursuant to the Federal Aviation Act of 1958, 49 U.S.C. §§40101, et seg., and regulations issued thereunder, codified in Part 13 of Title 14 of the Code of Federal Regulations. Submission of the telephone number is voluntary. The request for information is intended to provide you with an opportunity to participate in the investigation.

B.    Principal Purpose.    The requested information is intended to assist us in contacting you regarding this enforcement case.

C.    Routine Uses.    Records from this system of records may be disclosed in accordance with the routine uses as set forth in System of Records No. DOT/FAA 847, as published from time to time in the Federal Register.

D.    Effect of Failure to Respond.    If you do not provide the requested information, there may be a delay in contacting you regarding this enforcement case, and you may forfeit your right to a hearing on the merits of this case.

CONFIDENTIAL
000593

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
ATLANTA, GEORGIA

RETURN WITHIN 30 DAYS TO:

Office of the Regional Counsel                    DATE _____
Federal Aviation Administration
Southern Region
P. O. Box 20636
Atlanta, GA  30320

Telephone:  (404) 305-5200
Facsimile:  (404) 305-5223

Subject:  Notice of Proposed Civil Penalty, Case No. _____

In reply to your Notice of Proposed Civil Penalty, I elect to proceed as
indicated by my check mark beside the numbered paragraph(s) below:

1.    [ ]    I hereby submit the amount of the proposed civil penalty with the
understanding that an Order Assessing Civil Penalty will be issued in that
amount without further notice, and that I waive my right to a hearing.

2.    [ ]    I hereby submit evidence and information, demonstrating that a
violation of the regulations did not occur as alleged or that the amount of the
penalty is not warranted by the circumstances.

3.    [ ]    I hereby submit information and records showing that I am
financially unable to pay the proposed civil penalty, or that payment of the
penalty would prevent me from continuing in business.

4.    [ ]    I hereby request that a civil penalty be assessed in the amount of
$_____ and I submit the reasons for the reduction of the proposed
amount.  My request constitutes my agreement that if this offer is accepted by
the FAA, an Order Assessing Civil Penalty in the amount I submitted may be
issued without further notice and I waive my right to a hearing.

5.    a.    [ ]    I hereby request to discuss this matter in person at an
informal conference with an attorney from your office at the location checked
below.

            Check one:

            [ ]    Office of the Regional Counsel in Atlanta, Georgia
            [ ]    Flight Standards District Office in Atlanta, Georgia
            [ ]    Office of the Regional Counsel in _____
                   (See Attached List of Regional Offices.)

                                   OR

       b.    [ ]    I hereby request a telephonic informal conference.  Please
call me at the number listed below to make arrangements for the conference.

            _____ Telephone number to call for conference

000504

CONFIDENTIAL

6.   [ ]   I hereby request that the FAA assess a civil penalty without making findings of violations, and submit my reasons.   My request constitutes my agreement that if this offer is accepted, a Compromise Order will be issued in that amount and I waive my right to a hearing.

7.   [ ]   I hereby request a hearing in accordance with Part 13, Subpart G of the Federal Aviation Regulations with the understanding that a Complaint will be filed.   I request that the hearing be held in _____ . I am sending this request both to the FAA attorney and to the Hearing Docket, Federal Aviation Administration, 800 Independence Ave., SW, Room 924A, Washington, DC 20591, Attention: Hearing Docket Clerk.


Respondent:

Signature: _____

Name: _____

Address: _____

_____

_____

Telephone: _____


Attorney/representative:

Name: _____

Address: _____

_____

_____

Telephone: _____


Interjet International

20.............

Truw

000505

CONFIDENTIAL

ADDRESSES OF THE REGIONAL OFFICES

| | |
|---|---|
| ALASKA | Alaskan Region Headquarters<br>222 West 7th Avenue, #14<br>Anchorage, AK 99513 |
| CALIFORNIA | Western-Pacific Region Headquarters<br>15000 Aviation Boulevard<br>Hawthorne, CA 90261 |
| GEORGIA | Southern Region Headquarters<br>1701 Columbia Avenue<br>College Park, GA 30337 |
| ILLINOIS | Great Lakes Region Headquarters<br>O'Hare Lake Office Center<br>2300 East Devon Avenue, Room 419<br>Des Plaines, IL 60018 |
| MASSACHUSETTS | New England Region Headquarters<br>12 New England Executive Park<br>Burlington, MA 01803 |
| MISSOURI | Central Region Headquarters<br>601 East 12th Street, Room 1558<br>Federal Building<br>Kansas City, MO 64106 |
| NEW YORK | Eastern Region Headquarters<br>JFK International Airport<br>Fitzgerald Federal Building<br>Jamaica, NY 11430 |
| OKLAHOMA | Mike Monroney Aeronautical Center<br>6500 South MacArthur<br>Oklahoma City, OK 73169 |
| TEXAS | Southwest Region Headquarters<br>2601 Meacham Boulevard - 6E<br>Fort Worth, TX 76193-0007 |
| WASHINGTON | Northwest Mountain Region Headquarters<br>1601 Lind Avenue, SW<br>Renton, WA 98055-4056 |

CONFIDENTIAL