UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PATRICK SCOTT MAJOR,                    :        CASE NO. 00-6070-Ferguson
                                                 Magistrate Judge Lurana S. Snow
        Plaintiff,                      :        L.T. Case No. 99-021746-11

vs.                                     :

AMERIJET INTERNATIONAL, INC.,           :

        Defendant.                      :
_____/

## PLAINTIFF'S
## RESPONSE IN OPPOSITION TO
## MOTION IN LIMINE (FAA ACTION)



Plaintiff, Patrick Scott Major, files this response in opposition to defendant's motion in

limine to suppress the FAA's finding that Amerijet engaged in illegal action, and as grounds

states:

1.      In pertinent part, this is an action under the Florida Whistleblower Act. Major

must prove that he objected to an **illegal** activity by Amerijet and, for one of his two

whistleblower counts, that he disclosed the illegal action to an appropriate governmental agency.

2.      Major objected to an illegal activity: specifically, a violation of federal safety

regulations in a flight on August 17, 1999. Major reported the illegality in writing, first to

Amerijet, then to NASA, and later to the FAA directly.[1]

3.      The FAA, through its local official, John Roseborough, prepared an Enforcement

Investigation Report. (Exhibit A[2]) That report contains all the items of proof, or "I.O.P.s"

_____

[1] Plaintiff's statement of facts and response to summary judgment motion filed March 23, 2001, gives the complete
picture as to the various claims in the case, the nature of the whistleblower action, the putative reason for Major's
termination, and the sequence of events.

[2] The report was produced, in redacted form, through a Freedom of Information Act request, and authenticated by
Mr. Roseborough at his deposition.

necessary to demonstrate a violation. Mr. Roseborough gathered numerous items of proof and brought them together in his report. He then analyzed those proofs under the federal aviation regulations and excerpted certain regulations he deemed pertinent. He then made findings that Amerijet **had** violated certain regulations: the subject flight took off 17,000 pounds overweight **and** was operated in a careless and reckless manner. There are companion reports for the two other flight crew members: Brian Steele and Brett Wise.

4.    The FAA's comprehensive investigatory report validated Major's report: he had complained of this exact violation. See plaintiff's NASA report, attached as Exhibit B, page 5: "Amerijet Flight 827 exceeded aircraft performance limitations and violated FAA regulations in disregard for the most basic of air safety principles and CRM . . .."

5.    No evidence could be more central to Major's case than the fact that the FAA found the exact violation which he alleged. Pursuant to his claim under section 448.102(1), Florida Statutes, Major must prove that he disclosed, or threatened to disclose . . . an activity of the employer "that is in violation of a law, rule, or regulation." Under his 448.102(3) claim, Major must prove that he objected to an activity of the employer which, likewise, is in violation of a law, rule, or regulation. Amerijet **denies** that a violation occurred.

6.    **Not one** Amerijet manager admits to this day that it was wrong and Major was correct:

> Dave Bassett (company owner): "To this date my conclusion is that there still isn't a violation." (D. 56)
>
> Derry Huff (Director of Operations): "I believe [the FAA's citation to the violation] to be inaccurate . . .. The fact that there was a reduction necessary." (D. 122)

2

> Al Jorsey, Sr. (check airman): I believe [the FAA investigation]
> has been thrown out . . .
>
> Q:    And in your opinion it was ridiculous to begin with?
> A:    Right.
> Q:    Okay.
> A:    A waste of government time.

In mulling over the importance of this evidence, which is so clearly material, the Court need only ask whether Amerijet would be frantic to **admit** this evidence had the finding gone its way.

7.    Additionally, despite 30(b)(6) notices calling for the person most knowledgeable as to "[t]he FAA investigation, and any associated penalties, of the August 17, 1999, incident, as it relates to Amerijet or any of the pilots individually," Amerijet failed to produce any witness who had personal knowledge of the FAA investigation. Bassett claimed not to have any knowledge; he only gave the paperwork to Huff. (Bassett D. 59-60) Huff was produced as the person most knowledgeable, but claimed to know nothing other than Al Jorsey was cleared and the investigation was open as to Brian Steele and the airline. (Huff D. 105-108) He had no involvement and no knowledge as to any of the particulars of the investigation. (Id.) Amerijet's failure to produce a knowledgeable witness may well be the subject of a motion at the time of trial. Thankfully, despite Amerijet's stonewalling, Major was able to get the FAA's complete files under the Freedom of Information Act.

8.    There is clearly an issue, raised by Amerijet, as to whether the subject flight was illegal. The FAA's finding is fact-based and probative. If the Court is not inclined to simply deny the motion, plaintiff respectfully requests that it be deferred until the time of trial when the Court can review this very material issue in the complete context of the case.

CASE NO. 00-6070-Ferguson

## CONCLUSION

The Court should deny defendant's motion in limine to suppress the FAA report.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was furnished via U.S. Mail

to: **Susan Potter Norton, Esquire** and **Stephen P. Santiago, Esquire**, Attorney for Defendant,

Allen, Norton & Blue, P.A., 121 Majorca, Suite 300, Coral Gables, FL 33134, this 26th day of

March, 2001.

HEINRICH GORDON HARGROVE
WEIHE & JAMES, P.A.
Attorneys for Plaintiff
500 East Broward Boulevard, Suite 1000
Fort Lauderdale, Florida 33394
Telephone:     954-527-2800
Facsimile:     954-524-9481

By: _____
VALERIE SHEA
Florida Bar No. 436800

G:\LAW\81975\002\Pleadings\Resp-Oppo-Limine-FAA001.doc

4

NasaRpt: 8/19/99, 4:42 PM page 2
Incident date:  08-17-99

NASA, Aviation Safety Reporting System (ASRS report).
Report Date: 08-18-1999, Incident Date: 08-17-99
Time: 23:40z, Location: KFLL,
Type of Operation: FAR Part 121, Supplemental Air Carrier-Cargo Only.
Type of Aircraft: B-727/200, Advanced, w/Pemco Cargo Door Modification
Engines: JT8D-15 (3).
Reported by: First Officer, Flight Experience: 7,700hrs., Ratings: Boeing 727 Type, CFI, CFII,
   MEI, A&P, FEJ, with approximately 150 hours flight experience in the last ninety days.
Flight Phase: Takeoff, Airspace: Class C
Weather Factors:      Thunderstorms in vicinity, rainshowers overhead, contaminated
   runway; conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ.    Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening.  When I arrived,
the field was under heavy rainshowers.  Anticipating a Max-weight performance-limited
takeoff on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the *Navtech* runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff decision made
June 08, 1999 out of MIA.  On that rainy morning, a Continental 727 had taxied into
position and hold RW-12, then declined takeoff clearance... requesting full length 9L,
instead.  The night before it had rained ten inches.  It was raining at the time.  While
Tower had not provided a runway condition report, the runways were obviously wet.
Amerijet flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way.
Without prompting from the captain, I declined, reminding Tower that our flight required
full-length 9L.  The captain chastised me for refusing RW-12 against his wishes (even
though we had just finished discussing that the runway analysis did not support it, even
on a dry day, even if we believed the weights reported by ramp personnel).    The captain
insisted I radio-back Tower and accept RW-12.    I demurred.    After a brief but intense
discussion, AJT 823 finally departed full-length 9L using nearly all available runway before
finally breaking ground.  9L in MIA is 1,300' longer than MIA RW-12; clearly, had we
taken 12, there may have been an accident.  However, my refusal to accept RW-12 became
the subject of a complaint by the captain which was investigated by Amerijet's acting chief
pilot.  I was exonerated for my actions that day, but it was a profoundly uncomfortable
experience...especially in light of a pending age discrimination charge against the employer
(it has promoted nine junior, younger, less-qualified first officers to captain ahead of me),
management's acts of retaliation for the charge, and the company's protracted pattern of
punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory
compliance (duty times, hazmat and weight & balance), and the equitable treatment of
pilot employees...myself among them.  The new (acting) chief pilot seemed intent on
making a difference.  At the conclusion of his investigation, he stated, "Not only did you
do the right thing, but I would have done the same thing myself.  I have, in fact, walked off
an aircraft when a captain refused to get it deiced."



PLAINTIFF'S EXHIBIT
BE  11/8/00

CONFIDENTIAL

000052

NasaRpt: 8/19/99, 4:42 PM page 3
Incident date: 08-17-99

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), as is the case in all Amerijet Runway Analysis, there are no weight decrements for wet runways that do not specifically contain "Standing water". Consequently, flight crews, the training department and dispatch personnel consider all runways "Dry" for performance planning purposes unless there exists a contamination report that contains the specific words, "Standing Water".    I have noted that some Boeing 727 performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot reduction to the Max-weight V1 speed for runways that are, "...wide-soaked with water but do not have large areas of actual standing water". As of August 17, 1999, such questions had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 200' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they were June 08. The dispatcher I queried reported to me that to his understanding Amerijet performance analysis do not contain weight-limiting decrements unless "Standing water" is reported.   I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use.    Hence, the landing numbers seem to imply a braking degradation, and perhaps an impediment to acceleration as well, resulting from wet runway surfaces... irrespective of whether or not the runway contains "Standing water". "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights.", I said.    The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' on the runway, it's dry."

As aircraft 397AJ was loaded for departure, I explained my question to the check airman, who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day.   In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms, I recommended we default to the safer solution and accept the "Standing Water ≤ 1/4" weight and V1 reduction for our flight. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain dismissed my concern,    "We'll have to takeoff between water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.    He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.



NasaRpt: 8/19/99, 4:42 PM page 4
Incident date: 08-17-99

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available." The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower". Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway. The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst in the cross-groove channels worn by successive landing and departing aircraft. No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a Max EPR, packs-off, takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect a packs-off takeoff.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch'. AJT 827 is cleared for takeoff, turn right heading one zero zero". As Tower began its transmission, the captain had advanced the throttles. The takeoff clearance was then issued without pause or delay. The captain had released the brakes before I could reply to the runway report and clearance. Suddenly, I was isolated and out of options. Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. AJT 827 used all available runway. The aircraft rotated well inside the alternating red and white lights at the departure end of the runway and the main wheels broke ground at the last possible instant. The aircraft crossed the airport boundary at less than 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that? This airline is not approved for GPS navigation."

CONFIDENTIAL

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits specified in Amerijet's Ops Specs. I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked, incredulous. "Do you realize how incongruent that sounds coming from a check airman that just encouraged a flight crew to takeoff from a contaminated runway into possible windshear fifteen thousand pounds overweight? Even if I am wrong about navigating direct, ...and I don't think I am, one could get you violated, the other will get you killed. What is safe about that?" I shook my head.

AJT flight 827 exceeded aircraft performance limitations and violated FAA regulations in disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway in an aircraft that weighed fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the inevitable consequences eventually bestowed upon any air carrier which actively cultivates a culture of non-compliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on runways that are obviously contaminated, but cannot be described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning materials, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the contamination report.

My mistake August 17, was in letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the brother of its vice president, director of operations and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Had I done so before the aircraft taxied out of the ramp for take-off, I may have avoided the circumstances which placed my crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.



NasaRpt: 8/19/99, 4:42 PM page 6
Incident date: 08-17-99

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway.   The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff.   At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...and to the more strident actions required to prevent takeoff once initiated.   But that was not the controller's responsibility.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the captain and the check airman, prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the take-off from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Honestly, that did not occur to me until later. Would it have worked? I made a judgment call and elected not to intervene once the takeoff roll began.

Contributing factors included my excessive deference to management, not only with regard to the presence of the check airman, but pertaining to the recency of what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and on-going concern for regulatory compliance and flight safety at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way by denying them promotional and professional opportunities, abusing them in the simulator if need be...exploiting the PRIA to soil their careers while sending an unmistakably clear message to other flight crew who might consider showing similar unwelcome concern for flight safety and regulatory compliance.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17.   It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

CONFIDENTIAL



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
    Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
    Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP,
    08-17-99.

Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

## CONFIDENTIAL

1722 West Las Olas Blvd., Ft. Lauderdale, FL  33312
Voice & Fax: (954) 763-7019, C-Ph: (954) 614-1507, Email: Pmajor1178@aol.com

000057

RIS: FO 2150-1

```
|----------------------------------------------------------------------|
| ENFORCEMENT INVESTIGATIVE REPORT   |  Report Number   Related Number |
| (Read Order 2150.3 for instructions) |  2000SO170009                 |
|----------------------------------------------------------------------|
|                  ALLEGED VIOLATOR IDENTIFICATION                     |
|----------------------------------------------------------------------|
| 1. Name AMERIJET INTERNATIONAL INC                                   |
|    DBA Name                                                          |
|    Designator PCSA        | 2. Address (Include zip code)           |
|                           |    PERETZ, STEPHEN I ESQ ASV            |
|                           |    KLUGER PERETZ AND KAPLAN             |
|                           |    1970 MIAMI CENTER                    |
|                           |    MIAMI                  FL 33131      |
|----------------------------------------------------------------------|
| Telephone Number ( )  -  | 3. Date of Birth  / /  | 4. Sex          |
|----------------------------------------------------------------------|
| 5. FAA Cert. # | 6. FAA Certificate Type   |                         |
|    PCSA059B    | SCHED AIR CARRIER 121 &/O |                         |
|----------------------------------------------------------------------|
| 7. Aviation Employer                                                 |
|----------------------------------------------------------------------|
|     AIRCRAFT, ENGINE, PROPELLER, COMPONENT OR APPLIANCE INVOLVED     |
|----------------------------------------------------------------------|
| 8. Make BOEING | 9. Model  727      | 10. Ident. Number  397AJ       |
|                |                    |     ACFT SN                    |
|----------------------------------------------------------------------|
| 11. Owner Name     AMERIJET INTERNATIONAL INC                        |
|                    | 12. Address (Include zip code)                  |
|                    |     498 S W 34TH ST                             |
|                    |                                                |
|                    |     FORT LAUDERDALE       FL 33315             |
|----------------------------------------------------------------------|
|                        ALLEGED VIOLATION                             |
|----------------------------------------------------------------------|
| 13. Date Occurred | 14. Time | 15. Date Known to FAA | 16. Region of Discov |
|     1999/08/17    |  19:40   |     1999/10/18        |         SO      |
|----------------------------------------------------------------------|
| 17. Location FT LAUDERDALE-HOLLYW  FT LAUDERDALE  FL    Sec Cat 1    |
|              FT LAUDERDALE                                           |
|              Airport ID FLL                                         |
```

Handwritten annotations: "Send CD", "Pre?", "See related cases", "Steele"


PLAINTIFF'S
EXHIBIT
39

EIR 00SO170009

## SECTION B - SUMMARY OF FACTS

████████████████ on Tuesday, August 17, 1999, during the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time), B-727, N397AJ operated as Amerijet flight 827, a Supplemental Air Carrier operating under FAR Part 121, departed the Fort Lauderdale-Hollywood International Airport Runway 9 Left with Standing Water Less than one quarter (1/4) of an inch on the runway. **(IOP 1, page 3; IOP 3, pp. 5 -10; IOP 4 - 5.)**

The flight was operated without adjusting the maximum takeoff weight to that required by the Airplane Performance Manual, contrary to the Airplane Operating Manual. The aircraft weight and V1 degredations required for this flight, as the aircraft was configured, for runways with standing water of less than one quarter inch were 17,000 pounds and 28 knots. **(IOP 3, pp. 5 - 10; IOP 6 - 12.)**

The aircraft was taken off at a weight 17,000 pounds greater than allowed and at an indicated V1 airspeed 28 knots faster than allowed for conditions thus degrading the performance capability. **(IOP 6 and 12.)**

By virtue of the above, the flight was further operated ████████████████████ "in a careless or reckless manner so as to endanger the life or property of another".

3

EIR 00SO170009

## SECTION C - ITEMS OF PROOF

| IOP | #PAGES | DESCRIPTION |
|-----|--------|-------------|
| 1 | 3 | VIS PERSONNEL LIST AND OPERATOR INFORMATION |
| 2 | 4 | COPIES OF PERTINENT FAR PARTS 1, 121 AND 91 |
| 3 | 10 | LETTER OF COMPLAINT FROM PATRICK S. MAJOR |
| 4 | 2 | REQUEST FOR ATC TAPE FROM FLL ATCT AND TAPE |
| 5 | 2 | TYPED TRANSCRIPT OF ATCT TAPE |
| 6 | 3 | PAGES - AOM, NAVTECH, PERFORMANCE MANUAL |
| 7 | 4 | PERFORMANCE MANUAL PAGES |
| 8 | 2 | PAGES FROM WEIGHT AND BALANCE MANUAL |
| 9 | 1 | AIRCRAFT LOG BOOK MAINTENANCE LOG PAGE |
| 10 | 1 | AMERIJET FLIGHT RELEASE |
| 11 | 1 | WEATHER SHEET |
| 12 | 1 | . B-727-200C LOAD PLAN/WEIGHT AND BALANCE |
| 13 | 2 | CERTIFIED LOI SENT TO PRESIDENT DAVID G. BASSETT |
| 14 | 2 | LOI SENT TO DAVID G. BASSETT VIA REGULAR MAIL |
| 15 | 5 | AMERIJET VIOLATION HISTORY |

```
+----------------------------------------------------------------------+
: ISIS Air Operator (VIS) Report        Air Operator Directory Information :
: Air Operator:  PCSA    AMERIJET INTERNATIONAL INC                      :
:                                                                        :
: Title:    Main Maint Location    MML     AMERIJET INTERNATIONAL INCORPORA :
: Name:                                    498 SW 34TH STREET             :
: VIS Title:                                                             :
: Phone:    -    -    Ext    FTS    -      FORT LAUDERDALE    FL 33315    :
+----------------------------------------------------------------------+
: Title:                           DOS     AMERIJET INTERNATIONAL INCORPORA :
: Name:     BASSETT, DAVID G.              498 S.W. 34TH STREET           :
: VIS Title: PRESIDENT/GENERAL MANAGER/DIRE                              :
: Phone: 954-359-7670 Ext    FTS    -      FORT LAUDERDALE    FL 33315    :
+----------------------------------------------------------------------+
: Title:    General Manager        MGR                                    :
: Name:     BASSETT, DAVID G.                                             :
: VIS Title: PRESIDENT/GENERAL MANAGER                                    :
: Phone: 954-359-0077 Ext    FTS    -                                     :
+----------------------------------------------------------------------+
```

1 OF 3

**I.O.P. # 1**

```
¦ Title:                              DOS    AMERIJET INTERNATIONAL INCORPORA ¦
¦ Name:      BASSETT, DAVID G.               498 SW 34TH STREET               ¦
¦ VIS Title: GENERAL MANAGER/SAFETY OFFICER                                   ¦
¦ Phone: 954-359-0077 Ext    FTS     -       FORT LAUDERDALE    FL 33315       ¦
+-----------------------------------------------------------------------------+
¦ Title:     Director of Oper         DOP                                      ¦
¦ Name:      STEELE, PETER A.                                                  ¦
¦ VIS Title: VICE PRESIDENT OF OPERATIONS                                      ¦
¦ Phone: 954-359-0077 Ext 777 FTS    -                                         ¦
+-----------------------------------------------------------------------------+
¦ Title:     Dir of Maintenance       DMT                                      ¦
¦ Name:      VENUTO, JOSEPH                                                    ¦
¦ VIS Title: DIRECTOR OF MAINTENANCE                                           ¦
¦ Phone: 954-359-0077 Ext    FTS     -                                         ¦
+-----------------------------------------------------------------------------+
¦ Title:     Dir of Maintenance       DMT                                      ¦
¦ Name:      SCHUMACHER, IRVING F.                                            ¦
¦ VIS Title: VICE PRESIDENT OF MAINTENANCE                                     ¦
¦ Phone: 954-359-0077 Ext    FTS     -                                         ¦
+-----------------------------------------------------------------------------+
```

2 OF 3

I.O.P. # 1

ISIS Air Operator (VLS) Report Air Operator Aircraft Inventory Info
Air Operator: PCSA    AMERIJET INTERNATIONAL INC

| AIC | Qty | FAR | Max. Pass. Demo. | Max. Pass. Appr. | Flt. Att. Number | 129 Mnt. Pgm. | FAR 135 | | | | Com- muter |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Class | Turb. | VFR | Day | |
| B-727-200 | 10 | 121 | | | | | | | | | |

3 OF 3

I.O.P. # 1

"Medical certificate" means acceptable evidence of physical fitness on a form prescribed by the Administrator.

"Military operations area" (MOA) means an airspace that is established outside Class A airspace to separate or segregate certain nonhazardous military activities from IFR Traffic and to identify for VFR traffic where these activities are conducted.

"Minimum descent altitude" means the lowest altitude, expressed in feet above mean sea level, to which descent is authorized on final approach or during circle-to-land maneuvering in execution of a standard instrument approach procedure, where no electronic glide slope is provided.

"Minor alteration" means an alteration other than a major alteration.

"Minor repair" means a repair other than a major repair.

"Navigable airspace" means airspace at and above the minimum flight altitudes prescribed by or under this chapter, including airspace needed for safe takeoff and landing.

"Night" means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time.

"Nonprecision approach procedure" means a standard instrument approach procedure in which no electronic glide slope is provided.

"Operate," with respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose (except as provided in §91.13 of this chapter) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise).

"Operational control," with respect to a flight, means the exercise of authority over initiating, conducting, or terminating a flight.

"Overseas air commerce" means the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct of furtherance of a business or vocation, in commerce between a place in any State of the United States, or the District of Columbia, and any place in a territory or possession of the United States; or between a place in a territory or possession of the United States, and a place in any other territory or possession of the United States.

"Overseas air transportation" means the carriage by aircraft of persons or property as a common carrier for compensation or hire, or the carriage of mail by aircraft, in commerce —
    (1) Between a place in a State or the District of Columbia and a place in a possession of the United States; or
    (2) Between a place in a possession of the United States and a place in another possession of the United States;

whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

"Over-the-top" means above the layer of clouds or other obscuring phenomena forming the ceiling.

"Parachute" means a device used or intended to be used to retard the fall of a body or object through the air.

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

"Pilotage" means navigation by visual reference to landmarks.

"Pilot in command" means the person who:
    (1) Has final authority and responsibility for the operation and safety of the flight;
    (2) Has been designated as pilot in command before or during the flight; and
    (3) Holds the appropriate category, class, and type rating, if appropriate, for the conduct of the flight.

"Pitch setting" means the propeller blade setting as determined by the blade angle measured in a manner, and at a radius, specified by the instruction manual for the propeller.

"Positive control" means control of all air traffic, within designated airspace, by air traffic control.

"Powered-lift" means a heavier-than-air aircraft capable of vertical takeoff, vertical landing, and low speed flight that depends principally on engine-driven lift devices or engine thrust for lift during these flight regimes and on nonrotating airfoil(s) for lift during horizontal flight.

"Precision approach procedure" means a standard instrument approach procedure in which an electronic glide slope is provided, such as ILS and PAR.

I OF 4



I.O.P. # 2

Amend #47 eff 8-4-97

© JEPPESEN SANDERSON, INC., 1996, 1997. ALL RIGHTS RESERVED.

## SUBPART T — FLIGHT OPERATIONS

### 121.531 APPLICABILITY

This subpart prescribes requirements for flight operations applicable to all certificate holders, except where otherwise specified.

### 121.533 RESPONSIBILITY FOR OPERATIONAL CONTROL: DOMESTIC OPERATIONS

(a) Each certificate holder conducting domestic operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
(1) Monitoring the progress of each flight;
(2) Issuing necessary information for the safety of the flight; and
(3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

### 121.535 RESPONSIBILITY FOR OPERATIONAL CONTROL: FLAG OPERATIONS

(a) Each certificate holder conducting flag operations is responsible for operational control.

(b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning, delay, and dispatch release of a flight in compliance with this chapter and operations specifications.

(c) The aircraft dispatcher is responsible for —
(1) Monitoring the progress of each flight;
(2) Issuing necessary instructions and information for the safety of the flight; and
(3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo and airplane.

(e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(f) No pilot may operate an aircraft in a careless or reckless manner so as to endanger life or property.

### 121.537 RESPONSIBILITY FOR OPERATIONAL CONTROL: SUPPLEMENTAL OPERATIONS

(a) Each certificate holder conducting supplemental operations —
(1) Is responsible for operational control; and
(2) Shall list each person authorized by it to exercise operational control in its operator's manual.

(b) The pilot in command and the director of operations are jointly responsible for the initiation, continuation, diversion, and termination of a flight in compliance with this chapter and the operations specifications. The director of operations may delegate the functions for the initiation, continuation, diversion, and termination of a flight but he may not delegate the responsibility for those functions.

(c) The director of operations is responsible for canceling, diverting, or delaying a flight if in his opinion or the opinion of the pilot in command the flight cannot operate or continue to operate safely as planned or released. The director of operations is responsible for assuring that each flight is monitored with respect to at least the following:
(1) Departure of the flight from the place of origin and arrival at the place of destination, including intermediate stops and any diversions therefrom.
(2) Maintenance and mechanical delays encountered at places of origin and destination and intermediate stops.
(3) Any known conditions that may adversely affect the safety of flight.

(d) Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and aircraft. The pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.

(e) Each pilot in command of an aircraft is responsible for the preflight planning and the operation of the flight in compliance with this chapter and the operations specifications.

**I.O.P. # 2**

**2 OF 4**

© JEPPESEN SANDERSON, INC., 1996. ALL RIGHTS RESERVED.

## SUBPART G — ADDITIONAL EQUIPMENT AND OPERATING REQUIREMENTS FOR LARGE AND TRANSPORT CATEGORY AIRCRAFT

**91.601     APPLICABILITY**

This subpart applies to operation of large and transport category U.S.-registered civil aircraft.

**91.603     AURAL SPEED WARNING DEVICE**

No person may operate a transport category airplane in air commerce unless that airplane is equipped with an aural speed warning device that complies with §25.1303 (c)(1).

**91.605     TRANSPORT CATEGORY CIVIL AIRPLANE WEIGHT LIMITATIONS**

(a) No person may take off any transport category airplane (other than a turbine-engine-powered airplane certificated after September 30, 1958) unless —
  (1) The takeoff weight does not exceed the authorized maximum takeoff weight for the elevation of the airport of takeoff;
  (2) The elevation of the airport of takeoff is within the altitude range for which maximum takeoff weights have been determined;
  (3) Normal consumption of fuel and oil in flight to the airport of intended landing will leave a weight on arrival not in excess of the authorized maximum landing weight for the elevation of that airport; and
  (4) The elevations of the airport of intended landing and of all specified alternate airports are within the altitude range for which maximum landing weights have been determined.
(b) No person may operate a turbine-engine-powered transport category airplane certificated after September 30, 1958, contrary to the Airplane Flight Manual, or take off that airplane unless —
  (1) The takeoff weight does not exceed the takeoff weight specified in the Airplane Flight Manual for the elevation of the airport and for the ambient temperature existing at the time of takeoff;
  (2) Normal consumption of fuel and oil in flight to the airport of intended landing and to the alternate airports will leave a weight on arrival not in excess of the landing weight specified in the Airplane Flight Manual for the elevation of each of the airports involved and for the ambient temperatures expected at the time of landing;
  (3) The takeoff weight does not exceed the weight shown in the Airplane Flight Manual to correspond with the minimum distances required for takeoff, considering the elevation of the airport, the runway to be used, the effective runway gradient, the ambient temperature and wind component at the time of takeoff, and, if operating limitations exist for the minimum distances required for takeoff from wet runways, the runway surface condition (dry or wet). Wet runway distances associated with grooved or porous friction course runways, if provided in the Airplane Flight Manual, may be used only for runways that are grooved or treated with a porous friction course (PFC) overlay, and that the operator determines are designed, constructed, and maintained in a manner acceptable to the Administrator.
  (4) Where the takeoff distance includes a clearway, the clearway distance is not greater than one-half of —
    (i) The takeoff run, in the case of airplanes certificated after September 30, 1958, and before August 30, 1959; or
    (ii) The runway length, in the case of airplanes certificated after August 29, 1959.
(c) No person may take off a turbine-engine-powered transport category airplane certificated after August 29, 1959, unless, in addition to the requirements of paragraph (b) of this section —
  (1) The accelerate-stop distance is no greater than the length of the runway plus the length of the stopway (if present); and
  (2) The takeoff distance is no greater than the length of the runway plus the length of the clearway (if present); and
  (3) The takeoff run is no greater than the length of the runway.

**I.O.P. # 2**

**3 OF 4**

**A** *Amend #256 eff 3-20-98*

© JEPPESEN SANDERSON, INC., 1990, 1998. ALL RIGHTS RESERVED.

v-06070-WJZ  Document 140   Entered on FLSD Docket 03/27/2001   P

(d)   Any person taking off or landing a helicopter certificated under *part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting height-speed envelope established for that helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

### 91.11   PROHIBITION AGAINST INTERFERENCE WITH CREWMEMBERS

No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

### 91.13   CARELESS OR RECKLESS OPERATION



(a)   *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

(b)   *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

### 91.15   DROPPING OBJECTS

No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property. However, this section does not prohibit the dropping of any object if reasonable precautions are taken to avoid injury or damage to persons or property.

### 91.17   ALCOHOL OR DRUGS

(a)   No person may act or attempt to act as a crewmember of a civil aircraft —
   (1)   Within 8 hours after the consumption of any alcoholic beverage;
   (2)   While under the influence of alcohol;
   (3)   While using any drug that affects the person's faculties in any way contrary to safety; or
   (4)   While having .04 percent by weight or more alcohol in the blood.

(b)   Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.

(c)   A crewmember shall do the following:
   (1)   On request of a law enforcement officer, submit to a test to indicate the percentage by weight of alcohol in the blood, when —
      (i)   The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and
      (ii)   The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.
   (2)   Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates percentage by weight of alcohol in the blood.

*4 OF 4*

## I.O.P. # 2

*(Not published herein — Ed.)

© JEPPESEN SANDERSON, INC., 1990. ALL RIGHTS RESERVED.

Hand Delivered

John C. Roseborough
Principal Operation Inspector
FAA, FSDO-19
1050 Lee Wagener Blvd Suite 201
Ft Lauderdale FL 33315

Ronald DiVecca

RECEIVED BY

OCT 14 1999

FEDERAL AVIATION ADMINISTRATION
FSDO-19
FT. LAUDERDALE

Patrick & Beth Major

1 OF 10

I.O.P. # 3



**Patrick Major**

John C. Roseborough
Principal Operations Inspector
Federal Aviation Administration
Flight Standards district Office - 17
1050 Lee Wagener Blvd., Suite 201
Ft. Lauderdale, FL 33315
Voice: (954) 356-7523, Extension 154
Fax:    (954) 356-7531

10-01-99

Dear John,

Following is the text of three memo's-and letters regarding Amerijet Flight 827, 08-17-99, which you and I discussed, Thursday, September 16th.

I reported the incident to the director of operations and chief pilot as required by Amerijet's GOM, recommending the safety officer be notified as well, then sent a report to NASA's ASRS (Aviation Safety Reporting System). Amerijet's GOM further requires that its POI be notified: Thirty days after the incident, you told me it had yet to be reported by anyone other than me.

John, the termination of my employment is a classic whistle blower scenario; the only event between my being an employee in good standing and being fired because Amerijet had, "...lost confidence in my abilities as an airman..." is the complaint regarding a takeoff 15,000Lbs over the maximum performance limit for conditions at the field. That is the subject of a complaint to the DOT Inspector's General's Office. But, I am most concerned that if Amerijet does not immediately change its policies regarding takeoff from wet runways, someone is going to get hurt. The question is, will the FAA take action before that happens, or wait until newspaper headlines, carnage, catastrophe and public outrage leave it no other choice.

If I can be of further assistance, do not hesitate to contact me. The cellular phone is the best way to reach me.

Warmest Regards,

Patrick Major

Z OF 10



**I.O.P. #3**



**Patrick Major**

**Memo To:** Derry Huff, Chief Pilot (acting), Amerijet International, Inc.
        Pete Steele, Director of Operations and Interim Chief Pilot.
**Date:** 08-18-99
**Subject:** Contents of National Aeronautics and Space Administration Aviation Safety
Reporting System Report, (NASA Report) concerning AJT flight 827, KFLL-TTPP, 08-17-99.


Derry and Pete:

Following is the text of a report I today submitted to the NASA Aviation Safety Reporting
System (ASRS).

I respectfully suggest you submit a copy to Amerijet's safety officer.

Warmest Regards,

Pat


3 OF 10



**I.O.P. #3**



**Patrick Major**

**FAX**
The following facsimile transmission contains 6 pages, including this cover. Should you encounter any problems in reception, call Pat Major at (954) 614-1507.


**FAX To:** David Bassett, CEO, Designated Safety Officer, Amerijet International, Inc.
**Date:** 08-25-99
**Subject:** NASA ASRS Report

Greetings Dave,

Al Jorsey, Sr. indicated that should I want to ensure you are aware of the take-off performance planning problems recently encountered in FLL, particularly with regard to wet runways, then I should fax a copy of the following report directly to you.

I sent a copy to Pete and Derry last week requesting you be copied in entirety, but Al had little confidence you would ever see it if I did not submit it to you directly.

The issues are too important here to leave to chance. So, here you go. If this is a duplicate, accept my apologies.

Warmest Regards,

Pat

$4$ OF $10$



**I.O.P. #$3$**



Copy for John Rosebraugh,    **Patrick Major**
POI, FAA, FSDO-17

## NASA, Aviation Safety Reporting System
### (ASRS report)

**Report Date:** 08-18-1999, Incident Date: 08-17-99    ←——
**Time:** 23:40z, **Location:** KFLL,
**Type of Operation:** FAR Part 121, Supplemental Air Carrier-Cargo Only.
**Type of Aircraft:** B-727/200, Advanced, w/Pemco Cargo Door Modification
**Engines:** JT8D-15 (3).
**Reported by:** First Officer, Flight Experience: 7,700hrs.,
**Ratings:** Boeing 727 Type, CFI, CFII, MEI, A&P, FEJ, FAR Part 142 Certified Pilot and Flight
Engineer Instructor/Boeing 727.
**Flight Phase:** Takeoff, **Airspace:** Class C.
**Weather Factors:** Thunderstorms in vicinity, rainshowers overhead, contaminated runway;
conditions ripe for windshear.

### Incident Description

At 22:00z, August 17, 1999, I reported for duty as first officer aboard Amerijet International,
Inc. (AJT) Flight 827, Boeing 727, N397AJ. Thunderstorms and rainshowers had passed
through the area and were forecast to continue throughout the evening. When I arrived, the
field was under heavy rainshowers. Anticipating a max-weight performance-limited takeoff
on Runway 9L for Port of Spain, Trinidad, I called dispatch to pursue an updated
interpretation regarding the Navtech runway analysis in use by Amerijet.

The question regarding 9L in FLL initially came up as the result of a takeoff controversy
which took place June 08, 1999, out of MIA. On that rainy morning, a Continental 727 had
taxied into position and hold RW-12, then declined takeoff clearance... requesting full length
9L, instead. The night before it had rained ten inches. It was raining at the time. While
Tower had not provided a runway condition report, the runways were obviously wet. Amerijet
flight 823 was offered RW-12 as soon as the Continental 727 taxied out of the way. Without
prompting from the captain, I declined, reminding Tower that our flight required full-length 9L.
The captain chastised me for refusing RW-12 against his wishes (even though we had just
finished discussing that the runway analysis did not support it, even on a dry day, even if we
believed the weights reported by ramp personnel). The captain insisted I radio-back Tower
and accept RW-12. I demurred. After a brief discussion, AJT 823 finally departed full-length
9L using nearly all available runway before finally breaking ground. 9L in MIA is 1,300'
longer than MIA RW-12; clearly, had we taken 12, there may have been an accident.



5 OF 10

**I.O.P. #3**

However, my refusal to accept RW-12 became the subject of a disciplinary complaint by the captain which was investigated by Amerijet's acting chief pilot. I was exonerated for my actions that day, but it was a profoundly uncomfortable experience...especially in light of a pending age discrimination charge against the employer (it has promoted nine junior, younger, less-qualified first officers to captain ahead of me), management's acts of retaliation against me for the charge, and the company's protracted pattern of punitive behavior toward me as a result of my efforts pertaining to flight safety, regulatory compliance (duty times, hazmat and weight & balance), and the equitable treatment of pilot employees...myself among them. The new (acting) chief pilot seemed intent on making a difference. At the conclusion of his investigation, he stated, "Not only did you do the right thing, but I would have done the same thing myself. I have, in fact, walked off an aircraft when a captain refused to get it deiced."

In both my report and addendum to the chief pilot concerning the June 08, incident, I asked pointedly what those circumstances might foreshadow regarding Amerijet's plans to move its airside cargo-handling and flight operations to FLL. 9L FLL is 355 feet shorter than 12 in MIA. While flaps 20 are used in FLL (normal takeoff settings were flaps 15 in MIA), regardless how wet a runway, Amerijet flight crews are taught by the training department and warned by dispatch personnel to consider all runways "Dry" for performance planning purposes unless there exists a contamination report containing the specific words, "Standing Water." Though there are frequent storms in the area, rarely are contamination reports conducted at South Florida Airports. Most airlines encourage their crews to simply accept the "Standing Water less than 1/4"" penalty...reasoning that the penalty applies to depths as shallow as 1/8"... and is clearly the safest option. Some Boeing performance materials stipulate a 7,000 Lb. weight reduction and a 13 knot max-weight V1 speed reduction for runways that are, "...well-soaked with water but do not have large areas of actual standing water." But absent a contamination report specifically including the term "Standing Water", Amerijet considers all runways dry. Considering drag induced as aircraft tires displace water on the runway surface, additional drag produced by water spraying against the fuselage and wings, as well as reduced braking implications, that policy could be a recipe for disaster. As of August 17, 1999, these concerns had gone unanswered by Amerijet flight operations, training, management, dispatch and administrative personnel.

The captain on flight 827, August 17, was one and the same as the captain on flight 823, June 08. 9L in FLL is 355' shorter than 12 in MIA: 1,501' shorter than MIA 9L. The conditions were significantly worse August 17, than they had been June 08. Even so, the dispatcher I queried reported to me that to his understanding Amerijet performance policies do not observe weight penalties unless "Standing water" is reported. I pointed out that for landing weight limits, the only criteria are wet Vs dry, anti-skid operating or inop, and the flap setting in use. Hence, the landing numbers imply a braking degradation and an impediment to acceleration when runway surfaces are wet ... irrespective of whether or not the runway contains "Standing water." "I would think that wet-runway braking degradation would effect V1 speed and takeoff limit weights," I said. The dispatcher replied, "I will look into it, but for dispatch purposes, unless there is 'standing water' actually reported on the runway, it's dry."

6 OF 10

I.O.P. # 3

As aircraft 397AJ was loaded for departure, I explained my question to the check airman who arrived shortly before the captain, then to the captain, who was the subject of a line-check that day. In light of the apparent information gap in the runway analysis, intermittent heavy rain on the field, large puddles of water throughout the ramp area, and surrounding thunderstorms,. I recommended we default to the safest solution and accept the "Standing Water ≤ 1/4" weight and V1 penalty. That would require a 17,000 Lb. reduction in the flaps 20 runway limit from 195,200 Lbs (26 degrees Celsius), to 178,200 Lbs, and reduce the maximum performance-limited V1 speed by 28 Kts. The reported weight of our aircraft that day was 192,298 Lbs. The result would have been an extensive additional delay to wait for the weather to clear; the flight was already more than eight hours late. Both the check airman and the captain jokingly dismissed my concern, "We'll have to takeoff between the water droplets."

Push-back occurred at approximately 23:40z. As AJT 827 began to start engines, the captain noticed a seven plane wait for departure on 9L...all transport category air carriers.    He instructed the crew to start the number one engine only, then asked me to call for taxi clearance and request information pertaining to the reason for the apparent delay.

Ground Control reported that the delay was due to "Pilot discretion" regarding conditions at the field and weather in the vicinity. I asked if a runway report was available. "No braking action reports have been made. A runway inspection report is not yet available."    The ground controller then offered that if Amerijet 827 desired an immediate departure, we could expect to back-taxi on 9L into position-and-hold: "Contact Tower".    Before I could switch frequencies, though, the ground controller transmitted again asking us to stay with her as she contacted a USAir 737 that had turned itself around on the taxi-way in front of us ... ostensibly to note radar returns in the direction of takeoff and to get a better look at the runway surface.    The ground controller then called "Ramp One" to request a runway inspection. Once the USAir 737 was out of the way, Amerijet 827 was again instructed to contact Tower. Before leaving the frequency, I asked Ground to pass the runway report to Tower for relay to us when it became available.

Tower instructed AJT 827 to back-taxi into position and hold, 9L. As we did, I noted aloud that the rain intensity had increased, that there was definitely standing water on the runway, and that it appeared worst adjacent the channels of accumulated rubber left by successive landing and departing aircraft.    No contamination report had been relayed, as yet; it looked like we were going without it. So, I asked the captain if he would use a packs-off takeoff, "...For the grandmothers, wives and kids?" The captain seemed to consider my request, but did not answer; nor did he instruct the flight engineer(s) to expect it.

As AJT 827 turned into position and hold, Tower relayed the runway contamination report: "Amerijet 827, Ramp One reports the runway condition as follows: 'Wet, Standing Water, less than 1/4 inch. AJT 827 is cleared for takeoff, turn right heading one zero zero." As Tower began its transmission, the captain advanced the throttles and released the brakes. Probably because the aircraft was already rolling, tower issued the takeoff clearance without pause or delay. Before I could even begin to reply to the report and clearance, the aircraft was accelerating down the runway.    Previously, I thought I would have a chance to prevent

7 OF 10    I.U.P. # 3

the takeoff when the controller inevitably asked, "AJT 827, state your intentions." He did not. Suddenly, I was isolated and out of options.    Neither the flight engineer, flight engineer trainee, check-airman, or captain shared my concern regarding the weather, runway contamination, or overweight takeoff.

Despite the circumstances, I did not forcibly retard the throttles, stand on the brakes or otherwise interfere with the captain's choice to takeoff. Perhaps, I should have. I feared an aborted takeoff on a wet runway with the captain and I fighting over the controls could have been just as dangerous.    If all three engines operated normally, if no windshear was encountered, perhaps the takeoff would be safer than a mutiny-abort on a wet runway in driving rain. AJT 827 used all available runway.    The captain rotated well inside the ⟵ alternating red and white lights at an indicated airspeed five knots below V1.    The main wheels broke ground at the last possible instant and the aircraft crossed the airport boundary at approximately 100' struggling to attain V2, then V2 plus ten Kts, with the airspeed fluctuating +/- 3-5 Kts. I called-out the fluctuations then held my breath, praying for altitude.

Later, after we had weaved our way through the surrounding thunderstorms, as I accepted a direct clearance from abeam Beach Intersection to the Dorado (DDP) NDB, a distance of nearly 900 nautical miles, the check airman challenged me, "How can you accept that?  This airline is not approved for GPS navigation." (referring to the GPS installed in the aircraft, but not approved in the ops specs).

"By knowing where I am, then drawing a straight line on my chart and navigating." I replied. "I don't need RNAV to go direct. I can accept a direct clearance to anywhere on the planet as long as I can navigate within the limits of Class II navigation described in the Ops Specs.  I can confirm progress along my route by checking crossing radials and DME. I just need to be able to pinpoint my position at least once each hour."

"That may be. But the safest way is to ask for a heading."

"The safest way?" I asked. "Do you realize how incongruent that sounds coming from a check airman who just goaded a flight crew into taking off from a contaminated runway into possible windshear fifteen thousand pounds over the maximum performance limit? Even if I am wrong about navigating direct, ...and I don't think I am, one could get us violated, the other will get us killed. What is safe about that?"

AJT flight 827 exceeded aircraft limitations and violated FAA regulations in flagrant disregard for the most basic of air safety principles and CRM (cockpit resource management). It took off from a contaminated runway weighing fifteen thousand pounds more than the maximum specified for conditions... in circumstances ripe for windshear.

Not only am I concerned that the consequences inevitably bestowed upon any air carrier which actively cultivates a culture of noncompliance will soon come to roost at Amerijet, and for the devastation and loss of life such a tragedy would entail, but for the missing information in Amerijet's runway analysis pertaining to performance degradations on

8 OF 10        **I.O.P. #** 3

runways that are obviously contaminated, but have not been officially described as containing "Standing Water." Had the lesser limit been included in Amerijet takeoff performance and planning policies, the captain and check airman may not have been so inclined to disregard the more severe weight-limit reductions when the words "Standing Water" were specified in the official report.

Among my many mistakes August 17, was letting myself be intimidated by the presence of a check airman...a consummate professional airman and former army aviator who had previously demonstrated remarkable character, integrity and resolve amid a management hierarchy internally conflicted of manipulation, control and incompetence. Although it should not have been necessary, due to my deference to the check airman and to one of the most senior captains in Amerijet's employ (the 'sacred cow' brother of its vice president, director of operations, and interim chief pilot), I did not insist that the flight crew agree to a plan of action should the runway contamination report come back with the "Standing Water" terminology included. Admittedly, that was the captain's job, but had I insisted on such a plan before the aircraft taxied out of the ramp for takeoff, I may have avoided the circumstances which placed me and the rest of the crew in the position of risking our lives to do something abominably, unconscionably stupid: taking off overweight into adverse weather with a check airman and captain all too eager to one-up each other in their disregard for regulations, aircraft limitations, flight safety, and common sense.

After transmitting its report, Tower might have asked, "AJT 827, State your intentions". There had been no prior report indicating "Standing Water" on the runway. The controller could have surmised that the Amerijet crew might want to reconsider their circumstances before commencing takeoff once such a report was issued. At very least, it would have presented an opportunity for me to key the mike and request permission to taxi clear of the runway...the resulting criticism from the check airman and captain much preferred when compared to the risk of an overweight departure into possible windshear...as well as the strident actions required to prevent takeoff once initiated. But with the aircraft already rolling, Tower probably figured he had his answer.

While I went well beyond the call of reasonableness in repeatedly voicing my concerns to the chief pilot, dispatch, the check airman and captain prior to the flight, as well as to everyone in my crew immediately before the incident, I did not do everything possible to prevent Amerijet flight 827 from taking off August 17. I should not have allowed the aircraft to depart. Would forcibly aborting the takeoff from the right seat have presented a less dangerous scenario than what we encountered? Who can say? I decided against it. Should I have pressed the push-to-talk on my radio and transmitted over the open tower frequency while commanding the captain to abort the takeoff...embarrassing him into it? Would that have worked? Honestly, that did not occur to me until later. I made a judgment call and elected not to intervene once the takeoff roll began. Not a day passes that I don't relive the possible consequences of my choice.

Contributing factors included my deference to authority in the cockpit, not only with regard to the presence of a check airman who I held in high regard, and that particular captain (most other captains would not have been out there to start with), but pertaining to the recency of

9 OF 10    I.O.P. # 3

what, despite its outcome, can only be characterized as a rebuke subsequent to a similar experience slightly more than sixty days prior, as well the protracted reprimand implied by a succession of denials for promotional, professional, training and income opportunities as a result of my age and ongoing concern for flight safety and regulatory compliance at Amerijet.

In light of Amerijet management's unwillingness to address these matters in the past, I am concerned what might happen the next time a runway is wet and an aircraft prepares for a performance limited takeoff. I have addressed it specifically with the chief pilots (both acting and interim), the directors of operations, dispatch and training. I provided them a copy of this report and recommended that it be forwarded in its entirety to the airline's designated safety officer (its CEO). The overwhelming corporate imperative has been to get the job done at any cost; to punish those who stand in the way, impervious to the legitimacy of their concerns, by denying them promotional and professional opportunities, abusing them in the simulator if need be, terminating their employment and exploiting the PRIA (Pilot Records Improvement Act, 1996) to soil their careers... while sending an unmistakably clear message to other flight crew lest they, too, consider showing unwelcome interest in flight safety.

Despite all that, I had a job to do at 23:50 or so Tuesday evening, August 17. It did not get done. That is the reason for this report. I hope it will do someone, somewhere, some good.

Respectfully submitted,

copy for John Roseborough
POI, FAA, FSDO - 17

10-01-95

10 OF 10

I.O.P. # 3



# Memorandum

U.S. Department
of Transportation
**Federal Aviation**
**Administration**

Ft. Lauderdale International ATC Tower
4150 S.W. 12 Terrace
Ft. Lauderdale, Fl. 33315

Subject **INFORMATION:** Tape Request

Date: October 25, 1999

From: Manager

Reply To
Attn. of: FLL-2

Ft. Lauderdale Int'l ATC Tower

To: Manager, Ft Lauderdale FSDO-17

Per telephone request of October 22, 1999, the following tape recording is enclosed.

Ft. Lauderdale ATC Tower
August 17, 1999 UTC
Ground Control 2340 UTC-0000 UTC
Local Control North 2340 UTC – 0000 UTC

Please advise if we can be of any further assistance.

Ronald S. Boyd

1 OF 2
I.O.P. # 4



4

FORT LAUDERDALE INTERNATIONAL AIR TRAFFIC CONTROL TOWER
CERTIFIED RE-RECORDING OF AMERIJET (PCSA) FLIGHT 827 OCCURRING
AUGUST 17, 1999 DURING THE TIME PERIOD FROM 2340 UTC - 0000 UTC
(1940 - 2000 LOCAL DAYLIGHT SAVINGS TIME).

THE RE-RECORDING WAS PREPARED BY MICHAEL T. JONES, SUPPORT
SPECIALIST AT THE FORT LAUDERDALE-HOLLYWOOD AIR TRAFFIC
CONTROL TOWER.

THE COUNTER NUMBERS BELOW REPRESENT EITHER AMERIJET OR
FORT LAUDERDALE ATC VOICE COMMUNICATIONS AS PERTAIN TO AMJ
FLIGHT 827.  MOST OTHER VOICE COMMUNICATIONS HAVE NOT BEEN
IDENTIFIED WITH COUNTER NUMBERS.  DUE TO THE EXTRANEOUS NOISE
EMITTED IN THE SIDETONE OF THE RE-RECORDING, A CLEARER VOICE
TRANSMISSION/RENDITION CAN BE HEARD WHEN PLAYED ON A STEREO
RECORDER/PLAYER WITH THE VOLUME ON ONE SIDE TURNED LOWER.

| COUNTER (APPROX.) | DIALOGUE | BY |
|---|---|---|
| 129 | DELAY AHEAD? | AMJ |
| 138 | RWY CONDITION WET, NO REPORTS | ATC |
| 146 | WE'RE GONNA NEED A STANDING WATER REPORT | ATC |
| 168 | AMJ 827 REQUESTS TAXI | AMJ |
| 171 | AMJ 827 HOLD SHORT OF TAXIWAY BRAVO, STAND BY | ATC |
| 183 | RAMP 1 CALLS FLL ATCT | |
| 194 | AMJ 827 CALLS ASKING FOR THE CURRENT WINDS | AMJ |
| 198 | AMJ 827, WILL YOU BE ABLE TO DEPART | ATC |
| 203 | AMJ 827, TAXI TO RUNWAY 9 LEFT | ATC |
| 239 | RAMP ONE CALLS | |
| 241 | PROCEED | ATC |
| 243 | AJT IS ASKED IF THEY CAN ACCEPT DEPARTURE | ATC |
| 276 | RAMP ONE CALLS | |

279    RAMP ONE ADVISES LESS THAN ¼ INCH, GOOD DRAINAGE,
SLIGHT STANDING WATER ABOUT 6 FEET ON EITHER SIDE OF
CENTERLINE

349    CONVECTIVE SIGMET 51E AVAILABLE                ATC



**I.O.P. # 5**

1 OF 2

433 LOCAL CONTROL, NORTH POSITION COMMUNICATIONS BEGIN

464 DELTA 312 HEAVY (LOCKHEED L-1011, TRISTAR)
466 DELTA 312, CLEARED FOR TAKEOFF                                ATC

512 US AIR 2335 CALLS TO INQUIRE ABOUT WHAT WEATHER ATC SHOWS WITHIN 15 MILES OF FLL. ATC ADVISES THAT MAIN BODY OF STORM WILL BE AVOIDED WITH A 110 DEGREE HEADING AFTER TAKEOFF (20 DEGREES RIGHT OF TAKEOFF HEADING)

584 AMJ827 CALLS                                                  AMJ
585 AMJ 827, ARE YOU READY FOR DEPARTURE                          ATC

586 YES SIR, 827, YOU'LL PASS ON THAT RUNWAY REPORT WHEN YOU GET IT, RIGHT?                                              AMJ

587 YES, HE'S OUT THERE INSPECTING IT RIGHT NOW                   ATC

589 AMJ 827, GO OUT B2 AND BACK TAXI INTO POSITION AND HOLD                                                              ATC

607 AMJ 827, HE REPORTS THERE'S SOME STANDING WATER LESS THAN A QUARTER ON AN INCH                                       ATC

609 SOME STANDING WATER LESS THAN A QUARTER OF AN INCH, AMJ 827 READY FOR TAKEOFF                                        AMJ

610 AMJ 827 RUNWAY 9 LEFT CLEARED FOR TAKEOFF, TURN RIGHT HEADING 110                                                    ATC

611 RIGHT HEADING 110, CLEARED FOR TAKEOFF, AMJ 827, THANK YOU MUCH.                                                     AMJ

832 CHANGE YOUR CODE TO 1153                                      ATC
833 1123, 827                                                     AMJ

THANK YOU, CONTACT MIAMI DEPARTURE                                ATC



I.O.P. # 5
2 OF 2

v-06070-WJZ   Document 140   Entered on FLSD Docket 03/27/2001   P

CHAPTER    4 - OPERATIONS PROCEDURES                    REFERENCE:    4:1:55
SECTION    1A - OPERATING PROCEDURES                    ISSUED:       09-01-85
SUBJECT    55 - ADVERSE WEATHER TAKEOFF AND CLIMB       SUPERSEDES:   0
                                                        PAGE:         1

ADVERSE WEATHER TAKEOFF AND CLIMB - Reference 4:1:55

## Takeoff Limitations

Takeoff should not be attempted if the following limitations are exceeded:

- Dry snow more than 6 inches deep.

- Slush or wet snow more than 1/2 inch deep.

- Water more than 1/4 inch deep.

When values less than the aforementioned limits exist, check Performance Manual for appropriate reductions to maximum takeoff gross weight.

> CAUTION: DURING TAKEOFF, SNOW AND SLUSH PICKED UP BETWEEN THE NOSE-
> WHEEL TIRES MAY BE THROWN BACK AND PACKED INTO THE RAM AIR
> INLET, CAUSING BOTH AIR CONDITIONING PACKS TO TRIP OFF. TO
> REDUCE THE POSSIBILITY OF THIS OCCURRING, THE RAM AIR DOORS
> MAY BE POSITIONED TO THE FULL CLOSED POSITIONS JUST PRIOR TO
> TAKEOFF.

## Airplane Control

Exercise extreme caution in crosswinds. Normally, it is recommended that a runway more into the wind be requested when crosswind components over 15 kts are reported on known slippery runways.

> CAUTION: ENSURE THAT PARKING BRAKE IS RELEASED BEFORE STARTING
> TAKEOFF ROLL ON ICE OR SNOW COVERED RUNWAYS.

## Setting Takeoff Thrust

Align the airplane with the runway before increasing thrust. If engine anti-ice is being used for takeoff, ensure that engine thrust is increased to the highest practicable setting (80% N1 recommended) for 10 to 15 seconds before setting takeoff thrust. Observe stable engine operation before brake release.

Engine inlet ice can affect EPR indications. When takeoff thrust is set in icing conditions, crosscheck all engine instruments. Ensure that the indications are reasonable and that no engine limits are exceeded. Specifically, compare the N1 readings with the anticipated value and be prepared to reject the takeoff if a discrepancy exists between the EPR and N1 readings.

If the airplane starts to slide on ice or snow, release the brakes and begin the takeoff roll, but ensure that the instrument crosscheck is accomplished, including the comparison of the EPR and N1 readings. Apply firm nosedown elevator pressure to aid nose wheel steering effectiveness. Don't allow the lag in nose wheel steering effectiveness to cause over-controlling on slippery surfaces.

**I.O.P. # 6**

NAVTECH

The Runway Analysis provides data for takeoff and landing performance in adverse weather conditions for the B727-200 powered by JT8D-15/17 engines. Data are presented for operations on wet, standing water and snow covered runways in accordance with the guidelines and recommendations of FAA.

**WET RUNWAY** – A runway is considered wet when it is well soaked but without significant areas of standing water (depth less than 1/8 inch or 3mm of standing water). A runway is considered to be well soaked when there is sufficient moisture on the runway surface to cause it to appear reflective.

**RUNWAY CONTAMINATED BY STANDING WATER, SLUSH OR SNOW** – A runway is considered contaminated when at least 25% of the runway within the required length and width being used is covered by slush, standing water or snow greater than 3mm of equivalent water depth.

> • *Additional consideration: If the contaminates are lying on that portion of the runway where the high speed part of the takeoff roll will occur, it MAY BE appropriate to consider the runway contaminated.*

Daniel Liu

Aircraft Performance Engineer
Navtech Systems Support Inc.

**I.O.P. # 6**

**Navtech Systems Support Inc.**
175 Columbia Street West, Suite 102    Waterloo, Ontario, Canada, N2L 5Z5    Phone (519) 747-1170    Fax (519) 747-1827

SITA - YYZNSCR    AFTN - CYYZXNSX    ARINC - YKFNSCR

2 OF 3

**AMERIJET INTERNATIONAL    FORT LAUDERDALE, FL**

**B-727-200   JT8D-15**                **HOLLYWOOD INTL**

**KFLL    09L**                          **FLAPS   20**

| TEMP F | C | ZERO WIND | CLIMB LIMIT | A/C POD OFF MAX (+) | N1% GO FOR T/O EPR | ENG ARMD EPR | ENG ANTI-ICE ZERO WIND | A/C CLIMB LIMIT OFF (+) |
|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2000 C | 1980 | 0 C | 2.09 | 90 | 2.07 | 1975 | 1957 | 0 |
| 0 | -18 | 2000 C | 1980 | 0 C | 2.09 | 91 | 2.07 | 1983 | 1957 | 0 |
| 10 | -12 | 2000 C | 1980 | 0 C | 2.09 | 92 | 2.07 | 1983 | 1957 | 0 |
| 20 | -7 | 2000 C | 1980 | 0 C | 2.09 | 93 | 2.07 | 1983 | 1957 | 0 |
| 30 | -1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 32 | 0 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 34 | 1 | 2000 C | 1980 | 0 C | 2.09 | 94 | 2.07 | 1983 | 1957 | 0 |
| 36 | 2 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 38 | 3 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 40 | 4 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 42 | 6 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 44 | 7 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 46 | 8 | 2000 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1983 | 1957 | 0 |
| 48 | 9 | 1999 C | 1980 | 0 C | 2.09 | 95 | 2.07 | 1982 | 1957 | 0 |
| 50 | 10 | 1996 C | 1980 | 0 C | 2.09 | 96 | 2.07 | 1979 | 1957 | 0 |
| 52 | 11 | 1993 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 54 | 12 | 1990 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 56 | 13 | 1987 C | 1980 | 0 C | 2.09 | 96 | 2.07 | | | |
| 58 | 14 | 1984 C | 1980 | 0 C | 2.09 | 97 | 2.07 | | | |
| 60 | 16 | 1979 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 62 | 17 | 1975 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 64 | 18 | 1971 C | 1969 | 0 C | 2.09 | 97 | 2.07 | | | |
| 66 | 19 | 1967 R | 1969 | 2 R | 2.09 | 97 | 2.07 | | | |
| 68 | 20 | 1963 R | 1969 | 6 R | 2.09 | 98 | 2.07 | | | |
| 70 | 21 | 1961 R | 1969 | 8 R | 2.09 | 98 | 2.07 | | | |
| 72 | 22 | 1960 R | 1969 | 9 R | 2.09 | 98 | 2.07 | | | |
| 74 | 23 | 1958 R | 1969 | 11 R | 2.09 | 98 | 2.07 | | | |
| 76 | 24 | 1956 R | 1969 | 13 R | 2.09 | 98 | 2.07 | | | |
| 78 | 26 | 1952 R | 1969 | 14 R | 2.09 | 98 | 2.07 | | | |
| 80 | 27 | 1949 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 82 | 28 | 1946 R | 1969 | 14 R | 2.09 | 99 | 2.07 | | | |
| 84 | 29 | 1942 R | 1970 | 15 R | 2.09 | 99 | 2.07 | | | |
| 86 | 30 | 1928 R | 1951 | 15 R | 2.08 | 99 | 2.07 | | | |
| 88 | 31 | 1917 R | 1936 | 14 R | 2.07 | 99 | 2.07 | | | |
| 90 | 32 | 1906 R | 1921 | 13 R | 2.06 | 99 | 2.07 | | | |
| 92 | 33 | 1895 R | 1906 | 11 R | 2.05 | 98 | 2.06 | | | |
| 94 | 34 | 1884 R | 1891 | 7 R | 2.04 | 98 | 2.05 | | | |
| 96 | 36 | 1861 R | 1861 | 0 R | 2.02 | 98 | 2.04 | | | |
| 98 | 37 | 1849 C | 1847 | 0 C | 2.01 | 98 | 2.03 | | | |
| 100 | 38 | 1837 C | 1832 | 0 C | 2.01 | 98 | 2.02 | | | |
| 102 | 39 | 1826 C | 1818 | 0 C | 2.00 | 97 | 2.01 | | | |
| 104 | 40 | 1803 C | 1803 | 0 C | 1.99 | 97 | 2.00 | | | |
| 106 | 41 | 1803 C | 1789 | 0 C | 1.98 | 97 | 1.99 | | | |
| 108 | 42 | 1792 C | 1774 | 0 C | 1.97 | 97 | 1.98 | | | |
| 110 | 43 | 1781 C | 1759 | 0 C | 1.96 | 97 | 1.96 | | | |
| 112 | 44 | 1770 C | 1744 | 0 C | 1.95 | 97 | 1.95 | | | |
| 114 | 46 | 1748 C | 1715 | 0 C | 1.93 | 96 | 1.94 | | | |
| 116 | 47 | 1736 C | 1701 | 0 C | 1.92 | 96 | 1.93 | | | |
| 118 | 48 | 1724 C | 1687 | 0 C | 1.92 | 96 | 1.92 | | | |
| 120 | 49 | 1712 C | 1672 | 0 C | 1.91 | 96 | 1.91 | | | |

**PACKS ON    TORA = 9000**
**NOSE BRKS OFF    TODA = 9000**
**210 MPH TIRE    ASDA = 9000**
**ELEV = 11    GRAD = -.01%**

----NOTES----

1. CTR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.03    +.01
   ICE ON    NONE    -.02

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON    +.04

3. FLAP RETRACT HT (OCH)
   = 811 FMSL

4. OBST: HT (FT AGL) DIST (NM)
   50    1.81

DATE: 12/09/92

### GROSS WEIGHT CORRECTIONS

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
1 DEGREE F HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    0 LBS/KT EFF HEAD W
SUB FROM ZERO WIND    1301 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR --
*WIND    *RUNWAY SHORTENING    *ANTI-SKID INOP
*RUNWAY CONTAMINATION *MEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR--
*MEL PERFORMANCE DECREMENTS

### RUNWAY CONTAMINATION AND ANTI - SKID INOP DECREMENTS

| | STANDING WATER SLUSH OR WET SNOW -IN- | REDUCE ZERO WIND W BY: -LBS- | REDUCE V1 SPEED BY: -KNOTS- |
|---|---|---|---|
| DRY SNOW -IN- | < 1/4 | 17000 | 28 |
| | 3 1/2 TO 6    1/4 TO 1/2 | 30000 | 25 |
| | ICE | 17000 | 28 |
| | ANTI-SKID INOP | 8500 | 18 |

* = CHECK MAX STRUCTURAL WT

### LANDING DATA                    PACKS ON

| LNDG FLAP | LENGTH | ANTI SKID | MAX WT ZERO WIND | HW ADJ | DRY CRIT TW | TW ADJ | MAX WT ZERO WIND | HW ADJ | WET CRIT TW | TW ADJ | APT CRIT TEMP | SUB LB/F ABOVE CRIT TEMP | MAX OPER TEMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 | | | |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 3158 | *156600 | 950 | 0 | 3365 | 143 | 0 | 120 |

3 OF 3                    I.O.P. # 6

NAVTECH SYSTEMS



FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

## REDUCED EPR

Reduced takeoff thrust is the takeoff EPR computed using an assumed temperature. Assumed temperature is the HIGHEST TEMPERATURE on the Runway Analysis Chart that a take-off could be made at the ACTUAL Gross take-off weight of the aircraft. It will not be lower than maximum climb EPR.

Maximum takeoff thrust is the takeoff EPR computed using the airport temperature and pressure altitude.

Use reduced takeoff thrust whenever practicable to reduce turbine inlet temperature and engine EGT during takeoff.

DO NOT USE reduced takeoff thrust for any of the following conditions:

    When takeoff runway has standing water, ice, slush, or snow;

    When headwind adjustment has been used to increase allowable takeoff weight;

    When takeoff is to be made with a tailwind;

    When main gear antiskid is inoperative;

    When anti-ice is on;

    When airport temperature is below +6°F (-14°C);

    When mixed engines are installed;

    When wind shear is reported or expected;

    When conducting a two engine ferry;

    When deicing fluid has been used.

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSSBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

2 0 MAY 1999

AMERIJET INTERNATIONAL

REDUCED TAKEOFF THRUST EXAMPLE

AMERIJET INTERNATIONAL    FORT LAUDERDALE, FL

B-727-200   JT8D-15       HOLLYWOOD INTL

KFLL    09L          FLAPS    15

| TEMP F | C | ZERO WIND | CLIMB LIMIT | A/C POD OFF (+) | MAX EPR | N1% FOR T/O | GO ARND EPR | ENG ANTI-ICE ZERO WIND | A/C CLIMB LIMIT | OFF (+) |
|---|---|---|---|---|---|---|---|---|---|---|
| -10 | -23 | 2062 R 2090 | 23 R 2.10 | 90 2.07 | 2037 | 2065 | 23 |
| 0 | -18 | 2043 R 2090 | 21 R 2.10 | 91 2.07 | 2018 | 2065 | 21 |
| 10 | -12 | 2023 R 2090 | 21 R 2.10 | 92 2.07 | 1998 | 2065 | 21 |
| 20 | -7 | 2003 R 2090 | 21 R 2.10 | 93 2.07 | 1978 | 2065 | 21 |
| 30 | -1 | 1986 R 2090 | 20 R 2.10 | 94 2.07 | 1961 | 2065 | 20 |
| 32 | 0 | 1982 R 2090 | 20 R 2.10 | 94 2.07 | 1957 | 2065 | 20 |
| 34 | 1 | 1979 R 2090 | 19 R 2.10 | 94 2.07 | 1954 | 2065 | 19 |
| 36 | 2 | 1976 R 2090 | 19 R 2.10 | 95 2.07 | 1951 | 2065 | 19 |
| 38 | 3 | 1972 R 2090 | 19 R 2.10 | 95 2.07 | 1947 | 2065 | 19 |
| 40 | 4 | 1969 R 2090 | 16 R 2.10 | 95 2.07 | 1944 | 2065 | 18 |
| 42 | 6 | 1965 R 2090 | 19 R 2.10 | 95 2.07 | 1940 | 2065 | 19 |
| 44 | 7 | 1962 R 2090 | 19 R 2.10 | 95 2.07 | 1937 | 2065 | 19 |
| 46 | 8 | 1959 R 2090 | 19 R 2.10 | 95 2.07 | 1934 | 2065 | 19 |
| 48 | 9 | 1956 R 2090 | 19 R 2.10 | 96 2.07 | 1931 | 2065 | 19 |
| 50 | 10 | 1952 R 2090 | 20 R 2.10 | 96 2.07 | 1927 | 2065 | 20 |
| 52 | 11 | 1949 R 2090 | 20 R 2.10 | 96 2.07 |
| 54 | 12 | 1946 R 2090 | 19 R 2.10 | 96 2.07 |
| 56 | 13 | 1942 R 2090 | 20 R 2.10 | 96 2.07 |
| 58 | 14 | 1939 R 2090 | 20 R 2.10 | 97 2.07 |
| 60 | 16 | 1922 R 2090 | 33 R 2.10 | 97 2.07 |
| 62 | 17 | 1920 R 2090 | 31 R 2.10 | 97 2.07 |
| 64 | 18 | 1918 R 2090 | 30 R 2.10 | 97 2.07 |
| 66 | 19 | 1916 R 2090 | 28 R 2.10 | 97 2.07 |
| 68 | 20 | 1914 R 2090 | 27 R 2.10 | 98 2.07 |
| 70 | 21 | 1912 R 2090 | 25 R 2.10 | 98 2.07 |
| 72 | 22 | 1910 R 2090 | 24 R 2.10 | 98 2.07 |
| 74 | 23 | 1909 R 2090 | 21 R 2.10 | 98 2.07 |
| 76 | 24 | 1907 R 2090 | 20 R 2.10 | 98 2.07 |
| 78 | 26 | 1905 R 2090 | 18 R 2.10 | 99 2.07 |
| 80 | 27 | 1904 R 2090 | 16 R 2.10 | 99 2.07 |
| 82 | 28 | 1901 R 2090 | 16 R 2.10 | 99 2.07 |
| 84 | 29 | 1892 R 2088 | 22 R 2.10 | 99 2.07 |
| 86 | 30 | 1881 R 2071 | 20 R 2.08 | 99 2.07 |
| 88 | 31 | 1869 R 2054 | 19 R 2.07 | 99 2.07 |
| 90 | 32 | 1858 R 2037 | 17 R 2.06 | 99 2.06 |
| 92 | 33 | 1846 R 2019 | 16 R 2.05 | 98 2.06 |
| 94 | 34 | 1835 R 2001 | 14 R 2.04 | 98 2.05 |
| 96 | 36 | 1823 R 1983 | 13 R 2.03 | 98 2.04 |
| 98 | 37 | 1812 R 1965 | 12 R 2.02 | 98 2.03 |
| 100 | 38 | 1800 R 1947 | 11 R 2.01 | 98 2.02 |
| 102 | 39 | 1788 R 1930 | 12 R 2.00 | 97 2.01 |
| 104 | 40 | 1776 R 1913 | 13 R 1.99 | 97 2.00 |
| 106 | 41 | 1763 R 1896 | 15 R 1.98 | 97 1.99 |
| 108 | 42 | 1751 R 1879 | 16 R 1.97 | 97 1.98 |
| 110 | 43 | 1739 R 1862 | 17 R 1.96 | 97 1.96 |
| 112 | 44 | 1727 R 1845 | 18 R 1.95 | 97 1.95 |
| 114 | 46 | 1715 R 1828 | 19 R 1.94 | 96 1.94 |
| 116 | 47 | 1704 R 1811 | 19 R 1.93 | 96 1.93 |
| 118 | 48 | 1692 R 1794 | 20 R 1.92 | 96 1.92 |
| 120 | 49 | 1680 R 1777 | 21 R 1.90 | 96 1.91 |

* = CHECK MAX STRUCTURAL WT

PACKS ON    TORA = 9001
NOSE BRKS OFF    TDA = 9001
210 MPH TIRE    ASDA = 9001
ELEV = 11    GRAD = -.01%

----NOTES----

1. CTR ENG EPR: MOD-A    NON-MOD
   ICE OFF    +.04    +.03
   ICE ON    +.01    NONE

2. POD ENG EPR: (MOD NOT APPL)
   PACKS ON ICE OFF/ON    NONE
   PACKS OFF ICE OFF/ON    +.04

3. FLAP RETRACT HT(OCH)
   = 811 FDMSL

4. OBST: HT(FT AGL) DIST(NM)
   50    1.81

DATE: 12/09/93

GROSS WEIGHT CORRECTIONS

BARO PRESS - FOR EACH .1 IN HG BELOW 29.70 USE
1 DEGREE HOTTER TEMPERATURE

WIND - ADD TO ZERO WIND    321 LBS/KT EFF HEAD W
        SUB FROM ZERO WIND    1322 LBS/KT EFF TAIL W

ADJUST ZERO WIND COLUMN FOR —
   *WIND    *RUNWAY SHORTENING    *ANTI-SKID INOP
*RUNWAY CONTAMINATION *WEL PERFORMANCE DECREMENT

ADJUST CLIMB LIMIT FOR—
   *WEL PERFORMANCE DECREMENTS

RUNWAY CONTAMINATION AND ANTI - SKID INOP
DECREMENTS

|  |  | STANDING | REDUCE | REDUCE |
|---|---|---|---|---|
|  |  | WATER | ZERO | V1 |
| DRY | SLUSH OR | WIND W | SPEED |
| SNOW | WET SNOW | BY: | BY: |
| -D- | -D- | -LBS- | -LBS- |
|  | < 1/4 | 14000 | 31 |
| 3 1/2 TO 6 | 1/4 TO 1/2 | 28000 | 26 |
|  | ICE | 14000 | 31 |
| ANTI-SKID INOP |  | 6300 | 21 |

LANDING DATA    PACKS ON

| LNDG FLAP | LENGTH | ANTI SKID | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | MAX WT ZERO WIND | HW ADJ | CRIT TW | TW ADJ | SUB LB/F APT ABOVE CRIT TEMP | CRIT TEMP | MAX OPER TEMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 8432 | OPER | *204200 | 290 | 0 | 1358 | *205800 | 210 | 0 | 3257 |  |  |  |
| 30 | 8432 | INOP | *175700 | 970 | 0 | 1307 | *156400 | 950 | 0 | 3311 | 120 | 0 | 120 |
| 30 | 8423 | OPER | *204100 | 290 | 0 | 1357 | *205700 | 210 | 0 | 3255 |  |  |  |
| 30 | 8423 | INOP | *175500 | 970 | 0 | 1358 | *156600 | 950 | 0 | 3365 |  |  |  |

COMPUFLIGHT INC.

2 OF 4    I.O.P.# 7

v-06070-WJZ        Document 140        Entered on FLSD Docket 03/27/2001        P

MERIDET
INTERNATIONAL

Page: 11
Issued: 02/19/99
Revision: 1

REDUCED EPR INSTRUCTIONS

Reduced takeoff thrust is the takeoff EPR computed using an assumed temperature. Assumed temperature is the HIGHEST TEMPERATURE on the Runway Analysis Chart that a take-off could be made at the ACTUAL Gross take-off weight of the aircraft. It will not be lower than maximum climb EPR.

Maximum takeoff thrust is the takeoff EPR computed using the airport temperature and pressure altitude.

Use reduced takeoff thrust whenever practicable to reduce turbine inlet temperature and engine EGT during takeoff.

DO NOT USE reduced takeoff thrust for any of the following conditions:

When takeoff runway has standing water, ice, slush, or snow;

When headwind adjustment has been used to increase allowable takeoff weight;

When takeoff is to be made with a tailwind;

When main gear antiskid is inoperative;

When anti-ice is on;

When airport temperature is below +6°F (-14°C);

When mixed engines are installed;

When wind shear is reported or expected;

When conducting a two engine ferry;

When deicing fluid has been used.

3 OF 4

I.O.P. # 7

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

0 8 APR 1999

Issued: 02/19/99
Revision: 1

**REDUCED EPR INSTRUCTIONS**



AMERIJET INT'L      FT. LAUDERDALE, FLA.

B-727-100 JT8D-7      -HOLLYWOOD INTL

DATE 02/15/90      KFLL 13      FLAPS 15

TO OBTAIN REDUCED THRUST EPR SETTING
USE EXAMPLE AND FIND NORMAL EPR:

STEP:

1. Then enter chart at actual aircraft take-off weight. Note the **temperature** and **EPR**.

STEP

2. Compare against the EPR from the **maximum climb thrust for** bug sheet chart 11:3:6 use actual field temperature.

STEP

3. Use the highest EPR for reduced thrust. Thrust reduction may not exceed 25% of the normal take-off thrust. (This is equivalent to a 0.30 EPR reduction)

STEP

4. Use temperature in step 1 to determine V-speeds. 11:3:1

DECREMENTS

EXAMPLE

FT. LAUDERDALE RWY 13 - 60°F
ACTUAL GROSS T/O WT - 140,000
NORMAL TAKE-OFF THRUST = 1.96 EPR
STEP 1. = 140,000 LBS = 102°F AND 1.87 EPR
STEP 2. = MAX CLIMB THRUST (@ 15°C) (60°F)
     FOR BUG SHEET = 1.83
STEP 3. = 1.87 EPR IS THE REDUCED EPR
NOTE: THIS IS LESS THAN 0.30 REDUCTION FROM
     NORMAL TAKE-OFF THRUST 1.96 EPR.
STEP 4 = V SPEEDS @ 102°F = 123KT V1 138 KT V2

4 OF 4

I.O.P. # 7

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

A 8 APR 1999

Chapter:   9
Issued:    09/01/99
Revision:  65

WEIGHT AND BALANCE MANUAL

WEIGHT AND BALANCE

FLEET WEIGHT LIMITATIONS

| FLEET WEIGHT LIMITATIONS | | N994AJ → N397AJ ← N395AJ N495AJ     N797AJ | |
|---|---|---|---|
| Maximum Taxi Weight - (AFM) | | 197,700 | 197,700 | 197,700 |

Maximum Taxi Weight is a structural
limit for taxiing

| **MAXIMUM TAKE-OFF WEIGHT** | | 197,000 | 197,000 | 197,000 |
|---|---|---|---|

This is the maximum allowable gross
weight at brake release, just prior
to takeoff roll

| **MAXIMUM IN-FLIGHT WEIGHT (AFM)** | | | | |
|---|---|---|---|---|
| | FLAPS UP | **NOTE | 196,000 | **NOTE |
| | FLAPS 30 | **NOTE | 164,000 | **NOTE |
| | FLAPS 40 | **NOTE | 142,500 | **NOTE |

| **MAXIMUM LANDING WEIGHT - (AFM)** | | | | |
|---|---|---|---|---|
| | FLAPS 30 | 164,000 | 164,000 | *164,000 |
| | FLAPS 40 | 142,500 | 142,500 | (*EMERGENCY USE ONLY) |

| **MAXIMUM ZERO FUEL WEIGHT -** | 155,000 | 155,000 | 155,00 |
|---|---|---|---|

**NOTE: N994J maximum in-flight weight - 196,000.

**NOTE: N395AJ maximum in-flight weight - 196,000.

**NOTE: N495AJ maximum in-flight weight - 196,000.

2 OF 2

*NOTE: QW Landing Data

AMERIJET FLEET LIMITATIONS

Maximum Operating Airspeed of Vmo equals 350 knots indicated airspeed (KIAS), or code
"B" [350 knots equivalent airspeed (KIAS)].

I.O.P. # 8

FAA APPROVED, FT. LAUDERDALE FSDO
JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR
1 6 SEP 1999



## WEIGHT AND BALANCE MANUAL

### General Information

| Aircraft No. | B.O.W Weight | Moment |
|---|---|---|
| N794AJ | 93,316 | 88178325 |
| N994AJ | 94,139 | 88105202 |
| N395AJ | 93,883 | 88124473 |
| N495AJ | 92,711 | 87181149 |
| N895AJ | 93,005 | 88056640 |
| N196AJ | 92,819 | 87773553 |
| N296AJ | 93,379 | 87734708 |
| N397AJ | 93,308 | 88534151 |
| N797AJ | 92,868 | 88022669 |
| N598AJ | 92,772 | 87088635 |

1 OF 2

I.O.P. # 8

FAA APPROVED, FT. LAUDERDALE FSDO

JOHN C. ROSEBOROUGH
PRINCIPAL OPERATIONS INSPECTOR

1 6 SEP 1999

# AIRCRAFT LOG BOOK — AIRCRAFT MAINTENANCE LOG

FORM M1

A/C TYPE: B737

AIRCRAFT #: 3970

FLIGHT CODE: A

| OPERATING & ALL DEADHEAD CREW MEMBERS | EMPLOYEE NO. | INT | DISCREPANCIES (PLEASE PRINT) | CORRECTIVE ACTION |
|---|---|---|---|---|
| STEBE | 702.5 | B | In Transit check OK | In Transit check complete |
| Major | 803 | P | | |
| Rainsingh | | O | | |
| Wise | 1851 | B | | |
| Nassey Sr | 52098 | A | | |

VOR CHECK

LIC NO. 3145788  DATE 8/18/99

DATE 8/18/99

52010

AMERIJET FLIGHT RELEASE

KFLL/TTPP
IFR (INTERNATIONAL) ROUTE STORED IN AMERIJET COMPUTER
ARTCC MIAMI (ZMO) MAIN 305-716-1588    DATA 305-716-1640
00/17/97 (I DATE)    TIME 2055Z    TRIP/DATE 827/17    AIRCRAFT 39/JV    0727/8    ETD 2300
*HGM  FT LAUDERDALE    TO PORT OF SPAIN
FILED ROUTE:    ZBV ASSS DOP-W G449 POS
PLANNED ROUTE ZBV ZQA ZLS-N INDEE GTK ASSS DOP-W G449 POS
TOTAL DISTANCE  1459.9  DIRECT DISTANCE  1413.9    3.7    ALTERNATE    SVMB (155 NI / 277 DEG)

PLANNED BURN   37.2    3:30
ALTERNATE       6.3    0:30                    MACH .77
10% EXTRA FUEL  3.5    0:50           INDICATED AIRSPEED 300
RESERVE         4.1    0:30              TRUE AIRSPEED 470
HOLDING FUEL    0.0    0:00              FLIGHT LEVEL 290
TAXI FUEL       0.5                     ZERO FUEL WEIGHT 141.8
REQUIRED FUEL   51.6   4:40              TAKE OFF WEIGHT 192.9
ROF            14.9                      LANDING FUEL 13.9
EXTRA FUEL      0.0    0:00             LANDING WEIGHT 155.7
BLOCK FUEL      51.6   4:40               TOTAL BURN  38.1 (INCLUDES TAXI)
FOR EACH 10.0 OVER PLANNED TAKE OFF WEIGHT BURN WILL BE 1.5 OVER PLANNED BURN
PLANNED CARGO  49.1  NOI CARGO  50.2
CRUISE ONT -30 (ISA + 12)

PREPARED BY:    KIT TIWARI
CAPTAIN:    BRIAN STEELE
FIRST OFFICER:  PAT MAJUM
SECOND OFFICER: BRETT WISE
OBV/DON/DAT: AL JORSEY
                U. KHARSIWARI

DM) MANGLER    DATE    MEL REF
8942     07/18/1998    24-3    DOCS DEFFERED PER MDD UNDER ABOUT OVAN ( )
8988     07/24/1998    24-1    8 2 GID DIFFERENTIAL FARES
MO. 194.2  MEL IS BASED ON STRUCTURAL LIMITS ONLY NO AIRPORT DATA ON FILE FOR FT LAUDERDALE
WINDS: (24/76)BENOT 60/6  (20/69)HARDY 120/5  (14/63)PELNA 70/10

| FROM/TO | FRED | LEG | MTG | TIME REM | GS | TIME | TOT TIME | BURN | TOT BURN | FUEL REM |
|---------|------|-----|-----|----------|-----|------|----------|------|----------|----------|
| KFLL   118 D  119  ZBV | 116.7 | 51 | 1409 | | 320 | | | | TAKEOFF FUEL 51.1 | |
| ZBV   116 | +FIR+ | +K/MN+ | 17 | 1391 | | 6.0 | | | | |
| +FIR+ | TOC | | 69 | 1322 | 2:55 | 320 | 0:26 | 0:26 | 6.3 | 6.3 | 44.8 |
| TOC   D  112  ZQA | 112.7 | 22 | 1301 | 2:52 | 471 | 0:03 | 0:29 | 0.5 | 6.8 | 44.3 |
| ZQA  126 D  126  ZLS-N | 526.0 | 148 | 1153 | 2:33 | 472 | 0:19 | 0:47 | 3.7 | 10.5 | 40.6 |
| ZLS-N  119 D  119  INDEE | | 55 | 1098 | 2:26 | 469 | 0:07 | 0:54 | 1.4 | 11.9 | 39.3 |
| INDEE  119 D  120  GTK | 114.2 | 207 | 891 | 1:59 | 467 | 0:27 | 1:21 | 5.1 | 16.9 | 35.6 |
| GTK  132 A  133  COCBU | | 32 | 858 | 1:55 | 464 | 0:04 | 1:25 | 0.8 | 17.7 | 34.8 |
| COCBU  133  A  133  GRADI | | 69 | 790 | 1:47 | 465 | 0:09 | 1:34 | 1.7 | 19.4 | 33.6 |
| GRADI  134  A  134  HARDY | +1/1/SH | 55 | 735 | 1:39 | 465 | 0:07 | 1:41 | 1.3 | 20.7 | 32.4 |
| HARDY  134  A  135  IDAHO | | 80 | 654 | 1:29 | 465 | 0:10 | 1:51 | 1.9 | 22.6 | 28.5 |
| IDAHO  135  A  135  DOP-N | 391.0 | 84 | 570 | 1:18 | 465 | 0:11 | 2:02 | 2.0 | 24.6 | 26.5 |
| DOP-N  154  A  160  VARNA | | 11 | 559 | 1:17 | 465 | 0:01 | 2:04 | 0.3 | 24.9 | 26.3 |
| VARNA  160  A  160  GESSO | | 58 | 501 | 1:09 | 463 | 0:07 | 2:11 | 1.6 | 26.3 | 24.9 |
| GESSO  160  A  160  HENLI | | 40 | 461 | 1:04 | 465 | 0:05 | 2:16 | 1.0 | 27.2 | 23.9 |
| HENLI  161  A  161  ANNER | | 49 | 412 | 0:58 | 466 | 0:06 | 2:23 | 1.6 | 28.4 | 22.8 |
| ANNER  157  A  158  ANDRA | | 85 | 327 | 0:47 | 465 | 0:11 | 2:34 | 2.0 | 30.4 | 20.8 |
| ANDRA  160 | +FIR+ | +TTP+ | 4 | 323 | 0:46 | 466 | | 2:34 | 0.1 | 30.4 | 20.7 |
| +FIR+  A  160  PELNA | | 61 | 262 | 0:38 | 467 | 0:08 | 2:42 | 1.4 | 31.8 | 13.1 |
| PELNA  162  A  163  PERRY | | 64 | 198 | 0:30 | 467 | 0:08 | -2:50 | 1.8 | 33.6 | -17.8 |
| PERRY  164  A  164  PERBA | | 97 | 101 | 0:18 | 468 | 0:12 | 3:04 | 2.2 | 35.8 | 15.6 |
| PERBA  163 | TOD | | 14 | 87 | 0:16 | 470 | 0:08 | 3:04 | 0.6 | 35.8 | 15.3 |
| TOD  A  162  POS | 116.9 | 79 | 8 | | 326 | | DESCENT | 1.4 | | |
| POS  019 D  019  TTPP | | 8 | -9 | | 326 | | 3:09 | | 37.2 | 13.5 |

KT1) M26:40.3 / W80:09.1    ZBV W25:42.2 / W79:17.7    ZQA W25:01.7 / W77:27.0    ZLSN W23:34.8 / W75:15.8
INDEE N23:06.3 / W74:23.4    GTK N21:26.4 / W71:08.1    COCBU N21:08.9 / W70:39.3    GRADI N20:31.1 / W49:37.9
HARDY N20:00.4 / W48:49.0    IDAHO N19:15.6 / W67:38.4    DOPN N18:28.1 / W66:24.7    VARNA N18:19.0 / W66:18.8
GESSO N17:29.6 / W65:46.7    HENLI N16:55.1 / W65:24.5    ANNER N16:13.0 / W64:58.0    ANDRA N15:04.1 / W64:08.1
PELNA N14:08.0 / W63:33.0    PERRY N13:13.0 / W63:00.0    PERBA N11:48.3 / W62:11.4    POS N10:27.8 / W61:23.6
TTPP N10:35.6 / W61:20.9    SVMB N10:54.9 / W63:57.9
ACTUAL BLOCK FUEL OUT    520    ACTUAL BLOCK FUEL IN    15.7    TOTAL BURN    76.7    36.3
LAS PRICES ARE AMERIJET CONTRACT FUEL 520
Fuel cost at KFLL $0.60 Fuel cost at TTPP $0.68  Tanker fuel is needed for operational reasons = No difference in cost.

RELEASED BY _____    TIME OF RELEASE  21:45Z
I CERTIFY THAT I HAVE COMPLETED ON AIRPORT AND ROUTE PREFLIGHT AS REQUIRED BY FAR 121.443

CAPTAIN _____

FIR BOUNDARIES:  KZMA 0:13   TJTS 1:41   TTZP 2:34

KFLL/TTPP

I.O.P. # 10

```
. . .AO2 SLP159 CB DSNT A  DS T03060233 56022=
KFLL 172053Z 03009KT 10S  FEW035CB SCT050 SCT150 SCT  50 30/23
   A3000 RMK AO2 SLP159 CB VC E T03000228 58015=
TTPP 172100Z 06006KT 9999 FEW018 SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 172000Z 07007KT  FEW012CB SCT280 32/24 Q1011 NOSIG=
TTPP 171900Z 08006KT 9999 FEW010CB BKN280 31/23 Q1012 NOSIG=
TTPP 171800Z 12005KT 9999 FEW010CB SCT020 BKN280 31/25
   Q1013 TEMPO SHRA=
TGPY 172100Z 09009KT 9999 FEW021 29/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 172000Z 12011KT 9999 FEW021 30/25 Q1012=
TGPY 171900Z 11011KT 9999 FEW021 30/26 Q1012=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172100Z 10008KT 9999 FEW030 SCT300 30/23 Q1013 NOSIG=
TFFF 172000Z 10010KT 9999 FEW033 SCT300 30/23 Q1013 NOSIG=
TFFF 171900Z 08012KT 9999 FEW033 BKN300 31/22 Q1013 NOSIG=
TFFF 171800Z 09012KT 9999 SCT033 BKN300 31/22 Q1014 NOSIG=
TFFR 172100Z 12010KT 9999 FEW020 BKN260 31/23 Q1014 NOSIG=
TFFR 172000Z 10011KT 9999 SCT020 BKN260 32/23 Q1013 NOSIG=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
   Q1014 NOSIG
   CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
   Q1014 NOSIG
   CB (S)=
TFFR 171900Z 12012KT 9999 FEW016CB SCT020 BKN260 31/23
   Q1014 NOSIG
   CB (S)=
TFFR 171800Z 12010KT 100V170 9999 VCSH FEW016CB SCT020
   32/24 Q1014 NOSIG
   CB (S/WNW)=
TFFR 171800Z 12010KT 090V170 9999 VCSH FEW016CB SCT020
   32/24 Q1014 NOSIG
   CB (WNW)=
SVMG NO CURRENT REPORT.
SVMG 172000Z 36008KT 9999 BKN016CB SCT080 30/23 Q1012=
SVMG 171900Z 31005KT 9999 BKN016CB SCT080 31/24 Q1013=

-----------
FORECASTS .
-----------

MIA
KM1A 171737Z 171818 08006KT P6SM VCSH SCT025 BKN130 BKN250
   BECMG 2122 09005KT NSW SCT025 BKN250
   FM0100 VRB04KT P6SM SCT025 SCT250
   BECMG 0406 VCSH
   FM1500 09010KT P6SM FEW030 SCT250=
FLL
KFLL 171737Z 171818 08009KT P6SM VCSH SCT025 BKN130 BKN250
   BECMG 2122 NSW SCT025 BKN250
   FM0100 VRB04KT P6SM SCT025 SCT250
   BECMG 0406 VCSH
   FM1500 09010KT P6SM FEW030 SCT250=
TTPP 171600Z 171818 09008KT 9999 BKN024 TEMPO 1820 VRB20KT
   3200 SHRA FEW015CB SCT020 BKN040 BECMG 2224 10005KT=
TTPP 171000Z 171212 08010G20KT 9999 SCT020
   BKN300 PROB30 TEMPO 5000 SHRA FEW010CB BKN015
   PROB30 TEMPO 1621 3000 TSRA SCT008 BKN010CB
   BECMG 2223 08005KT=
TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
   TEMPO 5000 SHRA SCT016TCU BKN017 SCT040
   TEMPO 0010 00000KT
   BECMG 1012 11012KT=
TGPY 180024 TGPY 172100Z 180024 09008KT 9999 SCT020 SCT300
   TEMPO 5000 SHRA SCT016 TCU BKN017 SCT040
   TEMPO 0010 00000KT
   BECMG 1012 11012KT=
TGPY 171600Z 171818 NIL=
TFFF 172100Z 170024 VRB03KT 9999 FEW020 BKN300 BECMG 1213 08012KT
   SCT026 TEMPO 1415 8000 -SHRA BKN023 SCT050 PROB30 TEMPO
   1617 14014G28KT 4000 SHRA OR TSRA SCT016CB BKN018 ST050=
```



*11/10/99*
*SuPeRVISoR*

November 10, 1999

**CERTIFIED-RETURN RECEIPT**

Mr. David G. Bassett, President
Amerijet International Incorporated
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Mr. Bassett:

LETTER OF INVESTIGATION

File Number: 2000SO170009

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

1 OF 2

**I.O.P. # 13**

2

File: 8030.1

WP: H:\AMERIJET\LOIBAS01.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

Thank you for using Return Receipt Service.

SENDER:
□ Complete items 1 and/or 2 for additional services.
□ Complete items 3, 4a, and 4b.
□ Print your name and address on the reverse of this form so that we can return this card to you.
□ Attach this form to the front of the mailpiece, or on the back if space does not permit.
□ Write "Return Receipt Requested" on the mailpiece below the article number.
□ The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. □ Addressee's Address
2. □ Restricted Delivery

Is your RETURN ADDRESS completed on the reverse side?

3 Article Addressed to:

MR. DAVID G. BASSETT, PRESIDENT
AMERIJET INTERNATIONAL INCORP.
498 S.W. 34th STREET
FORT LAUDERDALE, FLORIDA 33315

4a. Article Number
P 372 062 005

4b. Service Type
□ Registered          ☒ Certified
□ Express Mail         □ Insured
☒ Return Receipt for Merchandise   □ COD

7 Date of Delivery  11/12

5. Received By: (Print Name)

8 Addressee's Address (Only if requested and fee is paid)

6. Signature (Addressee or Agent)

PS Form 3811, December 1994    102595-98-B-0223    Domestic Return Receipt

P 372 062 005
Receipt for
Certified Mail
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

Sent to
DAVID BASSETT
Street and No.
498 S.W. 34th ST.
P.O. State and ZIP Code
FT. LAUDERDALE FL 33315

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

SENT 11/10/99

PS Form 3800, June 1991

I.O.P. # 13

2 OF 2

*PGT*
*GPC*
*11/10/99*
*SUPERVISOR*
*//*

November 10, 1999

Mr. David G. Bassett, President
Amerijet International Incorporated
498 S.W. 34th Street
Fort Lauderdale, Florida 33315

Dear Mr. Bassett:

### LETTER OF INVESTIGATION

File Number: 2000SO170009

On August 17, 1999, at 2347 UTC (1947 Local Eastern Daylight Savings Time), Amerijet Flight #827, a Boeing 727, Registration number N397AJ, departed Fort Lauderdale International Airport Runway 9 Left enroute to Port of Spain Trinidad, West Indies. The aircraft departed Runway 9L with standing water reported by the FAA Air Traffic Control Tower of "Less than One Quarter of an Inch".

Amerijet's FAA Approved B-727 Performance Manual(s) relative departures from runways with less than one quarter inch standing water require a weight degradation of from 14,000 - 18,000 pounds and a V1 (Decision Speed) degradation of from 25 - 31 knots. It has been reported that no degradation's were applied rendering the aircraft overweight as to the prevailing conditions. Operation of this type is contrary to the Federal Aviation Regulations.

This letter is to advise you that this matter is under investigation by the Federal Aviation Administration (FAA). We wish to offer you an opportunity to discuss this personally and submit a written statement in your behalf. Should you choose to do either, this should be accomplished within ten days following receipt of this letter. Your statement should contain all pertinent facts and mitigating circumstances which you feel may have a bearing on this incident. If we do not hear from you within the specified time, our report will be processed without benefit of your statement.

Sincerely,

John C. Roseborough
Principal Operations Inspector

Enclosure: PRIVACY ACT NOTICE

**I.O.P. # 14**

**1 OF 2**

2

File: 8030.1

WP: H:\AMERIJET\LOIBAS01.DOC

SO-FSDO-17:J. ROSEBOROUGH:JCR:954-356-7523:11/10/99

I.O.P. # 14

2 OF 2

Code: PCSA   Violator Name: AMERIJET INTERNATIONAL INC

| No. of open<br>Violations | No. of closed<br>Violations | No. of reopen<br>Violations | No. of pending<br>Violations | Total |
|:---:|:---:|:---:|:---:|:---:|
| 3 | 40 | 0 | 0 | 43 |

```
--------------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
              LVL2  LVL1        MMENU        PRINT        RETRN         LOGOF
PRESS 'ENTER' KEY TO PROCEED
```

1 OF 5

I.O.P. # 15

```
------------------------------------------------------------------------
   Viol.Date   Status   Rgn    Case #      Related Case #   FAR's Violated (1)
   ---------   ------   ---   ------------  --------------   ------------------
_  1984-06-30  CLOSED   SO    1995SO170035                   121.401
_  1984-10-17  CLOSED   SO    1986SO620045                   91.29A
_  1984-10-17  CLOSED   SO    1986SO620046                   91.29A
_  1985-08-27  CLOSED   SO    1986SO620047                   39.3
_  1985-10-30  CLOSED   SO    1995SO170034                   121.434
_  1985-11-22  CLOSED   SO    1986SO620049                   91.29A
_  1985-12-09  CLOSED   SO    1986SO620044                   91.29A
_  1986-02-24  CLOSED   SO    1986SO620017                   91.29A
_  1986-04-01  CLOSED   SO    1986SO620043                   135.419G
_  1986-04-01  CLOSED   SO    1986SO620050                   121.371A
_  1986-04-01  CLOSED   SO    1986SO620042                   43.11A7
_  1987-02-04  CLOSED   SO    1987SO620015                   91.29A
_  1987-04-13  CLOSED   SO    1987SO620059                   135.65
_  1988-01-01  CLOSED   SO    1988SO170033                   43.13A
------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1       MMENU        PRINT        RETRN        LOGOF
Mark with 'X' to select; and F2 to execute.
```

2 OF 5

I.O.P. # 15

```
                          S  S Enforcement Information             Recs: 15
                      document held records meeting conditions from prior search

Jump to: VIOL. DATE    _____    Sort column: 1 A Crit.: _        of: 43
-------------------------------------------------------------------------------
   Viol.Date    Status   Rgn     Case #      Related Case #   FAR's Violated (1)
   ----------   ------   ---   ------------   --------------   ------------------
_  1988-01-25   CLOSED   SO    1988SO170032                    43.13
_  1988-03-24   CLOSED   SO    1988SO170048                    121.627C
_  1988-07-16   CLOSED   SO    1988SO620149                    121.380
_  1988-07-18   CLOSED   SO    1988SO620148                    121.133B
_  1988-07-19   CLOSED   SO    1988SO620146                    121.427B2
_  1988-07-19   CLOSED   SO    1988SO620147                    121.133B
_  1988-08-08   CLOSED   SO    1988SO620161                    43.13
_  1988-08-20   CLOSED   SO    1988SO620164                    43.13A
_  1988-08-22   CLOSED   SO    1988SO170047                    43.13A
_  1988-08-28   CLOSED   SO    1988SO620162                    43.13
_  1988-09-01   CLOSED   SO    1988SO170046                    121.361
_  1988-09-02   CLOSED   SO    1988SO620163                    43.13A
_  1988-09-22   CLOSED   SO    1988SO620181                    39.3
_  1989-09-28   CLOSED   WP    1989WP090194                    121.123
-------------------------------------------------------------------------------
ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
JMP/ST HELP  EXEC  LVL2  LVL1      MMENU        PRINT        RETRN        LOGOF
Mark with 'X' to select; and F2 to execute.
```

3 OF 5

I.O.P. # 15

```
             (A1)          IS Enforcement Information              Recs: 43
                       Records Entered ont                         of: 43
          to: VIOL. DATE  _____    Sort column: 1 A Crit.: _

          Viol.Date   Status  Rgn      Case #      Related Case #  FAR's Violated (1)
          ----------  ------  ---   ------------   --------------  ------------------
          1998-01-08  CLOSED  SO    1998SO740239                   175.20A
          _
          _
          _
          _
          _
          _
          _
          _
          _
          _
          _
          _
          _
        --_-----------------------------------------------------------------------
        ENTER--F1----F2----F3----F4----F5----F6----F7----F8----F9----F10----F11---F12--
        JMP/ST HELP  EXEC  LVL2  LVL1        MMENU         PRINT         RETRN        LOGOF
        Mark with 'X' to select; and F2 to execute.
```

5 OF 5

I.O.P. # 15



4

00SO170009

SECTION D - FACTS AND ANALYSIS

## FACTS

On Monday, October 4, 1999, the investigating Inspector found on his desk a letter **(IOP 3)** from the First Officer (Patrick Major EIR # 00SO170013) of the subject flight detailing the events which led to the investigation herein. This correspondence had followed a conference between the complainant and the investigating Inspector some weeks before in which the Inspector had requested the account to be put in writing. Due to a death in the family that occurred two days prior (Saturday, October 2nd), and walk in duty on October 4th, the letter could not be given due consideration. During the Inspectors resulting absence for the funeral of his mother and use or lose annual leave, the correspondent directed his concerns to the Department of Transportation's Inspector General, hence the investigation now in progress.

On Tuesday, August 17, 1999, between the hours of 2340 - 0000 UTC (1940 - 2000 local Eastern Daylight Savings Time) Amerijet B-727, N397AJ (a FAR 121 Supplemental Air Carrier, **IOP 1, page 3)**, operating as Amerijet (AMJ) Flight # 827 departed Runway 9L (9 Left) at Fort Lauderdale-Hollywood International Airport (FLL), Fort Lauderdale, Florida **(IOP 3, 4, 5, and 9)** when there was less than one quarter (1/4) of an inch of standing water on the departure runway as reported by the FLL FAA Air Traffic Control Tower (ATCT) following a runway contamination/condition check accomplished by the FLL Airport Authority identified on the ATCT tape recording **(IOP 4)** as "Ramp One". The airport runway contamination/condition report in detail represented that there was "less than ¼ inch, good drainage, slight standing water about six (6) feet on either side of centerline". This report was subsequently provided to the Flightcrew of AMJ 827 by the FLL ATCT as "some standing water less than a quarter of an inch" prior to a takeoff clearance being given to the flight, and was acknowledged by the pilot **(ATCT Tape counter number 607, IOP 4)**.

Amerijet AOM in Chapter 4, Section 1A, Subject 55 [4:1:55**(IOP 6, page 1)**] directs that for takeoff limitations other than as listed on this page, the user **"check Performance Manual for appropriate reductions to maximum takeoff gross weight"** (IOP 6, page 3). Even though the NAVTECH page **(IOP 6, page 2)** provides additional information as to wet runways and standing water of less than one eighth (1/8) inch, the information as contained on the Amerijet International B-

727-200, JT8D-15 Performance Chart for Fort Lauderdale runway 9L with Flaps 20 (IOP 6, page 3) is applicable. This chart requires a weight reduction of 17,000 pounds and a V1 airspeed reduction of 28 knots from the data as expressed on the B-727-200c Load Plan (IOP 12) rendering the figures of weight reduction from 192,298 to 175,298 pounds. The aircraft thus departed 17,000 pounds above its maximum gross takeoff weight as corrected for contaminated runway conditions, and therefore **contrary to** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (IOP 2, pages 3 and 4).

FAR Part 1 (IOP 2, page 1) clearly defines the terms **"Operate", "Operational Control"** and **"Person"**, as follows. The terms state in pertinent part, "Operate" means use, cause to use or authorize to use aircraft; "Operational Control" means the exercise of authority over initiating, conducting or terminating a flight"; "Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them".

**IOP 1, pp. 1 and 2,** identify Mr. David G. Basset as the President/General Manager/Safety Officer representing Amerijet and, therefore, a person accommodating the terms expressed above in concert with the company. As stipulated in ▮▮▮▮▮▮▮▮ **"Each certificate holder conducting supplemental operations - (1) is responsible for operational control."** The company through Mr. Bassett exercises Operational Control, hence, the flight as identified above was "operated" by Amerijet International Incorporated **contrary** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Amerijet International Incorporated has a violation history covering the years from 1984 through 1998 with forty (40) closed and three (3) open violations **(IOP 15).**

Mr. Bassett was sent two (2) Letters of Investigation (LOI), one via certified mail and one via regular mail and to date has failed to respond to either **(IOP 13 and 14).**